Approved: _____
MATTHEW PODOLSKY/ROBERT L. BOONE/ROBERT B. SOBELMAN
Assistant United States Attorneys

Before:   THE HONORABLE STEWART D. AARON
          United States Magistrate Judge
          Southern District of New York     **19MAG2927**

- - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA           : **SEALED COMPLAINT**
                                   :
          - v. -                   : Violations of 18 U.S.C.
                                   : §§ 371, 875(d), 1951, and 2
MICHAEL AVENATTI,                  :
                                   : COUNTY OF OFFENSE:
                    Defendant.     : NEW YORK

- - - - - - - - - - - - - - - - X

SOUTHERN DISTRICT OF NEW YORK, ss.:

CHRISTOPHER HARPER, being duly sworn, deposes and says that he is a Special Agent with the Federal Bureau of Investigation ("FBI"), and charges as follows:

**COUNT ONE**
(Conspiracy to Transmit Interstate
Communications with Intent to Extort)

1.   In or about March 2019, in the Southern District of New York and elsewhere, MICHAEL AVENATTI, the defendant, and others known and unknown, knowingly, and willfully, did combine, conspire, confederate, and agree together and with each other to commit an offense against the United States, to wit, transmission of an interstate communication with intent to extort, in violation of Title 18, United States Code, Section 875(d).

2.   It was a part and an object of the conspiracy that MICHAEL AVENATTI, the defendant, and others known and unknown, unlawfully, willfully, and knowingly, and with intent to extort from a corporation any money and other thing of value, would and did transmit in interstate commerce a communication containing a threat to injure the reputation of a corporation, in violation of Title 18, United States Code, Section 875(d), to wit, AVENATTI and a co-conspirator not named as a defendant herein ("CC-1") devised a scheme to extort a company by means of an

interstate communication by threatening to damage the company's reputation if the company did not agree to make multi-million dollar payments to AVENATTI and CC-1, and further agree to pay an additional $1.5 million to a client of AVENATTI's.

### OVERT ACTS

3. In furtherance of the conspiracy and to effect the illegal object thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

    a. On or about March 19, 2019, in Manhattan, MICHAEL AVENATTI, the defendant, and CC-1 met with attorneys for NIKE, Inc. ("Nike") and threatened to release damaging information regarding Nike if Nike did not agree to make multi-million dollar payments to AVENATTI and CC-1 and make an additional $1.5 million payment to an individual AVENATTI claimed to represent ("Client-1").

    b. On or about March 20, 2019, AVENATTI and CC-1 spoke by telephone with attorneys for Nike, during which AVENATTI stated, with respect to his demands for payment of millions of dollars, that if those demands were not met "I'll go take ten billion dollars off your client's market cap . . . I'm not fucking around."

(Title 18, United States Code, Section 371.)

### COUNT TWO
(Conspiracy to Commit Extortion)

4. In or about March 2019, in the Southern District of New York and elsewhere, MICHAEL AVENATTI, the defendant, and others known and unknown, unlawfully and knowingly combined, conspired, confederated, and agreed together and with each other to commit extortion, as that term is defined in Title 18, United States Code, Section 1951(b)(2), and thereby would and did obstruct, delay, and affect commerce and the movement of articles and commodities in commerce, as that term is defined in Title 18, United States Code, Section 1951(b)(3), to wit, on an interstate telephone call, AVENATTI and CC-1 used threats of economic harm in order to obtain multi-million dollar payments from Nike to AVENATTI and CC-1, and further to obtain an additional $1.5 million for Client-1.

(Title 18, United States Code, Section 1951.)

**COUNT THREE**
(Transmission of Interstate
Communications with Intent to Extort)

5.  On or about March 20, 2019, in the Southern District of New York and elsewhere, MICHAEL AVENATTI, the defendant, unlawfully, knowingly, and willfully, and with intent to extort from a corporation any money and other thing of value, did transmit in interstate commerce a communication containing a threat to injure the reputation of a corporation, and did aid and abet the same, to wit, AVENATTI, during an interstate telephone call, threatened to cause substantial financial harm to Nike and its reputation if Nike did not agree to make multi-million dollar payments to AVENATTI, and further agree to pay an additional $1.5 million to Client-1.

(Title 18, United States Code, Sections 875(d) and 2.)

**COUNT FOUR**
(Extortion)

6.  In or about March 2019, in the Southern District of New York and elsewhere, MICHAEL AVENATTI, the defendant, willfully and knowingly, did attempt to commit extortion as that term is defined in Title 18, United States Code, Section 1951(b)(2), and thereby would and did obstruct, delay, and affect commerce and the movement of articles and commodities in commerce, as that term is defined in Title 18, United States Code, Section 1951(b)(3), to wit, AVENATTI used threats of economic harm in an attempt to obtain multi-million dollar payments from Nike, and further to obtain an additional $1.5 million for Client-1.

(Title 18, United States Code, Sections 1951 and 2.)

**BACKGROUND TO THE EXTORTION SCHEME**

The bases for my knowledge and for the foregoing charges are, in part, as follows:

7.  I am a Special Agent with the FBI and I have been personally involved in the investigation of this matter, which has been handled jointly by Special Agents of the FBI and of the United States Attorney's Office.  This affidavit is based upon my personal participation in the investigation of this matter, my conversations with other law enforcement agents, witnesses,

and others, as well as my examination of reports and records. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

8. Based on my involvement in this investigation, and set forth in greater detail below, I have become aware of a multi-million extortion scheme in which MICHAEL AVENATTI, the defendant, and CC-1 used threats of economic and reputational harm to extort Nike, a multinational corporation engaged in, among other things, the marketing and sale of athletic apparel, footwear, and equipment. Specifically, AVENATTI threatened to hold a press conference on the eve of Nike's quarterly earnings call and the start of the annual National Collegiate Athletic Association ("NCAA") tournament at which he would announce allegations of misconduct by employees of Nike. AVENATTI stated that he would refrain from holding the press conference and harming Nike only if Nike made a payment of $1.5 million to a client of AVENATTI's in possession of information damaging to Nike, i.e., Client-1, and agreed to "retain" AVENATTI and CC-1 to conduct an "internal investigation" - an investigation that Nike did not request - for which AVENATTI and CC-1 demanded to be paid, at a minimum, between $15 and $25 million. Alternatively, and in lieu of such a retainer agreement, AVENATTI and CC-1 demanded a total payment of $22.5 million from Nike to resolve any claims Client-1 might have and additionally to buy AVENATTI's silence.

### RELEVANT ENTITIES AND INDIVIDUALS

9. As set forth further below, and based on my involvement with the investigation to date, I am aware of the following:

a. MICHAEL AVENATTI, the defendant, is an attorney licensed to practice in the state of California, with a large public following due to, among other things, his representation of celebrity and public figure clients, as well as frequent media appearances and use of social media.

b. CC-1 is also an attorney licensed to practice in the state of California, and similarly known for representation of celebrity and public figure clients.

4

c. Nike is a multinational, publicly-held corporation headquartered in Beaverton, Oregon. Nike produces and markets athletic apparel, footwear, and equipment, and also sponsors athletic teams in many sports, including basketball, at various levels, including the high school, amateur, collegiate, and professional levels.

d. "Client-1" is a coach of an amateur athletic union ("AAU") men's basketball program based in California. For a number of years, the AAU program coached by Client-1 had a sponsorship agreement with Nike pursuant to which Nike paid the AAU program approximately $72,000 annually.

e. "Attorney-1" and "Attorney-2" work at a law firm based in New York and represent Nike.

f. The "In-House Attorney" is an attorney who works for Nike.

## THE MARCH 19 MEETING WITH AVENATTI

10. Based on my conversations with other law enforcement officers, review of notes, text messages, and emails, and discussions with Attorney-1 who, as noted above, represents Nike, I have learned the following information, in substance and in part:

a. On or about March 13, 2019, Attorney-1 learned from a representative of Nike that CC-1 had contacted Nike and stated, in substance and in part, that he wished to speak to representatives of Nike. CC-1 had further stated, in substance and in part, that the discussion should occur in person, not over the phone, as it pertained to a sensitive matter.

b. On or about March 15, 2019, Attorney-1 spoke by phone with CC-1, and CC-1 stated, in substance and in part, that he was trying to be discreet on the phone, but that he and MICHAEL AVENATTI, the defendant, wished to speak with representatives of Nike in person.

c. On or about March 19, 2019, at approximately 12:00 p.m., Attorney-1, Attorney-2, and the In-House Attorney met with AVENATTI and CC-1 at CC-1's office in New York, New York, during which the following occurred, among other things:

i. AVENATTI stated, in substance and in part, that he represented Client-1, an AAU coach, whose team had previously had a contractual relationship with Nike, but whose

contract Nike had recently decided not to renew.  According to AVENATTI, Client-1 had evidence that one or more Nike employees had authorized and funded payments to the families of top high school basketball players and/or their families and attempted to conceal those payments, similar to conduct involving a rival company that had recently been the subject of a criminal prosecution in this District.  AVENATTI identified three former high school players in particular, and indicated that his client was aware of payments to others as well.

        ii.    AVENATTI further stated, in substance and in part, that he intended to hold a press conference the following day to publicize the asserted misconduct at Nike, which would negatively affect Nike's market value.  In particular, AVENATTI stated, in substance and in part, that he had approached Nike now because he knew that the annual NCAA tournament – an event of significance to Nike and its brand – was about to begin and further because he was aware that Nike's quarterly earnings call was scheduled for March 21, 2019, thus maximizing the potential financial and reputational damage his press conference could cause to Nike.

        iii.    AVENATTI further stated, in substance and in part, that he would refrain from holding that press conference and damaging Nike if Nike agreed to two demands: (1) Nike must pay $1.5 million to Client-1 as a settlement for any claims Client-1 might have regarding Nike's decision not to renew its contract with the team coached by Client-1; and (2) Nike must hire AVENATTI and CC-1 to conduct an internal investigation of Nike, with a provision that if Nike hired another firm to conduct such an internal investigation, Nike would still be required to pay AVENATTI and CC-1 at least twice the fees of any other firm hired.

        iv.    At the end of the meeting, AVENATTI and CC-1 indicated that Attorney-1 and Nike would have to agree to accept those demands immediately or AVENATTI would hold his press conference.  In particular, CC-1 indicated that he and AVENATTI would contact Attorney-1, Attorney-2, and the In-House Attorney later that afternoon to discuss Nike's response.

        d.    Later that day, Attorney-1 left a voicemail for CC-1 indicating that Nike needed time.  CC-1 subsequently returned Attorney-1's call and stated, in substance and in part, that AVENATTI had agreed to give Nike until Thursday (i.e. two days) to consider the demands before holding the threatened press conference.

        e.    After the conclusion of the meeting described above, representatives of Nike contacted representatives of the United States Attorney's Office for the Southern District of New York regarding AVENATTI's threats and extortionate demands.

## THE MARCH 20 CALL WITH AVENATTI

    11.    Based on my conversations with other law enforcement officers and Attorney-1, my own observations, and my review of notes, text messages, audio recordings and draft transcriptions of those conversations, I have learned the following information, in substance and in part:

        a.    On or about March 20, 2019, at the direction of law enforcement, Attorney-1 sent CC-1 a text message to schedule a telephone call for later that day.

        b.    On or about March 20, 2019, at approximately 4:00 p.m., Attorney-1 and Attorney-2, who were in their offices in New York, New York, spoke to CC-1 on a telephone call that was consensually recorded and monitored by law enforcement. During the call, and at the direction of law enforcement, Attorney-1 asked CC-1 for more time to consider the demands made by MICHAEL AVENATTI, the defendant, and CC-1 the day before and/or another in-person meeting to discuss those demands. CC-1, who stated, in substance and in part, that he was in Miami, Florida, at the time, said that he would speak to AVENATTI to discuss the possibility of delaying the deadline for Nike's response and would further discuss with AVENATTI the possibility of setting up another in-person meeting.

        c.    Less than an hour later, at approximately 4:50 p.m., Attorney-1 and Attorney-2 again spoke to CC-1 on a telephone call that was consensually recorded and monitored by law enforcement. During the call, CC-1 indicated that he had spoken to AVENATTI, who was yelling and angry because he did not believe that Nike needed more time to respond to the demands for payment. CC-1 stated, in substance and in part, that Attorney-1 and Attorney-2 would need to provide some justification for delaying the deadline and that CC-1 would attempt to set up another call with AVENATTI so that Attorney-1 could discuss the request for an extension with AVENATTI directly.

        d.    Shortly thereafter, at approximately 5:10 p.m., Attorney-1 and Attorney-2 engaged in a three-way phone conversation with AVENATTI and CC-1 that was consensually recorded and monitored by law enforcement. During that call, the following, among other things, occurred:

i.  AVENATTI reiterated that he expected to "get a million five for our guy" (i.e., Client-1) and be "hired to handle the internal investigation" adding that and "if you don't wanna do that, we're done here."[1]

ii.  AVENATTI also reiterated threats made during the previous in-person meeting along with his demand for a multi-million dollar retainer to do an internal investigation. With respect to the internal investigation, AVENATTI made clear that his demand was not simply to be retained by Nike but to be paid at least $10 million dollars or more by Nike in return for not holding a press conference.

iii.  In particular, AVENATTI stated, in part: "I'm not fucking around with this, and I'm not continuing to play games. . . . You guys know enough now to know you've got a serious problem. And it's worth more in exposure to me to just blow the lid on this thing. A few million dollars doesn't move the needle for me. I'm just being really frank with you. So if that's what, if that's what's being contemplated, then let's just say it was good to meet you, and we're done. And I'll proceed with my press conference tomorrow . . . . I'm not fucking around with this thing anymore. So if you guys think that you know, we're gonna negotiate a million five, and you're gonna hire us to do an internal investigation, but it's gonna be capped at 3 or 5 or 7 million dollars, like let's just be done. . . . And I'll go and I'll go take ten billion dollars off your client's market cap. But I'm not fucking around."

iv.  AVENATTI and CC-1 continued to discuss how much AVENATTI expected to be paid by Nike for doing an "internal investigation." AVENATTI made clear his view that an internal investigation of conduct at a company like Nike could be valued at "tens of millions of dollars, if not hundreds," stating, in part, "let's not bullshit each other. We all know what the reality of this is," adding later in the conversation that while he did not expect to be paid $100 million, he did expect to be paid more than $9 million.

v.  Finally, AVENATTI stated, in substance and in part, that he would agree to meet with Attorney-1 in person the following day, Thursday, March 21, the date of Nike's scheduled quarterly earnings call and the beginning of the NCAA tournament, to present the exact amount he demanded from Nike

---

[1] The quotations set forth in this Complaint are based on draft transcriptions of the recorded conversations, and are in preliminary form only and subject to change upon further review.

and under what terms it would have to be paid.  AVENATTI further stated, in substance and in part, that Nike would be required to provide an answer the following Monday or he would hold his press conference.

### THE MARCH 21 MEETING WITH AVENATTI

12.  Consistent with the phone call described above, and based on my conversations with other law enforcement officers and Attorney-1, my own observations, and my review of a video recording and draft transcription of that video recording, I know that, on or about March 21, 2019, MICHAEL AVENATTI, the defendant, CC-1, Attorney-1, and Attorney-2 met at CC-1's office in New York.  That meeting was consensually video- and audio-recorded by Attorney-1 and Attorney-2.  During that meeting, the following, among other things, occurred:

   a.    At the beginning of the meeting, and at the direction of law enforcement, Attorney-1 stated that he did not believe that a payment to AVENATTI's client would be the "sticking point" but that Attorney-1 needed to know more about the proposed "internal investigation."  AVENATTI stated, in substance and in part, that he and CC-1 would require a $12 million retainer to be paid immediately and to be "deemed earned when paid," with a minimum guarantee of $15 million in billings and a maximum of $25 million, "unless the scope changes."  During the meeting, AVENATTI and CC-1 also stated, in substance and in part, that an "internal investigation" could benefit Nike, by, among other things, allowing Nike to "self-report" any misconduct, and that it would be Nike's choice whether to do so.

   b.    Attorney-1 noted that Attorney-1 had never received a $12 million retainer from Nike and had never done an investigation for Nike "that breaks $10 million."  AVENATTI responded, in substance and in part, by asking whether Attorney-1 has ever "held the balls of the client in your hand where you could take five to six billion dollars market cap off of them?"

   c.    Attorney-1 also reiterated, at the direction of law enforcement, that Attorney-1 did not think paying AVENATTI's client $1.5 million would be a "stumbling block," but asked whether there would be any way to avoid AVENATTI carrying out the threatened press conference without Nike retaining AVENATTI and CC-1.  In particular, Attorney-1 asked, in substance and in part, whether Nike could resolve the demands just by paying Client-1, rather than retaining AVENATTI and CC-1.  CC-1 indicated that CC-1 understood that Nike might like to get rid of the problem in "one fell swoop," rather than have it "hanging

over their head." AVENATTI noted that he did not think it made sense for Nike to pay Client-1 an "exorbitant sum of money . . . in light of his role in this." AVENATTI and CC-1 then left the room to confer privately.

        d.    After returning, AVENATTI stated, in part, "If [Nike] wants to have one confidential settlement and we're done, they can buy that for twenty-two and half million dollars and we're done. . . . Full confidentiality, we ride off into the sunset. . . ."

        e.    AVENATTI then added that "I just wanna share with you what's gonna happen, if we don't reach a resolution." AVENATTI then laid out again his threat of harm to Nike, adding that, "as soon as this becomes public, I am going to receive calls from all over the country from parents and coaches and friends and all kinds of people – this is always what happens – and they are all going to say I've got an email or a text message or – now, 90% of that is going to be bullshit because it's always bullshit 90% of the time, always, whether it's R. Kelly or Trump, the list goes on and on – but 10% of it is actually going to be true, and then what's going to happen is that this is going to snowball . . . and every time we got more information, that's going to be the Washington Post, the New York Times, ESPN, a press conference, and the company will die – not die, but they are going to incur cut after cut after cut after cut, and that's what's going to happen as soon as this thing becomes public."

        f.    Finally, AVENATTI and CC-1 agreed to meet at Attorney-1's office on Monday, March 25, 2019. AVENATTI made clear that Nike would have to accede to his demands at that meeting or he would hold his press conference, stating in part, "If this is not papered on Monday, we are done. I don't want to hear about somebody on a bike trip. I don't want to hear that somebody has, that somebody's grandmother passed away or . . . the dog ate my homework, I don't want to hear – none of it is going to go anywhere unless somebody was killed in a plane crash, it's going to go zero, no place with me."

    13.    Based on my review of a Twitter account publicly associated with MICHAEL AVENATTI, the defendant, I have learned that, consistent with the threats communicated by AVENATTI, as described above, and within approximately two hours after the conclusion of the video-recorded meeting described above, AVENATTI posted the following message on Twitter:



Based on my participation in the investigation, and my review of the article referred to in the tweet described above, I am aware that the article refers to the prior prosecution involving employees of a rival company referred to by AVENATTI in his initial March 19 meeting with attorneys for Nike.

WHEREFORE, deponent respectfully requests that a warrant be issued for the arrest of MICHAEL AVENATTI, the defendant, and that he be arrested and imprisoned or bailed, as the case may be.

SPECIAL AGENT CHRISTOPHER HARPER
FEDERAL BUREAU OF INVESTIGATION

Sworn to before me this
24th day of March, 2019

THE HONORABLE STEWART D. AARON
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

11