ORIGINAL

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:  MAY 2 2 2019
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - -

UNITED STATES OF AMERICA

         - v. -

MICHAEL AVENATTI,

             Defendant.

- - - - - - - - - - - - - - - - x

:
:
:
:
:
:
:

INDICTMENT

19 Cr.

19 CRIM 373

JUDGE GARDEPHE

## OVERVIEW

1.   The charges in this Indictment stem from an extortion scheme in which MICHAEL AVENATTI, the defendant, and a co-conspirator not named as a defendant herein ("CC-1"), demanded tens of millions of dollars in payments from NIKE, Inc. ("Nike"), a multinational public corporation engaged in, among other things, the marketing and sale of athletic apparel, footwear, and equipment, by threatening to cause substantial economic and reputational harm to Nike if it did not accede to AVENATTI and CC-1's demands.  Specifically, AVENATTI and CC-1 threatened to hold a press conference on the eve of Nike's quarterly earnings call and the start of the annual National Collegiate Athletic Association ("NCAA") men's college basketball tournament, at which AVENATTI would make allegations of misconduct by Nike employees, unless Nike agreed to make a payment of $1.5 million to a client of AVENATTI's ("Client-1")

in possession of information damaging to Nike, and further agreed to "retain" AVENATTI and CC-1 to conduct an "internal investigation" that Nike had not requested and for which AVENATTI and CC-1 demanded to be paid, at a minimum, between $15 million and $25 million. Alternatively, and in lieu of such a retainer agreement, AVENATTI and CC-1 demanded a total payment of $22.5 million from Nike to resolve any claims Client-1 might have and additionally to buy AVENATTI and CC-1's silence.

<u>RELEVANT INDIVIDUALS AND ENTITIES</u>

2. At all relevant times, MICHAEL AVENATTI, the defendant, was an attorney licensed to practice in the state of California with a large public following due to, among other things, his representation of celebrity and public figure clients, as well as frequent media appearances and use of social media.

3. At all relevant times, CC-1 was an attorney licensed to practice in the state of California, and similarly was known for representation of celebrity and public figure clients, and frequent media appearances.

4. Nike is a multinational, publicly held corporation headquartered in Beaverton, Oregon. Nike produces and markets athletic apparel, footwear, and equipment, and sponsors athletic teams in many sports, including basketball, at

various levels, including the high school, amateur, collegiate, and professional levels.

5.      Client-1 is the director and head coach of an amateur youth basketball program (the "Basketball Program") based in California.  For a number of years, the Basketball Program coached by Client-1 had a sponsorship agreement with Nike pursuant to which Nike paid Client-1's program approximately $72,000 annually.

6.      "Attorney-1" and "Attorney-2" work at a law firm based in New York and represent Nike.

7.      The "In-House Attorney" is an attorney who works for Nike.

## THE EXTORTION SCHEME

8.      In or about March 2019, MICHAEL AVENATTI, the defendant, was contacted by Client-1, who sought AVENATTI's assistance after the Basketball Program was informed by Nike that its annual contractual sponsorship would not be renewed. AVENATTI agreed to a meeting and, upon so doing, AVENATTI wrote to CC-1 about the meeting and suggested that they work together in dealing with Nike regarding any claims Client-1 might have, due to CC-1's previous relationship with individuals at Nike.

9.      On or about March 5, 2019, MICHAEL AVENATTI, the defendant, met with Client-1.  During that meeting and in subsequent meetings and communications, Client-1 informed

AVENATTI, in substance and in part, that Client-1 wanted Nike to reinstate its $72,000 annual contractual sponsorship of the Basketball Program, which, as noted above, Nike had recently declined to renew.  During the meeting, Client-1 provided AVENATTI with information regarding what Client-1 believed to be misconduct by certain employees of Nike involving the funneling of illicit payments from Nike to the families of certain highly ranked high school basketball prospects.

10.  At no time during the March 5 meeting or otherwise did MICHAEL AVENATTI, the defendant, enter into a written retention agreement with Client-1, nor did AVENATTI ever inform Client-1 that CC-1 would be working with AVENATTI. Furthermore, although AVENATTI told Client-1 that AVENATTI believed he would be able to obtain a $1 million settlement for Client-1 from Nike, at no time did AVENATTI inform Client-1 that he also planned to demand payments from Nike for himself and CC-1.

11.  On or about March 12, 2019, CC-1 contacted Nike and stated, in substance and in part, that he wished to speak with Nike representatives and that the discussion should occur in person, not over the phone, as it pertained to a sensitive matter.  CC-1 also told Nike representatives that AVENATTI would accompany him to any meeting.  Nike ultimately agreed to a meeting to be held on or about March 19, 2019, and stated, in

4

substance, that Nike's outside counsel, including Attorney-1, would attend.

*The March 19 Meeting*

12.   On or about March 19, 2019, at approximately 12:00 p.m., Attorney-1, Attorney-2, and the In-House Attorney met with MICHAEL AVENATTI, the defendant, and CC-1 at CC-1's office in New York, New York, during which the following occurred, among other things:

a.   AVENATTI stated, in substance and in part, that he represented Client-1, a youth basketball coach, whose team had previously had a contractual relationship with Nike, but whose contract Nike had recently decided not to renew. According to AVENATTI, Client-1 had evidence that one or more Nike employees had authorized and funded payments to the families of top high school basketball players and attempted to conceal those payments, similar to conduct involving a competitor of Nike's that had recently been the subject of a criminal prosecution by the United States Attorney's Office for the Southern District of New York.  AVENATTI identified three former high school players in particular, and stated that his client was aware of payments to others as well.

b.   AVENATTI further stated, in substance and in part, that he intended to hold a press conference the following day to publicize the asserted misconduct at Nike, which would

5

negatively affect Nike's market value.  In particular, AVENATTI
stated, in substance and in part, that he had approached Nike
now because he knew that the annual NCAA men's college
basketball tournament – an event of significance to Nike and its
brand – was about to begin and further because he was aware that
Nike's quarterly earnings call was scheduled for March 21, 2019,
thus maximizing the potential financial and reputational damage
his press conference could cause to Nike.

        c.    AVENATTI further stated, in substance and in
part, that he would refrain from holding that press conference
and damaging Nike if Nike acceded  to two demands: (1) Nike must
pay $1.5 million to Client-1 as a settlement for any claims
Client-1 might have regarding Nike's decision not to renew its
contract with the team coached by Client-1; and (2) Nike must
hire AVENATTI and CC-1 to conduct an internal investigation of
Nike, with a provision that if Nike hired another firm to
conduct such an internal investigation, Nike would still be
required to pay AVENATTI and CC-1 at least twice the fees of any
other firm hired.

        d.    AVENATTI also stated, in substance and in
part, that if Nike agreed to retain AVENATTI and CC-1 to conduct
an internal investigation, then Nike would be able to decide
whether any misconduct should be disclosed to law enforcement
authorities.

e.    At the end of the meeting, AVENATTI and CC-1 stated, in substance, that Attorney-1 and Nike would have to agree to accept those demands immediately or AVENATTI would hold his press conference.  In particular, CC-1 stated that he and AVENATTI would contact Attorney-1, Attorney-2, and the In-House Attorney later that afternoon to discuss Nike's response.

13.  Later on or about March 19, 2019, Attorney-1 left a voicemail for CC-1 stating that Nike needed time to consider the demands made by CC-1 and MICHAEL AVENATTI, the defendant. CC-1 subsequently returned Attorney-1's call and stated, in substance and in part, that AVENATTI had agreed to give Nike until Thursday (i.e., two days) to consider the demands before holding the threatened press conference.

14.  After the conclusion of the meeting described above, representatives of Nike contacted representatives of the United States Attorney's Office for the Southern District of New York regarding the threats and extortionate demands by MICHAEL AVENATTI, the defendant, and CC-1.

*The March 20 Call*

15.  On or about March 20, 2019, at approximately 4:00 p.m., Attorney-1 and Attorney-2, who were in their offices in New York, New York, spoke to CC-1 on a telephone call that was consensually recorded and monitored by law enforcement. During the call, and at the direction of law enforcement,

Attorney-1 asked CC-1 for more time to consider the demands made
by MICHAEL AVENATTI, the defendant, and CC-1 the day before
and/or another in-person meeting to discuss those demands.
CC-1, who stated, in substance and in part, that he was in
Miami, Florida, at the time, said that he would speak to
AVENATTI to discuss the possibility of delaying the deadline for
Nike's response and would further discuss with AVENATTI the
possibility of setting up another in-person meeting.

     16.  Less than an hour later, at approximately
4:50 p.m., Attorney-1 and Attorney-2 again spoke to CC-1 on a
telephone call that was consensually recorded and monitored by
law enforcement.  During the call, CC-1 said that he had spoken
to MICHAEL AVENATTI, the defendant, who was yelling and angry
because he did not believe that Nike needed more time to respond
to the demands for payment.  CC-1 stated, in substance and in
part, that Attorney-1 and Attorney-2 would need to provide some
justification for delaying the deadline and that CC-1 would
attempt to set up another call with AVENATTI so that Attorney-1
could discuss the request for an extension with AVENATTI
directly.

     17.  Shortly thereafter, at approximately 5:10 p.m.,
Attorney-1 and Attorney-2 engaged in a conference call with
MICHAEL AVENATTI, the defendant, and CC-1 that was consensually

recorded and monitored by law enforcement.  During that call,
the following, among other things, occurred:

        a.   AVENATTI reiterated that he expected to "get
a million five for our guy" (i.e., Client-1) and be "hired to
handle the internal investigation," adding that and "if you
don't wanna do that, we're done here."

        b.   AVENATTI also reiterated threats made during
the previous in-person meeting, along with his demand for a
multi-million dollar retainer to do an internal investigation.
With respect to the internal investigation, AVENATTI made clear
that his demand was not simply that he and CC-1 be retained by
Nike, but that they be paid at least $10 million dollars or more
by Nike in return for not holding a press conference.

        c.   In particular, AVENATTI stated, in part:
"I'm not fucking around with this, and I'm not continuing to
play games. . . .  You guys know enough now to know you've got a
serious problem.  And it's worth more in exposure to me to just
blow the lid on this thing.  A few million dollars doesn't move
the needle for me.  I'm just being really frank with you.  So if
that's what, if that's what's being contemplated, then let's
just say it was good to meet you, and we're done.  And I'll
proceed with my press conference tomorrow . . . .  I'm not
fucking around with this thing anymore.  So if you guys think
that you know, we're gonna negotiate a million five, and you're

gonna hire us to do an internal investigation, but it's gonna be capped at 3 or 5 or 7 million dollars, like, let's just be done. . . . And I'll go and I'll go take ten billion dollars off your client's market cap.  But I'm not fucking around."

       d.   AVENATTI made clear his view that an internal investigation of conduct at a company like Nike could be valued at "tens of millions of dollars, if not hundreds," stating, in part, "let's not bullshit each other.  We all know what the reality of this is," adding later in the conversation that while he and CC-1 did not expect to be paid $100 million, he did expect them to be paid more than $9 million.

       e.   Finally, AVENATTI stated, in substance and in part, that he would agree to meet with Attorney-1 in person the following day, Thursday, March 21, the date of Nike's scheduled quarterly earnings call and the beginning of the NCAA tournament, to present the exact amount AVENATTI and CC-1 demanded from Nike and under what terms it would have to be paid.  AVENATTI further stated, in substance and in part, that Nike would be required to provide an answer the following Monday or he would hold his press conference.

*The March 21 Meeting*

       18.  On or about March 21, 2019, MICHAEL AVENATTI, the defendant, CC-1, Attorney-1, and Attorney-2 met at CC-1's office in New York.  That meeting was consensually video- and audio-

recorded.  During that meeting, the following, among other things, occurred:

        a.   At the beginning of the meeting, and at the direction of law enforcement, Attorney-1 stated that he did not believe that a payment to AVENATTI's client would be the "sticking point," but that Attorney-1 needed to know more about the proposed "internal investigation."  AVENATTI stated, in substance and in part, that he and CC-1 would require a $12 million retainer to be paid immediately and to be "deemed earned when paid," with a minimum guarantee of $15 million in billings and a maximum of $25 million, "unless the scope changes."  During the meeting, AVENATTI and CC-1 also stated, in substance and in part, that an "internal investigation" could benefit Nike, by, among other things, allowing Nike to "self-report" any misconduct, and that it would be Nike's choice whether to disclose its alleged misconduct.

        b.   Attorney-1 noted that Attorney-1 had never received a $12 million retainer from Nike and had never done an investigation for Nike "that breaks $10 million."  AVENATTI responded, in substance and in part, by asking whether Attorney-1 has ever "held the balls of the client in your hand where you could take five to six billion dollars market cap off of them?"

c.   Attorney-1 also reiterated, at the direction
of law enforcement, that Attorney-1 did not think paying
AVENATTI's client $1.5 million would be a "stumbling block," but
asked whether there would be any way to avoid AVENATTI carrying
out the threatened press conference without Nike retaining
AVENATTI and CC-1.  In particular, Attorney-1 asked, in
substance and in part, whether Nike could resolve the demands
just by paying Client-1, rather than retaining AVENATTI and
CC-1.  CC-1 said that he understood that Nike might like to get
rid of the problem in "one fell swoop," rather than have it
"hanging over their head."  AVENATTI stated that he did not
think it made sense for Nike to pay Client-1 an "exorbitant sum
of money . . . in light of his role in this."  AVENATTI and CC-1
then left the room to confer privately.

d.   After AVENATTI and CC-1 returned to the
conference room, AVENATTI told Attorney-1 and Attorney-2, in
part, "If [Nike] wants to have one confidential settlement and
we're done, they can buy that for twenty-two and half million
dollars and we're done. . . . Full confidentiality, we ride off
into the sunset. . . ."

e.   AVENATTI then added that "I just wanna share
with you what's gonna happen, if we don't reach a resolution."
AVENATTI then laid out again his and CC-1's threat of harm to
Nike, adding that, "as soon as this becomes public, I am going

12

to receive calls from all over the country from parents and coaches and friends and all kinds of people — this is always what happens — and they are all going to say I've got an email or a text message or — now, 90% of that is going to be bullshit because it's always bullshit 90% of the time, always, whether it's R. Kelly or Trump, the list goes on and on — but 10% of it is actually going to be true, and then what's going to happen is that this is going to snowball . . . and every time we got more information, that's going to be the Washington Post, the New York Times, ESPN, a press conference, and the company will die — not die, but they are going to incur cut after cut after cut after cut, and that's what's going to happen as soon as this thing becomes public."

       f.    Finally, AVENATTI and CC-1 agreed to meet at Attorney-1's office on Monday, March 25, 2019, to hear whether Nike was willing to make the demanded payments. AVENATTI stated that Nike would have to accede to his demands at that meeting or he would hold his press conference, stating in part, "If this is not papered on Monday, we are done. I don't want to hear about somebody on a bike trip. I don't want to hear that somebody has, that somebody's grandmother passed away or . . . the dog ate my homework, I don't want to hear — none of it is going to go anywhere unless somebody was killed in a plane crash, it's going to go zero, no place with me."

*The March 21 "Warning Shot"*

19.   Within approximately two hours after the
conclusion of the audio- and video-recorded meeting described
above, MICHAEL AVENATTI, the defendant, posted the following
message on Twitter (the "March 21 Tweet"):

 **Michael Avenatti** ✔ @MichaelA... · 36m   ⌄
Something tells me that we have not reached
the end of this scandal. It is likely far far
broader than imagined...



College basketball corruption trial: Ex-
Adidas exec sentenced to nine months in ...
🔗 cbssports.com

💬 18        ↻ 38        ♡ 129        ⬆

20.   The article linked in the March 21 Tweet refers
to the prior prosecution by the United States Attorney's Office
for the Southern District of New York involving employees of a
competitor of Nike referred to by MICHAEL AVENATTI, the
defendant, and CC-1 in their initial March 19 meeting with
attorneys for Nike.

21.   Shortly after posting the March 21 Tweet, MICHAEL
AVENATTI, the defendant, sent by text message to CC-1 a link to
the March 21 Tweet and a message stating: "Warning shot."

*The Planned March 25 Meeting*

22.   As noted above, MICHAEL AVENATTI, the defendant,
and CC-1 were scheduled to meet with Attorney-1 and Attorney-2
on March 25, 2019.   The day before, CC-1 attempted
unsuccessfully to change the time of the meeting due to a
scheduling conflict.   AVENATTI sent a text message to CC-1
stating that he "[did not] want to lose the meeting . . .
because we have to get an answer tmrw."

23.   The next day, just prior to the meeting, CC-1
sent a text message to MICHAEL AVENATTI, the defendant, stating
that he was still at his prior meeting and would probably not be
free until 2:30 p.m.   AVENATTI proceeded to the office complex
of Attorney-1 and Attorney-2 in Manhattan, and he was arrested
by law enforcement in the vicinity of that complex before the
meeting could take place.   Prior to his arrest, AVENATTI sent a
text message to CC-1 stating: "Call me immediately.   The FBI
just showed up at the client's home.   And pls send me the phone
number for the atty."   Approximately three minutes later, CC-1
responded: "Call me.   I keep getting vm.   Your vm."

24.   Immediately after MICHAEL AVENATTI, the
defendant, learned that law enforcement had approached Client-1,

15

but shortly before his arrest, AVENATTI posted the following

message on Twitter:



**Michael Avenatti** ✔
@MichaelAvenatti

**Tmrw at 11 am ET, we will be holding a
press conference to disclose a major
high school/college basketball scandal
perpetrated by @Nike that we have
uncovered. This criminal conduct
reaches the highest levels of Nike and
involves some of the biggest names in
college basketball.**

12:16 PM · Mar 25, 2019 · Twitter for iPhone

COUNT ONE

(Conspiracy to Transmit Interstate
Communications with Intent to Extort)

The Grand Jury charges:

25.   The allegations contained in paragraphs 1 through

24 above are hereby repeated, realleged, and incorporated by

reference as if fully set forth herein.

26.   In or about March 2019, in the Southern District

of New York and elsewhere, MICHAEL AVENATTI, the defendant, and

others known and unknown, knowingly and willfully did combine,

conspire, confederate, and agree together and with each other to

commit an offense against the United States, to wit,

transmission of an interstate communication with intent to

extort, in violation of Title 18, United States Code, Section
875(d).

27.  It was a part and an object of the conspiracy
that MICHAEL AVENATTI, the defendant, and others known and
unknown, knowingly, and with intent to extort from a corporation
any money and other thing of value, would and did transmit in
interstate commerce a communication containing a threat to
injure the reputation of a corporation, in violation of Title
18, United States Code, Section 875(d), to wit, AVENATTI and
CC-1 agreed to extort Nike by means of an interstate
communication by threatening to damage Nike's reputation if Nike
did not agree to make multi-million dollar payments to AVENATTI
and CC-1.

OVERT ACTS

28.  In furtherance of the conspiracy and to effect
the illegal object thereof, the following overt acts, among
others, were committed in the Southern District of New York and
elsewhere:

a.  On or about March 19, 2019, in Manhattan,
MICHAEL AVENATTI, the defendant, and CC-1 met with attorneys for
Nike and threatened to release damaging information regarding
Nike if Nike did not agree to make multi-million dollar payments
to AVENATTI and CC-1.

b.   On or about March 20, 2019, AVENATTI and
CC-1 spoke by telephone with attorneys for Nike, during which
AVENATTI stated, with respect to his demands for payment of
millions of dollars, that if those demands were not met "I'll go
take ten billion dollars off your client's market cap . . .  I'm
not fucking around."

(Title 18, United States Code, Section 371.)

COUNT TWO

(Conspiracy to Commit Extortion)

The Grand Jury further charges:

29.   The allegations contained in paragraphs 1 through
24 above are hereby repeated, realleged, and incorporated by
reference as if fully set forth herein.

30.   In or about March 2019, in the Southern District
of New York and elsewhere, MICHAEL AVENATTI, the defendant, and
others known and unknown, knowingly did combine, conspire,
confederate, and agree together and with each other to commit
extortion, as that term is defined in Title 18, United States
Code, Section 1951(b)(2), and thereby would and did obstruct,
delay, and affect commerce and the movement of articles and
commodities in commerce, as that term is defined in Title 18,
United States Code, Section 1951(b)(3), including by the
wrongful use of fear of economic loss, to wit, AVENATTI and CC-1
used threats of economic harm in order to obtain multi-million

18

dollar payments from Nike, a multinational corporation, to AVENATTI and CC-1.

(Title 18, United States Code, Section 1951.)

COUNT THREE

(Transmission of Interstate
Communications with Intent to Extort)

The Grand Jury further charges:

31.  The allegations contained in paragraphs 1 through 24 above are hereby repeated, realleged, and incorporated by reference as if fully set forth herein.

32.  On or about March 20, 2019, in the Southern District of New York and elsewhere, MICHAEL AVENATTI, the defendant, knowingly, and with intent to extort from a corporation any money and other thing of value, did transmit in interstate commerce a communication containing a threat to injure the reputation of a corporation, and did aid and abet the same, to wit, AVENATTI, during an interstate telephone call, threatened to cause substantial financial harm to Nike and its reputation if Nike did not agree to make multi-million dollar payments to AVENATTI and CC-1.

(Title 18, United States Code, Sections 875(d) and 2.)

COUNT FOUR

(Extortion)

The Grand Jury further charges:

33.   The allegations contained in paragraphs 1 through 24 above are hereby repeated, realleged, and incorporated by reference as if fully set forth herein.

34.   In or about March 2019, in the Southern District of New York and elsewhere, MICHAEL AVENATTI, the defendant, knowingly did attempt to commit extortion as that term is defined in Title 18, United States Code, Section 1951(b)(2), and thereby would and did obstruct, delay, and affect commerce and the movement of articles and commodities in commerce, as that term is defined in Title 18, United States Code, Section 1951(b)(3), to wit, AVENATTI used threats of economic harm in an attempt to obtain multi-million dollar payments from Nike, a multinational corporation.

(Title 18, United States Code, Sections 1951 and 2.)

FORFEITURE ALLEGATION

35.   As the result of committing one or more of the offenses charged in Counts One through Four of this Indictment, MICHAEL AVENATTI, the defendant, shall forfeit to the United States, pursuant to Title 18, United States, Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), any and all property, real and personal, that

constitutes or is derived from proceeds traceable to the
commission of said offenses, including but not limited to a sum
of money in United States currency representing the amount of
proceeds traceable to the commission of said offenses.

<u>Substitute Asset Provision</u>

36.   If any of the above-described forfeitable
property, as a result of any act or omission of the defendant:

a.   cannot be located upon the exercise of due
diligence;

b.   has been transferred or sold to, or
deposited with, a third person;

c.   has been placed beyond the jurisdiction of
the Court;

d.   has been substantially diminished in value;
or

e.   has been commingled with other property that
cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21,
United States Code, Section 853(p), and Title 28, United States
Code, Section 2461(c), to seek forfeiture of any other property

of said defendant up to the value of the above forfeitable

property.

(Title 18, United States Code, Sections 981;
Title 21, United States Code, Section 853(p);
Title 28, United States Code, Section 2461.)

FOREPERSON

GEOFFREY S. BERMAN
United States Attorney

22

Form No. USA-33s-274 (Ed. 9-25-58)

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

### UNITED STATES OF AMERICA

- v. -

### MICHAEL AVENATTI,

Defendant.

### INDICTMENT

19 Cr.

(18 U.S.C. §§ 371, 875, 1951, and 2.)

GEOFFREY S. BERMAN
United States Attorney.

_____
Foreperson

May 22, 2019
Filed Sealed Indictment. Case assigned to Judge Gardephe
U.S.M.J. Debra Freeman