UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,            :

vs.                                  :        19 Cr. 373 (PGG)

MICHAEL AVENATTI,                    :

           Defendant.              :        **ORAL ARGUMENT REQUESTED**

_____

**DEFENDANT AVENATTI'S MEMORANDUM OF LAW IN SUPPORT
OF HIS MOTION TO DISMISS INDICTMENT FOR VINDICTIVE
AND SELECTIVE PROSECUTION, AND FOR DISCOVERY**

Scott A. Srebnick
SCOTT A. SREBNICK, P.A.
201 South Biscayne Boulevard
Suite 1210
Miami, FL 33131
Telephone: (305) 285-9019
Facsimile: (305) 377-9937
E-Mail: Scott@srebnicklaw.com

Jose M. Quinon
JOSE M. QUINON, P.A.
2333 Brickell Avenue, Suite A-1
Miami, FL 33129
Telephone: (305) 858-5700
Facsimile: (305) 358-7848
E-Mail: jquinon@quinonlaw.com

*Attorneys for Defendant Michael Avenatti*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES .................................................................................................... iii

I.      INTRODUCTION ..................................................................................................1

II.     FACTUAL BACKGROUND ................................................................................6

        A.  Coach Gary Franklin and Nike's Misconduct .......................................6

        B.  Michael Avenatti's Feud with President Trump and the USAO SDNY ..........27

        C.  The Relationship Between USA Berman and President Trump......................31

III.    ARGUMENT .......................................................................................................32

        THE INDICTMENT VIOLATES AVENATTI'S RIGHTS
        UNDER THE FIFTH AMENDMENT'S DUE PROCESS
        CLAUSE................................................................................................................32

        A.  Selective Prosecution....................................................................................34

        B.  Vindictive Prosecution..................................................................................42

IV.     REQUEST FOR DISCOVERY ..........................................................................42

V.      CONCLUSION ...................................................................................................43

        CERTIFICATE OF SERVICE ..........................................................................44

## <u>TABLE OF AUTHORITIES</u>

### <u>CASES</u>

*Blackledge v. Perry*,
    417 U.S. 21 (1974) ........................................................................................................33

*Bordenkircher v. Hayes*,
    434 U.S. 357 (1978) ......................................................................................................33

*Bowen v. Adidas America, Inc.*, et al,
    Case No. 3:18-cv-03118-JFA (D.S.C. Nov. 19, 2018) ...................................................9

*Chevron Corporation v. Donziger*,
    833 F.3d 74 (2d Cir. 2016) ...........................................................................................40

*Clifford v. Trump, et al.*,
    No. 18-cv-2217-SJP (C.D. Ca) ....................................................................................29

*Clifford v. Trump*,
    No. 18-cv-6893-SJO (C.D. Ca) ....................................................................................29

*Cobb v. Enhanced Recovery Company, LLC*,
    No. 17-CV-1629 (VLB), 2019 WL 1115755 (S.D.N.Y. Mar. 11, 2019) .....................2

*National Organization for Women, Inc., v. Scheidler*,
    267 F.3d 687 (7th Cir. 2001),
    *reversed on other grounds*, 537 U.S. 393 (2003)........................................................40

*Richmond v. General Nutrition Centers, Inc.*,
    No. 08-cv-3577-PAE, 2012 WL 762307 (S.D.N.Y.  Mar. 9, 2012) ............................39

*United States v. Armstrong*,
    517 U.S. 456 (1996) ...............................................................................................32, 34

*United States v. Batchelder*,
    442 U.S. 114 (1979) ......................................................................................................32

*United States v. Berrios*,
    501 F.2d 1207 (2d Cir. 1974)........................................................................................34

*United States v. Cohen*,
    18-cr-602-WHP (S.D.N.Y.) ..................................................................................... 27-28

*United States v. Enmons,*
    410 U.S. 396 (1973) ...................................................................................................38

*United States v. Gatto,*
    295 F.Supp.3d 336 (S.D.N.Y. 2018) ........................................................................21

*United States v. Gatto, Code, et al.*
    No. 17-cr-0686 (LAK) (SDNY) ..................................................................................8

*United States v. Goodwin,*
    457 U.S. 368 (1982) ...................................................................................................33

*United States v. Hastings,*
    126 F.3d 310 (4th Cir. 1997) ....................................................................................34

*United States v. Jackson,*
    180 F.3d 55 (2d Cir. 1999),
    *on reh'g* 196 F.3d 383 (2d Cir. 1999) .............................................................. Passim

*United States v. Johnson,*
    171 F.3d 139 (2d Cir. 1999)......................................................................................33

*United States v. King,*
    126 F.3d 394 (2d Cir. 1997)......................................................................................33

*United States v. Koh,*
    199 F.3d 632 (2d Cir. 1999)......................................................................................33

*United States v. Lewis,*
    517 F.3d 20 (1st Cir. 2008) .......................................................................................34

*United States v. Mason Tenders Dist. Council of Greater*
    *New York,* No. 94-civ-06487 (RWS),
    1995 WL 679245, *16 (S.D.N.Y. Nov. 15, 1995),
    *as modified by* 1996 WL 22360 (S.D.N.Y. Jan. 19, 1996) .........................................40

*United States v. Pendergraft,*
    297 F.3d 1198 (11th Cir. 2002)..................................................................................38

*United States v. Rosenblatt,*
    554 F.2d 36 (2d Cir. 1977).........................................................................................5

*United States v. Sanchez,*
    517 F.3d 651 (2d Cir. 2008)......................................................................................30

*United States v. Sanders*,
 211 F.3d 711 (2d Cir. 2000) ................................................................. 33-34

*United States v. Silver*,
 103 F.Supp.3d 370 (S.D.N.Y. 2015) ...................................................... 2, 37

*United States v. Stewart*,
 590 F.3d 93 (2d Cir 2009) ....................................................................33, 36

*United States v. Stone*,
 No. 19-0018 (ABJ), 2019 WL 2502929, *22
 (D.D.C. Aug. 1, 2019) ............................................................................35

*United States v. Webster AV Management, LLC*,
 No. 16-cv-09913-PGG (S.D.N.Y.) ........................................................41

*Wayte v. United States*,
 470 U.S. 598 (1985) ...............................................................................32

## CALIFORNIA BUSINESS AND PROFESSIONS CODE

Section 17200 ...............................................................................................40

Section 17203 ...............................................................................................40

Section 17204 ...............................................................................................40

## STATUTES

18 U.S.C. §875(d) ..........................................................................................4

18 U.S.C. §1951 ..............................................................................................4

28 U.S.C. §546(d) ........................................................................................31

## UNITED STATES CONSTITUTION

AMEND I ............................................................................................ Passim

AMEND V ........................................................................................... Passim

## MISCELLANEOUS

Article II, Section 3 of the Constitution...................................................................30

Fed.R.Crim.P. 12(b)(3)(A)(iv)..............................................................................1

Fed.R.Evid. 201 ................................................................................................2,9

Fed.R.Evid. 408 .............................................................................................19, 24

Local Criminal Rule 23.1(d)(7) .........................................................................2, 37

NCAA Division 1 Manual, Bylaw 12..................................................................21

US Attorney's Manual, §9.2032..........................................................................5

Defendant Michael Avenatti, through counsel, and pursuant to Fed.R.Crim.P. 12(b)(3)(A)(iv) and the Due Process Clause, respectfully submits this memorandum of law in support of his Motion to Dismiss Indictment for Vindictive and Selective Prosecution. Mr. Avenatti requests discovery and an evidentiary hearing on his claims that he was targeted for prosecution in this case for unconstitutionally vindictive and selective reasons.

## I.     INTRODUCTION

On March 25, 2019, after an "investigation" that lasted less than four business days, U.S. Attorney Geoffrey Berman ("USA Berman") issued a press release to announce the arrest of attorney Michael Avenatti, a high-profile political antagonist of President Donald Trump, for allegedly engaging in a scheme to extort Nike, a Fortune 100 corporation. (Exhibit A).[1] USA Berman stated that Mr. Avenatti "used illegal and extortionate threats for the purpose of obtaining millions of dollars in payments from" Nike. (Exh. A). The alleged extortionate conduct consisted of Mr. Avenatti's threat to publicly expose the truth about Nike's misconduct toward his client, Coach Gary Franklin, Sr., if Nike did not agree to: a) make a payment of $1.5 million to Coach Franklin; and b) retain Mr. Avenatti and attorney Mark Geragos to conduct an internal investigation of Nike at a projected cost of between $15 and $25 million. USA Berman commented that "[w]hen lawyers use their law licenses as weapons, as a *guise* to extort payments for themselves, they are no longer acting as attorneys. They are acting *as criminals*, and they will [be] held responsible for their conduct." (Exh. A) (emphasis added). FBI Asst. Dir. William F. Sweeney Jr., added that "[a]s alleged, Michael Avenatti

---

[1] References to exhibits throughout this Memorandum of Law are to the exhibits attached to the Declaration of Scott A. Srebnick in support of the Motion to Dismiss Indictment for Vindictive and Selective Prosecution, and for Discovery. That Declaration will be filed as soon as the parties resolve any possible redactions to the exhibits pursuant to the Protective Order (Doc. #16).

approached Nike last week with a list of financial demands *in exchange for covering up* allegations of misconduct on behalf of the company." (Exh. A) (emphasis added). FBI Asst. Dir. Sweeney opined that "[t]his is nothing more than a straightforward case of extortion. In the event anyone needs to be reminded, this type of behavior is illegal and it will not be tolerated – especially when committed by a lawyer who is supposed to use his license to practice law, not to willfully violate it." (Exh. A).

In addition to the press release, USA Berman held a press conference, *see* https://www.youtube.com/watch?v=SPlPPIW4SYE, using as a visual aid a poster board entitled "The Alleged Extortion Scheme Timeline," illustrating that the alleged scheme played out over a 3-day period and repeating USA Berman's personal opinion that Mr. Avenatti demanded payments "under the guise of legal work."[2] During the press conference, USA Berman boldly proclaimed that "*Avenatti's conduct had nothing to do with zealous advocacy for a client or any other kind of legitimate legal work*." (emphasis added).[3] But, as shown below, FBI Asst. Dir. Sweeney's claim that Mr. Avenatti had demanded funds in exchange for "covering up allegations of misconduct" was squarely contradicted by evidence in the FBI's

---

[2] Pursuant to Fed.R.Evid. 201, this Court may take judicial notice of publicly available information contained on websites where the authenticity of the sites has not been questioned. *See, e.g., Cobb v. Enhanced Recovery Company, LLC*, No. 17-CV-1629 (VLB), 2019 WL 1115755 (S.D.N.Y. Mar. 11, 2019). Mr. Avenatti asks this Court to take judicial notice of the fact that the press conference occurred and that it received intense and widespread media coverage.

[3] The statements by USA Berman and FBI Assistant Director Sweeney constitute "opinion[s] as to the accused's guilt or innocence or as to the merits of the case or the evidence in the case," *see* Local Criminal Rule 23.1(d)(7), which under the rules of this court "presumptively involve a substantial likelihood that their public dissemination will interfere with a fair trial or otherwise prejudice the due administration of justice within the meaning of this rule." *Id.* The prejudicial effect of statements such as these is not "magically dispelled by sprinkling the words 'alleged' or 'allegations' liberally throughout the press release." *United States v. Silver*, 103 F.Supp.3d 370, 378 (S.D.N.Y. 2015).

possession. Moreover, having arrested Mr. Avenatti before conducting a real investigation of Coach Franklin's claim, neither USA Berman nor anyone else associated with his prosecution team had any factual basis to conclude that Mr. Avenatti's conduct was unrelated to "zealous advocacy for a client" and "legitimate legal work."

To be sure, in its zest to nab Mr. Avenatti, a high-profile target, the USAO-SDNY eschewed the typically careful and thoughtful fact-gathering investigation on which it historically prides itself. Instead, it rushed to charge Mr. Avenatti – but not Mr. Geragos – with extortion before conducting a meaningful investigation relevant to a central, basic question in an extortion case: what was the nexus between the threat to Nike's reputation and Coach Franklin's "claim of right?" *See United States v. Jackson*, 180 F.3d 55, 69-71 (2d Cir. 1999), *on reh'g* 196 F.3d 383 (2d Cir. 1999). Prior to arresting Mr. Avenatti, the USAO-SDNY either did not bother to learn (or deliberately ignored) the extent of Nike's misconduct, the history of the relationship between Coach Franklin and Nike, the bases for Coach Franklin's potential legal claims against Nike, his litigation objectives, the purpose for the requested internal investigation, or the reasons why Coach Franklin retained Mr. Avenatti. Nonetheless, the USAO-SDNY arrested Mr. Avenatti, concluding without any real investigation that his demand to root out corruption at Nike was solely in pursuit of his own agenda and was unrelated to any claim of Coach Gary Franklin. It is doubtful that attorney "John Doe" would have encountered such a swift reaction from the USAO-SDNY; Mark Geragos certainly did not.

*After* arresting Mr. Avenatti on the criminal complaint, the government then began to collect documentary evidence, including thousands of pages of Coach Franklin's text messages and e-mails, that it should have sought to obtain before jumping to a conclusion about Mr.

Avenatti.   Those communications prove that Mr. Avenatti's demand to spearhead an investigation of Nike was consistent with, and in furtherance of, the expressly-stated and *legitimate* litigation objectives that Coach Franklin sought to pursue long before he first contacted Mr. Avenatti.  Contrary to USA Berman's ill-informed and premature statements during his press conference, Mr. Avenatti's settlement demand constituted "zealous advocacy" for his client and had a clear nexus to "legitimate legal work" for which he had been retained by Coach Franklin.

Curiously, nearly five months after Mr. Avenatti's arrest, the USAO-SDNY has not charged Mr. Geragos with any offense, despite that neither the Indictment nor the evidence nor the law of conspiracy draws any meaningful distinctions between his conduct and Mr. Avenatti's.  To be clear, the evidence gathered by the government after Mr. Avenatti's arrest proves that neither Mr. Avenatti nor Mr. Geragos committed, or conspired to commit, extortion.  Perhaps that explains why Mr. Geragos has not been charged.

With respect to Mr. Avenatti, however, the die had been cast.  Having opted to make a big splash with a quick arrest and a precipitous press conference containing unsubstantiated and misleading statements, reversing course in such a high-profile case, though warranted, was not an option for the USAO-SDNY or the FBI.  Instead, the USAO-SDNY doubled down and, on May 22, 2019, secured a four-count Indictment, charging only Mr. Avenatti with conspiring with "CC-1" (obviously a reference to Mr. Geragos) to violate 18 U.S.C. §875(d) (Count One), conspiring with CC-1 to violate the Hobbs Act, 18 U.S.C. §1951 (Count Two), and attempted violations of those statutes (Counts Three and Four).

Significantly, Mr. Geragos, both personally and through his lawyer, has told the USAO-SDNY in multiple "innocence proffer" sessions after Mr. Avenatti's arrest that he lacked

criminal intent and that there was no conspiracy between him and Mr. Avenatti to extort Nike.[4]
If the USAO-SDNY prosecutors believe that Mr. Geragos is telling the truth – *i.e.,* that **he** was
not a co-conspirator – then there is no legal or factual basis for the conspiracy charges against
Mr. Avenatti and the USAO-SDNY should dismiss those charges.[5]   If the USAO-SDNY
prosecutors believe that Mr. Geragos has lied to them, but nonetheless the prosecutors have
opted to prosecute only Mr. Avenatti for conspiring with Mr. Geragos, the prosecution reeks
of selectiveness and vindictiveness.

      Undersigned counsel is unaware of any comparable white-collar case in which an
investigation of a lawyer for conduct undertaken in connection with the representation of a
client was completed with such breakneck speed.   The USAO-SDNY is required to follow
DOJ policy, which requires "reasonable" notice to the DOJ Criminal Division for certain
prosecutions of attorneys.   *See, e.g.,* US Attorney's Manual, §9.2032.   For due process
purposes, the relevant question is "why the disparate treatment of Mr. Avenatti?"   In the mine-
run case where a defendant alleges selective or vindictive prosecution, the answer to the "why"
question is often elusive.   Defendants are typically hard-pressed to produce any evidence to
obtain discovery to prove their claim.   Here, by contrast, there is ample evidence to warrant

---

[4]   The USAO-SDNY produced the notes and interview reports from those innocence proffer
sessions on July 26, 2019, in response to a *Brady* demand by Mr. Avenatti's counsel specifically
requesting that evidence.   The materials reveal that USA Berman personally attended at least one
of the proffer sessions.

[5]   A conspiracy requires a meeting of the minds of at least two people.   *United States v. Rosenblatt*,
554 F.2d 36, 38 (2d Cir. 1977).   "(U)nless at least two people commit (the act of agreeing), no one
does.").   *Id.* (citation omitted).   Although the Indictment alleges other "known and unknown"
conspirators, the USAO-SDNY has declined undersigned counsel's request for disclosure of the
identity of any alleged co-conspirators other than Mr. Geragos.   Plainly, there are none.

further inquiry, in the form of discovery and an evidentiary hearing, into the USAO-SDNY's

reasons for its highly irregular treatment of Mr. Avenatti. He is entitled to due process.

## II.   FACTUAL BACKGROUND[6]

### A.   Coach Gary Franklin and Nike's Misconduct

In or about 2006, Coach Gary Franklin founded California Supreme, a basketball

"travel team" comprised of elite high school age players looking to develop their skills and

showcase their talents for future opportunities in the game.  Shortly thereafter, Nike awarded

an Elite Youth Basketball ("EYB") sponsorship to the California Supreme.  By 2010, Nike

had created the Elite Youth Basketball League ("EYBL"), an organized league of travel teams

for the top high school players, featuring more than 40 teams from around the country,

including the California Supreme.

In 2010, Nike entered into a 3-year "Travel Team Contract" with the California

Supreme, whereby Nike paid the team $70,000 per year and supplied it with uniforms, shoes,

basketballs, and other accessories.  (Exhibit B).  That contract was subsequently renewed for

additional periods.  By 2017, the travel team contract was paying California Supreme $72,000

per year.  (Exhibit C).  During Coach Franklin's tenure, the California Supreme attracted many

talented players, including seven footers such as Deandre Ayton, a future first overall pick in

the 2018 NBA draft, Bol Bol, currently with the NBA's Denver Nuggets, and Brandon McCoy,

a player currently in the NBA G League.

---

[6] This factual recitation is based on evidence contained within the Rule 16 discovery provided by
the government, including e-mails, text messages, and memoranda produced by Coach Franklin
and others to the government after the arrest of Mr. Avenatti, and reasonable inferences from the
evidence, as well as from publicly available information that is not subject to any real dispute.

Carlton Debose was the Director of Nike EYB, Jamal James was the Manager of Nike EYB, and John Stovall was Nike's Recruiting Coordinator.   In 2016-17, Nike executives Debose and James pressured Coach Franklin to engage in a pattern of misconduct or risk losing his Nike EYB-sponsored team.   Among other things, the Nike executives directed Coach Franklin to make multiple payments for the benefit of amateur players, in violation of NCAA rules and federal criminal law, including:

**2016**
$30,000 payment to DeAndre Ayton's handler, Mel McDonald
$10,000 check to Brandon McCoy's handler, Shaun Manning
$5,000 in cash to Brandon McCoy's handler, Shaun Manning
$10,000 in cash to DeAndre Ayton's mother
Travel expenses for DeAndre Ayton's family

**2017**
$29,528 wire transfer to Bol Bol's handler, Mel McDonald
$12,500 wire transfer to Bol Bol's handler, Mel McDonald

(Exhibit D).   Nike executives directed Coach Franklin to submit false invoices to Nike to disguise the payments as travel expenses and sponsorships for 501(c)(3) organizations.   (*E.g.,* Exhibit D, at USAO373_00024804; USAO373_0024832).   They successfully pressured him to allow two other individuals (Bol Bol's handler Mel McDonald and a California lawyer named Bryan Freedman) to take over the California Supreme "17U" team in order to deter McDonald from steering Bol Bol to an Adidas-sponsored team.   Freedman's goal was to ensure that his own son would be able to play on a top 17U Elite EYB team alongside Bol Bol.[7] Coach Franklin was forced out by Nike executives when he no longer felt comfortable going

---

[7] According to Coach Franklin, between approximately 2014 and 2016, attorney Freedman made multiple offers of payment (totaling more than $100,000) to Coach Franklin for Freedman's son to start on California Supreme's 16U and 17U elite teams.  Coach Franklin rejected those offers, so Freedman enlisted the assistance of the Nike executives to pressure Coach Franklin and help wrest control of the 17U team from him.

along with their scheme.  (*E.g.,* Exhibit E, at USAO373_00046134) ("We should give Gary an ultimatum.  Do what we are asking or lose your EYBL spot…").  After suffering considerable damage to his brand and reputation as the leader of California Supreme, Coach Franklin had enough.

In early 2018, Coach Franklin solicited advice from a consultant/advisor named Jeffrey Auerbach, an entertainment industry executive with considerable prior experience in professional sports management, whose son had previously played for Coach Franklin and who had warned Coach Franklin about Nike.  Auerbach was the then Managing Director of Bedford Consulting, which provides business consulting and advisory services to companies in the entertainment, sports, and technology fields.  Over the course of the next year – long before they first approached Mr. Avenatti to get involved in late February 2019 – Auerbach and Coach Franklin strategized how to hold Nike and its executives accountable for the corruption and hostile takeover of Coach Franklin's program.

By that time (early 2018), the USAO-SDNY had brought a criminal case against the Director of Global Sports Marketing for Adidas and another Adidas executive who formerly ran Nike EYBL, alleging conspiracy to commit wire fraud in connection with a scheme to bribe high school basketball players to attend and play for universities that had contracts with Adidas.  *See United States v. Gatto, Code et al.*, No. 17-cr-0686 (LAK) (SDNY).  Moreover, according to published media reports at the time, the USAO-SDNY had served a grand jury subpoena on Nike EYBL in September 2017 in connection with that case.

https://www.espn.com/mens-college-basketball/story/_/id/20847512/nike-elite-youth-basketball-league-served-subpoena-sources.[8]

Against this backdrop, Auerbach, on behalf of and in conjunction with Coach Franklin, began to compile substantial evidence related to Nike's misconduct.  They researched the Adidas scandal and the pending criminal charges to discover parallels with Nike's conduct.  They communicated by text and e-mail on a regular basis, almost daily during some months, and had lengthy phone conversations.  They contemplated retaining counsel, approaching the FBI to report Nike's conduct, and/or suing Nike.  They studied the civil racketeering lawsuit that had been filed by a basketball player named Brian Bowen against Adidas and the individuals who had been criminally charged and convicted in the Adidas scandal.  *See Bowen v. Adidas America, Inc., et al*, Case No. 3:18-cv-03118-JFA (D.S.C. Nov. 19, 2018).

The hundreds of pages of text and email communications between Coach Franklin and Auerbach demonstrate that their quest to hold Nike accountable was all-consuming.  Those communications, which the USAO-SDNY prosecutors decided to obtain only after they arrested Mr. Avenatti, conspicuously reveal that Coach Franklin had two objectives.  His first and overriding goal was to seek "***justice***" against Nike and its executives by purging the rampant corruption.  (*See* Exhibits F, G, H, I, J).  Coach Franklin and Auerbach were convinced that the misconduct was not confined to the California Supreme (one of more than 40 teams in

---

[8] Undersigned counsel requests that the Court take judicial notice under Fed.R.Evid. 201 that Nike EYBL was served with a federal grand jury subpoena.  Undersigned counsel do not know whether, in response to the grand jury subpoena, Nike produced any documents related to the improper payments for the benefit of high school players, or whether the subpoena requested such information.  However, in response to a *Brady/Giglio* demand, the government has now produced to undersigned counsel internal communications within Nike that prove a wide array of such misconduct by Nike.  At this point, it is unclear to undersigned counsel ***when*** Nike produced those documents to the government.

the Nike EYBL), that other EYBL coaches were also funneling money to players at Nike's request, and that other Nike executives in addition to DeBose and James participated in, were aware of, and/or turned a blind eye to the misconduct.  For Coach Franklin, true *justice* meant, for starters, ridding the company of DeBose and James and then further investigating Nike to find out how far and wide in EYB the misconduct stretched.  Coach Franklin, whom many considered to be one of the good guys in amateur basketball, wanted a legitimate and thorough investigation of Nike – *i.e.,* not a whitewash. Coach Franklin's second goal was to seek money damages for the harm occasioned upon him, his reputation, and the California Supreme brand.

That Coach Franklin was even more interested in *justice* and cleaning up Nike than he was in money is abundantly clear from the dozens of communications between Coach Franklin and Auerbach about "justice" and what that meant to them, with only a handful of the many examples excerpted below.  Their unquenched thirst for ridding Nike of corruption is evident as early as March 2018 – a full year *before* Mr. Avenatti was even hired -- when they considered reporting the misconduct to John Slusher, Nike's Executive Vice President of Global Sports Marketing and one of the top executives at the entire company:

Jeffrey Auerbach - Hudson 2020

Hey Gary, hope you had a good weekend. Just wanted to let you know, I thought about it over the weekend, and I'm definitely up for going to Nike/Slusher for some justice, if you still are? I'd like to nail these corrupt EYBL execs, send them packing! Let me know.

Status: Read
Read: 3/26/2018 6:58:01 PM(UTC-7)

3/26/2018 6:01:04 PM(UTC-7)



**Gary  Franklin**

Jeff ur right I want some justice this isn't right I've spent 14 yrs grinding, building needing loyal to the Nike brand b4 any of those guys got in position and for them to make up lies it's unjust and the corruption they pulled to get me out has hurt my business brand bcuz of personal issue which had not to with me.

Status: Sent
Delivered: 3/27/2018 8:03:36 AM(UTC-7)

3/27/2018 8:03:33 AM(UTC-7)

\*     \*     \*

**Jeffrey Auerbach - Hudson 2020**

Good to hear. So, to confirm, you're ready for me to contact John Slusher and Nike, on your behalf, to inform Nike that you and the CA Supreme program, an 11+ year Nike EYBL Program, with an impeccable track record and success, have been irreparably harmed by rogue Nike EYBL executives who have bullied, abused, cheated and lied, while participating in collusion, fraud and corruption; introduced "handlers" with a criminal records procuring players illegally, to your program, an unscrupulous parent who self-funded the recruitment of a top player, and strong armed you into participating in these executives unsavory schemes to their professional and personal benefit, and CA Supreme's total detriment. In spite of all the harm and damage these few rogue Nike EYBL executives have caused you and your program, and because of the 11+ years of success with Nike, you remain loyal to the company. That said, you want "justice above all else," and so you are turning to the company first, in an effort to expose the illicit behavior bestowed on you and CA Supreme by certain rogue Nike EYBL executives, with the hope  Nike Corporate will do the right thing and swiftly take action. If not, your plan is to go to the FBI in the next 5-10 days to expose everything that has transpired and seek the justice you deserve and to stop these rogue Nike EYBL executives from further criminal behavior and harming or bullying others. Please confirm that you want me to proceed as outlined above.

Status: Read
Read: 3/27/2018 12:29:36 PM(UTC-7)

3/27/2018 9:13:57 AM(UTC-7)

\*     \*     \*

**Gary  Franklin**

Ok Jeff let's talk more next week and strategize on the timing I will explain I and in the middle of getting all of my product for my teams shipped out to me and I don't want any hiccups if they get wind of they r being exposed of all these very wrongful acts

Status: Sent
Delivered: 3/27/2018 1:57:35 PM(UTC-7)

3/27/2018 1:57:35 PM(UTC-7)

(Exhibit F) (emphasis added).  The communications between Coach Franklin and Auerbach

continued over the course of the next year, while they hoped that Nike would police itself and

self-correct in the wake of the ongoing Adidas scandal.  On October 10, 2018, Auerbach texted

Coach Franklin about what "justice" might look like:



(Exhibit G) (emphasis added).

On January 8, 2019, with Auerbach's assistance, Coach Franklin summarized his

objectives in a letter to a lawyer he considered retaining (before Mr. Avenatti):

Begin forwarded message:

**From:** Gary Frank in <ca supremebba_@yahoo.com>
**Subject: Nike EYB Business**
**Date:** January 8, 2019 at 6:31:32 PM PST
**To:** Trent Cope and <trent@trentcope and aw.com>
**Cc:** Jeffrey Auerbach <jeffreyauerbach@bedfordconsu ting a.com>

Hi Trent,

In response to your question about Nike, what I'm looking for is justice and restitution.

With Jeff's help, I want to inform Nike senior management of the excessive corporate corruption, abuse and crimes perpetrated by Nike EYB executives in 2016 and 2017 —and demand Nike immediately terminate the executives involved, and (in coordination with me) report THESE wrongdoings and remedies to the FBI and other federal authorities.

Further, I want Nike to commit to the following:

1. Clean up and reorganize Nike EYB and grassroots basketball by installing new management and procedures to best prevent this type of abuse and criminal activity from happening in the future.

2. Full financial and other restitution to me and California Supreme.

3. Nike to fully indemnify me and California Supreme from any and all wrongdoing and pay for all my legal and other related expenses in this matter.

I will make it clear to Nike, that if they don't promptly agree and/or we can't come to terms re the above, I will seek justice by immediately going to the FBI to report the following federal crimes (with evidence) committed by Nike EYB and its executives, including, but not limited to:

- Racketeering
- Conspiracy to commit bribery
- Bribery
- Money-laundering
- Fraud
- Extortion
- Conspiracy to commit wire fraud
- Conspiracy to commit mail fraud
- Wire fraud
- Mail fraud
- Coercion

Trent, Jeff's ready to call his friend/associate, the number #2 guy at Nike, but first we would really appreciate your meeting with us once more for some clarity on the crimes involved and the legal process moving forward. We'll make it work to accommodate your schedule day or night, and promise to keep it short.

Thanks

G

PS Also Jeff office is in the building next door to yours if you prefer?

(Exhibit H).  Plainly, Coach Franklin wanted an internal investigation conducted of Nike; there

is no other way to "clean up" and "reorganize" Nike and install "new management and

procedures" without a thorough investigation.

On February 1, 2019 – a month before they first met Mr. Avenatti -- Auerbach texted

Coach Franklin:

████████ Jeffrey Auerbach - Hudson 2020

Good morning. I have to tell you, when I realized yesterday Carlton had no intention of speaking with me (probably from the start), and we weren't going to meet these crooks & liars to get you a new deal, I felt very down… In just 4-5 days of emails (not a conversation or meeting), I was amazed how dirty I felt dealing with them. Not sure how you survived their constant juvenile behavior, lies and emotional abuse and abuse of power for so damn long?

Today, I feel re-energized, repurposed and extremely fortunate the man/woman upstairs was watching out for us, and steered us away from a deal with the devil—and put us on a more righteous path.

I see a great opportunity, it's name is Truth and Justice.

It's time to go to John Slusher and Nike to report these criminals, liars and the widespread, ongoing, corruption and abuse taking place at Nike EYB.

We will tell John your whole story, show him proof, relay your demand for justice and willingness to fall on the sword to get it, and ask for his/Nike's help in return for your cooperation and their ability to control the process.

Non-negotiable: Carlton DeBose & Jamal James terminated immediately

Monday or Tuesday, we proceed and I make the call.

In the off chance that belief in Slusher being a standup guy who can and will help us is wrong, or John has some valid legal or corporate reason he can't help us, then we will take your story to the highest U.S. authority on Justice and Truth, the FBI and DOJ…

Status: Read
Read: 2/1/2019 11:01:08 AM(UTC-8)

2/1/2019 10:56:38 AM(UTC-8)

(Exhibit I) (emphasis added).

On February 6, 2019 – again, before Mr. Avenatti had even heard of Coach Franklin - - Auerbach reported Nike's misconduct to Nike's EVP John Slusher, a top executive at the company.  As documented in Auerbach's contemporaneous "Memo to the File," Auerbach told EVP Slusher that:

- Coach Franklin "endured workplace bullying and abuse for over 2 years" by Nike executives DeBose and James;

- "There was ongoing corruption and illicit schemes being carried out by DeBose and James and how they brought this corruption into California Supreme, directing Gary to submit fake invoices, make cash and bank-wire payments to handlers and family members of top Nike elite players … similar to those in the recent DOJ-Adidas case;

- Coach Franklin had "suffered a great deal and his program severely harmed by the corruption, the abuse and the aftermath,"

- Coach Franklin "now wants *Justice*. In addition, he's always been loyal to Nike *and wants to help the company clean-up EYB, get rid of the corruption and corrupt execs*."

- "Justice" for Coach Franklin meant "firing DeBose and James … *for starters.*"

(Exhibit J, at USAO373_00024795) (emphasis added). In response to this phone call, EVP Slusher claimed that, given "the seriousness of the matters you raised and how serious we take those situations," he had referred Auerbach to Nike's outside counsel, Andrew Michaelson at Boies Schiller and Flexner ("BSF") in New York. (Exhibit J, at USAO373_00024792).

In mid-February 2019, Auerbach and Coach Franklin accelerated their efforts to retain counsel to represent Coach Franklin against Nike, as they were skeptical that Nike would be willing or capable of policing itself. Recognizing the expense of retaining an attorney on an hourly basis, Auerbach told Coach Franklin that:



+█████████ Jeffrey Auerbach - Hudson 2020

Will all do respect, we're taking the approach, you can't afford ANY of these attorneys… This is a pro-bono case, or percentage of settlement (which won't move any of them). Pierre, Avenetti, and even a sole practitioner like Trent, it costs too much money to hire them… (to do it right) my gut is that the injustice to you and to the high school players, their families, schools, by Nike is the part that will attract an Avenatti (and several other factors I'll discuss with you later). It's worth reaching our and trying to meet with him… Can't hurt. (Please dear God, have him dislike Freedman! If so, that alone, will get him onboard…)

**Status:** Read
**Read:** 2/14/2019 2:30:26 PM(UTC-8)

2/14/2019 2:19:48 PM(UTC-8)

\*   \*   \*

> ███████ Jeffrey Auerbach - Hudson 2020
>
> We will appeal to their sense of justice and duty. Also the opportunity to really light the next fuse (Racketeering) in the Sneaker Company Scandal, and answer a BIG question which NIKE will not want asked, WHY HASN'T THE DOJ INDICT EXECS AT NIKE WHO COMMITTED THE SAME  CRIMES?!! WHY JUST ADIDAS?! THere's a lot at play here for a guy like Avenatti. I feel very bad John and Nike wasn't proactive and reached out to you. It forces me to devise a strategy that goes after Nike, which I NEVER intended or wanted to do. But now they are forcing the issue and acting very badly. I can only hoe once we contact their Lawyer they pony up and do the right thing, get rid of the crooks, etc. If not, they need to be exposed. And if for some strange reason the FBI and DOJ aren't pursing them like Adidas—then the question needs to be asked in a big way—WHY?
>
> **Status:** Read
> **Read:** 2/14/2019 2:30:26 PM(UTC-8)
>
> 2/14/2019 2:27:32 PM(UTC-8)

(Exhibit K) (emphasis added).

Shortly thereafter, Auerbach reached out to Mr. Avenatti for the first time in an effort to assist Coach Franklin in pursuing his objectives.[9]  On March 1, 2019, Auerbach was finally able to speak with Mr. Avenatti for the first time and, based on that conversation, later e-mailed Mr. Avenatti that he (Avenatti) was "a source of hope for me – in a time of much despair" and "look[ed] forward to further discussing *Gary Franklin, Found/Program Director of California Supreme Youth Basketball v. Nike Elite Youth Basketball & Nike, Inc.*," in reference to the contemplated lawsuit against Nike.  (Exhibit L).

On March 5, 2019, Mr. Avenatti met with Auerbach and Coach Franklin.  At that meeting, and in subsequent communications, they made their objectives known to Mr. Avenatti.  Prior to Mr. Avenatti's first meeting with Nike lawyers, Auerbach provided Avenatti

---

[9] As of early 2019, Avenatti was the current national *Public Justice Trial Lawyer of the Year* as a result of his work on behalf of first responders, doctors and nurses in a class action tried in federal court, which resulted in a jury verdict in excess of $454 million in 2017.  As of March 2019, he had been practicing as a nationally known trial lawyer for nearly twenty years, with multiple seven and eight figure verdicts and settlements.

with: a) a summary of Nike's misconduct towards Coach Franklin and corroborating financial records, (Exhibit D); b) a copy of the "Memo to the File" summarizing Auerbach's telephone conversation with Nike EVP Slusher, which outlined Coach Franklin's demands of Nike, (Exhibit J); c) a file-stamped copy of the civil RICO complaint filed against Adidas in the District of South Carolina, which included claims for money damages and injunctive relief, (Exhibit M); and d) a 28-page PowerPoint presentation, headlined *Gary Franklin, California Supreme Elite Youth Basketball v. Nike USA, Inc., Nike, Inc., Nike EYB*, (Exhibit N), laying out the facts of a potential civil lawsuit against Nike, and providing Mr. Avenatti with the factual background regarding the conduct of DeBose, James, Freedman, and McDonald (Exhibit N, at USAO373_28491-28493).   One of the slides of the PowerPoint presentation posed the following three questions:



(Exhibit N, at p. 5).  Moreover, Coach Franklin and Auerbach made it clear to Mr. Avenatti that they had information that the corruption within Nike went far beyond the payments and

false invoices that DeBose and James had directed Coach Franklin to make.  Given the passage of nearly eighteen months since Nike EYBL received a federal grand jury subpoena, coupled with the fact that DeBose and James were still employed by Nike in the wake of the Adidas scandal, Coach Franklin and Auerbach believed that Nike was not capable or willing to investigate itself or self-correct.

Mr. Avenatti contacted his colleague, attorney Mark Geragos, a criminal defense lawyer with decades of experience because, among other reasons, Geragos had a relationship with Nike's General Counsel as a result of Geragos's recent representation of Colin Kaepernick, a former NFL quarterback and Nike-sponsored athlete who had just settled his lawsuit against the NFL.  Mr. Avenatti and Mr. Geragos agreed to work together on behalf of Coach Franklin and approach Nike's General Counsel to discuss a pre-lawsuit settlement of Coach Franklin's claims.  They also discussed the need for an internal investigation.

On March 12, 2019, Mr. Geragos initiated communication with Casey Kaplan, Nike's Assistant General Counsel for Litigation and Internal Investigations for the purpose of setting up a "confidential mediation discussion."  Following Mr. Geragos's communication with Kaplan,  Mr. Avenatti and Mr. Geragos discussed the scope of a potential internal investigation of Nike and began researching what other law firms typically charge for investigations of large multi-national corporations.  Mr. Avenatti texted Mr. Geragos a link to a New York Times story entitled "The Mounting Costs of Internal Investigations."  (Exhibit T) (noting that such investigations can exceed $100 million).

Mr. Geragos thereafter communicated with Nike's attorney Scott Wilson of BSF several times by telephone and text message before the parties agreed to the first in-person settlement meeting, on March 19, 2019, at Mr. Geragos's law office in Manhattan.  The

attorneys present at that first meeting, which was not recorded, included both Mr. Avenatti and Mr. Geragos, attorneys Scott Wilson and Ben Homes from BSF, and Rob Leinwand, an attorney at Nike with the title Vice President of Global Litigation and Employment Counsel. Whereas Mr. Geragos had communicated with the lawyers for Nike multiple times by text and telephone before this meeting, Mr. Avenatti had not. BSF attorney Homes took handwritten notes at the meeting; he thereafter prepared typewritten notes of the same meeting. (Exhibit O). The parties all agreed at the meeting that it was a settlement discussion designed to allow for a candid conversation about resolving Coach Franklin's claims, protected by Fed.R.Evid. 408, (Exh. O, at USAO373_00026191), a point that Mr. Geragos confirmed in his proffer sessions with the government.

At that March 19, 2019 meeting, Mr. Avenatti informed Nike's counsel that he represented Coach Franklin, a whistleblower who was directed by DeBose and James to make multiple payments for the benefit of high school players, including the first overall pick in the 2018 NBA Draft, and was then being squeezed out of his contract by Nike. (Exh. O, at USAO373_00026191-26192). Mr. Avenatti told Nike's counsel that Coach Franklin had claims for "breach of contract, tortious interference, and potentially other claims." (Exh. O, at USAO373_00026192). Mr. Avenatti discussed the fact that he would claim in the lawsuit that Mr. Franklin had been targeted by Nike and that Franklin would say "that he was threatened that he would lose his program if he refused to make these payments." (Exh. O, at USAO373_00026197). Mr. Avenatti allowed Nike's counsel to review the documentary evidence that he had brought to the meeting in support of Coach Franklin's legal claims (Exh. D), including but not limited to the bank statements, false invoices, and text messages. (Exh. O, at USAO373_00026194-26195). In addition, Mr. Avenatti raised the possibility that Nike

had deceived the government when responding to the subpoena directed at Nike in 2017 by failing to produce those very documents that proved Nike's corruption. (Exh. O, at USAO373_00026192).

Consistent with Coach Franklin's stated dual objectives, Mr. Avenatti proposed a settlement with two components: a) that Nike pay $1.5 million to Coach Franklin for damages caused to him, understanding that the money could not preclude Coach Franklin from giving testimony to the government; and b) that Nike commence a thorough internal investigation, to be led by Mr. Avenatti and Mr. Geragos. (Exh. O, at USAO373_26192, 26197). Mr. Avenatti told Nike's counsel that "[w]hatever the investigation costs, it costs" (inasmuch as the EYBL consisted of more than 40 teams over different age groups), but he made it clear he was "not asking [Nike] to pay for nothing. We will share the findings of the investigation with whoever you want us to share it with." (Exh. O, at USAO373_26197). Mr. Avenatti stated that he would go public with his evidence if Nike did not meet those conditions. (Exh. O, at USAO373_26196). Contrary to Asst. Director Sweeney's press statement, ***at no point did Mr. Avenatti promise to "cover up" Nike's misconduct in exchange for payments***. Rather, Mr. Avenatti made it clear that Coach Franklin would cooperate with the investigation, and that the payments could ***not*** buy Coach Franklin's silence in the event of a subpoena or other process. (Exh. O, at USAO373_00026192) ("***We will include express language in the settlement agreement that will not prevent my client from giving any future testimony to the government. I'm sure you will agree that this will be in both of our client's interests***").

At that March 19, 2019, meeting, none of the Nike lawyers denied that Nike EYB was fraught with misconduct and, indeed, BSF attorney Wilson professed to have an "interest in

conducting an internal investigation surrounding these allegations."[10]  (Exh. O, at USAO373_00026193).  To be sure, Nike executives knew that Coach Franklin's claims were true inasmuch as internal text messages and e-mails possessed by Nike contain admissions by Nike executives that they were funneling money to the families of high school players, and the invoices and bank statements shown to the Nike lawyers by Mr. Avenatti corroborated those payments.  (Exh. D; Exh. E).

Moreover, if the Nike lawyers did not already know it by March 19, 2019, an internal investigation would have revealed that the misconduct directed by Nike executives toward Coach Franklin merely scratched the surface of the widespread corruption of amateur basketball at Nike.  Specifically, Nike possessed text messages, e-mails, and other documents from 2016-17 – before it received the grand jury subpoena from the USAO-SDNY -- proving that Nike executives had arranged for and concealed payments, often in cash, to amateur basketball players and their families and "handlers."[11]  By way of example only (produced to undersigned in response to a demand pursuant to *Brady/Giglio*):

---

[10] Mr. Geragos, during a proffer session, remarked that by the end of the first meeting, he felt Nike might have a real problem. There was not much push back from Nike during the second half of the meeting, and Mr. Geragos thought they would be able to negotiate a settlement.  Mr. Geragos – an experienced criminal defense attorney – did not view the meeting as an extortionate shake down but as part of a negotiating process designed to resolve a client's claims.

[11] Payments to a college-bound high school player and his/her family are expressly prohibited by NCAA Rules.  *See generally* NCAA Division 1 Manual, Bylaw 12; *see also* NCAA Bylaw 12.1.2 ("An individual loses amateur status and thus shall not be eligible for intercollegiate competition in a particular sport if the individual … (b) accepts a promise of pay…").  Paying amateur players, knowing that such payments would render the players ineligible for the college scholarships, can be punished under federal criminal law.  *See United States v. Gatto*, 295 F.Supp.3d 336, 345-49 (S.D.N.Y. 2018).  Moreover, concealing (and deducting) illegal payments, especially through charitable organizations, may violate criminal tax statutes.

- Jamal James texted DeBose and Nike Recruiting Coordinator John Stovall in February 2017, asking whether they would be "willing to do … whatever may be needed for the Zion/Romeo situations as well as the money we're now going to do for the [minor] kid in Michigan," to which Stovall responded

  Langford – 20
  Zion – 35 plus
  [minor] – 15[12]

  Debose responded that he was willing to pay Langford, Zion and [minor] the $70,000 and that they should "stay aggressive" while he got "creative" with the budget.  (Exh. E, at USAO373_00046130).

- Stovall informed James and DeBose that they still had "not presented our new offer" to Zion Williamson but agreed that it was not a good idea "to put it in print..."  (Exh. E, at USAO373_00046135).

- An EYBL coach expressed concern to Nike executives about the fact that players and family members were getting paid and that he couldn't "see how this ends well for NIKE or the EYBL.  Some of us will be deemed guilty by association others will be found guilty of failure to supervise…"  (Exhibit P, at USAO373_00046148).

- DeBose told Nico Harrison, Nike's Vice President of North America Basketball Operations, that he (DeBose) was "willing to bet that 38 of 40 teams in the EYBL had to pay a moderate to considerable ransom to families just to play in the EYBL.  Of these approximate 38 teams these arrangements are being viewed as a contract by the families and players…"  (Exh. P, at USAO373_00046184).

- Rachel Baker, a Nike executive who led "Event Strategy" for the EYBL, expressed concern to a colleague about carrying large amounts of cash through airport security and indicated that she would lie and "just say I just sold my car" if she got stopped; (Exh. E, at USAO373_00046146-47).

- DeBose acknowledged in an exchange of text messages with an assistant coach at the University of Kentucky that Nike was funneling payments to high school players through ***at least ten*** different EYBL coaches.  (Exh. E, at USAO373_00046143).

---

[12] Romeo refers to Romeo Langford, a first-round selection in the 2019 NBA Draft, currently with the Boston Celtics; Zion refers to Zion Williamson, currently with the New Orleans Pelicans and the first overall pick in the 2019 NBA Draft.  The third individual is a minor.

Indeed, Nike's internal documents contain numerous other examples of the pervasive misconduct.  (*See, e.g.,* Exh. P, at USAO373_46151-52) (breakdown of cash payments).

Immediately after the March 19, 2019, meeting, in the face of evidence of widespread malfeasance by its own client, BSF attorneys contacted federal law enforcement to report an alleged "extortion plot" by Mr. Avenatti and Mr. Geragos.  Rather than question the motives of the BSF lawyers looking to protect Nike and curry favor with the government, the USAO-SDNY immediately set its sights on Mr. Avenatti.  Thereafter, over the course of the next two days, BSF attorney Scott Wilson, at the behest of the FBI, audio-recorded several telephone conversations with Mr. Geragos and one with Mr. Avenatti, on March 20, 2019, during which Mr. Avenatti, using some of the colorful language quoted in the speaking indictment, reiterated the settlement demand that Nike pay $1.5M in damages to Coach Franklin and hire Mr. Avenatti and Mr. Geragos to handle the internal investigation or "we're done."   When repeatedly pressed by BSF attorney Wilson "to put a number on the cost of the internal investigation," Mr. Avenatti asked BSF attorney Wilson: "what would you quote?  We'll go with your quote.  You tell me what Boies Schiller would quote and you tell me what that number is and I'm highly confident that that number would probably be acceptable or something very close to it."

A second, in-person, settlement meeting was held at Mr. Geragos's office on March 21, 2019.  BSF attorney Wilson video-recorded[13] that meeting at the behest of the government.[14]

---

[13] Upon the Court's request, undersigned counsel will provide the Court with a thumb drive of the video recording of the March 21, 2019, meeting.

[14] In its Complaint and later in the speaking Indictment, the government selectively quoted excerpts from the various meetings and telephone conversation.  The government did not include in the

The participants at the March 21, 2019, video-recorded meeting were Mr. Avenatti, Mr. Geragos, and BSF attorneys Wilson and Homes.  They agreed again that those conversations were discussions relating to the settlement of Coach Franklin's claims, protected under Fed.R.Evid. 408.  During that settlement discussion, BSF attorney Wilson stated that he did not think the $1.5M to settle the civil claims would be the "sticking point."  With respect to the internal investigation, Mr. Avenatti explained that the "ask" was a $12 million retainer upon signing, with a minimum fee of $15 million and a cap at $25 million, and the ability during the investigation to report directly to the Nike General Counsel's office.  Mr. Avenatti discussed the hourly rate for attorneys and paralegals, and Mr. Geragos indicated that there would be private investigators "on the ground to do interviews and things of that nature."

Whereas BSF attorney Wilson suggested (presumably at the behest of law enforcement) that the damages amount ($1.5 million) might not be a "stumbling block," he did not commit to the *justice* component of the settlement demand.  Instead, BSF attorney Wilson invited Mr. Avenatti and Mr. Geragos to propose a settlement amount to resolve the matter without Nike retaining them to conduct the internal investigation.  Mr. Avenatti asked Nike counsel: "why would you want to do that?" given that Nike would "have to do an internal investigation anyway."  When BSF attorney Wilson suggested that he would have difficulty persuading Nike to hire plaintiff's counsel to do the investigation, and that Nike might have an appetite for finality vis-à-vis Coach Franklin "[i]f the money went higher," Mr. Avenatti, after

---

Indictment any references to the many text messages and e-mails evincing Coach Franklin's demands for justice and an internal investigation, all of which disprove USA Berman's public statements that the internal investigation was a "guise" by Mr. Avenatti.  Nor did the government quote any aspects of the conversations that demonstrate the nexus between the settlement demand and Coach Franklin's desire for justice, thereby completely undercutting their case.

consulting with Mr. Geragos, proposed a settlement amount of $22.5 million.   Such a settlement would, of course, have to first be approved by Coach Franklin, inasmuch as the draft settlement agreement that Mr. Avenatti handed to BSF attorney Wilson at the conclusion of the meeting specifically provided for the signature of Coach Gary Franklin, both individually and on behalf of California Supreme Youth Basketball, Inc.  (Exhibit Q, p.4).

Importantly, the draft settlement agreement provided that the "terms and conditions of this Agreement and the underlying negotiations" would be confidential, "provided, however, that nothing herein shall restrict the disclosure of this Agreement and its terms … in connection with responding to a lawfully issued subpoena or request by a governmental body."  (Exh. Q, at p.1) (emphasis added).   Thus, contrary to Asst. Director Sweeney's misleading press statement, at no point did Mr. Avenatti demand money in exchange for "covering up" Nike's misconduct.  ***In fact, the draft settlement agreement allowed for just the opposite – the disclosure of the underlying facts of Nike's misconduct to anyone, including the government (only the "terms and conditions" of the Agreement would be confidential).***  Mr. Avenatti also made it clear at the March 21 meeting that "[w]e can leave it to Nike and its other lawyers to figure out what to do with this and handle it appropriately," that "they can hire Boies or whoever else they want to hire to do whatever they want to do, and you guys can figure out what you want," and that Coach Franklin would cooperate with such an investigation but "he's not going to do anything illegal."

The multiple conversations over the course of three days left no doubt that Mr. Geragos and Mr. Avenatti advocated in unison and shared the same strategy.  Mr. Geragos told the BSF lawyers that: 1) Mr. Avenatti intended to hold a press conference in the event Nike did not resolve the matter; 2) the internal investigation would be a real one, promising that "we'll get

to the bottom of it, its not gonna happen again," and 3) "we like to affect change, just like Nike does, and if there's something going on there and its more widespread than we even suspect, it would be a good idea to root it out and fix it, don't you think?"  Mr. Geragos participated in conversations about the anticipated legal fees for the internal investigation and how the investigation would be carried out.

On March 24, 2019, without having ever spoken with Coach Franklin or Auerbach -- and without being aware of Coach Franklin's litigation objectives -- federal prosecutors filed a criminal complaint against Mr. Avenatti and arrested him the following day.  Because they never bothered to seriously investigate the facts before charging Mr. Avenatti, federal law enforcement had prematurely concluded that the "internal investigation" of Nike was an Avenatti-inspired idea, untethered to Coach Franklin's legitimate quest for justice.  USA Berman had no knowledge whatsoever of Coach Franklin's ***dual*** objectives of seeking money damages and equitable relief.  Nor did he even attempt to discover those objectives before bringing the weight of his office down on Mr. Avenatti.  The federal prosecutors lacked any basis to conclude that the settlement demand by Mr. Avenatti and Mr. Geragos was unrelated to Coach Franklin's legitimate claims and objectives.

Significantly, the Indictment describes "CC-1" (obviously Mr. Geragos) as a co-conspirator who also "devised" the scheme, "used threats of economic and reputational harm to extort Nike," communicated time deadlines for Nike to consider their requests, and expected to participate in the internal investigation and share in the proposed legal fees.  Nonetheless, for reasons that to this day have not been explained, nor can be legitimately explained, law enforcement indicted only Mr. Avenatti.  Neither Mr. Geragos nor Mr. Avenatti should be indicted for the conduct in this case.  There is no crime.

### B.     Michael Avenatti's Feud with President Trump and the USAO-SDNY

In or around 2006, President Trump had an affair with an adult film actress named Stephanie Clifford a/k/a Stormy Daniels.  On June 16, 2015, Donald Trump announced his candidacy for the President of the United States; he officially became the Republican Party nominee on July 19, 2016.  *See* DE 48-1:39-40 in *United States v. Cohen*, 18-cr-602-WHP (S.D.N.Y.) (Exhibit R, at p.39).  On or about October 7, 2016 – a month before the general election -- the *Washington Post* published online a video and accompanying audio in which Trump referred to women in vulgar terms in a 2005 conversation with Billy Bush, the host of *Access Hollywood*.  (Exh. R, at p.40).

President Trump knew that, in the wake of the *Access Hollywood* scandal, the Stormy Daniels story would further threaten his chances in the general election.  Over the course of the next three weeks, Trump's personal attorney Michael Cohen was able to orchestrate a settlement, which contained a non-disclosure agreement, pursuant to which Cohen made a $130,000 payment to Daniels for the purpose of securing her ongoing silence with respect to her affair with President Trump.  (Exh. R, at pp.41-52).

On or about January 12, 2018, the *Wall Street Journal* first reported that Cohen had arranged the hush payment to Daniels.  (Exh. R, at p.55).  Although Cohen admitted making the payment, (Exh. R, at p.56), President Trump lied to the American public when he denied knowing about it.  On April 8, 2018, the FBI applied for a warrant to search Cohen's residence and office in Manhattan.  (Exh. R).  The search warrant affidavit, recently unsealed, alleged campaign finance violations in connection with the payment by Cohen to Daniels.  USA Berman was recused from the USAO-SDNY investigation of Cohen for reasons that have not

been publicly explained.  President Trump hired Rudy Giuliani, USA Berman's former law partner, as his personal counsel in connection with the Cohen investigation.

In June 2018, in connection with the Cohen investigation, prosecutors with the USAO-SDNY sought to interview Mr. Avenatti's (then) client Stormy Daniels.  An interview was scheduled for Monday, June 25, 2018.  The night before the meeting, and after Mr. Avenatti and his client had travelled to New York for the meeting, the USAO-SDNY canceled it, accusing Mr. Avenatti in an e-mail of leaking to the press the fact and location of the meeting. Mr. Avenatti responded by e-mail to the prosecutors that they "should know better than to make false accusations without evidence" and described what transpired as "a disgrace and completely unprofessional."  (Exhibit S).  The meeting with Mr. Avenatti and Daniels was never rescheduled.

On August 21, 2018, Cohen pleaded guilty to an Information charging him with, among other crimes, campaign finance violations related to the payment to Daniels.  *See United States v. Cohen*, 18-cr-602-WHP (S.D.N.Y.) (DE 2:14-19 & DE7:23).  Cohen admitted under oath that he committed the campaign finance violations "in coordination with, and at the direction of" President Trump.  *Id.*  Phone records corroborate Cohen's public statements that Trump directed Cohen to pay the $130,000 to Stormy Daniels in an effort to silence her.  (Exh. R, at pp.41-52).  Other records demonstrate that individuals close to the President, including his son Donald, Jr., and Hope Hicks participated in either the payment to Daniels or in the coverup. *Id.*  Curiously, none of the other participants in the criminal conspiracy with Cohen were indicted and the investigation appears to have now been completed.

While the FBI was conducting its criminal investigation into the illegal payment to Daniels, Mr. Avenatti was President Trump's chief antagonist in the civil arena and in the court

of public opinion.  Mr. Avenatti represented Daniels in connection with two lawsuits against Trump.  First, on March 6, 2018, Daniels filed an action against President Trump in California state court seeking to have the NDA declared unenforceable.  That action was ultimately removed to the United States District Court for the Central District of California.  *See Clifford v. Trump, et al.*, No. 18-cv-2217-SJP (C.D. Ca).  President Trump resisted efforts by Mr. Avenatti to take his deposition and then ultimately disavowed his intent to enforce the NDA against Daniels, rendering the case moot in the view of the district court.  Second, Daniels filed an action for defamation against President Trump in response to a tweet by Trump that suggested she was a liar.  *See Clifford v. Trump*, No. 18-cv-6893-SJO (C.D. Ca) (transferred from SDNY).  The defamation action was dismissed because the district court found that Trump's tweet was protected by the First Amendment.  *Id.*  Mr. Avenatti was interviewed on television hundreds of times about President Trump's behavior and became, in many ways, the foil for President Trump.[15]

Through the exercise of Daniels' First Amendment right of access to the courts and his own First Amendment right to speak truth to power, these lawsuits gave Mr. Avenatti a platform to expose, for the public's benefit, allegations of President Trump's misconduct and mendacity.  His efforts attracted virtually nonstop media attention, thereby enabling the public to judge for themselves whether President Trump was a criminal and a liar.  Not surprisingly, President Trump did not take kindly to Mr. Avenatti's advocacy for his client and exercise of his own constitutional rights.  On September 26, 2018, Trump tweeted:

---

[15] Mr. Avenatti requests that the Court take judicial notice of these publicly reported facts.



On October 16, 2018 Trump tweeted:



President Trump is the leader of the Executive Branch.  Under Article II, Section 3 of

the Constitution, it is his duty to "take Care that the Laws be faithfully executed," which means

he has the power to prosecute.  *United States v. Sanchez*, 517 F.3d 651, 670 (2d Cir. 2008).

The United States Attorney is "designated by statute as the President's delegate[] to help him

discharge his constitutional responsibility" to decide whether, whom, and what charge to prosecute. *Id.* President Trump has publicly expressed his disdain for Mr. Avenatti as a "third rate lawyer" and "total low-life."[16] This expression of disdain for Mr. Avenatti is especially troubling in view of President Trump's persistent public efforts to target his political enemies, including those who have criticized him in the media or confronted him in the political arena.[17]

### C.    The Relationship Between USA Berman and President Trump

In January 2018, after the unusual circumstance of being personally interviewed for the position by President Trump, USA Berman was appointed by then Attorney General Jeff Sessions to the role of U.S. Attorney for a statutory period of 120 days. In April 2018, the judges of the Southern District of New York appointed USA Berman pursuant to 28 U.S.C. §546(d) to continue to serve until a presidential nominee is confirmed by the Senate. Prior to his appointment, USA Berman was a partner at the law firm of Greenberg Traurig, where he practiced law with Giuliani, Trump's personal lawyer. According to USA Berman's own financial disclosure, available online, he held a position in the General Counsel's Office of the

---

[16] Steve Bannon, President Trump's former chief strategist, and others, described Mr. Avenatti as a serious threat to Trump's re-election chances in 2020.

[17] Mr. Avenatti requests that the Court take judicial notice of the many documented instances in which President Trump, either personally or through his lawyers, has sought to use his power as the leader of the Executive Branch to target enemies in politics and the media for investigation, prosecution, and/or other retaliatory action, including Hillary Clinton, James Comey, Andrew McCabe, Peter Strzok, Jeff Bezos, and others.
https://www.nytimes.com/2018/11/20/us/politics/president-trump-justice-department.html;
https://www.washingtonpost.com/business/2019/08/01/after-trump-cites-amazon-concerns-pentagon-re-examines-billion-jedi-cloud-contract-process;
https://www.washingtonpost.com/national-security/peter-strzok-whose-anti-trump-texts-got-him-fired-from-the-fbi-sues-for-reinstatement/2019/08/06/eaf83060-b789-11e9-a091-6a96e67d9cce_story.html;    https://www.washingtonpost.com/national-security/andrew-mccabe-sues-fbi-over-firing-alleges-plot-by-trump-to-oust-those-disloyal-to-the-president/2019/08/08/098315e8-b9f8-11e9-b3b4-2bb69e8c4e39_story.html

Donald J. Trump Presidential Transition Team.  According to published media reports, USA Berman contributed $5,400 to the Trump campaign for president.[18] https://www.newsweek.com/trump-sessions-southern-district-new-york-geoffrey-berman-russia-investigation-770828.

As noted above, USA Berman was recused by the DOJ from participation in the Cohen investigation, presumably as a result of his ties to President Trump.  Yet, USA Berman has assumed a prominent role in the prosecution of Mr. Avenatti, the public announcement of the arrest and charges, and interviews and decisions with respect to Mr. Geragos.

## III.   ARGUMENT

### THE INDICTMENT VIOLATES AVENATTI'S RIGHTS UNDER THE FIFTH AMENDMENT'S DUE PROCESS CLAUSE

A prosecutor's discretion to bring charges is "subject to constitutional constraints." *United States v. Batchelder*, 442 U.S. 114, 125 (1979).  "One of these constraints, imposed by the equal protection component of the Due Process Clause of the Fifth Amendment, is that the decision whether to prosecute may not be based on 'an unjustifiable standard such as race, religion, or other arbitrary classification.'"  *United States v. Armstrong¸* 517 U.S. 456, 464 (1996) (citation omitted).  A claim of selective prosecution draws on "ordinary equal protection standards." *Id.* at 465.  A defendant must show that the "federal prosecutorial policy 'had a discriminatory effect and that it was motivated by a discriminatory purpose.'"  *Id.* (quoting *Wayte v. United States*, 470 U.S. 598, 608 (1985)).  Thus, to succeed on a claim of selective prosecution, a defendant must establish that he/she was "treated differently from

---

[18] Mr. Avenatti requests that the Court take judicial notice of the undisputed facts contained in this paragraph.

other similarly situated individuals" and that "such differential treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure [the defendant]." *United States v. Stewart*, 590 F.3d 93, 121 (2d Cir 2009) (citation omitted).

Another such constraint is that a prosecution may not be brought with a vindictive motive; "[t]o punish a person because he has done what the law plainly allows him to do is a due process violation of the most basic sort." *Bordenkircher v. Hayes*, 434 U.S. 357, 363 (1978). "Accordingly, an indictment will be dismissed if there is a finding of 'actual' vindictiveness, or if there is a presumption of vindictiveness that has not been rebutted by objective evidence justifying the prosecutor's action." *United States v. Johnson*, 171 F.3d 139, 140 (2d Cir. 1999). To establish actual vindictiveness, the defendant must show that "(1) the prosecutor harbored genuine animus toward the defendant, or was prevailed upon to bring the charges by another with animus such that the prosecutor could be considered a 'stalking horse,' and (2) [the defendant] would not have been prosecuted except for the animus." *United States v. Koh*, 199 F.3d 632, 640 (2d Cir. 1999) (internal quotation marks omitted). To establish a presumption of prosecutorial vindictiveness, the defendant must show that "the circumstances of a case pose a 'realistic likelihood' of such vindictiveness." *United States v. King*, 126 F.3d 394, 397 (2d Cir. 1997) (quoting *Blackledge v. Perry*, 417 U.S. 21, 27 (1974)). Any such presumption may be "overcome by objective evidence justifying the prosecutor's action." *United States v. Goodwin*, 457 U.S. 368, 376 n.8 (1982). However, "[a] presumption of vindictiveness ***generally*** does not arise in a pretrial setting." *United States v. Sanders¸* 211 F.3d 711, 717 (2d Cir. 2000) (emphasis added).

The standard for obtaining discovery on claims of vindictive prosecution and selective prosecution is the same. *Id.* ("We see no reason to apply a different standard to obtain discovery on a claim of vindictive prosecution."). To obtain discovery, the defendant must provide "some evidence tending to show the existence of the essential elements of the defense." *United States v. Berrios*, 501 F.2d 1207, 1211 (2d Cir. 1974) (quoted in *Armstrong*, 517 U.S. at 468). Admittedly, the standard is a "rigorous" one, to serve as a "significant barrier to the litigation of insubstantial claims," as courts are understandably reluctant to "exercise judicial power over a 'special province' of the Executive." *Armstrong*, 517 U.S. at 464. A "presumption of regularity" supports prosecutorial decisions, and the clear evidence needed to undermine the presumption that prosecutors have "properly discharged their official duties" is most often elusive. *Id.* (citations omitted). The standard for obtaining discovery, however, should not be an ***impossible*** one. In this case, Mr. Avenatti has made a sufficient showing to obtain discovery on both his selective and vindictive prosecution claims.

## A. <u>Selective Prosecution</u>

The evidence described above, corroborated by documents and recordings, is more than sufficient to entitle Mr. Avenatti to discovery on his selective prosecution claim. First, it is beyond serious dispute that Mr. Avenatti was singled out for prosecution from the only other similarly situated individual. "[D]efendants are similarly situated … when their circumstances present no distinguishable legitimate prosecutorial factors that might justify making different prosecutorial decisions with respect to them." *United States v. Hastings*, 126 F.3d 310, 315 (4th Cir. 1997) (internal quotation marks and citations omitted); *see also United States v. Lewis*, 517 F.3d 20, 27 (1st Cir. 2008) ("A similarly situated offender is one outside the protected class who has committed roughly the same crime under roughly the same circumstances but against

whom the law has not been enforced."). "[A] defendant must show that the crimes charged and those allegedly committed by the comparator are the same or similar and arose in the similar circumstances." *United States v. Stone*, No. 19-0018 (ABJ), 2019 WL 2502929, *22 (D.D.C. Aug. 1, 2019).

Mr. Geragos is "CC-1," the *only* other co-conspirator referenced in the Indictment. The Indictment alleges that Mr. Geragos conspired with Mr. Avenatti and participated in every relevant meeting and telephone conversation in this case. In fact, Mr. Geragos had more communications than Mr. Avenatti with Nike and its counsel. At no point did Mr. Geragos, a criminal defense lawyer, express any discomfort with the objectives of the meetings with Nike or the settlement demand that was made on behalf of Coach Franklin. To be sure, Mr. Geragos explained why it made sense for him and Mr. Avenatti to handle an internal investigation of Nike; he assured Nike counsel that "we'll get to the bottom of it, its not gonna happen again." Mr. Geragos participated in the discussion about how the investigation would be staffed and the fees that would be charged. Mr. Geragos also communicated to Nike that it was Mr. Avenatti's intent to hold a press conference if the settlement demand was not met.

Moreover, over the course of at least seven in-person or telephonic conferences with the USAO-SDNY since Mr. Avenatti's indictment (between April and June 2019), Mr. Geragos and/or his counsel have denied to the government that he conspired with Mr. Avenatti. Yet, on July 12, 2019, after these "innocence proffer" sessions, the government continued to assert that Mr. Geragos was a co-conspirator in connection with an *ex parte* application to this Court for a warrant to obtain documents from Mr. Avenatti's Twitter account. To be clear, neither Mr. Avenatti nor Mr. Geragos has committed any crime in this case; the government's

persistence in charging only Mr. Avenatti in the face of similar conduct by a similarly situated individual satisfies the first prong of the selective prosecution inquiry.

As for the second prong, the evidence is more than sufficient to obtain discovery on Mr. Avenatti's claim that he has been targeted based on "impermissible considerations," including the exercise of his First Amendment rights, and a "malicious or bad faith intent to injure" him. *Stewart*, 590 F.3d at 121. Over the course of the past year, Mr. Avenatti was the most visible antagonist and adversary of the leader of the Executive Branch. Mr. Avenatti exercised his First Amendment rights to criticize President Trump and to file lawsuits against him. President Trump publicly mocked Mr. Avenatti as a "third-rate lawyer" and "total low-life." The personal animus of President Trump, and those in his inner circle (*e.g.,* Giuliani) toward Mr. Avenatti has been on public display and was well-known to everyone, including USA Berman. There are substantial ties between USA Berman, who has assumed a prominent role in this prosecution, and President Trump, including that USA Berman: a) was the law partner of the President's personal lawyer; b) contributed the maximum amount to President Trump's 2016 presidential campaign; c) volunteered on the Trump transition team; and d) was recused from the Cohen investigation and prosecution. If USA Berman was recused from the Cohen investigation because of his ties to President Trump, then it would be equally improper for him to be in charge of the prosecution of President Trump's most vocal and visible adversary. To further compound the animus, there was demonstrated friction between the USAO-SDNY and Mr. Avenatti arising out of the Cohen prosecution, inasmuch as the AUSAs in that case accused Mr. Avenatti of leaking to the press that an interview of Stormy Daniels would be taking place.

Beyond that, the USAO-SDNY demonstrated malice and personal animus toward Mr. Avenatti in the press release and press conference held by law enforcement upon his arrest. Despite the language of Local Criminal Rule 23.1(d)(7) and the district court's warnings to the USAO-SDNY about extrajudicial statements in the *Silver* case, USA Berman opined that Mr. Avenatti was using his law license as a "weapon" and "guise" to extort money and acted like a "criminal."  FBI Asst. Dir. Sweeney also commented on the merits of the case, calling it a "straightforward case of extortion" and stating, in disregard of the clear evidence in his possession, that Mr. Avenatti made a list of demands in exchange for "covering up" Nike's misconduct.

All of these circumstances must be considered in conjunction with the unusual way that the government has handled this prosecution. Rather than probe Nike for the rampant and serious corruption barely below the surface, the USAO-SDNY has instead opted to prosecute the lawyer seeking to hold Nike accountable for the legitimate grievances of his client.  The nature of the charges appears to be either unprecedented or, at a minimum, exceedingly rare. Undersigned counsel have not located a comparable case.  The haste with which this white-collar case was brought – within a few business days, without any meaningful attempt to understand the underlying facts or Coach Franklin's "claim of right" -- raises significant questions about law enforcement's motives.  It raises serious questions as to why, in a white-collar case, the USAO-SDNY disregarded its usual deliberate and careful investigative process in favor of a quick arrest of Mr. Avenatti and a big media splash.

The sprint to arrest Mr. Avenatti is particularly troublesome – and reeks of unconstitutional motive -- considering that the crime of extortion can be complex even in the garden variety case. *See generally Jackson*, 180 F.3d at 67-71.  The crime of extortion, under

both 18 U.S.C. §1951 and 18 U.S.C. §875(d), requires "wrongful" behavior on the part of an accused.  *See United States v. Enmons,* 410 U.S. 396 (1973); *Jackson*, 180 F.3d at 67-69.  When the allegedly "extortionate" demand is made during confidential settlement discussions by a lawyer on behalf of a client pursuing a legitimate claim, the issue of "wrongfulness" is a thorny one, as courts are loath to criminalize litigation-related threats, inasmuch as criminalization naturally deters the exercise of First Amendment rights.  *See United States v. Pendergraft*, 297 F.3d 1198, 1205-08 (11th Cir. 2002).  Indeed, even where a party threatens frivolous litigation accompanied by false affidavits – circumstances that do not exist here – courts have refused to allow criminal liability under the extortion statutes.  *Id.*  The analysis of "wrongfulness" requires, among other things, an understanding of the "claim of right" at issue and whether the lawyer believed he or she was pursuing legitimate demands with a nexus to that claim of right.  *Cf. Jackson, supra*.

Unlike "threatened disclosures of such matters as sexual indiscretions that have no nexus with any plausible claim of right," *Jackson*, 180 F.3d at 70, where a client like Coach Franklin has been wronged by a major corporation such as Nike, it is incumbent upon a prosecutor to engage in a more rigorous and penetrating analysis of the client's possible legal claims before prematurely concluding that a lawyer's demands constitute extortion.  Litigation itself is inherently threatening and poses a risk to all parties.  Every day of the week, across the nation, in settlement discussions, mediation sessions, and plea negotiations, lawyers, including prosecutors, use fear and threats of harm and reputational damage, both overtly and more subtly, as leverage to settle civil cases and secure guilty pleas.  They often use hardball

tactics and colorful language.[19]   And, they often make demands for legal and equitable relief that they may not be able to obtain after a verdict but are acceptable within the context of settlement discussions.   Yet, extortion charges against attorneys for making settlement demands are beyond exceedingly rare, for reasons that make sense as a matter of public policy.

A prosecutor's decision to charge a lawyer with a crime under these circumstances should be made only after a thorough understanding of the underlying facts and a careful analysis of the law.   Under *Jackson*, Mr. Avenatti's behavior is not "wrongful" as a matter of law because there was a "claim of right" to his settlement demands – *i.e.,* a nexus between the "threat" and Coach Franklin's plausible claim of right.   The evidence shows that Coach Franklin was contemplating a civil RICO action long before he sought Mr. Avenatti's representation.   Coach Franklin wanted restitution (money) and justice (equitable relief).   Coach Franklin wanted equitable relief in the form of an internal investigation of Nike, and Nike had demonstrated it was incapable of policing itself, given that several culpable executives remained at the company eighteen months after Nike received a grand jury subpoena in the wake of the Adidas scandal and despite widespread knowledge of the corruption.

Mr. Avenatti's initial settlement demand sought both monetary and equitable relief, which was available under both federal and state law in multiple jurisdictions.   "[A] federal court is authorized to grant equitable relief to a private plaintiff who has proven injury to its

---

[19] It is understood that settlement negotiations are typically punctuated with numerous instances of puffery and posturing.   *Richmond v. General Nutrition Centers, Inc.*, No. 08-cv-3577-PAE, 2012 WL 762307, *7 (S.D.N.Y.  Mar. 9, 2012).   "A settlement discussion is a negotiation, and a party's assertion as to injury or damages may, or may not, be anchored in fact."   *Id.*

business or property by reason of a defendant's violation of §1962…" *Chevron Corporation v. Donziger*, 833 F.3d 74, 137 (2d Cir. 2016).  This "is consistent with Congress's intent 'to encourage[e] civil litigation to supplement Government efforts to deter and penalize the … prohibited practices.  The object of civil RICO is thus not merely to compensate victims ***but to turn them into prosecutors, 'private attorneys general,' dedicated to eliminating racketeering activity.'"*** *Id.* (quoting *National Organization for Women, Inc., v. Scheidler*, 267 F.3d 687, 695 (7th Cir. 2001), *reversed on other grounds*, 537 U.S. 393 (2003)) (emphasis added).  The types of RICO injunctive relief that can be tailored to particular situations are virtually limitless.  "Section 1964's exhortation to craft relief broadly recognizes the importance of looking to the wider context in which the racketeering took place."  *United States v. Mason Tenders Dist. Council of Greater New York*, No. 94-civ-06487 (RWS), 1995 WL 679245, *16 (S.D.NY. Nov. 15, 1995), *as modified by* 1996 WL 22360 (S.D.N.Y. Jan. 19, 1996).   Furthermore, California Business and Professions Code section 17200, *et seq.*, authorizes private right of action for injunctive relief to prevent "unfair competition," defined broadly as "any unlawful, unfair or fraudulent business act or practice." *Id.*; *see also* §§17203, 17204.

The alleged threat by Mr. Avenatti to publicly expose Nike's conduct had a nexus to a plausible claim of right of Coach Franklin.  Mr. Avenatti's demand, as a component of the settlement, that he and Mr. Geragos be the lawyers hired by Nike to conduct the internal investigation is inextricably intertwined with that claim.  Although the USAO-SDNY might argue it is unusual for the plaintiff's lawyer to demand, as part of a settlement, that he be retained to handle the internal investigation of the defendant – and to be paid for it -- the USAO-SDNY itself routinely insists in settlement agreements on having final approval

authority over the selection of inspectors, monitors, and trainers implementing a costly compliance program in civil lawsuits and/or in connection with Deferred Prosecution Agreements. *See, e.g.,* DE37-1 in *United States v. Webster AV Management, LLC*, No. 16-cv-09913-PGG (S.D.N.Y.), at ¶13, ¶46.

None of that apparently mattered to the USAO-SDNY because the USAO-SDNY never bothered to investigate Coach Franklin's claim of right before charging Mr. Avenatti. The USAO-SDNY's decision to indict only Mr. Avenatti speaks volumes. If the USAO-SDNY has concluded, after Mr. Geragos's proffer sessions, that no crime was committed, then the government must explain why Mr. Avenatti remains under indictment in this case. If Mr. Geragos has been spared because the government has concluded that he was truthful when he denied having conspired with Mr. Avenatti, then serious questions abound as to why the government has not dismissed the conspiracy counts against Mr. Avenatti. Finally, if the government has concluded that Mr. Geragos was ***untruthful*** in his proffer sessions – *i.e.,* that he sought to extort Nike and then lied to the government about it -- the government will be hard-pressed to provide a legitimate explanation for its decision to prosecute only Mr. Avenatti.

Truth be told, and as demonstrated *supra*, the explanation that leaps from the record is that the USAO-SDNY substituted its own personal impressions of Mr. Avenatti, drawn from his aggressive public persona, long feud with President Trump, and brief entanglement with the USAO-SDNY in the Michael Cohen investigation, in place of a neutral, detached, and comprehensive investigation of the facts and evidence. If Mr. Avenatti were attorney Doe – or Mr. Geragos, for that matter – he would not have been arrested or charged. The facts

outlined above more than satisfy the "some evidence" standard for Mr. Avenatti to obtain discovery on his claim of selective prosecution.

B.  **Vindictive Prosecution**

The same facts that support Mr. Avenatti's selective prosecution claim also animate his vindictive prosecution claim, namely, the unusual nature of the charges and the swiftness of the arrest.  But there is more.  President Trump, the leader of the Executive Branch, and his family have demonstrated genuine animus toward Mr. Avenatti,[20] a fact well-known to USA Berman.  USA Berman's relationship with President Trump, or at least the perception thereof, was sufficient to warrant his recusal from the Michael Cohen investigation.  That USA Berman did not see fit to likewise recuse himself from Mr. Avenatti's case but, instead, has taken a very active role in it, is circumstantial evidence that he may be considered a "stalking horse" for President Trump.  That Mr. Avenatti "would not have been prosecuted except for the animus" is abundantly clear given that USA Berman has opted to not seek an indictment of the only other similarly situated individual (or Nike, for that matter, and its executives).  Mr. Avenatti is entitled to discovery on this claim.

## IV.    REQUEST FOR DISCOVERY

Mr. Avenatti respectfully requests the following discovery from the USAO-SDNY on his motion.

A.    All internal documents, including memoranda, notes, e-mails, and text messages that, in any way, reference the reasons why Mr. Avenatti was arrested and/or charged in this case;

---

[20] President Trump's son, Donald Trump, Jr., gleefully celebrated on Twitter when Mr. Avenatti was arrested on March 25, 2019, posting various tweets on his twitter.com/DonaldJTrumpJr account about Mr. Avenatti's arrest, of which the Court can take judicial notice.

B.      All internal documents, including memoranda, notes, e-mails, and text messages that, in any way, reference the reasons why Mark Geragos was not arrested or charged in this case;

C.      A list of all cases in the last 25 years in which a lawyer was charged with extortion for settlement demands made in connection with the representation of a client;

D.      All oral and written communications, including but not limited to memoranda, emails, text messages, and the like, between the USAO-SDNY and the Department of Justice regarding the decision to arrest and charge Mr. Avenatti;

E.      All oral and written communications, including but not limited to memoranda, emails, text messages, and the like, written by members of the USAO-SDNY expressing negative personal feelings about Mr. Avenatti, in connection with the instant investigation, the investigation that led to his arrest in *United States v. Avenatti*, Case No. 19-374-cr-DAB, or the Michael Cohen investigation;

F.      All oral and written communications, including but not limited to memoranda, emails, text messages, and the like, between the USAO-SDNY and the Department of Justice regarding the decision not to arrest or charge Mr. Geragos; and

G.      All oral and written communications, including but not limited to memoranda, emails, text messages, and the like, between the USAO-SDNY and/or the Department of Justice and the White House, President Trump, or anyone on his behalf (*e.g.,* his personal counsel), regarding Mr. Avenatti.

H.      All documents reflecting any communication regarding Mr. Avenatti between the USAO-SDNY and/or the Department of Justice and the White House, President Trump, or anyone on his behalf (*e.g.,* his personal counsel).

## V.  <u>CONCLUSION</u>

For the foregoing reasons, Mr. Avenatti respectfully requests that the Court dismiss the Indictment against him or, in the alternative, grant the requested discovery and an evidentiary hearing on this motion.

Respectfully submitted,

By:    /s/Scott A. Srebnick
          Scott A. Srebnick, P.A.
          201 South Biscayne Boulevard
          Suite 1210
          Miami, FL 33131
          Telephone: (305) 285-9019
          Facsimile:  (305) 377-9937
          E-Mail:  Scott@srebnicklaw.com

By:    /s/Jose M. Quinon
          Jose M. Quinon, P.A.
          2333 Brickell Avenue, Suite A-1
          Miami, FL 33129
          Telephone:  (305) 858-5700
          Facsimile:  (305) 358-7848
          E-Mail:  jquinon@quinonlaw.com

*Attorneys for Defendant Michael Avenatti*

## CERTIFICATE OF SERVICE

I hereby certify that on August 14, 2019, I caused a true and correct copy of the foregoing to be served by electronic means, via the Court's CM/ECF system, on all counsel registered to receive electronic notices.

/s/Scott A. Srebnick
Scott A. Srebnick