# Exhibit M



**From:** **Jeffrey Auerbach** ███████████████
**Subject:** Brian Bowen Racketeering Suit Against Adidas Articles and Filing
**Date:** March 18, 2019 at 3:38 PM
**To:** Michael Avenatti ███████████

Michael, see attached.

Jeffrey Auerbach
Managing Director
Bedford Consulting
310-499-4949 Off
██████████████████████





Brian Bowen
Racket…91.pdf

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF SOUTH CAROLINA

## COLUMBIA DIVISION

| | | |
|---|---|---|
| BRIAN BOWEN II, | ) | C/A No.:  3:18-3118-JFA_____ |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | **COMPLAINT** |
| | ) | (Jury Trial Demanded) |
| ADIDAS AMERICA, INC.; | ) | |
| JAMES GATTO; MERL CODE; | ) | |
| CHRISTIAN DAWKINS; MUNISH | ) | |
| SOOD; THOMAS GASSNOLA; and | ) | |
| CHRISTOPHER RIVERS | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## **TABLE OF CONTENTS**

I. INTRODUCTION ................................................................................................................ 1

II. JURISDICTION AND VENUE .......................................................................................... 3

III. PARTIES ............................................................................................................................. 4

IV. FACTUAL BACKGROUND ............................................................................................. 7

    A.  THE NCAA'S $20,000,000,000 PRODUCT ............................................................... 7

    B.  AMATEURISM IS THE CORE OF THE NCAA'S PRODUCT ................................. 9

    C.  THE $25 BILLION SNEAKER INDUSTRY ............................................................ 13

        i.       Origins of the Sneaker Industry ........................................................................ 13

        ii.      Adidas Infiltrates Amateur Athletics ................................................................ 17

        iii.    The Outsized Influence of Adidas-Sponsored Grassroots Basketball ............. 20

    D.  THE "UNIVERSITY OF ADIDAS AT LOUISVILLE" ........................................... 23

V. SDNY CRIMINAL INVESTIGATION .......................................................................... 26

VI. OVERVIEW OF DEFENDANTS' RACKETEERING ACTIVITY ................................ 30

    A.  THE ADIDAS "BLACK OPS" BRIBERY ENTERPRISE ....................................... 30

    B.  THE ADIDAS BRIBERY ENTERPRISE ENGAGED IN A PATTERN OF RACKETEERING
       ACTIVITY ................................................................................................................. 38

        i.       Racketeering Activity Involving North Carolina State University ................... 42

        ii.      Racketeering Activity Involving the University of Kansas ............................... 45

        iii.    Racketeering Activity Involving the University of Miami ............................... 54

        iv.    Racketeering Activity Involving the University of Louisville
               that Injured Plaintiff .......................................................................................... 55

VII. MONEY LAUNDERING CONSPIRACY IN FURTHERANCE OF THE ENTERPRISE'S
     PREDICATE ACTS ........................................................................................................ 65

COUNT I .................................................................................................................................. 73

COUNT II ................................................................................................................................. 77

COUNT III ............................................................................................................................... 78

COUNT IV ............................................................................................................................... 81

RELIEF REQUESTED ............................................................................................................ 82

DEMAND FOR JURY TRIAL ............................................................................................... 83

Plaintiff Brian Bowen II ("Brian") by and through his undersigned counsel, brings this action against Adidas America, Inc., James Gatto, Merl Code, Munish Sood, Christopher Dawkins, Thomas Gassnola, and Christopher Rivers and alleges violations of the federal Racketeering Influenced and Corrupt Organizations Act.  In support of his claims, Plaintiff hereby alleges as follows:

## I.    <u>INTRODUCTION</u>

1.    This action arises from a criminal bribery and fraud scheme spearheaded by Adidas America, its employees and consultants, numerous AAU and NCAA Division I men's basketball coaches, and certain financial intermediaries that exists to infiltrate amateur athletics by preying upon the families of top-ranked high school student-athletes in order to get their children to play basketball at Adidas-sponsored universities.

2.    This criminal enterprise has but a single motive: profit.  Profit for Adidas by annually poaching the country's top high school basketball recruits and chaining them to the Adidas-brand through increased market share in the ultra-competitive $25 billion athletic shoe market.  Profit for the co-conspirators and would-be agents who launder and funnel Adidas's bribe money through non-profit entities to secure commitments from top high school basketball recruits to attend Adidas sponsored universities.

3.    All of this profit comes at the expense of Plaintiff Brian Bowen and other student-athlete victims who, by virtue of the criminal scheme directed by Adidas and its lieutenants, lost their eligibility to play college basketball, lost their eligibility to receive financial aid necessary to continue their education, and lost the singular opportunity to develop physically and athletically into NBA draft picks at a NCAA Division I men's basketball program.

USAO373_00024907

4.      The criminality and fraudulent conduct of the Defendants resulted in student athletes being exploited during their collegiate basketball career—once they commit to an Adidas sponsored university those students are duty bound to wear Adidas gear and to allow Adidas to market their image and likeness for corporate profit for free.

5.      Many of the families of student-athletes preyed upon by Adidas and its criminal enterprise are unsophisticated and come from poor or modest backgrounds.  Through exploitation of their social inequity and lack of representation, they became pawns of Defendants and unwittingly put their children's education and promising athletic careers in jeopardy.

6.      The purpose of this action is to hold Adidas America, a unit of a large, multi-national corporation based in Germany, and its criminal co-conspirators liable for the harm they have wrought on the life and career of Brian Bowen II.

7.      Brian came to the University of Louisville with a bright future and three reasonable expectations: (1) to further develop his God-given talents as a basketball player by participating in competitive college basketball at one of the top programs in the country under the guidance of a coach with one of the best records in NCAA history; (2) to further pursue his long-standing commitment to academic study with a level of discipline that set him apart in the eyes of college basketball coaches; and (3) to advance to the NBA at a time of his choosing based upon projections as to which round of the draft he would be selected.

8.      For Brian and other top high school basketball players, the NCAA is the proving ground for the NBA.  Top collegiate programs like the University of Louisville offer a unique, exceptional product, providing their athletes with the opportunity to compete at the highest level of college sports, often in front of large crowds and television audiences.  Top high school prospects at these top programs enjoy state-of-the-art training facilities, elite coaching, athletic

USAO373_00024908

trainers, medical treatment, and nutritionists rivaling that of many professional teams.  Members

of the University of Louisville's men's basketball team, for example, practice and play in the $238

million athletic facility known as the KFC Yum! Center—a venue with a seating capacity larger

than any NBA arena.

9.     The quality of competition offered by NCAA Division I men's basketball is

superior to that found in other basketball leagues outside of the NBA, including minor league

basketball and foreign professional leagues.  Indeed, courts examining the college athletics market

have found that "very few athletes talented enough to play . . . Division I basketball opt not to

attend."  *O'Bannon v. Nat'l Collegiate Athletic Ass'n*, 802 F.3d 1049, 1056 (9th Cir. 2015).

10.     These benefits notwithstanding, on information and belief, injustices are routinely

committed against Division I student-athletes.  While some attempt to characterize a student-

athlete's goals of academics and athletics as a binary choice, in reality the goals of reaching one's

aptitude in the classroom and on the basketball court are parallel endeavors that are not mutually

exclusive.  When and where an athlete will be drafted by a professional sports team is determined

by many factors that are outside of the athlete's control.  What is within the athlete's control is

timing his decision to forego NCAA eligibility and enter the NBA draft when his stock is at its

peak.  Defendants robbed Brian of control over his education and career.

## II.    JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331

based upon the federal claims asserted under the Racketeer Influenced and Corrupt Organizations

Act ("RICO"), 18 U.S.C. § 1961 *et seq.*

USAO373_00024909

12.     This Court has personal jurisdiction over all Defendants pursuant to 18 U.S.C. §§ 1965(a), (b), and (d) because Defendants Adidas America, Inc. and Merl Code reside in, are found in, have an agent in, and/or transact affairs in the District of South Carolina and the Court may exercise nationwide jurisdiction over the other named Defendants where the "ends of justice" require.  Here, the interests of justice require that Plaintiff be allowed to bring all members of the nationwide RICO enterprise before the court in a single trial.

13.     Venue is proper in this judicial district pursuant to 18 U.S.C. §§ 1965(a), (b), and (d) and 28 U.S.C. § 1391(b) for all Defendants because Defendant Adidas America, Inc. has an agent located at 2 Office Park Court, Suite 103, Columbia, South Carolina 29223 and transacts its affairs in this district, because Defendant Merl Code resides in the District of South Carolina, and because a substantial part of the events or omissions giving rise to this action occurred in the District of South Carolina.

### III.    PARTIES

14.     Plaintiff Brian Bowen II is a citizen of the United States and resident of Columbia, South Carolina.  In 2017, he was a McDonald's All-American high school basketball player, widely ranked as a five-star recruit, and was one of the most sought-after college basketball prospects in the United States.

15.     Defendant Adidas America, Inc. ("Adidas") is an athletic apparel company headquartered in Portland, Oregon.  Adidas sponsors numerous high school basketball programs, NCAA Division I college athletic programs, and professional athletes.  Adidas employs hundreds of individuals in South Carolina, from where it distributes approximately 80% of its North American sales.  Adidas directs all U.S.-based operations on behalf of Adidas A.G., a joint stock corporation organized and existing under the laws of the Federal Republic of Germany.

USAO373_00024910

16.     Defendant James Gatto, on information and belief, is citizen of the United States and a resident of Oregon.  Gatto has worked for Adidas for over twenty years and, at all relevant times, served as its Director of Global Sports Marketing – Basketball.  In this role, Gatto is responsible for overseeing Adidas's high school and college basketball programs.  On September 25, 2017, Gatto was arrested and charged in a criminal complaint with three counts of wire fraud and one count of money laundering by the U.S. Attorney for the Southern District of New York stemming from his role in the Adidas Bribery Enterprise described below.  *See United States v. James Gatto et al.*, No. 1:17-cr-00686-LAK (S.D.N.Y.).

17.     Defendant Merl Code, on information and belief, is citizen of the United States and a resident of South Carolina.  At all times relevant to this complaint, Code served as consultant to Adidas and was also affiliated with various high school and college basketball programs sponsored by Adidas.  On September 25, 2017, Code was arrested and charged in a criminal complaint with two counts of wire fraud, one count of wire fraud conspiracy, and one count of money laundering conspiracy by the U.S. Attorney for the Southern District of New York stemming from his role in the Adidas Bribery Enterprise described below.  *See United States v. James Gatto et al.*, No. 1:17-cr-00686-LAK (S.D.N.Y.).

18.     Defendant Christian Dawkins, on information and belief, is a citizen of the United States and a resident of Michigan.  Dawkins is a self-proclaimed athlete advisor and was formerly team director of the Adidas-sponsored AAU basketball team known as Dorian's Pride, a team on which Plaintiff Bowen played during his middle school years.  On September 25, 2017, Dawkins was arrested and charged in a criminal complaint with twelve felony counts, including bribery conspiracy, wire fraud, and money laundering conspiracy by the U.S. Attorney for the Southern

USAO373_00024911

District of New York stemming from his role in the Adidas Bribery Enterprise described below. *See United States v. James Gatto et al.*, No. 1:17-cr-00686-LAK (S.D.N.Y.).

19.    Defendant Munish Sood, on information and belief, is a citizen of the United States and a resident of New Jersey.  He is the founder and chief investment officer of Princeton Advisory Group, a firm that provides investment management services to institutional clients and family offices and, on information and belief, has in excess of $600 million under management.  Through his position as head of an investment firm, Sood helped Adidas funnel its bribe payments and was complicit in facilitating the use sham invoices to disguise those bribe payments on Adidas's books and records.  As set forth below in Section V, Sood is also a long-time associate of the confidential witness who disclosed the Adidas bribery scheme to federal law enforcement authorities.  On September 25, 2017, Sood was arrested and charged in a criminal complaint with twelve felony counts, including bribery conspiracy, wire fraud, and money laundering conspiracy by the U.S. Attorney for the Southern District of New York stemming from his role in the Adidas Bribery Enterprise.  *See United States v. James Gatto et al.*, No. 1:17-cr-00686-LAK (S.D.N.Y.).  On August 27, 2018, Sood pleaded guilty to felony conspiracy to commit bribery, honest services fraud and Travel Act offenses; payment of bribes to an agent of a federally funded organization; and wire fraud conspiracy and is cooperating with the government.

20.    Defendant Thomas Joseph "T.J." Gassnola, on information and belief, is a citizen of the United States and a resident of Massachusetts.  At all relevant times, Gassnola was a paid outside consultant to Adidas America and reported to Defendant James Gatto.  Gassnola's work as a consultant to Adidas included building relationships with college basketball programs, high school teams, and student-athlete recruits, for which he received over a half million dollars in compensation and fraudulent expense reimbursements.  Gassnola was also team director of the

USAO373_00024912

Adidas-sponsored AAU basketball team known as the New England Playaz, a program that received approximately $150,000 in sponsorship money from Adidas.    On March 30, 2018, Gassnola was arrested and charged in a criminal complaint with one count of conspiracy to commit wire fraud by the U.S. Attorney for the Southern District of New York stemming from his role in the Adidas Bribery Enterprise.  *See United States v. Thomas Gassnola*, No. 1:18-cr-00252-VM (S.D.N.Y.).  Gassnola pleaded guilty to the charge and is cooperating with the government.

21.    Defendant Christopher Rivers, on information and belief, is citizen of the United States and resides in Oregon.  Rivers has been employed by Adidas America since 2009 as Senior Player Relations Manager for Adidas's basketball division.  On information and belief, Rivers is responsible for Adidas's relationship with AAU and high school basketball teams and has authority to decide which of those teams will receive Adidas sponsorship money and merchandise.

## IV.    FACTUAL BACKGROUND

### A.    The NCAA's $20,000,000,000 Product

22.    The National Collegiate Athletic Association ("NCAA") is a non-profit organization that regulates amateur athletics at over 1,200 member colleges and universities.  Its membership is divided into three divisions: Division I includes approximately 350 college and universities, representing the nation's largest academic institutions by student population and which enjoy the largest athletic budgets; Division II includes small to medium size schools with smaller athletic budgets; and Division III includes smaller schools that do not offer or permit athletic scholarships.  Each division is further divided into conferences, within which NCAA member institutions play many of their games.

USAO373_00024913

23.     Intercollegiate athletics, particularly at the Division I level, is a multi-billion-dollar industry providing enormous revenue and publicity for the NCAA, its member schools, and its conferences.

24.     Division I men's basketball is by far the largest revenue generator for the NCAA. According to the NCAA, "[t]elevision and marketing rights fees, primarily from the Division I men's basketball championship, generate the majority of our revenue. Championship ticket sales provide most of the remaining dollars."[1]

25.     In fiscal year 2017, the NCAA generated over $1.05 *billion* in revenue—almost all of which came from a multi-year broadcasting rights agreement for Division I men's basketball games with CBS Sports and Turner Broadcasting System, Inc.

26.     In 2010, CBS Sports and Turner Broadcasting entered an agreement with the NCAA to pay $10,800,000,000 for the exclusive television and multimedia broadcasting rights to the annual, three-week long Division I men's basketball national championship known as "March Madness" through 2024.  The NCAA later extended its agreement with CBS and Turner through 2032 for an additional $8,800,000,000.

27.     The value of this almost $20 billion broadcasting agreement stems from the incredible popularity of college basketball in the United States.  In 2018, over 97 million people in the U.S. watched the NCAA men's basketball national championship tournament, while an estimated 20% of the entire U.S. population filled out March Madness tournament brackets in hopes of picking a winner.  Among the reasons consumers are attracted to amateur collegiate

---

[1]     *See* NCAA, Where Does the Money Go?, http://www.ncaa.org/about/resources/finances

USAO373_00024914

sports, according to the NCAA, is "the purity of the athletic competition relative to professional sports."[2]

28.      No corporate entities benefit more from the vast popularity of college basketball than the athletic apparel industry.  According to market research from Bloomberg, the three largest athletic apparel companies (Nike, Adidas and Under Armour) stood to gain almost $1.6 billion worth of free television exposure by sponsoring teams participating in the 2017 NCAA men's basketball national championship tournament, assuming the brand logos emblazoned on team uniforms and shoes remained visible to viewers for only 20% of broadcasted game time.  The more often the shoe company logos appear on television, the more valuable the apparel sponsorship becomes.

**B.    Amateurism is the Core of the NCAA's product**

29.      The NCAA seeks to preserve amateurism in intercollegiate athletics through an extensive set of rules set forth in its constitution, bylaws, regulations, manuals, rule interpretations, and policy statements.  These rules govern all aspects of athletics, from eligibility standards for prospective students wishing to participate in college sports to the number of daily meals and snacks that college teams can provide to their players.

30.      For prospective college athletes, the NCAA rules and regulations on amateurism are far-reaching and effectively govern their day-to-day lives.  The eligibility rules dictate the games and tournaments in which high school-age and younger student-athletes can participate; what prize money they can or cannot accept; what teams they can or cannot play for or associate with; what persons they may or may not seek academic or athletic advice from; what tutoring or mentoring they may receive and from whom; what expenses they may accept in connection with

---

[2]      *See In re Nat'l Collegiate Athletic Assoc. Athletic Grant-in-Aid Antitrust Litig.*, MDL Dkt. No. 4:14-md-025410CW (N.D. Cal. Aug. 27, 2018) (ECF No. 993 at 2) (Defendants' Opening Statement).

USAO373_00024915

athletic participation; what academic courses they must take in order to satisfy collegiate academic eligibility; and what financial assistance they may receive, in what form, and from whom.

31.    When it comes to student-athlete recruitment, the NCAA controls who prospective student-athletes and their parents can communicate with, as well as the timing of recruitment, the size and shape of the recruiting materials, and the opportunities for campus visits.  Student-athletes who are recruited to universities in violation of NCAA rules are at risk of being declared ineligible to participate in athletics.  Prospective student-athletes, their families, and coaches therefore must attest to the recruit's amateur status and are prohibited from receiving any benefits, including money, travel, clothing or other merchandise, directly or indirectly from a financial advisor or an agent (which is defined broadly to include anyone "who, directly or indirectly . . . seeks to obtain any type of financial gain or benefit  . . . from a student-athlete's potential earnings as a professional athlete.").

32.    Despite imposing significant limitations on prospective student athletes, the NCAA affords college athletic programs substantial leeway in finding talented players.  Member schools are allowed to award up to thirteen athletic full scholarships in Division I basketball and can begin recruiting student-athletes *years* before they can matriculate.  College coaches run camps and clinics for young children, and NCAA member institutions make scholarship offers to student-athletes as early as middle school.

33.    For young grade school children who hope to one day compete on the college basketball court, the NCAA rules go even further, permitting Division I men's basketball coaches to scout promising basketball talent while those kids are still in elementary school. *See* NCAA Bylaw 13.1.7.16.

USAO373_00024916

34.    Once students-athletes matriculate at an NCAA school, the NCAA, though its member institutions, continues to impose a wide variety of conditions on student athletes.  For example, student-athletes may not receive compensation beyond educational expenses approved by the NCAA; they may not retain an agent to guide them in exploration of future professional sports careers; they must meet minimum requirements for educational progress; and they are strictly limited in receiving compensation for non-athletic services that might be understood to reflect on their athletic ability.  Student-athletes are also required to attest annually to their amateur status.  Parents of student-athlete recruits are also required to sign similar statements attesting to their child's amateur status.

35.    The degree to which these NCAA rules permeate the lives of student-athletes in the name of amateurism is evident in reports of rule violations.  In 2013, for example, the University of Oklahoma reported to the NCAA that "[t]hree current student-athletes received food in excess of NCAA regulation at a graduation banquet" because "[t]he players were provided pasta in excess of the permissible amount allowed."  As punishment, the three offending Oklahoma football players were "required to donate $3.83 each (the cost of the pasta serving) to a charity of their choice in order to be reinstated."[3]

36.    Despite the NCAA's capacity to enforce rule violations against athletes, it has struggled since its inception to effectively and consistently police its amateurism rules against outside influences.  Indeed, there has long been an intense competition among colleges to field the best athletic teams.  In the early 1920s, it was common place for colleges to pay their athletes under the table in a variety of creative ways; a 1929 study found that 81 out of 112 schools surveyed provided some sort of improper inducement to their athletes.  *See O'Bannon v. Nat'l Collegiate*

---

[3]    *See* Ryan Aber, *OU Releases List of Self-Reported NCAA Violations*, NEWSOK, Feb. 18, 2014, *available at* https://newsok.com/article/3934985/ou-releases-list-of-self-reported-ncaa-violations

USAO373_00024917

*Athletic Ass'n*, 802 F.3d 1049, 1054 (9th Cir. 2015).  In 1948, the NCAA sought to strengthen its enforcement capabilities by adopting the "Sanity Code" – a set of rules that prohibited schools from providing student-athletes with financial aid that was based on athletic ability and not available to other students.  The Sanity Code also created a new Compliance Committee that could terminate an institution's NCAA membership.  *See* Daniel E. Lazaroff, *The NCAA in Its Second Century: Defender of Amateurism or Antitrust Recidivist*, 86 OR. L. REV. 329, 333 (2007).  Since the Sanity Code days, the NCAA has struggled in its efforts to effectively and consistently enforce its rules and regulations over amateur athletics.

37.    Notably absent from any of the NCAA rules or regulations is any proscription or limitation on the amount of money that large corporate interests can pour into college sports and university athletic programs.  Though the NCAA concedes that "corporations are willing to pay premium prices for the opportunity to put their products before the eyes of an enormous audience,"[4] it has failed to implement any meaningful restrictions on corporate interests despite its constitutional mandate to protect student-athletes "from exploitation by professional and commercial enterprises."[5]

38.    As a result, large corporations in general, and Adidas more particularly, stand to benefit from associating their brands with talented student-athletes and are free to use their power, money, and influence in the world of basketball to coerce young athletes and their families into eligibility-destroying conduct, but suffer no penalty for doing so.

39.    The NCAA's ineffective enforcement scheme was, at all times relevant hereto, known by and exploited by the Defendants.

---

[4]    NCAA TASK FORCE ON COMMERCIAL ACTIVITY IN DIVISION I INTERCOLLEGIATE ATHLETICS, FINAL REPORT SUPPLEMENT NO. 6 ADDENDUM TO DIVISION I BOARD OF DIRECTORS 3 (2009).

[5]    NAT'L COLLEGIATE ATHLETIC ASS'N, CONSTITUTION § 2.9.

USAO373_00024918

**C.    The $25 billion Sneaker Industry**

    **i.    Origins of the Sneaker Industry**

    41.    In the world of basketball, Adidas's three-stripe logo is everywhere.  From high school leagues and college teams to the NBA, Adidas has poured billions into sponsorships of individual ball players and teams over the past decade in a drive to gain market share in the hyper-competitive athletic shoe market.

    42.    Dubbed the "sneaker industry," this market is dominated by three main players: Nike, Under Armour, and Adidas.  These companies amassed over $25 billion in sales in 2013, and revenue today continues to skyrocket.

    43.    The largest driver of sneaker sales in the U.S. are consumers in the 18 to 34-year-old demographic.  In 2014, they accounted for over $21 billion in footwear sales and continue to drive tremendous demand today.  Yet, the sale of sneakers was not always a multi-billion-dollar enterprise.

    44.    The origins of the sneaker culture date back to the 1920s, when a charismatic young basketball player named Chuck Taylor joined forces with the Converse Rubber Shoe Company, an outfit best known at the time for its rubber galoshes.  Taylor became a part-time salesman and part-time player-coach for the company's club basketball team.  Travelling around the country, Taylor taught young kids the game of basketball while wearing the company's rubber-soled canvas lace-up.  After he suggested adding ankle support to the shoe, the Converse All Star was born.  Not long after, Taylor signed a contract with Converse to add his name to the shoe, and in 1934 the All Star became known as the Chuck Taylor All Star, thus marking the first athlete endorsement of a shoe.  It has been estimated that 60% of Americans have owned at least one pair of "Chucks" in their lifetime.

USAO373_00024919



*Converse "Chuck Taylor" All Star circa 1957*

45.     As it turns out, Chuck Taylor was not a terribly talented basketball player, but he knew how to pitch shoes to the young kids who watched him play.  His legacy, and Converse's market share in basketball, dominated for decades.  By the 1970s, legendary college coaches such as Kentucky's Joe B. Hall and North Carolina's Dean Smith had outfitted their teams in All Stars, thus proving to the sneaker industry the profitability of identifying shoes with star players.

46.     Adidas, on the other hand, struggled to gain market share in the lucrative and growing U.S. sneaker market during the 1950s and 1960s; however, on information and belief, over time it came to recognize the profits that could flow from associating an athletic shoe with an individual player.

47.     In 1971, Adidas's original tennis shoe was renamed and rebranded as the "Stan Smith" after the acclaimed tennis champion Stan Smith, who at that time was ranked No. 1 in the world.  For Adidas, associating its tennis shoe with an individual player became a market opener in the U.S. that would pay dividends for years.  Since its introduction, Adidas has sold 30 million pairs of Stan Smith sneakers.

14

USAO373_00024920

48.    From the 1970's through the present, Adidas embarked on a marketing strategy to increase corporate profits by pairing an athlete's likeness with their product. This market strategy was so profitable for Adidas that it later ventured outside the sports market with the same profitable strategy, signing sneaker endorsement deals with popular musicians and celebrities such as Pharrell Williams and Kanye West.

Adidas's "Pharrell Williams Solarhu Tennis V2 Shoe"



Adidas's "Kanye West Yeezy Boost 350"



49.    Converse and Adidas's success with branding their products with a specific athlete was not lost on the sneaker industry. In 1977, a small-time basketball promoter named Sonny Vaccaro emerged on the scene and approached Nike's marketing team with a plan to displace

USAO373_00024921

Converse's reign over the college market. It has been reported that Mr. Vaccaro would later travel around the country offering college coaches $2,000 contracts to become Nike "consultants" with the promise of free shoes to the players on their teams if they accepted.

50.     By 1979, Nike had signed up more than 50 college basketball coaches as consultants. When Sports Illustrated's NCAA tournament issue came out on March 26, 1979, it featured on the cover a young Indiana State University player named Larry Bird. He was wearing a pair of Nike's.

51.     Sonny Vaccaro would become a prominent figure in the sneaker industry. In the 1980s, he pushed Nike to sign a bet-the-company shoe deal with college all-star Michael Jordan. Jordan wore Converse shoes while playing for the University of North Carolina and preferred Adidas. But Adidas reportedly had little interest in pursuing Jordan, so he signed with Nike. Although Jordan's initial endorsement agreement with Nike allowed the company to cancel the contract if sales of Air Jordan-branded shoes did not reach $4 million by the third year, Nike ended up selling $70 million worth of Air Jordans in their first two months on the market. Such is the power of athletic endorsements.[6]

52.     In 1987, Nike expanded its relationship with college athletic programs. According to Vaccaro, "the world changed" when the University of Miami called and asked him if Nike would be willing to sign a first-of-a-kind "all-school" deal to sponsor every varsity athlete on campus. Vaccaro quickly agreed and immediately telephoned Nike co-founder Phil Knight to share the news, telling him: "This is it, we hit the motherload. Now we own the school."[7]

---

[6]     Darren Rovel, *Michael Jordan's Agent Tries to Set Record Straight on Original Nike Deal*, ESPN.COM, May 4, 2016, *available at* http://www.espn.com/nba/story/_/id/15463041/michael-jordan-agent-tries-set-record-straight-original-nike-deal

[7]     Matthew Kish, *Sonny Vaccaro, the University of Miami and the $250 million Shoe Business*, PORTLAND BUS. J., Dec. 18, 2014, *available at* https://www.bizjournals.com/portland/blog/threads_and_laces/2014/12/sonny-vaccaro-the-university-of-miami-nike-adidas.html

USAO373_00024922

53.     Vaccaro later recounted the power of an all-school sneaker sponsorship in an interview with the New York Times:

> Now all the major schools are all-school deals with one shoe company.  That gives them control over everything.  You do an all-school deal, the president signs off, the athletic director, the coach — you own everything in that school.[8]

54.     In 1991, Vaccaro left Nike to join Adidas.  Two years later, he hired a young college graduate with a marketing degree named James Gatto.

**ii.     Adidas Infiltrates Amateur Athletics**

55.     The branding on a sneaker of a single marquee pro basketball player, such as LeBron James or Stephan Curry, can net a shoe company more than a $1 billion annually.

56.     According to one of Adidas's chief competitors in the sneaker industry, Skechers, "the market for basketball shoes is driven as much by brand perception, attitude, and style as it is by shoe performance.  The ability to develop 'street credibility' by having talented young players and trendsetters wear a company's shoes can make or break a brand's reputation."[9]

57.     To be in a position to sign such a star player who can produce that kind of revenue, however, a sneaker company must start early and cast a wide net. Upon information and belief, Adidas recognized that without infiltrating high school amateur athletics it would lose out on significant revenues and sales.

58.     Amateur athletics and the NCAA product provide Adidas with higher profit margins because, on information and belief, Adidas does not have to compensate amateur athletes

---

[8]     Marc Tracy & Rebecca Ruiz, *In College Basketball Scandal, Follow the Money (and the Shoes)*, N.Y. TIMES, Sept. 28, 2017, at A1, *available at* https://www.nytimes.com/2017/09/27/sports/ncaabasketball/adidas-pitino-louisville.html

[9]     *Skechers v. Adidas America, Inc.*, No. 2:18-cv-03882 (C.D. Cal. May 9, 2018) (ECF 1 ¶ 3.)

USAO373_00024923

for wearing its brand but can instead aggressively promote them wearing its products. By doing this, Adidas generates money off of young players as amateurs and, later, when they turn pro.

59.    Beginning in high school, on information and believe, Adidas quickly began promoting its relationship with Brian, including but not limited to featuring promotional photos of him on its website wearing its logo, which it continues to do as of the date of this complaint.[10]



60.    Plaintiff is informed and believes many responsible, for-profit corporations would classify Adidas's infiltration of amateur athletics and use of an individual athlete without compensating him as nothing more than exploitation. For Adidas, however, it was business as usual. Perhaps the profits were so lucrative Adidas and its executives convinced themselves that exploiting amateur athletes like Brian for profit is acceptable much the same way plantation owners convinced themselves that slave labor was acceptable.

---

[10]    *See* https://news.adidas.com/US/images-and-videos/image/Brian-Bowen--adidas-Gauntlet-Dallas-1/a/c8b96d13-1caa-4ff8-b095-94f782d8ca04 (last visited Nov. 19, 2018).

USAO373_00024924

61.    Nike, for example, has dominated the sneaker industry for decades with a reported 90% share of the market.  It spends billions on athlete endorsements.  Its Jordan brand alone enjoys more than twenty times Adidas's share of the basketball market.  Simply put, Nike's investment brings it a higher profile, which translates to more space on retail shelves and more opportunities to put its trademarked "swoosh" on television.  Nike knows that fans want what their favorite players wear.

62.    For years, Adidas has been chasing the Nike rabbit in a race to grab market share but has consistently come up short.

63.    In 2006, for example, Adidas plunged nearly half a billion dollars into a sponsorship agreement with the NBA in hopes of dominating the professional ranks.  But the deal had a major flaw: Adidas could place its logo on players' warm-up gear, but not on their uniforms.  So when the television cameras were turned on, Adidas's logo was left hanging in the locker room.

64.    In 2012, Adidas tried again to make a run at Nike by signing the biggest player endorsement contract in the history of sports.  The fourteen year, $185 million deal with Chicago Bulls all-star Derrick Rose included precedent-setting payouts: $12 million in annual retainers; up to $6.25 million in annual royalties; up to $4.8 million in appearance fees annually; use of a private aircraft; $250-$300k annually in "consulting fees" to Rose's older brother; $50-75k annually in "consulting fees" to Rose's childhood friend; and a pledge by Adidas to contribute $150,000 annually to the AAU basketball team of Rose's choice.[11]

65.    Adidas inked the deal with Rose on February 24, 2012.  Sixty-four days later, Rose tore his ACL and missed the entire 2012-13 season.  A second knee injury had him sidelined for

---

[11]    Jon Wertheim, *Why is Adidas Still Paying Derrick Rose Superstar Money?*, SPORTS ILLUSTRATED, Feb. 6, 2018, *available at* https://www.si.com/nba/2018/02/06/derrick-rose-adidas-sneaker-contract-details-cavaliers-knicks-bulls

USAO373_00024925

all but ten games the following season.  And his alleged conduct off the court landed him in

criminal and civil jeopardy.  Consequently, Adidas was forced to take a loss on the deal.  In 2012

and 2013, Adidas sold only $65 million of Rose sneakers—one-fifth of what Nike's LeBron James

sneakers sold in 2013 alone and far less than what it agreed to pay Rose.  Though much has been

written about Rose's "stunning decline" in the world of basketball, Adidas remains on the hook to

him through September 30, 2025.

66.    Following these and other setbacks, in June 2014 Adidas America brought in a new

CEO, Mark King.  In short order, the company announced that it was walking away from the NBA

sponsorship and would redeploy its money to the high school and college basketball markets.

67.    Chris Grancio, Adidas's global basketball general manager, made it known that the

company was "going to invest more money in basketball over the next five years that we ever

have," explaining that the company's new strategy boils down to getting more Adidas shoes on

the feet of "high school kids."  According to Grancio, "[w]e haven't been able to elevate our brand

for the basketball consumer that we're targeting.  We ultimately decided that we would change our

investment strategy and invest more players on the court." [12]

### iii.    The Outsized Influence of Adidas-Sponsored Grassroots Basketball

68.    Long before top basketball players reach college-age, they are showered with

"money, swag, and perks" by the sneaker industry through participation in "summer basketball"

or "grassroots" leagues sponsored by the Amateur Athletic Union ("AAU") and major sneaker

companies.[13]

---

[12]    Matthew Kish, *Adidas Drops Bid to Extend NBA Deal, Redraws Strategy*, PORTLAND BUS. J., Mar. 16, 2015, *available at https://www.bizjournals.com/portland/blog/threads_and_laces/2015/03/exclusive-adidas-drops-nba-bid-redraws-basketball.html*

[13]    Tracy & Ruiz, *supra* note 8.

USAO373_00024926

69.     Though AAU basketball has existed in some form for over a century, its influence over college basketball recruiting can be traced to two watershed events: (1) Congress's passage of the Amateur Sports Act in 1978, which removed from the AAU's purview any governance role over international Olympic teams, forcing it to refocus its efforts on youth sports; and (2) the restructuring of the NCAA's college basketball recruiting calendar, which put an emphasis on summer basketball leagues over traditional high school basketball programs whose seasons typically end in March.

70.     Recognizing the importance of the summer basketball leagues in identifying and recruiting future NBA stars, the sneaker companies quickly moved to dominate the space by sponsoring summer camps and tournaments for middle schoolers and high school players so that their affiliated college and NBA teams could do one-stop shopping for players.

71.     According to USA Basketball, the organization that sponsors the men's and women's U.S. National and Olympic basketball teams, summer basketball has become "crucial" to college recruiting because "coaches only get so many opportunities to see a player perform" given the strict recruiting calendar mandated under NCAA rules.  Consequently, "[e]vent organizers like the AAU, Nike or Adidas line up its biggest tournaments to take place during the NCAA evaluation period, with the AAU calling summer hoops 'the place to be.'  For teenagers in pursuit of a college basketball scholarship, being at 'the place to be' isn't an option—it's a must."[14]

72.     In the words of college basketball scout Tom Konchalski, "If you're not on the shoe company circuit, it's hard to get recruited at the highest level.  It's very difficult."[15]

---

[14]     Ryan Wood, *Why Summer Basketball Is Crucial to Recruiting*, USA BASKETBALL, Apr. 12, 2012, https://www.usab.com/youth/news/2012/04/why-summer-basketball-is-crucial-to-recruiting.aspx

[15]     Tracy & Ruiz, *supra* note 8.

USAO373_00024927

73.    For Adidas, sponsoring summer league camps and programs gives it the opportunity to build relationships with young players and college coaches, further ingratiating its brand into player's lives at an early age and using that relationship to leverage a player's college recruiting decisions.  Adidas's Junior Gauntlet summer league, for example, showcases young boys in the 5th through 8th grades.  As one sportswriter explained:

> For the most part, this is how the college basketball/sneaker industry operates now: Youth basketball players are put on sneaker-driven AAU travel teams, and then outfitted with a sneaker brand up through middle school and high school. The college basketball offers roll in for the star players. But when it comes time for the player to pick a school, they usually align with the sneaker brand that has been with them since the beginning. It's not about the university; but rather the sneaker brand that represents the basketball team.[16]

74.    Though the dominance of sneaker industry money in summer league youth basketball and recruiting has been widely reported, the NCAA is effectively powerless to regulate summer leagues unaffiliated with any of its member institutions.  In 2018, the Rice Commission issued a call for reform:

> While an elite basketball player is in high school, he will virtually always develop a relationship with a non-scholastic basketball team and coach and with an apparel company – most likely one of Nike, Adidas or Under Armour. Specifically, apparel companies sponsor elite high school teams that participate in NCAA-certified and other events around the country, including all-star games, camps, and other so-called elite experiences. . . . By funding non-scholastic basketball, the apparel companies receive valuable input about their products, important exposure and credibility through their products' use, and an opportunity to form early relationships with future college and professional athletes. In connection with participating in these events and experiences, elite players (and their families) may receive luxury travel, gear and other benefits. Sometimes the apparel companies pay the non-scholastic basketball coaches for working with these teams and/or participating in their events.
>
> In addition to coaching, experience, gear and travel, these non-scholastic basketball teams and events offer players exposure, including to Division I coaches. For example, Division I coaches attend and recruit at the NCAA-certified events

---

[16]    Jason McIntyre, *The FBI Just Blew Up the College Basketball-AAU Sneaker Industry: Fraud, Corruption, Bribery*, THEBIGLEAD.COM, Sept. 26, 2017, *available at* https://thebiglead.com/2017/09/26/the-fbi-just-blew-up-the-college-basketball-aau-sneaker-industry-fraud-corruption-bribery/

USAO373_00024928

which are held in April and July each year. <u>Many summer coaches have ongoing
relationships with Division I coaches. They can thus bring "their" players to the
attention of Division I coaches and potentially influence players to attend particular
schools, including schools where "their" apparel company is a sponsor.</u>[17]

## D.    The "University of Adidas at Louisville"[18]

75.    Within a few months of the start of Mark King's tenure as Adidas CEO, the
company began signing universities to aggressive all-school sponsorships. Its race to capture
market share culminated in one of the most expensive corporate sponsorships in the history of
college sports: the University of Louisville.

76.    Adidas and the University of Louisville began their relationship in 1998, when
Adidas agreed to give the university's athletic department a small discount on apparel: for every
two pairs of Adidas shoes purchased at retail, Adidas marked down the third pair 20 percent.

77.    Over the years, Adidas would find value in its relationship with Louisville. In
March 2001, Louisville hired Rick Pitino to coach its men's basketball team. At the time, Pitino
was the 16th all-time winning coach in college history. Within a few seasons, Pitino coached
Louisville to their first Final Four appearance in almost two decades, creating buzz for the
basketball team and raising the public profile of its athletics department. In 2013, Pitino coached
Louisville to the NCAA National Championship. The following year, Adidas announced a $39
million branding contract with Louisville.

78.    Within a couple of years, however, Louisville's basketball program would become
embroiled in scandals, leading Louisville to preemptively ban its men's basketball team from any

---

[17]    Commission on College Basketball, Report and Recommendations to Address the Issues Facing College
Basketball Report 25 (2018) ("Rice Commission Report").

[18]    Steve Fainaru & Mark Fainaru-Wada, *How a Mid-level School Became the University of Adidas at Louisville*,
ESPN THE MAGAZINE, Dec. 25, 2017, *available at* http://www.espn.com/espn/otl/story/_/id/21710106/louisville-
athletic-director-tom-jurich-leveraged-big-deals-build-university-sports-powerhouse-only-watch-burn-amid-
charges-excess

USAO373_00024929

post-season play in the 2016 ACC conference championship and NCAA tournament.   The NCAA later ordered Louisville to vacate records of every game it won from the 2011-12 through 2014-15 seasons and all of its NCAA tournament appearances during that period, including its 2012 and 2013 trips to the Final Four and 2013 National Championship.

79.    Just months after the NCAA imposed these sanctions, Adidas and Louisville announced what would be described as "one of the richest sponsorships deals in college athletics." Louisville's athletic director called it "unprecedented for Adidas," while Adidas CEO King labeled it "one of our largest ever investments in sport in America."

80.    Under the terms of the deal, Adidas would pay the athletic department $160 million over ten years, including $79 million in cash, making it the biggest NCAA sponsorship deal ever for Adidas and the fourth largest all-school deal in college athletic history.  Adidas's senior director of sports marketing, Chris McGuire, touted it as Adidas's "largest commitment in the college space."

81.    The agreement provided a six-fold increase in the cash paid annually by Adidas to Louisville's athletic department—from a maximum base compensation of $1,575,000 for the 2017-18 season to $10,000,000 for the 2018-19 season.

82.    Adidas's $160 million deal with the University of Louisville bought itself extreme control over the school's student-athletes.  (*See* Ex. 1).  As an example, the contact cedes approval of certain *medical decisions* to Adidas when there is a possibility that a player's treatment might obscure the company's logo on the basketball court.  To illustrate, if a player's ankle requires taping (a treatment known as "spatting"), Adidas is afforded the right of first refusal should the tape cover up the Adidas logo on the player's shoe.   As author and journalist Michael Sokolove explained:

USAO373_00024930

> Spatting refers to ankle taping, except that the tape goes around the shoe
> and over the sock.  It is more like bracing. As many as half the players in
> the NFL have their ankles spatted every game.  Many athletic trainers
> believe in it, and some studies have shown that it cuts down on the
> occurrence of ankle sprains. . . [19]

The Adidas contract called for penalties to Louisville for multiple occurrences of "unauthorized"

spatting, including a loss of up to 25% of contract payments in a given year if spatting occurs

during the NCAA tournament.  And, if a player or trainer chose to tape an ankle for medical

reasons, Louisville must "afford Adidas the opportunity to remedy the problem."  The contract

also provides that if a player experiences a medical problem related to his shoe, Adidas must have

an opportunity to remedy it before the player is allowed to wear a non-Adidas sneaker.

> In the event any team member shall at any time suffer any physical injury,
> pain, or discomfort attributed to the use of Adidas shoes due to a bona fide
> medical condition as evidenced by a certification by the Team's physician
> which is serious enough to affect the athlete's performance, then University
> shall so advise Adidas and afford Adidas the opportunity to remedy the
> problem.

83.    As record-setting a deal as this was, it was negotiated in almost complete secrecy.

On information and belief, Louisville' athletic director, Tom Jurich, met quietly with two senior

Adidas executives, Chris McGuire and Jim Murphy, over a period of months to hammer out the

terms.  Neither Louisville's President, Dr. Gregory Postel, nor the University of Louisville Athletic

Association's Board of Directors, which governs the athletic department, were consulted or

notified about it.  According to Dr. Postel, he and board members only learned of the record-setting

all-school sneaker deal *after* it was publicly announced by the athletic department.

---

[19]    Michael Sokolove, THE LAST TEMPTATION OF RICK PITINO: A STORY OF CORRUPTION, SCANDAL, AND THE
BIG BUSINESS OF COLLEGE BASKETBALL (Penguin Press 2018).

USAO373_00024931

84.     When later asked by reporters if the Adidas money was "tainted by the alleged role of Adidas executives in the pay for play scheme," that is, Defendants' racketeering activity, Postel replied, "[i]f it's any way tainted, we want no part of it."

## V.    SDNY CRIMINAL INVESTIGATION

85.     On September 26, 2017, federal authorities arrested Adidas executives Gatto and Code, along with financier Sood and would-be agent Dawkins, and unsealed three criminal complaints charging them, four NCAA Division I men's basketball coaches, and two other co-conspirators with years-long criminal fraud and corruption schemes involving bribery of college basketball coaches by Adidas executives and the funneling of illicit and improper payments to the families of student-athlete recruits in violation of NCAA rules.

86.     The criminal complaints and subsequent indictments followed a three-year investigation of the sneaker industry by the U.S. Department of Justice believed to have started in 2014.  The investigation was reportedly sparked by the disclosure of wide-spread corruption in the world of college basketball by a Pittsburgh-based financial advisor named Marty Blazer.  Blazer was under investigation by the Securities and Exchange Commission for defrauding clients and had also been caught up in a separate investigation in North Carolina regarding payments made to student-athlete football players.  Facing up to 67 years in prison on criminal fraud charges, Blazer offered to provide investigators with a roadmap to corruption in college basketball.  Blazer's cooperation had him "flying or driving across the country -- Atlanta, Las Vegas, Miami, New York, South Carolina, New Jersey, West Virginia, Alabama -- to meet with coaches, parents, players, FBI agents and, eventually, executives with Adidas."[20]

---

[20]     Paula Lavigne, *How One Man's Hollywood Flop Set Off NCAA Basketball's Biggest Scandal*, ESPN.COM, Mar. 14, 2018, *available at* http://www.espn.com/espn/story/_/id/22748218/how-one-man-hollywood-flop-set-ncaa-basketball-biggest-scandal

USAO373_00024932

87.    On information and belief, the FBI also intercepted and recorded approximately 6,670 telephone calls by and among Defendants Gatto, Code, Sood, Dawkins, Gassnola and others related to the bribery scheme.  In total, prosecutors identified approximately 49 relevant calls lasting three hours and twenty minutes on Gatto's wiretap; 303 relevant calls lasting forty-six hours on Code's wiretap; 86 relevant calls lasting eight hours on Sood's wiretap; and 554 relevant calls lasting seventy-seven hours on Dawkins's wiretap.

88.    Utilizing the information provided by Blazer and other informants, undercover agents, and the wiretaps, the FBI closed in on the Adidas's executives and co-conspirators.

89.    Prosecutors would discover two related bribery schemes.  In the first, "college basketball coaches took cash bribes from athlete advisors, including business managers and financial advisors, in exchange for using their influence over college players under their control to pressure and direct those players and their families to retain the services of the advisors paying the bribes."

90.    In the second scheme—which is central to this action—prosecutors alleged that Adidas's employees, "working in connection with corrupt advisors, funneled bribe payments to high school-aged players and their families to secure those players' commitments to attend universities sponsored by [Adidas], rather than universities sponsored by rival athletic apparel companies."

91.    The government's criminal complaint charged Gatto, Code, Dawkins, Augustine, and Sood with two counts of wire fraud, one count of conspiracy to commit wire fraud, and one count of money laundering conspiracy.  (*See* Ex. 2.)

92.    In announcing defendants' arrests, the Acting U.S. Attorney for the Southern District of New York, Joon Kim, characterized the behavior of these defendants as "circling blue-

USAO373_00024933

chip prospects like coyotes" and exploiting "the hoop dreams of student-athletes across the country, treating them as little more than opportunities to enrich themselves through bribery and fraud schemes."

93.    FBI Assistant Director William Sweeney, Jr. described the defendants' "corrupt practice in which highly rated high school and college basketball players were steered toward lucrative business deals with agents, advisors, and an international athletics apparel company [Adidas]." (emphasis added).  He also described how Adidas-sponsored NCAA Division I and AAU coaches "created a pay-to-play culture, agreeing to provide access to their most valuable players while also effectively exerting their influence over them."

94.    Federal prosecutors summarized the criminal scheme in the image below:



28

95.    A grand jury subsequently indicted Gatto, Code, and Dawkins on November 7, 2017 for conspiracy to commit wire fraud based on the conduct outlined in the criminal complaint.

96.    On April 10, 2018, a grand jury returned a superseding indictment against Gatto, Code, and Dawkins, charging them each with one count of conspiracy to commit wire fraud and two counts of wire fraud.

97.    Two weeks later, Adidas announced the resignation of its CEO, Mark King, after only four years on the job.

98.    On August 14, 2018, a grand jury returned a second superseding indictment, again charging Gatto, Code, and Dawkins with one count of conspiracy to commit wire fraud and two counts of wire fraud for their role in funneling improper payments to the families of student-athlete recruits for the benefit of Adidas and others.

99.    During its criminal investigation, prosecutors issued subpoenas to Defendant Adidas, the NCAA, and the University of Louisville.  In response to those subpoenas, Adidas produced over 89,000 pages of responsive material, including email correspondence and text messages involving various Adidas employees; the University of Louisville produced over 33,000 pages of responsive material, including email correspondence and text messages involving university employees; and the NCAA produced approximately 1,000 pages of responsive materials.

100.    In addition to the University of Louisville, grand jury subpoenas were also sent to other Adidas-sponsored universities, including North Carolina State University, the University of Kansas, and the University of Maryland.  The January 8, 2018 subpoena issued to the University of Kansas, for example, demanded "[a]ll communications between any member of the Kansas Athletic Department, including the coaching staff of the Kansas men's basketball team, and: (i)

29

USAO373_00024935

James Gatto, a/k/a/ "Jim" [Adidas's head of global sports marketing – basketball]; (ii) Christopher

Rivers [Adidas's director of global basketball sports marketing]; (iii) Thomas ("TJ") Gassnola

[director of an Adidas-sponsored AAU team]; (iv) Merl Code [Adidas consultant], and (v) any

other representative of Adidas."

101.    In October 2018, the criminal cases against Defendants Gatto, Code, and Dawkins

were tried in U.S. District Court.  Following a two-and-a-half-week jury trial, the three defendants

were convicted on all charges: including all wire fraud conspiracy and substantive wire fraud

counts.

102.    Plaintiff is informed and believes that the publicly disclosed revelations from the

federal criminal prosecution against Gatto, Code, and Dawkins have only scratched the surface of

Defendants' criminal conduct—and that of the entire sneaker industry—and therefore will seek

discovery to ascertain the full nature and extent of the illegal scheme perpetrated on Adidas's

behalf by all members of the racketeering enterprise.

## VI.    OVERVIEW OF DEFENDANTS' RACKETEERING ACTIVITY

### A.    The Adidas "Black Ops" Bribery Enterprise

103.    At all times relevant to this Complaint, Adidas America, together with its

executives and agents James Gatto and Chris Rivers; consultants Merl Code and T.J. Gassnola;

Christian Dawkins, financier Munish Sood, and various NCAA coaches and Adidas-sponsored

AAU team directors, collectively constitute an "enterprise," as defined in Title 18, United States

Code § 1961(4), that is, a group of individuals and entities associated in fact (hereinafter the

"Adidas Bribery Enterprise").

104.    The principal purpose of the Adidas Bribery Enterprise is to help Adidas artificially

grow and preserve market share in the ultracompetitive sneaker industry by infiltrating high school

USAO373_00024936

level and Division I men's basketball through bribery and illegal acts, including by funneling Adidas money to predominantly underprivileged parents of prospective student-athletes in order to coerce commitments from their children to play Division I men's basketball at Adidas-sponsored universities so those schools could field the best teams in the NCAA and showcase the Adidas brand to millions of fans. Through this exploitation of the young players' images and likenesses to consumers wishing to purchase shoes and apparel worn by their favorite teams and players, Adidas profited.

105.    Adidas personnel have admitted as much. During opening statements in his criminal trial, Defendant Gatto, through counsel, acknowledged the purpose of this scheme:

- "[F]rom Jim [Gatto's] perspective, this is a win-win-win situation. It's a win for the universities who end up with top-ranked players who hopefully lead the universities to basketball glory. It's a win for Jim's employer, Adidas, which is the corporate sponsor of these universities and which would benefit from being associated with a winning basketball team." (Gatto Opening Crim. Tr. 68:20-69:3.)[21]

- "[T]he evidence will show that these kids bring in millions of dollars in revenue." (Gatto Opening Crim. Tr. 69:12-13.)

- "[A] successful basketball program is the equivalent of a winning lottery ticket." (Gatto Opening Crim. Tr. 70:11-12.)

- "[E]ach of the apparel companies, Nike, Under Armour, Adidas, they are able to sell millions of dollars in merchandise—t-shirts, jerseys, sneakers, you name it. The kids on the court, however, the ones whose blood, sweat and tears is making this game a billion dollar industry, they are not allowed to earn a dime." (Gatto Opening Crim. Tr. 71:12-17.)

- "Now, to be fair, Adidas is not sponsoring these universities out of the goodness of its corporate heart. The better that one of these colleges does on the basketball court, the better it is for Adidas, which gets to be associated with a winning team and in the end hopefully sell more sneakers." (Gatto Opening Crim. Tr. 81:5-9.)

---

[21]    References to the Gatto Opening and Code Opening transcripts are from the first day of the jury trial, October 2, 2018, in the matter *United States v. Gatto et al.*, No. 17-cr-00686-LAK (S.D.N.Y. 2018).

USAO373_00024937

- "And we are going to be straight with you here.  If a basketball coach went to Jim [Gatto] and told him that he really wanted a particular kid on that team and he asked Jim to make that happen, Jim understood, Jim understood that to mean that Adidas should help the kid's family out financially, if that's what they wanted."  (Gatto Opening Crim. Tr. 81:24-82:4.)

106.    Merl Code, through his counsel, also conceded the benefits of the scheme during his opening statement in his criminal trial:

> "The shoe company gets substantial exposure if the shoe company's team does well in the NCAA tournament, and the university gets substantial funds by being sponsored by the shoe company.  So just as a winning team at Duke or Kentucky can be a walking, talking ad for Nike, a Final Four and a national championship team at Louisville can do the exact same thing for Adidas."  (Code Opening Crim. Tr. 101:4-10.)

107.    Upon information and belief, the Adidas Bribery Enterprise participants operated in a cohesive manner, with members working together in a coordinated manner for years to further the Enterprise's goals.  By banding together to prop up the Adidas brand through deceptive and illegal conduct, the Enterprise participants stood to grow their own power and influence in college basketball.

108.    Each member of the Enterprise had a hand in directing and participating in its criminal conduct:

a. The <u>Adidas Participants</u> (Adidas, Gatto, Code, Rivers, and other unidentified Adidas employees and agents), on information and belief, funded the Enterprise, directed its illegal market share strategy, and facilitated the creation and reimbursement of sham invoices, with Adidas providing money for bribes and Defendant Gatto serving as the field marshal of the Enterprise's operations by approving bribe requests coming in from other Enterprise participants, managing its on- and off-the-books budget, and arranging for Adidas money to be laundered through other participants.  Defendant Code assisted Gatto and served as one of

32

USAO373_00024938

several financial intermediaries between Adidas and the coerced student-athletes and families.  Defendant Rivers, along with "Senior Executive-1," an unidentified Adidas executive referenced in an FBI affidavit, also directed Adidas's bribery scheme and directly paid money to players.  Other unidentified Adidas Participants include company employees and agents who facilitated the fraudulent payments from Adidas's treasury by budgeting and approving bribery payment requests, drafting payment instruments and/or ordering wire transfers, and recording false entries on Adidas's financial ledgers in order to cover up the true purpose of the funds, such as accountants, internal auditors, basketball program personnel, and marketing personnel.

b. The Athlete Advisor Participants include Defendants Sood and Dawkins, who on information and belief, served as liaisons with the families of targeted student-athletes, pressured them to sign with specific Adidas-sponsored AAU and Division I teams, laundered Adidas's money so it would appear untraceable in the hands of the coerced student-athletes and families, and served as bagmen.

c. The Division I Basketball Participants include certain NCAA Division I men's basketball coaches at Adidas-sponsored universities, acting in their individual capacities, including coaches at the University of Louisville, University of Kansas, North Carolina State University, and elsewhere.  On information and belief, these participants helped create and grow the market for Adidas bribes and coercion by requesting assistance from the Enterprise in recruiting talented young basketball players to their teams through bribes to their families.  In doing so, these participants acted against the interests of their respective employers, the

USAO373_00024939

universities.  Though these coaches are popular sports figures at their universities, none were authorized by their respective universities to solicit bribe payments from other Enterprise Participants for the benefit of recruiting players.  To the contrary, on information and belief, each was under a contractual obligation at all relevant times to refrain from engaging in any conduct that would violate NCAA rules or conduct that otherwise was not fully aligned with the interests of the universities they served.    Division I Basketball Participants include the following non-defendant co-conspirators:

i.      Kenny Johnson, at all relevant times, was an assistant basketball coach at the University of Louisville, where his responsibilities included recruiting high school athletes to play basketball for Louisville.  Prior to joining Louisville, Coach Johnson served as the recruiting coordinator and assistant basketball coach for Adidas-sponsored Indiana University.  On information and belief, Coach Johnson was aware of and participated in the payment of bribe money to Plaintiff's father.

ii.     Jordan Fair, at all relevant times, was an assistant basketball coach at the University of Louisville, where his responsibilities included recruiting high school athletes to play basketball for Louisville.  Prior to his promotion to assistant coach, Coach Fair served as a program assistant for Louisville's men's basketball team, where his duties included assisting in on-campus recruiting for players.  On information and belief, Coach Fair attended at least one meeting with Enterprise members during which they discussed the bribery scheme.

USAO373_00024940

iii.   Bill Self is the head men's basketball coach at the University of Kansas. On information and belief, Coach Self was aware of a bribe payment made to the legal guardian of Kansas recruit Silvio De Sousa by Adidas and communicated with Defendants Gatto and Gassnola about it.

iv.   Kurtis Townsend is an assistant head men's basketball coach at the University of Kansas. On information and belief, Coach Townsend was aware of a bribe payment made to the legal guardian of Kansas recruit Silvio De Sousa by Adidas and communicated with Defendants Gatto and Gassnola about it.

v.   Orlando Early, at all relevant times, was an assistant head men's basketball coach at North Carolina State University. On information and belief, Coach Early accepted a bribe payment from Adidas on behalf of the father of NC State recruit Dennis Smith, Jr.

d. The AAU Basketball Participants include AAU high school basketball teams sponsored by Adidas and their team directors, coaches, and administrators. On information and belief, these participants, including Defendant Gassnola, helped create and grow the market for Adidas bribes and coercion by identifying talented young basketball players to target and to steer them to other Enterprise participants. AAU Basketball Participants include the following non-defendant co-conspirators:

i.   1 Family, on information and belief, is an Adidas-sponsored AAU basketball team based in Florida and is registered as a charitable organization under Section 501(c)(3) of the Internal Revenue Code.

ii.   Jonathan Brad Augustine who, at all relevant times, served as director of the 1 Family basketball team and as President of the team's 501(c)(3) charitable

USAO373_00024941

organization, whose stated purpose is to provide assistance to high school athletes to help them "grow, develop and achieve in the classroom as well as to secure a scholarship to attend an accredited college or university."

iii.    Karolina Khaos, on information and belief, is an Adidas-sponsored AAU basketball team based in South Carolina and is registered as a charitable organization under Section 501(c)(3) of the Internal Revenue Code.

iv.    New England Playaz, on information and belief, is an Adidas-sponsored AAU basketball team based in Massachusetts and is registered as a charitable organization under Section 501(c)(3) of the Internal Revenue Code.

109.    Within Adidas, the criminal Enterprise was referred to interchangeably as "Black Ops," "Black Ops Soul Patrol," and "underground stuff."

110.    Defendant Chris Rivers discussed Black Ops in a February 17, 2015 email sent to Gatto, Gassnola and approximately a dozen other Adidas employees, including individuals in the company's marketing and grassroots basketball division, where he wrote:

> I am requesting that after every trip a short written recap be sent to Jim [Gatto] and myself.  I am not concerned with the format, although later in the year I will formalize, but it is important that we have notes on who we are seeing and how each of these touch points will help us in the short- and long-term future. . . .
>
> Please don't include any confidential Black Opp's [sic] information but make sure there is enough detail that validates the money we spent, in addition to demonstrating how we are building relationships that will help us in the draft signing process.

111.    In testimony at the criminal trial of Gatto, Code, and Dawkins, T.J. Gassnola confirmed that Rivers's statement regarding "confidential Black Opps [sic] information" was a coded reference meaning "payments to players and families of players" and that Rivers made clear to Adidas employees that he "didn't want any proof of" such payments in writing.

36

112.    Gassnola testified that members of Black Ops included not only the 15 recipients of River's email at Adidas, but others including an AAU team director from Compton, California.

113.    The Enterprise operated continuously, targeting each new class of prospective Division I men's basketball players on an annual basis with the same or similar criminal acts of racketeering in furtherance of its goals.  The activities of the Enterprise are so entwined in Adidas's course of securing market share in the sneaker industry that the company, according to prosecutors, maintained a "multimillion-dollar budget" for bribe payments and, in a few instances when funds ran low, had to postpone bribe payments until the company's next fiscal year.

114.    The Adidas Bribery Enterprise constituted an ongoing organization whose members functioned as a continuing unit, separately and distinctly from its individual members, for the common purpose of achieving the objectives of the Enterprise.  The Enterprise was engaged in and, as set forth herein, its activities affected, interstate commerce.

115.    Because the members of the Adidas Bribery Enterprise were aware that their conduct would render the student-athlete victims ineligible to play Division I basketball and because the means and methods of the enterprise were criminal in nature, they committed to carrying out their illegal conduct in secret.

116.    By banding together to prop up the Adidas brand through deceptive and illegal conduct, all of the Enterprise participants stood to gain financially: the Adidas Participants gained market share and increased top-line revenue for Defendant Adidas, allowing the individual Adidas Participants to ensure their value to the company, secure enhanced performance-based compensation as a result, and, upon information and belief, in some instances divert Adidas bribe money for personal use; the Athlete Advisor participants gained leverage over student-athletes and recruits through their close association with Adidas and the Division I/AAU Basketball

37

USAO373_00024943

Participants such that they could successfully persuade and pressure student-athletes to commit to retaining their professional services upon turning pro; the AAU Basketball Participants gained leverage over high school players through their close association with Adidas, enhancing their reputations as feeder programs for top Adidas-sponsored Division I teams and, upon information and belief, also diverted Adidas bribe money for personal use; while the Division I Basketball Participants gained by securing the country's top high school basketball players to their college teams, thus enhancing their professional reputations and perceived value as top NCAA coaches, leading to enhanced compensation from Division I programs.

117.    To further their corrupt ends, the Defendants and their co-conspirators provided one another with mutual aid and protection. Members of the Enterprise engaged in conduct designed to prevent the detection of their illegal activities, including through clandestine meetings in discreet locations, such as on a yacht and in a Las Vegas hotel room, and communicating in code and on untraceable "burner" cell phones.

**B.    The Adidas Bribery Enterprise Engaged in a Pattern of Racketeering Activity**

118.    On information and belief, Defendants used the Enterprise to engage in a pattern of racketeering activity over many years, during which it targeted many high school student-athlete recruits using the same or similar methods for the purpose of coercing them to play Division I men's basketball at Adidas-sponsored schools.    In operating this racketeering Enterprise, Defendants repeatedly violated federal wire fraud, sports bribery, and money laundering statutes in the District of South Carolina and elsewhere.    Ultimately, the commencement of this racketeering activity is known to Defendants and will be the subject of discovery.

119.    Each of the predicate acts of racketeering listed below was intended to defraud the relevant universities and student-athlete victims in several ways.    First, because the bribe payments

USAO373_00024944

rendered the affected student-athletes ineligible to participate in Division I athletics under NCAA rules, Defendants conspired to conceal the bribe payments from the universities, thereby causing them to provide or agree to provide athletic-based scholarships and financial aid under false and fraudulent pretenses.    Using interstate wire communications, Defendants defrauded the universities, or attempted to do so, thereby depriving the universities of significant and necessary information regarding the non-compliance with NCAA rules caused by their actions.  In doing so, the Defendants knowingly interfered with the universities' ability to control their assets, including decision-making about the distribution of their limited athletic scholarships; and created a risk of tangible economic harm to the universities, such as the possible disgorgement of profit-sharing by the NCAA, monetary fines, restrictions on athlete recruitment and the distribution of athletic scholarships, the potential ineligibility of the universities' basketball teams to compete in NCAA programs in general (also known as the NCAA "death penalty"), and the ineligibility of Division I student-athletes in particular.

120.    Second, using interstate wire communications, Defendants defrauded the unsuspecting student-athletes, including Plaintiff, by depriving them of significant and necessary information regarding the actions taken to destroy their NCAA eligibility.  In doing so, Defendants created a risk of tangible economic harm to the student-athletes, including Plaintiff, and interfered with their right to control their assets and career path, including but not limited to decision-making about which university to attend to receive their education, whether to accept an athletic scholarship offer from a particular university, and whether and when to forego playing in the NCAA and enter the NBA draft.

121.    Third, Defendants knowingly influenced through bribery, or attempted to influence through bribery, Division I men's basketball games in violation of 18 U.S.C. § 224.  By recruiting

USAO373_00024945

the country's top high school basketball players to join Adidas-sponsored Division I teams through coercive bribes to their families, Enterprise participants sought to improve the win-loss records of the Adidas-sponsored universities to the detriment of the non-Adidas teams. Indeed, the overarching purpose of the racketeering activity was to generate more revenue for Adidas by creating greater visibility for the Adidas brand through its association with winning players and winning teams. By influencing which Division I teams the country's top recruits would join, and thus, influencing the composition of those teams, Adidas influenced, or attempted to influence, the outcome of the relevant teams' regular season and tournament basketball games (which are pre-scheduled and publicly announced well in advance of tip-off) to create more wins for Adidas-sponsored teams. Simply put, by securing the top student-athletes in the country on its sponsored teams through this bribery scheme, Adidas stacked the deck against opposing teams, denying opposing teams the fair opportunity to recruit those same players and, on information and belief, caused the opposing coaches, players and teams to alter their game strategy and "start or sit" decisions when competing against Adidas teams with players rendered ineligible because of Defendants' scheme.

122. Fourth, the Defendants knowingly conspired to engage in money laundering in furtherance of their bribery scheme. Specifically, Defendants Adidas, Rivers, Gatto, Code, Dawkins, Gassnola, and Sood did knowingly and willfully combine, conspire, confederate, and agree with each other, with co-conspirators Augustine, Johnson, the New England Playaz, 1 Family, and the Karolina Khaos, and with other persons unknown to Plaintiff to commit offenses against the United States in violation of 18 U.S.C. §§ 1956 and 1957—namely: to knowingly conduct and attempt to conduct financial transactions affecting interstate commerce, which transactions involved the proceeds of specified unlawful activity—that is, wire fraud, sports

USAO373_00024946

bribery, and tax fraud—knowing that the transactions were designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, and that while conducting and attempting to conduct such financial transactions, knew that the property involved in the financial transactions represented the proceeds of some form of unlawful activity.

123.    As a consequence of these criminal acts, the student-athletes who had no knowledge of the fraudulent bribery scheme, such as Plaintiff Bowen, stood to lose, and did in fact lose, their eligibility to continue as student-athletes at NCAA institutions, lost the opportunity to develop and showcase their basketball skills and athleticism in NCAA games and tournaments in a manner that would significantly enhance their marketability to NBA teams, and lost precious competitive playing time to develop into professional athletes in the NBA (a league with an average career length of less than five years), thus minimizing their lifetime earning potential by tens of millions of dollars by, among other things, reducing the amount of time they would play under league maximum contracts.

124.    Both the harm to the universities and the harm to unsuspecting student-athletes was the intended consequence of the scheme.  Defendants needed the universities and their athletic arms to unwittingly award athletic scholarships to these highly sought-after student-athletes in order to induce them to commit to their teams without the knowledge that Defendants' scheme rendered them ineligible under NCAA rules.  Defendants likewise needed the unsuspecting student-athlete recruits to accept those high-value scholarship offers so that they would commit to playing basketball at Adidas-sponsored schools instead of at schools where they may have had better pre-professional athletic and academic opportunities or on professional teams.

41

### i.    Racketeering Activity Involving North Carolina State University

125.    In 2015, on information and belief, the Enterprise targeted Dennis Smith, a young basketball recruit who had committed to play men's basketball for North Carolina State University ("NC State"), a Division I school sponsored by Adidas.  Smith was one of the top high school players in North Carolina and had played on an Adidas-sponsored AAU basketball team while in high school.  He was also a featured player at the Adidas Uprising tournament in California, where Adidas invites the top high school players from around the country to come play and showcase their skills.

126.    In early 2015, on information and belief, Defendant Rivers had approved a bribe payment of $25,000 in order to secure Smith, Jr.'s attendance at Adidas-sponsored NC State. Rivers discussed this arrangement with Defendant T.J. Gassnola following a January 20, 2015 event they attended together.

127.    Yet, in the fall of 2015, Gassnola learned from Orlando Early, an assistant men's basketball coach at NC State coach (referred to in the government's superseding indictment as Coach-4), that Smith was not happy with his decision to commit to NC State and was considering de-committing before the start of the 2016-17 college basketball season.  As Gassnola explained during the criminal trial of Gatto, Code, and Dawkins:

> Orlando Early reached out to me that there were some issues surrounding Dennis and the people around him.  There were certain things that were promised to the family, from who I don't know, but there was a lot of minutia around it, and he just seemed uncomfortable and he was having some issues with keeping that situation together.

128.    Based on that concern, and on information and belief, the Enterprise planned, discussed, and engaged in the following acts using interstate wire communications:

USAO373_00024948

a.      Gassnola told Coach Early that he would pay $40,000 to Dennis Smith, Sr. to ensure his son's commitment to NC State.

b.      On October 30, 2015, Gassnola, based in Massachusetts, withdrew $40,000 in cash from the New England Playaz AAU team account at Berkshire Bank.

c.      On November 1, 2015, Gassnola purchased a ticket on Delta Air Lines and flew from Hartford, Connecticut to Raleigh, North Carolina with the cash.

d.      On November 2, 2015, Gassnola drove to Coach Early's home in a rental car and delivered the bribe money.

e.      Coach Early told Gassnola that he would pass the $40,000 bribe to Shawn Farmer, Smith's Jr.'s personal trainer, who would in turn give the money to Smith Sr.

f.      Gassnola then issued one or more sham invoices to Adidas using interstate wire communication so that Adidas would have a pretext to provide reimbursement for the $40,000 paid to Smith's father.  Adidas and Gatto received one or more sham invoices from Gassnola and provided full reimbursement with knowledge of their falsity and true purpose.

g.      In December 2015, Smith signed a financial aid agreement with NC State and certified his eligibility for an athletic scholarship, including a certification whether in the past year he "or any member of [his family] [had] been paid money, borrowed money, or received any benefit of any kind form an athletics booster, sports agent, runner, or financial advisor," to which Smith responded "no."

h.      Thereafter, Smith enrolled at NC State on an athletic scholarship and played on the school's Division I men's basketball team during the 2016-17.  Smith played in

USAO373_00024949

32 televised NC State games wearing Adidas-branded gear.  Each of these games was publicly announced prior to its occurrence.

129.    The $40,000 payment to Smith's father from Adidas was designed to be concealed, including from the NCAA and officials at NC State, in order for the scheme to succeed and for Smith, Jr. to appear to be eligible to receive an athletic scholarship.  In furtherance of this scheme, Adidas, Gatto, Rivers, Gassnola and other Enterprise participants made, intended to make, or caused or intended to cause others to make false certifications to NC State and the NCAA regarding the existence of the $40,000 bribe payment and known violations of NCAA rules, and for NC State to award scholarship money to an Adidas-sponsored athlete under false pretenses and to interfere with the school's ability to award scholarship funds in a manner consistent with NCAA rules. These certifications included a certification by Dennis Smith, Jr. as to his amateur status and compliance with NCAA amateurism rules and, on information and belief, a false certification by Coach Early regarding his knowledge of recruiting violations.  On information and belief, NC State administrators outside of the athletic department have the final say on whether a student is eligible to receive an athletic scholarship and those administrators would not have approved an athletic scholarship to Smith Jr. had they been aware of the $40,000 payment to his father by Adidas.

130.    Following the $40,000 payment to Smith, Adidas executives, including Gatto and Rivers, discussed a potential shoe endorsement deal with Smith Jr.

131.    In June 2017, Smith entered the NBA draft and now plays basketball for the Dallas Mavericks.  Smith's long-term value to Adidas as a sponsored athlete was based, in part, on his high visibility and position as a point guard.  Yet his unexpected signing of a $2 million sneaker

USAO373_00024950

deal with Under Amour in summer 2017 proved to be "a straight-up coup for Under Armour" and

a huge loss to Adidas.  According to SBNation:

> Smith should've been a no-brainer for any of the big companies.  He ended
> up being a late lottery pick at No. 9, but he's one of the most athletic players
> in the draft class as a guard.  Sneaker companies want to sign guards because
> of how often they have the ball.  All eyes are always on them.
>
> . . . .
>
> Adidas has been there every step of the way for Smith, and it was expected
> that they'd have a bit of pull on him because of their past together.  That
> obviously turned out not to be the case.  Smith's lottery position didn't
> exactly help his cause, but Adidas missed out on an opportunity to sign one
> of the better talents in the draft class.  It hurts them a bit more because now
> they're on the outside looking in with this class.[22]

132.    On July 4, 2017, after Smith Jr. signed the sneaker endorsement deal with Under

Armour, Gassnola sent a text message to Gatto, stating, "Wish you would tell Dennis to beat it.

The disrespect is out of line."

**ii.    Racketeering Activity Involving the University of Kansas**

133.    Between 2015 and 2017, Adidas continued funneling bribe payments to secure

student-athletes' attendance at Adidas-sponsored universities in violation of federal wire fraud,

money laundering, and sport bribery statues.

134.    On information and belief, in or around October 2016 and continuing into at least

November 2017, Gatto, Adidas, and Gassnola conspired to illicitly transfer approximately $90,000

from Adidas to the mother of Billy Preston, a five-star recruit and McDonald's All-American high

school basketball player, to secure his commitment to attend the University of Kansas—a Division

I school sponsored by Adidas.

---

[22]    Michael D. Sykes, II, *Dennis Smith, Jr. Spurns Adidas and Nike to join Under Armour*, SBNATION.COM,
Aug. 8, 2017, *available at* https://www.sbnation.com/2017/8/8/16112342/dennis-smith-jr-under-armour-shoe-deal
(emphasis added).

USAO373_00024951

135.    On information and belief, the agreement to funnel payments to Preston's mother was made by Defendants Gatto, Adidas, Gassnola and others shortly after Preston unofficially committed to the University of Kansas.  These Defendants agreed to conceal the source of payments by causing the money to be transferred indirectly to Preston's mother from Adidas through a series of installment payments from Gassnola's AAU team.  At Gatto's direction, Gassnola submitted sham invoices to Adidas requesting the funds using interstate wire communication, which Adidas provided knowing that the money would be used to bribe Preston's mother to secure his commitment to the University of Kansas. On information and belief, the Enterprise planned, discussed, and engaged in the following acts using interstate wire communications:

    a.    On September 30, 2016, Preston made an official recruiting visit to the University of Kansas and also attended the opening night of the Kansas men's and women's basketball practice on October 1 known as "Late Night at the Phog."  Jim Gatto and T.J. Gassnola also attended the event, as did Preston's mother.

    b.    That evening, Gassnola met with Preston's mother in his room at the Olead Hotel and instructed her not to accept any offers of money from anyone other than Adidas. He then then offered her a bribe of $90,000 to ensure Preston would play for the University of Kansas men's basketball team.

    c.    The following morning, as Gassnola and Gatto were travelling to the airport, Gassnola recounted his conversation with Preston's mother.  Gatto instructed Gassnola to move forward with the payments.

    d.    Gassnola subsequently emailed an invoice dated October 15, 2016 to Gatto in order to secure the first installment of the bribe payment.  To paper over the true purpose

USAO373_00024952

and recipient of the funds, Gatto and Gassnola agreed to describe the payment on

the invoice as a "Basketball Team Tournaments Fee" for Gassnola's AAU team,

the New England Playaz.

e.  On October 21, 2016, Adidas wired $50,000 into the New England Playaz bank

account.

f.  On or about October 31, 2016, Gassnola withdrew the $50,000 Adidas payment

from the team's account and, on November 1, 2016, personally delivered $30,000

to Preston's mother at a hotel room in Manhattan, New York.

g.  On November 9, 2016, Preston and his mother signed certain paperwork submitted

to the University of Kansas in connection with Preston's intention to enroll and

accept an athletic scholarship from the school.  In particular, Preston certified his

understanding that in order "to qualify for this athletic aid, I must . . . [m]eet and

maintain eligibility requirements for participation and financial aid established by"

the NCAA and University of Kansas.

h.  On January 18, 2017, Adidas wired $90,000 to the New England Playaz bank

account at Berkshire Bank, a portion of which was intended for Preston's mother.

To conceal the true purpose and recipient of the funds, Gatto and Gassnola

described the payment on the invoice as "2017 1st Quarter Consultant Fee and T &

E for 1st Quarter 2017."

i.  On January 19, 2017, Gassnola withdrew $27,500 of those funds in cash.  He then

met Preston's mother in a room at the SLS Las Vegas Hotel and gave her an

envelope containing $20,000 in cash.  Gassnola kept the remaining $7,500 for

gambling and shopping expenses.

USAO373_00024953

j.  On February 24, 2017, Gassnola instructed his fiancée to wire $20,000 to Preston's partner, Timcha Kirby.  Gassnola told his fiancée to describe the payment on the wire transfer as "basketball camp."

k.  Gassnola later told Gatto about the payment, and they agreed to use another sham invoice to secure the funds to reimburse Gassnola.  Gassnola subsequently sent Gatto an invoice from himself, dated May 1, 2017, requesting payment from Adidas to the New England Playaz account at Berkshire Bank for a $70,000 "tournament activation fee."  Gassnola testified that this description was false and that he, Gatto, and Adidas intend a portion of the money to be paid to Preston's mother.

l.  On May 31, 2017, Adidas wired $70,000 to the New England Playaz bank account at Berkshire Bank, a portion of which was intended for Preston's mother.

m. On June 14, 2017, Gassnola wired $15,000 from the New England Playaz account at Berkshire Bank to Preston's mother.

n.  Adidas would make one more payment to Preston's mother: in a text message dated Sept. 22, 2017, Gassnola informed Preston's mother: "Have money for you, 4K. Gonna send it late today, early tomorrow when I get back from Atlanta."

136.    In and around August 2017, Adidas and other members of the Enterprise conspired to secure through bribery the commitment of yet another top-rated high school basketball player to the University of Kansas, Silvio De Sousa.

137.    On August 8, 2017, University of Kansas assistant men's basketball coach Kurtis Townsend forwarded to Gassnola the contact information for De Sousa's legal guardian, Fenny Falmagne.  The next morning, at 10:22 a.m., Gassnola texted Kansas head coach Bill Self with a request: "Hall of Famer.  When you have 5 minutes and your alone.  Call me p."  Two hours later,

48

at 11:43 a.m., Coach Self called Gassnola on the telephone and they spoke for five minutes and

six seconds.

138.    Later on August 9, 2017, beginning at 5:24 p.m., Gassnola and Coach Townsend

exchanged the following text messages:

    a. Gassnola to Townsend at 5:24 p.m.: "Hit me when u can"

    b. Townsend to Gassnola at 6:08 p.m.: "Coach self just talked to fenny let me know
       how it goes."

    c. Gassnola to Townsend at 6:08 p.m.: "I call no answer"

    d. Gassnola to Townsend at 6:08 p.m.: "I'll do it again now"

    e. Townsend to Gassnola at 6:08 p.m.: "He was on with us."

139.    At the time, De Sousa's legal guardian, Fenny Falmagne, had informed Gassnola

that he had received an illicit $60,000 payment from an unidentified booster for the University of

Maryland in return for a commitment to steer De Sousa to play basketball there (the University of

Maryland has an apparel contract with Under Armour).  De Sousa's guardian explained to

Gassnola, on information and belief, that De Sousa preferred to attend the University of Kansas,

but in order to do so the guardian would need to repay the illicit payments to the University of

Maryland booster.

140.    Later on the evening of August 9, 2017, Gassnola and Coach Self exchanged the

following text messages:

    a. Gassnola to Self at 9:33 p.m.: "I talked with Fennie"

    b. Self to Gassnola at 9:34 p.m.: "We good?"

    c. Gassnola to Self at 9:34 p.m.: "Always. That's was light work.  Ball is in his court
       now."

USAO373_00024955

d. Self to Gassnola at 9:34 p.m.: "Spoke to Sean.  All good."  [According to prosecutors, Coach Self was referring to Kansas deputy athletic director Sean Lester.]

e. Gassnola to Self at 9:35 p.m.: "Will it be done by Tuesday Deadline ?"

f. Self to Gassnola at 9:35 p.m.: "From what I was told yes"

g. Gassnola to Self: "Great. Thank u boss"

141.    At the time of the above exchange, Kansas and Adidas were in the midst of negotiating an extension of Adidas's apparel sponsorship agreement with the university.  On information and belief, Coach Self linked in his discussion with Gassnola the help that he was getting from Adidas to bring him players such as De Sousa to the school's extension of Adidas's sponsorship agreement.

142.    On August 16, 2017, Coach Townsend forwarded to Gassnola a text message he received from Fenny Falmagne.  The forwarded text message was a conversation Falmagne had with his boss, Jon Lasko.  Lasko is a board member of the Under Armour-sponsored AAU team called the Florida Vipers.  De Sousa was a player on the Florida Vipers team.

a. In the original message to Falmagne, Lasko writes: "Fenny, I am in Indiana and Coach Ostrum asked me for an update.  They are super willing to do what it takes to recruit Silvio.  Is that something of interest for us?"  [Ostrum is an associate head coach of the Indiana University men's basketball team.]

b. Falmagne forwarded the message from Lasko to Coach Townsend and explained: "Coach, that's my boss.  Still pushing the issue, coach."

c. Coach Townsend then forwarded the message to Gassnola.  Gassnola asked Townsend to explain its context.  Townsend replied, "He needs to <u>get out from under this guy</u>.  Doesn't mean anything, I was sending you what he sent me" (emphasis added).  On information and belief, "get out from under this guy" was a reference to Lasko (the board member of the Under Armour sponsored AAU team) and the attempt to pay back the University of Maryland booster.

143.    On August 19, 2017, Gassnola and Coach Self exchanged more text messages.  On information and belief, Coach Self was reiterating his request for the Enterprise's assistance in

50

securing top recruits to his team as a condition for his support of Adidas's sponsorship agreement with Kansas:

    a. Gassnola to Coach Self at 2:52 p.m.: "Hall of famer.  Thank you for the help with Getting this extension done.  Thx brotha"

    b. Self to Gassnola at 2:53 p.m.: "I'm happy with adidas.  Just got to get a couple of real guys."

144.    In response to the above discussions between Gassnola and the Kansas coaches, the Enterprise executed another criminal conspiracy involving wire fraud and sports bribery to secure De Sousa's commitment to the University of Kansas.  On information and belief, the Enterprise planned, discussed, and engaged in the following acts using interstate wire communications in furtherance of that conspiracy:

    a. After speaking with De Sousa's guardian, Gassnola informed Gatto of the situation regarding the need to repay $60,000 "to get Silvio's guy out from under his deal they had with this booster from Maryland."  Gassnola testified that he told Gatto "what it was going to cost and what we had to do to get it done."

    b. On Saturday, August 26, 2017, De Sousa and Falmagne made what the media described as a "surprise" official recruiting visit to the University of Kansas.  Later that day, Coach Townsend forwarded to Gassnola a text message he received from Falmagne which read: "We are good to go  We will commit tomorrow"

    c. On Sunday, August 27, 2017, De Sousa orally committed to play basketball at the University of Kansas.

    d. On Monday, August 28, 2017, Gassnola sent a text message to Gatto stating, "Silvio De Sousa commits to KU today."

51

e.  On Wednesday, August 30, 2017, De Sousa officially signed with the University
    of Kansas.  Sports journalists covering college basketball described De Sousa's
    decision not to attend the University of Maryland and, instead, commit to Kansas
    as a surprise: "His visit came out of nowhere and the whole process of recruiting
    him was shorter than most.  But that was all of the time Class of 2018, five-star big
    man Silvio De Sousa needed to discover that Kansas was the right place for him."[23]

f.  On Thursday, August 31, 2017 at 4:21 p.m., Coach Self and Defendant Gatto had
    a five-minute telephone conversation.  The call was wiretapped by the FBI, but due
    to a technical issue the conversation apparently was not recorded.

g.  On or about September 11, 2017, Gatto spoke with Gassnola by telephone.  During
    the call, Gassnola told Gatto "I have got to send this guy <u>another 20 grand</u> out on
    Wednesday," referring to Fenny Falmagne, "because I have got to <u>get him out from</u>
    <u>under this Under Armor deal</u>," (emphasis added).  Gatto and Gassnola then
    discussed how Adidas and Gatto would reimburse Gassnola for making the $20,000
    payment.  They also discussed Gassnola's expenses, including discussions
    regarding Black Ops "underground" payments and whether to include those in
    Gassnola's expense reports.  Gatto told Gassnola on the call, "Put it all down, put
    everything down."

h.  Less than two weeks later, on September 22, 2017, Adidas publicly announced the
    extension of its sponsorship agreement with the University of Kansas.[24]  Under the

---

[23]    Mark Tait, *KU Lands Commitment from 5-Star, 2018 Power Forward Silvio De Sousa*, KUSPORTS.COM,
Aug. 30, 2017, *available at* http://www2 kusports.com/news/2017/aug/30/sources-ku-lands-commitment-5-star-
2018-power-forw/
[24]    Press Release, Adidas America, Inc., Adidas and University of Kansas Announce an Extension in Their
Long-term Partnership (Sept. 22, 2017), *available at* https://news.adidas.com/US/Latest-News/adidas-and-university-
of-kansas-announce-an-extension-in-their-long-term-partnership/s/75f006e9-ed57-4ba1-b3fe-ddc1372145ff

USAO373_00024958

terms of the deal, Adidas would continue providing Kansas student-athletes with Adidas-branded footwear, uniforms, apparel, and accessories through 2031. The $191 million deal is the second largest Adidas sponsorship in college sports, and the largest in terms of total dollars paid to a school.

i.  On or about November 13, 2017, De Sousa and his guardian each signed certain paperwork submitted to the University of Kansas in connection with De Sousa's intention to enroll and acceptance of an athletic scholarship from the school. In particular, De Sousa certified his understanding that in order "to qualify for this athletic aid, I must . . . [m]eet and maintain eligibility requirements for participation and financial aid established by" the NCAA and University of Kansas.

145.  On information and belief, the payments made by Adidas to Billy Preston's mother and Silvio De Sousa's guardian were designed to be concealed, including from the NCAA and officials at the University of Kansas, among others, for the scheme to succeed and for the student-athletes to appear eligible to receive an athletic scholarship. In furtherance of this scheme, Adidas, Gatto, Gassnola and other members of the Enterprise made, intended to make, or caused or intended to cause others to make false certifications to the University of Kansas and the NCAA about the existence of the payments and known violations of NCAA rules, and for the University of Kansas to award scholarship money to Adidas-sponsored athletes under false pretenses and to interfere with the university's ability to award scholarship funds in a manner consistent with NCAA rules. These certifications included certifications by Billy Preston and Silvio De Sousa as to their amateur status and compliance with NCAA amateurism rules and, on information and belief, false certifications by Coach Self and Coach Townsend regarding their knowledge of potential recruiting violations. On information and belief, University of Kansas administrators

53

USAO373_00024959

outside of the athletic department have the final say on whether a student is eligible to receive an athletic scholarship and those administrators would not have approved athletic scholarships to Preston or De Sousa had they been aware of the bribe payments by Adidas.

146.    Kansas played in 39 games during the 2017-18 season for which Preston and De Sousa were recruited as players.  Each of these games was publicly announced prior to its occurrence.

### iii.    Racketeering Activity Involving the University of Miami

147.    Upon information and belief, beginning in July 2017, Enterprise members Gatto, Code, Augustine, Dawkins, and unknown others, conspired to illicitly funnel approximately $150,000 from Adidas to the family of another student-athlete who was a top high school basketball player in an effort to secure his commitment to play basketball at the University of Miami.  On information and belief, the Enterprise engaged in the following acts in furtherance of that conspiracy:

a.    On or about August 9, 2017, Dawkins and Code discussed by telephone a plan to pay money to the family of the high school recruit in order to secure his commitment to play basketball at the University of Miami.  During the call, Dawkins and Code discussed the fact that a coach at the University of Miami would need to telephone Gatto as part of the scheme.  Dawkins told Code on the call that the Miami coach "knows something gotta happen for it to get done."

b.    A few days later, on August 11, 2017, Gatto and Code spoke by telephone about an alleged request from the University of Miami coach that Adidas pay $150,000 to the high school recruit in order to prevent him from committing to a different university sponsored by a rival athletic apparel company that supposedly offered to

USAO373_00024960

pay him $150,000.  During the call, Code told Gatto that they had "another [University of Louisville] situation" and that Miami coaches wanted to recruit this high school player to join its 2018 team.  Gatto confirmed that he had already learned about the request from coaches at Miami for assistance in securing the particular high school player's commitment to attend the University of Miami, and told Code that he had already spoken to the Miami coach about the player.  During the call, Gatto indicated Adidas's willingness to pay money to the recruit's family to secure his commitment to Miami, but with respect to the $150,000 sum, Gatto asked Code to try to negotiate the price down to $100,000.

c.  The University of Miami played 32 games during the 2017-18 season.  Each of these games was publicly announced prior to its occurrence.

### iv.  Racketeering Activity Involving the University of Louisville that Injured Plaintiff Brian Bowen

148.  By Spring 2017, the Enterprise's scheme to funnel bribe payments to secure student-athletes' attendance at Adidas-sponsored universities escalated to larger dollar amounts.

149.  By May 2017, Brian had not yet decided where he would attend college and play Division I basketball.

150.  Brian was a highly sought-after college prospect because he performed in the classroom, on the court and was relentless in his pursuit to maximize his God-given athletic ability.

151.  Under NCAA rules recruits like Brian are only allowed five (5) official visits to Division I schools.

152.  For many high school students five official visits would be more than enough visits to allow them to make the best athletic and academic decision for their future.  For Brian, however,

USAO373_00024961

this rule handicapped him in his ability to fully assess each of the many schools that had offered him a full scholarship.

153.    Brian did not choose the University of Louisville as one of his five official visits. This fact, upon information and belief, was not lost on the Defendants and led them to contact Brian's father about securing a commitment from Brian to play at the University of Louisville.

154.    On May 18, 2017, Dawkins sent Merl Code a text message asking, "Any Adidas schools that make sense for Bowen?"  A few days later, Code responded to Dawkins: "don't send Bowen to Oregon.  Call me."  The University of Oregon is a Nike sponsored school.

155.    In the days that followed, and on information and belief, federal authorities intercepted cellular telephone calls during which Defendants Gatto, Code, Sood, Gassnola, Dawkins and unidentified others agreed to a request from an assistant coach at the University of Louisville that Adidas bribe Brian's father to ensure his son's commitment to play at the University of Louisville and to ensure his son would sign an endorsement deal with Adidas upon entering the NBA.  During one of those conversations, Gatto asked Code, "What do we do with Bowen?  A hundred?"

156.    On May 30, 2017, Dawkins and Code spoke on the telephone.  Dawkins said, "Tell Jim [Gatto].  Let's get it done.  I have to discuss with you the set up in the a.m."  At no time ever, however, had Plaintiff hired or authorized Dawkins or anyone else to act in any capacity as a sports agent or to secure his admission to any university in exchange for any benefit.

157.    The following day, May 31, 2017, Dawkins sent a text message to Code: "The deal is pretty much done.  Just need to get everything lined up with Gatto and we can get scholarship papers signed.  I can hold off Oregon, I'm pretty sure."  Code responded minutes later: "It's done. We just need to get the letter of intent signed, not just the scholarship papers."  Although the

USAO373_00024962

deadline for a college basketball recruit to sign a "letter of intent" had long since passed, on information and belief, Code wanted Brian to sign such a letter because doing so would commit him in writing to the University of Louisville (and, therefore, Adidas).

158.    That same day, Gassnola sent a text message to Dawkins stating, "Bowen needs to commit this evening."

159.    On June 3, 2017, Brian announced publicly that he would attend the University of Louisville. Brian's decision to attend the University of Louisville came after he visited its campus, where he met with Coach Pitino, assistant coaches Kenny Johnson and Jordan Fair, and other members of the university's athletic department.  While there, the athletic department informed him that he was eligible to play Division I basketball and offered him a spot on the basketball team.  Believing the coaches and athletic department officials were acting in good faith, and relying on their representations regarding his NCAA eligibility, Brian accepted the offer.  Furthermore, on June 1, 2017, Brian entered into a student-athlete financial aid contract with the University. This legally binding contract represented, among other things, a property interest that Brian possessed and was entitled to enjoy free from the Defendants' interference or harm.

160.    Brian had no knowledge of the Adidas bribery scheme and had no reason to believe that Adidas and its co-conspirators were engaged in criminal acts to secure his commitment to the University of Louisville.

161.    Upon information and belief, Adidas was expected to record the $100,000 payment to Brian's father "off the books," as that was the manner in which prior dealings with Defendant Code had been handled by Adidas.  But prior to making the bribe payment, Gatto and Code needed to generate a sham purchase order and invoice to mask the illegal payment on Adidas's financial records so it could not be traced back to the company if it were to ever come to light.

USAO373_00024963

162.    On June 5, 2017, Code sent Gatto a sham invoice from the Karolina Khaos AAU team based in South Carolina for $25,000 in travel expenses.  Gatto approved this invoice for payment knowing it was false and sent it to Adidas's marketing finance department for payment.

163.    On June 19, 2017, Gatto forwarded a second invoice from the Karolina Khaos AAU team for $5,000 to the Adidas marketing finance department for payment knowing it was false. Gatto told the recipient, "I sent you an invoice last week for them, was for something else.  This is for some travel, can you please process this one as well."

164.    On June 22, 2017, the marketing finance department sent an email response to Gatto informing him that the Karolina Khaos team could not be found in the company's vendor payment system and that it would need to be registered as a vendor before the invoice could be processed. Gatto subsequently informed Code of the problem.

165.    Code then asked Sood, Dawkins, and an unidentified FBI undercover agent referred to as Jeff DeAngelo, who was posing as a financial backer for a new sports management business that Dawkins and Sood were forming called Loyd Inc, to make an initial $25,000 payment to Brian's father on Adidas's behalf with the understanding that it would later be reimbursed by Adidas.  In particular, on or about July 7, 2017, Dawkins and Code discussed this plan on a telephone call that was picked up on the FBI's wiretap:

    a.  Code told Dawkins that he had "bad news" about the payment from Adidas, explaining that "my group gets [] an email about the invoice" that "ask[s] for all these PO numbers and vendor numbers and blah blah blah blah blah."

    b.  Code explained that he had expected Gatto and Adidas to have handled the bribery payment "off the books," noting that he had received such payments earlier that year that "didn't go through the system."

USAO373_00024964

    c.   Code then informed Dawkins that he had tried to submit a sham invoice to Adidas for the bribe payment, but when he submitted the invoice "for the whole [University of Louisville] situation," Adidas "didn't have a record of [the] organization in the system." Code described how he would have to "create a vendor number" and then a "purchase order" to justify the request for bribe money. Consequently, they would not have access to the funds for several weeks.

    d.   Code lamented to Dawkins that Gatto should have "flex[ed] his muscle and push[ed] it though the system, but that's obviously not what's happening." Code then asked whether Dawkins could arrange for Sood or DeAngelo to make an initial payment to Brian's father. Code told Dawkins that Adidas would reimburse them for the initial payment.

166.    Upon information and belief, on or about July 10, 2017, Code, Sood and DeAngelo spoke on a telephone call regarding the need for DeAngelo to fund the initial $25,000 payment. Code explained that sham arrangements like this are how athletic apparel companies like Adidas mask payments to high-school athletes in order to get around NCAA rules. Code further admitted that the rationale behind Adidas making such payments was to ensure not only that a targeted high-school athlete would attend an Adidas-sponsored university, but also that the athlete would sign an endorsement deal with Adidas when he entered the NBA. In particular:

    a.   Code, Sood, and DeAngelo discussed the possibility that DeAngelo would "front" the money needed to make the first $25,000 payment because, according to Code, "long story short, it's gotta go through some processes at Adidas and steps and what have you, and it takes a while, so we're talking another two to three weeks before it really runs through the corporate structure."

USAO373_00024965

b.  Code suggested to Sood and DeAngelo that "for cleanliness and lack of questions," the bribe payment should be in cash.

c.  Code also confirmed the rationale for the bribe was to ensure that Brian would sign an endorsement contract with Adidas and Dawkins's new company when he entered the NBA.

d.  DeAngelo agreed to front the initial $25,000 payment and Code confirmed that Adidas could reimburse the payment in "a number of ways."

e.  Code told Sood that Adidas could not reimburse Loyd Inc. directly, but the payment would have to be funneled through a "501(c)(3)" and then the 501(c)(3) organization would pass it to Brian's father.

f.  Code also told Sood and DeAngelo that "you guys are being introduced to . . . how stuff happens with kids and getting into particular schools and so this is kind of one of those instances where we needed to step up and help one of our flagship schools in [Louisville], you know, secure a five star caliber kid.  Obviously that helps, you know, our potential business . . . and that's an Adidas-sponsored school."

g.  Highlighting Defendant's intent to defraud the university, Code explained that by funneling the money through third-party companies, Adidas was "not engaging in a monetary relationship with an amateur athlete," rather, "we're engaging in a monetary relationship with a business manager, and whatever he decides to do with it, that's between him and the [student-athlete's] family."  Code added, "we can't get involved directly in those kinds of situations and scenarios."

USAO373_00024966

167.    Upon information and belief, on July 12, 2017, the undercover FBI agent known as Jeff DeAngelo traveled to Sood's office in Princeton, New Jersey and gave him an envelope containing $25,000 in cash.

168.    Sood then confirmed to Dawkins that he received the cash.  The same day, Dawkins sent Sood a text message stating, "OK.  Cool.  Give him [Bowen, Sr.] 19,400, put the rest in my account."

169.    On July 13, 2017, Sood drove to a parking lot of an office building in Morristown, New Jersey to meet Bowen, Sr. and gave him $19,400 in cash.

170.    Upon information and belief, during a telephone call on July 14, 2017 between Sood and Dawkins, Sood confirmed that he provided Brian's father the bribe money and expressed his belief that by doing so he had secured Brian's commitment to attend the University of Louisville and commitment to retain a new sports management company that Dawkins and Sood were forming.

171.    On the July 14 call, Dawkins explained to Sood that if Brian was a "one and done" player, meaning that if he played only one year of Division I men's basketball before entering the NBA draft, "he may be top 20" pick in the draft, but if Brian played two years of Division I basketball he "should be a top ten pick."

172.    On or about July 24, 2017, federal authorities recorded a call between Code and Dawkins discussing how Gatto and others at Adidas intended to reimburse the initial $25,000 installment of the bribe and make payment on the balance.  Dawkins told Code that he did not want anything "funky" to happen to the funding.  Code agreed, telling Dawkins that he might have to "lean on" another senior executive at Adidas to finance the payments.  Code and Dawkins also discussed that Gatto and others at Adidas were accounting for the unlawful bribe payment by

USAO373_00024967

booking it on Adidas's records as a payment to the Karolina Khaos AAU team that is affiliated with Code. When Dawkins expressed surprise that Adidas was recording some of the bribe payments on its books at all, Code reassured him that Gatto had identified it "as a payment to my team, to my organization, so it's on the books, [but] it's not on the books for what it's actually for."

173.    On August 1, 2017, the Karolina Khaos AAU team received an incoming wire transfer of $30,000 from Adidas. The same day, a $25,000 check issued from the Wells Fargo bank account belonging to the Karolina Khaos AAU team was deposited into Dawkins's Loyd Inc. account at Bank of America. In an apparent effort to obscure its illegal purpose, and at Code's direction, the memo line of the $25,000 check identified it as a payment for "consulting fees."

174.    Upon information and belief, in a telephone call on or about August 16, 2017, Dawkins confirmed to the undercover FBI agent known as Jill Bailey that Code had reimbursed Dawkins on behalf of Adidas through a payment to Dawkins's Loyd Inc. account. During that call, Dawkins also told Bailey that he was in the process of signing family members who received Adidas bribe money to agreements because "I want us as protected as possible across the board," adding that," obviously we have to put funding out, and obviously some of it can't be completely accounted for on paper because some of it is, whatever you want to call it, illegal."

175.    On information and belief, Gatto and Code started making plans in mid-September 2017 to create another sham invoice to cover a second $25,000 installment of the bribe payment that was to be made to Brian's father in November 2017. On or about September 13, 2017, federal authorities recorded a telephone call between Gatto and Code in which they discussed plans for the additional bribe payments to be made by Adidas. During that call, Gatto told Code that in order to prepare for a second payment in November 2017, they should "get the invoice in now,"

USAO373_00024968

adding that "it's probably going to take a month, haha, in our system . . . Let's just get that out of the way now." Gatto noted that they would "figure out the other fifty [thousand] in '18."

176.    Gatto and Code were arrested before the second payment could be made.

177.    The agreed upon $100,000 series of payments to Brian's father from Adidas was designed to be concealed, including from Brian, the NCAA, and officials at the University of Louisville, for the scheme to succeed and for Brian to appear to be eligible to receive an athletic scholarship.  In furtherance of this scheme, Adidas, Gatto, Rivers, Gassnola and other Enterprise participants knowingly made, intended to make, or caused or intended to cause others to make false certifications to the University of Louisville and the NCAA regarding the existence of the $100,000 bribe and known violations of NCAA rules, and for Louisville to award scholarship money to an Adidas-sponsored athlete under false pretenses and to interfere with the school's ability to award scholarship funds in a manner consistent with NCAA rules.  These certifications included a certification by Brian as to his amateur status and compliance with NCAA amateurism rules and, on information and belief, false certifications by Coach Johnson and Coach Fair regarding their knowledge of potential recruiting violations.  On information and belief, University of Louisville administrators outside of the athletic department have the final say on whether a student is eligible to receive an athletic scholarship and those administrators would not have approved an athletic scholarship to Brian had they been aware of the bribe payments to his father by Adidas and Coach Johnson.

178.    Upon information and belief, Brian Bowen was not the only student-athlete whom the Enterprise improperly sought to steer to the University of Louisville via the bribery scheme with the expectation that he would sign an endorsement deal with Adidas when he entered the NBA.  On or about July 27, 2017, federal authorities recorded a meeting in a Las Vegas hotel room

USAO373_00024969

between Jeff DeAngelo, Dawkins, co-conspirator Brad Augustine, an unidentified assistant basketball coach for the University of Louisville ("Coach-1"), which on information and belief is Jordan Fair, and FBI informant Marty Blazer, during which the five men discussed their plans to bribe the family of a high school recruit who was playing for Augustine's "1 Family" AAU team and expected to graduate in 2019.  As Dawkins explained, the money would "get this kid to," attend the University of Louisville with the expectation that "the kid will come back to us," referring to himself and the sports management business he was forming with of Sood.  Further, on information and belief, during the Las Vegas meeting:

a. Dawkins noted that because Louisville was already on probation with the NCAA, they would have to be particularly careful with how they passed money to the high school recruit's family.  Coach Fair agreed, stating "we gotta be very low key."

b. Augustine stated that Adidas, which sponsored the second player's AAU team, would be supportive of the plan, while Dawkins concluded that their plan to funnel money to the high school player's family in exchange for the player's commitment to attend the University of Louisville and to sign with Dawkins and Adidas "works on every angle. We have Merl [Code] at [Adidas], we have Brad [Augustine] out with the kid," and, nodding at Coach Fair, "we have [the University of Louisville]."

c. Dawkins, DeAngelo, and Augustine then discussed the logistics of funneling bribe payments from Adidas to the recruit's family.  Augustine suggested the "easiest way" would be to send the money to a non-profit set up for Augustine's 1 Family team, but that he would also accept cash.  DeAngelo then handed Augustine an envelope containing $12,700 in cash and explained to Coach Fair that it would

USAO373_00024970

"mak[e] [Louisville] and your program happy in the sense that the kid is . . . going to Louisville, and after Louisville, he's gonna come back to us."

    d.    After Coach Fair left the hotel room, Dawkins and the others spoke about the scheme to bribe Plaintiff Bowen's father.

179.    The University of Louisville played 33 games during the 2017-18 regular season. Each of these games was publicly announced prior to its occurrence.

## C.    <u>Money Laundering Conspiracy in Furtherance of the Enterprise's Predicate Acts</u>

180.    In executing the bribery scheme described above, the Adidas Bribery Enterprise participants conspired to knowingly conduct and attempt to conduct financial transactions affecting interstate commerce involving the proceeds of specified unlawful activity—*i.e.*, wire fraud, sports bribery, and tax fraud—knowing that the transactions were designed in whole or in part to conceal and disguise the nature, location, source, ownership and control of the proceeds of such unlawful activity and knowing that the funds involved represented proceeds of some form of unlawful activity.

181.    As set forth above, and on information and belief, the Enterprise has engaged in predicate acts of racketeering for years, including in the period when informant Marty Blazer first learned of the criminal conduct.

182.    Specifically, and in the words one of Adidas's sneaker industry competitors, "[A]didas achieved valuable marketing advantages as the players subject to its bribes wore [A]didas's products, impliedly suggesting that such products have superior style or performance characteristics. [A]didas thereby unfairly and illegally boosted its goodwill, image, and reputation and affected consumer preferences—both in the athletic performance and athletic fashion footwear markets and in the overall footwear market where both companies [Adidas and Skechers]

65

USAO373_00024971

compete." *Skechers USA, Inc. v. Adidas America, Inc.*, No. 2:18-cv-03882, C.D. Cal. May 9, 2018 (ECF No. 1 ¶ 4).

183.    Upon information and belief, as a result of affecting consumer preferences through its unlawful bribery and market boosting efforts, Adidas generated additional proceeds from sales of apparel and footwear that it would not have received had it not engaged in the criminal acts of racketeering described herein—money that the Adidas Bribery Enterprise participants then converted to cash through their sham invoicing scheme and illegally directed to the next round of prospective student-athletes at Adidas-sponsored universities.

184.    To conceal its redeployment of these proceeds, the Enterprise laundered these funds through bank accounts controlled by AAU grassroots basketball teams affiliated with the Adidas brand and controlled by Defendants Code, Gassnola, and other AAU Basketball Participants.  The purpose of laundering the funds through AAU grassroots basketball teams was to conceal the source of the funds before they were delivered to families of student-athlete recruits so there would be no apparent linkage to Adidas.

185.    Among the AAU basketball teams that the Enterprise conspired to launder Adidas's proceeds through are the Karolina Khaos, based in South Carolina, the New England Playaz, based in Massachusetts, and 1Family, based in Florida.

186.    On information and belief, each of these teams are registered as tax-exempt charitable organizations under section 501(c)(3) of the Internal Revenue Code.

187.    For example, Defendants attempted to launder money to be paid to Plaintiff's father by creating and paying sham invoices ostensibly from the Karolina Khaos AAU team.  In June 2017, Ricky Robertson, the director of basketball operations for the Karolina Khaos and manager of its finances, met with Defendant Code at Robertson's church.  During the meeting, Code

USAO373_00024972

informed Robertson that "there would be some extra money coming" into the team's bank account and to let Code know when the money arrived. Code did not inform Robertson of the purpose of the incoming funds.

188.    On June 5, 2017, Code sent an email to Gatto that included as an attachment an invoice from the Karolina Khaos for $25,000 in travel team expenses, which Gatto then approved and forwarded to Adidas's marketing finance department for payment.

189.    On June 19, 2017, Gatto sent a second email to the marketing finance department with another invoice from the Karolina Khaos for $5000. Gatto told the recipient, "I sent you an invoice last week for them, was for something else. This is for some travel, can you please process this one as well."

190.    On June 22, 2017, the marketing finance department sent an email response to Gatto stating, "I cannot find these guys in the system. We will need to set them up as a vendor. Do you need the forms?"

191.    On July 6, 2017, Merl Code sent an email to Adidas's basketball sports marketing department, copying Robertson, that included as an attachment an invoice labeled "Karolina Khaos, July travel expenses, Adidas invoice 2017." The invoice, dated June 18, 2017, indicated it was from the Karolina Khaos, care of Robertson, to Jim Gatto. The invoice included a false description of "July travel team expenses" in the amount of $30,000. In fact, Robertson never requested a $30,000 payment from Adidas for July travel team expenses.

192.    In a July 6, 2017 email, Gatto and the marketing finance department discussed that Code combined the original $25,000 and $5,000 invoices together into a revised, single invoice for $30,000. Gatto signed and approved the revised $30,000 invoice for payment.

USAO373_00024973

193.    On July 26, 2017, the marketing finance department emailed Gatto, "Sent it in today.  They should be seeing payment soon."

194.    On August 1, 2017, Adidas deposited $30,000 into the Wells Fargo bank account of the Karolina Khaos AAU team.  Robertson did not know why Adidas deposited funds into his team's account.

195.    On the same day, and at Defendant Code's direction, Robertson wrote a check in the amount of $25,000 from the Karolina Khaos account to Loyd Inc.—a company created by Dawkins and Sood and the undercover FBI agents.  Robertson and Code exchanged text messages that day, including images of a receipt for the $25,000 check deposit into the Loyd Inc. account and information regarding when the funds deposited into the Loyd Inc. account would be available.

196.    On the same day, Code sent a text message to Dawkins that included an image of the deposit receipt into the Loyd Inc. bank account that Dawkins controlled.

197.    On the same day, and at Defendant Code's direction, Robertson withdrew $5,000 in cash from the Karolina Khaos account and delivered it to Code at a barber shop in Greenville, South Carolina.

198.    On September 13, 2017, as described above, Gatto and Code spoke on the telephone regarding a second invoice from the Karolina Khaos.  The following day, Merl Code sent an email to Gatto, copying Robertson, that included as an attachment an invoice labeled "Karolina Khaos, November travel expenses, Adidas invoice 2017."  In the email, Code wrote to Gatto: "Per our discussion, I'm sending over the invoice requested for submission and processing."

199.    The invoice, dated September 18, 2017, was marked from the Karolina Khaos to Jim Gatto.  The invoice included a false description of "November travel team expenses" in the amount of $25,000.  In fact, Robertson never requested a $25,000 payment for November travel

USAO373_00024974

team expenses, had no team travel planned in November 2017, and the team played no games in November 2017. Gatto approved the invoice for payment.

200.    On September 20, 2017, Adidas deposited $25,000 into the Wells Fargo bank account of the Karolina Khaos AAU team.

201.    On or about September 20, 2017, Code and Robertson exchanged text messages in which Code asked Robertson, "Did you get a payment confirmation email" and Robertson replied, "No, not yet." Code and Robertson also spoke on the telephone regarding the funds.

202.    On September 21, 2017, at Code's direction, Robertson drafted a check in the amount of $25,000 from the Karolina Khaos Wells Fargo account to Loyd Inc., wrote "consulting fees" in the memo line of the check, and delivered the check to a local Bank of America branch. At the time he wrote the check, Loyd Inc. had never provided consulting services to the Karolina Khaos team.

203.    On the same day, Code sent a text message to Dawkins that included an image of a receipt for the $25,000 deposit into the Loyd Inc. bank account that Dawkins controlled. On information and belief, those funds were to be paid by Defendants to Plaintiff's father as the next installment of the $100,000 bribe and would have been paid but for Defendants' arrests on September 25, 2017.

204.    Another example of the Enterprise's money laundering activity in furtherance of its racketeering activity involves the New England Playaz AAU team controlled by Defendant Gassnola. On information and belief, the contract between Adidas and the New England Playaz called for the team to receive $70,000 annually in bona fide sponsorship funds. Between January 2016 and August 2017, however, Adidas funneled $761,810 through the team's bank account. The following exemplar fictitious invoices were paid by Adidas:

USAO373_00024975

a.  October 15, 2016 invoice for $50,000 submitted to Adidas by Gassnola on behalf of the New England Playaz for tournament fees;

b.  January 4, 2017 invoice for $90,000 submitted to Adidas by Gassnola on behalf of the New England Playaz for a first quarter 2017 consultant fee and first quarter travel and expenses;

c.  May 1, 2017 invoice for $70,000 submitted to Adidas by Gassnola on behalf of the New England Playaz for a tournament fee.

205.    Gassnola also submitted sham invoices directly to Adidas for reimbursement to him personally for consulting services and expenses, totaling $239,521.67 in a single period.  Further examples of the wire fraud involving Adidas and the New England Playaz is set forth earlier in this Complaint.

206.    On information and belief, each of these invoices were reviewed and approved by the Adidas Participants, including Gatto, Rivers, and Code, and were in fact paid by Adidas.  On information and belief, the Adidas Participants were aware that the true purpose of these sham invoices payments was to secure funds for the Enterprise's racketeering activity and not for legitimate AAU team expenses.

207.    On information and belief, the money funneled through these sham invoices was directed to and made available for use by the Adidas Bribery Enterprise in its unlawful racketeering activity.

208.    On information and belief, one of the reasons the Enterprise was able to easily launder money from Adidas to the families was due to intentionally loose oversight and lack of meaningful financial controls over Adidas's finances.  Plaintiff is informed and believes that, within Adidas, the marketing finance department routinely approves for payment invoices that are

70

marked with Defendant Gatto's signature, regardless of the dollar amount requested or the reasonableness of the expense.

209.    On information and belief, Adidas's U.S. sports marketing budget is intentionally inflated so that it includes funds to be used for the Enterprise's bribery scheme.  These funds are allocated to the discretionary portion or "flex" portion of the basketball marketing budget.  On information and belief, Adidas and its executives purposefully maintained a large, discretionary budget for its basketball marketing group in order to facilitate payment of the sham invoices.

210.    For example, although AAU basketball tournament fees average around $500, the marketing finance department approved sham invoices for tournament fees more than 100 times that amount, including the May 1, 2017 invoice from the New England Playaz for a $70,000 tournament fee.

211.    When such payments are approved for payment, Adidas's marketing finance department assigns the payment a budget code.  On information and belief, this budget code is used to track and aggregate expenses by category for financial and tax reporting purposes.  Thus, when payment on a fictitious invoice is assigned to a budget code reserved for a legitimate activity, Adidas's financial books and records are rendered inaccurate and unreliable.

212.    Further, on information and belief, when Adidas launders bribe money through the AAU teams and assigns a corresponding budget expense code to those funds as payments made to 501(c)(3) charitable organizations, an improper tax benefit is created, resulting in inflated earnings and a material understatement of the company's tax expense.

213.    Had Adidas properly recorded the bribe payments on its books, a tax on such payments would be due and owing.  On information and belief, however, Adidas knowingly improperly recorded its money laundering activity with the intent of avoiding such tax liabilities.

USAO373_00024977

As a consequence, the avoidance of tax liability made more funds available to be deployed for use by the Enterprise.

214.    Over the course of years and, on information and belief, after millions of dollars in bribe money has been laundered through the company by the Enterprise and improperly recorded on the company's books and records, Adidas's knowing participation in the racketeering activity likely had a material effect on the company's financial statements.

215.    Thus, on information and belief, through the fictitious invoicing scheme that is part and parcel of the Enterprise's racketeering activity, Adidas knowingly committed tax fraud, cheating the federal government out of significant tax revenue as well as causing the recipients of those funds, such as Dawkins, Gassnola and Code, to similarly underreport income for tax reporting purposes.

216.    But for the arrests of Defendants Gatto, Code, Dawkins and several of their co-conspirators, the Adidas Bribery Enterprise's scheme to exploit the careers of young basketball players in order to gain market share in the competitive sneaker industry would have continued indefinitely, as the illegal conduct engaged in by the Enterprise—namely sports bribery, wire fraud, and money laundering—had been a consistent and successful tactic for Adidas for years and had no defined endpoint in sight.  By targeting the parents of young student-athletes, the Enterprise posed a special threat to their social well-being and that of their children.  Even those student-athletes whose eligibility was not impacted by the Adidas Bribery Enterprise but whose on-court performance and records were inevitably altered by Adidas's unlawful influence on the college basketball games they played in, suffered a loss.

217.    The significance of the racketeering activity described herein, and the seriousness to which Defendants pursued this illegal scheme, is reflected in statements (perhaps hyperbole, but

USAO373_00024978

nonetheless disturbing) made by Defendants Dawkins and Code to undercover FBI agents in a

meeting held in New York that was surreptitiously video recorded by the government (as depicted

in the still image below):



Merl Code: "I'm surprised there aren't more murders in our space."

Christian Dawkins: "There really should be."

### <u>COUNT I</u>
**Violation of § 1962(c) of the Racketeer Influenced and Corrupt Organizations Act (RICO)**
**Provisions of the Organized Crime Control Act of 1970**
**Against All Defendants**

218.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth

herein.

219.    At all relevant times, Defendants were each "persons" within the meaning of 18

U.S.C. § 1961(3).

USAO373_00024979

220.    At all relevant times, as described in above, the Adidas Participants, Athlete Advisor Participants, Division I Basketball Participants, and AAU Basketball Participants formed the Adidas Bribery Enterprise.

221.    At all relevant times, all Defendants were "persons . . . associated with" the Adidas Bribery Enterprise within the meaning of 18 U.S.C. § 1962(c).

222.    At all relevant times, the Adidas Bribery Enterprise was engaged in a pattern of activity that affected interstate commerce.

223.    At all relevant times, as described above, in furtherance and for the purpose of executing the described bribery scheme, the Defendants, acting personally or through their agents or co-conspirators, conducted the affairs of the Adidas Bribery Enterprise through a pattern of racketeering activity, as that term is defined in 18 U.S.C. § 1961(5).  The goal of the racketeering activity was to conduct the affairs of the Adidas Bribery Enterprise in a manner that illegally and secretly funneled money to the families of prospective student-athletes, including Plaintiff's father.  Defendants and their co-conspirators unlawfully sought to benefit from, and did benefited from, these illegal acts.

224.    The racketeering activity, consisting of predicate acts found in 18 U.S.C. § 1961(1), include repeated acts of wire fraud in violation of 18 U.S.C. §§ 1341 and 1343 as well as aiding and abetting the commission of those predicate acts.  Each wiring communication incident to carrying out the fraudulent scheme—to or from Adidas, to or from the University of Louisville, to or from the parents or guardians of student-athletes, or by and among the conspirators—constituted a separate violation of the law.  Each use of the wires to transmit or exchange bribery payments by and among the conspirators and to cover up the fraudulent scheme also constituted a separate

USAO373_00024980

violation of the law. And each such violation directly and proximately resulted in Plaintiff's loss of NCAA eligibility and concomitant foreseeable economic injury.

225. Additional racketeering activity, consisting of violations of the federal sports bribery statute, 18 U.S.C. § 224, includes Defendants' serial use of bribery to influence the composition of Adidas-sponsored Division I men's basketball teams, which formed a pattern of racketeering activity that directly and proximately caused each affected student-athlete to lose their eligibility to play Division I basketball for any NCAA member institution. Each of the Enterprise's overt acts of sports bribery, and conspiracies to carry into effect its sports bribery scheme, to influence Division I men's basketball teams constitutes a separate violation of the law. Defendants use of bribery and attempts at bribery to influence in any way the University of Louisville men's basketball games during the 2017-18 season directly and proximately caused Plaintiff's loss of NCAA eligibility and resulted in concomitant foreseeable economic injury to him.

226. Additional racketeering activity consists of violations of the federal money laundering statute, 18 U.S.C. §§ 1956 and 1957. Defendants knowingly and repeatedly used financial transactions to funnel bribe payments from Adidas to the families of student-athletes using proceeds of the Enterprise's unlawful activity. Defendants engaged in such financial transactions, many of which were in amounts greater than $10,000, with the intent to promote the carrying on of the Adidas Bribery Enterprise and with knowledge that the transactions were designed to conceal and disguise the nature, location, source, ownership and control of the money generated by Adidas through the Enterprise's unlawful activities. Additionally, Defendant Adidas knowingly participated in the money laundering activity with knowledge that by using sham invoices to facilitate bribe payments it was actively engaging in tax evasion and tax fraud. Each financial transaction using proceeds of the Enterprise's illegal conduct to bribe families of student-

USAO373_00024981

athletes constitutes a separate violation of the law.  And each such money laundering violation made for the purpose of securing Plaintiff's attendance at the University of Louisville directly and proximately resulted in Plaintiff's loss of NCAA eligibility and directly and proximately caused foreseeable economic injury to Plaintiff.

227.    As a direct and proximate consequence of each of the predicate acts of racketeering activity outlined above and related to Plaintiff Brian Bowen, Plaintiff suffered damages, including but not limited to the following: (1) loss of eligibility to play Division I basketball at the University of Louisville; (2) suspension from the University of Louisville men's basketball team following the public disclosure of Defendants' criminal fraud; (3) forced removal from the University of Louisville men's basketball team after it announced publicly via Twitter that "Brian Bowen will not play at the University of Louisville;" (4) concomitant financial and social costs arising from his removal from the University of Louisville's men's basketball team; (5) lost property interest in his Athletics Financial Aid Agreement for Student-Athletes with the University of Louisville; (6) costs incurred with applying for and trying out for other Division I men's basketball teams mid-season in hopes of continuing as a student-athlete at another NCAA institution, including relocation costs to South Carolina; (7) loss of eligibility to play Division I basketball at any NCAA member institution; (8) lost opportunity to enjoy the benefits and experience as a student-athlete at any NCAA member institution and associated impact on lifetime earnings; (9) loss of ability to develop basketball skills at the highest level of amateur competition as a Division I athlete; (10) lost opportunity to enter the NBA draft as a first or second round draft pick after only one or two years of experience playing Division I basketball and associated impact on his lifetime career earnings; (11) costs incurred with obtaining alternative employment as a professional basketball player in Sydney, Australia, including relocation costs; (12) attorney's fees and costs incurred by

USAO373_00024982

Plaintiff in connection with the federal government's investigation of Defendants' criminal conduct; and (13) attorney's fees and costs incurred in bringing this action.

<u>**COUNT II**</u>
**Violation of § 1962(d) of the Racketeer Influenced and Corrupt Organizations Act (RICO)**
**Provisions of the Organized Crime Control Act of 1970**
**Against All Defendants**

228.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

229.    Section 1962(d) of RICO provides that it "shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

230.    As set forth above, Defendants violated § 1962(d) by agreeing and conspiring to violate 18 U.S.C. § 1962(c). The object of this conspiracy has been and is to conduct or participate in, directly or indirectly, the conduct of the affairs of the Adidas Bribery Enterprise described previously through a pattern of racketeering activity.

231.    As demonstrated in detail above, beginning as early as 2014, Defendants, co-conspirators, and Enterprise participants agreed to join the conspiracy, agreed to commit and did commit the acts described herein, and knew that these acts were part of a pattern of racketeering activity.

232.    As demonstrated in detail above, the Defendants agreed to conduct and participate in the conduct of the affairs of the Adidas Bribery Enterprise, directly and indirectly, through a pattern of racketeering activity, as that term is defined in 18 U.S.C. § 1961, said racketeering activity consisting of multiple acts of sports bribery under 18 U.S.C. § 224, multiple acts of wire fraud under 18 U.S.C. § 1343, and multiple acts of money laundering under 18 U.S.C. §§ 1956 and 1957.

USAO373_00024983

233.    Defendants and their co-conspirators have engaged in numerous overt and predicate fraudulent racketeering acts in furtherance of the conspiracy, including multiple instances of falsifying financial documents, laundering money, planning and communicating about the conspiracy through interstate wire communications, and conspiring to influence the composition of Division I men's basketball teams and outcomes of games through bribery.

234.    The nature of the above-described acts in furtherance of the conspiracy gives rise to an inference that Defendants, co-conspirators and Enterprise participants not only agreed to the objective of an 18 U.S.C. § 1962(d) violation of RICO by conspiring to violate 18 U.S.C. § 1962(c), but they were also aware that their ongoing fraudulent acts have been and are part of an overall pattern of racketeering activity and were aware of the essential nature and scope of the Adidas Bribery Enterprise and intended to participate in it.

235.    As a direct and proximate result of Defendants' overt acts and predicate acts in furtherance of violating 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(d), Plaintiff Bowen has been injured in his business and property as set forth more fully above in Count I.

## COUNT III

**Violation of § 1962(a) of the Racketeer Influenced and Corrupt Organizations Act (RICO)
Provisions of the Organized Crime Control Act of 1970
Against Defendant Adidas**

236.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

237.    This Count is against Defendant Adidas America, Inc.

238.    The Adidas Bribery Enterprise is an enterprise engaged in the pattern of racketeering activity described above and whose activities affect interstate commerce.

USAO373_00024984

239.    Upon information and belief, Adidas used and invested income that was received from the pattern of racketeering activity engaged in by the Adidas Bribery Enterprise.

240.    Specifically, and in the words of one of Adidas's sneaker industry competitors, "[A]didas achieved valuable marketing advantages as the players subject to its bribes wore [A]didas's products, impliedly suggesting that such products have superior style or performance characteristics. [A]didas thereby unfairly and illegally boosted its goodwill, image, and reputation and affected consumer preferences—both in the athletic performance and athletic fashion footwear markets and in the overall footwear market where both companies [Adidas and Skechers] compete." *Skechers USA, Inc. v. Adidas America, Inc.*, No. 2:18-cv-03882 (C.D. Cal. May 9, 2018) (ECF No. 1 ¶ 4).

241.    Upon information and belief, as a result of affecting consumer preferences through its unlawful bribery and market boosting efforts, Adidas generated additional income from sales of apparel and footwear that it would not have received had it not engaged in the criminal acts of racketeering described herein—income that the Adidas Bribery Enterprise participants then converted to cash through their sham invoicing scheme and illegally redeployed to the next round of prospective student-athletes at Adidas-sponsored universities.

242.    The amount of racketeering income that Adidas redeployed into the Enterprise is reflected in the off-the-books annual budget that it maintained for bribe payments and associated payoffs to facilitators and is believed to be in excess of millions of dollars annually.

243.    Plaintiff is informed and believes that illegal income generated through Defendants' racketeering activity in the years prior to his recruitment to the University of Louisville sustained the Adidas Bribery Enterprise in future recruiting seasons and, specifically, was used to fund the bribe payments directed towards his recruitment.

USAO373_00024985

244.    As a direct and proximate result of Adidas's racketeering activities and violation of

18 U.S.C. § 1962(a), Adidas directly and proximately caused Plaintiff's loss of NCAA eligibility,

thereby resulting in foreseeable economic injury to Plaintiff, including but not limited to the

following: (1) loss of eligibility to play Division I basketball at the University of Louisville; (2)

suspension from the University of Louisville men's basketball team following the public

disclosure of Defendants' criminal fraud; (3) forced removal from the University of Louisville

men's basketball team after it announced publicly via Twitter that "Brian Bowen will not play at

the University of Louisville;" (4) concomitant financial and social costs arising from his removal

from the University of Louisville's men's basketball team; (5) lost property interest in his Athletics

Financial Aid Agreement for Student-Athletes with the University of Louisville; (6) costs incurred

with applying for and trying out for other Division I men's basketball teams mid-season in hopes

of continuing as a student-athlete at another NCAA institution, including relocation costs to South

Carolina; (7) loss of eligibility to play Division I basketball at any NCAA member institution; (8)

lost opportunity to enjoy the benefits and experience as a student-athlete at any NCAA member

institution and associated impact on lifetime earnings; (9) loss of ability to develop basketball skills

at the highest level of amateur competition as a Division I athlete; (10) lost opportunity to enter

the NBA draft as a first or second round draft pick after only one or two years of experience playing

Division I basketball and associated impact on his lifetime career earnings; (11) costs incurred

with obtaining alternative employment as a professional basketball player in Sydney, Australia,

including relocation costs; (12) attorney's fees and costs incurred by Plaintiff in connection with

the federal government's investigation of Defendants' criminal conduct; and (13) attorney's fees

and costs incurred in bringing this action.

USAO373_00024986

## COUNT IV

**Violation of § 1962(d) of the Racketeer Influenced and Corrupt Organizations Act (RICO)**
**Provisions of the Organized Crime Control Act of 1970**
**Against Defendant Adidas**

245.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

246.    Section 1962(d) of RICO provides that it "shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

247.    As set forth above, Defendant Adidas violated § 1962(d) by agreeing and conspiring to violate 18 U.S.C. § 1962(a).  The object of this conspiracy has been and is to use or invest income derived from a pattern of racketeering activity in interstate commerce described above.

248.    As demonstrated in detail above, Defendant Adidas, along with its co-defendants, co-conspirators, and Enterprise participants intentionally conspired and agreed to directly and indirectly use or invest income that it derived from a pattern of racketeering activity in interstate commerce.

249.    Defendant Adidas and its co-conspirators engaged in numerous overt and predicate fraudulent racketeering acts in furtherance of the conspiracy, including multiple instances of falsifying financial documents, laundering money, planning and communicating about the conspiracy through interstate wire communications, and conspiring to influence men's basketball games through bribery.

250.    The nature of the above-described acts in furtherance of the conspiracy gives rise to an inference that Defendant Adidas, its co-defendants, co-conspirators and Enterprise participants not only agreed to the objective of an 18 U.S.C. § 1962(d) violation of RICO by conspiring to violate 18 U.S.C. § 1962(a), but they were also aware that their ongoing fraudulent

81

acts have been and are part of an overall pattern of racketeering activity and were aware of the essential nature and scope of the Adidas Bribery Enterprise and intended to participate in it.

251.    As a direct and proximate result of Defendant Adidas's overt acts and predicate acts in furtherance of violating 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(a), Plaintiff Bowen has been injured in his business and property as set forth more fully above in Count III.

## **RELIEF REQUESTED**

WHEREFORE, the Plaintiff respectfully prays that this Court grants the following relief:

1.    Entering judgment in favor of the Plaintiff on all Counts in a final order against each of the Defendants;

2.    Enjoining Defendant Adidas and its employees, officers, directors, agents, successors, assignees, merged or acquired predecessors, parent or controlling entities, subsidiaries, and all other persons acting in concert or participation with it from engaging in sponsorship of NCAA Division I men's basketball programs;

3.    Awarding Plaintiff actual damages, treble damages, injunctive and equitable relief, forfeiture as deemed proper by the Court, and attorney's fees and all costs and expenses of suit pursuant to Plaintiff's racketeering claims; and

4.    Awarding Plaintiff such other and further relief as may be just and proper under the circumstances.

USAO373_00024988

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff, by counsel and pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, hereby demands a trial by jury in this action.


Dated: November 19, 2018                    Respectfully submitted,


                                            **MCLEOD LAW GROUP, LLC**

                                            <u>/s/ W. Mullins McLeod, Jr.</u>
                                            W. Mullins McLeod, Jr.  (Fed ID No.: 7142)
                                            Colin V. Ram (Fed ID Application Forthcoming)
                                            H. Cooper Wilson, III (Fed ID No.: 10107)
                                            P.O. Box 21624
                                            Charleston, South Carolina 29413
                                            Tel: (843) 277-6655
                                            Fax: (843) 277-6660

                                            *Attorneys for the Plaintiff Brian Bowen II*

USAO373_00024989