# Exhibit O

## Notes of March 19, 2019 Meeting with M. Avenatti and M. Geragos

**Participants:** Michael Avenatti, Mark Geragos, Rob Leinwand (Nike), Scott Wilson (BSF), Benjamin Homes (BSF)

**Time:** Approximately 12:00 p.m. EST.

These notes were drafted by Mr. Homes on 3/19/19 from handwritten notes that were taken contemporaneously with the meeting that the notes describe. These notes are not a verbatim transcript, but reflect Mr. Homes's best recollection of what was said at the time they were drafted. A copy of the handwritten notes from the meeting are attached as Exhibit A.

[Mr. Wilson began the conversation by talking about Mark Geragos's offices. Mr. Wilson also discussed BSF's acquisition of Caldwell Leslie in Los Angeles.]

[Mr. Wilson handed Mr. Geragos and Mr. Avenatti his business card.]

Mr. Geragos: Michael was telling me two weeks ago that he had something about Nike that he was going to go public with. I told him that I had worked with Nike before and that these were reasonable people. I contacted Casey Kaplan at Nike, who I had been in contact with about a different matter.

[Mr. Avenatti asked for the names and affiliation of Mr. Homes and Mr. Leinwand.]

Mr. Wilson: We agreed to take this meeting after Mark reached out, but we are still not sure why we are here.

Mr. Avenatti: Before we begin, can we agree that this conversation is covered by Rule 408 as a confidential settlement discussion, and that nothing discussed here will be admissible in any litigation.

Mr. Wilson: We agree that this meeting is covered by 408.

Mr. Avenatti: I will cut straight to the chase. Nike has a problem that makes the Adidas problem look small. I represent a whistleblower who has information that Nike directed the whistleblower to make payments to the number one pick in last year's draft.

Mr. Wilson: Who was the number one pick in last year's draft?

Mr. Avenatti: DeAndre Ayton.

I have information that this conduct reaches Nico Harrison. I am not sure, but it could even reach Lynn Merritt. I have emails, text messages, "bogus" invoices, and travel records that indicate Carlton DeBose and Jamal James were directing these payments.

Produced Subject to FRCP 6(e)
FOIA Confidential Treatment Requested

NCBB-5000021

USAO373_00026191

I have information that Nike received a January 2017 subpoena from SDNY. I am going to guess that none of what I have was produced to the government under that subpoena. I do not know what the subpoena called for, but I am going to guess that all of what I have was covered by the subpoena, which could create a real problem for Nike.

I have reason to believe that Nike has known about this conduct, which could create a significant issue for Nike for failing to disclose these practices to the SEC. These payments were directed by Carlton DeBose who I believe was hired by Merl Code. I also believe that Jamal James may have been hired by Merl Code.

Nike is Nike; not Adidas. I am a fan of Nike. If I wasn't a fan of Nike, this would already be a national story.

I represent a whistleblower who is a former youth director of an EYBL team. Carlton [DeBose] and Jamal [James] squeezed him out of his contract. I believe he has a claim for breach of contract, tortious interference, and potentially other claims.

My client facilitated payments to players at the direction of Carlton [DeBose]. He was directed to pay $10,000 to the mother of DeAndre Ayton. He was told to break the payment into two $5,000 payments to avoid compliance issues. I also have information that Nike paid for the flight for my client to deliver the money to Andrea Ayton.

My client was also directed to make multiple payments to Bol Bol, Brandon McCoy, and others.

Mr. Wilson: Who were the other players your client was directed to make payments to?

Mr. Avenatti: I am not going to say at this point, but there were payments to others and all were directed by Nike through my client. I have text messages between my client and individuals at Nike.

I have the following demands:

1) First, my client's claim is settled and he agrees to "cooperate." We will include express language in the settlement agreement that will not prevent my client from giving any future testimony to the government. I'm sure you will agree that this will be in both of our client's interests.

2) Second, Nike agrees to conduct an internal investigation related to this conduct, which will be led by Mark Geragos and myself. We will discuss anything that we find with Nike, who can then decide whether we should disclose that information to SDNY.

Mr. Wilson: Can you disclose who your client is?

Mr. Avenatti: I am happy to disclose that information later if we appear to be making progress in our discussions.

Produced Subject to FRCP 6(e)
FOIA Confidential Treatment Requested

NCBB-5000022

USAO373_00026192

Mr. Wilson: It is difficult to give advice to my client without knowing the identity of your client.

Mr. Avenatti: I am going to hold a press conference tomorrow and the identity of my client will not make a difference. I have Rebecca Ruiz at the New York Times on call and I am sure she will print the story with or without the identity of my client.

I have text messages from my client showing executives at Nike directing payments to DeAndre Ayton's mother.

Mr. Geragos: Wouldn't the identity of the individuals at Nike drive this story?

Mr. Wilson: There are dozens of people who run EYBL teams so it would be helpful to know the identity of your client.

Mr. Avenatti: I can show you a text from your client directing a payment to a program to pay a player.

Mr. Wilson: When you say that Nike has a SDNY subpoena—

Mr. Avenatti: Look, if you don't believe that anything happened—

It is possible that Carlton [DeBose] and Jamal [James] are rogue bad actors. But it is also possible that people at Nike turned a blind eye. What is not possible is that my client did this on his own. I have text messages, emails, and banking records which show payments going from Nike to Cal Supreme and then being siphoned off at the direction of Nike.

Mr. Wilson: Why have you not taken this information to the DOJ or the SEC?

Mr. Avenatti: I have not taken this information to the Government.

Mr. Wilson: You could be wearing a wire for all we know. [Laughter.]

[Mr. Avenatti opens his coat and shows the room that he is not wearing a wire.]

Mr. Wilson: Our client has three primary interests:

1) We have an interest in not being dragged through the press;

2) we have an interest in complying with the Government; and

3) we have an interest in conducting an internal investigation surrounding these allegations.

Mr. Geragos: I thought that Nike did the "right thing" in dealing with Colin Kaepernick. I don't know what the truth of all of this is, but I have seen documents implicating Nike and it is concerning. I don't know what the Nike reaction would be.

Produced Subject to FRCP 6(e)
FOIA Confidential Treatment Requested

NCBB-5000023

USAO373_00026193

<u>Mr. Wilson</u>: Rob [Leinwand] is the number two guy in the legal department. We are not in a position to sign anything today, but you have Rob [Leinwand] here so we are taking these allegations seriously.

Adidas has somehow been able to avoid indictment even after one of their mid-level executives has been convicted.

<u>Mr. Avenatti</u>: My client is Gary Franklin.

<u>Mr. Wilson</u>: Director of Cal Supreme.

<u>Mr. Leinwand</u>: I would like to see the documents that you have.

[Mr. Avenatti asked Mr. Homes to stop taking notes, which Mr. Homes did. Mr. Wilson slid around the table so that he was sitting next to Mr. Avenatti and across from Mr. Homes and Mr. Leinwand. Mr. Geragos got up from the table. Mr. Avenatti then showed Mr. Wilson a number of documents that he had in his possession. Although Mr. Homes was sitting across the table and therefore could not see the documents perfectly, he could make out what some of the documents said or related to. Mr. Homes could also hear Mr. Avenatti and Mr. Wilson discussing the contents of the documents.

After Mr. Wilson finished reviewing the documents, Mr. Wilson, Mr. Leinwand, and Mr. Homes were taken to a different floor in the building so that they could discuss internally. The meeting was being held in a conference room on the fourth floor and Mr. Wilson, Mr. Leinwand, and Mr. Homes were taken to an empty room on the sixth floor.

Mr. Wilson began describing the documents he was shown by Mr. Avenatti. Mr. Homes resumed taking notes. Mr. Wilson said that there was a cover page before the actual documents, which appeared to be from a draft complaint or memo. Mr. Wilson said that Mr. Avenatti then showed Mr. Wilson the underlying documents, which appeared to be in the form of exhibits to the cover page.

Mr. Wilson said that he saw a text message between Gary Franklin and Carlton DeBose and a text message between Gary Franklin and Andrea Ayton. Mr. Wilson said that Mr. DeBose's phone number was partially redacted, but that he could see that the area code was 708.

Mr. Wilson said that he saw a communication from June 2016 referencing a payment to Brandon McCoy through Brandon McCoy's handler Shaun Manning.

Mr. Wilson said that he was shown bank records from Cal Supreme's Bank of America account, which showed monies coming in from Nike and monies going out to American All Star Basketball (Mr. McDonald's 501(c)(3)). Mr. Homes remembers Mr. Avenatti or Mr. Wilson commenting, at the time that Mr. Wilson was shown this document, that the payment from Cal Supreme to AASB was for $28,000 and was in June 2016. Mr. Wilson later said that the $28,000 payment to AASB could have been in 2017.

Produced Subject to FRCP 6(e)
FOIA Confidential Treatment Requested

NCBB-5000024

USAO373_00026194

Mr. Wilson also said that he saw two withdraws of $5,000 from Cal Supreme's Bank of America account. Mr. Wilson said that he saw communications between Gary Franklin and Carlton DeBose in which Mr. Franklin told Mr. DeBose that $5,000 was the maximum amount he could withdraw.

Mr. Wilson said that he saw communications between Mr. Franklin and Mr. DeBose in which Mr. DeBose told Mr. Franklin to give money to Mr. McDonald.

Mr. Wilson said that he saw Cal Supreme invoices to Nike in June 2016 for $60,000. Mr. Wilson said that he saw text messages from Mr. DeBose to Mr. Franklin in which Mr. DeBose told Mr. Franklin what description to provide on the Cal Supreme invoices.

Mr. Wilson said that he did not see any documents that explicitly said that Mr. DeBose directed Mr. Franklin to provide any money to a player.

Mr. Wilson said that he saw communications between Mr. Franklin and Mr. DeBose in which Mr. DeBose told Mr. Franklin to send someone you "trust" from your program to "PHX." Mr. Wilson said that he saw emails from Gabby Olivares booking flights for Mr. Franklin to travel to Phoenix.

Mr. Wilson said that he saw communications referencing a $10,000 payment to DeAndre Ayton's mother.

Mr. Wilson said that he saw Cal Supreme invoices to Nike from April or June of 2017.

Mr. Wilson said that he saw communications that described Mr. McDonald as Bol Bol's handler.

Mr. Wilson said that he was shown bank records from Cal Supreme's Bank of America account which showed monies coming in from Nike and monies going out to American All Star Basketball in 2017. Mr. Homes remembers Mr. Wilson commenting, at the time he was shown this document, that the figure of this payment was an odd amount.

Mr. Wilson said that the cover sheet for the 2017 documents referenced a text from Jamal James, but that Mr. Wilson never saw the actual document.

Mr. Wilson, Mr. Leinwand, and Mr. Homes returned to the original conference room on the fourth floor.]

Mr. Leinwand: I appreciate hearing about this, but we need more time.

1) Hillary Krane is on vacation and I need to talk with her before we make any decisions. Nike is also a public company, so we will also need to meet with the board.

2) I get the claims, but we need to look at Nike's contract with Gary [Franklin] before we make any decisions. I also do not know what he is seeking. Do you have a number in mind?

Produced Subject to FRCP 6(e)
FOIA Confidential Treatment Requested

NCBB-5000025

USAO373_00026195

Mr. Wilson: I think you alluded to a second client.

Mr. Avenatti: That client does not have a claim. That client is not important.

Mr. Wilson: I don't think you would have brought up that information if the second client was not important.

Mr. Avenatti: You asked me whether I had a second client. I did not lead with that information.

Mr. Wilson: Do you have a number?

Mr. Avenatti: This reminds me of a case that I was previously involved in regarding a class action complaint against Kimberly Clark. We had a mediation early on the case. Judge Lou Meisinger was the mediator. Prior to becoming a judge, Lou [Meisinger] was the general counsel to a little company called Disney.

At that meeting, we asked to settle the claim for $31.5 million. [Lou] Meisinger believed that this was a reasonable offer and tried to convince the Kimberly Clark to accept the deal. [Lou] Meisinger told a story about when he was the general counsel at Disney and brought a settlement offer of $50 million to the board. [Lou] Meisinger said that the board rejected the settlement offer, which ended up costing the company a great deal of money.

Ultimately, Kimberly Clark would not agree to pay the $31.5 million. Twenty-nine months later, after the company paid $51 million in legal fees to King & Spalding, we got a jury verdict against the company for $400 million. That verdict has subsequently been reduced and is on appeal, but the total number is much larger than what they company could have settled for.

Tomorrow is a "unique" day for me:

1) It is the day before Nike's earnings report;

2) it is the day before the start of the NCAA tournament;

3) it is the day I am prepared to "blow this open."

I also understand that these decisions are not difficult to make.

[With respect to the following, Mr. Homes does not recall the specific words used and those words are not recorded in Mr. Homes's notes, but Mr. Homes does have a specific recollection that Mr. Avenatti made a statement about the size of Nike's market cap and insinuated that his press conference could have an effect on Nike's stock price.]

Mr. Wilson: We understand that the media threat is clear. And understand its immediate impact.

Mr. Geragos: I was going to suggest calling you back around 3:00 or 3:15 p.m.

Produced Subject to FRCP 6(e)
FOIA Confidential Treatment Requested

NCBB-5000026

USAO373_00026196

Mr. Avenatti: I will cut to the chase. My demand is this:

1) I want $1.5 million for Gary [Franklin]. This includes a full release both ways. Any agreement will include language that protects the company and will make clear that Nike is not buying Gary [Franklin]'s testimony.

2) Whatever the internal investigation costs, it costs. There is going to be a big "downstroke" and a "most favored nation's clause." If Nike brings in any other firms, the minimum amount of fees we are paid has to be two times the amount of fees paid to any other firms. We think we are well-situated to handle this investigation. Given my persona, I think the people involved in the investigation will be willing to talk to me. But it's not going to be cheap. We are not asking you to pay for nothing. We will share the findings of the investigation with whoever you want us to share it with.

Gary [Franklin] will never be able to have another Nike program again.

Mr. Wilson: What would Gary [Franklin] say to complement the documents?

Mr. Avenatti: He would say that he was directed to make multiple payments to players. And that he was threatened that he would lose his program if he refused to make these payments. He would say that he was told how to structure the invoices by Nike, and that he facilitated payments to DeAndre Ayton, Bol Bol, and Brandon McCoy.

Mr. Wilson: Do you exclusively represent Mr. Franklin.

Mr. Avenatti: Yes.

Mr. Wilson: We are here in good faith, but we are not going to be signing anything tomorrow. I also want to raise that disclosing this information could blow up the lives of the players involved. I have kids, I don't know if you have kids.

Mr. Avenatti: I don't give a shit. These players are not kids, they are adults who made a decision to take the money.

I agree that the system is broken, but the system is the system.

Mr. Wilson: It's not clear that all of the kids knew that they were being paid. Same goes for the college admissions scandal. It's not clear that all of the kids realized that they were being given extra help to get into college.

Mr. Avenatti: That's a fair point. But my biggest consideration with the delay is that you fuck Mark and me.

Mr. Wilson: Mark is pretty, but I don't want to fuck him.

Produced Subject to FRCP 6(e)
FOIA Confidential Treatment Requested

NCBB-5000027

USAO373_00026197

Mr. Leinwand: The effect of doing a press release during the NCAA tournament is probably the same as doing a press release before the NCAA tournament. You have to realize this is a public company and nothing moves fast. I don't think that I can move before tomorrow.

Mr. Geragos: Let's have a call at 3:00 p.m.

Mr. Avenatti: There is nothing stopping you from calling the general counsel.

Mr. Leinwand: The general counsel is on vacation in Europe.

Mr. Avenatti: When was the last time you went on a vacation where you were not reachable by phone?

Mr. Leinwand: This is the general counsel of a public company. When I go on vacation I am reachable by phone, but that doesn't mean that she is. I also need to talk to the head of communications and the head of sports marketing. And they are going to say who the fuck is Gary Franklin and Jamal James and Carlton DeBose.

Mr. Avenatti: Why do you need to talk to the head of communications?

Mr. Leinwand: Because this is also a communications issue and the head of communications will need to assess our exposure.

Mr. Geragos: Who is the head of sports marketing?

Mr. Leinwand: John Slusher.

Mr. Geragos: We will text you around 3:30 p.m. We have to go to a meeting at the Eastern District [of New York] for an unrelated matter at 2:00 p.m. that I worked very hard to arrange. And I have a court appearance at 4:00 p.m.

Mr. Avenatti: Where will you be this afternoon? Will you be in Manhattan?

Mr. Wilson: Yes, we will be at our offices in Manhattan.

[The parties shook hands and concluded the meeting. The meeting ended at approximately 1:30 p.m. EST.]

# # #

Produced Subject to FRCP 6(e)
FOIA Confidential Treatment Requested

NCBB-5000028

USAO373_00026198