```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - x
                                 :
   UNITED STATES OF AMERICA      :
                                 :   SUPERSEDING INDICTMENT
         - v. -                  :
                                 :   S1 19 Cr. 373 (PGG)
   MICHAEL AVENATTI,             :
                                 :
              Defendant.         :
                                 :
- - - - - - - - - - - - - - - - x
```

## OVERVIEW

1.  The charges in this Indictment stem from an extortion and fraud scheme in which MICHAEL AVENATTI, the defendant, used confidential information provided by a client ("Client-1") to demand tens of millions of dollars in payments for AVENATTI himself from NIKE, Inc. ("Nike"), a multinational public corporation engaged in, among other things, the marketing and sale of athletic apparel, footwear, and equipment, by threatening to cause substantial economic and reputational harm to Nike if it did not give in to AVENATTI's demands. Specifically, AVENATTI threatened to hold a press conference on the eve of Nike's quarterly earnings call and the start of the annual National Collegiate Athletic Association ("NCAA") men's college basketball tournament, at which AVENATTI would publicly make allegations of misconduct by Nike employees, unless Nike agreed, in addition to making a payment of $1.5 million to Client-1, to "retain" AVENATTI and another attorney working with

AVENATTI ("Attorney-1") to conduct an "internal investigation" that Nike had not requested and for which AVENATTI demanded that he and Attorney-1 be paid, at a minimum, between $15 million and $25 million.  Alternatively, and in lieu of such a retainer, AVENATTI demanded a total payment of $22.5 million from Nike to resolve any claims that Client-1 might have and to buy AVENATTI's silence.  AVENATTI made these threats—including the demand for payments to himself and the threat to publicize confidential information provided to AVENATTI by Client-1— without Client-1's knowledge or consent.

## RELEVANT INDIVIDUALS AND ENTITIES

2.   At all relevant times, MICHAEL AVENATTI, the defendant, was an attorney licensed to practice in the state of California with a large public following as a result of, among other things, his representation of celebrity and public figure clients, as well as frequent media appearances and use of social media.  As an attorney, AVENATTI was required to comply with all ethical and statutory obligations imposed on licensed attorneys, including ethical and legal obligations that impose duties of confidentiality, loyalty, honesty, and fair dealing with respect to all clients.  In connection with his representation of Client-1, AVENATTI owed Client-1 duties of, among other things, confidentiality, loyalty, honesty, and fair dealing.

3. At all relevant times, Attorney-1 was an attorney licensed to practice in the state of California, and similarly was known for representation of celebrity and public figure clients, and frequent media appearances.

4. Nike is a multinational, publicly held corporation headquartered in Beaverton, Oregon. Nike produces and markets athletic apparel, footwear, and equipment, and sponsors athletic teams in many sports, including basketball, at the high school, amateur, collegiate, and professional levels.

5. Client-1 was the director and head coach of an amateur youth basketball program (the "Basketball Program") based in California. For a number of years, the Basketball Program coached by Client-1 had a sponsorship agreement with Nike pursuant to which Nike paid Client-1's program approximately $72,000 annually.

6. At all relevant times, "Outside Counsel-1" and "Outside Counsel-2" worked at a law firm based in New York and represented Nike.

7. At all relevant times, the "In-House Counsel" was an attorney who worked for Nike.

## THE EXTORTION AND FRAUD SCHEME

8.  In or about March 2019, MICHAEL AVENATTI, the defendant, was contacted by Client-1, who sought AVENATTI's legal assistance after the Basketball Program was informed by Nike that its annual contractual sponsorship would not be renewed.

9.  On or about March 5, 2019, MICHAEL AVENATTI, the defendant, met with Client-1.  During that meeting and in subsequent meetings and communications, Client-1 informed AVENATTI, in substance and in part, that Client-1 wanted Nike to reinstate its $72,000 annual contractual sponsorship of the Basketball Program, which, as noted above, Nike had recently declined to renew.  During the meeting, Client-1 provided AVENATTI with information regarding what Client-1 believed to be misconduct by certain employees of Nike involving the alleged funneling of illicit payments from Nike to the families of certain highly ranked high school basketball prospects.

10. Although MICHAEL AVENATTI, the defendant, told Client-1 that AVENATTI believed that he would be able to obtain a $1 million settlement for Client-1 from Nike, at no time during the March 5, 2019 meeting or otherwise did AVENATTI inform Client-1 that AVENATTI also would and did seek or demand payments from Nike for himself in exchange for resolving any potential claims made by Client-1 and not causing financial and

reputational harm to Nike, or that AVENATTI would and did seek to make any agreement with Nike contingent upon Nike making payments to AVENATTI himself.  Furthermore, at no time did AVENATTI inform Client-1 that AVENATTI intended to threaten to publicize the confidential information that Client-1 had provided to AVENATTI, nor did AVENATTI obtain Client-1's permission to publicize any such information.

*The March 19 Meeting*

11.  On or about March 19, 2019, at approximately 12:00 p.m., Outside Counsel-1, Outside Counsel-2, and the In-House Counsel met with MICHAEL AVENATTI, the defendant, in New York, New York, during which the following occurred, among other things:

a.   AVENATTI stated, in substance and in part, that he represented Client-1, a youth basketball coach, whose team had previously had a contractual relationship with Nike, but whose contract Nike had recently decided not to renew. According to AVENATTI, Client-1 had evidence that one or more Nike employees had authorized and funded payments to the families of top high school basketball players and attempted to conceal those payments, similar to conduct involving a competitor of Nike that had recently been the subject of a criminal investigation by the United States Attorney's Office for the Southern District of New York.

b. AVENATTI further stated, in substance and in part, that he intended to hold a press conference the following day to publicize the asserted misconduct at Nike, which would negatively affect Nike's public market value. In particular, AVENATTI stated, in substance and in part, that he had approached Nike now because he knew that the annual NCAA men's college basketball tournament—an event of significance to Nike and its brand—was about to begin, and further because he was aware that Nike's quarterly earnings call was scheduled for March 21, 2019, thus maximizing the potential financial and reputational damage his press conference could cause to Nike.

c. AVENATTI further stated, in substance and in part, that he would refrain from holding that press conference and damaging Nike if Nike agreed to two demands: (1) Nike must pay $1.5 million to Client-1 as a settlement for any claims Client-1 might have regarding Nike's decision not to renew its contract with the Basketball Program; and (2) Nike must hire AVENATTI and Attorney-1 to conduct an internal investigation of Nike, with a provision that if Nike hired another firm to conduct such an internal investigation, Nike would still be required to pay AVENATTI and Attorney-1 at least twice the fees of any other firm hired.

d. AVENATTI also stated, in substance and in part, that if Nike agreed to retain AVENATTI to conduct an

internal investigation, then Nike would be able to decide whether any misconduct uncovered by the investigation should be disclosed to law enforcement authorities.

   e. At the end of the meeting, AVENATTI made clear, in substance, that Outside Counsel-1 and Nike would have to agree to accept those demands immediately or AVENATTI would hold his threatened press conference.

   f. As noted above, at no time, including after the March 19 Meeting, did AVENATTI inform Client-1 that AVENATTI had (1) threatened to publicize confidential information provided to AVENATTI by Client-1, or (2) used that information to demand a multimillion dollar payment for himself.

  12. After the meeting, representatives of Nike contacted representatives of the United States Attorney's Office for the Southern District of New York regarding the threats and extortionate demands made by MICHAEL AVENATTI, the defendant.

*The March 20 Call*

  13. On or about March 20, 2019, Outside Counsel-1 and Outside Counsel-2 engaged in a conference call with MICHAEL AVENATTI, the defendant, and Attorney-1, which was consensually recorded by law enforcement. During that call, the following, among other things, occurred:

   a. AVENATTI reiterated that he expected to "get a million five for our guy" (i.e., Client-1) and be "hired to

handle the internal investigation," adding, "if you don't wanna do that, we're done."

      b.    AVENATTI also reiterated threats made during the previous in-person meeting, along with his demand for a multimillion dollar retainer to do an internal investigation. With respect to such investigation, AVENATTI made clear, in substance, that his demand was not simply that he be retained by Nike, but also that he be paid millions of dollars by Nike in return for not holding a press conference.

      c.    In particular, AVENATTI stated, in part: "I'm not fucking around with this, and I'm not continuing to play games. . . . You guys know enough now to know you've got a serious problem. And it's worth more in exposure to me to just blow the lid on this thing. A few million dollars doesn't move the needle for me. I'm just being really frank with you. So if that's what, if that's what is being contemplated, then let's just say it was good to meet you, and we're done. And I'll proceed with my press conference tomorrow . . . . I'm not fucking around with this thing anymore. So if you guys think that you know, we're gonna negotiate a million five, and you're gonna hire us to do an internal investigation, but it's gonna be capped at 3 or 5 or 7 million dollars, like let's just be done. . . . And I'll go and I'll go take ten billion dollars off your client's market cap. But I'm not fucking around."

    d. AVENATTI also stated that an internal investigation of conduct at a company like Nike could be valued at "tens of millions of dollars, if not hundreds," saying, in part, "let's not bullshit each other. . . . We all know what the reality of this is," adding later in the conversation that while he did not expect to be paid $100 million, he did expect to be paid more than $9 million.

    e. Finally, AVENATTI stated, in substance and in part, that he would agree to meet with Outside Counsel-1 in person the following day, Thursday, March 21, the date of Nike's scheduled quarterly earnings call and the beginning of the NCAA tournament, to present the exact amount AVENATTI demanded from Nike and under what terms it would have to be paid. AVENATTI further stated, in substance and in part, that Nike would be required to provide an answer the following Monday or he would hold his press conference.

*The March 21 Meeting*

  14. On or about March 21, 2019, MICHAEL AVENATTI, the defendant, Attorney-1, Outside Counsel-1, and Outside Counsel-2 met in New York, New York. That meeting was consensually video- and audio-recorded by law enforcement. During that meeting, the following, among other things, occurred:

    a. At the beginning of the meeting, at the direction of law enforcement, Outside Counsel-1 stated that he

9

did not believe that a payment to AVENATTI's client would be the "sticking point," but that Outside Counsel-1 needed to know more about the proposed "internal investigation." AVENATTI stated, in substance and in part, that he would require a $12 million retainer to be paid immediately and to be "deemed earned when paid," with a minimum guarantee of $15 million in billings and a maximum of $25 million, "unless the scope changes." Later during the meeting, AVENATTI also stated, in substance and in part, that an "internal investigation" could benefit Nike, by, among other things, allowing Nike to "self-report" any alleged misconduct, and that it would be Nike's choice whether to disclose such alleged misconduct.

        b. Outside Counsel-1 reiterated, at the direction of law enforcement, that Outside Counsel-1 did not think paying AVENATTI's client $1.5 million would be a "stumbling block," but asked whether there would be any way to avoid AVENATTI carrying out his threatened press conference without Nike retaining AVENATTI. In particular, Outside Counsel-1 asked, in substance and in part, whether Nike could resolve AVENATTI's demands just by paying Client-1, rather than retaining AVENATTI. AVENATTI responded that he did not think it made sense for Nike to pay Client-1 an "exorbitant sum of money . . . in light of his role in this."

    c. Outside Counsel-1 noted that Outside Counsel-1 had never received a $12 million retainer from Nike and had never done an investigation for Nike "that breaks $10 million." AVENATTI responded, in part, by asking whether Outside Counsel-1 had ever "held the balls of the client in your hand where you could take five, six billion dollars in market cap off of 'em?"

    d. AVENATTI subsequently told Outside Counsel-1 and Outside Counsel-2, in part, "If [Nike] wants to have one confidential settlement and we're done, they can buy that for twenty-two and half million dollars and we're done. . . . Full confidentiality, we ride off into the sunset. . . ."

    e. AVENATTI added, "I just wanna share with you what's gonna happen, if we don't reach a resolution." AVENATTI then laid out again his threat of harm to Nike, adding that, "as soon as this becomes public, I'm gonna receive calls from all over the country from parents and coaches and friends and all kinds of people, because this is always what happens—and they are all going to say I've got an email or a text message or—now, 90% of that is going to be bullshit because it's always bullshit 90% of the time. Always. Whether it's R. Kelly or Trump, the list goes on and on—but 10% of it is actually going to be true. And then what's going to happen is, this will snowball . . . and every time we get more information, that's

gonna be the Washington Post, the New York Times, ESPN, a press conference, and the company will die—not die, but they are going to incur cut after cut after cut after cut, and that's what's going to happen as soon as this thing becomes public."

        f.    Finally, AVENATTI agreed to meet at Outside Counsel-1's office on Monday, March 25, 2019, to hear whether Nike was willing to make the demanded payments.  AVENATTI stated that Nike would have to agree to his demands at that meeting or he would hold his threatened press conference, stating in part, "If this is not papered on Monday, we're done. . . .  I don't want to hear about somebody on a bike trip.  I don't want to hear that somebody has, that somebody's grandmother passed away or . . . the dog ate my homework, I don't want to hear—none of it is going to go anywhere unless somebody was killed in a plane crash.  It's going to go zero, no place with me."

        g.    At no point following the March 21 Meeting did AVENATTI inform Client-1 that Nike had offered to resolve Client-1's claims without paying AVENATTI.  Nor did AVENATTI inform Client-1 that AVENATTI had continued to threaten to publicize confidential information provided to AVENATTI by Client-1, or that AVENATTI had continued to use that information to demand a multimillion dollar payment for himself.

*The March 21 Tweet*

15. Within approximately two hours after the conclusion of the audio- and video-recorded meeting described above, MICHAEL AVENATTI, the defendant, without consulting with Client-1, posted the following message on Twitter (the "March 21 Tweet"):



16. The article linked in the March 21 Tweet refers to a prior prosecution by the United States Attorney's Office for the Southern District of New York involving employees of a competitor of Nike referred to by MICHAEL AVENATTI, the defendant, in the initial March 19 meeting with attorneys for Nike.

*The Planned March 25 Meeting*

17. On or about March 25, 2019, MICHAEL AVENATTI, the defendant, arrived at the office complex of Outside Counsel-1 and Outside Counsel-2 in Manhattan, and he was arrested by law enforcement in the vicinity of that complex before the meeting could take place.

18. Shortly before his arrest, MICHAEL AVENATTI, the defendant, learned that law enforcement had approached Client-1. Without Client-1's permission, AVENATTI posted the following message on Twitter:



**Michael Avenatti** ✓
@MichaelAvenatti

Tmrw at 11 am ET, we will be holding a press conference to disclose a major high school/college basketball scandal perpetrated by @Nike that we have uncovered. This criminal conduct reaches the highest levels of Nike and involves some of the biggest names in college basketball.

12:16 PM · Mar 25, 2019 · Twitter for iPhone

COUNT ONE

(Transmission of Interstate
Communications with Intent to Extort)

The Grand Jury charges:

19. The allegations contained in paragraphs 1 through 18 above are hereby repeated, realleged, and incorporated by reference as if fully set forth herein.

20. On or about March 20, 2019, in the Southern District of New York and elsewhere, MICHAEL AVENATTI, the defendant, with intent to extort from a corporation money and a thing of value, transmitted in interstate commerce a communication containing a threat to injure the property and reputation of the corporation, to wit, AVENATTI, during an interstate telephone call, threatened to cause financial harm to Nike and its reputation if Nike did not agree to make multimillion dollar payments to AVENATTI.

(Title 18, United States Code, Sections 875(d) and 2.)

COUNT TWO

(Extortion)

The Grand Jury further charges:

21. The allegations contained in paragraphs 1 through 18 above are hereby repeated, realleged, and incorporated by reference as if fully set forth herein.

15

22. In or about March 2019, in the Southern District of New York and elsewhere, MICHAEL AVENATTI, the defendant, attempted to commit extortion as that term is defined in Title 18, United States Code, Section 1951(b)(2), and thereby would and did obstruct, delay, and affect commerce and the movement of articles and commodities in commerce, as that term is defined in Title 18, United States Code, Section 1951(b)(3), to wit, AVENATTI used threats of economic and reputational harm in an attempt to obtain multimillion dollar payments from Nike, a multinational public corporation.

(Title 18, United States Code, Sections 1951 and 2.)

## COUNT THREE

(Wire Fraud)

The Grand Jury further charges:

23. The allegations contained in paragraphs 1 through 18 above are hereby repeated, realleged, and incorporated by reference as if fully set forth herein.

24. In or about March 2019, in the Southern District of New York and elsewhere, MICHAEL AVENATTI, the defendant, having devised and intending to devise a scheme and artifice to defraud, and to deprive Client-1 of Client-1's intangible right to the honest services of AVENATTI, transmitted and caused to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds

for the purpose of executing such scheme and artifice, to wit, AVENATTI, owing a duty of honest services to Client-1, engaged in a scheme to obtain payments for himself from Nike based on confidential information provided to AVENATTI by Client-1 for the purpose of furthering AVENATTI's representation of Client-1, without Client-1's knowledge or approval, and used and caused the use of interstate communications to effect the scheme.

(Title 18, United States Code, Sections 1343 and 1346.)

## FORFEITURE ALLEGATION

25. As the result of committing one or more of the offenses charged in Counts One through Three of this Indictment, MICHAEL AVENATTI, the defendant, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), any and all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of said offenses, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offenses.

### Substitute Asset Provision

26. If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to, or deposited with, a third person;

    c. has been placed beyond the jurisdiction of the Court;

    d. has been substantially diminished in value; or

    e. has been commingled with other property that cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), and Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of said defendant up to the value of the above forfeitable property.

    (Title 18, United States Code, Sections 981;
    Title 21, United States Code, Section 853(p);
    Title 28, United States Code, Section 2461.)

_____
FOREPERSON

_____
GEOFFREY S. BERMAN
United States Attorney

Form No. USA-33s-274 (Ed. 9-25-58)

---

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

---

**UNITED STATES OF AMERICA**

- v. -

**MICHAEL AVENATTI,**

Defendant.

---

**SUPERSEDING INDICTMENT**

S1 19 Cr. 373 (PGG)

(18 U.S.C. §§ 371, 875, 1343, 1346, 1951, and 2.)

GEOFFREY S. BERMAN
United States Attorney.

_____
Foreperson

---

11/13/19
(CA)

SUPERSEDING INDICTMENT FILED

KN PARKER
USMJ