UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,              :

vs.                                    :        S1 19 Cr. 373 (PGG)

MICHAEL AVENATTI,                      :

                    Defendant.         :
_____


**DEFENDANT AVENATTI'S MEMORANDUM IN SUPPORT
OF MOTION *IN LIMINE* TO EXCLUDE ALL EVIDENCE OF
SETTLEMENT NEGOTIATIONS AND COMMUNICATIONS**


Scott A. Srebnick
SCOTT A. SREBNICK, P.A.
201 South Biscayne Boulevard
Suite 1210
Miami, FL 33131
Telephone: (305) 285-9019
Facsimile:  (305) 377-9937
E-Mail:  Scott@srebnicklaw.com


Jose M. Quinon
JOSE M. QUINON, P.A.
2333 Brickell Avenue, Suite A-1
Miami, FL 33129
Telephone:  (305) 858-5700
Facsimile:  (305) 358-7848
E-Mail:  jquinon@quinonlaw.com

*Attorneys for Defendant Michael Avenatti*

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................. iii

    I.      PRELIMINARY STATEMENT ............................................................... 1

    II.    THE FACTS ............................................................................................. 2

    III.   LEGAL DISCUSSION ........................................................................... 8

CONCLUSION ............................................................................................................. 17

CERTIFICATE OF SERVICE ..................................................................................... 18

## **TABLE OF AUTHORITIES**

**CASES**:                                                                                                      Page

*Black v. Green Harbour Homeowners' Ass'n,*
    798 N.Y.S.2d 753 (3d Dept. 2005) ............................................................................14

*Coles v. Washington Free Weekly, Inc.*,
    881 F.Supp. 26 (D.D.C. 1995) ...................................................................................1

*Feist v. Paxfire*,
    No. 11-Cv-5436,
    2017 WL 177652 (S.D.N.Y. Jan. 17, 2017)..............................................................13

*Flomenhaft v. Finkelstein*,
    8 N.Y.S.3d, 161, 164 (1st Dept. 2015)......................................................................14

*Frechtman v. Gutterrnan*,
    979 N.Y.S.2d 58 (1st Dept. 2014)..............................................................................14

*Front, Inc. v. Khalil*,
    28 N.E.3d 15 (N.Y. 2015) ....................................................................................13, 14

*Funk v. United States*,
    290 U.S. 371 (1933) ...................................................................................................9

*Goldstein v. Cogswell*,
    No. 85 CIV. 9256 (KMW),
    1992 WL 131723 (S.D.N.Y. June 1, 1992)................................................................14

*Goodyear Tire & Rubber Co. v. Chiles Power Supply, Inc.*,
    332 F.3d 976 (6th Cir. 2003) .....................................................................................17

*Greenberg v. Aetna Ins. Co.*,
    235 A.2d 576 (Pa. 1967) ...........................................................................................13

*Hodgson v. Scarlett*,
    171 Eng. Rep. 362 (C.P.1817) ..................................................................................10

*In re Grand Jury Investigation*,
    399 F.3d 527 (2d Cir. 2005).......................................................................................9

*I.S. Joseph Co., Inc. v. J. Lauritzen A/S*,
    751 F.2d 265 (8th Cir. 1984)......................................................................................16

**<u>CASES</u>**:                                                                                                  **<u>Page</u>**

*Jaffee v. Redmond*,
    518 U.S. 1 (1996) ..................................................................................9, 13, 15, 16

*Kirk v. Heppt*,
    532 F. Supp. 2d 586, 593 (S.D.N.Y. 2008) ................................................14

*Klein v. McGauley*,
    29 A.D.2d 418 (N.Y. App. Div. 1968) .......................................................14

*Martirano v. Frost*,
    255 N.E.2d 693 (1969) ................................................................................14

*Munster v. Lamb*,
    11 Q.B.D. 588 (1883) ..................................................................................11

*NSB Technologies, Inc. v. Specialty Direct Marketing, Inc.*,
    2004 WL 1918708 (N.D.Ill. 2004) .............................................................13

*Rex v. Skinner*,
    98 Eng. Rep. 529 (K.B. 1772) ....................................................................10

*Sexter v. Warmflash, P.C. v. Margrabe*,
    828 N.Y.S.2d 315 (1st Dept. 2007) .............................................................14

*Silberg v. Anderson*,
    786 P.2d 365 (Cal. 1990) ............................................................................12

*Simms v. Seaman*,
    308 Conn. 523,
    69 A.3d 880 (Conn. 2013) ...................................................................... 10-12

*State v. Rendelman*,
    947 A.2d 546 (Md. 2008) ............................................................................16

*Surace v. Wuliger*,
    495 N.E. 2d 939 (Ohio 1986) .....................................................................12

*Trammel v. United States*,
    445 U.S. 40 (1980) ........................................................................................9

**CASES**:                                                                            **Page**

*United States v. Gillock*,
    445 U.S. 360 (1980) ............................................................................................9

*United States v. Pendergraft*,
    297 F.3d 1198 (11th Cir. 2002)........................................................................15

*Vemco, Inc. v. Camardella*,
    23 F.3d 129 (6th Cir. 1994)..............................................................................16


**FEDERAL RULES OF EVIDENCE**:

Rule 408 ........................................................................................................ passim

Rule 501 ........................................................................................................ passim


**UNITED STATES CONSTITUTION**:

AMEND I ...............................................................................................................2


**MISCELLANEOUS**:

Anenson, T., "Absolute Immunity from Civil Liability; Lessons for
    Litigation Lawyers," 31 Pepp. L. Rev. 915 (2004) ............................................. passim

Steinberg, M., and Weissler, L, The Litigation Privilege as a Shelter
    for Miscreant Legal Counsel. 97 Ore. Law. Rev. 1 (2018)........................................13

3 Restatement (Second), at §586 ...........................................................................11

Defendant Michael Avenatti, through counsel, and pursuant to Rule 501 of the Federal Rules of Evidence, respectfully submits this Memorandum of Law in support of his Motion to Exclude all Evidence of Settlement Negotiations and Discussions.

## I.   <u>PRELIMINARY STATEMENT</u>

"Litigation in high profile cases is not for the faint of heart." *Coles v. Washington Free Weekly, Inc.*, 881 F.Supp. 26, 34 (D.D.C. 1995).  Courts tolerate – and afford privileges and protection for -- certain types of conduct before and during litigation because of considerations of public policy that seek to encourage zealous advocacy and discourage disgruntled litigants from suing each other for litigation-related conduct.  Thus, for example, lawyers enjoy a "litigation privilege" against civil liability for statements made in the course of litigation, which extends to pre-litigation demand letters.  Similarly, courts have carved out protection from both civil and ***criminal*** liability for extortion for pre-lawsuit communications that involve a threat to litigate, even if the lawsuit is meritless or to be filed in bad faith.

In this case, Mr. Avenatti asks this Court to recognize a federal common law privilege, under Rule 501, for agreed-upon confidential settlement communications between lawyers, where the communications do not involve any threats of force or violence.  The same principles that inform: a) the recognition of a "litigation privilege" in all fifty states and b) the carve-out from the extortion statute for litigation-related threats favor the recognition of a federal common law privilege for a narrow set of settlement communications under Rule 501.  Absent such a privilege, lawyers will be incentivized to surreptitiously audio-record each other and participating neutrals during settlement conferences in contravention of the spirit of such meetings, with the hope that one side will be able to leverage statements made during those meetings against the opposing party and counsel.  Accordingly, Mr. Avenatti moves the Court

to exclude from evidence all communications he had with lawyers representing Nike from March 19-21, 2019.

## II. <u>THE FACTS</u>

This case involves the prosecution of a lawyer for statements made during pre-litigation settlement discussions with other lawyers where: a) no non-lawyers were ever involved in any of the discussions AND b) the lawyers who participated in the discussions *repeatedly* agreed (i) that the discussions were in connection with the settlement of claims between their respective clients and (ii) were covered by Fed.R.Evid. 408.  There is no allegation of any threats of force or violence made during any of the discussions.  Rather, as alleged, Mr. Avenatti stated that he would hold a press conference (*i.e.,* exercise a First Amendment right) if Nike did not satisfy certain settlement demands related to claims of Mr. Avenatti's client, Coach Gary Franklin, Sr., of the California Supreme, a travel team in the Nike Elite Youth Basketball League.

In late February and again on or about March 1, 2019, a Los Angeles-area consultant named Jeffrey Auerbach contacted Mr. Avenatti to enlist his legal assistance on behalf of Coach Franklin.  They spoke, and based on that conversation, Mr. Auerbach e-mailed Mr. Avenatti that he (Avenatti) was "a source of hope for me – in a time of much despair" and "look[ed] forward to further discussing *Gary Franklin, Found/Program Director of California Supreme Youth Basketball v. Nike Elite Youth Basketball & Nike, Inc.*," in reference to a contemplated lawsuit against Nike. (Dkt. #30-12).  Mr. Avenatti met with Coach Franklin and Mr. Auerbach on March 5, 2019, at which time they outlined the facts of a potential legal case that Coach Franklin had against Nike.

Mr. Avenatti contacted his colleague, attorney Mark Geragos, a criminal defense lawyer with decades of experience because, among other reasons, Mr. Geragos had a relationship with Nike's General Counsel as a result of Mr. Geragos's recent representation of Colin Kaepernick, a former NFL quarterback and Nike-sponsored athlete who had just settled his lawsuit against the NFL. Mr. Avenatti and Mr. Geragos agreed to work together on behalf of Coach Franklin and approach Nike's General Counsel to discuss a pre-lawsuit settlement of Coach Franklin's claims. On March 12, 2019, Mr. Geragos texted Casey Kaplan, Nike's Assistant General Counsel for Litigation and Internal Investigations, asking to set up a meeting for a "confidential mediation discussion." The following day, Mr. Geragos spoke with Scott Wilson, Nike's outside counsel at Boies Schiller and Flexner. Mr. Geragos told BSF attorney Wilson that it appeared Nike had an "Adidas problem" and that Geragos was hoping they could have an attorneys-only mediated discussion. On March 15, 2019, Mr. Geragos and Wilson agreed that the settlement meeting would occur on March 19, 2019.

On March 18, 2019, in anticipation of the settlement meeting the next day, Mr. Avenatti again met with Mr. Auerbach and Coach Franklin. Mr. Auerbach provided Mr. Avenatti with: a) a written summary of Nike's conduct vis-à-vis Coach Franklin and corroborating financial records, (Dkt. #30-4); b) a copy of the "Memo to the File" summarizing Mr. Auerbach's telephone conversation with Nike EVP John Slusher, which outlined Coach Franklin's previous demands of Nike, (Dkt. #30-10:6); c) a file-stamped copy of a civil RICO complaint that had been filed against Adidas in the District of South Carolina alleging misconduct by Adidas in the payment of players, (Dkt. #30-13); and d) a 28-page PowerPoint presentation, headlined *Gary Franklin, California Supreme Elite Youth Basketball v. Nike USA, Inc., Nike, Inc., Nike EYB*, (Dkt. #30-14), laying out the facts of a potential civil lawsuit against Nike, and

providing Mr. Avenatti with the factual background regarding the conduct of several Nike executives and others. (Dkt. #30-14:26-28).

On March 19, 2019, Mr. Avenatti and Mr. Geragos met with Nike representatives for the first time, at Mr. Geragos's law office in Manhattan.  The attorneys present at that first meeting, which was not recorded to the knowledge of the defense,[1] included Mr. Avenatti and Mr. Geragos, attorneys Scott Wilson and Ben Homes from BSF, and Rob Leinwand, an attorney at Nike with the title "Vice President of Global Litigation and Employment Counsel." There were no non-attorneys present.  BSF attorney Homes took handwritten notes at the meeting and thereafter prepared typewritten notes of the same meeting.  This was the first time that Mr. Avenatti had any communications with Nike relating to Coach Franklin - all prior communications were handled by Mr. Geragos.

Critically, before any substantive discussion, Mr. Avenatti requested that all present agree that the conversation would be covered by Rule 408 as "a confidential settlement discussion," and that nothing discussed would be admissible in any litigation.  (Dkt. #30-15:2). BSF attorney Wilson agreed that the meeting was covered by 408 – "We agree that this meeting is covered by 408."  (Dkt. #30-15:2).[2]  Thus, the evidence is unrefuted that the purpose of the meeting was to settle a lawsuit, on behalf of a client, in anticipation of litigation.  Otherwise, 408 would have no relevance and the parties would not have agreed it applied.

---

[1] Importantly, this first meeting was the most extensive and longest communication with Nike relating to the issues in this case.

[2] By relying on attorney Homes's notes, the defense is not vouching for their accuracy in all respects.  Rather, they constitute evidence in support of Mr. Avenatti's argument that the lawyers all understood that the discussions were always confidential negotiations to settle a potential lawsuit.

Mr. Avenatti next informed the Nike lawyers that he represented a "whistleblower;" he mentioned claims for "breach of contract, tortious interference, and potentially other claims;" and, after Nike lawyer Wilson asked to see the evidence supporting the claims, he allowed Mr. Wilson to review certain documents provided by Coach Franklin.  Mr. Wilson, on behalf of Nike, stated that Nike had "three primary interests: 1) We have an interest in not being dragged through the press; 2) we have an interest in complying with the Government; and 3) we have an interest in conducting an internal investigation surrounding these allegations."  (Dkt. #30-15:4).  Nike lawyer Rob Leinwand recognized that this meeting was about resolving a lawsuit, stating "I get the claims, but we need to look at Nike's contract with Gary before we make any decisions.  I also do not know what he is seeking.  Do you have a number in mind?"  (Dkt. #30-15:6).  He later added, "I also need to talk to the head of communications and the head of sports marketing.  And they are going to say who the f-k is Gary Franklin and Jamal James and Carlton DeBose."  (Dkt. #30-15:9).

Mr. Avenatti and Mr. Geragos next spoke with BSF attorney Wilson by telephone on March 20, 2019 and had further settlement discussions.  Only attorneys participated in the call (although, unbeknownst to Mr. Avenatti, the FBI was recording and perhaps contemporaneously listening to the call).   Thereafter on Thursday, March 21, 2019, Mr. Avenatti and Mr. Geragos met with BSF attorneys Wilson and Homes, again at Mr. Geragos's office, for the purpose of settling the claims.  During that meeting, which was audio and video recorded, Mr. Avenatti and BSF attorney Wilson confirmed the confidential nature of their settlement discussions.

MA         Um and by the way, I assume that for the sake of our discussion here today, that all the parameters of 408 and confidentiality and everything from before have carried over

SW          We can stick with 408

MA         Right, strictly confidential

SW          408

MA         What's the difference between 408 and strictly confidential?

SW          What do you mean by strictly confidential?

MA         Well, see, that causes me a little concern. What is the issue relating to the difference between strictly confidential and 408 ...

SW          Michael I don't want you to have a press conference.  I have to be able to talk to the CEO ...

MA         Oh- of course you do

SW          Potentially disclosure counsel, you know uh-

MA         Well there's no disclosure of this meeting to disclosure counsel

SW          I mean SEC disclosure counsel. You're threatening a giant press conference. I- if something happens and there's an effect on the stock price, you don't think that I would need to- uh again all under the company's privilege, I…

MG         Correct.  If it's broad enough to come under a mediation, a 408 a confidentiality

SW          ***Strict.  This meeting is under, I've assumed all our conversations since we sat down were 408 and um, believe you me, I intend to keep this confidential***

MA         Okay. Well do you think that if I have a press conference I could recount what happened in this meeting?

SW          Do I think you will or won't?

MA         No I mean is it your understanding that the parties have the ability to do that?  Because that is not my understanding but if we'd like to have a different understanding we can reach it.

SW          Look I'll be totally candid.  If you have a press conference, I'll be watching very closely for what you say and I preserve my right to take the position that you've waived, because you've said things that I think ***violate the confidentiality of***

|     | ***these discussions*** - if you go in and say Nike was willing to, you know, pay whatever, which I would think would violate our agreement, then- |
|-----|---|
| MA  | I would never say that |
| SW  | I don't know what you're gonna do Michael- |
| MA  | No (U/I) |
| SW  | We've known each other for 2 days |
| MA  | I understand that but I would |
| SW  | You might say that in order to make it seem very real, to make it seem very big |
| MA  | ***No, I would, I would just so you know it would not be my intention to do that. That would be a violation of the spirit of what we're trying to do here. Regardless, even if we are not able to reach a deal, that, that is not my intention-*** |
| SW  | ***Okay, that is not my intention either*** |
| MA  | So it's not my intention to disclose that we met, that, what we talked about, I mean we've had a very candid talk- |
| SW  | Nor is it mine |
| MA  | Ok alright so then we're square on that. |
| SW  | Yep. We are on the same page. |
| MA  | Look, I mean if we, if we are not able to resolve this, ***as far as I'm concerned, we go status quo ante to before we sat down*** |
| SW  | ***Yes***. How, um the client will ask me this. You can answer or you can not answer. If we're not able to resolve it on Monday morning, how quickly will you go to the Press? |
| MA  | I'm not going to answer that question. |
| SW  | You know I gotta ask those things.  Okay - I will come with authority on Monday. |
| MG  | Okay. |

SW                I've got your ask.  Thank you for the courtesy personally and professionally.

*See* Declaration of Scott A. Srebnick (filed contemporaneously herewith), ¶2.[3]

On Monday, March 25, 2019, the USAO-SDNY and FBI arrested Mr. Avenatti on a criminal complaint, alleging that the statements he made during the March 19-21 settlement discussions with the Nike attorneys violate the extortion statutes.  That same day, the law enforcement officials issued a press release and held a press conference, using cherry-picked statements made by Mr. Avenatti during the settlement discussions.  The criminal complaint, and the subsequent Indictment and Superseding Indictment likewise revealed verbatim statements made during the settlement discussions.  The BSF lawyers produced the handwritten and typewritten notes of the unrecorded March 19 meeting to the government. (Dkt. #30-15).

### III.  <u>LEGAL DISCUSSION</u>

The statements made by Mr. Avenatti to the Nike lawyers during the pre-litigation settlement discussions on March 19-21, 2019, should be excluded under a privilege for confidential settlement negotiations among lawyers pursuant to Rule 501 of the Federal Rules of Evidence.  Rule 501 provides:

> The common law – as interpreted by United States courts in the light of reason and experience – governs a claim of privilege unless any of the following provides otherwise:
>
> - the United States Constitution
> - a federal statute; or
> - rules prescribed by the Supreme Court.
>
> But, in a civil case, state law governs privilege regarding a claim or defense for which state law supplies the rule of decision.

---

[3] The government has advised that it intends to prepare its own transcript of the March 21, 2019 meeting, which may have slight differences with the excerpt cited above.

In criminal cases, Rule 501 plainly requires that the court apply the federal law of privilege, as opposed to state law. *In re Grand Jury Investigation*, 399 F.3d 527, 530 (2d Cir. 2005); *United States v. Gillock*, 445 U.S. 360, 368 (1980). Rule 501 "authorizes federal courts to define new privileges by interpreting common law principles "in the light of reason and experience." *See Jaffee v. Redmond*, 518 U.S. 1, 8 (1996). "[T]he common law is not immutable but flexible, and by its own principles adapts itself to varying conditions." *Id.* (quoting *Funk v. United States*, 290 U.S. 371, 383 (1933)). Thus, the rule "did not freeze the law governing the privileges of witnesses in federal trials at a particular point in our history, but rather directed federal courts to 'continue the evolutionary development of testimonial privileges.'" *Jaffee*, 518 U.S. at 9 (quoting *Trammel v. United States*, 445 U.S. 40, 47 (1980)). While the fundamental maxim that "the public … has a right to every man's evidence" is the general rule, exceptions may be justified by a "public good transcending the normally predominant principle of utilizing all rational means for ascertaining truth." *Trammel*, 445 U.S. at 50 (citation omitted).

The *Jaffee* decision, which addressed the psychotherapist-patient privilege, established four factors to consider in determining whether to recognize a federal common law privilege:

> (1) whether the asserted privilege is "rooted in the imperative need for confidence and trust";

> (2) whether the privilege would serve public ends;

> (3) whether the evidentiary detriment caused by an exercise of the privilege is modest; and

> (4) whether denial of the federal privilege would frustrate a parallel privilege adopted by the states.

*See Jaffee*, 518 U.S. at 9-13.

The same considerations that animate the well-recognized "litigation privilege" against civil liability for certain types of actions compel the recognition of a more limited evidentiary privilege under Rule 501 for communications between lawyers during pre-litigation settlement conferences, where such communications do not threaten force or violence.  The litigation privilege initially developed in the context of defamation claims.  "Absolute immunity for defamatory statements made in the course of judicial proceedings has been recognized by common-law courts for many centuries and can be traced back to medieval England." *Simms v. Seaman*, 308 Conn. 523, 531, 69 A.3d 880, 885 (Conn. 2013).  "The privilege arose soon after the Norman Conquest and the introduction of the adversary system" and has been deemed "as old as the law itself." *Id.* (quoting T. Anenson*, Absolute Immunity from Civil Liability; Lessons for Litigation Lawyers*, 31 Pepp. L.Rev. 915, 918 (2004)).  The first reported decision dismissing an action against an attorney on the ground of privilege was issued in 1606.  *Simms*, 69 A.3d at 885.

The principle that an attorney should enjoy a zone of protection around statements made in litigation was reiterated numerous times by English courts, as explained by the Connecticut Supreme Court in *Simms, supra*.  *See, e.g., Hodgson v. Scarlett*, 171 Eng. Rep. 362, 363 (C.P.1817) ("[N]o action can maintained for words spoken in judicial proceedings … It is necessary to the due administration of justice, that counsel should be protected in the execution of their duty in [c]ourt; and that observations made in the due discharge of that duty should not be deemed actionable."); *Rex v. Skinner*, 98 Eng. Rep. 529, 530 (K.B. 1772) ("[N]either party, witness, counsel, jury, or [j]udge, can  be put to answer, civilly or criminally, for words spoken in office.  If the words spoken are opprobrious or irrelevant to the case, the [c]ourt will take notice of them as a contempt, and examine on information.  If any thing of malamens is found

on such enquiry, it will be punished suitably.").

In *Munster v. Lamb,* 11 Q.B.D. 588, 599 (1883),[4] the English court described the litigation privilege as including all defamatory language, even if lacking in relevancy to the disputed issues or motivated by malice or misconduct.  The court noted the special protection that counsel need to enjoy in the context of representing clients, reasoning that:

> counsel has a special need to have his mind clear from all anxiety.... What he has to do, is to argue as best he can ... in order to maintain the proposition which will carry with it either the protection or the remedy which he desires for his client. If amidst the difficulties of his position he were to be called upon during the heat of his argument to consider whether what he says is true or false, whether what he says is relevant or irrelevant, he would have his mind so embarrassed that he could not do the duty which he is called upon to perform. For, more than a judge, infinitely more than a witness, he wants protection on the ground of benefit to the public. The rule of law is that what is said in the course of the administration of the law, is privileged; ***and the reason of that rule covers a counsel even more than a judge or a witness****.... The reason of the rule is, that a counsel, who is not malicious and who is acting bona fide, may not be in danger of having actions brought against him. If the rule of law were otherwise, the most innocent of counsel might be unrighteously harassed with suits, **and therefore it is better to make the rule of law so large that an innocent counsel shall never be troubled, although by making it so large counsel are included who have been guilty of malice and misconduct....** With regard to counsel, the questions of malice, bona fides, and relevancy, cannot be raised; the only question is, **whether what is complained of has been said in the course of the administration of the law. If that be so, the case against a counsel must be stopped at once**.

*Id.,* at 603–605 (emphasis added).

The rule in the Restatement (Second) of Torts provides that "[a]n attorney at law is absolutely privileged to publish defamatory matter concerning another in communications preliminary to a proposed judicial proceeding, or in the institution of, or during the course and as a part of, a judicial proceeding in which he participates as counsel, if it has some relation to

---

[4] The Queen's Bench Division is one of the three divisions of the High Court of Justice in England.

the proceeding." 3 Restatement (Second), at §586, p.247. A comment to §586 further provides that the privilege "protects the attorney from liability in an action for defamation irrespective of his purpose in publishing the defamatory matter, his belief in its truth, or even his knowledge of its falsity." *Id.*, comment (a).

The litigation privilege is supported by three rationales. *Simms*, 69 A.3d at 887. First, "it protects the rights of clients who should not be imperiled by subjecting their legal advisors to the constant fear of lawsuits arising out of their conduct in the course of legal representation." T. Anenson, *supra*, 31 Pepp. L.Rev. at 922. Second, the privilege furthers "the administration of justice by preserving access to the courts. If parties could file retaliatory lawsuit and cause the removal of their adversary's counsel on that basis, the judicial process would be compromised." *Id.* at 923-24. Third, there are other remedies – such as a court's inherent contempt powers and the potential for state and local bar disciplinary proceedings – that can be imposed to deter malicious conduct. *Id.* at 925. To be sure, the policy underlying the well-settled principle of absolute immunity in civil cases was emphasized by the Supreme Court of Ohio as follows:

> The most basic goal of our judicial system is to afford litigants the opportunity to freely and fully discuss all the various aspects of a case in order to assist the court in determining the truth, so that the decision it renders is both fair and just. While the imposition of an absolute privilege in judicial proceedings may prevent redress of particular scurrilous and defamatory allegations that tend to harm the reputation of the person defamed, a contrary rule, in our view, would unduly stifle attorneys from zealously advancing the interests of their clients in possible violation of the Code or Professional Responsibility, and would clog court dockets with a multitude of lawsuits based upon alleged defamatory statements made in other judicial proceedings.

*Surace v. Wuliger*, 495 N.E. 2d 939, 944 (Ohio 1986). The litigation privilege has been viewed as "the backbone to an effective and smoothly operating system," *Silberg v. Anderson*, 786

P.2d 365 370 (Cal. 1990) (citation omitted).  While [w]rong may at times be done to a defamed party … it is *damnum obsque injuria*.  The inconvenience of the individual must yield to a rule for the good of the general public." *Greenberg v. Aetna Ins. Co.*, 235 A.2d 576, 578 (Pa. 1967) (citation omitted).

For these policy reasons, all fifty states recognize some form of litigation privilege in civil cases. *NSB Technologies, Inc. v. Specialty Direct Marketing, Inc.*, No. 03-CV-2323, 2004 WL 1918708, *3 (N.D.Ill. 2004) (recognizing federal common law litigation privilege); T. Anenson, *supra*, at 927.  And, they do so because the state legislatures and courts have weighed the same policy interests that the Supreme Court in *Jaffee* considers important.  The "litigation privilege" is "deemed essential for enabling lawyers to zealously represent their clients without the threat of suit from disgruntled non-clients."  *See* Steinberg, M., and Weissler, L, *The Litigation Privilege as a Shelter for Miscreant Legal Counsel,* 97 Ore. Law. Rev. 1, 5 (2018). "Although courts vary somewhat in their description of the Privilege, the essence of the Privilege is that attorneys are immune from civil liability to non-clients for actions taken in connection with representing a client in litigation." *Id.* at 5-6 (citation omitted).

Moreover, the reality is that "the litigation process begins prior to the filing of a lawsuit," as reflected in "several legal doctrines that may be invoked before the institution of legal action, thereby covering pre-complaint communications and conduct." *Id.* at 12.  For example, in New York, statements pertinent to a good faith anticipated litigation made by attorneys before the commencement of litigation are privileged and "no cause of action for defamation can be based on those statements." *Front, Inc. v. Khalil*, 28 N.E.3d 15, 16 (N.Y. 2015); *see also Feist v. Paxfire*, No. 11-Cv-5436, 2017 WL 177652, *5 (S.D.N.Y. Jan. 17, 2017) (rejecting defamation claims against defendant whose attorneys emailed a draft

complaint to the media before the complaint was actually filed).  The privilege covers statements made in connection with pending or contemplated litigation.  *Goldstein v. Cogswell*, No. 85 CIV. 9256 (KMW), 1992 WL 131723, at *27 n.32 (S.D.N.Y. June 1, 1992).  It covers statements made outside court, including in written communications "between litigating parties or their attorneys."  *Klein v. McGauley*, 29 A.D.2d 418, 420 (N.Y. App. Div. 1968).  It covers "cease and desist letters."  *Khalil*, 28 N.E.3d at 19.  And it covers "all pertinent communications among the parties, counsel, witnesses and the court," regardless "[w]hether a statement was made in or out of court, was on or off the record, or was made orally or in writing."  *Frechtman v. Gutterran*, 979 N.Y.S.2d 58 (1st Dept. 2014) (quoting *Sexter v. Warmflash, P.C. v. Margrabe*, 828 N.Y.S.2d 315 (1st Dept. 2007)).

When the pre-litigation privilege is invoked in connection with an allegedly defamatory statement made during pending or contemplated litigation, "any doubts are to be resolved in favor of pertinence."  *Flomenhaft v. Finkelstein*, 8 N.Y.S.3d, 161, 164 (1st Dept. 2015).  "[T]he test to determine whether a statement is pertinent to litigation is "'extremely liberal,'" such that the offending statement, to be actionable, must have been 'outrageously out of context.'"  *Id.* at 164-65 (emphasis supplied) (quoting *Black v. Green Harbour Homeowners' Ass'n*, 798 N.Y.S.2d 753 (3d Dept. 2005), and *Martirano v. Frost*, 255 N.E.2d 693 (1969)); *Kirk v. Heppt*, 532 F. Supp. 2d 586, 593 (S.D.N.Y. 2008).  The New York Court of Appeals in *Khalil* held that to prevail on the pre-litigation privilege the defendant need only establish *one element*: the allegedly defamatory statement at issue was "pertinent to a good faith anticipated litigation." 28 N.E.3d at 16.  Upon establishing that element, summary judgment for the defendant is required.  *See id.*

While the litigation privilege originated to protect attorneys from lawsuits for defamation, that privilege (or immunity) has been logically extended to other civil claims as well, including negligence, breach of confidentiality, abuse of process, intentional infliction of emotional distress, negligent infliction of emotional distress, invasion of privacy, civil conspiracy, interference with contractual or business relations, fraud, and, in some cases, malicious prosecution. Anenson*, supra*, at pp. 927-28, n. 65-75 (collecting cases).

Although the discussion above pertains to the litigation privilege, the same rationale supports the recognition of a federal common law privilege for settlement negotiations between lawyers under the circumstances of this case. "[T]he policy decisions of the States bear on the question whether federal courts should recognize a new privilege or amend the coverage of an existing one." *Jaffee*, 518 U.S. at 12. Recognizing an evidentiary privilege for allegedly extortionate threats, involving wrongful use of fear of economic harm, made during settlement negotiations would promote the policy decisions discussed above. If an attorney has a privilege against civil liability for **intentionally defaming** a potential litigant – *i.e.,* for knowingly publishing **false** information about the litigant – then certainly an attorney's alleged threat to opposing counsel in a settlement conference to publish **truthful** information about the opposing party should, at a minimum, be the subject of an evidentiary privilege.

Importantly, the same considerations of public policy that have cemented the "litigation privilege" in American jurisprudence have also led courts to create an exception to **criminal liability** for allegations of extortion in relation to pre-suit threats to litigate. Thus, in *United States v. Pendergraft*, 297 F.3d 1198, 1205-06 (11th Cir. 2002), the Court held that a threat to litigate, even in bad faith, was not "wrongful" under the Hobbs Act. The Court reasoned that "[a]llowing litigants to be charged with extortion would open yet another collateral way for

litigants to attack one another.  The reality is that litigating parties often accuse each other of bad faith.  The prospect of such civil cases ending as criminal prosecutions gives us pause." *Id.* at 1207; *State v. Rendelman*, 947 A.2d 546, 555-56 (Md. 2008) ("If, upon examining the law, we find that an individual retains a lawful right to engage in certain conduct, a threat to engage in that conduct unless a payment is made cannot constitute extortion under Maryland law.").  Likewise, courts have carved out protection from ***civil*** extortion liability for pre-suit communications involving a threat to litigate, even if meritless or in bad faith.  *Vemco, Inc. v. Camardella*, 23 F.3d 129, 134 (6th Cir. 1994) ("A threat of litigation if a party fails to fulfill even a fraudulent contract … does not constitute extortion."); *I.S. Joseph Co., Inc. v. J. Lauritzen A/S*, 751 F.2d 265, 267 (8th Cir. 1984) (even a groundless, bad-faith threat to sue does not instill fear "within the meaning of the criminal statute prohibiting extortion").

The federal common law privilege Mr. Avenatti is asking the Court to recognize under Rule 501 is a narrow one, and the "evidentiary detriment caused by an exercise of the privilege is modest."  *Jaffee*, 518 U.S. at 9-13.  It would not shield threats of violence directed at opposing counsel or opposing parties.  Rather, it would be limited to the threatened use of fear of economic harm directed from one lawyer to another, without the presence of any non-lawyers, during an agreed-upon settlement conference.  Lawyers are trained and well-equipped to deal with such threats – such as the threat of a press conference -- including by warning the threatening counsel that he/she may be crossing the line by following through on such a threat. The privilege would serve the public ends by discouraging lawyers from surreptitiously recording each other during settlement conversations and from falsely accusing each other of extortion for statements made during settlement negotiations.

The Second Circuit has neither recognized nor rejected a federal common law privilege for pre-litigation settlement communications.  The Sixth Circuit, however, in *Goodyear Tire & Rubber Co. v. Chiles Power Supply, Inc.*, 332 F.3d 976 (6th Cir. 2003) recognized such a federal common law privilege.  In that case, the Court protected from third-party discovery an alleged bribe offer made during settlement discussions.[5]

Recognizing a federal common law privilege under Rule 501 for non-violent statements made by a lawyer during settlement discussions among only lawyers does not conflict with Fed.R.Evid. 408.  That rule governs when compromise offers and negotiations are admissible for or against parties to the litigation, such as to "prove or disprove the validity or amount of a disputed claim…"  It does not address the admissibility against a lawyer of non-violent statements made by that lawyer during an agreed-upon settlement conference with opposing counsel.

## IV.  <u>CONCLUSION</u>

For the foregoing reasons, this Court should exclude from evidence all statements made during negotiations between Mr. Avenatti and Nike's counsel between March 19-21, 2019.

Respectfully submitted,

By:      /s/Scott A. Srebnick
         Scott A. Srebnick, P.A.
         201 South Biscayne Boulevard, #1210
         Miami, FL 33131
         Telephone: (305) 285-9019
         Facsimile:  (305) 377-9937
         E-Mail:  Scott@srebnicklaw.com

---

[5] Although *Goodyear* has been criticized by lower courts for applying a federal common law privilege in a diversity case, it remains the law of the Sixth Circuit.  *In re Skelaxin (Metaxalone) Antitrust Litigation*, No. 1:12-md-2343, 2014 WL 12769616, *3 (E.D. Tenn. July 29, 2014); *but see In re MSTG, Inc.*, 675 F.3d 1337, 1342-48 (Fed.Cir. 2012) (declining to recognize settlement negotiation privilege).

17

By:    /s/Jose M. Quinon
Jose M. Quinon, P.A.
2333 Brickell Avenue, Suite A-1
Miami, FL 33129
Telephone:  (305) 858-5700
Facsimile:  (305) 358-7848
E-Mail:  jquinon@quinonlaw.com

*Attorneys for Defendant Michael Avenatti*

## CERTIFICATE OF SERVICE

I hereby certify that on December 10, 2019, I caused a true and correct copy of the foregoing to be served by electronic means, via the Court's CM/ECF system, on all counsel registered to receive electronic notices.

/s/Scott A. Srebnick
Scott A. Srebnick