UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,        :

vs.                          :       S1 19 Cr. 373 (PGG)

MICHAEL AVENATTI,            :

           Defendant.         :
_____

**DEFENDANT AVENATTI'S REPLY MEMORANDUM
IN SUPPORT OF MOTION *IN LIMINE* TO EXCLUDE
GOVERNMENT'S PROPOSED EXPERT TESTIMONY**

Scott A. Srebnick
SCOTT A. SREBNICK, P.A.
201 South Biscayne Boulevard
Suite 1210
Miami, FL 33131
Telephone: (305) 285-9019
Facsimile:  (305) 377-9937
E-Mail:  Scott@srebnicklaw.com

Jose M. Quinon
JOSE M. QUINON, P.A.
2333 Brickell Avenue, Suite A-1
Miami, FL 33129
Telephone:  (305) 858-5700
Facsimile:  (305) 358-7848
E-Mail:  jquinon@quinonlaw.com

*Attorneys for Defendant Michael Avenatti*

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ iii

    I.       DISCUSSION ............................................................................................ 1

       A.  Legal Expert Testimony that a Lawyer on Trial
           Violated His Fiduciary Duties is Inadmissible ........................................... 1

       B.  The Government has not Established
           Reliability and Acceptable Methodology ................................................... 8

       C.  The Government's Notice is Deficient ...................................................... 11

       D.  A Daubert Hearing is Required ................................................................ 11

    II.     CONCLUSION ...................................................................................... 11

CERTIFICATE OF SERVICE .......................................................................................... 12

# TABLE OF AUTHORITIES

**CASES:**                                                                                                  **Page**

*Daubert v. Merrill Dow Pharmaceuticals,*
    509 U.S. 579 (1993) ...............................................................................9. 11

*Kumho Tire Co. v. Carmichael,*
    526 U.S. 137 (1999) ...................................................................................9

*Lippe v. Bairnco Corp.*,
    No. 96-Civ. 7600 (DC),
    2002 WL 15630 (S.D.N.Y. Jan. 7, 2002)................................................2, 3

*McDonnell v. United States*,
    136 S.Ct. 2355 (2016) ............................................................... 2

*Nimely v. City of New York*,
    414 F.3d 381 (2d Cir. 2005)........................................................7

*Obrycka v. City of Chicago*,
    792 F. Supp. 2d 1013 (N.D. Ill. 2011) ................................... 10

*Primavera Familienstifung v. Askin*,
    130 F.Supp. 2d 450 (S.D.N.Y. 2001), *abrogated on other grds.*
    *by Casey v. Merck & Co., Inc.,* 653 F.3d 95 (2d Cir. 2011) .........................3

*Skilling v. United States*,
    561 U.S. 358 (2010) ...................................................................6

*Sommerfield v. City of Chicago*,
    254 F.R.D. 317 (N.D. Ill. 2008) ...............................................10

*Therasense, Inc. v. Becton, Dickinson and Co.*,
    No. 04-2123, 04-3327, 04-3732, 05-3117 (WHA)
    2008 WL 2323856 (N.D. CA. May 22, 2008) ............................10

*Tiffany (NJ) Inc. v. eBay, Inc.*,
    576 F.Supp.2d 457 (S.D.N.Y. 2007)..........................................3

*United States v. Cavin,*
    39 F.3d 1299 (5th Cir. 1994) .....................................................4, 5

**<u>CASES</u>:**                                                                                                      **<u>Page</u>**

*United States v. Kellington*,
217 F.3d 1084 (9th Cir. 2000) ................................................................................4, 5

*United States v. Kelly*,
    888 F.2d 732 (11th Cir. 1989) ...............................................................4, 5

*United States v. Skelos*,
    707 F. Appx. 733 (2d Cir. 2017) ...............................................................1, 2

*United States v. Skelos*,
    No. 15 Cr. 317 (S.D.N.Y.) (KMW) ..........................................................1,2

*United States v. Tuzman*,
    301 F.Supp.3d 430 (S.D.N.Y. 2017) ...........................................................7


**<u>FEDERAL RULES OF EVIDENCE</u>**

Rule 702 ................................................................................................... Passim

Defendant Michael Avenatti, through counsel, respectfully submits this memorandum in reply to the Memorandum of Law of the United States in Opposition to the Defendant's Motion *in Limine* to Preclude Expert Testimony ("Govt Mem.") (Dkt. No. 98).

## I. DISCUSSION

### A. Legal Expert Testimony that a Lawyer on Trial Violated his Fiduciary Duties is Inadmissible

The government cites a total of forty-four (44) cases in its response to Mr. Avenatti's motion to exclude the testimony of the government's legal experts. (Dkt. No. 98:ii-iv). Not a single one – NOT ONE – holds or even remotely suggests that it is permissible for the government to offer an opinion at trial from a legal ethics expert that a lawyer-defendant violated his fiduciary duties to a client. That is not surprising, inasmuch as the law is settled and clear that the admission of such expert opinion testimony would be clear error.

Further, the two cases on which the government primarily relies for the broad proposition that its proposed expert testimony is relevant and admissible (Dkt. No. 98:9-10) actually severely undermine the government's argument. First, *United States v. Skelos*, 707 F. Appx. 733, 740 (2d Cir. 2017), cited by the government as "upholding admission of testimony by ethics authority regarding New York state ethics rules …," (Dkt. No. 98:10), involved a ***fact witness***, not an expert witness, who testified that she had prepared training materials (i.e. a PowerPoint presentation) for State Senators that contained excerpts of various ethics rules and that Defendant Skelos had been trained using the PowerPoint. *See United States v. Skelos*, No. 15 Cr. 317 (KMW) (ECF No. 140:84-107) (witness's testimony attached hereto as Exhibit 1). Indeed, after the fact witness testified on direct, the prosecutor in *Skelos* successfully prevented the defense from using the witness as a quasi-expert witness on ethics rules, stating:

> Your Honor, the government was very careful to elicit on direct only factual issues, that is, we just read through the PowerPoint and said were the senators trained on this. **We have not asked about her legal opinions about anything, whether certain things violate those laws**. The entire purpose of this, especially in light of defendants' concern about this witness, was **just to factually state he's been trained on these laws**. I want to make sure that [defense counsel] – sounds like maybe he's going this way – is going to try to turn her into a quasi expert witness on the development of the laws, *what it means*, et cetera. And I want to make sure we're on the same page. This witness is being offered for a limited purpose, in light of the defendants' objections.

(Exh. 1, ECF No. 140:102) (emphasis added). A second *Skelos* prosecutor added that the scope of the witness's direct testimony was narrow, noting Judge Caproni's ruling in another case that "dueling experts on the meaning of state law [] is not admissible from either side," to which Judge Wood noted her agreement. (Exh. 1, ECF No. 140:102-03). Moreover, the Second Circuit held that the district court erred by allowing another fact witness (a State Senator) to testify that "assist[ing] individuals or companies in getting meetings with state agencies" was part of the "official duties" of a state senator because such testimony conflicted with the legal definition of "official act" in *McDonnell v. United States*, 136 S.Ct. 2355, 2382 (2016). *Skelos*, 707 F. App'x at 740.

Second, the government cites *Lippe v. Bairnco Corp.*, No. 96-Civ. 7600 (DC), 2002 WL 15630, at *2 (S.D.N.Y. Jan. 7, 2002), for the proposition that an expert "may properly testify as to the customs and standards of an industry, and opine as to how a party's conduct measured up against such standards." (Dkt. No. 98:9) (quoting *Lippe*). The testimony in *Lippe*, however, had nothing to do with customs or standards. Rather, Judge Chin held that while he would permit a proposed expert to provide limited testimony about corporate conveyances and transactions, he would not allow the expert to state ultimate legal conclusions, opine that the conveyances were fraudulent, or testify about anyone's intent.

*Lippe*, 2002 WL 15630, at *3.

The "customs and standards" quote in *Lippe* cited the district court's opinion in *Primavera Familienstifung v. Askin*, 130 F.Supp. 2d 450 (S.D.N.Y. 2001), *abrogated on other grds. by Casey v. Merck & Co., Inc.,* 653 F.3d 95 (2d Cir. 2011). In *Primavera*, the district court **excluded** the expert's testimony in its entirety because it was rife with inadmissible opinions about the scope of legal obligations and improper conclusions that the conduct at issue breached those legal obligations. The court rejected a party's effort to present expert testimony about the law through the back door by labeling it "testimony about industry custom or practice." *Primavera*, 130 F.Supp.2d at 529.[1]

The government does the same here, repeatedly attempting in its opposition to recast its experts' conclusions about California ethics rules and laws as testimony about the "custom and practice of the legal trade and in particular the practices embodied in state standards and rules of professional responsibility…" (Dkt. No. 98:9); *see also* (Dkt. No. 98:12) ("In short, expert testimony explaining the standards and practices in the legal industry is both relevant and admissible…"); (Dkt. No. 98:13, n.4) ("Similarly, courts routinely admit expert testimony regarding the standards of care … in unlawful dispensation cases against doctors…"); (Dkt. No. 98:15; 98:16; 98:17; 98:18). But nowhere in either its initial expert witness notice or its supplemental notice did the government mention customs, practices, standards of care, or legal industry standards. (Dkt. No. 83-1; 83-3). Rather, the government's notices make clear that these experts interpreted laws and rules, and will opine that Mr. Avenatti violated them.

---

[1] A third case initially cited by the government for a general proposition about the relevance of proffered expert testimony -- *Tiffany (NJ) Inc. v. eBay, Inc.*, 576 F.Supp. 2d 457, 459 (S.D.N.Y. 2007) (Dkt. No. 98:10) – involved a "statistical sampling" expert, not an expert about ethics.

The government cites a trilogy of cases for the proposition that "in the prosecution of a lawyer for conduct stemming from his or her representation of a client, expert testimony on the lawyer's ethical obligations is relevant to establish the lawyer's intent and state of mind." (Dkt. No. 98:12) (quoting *United States v. Kellington*, 217 F.3d 1084, 1098 (9th Cir. 2000) (citing *United States v. Cavin*, 39 F.3d 1299, 1309 (5th Cir. 1994) and *United States v. Kelly*, 888 F.2d 732, 743 (11th Cir. 1989)).  But the government avoids any discussion of the unique facts of those cases, all of which involved the prosecution of lawyers for acts allegedly committed in furtherance of a client's crimes.  *Kellington*, 217 F.3d at 1089 (lawyer and client charged and tried together for obstruction of justice); *Cavin*, 39 F.3d at 1304 (lawyer and client charged together for conspiring to defraud regulators); *Kelly*, 888 F.2d at 738 (lawyer and client charged together with drug trafficking).  In each case, the lawyer sought to explain acts that he undertook on behalf of the client by offering evidence of his obligations under the rules of professional responsibility, in order to negate criminal intent.  The courts held that, to the extent the rules of professional responsibility were relevant to the lawyer's state of mind and why he acted in a certain way, the *defendant-lawyer* was entitled to present evidence of those rules and how they affected him.  *Kelly*, 888 F.2d at 743 ("Kelly sought to testify regarding his understanding of his professional obligations as an attorney, and how that understanding affected his conduct.");[2] *Cavin*, 39 F.3d at 1309 ("holding that a lawyer accused of participating in his client's fraud is entitled to present evidence of his professional, including ethical responsibilities, and the manner in which they influenced him"); *Kellington*, 217 F.3d

---

[2] The lawyer in *Kelly* did not seek to present expert testimony on professional obligations.  Rather, the court admitted the rules and canons in evidence.

at 1099 (evidence of lawyer's duties "was obviously relevant to negate criminal intent and/or to establish a 'bona fide legal representation defense' under §1515(c).").[3]   None of the three courts held that an expert may opine that a criminal defendant's conduct violates rules of professional conduct.   And, certainly, none of them suggested that a legal expert may, after reviewing only the allegations in a speaking indictment, tell the jury that a defendant violated as many as eight separate rules of professional conduct.

The government argues that its expert testimony is relevant and admissible because of "defendant's apparent plan to argue that such standards and practices support his conduct – and [are] wholly consistent with case law." (Dkt. 98:13).   The government misapprehends the nature of Mr. Avenatti's defense.   Unlike the lawyers in *Kellington*, *Cavin,* and *Kelly*, Mr. Avenatti does not intend to present evidence of ethics rules nor claim that any specific conduct was motivated by his understanding of a particular California rule.   Those cases are simply inapposite.

Nor has Mr. Avenatti conceded the relevance of the California Bar Rules by including proposed instructions about several rules in his requests to charge.  (Dkt. No. 97:57).  These instructions were submitted, in an abundance of caution, depending on the evidence admitted at trial, a point Mr. Avenatti specifically noted in his submission. (Dkt. No. 97:57 & n.47).  *To*

---

[3] *Kellington*, in fact, highlights the risks inherent in permitting competing legal experts to interpret laws and opine on whether a defendant violated them.  There, the government moved *in limine* to preclude all expert testimony about lawyer ethics, but the district court denied the motion.  *Id.* at 1097 n.15.  What ensued was basically an ethics testimony free-for-all, with both sides calling legal experts to give competing interpretations of the applicable rules as applied to the defendant's conduct.  *Id.* at 1090. This caused the district court to change course and instruct the jury that the ethics testimony "was mere background information," preclude the lawyers from making "any ethics type of argument," and instruct the jury that the law comes from him, not the witnesses.  *Id.* at 1090, 1097 n.15.  The district court later admitted its own error in the way it handled the entire situation and granted the defendant a new trial, which the Ninth Circuit affirmed.

*be even more clear, however, Mr. Avenatti hereby objects to **any** testimony or evidence about rules of professional conduct as they are irrelevant to the charges in this case, and the probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, and misleading and distracting the jury*.   This case is about whether Mr. Avenatti violated federal criminal statutes; it is not about whether Mr. Avenatti violated California Bar Rules.

The government is wrong to suggest that Mr. Avenatti has somehow conceded the relevance of the bar rules by acknowledging that a fiduciary duty is an element of honest services wire fraud.  (Dkt. No. 98:9) ("Indeed, the defendant does not appear seriously to argue otherwise.").  The only fiduciary duty that is relevant in an "honest services wire fraud" case is the duty to not engage in bribery or kickbacks.  *Skilling v. United States*, 561 U.S. 358, 411 (2010).  Expert testimony that Mr. Avenatti violated various rules of professional conduct does not make it any more likely his conduct amounted to the solicitation of a bribe or kickback, or committed a federal crime.

The government seems particularly eager to engage in trial by assumption, (Dkt. No. 98:15-16), inasmuch as the experts' proposed testimony is based entirely on the assumption that everything contained within the Superseding Indictment is true.  (Dkt. No. 98:15-16). Specifically, in its expert notice, the government advised that the experts had reviewed no case materials but only the Superseding Indictment (Dkt. No. 72), which contains select "facts" and cherry-picked quotes from recorded conversations, as well as the government's *allegation* that Mr. Avenatti did not inform Coach Franklin of Mr. Avenatti's intended settlement demand and certain negotiating tactics.  (*e.g,.* Dkt. No. 72:5, 7, 12).  The government had the experts assume the truth of just the allegations in the Superseding Indictment and then arrive at their

opinions about different rules violations.[4]   Does the government intend at trial to read the entire Superseding Indictment in front of the jury, in the form of a hypothetical, notwithstanding the Court's customary practice to not give speaking indictments to the jury? *See, e.g., United States v. Tuzman*, 301 F.Supp.3d 430, 454 (S.D.N.Y. 2017).[5]

Moreover, the government fails to explain how the experts' opinions about ethics rules that assumes only the allegations in the Superseding Indictment could possibly "help the trier of fact to understand the evidence or to determine a fact in issue," as required by Rule 702. Courts should be wary of opinions that require experts, in front of the jury, to accept the credibility of government witnesses because of the risk of improper vouching; such opinions should be excluded under Rule 403. *Cf. Nimely v. City of New York*, 414 F.3d 381, 398 (2d Cir. 2005) ("We have, in other factual contexts, disapproved of the practice of expert witnesses basing their conclusions on the in-court testimony of fact witnesses, out of concern that such expert testimony may improperly bolster the account given by the fact witnesses.").

The government argues that "even if the Court were to preclude testimony stating that the defendant violated the applicable rules of conduct, [the experts] could still appropriately testify as to the nature and practices of the applicable rules and duties…"  (Dkt. No. 98:15). The government, however, fails to advance any theory of relevance of the rules to the facts of this case.  Moreover, the government fails to explain why experts, as opposed to the court, should be the source of law for the jury.

---

[4] Importantly, the experts have not qualified their opinions or made their opinions dependent on a further review of actual evidence and/or the evidence or testimony admitted at trial.  Instead, the experts have already reached their conclusions and opinions based on a review of one document.

[5] Mr. Avenatti respectfully asks the Court to follow its customary practice in that regard.

### B.  The Government has not Established
### Reliability and Acceptable Methodology

The legal experts' exclusive reliance on the allegations in the Superseding Indictment to opine that Mr. Avenatti intentionally violated his fiduciary duties to Coach Franklin renders their testimony inherently unreliable.[6]  Any impartial expert would have quickly realized from the onset that the Superseding Indictment alone, a document drafted by attorneys representing one party for purposes of litigation, contains insufficient information to render any such opinions.[7]  The expert would have then insisted as part of his or her methodology on reviewing at least some actual evidence in the case *before* arriving at any opinion.

One example suffices to demonstrate why.  The experts are prepared to testify that Mr. Avenatti violated California Bar Rule 1.2 "by not keeping Client-1 informed."  (Dkt. No. 83-1:2).  They rely solely on the Superseding Indictment's allegations that Mr. Avenatti did not inform or obtain Coach Franklin's consent for both components of the settlement demand and Mr. Avenatti's negotiating strategies and tactics.  Mr. Avenatti had two meetings with Coach Franklin before Mr. Avenatti began the settlement negotiations with Nike over a three-day period.  They also spoke several times by telephone during the three-day period.  The experts have no idea what Mr. Avenatti and Coach Franklin discussed during those conversations,

---

[6] This is a serious case in which Mr. Avenatti's liberty is at stake.  The fact that the experts retained by the government would agree to render an opinion that Mr. Avenatti violated California Bar Rules solely on the basis of the government's speaking indictment, without insisting on a basic review of actual information, documents and evidence, raises serious questions as to their impartiality, objectivity, independence and reliability.

[7] The experts apparently made no attempt to verify the accuracy or completeness of the Superseding Indictment before reaching their opinions nor have they or the government made *any showing* that experts in their field of expertise (legal ethics) reasonably *rely solely on such a document* in forming opinions.

what Coach Franklin communicated to Mr. Avenatti about his litigation objectives, and whether Coach Franklin had even expressed any desire for a "play-by-play" of the settlement negotiations.  The experts have not a clue about whether Mr. Avenatti and Coach Franklin reached an explicit or implicit agreement on the allocation of authority.  Most important, they have no idea how Mr. Avenatti interpreted those conversations and whether he believed he had authority.  To be sure, the Comment to California Bar Rule 1.2 makes it clear that the allocation of authority in every lawyer-client relationship is different: "At the outset of, or during a representation, the client may authorize the lawyer to take specific action on the client's behalf without further consultation.  Absent a material change in circumstances and subject to rule 1.4, a lawyer may rely on such an advance authorization.  The client may revoke such authority at any time."  The experts' reliance on only the incomplete information in the Superseding Indictment to conclude that Mr. Avenatti intentionally violated the Bar Rules treats the lawyer-client relationship as if "one size fits all."  It trivializes the complicated and nuanced nature of the relationship.  And it demonstrates an effort to testify to a "result," as opposed to a search for the truth with a subsequent expert opinion based on sufficient facts and evidence.

The government's approach, if endorsed, would render the requirements of Rule 702, *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), and *Daubert v. Merrill Dow Pharmaceuticals,* 509 U.S. 579 (1993), meaningless.[8]   As the proponent of the expert

---

[8] For instance, every plaintiff attorney who desired expert testimony on a subject would spoon feed a copy of the operative complaint or a one-sided summary of facts to a purported expert, tell the expert to assume everything in it is true, and then have the expert come before the jury and provide his or her opinions without any analysis or review of the underlying evidence or documents.  The expert report in each case would be a list of opinions with a "list" of one document as having been reviewed.  This is the very definition of using an expert as a "hired gun" as opposed to having the expert approach a case as a professional, unbiased, independent witness.

testimony, the government has the burden to demonstrate that the methodology each of their experts used to support his or her opinions, together with the sources of information used to form those opinions, is reliable. *The government has done neither*.  Indeed, by only relying on allegations in a charging document to form an opinion that Mr. Avenatti intentionally violated his duties to Coach Franklin, the experts failed to utilize an acceptable methodology and failed to demonstrate the intellectual rigor that characterizes the practice of an expert in the relevant field.  Accordingly, the testimony must be excluded.  *See*, *e.g.*, *Obrycka v. City of Chicago*, 792 F.Supp.2d 1013, 1026 (N.D. Ill. 2011) (rejecting an expert's methodology and noting, "Although Plaintiff's counsel did produce to Dr. Manning the primary source documents that they summarize, selectively quote from, and otherwise cite in their Outlines, the manner in which Dr. Manning seems to have uncritically relied solely on Plaintiff's counsel's Outlines—which are, again, Plaintiff's roadmap of the case and the evidence her counsel has identified as supporting her claims—is not 'good science' or sound methodology…"); *Sommerfield v. City of Chicago*, 254 F.R.D. 317, 320-21 (N.D. Ill. 2008) (finding expert's sole reliance on a complaint and deposition summaries in reaching his opinions as failing to meet the standards of Rule 702); *Cf. Therasense, Inc. v. Becton, Dickinson and Co.*, No. 04-212 (WHA), 2008 WL 2323856 (N.D. CA. 2008) (rejecting proffered expert opinion under 702 and noting, "One of the worst abuses in civil litigation is the attempted spoon-feeding of client-prepared and lawyer-orchestrated 'facts' to a hired expert who then 'relies' on the information to express an opinion.").[9]

---

[9] This is not to suggest that experts may not testify in cases where facts are in dispute.  *See Sommerfield*, 254 F.R.D. at 320-21.  But where the sole basis for the expert's opinion is a necessarily "under-inclusive" summary prepared by one party, the requisite reliability is lacking.

### C.  **The Government's Notice is Deficient**

The government defends the adequacy of its notice and argues that Mr. Avenatti is not entitled to additional details.  The government boldly insists that its notice "is substantially similar in all relevant respects" to Mr. Avenatti's expert notice.  (Dkt. No. 96-1; Dkt. No. 98:21).  A side-by-side comparison of the two notices reveals that, other than an equal number of pages, the defense notice complies with Rule 16 while the government's notice falls woefully short in terms of the specifics of the opinions and the bases for them.

### D.  **A Daubert Hearing is Required**

As outlined in the motion and above, there are serious questions regarding the reliability, methodology, and bases of the government experts' opinions.  At a minimum, therefore, the Court should conduct a *Daubert* hearing.

## II.    CONCLUSION

For the foregoing reasons, the Court should exclude the proposed legal expert testimony as lacking reliability, unhelpful to the jury, unfairly prejudicial, misleading, and confusing.

Respectfully submitted,

By:    /s/Scott A. Srebnick
       Scott A. Srebnick, P.A.
       201 South Biscayne Boulevard, #1210
       Miami, FL 33131
       Telephone: (305) 285-9019
       Facsimile:  (305) 377-9937
       E-Mail:  Scott@srebnicklaw.com

By:    /s/Jose M. Quinon
       Jose M. Quinon, P.A.
       2333 Brickell Avenue, Suite A-1
       Miami, FL 33129
       Telephone:  (305) 858-5700
       Facsimile:  (305) 358-7848
       E-Mail:  jquinon@quinonlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on December 15, 2019, I caused a true and correct copy of the foregoing to be served by electronic means, via the Court's CM/ECF system, on all counsel registered to receive electronic notices.

/s/Scott A. Srebnick
Scott A. Srebnick

FC4TSKE1

```
1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4               v.                          15 CR 317 (KMW)

5    DEAN SKELOS and ADAM SKELOS,

6               Defendants.

7    ------------------------------x

8                                           New York, N.Y.
                                            December 4, 2015
9                                           9:50 a.m.

10   Before:

11                   HON. KIMBA M. WOOD,

12                                          District Judge

13
                           APPEARANCES
14
     PREET BHARARA
15        United States Attorney for the
          Southern District of New York
16   JASON MASIMORE
     TATIANA MARTINS
17   RAHUL MUKHI
     THOMAS McKAY
18        Assistant United States Attorneys

19   GAGE, SPENCER & FLEMING
          Attorneys for Defendant Dean Skelos
20   G. ROBERT GAGE, JR.
     JOSEPH EVANS
21
     ROPES & GRAY
22        Attorneys for Defendant Adam Skelos
     CHRISTOPHER CONNIFF
23   JOHN DANIELS

24

25
```

1    to give you a legal instruction.

2            You are about to hear testimony regarding the

3    provisions of state ethics laws that apply to public officials

4    of the State of New York.  Dean Skelos is not on trial for any

5    violation of state ethics laws.  You may not find him guilty on

6    any count in this case merely because you believe that he may

7    have violated state ethics laws.  However, you may consider the

8    evidence regarding training Dean Skelos received on state

9    ethics laws to the extent that you find it sheds light on

10   whether or not Dean Skelos acted with fraudulent or corrupt

11   intent.

12    LISA REID,

13        called as a witness by the Government,

14        having been duly sworn, testified as follows:

15   DIRECT EXAMINATION

16   BY MS. MARTINS:

17   Q.   Good morning, Ms. Reid.

18   A.   Good morning.

19   Q.   Ms. Reid, where do you work?

20   A.   I work for the New York State Legislative Ethics

21   Commission.

22   Q.   What is the New York State Legislative Ethics Commission?

23   A.   The Legislative Ethics Commission is a commission that is

24   part of the New York State legislature that is comprised of

25   four legislative members and four private citizens who are

 1    appointed by the legislature.  It is evenly split between

 2    assembly representation and senate representation, and it is

 3    bipartisan, so evenly split between Republican and Democratic

 4    representation.  And the Legislative Ethics Commission is

 5    responsible for administration and advice regarding public --

 6    certain provisions of Public Officers Law.

 7    Q.  What is your title at the Legislative Ethics Commission?

 8    A.  I am executive director and counsel.

 9    Q.  And how far did you go in school?

10    A.  I have a law degree.

11    Q.  Now who do you report to as the executive director of the

12    Legislative Ethics Commission?

13    A.  I actually report to commission as a whole, which is all

14    eight members.  My time and attendance and things like that are

15    approved by the co-chairs of the commission.

16    Q.  And how long have you been the executive director of the

17    commission?

18    A.  It will be seven years in the end of December.

19    Q.  And did you work there before you became its executive

20    director?

21    A.  No, I did not.

22    Q.  What did you work as before you became executive director?

23    A.  I was in private practice primarily in the areas of -- I

24    was a law guardian for Albany County Family Court and

25    residential real estate.

1  Q.  So you were a practicing lawyer?

2  A.  Yes.

3  Q.  And what are your duties and responsibilities generally as

4  the executive director of the commission?

5  A.  Generally my duties and responsibilities are to prepare

6  materials for the commissioners for meetings that we hold every

7  two months.  I'm also responsible for giving, when asked,

8  informal advice on ethics laws within the jurisdiction of the

9  commission to legislative employees and senators and

10 assemblymen, and also for drafting formal advice upon request

11 that's approved by the commission.  We also review annual

12 statements and financial disclosure, and I prepare documents to

13 assess penalties when legislators or legislative employees are

14 accused of violations.  And finally, upon the request of either

15 houses of the legislature, we assist with training.

16 Q.  When you say training, training on what?

17 A.  Training on Sections 73, 73A and 74 of the Public Officers

18 Law as prescribed in statute.

19 Q.  So just in general terms, let's break those through three

20 laws down, what is the general subject matter of Public

21 Officers Law 73?

22 A.  Section 73 primarily deals with business and outside

23 interests and outside employment, also covers gift laws,

24 relationships with state agencies, and prohibitions on certain

25 appearances.

1   Q.  In general terms, what's the subject matter of Public

2   Officers Law 73A?

3   A.  Section 73A deals with the annual statement financial

4   disclosure that is required to be filed.  It sets out the

5   provisions for filing and also establishes the exact form.

6   Q.  And what about the Section 74 of that law?

7   A.  Section 74 relates primarily to substantial conflicts of

8   interest.

9   Q.  Now are -- the Public Officers Law, is that a state law or

10  a federal law?

11  A.  It's a New York State law.

12  Q.  And are they referred to colloquially as the ethics laws?

13  A.  Often, yes.

14  Q.  And again, who do the laws apply to?

15  A.  All state agency employees executive branch employees, New

16  York State legislators and legislative employees and also

17  members of certain commissions and public authorities.

18  Q.  Now how does the ethics commission -- sorry, the

19  Legislative Ethics Commission make sure that legislators are

20  aware of the provisions of the ethics laws?

21  A.  The way the Legislative Ethics Commission makes sure

22  everyone is aware are we distribute copies of the law to all

23  legislators with their annual statement of financial

24  disclosure, and then the houses, when they do training, we

25  provide that upon their request and discuss those there as

1    well.

2    Q.   And are you personally responsible for conducting some of

3    those trainings?

4    A.   The legislature is actually statutorily responsible, but

5    when they ask me, yes, I personally conduct the trainings.

6    Q.   Now just focusing on the legislature for a minute, who

7    within the legislature gets training on these laws?

8    A.   Everyone.  All of the members of the senate and the

9    assembly, by statute, anyone who is a policy maker or what's

10   known as a long form filer, anyone who makes in excess of

11   $91,000 a year, and then the legislature itself has required

12   that all employees receive training, although it's not

13   statutorily required.

14   Q.   And are legislators typically trained together or

15   separately from their staff?

16   A.   Typically separately.

17   Q.   And are the senate and assembly trained separately or

18   together, generally?

19   A.   Generally separately.

20   Q.   Now in addition to trainings run by the legislative ethics

21   commission upon the request of the legislature, are there other

22   trainings that are conducted by the senate or the assembly

23   itself?

24   A.   It is my understanding there are.

25   Q.   Now is there any statutory requirement that legislators

1    must complete a certain amount of training on these laws?

2    A.   Statutorily, yes, it's required that legislators and all

3    new legislative employees receive a two-hour training within

4    two years of taking office or becoming employed, and then every

5    three years after that, although typically the policies of the

6    houses are to do it more often.

7    Q.   And the trainings that you have conducted on the Public

8    Officers Laws, do they focus on Section 73, 73A and 74

9    together, or do you conduct separate trainings on each of those

10   provisions?

11   A.   Generally together.

12   Q.   And now over the last five years, since 2010, have you

13   personally conducted training on these laws for the senate?

14   A.   Yes.

15   Q.   And as far as you're aware, has the senate conducted

16   additional trainings on these laws for its own members?

17   A.   I believe they have.  Well, I'm not sure if it was on those

18   laws specifically, I know that they conducted additional

19   training.

20   Q.   And by the way, when you conduct the training sessions for

21   the members of the senate, can members ask questions?

22   A.   Oh, yes.

23   Q.   Is there a Q and A?

24   A.   Yes.

25   Q.   Now does your office typically prepare any materials in

FC4TSKE3                            Reid - direct

```
 1  connection with the training that you are going to give, like a
 2  PowerPoint slide or outline or anything of that nature?
 3  A.  Often we do.  Not always, but often we do.
 4  Q.  And are there significant changes from year to year in
 5  these laws?
 6  A.  There have been some, and those are usually the focus of
 7  new training.
 8  Q.  Now let me direct your attention to Government
 9  Exhibit 1910, which -- one moment.
10          (Pause)
11  Q.  Do you see what is up on your screen?
12  A.  There isn't anything on my screen.
13          Now there is.
14  Q.  Do you recognize this document?
15  A.  Yes.
16  Q.  And what is it?
17  A.  It's a PowerPoint that was prepared by my deputy counsel
18  and myself for senate member and ethics -- staff ethics
19  training, February 2011.
20          MS. MARTINS:  The government offers Government
21  Exhibit 1910.
22          MR. GAGE:  Your Honor, we had this discussion this
23  morning, so I would like a running note of what I said this
24  morning.
25          THE COURT:  Government Exhibit 1910 is received over
```

FC4TSKE3                          Reid - direct

1    objection.

2              (Government's Exhibit 1910 received in evidence)

3    BY MS. MARTINS:

4    Q.  It says New York State Legislative Ethics Commission.  Is

5    that the commission that you're the executive director of?

6    A.  Yes.

7    Q.  Is says senate member and staff ethics training,

8    February 2011.

9    A.  Yes.

10   Q.  And then underneath your name and assistant counsel, do you

11   see that?

12   A.  Yes.

13   Q.  If we quickly flip through so you can see what this is.

14   Just remind us what this document is.

15   A.  It's a PowerPoint that was used in conjunction with some

16   lecture at legislative training sessions.

17   Q.  Now before we review this PowerPoint, are you familiar with

18   Senator Skelos?

19   A.  Yes.

20   Q.  And what position did he hold in the senate at the time of

21   his training in February 2011?

22   A.  In 2011 he was temporary president and Republican leader of

23   the senate.

24             MS. MARTINS:  Now if we pull up Government Exhibit 12

25   in evidence, look at paragraph 4, this is a stipulation that's

FC4TSKE3                          Reid - direct

1    in evidence, says:  Government Exhibits 1912 through 1915 are

2    true and accurate copies of documents that were maintained by

3    the New York State Senate.

4             The government offers 1912 through 1915.

5             THE COURT:  Subject to the objection, I receive

6    Government Exhibits 1912 through 1915 over objection.

7             (Government's Exhibits 1912 through 1915 received in

8    evidence)

9             MS. MARTINS:  If we publish Government Exhibit 1912.

10   Focus on the top half.

11   Q.  Do you see it says yes, ethics training for all senate

12   members, and then says calendar entry Tuesday, February 15.  Do

13   you see that?

14   A.  Yes.

15            MS. MARTINS:  Could publish Government Exhibit 1913.

16   Look at the top, it says New York State ethics training,

17   February 15, 2011.  And if we look at page 5, please.

18   Q.  And do you see there's a signature across from Dean G.

19   Skelos?

20   A.  Yes.

21            MS. MARTINS:  So we can take that down and let's look

22   at the PowerPoint.  Ms. Danzo, if we can go to page 6.

23   Q.  You see there's Public Officers Law Section 73?

24   A.  Yes.

25   Q.  And these are part of what is generally referred to as the

FC4TSKE3                          Reid - direct

1    ethics laws that we have been talking about?

2    A.  It's part of the ethics laws we have been talking about,

3    yes.

4    Q.  It says:  Restrictions on gifts to legislators, legislative

5    staff, and third parties.

6    A.  Yes.

7    Q.  And underneath it says:  General standard.  Nothing more

8    than nominal value where it could reasonably be inferred that

9    the gift was intended to influence, could reasonably be

10   expected to influence, or was intended as a reward for any

11   official action.

12          Do you see that?

13   A.  Yes.

14   Q.  And is there a definition in the statute of nominal value?

15   A.  No.

16   Q.  And what is that?

17          Sorry, did you say yes or no?

18   A.  I said no.

19   Q.  Do have a general understanding of what nominal value

20   means?

21   A.  Nominal, it's somewhat of a fluid standard, it can depend

22   on the circumstances, but generally it's a small amount.

23   Q.  Now let's flip to the next page, please.

24          Are we still under Section 73 here?

25   A.  Yes.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1   Q.  Gifts from lobbyists/clients of lobbyists.  The giver is a

2   lobbyist, or client of a lobbyist, cannot solicit, accept or

3   receive a gift, as defined in the statute, unless under the

4   circumstances it is not reasonable to infer that the gift was

5   intended to influence or the gift falls into one of the

6   exceptions.

7           Do you see that?

8   A.  Yes.

9   Q.  It says gifts as defined in Section 1-C of the legislative

10  law.

11  A.  Yes.

12  Q.  Are there categories of what constitute as a gift under

13  this law?

14  A.  They're not really categories, it's a description, and it

15  says that a gift includes, for example, money, property,

16  forfeiture and so forth.

17  Q.  And again, is this part of the training that members are

18  given, members of the legislature, including the senate, are

19  given?

20  A.  Yes.

21          MS. MARTINS:  Now let's turn to the next slide.

22  Q.  And there's some exceptions here to definition of gift, do

23  you see that?

24  A.  Yes.

25  Q.  And include complimentary attendants, including food and

1    beverage at charitable or political events.  Do you see that?

2    A.  Yes.

3    Q.  And other things like promotional items with a substantial

4    resale value, gifts from a family member, political

5    contributions received, et cetera.  Do you see that?

6    A.  Yes.

7    Q.  If we turn to next page, gifts made to third parties.

8    A.  Yes.

9    Q.  Gifts also may not be made to third parties, including

10   charitable organizations of official designation, or on behalf

11   where the gift was intended to influence.  Do you see that?

12   A.  Yes.

13   Q.  So are senate members trained on these aspects of this law?

14   A.  Yes.

15          MS. MARTINS:  Now if we skip the next four slides and

16   stop on that slide.

17   Q.  Do you see that's a Public Officers Law Section 74, Code of

18   Ethics and Ethical Standards?

19   A.  Yes.

20   Q.  And at the top bullet:  Generally.  No outside interest in

21   any business or transaction or professional activity or incur

22   any obligation which is in substantial conflict with the proper

23   discharge of duties in the public interest.  Do you see that?

24   A.  Yes.

25   Q.  And again, are members of the senate trained on this?

1   A.  Yes.

2             MS. MARTINS:  If we look at the next page.

3   Q.  Should not use official position to secure unwarranted

4   privileges for himself or others.  Do you see that?

5   A.  Yes.

6   Q.  Specifically prohibits the use of state property for

7   private business or compensated non-governmental purposes.  Do

8   you see that?

9   A.  Yes.

10  Q.  And then if we look at the third bullet there, it says:  A

11  member of the legislature should not, by his conduct, give

12  reasonable basis for the impression that any person can

13  improperly influence him or unduly enjoy his favor in the

14  performance of his official duties or that he is affected by

15  kinship, rank, position, or influence of any party or person.

16  Do you see that?

17  A.  Yes.

18  Q.  And what is kinship?

19  A.  It would be a relative.

20  Q.  And if we look at the last bullet:  Should endeavor to

21  pursue a course of conduct which will not raise a suspicion

22  among the public that he is likely to be engaged in acts that

23  are in violation of his trust.  Do you see that?

24  A.  Yes.

25  Q.  And again, are senate members trained on this?

1    A.  Yes.

2    Q.  Now after this training in 2011, when was the next training

3    conducted by the Legislative Ethics Committee of senate

4    members?

5    A.  I don't remember.

6    Q.  Let me show you and see this refreshes your recollection,

7    just for the witness and counsel, Government Exhibit 2133 for

8    identification.

9         If you could look through that email, Ms. Reid, and

10   look up when you're done and tell me if that refreshes your

11   recollection of approximately when.

12   A.  It was done in the spring of 2014.

13   Q.  And in 2014 was the training generally similar to the

14   training that we just reviewed, to your best recollection?

15   A.  To my best recollection it was similar.  It was certainly

16   on the same three sections of Public Officers Law.

17   Q.  And in connection with your testimony today, have you had

18   opportunity to review your own emails and other materials

19   related to that training?

20   A.  Yes.

21   Q.  And based on that review, including what you just read to

22   refresh your recollection, do you have an understanding as to

23   whether Senator Skelos received ethics training in 2014?

24   A.  It's my understanding that he did.

25   Q.  Now in addition to the trainings, are there other ways that

1   legislators, such as Senator Skelos, could familiarize

2   themselves with the provisions of the ethics laws?

3   A.  Well, the ethics laws are sent to each member on an annual

4   basis when they receive the materials to file their annual

5   statement of financial disclosure.  So they have a copy that

6   they get.

7   Q.  And when you say they're sent, who sends them?

8   A.  The Legislative Ethics Commission sends them with their

9   annual statement of financial disclosure forms every April.

10          MS. MARTINS:  And let me pull up Government

11  Exhibit 12, which is a stipulation.

12  Q.  And paragraph 2 says:  Government Exhibits 1907 and 1908

13  and true and accurate copies of documents that were maintained

14  in the senate office of Dean Skelos.

15          Do you see that?

16  A.  Yes.

17          MS. MARTINS:  The government offers 1907 and 1908.

18          THE COURT:  Subject to the same objection, the Court

19  receives Government Exhibits 1907 and 1908 over objection.

20          (Government's Exhibits 1907 and 1908 received in

21  evidence)

22          MS. MARTINS:  If we could publish Government

23  Exhibit 1907, please, which is a copy of the document that was

24  maintained in Senator Skelos' office.

25  Q.  Do you recognize the first page here?

1    A.  Yes.

2    Q.  And what is this document?

3    A.  It's the cover of the statute book that is sent to members

4    and staff every year.

5    Q.  And it contains the same provisions we heard about that

6    senators are trained on?

7    A.  Yes.

8            MS. MARTINS:  If you flip forward just to show the

9    full exhibit.

10   Q.  Now do legislators have to acknowledge they received a copy

11   of the ethics laws?

12   A.  Not that I'm aware of.

13           MS. MARTINS:  Let me offer, pursuant to Government

14   Exhibit 12, paragraph 3, Government Exhibits 1911A through

15   1911K are true and correct oaths of office for Dean Skelos

16   maintained by the New York State Senate.

17           The government offers Government Exhibits 1911A

18   through 1911K.

19           THE COURT:  The Court receives Government

20   Exhibits 1911A through 1911K over objection.

21           (Government's Exhibits 1911A through 1911K received in

22   evidence)

23           MS. MARTINS:  Your Honor, to clarify, I'm not sure if

24   the objection applies to this particular document that's been

25   stipulated to.

FC4TSKE3                          Reid - cross

1              THE COURT:  Okay.

2              MR. GAGE:  Based on the morning's discussion, your

3     Honor.

4              THE COURT:  Does it or not?

5              MR. GAGE:  If does, your Honor, my objection pursuant

6     to the conversation this morning.

7              THE COURT:  All right.

8              MS. MARTINS:  If we could pull up Government

9     Exhibit 1911-G.

10    Q.  And this is just the oath of office.

11    A.  Yes.

12    Q.  In this particular year, do you see there's a signature on

13    the bottom?

14    A.  Yes.

15    Q.  And then on the right hand middle there's a signature

16    underneath the typed name Dean G. Skelos?

17    A.  Yes.

18    Q.  And at the bottom, right above the bottom signature it

19    says:  I hereby acknowledge receipt of a copy of Public

20    Officers Law section 73 through 78, have read the same, and

21    agree to conform to the provisions thereof.

22             Do you see that?

23    A.  Yes.

24             MS. MARTINS:  Nothing further, your Honor.

25             THE COURT:  Mr. Gage.

FC4TSKE3                          Reid - cross

 1              MR. GAGE:  Thank you, your Honor.

 2   BY MR. GAGE:

 3   Q.  Good afternoon, Ms. Reid.

 4   A.  Good afternoon.

 5   Q.  Would it be fair to say that gifts to third parties is a

 6   new and evolving area of the ethics laws?

 7              MS. MARTINS:  Objection.

 8              THE COURT:  I think that's too vague.

 9   Q.  Would it be fair to say that gifts made to third parties is

10   a relatively new area of the statute?

11              MS. MARTINS:  Objection.

12              THE COURT:  Could you be more specific about time?

13              MR. GAGE:  Well, Ms. Reid -- I'm going to ask Ms. Reid

14   that question.

15              MS. MARTINS:  Your Honor, could we have a sidebar

16   before we continue?

17              THE COURT:  Yes.

18              (Continued on next page)

19

20

21

22

23

24

25

FC4TSKE3                              Reid - cross

1              (At sidebar)

2              MS. MARTINS:  Your Honor, the government was very

3      careful to elicit on direct only factual issues, that is, we

4      just read through the PowerPoint and said were the senators

5      trained on this.  We have not asked her about her legal

6      opinions about anything, whether certain things violate those

7      laws.  The entire purpose of this, especially in light of

8      defendants' concern about this witness, was just to factually

9      state he's been trained on these laws.

10             I want to make sure that Mr. Gage -- sounds like maybe

11     he's going this way -- is going to try to turn her into a quasi

12     expert witness on the development of the laws, what it means,

13     et cetera.  And I want to make sure we're on the same page.

14     This witness is being offered for a limited purpose, in light

15     of the defendants' objections.

16             THE COURT:  If you want to move to matters outside of

17     the direct you'll have to adopt her as your own witness.

18             MR. GAGE:  I have very few questions for this witness,

19     but to be clear, reading off the 302, gifts made to third

20     parties is a relatively new area to the statute.

21             I'm not trying to make this witness an expert witness

22     or anything else, I'm trying to point out what I gather she

23     told the government that gifts made to third parties is a new

24     area.  If the government objects, so be it.

25             MR. MUKHI:  If she told the government that during an

FC4TSKE3                              Reid - cross

1    interview session it's still not within the scope of her direct

2    testimony.  We also alerted the defense to this issue early on,

3    and there is a specific ruling that Judge Caproni issued

4    precluding exactly this type of testimony elicited by the

5    defense and saying the narrow factual issue in that case,

6    making that into an expert case, dueling experts on the meaning

7    of state law, is not admissible from either side.

8            THE COURT:  I agree.

9            MR. GAGE:  So you're sustaining the objection?

10           THE COURT:  Yes.

11           MR. GAGE:  As long as we're here, I could cut it

12   probably very short in the light of this discussion.  I

13   respectfully disagree with the government's position to the

14   question I was asking, but that said, the Court ruled.  I'm

15   just going to ask the witness if determinations of ethics

16   violations are fact specific.

17           THE COURT:  That goes beyond it as well.

18           MR. GAGE:  Again, I would say that I think I should be

19   able to ask that, so really the only question I will be able to

20   ask is to repeat your Honor's instruction, which is her work

21   focused solely on ethics violations.

22           MS. MARTINS:  As opposed to what?

23           MR. GAGE:  As opposed to questions I identified.

24           MS. MARTINS:  As opposed to federal laws?

25           MR. GAGE:  No, to criminal laws.

1           MS. MARTINS:  Okay.

2           MR. MUKHI:  One housekeeping matter.  I don't know

3   what time you're planning to break for lunch today, because we

4   discussed having an extended lunch to discuss the charge.  We

5   have witnesses lined up when we come from break at that point,

6   if it's convenient.

7           THE COURT:  I think it make sense to break.  How long

8   do you think we're going to need for this discussion?

9           MR. GAGE:  For this examination?

10          THE COURT:  No, I'm sorry.

11          MR. GAGE:  Very quick.

12          THE COURT:  The discussion of the jury charge, the two

13  points.

14          MR. MUKHI:  I think we can do it under an hour is the

15  government's view.

16          MR. GAGE:  I was going to suggest -- I know

17  Mr. Conniff has a 5 o'clock appointment, if we break a bit

18  early today, doing it at the end of the day.

19          MS. MARTINS:  I think we should reserve that option in

20  case lunch is not sufficient to jam it in, and have

21  Mr. Conniff --

22          MR. CONNIFF:  I have to leave at 5 o'clock.

23          THE COURT:  Why don't we break after this witness and

24  take an hour and three quarter lunch.

25          MR. CONNIFF:  Are we going to eat lunch first and come

1   back?

2                MS. MARTINS:  So we're thinking clearly.

3                MR. GAGE:  Let me say:  Good question.

4                THE COURT:  Can I tell the jury that it now appears

5   that the testimony will be complete as of some point next week?

6                MR. MUKHI:  From the government, yes.

7                MR. GAGE:  Almost certainly, your Honor.

8        May I say now, because I'm going to be so short with

9   this witness, I am going to endeavor -- I am going to meet with

10  my client tonight, and I will endeavor, as early as possible

11  tomorrow, to let the government know, one, if there are going

12  to be defense witnesses.  And I want to say that directly to

13  your Honor as opposed to standing behind the podium.  I will do

14  that, and I understand the spirit of our discussions, number

15  one.

16       Secondly, it may take a bit longer to determine

17  whether or not my client is going to testify.  If there's a

18  earlier determination, I pledge to your Honor and the

19  government, and I have said it to them before, I will let them

20  know as soon as I think I'm able to let them know.

21       And the third point is on these stipulations, I will

22  get -- I identified four areas, there are one or two more that

23  hopefully we can hammer out, but the short answer to your

24  Honor's question is we won't go beyond next week.

25                THE COURT:  Unless the government has sufficient

FC4TSKE3                          Reid - cross

1    notice that Mr. Dean Skelos will testify, I am likely to grant

2    an adjournment, if one is requested, so they can prepare, given

3    the importance of the witness.  I want you to know that.

4            MR. GAGE:  I understand what your Honor is saying, but

5    I wanted to say directly to your Honor that I will do the

6    absolute best I can.

7            MR. MASIMORE:  Judge, to that end, I think -- if the

8    schedule holds out, I think we'll be done with the substantive

9    portion that goes to Senator Skelos by the end of the day

10   likely today.  So that should put them in a better position.

11           MR. CONNIFF:  I lost the last part.

12           MR. MASIMORE:  I will tell you later.

13           (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

FC4TSKE3

1              (In open court)

2    BY MR. GAGE:

3    Q.  Ms. Reid, the only training you provide relates to Public

4    Officers Law 73, 73A and 74, is that correct?

5    A.  Yes.

6              MR. GAGE:  Nothing further, your Honor.

7              MS. MARTINS:  Nothing further, your Honor.

8              THE COURT:  Thank you, Ms. Reid, you may step down.

9              Members of the jury, we are coming to the end of the

10   testimony in the case.  It won't end today but it should end

11   early next week.  Once we get that close to the end, we

12   sometimes need time to iron out legal points that come up with

13   respect to the jury charge I'm going to give you at the close

14   of the case.  We often will need to take either a longer lunch

15   or start late or stop early.  Today we need to take a longer

16   lunch, we need to take an hour and three quarter lunch, which

17   means instead of from one to two, we'll take from 12:50 -- I'm

18   not very good at math, to 2:10, is that right?

19             MR. GAGE:  That's fine, your Honor.

20             THE COURT:  Maybe that's close.  Okay.  Until 2:10.

21             (Continued on next page)

22

23

24

25