UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,          :

vs.                                :          No. S1 19 Cr. 373 (PGG)

MICHAEL AVENATTI,                  :

          Defendant.              :
_____

## DEFENDANT AVENATTI'S RESPONSE TO GOVERNMENT'S MOTIONS IN LIMINE

Scott A. Srebnick
SCOTT A. SREBNICK, P.A.
201 South Biscayne Boulevard
Suite 1210
Miami, FL 33131
Telephone: (305) 285-9019
Facsimile:  (305) 377-9937
E-Mail:  Scott@srebnicklaw.com


Jose M. Quinon
JOSE M. QUINON, P.A.
2333 Brickell Avenue, Suite A-1
Miami, FL 33129
Telephone:  (305) 858-5700
Facsimile:  (305) 358-7848
E-Mail:  jquinon@quinonlaw.com


E. Danya Perry
PERRY GUHA LLP
35 East 62nd Street
New York, New York 10065
Telephone: (212) 399-8340
Facsimile: (212) 399-8331
E-mail: dperry@perryguha.com

*Attorneys for Defendant Michael Avenatti*

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................ iii

OVERVIEW ................................................................................................................... 1

ARGUMENT ................................................................................................................. 11

    I.      Political Motivations, Selective Prosecution, and Haste ............................... 11

    II.     Whether the Matter Should be Dealt with Solely
          Administratively or Civilly ........................................................................... 12

    III.    Argument that the Charges are Unconstitutionally Vague .......................... 14

    IV.    Potential Punishment that Mr. Avenatti Faces if Convicted ....................... 14

    V.      Charging Decisions with Respect to Others ................................................ 14

    VI.    Prior Good Acts or Failure to Commit Other Bad Acts ............................... 16

    VII.   Positive Results for Clients or Society from Other Lawsuits ...................... 17

    VIII.  Nike's Specific Misconduct of Which Mr. Avenatti was Unaware ............. 18

          A.  Bias and Motive ................................................................................. 19

          B.  Rebutting Evidence of "Wrongfulness" ............................................. 22

          C.  Witnesses Invoking the Fifth Before the Jury .................................... 24

          D.  Whether any Alleged Misconduct by Nike Outweighs his Own .......... 24

    IX.    The Value of Coach Franklin's Claims and the Cost of an
          Investigation without a Connection to Mr. Avenatti's
          Contemporaneous Knowledge ...................................................................... 25

    X.      Out-of-Court Statements Made by Mr. Geragos to the Government ........... 26

    XI.    Defense Expert Testimony ........................................................................... 27

CONCLUSION .............................................................................................................. 28

CERTIFICATE OF SERVICE ..................................................................................... 29

# TABLE OF AUTHORITIES

**CASES**                                                                                                **Page**

*Caiola v. Citibank, N.A.*,
    295 F.3d 312 (2d Cir. 2002) .........................................................................................21

*Meyer v. Jinkosolar Holdings Co., Ltd.*,
    761 F.3d 245 (2d Cir. 2014) .........................................................................................21

*United States v. Aboumoussallem*,
    726 F.2d 906 (2d Cir. 1984) .........................................................................................22

*United States v. Abu-Jihaad*,
    630 F.3d 102 (2d Cir. 2010) .........................................................................................22

*United States v. Atherton*,
    936 F.2d 728 (2d Cir. 1991) .........................................................................................20

*United States v. Bahadar*,
    954 F.2d 821 (2d Cir. 1992) .........................................................................................16

*United States v. Gatto, Code et al.*,
    No. 17-cr-0686 (LAK) (SDNY) .....................................................................................3

*United States v. Gatto*,
    295 F.Supp.3d 336 (S.D.N.Y. 2018) ............................................................................18

*United States v. Harvey*,
    547 F.2d 720 (2d Cir. 1976) ..................................................................................19, 21

*United States v. Jackson*,
    180 F.3d 55 (2d Cir. 1999) ....................................................................................18, 23

*United States v. James*,
    609 F.2d 36 (2d Cir. 1979) ...........................................................................................20

*United States v. Lankford*,
    955 F.2d 1545 (11th Cir. 1992) ....................................................................................20

*United States v. Litvak*,
    808 F.3d 160 (2d Cir. 2015) .........................................................................................23

*United States v. Myerson*,
    18 F.3d 153 (2d Cir. 1994) ...........................................................................................16

**CASES**                                                                                    **Page**

*United States v. Pendergraft*,
    297 F3d 1198 (11th Cir. 2002).......................................................................18

*United States v. Rosado*,
    728 F.2d 89 (2d Cir. 1984).........................................................................13

*United States v. White*,
    692 F.3d 235 (2d Cir. 2012).......................................................................22

*United States v. Zappola*,
    646 F.2d 48 (2d Cir. 1981)....................................................................15, 24


**UNITED STATES CONSTITUTION**

AMEND V ...........................................................................................24, 26


**FEDERAL RULES OF EVIDENCE**

Rule 401 ....................................................................................16, 22, 23

Rule 402 ...............................................................................................22

Rule 404(b) ..........................................................................................23

Rule 408 ................................................................................................8

Rule 807 ...............................................................................................36

Rule 807(a)(1)........................................................................................26

Rule 807(a)(2)........................................................................................27


**MISCELLANEOUS**

NCAA Division 1 Manual, Bylaw 12................................................................18

NCAA Bylaw 12.1.2..................................................................................18

Defendant Michael Avenatti, through counsel, respectfully responds to the government's motions *in limine* (Dkt. No. 96). As discussed in more detail below, and as undersigned counsel mentioned at the hearing held on December 17, 2019, several of the government's motions seek to preclude arguments that Mr. Avenatti has no intention of pursuing at trial. However, even those motions are written so broadly that they necessarily encompass relevant evidence that will be offered for a legitimate purpose and not the improper purpose identified by the government. Moreover, several of the motions' headings do not correspond to the actual argument advanced in that section. Thus, to avoid any confusion or misunderstandings at trial, Mr. Avenatti will respond to each of the government's motions by alerting the government and the Court, where possible, to the types of arguments that he believes are permissible and appropriate within each broad category. We note that several of the motions strike at the heart of Mr. Avenatti's ability to mount a defense and right to a fair trial (*e.g.,* Arg. VIII, IX, X).

We start with an overview of the facts that are relevant to Mr. Avenatti's defense so that the Court may have a more complete picture in considering the government's motions.

## <u>OVERVIEW</u>

The Nike Elite Youth Basketball League ("EYBL") is a Nike-sponsored, organized league of travel teams for the top high school players, featuring more than 40 teams from around the country. Carlton DeBose was the Director of Nike EYBL and Jamal James was the Manager of Nike EYBL; they were the two Nike executives with day-to-day oversight over the EYBL. The Nike EYBL competes with other leagues, run by competitors Adidas and Under Armour, to attract the top high school talent to wear their apparel and thereafter attend

the universities with whom they have apparel contracts and ultimately sign sneaker contracts once they turn pro.

Coach Gary Franklin was the coach of the California Supreme, which had a sponsorship contract with Nike for many years. According to Coach Franklin, he ran a clean program until 2016-17, when Nike executives DeBose and James began directing him to funnel Nike money to the families and "handlers" of several high school basketball players to play with the California Supreme. For example, DeBose and James: a) directed Coach Franklin to make tens of thousands of dollars of payments from Nike for the benefit of high school players DeAndre Ayton, Bol Bol, and Brandon McCoy, in violation of NCAA rules, (Dkt. No. 30-4); b) directed Coach Franklin to submit fake invoices to Nike to disguise the payments as legitimate expenses, sponsorships and charitable contributions; (Dkt. No. 30-4:10, 38), and c) wrested control from Coach Franklin of his 17U team and turned it over to a California lawyer named Bryan Freedman because Freedman promised he could attract Bol away from Adidas. (Dkt. No. 30-14:28).[1] The Nike executives gave Coach Franklin an ultimatum: "Do what we are asking or lose your EYBL spot…" (*E.g.*, Dkt. No. 30-5:5).

On or about September 26, 2017, the USAO-SDNY filed a criminal complaint against Jim Gatto (the Director of Global Sports Marketing for Adidas), Merl Code (another Adidas executive who formerly ran the Nike EYBL), and several college basketball coaches, alleging conspiracy to commit wire fraud in connection with a scheme to bribe high school basketball

---

[1] According to Coach Franklin, between approximately 2014 and 2016, attorney Freedman made multiple offers of payment (totaling more than $100,000) to Coach Franklin for Freedman's son to start on California Supreme's 16U and 17U elite teams. Coach Franklin rejected those offers, so Freedman enlisted the assistance of the Nike executives to force Coach Franklin to cede control of the 17U team.

players to attend and play for universities that had contracts with Adidas.  *See United States v.*
*Gatto, Code et al.*, No. 17-cr-0686 (LAK) (SDNY) (hereinafter "the NCAA criminal
investigation").  At the same time, the USAO-SDNY served a federal grand jury subpoena
upon Nike – reportedly directed at the EYBL -- in connection with the NCAA criminal
investigation. https://www.espn.com/mens-college-basketball/story/_/id/20847512/nike-elite-
youth-basketball-league-served-subpoena-sources.  Upon information and belief, the
subpoena covered the time period from January 1, 2016, through September 30, 2017. (Dkt.
No. 58:2 & n.2).  When Nike was confronted with media inquiries about the arrests and
reported grand jury subpoena, it issued at least two press releases on or about September 28,
2017, that read in part as follows:

> Nike believes in fair and ethical play both in business and sports and strongly
> opposes any form of manipulation.
>
> Nike firmly believes in compliance with laws and fair play in all sports.  There
> are no allegations against Nike in the complaints and we are committed to
> cooperating with any government investigation into this matter.

https://www.espn.com/mens-college-basketball/story/_/id/20847512/nike-elite-youth-
basketball-league-served-subpoena-sources;  https://sgbonline.com/nike-under-investigation-
in-college-basketball-bribery-scandal/.

In response to the grand jury subpoena, Nike, through its counsel at Boies Schiller
Flexner ("BSF"), produced thousands of pages of documents to the USAO-SDNY.  Those
documents revealed that payments by Nike for the benefit of amateur players were pervasive.
For example, Carlton DeBose acknowledged in an exchange of text messages with an assistant
coach at the University of Kentucky that Nike was funneling payments to high school players
through ***at least ten*** different EYBL coaches.  (Dkt. No. 30-5:8).  Mr. DeBose further told Nico

Harrison, Nike's Vice President of North America Basketball Operations, that he (DeBose) was "willing to bet that **38 of 40** teams in the EYBL had to pay a moderate to considerable ransom to families just to play in the EYBL.  Of these approximate 38 teams these arrangements are being viewed as a contract by the families and players…"  (Dkt. No. 30-16:7) (emphasis added).  One EYBL coach from a New York team wrote that "[t]he 'secrets' of players and/or their family members 'getting paid' are no longer secrets and quite frankly are spoken about rather openly" and further expressed his concern and noted that "I can't see how this ends well for NIKE or the EYBL.  Some of us will be deemed guilty by association others will be found guilty of failure to supervise…"  (Dkt. No. 30-16:2).  Another Nike executive who led "Event Strategy" for the EYBL admitted to carrying large amounts of cash through airport security and indicated that she would lie and "just say I just sold my car" if she got stopped (Dkt. No. 30-5:10-11).  There are numerous other examples of the endemic behavior.  (*See, e.g.,* Dkt. No. 30-16:5-6) (breakdown of cash payments).[2]

In early 2018, Coach Franklin solicited advice from a consultant/advisor named Jeffrey Auerbach, an entertainment and sports industry executive with prior ties to Nike's founder.  Over the course of the next year – long before they first approached Mr. Avenatti to get involved in late February 2019 – Auerbach and Coach Franklin strategized how to hold Nike

---

[2] The information outlined above is contained in documents that were produced by the USAO-SDNY to undersigned counsel in response to a *Brady/Giglio* request. They were originally produced by Nike in response to the grand jury subpoena in the NCAA criminal investigation. Government counsel have advised that the documents produced to the defense are only a subset of the total documents produced by Nike; these particular documents were generated by using search terms such as "Gary Franklin" and "California Supreme" (terms unilaterally selected by the government).  The defense has requested the government to expand those search terms to include additional names such as "Carlton DeBose" and "Jamal James" (among others).  These additional search terms generated another approximate 1000 pages, which the government has not yet produced to the defense.

and its executives accountable for the corruption, takeover of Coach Franklin's program, and damage done to Coach Franklin.  Mr. Auerbach, on behalf of and in conjunction with Coach Franklin, began to compile substantial evidence related to Nike's misconduct.  They researched the Adidas scandal and the pending criminal charges to discover parallels with Nike's conduct and possible civil claims Coach Franklin could bring.  They communicated by text and e-mail on a regular basis and had lengthy phone conversations.  They discussed retaining counsel, approaching the FBI to report Nike's conduct, exposing Nike's corruption, and/or suing Nike.

The text and email communications between Coach Franklin and Mr. Auerbach demonstrate that their quest to hold Nike accountable was all-consuming.  Those communications reveal that Coach Franklin wanted to seek "***justice***" against Nike and its executives by purging the rampant corruption.  (*See, e.g.,* Dkt. No. 30-6; 30-7; 30-8; 30-9).  Coach Franklin knew that the misconduct was not confined to the California Supreme, that other EYBL coaches were also funneling money to players at Nike's request, and that other Nike executives in addition to DeBose and James participated in, were aware of, and/or turned a blind eye to the misconduct.  For Coach Franklin, true justice meant, for starters, ridding the company of DeBose and James and then further investigating Nike to find out how far and wide within EYBL and Nike the misconduct stretched.  His own words show that Coach Franklin's overriding objective was a legitimate and thorough investigation of Nike, not a whitewash. Coach Franklin's second goal was to seek compensation for the harm occasioned upon him and his brand.

On or about February 6, 2019 – before Mr. Avenatti had even heard of Coach Franklin – Mr. Auerbach called Nike's EVP John Slusher, a top executive at the company, and reported

the misconduct.  As documented in his "Memo to the File," Mr. Auerbach made clear that the corruption within EYBL was systemic and not limited to California Supreme. For example, he told EVP Slusher that: a) Coach Franklin "endured workplace bullying and abuse for over 2 years" by Nike executives DeBose and James; b) that "[t]here was ongoing corruption and illicit schemes being carried out by DeBose and James and *how they brought this corruption into* California Supreme, directing Gary to submit fake invoices, make cash and bank-wire payments to handlers and family members of top Nike elite players … similar to those in the recent DOJ-Adidas case;" c) Coach Franklin's program had been "severely harmed by the corruption, the abuse and the aftermath;" d) Coach Franklin "now wants Justice" and "wants to help the company *clean-up EYB, get rid of the corruption and corrupt execs*;" and e) that justice for Coach Franklin meant "firing DeBose and James … *for starters.*"  (Dkt. No. 30-10:6) (emphasis added).  In response to this phone call, EVP Slusher claimed that, given "the seriousness of the matters you raised and how serious we take those situations," he had referred Mr. Auerbach to Nike's outside counsel at Boies Schiller and Flexner ("BSF").  (Dkt. No. 30-10:3).  On February 11, 2019, a mere five days after Mr. Slusher learned that Mr. Auerbach and Coach Franklin knew of the widespread corruption and were intent on exposing it and cleaning it up, Nike made a supplemental production to the grand jury in response to the subpoena served seventeen months earlier, to wit: the fake invoices that Nike executives solicited from Coach Franklin to disguise the payments to players (and internal Nike accounting documents related to the fake invoices).

On or about February 14, 2019, Mr. Auerbach suggested to Coach Franklin that they attempt to reach Mr. Avenatti for a consultation.  Mr. Auerbach shared with Coach Franklin videos of press interviews that Mr. Avenatti had given in several high-profile matters.  Shortly

thereafter, Mr. Auerbach reached out to Mr. Avenatti for the first time in an effort to assist Coach Franklin in pursuing his objectives.  On March 1, 2019, after they spoke, Mr. Auerbach e-mailed Mr. Avenatti that he (Avenatti) was "a source of hope for me – in a time of much despair" and "look[ed] forward to further discussing *Gary Franklin, Founder/Program Director of California Supreme Youth Basketball v. Nike Elite Youth Basketball & Nike, Inc.*," in reference to the caption for the contemplated lawsuit against Nike.  (Dkt. No. 30-12).

Mr. Avenatti next met twice in person with Mr. Auerbach and Coach Franklin.  They made their two objectives known to Mr. Avenatti: rooting out corruption at Nike, and financial compensation to Coach Franklin.  They also provided Mr. Avenatti with, among other things: a) a packet of the evidence of Nike's misconduct towards Coach Franklin, including text messages, bank records, and fake invoices, (Dkt. No. 30-4); b) a copy of the "Memo to the File" summarizing Mr. Auerbach's telephone conversation with Nike EVP Slusher, which outlined Coach Franklin's prior demands of Nike, (Dkt. No. 30-10); c) a file-stamped copy of the civil RICO complaint filed against Adidas in the District of South Carolina, which included claims for money damages and injunctive relief, (Dkt. No. 30-13); and d) a 28-page PowerPoint presentation, headlined *Gary Franklin, California Supreme Elite Youth Basketball v. Nike USA, Inc., Nike, Inc., Nike EYB*, (Dkt. No. 30-14), identifying the potential defendants in a civil lawsuit, providing Mr. Avenatti with factual information, and identifying relevant questions about Nike's conduct that needed to be answered.  Importantly, they placed no limitations on Mr. Avenatti's use of the evidence in future settlement negotiations with Nike. To the contrary, they specifically told Mr. Avenatti that they wanted to bring the evidence of Nike's misconduct to the attention of Nike's top brass and others.

Mr. Avenatti contacted attorney Mark Geragos, who agreed to work with Mr. Avenatti to approach Nike to negotiate a pre-lawsuit settlement of Coach Franklin's claims. They discussed that Nike would need to conduct an internal investigation. On March 12, 2019, Mr. Geragos initiated communication with Nike's Assistant General Counsel for Litigation and Internal Investigations, for the purpose of setting up a "confidential mediation discussion." That evening, Mr. Avenatti and Mr. Geragos spoke by telephone to discuss the scope of a potential internal investigation of Nike, after which Mr. Avenatti texted Mr. Geragos a link to a New York Times story entitled "The Mounting Costs of Internal Investigations." (Dkt. No. 30-20) (noting that such investigations can exceed $100 million).

On March 19, 2019, a meeting was held at Mr. Geragos' law office in Manhattan. The attorneys present at that first meeting included both Mr. Avenatti and Mr. Geragos, attorneys Scott Wilson and Ben Homes from BSF, and Rob Leinwand, an attorney at Nike with the title Vice President of Global Litigation and Employment Counsel. BSF attorney Homes took handwritten notes at the meeting; he thereafter prepared typewritten notes of the same meeting. (Dkt. No. 30-15). The parties all agreed at the meeting that it was a confidential settlement discussion designed to allow for a candid conversation about resolving Coach Franklin's claims, protected by Fed.R.Evid. 408. (Dkt. No. 30-15:2). At that March 19, 2019 meeting, Mr. Avenatti informed Nike's counsel that he represented Coach Franklin, who had potential legal claims against Nike. (Dkt. No. 30-15:3). Mr. Avenatti allowed Nike's counsel to review the documentary evidence that he had brought to the meeting in support of Coach Franklin's legal claims but did not let Nike's counsel keep a copy of the documents or take contemporaneous notes about the documents. (Dkt. No. 30-15:5; Dkt. No. 30-4). Mr. Avenatti outlined the two components of an initial settlement demand, which included that Nike agree

to pay $1.5 million to Coach Franklin and agree to conduct an internal investigation to be led by Mr. Avenatti and Mr. Geragos. (Dkt. No. 30-15:3, 8). BSF attorney Wilson made clear very quickly that Nike had an "interest in conducting an internal investigation surrounding these allegations." (Dkt. No. 30-15:4). To be sure, the Nike lawyers knew that Coach Franklin's claims were true inasmuch as internal text messages and e-mails produced by Nike to the USAO-SDNY contain admissions by Nike executives that they were funneling money to the families of high school players, and the invoices and bank statements shown to the Nike lawyers by Mr. Avenatti corroborated that payments had been made for the benefit of players.

Immediately after the March 19, 2019 meeting, in the face of evidence of widespread misconduct by its own client similar to that charged in the Adidas case, BSF attorneys contacted federal law enforcement to report an alleged attempted extortion. Thereafter, over the course of the next two days, BSF attorney Scott Wilson, at the behest of the FBI, audio-recorded several telephone conversations with Mr. Geragos and one with Mr. Avenatti, on March 20, 2019. A second, in-person, settlement meeting was held at Mr. Geragos' office on March 21, 2019. BSF attorney Wilson video-recorded that meeting at the behest of the government. The participants at the March 21, 2019 video-recorded meeting were Mr. Avenatti, Mr. Geragos, and BSF attorneys Wilson and Homes. During that settlement discussion, BSF attorney Wilson stated that he did not think the $1.5M demand for money for Coach Franklin would be the "sticking point." With respect to the internal investigation, Mr. Avenatti explained that the "ask" was a $12 million retainer upon signing, with a minimum fee of $15 million and a cap at $25 million, and the ability during the investigation to report directly to the Nike General Counsel's office. BSF attorney Wilson invited Mr. Avenatti and Mr. Geragos to propose a settlement amount to resolve the matter without Nike retaining them

to conduct the internal investigation.  Mr. Avenatti, after consulting with Mr. Geragos, proposed a settlement amount of $22.5 million.  Mr. Avenatti provided BSF attorney Wilson with a draft of a settlement agreement (with the amount of the settlement left blank) that specifically required two signatures of Coach Gary Franklin, both individually and on behalf of California Supreme Youth Basketball, Inc.  (Dkt. No. 30-17:1,4).

The draft settlement agreement provided that the "terms and conditions of this Agreement and the underlying negotiations" would be confidential (as opposed to the actual facts of the underlying conduct), "provided, however, that nothing herein shall restrict the disclosure of this Agreement and its terms … in connection with responding to a lawfully issued subpoena or request by a governmental body."  (Dkt. No. 30-17:1) (emphasis added). Mr. Avenatti also made it clear at the March 21 meeting that Nike would have to "self-report," "[w]e can leave it to Nike and its other lawyers to figure out what to do with this and handle it appropriately," that "they can hire Boies or whoever else they want to hire to do whatever they want to do, and you guys can figure out what you want," and that Coach Franklin would cooperate with such an investigation but "he's not going to do anything illegal."  Nike never made any offer or counteroffer to Mr. Avenatti's settlement demands.  The USAO-SDNY decided to charge Mr. Avenatti the next day (approximately 72 hours after they were first approached by BSF) and Mr. Avenatti was arrested the following business day (Monday).

On the date of Mr. Avenatti's arrest, USA Geoffrey Berman confirmed that the investigation of Nike was "continuing."   https://m.youtube.com/watch?v=XRFv5JD_tB8 (16:50 – 17:02).  Significantly, after Mr. Avenatti's arrest – and more than eighteen months after it received the federal grand jury subpoena in the NCAA criminal investigation -- Nike produce additional documents to the government that it apparently had not previously

produced, including evidence of arrangements made by Nike for Coach Franklin to travel to Arizona to pay the family of DeAndre Ayton.

## ARGUMENT

### I.   Political Motivations, Selective Prosecution, and Haste

Mr. Avenatti does not intend to make a "jury nullification" argument.  However, Mr. Avenatti respectfully submits that it is relevant and permissible to question the lawyers representing Nike about their motivations for reporting him to the USAO-SDNY and claiming that the unrecorded March 19 meeting was part of an extortion plot.  In particular, Mr. Avenatti may seek to elicit testimony that the Nike lawyers knew he was a high-profile nemesis of President Trump, that there was personal animus between President Trump and Mr. Avenatti, and that, according to published reports, USA Berman was closely aligned with President Trump.  (Dkt. No. 29:33-38).  As detailed in our motion for vindictive prosecution, there is evidence that President Trump's political appointee, USA Berman, personally participated in the case in a manner unusual for a sitting United States Attorney.  (Dkt. No. 29:11 n.4; Dkt. No. 29:38).  It is relevant whether the Nike lawyers believed that cooperating against a high-profile person against whom the leader of the Executive Branch had expressed disdain – as opposed to any other lawyer -- would inure to the benefit of their client Nike in the continuing NCAA criminal investigation.[3]

Moreover, the government's request that the Court preclude any argument that Mr. Avenatti was "charged in haste" lacks any foundation or legal basis, and the government cites no case law to support that request.  To be clear, Mr. Avenatti intends to argue that the

---

[3] To be clear, Mr. Avenatti would not suggest that the individual trial prosecutors harbor any personal animus against Mr. Avenatti.

government rushed to judgment in this case without conducting a proper and thorough investigation.  Such an argument is not only permissible, but it is crucial in this case.  For example, the government's "honest services" wire fraud theory on Count Three, as best as we can decipher, is that Mr. Avenatti solicited legal fees from Nike for himself without disclosing or ever intending to disclose the arrangement to Coach Franklin.  The negotiations between Mr. Avenatti and the Nike lawyers occurred over a three-day period between March 19-21, 2019.  It is the ***centerpiece*** of Mr. Avenatti's defense to this charge that: a) he had broad authority from Coach Franklin to handle the initial negotiations and make a settlement demand as he saw fit (including the authority to demand that Mr. Avenatti lead an internal investigation of Nike), b) the two components of the settlement demand made by Mr. Avenatti were in furtherance of Coach Franklin's litigation objectives, and **c)** Coach Franklin would have had to approve the internal investigation arrangement before it was finalized.  Nike, however, never made any offer of settlement or counteroffer nor agreed to the settlement demand.  Mr. Avenatti is entitled to argue that the government rushed to arrest him. Had the government not acted with haste, it would have been clear that the entire arrangement contemplated written consent from Coach Franklin with full disclosure.  Any retention by Nike would and could not have been a secret.  The rush-to-judgment argument is essential to all three counts but is particularly critical to demonstrating to the jury that the government's honest services theory is misguided.

## II.   <u>Whether the Matter Should be Dealt with Solely Administratively or Civilly</u>

As Mr. Avenatti understands the government's argument regarding the second motion *in limine*, he should be precluded from arguing the "motivations of individual 'federal prosecutors,' whether those prosecutors have their 'own views,' the merits or lack thereof of

those views, or the allegedly negative ramifications of the enforcement in this case of the laws enacted by Congress." (Dkt. No. 96:9). The only case cited by the government in respect to this motion *in limine -- United States v. Rosado*, 728 F.2d 89, 93 (2d Cir. 1984) -- involved a terrorist group in Puerto Rico who tried to mount a political defense by condemning United States involvement in Puerto Rico and in third world countries and the alleged FBI persecution of sympathizers for independence for Puerto Rico. Mr. Avenatti would not seek to advance those types of arguments.

But the heading of the government's motion *in limine*, (Dkt. No. 96:8), seems to be driving at a different point than the body of the argument. So, to be clear, Mr. Avenatti ***does*** intend to argue that he is not guilty of the crimes charged and that this case does not belong, and never should have been brought, in federal district court as a criminal case. Indeed, it is Mr. Avenatti's position that this case against him ***also does not*** belong in a civil courtroom or in any kind of administrative or California Bar proceeding.

To the extent the government is permitted to offer evidence regarding California Bar Rules, and then argue to the jury that Mr. Avenatti violated the California Bar Rules and that such violation is evidence of his guilt on criminal charges, Mr. Avenatti reserves the right to rebut such arguments. In that event, it would be entirely permissible for Mr. Avenatti to: a) deny that he violated any ethics rules in this case; b) argue that any purported violation of ethics rules does not mean that he possessed the criminal intent required for the offenses of conviction; c) argue that the government is improperly trying to convert mere alleged breaches of ethics rules into criminal offenses; and d) argue that there is a forum – a Bar proceeding --- to address mere violations of ethics rules.

### III.  Argument that the Charges are Unconstitutionally Vague

Mr. Avenatti does not intend to argue to the jury that he deserves to be acquitted because the statutes and charges are unconstitutional.  However, as to Counts One and Two, he does intend to argue, based on the evidence, that his conduct was not wrongful and that he did not believe it was wrongful.  He also intends to argue that Mr. Geragos, a seasoned and respected criminal defense lawyer with decades of experience, actively participated with him in every meeting and phone call, and never expressed any concern during any of the meetings or recorded conversations that they were crossing any line.  Moreover, as to Count Three, to the extent that the government is permitted to offer evidence of ethics rules, Mr. Avenatti intends to argue that his conduct was consistent with a reasonable interpretation of those rules.

### IV.  Potential Punishment that Mr. Avenatti Faces if Convicted

Mr. Avenatti does not intend to make any such argument.  (Dkt. No. 96:10).

### V.  Charging Decisions with Respect to Others

Mr. Avenatti does not intend to offer evidence or argument concerning the differences between the original indictment and the superseding indictment.  (Dkt. No. 96:11).

With respect to arguments about the fact that persons not on trial have not been charged, the government focuses on Attorney-1 (Mr. Geragos), who both personally and through his counsel participated in multiple "innocence proffer" sessions with the government.  Those proffers are exculpatory of Mr. Avenatti.[4]  As noted above, Mr. Geragos is an experienced criminal defense lawyer, intimately familiar with the extortion statutes.  He told prosecutors

---

[4] At the Court's request, we will furnish the Court with the Geragos proffer notes provided by the government in discovery.

that there was no agreement between him and Mr. Avenatti to extort Nike.  He never expressed any concern to Mr. Avenatti that threats of a press conference or demand for an internal investigation constitute extortion under the circumstances presented.  Indeed, Mr. Geragos told prosecutors that it was he who had insisted on the internal investigation of Nike.  Such testimony is relevant to Mr. Avenatti's state of mind and whether he acted with intent to extort Nike.

Mr. Avenatti has subpoenaed Mr. Geragos and intends to call him as a witness.  If he testifies, the jury is sure to learn that he has not been charged because it is relevant to the jury's assessment of his credibility.  Given the multiple, exculpatory innocence proffers he has made to the prosecutors in connection with this investigation, Mr. Geragos should be required to provide that same information in the form of testimony to the jury.  Mr. Geragos cannot reasonably fear that testimony consistent with those exculpatory innocence proffers, which the government has apparently accepted as true, would tend to incriminate him.

Moreover, the government has obviously made the internal decision that it will not charge Mr. Geragos; though the Complaint and underlying Indictment alleged conspiracy charges against Mr. Avenatti for a conspiracy with Mr. Geragos (who was denoted in those charging instruments as "CC-1), both the conspiracy counts and "CC-1" were deleted from the Superseding Indictment.  Thus, Mr. Geragos does not have a "reasonable fear of prosecution" for any crimes.  *United States v. Zappola*, 646 F.2d 48, 53 (2d Cir. 1981).  Should Mr. Geragos decline to testify on the basis of a constitutional privilege, the Court would need to determine whether the assertion of the privilege is in good faith and whether the government, if it refuses to immunize Mr. Geragos despite a lack of intention to prosecute him, should be compelled to

grant defense witness immunity.  *See, generally, United States v. Bahadar*, 954 F.2d 821, 826 (2d Cir. 1992).

In the event Mr. Geragos does not testify despite Mr. Avenatti's efforts to compel his testimony, Mr. Avenatti will seek a "Missing Witness" instruction that "[b]ecause the government had it peculiarly within its power to produce Mr. Geragos and failed to do so, the jury may infer that the testimony of Mr. Geragos would have been favorable to Mr. Avenatti and unfavorable to the government." *Cf. United States v. Myerson*, 18 F.3d 153, 160 (2d Cir. 1994) ("[I]n the absence of circumstances that indicate the government has failed to immunize an ***exculpatory*** witness, a district court does not abuse its discretion by refusing to give a missing witness charge.") (emphasis added).  Given the number of uncertainties, it may be preferable for the Court to defer ruling on the government's request until the issue surrounding Mr. Geragos' testimony becomes clear.

## VI. <u>Prior Good Acts or Failure to Commit Other Bad Acts</u>

Mr. Avenatti does not intend to present any independent evidence of "good acts" or failure to commit "bad acts" for the purpose of establishing a "propensity not to commit crimes."  (Dkt. No. 96:12-13).  However, to the extent that any good acts are relevant under Fed.R.Evid. 401, inextricably intertwined with the evidence, and/or necessary for the jury to understand the complete picture of what happened ***in this case***, Mr. Avenatti should not be precluded from presenting any such evidence.

One example is illustrative.  The evidence will show that Coach Franklin and Mr. Auerbach decided to engage Mr. Avenatti precisely because of his reputation for seeking justice for the underdog and because Mr. Avenatti had the experience and courage to take on a corporation the size of Nike.   (*E.g.,* Dkt. No. 29:21-22).  Between mid-February and early

March 2019, while urging that Mr. Avenatti would be the right lawyer to accomplish Coach Franklin's goals, Mr. Auerbach sent text messages to Coach Franklin with background information concerning Mr. Avenatti and links to several recordings of Mr. Avenatti's interviews and press conferences, and urged Coach Franklin to watch and listen to them.[5]  Mr. Avenatti has not yet decided which video(s) he would seek to play during cross-examination of Coach Franklin because he has not yet heard that testimony.  However, Coach Franklin's reasons and motivations for hiring Mr. Avenatti, as opposed to a timid lawyer – *for the express purpose of exposing Nike's conduct vis-à-vis Coach Franklin* – squarely contradict the government's flawed theory that Coach Franklin did not authorize Mr. Avenatti to do so.

### VII.   Positive Results for Clients or Society from other Lawsuits

Mr. Avenatti does not intend to present evidence of results in other unrelated lawsuits for the purpose of showing his good character or contributions to society.  However, to the extent such results are relevant for some other purpose – *e.g.,* Coach Franklin's reasons for hiring him -- he may seek to offer that evidence.  As another example, evidence of recent financial success is relevant to rebut the government's financial motive argument (which Mr. Avenatti has moved to exclude), a point the government has acknowledged.  (Dkt. No. 96:13). Moreover, Mr. Avenatti intends to present evidence that he is a trial lawyer who regularly files civil lawsuits, that the complaints he files often include claims for damages and injunctive relief, and that he often held press conferences as part of his litigation strategy.  Such testimony would rebut any suggestion that the threatened press conference was untethered to contemplated litigation against Nike.

---

[5] Those text messages and links were produced by Coach Franklin to the government and are part of the discovery.

Moreover, Mr. Avenatti does not intend to argue that, as a policy matter, lawyers engaged in settlement negotiations should be free to make ***illegal*** threats.  To be sure, he intends to abide by the Court's jury instructions and definitions regarding when the use of fear or threats to reputation are "wrongful."  But causing fear of economic loss is not inherently wrongful, *see United States v. Jackson*, 180 F.3d 55, 70 (2d Cir. 1999); *United States v. Pendergraft*, 297 F3d 1198, 1206 (11th Cir. 2002), and Mr. Avenatti intends to argue that hard bargaining is acceptable and expected, that it is not a crime to threaten litigation, be crude, use offensive language, or engage in puffing or posturing during settlement negotiations, nor is it inherently wrongful to threaten public exposure of plausible legal claims.

## VIII.  <u>Nike's Specific Misconduct of Which Mr. Avenatti was Unaware</u>

The government's motion seeks to preclude Mr. Avenatti from presenting evidence and argument to demonstrate that Nike's misconduct vis-à-vis Coach Franklin was a small fraction of Nike's broader corruption of amateur basketball.  The evidence would show that, as Coach Franklin told Mr. Avenatti in their very first meeting, Nike executives had engaged in a systematic, widespread scheme to funnel money, often in cash, to amateur basketball players and their families and handlers directly and through multiple EYBL coaches, including Coach Franklin.[6]  Those executives discussed, offered, and in many cases arranged for hundreds of

---

[6] Payments to a college-bound high school player and his/her family are expressly prohibited by NCAA Rules.  *See generally* NCAA Division 1 Manual, Bylaw 12; *see also* NCAA Bylaw 12.1.2 ("An individual loses amateur status and thus shall not be eligible for intercollegiate competition in a particular sport if the individual … (b) accepts a promise of pay…").  Paying amateur players, knowing that such payments would render the players ineligible for the college scholarships, can be punished under federal criminal law.  *See United States v. Gatto*, 295 F.Supp.3d 336, 345-49 (S.D.N.Y. 2018).  Deducting those payments to players as expenses, with fake invoices to support them, may also violate federal tax laws.

thousands of dollars in payments to some of the most recognized names in high school (and now professional) basketball to induce such players to join teams in Nike's EYBL.

The government claims that the evidence of Nike's rampant misconduct and corruption of amateur basketball should be excluded at trial because Mr. Avenatti did not have contemporaneous knowledge of the *specifics* of that additional conduct when he represented Coach Franklin.  The government recites the familiar catchphrase that Mr. Avenatti is seeking to put the "victim on trial."  (Dkt. No. 96:14). That platitude has no meaning here because the evidence is demonstrably relevant for a multitude of reasons, as set forth below, and its exclusion would violate Mr. Avenatti's rights under the Confrontation Clause.

### A.   Bias and Motive

The Confrontation Clause "requires that a criminal defendant be afforded a meaningful opportunity to cross-examine witnesses against him in order to show bias or improper motive for their testimony."  *Brinson v. Walker*, 547 F.3d 387, 392 (2d Cir. 2008).  The evidence of Nike's broader misconduct is directly relevant to prove the bias and motive of Nike witnesses who will testify at trial, including its outside lawyers and in-house counsel.  *United States v. Harvey*, 547 F.2d 720, 722 (2d Cir. 1976) ("Special treatment is accorded evidence which is probative of a special motive to lie 'for if believed it colors every bit of testimony given by the witness whose motives are barred.'").  As set forth above, in 2017-18, the USAO-SDNY brought a criminal case, and obtained convictions against, Adidas executives that put the spotlight squarely on Adidas's behavior – including on a former Nike executive who had previously run the EYBL program in question here.  The USAO-SDNY had also issued a grand jury subpoena to Nike, and its counsel at BSF produced thousands of pages of documents to

the USAO-SDNY covering the time period from January 1, 2016, through September 30, 2017. (Dkt. No. 58:2 & n.2).  Those documents revealed the broader misconduct described above.

When Nike and its lawyers from BSF reported Mr. Avenatti to the USAO-SDNY on March 19, 2019, leading to his arrest five days later, they were well aware that the NCAA criminal investigation was ongoing and that Nike's fate remained uncertain. The BSF lawyers knew that Nike had failed to timely produce many relevant documents to the grand jury relating to Coach Franklin.  They knew that FBI Assistant Director William Sweeney had publicly warned others involved in amateur basketball at the time of the arrests in the Adidas case that: "We have your playbook.  Our investigation is ongoing and we are conducting additional interviews as I speak." Nike and its lawyers knew that cooperation against Mr. Avenatti might yield significant benefits for Nike and its executives in that criminal investigation.  And that motive has not diminished; when USA Berman was given the opportunity to exonerate Nike at his press conference on the date of Mr. Avenatti's arrest, USA Berman declined and stated that the NCAA criminal investigation is "continuing."  Indeed, Nike's conduct remains within the statute of limitations.

Given the continuing investigation by the very same office that is prosecuting Mr. Avenatti, evidence of Nike's widespread misconduct is plainly relevant to the motive of Nike's agents -- its outside counsel and in-house lawyers -- to testify favorably for the government. *See, e.g., United States v. James*, 609 F.2d 36, 46 (2d Cir. 1979) ("The strength of the case against Starns in North Carolina, if known by him, could bear upon Starns' motive to testify in this case."); *United States v. Lankford*¸ 955 F.2d 1545, 1549 (11th Cir. 1992) (defendant's confrontation rights violated when district court excluded evidence that a key witness's sons were charged with marijuana distribution in state court and might be facing a federal

investigation; witness's "desire to cooperate may have in fact been motivated by an effort to prevent such an investigation."); *United States v. Atherton*, 936 F.2d 728, 734 (2d Cir. 1991) (probative value of illegal conduct by a government witness depends on a "showing that the government was contemplating prosecution, or at least was aware of, the illegality."); *Cf. Harvey,* 547 F.2d at 722 ("bias of a witness is not a collateral issue and extrinsic evidence is admissible to prove that a witness has a motive to testify falsely.").  The more substantial the misconduct, the greater the motive of Nike witnesses to implicate Mr. Avenatti.

Moreover, when Nike was confronted with media inquiries about the arrests and reported grand jury subpoena in the NCAA criminal investigation, it issued the aforementioned press releases, professing its belief in "fair and ethical play both in business and sports" and "compliance with laws and fair play in all sports."  The documents subsequently produced by Nike to the government belied Nike's claim that it believed in "fair and ethical play" and "oppos[ing] any form of manipulation."  Once a public company speaks on an issue, the company has a duty to tell the whole truth and to be both accurate and complete in its public statements to ensure that they are not misleading.  *Meyer v. Jinkosolar Holdings Co., Ltd.*, 761 F.3d 245, 250 (2d Cir. 2014); *Caiola v. Citibank, N.A.*, 295 F.3d 312, 331 (2d Cir. 2002). Nike's failure to disclose the broader misconduct to the investing public is relevant to impeach the testimony of Nike witnesses.

In its motion, the government states that it "expects to elicit from these [Nike lawyers] their understanding of the general nature of the NCAA investigation as it pertains to Nike, including the fact that Nike received a subpoena in that investigation and produced documents in response to that subpoena."  (Dkt. No. 96:18).  The government further states that it "intends to elicit that Nike initially reported the defendant's conduct to the USAO-SDNY team handling

the NCAA Investigation and affirmatively cooperated in the resulting investigation."  (Dkt. No. 96:18).  In other words, the government intends to portray Nike as a good corporate citizen, having produced documents in response to the grand jury subpoena and affirmatively cooperated in the investigation of Mr. Avenatti.  Yet, the government seeks to preclude Mr. Avenatti from offering competing evidence and probing the compelling reasons why Nike has a substantial motive to cooperate against Mr. Avenatti.  Apparently, in the government's view, Mr. Avenatti should be limited to asking the Nike witnesses *whether* they have an interest in cooperating – and be stuck with the answer – but not *why* that motive is so powerful in this case. (Dkt. No. 96:18).  This is improper.

### B.  Rebutting Evidence of "Wrongfulness"

Evidence of Nike's specific misconduct beyond that directed at Coach Franklin is directly relevant to counter the government's claim that Mr. Avenatti acted wrongfully in demanding an internal investigation and to be paid for it. "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining this action."  Fed.R.Evid. 401. "To be relevant, evidence need not be sufficient by itself to prove a fact in issue, much less to prove it beyond a reasonable doubt."  *United States v. Abu-Jihaad*, 630 F.3d 102, 132 (2d Cir. 2010).  Rule 401 prescribes a "very low standard" for relevance.  *United States v. White*, 692 F.3d 235, 246 (2d Cir. 2012).  [U]nless an exception applies, all 'relevant evidence is admissible.'"  *Id.* (quoting Fed.R.Evid. 402).

Evidence that Nike directed many other EYBL coaches to make payments to high school players proves that this was Nike's *modus operandi* and not some accident or mistake. *See United States v. Aboumoussallem*, 726 F.2d 906, 911 (2d Cir. 1984) (discussing lower

standard for admitting similar acts evidence for defensive purposes under Rule 404(b)); *cf. United States v. Litvak*, 808 F.3d 160, 188-89 (2d Cir. 2015) (noting low threshold for admissibility under Rule 401 and concluding that district court erred by excluding evidence that defendant's supervisors had approved identical conduct committed by other employees at company, even though not known to the defendant). The evidence corroborates Mr. Avenatti's defense that Coach Franklin had a plausible claim against Nike when Mr. Avenatti allegedly threatened a press conference; proof of a plausible claim is the antidote to an allegation of wrongfulness. *See United States v. Jackson,* 180 F.3d 55, 69-71 (2d Cir. 1999).

Beyond that, and importantly, there is substantial evidence that Mr. Avenatti was aware of the broader misconduct, even if not the specific instances of it, which justified his demand on behalf of Coach Franklin to root out corruption in Nike EYBL and influenced his estimated cost of the internal investigation. For starters, the evidence will show that he knew that Nike EYBL had been served with a federal grand jury subpoena by the USAO-SDNY in 2017 in connection with the NCAA criminal investigation that brought down an Adidas executive, college coaches, and an Adidas consultant who was the former Director of Nike EYBL. (Dkt. No. 30-15:3). Moreover, the evidence will show that, in March 2019, Coach Franklin and Mr. Auerbach informed him that there was widespread, ongoing corruption and illicit schemes being carried out by Nike executives DeBose and James and that they brought this systemic corruption ***into*** the California Supreme program. (Dkt. No. 30-10:6). Mr. Auerbach provided Mr. Avenatti with a lengthy civil RICO complaint filed by a player named Brian Bowen against Adidas, Gatto, Code (the former Director of Nike EYBL) and others, in which Bowen alleged that criminal conduct permeated "the entire sneaker industry." (Dkt. No. 30-13:34). The PowerPoint presentation that Mr. Auerbach prepared for Mr. Avenatti referenced the April

2018 Report of the Commission on College Basketball, chaired by former Secretary of State Condoleezza Rice, who stated that "[t]he corruption we observed in college basketball has its roots in youth basketball."  (Dkt. No. 30-14:3).[7]  Mr. Auerbach shared several news articles with Mr. Avenatti suggesting that the corruption in amateur basketball was endemic.  They told Mr. Avenatti that the entire EYBL needed to be cleaned up nationwide.  The specifics of Nike's broader misconduct plainly corroborate what Mr. Avenatti believed at the time and are relevant to establish that Mr. Avenatti did not act "wrongfully" – and did not believe he was doing so -- by demanding that he and Mr. Geragos be engaged to lead a comprehensive investigation of Nike on behalf of Coach Franklin.

### C.     Witnesses Invoking the Fifth Before the Jury

Mr. Avenatti has served trial subpoenas on several Nike witnesses who interacted directly with Coach Franklin and/or Mr. Auerbach but does not know whether any of those witnesses intends to assert a Fifth Amendment privilege. To the extent any Nike witness seeks to assert a privilege, it should be done on a question-by-question basis, outside the presence of the jury, so that the Court can make a "particularized inquiry to determine whether the assertion was founded on a reasonable fear of prosecution as to each of the posed questions."  *Zappola*, 646 F.2d at 53.  Having reviewed the case law further, Mr. Avenatti does not seek to have any witness assert a Fifth Amendment privilege before the jury.

### D.     Whether any Alleged Misconduct by Nike Outweighs his Own

Mr. Avenatti intends to argue that he is not guilty because he is in fact not guilty, not that any alleged crimes should be excused because they are outweighed by Nike's misconduct.

---

[7] The Report itself, which received considerable media attention, lamented the lack of effective controls in place in the apparel companies' spending in non-scholastic basketball.

IX.    **The Value of Coach Franklin's Claims and the Cost of an Investigation without a Connection to Mr. Avenatti's Contemporaneous Knowledge**

The government seeks to exclude evidence or argument about the value of Coach Franklin's claims and the cost of an internal investigation of Nike without a connection to Mr. Avenatti's contemporaneous knowledge. (Dkt. No. 96:23). It is not entirely clear what precisely the government is seeking to preclude. As the government is aware, the final value of claims in litigation is unknown to anyone until the case settles or there is a judgment after verdict. Likewise, the estimated cost of an internal investigation was just that – an estimate – until the investigation was completed.

Mr. Avenatti intends to present evidence that, in March 2019, Mr. Auerbach informed him that, after thoroughly reviewing the matter for over a year, he had found significant evidence that: a) there was ongoing corruption and illicit schemes being carried out by Nike executives DeBose and James and that they brought their corruption into the California Supreme program; b) Nike could be characterized as an "enterprise" under the civil RICO statutes, with possible predicate acts to include fraud, bribery, extortion, money laundering, etc.; and c) that Nike's EYBL – which consisted of approximately 40 teams -- needed to be cleaned up in its entirety. (E.g., Dkt. No. 30-14). Mr. Auerbach further informed Mr. Avenatti that the misconduct within Nike paralleled the misconduct within Adidas, which resulted in a lengthy civil RICO complaint filed by a player named Brian Bowen against Adidas, alleging that the misconduct permeated the entire sneaker industry. (Dkt. No. 30-13). Before Mr. Avenatti provided an estimated cost of the investigation, he knew Nike had been served with a federal grand jury subpoena by the USAO-SDNY in 2017 in connection with the NCAA criminal investigation (Dkt. No. 30-15:3), that had already resulted in criminal charges against

at least eight people in three separate indictments pertaining to Adidas. On March 12, 2019, before communicating with Nike, Mr. Avenatti texted Mr. Geragos a link to a *New York Times* article entitled "The Mounting Costs of Internal Investigations," which noted that internal investigations can exceed $100 million in cost. (Dkt. No. 30- 20). Mr. Avenatti is well within his right to argue to the jury that his estimate of $15-25 million for an internal investigation was reasonable given the potential breadth of the misconduct, the information he had been provided, and the research he had conducted.

## X.     Out-of-Court Statements Made by Mr. Geragos to the Government

As noted above, Mr. Geragos, personally and through his counsel, participated in multiple innocence proffer sessions with the government. Mr. Avenatti provided notice to the government that he might seek to offer one or more statements in evidence under Rule 807, namely Mr. Geragos' statements that he did not conspire with Mr. Avenatti or intend to threaten or extort Nike. Mr. Geragos, through his lawyer, also stated multiple times that Mr. Geragos told Mr. Avenatti they should insist on the internal investigation of Nike (which Mr. Avenatti would also seek to offer in evidence under Rule 807). *See* USAO373_00029903-05.

As noted above, Mr. Avenatti has served a trial subpoena on Mr. Geragos. This issue will therefore become ripe at the time of the defense case only in the event Mr. Geragos asserts his Fifth Amendment privilege, the Court upholds that assertion, the government refuses to make him available (*i.e.,* immunize him) even though it has no intention of prosecuting him, and the Court declines to order the government to do so under the Due Process Clause. Thus, Mr. Avenatti requests that the Court defer ruling on this issue until such time as it becomes ripe, at which point the Court will be in a better position to assess the trustworthiness of the statements under Rule 807(a)(1) and whether the statements are more probative on the point

for which it is offered than any other evidence that Mr. Avenatti can obtain through reasonable efforts under Rule 807(a)(2).[8]

## XI.     Defense Expert Testimony

At the arraignment and hearing on December 17, 2019, the Court indicated that Mr. Avenatti's expert witness summary provided more detail than the government's; the Court did not require a supplemental notice from Mr. Avenatti.  Thus, the notice is not an issue.  The government has not yet provided its supplemental notice in response to the Court's directive at the hearing.  Thus, at present, Mr. Avenatti does not know what the scope of the rebuttal testimony will be.  Nonetheless, Mr. Avenatti maintains his position that no expert testimony about ethics rules should be offered at trial.

To the extent such testimony is allowed, the government does not object to the "core substance" of the defense expert's testimony.  (Dkt. No. 96:29).  Rather, the government objects to two specific areas of inquiry.  First, the government argues that the defense expert should not be permitted to opine "as to her perception of any negative consequences that might flow from defendant's conviction." (Dkt. No. 96:30). Nowhere in Mr. Avenatti's expert notice does he suggest he would elicit testimony that even approaches that.  But, in the event expert testimony is permitted, the defense expert should be permitted to opine that it would be reasonable for a lawyer to not inform a client about statements made by opposing counsel in a settlement conference that do not rise to the level of a settlement offer "because of the risk of creating false expectations in the mind of the client."  (Dkt. No. 96:30).  Likewise, to the extent legal expert testimony is permitted, the defense expert should be able to opine that the absence

---

[8] Assuming the Court has not yet ruled that the statements are admissible, Mr. Avenatti would not reference any statements from the proffer sessions in his opening statement.

of a written fee agreement works to the advantage of the client because it limits the compensation of the lawyer to a determination based on *quantum meruit.* The government also takes issue with the defense expert's proposed opinion that plaintiff's lawyers often get retained by the defendant after settling an employment litigation claim. This was merely an example that the defense expert would offer to show that the conflicts of interest rule does not categorically prohibit a plaintiff's lawyer from being retained by the current client's adversary to conduct an internal investigation. There is nothing improper about the expert pointing to this example, provided the expert has knowledge and experience with such instances.

## <u>CONCLUSION</u>

For the foregoing reasons, Mr. Avenatti respectfully requests that the Court deny those government motions *in limine* to which he has argued in opposition.

Respectfully submitted,

By:   <u>/s/Scott A. Srebnick</u>
      Scott A. Srebnick, P.A.
      201 South Biscayne Boulevard
      Suite 1210
      Miami, FL 33131
      Telephone: (305) 285-9019
      Facsimile: (305) 377-9937
      E-Mail: Scott@srebnicklaw.com

By:   <u>/s/Jose M. Quinon</u>
      Jose M. Quinon, P.A.
      2333 Brickell Avenue, Suite A-1
      Miami, FL 33129
      Telephone: (305) 858-5700
      Facsimile: (305) 358-7848
      E-Mail: jquinon@quinonlaw.com

By:   <u>/s/ E. Danya Perry</u>
      E. Danya Perry
      PERRY GUHA LLP
      35 East 62nd Street
      New York, New York 10065
      Telephone: (212) 399-8340
      Facsimile: (212) 399-8331
      E-mail: dperry@perryguha.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 24, 2019, I caused a true and correct copy of the foregoing to be served by electronic means, via the Court's CM/ECF system, on all counsel registered to receive electronic notices.

<u>/s/Scott A. Srebnick</u>
Scott A. Srebnick