UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| -against- | MEMORANDUM <u>OPINION & ORDER</u> |
| MICHAEL AVENATTI, | (S1) 19 Cr. 373 (PGG) |
| Defendant. | |

---

PAUL G. GARDEPHE, U.S.D.J.:

        Indictment (S1) 19 Cr. 373 charges Defendant Michael Avenatti with transmitting interstate communications with intent to extort, in violation of 18 U.S.C. § 875(d) (Count One); Hobbs Act extortion, in violation of 18 U.S.C. § 1951 (Count Two); and honest services wire fraud, in violation of 18 U.S.C. §§ 1343 and 1346 (Count Three).  The Government charges that Avenatti – who is licensed to practice law in California – transmitted in interstate commerce threats "to cause financial harm to Nike and its reputation if Nike did not agree to make multimillion dollar payments to Avenatti"; "used threats of economic and reputational harm in an attempt to obtain multimillion dollar payments from Nike"; and used interstate communications to "engage[] in a scheme to obtain payments for himself from Nike based on confidential information provided to AVENATTI by Client-1 for the purpose of furthering AVENATTI's representation of Client-1, without Client-1's knowledge or approval," thereby depriving Client-1 of the "duty of honest services" he was owed.  ((S1) Indictment (Dkt. No. 72) ¶¶ 20, 22, 24)

        Avenatti has moved to dismiss Counts One and Two on the grounds that (1) they fail to allege "wrongful" conduct; and (2) the extortion statutes are vague as applied.  (Def. Mot.

(Dkt. No. 34; see also Nov. 13, 2019 Def. Ltr. (Dkt. No. 71))  For the reasons stated below, Avenatti's motion to dismiss will be denied.

## BACKGROUND

### I.     THE (S1) INDICTMENT'S FACTUAL ALLEGATIONS AND CHARGES

The (S1) Indictment alleges that Client-1 is the director and head coach of an amateur youth basketball program (the "Basketball Program") based in California. "For a number of years, the Basketball Program . . . had a sponsorship program with Nike[,] pursuant to which Nike paid the program approximately $72,000 annually."  ((S1) Indictment (Dkt. No. 72) ¶ 5)  In March 2019, Client-1 contacted Avenatti seeking "legal assistance after [Nike informed] the Basketball Program . . . that its annual contractual sponsorship would not be renewed."  (Id. ¶ 8)

Avenatti and Client-1 met on March 5, 2019.  "During that meeting and in subsequent meetings and communications, Client-1 informed AVENATTI . . . that [he] wanted Nike to reinstate its $72,000 annual contractual sponsorship of the Basketball Program." "During the [March 5, 2019] meeting, Client-1 provided AVENATTI with information regarding what Client-1 believed to be misconduct by certain employees of Nike involving the alleged funneling of illicit payments from Nike to the families of certain highly ranked high school basketball prospects."  (Id. ¶ 9)

At the March 5, 2019 meeting, Avenatti "told Client-1 that [he] believed that he would be able to obtain a $1 million settlement for Client-1 from Nike. . . ."  However,

> at no time during the March 5, 2019 meeting or otherwise did AVENATTI inform Client-1 that AVENATTI also would and did seek or demand payments from Nike for himself in exchange for resolving any potential claims made by Client-1 and not causing financial and reputational harm to Nike, or that AVENATTI would and did seek to make any agreement with Nike contingent upon Nike making payments to AVENATTI himself. Furthermore, at no time did AVENATTI inform Client-1 that AVENATTI intended to

> threaten to publicize the confidential information that Client-1 had provided to AVENATTI, nor did AVENATTI obtain Client-1's permission to publicize any such information.

(Id. ¶ 10)

The Indictment goes on to allege that during a March 19, 2019 meeting with Nike's lawyers, Avenatti told Nike that

> he represented Client-1, "a youth basketball coach, whose team had previously had a contractual relationship with Nike, but whose contract Nike had recently decided not to renew";
>
> Client-1 "had evidence that one or more Nike employees had authorized and funded payments to the families of top high school basketball players and attempted to conceal those payments";
>
> "he intended to hold a press conference the following day to publicize the asserted misconduct at Nike, which would negatively affect Nike's market value"; and
>
> he "would refrain from holding that press conference and damaging Nike if Nike agreed to two demands: (1) Nike must pay $1.5 million to Client-1 as a settlement for any claims Client-1 might have regarding Nike's decision not to renew its contract with the Basketball Program; and (2) Nike must hire AVENATTI and Attorney-1 to conduct an internal investigation of Nike, with a provision that if Nike hired another firm to conduct such an internal investigation, Nike would still be required to pay AVENATTI and Attorney-1 at least twice the fees of any other firm hired."

(Id. ¶ 11)

In a March 20, 2019 telephone call with Nike's counsel, Avenatti reiterated that he expected to "get a million five for [Client-1]" and to be "hired to handle the internal investigation," for which he demanded a "multimillion dollar retainer" in exchange for not holding a press conference. (Id. ¶ 13(a)-(b)) According to Avenatti, "3 or 5 or 7 million dollars" would not be sufficient for his retainer. Unless Nike agreed to a larger retainer, Avenatti would hold a press conference that would "take ten billion dollars off [Nike's] market cap" (Id. ¶ 13(c))

3

Avenatti also stated that "he expected to be paid more than $9 million." (Id. ¶ 13(d))  At the end of the call, Avenatti agreed to meet with Nike's lawyers the next day.  (Id. ¶ 13(e))

On March 21, 2019, Avenatti met with Nike's lawyers in Manhattan.  (Id. ¶ 14)  At that meeting, Avenatti demanded "a $12 million retainer to be paid immediately and to be 'deemed earned when paid,' with a minimum guarantee of $15 million in billings and a maximum of $25 million, 'unless the scope changes.'"  (Id. ¶ 14(a))  Nike's counsel asked Avenatti whether Nike could simply pay Client-1, "rather than retaining AVENATTI.  AVENATTI responded that he did not think it made sense for Nike to pay Client-1 an 'exorbitant sum of money . . . in light of his role in this.'"  (Id. ¶ 14(b))  Avenatti agreed to meet with Nike's counsel "on March 25, 2019, to hear whether Nike was willing to make the demanded payments.  AVENATTI stated that Nike would have to agree to his demands at that meeting or he would hold his threatened press conference."  (Id. ¶ 14(f))

According to the Indictment, Avenatti did not "inform Client-1 that Nike had offered to resolve Client-1's claims without paying AVENATTI.  Nor did AVENATTI inform Client-1 that AVENATTI had continued to threaten to publicize confidential information provided to AVENATTI by Client-1, or that AVENATTI had continued to use that information to demand a multimillion dollar payment for himself."  (Id. ¶ 14(g))

About two hours after the March 21, 2019 meeting, and without consulting Client-1, Avenatti posted the following message on Twitter:

4



(Id. ¶ 15; see also @MichaelAvenatti, Twitter (Mar. 21, 2019, 3:52 p.m.), https://twitter.com/MichaelAvenatti/status/1108818722767163392)

The article linked in the March 21, 2019 tweet refers to a prosecution brought by the Government against employees of Adidas – a competitor of Nike.  (Id. ¶ 16)

On March 25, 2019, after Avenatti learned that law enforcement had approached Client-1, but shortly before he was arrested, Avenatti posted the following message to Twitter:



5

(Id. ¶ 18; see also @MichaelAvenatti, Twitter (Mar. 25, 2019, 12:16 p.m.), https://twitter.com/MichaelAvenatti/status/1110213957170749440)

Later that day, Avenatti was arrested as he approached Nike's counsel's office complex in Manhattan for the scheduled March 25, 2019 meeting. (Id. ¶ 17)

The (S1) Indictment charges Avenatti with: (1) transmitting interstate communications with intent to extort, in violation of 18 U.S.C. § 875(d), in that "AVENATTI, during an interstate telephone call, threatened to cause financial harm to Nike and its reputation if Nike did not agree to make multimillion dollar payments to AVENATTI"; (2) attempted extortion, in violation of 18 U.S.C. §§ 1951, in that "AVENATTI used threats of economic and reputational harm in an attempt to obtain multimillion dollar payments from Nike, a multinational public corporation"; and (3) committing honest services wire fraud, in violation of 18 U.S.C. §§ 1343 and 1346, in that he "engaged in a scheme to obtain payments for himself from Nike based on confidential information provided to AVENATTI by Client-1 . . . without Client-1's knowledge or approval, and used and caused the use of interstate communications to effect the scheme." (Id. ¶¶ 20, 22, 24)

## DISCUSSION

### I. DEFENDANT'S MOTION TO DISMISS

Avenatti argues that Counts One and Two – which charge him with extorting Nike through threats of economic and reputational harm in violation of 18 U.S.C. §§ 875(d) and 1951 – must be dismissed, because they fail to allege "wrongful" conduct and are vague as applied. (Def. Br. (Dkt. No. 35) at 6)

The Government argues that these counts are legally sufficient, in that they plead the elements of the offenses "and describe[] in detail the time, place, and circumstances of the

offenses. . . . Nothing more is required." (Govt. Opp. (Dkt. No. 57) at 12 (citing United States v. Alfonso, 143 F.3d 772, 776 (2d Cir. 1998))  The Government further contends that Avenatti's argument that his conduct was not "wrongful" as a matter of law is both premature and incorrect. (Id. at 12-13)  Similarly, as to Avenatti's vague-as-applied challenge, the Government contends that such challenges "must wait until the facts have been established at trial. . . . On this basis alone, the defendant's claim must be rejected." (Id. at 19)

## II. WHETHER THE INDICTMENT IS LEGALLY SUFFICIENT

### A. Whether the Indictment Pleads the Statutory Elements

Fed. R. Crim. P. 7(c)(1) provides that an indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged. . . ."  "[A]n indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." Hamling v. United States, 418 U.S. 87, 117 (1974) (citation omitted); see also United States v. Frias, 521 F.3d 229, 235 (2d Cir. 2008) ("Typically, to state an offense, an indictment need only track the language of the statute and, if necessary to apprise the defendant of the nature of the accusation against him, state time and place in approximate terms." (internal quotation marks and citation omitted)).

"The dismissal of an indictment is an 'extraordinary remedy' reserved only for extremely limited circumstances implicating fundamental rights." United States v. De La Pava, 268 F.3d 157, 165 (2d Cir. 2001) (citing United States v. Nai Fook Li, 206 F.3d 56, 62 (1st Cir. 2000) (en banc)  Indeed, dismissal of charges is an "extreme sanction," United States v. Fields, 592 F.2d 638, 647 (2d Cir. 1978), that has been upheld "only in very limited and extreme circumstances," and should be "reserved for the truly extreme cases," "especially where serious

7

criminal conduct is involved." United States v. Broward, 594 F.2d 345, 351 (2d Cir. 1979). In reviewing a motion to dismiss an indictment, the Court must take the allegations of the indictment as true. Boyce Motor Lines v. United States, 342 U.S. 337, 343 n. 16 (1952); New York v. Tanella, 374 F.3d 141, 148 (2d Cir. 2004).

Title 18, United States Code, Section 875(d) provides that

> [w]hoever, with intent to extort from any person, firm, association, or corporation, any money or other thing of value, transmits in interstate or foreign commerce any communication containing any threat to injure the property or reputation of the addressee or of another or the reputation of a deceased person or any threat to accuse the addressee or any other person of a crime, shall be fined under this title or imprisoned not more than two years, or both.

18 U.S.C. § 875(d).

Title 18, United States Code, Section 1951 provides that

> [w]hoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both.

18 U.S.C. § 1951(a). As used in Section 1951, "extortion" means "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b)(2).

Here, Count One tracks the language of 18 U.S.C. § 875(d), and Count Two tracks the language of 18 U.S.C. § 1951(a).

Count One charges, in part:

> On or about March 20, 2019, in the Southern District of New York and elsewhere, MICHAEL AVENATTI, the defendant, with intent to extort from a corporation money and a thing of value, transmitted in interstate commerce a communication containing a threat to injure the property and reputation of the corporation, to wit, AVENATTI, during

8

>an interstate telephone call, threatened to cause financial harm to Nike and its reputation if Nike did not agree to make multimillion dollar payments to AVENATTI.

((S1) Indictment (Dkt. No. 72) at ¶ 20)

Count Two charges, in part:

>In or about March 2019, in the Southern District of New York and elsewhere, MICHAEL AVENATTI, the defendant, attempted to commit extortion as that term is defined in Title 18, United States Code, Section 1951(b)(2), and thereby would and did obstruct, delay, and affect commerce and the movement of articles and commodities in commerce, as that term is defined in Title 18, United States Code, Section 1951(b)(3), to wit, AVENATTI used threats of economic and reputational harm in an attempt to obtain multimillion dollar payments from Nike, a multinational public corporation.

(Id. at ¶ 22)

Because these counts track the language of the respective statutes, apprise Avenatti of the nature of the accusations against him, and provide notice generally of where and when the crimes occurred, they are legally sufficient. See Frias, 521 F.3d at 235.

### B.     Whether the Indictment Pleads Facts Demonstrating Wrongful Conduct

Avenatti argues, however, that "'extortion' is defined in §1951(b)(2) as 'the obtaining of property from another, with his consent, induced by **wrongful** use of actual or threatened force, violence, or fear. . . .'" (Def. Br. (Dkt. No. 35) at 8) (emphasis in Def. Br.), and that the Indictment's factual "allegations, even [if] accepted as true, do not describe 'wrongful conduct' under the law." (Id. at 9)  According to Avenatti, his "conduct, as alleged [in the Indictment], does not fit within the 'contours' of what constitutes extortion," and "the law did not provide fair notice to Mr. Avenatti that he could go to prison for allegedly threatening to reveal truthful information related to a client's claim against Nike." (Def. Reply (Dkt. No. 64) at 8)

The leading case in this area is, of course, United States v. Jackson, 180 F.3d 55 (2d Cir. 1999) ("Jackson I"), on reh'g, 196 F.3d 383 (2d Cir. 1999) ("Jackson II"))).  Given that

9

Jackson has application here, the Court will discuss the facts of that case and what it teaches in some detail.

1. ***United States v. Jackson***

In United States v. Jackson, the defendant – Autumn Jackson – threatened to harm the alleged victim, Bill Cosby, through public disclosure that she was his out-of-wedlock daughter. Cosby had had an extramarital affair with Jackson's mother, Shawn Thompson, and after Jackson was born in 1974, Thompson told Cosby that he was the father. Although Cosby disputed that assertion, for more than 20 years after Jackson's birth, he made payments to Thompson that totaled more than $100,000, using cashier's checks and traveler's checks that would not reveal his identity. Cosby ultimately established a trust fund for Thompson, and a trust to pay for Jackson's college tuition. While Jackson was in college, Cosby spoke with her about fifteen times by telephone, telling her that he "'loved her very, very much.'" Jackson, 180 F.3d at 59-60.

In December 1996, Jackson reinitiated contact with Cosby, and demanded money. Cosby sent her $3,000. In January 1997, Jackson began calling Cosby's business associates – including companies whose products Cosby endorsed and the network that carried Cosby's prime-time television program – threatening to publicize her claim to be Cosby's daughter. She also contacted Cosby's lawyer, demanding that Cosby "'send her money to live on.'" Cosby's lawyer refused. Jackson then sent letters to political figures, to the network carrying Cosby's television show, to the companies whose products he endorsed, and to others, stating that she was Cosby's daughter and that he had left her "'cold, penniless, and homeless.'" When these efforts to extract additional money from Cosby proved ineffective, Jackson sent Cosby's lawyer a copy of an agreement that she was about to enter into with The Globe, a tabloid newspaper.

10

With the draft contract Jackson enclosed a letter saying, "'I need monies and I need monies now.'" Cosby's lawyer then spoke by telephone with Jackson, who stated that she wanted $40 million in exchange for not selling her story to the tabloids. Cosby told his lawyer that he would not pay, and instructed the lawyer to report Jackson's threats to the Federal Bureau of Investigation ("FBI"). Id. at 60-63.

In subsequent conversations that were monitored by the FBI, Cosby's lawyer and Jackson negotiated her fee for agreeing not to share her story with the tabloids. Ultimately, the two arrived at a figure of $24 million. Jackson was arrested after a meeting at the lawyer's Manhattan office, at which she had signed a contract in which she agreed – in exchange for $24 million – not to discuss with The Globe or any other media outlet her claim that she was Cosby's daughter. Id. at 63-64.

Jackson was charged with interstate transmission of threats to injure another's reputation with the intent to extort money, in violation of 18 U.S.C. § 875(d); conspiracy to do the same, in violation of 18 U.S.C. § 371; and interstate travel in order to promote extortion, in violation of 18 U.S.C. §1952(a)(3).

At trial, Jackson asked the district judge to charge the jury that

> [t]o act with intent to "extort" means to act with the intent to obtain money or something of value from someone else, with that person's consent, but caused or induced by the wrongful use of fear,

and to explain that

> [t]he term "wrongful" in this regard means that the government must prove beyond a reasonable doubt, first, that the defendant had no lawful claim or right to the money or property he or she sought or attempted to obtain, and second, that the defendant knew that he or she had no lawful claim or right to the money or property he or she sought or attempted to obtain.
>
> If you have a reasonable doubt as to whether a defendant's object or purpose was to obtain money or other thing of value to which he or she was lawfully entitled, or believed

11

> he or she was lawfully entitled, then the defendant would not be acting in a "wrongful" manner and you must find him or her not guilty.

Id. at 65.

The trial judge rejected the proposed jury instruction, finding that "threatening someone's reputation for money or a thing of value is inherently wrongful." Id. (internal quotation marks and citation omitted). Consistent with this ruling, the court's recitation of the elements of the Section 875(d) offense in the jury charge did not reference wrongfulness. Indeed, the trial judge instructed the jury, in essence, that wrongfulness was irrelevant: "it makes no difference whether the defendant was actually owed any money by Bill Cosby or thought he or she was. That is because the law does not permit someone to obtain money or a thing of value by threatening to injure another person's reputation." Id. at 66 (emphasis in Jackson I) (internal quotation marks and citation omitted).

The jury convicted Jackson on all three counts, and she was sentenced to twenty-six months' imprisonment. Id. at 58-59, 64.

On appeal, Jackson argued that the district judge's jury instructions were erroneous, because she had not included – despite defense counsel's request – "any instruction that, in order to convict, the jury must find that the threat to injure Cosby's reputation was 'wrongful.'" Jackson argued, in the alternative, that if 18 U.S.C. § 875(d) "does not include an element of wrongfulness, it is unconstitutionally overbroad and vague." Id. at 64-65.

The Second Circuit concluded that the phrase "intent to extort" – as used in Section 875(d) – "was meant to reach only demands that are wrongful." Id. at 68; see also id. at 70-71. The court also cited United States v. Clemente, 640 F.2d 1069 (2d Cir. 1981) for the proposition that "a threat to cause economic loss is not inherently wrongful; it becomes wrongful

only when it is used to obtain property to which the threatener is not entitled." Id. at 70 (citing Clemente, 640 F.2d at 1077).

The court expanded on this thought as follows:

> We conclude that not all threats to reputation are within the scope of § 875(d), that the objective of the party employing fear of economic loss or damage to reputation will have a bearing on the lawfulness of its use, and that it is material whether the defendant had a claim of right to the money demanded.
>
> We do, however, view as inherently wrongful the type of threat to reputation that has no nexus to a claim of right. . . .
>
> Where there is no plausible claim of right and the only leverage to force the payment of money resides in the threat, where actual disclosure would be counterproductive, and where compliance with the threatener's demands provides no assurance against additional demands based on renewed threats of disclosure, we regard a threat to reputation as inherently wrongful. We conclude that where a threat of harm to a person's reputation seeks money or property to which the threatener does not have, and cannot reasonably believe she has, a claim of right, or where the threat has no nexus to a plausible claim of right, the threat is inherently wrongful and its transmission in interstate commerce is prohibited by § 875(d).

Id. at 70-71.

The Second Circuit went on to conclude that the district judge's jury charge was erroneous, because it "did not limit the scope of [the term 'extortion'] to the obtaining of property to which the defendant had no actual, or reasonable belief of, entitlement," and granted Jackson a new trial on all three counts. Id. at 71-72. The court reached this result despite finding that

> [t]he evidence at trial was plainly sufficient to support verdicts of guilty had the jury been properly instructed. Even if Jackson were Cosby's child, a rational jury could find that her demand, given her age (22) and the amount ($40 million), did not reflect a plausible claim for support. The evidence supported an inference that Jackson had no right to demand money from Cosby pursuant to a contract or promise and no right to insist that she be included in his will. The jury thus could have found that her threat to disclose was the only leverage she had to extract money from him; that if she sold her story to The Globe, she would lose that leverage; and that if Cosby had capitulated and paid her in order to prevent disclosure, there was no logical guarantee that there would not be a similar threat and demand in the future. Thus, had the jury been instructed that the "with

13

intent to extort" element meant that defendants could be found guilty of violating § 875(d) only if Jackson's threat to disclose was issued in connection with a claim for money to which she was not entitled or which had no nexus to a plausible claim of right, the jury could permissibly have returned verdicts of guilty on that count.

We conclude, however, that the court's failure to inform the jury of the proper scope of the intent-to-extort element of § 875(d) erroneously allowed the jury to find defendants guilty of violating that section on the premise that any and every threat to reputation in order to obtain money is inherently wrongful.

Id. at 71-72.

The Second Circuit later reinstated Jackson's convictions in the wake of Neder v. United States, 527 U.S. 1 (1999), in which the Supreme Court announced that harmless error analysis applies to a trial court's failure to instruct on an element of the offense. The Second Circuit found that "a properly instructed jury would . . . have found [Jackson] guilty, rejecting the proposition that she had any plausible claim of right to $40 million." Jackson II, 196 F.3d 383, 388 (2d Cir. 1999).

### 2.   **Application of *Jackson***

Avenatti contends that the extortion counts must be dismissed because, as a matter of law, the conduct the Indictment alleges he committed is not "wrongful." (Def. Br. (Dkt. No. 35) at 9)  Noting that "the use of economic fear or a threat to injure the reputation of another is not inherently wrongful," id. at 10 (citing Clemente, 640 F.2d at 1077; Jackson I, 180 F.3d at 70) (emphasis omitted), Avenatti asserts that the conduct he is alleged to have committed is not "wrongful," because he

> had the right to publicly expose truthful information about Nike's misconduct.  He had the right to demand from Nike a settlement of his client's claims. . . . He had the right to demand a settlement on terms that may seem extraordinary to some. . . . He had the right

14

to demand attorney's fees for himself as part of the overall settlement of his client's claims.

(Id. at 11)

Avenatti's argument ignores both the factual allegations in the Indictment and critical language in Jackson I and Clemente. While the Jackson I court states that "a threat to cause economic loss [or reputational harm] is not inherently wrongful," the court goes on to hold that such a threat "<u>becomes wrongful . . . when it is used to obtain property to which the threatener is not entitled</u>." Jackson I, 180 F.3d at 70 (emphasis added); see also Clemente, 640 F.2d at 1077 ("the use of fear of economic loss to obtain property to which one is not entitled is wrongful"); see also Chevron Corp. v. Donziger, 974 F. Supp. 2d 362, 579 (S.D.N.Y. 2014), aff'd, 833 F.3d 74 (2d Cir. 2016) ("[t]he element of wrongfulness may be supplied by (1) the lack of a plausible claim of entitlement to the property demanded, <u>or</u> (2) the lack of a good faith belief of entitlement, <u>or</u> (3) the lack of a nexus between the threat and the claim of right. It may be supplied also, in this Court's view, by inherently wrongful conduct." (emphases in original)).

The core of the Indictment's factual allegations is that Avenatti used threats of economic and reputational harm to demand millions of dollars from Nike, for himself, to which he had no plausible claim of right. Even if Avenatti "had the right to" (1) "publicly expose truthful information about Nike's misconduct"; (2) "demand from Nike a settlement of his client's claims"; (3) "demand a settlement on terms that may seem extraordinary to some"; and (4) "demand attorney's fees for himself as part of the overall settlement of his client's claims," as he asserts in his brief (see Def. Br. (Dkt. No. 35) at 11), the charges against Avenatti are not premised on such conduct. The Government instead alleges that Avenatti – using confidential information supplied by his client – demanded $15 to $25 million from Nike for himself, without

15

his client's knowledge, and to his client's detriment.  ((S1) Indictment (Dkt. No. 72) at ¶¶ 1, 9-10, 11(c), 11(f), 14(b), 14(g))  Indeed, the Indictment alleges that when Nike's counsel asked whether Nike could resolve Avenatti's demands simply by paying his client – rather than by retaining Avenatti – Avenatti rejected that proposal, stating that it would not make sense for Nike to pay his client "'an exorbitant sum of money . . . in light of his role in this.'"  (Id. at ¶ 14(b))[1]

Assuming arguendo that a speaking indictment alleging extortion must plead facts demonstrating that a defendant engaged in "wrongful" conduct, the (S1) Indictment meets that standard.  The Indictment adequately alleges that Avenatti engaged in "wrongful" conduct, because it pleads facts demonstrating that Avenatti used threats of economic and reputational harm to demand millions of dollars from Nike, for himself, to which he had no plausible claim of right.  While Avenatti's client may have been in a position to make demands on Nike, Avenatti had no right – independent of his client – to demand millions of dollars from Nike (1) based on confidential information supplied by his client; (2) without his client's knowledge; and (3) to his client's detriment.[2]  Whether or not Avenatti engaged in such conduct is, of course, a question for the jury.  Similarly, whether or not Avenatti had "a plausible claim of right," and whether or

---

[1] Avenatti argues that "[c]ourts have largely exempted [litigation-related] threats from the extortion statutes as a matter of law because, by its very nature, litigation is inherently threatening and poses a risk of economic loss to all parties." (Def. Br. (Dkt. No. 35) at 13)  But the unusual feature of this case is that the Government alleges that Avenatti – using his client's confidential information – demanded millions of dollars for himself, without his client's knowledge, and to his client's detriment.  ((S1) Indictment (Dkt. No. 72) at ¶¶ 11(c), 13(a), 14(a), 14(b), 14(d))  These factual allegations take this case outside the usual parameters of civil litigation, constitute "wrongful" conduct, and raise the specter of extortion.

[2] Indeed, the Indictment alleges that the millions of dollars Avenatti sought for himself were completely divorced from his client's claim.  For example, the Indictment alleges that Avenatti told Nike that if it chose to hire another law firm to conduct an internal investigation, Nike would be required to pay Avenatti "at least twice the fees of any other firm [that was] hired."  ((S1) Indictment (Dkt. No. 72) at ¶ 11(c))

16

not "there is a nexus between [his alleged] threat[s]" and that "plausible claim of right," are questions for the jury. Jackson I, 180 F.3d at 71.

### III. WHETHER THE EXTORTION STATUTES ARE VAGUE AS APPLIED

Avenatti contends that extortion jurisprudence on "wrongfulness" "at best provide[s] insufficient guidance and leave[s] a vacuum filled by vagueness," and that "[t]he 'wrongfulness' element of the extortion statute is vague as applied to [] Avenatti's alleged conduct. . . ." (Def. Br. (Dkt. No. 35) at 22)

"'The void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement.'" United States v. Halloran, 821 F.3d 321, 337 (2d Cir. 2016) (quoting United States v. Rosen, 716 F.3d 691, 699 (2d Cir. 2013). "'The doctrine addresses concerns about (1) fair notice and (2) arbitrary and discriminatory prosecutions.'" Id. (quoting Rosen, 716 F.3d at 699). Under the "'fair notice' prong, a court must determine 'whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal.'" Id. (quoting Rosen, 716 F.3d at 699). As Avenatti recognizes (see Def. Br. (Dkt. No. 35) at 21), "resolution of a defendant's void for vagueness challenge ordinarily requires 'a more expansive factual record to be developed at trial.'" (Id. (quoting United States v. Hoskins, 73 F. Supp. 3d 154, 166 (D. Conn. 2014)).

Avenatti's motion to dismiss on vagueness grounds will be denied as premature. See id. It is worth noting, however, that similar vagueness challenges to the extortion statutes

have been rejected.  <u>See</u>, <u>e.g.</u>, <u>United States v. Jackson</u>, 986 F. Supp. 829, 835-37 (S.D.N.Y. 1997); <u>see</u> <u>also</u> <u>United States v. Coss</u>, 677 F.3d 278, 289-90 (6th Cir. 2012)

## **CONCLUSION**

For the reasons stated above, Avenatti's motion to dismiss Count One and Count Two on grounds of insufficiency and vagueness (Def. Mot. (Dkt. No. 34)) is denied.

Dated: New York, New York
       January 6, 2020

SO ORDERED.

_____
Paul G. Gardephe
United States District Judge