UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>-against-<br><br>MICHAEL AVENATTI,<br><br>Defendant. | **ORDER**<br><br>(S1) 19 Cr. 373 (PGG) |

PAUL G. GARDEPHE, U.S.D.J.:

        Defendant Michael Avenatti has moved for issuance of a Rule 17(c) subpoena

<u>duces</u> <u>tecum</u> on non-party Gary Franklin (the "Motion").[1]  The proposed Rule 17(c) subpoena

seeks production of

1. [a]ll audio recordings (and transcripts thereof) that Gary Franklin, Sr., or Jeffrey Auerbach made of conversations or meetings with Nike executives, including Jamal James, Carlton DeBose, Nico Harrison, Bryan Freedman; Mel McDonald; and/or with Michael Avenatti, discussing or referencing Franklin's potential claims against Nike, Nike's conduct directed at Franklin, and/or the payment to amateur basketball players and/or their families or agents between January 1, 2016, and March 25, 2019[;]

2. [u]nredacted versions of all text messages and e-mails between Gary Franklin, Sr., and Jeffrey Auerbach, produced by Franklin to the FBI or USAO-SDNY;

3. [t]he "recording" referenced in the text message with the Bates-stamp "Franklin 1017."

(<u>See</u> Sept. 6, 2019 Srebnick Decl., Ex. 1; Sept. 6, 2019 Def. Br. at 1)

        Defendant, Franklin, and the Government have all requested that the Motion,

Franklin's objection, the Government's opposition, and related filings be maintained under seal.

## **BACKGROUND**

        Defendant has asked this Court to issue a Rule 17(c) subpoena for, <u>inter</u> <u>alia</u>,

recordings that Franklin made of telephone conversations and meetings he had with Nike

---

[1]  This Court denied Defendant's motion in a separate order bearing today's date.  (<u>See</u> January 6, 2020 Order)

executives in or about 2017-18.  The recordings were apparently made without the knowledge of

the Nike executives.  The Defendant, Franklin, and the Government all contend that the filings

concerning the proposed Rule 17(c) subpoena should be sealed to protect the privacy of Franklin,

the Nike executives, and others.  (Sept. 6, 2019 Def. Req. to Seal; Sept. 23, 2019 Franklin Ltr.;

Sept. 23, 2019 Proctor Decl. at 1; Sept. 27, 2019 Franklin Ltr. at 1; September 23, 2019 Govt.

Ltr. at 1 n.1)  Relying on United States v. Kravetz, 706 F.3d 47, 53-56 (1st Cir. 2013) and other

precedent, the Defendant, Franklin, and the Government further contend that materials requested

in a defendant's Rule 17(c) subpoena – and briefing regarding requests for Rule 17(c) subpoenas

– are not subject to the presumption of access that applies to judicial documents.  (Sept. 6, 2019

Def. Req. to Seal; Sept. 23, 2019 Franklin Ltr.; Sept. 23, 2019 Govt. Ltr. at 1 n.1)

**DISCUSSION**

## I.      LEGAL STANDARDS

As a rule, "the press and general public have a constitutional right of access to

criminal trials."  Globe Newspaper Co. v. Superior Court, 457 U.S. 596, 603 (1982); United

States v. Smith, 985 F. Supp. 2d 506, 516 (S.D.N.Y. 2013).  The Supreme Court has also

extended the First Amendment right of access to other criminal proceedings.  Smith, 985 F.

Supp. 2d at 516 (citing Press-Enter. Co. v. Superior Court of Cal., 478 U.S. 1 (1986) (noting that

courts should consider (i) whether the proceeding or filing at issue has historically been open to

the press and general public (the "experience" prong) and (ii) whether public access plays a

significant role in the functioning of the particular process in question (the "logic" prong))).

The Second Circuit has held that the First Amendment right of access applies

generally to suppression hearings, see In re Herald Co., 734 F.2d 93, 98-100 (2d Cir. 1984); voir

dire, see ABC, Inc. v. Stewart, 360 F.3d 90, 105-06 (2d Cir. 2004); plea hearings, see United

2

States v. Haller, 837 F.2d 84, 86 (2d Cir. 1988); and sentencings, see United States v. Alcantara, 396 F.3d 189, 191-92 (2d Cir. 2005).

By contrast, materials exchanged in criminal or civil discovery are generally viewed as outside the judicial function and therefore not presumptively accessible.  The court in United States v. Smith, 985 F. Supp. 2d 506 (S.D.N.Y. 2013) summarized the case law – and the logic courts have employed – as follows:

> Because discovery is a private process between the parties to an action (even if governed by specific rules and managed by trial judges), courts generally view the documents or materials shared between them as outside the judicial function and therefore not presumptively accessible. See [United States v. Amodeo, 71 F.3d 1044, 1050 (2d Cir. 1995)] (noting that because documents "passed between the parties in discovery" "play no role in the performance of Article III functions," they "lie entirely beyond" the common law presumption of access); accord Seattle Times Co. v. Rhinehart, 467 U.S. 20, 33 . . . (1984) (noting that "restraints placed on discovered, but not yet admitted, information are not a restriction on a traditionally public source of information"); United States v. Kravetz, 706 F.3d 47, 54 (1st Cir. 2013) ("[T]here is no tradition of access to criminal discovery."); Baxter Int'l, Inc. v. Abbott Labs., 297 F.3d 544, 545 (7th Cir. 2002) (noting that "[s]ecrecy is fine at the discovery stage, before the material enters the judicial record[]"); Bank of Am. Nat'l Trust & Sav. Ass'n v. Hotel Rittenhouse Assocs., 800 F.2d 339, 343 (3d Cir. 1986) (stating that "discovery . . . which is ordinarily conducted in private, stands on a different footing than does a motion filed by a party seeking action by the court"); Travelers Indem. Co. v. Excalibur Reinsurance Corp., No. 11-CV-1209, 2013 WL 4012772, at *11 (D.[ ]Conn. Aug. 5, 2013) ("Put simply, the public has no constitutional, statutory or common-law right of access to unfiled discovery."); United States v. Gangi, No. 97-CR-1215, 1998 WL 226196, at *3 (S.D.N.Y. May 4, 1998) (noting that there is no common law tradition of public access to discovery in criminal cases).  Indeed, even discovery materials filed with the court in connection with discovery-related disputes are not covered by the qualified right of access.  See SEC v. TheStreet.Com, 273 F.3d 222, 233 (2d Cir. 2001) (rejecting claim that deposition testimony became a "judicial document" "because the Court reviewed it in order to decide whether or not to enter [a] protective order"); United States v. Wolfson, 55 F.3d 58, 61 (2d Cir. 1995) ("We are not aware . . . of any common-law principle that documents submitted to a court in camera for the sole purpose of confirming that the refusal to disclose them to another party was proper, are to be deemed judicial records open to the public."); accord United States v. Wecht, 484 F.3d 194, 209 (3d Cir. 2007) (noting that "documents filed with the court are generally subject to the common law right of access, unless attached to a discovery motion"); Leucadia, Inc. v. Applied Extrusion Techs., Inc., 998 F.2d 157, 165 (3d Cir. 1993) (holding that "there is a presumptive [common law] right to public access to all material filed in connection with nondiscovery pretrial motions, . . . but no such right as to discovery motions and their

supporting documents"). <u>See generally</u> <u>Newsday</u>, 730 F.3d at 167 n. 15 (noting that "the category of 'judicial documents' should not be readily expanded," and "the fact that a document is relevant to the subject matter of a judicial proceeding, or that the proceeding was in some way stimulated by the document, does not make it public").

With respect to logic, the courts have recognized the pitfalls in allowing unfettered public access to discovery materials.  For one, the purpose of the discovery rules – to encourage the disclosure of information and materials to avoid unnecessary surprise and to level the playing field – might be undermined.  <u>See</u> <u>Kravetz</u>, 706 F.3d at 54 (noting that decisions restricting public access to criminal discovery materials "are grounded largely on the concerns surrounding the deleterious effect that public access would have on the parties' search for and exchange of information in the discovery process"); <u>Anderson</u>, 799 F.2d [1438,] 1441 [(11th Cir. 1986)] ("If . . . discovery information and discovery orders were readily available to the public and the press, the consequences to the smooth functioning of the discovery process would be severe.").  For another, there is the risk that disclosure of some of the discovery materials could taint a trial.  <u>See</u> <u>United States v. McVeigh</u>, 119 F.3d 806, 813 (10th Cir. 1997) (upholding district court's sealing of discovery materials deemed inadmissible at trial, holding that "disclosure of such [materials] would play a negative role in the functioning of the criminal process, by exposing the public generally, as well as potential jurors, to incriminating evidence that the law has determined may not be used to support a conviction"); <u>United States v. White</u>, No. 04-CR-370, 2004 WL 2399731, at *5 (E.D. Pa. Sept. 22, 2004) (noting that "[i]f the prosecutors and/or defense counsel had a practice of disclosing discovery materials to the media, this could be disruptive to a fair trial for all parties. . . .").  And, because the discovery rules are reciprocal, there is the risk that unfettered public access could jeopardize a defendant's trial strategy.  <u>See</u> <u>Kravetz</u>, 706 F.3d at 54 (noting, in context of journalist's request for materials obtained by Rule 17(c) subpoena, that "there is scant value and considerable danger in a rule that could result in requiring counsel for a criminal defendant to prematurely expose trial strategy to public scrutiny").

<u>Smith</u>, 985 F. Supp. 2d at 519-20.

The Second Circuit has articulated a three-step process for determining whether documents should be placed under seal.  First, a court must determine whether the presumption of access attaches.  A presumption of access attaches to any document that is a "judicial document" – <u>i.e.</u>, an "item . . . relevant to the performance of the judicial function and useful in the judicial process."  <u>Lugosch v. Pyramid Co. of Onondaga</u>, 435 F.3d 110, 115 (2d Cir. 2006) (quoting <u>United States v. Amodeo</u>, 44 F.3d 141, 145 (2d Cir. 1995) ("<u>Amodeo I</u>") (internal quotation marks omitted)).  "[T]he mere filing of a paper or document with the court is

insufficient to render that paper a judicial document subject to the right of public access."
Amodeo I at 145.

When the document at issue is a "judicial document," however, the court must
then determine the weight of the presumption of access.  "[T]he weight to be given the
presumption of access must be governed by the role of the material at issue in the exercise of
Article III judicial power and the resultant value of such information to those monitoring the
federal courts.  Generally, the information will fall somewhere on a continuum from matters that
directly affect an adjudication to matters that come within a court's purview solely to insure their
irrelevance."  Lugosch, 435 F.3d at 119 (quoting United States v. Amodeo, 71 F.3d 1044, 1049
(2d Cir. 1995) ("Amodeo II") (internal quotation marks omitted)).

Finally, after determining the weight of the presumption of access, the court must
"balance competing considerations against it."  Id. at 120 (quoting Amodeo II at 1050 (internal
quotation marks omitted)).  "Such countervailing factors include but are not limited to 'the
danger of impairing law enforcement or judicial efficiency' and 'the privacy interests of those
resisting disclosure.'"  Id. (quoting Amodeo II at 1050).

Generally, there is a strong presumption of access to "judicial documents,"
because they will "directly affect" the Court's adjudication of this case.  See, e.g., Standard Inv.
Chartered, Inc. v. Nat'l Assn. of Sec. Dealers, Inc., No. 07 Civ. 2014, 2008 WL 199537, at *3,
16 (S.D.N.Y. Jan. 22, 2008) (quoting Amodeo II, 71 F.3d at 1049).  To rebut the strong
presumption of access, a party seeking sealing must offer specific facts "demonstrating that
closure is essential to preserve higher values and is narrowly tailored to serve that interest."
Lugosch, 435 F.3d at 120 (quoting In re New York Times Co., 828 F.2d 110, 116 (2d Cir.
1987)).

## II.   ANALYSIS

### A.   Whether the Presumption of Access Applies

"[F]ilings related to, inter alia, motions to compel testimony, to quash trial subpoenae, and to exclude certain deposition testimony . . . call upon the court to exercise its Article III powers.  Moreover, erroneous judicial decision-making with respect to such evidentiary and discovery matters can cause substantial harm.  Such materials are therefore of value 'to those monitoring the federal courts.'  Thus, all documents submitted in connection with, and relevant to, such judicial decision-making are subject to at least some presumption of public access."  Brown v. Maxwell, 929 F.3d 41, 50 (2d Cir. 2019).[2]

The materials at issue here concern a dispute about whether the Court should issue a Rule 17(c) subpoena for certain recordings, transcripts, and text messages sought by the defense.[3]  Acknowledging that pre-trial discovery materials themselves generally "lie entirely beyond the presumption's reach," as they "play no role in the performance of Article III functions," Amodeo II, 71 F.3d at 1050 (citing F.T.C. v. Standard Fin. Management, 830 F.2d 404, 408 (1st Cir. 1987); Bank of America Nat. Trust and Sav. Ass'n v. Hotel Rittenhouse Assocs., 800 F.2d 339, 343 (3d Cir. 1986) (internal citations and quotation marks omitted)); see also Smith, 985 F. Supp. 2d at 520 ("[D]iscovery materials filed with the court in connection

---

[2]  In the context of criminal discovery associated with Rule 17(c) subpoenas, the First Circuit takes a somewhat different view.  In United States v. Kravetz, 706 F.3d 47 (1st Cir. 2013), the First Circuit held that the "review and disposition of . . . 17(c) requests . . . relate merely to the judge's trial management role," and that accordingly "no presumptive right of public access . . . attaches to the Rule 17(c) subpoenas or the related documents filed in connection with the underlying criminal prosecution in this case. . . . [A]ccess may be obtained only upon a showing of special need."  Id. at 54-56.

[3]  The dispute is in the nature of a motion to quash.  Because Defendant has sought the Court's approval of his proposed Rule 17(c) subpoena, the subpoena has not yet issued, and accordingly a motion to quash will not lie.

with discovery-related disputes are not covered by the qualified right of access."), this Court concludes that much of the material submitted in connection with Defendant's motion falls with the logic of <u>Brown</u>:  the motion "call[s] upon the [C]ourt to exercise its Article III powers," and "erroneous judicial decision-making with respect to [the parties' dispute could] cause substantial harm."  Accordingly, the briefing and most of the supporting material submitted in connection with Defendant's motion is "subject to at least some presumption of public access."  <u>Brown</u>, 929 F.3d at 50.

### B.  Weight to be Accorded to the Presumption of Access

"[T]he weight to be given the presumption of access must be governed by the role of the material at issue in the exercise of Article III judicial power and the resultant value of such information to those monitoring the federal courts.  Generally, the information will fall somewhere on a continuum from matters that directly affect an adjudication to matters that come within a court's purview solely to insure their irrelevance."  <u>Lugosch</u>, 435 F.3d at 119 (quoting <u>Amodeo II</u>, 71 F.3d at 1049 (internal quotation marks omitted)).

> Where statements or documents in the middle of the continuum are at issue, the weight to be accorded to the presumption of access must be determined by the exercise of judgment.  That judgment can be informed in part by tradition. Where such documents are usually filed with the court and are generally available, the weight of the presumption is stronger than where filing with the court is unusual or is generally under seal.  Where testimony or documents play only a negligible role in the performance of Article III duties, the weight of the presumption is low and amounts to little more than a prediction of public access absent a countervailing reason.

<u>Amodeo II</u> at 1049-50.

The briefing, declarations, and motion papers at issue here are of a sort that is generally filed with the court and made publicly available.  Moreover, as noted above, Defendant's motion papers, Franklin's objection, and the Government's opposition (the "Rule 17(c) Motion Papers") "call upon the court to exercise its Article III powers."  The Court

concludes that the materials at issue are "of value to those monitoring the federal courts," Brown, 929 F.3d at 50 (quoting Amodeo II, 71 F.3d at 1050), and that accordingly the presumption of access is entitled to weight here.[4]

### C.    Countervailing Considerations

"A court's conclusion that a qualified First Amendment right of access to certain judicial documents exists does not end the inquiry." Lugosch, 435 F.3d at 120.  "'[D]ocuments may be sealed if specific, on the record findings are made demonstrating that closure is essential to preserve higher values and is narrowly tailored to serve that interest.'" Id. (quoting In re New York Times Co., 828 F.2d at 116 (internal quotation marks omitted).  "Broad and general findings by the trial court, however, are not sufficient to justify closure."  Id.

Here, Franklin contends that the Rule 17(c) motion papers should be sealed (Sept. 23, 2019 Franklin Ltr. at 1; Sept. 27, 2019 Franklin Ltr. at 1); Defendant does not object to sealing (Sept. 6, 2019 Def. Req. to Seal); and the Government states that these materials "should

---

[4]  The qualified right of public access is critical to retaining public trust in judicial proceedings, particularly high-profile judicial proceedings such as this.  As the Second Circuit acknowledged in Amodeo II,

> [t]he presumption of access is based on the need for federal courts, although independent – indeed, particularly because they are independent – to have a measure of accountability and for the public to have confidence in the administration of justice.  Federal courts exercise powers under Article III that impact upon virtually all citizens, but judges, once nominated and confirmed, serve for life unless impeached through a process that is politically and practically inconvenient to invoke.  Although courts have a number of internal checks, such as appellate review by multi-judge tribunals, professional and public monitoring is an essential feature of democratic control.  Monitoring both provides judges with critical views of their work and deters arbitrary judicial behavior.  Without monitoring, moreover, the public could have no confidence in the conscientiousness, reasonableness, or honesty of judicial proceedings.  Such monitoring is not possible without access to testimony and documents that are used in the performance of Article III functions.

Amodeo II, 71 F.3d at 1048.

be maintained under seal, at least at this time." (Sept. 23, 2019 Govt. Ltr. at 1 n.1) As discussed below, Franklin and the parties have provided this Court will little basis to maintain under seal the briefing and supporting papers concerning Avenatti's Rule 17(c) subpoena application.

In a September 23, 2019 letter, Franklin argues that the "defendant's [m]otion and supporting materials . . . implicate the privacy of certain individuals . . . . Franklin . . . requests that his objection [to the requested Rule 17(c) subpoena] likewise be sealed[,] . . . in light of its reliance on the under-seal [m]otion and the privacy interests of [] Franklin and other non-parties." (Sept. 23, 2019 Franklin Ltr. at 1) In this submission, Franklin provides no explanation of the privacy interests at stake.

In a September 27, 2019 letter, Franklin requests "that the Rule 17(c) Papers be maintained under seal on the basis that they implicate [] Franklin's privacy interests." (Sept. 27, 2019 Franklin Ltr. at 1) Franklin asserts that

> [s]ealing is particularly appropriate in this case given the requests contained in the defendant's proposed Rule 17(c) subpoena and the statements in Mr. Franklin's objection. The proposed subpoena, which is quoted at length in the objection, requests categories of communications that implicate the rights and privacy interests of non-parties, including Mr. Franklin and others associated with Cal Supreme and Nike. The proposed subpoena also requests a category of communications that, were any such communications to exist, could potentially expose Mr. Franklin to liability under California law. Given the high-profile nature of this case, disclosing even the _potential_ existence of this category of communications in the public record would implicate Mr. Franklin's privacy concerns. Any potential countervailing considerations are mitigated in light of the fact that the government and defense counsel have consented to Mr. Franklin's sealing request. For these reasons, Mr. Franklin requests that the Rule 17(c) Papers be filed and maintained under seal.

(Sept. 27, 2019 Franklin Ltr. at 3 (emphasis in original))

Neither the Government nor Avenatti provides any substantive explanation for why the briefing and supporting papers concerning Avenatti's Rule 17(c) application should be sealed. (Sept. 23, 2019 Govt. Ltr. at 1 n.1; Sept. 6, 2019 Def. Req. to Seal).

"In determining the weight to be accorded an assertion of a right of privacy, courts should first consider the degree to which the subject matter is traditionally considered private rather than public.  Financial records of a wholly owned business, family affairs, illnesses, embarrassing conduct with no public ramifications, and similar matters will weigh more heavily against access than conduct affecting a substantial portion of the public."  Amodeo II, 71 F.3d at 1051.  The privacy and reputation of crime victims has also been recognized as a countervailing interest to the presumption of public access.  See, e.g., United States v. Cohen, 366 F. Supp. 3d 612, 625 n.4 (S.D.N.Y. 2019); United States v. Belfort, No. 98-CR-0859, 2014 WL 2612508, at *3 (E.D.N.Y. June 11, 2014).

"[C]ases that recognize the interests of third parties as justifying non-disclosure of certain materials speak to the unfairness of being stigmatized from sensationalized and potentially out-of-context insinuations of wrongdoing, combined with the inability of those third parties to clear their names at trial."  United States v. Smith, 985 F. Supp. 2d 506, 526 (S.D.N.Y. 2013) (citing United States v. Ladd, 218 F.3d 701, 703 (7th Cir. 2000); United States v. Simpson, Criminal No. 3:09-CR-249-D (06), 2010 WL 3633611, at *2 (N.D. Tex. Sept. 20, 2010) ("The primary concern is that public disclosure of the persons associated with criminal activity may cause damage to the unindicted person's reputation with no corresponding opportunity to defend his reputation at trial.")).

In considering whether sealing is appropriate, an important consideration is, of course, whether the information sought to be kept confidential is already public.  See, e.g., In re New York Times, 828 F.2d at 116 (holding that "wholesale sealing" was not appropriate where "much of the . . . material contained in the papers [in question] has already been publicized").

Franklin's arguments as to the privacy interests at issue here are scarcely more than bare assertions that such interests exist.  Moreover, Franklin does not acknowledge that all of the individuals referenced in the Rule 17(c) motion papers have been the subject of extensive press reports and/or previous court filings publicly docketed – without objection – in this case.

In Defendant's Rule 17(c) motion papers, he asserts "that Franklin had been recording telephone conversations and meetings with Nike executives, as well as with Freedman and McDonald, in order to preserve evidence for a future legal case against them and Nike." (Sept. 6, 2019 Def. Br. at 7)  In Defendant's reply, he contends that Nike executives "pressured [] Franklin and others to make payments to high school basketball players (and their families) to join the Nike Elite Youth Basketball League . . . [and that] Franklin began to surreptitiously record conversations with" "Nike executives and Freedman and McDonald."  Franklin "had the conversations transcribed by a transcription service and shared the transcripts with his advisor Auerbach.  The discovery produced by [] Franklin and [] Auerbach to the government and by the government to [] Avenatti is replete with specific references to those recordings."  (Sept. 25, 2019 Def. Reply Ltr. at 1-3)

All of the individuals referenced in the Rule 17(c) Motion Papers have been previously identified in court filings filed on the public docket and in press reports.  A number of these individuals have been publicly linked to allegations that Nike employees – particularly those involved with Nike's Elite Youth Basketball League ("EYBL") – were paying high-profile youth basketball players, and their handlers and families, tens of thousands of dollars in secret payments.  For example, Avenatti has filed on the public docket documents that implicate Franklin – who is expected to be a witness at trial – and Nike executives DeBose, James, and Harrison in conveying payments from Nike to players and their handlers and families.  (See, e.g.

Aug. 16, 2019 Srebnick Decl. (Dkt. No. 30), Ex. D (Dkt. No. 30-4) at 2-3 (March 18, 2019

"[m]emorandum" from Jeffrey Auerbach to Michael Avenatti asserting that payments to family

members, "handlers," and a coach "were initiated, authorized[,] and directed by Nike Elite Youth

Basketball [League] . . . executives Carlton DeBose in 2016, and Carlton DeBose and Jamal

James in 2017, and carried[]out on Nike's behalf by Gary Franklin. . . ."); (Sept. 6, 2019

Srebnick Decl., Ex. 1 (Dkt. No. 51-1) at 5) (attachment to requested Rule 17(c) subpoena

addressed to Nike requesting "[a]ll false invoices" that DeBose and James used "to hide

payments (whether cash or otherwise) to amateur basketball players and/or their families or

agents (including handlers), between January 1, 2016, and March 25, 2019"); (Aug. 16, 2019

Srebnick Decl., Ex. O (Dkt. No. 30-15) at 2) (typewritten notes, "drafted by [an attorney for

Nike] from handwritten notes . . . taken contemporaneously with the meeting that the notes

describe," in which Avenatti is described as alleging that Nike's illicit conduct "reaches Nico

Harrison")

        In his public court filings, Avenatti also includes exhibits in which Bryan

Freedman and Mel McDonald are alleged to have received secret payments from Nike.  (See,

e.g. Aug. 16, 2019 Srebnick Decl., Ex. D (Dkt. No. 30-4) at 3 (a March 18, 2019

"[m]emorandum" from Jeffrey Auerbach to Michael Avenatti asserting that "[t]he actions [and

payments] . . . initiated, authorized[,] and directed by Nike Elite Youth Basketball [League] . . .

executives Carlton DeBose in 2016, and Carlton DeBose and Jamal James in 2017, and

carried[]out on Nike's behalf by Gary Franklin[,] . . . " included payments made to Melvin

McDonald.); see also Sept. 6, 2019 Srebnick Decl., Ex. 2 (Dkt. No. 51-2) at 2-6 (attaching copies

of text messages between DeBose and James produced by the Government in discovery,

including text messages discussing giving checks to McDonald and Freedman))  Avenatti has

also filed on the public docket a July 30, 2016 email from DeBose to Harrison in which DeBose

states that he is "willing to bet that 38 of 40 teams in the EYBL had to pay a moderate to

considerable ransom to families to just play in the EYBL.  Of these approximate 38 teams these

arrangements are being viewed as a contract by the families and players (a contract that they are

taking much less to play for which already puts a sour taste in their mouths about NIKE) e.g.:

one of our EYBL teams may take care of a player's family hotel room, travel and meals while

the competition is offering this same family:  Travel, meals, hotel room, unlimited product and

anywhere from $10K to $100K (not a typo)"  (Aug. 16, 2019 Srebnick Decl., Ex. P (Dkt. No. 30-

16) at 7)

   The press has reported on these filings, and on the alleged involvement of each of

the individuals named in Defendant's Motion.  See, e.g., Jeff Manning, Bad Blood, Betrayal

Turns L.A. Coach into Nike Whistleblower, The Oregonian/OregonLive (Sept. 8, 2019),

https://www.oregonlive.com/business/2019/09/bad-blood-betrayal-turns-la-coach-into-nike-

whistleblower.html (describing (1) Franklin as seeking "justice" against Nike; (2) Freedman and

McDonald as "mak[ing] a play" for Franklin's team; (3) Franklin's team as "funneling Nike

money" to McDonald; (4) Auerbach as Franklin's advisor, who reached out to Nike; and (5)

Avenatti as Franklin's attorney who "would get Nike's attention"); Childs Walker, Court Filings

in Michael Avenatti Case Describe Ruthless Recruiting Battles Involving Under Armour, The

Baltimore Sun (Aug. 22, 2019), https://www.baltimoresun.com/sports/college/basketball/bs-sp-

under-armour-recruiting-avenatti-20190822-avphiahexzh2phrentyiythrj4-story.html (reporting

that DeBose sent an email to Harrison stating that "38 of 40 teams in the EYBL had to pay a

moderate to considerable ransom to families to just play in the EYBL'" (citing Aug. 16, 2019

Srebnick Decl., Ex. P (Dkt. No. 30-16) at 7)); Mark Schlabach, Filings Suggest Nike Paid in

Pursuit of Players, ESPN.com (Aug. 16, 2019), https://www.espn.com/mens-college-basketball/story/_/id/27403106/filings-suggest-nike-paid-pursuit-players (describing McDonald as "outlin[ing] payments that were to be made to the handlers and family of an unnamed player" and citing "emails and text messages that alleged [that] a Nike employee approved at least under-the-table payments to [star players] when they were still in high school in February 2017").

Other news articles cite to "several dozen documents" that Avenatti released on April 6, 2019.  See Brad Schmidt, Nike Paid Associates of Bol Bol, Deandre Ayton and Brandon McCoy, Michael Avenatti Claims in Final Four Document Dump, The Oregonian/OregonLive (April 7, 2019), https://www.oregonlive.com/news/2019/04/nike-paid-bol-bol-deandre-ayton-and-brandon-mccoy-michael-avenatti-claims-in-document-dump.html ("Avenatti on Saturday released documents he claims show Nike paid money to associates of [players] . . . Avenatti claims Nike paid Franklin tens of thousands of dollars in 2017 and Franklin paid that money to Melvin McDonald . . . . Avenatti [also] released text messages he said are between Franklin and a Nike employee, Jamal James, from that time[, in which] Franklin asks how much he's supposed to pay."); see also @MichaelAvenatti, Twitter (Apr. 6, 2019, 9:01 a.m.), https://twitter.com/MichaelAvenatti/status/1114558683327991809 (stating that he links to "SOME of the evidence showing Nike bribed players to attend 'Nike' colleges" (emphasis and quotation marks in original)).

Avenatti's Motion asserts that Franklin or his adviser Jeffrey Auerbach secretly recorded conversations with Nike executives.  (Sept. 6, 2019 Def. Br. at 1, 7)  Franklin's counsel asserts that disclosure of the recordings "could potentially expose Mr. Franklin to liability under

California law."[5]  (Sept. 27, 2019 Franklin Ltr.)  It is unclear whether there is any realistic

possibility of prosecution under this statute.  In any event, the suggestion that Franklin or

Auerbach recorded others without their knowledge is not the type of sensational accusation that

is likely to stigmatize them or cause substantial reputational harm.

          The Court concludes that Franklin and the parties have not provided sufficient

countervailing considerations to overcome the "strong presumption of [public] access" that

attaches to these judicial documents.  Lugosch, 435 F.3d at 121.  Specific facts have not been

offered "demonstrating that closure is essential to preserve higher values and is narrowly tailored

to serve that interest."  Id. at 120 (quoting In re New York Times Co., 828 F.2d at 116).

---

[5]  "In 1967, the [California] Legislature enacted [S]ection 632 as part of the Invasion of Privacy
Act (§ 630 et seq.).  'The purpose of the act was to protect the right of privacy by, among other
things,' 'replacing prior laws that permitted the recording of telephone conversations with the
consent of [only] one party to the conversation.'"  People v. Guzman, 8 Cal. 5th 673, 2019 WL
6604572 at *2 (Cal. 2019) (citing Flanagan v. Flanagan, 41 P.3d 575, 577 (Cal. 2002)).  "Section
632, a multipart provision, operates to prohibit such recordings."  Id.  Section 632 prohibits
eavesdropping upon or recording "a confidential communication" "intentionally and without the
consent of all parties."  Cal. Penal Code § 632(a).  A "conversation is confidential if a party to
that conversation has an objectively reasonable expectation that the conversation is not being
overheard or recorded."  Flanagan v. Flanagan, 41 P.3d 576-77.  "Presently, such recording is
punishable by a fine of as much as 'two thousand five hundred dollars ($2,500) per violation,'
imprisonment in state prison of up to a year, or 'both that fine and imprisonment.'"  Guzman,
2019 WL 6604572 at *6 (citing Cal. Penal Code § 632(a)).  "For repeat offenders, the penalties
increase to 'ten thousand dollars ($10,000) per violation.' . . . Furthermore, individuals who are
injured by secret recordings made in violation of section 632 can bring civil actions against the
perpetrators to recover statutory or actual damages."  Id. (citing Cal. Penal Code § 637.2(a)).

## CONCLUSION

For the reasons stated above, the applications of Franklin, Defendant, and the

Government to seal Defendant's motion for issuance of a Rule 17(c) subpoena, Franklin's

objection, the Government's opposition, and associated filings is denied.  The parties and

Franklin are to file these submissions on the public docket – along with the submissions filed in

support of sealing – by January 8, 2020.  The discovery materials submitted to the Court –

including Exhibits 2 and 3 to the Srebnick declaration, and the materials provided to the Court in

response to its October 25, 2019 sealed order – will remain under seal.  See Smith, 985 F. Supp.

2d at 520.

Dated: New York, New York
       January 6, 2020

SO ORDERED.

Paul G. Gardephe
United States District Judge

16