UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

-against-

MICHAEL AVENATTI,
                     Defendant.

**ORDER**

(S1) 19 Cr. 373 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

        Indictment (S1) 19 Cr. 373 charges Defendant Michael Avenatti with transmitting interstate communications with intent to extort, extortion, and honest services wire fraud.  The Government charges that Avenatti – who is licensed to practice law in the state of California – transmitted in interstate commerce threats "to cause financial harm to Nike and its reputation if Nike did not agree to make multimillion dollar payments to AVENATTI"; used "threats of economic and reputational harm in an attempt to obtain multimillion dollar payments from Nike"; and used interstate communications to "engage[] in a scheme to obtain payments for himself from Nike based on confidential information provided to AVENATTI by Client-1 for the purpose of furthering AVENATTI's representation of Client-1, without Client-1's knowledge or approval," thereby depriving Client-1 of the "duty of honest services" he was owed.  ((S1) Indictment (Dkt. No. 72) ¶¶ 3, 20, 22, 24)

        Avenatti has moved for issuance of a Rule 17(c) subpoena duces tecum to Gary Franklin, Sr.  The Court understands Franklin to be the "Client-1" referenced in the (S1) Indictment.  (See Sept. 6, 2019 Srebnick Decl., Ex. 1; Sept. 6, 2019 Def. Br.)  Avenatti seeks production of the following materials:

1. All audio recordings (and transcripts thereof) that Gary Franklin, Sr., or Jeffrey Auerbach made of conversations or meetings with Nike executives, including Jamal James, Carlton DeBose, Nico Harrison, Bryan Freedman; Mel McDonald; and/or with Michael Avenatti,

> discussing or referencing Franklin's potential claims against Nike, Nike's conduct directed at Franklin, and/or the payment to amateur basketball players and/or their families or agents between January 1, 2016, and March 25, 2019.
>
> 2. Unredacted versions of all text messages and e-mails between Gary Franklin, Sr., and Jeffrey Auerbach, produced by Franklin to the FBI or USAO-SDNY;
>
> 3. The "recording" referenced in the text message with the Bates-stamp "Franklin 1017."

(Sept. 6, 2019 Def. Br. at 1)

Both Franklin and the Government have filed objections to Avenatti's motion. (See Sept. 23, 2019 Franklin Obj.; Sept. 23, 2019 Govt. Ltr.)  Franklin argues that the proposed subpoena is "an improper fishing expedition," while the Government contends that Defendant's proposed subpoena "is precisely the kind of blanket request that courts uniformly hold is insufficient."  (Sept. 23, 2019 Franklin Obj. at 4; Sept. 23, 2019 Govt. Ltr. at 3).

In his Reply, Defendant responds to these arguments by stating that he seeks sixteen recordings made by Franklin, along with transcripts of these communications.  Defendant provides the filenames of the recordings he seeks, along with Bates number cites to Rule 16 discovery in which these recordings are referenced.  (Sept. 25, 2019 Def. Reply Ltr. at 2-3)

Because the discovery materials cited by Defendant had not been provided to the Court, the Court issued an order on October 25, 2019 directing Avenatti to provide copies of the discovery materials that he relied on.  (Oct. 25, 2019 Sealed Order)  Because Defendant's proposed subpoena seeks unredacted versions of certain text messages and emails produced by Franklin to the Government, the October 25, 2019 Order also directs the Government to inform the Court whether it has access to unredacted versions of the text messages and emails sought by Avenatti.  (Id.)  On October 27, 2019, the Government submitted a letter stating that it does not have unredacted versions of the text messages and emails sought by Defendant.  (Oct. 27, 2019 Govt. Ltr.)

**BACKGROUND**

**I.   THE (S1) INDICTMENT'S FACTUAL ALLEGATIONS AND CHARGES**

Franklin – "Client-1" in the (S1) Indictment – is the director and head coach of an amateur youth basketball program (the "Basketball Program") based in California. "For a number of years, the Basketball Program . . . had a sponsorship program with Nike[,] pursuant to which Nike paid Client-1's program approximately $72,000 annually." ((S1) Indictment (Dkt. No. 72) ¶ 5)  In March 2019, Franklin contacted Avenatti seeking "legal assistance after [Nike informed] the Basketball Program . . . that its annual contractual sponsorship would not be renewed." (Id. ¶ 8)

Avenatti and Franklin met on March 5, 2019.  "During that meeting and in subsequent meetings and communications, [Franklin] informed AVENATTI . . . that [he] wanted Nike to reinstate its $72,000 annual contractual sponsorship of the Basketball Program." "During the [March 5, 2019] meeting, [Franklin] provided AVENATTI with information regarding what [Franklin] believed to be misconduct by certain employees of Nike involving the alleged funneling of illicit payments from Nike to the families of certain highly ranked high school basketball prospects." (Id. ¶ 9)

At the March 5, 2019 meeting, Avenatti "told [Franklin] that [he] believed that he would be able to obtain a $1 million settlement for [Franklin] from Nike. . . ."  However,

> at no time during the March 5, 2019 meeting or otherwise did AVENATTI inform [Franklin] that AVENATTI also would and did seek or demand payments from Nike for himself in exchange for resolving any potential claims made by [Franklin] and not causing financial and reputational harm to Nike, or that AVENATTI would and did seek to make any agreement with Nike contingent upon Nike making payments to AVENATTI himself.  Furthermore, at no time did AVENATTI inform [Franklin] that AVENATTI intended to threaten to publicize the confidential information that [Franklin]

3

> had provided to AVENATT, nor did AVENATTI obtain [Franklin's] permission to publicize any such information.

(Id. ¶ 10)

The Indictment goes on to allege that during a March 19, 2019 meeting with Nike's lawyers, Avenatti told Nike that

> he represented Franklin, "a youth basketball coach, whose team had previously had a contractual relationship with Nike, but whose contract Nike had recently decided not to renew";
>
> Franklin "had evidence that one or more Nike employees had authorized and funded payments to the families of top high school basketball players and attempted to conceal those payments";
>
> "he intended to hold a press conference the following day to publicize the asserted misconduct at Nike, which would negatively affect Nike's market value"; and
>
> he "would refrain from holding that press conference and damaging Nike if Nike agreed to two demands: (1) Nike must pay $1.5 million to [Franklin] as a settlement for any claims [Franklin] might have regarding Nike's decision not to renew its contract with the Basketball Program; and (2) Nike must hire AVENATTI and Attorney-1 to conduct an internal investigation of Nike, with a provision that if Nike hired another firm to conduct such an internal investigation, Nike would still be required to pay AVENATTI and Attorney-1 at least twice the fees of any other firm hired."

(Id. ¶ 11)

The Indictment further alleges that in a subsequent meeting and calls with Nike attorneys, Avenatti repeated his demand that he be paid millions of dollars by Nike "in return for not holding a press conference," in which Avenatti would "take ten billion dollars off [of Nike's] market cap." (Id. ¶ 13) Avenatti rebuffed Nike's offer to resolve Avenatti's demands simply "by paying [Franklin], rather than retaining AVENATTI [to conduct an internal investigation of Nike]." (Id. at ¶ 14)

The (S1) Indictment charges Avenatti with: (1) transmitting interstate communications with intent to extort, in violation of 18 U.S.C. §§ 875(d) and 2, in that

4

"AVENATTI, during an interstate telephone call, threatened to cause financial harm to Nike and its reputation if Nike did not agree to make multimillion dollar payments to AVENATTI"; (2) attempted extortion, in violation of 18 U.S.C. §§ 1951 and 2, in that "AVENATTI used threats of economic and reputational harm in an attempt to obtain multimillion dollar payments from Nike, a multinational public corporation"; and (3) committing honest services wire fraud, in violation of 18 U.S.C. §§ 1343 and 1346, in that he "engaged in a scheme to obtain payments for himself from Nike based on confidential information provided to AVENATTI by [Franklin] . . . without [Franklin's] knowledge or approval, and used and caused the use of interstate communications to effect the scheme."  (Id. ¶¶ 20, 22, 24)

## II.   DEFENDANT'S PROPOSED RULE 17(c) SUBPOENA

Avenatti's proposed Rule 17(c) subpoena seeks the following materials:

1. All audio recordings (and transcripts thereof) that Gary Franklin, Sr., or Jeffrey Auerbach made of conversations or meetings with Nike executives, including Jamal James, Carlton DeBose, Nico Harrison, Bryan Freedman; Mel McDonald; and/or with Michael Avenatti, discussing or referencing Franklin's potential claims against Nike, Nike's conduct directed at Franklin, and/or the payment to amateur basketball players and/or their families or agents between January 1, 2016, and March 25, 2019.

2. Unredacted versions of all text messages and e-mails between Gary Franklin, Sr., and Jeffrey Auerbach, produced by Franklin to the FBI or USAO-SDNY; and

3. The "recording" referenced in the text message with the Bates-stamp "Franklin 1017."

(Sept. 6, 2019 Srebnick Decl., Ex. 1; Sept. 6, 2019 Def. Br. at 1)

According to Avenatti, Jeffrey Auerbach was serving as Franklin's "advisor/consultant" in 2018 and 2019 as Franklin was preparing to bring a lawsuit against Nike.  (Sept. 6, 2019 Def. Br. at 7)  Avenatti further alleges that

> Nike executives Carlton Debose and Jamal James pressured Coach Franklin and others to make payments to high school basketball players (and their families) to

5

> join the Nike Elite Youth Basketball League ("EYBL"), including the California Supreme, a Nike-sponsored team founded and operated by Coach Franklin.

(Sept. 25, 2019 Def. Reply Ltr. at 1)[1]  According to Avenatti,

> Nike executives also forced Coach Franklin to cede control of his prestigious 17 and under team to a California lawyer named Bryan Freedman and a "handler" with a criminal record named Mel McDonald, so that Freedman could have his son play on the team alongside Bol Bol, a player who was paid money and managed by McDonald. . . . As a result, Coach Franklin lost control of that team, suffered severe damage to his brand and reputation, and began to complain of health issues caused by stress.

(Id. at 2) Avenatti maintains that as

> Coach Franklin became more and more concerned about the collaborative actions of Nike executives and Freedman and McDonald, [he] began to surreptitiously record conversations with them.  He had the conversations transcribed by a transcription service and shared the transcripts with his advisor Auerbach.  The discovery produced by Coach Franklin and Mr. Auerbach to the government and by the government to Mr. Avenatti is replete with specific references to the recordings . . . .

(Id.)

## DISCUSSION

## I.      LEGAL STANDARDS

Federal Rule of Criminal Procedure 17(c) provides that "[a] subpoena may order the witness to produce any books, papers, documents, data, or other objects the subpoena designates.  The court may direct the witness to produce the designated items in court before trial or before they are to be offered in evidence."  Fed. R. Crim. P. 17(c)(1).  A court may quash a Rule 17(c) subpoena "if compliance would be unreasonable or oppressive."  Fed. R. Crim. P. 17(c)(2).

---

[1] The role of Nike executive Nico Harrison is not explained. .

6

"Rule 17(c) was not intended to provide an additional means of discovery" to a defendant in a criminal case. Bowman Dairy Co. v. United States, 341 U.S. 214, 220 (1951). "Its chief innovation was to expedite the trial by providing a time and place before trial for the inspection of the subpoenaed materials." Id. (citing United States v. Md. & Va. Milk Producers Ass'n, 9 F.R.D. 509, 510 (D.D.C. 1949)); see id. at 220-21 ("[T]he plain words of the Rule . . . must be given their ordinary meaning to carry out the purpose of establishing a more liberal policy for the production, inspection and use of materials at the trial."; see also Milk Producers, 9 F.R.D. at 510 ("The purpose of [Rule 17(c)] is a limited one.  It is to make it possible to require the production before the trial of documents subpoenaed for use at the trial.  Its purpose is merely to shorten the trial.  It is not intended as a discovery provision.").

A Rule 17(c) subpoena must meet the tests of "(1) relevancy; (2) admissibility; [and] (3) specificity." United States v. Nixon, 418 U.S. 683, 700 (1974); see also United States v. Seabrook, No. 16-CR-467, 2017 WL 4838311, at *1 (S.D.N.Y. Oct. 23, 2017) (Rule 17(c) "subpoena must meet three criteria:  '(1) relevancy; (2) admissibility; [and] (3) specificity'" (quoting United States v. Ulbricht, 858 F.3d 71, 109 (2d Cir. 2017) (citing Nixon, 418 U.S. at 700))); United States v. Barcelo, No. 13-CR-38 RJS, 2014 WL 4058066, at *4, *15 (S.D.N.Y. Aug. 15, 2014) (denying post-trial motions premised on quashing of Rule 17(c) subpoena that did not meet Nixon standards for admissibility and specificity), aff'd, 628 F. App'x 36 (2d Cir. 2015)).

Accordingly, a party seeking a Rule 17(c) subpoena

> must show:  (1) that the documents are evidentiary and relevant; (2) that they are not otherwise procurable reasonably in advance of trial by exercise of due diligence; (3) that the party cannot properly prepare for trial without such production and inspection . . . and that the failure to obtain such inspection may tend unreasonably to delay the trial; and (4) that the application is made in good faith and is not intended as a general "fishing expedition."

7

Nixon, 418 U.S. at 699-700 (citing United States v. Iozia, 13 F.R.D. 335, 338 (S.D.N.Y. 1952) (Weinfeld, J.)) (footnote omitted).

While the specificity requirement is intended "'to provide the subpoenaed party or other party having standing with enough knowledge about what documents are being requested so as to lodge any objections on relevancy or admissibility,'" this requirement also "ensures that a Rule 17(c) subpoena will not be used as a 'fishing expedition to see what may turn up.'" United States v. Libby, 432 F. Supp. 2d 26, 32 (D.D.C. 2006) (quoting United States v. Anderson, 31 F. Supp. 2d 933, 945 (D. Kan. 1998); United States v. King, 164 F.R.D. 542, 545 (D. Kan. 1996)).

> In order to avoid speculation that the moving party is using Rule 17(c) to circumvent normal discovery requirements, the party's Rule 17(c) subpoena "must be able to 'reasonably specify the information contained or believed to be contained in the documents sought' rather than 'merely hop[e] that something useful will turn up.'" Subpoenas seeking "any and all" materials, without mention of "specific admissible evidence," justify the inference that the defense is engaging in the type of "fishing expedition" prohibited by Nixon.

United States v. Mendinueta-Ibarro, 956 F. Supp. 2d 511, 512-513 (S.D.N.Y. 2013) (quoting United States v. Louis, No. 04 Cr. 203(LTS), 2005 WL 180885, at *5 (S.D.N.Y. Jan. 27, 2005)) (alteration in Louis) (quashing subpoena that requested "'any and all writings and records' related to the [police department's] contact with a particular confidential witness").

As a general rule, "the need for evidence to impeach witnesses is insufficient to require its production in advance of trial." Nixon, 418 U.S. at 701-02 (citing United States v. Carter, 15 F.R.D. 367, 371 (D.D.C. 1954)); see also United States v. Weissman, No. 01 CR. 529 (BSJ), 2002 WL 31875410, at *1 (S.D.N.Y. Dec. 26, 2002) ("[S]everal cases articulate an absolute prohibition on the use of a Rule 17(c) subpoena solely for impeachment purposes."); United States v. Cherry, 876 F. Supp. 547, 553 (S.D.N.Y. 1995) ("Courts have consistently

8

interpreted the admissibility standard of Rule 17(c) to preclude production of materials whose evidentiary use is limited to impeachment.") (collecting cases).

## II. ANALYSIS

In moving for issuance of his proposed Rule 17(c) subpoena, Avenatti argues that the Government will be required to prove at trial – as to the extortion charges against him – "wrongfulness." (Sept. 6, 2019 Def. Br. at 2) According to Avenatti, the materials he seeks in his proposed Rule 17(c) subpoena are necessary to permit him to rebut the Government's claim that his conduct was "wrongful." (Id. at 2, 7-10)

### A. Franklin's Audio Recordings and Related Transcripts

Avenatti contends that, on behalf of Franklin, he approached Nike's lawyers in March 2019 to "settle a real claim on behalf of a real client based on real misconduct . . . ." (Sept. 25, 2019 Def. Reply Ltr. at 3) Avenatti argues that he needs Franklin's recordings – as well as the other requested materials – in order to demonstrate "that his conduct was not 'wrongful' because, among other reasons, his alleged threats to expose misconduct within Nike (a) were made during confidential settlement negotiations among lawyers; (b) were in furtherance of settling plausible legal claims that Franklin had against Nike; (c) had a direct nexus to those plausible claims; and (d) were part of contemplated and anticipated litigation that would have been filed in the public record." (Sept. 6, 2019 Def. Br. at 2)

Avenatti's application suffers from a number of defects. As an initial matter, none of the charges in the (S1) Indictment are premised on the $1.5 million demand that Avenatti made on behalf of Franklin. To the contrary, the Indictment charges that Avenatti committed extortion and honest services wire fraud by demanding $15 to $25 million <u>for himself</u> in exchange for not holding a press conference at which Nike's alleged misconduct would be

9

revealed, and that he made these demands without Franklin's knowledge or approval, and to the detriment of his client.  ((S1) Indictment ¶¶ 1, 10-11, 13-14)

While (1) some evidence of Franklin's belief that he had a legal claim against Nike is necessary background to the chain of events, and (2) Avenatti will be permitted to offer evidence, and to argue to the jury, that he approached Nike in order to "settle a real claim on behalf of a real client based on real misconduct" (Sept. 25, 2019 Def. Reply Ltr. at 3), if the evidence were to show that Avenatti demanded $15 to $25 million <u>for himself</u> – without Franklin's knowledge – Avenatti's conduct would not be justified by any alleged injury that Franklin suffered at Nike's hands.[2]  And while Avenatti contends that he needs the Franklin recordings in order to demonstrate that his financial demands on Nike "were [made] in furtherance of settling plausible legal claims that Franklin had against Nike," the charges against Avenatti are not premised on demands he made on behalf of Franklin.  Instead, the charges are premised on the theory that Avenatti demanded $15 to $25 million for himself – in exchange for not holding a press conference at which Nike's misconduct would be disclosed – and not to compensate Franklin for injuries Nike had caused Franklin.

In sum, the Court does not expect the validity or nature of Franklin's claim against Nike to be a central issue at trial.  Instead, the critical issue at trial will be whether the Government has proven beyond a reasonable doubt that Avenatti demanded $15 to $25 million <u>for himself</u> in exchange for not conducting a press conference at which Nike's alleged misconduct would be revealed, and whether he did so without his client's knowledge and consent.  As such, Avenatti's request for a Rule 17(c) subpoena requiring production of

---

[2]  Evidence that Nike engaged in widespread corruption in the area of amateur basketball likewise does not provide a defense to the extortion and honest services wire fraud charges against Avenatti.

10

recordings Franklin made – and related transcripts – does not satisfy the initial requirement of relevance.[3] See Nixon, 418 U.S. at 700.

Avenatti's requested subpoena also violates the restrictions that apply under Fed. R. Crim. P. 17(c), which is not a vehicle to expand the limited discovery provided for under Fed. R. Crim. P. 16. See Bowman Dairy Co., 341 U.S. at 220. The request for "[a]ll audio recordings (and transcripts thereof)" (1) involving Franklin, Auerbach and six others; (2) that contain a discussion of corruption in amateur basketball; and (3) that took place within a thirty-nine month period, reads like a request under the Federal Rules of Civil Procedure. But this is not a civil case, and the rules of civil discovery do not apply. Blanket requests of this sort violate the specificity requirement set forth in Nixon, 418 U.S. at 700, which bars "fishing expeditions to see what may turn up." Libby, 432 F. Supp. 2d at 32. Given the breadth of Avenatti's request, the proposed Rule 17(c) subpoena constitutes the proverbial "fishing expedition" prohibited under the case law.

Finally, and as discussed above, the admissibility standard under Rule 17(c) does not extend to impeachment material. Nixon, 418 U.S. at 701-02; Weissman, 2002 WL 31875410, at *1; Cherry, 876 F. Supp. at 553. Accordingly, to the extent that Avenatti argues

---

[3] Avenatti has also not suggested that, in acting as he did, he relied on the Franklin recordings. Indeed, Avenatti has not suggested that he had any contemporaneous knowledge of the content of the Franklin recordings. Given that Avenatti has not suggested that he had knowledge of the content of the Franklin recordings at the time of his communications with Nike, the content of those recordings is not likely to shed light on Avenatti's intent and on whether his conduct was "wrongful."

that he needs the Franklin recordings in order to demonstrate witnesses' bias or self-interest (see Sept. 6, 2019 Def. Br. at 5, 9), that argument is not persuasive.

Avenatti's request that a Rule 17(c) subpoena be issued for Franklin's audio recordings and related transcripts will be denied.

### B. Request for Unredacted Emails and Text Messages

Certain of the Franklin-Auerbach emails and text messages that the Government provided to Avenatti in discovery are redacted.[4]  The Government has confirmed that these emails and text messages were produced by Franklin to the Government in redacted form, and that the Government made no additional redactions before producing the emails and text messages to Avenatti.  See Oct. 27, 2019 Govt. Ltr.

Avenatti seeks access to the redacted portions of these communications "to provide context" to the surrounding messages that were produced.  (Sept. 6, 2019 Def. Br. at 9) This bare assertion is not sufficient to satisfy the relevancy, admissibility, and specificity requirements under Nixon.  Accordingly, the request for a Rule 17(c) subpoena directing production of unredacted versions of certain Franklin and Auerbach email and text messages will be denied.

### C. Request for Recording Referenced in Text Message Bearing Bate Stamp Franklin 1017

According to Avenatti, a March 25, 2019 Franklin-Auerbach text message produced by the Government in discovery "makes reference to a voice recording that Auerbach instructs Franklin to tell an unidentified woman not to mention."  (Id. at 9 (emphasis in original))

---

[4]  Franklin asserts that the emails and text messages were redacted to protect material subject to the attorney-client privilege.  According to Franklin, the communications in question were "with counsel for the purpose of obtaining legal advice. . . . [Franklin and Auerbach] communicated with other counsel prior to and after engaging Mr. Avenatti."  (Sept. 23, 2019 Franklin Br. at 7)

12

Avenatti seeks production of the referenced recording, arguing that "the expression of concern by Auerbach about a recording on the date of Mr. Avenatti's arrest suggests that the recording would impeach Franklin in some respect." (Id. at 10)

This request fails on multiple grounds. As an initial matter, it relies on rank speculation. Secondly, it does not satisfy any of the three Nixon requisites for issuance of a Rule 17(c) subpoena. Finally, as discussed above, "the need for evidence to impeach witnesses is insufficient to require its production in advance of trial." Nixon, 418 U.S. at 701-02. Accordingly, Avenatti's request for a Rule 17(c) subpoena directing production of the recording referenced in the text message Bate-stamped Franklin 1017 will be denied.

## CONCLUSION

For the reasons stated above, Defendant's motion for issuance of a Rule 17(c) subpoena is denied.

Dated: New York, New York
January 6, 2020

SO ORDERED.

_____
Paul G. Gardephe
United States District Judge