UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA

-against-

MICHAEL AVENATTI,

Defendant.

**MEMORANDUM
OPINION & ORDER**

(S1) 19 Cr. 373 (PGG)

---

PAUL G. GARDEPHE, U.S.D.J.:

Indictment (S1) 19 Cr. 373 charges Defendant Michael Avenatti with transmitting interstate communications with intent to extort, in violation of 18 U.S.C. § 875(d) (Count One); Hobbs Act extortion, in violation of 18 U.S.C. § 1951 (Count Two); and honest services wire fraud, in violation of 18 U.S.C. §§ 1343 and 1346 (Count Three).  The Government charges that Avenatti – who is licensed to practice law in California – transmitted in interstate commerce threats "to cause financial harm to Nike and its reputation if Nike did not agree to make multimillion dollar payments to Avenatti"; "used threats of economic and reputational harm in an attempt to obtain multimillion dollar payments from Nike"; and used interstate communications to "engage[] in a scheme to obtain payments for himself from Nike based on confidential information provided to AVENATTI by Client-1 for the purpose of furthering AVENATTI's representation of Client-1, without Client-1's knowledge or approval," thereby depriving Client-1 of the "duty of honest services" he was owed.  ((S1) Indictment (Dkt. No. 72) ¶¶ 20, 22, 24)

Avenatti has moved to dismiss Count Three, the honest services wire fraud count. (Def. Mot. (Dkt. No. 74))  Avenatti contends that Count Three must be dismissed because (1) Skilling v. United States, 561 U.S. 358 (2010), limits the honest services wire fraud statute to

bribes and kickbacks, and the (S1) Indictment does not allege a bribe or kickback; (2) the "honest services wire fraud charge fails to allege a violation of a legally cognizable duty"; and (3) the "honest services wire fraud statute is vague-as-applied." (Def. Br. (Dkt. No. 75) at 12, 14, 16) (emphasis omitted)).[1]  For the reasons stated below, Avenatti's motion to dismiss Count Three will be denied.

## BACKGROUND

### I.   THE (S1) INDICTMENT'S FACTUAL ALLEGATIONS AND CHARGES

The (S1) Indictment alleges that Client-1 is the director and head coach of an amateur youth basketball program (the "Basketball Program") based in California.  "For a number of years, the Basketball Program . . . had a sponsorship program with Nike[,] pursuant to which Nike paid the program approximately $72,000 annually."  ((S1) Indictment (Dkt. No. 72) ¶ 5)  In March 2019, Client-1 sought legal assistance from Avenatti "after [Nike informed] the Basketball Program . . . that its annual contractual sponsorship would not be renewed."  (Id. ¶ 8)

Avenatti and Client-1 met on March 5, 2019.  "During that meeting and in subsequent meetings and communications, Client-1 informed AVENATTI . . . that [he] wanted Nike to reinstate its $72,000 annual contractual sponsorship of the Basketball Program."  "During the [March 5, 2019] meeting, Client-1 [also] provided AVENATTI with information regarding what Client-1 believed to be misconduct by certain employees of Nike involving the

---

[1] Citations to page numbers of docketed materials correspond to the pagination generated by this District's Electronic Case Filing ("ECF") system.

alleged funneling of illicit payments from Nike to the families of certain highly ranked high school basketball prospects." (Id. ¶ 9)

At the March 5, 2019 meeting, Avenatti "told Client-1 that [he] believed that he would be able to obtain a $1 million settlement for Client-1 from Nike. . . ." However,

> at no time during the March 5, 2019 meeting or otherwise did AVENATTI inform Client-1 that AVENATTI also would and did seek or demand payments from Nike for himself in exchange for resolving any potential claims made by Client-1 and not causing financial and reputational harm to Nike, or that AVENATTI would and did seek to make any agreement with Nike contingent upon Nike making payments to AVENATTI himself. Furthermore, at no time did AVENATTI inform Client-1 that AVENATTI intended to threaten to publicize the confidential information that Client-1 had provided to AVENATTI, nor did AVENATTI obtain Client-1's permission to publicize any such information.

(Id. ¶ 10)

The Indictment goes on to allege that during a March 19, 2019 meeting with Nike's lawyers, Avenatti told Nike that

> he represented Client-1, "a youth basketball coach, whose team had previously had a contractual relationship with Nike, but whose contract Nike had recently decided not to renew";
>
> Client-1 "had evidence that one or more Nike employees had authorized and funded payments to the families of top high school basketball players and attempted to conceal those payments";
>
> "he intended to hold a press conference the following day to publicize the asserted misconduct at Nike, which would negatively affect Nike's market value"; and
>
> he "would refrain from holding that press conference and damaging Nike if Nike agreed to two demands: (1) Nike must pay $1.5 million to Client-1 as a settlement for any claims Client-1 might have regarding Nike's decision not to renew its contract with the Basketball Program; and (2) Nike must hire AVENATTI and Attorney-1 to conduct an internal investigation of Nike, with a provision that if Nike hired another firm to conduct

3

such an internal investigation, Nike would still be required to pay AVENATTI and Attorney-1 at least twice the fees of any other firm hired."

(Id. ¶ 11)

In a March 20, 2019 telephone call with Nike's counsel, Avenatti reiterated that he expected to "get a million five for [Client-1]" and to be "hired to handle the internal investigation," for which he demanded a "multimillion dollar retainer" in exchange for not holding a press conference. (Id. ¶ 13(a)-(b)) According to Avenatti, "3 or 5 or 7 million dollars" would not be sufficient for his retainer. Unless Nike agreed to a larger retainer, Avenatti would hold a press conference that would "take ten billion dollars off [Nike's] market cap" (Id. ¶ 13(c)) Avenatti also stated that "he expected to be paid more than $9 million." (Id. ¶ 13(d)) At the end of the call, Avenatti agreed to meet with Nike's lawyers the next day. (Id. ¶ 13(e))

On March 21, 2019, Avenatti met with Nike's lawyers in Manhattan. (Id. ¶ 14) At that meeting, Avenatti demanded "a $12 million retainer to be paid immediately and to be 'deemed earned when paid,' with a minimum guarantee of $15 million in billings and a maximum of $25 million, 'unless the scope changes.'" (Id. ¶ 14(a)) Nike's counsel asked Avenatti whether Nike could simply pay Client-1, "rather than retaining AVENATTI. AVENATTI responded that he did not think it made sense for Nike to pay Client-1 an 'exorbitant sum of money . . . in light of his role in this.'" (Id. ¶ 14(b)) Avenatti agreed to meet with Nike's counsel "on March 25, 2019, to hear whether Nike was willing to make the demanded payments. AVENATTI stated that Nike would have to agree to his demands at that meeting or he would hold his threatened press conference." (Id. ¶ 14(f))

According to the (S1) Indictment, Avenatti did not "inform Client-1 that Nike had offered to resolve Client-1's claims without paying AVENATTI. Nor did AVENATTI inform Client-1 that AVENATTI had continued to threaten to publicize confidential information

4

provided to AVENATTI by Client-1, or that AVENATTI had continued to use that information to demand a multimillion dollar payment for himself." (Id. ¶ 14(g))

About two hours after the March 21, 2019 meeting, and without consulting Client-1, Avenatti posted the following message on Twitter:



(Id. ¶ 15; see also @MichaelAvenatti, Twitter (Mar. 21, 2019, 3:52 p.m.), https://twitter.com/MichaelAvenatti/status/1108818722767163392)  The article linked in the March 21, 2019 tweet refers to a prosecution brought by the Government against employees of Adidas – a competitor of Nike.  (Id. ¶ 16)

On March 25, 2019, after Avenatti learned that law enforcement officers had approached Client-1, but shortly before he was arrested, Avenatti posted the following message to Twitter:



5

(Id. ¶ 18; see also @MichaelAvenatti, Twitter (Mar. 25, 2019, 12:16 p.m.), https://twitter.com/MichaelAvenatti/status/1110213957170749440)

Later that day, Avenatti was arrested as he approached Nike's counsel's office complex in Manhattan for the scheduled March 25, 2019 meeting. (Id. ¶ 17)

The (S1) Indictment charges Avenatti with: (1) transmitting interstate communications with intent to extort, in violation of 18 U.S.C. § 875(d), in that "AVENATTI, during an interstate telephone call, threatened to cause financial harm to Nike and its reputation if Nike did not agree to make multimillion dollar payments to AVENATTI"; (2) attempted extortion, in violation of 18 U.S.C. § 1951, in that "AVENATTI used threats of economic and reputational harm in an attempt to obtain multimillion dollar payments from Nike, a multinational public corporation"; and (3) committing honest services wire fraud, in violation of 18 U.S.C. §§ 1343 and 1346, in that he "engaged in a scheme to obtain payments for himself from Nike based on confidential information provided to AVENATTI by Client-1 . . . without Client-1's knowledge or approval, and used and caused the use of interstate communications to effect the scheme." (Id. ¶¶ 20, 22, 24)

## DISCUSSION

**I.      DEFENDANT'S MOTION TO DISMISS COUNT THREE**

Avenatti contends that Count Three – which alleges honest services wire fraud, in violation of 18 U.S.C. §§ 1343 and 1346 – must be dismissed, because (1) Skilling v. United States, 561 U.S. 358 (2010), limits the honest services wire fraud statute to bribes and kickbacks, and the (S1) Indictment does not allege a bribe or kickback; (2) the "honest services wire fraud

6

charge fails to allege a violation of a legally cognizable duty"; and (3) the "honest services wire fraud statute is vague-as-applied." (Def. Br. (Dkt. No. 75) at 12, 14, 16) (emphasis omitted))

The Government argues that Count Three is legally sufficient in that it "'contains the elements of the offense charged and fairly informs [Avenatti] of the charge against which he must defend, and . . . enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." (Govt. Opp. (Dkt. No. 79) at 8 (citing Hamling v. United States, 418 U.S. 87, 117 (1974))) The Government further asserts that Avenatti "is wrong" in arguing that "an indictment, in addition to tracking the [language of the honest services wire fraud] statute, must contain certain words consistent with case law's interpretation of the statute's scope," such as "bribe" or "kickback." (Id. at 9)

As to Avenatti's argument that the Indictment does not allege that he violated a legally cognizable duty, the Government asserts that it is "clear that attorneys owe a duty of honest services to their clients," and that the Indictment adequately alleges that he breached the duty he owed to Client-1. According to the Government, Avenatti is not challenging the legal sufficiency of the honest services wire fraud charge, but is instead arguing – prematurely – that the proof will be insufficient to demonstrate that he "violate[d] his fiduciary duty to Client-1." (Id. at 11-12 (citing United States v. Bout, No. 08 Cr. 365(SAS), 2011 WL 2693720 at *5 n.73 (S.D.N.Y. July 11, 2011) ("To the extent [that defendant's] challenges are to the sufficiency of the Government's evidence to satisfy – as opposed to the sufficiency of the Indictment to allege – the federal elements of the crimes charged, those arguments are not appropriately decided on a

motion to dismiss." (internal quotation marks omitted) (emphasis in original)), aff'd, 731 F.3d 233 (2d Cir. 2013)))

As to Avenatti's vague-as-applied challenge, the Government contends that "courts 'must await conclusion of the trial' to determine whether a statute is unconstitutionally vague in a particular case. . . . [T]he inquiry is fact-specific and thus cannot be decided without the record developed at trial."  (Id. at 12-13 (emphasis in original) (quoting United States v. Milani, 739 F. Supp. 216, 218 (S.D.N.Y. 1990)) (citing Maynard v. Cartwright, 486 U.S. 356, 361 (1988))

## II.    WHETHER THE HONEST SERVICES WIRE FRAUD CHARGE IS LEGALLY SUFFICIENT

### A.    Whether the Statutory Elements Are Pled

Fed. R. Crim. P. 7(c)(1) provides that an indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged. . . ."  "[A]n indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense."  Hamling, 418 U.S. at 117 (citation omitted); see also United States v. Frias, 521 F.3d 229, 235 (2d Cir. 2008) ("Typically, to state an offense, an indictment need only track the language of the statute and, if necessary to apprise the defendant of the nature of the accusation against him, state time and place in approximate terms." (internal quotation marks and citation omitted)).

"The dismissal of an indictment is an 'extraordinary remedy' reserved only for extremely limited circumstances implicating fundamental rights."  United States v. De La Pava, 268 F.3d 157, 165 (2d Cir. 2001) (citing United States v. Nai Fook Li, 206 F.3d 56, 62 (1st Cir. 2000) (en banc)  Indeed, dismissal of charges is an "extreme sanction," United States v. Fields,

592 F.2d 638, 647 (2d Cir. 1978), that has been upheld "only in very limited and extreme circumstances," and should be "reserved for the truly extreme cases," "especially where serious criminal conduct is involved." United States v. Broward, 594 F.2d 345, 351 (2d Cir. 1979).  In reviewing a motion to dismiss an indictment, the Court must take the allegations of the indictment as true.  Boyce Motor Lines v. United States, 342 U.S. 337, 343 n. 16 (1952); New York v. Tanella, 374 F.3d 141, 148 (2d Cir. 2004).

Title 18, United States Code, Section 1343 provides that

> [w]hoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both. . . .

18 U.S.C. § 1343.

Title 18, United States Code, Section 1346 provides that

> . . . the term "scheme or artifice to defraud" includes a scheme or artifice to deprive another of the intangible right of honest services.

18 U.S.C. § 1346.

Count Three charges, in part, that

> [i]n or about March 2019, in the Southern District of New York and elsewhere, MICHAEL AVENATTI, the defendant, having devised and intending to devise a scheme and artifice to defraud, and to deprive Client-1 of Client-1's intangible right to the honest services of AVENATTI, transmitted and caused to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purposes of executing such scheme and artifice, to wit, AVENATTI, owing a duty of honest services to Client-1, engaged in a scheme to obtain payments for himself from Nike based on confidential information provided to AVENATTI by Client-1 for the purpose of furthering AVENATTI's representation of Client-1, without Client-

9

>1's knowledge or approval, and used and caused the use of interstate communications to effect the scheme.

((S1) Indictment (Dkt. No. 72) ¶ 24)

Because Count Three tracks the language of 18 U.S.C. §§ 1343 and 1346, apprises Avenatti of the nature of the accusation against him, and – when read in conjunction with the "Overview" section of the Indictment, which Count Three incorporates by reference – provides notice generally of where and when the crime occurred, Count Three is legally sufficient.

### B.      Whether Count Three Alleges a Bribery Scheme

Avenatti argues that Count Three is legally insufficient, however, because it does not use the word "bribe" or "kickback." (Def. Br. (Dkt. No. 75) at 13) Avenatti notes that in Skilling, the Supreme Court held that "'§ 1346 criminalizes only the bribe-and-kickback core of the pre-McNally case law.'" (Id. at 12 (quoting Skilling, 561 U.S. at 409) (emphasis in Skilling) Avenatti contends that "Count Three cannot stand," because "[n]either the word 'bribe' nor the word 'kickback' . . . can be found anywhere. Nor can the alleged scheme described in the Superseding Indictment be fairly characterized as a 'bribe' or 'kickback' scheme." (Id. at 13) As a result, Count Three fails to "allege a crime within the terms of the applicable statute." (Id. at 7 (citing United States v. Aleynikov, 676 F.3d 71, 75-76 (2d Cir. 2012) ("[A] federal indictment can be challenged on the ground that it fails to allege a crime within the terms of the applicable statute.")); Def. Reply (Dkt. No. 80) at 2 (citing United States v. Pirro, 212 F.3d 86, 92-95 (2d Cir. 2000) ("[W]hen one element of the offense is implicit in the statute, rather than explicit, and the indictment tracks the language of the statute and fails to allege the implicit

element explicitly, the indictment fails to state an offense." (internal quotation marks and citation omitted))))

Post-Skilling, it is clear that the scope of the honest services wire fraud statute is limited to schemes involving bribes or kickbacks.  See Skilling, 561 U.S. at 409.  Moreover, "to violate the right to honest services, the charged conduct must involve a quid pro quo, i.e., an 'intent to give or receive something of value in exchange for an . . . act.'"  United States v. Nouri, 711 F.3d 129, 139 (2d Cir. 2013) (quoting United States v. Bruno, 661 F.3d 733, 743-44 (2d Cir. 2011).  The Government is not required to prove that the fraudulent scheme was successful, however, see Pasquantino v. United States, 544 U.S. 349, 371 (2005) ("[T]he wire fraud statute punishes the scheme, not its success."), and to demonstrate a quid pro quo agreement, the Government merely "ha[s] to prove, beyond a reasonable doubt, . . . that the defendant received, or intended to receive, something of value in exchange for an . . . act." United States v. Silver, 864 F.3d 102, 111 (2d Cir. 2017) (citing Bruno, 661 F.3d at 743-44 (in a prosecution of honest services fraud under a bribery theory, "[t]he key inquiry is whether, in light of all the evidence, an intent to give or receive something of value in exchange for an . . . act has been proved beyond a reasonable doubt")).

Here, as an initial matter, this Court is not aware of any case suggesting that the words "bribe" or "kickback" have talismanic significance.  Accordingly, to the extent that Avenatti contends that Count Three is insufficient as a matter of law because it does not use the words "bribe" or "kickback," this Court rejects that argument as unsupported.[2]  Moreover, to the

---

[2]  Indeed, in a recent decision, the Second Circuit remarked that "it is difficult to understand how an indictment that tracks the exact language of the statute, and that expressly charges that the defendant violated it, fails on its face to charge that the defendant committed a federal crime." United States v. Balde, --- F.3d ----, No. 17-1337-cr, 2019 WL 5938025, at *11 (2d Cir. Nov. 13, 2019) (emphasis omitted).

extent that Avenatti argues that a speaking indictment must plead facts demonstrating a bribe or kickback, and a quid pro quo, this Court concludes that the Indictment contains the necessary factual allegations. Indeed, contrary to Avenatti's argument (see Def. Br. (Dkt. No. 75) at 13), "the alleged scheme described in the Superseding Indictment [can] be fairly characterized as a 'bribe' . . . scheme." (Id.)[3]

Count Three alleges that "[i]n connection with his representation of Client-1, AVENATTI owed Client-1 duties of, among other things, confidentiality, loyalty, honesty, and fair dealing . . . ." ((S1) Indictment (Dkt. No. 72) ¶ 2) The Indictment further alleges that, in violation of those duties, Avenatti solicited Nike for "payments to himself . . . without Client-1's knowledge or consent." (Id. ¶ 1) According to the Government, Avenatti used Client-1's confidential information in soliciting Nike for "payments to himself." (Id. ¶10) The quid pro quo alleged in the Indictment is that – in exchange for the millions of dollars he sought from Nike – Avenatti would not publicly disclose the misconduct of Nike employees reported to Avenatti by Client-1. (Id. ¶¶ 11, 13(b), 14(a)) In (1) using Client-1's confidential information to solicit Nike for a multimillion dollar payment, and (2) promising that – in exchange for Nike's multimillion dollar payment – he would not publicly disclose Client-1's information concerning the misconduct of Nike employees, and (3) doing so without Client-1's knowledge and to Client-

---

[3] The Government does not contend that Avenatti engaged in a kickback scheme. (Dec. 17, 2019 Conf. Tr. (Dkt. No. 102) at 29-32 ("[Avenatti] explained that he would settle his client's claim if he was paid a bribe, a side payment, and that he would not settle that claim if he were not paid. . . . [Avenatti] defrauded his client of his right to Mr. Avenatti's honest services, and he did that by demanding that Nike pay him in exchange for taking action or not taking action with respect to his client, not disclosing that to his client. And that is a classic honest service[s] fraud.")

1's detriment,[4] the Government claims that Avenatti committed honest services wire fraud through solicitation of a bribe.  (Id. ¶ 24)  The Court concludes that these allegations are sufficient to allege honest services wire fraud premised on a scheme to solicit a bribe.

United States v. Aleynikov, 676 F.3d 71 (2d Cir. 2012), and United States v. Pirro, 212 F.3d 86 (2d Cir. 2000), cited by Defendant (see Def. Br. (Dkt. No. 75) at 7; Def. Reply (Dkt. No. 80) at 2) are not to the contrary.  While these cases indicate that, under certain circumstances, a defendant may properly challenge the legal sufficiency of an indictment on a motion to dismiss, they do not suggest that Count Three is insufficiently pled.

In Aleynikov, the defendant was convicted at trial of violating the National Stolen Property Act ("NSPA") and the Economic Espionage Act of 1996 ("EEA").  On appeal, the defendant argued that "his conduct did not constitute an offense under either statute," and that the district court erred in denying his motion to dismiss these charges.  Aleynikov, 676 F.3d at 73.  The Second Circuit agreed, finding "that Aleynikov's conduct did not constitute an offense under either the NSPA or the EEA, and that the indictment was therefore legally insufficient." Id. at 76.  The court ruled that "the source code that Aleynikov uploaded to a server in Germany, then downloaded to his computer devices in New Jersey, and later transferred to Illinois, [did not] constitute[] stolen 'goods,' 'wares,' or 'merchandise' within the meaning of the NSPA[, b]ased on the substantial weight of the case law, as well as the ordinary meaning of the words[, as] the theft and subsequent interstate transmission of purely intangible goods is beyond the scope of the NSPA."  Id. at 76-77.  The Second Circuit further found that, "[b]ecause the [system whose source code Aleynikov stole] was not designed to enter or pass in commerce, or to make

---

[4] The Indictment alleges that Avenatti rejected Nike's offer to resolve the dispute simply by paying Client-1, stating that "he did not think it made sense for Nike to pay Client-1 an 'exorbitant sum of money . . . in light of his role in this.'"  (Id. ¶ 14(b))

13

something that does, Aleynikov's theft of source code relating to that system was not an offense under the EEA." Id. at 82.

Aleynikov has no application here, because Count Three – in pleading facts making out an honest services wire fraud charge premised on a solicitation of a bribe and a proposed quid pro quo – abides by Skilling's limitation on the scope of the honest services wire fraud statute.

In Pirro, the Second Circuit affirmed a district court's order dismissing – prior to trial – a portion of one count charging the filing of a false 1992 U.S. income tax return for an S corporation. In the indictment, the Government alleged that Pirro had failed to report Robert Boyle's ownership interest in the S corporation. United States v. Pirro, 96 F. Supp. 2d 279, 280 (S.D.N.Y. 1999). Pirro argued that Boyle never became a shareholder in the S corporation, and that accordingly, Pirro had no obligation to report his interest on the tax return. Pirro, 96 F. Supp. 2d at 281. The Government contended that, while Boyle was not a shareholder of record, he was a "de facto shareholder" or a holder of an ownership interest in the S corporation, and that accordingly Boyle should have been listed on the tax return. Id. at 281-82. The district judge found that "[a] review of the authority governing this issue strongly suggests that the law does not impose such a duty. At a minimum, the legal obligation to do so is sufficiently debatable so that the 'duty' in question cannot be said to be 'clear' and, thus, should not supply the predicate for criminal liability." Id. at 283. The district court went on to grant Pirro's motion to strike the allegations regarding the S corporation's tax return on grounds of legal

insufficiency, because the Government's "failure to allege that Boyle was a 'shareholder' of [the S corporation] result[ed] in a failure to allege the violation of a 'known legal duty.'" Id. at 282.

On appeal, the Second Circuit affirmed. In resolving the "battle over whether there [was] a known legal duty for Pirro to declare the alleged 'ownership interest' of [Boyle]," Pirro, 212 F.3d at 90, the Second Circuit concluded that "[t]he tax law provided Pirro no notice that failure to report an 'ownership interest' was criminal," and that "the indictment does not charge a violation of a known legal duty." Id. at 91.

Pirro has no application here, because Count Three – unlike the charging language at issue in Pirro – alleges a violation of a "known legal duty." Pirro, 212 F.3d at 91. As discussed above, Count Three tracks the language of the honest services wire fraud statutes and alleges conduct that fits within the boundaries of Skilling.

Finally, Avenatti's brief contains a throwaway line complaining that "[t]here is no allegation of a quid pro quo with a corrupt partner." (Def. Br. (Dkt. No. 75) at 13) Avenatti thus appears to contend that the honest services wire fraud charge must be dismissed because the Indictment does not allege that Nike was willing to enter into the proposed quid pro quo arrangement Avenatti allegedly proposed. Avenatti cites no law suggesting that a willing, corrupt partner is a prerequisite for an honest services wire fraud charge predicated on an alleged bribery scheme, however.[5]

As discussed above, the Government is not required to demonstrate that the alleged scheme to defraud was successful, because the "wire fraud statute punishes the scheme, not its success." Pasquantino, 544 U.S. at 371. Moreover, as to the bribery component of an

---

[5] The Government does not substantively address Avenatti's argument that a "corrupt partner" is a necessary element of the crime. (Govt. Opp. (Dkt. No. 79) at 10 n.4).

honest services wire fraud charge, the argument that proof of a "corrupt partner" is necessary has been rejected:

> [T]his Court finds . . . that an agreement is not required in order to prove the existence of a quid pro quo in honest services fraud . . . .
>
> For honest services fraud, although there may be an "agreement" on the facts of any given case, the third party's state of mind is legally irrelevant because the focus of the crime is on the defendant's state of mind: "To establish the corrupt intent necessary to a bribery conviction, the Government must prove that the defendant had a specific intent to give something of value in exchange for an official act. . . ." Rosen, 716 F.3d at 700 (quoting Alfisi, 308 F.3d at 149) (internal quotation marks and alterations omitted) (emphasis in original). See also Bruno, 661 F.3d at 744 ("The key inquiry is whether, in light of all the evidence, an intent to give or receive something of value in exchange for an official act has been proved beyond a reasonable doubt."). In the seminal case United States v. Sun-Diamond Growers of California, the Supreme Court made no mention of the third party's state of mind or any required agreement when discussing the required mens rea for bribery: "Bribery requires intent . . . 'to be influenced' in an official act. . . . In other words, for bribery there must be a quid pro quo – a specific intent to give or receive something of value in exchange for an official act." 526 U.S. 398, 404-05 (1999) (emphasis in original). See also Ganim, 510 F.3d at 148 ("We found the jury charge sufficient because it required the jury to find a corrupt intent on the part of the payor to influence the performance of official acts.") (discussing United States v. Bonito, 57 F.3d 167, 171 (2d Cir. 1995)); United States v. Alfisi, 308 F.3d at 149 ("The 'corrupt' intent necessary to a bribery conviction is in the nature of a quid pro quo requirement; that is, there must be a specific intent to give something of value in exchange for an official act.") (quoting Sun-Diamond, 526 U.S. at 404-05) (internal quotation marks and alteration omitted). Honest services fraud effected by bribery "does not require the [third party] to agree to . . . a corrupt exchange. . . . [A] defendant may be guilty of honest-services bribery where he offers [his counterparty] something of value with a specific intent to effect a quid pro quo even if [the counterparty] emphatically refuses to accept. In other words, though the [defendant] is guilty of honest-services fraud, his attempted target may be entirely innocent." Ring, 706 F.3d 460, 467 (D.C. Cir. 2013) (citations omitted). In short, the focus of bribery-based honest services fraud is the defendant's state of mind and his understanding that there is a quid pro quo exchange – no actual agreement with the counterparty, implicit or explicit, is required.

United States v. Silver, No. 15 Cr. 93(VEC), 2018 WL 4440496, at *6 (S.D.N.Y. Sept. 17, 2018).

Because Count Three tracks the language of the respective statutes, includes allegations that meet Skilling's requirements for honest services fraud, apprises Avenatti of the nature of the accusations against him, and provides notice generally of where and when the crime occurred, this charge is legally sufficient. See Frias, 521 F.3d at 235; United States v. Heicklen, 858 F. Supp. 2d 256, 263 (S.D.N.Y. 2012).

### C. Whether the Indictment Pleads Facts Demonstrating Violation of a Legally Cognizable Duty

Avenatti argues that the Indictment does not plead facts demonstrating that he violated a legally cognizable duty, because "[t]here is no allegation that [he] accepted a single penny from Nike without disclosing it to his client." (Def. Br. (Dkt. No. 75) at 14) Avenatti further contends that lawyers frequently make demands during settlement negotiations that are "unrealistic and imbued with 'puffery or posturing rather than a fair or realistic appraisal of a party's damages.'" (Id. at 14-15 (citing Vermande v. Hyundai Motor America, Inc., 352 F. Supp. 2d 195, 203 (D. Conn. 2004))) According to Avenatti, in a private-sector honest services fraud case, "the government must allege that a bribe was being solicited in exchange for an actual official decision made by the attorney, not just statements, demands, or chatter during settlement negotiations." (Def. Reply (Dkt. No. 80) at 5)

As discussed above, in order to demonstrate a quid pro quo agreement, the "Government has to prove, beyond a reasonable doubt, . . . that the defendant received, or intended to receive, something of value in exchange for an official act." Silver, 864 F.3d at 111 (emphasis added) (citing Bruno, 661 F.3d at 743-44 (in a prosecution for honest services fraud under a bribery theory, "[t]he key inquiry is whether, in light of all the evidence, an intent to give

17

or receive something of value in exchange for an official act has been proved beyond a reasonable doubt")). Accordingly, here the Government must prove not that Avenatti received money from Nike, but rather that Avenatti "intended to receive[] something of value [from Nike] in exchange for [violating the duty he owed his client]." (Id.) Avenatti's argument that he did not receive "a single penny from Nike" is thus irrelevant.

As to Avenatti's argument that lawyers engaged in settlement negotiations frequently engage in "puffery and posturing," and that demands made in settlement conferences frequently bear little connection with reality (see Def. Br. (Dkt. No. 75) at 14-15; Def. Reply (Dkt. No. 80) at 5 n.1), the honest services wire fraud charge, like the extortion charges discussed in this Court's January 6, 2020 order, is not premised on "puffery or posturing." (See Jan. 6, 2020 order (Dkt. No. 120)) Instead – as discussed above – Count Three is premised on specific factual allegations that Avenatti (1) used confidential information provided by his client to solicit side-payments from Nike for himself – without his client's knowledge and to his client's detriment; and (2) offered not to take certain actions with respect to his client's claim if Nike paid Avenatti millions of dollars.

The Indictment pleads facts sufficient to demonstrate that Avenatti violated the legally cognizable duties a lawyer owes to his client.

### III.   WHETHER THE HONEST SERVICES FRAUD STATUTES ARE VAGUE AS APPLIED

Avenatti contends that Count Three must be dismissed because the honest services fraud statutes are vague as applied. (Def. Br. (Dkt. No. 75) at 16)

Avenatti acknowledges that "resolution of a defendant's void for vagueness challenge ordinarily requires 'a more expansive factual record to be developed at trial.'" (Id. (quoting United States v. Hoskins, 73 F. Supp. 3d 154, 166 (D. Conn. 2014); citing United States

v. Milani, 739 F. Supp. 216, 218 (S.D.N.Y. 1990)))  Avenatti argues that "[h]ere, however, the Court need not wait until trial because Skilling provides all of the clear guidance that this Court needs. . . . Skilling requires a bribe or kickback and here there is no allegation of a bribe or kickback."  (Id.)

"'The void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement.'" United States v. Halloran, 821 F.3d 321, 337 (2d Cir. 2016) (quoting United States v. Rosen, 716 F.3d 691, 699 (2d Cir. 2013).  "'The doctrine addresses concerns about (1) fair notice and (2) arbitrary and discriminatory prosecutions.'"  Id. (quoting Rosen, 716 F.3d at 699).  Under the "'fair notice' prong, a court must determine 'whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal.'"  Halloran, 821 F.3d at 321 (quoting Rosen, 716 F.3d at 699).

To the extent that Avenatti argues that the Indictment does not allege a bribe scheme, the Court has rejected that argument.  To the extent that Avenatti argues more broadly

that the honest services wire fraud statutes did not provide him with notice that his conduct was unlawful, his motion will be denied as premature.  See Hoskins, 73 F. Supp. 3d at 166.

## CONCLUSION

For the reasons stated above, Defendant Avenatti's motion to dismiss Count Three on grounds of insufficiency and vagueness (Def. Mot. (Dkt. No. 74)) is denied.

Dated: New York, New York
January 8, 2020

SO ORDERED.

_____
Paul G. Gardephe
United States District Judge