**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

UNITED STATES OF AMERICA,

        v.

MICHAEL AVENATTI,

        *Defendant*.

No. S1 19 Cr. 373 (PGG)

---

### DEFENDANT AVENATTI'S MEMORANDUM OF LAW IN OPPOSITION TO NON-PARTY NIKE'S MOTION TO QUASH

Scott A. Srebnick
SCOTT A. SREBNICK, P.A.
201 South Biscayne Boulevard
Suite 1210
Miami, FL 33131
Telephone: (305) 285-9019
Facsimile: (305) 377-9937
E-Mail: Scott@srebnicklaw.com

Jose M. Quinon
JOSE M. QUINON, P.A.
2333 Brickell Avenue, Suite A-1
Miami, FL 33129
Telephone: (305) 858-5700
Facsimile: (305) 358-7848
E-Mail: jquinon@quinonlaw.com

E. Danya Perry
PERRY GUHA LLP
35 East 62nd Street
New York, New York 10065
Telephone: (212) 399-8340
Facsimile: (212) 399-8331
E-mail: dperry@perryguha.com

*Attorneys for Defendant Michael Avenatti*

## I.    PRELIMINARY STATEMENT

In its motion to quash Mr. Avenatti's subpoenas to a number of its witnesses, Nike seeks to deprive Mr. Avenatti of his right to defend himself against the serious criminal charges that were initiated against him at Nike's provocation.   Nike argues that the subpoenaed witnesses have no relevant testimony because they never spoke with Mr. Avenatti and could only "possibly offer . . . testimony about Nike's actual conduct with respect to amateur basketball." (Dkt. No. 115:1).  Nike's blinkered view is that Mr. Avenatti cannot possibly offer a defense to the recorded conversations ("he cannot dispute that he made these threats") and that therefore the Nike witnesses should not be "drag[ged] . . . across the country to testify at his trial." *Id.* at 1. But Mr. Avenatti is exercising his right to proceed to trial because he *does* dispute – vehemently – that he engaged in extortionate conduct or solicitation of a bribe. In that regard, the subpoenaed witnesses have *relevant fact testimony* to offer about the plausible claims that Mr. Avenatti believed he was pursuing on behalf of his client, Coach Gary Franklin. Moreover, Nike's argument profoundly misunderstands the protections offered to a criminal defendant under our Constitution and rule of law. In our criminal justice system, a defendant is entitled to mount a defense by demonstrating *the bias and motive* of the alleged victim – an argument that Nike does not squarely address.  This is so even if the "victim" believes itself to be blameless and the defense to be unavailing.

In its filing, Nike effectively makes Mr. Avenatti's point.  Nike casts itself as an innocent, claiming that "Nike committed no crimes and fully cooperated" and that it "conducted its own internal investigation, cooperated with the Government's investigation, and produced documents and information to the Government." (Dkt. No. 115:1-2, n.1, and 8:

"Nike committed no crime, and it cooperated fully.").[1]  Counsel for Nike undoubtedly will testify accordingly at trial and deny motive to cooperate against Mr. Avenatti.  *Mr. Avenatti is not stuck with those self-serving denials*: that is simply not how our system works.  Instead, under well-settled law, Mr. Avenatti is entitled to prove up Nike's motive through extrinsic evidence in the form of witnesses and documents. That evidence will show that Nike was in fact engaged in the corruption of amateur basketball;  that Nike did not "fully cooperate" with the SDNY in its investigation;[2] that Nike did not produce certain critical documents to the government until it became apparent that Nike had a whistleblower in the form of Coach Franklin; that the investigation of Nike was "continuing" at least as of the time Mr. Avenatti was arrested (and apparently still is); and that Nike was motivated to (belatedly) self-report to those same prosecutors and point the finger elsewhere in order to curry favor with them.  That is classic proof of motive and Mr. Avenatti has a constitutional right to present it, no matter that Nike might find it inconvenient.

---

[1] As set forth below, the investigation to which Nike is referring is to a grand jury investigation conducted out of the Southern District of New York, involving corruption in amateur basketball. Nike was served with a subpoena in September 2017 in connection with that investigation.

[2] Nike's contempt for the government's investigation of its conduct is readily apparent from documents viewed by the defense for the first time just yesterday.  For instance, right in the middle of the FBI investigation, on April 11, 2018, two of the subpoenaed Nike executives were sending each other texts cursing at the FBI and pejoratively ridiculing the investigation.  Those texts are currently designated "Confidential" under the Amended Protective Order so we do not quote their content.  The defense first had access to many of these documents on January 8, 2020, when it was permitted to review a subset of documents provided to the government by Nike. It was not permitted to copy them at that time, and Mr. Avenatti has since requested a limited number of these documents.

## II.    FACTUAL BACKGROUND

### A.  Nike's Systemic Corruption[3]

From 2010 until 2018, Coach Gary Franklin was the head of the California Supreme, a basketball "travel team" within Nike's Elite Youth Basketball League ("EYBL"). EYBL is an organized league of travel teams for top high school players, featuring more than 40 teams from around the country, including the California Supreme.  During Coach Franklin's tenure, the California Supreme attracted many talented players, including seven footers such as Deandre Ayton (a future first overall pick in the 2018 NBA draft), Bol Bol (currently with the NBA's Denver Nuggets), and Brandon McCoy (a player currently in the NBA G League).

In 2016-17, Nike EYBL executives Carlton DeBose and Jamal James successfully pressured Coach Franklin to make multiple payments for the benefit of amateur players, in violation of (at a minimum) NCAA rules.[4] (Dkt. No. 29:13; Dkt. No. 30-4).  Nike executives directed Coach Franklin and others to submit fabricated invoices to Nike to disguise the payments as travel expenses and sponsorships for 501(c)(3) organizations.  (Dkt. 30-4:10, 38). DeBose, James, and Nike Recruiting Coordinator John Stovall were directly involved in forcing Coach Franklin out of his 17U team before the start of the 2017 season, despite that Coach Franklin had a valid, existing contract to run that team in the EYBL and had relied on

---

[3] Mr. Avenatti has previously laid out portions of the relevant background, but he repeats it herein for the convenience of the Court.

[4] Paying amateur players, knowing that such payments would render the players ineligible for college scholarships, can under certain circumstances be punished under federal criminal law.  *See United States v. Gatto*, 295 F.Supp.3d 336, 345-49 (S.D.N.Y. 2018).  Moreover, concealing (and deducting) payments to amateur players, especially through charitable organizations, may violate criminal tax statutes.

that contract to make certain commitments to the community.    (Dkt. No. 30-3; Dkt. No. 30-5:4-5) ("We should give Gary an ultimatum.  Do what we are asking or lose your EYBL spot…").

Nike's corruption went well beyond the prohibited payments made through Coach Franklin. Specifically, text messages, e-mails, and other documents show that Nike executives sought to arrange for payments, often in cash, to other amateur basketball players and their families and "handlers."  (Dkt. No. 29:28).  Examples of these text messages were set forth in Mr. Avenatti's motion to dismiss.  (Dkt. No. 29)  Since the filing of that motion, undersigned counsel have been permitted to view additional documents – belatedly produced by Nike to the government pursuant to the September 2017 subpoena only *after* Mr. Avenatti's arrest in March 2019. These new documents further corroborate prohibited payments, including discussions between DeBose and James about $7,000 in cash being dropped off to an amateur player's mother, instructions by DeBose to a coach to send a bogus invoice to route a "medical payment" to a player's mother, and requests for free merchandise by handler Mel McDonald to Jamal James that prompted James to warn McDonald about sending e-mails that contain evidence of NCAA violations.[5]  Nike's internal documents contain numerous other examples of this scheme to funnel money to amateur players, their families, and handlers.  (*See, e.g.,* Dkt. No. 30-16:5-6) (breakdown of cash payments through handler Mel McDonald).  There is

_____

[5] As noted above, the defense first had access to many of these documents on January 8, 2020, when it was permitted to review a subset of documents provided to the government by Nike, but it was not permitted to copy them. Mr. Avenatti has since requested a limited number of these documents.

also evidence in the discovery suggesting that Nike executives Lynn Merritt[6] and Nico Harrison were generally aware of the payments.  (Dkt. No. 30-5:8-9) ("Have to do it cleanly and with a process.  I'm good but it's enough to where Lynn and Nico don't want to know the intimate details to cover their asses.").

## B.  The Failure by Nike and BSF to Properly Investigate Nike's Misconduct

Nike was served with a federal grand jury subpoena in September 2017, in connection with an investigation conducted by the United States Attorney's Office for the Southern District of New York.  The SDNY had contemporaneously brought a criminal case against the Director of Global Sports Marketing for Adidas and another Adidas executive – Merl Code – who formerly ran Nike EYBL, alleging conspiracy to commit wire fraud in connection with a scheme to bribe high school basketball players to attend and play for universities that had contracts with Adidas.  *See United States v. Gatto, Code, et al.*, No. 17-cr-0686 (LAK) (SDNY).  Between October 2017 and May 2018, Nike produced slightly more than 11,000 pages of documents to the SDNY pursuant to the grand jury subpoena.  Nike appears to have made the decision that, as of May 2018, it was done producing documents to the government.

As the grand jury investigation into Nike was progressing, Coach Franklin, having been asked to participate in Nike's scheme and having lost his 17U team, decided that he would take action against Nike and seek "justice" (a word he repeatedly used in describing what he most wanted as against Nike).  In early 2018, Coach Franklin teamed up with Jeffrey Auerbach, an entertainment industry executive with considerable prior experience in professional sports

---

[6] Lynn Merritt signed the California Supreme Travel Team Contract on behalf of Nike while Gary Franklin signed on behalf of California Supreme. (Dkt. No. 30-3:2).

management, whose son had previously played for Coach Franklin. Over the course of the next year – long before they first approached Mr. Avenatti to get involved in late February 2019 – Mr. Auerbach and Coach Franklin strategized about how to hold Nike and its executives accountable for the widespread corruption. After compiling a dossier documenting Nike's corruption with respect to California Supreme and beyond, and secretly recording Nike executives, Mr. Franklin decided to have Mr. Auerbach reach out to EYBL executives DeBose and James on January 28, 2019 to begin a dialogue about Coach Franklin. Mr. James responded that they would have their lawyers look at it.

Dissatisfied with the brush-off from Messrs. DeBose and James, Mr. Auerbach then spoke at length with his "friend" at Nike – EVP John Slusher – on February 6, 2019. During that call, Mr. Auerbach made specific allegations of corruption against Messrs. DeBose and James and described "how they brought this corruption into California Supreme." (Dkt. No. 30-10:6). Mr. Auerbach made it clear that Coach Franklin "now wants Justice," which included "help[ing] the company clean-up EYB, get rid of the corruption and corrupt execs." (Dkt. No. 30-10:6). Mr. Slusher emailed Mr. Auerbach on February 11, 2019 to say: "Due to the seriousness of the matters you raised and how serious we take those situations, *I immediately contacted my legal department* and they are reviewing." (Dkt. No. 30-10:3). He also suggested that any additional communications would be best handled by Nike's "*outside counsel that deals with EYBL matters*," BSF.

Almost immediately after Mr. Auerbach's outreach to Messrs. DeBose, James and Slusher, and with full understanding that Coach Franklin was prepared to ensure that the corruption at Nike was investigated and exposed, Nike suddenly began producing documents

to the SDNY grand jury once again. Thus, whereas Nike had not produced a *single* document in some *nine months* (since May 4, 2018), it now made several new batches of production, beginning on February 2, 2019. It then produced two new batches of documents on February 11, 2019 and March 11, 2019. And then, fast forwarding to Mr. Avenatti's arrest on March 25, 2019, and as late as July 12, 2019 – nearly 21 months after being served with the grand jury subpoena – Nike produced a total of some *6,500 additional* documents to the SDNY.  In total, as of July 12, 2019, had produced more than 17,800 pages to the government – much of which was produced to the government only *after* it became aware through Mr. Auerbach that Coach Franklin was beginning to make noise about the corruption within EYBL.

Pursuant to a *Brady/Giglio* request, the defense has now had the opportunity to review a subset of the documents produced by Nike to the SDNY.  It is clear that scores of documents relevant to the scheme to pay amateur players were produced by Nike to the SDNY only *after* Mr. Auerbach first reached out to Messrs. DeBose, James, and Slusher. To take one example, a large volume of text messages between and among different Nike executives such as Messrs. DeBose, James, and Stovall, evidencing the scheme, were produced to the government only in or after February 2019.

The 21-month delay in producing these documents to the government raises serious questions about Nike's narrative of "full cooperation" with the government's investigation. (Dkt. No. 115).  To be sure, a reasonable inference is that once Nike realized that Coach Franklin was going to expose corruption at Nike – corruption that Nike had failed to properly investigate and adequately disclose to the government – and then when Coach Franklin's

claims became public with Mr. Avenatti's arrest, Nike's counsel scrambled to produce documents that Nike had previously failed to produce to the SDNY grand jury.

Indeed, by the time that Messrs. Avenatti and Geragos walked into the meeting with BSF lawyers on March 19, 2019, the trap already had been set. Upon Mr. Auerbach's outreach in late January/early February 2019 regarding Coach Franklin's claims of corruption, Nike and BSF well understood that Coach Franklin's claims were bad news for Nike. In fact, from his very first calls with Mr. Geragos on March 13, 2019, BSF attorney Scott Wilson made sure to have associates on the calls to transcribe what were simple scheduling conversations.  There is no doubt that BSF and Nike were on high alert before Mr. Avenatti even walked in the door for the March 19 meeting as to the subject matter of the meeting and as to Nike's exposure. Despite this, Scott Wilson's entire conversation with Mr. Avenatti on that day was seemingly a ruse: he pretended to have no idea who Coach Franklin was or what his claims were, despite that Nike, via BSF, had been scrambling to make several batches of production to SDNY following Mr. Auerbach's outreach and – *only days earlier* – BSF had made a production of relevant documents to the government.

## C.  The Subpoenaed Nike Witnesses

The subpoenaed Nike witnesses are Carlton DeBose, Jamal James, Nico Harrison, Lynn Merritt, John Slusher, John Stovall, and Rachel Baker.[7]

---

[7] The defense served Nike's counsel by e-mail with trial subpoenas for Rachel Baker and John Stovall after Nike filed its motion to quash but notified Nike's counsel that it would treat its motion to quash as applying to those additional two witnesses as well.

### III.  ARGUMENT

### A.  Mr. Avenatti is Entitled to Call the Nike Witnesses to Show Bias and Motive

The above recitation of facts goes directly to motive.  These facts help explain *why* it was that the Nike lawyers participating in a settlement negotiation — at which an initial (and explicitly not a final) ask was made by plaintiffs' attorneys on behalf of a legitimate client with a legitimate claim – acted in the extraordinary manner in which they did. Many lawyers believe that their adversaries are being unfair and even over-the-top in their demands, but it is unheard-of for them to pick up the phone to call law enforcement immediately upon leaving a settlement negotiation.  Nike might argue that it did so because Nike's lawyers were so alarmed by what they heard in that meeting. But Mr. Avenatti is entitled to present his counter-narrative: the notes from the meeting betray absolutely no alarm or upset or push-back – *none*. To the contrary, Mr. Wilson played Messrs. Geragos and Avenatti so that he could reach out to law enforcement and – belatedly – offer up Nike's cooperation.

To be sure, Nike executives knew on March 19, 2019 that Coach Franklin's claims were true: they were in possession of internal text messages and e-mails containing admissions by Nike executives that they were funneling money to the families of high school players, and the invoices and bank statements shown to the Nike lawyers by Mr. Avenatti corroborated those payments. (Dkt. No. 30-4; 30-5)  So in order to answer the question as to *why* Nike's lawyers immediately picked up the phone to call law enforcement, and why they have a motive to implicate Mr. Avenatti in this case, Mr. Avenatti is entitled to explore the self-preservative reasons that prompted Nike and BSF to do so and to thereafter goad Mr. Avenatti in a certain

direction.[8]   Indeed, at the parties' last conference, this Court stated in response to Mr. Avenatti's motive argument: "*I totally understand your point that Nike itself was under investigation and had a motive to curry favor with the government. That is obvious and I acknowledge that*. . .". (12/17/19 tr. at 38) (emphasis added).  Mr. Avenatti not only is entitled to adduce this motive evidence, but he is entitled to do it through the presentation of extrinsic evidence.

Evidence of Nike's broader misconduct is directly relevant to prove the bias and motive of Nike witnesses who will testify at trial, including its outside lawyers and in-house counsel. *United States v. Harvey*, 547 F.2d 720, 722 (2d Cir. 1976) ("Special treatment is accorded evidence which is probative of a special motive to lie 'for if believed it colors every bit of testimony given by the witness whose motives are barred.'"). Indeed, exposure of a witness's motivation in testifying is so significant that, in a criminal case, curtailment of examination of motive may amount to a denial of due process or the right to confrontation. *See Davis v. Alaska,* 415 U.S. 308, 316–17, 94 S.Ct. 1105, 1110–11, 39 L.Ed.2d 347 (1974).

As set forth above, in 2017-18, the SDNY brought a criminal case, and subsequently obtained convictions against, Adidas executives that put the spotlight squarely on Adidas's

---

[8] To take just one example, Mr. Wilson repeatedly baited Messrs. Avenatti and Geragos into providing a price tag on the investigation. Early on, Mr. Avenatti clearly stated that the investigation would need to be robust given the extent of the corruption, but that "whatever the internal investigation costs, it costs."  Mr. Wilson immediately stated that everyone's interests were aligned, because Nike had an "interest in conducting an internal investigation surrounding these allegations." The next day, Mr. Wilson tried to jack up what the price tag would be, despite that Mr. Avenatti repeatedly stated that they would be willing to be paid whatever BSF would charge. Only after Mr. Wilson acknowledged that a BSF internal investigation of this kind could be in the range of $10 to $20 million did Mr. Avenatti come back with pricing in this range the following day.

behavior – including on a former Nike executive who had previously run the EYBL program. The SDNY had also issued a grand jury subpoena to Nike, and its counsel at BSF produced thousands of pages of documents to the SDNY covering the time period from January 1, 2016, through September 30, 2017.  (Dkt. No. 58:2 & n.2).  Those documents revealed broad misconduct, but notably, Nike failed to disclose numerous documents relating to Coach Franklin until after his advisor Jeffrey Auerbach began making noise in his effort to seek "justice" for Coach Franklin, and after Mr. Avenatti and Mr. Geragos arrived on the scene to do same.

When Nike and its lawyers from BSF reported Mr. Avenatti to the SDNY on March 19, 2019, leading to an arrest warrant issued a mere five days later, they were keenly aware that the NCAA criminal investigation was ongoing and that Nike's fate remained uncertain.[9] BSF and Nike also knew that Nike had not timely produced highly relevant documents to the grand jury relating to their widespread corruption and Coach Franklin.  Nike and its lawyers knew that cooperation against others (including a high-profile target, Mr. Avenatti) might yield significant benefits for Nike and its executives in that criminal investigation.  And to be clear, that motive has not diminished; when USA Berman was given the opportunity to exonerate Nike at his press conference on the date of Mr. Avenatti's arrest, USA Berman declined and stated that the investigation is "continuing."  Nike's conduct remains within the statute of limitations.

---

[9] For example, they knew that FBI Assistant Director William Sweeney had publicly warned others involved in amateur basketball at the time of the arrests in the Adidas case that: "We have your playbook.  Our investigation is ongoing and we are conducting additional interviews as I speak."

Given the continuing investigation by the very same office that is prosecuting Mr. Avenatti, evidence of Nike's widespread misconduct is plainly relevant to Nike's motive to have brought this case and to cooperate in its prosecution.  *See, e.g., United States v. James*, 609 F.2d 36, 46 (2d Cir. 1979) ("The strength of the case against Starns in North Carolina, if known by him, could bear upon Starns' motive to testify in this case."); *United States v. Lankford¸* 955 F.2d 1545, 1549 (11th Cir. 1992) (defendant's confrontation rights violated when district court excluded evidence that a key witness's sons were charged with marijuana distribution in state court and might be facing a federal investigation; witness's "desire to cooperate may have in fact been motivated by an effort to prevent such an investigation."); *United States v. Atherton*, 936 F.2d 728, 734 (2d Cir. 1991) (probative value of illegal conduct by a government witness depends on a "showing that the government was contemplating prosecution, or at least was aware of, the illegality.");  *United States v. Salerno,* 937 F.2d 797, 809 (2d Cir.), *modified on other grounds,* 952 F.2d 623, *amended on other grounds,* 952 F.2d 624 (1991), *rev'd on other grounds,* 505 U.S. 312, 112 S. Ct. 2503 (1992), *on remand,* 974 F.2d 231 (2d Cir.), *vacated on other grounds,* 8 F.3d 909 (1993) (reversing conviction where defendant was not permitted to call witness to establish government's bias and motive); *Cf. Harvey,* 547 F.2d at 722.  Moreover, the more substantial the misconduct, the greater the chance of criminal prosecution and the greater the motive of Nike witnesses to cooperate and to implicate Mr. Avenatti.

In Nike's view, Mr. Avenatti should be limited to asking the Nike witnesses whether they have an interest in cooperating – and be stuck with the answer – but not be permitted to ask why that motive is so powerful in this case.  This is improper and seeks to deprive Mr.

Avenatti of his basic right to present a defense.  As the Second Circuit stated in *United States v. Harvey*: "The law of evidence has long recognized that a cross-examiner is not required to 'take the answer' of a witness concerning possible bias, but may proffer extrinsic evidence, including the testimony of other witnesses, to prove the facts showing a bias in favor of or against a party." 547 F.2d at 822 (citation omitted). Further, it noted that "the law is well settled in this Circuit, as in others, that bias of a witness is not a collateral issue and extrinsic evidence is admissible to prove that a witness has a motive to testify falsely." *Id.* (citation omitted).

Instead of addressing – at all – Mr. Avenatti's actual (and irrefutable) argument that he is entitled to establish motive through extrinsic evidence, Nike instead devotes several pages in its brief toward the argument that the Nike witnesses should not be called to extrinsically impeach the testimony of Nike's counsel. (Dkt. No. 115:4-6). This argument is a head-scratcher, as that has never been the purpose for which Mr. Avenatti seeks to call the Nike witnesses.[10] To be very clear: the Nike witnesses are being called to establish Nike's motive to testify at Mr. Avenatti's trial in favor of the government and explain its hair-trigger reaction in bringing an initial settlement demand to the attention of the very same prosecutors who were investigating Nike. *Nike was not concerned that it was being extorted*; it was concerned that it was in the cross-hairs of the government, and it was trying desperately to deflect.

---

[10] As part of this straw-man argument, Nike argues that the recorded conversations are so damning that essentially this case will try itself, such that Mr. Avenatti need not even bother mounting a defense at all. *See* Dkt. No. 115: 4-5. Fortunately for our constitutional democracy, that is not the way our criminal justice system works, and it is not the case that a defendant is not permitted to put on a defense because of some judgment by a motivated witness that the evidence against the defendant is so strong that it is not worth defending. Further, Nike ignores the fact that the longest negotiation session with Nike involving Mr. Avenatti – the critical first meeting where Nike's lawyers and Mr. Geragos made a number of statements helpful to Mr. Avenatti - *was not recorded*.

### B. Mr. Avenatti is Entitled to Call Nike Fact Witnesses to Establish Coach Franklin's Plausible Claim of Right

Mr. Avenatti's defense is that, acting in a representative capacity on behalf of Coach Franklin, he met with Nike's counsel to settle Coach Franklin's plausible claims against Nike in a manner that achieved Coach Franklin's dual objectives of justice and compensation. There is substantial evidence to support the defense that Mr. Avenatti's demand for an internal investigation was well within the scope of his authority, and that he reasonably believed that to be so. Although the government would like to sell a different narrative to the jury – *i.e.,* that Mr. Avenatti was acting outside the scope of his authority, and therefore, it is irrelevant that Coach Franklin had a plausible claim – the defense rejects that narrative and will urge the jury to do the same. Mr. Avenatti is entitled to present evidence to support that he had authority to make both components of the settlement demand *and* that he was pursuing a plausible claim that Coach Franklin had against Nike.

Messrs. DeBose and James have relevant factual testimony to offer about Nike's efforts to force Coach Franklin to violate NCAA rules and route payments to players through the submission of fake invoices. Messrs. DeBose, James, and Stovall have relevant information about the efforts to strip Coach Franklin of his 17U team while he had a contract. They, and Ms. Baker, have relevant testimony about the widespread nature of the corruption. Messrs. Merritt and Harrison have relevant testimony to offer about whether Nike deliberately turned a blind eye to it. Mr. Slusher has relevant factual testimony to offer about Mr. Auerbach's call to him to report the corruption that was brought into Coach Franklin's program by Nike executives and to corroborate that Coach Franklin demanded *justice*, which meant to clean up Nike EYBL. Mr. Slusher also has critical testimony about Nike's reaction to the information

provided to him by Mr. Auerbach, including that Mr. Slusher immediately ran it up the chain at Nike and also reported it to Nike's outside lawyers at BSF. As set forth above, all of this also goes to Mr. Avenatti's defense that Nike was so deeply concerned that Nike itself was in trouble that it was motivated to cooperate with the government and cast itself as victim by offering up Mr. Avenatti on a silver platter.[11]

Nike misses the point in arguing that its witnesses should not be called because they have "no testimony to offer about what Mr. Avenatti knew at the time of his scheme" (Dkt. No. 115:3). The Nike witnesses pointedly are not being called to testify to conversations they had with Mr. Avenatti or to Mr. Avenatti's communications with Coach Franklin. They are being called to establish that Coach Franklin had a plausible claim and, as set forth above, that Nike had a motive to deflect heat away from itself and onto someone else.

### C.  Mr. Avenatti is Entitled to Call the Nike Witnesses to Rebut the Claim of Wrongfulness and Justify the Estimated Cost of the Investigation

The government's case-in-chief will no doubt highlight the estimated cost that Mr. Avenatti placed on the internal investigation of $15-25 million.  The government will either explicitly or implicitly ask the jury to infer that this amount is exorbitant and had no basis in reality, despite the fact that law firms – including BSF – often bill substantially more than that for internal investigations.  Evidence of Nike's widespread misconduct beyond that directed at Coach Franklin will prove the reasonableness of the estimate, which Wilson and Nike

---

[11] In this regard, Mr. Slusher's testimony is not hearsay. His testimony about his conversations with Mr. Auerbach and then the fact of his conversations (but not the content, where privileged) of his conversations within Nike and with BSF will be offered not for the truth, but for the effect that this had on Nike and on Nike's motive in reaching out to the SDNY.

repeatedly solicited from Mr. Avenatti,[12] and directly rebuts the government's arguments that the *amount* of the estimated cost of the investigation is itself evidence that Mr. Avenatti acted wrongfully.  "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining this action."  Fed. R. Evid. 401. "To be relevant, evidence need not be sufficient by itself to prove a fact in issue, much less to prove it beyond a reasonable doubt."  *United States v. Abu-Jihaad*, 630 F.3d 102, 132 (2d Cir. 2010).  Rule 401 prescribes a "very low standard" for relevance.  *United States v. White*, 692 F.3d 235, 246 (2d Cir. 2012).  [U]nless an exception applies, all 'relevant evidence is admissible.'"  *Id.* (quoting Fed. R. Evid. 402).

If the government is permitted to highlight the amount Mr. Avenatti demanded as being exorbitant, Mr. Avenatti is entitled to present evidence that his estimate for the cost of the investigation was reasonable and grounded in reality in light of the number of EYBL teams; the fact that the misconduct originated at the top of Nike and permeated the entire EYBL; the number of coaches, players and executives involved; the length of time the conduct had occurred; the number of witnesses that would need to be interviewed; the amount of documents that would need to be reviewed; and the breadth of the misconduct shown by the documents. Moreover, evidence that Nike directed many other EYBL coaches to make payments to high school players proves that this was Nike's *modus operandi* and not some accident or mistake. *See United States v. Aboumoussallem*, 726 F.2d 906, 911 (2d Cir. 1984) (discussing lower standard for admitting similar acts evidence for defensive purposes under Rule 404(b)); *cf.*

---

[12] It bears repeating that Mr. Avenatti made no specific monetary demands on Nike whatsoever until well *after* Nike stated it had an interest in conducting the internal investigation Mr. Avenatti had proposed.

*United States v. Litvak*, 808 F.3d 160, 188-89 (2d Cir. 2015) (noting low threshold for admissibility under Rule 401 and concluding that district court erred by excluding evidence that defendant's supervisors had approved identical conduct committed by other employees at company, even though not known to the defendant).   As set forth above, the evidence corroborates Mr. Avenatti's defense that Coach Franklin had a plausible claim against Nike when Mr. Avenatti allegedly threatened a press conference; proof of a plausible claim is the antidote to an allegation of wrongfulness.   *See United States v. Jackson,* 180 F.3d 55, 69-71 (2d Cir. 1999).

Beyond that, and importantly, there is substantial evidence that Mr. Avenatti was aware of the broader misconduct, even if not the specific instances of it, which justified his demand on behalf of Coach Franklin to root out corruption in Nike EYBL and influenced his estimated cost of the internal investigation.   For starters, the evidence will show that he knew that Nike EYBL had been served with a federal grand jury subpoena by the SDNY in 2017 in connection with the NCAA criminal investigation that brought down an Adidas executive, college coaches, and an Adidas consultant who was the former Director of Nike EYBL.   (Dkt. No. 30-15:3).   Moreover, the evidence will show that, in March 2019, Coach Franklin and Mr. Auerbach informed Mr. Avenatti that there was widespread, ongoing corruption being carried out by Nike executives DeBose and James and that they had brought this systemic corruption into the California Supreme program and others across the country.   (Dkt. No. 30-10:6). Further, Mr. Auerbach provided Mr. Avenatti with a lengthy civil RICO complaint filed by a player named Brian Bowen against Adidas, Gatto, Code (the former Director of Nike EYBL) and others, in which Bowen alleged that criminal conduct permeated "the entire sneaker

industry." (Dkt. No. 30-13:34). The PowerPoint presentation that Mr. Auerbach prepared for Mr. Avenatti referenced the April 2018 Report of the Commission on College Basketball, chaired by former Secretary of State Condoleezza Rice, who stated that "[t]he corruption we observed in college basketball has its roots in youth basketball." (Dkt. No. 30-14:3).[13] Mr. Auerbach shared several news articles with Mr. Avenatti suggesting that the corruption in amateur basketball was endemic. They told Mr. Avenatti that the entire EYBL needed to be cleaned up nationwide. The specifics of Nike's broader misconduct plainly corroborate what Mr. Avenatti believed at the time and are relevant to establish that Mr. Avenatti did not act "wrongfully" – and did not believe he was doing so – by demanding that he and Mr. Geragos be engaged to lead a comprehensive investigation of Nike in order to clean up the rampant misconduct, as Coach Franklin wanted. The evidence will counter the misleading picture that the estimated cost of the investigation was divorced from reality and will show that the cost estimate was pegged to the significant work that the investigation would entail.

### D.  The Nike Witnesses' Testimony is not Excludable Under Rule 403

Nike's final argument in support of its motion to quash is that the evidence should be excluded under Rule 403 of the Federal Rules of Evidence 403 to avoid a "mini-trial." (Dkt. No. 115:7-10). Nike cites to a single case for this argument, *United States v. James*, 609 F.2d 36, 46 (2d Cir. 1979); yet, in that case, the Second Circuit found that was in fact *error* for the lower court to have excluded the extrinsic evidence of a witnesses' motive. It is true that the *James* court ruled that, under the circumstances of that case, the error was harmless because

---

[13] The Report itself, which received considerable media attention, lamented the lack of effective controls in place in the apparel companies' spending in non-scholastic basketball.

the jury was presented with "overwhelming evidence going to motive" in other forms. *Id.* at 48. But it is odd, and telling, that Nike clings to a case where the Court of Appeals squarely held that it is error for a trial court to exclude extrinsic motive evidence. As noted above, Mr. Avenatti "should be afforded the opportunity to present facts which, if believed, could lead to the conclusion that a witness who has testified against him either favored the prosecution or was hostile to the defendant. Evidence of all facts and circumstances which 'tend to show that a witness may shade his testimony for the purpose of helping to establish one side of a cause only,' should be received." *United States v. Harvey*, 547 F.2d 720, 723 (2d Cir. 1976) (internal quotations omitted).

Nor, in any event, would the Nike witnesses' testimony occasion a "mini-trial." The testimony that each witness would provide is relatively limited.  Messrs. DeBose, James, Baker, and Stovall would each be shown Nike-produced documents evincing payments for the benefit of amateur players and be asked questions about their knowledge and participation, and whether they had provided relevant documents in connection with the SDNY grand jury investigation prior to February 2019.  Lynn Merritt and Nico Harrison would be asked about Coach Franklin's contract, their knowledge of payments to amateur players and the stripping of Coach Franklin's team while his contract was pending.  John Slusher would be asked about Mr. Auerbach's outreach to Nike, the demand for justice, and Nike's reaction to it.  The "mini-trial" of which Nike complains is actually Mr. Avenatti's "defense case" – and one that Mr. Avenatti is constitutionally entitled to present.

## IV.  **CONCLUSION**

For the foregoing reasons, Mr. Avenatti respectfully requests that the Court deny Nike's

motion to quash the subpoenas to its witnesses.

Dated:          January 9, 2020

Respectfully submitted,

By:   /s/Scott A. Srebnick
      Scott A. Srebnick, P.A.
      201 South Biscayne Boulevard
      Suite 1210
      Miami, FL 33131
      Telephone: (305) 285-9019
      Facsimile: (305) 377-9937
      E-Mail: Scott@srebnicklaw.com

By:   /s/Jose M. Quinon
      Jose M. Quinon, P.A.
      2333 Brickell Avenue, Suite A-1
      Miami, FL 33129
      Telephone:  (305) 858-5700
      Facsimile:  (305) 358-7848
      E-Mail:  jquinon@quinonlaw.com

By:   /s/ E. Danya Perry
      E. Danya Perry
      PERRY GUHA LLP
      35 East 62nd Street
      New York, New York 10065
      Telephone: (212) 399-8340
      Facsimile: (212) 399-8331
      E-mail: dperry@perryguha.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 9, 2020, I caused a true and correct copy of the foregoing to be served by electronic means, via the Court's CM/ECF system, on all counsel registered to receive electronic notices.

<u>/s/Scott A. Srebnick</u>
Scott A. Srebnick