UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

        v.

MICHAEL AVENATTI,

              Defendant.

No. 19 Cr. 373

# MEMORANDUM OF LAW IN FURTHER SUPPORT OF
# NON-PARTY NIKE, INC.'S MOTION TO QUASH

Peter M. Skinner
Andrew Z. Michaelson
David L. Simons
BOIES SCHILLER FLEXNER LLP
55 Hudson Yards
New York, NY 10001
(t) +1 212 446 2300
(f) +1 212 446 2380

*Attorneys for NIKE, Inc.*

# **TABLE OF CONTENTS**

**PRELIMINARY STATEMENT** ................................................................................................ 1

**FACTUAL SUMMARY** ............................................................................................................ 4

**I.      Nike's Timely Cooperation With the SDNY** ................................................................ 4

**II.     Nike's Continued Cooperation Following Mr. Avenatti's Threats** ............................. 5

**ARGUMENT** .............................................................................................................................. 7

**I.      Defendant Cannot Use the Nike Employees' Testimony to Prove a Plausible
         Claim of Right or Rebut a Claim of Wrongfulness** ...................................................... 7

**II.     Defendant's "Bias and Motive" Arguments Fail** ......................................................... 8

**III.    The Nike Employees' Testimony Is Also Inadmissible Under Rule 403(b).** ............... 10

**CONCLUSION** ........................................................................................................................ 12

NIKE, Inc. ("Nike") respectfully submits this reply memorandum of law in further support of its motion to quash Defendant Michael Avenatti's subpoenas for seven Nike employees—John Slusher, Lynn Merritt, Nico Harrison, Carlton DeBose, Jamal James, John Stovall, and Rachel Baker (the "Nike Employees")[1]—to testify at his criminal trial beginning on January 21, 2019.

## PRELIMINARY STATEMENT

Mr. Avenatti is charged with extortionately demanding that Nike pay *him* $15 to $25 million. Since he was demanding money for himself, and not his client, this Court recently ruled that his threats cannot be justified by the extent of any legal claims that his client, Gary Franklin, may have against Nike. *See* Order of Jan. 6, 2020 [122] (hereinafter "Jan. 6 Order") at 10.) It is Mr. Avenatti who is on trial in this case, not Nike, and Nike's conduct provides no defense to the charges he is facing. (*Id.* at 10 n.2.) Despite the obvious relevance of this Court's Jan. 6 Order to Mr. Avenatti's request to subpoena seven Nike employees for testimony, Mr. Avenatti does not even address it in his opposition to the instant motion to quash.

Instead, Mr. Avenatti argues that testimony from the Nike Employees about Nike's conduct should be presented to the jury—even if it is irrelevant to his defense—because it would establish that the Nike lawyers who testify at the trial ("Nike counsel") have "bias and motive" to testify favorably to the Government. This is a ruse. Mr. Avenatti is plainly seeking to use "bias and motive" as a vehicle to put Nike's conduct before the jury, to try to distract the jury from his own criminal conduct. He is doing everything he can to put his victim on trial, and to the extent the Court's Jan. 6 Order forecloses him from introducing evidence of Nike's conduct as part of his

---

[1] As explained by Mr. Avenatti, the Defense served trial subpoenas on Ms. Baker and Mr. Stovall after Nike had filed its motion to quash, "but notified Nike's counsel that it would treat its motion to quash as applying to those additional two witnesses as well." (Opp. Nike's Mot. Quash [131] ("Opp.") at 9 n.7.) Nike therefore respectfully requests that the Court apply Nike's motion to quash to the trial subpoenas served on Ms. Baker and Mr. Stovall.

1

defense, he is trying to get it in through the back door as evidence of "bias and motive." The Court should reject this.

Mr. Avenatti's account of Nike counsel's "bias and motive" is built on falsehoods. He claims that they are biased because Nike committed crimes and failed to cooperate with the Government's investigation, but these claims are false. But if Mr. Avenatti is permitted to introduce these allegations at trial, the Government will have no choice but to respond, just as Nike must do so here.

Put simply, Nike's cooperation with the Government's investigation into corruption in amateur basketball has been extensive. Nike received a grand jury subpoena for documents in connection with the Government's investigation in September 2017, and it substantially completed its production of documents responsive to that subpoena in May 2018. In early 2019, Nike promptly responded to follow-up requests from the Government. Then, when Mr. Avenatti approached Nike in March 2019 with threats and allegations, Nike immediately reported Mr. Avenatti's threats to the Government and also reported the substance of his allegations about Nike. This is what companies that are fully cooperating with law enforcement do.

The notion that Nike's cooperation was incomplete prior to Mr. Avenatti's threats is fiction. Mr. Avenatti mistakenly asserts that Nike produced documents in the spring of 2019 as a response to Jeffrey Auerbach reaching out to Nike. In fact, the record makes clear that Nike made those productions in response to specific follow-up requests from the Government. Mr. Avenatti is also mistaken in asserting that Nike produced specific documents only *after* he threatened Nike. Indeed, the documents to which Mr. Avenatti most frequently cites in support of his purported allegations about Nike were produced to the Government on or before May 4, 2018, ten months before Mr. Avenatti surfaced. Instead of establishing the inadequacy of Nike's cooperation, the

timing of Nike's production of these documents proves precisely the opposite.

Similarly, the notion that Nike engaged in widespread corruption in amateur basketball is fiction. Individuals associated with Adidas—not Nike—were indicted for paying amateur players in exchange for those players' commitments to attend specific, Adidas-sponsored NCAA institutions, thereby defrauding those institutions out of scholarships. It is telling that Mr. Avenatti has *never* asserted that his client, Mr. Franklin, told him that Nike paid high school players in exchange for commitments to attend Nike-sponsored NCAA institutions. And now that Mr. Avenatti has received extensive discovery from the Office of the United States Attorney for the Southern District of New York (the "SDNY"), Mr. Avenatti is *still* not asserting that Nike paid high school players to attend Nike-sponsored NCAA institutions. Mr. Avenatti is alleging that Nike or Nike-sponsored teams may have provided money to high school players, *which is not a crime and may not even violate NCAA rules*.[2] (*See* Opp. 6.)

Here lies the central conceit of Mr. Avenatti's argument in favor of calling the Nike Employees to impeach Nike's counsel on "bias and motive." At the end of the day, once you strip away his bluster, *not even Mr. Avenatti is claiming that Nike did what Adidas did*.

The fact of the matter is that the testimony of Nike counsel will be limited. Nike counsel will testify primarily about their communications with Mr. Avenatti, all but one of which was recorded. To be sure, Mr. Avenatti should be permitted to cross-examine the Nike counsel about

---

[2] NCAA regulations sensibly permit payments to players and their families for reasonable expenses incurred in connection with travel to tournaments and practices—events they otherwise might be unable to attend. *See* NCAA Division I Manual §§ 12.02.2, 12.1.2.1.4.3 (2019), https://web3.ncaa.org/lsdbi/reports/getReport/90008. Amateur teams that participate in Nike's Elite Youth Basketball League ("EYBL"), typically travel to at least five different events across the country each season. The teams often travel with 15 players, multiple coaches and chaperones, and in certain instances players' family members. Permitted expenses, which include airfare, lodging, food, and other reasonable expenses, easily run into the hundreds of thousands of dollars.

bias and motive. But that cross-examination should be appropriately limited to prevent it from becoming a vehicle to confuse the jury with mini-trials about Nike, and in any event, Mr. Avenatti should not be permitted to impeach the Nike counsel extrinsically by calling the Nike Employees. Nike's motion to quash Mr. Avenatti's subpoenas should be granted.

## FACTUAL SUMMARY

### I. Nike's Timely Cooperation with the SDNY

On September 26, 2017, the SDNY announced the arrests of individuals associated with Adidas, a Nike competitor, on charges of fraud. According to the indictment in that case, an Adidas executive and consultant arranged payments to amateur basketball players (or their families) in exchange for those players' commitments to attend an NCAA school sponsored by Adidas. The Government charged that the scheme constituted a fraud on the universities, which provided the players with scholarships on the basis of false representations regarding player eligibility.

Shortly after the arrests, the SDNY issued a grand jury subpoena to Nike in connection with its investigation into criminal conduct related to amateur basketball (the "Grand Jury Subpoena"). Nike engaged outside counsel, Boies Schiller Flexner LLP ("BSF"), and its cooperation with the SDNY investigation began immediately. Nike made its first production of documents to the SDNY on October 4, 2017. By May 4, 2018, it had substantially completed its production of documents responsive to the Grand Jury Subpoena.

In January and February 2019, the SDNY reached out with follow-up requests for information, and Nike produced documents and information responsive to these requests in February and March 2019. Mr. Avenatti's suggestion that Nike produced documents in February and March 2019 because it was concerned about Mr. Franklin and Jeffrey Auerbach is demonstrably incorrect: communications between Nike and the SDNY make clear that Nike's

productions were made directly in response to the SDNY's follow-up requests.

**II.     Nike's Continued Cooperation Following Mr. Avenatti's Threats**

On March 19, 2019, Nike representatives participated in a meeting with Mr. Avenatti during which Mr. Avenatti first made his extortionate demands. Mr. Avenatti made allegations regarding Nike's conduct and he showed Nike counsel documents that were not in Nike's possession (including, for example, internal Cal Supreme records). Nike immediately reported its meeting with Mr. Avenatti to the SDNY. Specifically, Nike reported Mr. Avenatti's extortionate demands, and it also reported on Mr. Avenatti's allegations regarding Nike's conduct. In other words, Nike immediately reported to the SDNY the very allegations that Mr. Avenatti now claims Nike wanted to keep secret from the SDNY.

Nike continued to cooperate with the SDNY's investigation into amateur basketball, but Mr. Avenatti is either mistaken or deliberately misleading about the content of Nike's subsequent productions. Mr. Avenatti identifies three documents that he asserts Nike produced "only *after*" Mr. Avenatti met with Nike.[3] (Opp. 5.) The first document includes a reference to "$7,000 in cash being dropped off to an amateur player's mother." (Opp. 5.) Nike produced a document describing this payment (which was made by a team director, not Nike), on December 14, 2017, more than one year before Mr. Avenatti's scheme.

Second, Mr. Avenatti refers to instructions by Mr. DeBose to provide money to a player's mother to reimburse for "medical expenses." (Opp. 5.) Nike produced documents relating to these medical expenses to the SDNY on May 4, 2018, well before Mr. Avenatti's scheme. These

---

[3] The Protective Order prohibits Mr. Avenatti from quoting or excerpting Nike documents. In an attempt to smear Nike publicly, he nonetheless describes a few in general terms, and since his descriptions are misleading and he is mistaken about when Nike produced them, we address those documents herein.

documents make clear that the player in question sustained an injury while playing in a Nike-sponsored event, and that the amount of the payment to the player's mother (under $2,000) was consistent with the amount of the medical bill. NCAA regulations permit Nike to cover such medical expenses. *See* NCAA Division I Manual §§ 12.02.2, 12.1.2.1.4.3 (2019), https://web3.ncaa.org/lsdbi/reports/getReport/90008.

Third, Mr. Avenatti refers to an email regarding "requests for free merchandise." Nike produced this document to the SDNY on July 12, 2019, which is after Mr. Avenatti's arrest, because following Mr. Avenatti's arrest Nike decided to make a production of all communications with Mr. Franklin and certain other individuals associated with Cal Supreme, irrespective of search terms and irrespective of responsiveness to the Grand Jury Subpoena. This production consisted largely of emails concerning team rosters. It also included this document, which was not responsive to the Grand Jury Subpoena because it concerns providing players with a nominal amount of product—shoes and clothing—not cash. Documents that Nike had identified as responsive to the Grand Jury Subpoena had been produced long before.

Mr. Avenatti also references a few specific documents that he claims evince payments to amateur players (Opp. 5-6 (first citing Dkt. No. 30-16 at 5-6, and then citing Dkt. No. 30-5 at 8-9)), but Nike produced each and every one of these documents *on or prior to May 4, 2018*. The fact that Mr. Avenatti supports his allegations of Nike's purported misconduct almost entirely by reference to documents that Nike produced on or before May 4, 2018, over 10 months before he approached the company, establishes the reasonableness of Nike's response to the Grand Jury Subpoena.[4]

---

[4] Mr. Avenatti also references a Nike document from April 2018 in which he claims that Nike employees were "cursing" at the FBI and "pejoratively ridiculing the investigation." (Opp.

6

**ARGUMENT**

I.  **Defendant Cannot Use the Nike Employees' Testimony to Prove a Plausible Claim of Right or Rebut a Claim of Wrongfulness**

Testimony from the Nike Employees is legally irrelevant to Mr. Avenatti's defense. This Court has already ruled that "[e]vidence that Nike engaged in widespread corruption in the area of amateur basketball likewise does not provide a defense to the extortion and honest services wire fraud charges against Avenatti." (Jan. 6 Order at 10 n.2.) The Court was right to do so. It is an "established principle" in the Second Circuit that "when a threat is made to injure the reputation of another, the truth of the damaging allegations underlying the threat is not a defense to a charge of extortion under § 875(d)." *United States v. Jackson*, 180 F.3d 55, 66 (2d Cir.) (collecting cases), *on reh'g on other grounds*, 196 F.3d 383 (2d Cir. 1999).

Nevertheless, despite clear Second Circuit precedent and the recent ruling from this Court, Mr. Avenatti continues to insist that misconduct by Nike would somehow exonerate him. He therefore seeks to present evidence that "he had authority to make a settlement demand *and* that he was pursuing a plausible claim that Coach Franklin had against Nike." (Opp. 15.) But the Nike Employees have no testimony that bears on the scope of Mr. Avenatti's authority, nor can they testify to Mr. Avenatti's understanding of Mr. Franklin's "claim." The Nike Employees never spoke to Mr. Avenatti, and they were never told what Mr. Avenatti heard about Nike or what he

---

3 n.2.) This text exchange between Nike sports marketing employees followed press reports describing payments made by an NBA agent to a number of high school and college basketball players. The press reports, which were based on documents relating to the SDNY investigation that had been leaked to the press, needlessly and unfairly harmed the reputation of many young players, upsetting Nike employees. The text exchange between the Nike employees was animated by a concern that the FBI had been the source of the leak. It is ironic that Mr. Avenatti raises this, since Mr. Avenatti has no qualms about generating news that recklessly and falsely harms young players' reputations.

was instructed to do.

This Court recently ruled that information about which Mr. Avenatti had no knowledge at the time of his communications with Nike "is not likely to shed light on Avenatti's intent and on whether his conduct was 'wrongful.'" (Jan. 6 Order at 11 n.3.) Mr. Avenatti proffers a list of what each of the Nike Employees would testify about, and noticeably absent from that list is any reference to what Mr. Avenatti knew when he communicated his demands to Nike.[5] (*See* Opp. 20.)  This Court's recent order inevitably leads to the conclusion that Nike's motion to quash should be granted, yet Mr. Avenatti fails to address it, let alone distinguish it.

## II. Defendant's "Bias and Motive" Arguments Fail

Nor should the Nike Employees be called to offer testimony about "bias and motive." (Opp. 10-14).  There appear to be two separate reasons why Mr. Avenatti would like to call the Nike Employees to establish "bias and motive." The first is to establish *Nike's* motive for reporting Mr. Avenatti's threatening conduct to the SDNY.  The second is to establish (through extrinsic evidence) that *Nike counsel* have a bias to testify favorably to the Government.  Both arguments fail.

As to Mr. Avenatti's first argument, Nike's reasons for reporting Mr. Avenatti's threats to the SDNY are irrelevant to this case.  In any event, it should have been entirely predictable that Nike *would* report their meeting to the SDNY given that Mr. Avenatti made allegations about

---

[5] Mr. Avenatti also argues that he should be permitted to call the Nike Employees to demonstrate the validity of the dollar value of his request to be hired to perform an internal investigation.  The Nike Employees are not practicing lawyers.  They have no basis to testify about how internal investigations are conducted, how much they cost, or what Mr. Avenatti might have reasonably believed they cost.

Nike's conduct and that Nike was cooperating with the SDNY's investigation. That is elementary white collar law practice.

As to Mr. Avenatti's second argument, to be clear: Mr. Avenatti's confrontation rights guarantee only that he may *cross-examine* the Nike witnesses on their bias or motive to testify. *See Davis v. Alaska*, 415 U.S. 308, 316 (1974). Mr. Avenatti has no constitutional right to impeach the Nike witnesses extrinsically, and he cites no case law compelling such a result.[6] Rather, cases like *United States v. Harvey* reflect that the Court has "discretion" to limit or allow the admission of extrinsic evidence of bias "as the trial court in its discretion deems proper." 547 F.2d 720, 723 (2d Cir. 1976). Exercising this discretion to exclude evidence would be particularly appropriate here.

Mr. Avenatti has not proffered any plausible link connecting the Nike Employees' testimony to the purported biases or motives of Nike counsel. The Nike Employees cannot testify as to what facts the lawyers knew about Nike's conduct. They cannot speak to the lawyers' assessments of Nike's legal risk. They cannot speak to the timing or content of Nike's productions to the SDNY. And they are not white collar experts with knowledge of how the U.S. Department of Justice evaluates corporate conduct and makes decisions regarding whether to charge corporate entities. In short, the Nike Employees have no admissible, relevant testimony to offer to impeach Nike counsel on bias or motive. Mr. Avenatti may seek to cross-examine Nike counsel on some of these subjects, but he should not be permitted to call the Nike Employees to do so extrinsically.[7]

---

[6] Most of the cases cited in Mr. Avenatti's "bias and motive" section involve restrictions on the scope of cross-examination. *See Davis*, 415 U.S. at 316-17 (1974); *United States v. Lankford*, 955 F.2d 1545, 1549 (11th Cir. 1992); *United States v. James*, 609 F.2d 36, 45-46 (2d Cir. 1979).

[7] Mr. Avenatti's expectation that Nike counsel will "undoubtedly" deny motive to cooperate against Mr. Avenatti is unfounded. (Opp. 3.)

9

### III. The Nike Employees' Testimony Is Also Inadmissible Under Rule 403(b).

Even if the Court were to find that testimony from the Nike Employees would have some limited probative value as extrinsic evidence of impeachment, the testimony should nevertheless be excluded under Rule 403. Nike anticipates that its counsel will testify largely about their communications with Mr. Avenatti, almost all of which were recorded. Only one meeting between Nike's counsel and Mr. Avenatti was *not* recorded. The probative value of impeaching Nike counsel about what happened during that one meeting is limited, and conversely, the prejudice and confusion that would inevitably result from testimony by the Nike Employees is tremendous. The whole point of calling the Nike Employees would be to put Nike's conduct at trial, to distract the jury. Indeed, Mr. Avenatti is openly requesting to have the very kind of "mini-trial" that Rule 403 is intended to prevent, in which no fewer than seven witnesses would be called for the sole purpose of resolving whether the defendant's *victim* has committed a crime. (Opp. 20.) To answer this question—which has no direct bearing on Mr. Avenatti's defense—Mr. Avenatti proposes to ask six of the seven Nike Employees about their purported "knowledge" of payments to amateur players, which is not even criminal.[8] (Opp. 20.) He would question certain of the Nike Employees about their cooperation with Nike's internal investigation, and he would show them documents that he claims evince "payments for the benefit of amateur players." (*Id.*)

In truth, Mr. Avenatti would *not* be eliciting this testimony to impeach the testimony of Nike counsel on "bias and motive." Their purported "bias and motive" is merely a Trojan horse that Mr. Avenatti would use to present to the jury a broader, irrelevant defense that paints Nike as

---

[8] The seventh employee, John Slusher, would be asked about Mr. Auerbach's outreach to Nike and Mr. Auerbach's supposed "demand for justice." Whether Mr. Auerbach told Mr. Slusher that Mr. Franklin was seeking "justice" is hearsay that is offered for the truth of the matter asserted (namely, that Mr. Franklin did tell Mr. Auerbach that he wanted justice). Mr. Slusher has no admissible testimony that is relevant to "bias and motive."

the villain and himself as the hero (while doing significant collateral damage to whichever basketball players he decides to drag through the mud in the process). The Government would have no choice but to respond, and the "mini-trial" that Mr. Avenatti desires would commence.

Precedent does not support what Mr. Avenatti is trying to accomplish. Contrary to Mr. Avenatti's suggestion,[9] courts in the Second Circuit routinely apply Rule 403 to exclude evidence of government cooperators' bias. For example, in *United States v. Stewart*, the defendant (Martha Stewart) sought to cross-examine a government cooperator on whether he had violated his cooperation agreement by using marijuana while on a trip to Jamaica. 433 F.3d 273, 313 (2d Cir. 2006). Stewart "sought to raise the matter to illustrate [the cooperator]'s incentive to lie to avoid termination of his cooperation agreement." *Id*. The district court barred the line of questioning, citing Rule 403, and Stewart was convicted. *Id*. On appeal, the Second Circuit rejected Stewart's argument that the district court's ruling formed a basis for overturning the verdict, affirming that the desired line of cross-examination would have created a "'mini-trial' on the legality of marijuana use in Jamaica and whether or not [the cooperator] could be prosecuted for his conduct or had breached his cooperation agreement," which "would have been a confusing distraction in an already lengthy and complex trial." *Id*.

Here, much like in *Stewart*, Mr. Avenatti seeks to create a new trial within his own, wherein the jury will be asked to embark on a detour away from the question of Mr. Avenatti's own criminal liability to consider someone else's. If anything, *Stewart* was a far closer case than exists here,

---

[9] Mr. Avenatti's discussion of *United States v. James*, a case he originally cited in his response to the Government's motions *in limine*, continues to mislead. The issue with Mr. Avenatti's use of *James* to support his position is not that in that case "the error was harmless" (Opp. 19.) The issue is that the error in that case had nothing to do Rule 403. As noted previously, the *James* court was reviewing an improper application of Federal Rule of Evidence 608(b), which is not at issue here. *See* 609 F.2d at 45-46. Had the same extrinsic evidence been excluded under Rule 403, the Second Circuit expressly noted that its holding may have been different.

where Mr. Avenatti seeks to use other witnesses to *extrinsically* impeach, and does not suggest that the Government witnesses, themselves, engaged in any misconduct. *Stewart*, 433 F.3d at 313.

*United States v. Harvey* is entirely different. In *Harvey*, there was "no indication in the record that [the proposed witness]'s testimony posed a realistic possibility of confusion or prejudice, or would have cause a significant delay in the proceedings." 547 F.2d 720, 723 (2d Cir. 1976). Where, in contrast, such possibilities are realistic, courts routinely (and rightly) exclude bias and motive evidence under Rule 403. *See, e.g.*, *United States v. Morales*, 474 F. App'x 30, 33-34 (2d Cir. 2012) (affirming that any probative value of evidence that a government witness may have lied about his involvement in domestic abuse was "substantially outweighed by the risk of creating a confusing distraction from the central issues at trial"); *United States v. Asaro*, No. 14-cr-26 (ARR), 2015 WL 5841804, at *7 (E.D.N.Y. Oct. 7, 2015) (barring cross-examination about the length of government cooperators' prison sentences which, although probative of the cooperators' bias, posed "a substantial danger of unduly prolonging the trial, confusing the issues, and misleading the jury"); *see also United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000) (noting that even where "[e]vidence of other crimes, wrongs, or acts" is probative of an individual's motive, the evidence remains subject to "the probative-prejudice balancing test of Rule 403" (first quoting Fed. R. Evid. 404(b), and then quoting *United States v. Inserra*, 34 F.3d 83, 89 (2d Cir. 1994)). Mr. Avenatti's subpoenas warrant the same treatment here.

## CONCLUSION

For the foregoing reasons, and for the reasons stated in Nike's December 31, 2019, memorandum of law, Nike respectfully requests the Court quash the subpoenas.

Dated: January 13, 2020	Respectfully submitted,

/s/ Peter M. Skinner
Peter M. Skinner
Andrew Z. Michaelson
David L. Simons
BOIES SCHILLER FLEXNER LLP
55 Hudson Yards
New York, NY 10001
(t) +1 212 446 2300
(f) +1 212 446 2380

*Attorneys for NIKE, Inc.*