UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

-against-

MICHAEL AVENATTI,

Defendant.

**MEMORANDUM
OPINION & ORDER**

(S1) 19 Cr. 373 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

Indictment (S1) 19 Cr. 373 charges Michael Avenatti with transmitting interstate communications with intent to extort, in violation of 18 U.S.C. § 875(d) (Count One); Hobbs Act extortion, in violation of 18 U.S.C. § 1951 (Count Two); and honest services wire fraud, in violation of 18 U.S.C. §§ 1343 and 1346 (Count Three).  The Government charges that Avenatti – who is licensed to practice law in California – transmitted in interstate commerce threats "to cause financial harm to Nike and its reputation if Nike did not agree to make multimillion dollar payments to Avenatti"; "used threats of economic and reputational harm in an attempt to obtain multimillion dollar payments from Nike"; and used interstate communications to "engage[] in a scheme to obtain payments for himself from Nike based on confidential information provided to AVENATTI by Client-1 for the purpose of furthering AVENATTI's representation of Client-1, without Client-1's knowledge or approval," thereby depriving Client-1 of the "duty of honest services" he was owed.  ((S1) Indictment (Dkt. No. 72) ¶¶ 20, 22, 24) (emphasis in original).

Avenatti has moved to dismiss all three counts of the (S1) Indictment on the grounds that "that he was targeted for prosecution in this case for unconstitutionally vindictive and selective reasons."  In the alternative, Avenatti seeks discovery and an evidentiary hearing

concerning these defenses.  (Def. Br. (Dkt. No. 29) at 7, 48-49; see also Def. Mot. (Dkt. No. 28))[1]  For the reasons stated below, Avenatti's motion to dismiss will be denied.

## BACKGROUND

## I.    THE (S1) INDICTMENT'S FACTUAL ALLEGATIONS AND CHARGES

The (S1) Indictment alleges that Client-1 – since identified as Gary Franklin – is the director and head coach of an amateur youth basketball program (the "Basketball Program") based in California.  "For a number of years, the Basketball Program . . . had a sponsorship program with Nike[,] pursuant to which Nike paid the program approximately $72,000 annually."  ((S1) Indictment (Dkt. No. 72) ¶ 5)  In March 2019, Franklin sought legal assistance from Avenatti "after [Nike informed] the Basketball Program . . . that its annual contractual sponsorship would not be renewed."  (Id. ¶ 8)

Avenatti and Franklin met on March 5, 2019.  "During that meeting and in subsequent meetings and communications, [Franklin] informed AVENATTI . . . that [he] wanted Nike to reinstate its $72,000 annual contractual sponsorship of the Basketball Program."  "During the [March 5, 2019] meeting, [Franklin] [also] provided AVENATTI with information regarding what [Franklin] believed to be misconduct by certain employees of Nike involving the alleged funneling of illicit payments from Nike to the families of certain highly ranked high school basketball prospects."  (Id. ¶ 9) (emphasis in original).

At the March 5, 2019 meeting, Avenatti told Franklin "that [he] believed that he would be able to obtain a $1 million settlement for [Franklin] from Nike. . . ."  However,

> at no time during the March 5, 2019 meeting or otherwise did AVENATTI inform [Franklin] that AVENATTI also would and did seek or demand payments from Nike for himself in exchange for resolving any potential claims made by [Franklin] and not

---

[1] Citations to page numbers of docketed materials correspond to the pagination generated by this District's Electronic Case Filing ("ECF") system.

causing financial and reputational harm to Nike, or that AVENATTI would and did seek to make any agreement with Nike contingent upon Nike making payments to AVENATTI himself.  Furthermore, at no time did AVENATTI inform [Franklin] that AVENATTI intended to threaten to publicize the confidential information that [Franklin] had provided to AVENATTI, nor did AVENATTI obtain [Franklin's] permission to publicize any such information.

(Id. ¶ 10) (emphasis in original).

        The Indictment goes on to allege that during a March 19, 2019 meeting with

Nike's lawyers, Avenatti told Nike that

> he represented Franklin, "a youth basketball coach, whose team had previously had a contractual relationship with Nike, but whose contract Nike had recently decided not to renew";

> Franklin "had evidence that one or more Nike employees had authorized and funded payments to the families of top high school basketball players and attempted to conceal those payments";

> Avenatti "intended to hold a press conference the following day to publicize the asserted misconduct at Nike, which would negatively affect Nike's market value"; and

> Avenatti "would refrain from holding that press conference and damaging Nike if Nike agreed to two demands:  (1) Nike must pay $1.5 million to [Franklin] as a settlement for any claims [Franklin] might have regarding Nike's decision not to renew its contract with the Basketball Program; and (2) Nike must hire AVENATTI and Attorney-1 to conduct an internal investigation of Nike, with a provision that if Nike hired another firm to conduct such an internal investigation, Nike would still be required to pay AVENATTI and Attorney-1 at least twice the fees of any other firm hired."

(Id. ¶ 11) (emphasis in original).

        In a March 20, 2019 telephone call with Nike's counsel, Avenatti reiterated that

he expected to "get a million five for [Franklin]" and to be "hired to handle the internal

investigation," for which he demanded a "multimillion dollar retainer" in exchange for not

holding a press conference.  (Id. ¶ 13(a)-(b))  According to Avenatti, "3 or 5 or 7 million dollars"

would not be sufficient for his retainer.  Unless Nike agreed to a larger retainer, Avenatti would

hold a press conference that would "take ten billion dollars off [Nike's] market cap"  (Id. ¶ 13(c))

Avenatti also stated that "he expected to be paid more than $9 million" by Nike.  (Id. ¶ 13(d))  At the end of the call, Avenatti agreed to meet with Nike's lawyers the next day.  (Id. ¶ 13(e))

On March 21, 2019, Avenatti met with Nike's lawyers in Manhattan.  (Id. ¶ 14)  At that meeting, Avenatti demanded "a $12 million retainer to be paid immediately and to be 'deemed earned when paid,' with a minimum guarantee of $15 million in billings and a maximum of $25 million, 'unless the scope changes.'"  (Id. ¶ 14(a))  Nike's counsel asked Avenatti whether Nike could simply pay Franklin, "rather than retaining AVENATTI.  AVENATTI responded that he did not think it made sense for Nike to pay [Franklin] an 'exorbitant sum of money . . . in light of his role in this.'"  (Id. ¶ 14(b)) (emphasis in original)  Avenatti agreed to meet with Nike's counsel "on March 25, 2019, to hear whether Nike was willing to make the demanded payments.  AVENATTI stated that Nike would have to agree to his demands at that meeting or he would hold his threatened press conference."  (Id. ¶ 14(f)) (emphasis in original).

According to the (S1) Indictment, Avenatti did not "inform [Franklin] that Nike had offered to resolve [Franklin's] claims without paying AVENATTI.  Nor did AVENATTI inform [Franklin] that AVENATTI had continued to threaten to publicize confidential information provided to AVENATTI by [Franklin], or that AVENATTI had continued to use that information to demand a multimillion dollar payment for himself."  (Id. ¶ 14(g)) (emphasis in original).

About two hours after the March 21, 2019 meeting, and without consulting Franklin, Avenatti posted the following message on Twitter:



(Id. ¶ 15; see also @MichaelAvenatti, Twitter (Mar. 21, 2019, 3:52 p.m.),

https://twitter.com/MichaelAvenatti/status/1108818722767163392)  The article linked in the

March 21, 2019 tweet refers to a prosecution brought by the Government against employees of

Adidas – a competitor of Nike.  (Id. ¶ 16)

On March 25, 2019, after Avenatti learned that law enforcement officers had

approached Franklin, Avenatti posted the following message to Twitter:



(Id. ¶ 18; see also @MichaelAvenatti, Twitter (Mar. 25, 2019, 12:16 p.m.),

https://twitter.com/MichaelAvenatti/status/1110213957170749440)

Later that day, Avenatti was arrested as he approached Nike's counsel's office

complex in Manhattan for the scheduled March 25, 2019 meeting.  (Id. ¶ 17)

The (S1) Indictment charges Avenatti with:  (1) transmitting interstate

communications with intent to extort, in violation of 18 U.S.C. § 875(d), in that "AVENATTI,

during an interstate telephone call, threatened to cause financial harm to Nike and its reputation

if Nike did not agree to make multimillion dollar payments to AVENATTI"; (2) attempted

extortion, in violation of 18 U.S.C. § 1951, in that "AVENATTI used threats of economic and

reputational harm in an attempt to obtain multimillion dollar payments from Nike, a

multinational public corporation"; and (3) honest services wire fraud, in violation of 18 U.S.C.

§§ 1343 and 1346, in that he "engaged in a scheme to obtain payments for himself from Nike

based on confidential information provided to AVENATTI by [Franklin] . . . without

[Franklin's] knowledge or approval, and used and caused the use of interstate communications to

effect the scheme."  (Id. ¶¶ 20, 22, 24) (emphasis in original).

## II.    DEFENDANT'S MOTION TO DISMISS ON GROUNDS
##        OF VINDICTIVE AND SELECTIVE PROSECUTION

Avenatti contends that the charges against him must be dismissed because "he

was targeted for prosecution in this case for unconstitutionally vindictive and selective reasons."

(Def. Br. (Dkt. No. 29) at 7)  In support of his motion, Avenatti makes the following arguments:

1. The initial charges against Avenatti were premised on an inadequate investigation
   "that lasted less than four business days" and that was conducted at "breakneck
   speed."  (Id. at 7, 11; see also id. at 9 (the U.S. Attorney's Office "arrested Mr.
   Avenatti before conducting a real investigation of Coach Franklin's claim"); id. at 32

(the U.S. Attorney's Office "never bothered to seriously investigate the facts before charging Mr. Avenatti")).

2. At a press conference conducted on the day of Avenatti's arrest – and in a press release issued that day – U.S. Attorney Geoffrey Berman stated that (a) "when lawyers use their law licenses as weapons, as a guise to extort payments for themselves, they are no longer acting as attorneys. They are acting as criminals, and they will [be] held responsible for their conduct."; and (b) at that same press conference, the U.S. Attorney stated that "Avenatti's conduct had nothing to do with zealous advocacy for a client or any other kind of legitimate legal work." (Id. at 7-8 (quoting Srebnick Decl., Ex. A (Dkt. No. 30-1) (Press Release) at 2; March 25, 2019 USAO-SDNY Press Conference Video at 00:31-00:39;)[2] Avenatti asserts that these comments reflect Berman's personal animus and malice towards him, and violate Local Criminal Rule 23.1(d)(7), which bars lawyers and "government agents" from offering "[a]ny opinion as to the accused's guilt or innocence or as to the merits of the case or the evidence in the case." (Id. at 8 n.3 (citing L.R. Crim. P. 23.1(d)(7))).

3. Mark Geragos – the "Attorney-1" referenced in the (S1) Indictment, and the unindicted co-conspirator in the original indictment – was not prosecuted, even though he initiated contact with Nike's counsel, and attended meetings at which Avenatti presented his demands to Nike. "Mr. Geragos and Mr. Avenatti advocated in unison and shared the same strategy," and yet only Avenatti was charged. (Id. at 9-11, 24-25, 30-32)

4. No "John Doe" attorney who committed comparable conduct would have been prosecuted by the U.S. Attorney's Office. (Id. at 47)

5. Franklin's contemporaneous text messages and emails show that "Avenatti's demand to spearhead an investigation of Nike was consistent with, and in furtherance of, the expressly-stated and legitimate litigation objectives that Coach Franklin sought to pursue long before he first contacted Mr. Avenatti." (Id. at 10 (emphasis in original); see also id. at 29 n.14).

6. The personal animosity between President Trump and Avenatti arising from Avenatti's prior representation of porn star Stephanie Clifford, a/k/a Stormy Daniels demonstrates that this is a vindictive prosecution. According to Avenatti, President Trump's personal lawyer Michael Cohen orchestrated a $130,000 payment to Daniels

---

[2] Avenatti also cites the following statements from FBI Assistant Director Sweeney at the press conference and in a press release: "'As alleged, Michael Avenatti approached Nike last week with a list of financial demands in exchange for covering up allegations of misconduct on behalf of the company. . . . This is nothing more than a straightforward case of extortion. In the event anyone needs to be reminded, this type of behavior is illegal and it will not be tolerated – especially when committed by a lawyer who is supposed to use his license to practice law, not to willfully violate it.'" (Id. at 7-8 (quoting Srebnick Decl., Ex. A (Dkt. No. 30-1) (Press Release) at 2-3; see also March 25, 2019 USAO-SDNY Press Conference Video at 09:09-09:23).

in order to secure her silence concerning her alleged affair with President Trump. Cohen came under investigation by the Southern District U.S. Attorney's Office for "alleged campaign finance violations," and U.S. Attorney Berman recused himself from that investigation.  "President Trump hired Rudy Giuliani, USA Berman's former law partner, as his personal counsel in connection with the Cohen investigation."  (Id. at 33-34)

Southern District prosecutors pursuing the Cohen investigation scheduled an interview with Avenatti's then client Daniels, but prosecutors cancelled the meeting the night before, "accusing Mr. Avenatti in an e-mail of leaking to the press the fact and location of the meeting."  (Id. at 34)

Avenatti asserts that "[w]hile the FBI was conducting its criminal investigation into the illegal payment to Daniels, Mr. Avenatti was President Trump's chief antagonist in the civil arena and in the court of public opinion.  Mr. Avenatti represented Daniels in connection with two lawsuits against Trump. . . . Mr. Avenatti was interviewed on television hundreds of times about President Trump's behavior and became, in many ways, the foil for President Trump. . . . President Trump did not take kindly to Mr. Avenatti's advocacy for his client. . . ."  (Id. at 34-35)

In a September 26, 2018 tweet, President Trump said the following about Avenatti:

> Avenatti is a third[-]rate lawyer who is good at making false accusations, like he did on me and like he is now doing on Judge Brett Kavanaugh.  He is just looking for attention and doesn't want people to look at his past record and relationships – a total low-life!

(Id. at 36)

On October 16, 2018, after Daniel's defamation case against Trump was dismissed, President Trump issued a tweet celebrating the victory, and saying, "now I can go after Horseface and her 3rd rate lawyer. . . ."

(Id. (emphasis omitted))

7. The relationship between President Trump and U.S. Attorney Berman demonstrates that this is a vindictive prosecution.  Avenatti notes that Berman was interviewed for his current position by President Trump, was appointed to his current position by Attorney General Sessions, was never confirmed by the Senate, and is currently serving as U.S. Attorney pursuant to 28 U.S.C. § 546(d) and order of the judges of the Southern District of New York.  Avenatti further notes that Berman was formerly a partner in Greenberg Traurig – the same law firm in which Giuliani was briefly a

partner; that Berman served on Trump's presidential transition team; and that he donated $5400 to the Trump campaign.  (Id. at 37-38)

Avenatti contends that these facts and circumstances require that the charges against him be dismissed on grounds of vindictive and selective prosecution.  In the alternative, Avenatti asserts that he is entitled to broad discovery from the U.S. Attorney's Office concerning these defenses, and to an evidentiary hearing.  (Def. Br. (Dkt. No. 29) at 7, 48-49; see also Def. Mot. (Dkt. No. 28))  As to discovery from the U.S. Attorney's Office, Avenatti contends that he is entitled to the following:

1. All internal documents, including memoranda, notes, e-mails, and text messages that, in any way, reference the reasons why Mr. Avenatti was arrested and/or charged in this case;

2. All internal documents, including memoranda, notes, e-mails, and text messages that, in any way, reference the reasons why Mark Geragos was not arrested or charged in this case;

3. A list of all cases in the last 25 years in which a lawyer was charged with extortion for settlement demands made in connection with the representation of a client;

4. All oral and written communications, including but not limited to memoranda, emails, text messages, and the like, between the USAO-SDNY and the Department of Justice regarding the decision to arrest and charge Mr. Avenatti;

5. All oral and written communications, including but not limited to memoranda, emails, text messages, and the like, written by members of the USAO-SDNY expressing negative personal feelings about Mr. Avenatti, in connection with the instant investigation, the investigation that led to his arrest in United States v. Avenatti, Case No. 19-374-cr-DAB, or the Michael Cohen investigation;

6. All oral and written communications, including but not limited to memoranda, emails, text messages, and the like, between the USAO-SDNY and the Department of Justice regarding the decision not to arrest or charge Mr. Geragos; and

7. All oral and written communications, including but not limited to memoranda, emails, text messages, and the like, between the USAO-SDNY and/or the Department of Justice and the White House, President Trump, or anyone on his behalf (e.g., his personal counsel), regarding Mr. Avenatti.

8. All documents reflecting any communication regarding Mr. Avenatti between the USAO-SDNY and/or the Department of Justice and the White House, President Trump, or anyone on his behalf (e.g., his personal counsel).

(Def. Br. (Dkt. No. 29) at 48-49)

## DISCUSSION

## I.   LEGAL STANDARDS

### A.   The Proper Scope of Prosecutorial Discretion

The Attorney General and United States Attorneys retain "'broad discretion' to enforce the Nation's criminal laws." United States v. Armstrong, 517 U.S. 456, 464-65 (1996) (citing Wayte v. United States, 470 U.S. 598, 607 (1985) ("In our criminal justice system, the Government retains 'broad discretion' as to whom to prosecute.")); see also United States v. Goodwin, 457 U.S. 368, 380 n.11 (1982). "[S]o long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his [or her] discretion." Bordenkircher v. Hayes, 434 U.S. 357, 364 (1978).

Moreover, "'[t]he presumption of regularity supports' . . . prosecutorial decisions and, 'in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties.'" Armstrong, 517 U.S. at 464 (quoting United States v. Chemical Foundation, Inc., 272 U.S. 1, 14-15 (1926)); see also United States v. Sanders, 211 F.3d 711, 716 (2d Cir. 2000) ("a prosecutor's pretrial charging decision is presumed legitimate").

> This broad discretion rests largely on the recognition that the decision to prosecute is particularly ill-suited to judicial review. Such factors as the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan are not readily susceptible to the kind of analysis the courts are competent to undertake. Judicial supervision in this area, moreover, entails systemic costs of particular concern. Examining the basis of a prosecution delays the criminal proceeding, threatens to chill law enforcement by subjecting the

prosecutor's motives and decisionmaking to outside inquiry, and may
undermine prosecutorial effectiveness by revealing the Government's
enforcement policy.  All these are substantial concerns that make the
courts properly hesitant to examine the decision whether to prosecute.

. . . [A]lthough prosecutorial discretion is broad, it is not "'unfettered.'
Selectivity in the enforcement of criminal laws is . . . subject to
constitutional constraints."  United States v. Batchelder, 442 U.S. 114, 125
. . . (1979) (footnote omitted)).  In particular, the decision to prosecute
may not be "'deliberately based upon an unjustifiable standard such as
race, religion, or other arbitrary classification,'" Bordenkircher v. Hayes,
supra, 434 U.S.[] at 364 . . ., quoting Oyler v. Boles, 368 U.S. 448, 456 . . .
(1962), including the exercise of protected statutory and constitutional
rights, see United States v. Goodwin, supra, 457 U.S.[] at 372. . . .

Wayte, 470 U.S. at 607-08.

## B.   Vindictive Prosecution

"To punish a person because he has done what the law plainly allows him to do is

a due process violation of the most basic sort . . . and for an agent of the State to pursue a course

of action whose objective is to penalize a person's reliance on his legal rights is 'patently

unconstitutional.'"  Bordenkircher, 434 U.S. at 363 (quoting Chaffin v. Stynchcombe, 412 U.S.

17, 32-33 n.20 (1973); see also United States v. Jackson, 390 U.S. 570 (1968).  "Accordingly, an

indictment will be dismissed if there is a finding of 'actual' vindictiveness, or if there is a

presumption of vindictiveness that has not been rebutted by objective evidence justifying the

prosecutor's action."  Sanders, 211 F.3d at 716 (quoting United States v. Johnson, 171 F.3d 139,

140 (2d Cir. 1999) (per curiam)).  "Actual vindictiveness must play no part in a prosecutorial or

sentencing decision and, 'since the fear of such vindictiveness may unconstitutionally deter a

defendant's exercise of [his rights],' the appearance of vindictiveness must also be avoided."

United States v. King, 126 F.3d 394, 397 (2d Cir. 1997).

"To establish an actual vindictive motive, a defendant must prove objectively that

the prosecutor's charging decision was a 'direct and unjustifiable penalty' . . . that resulted

'solely from the defendant's exercise of a protected legal right.'"  Sanders, 211 F.3d at 716-17

(quoting Goodwin, 457 U.S. at 380 n.11, 384, 384 n.19).  "Put another way, the defendant must

show that '(1) the prosecutor harbored genuine animus toward the defendant, or was prevailed

upon to bring the charges by another with animus such that the prosecutor could be considered a

"stalking horse," and (2) [the defendant] would not have been prosecuted except for the

animus.'"  Id. at 717 (quoting United States v. Koh, 199 F.3d 632, 640 (2d Cir. 1999) (internal

quotation marks omitted)).  "A finding of actual vindictiveness requires 'direct' evidence, such

as evidence of a statement by the prosecutor, which is available 'only in a rare case.'"  Johnson,

171 F.3d at 140 (quoting Goodwin, 457 U.S. at 380-81 & n.12, 384 & n.19).

        "To establish a presumption of prosecutorial vindictiveness, the defendant must

show that 'the circumstances of a case pose a realistic likelihood' of such vindictiveness."

Sanders, 211 F.3d at 717 (quoting King, 126 F.3d at 397); see also Johnson, 171 F.3d at 141 ("A

presumption of vindictiveness arises when the circumstances of the case create a 'realistic

likelihood' of prosecutorial vindictiveness.").  "The circumstances must present a realistic

likelihood of vindictiveness that would be applicable in all cases, and any such presumption may

be overcome by objective evidence justifying the prosecutor's action."  United States v. Stewart,

590 F.3d 93, 122 (2d Cir. 2009) (quoting Sanders, 211 F.3d at 717 (citations and internal

quotation marks omitted)).  The Second Circuit has "consistently adhered to the principle that the

presumption of prosecutorial vindictiveness does not exist in a pretrial setting."  Id. (quoting

Paradise v. CCI Warden, 136 F.3d 331, 335 (2d Cir. 1998) (internal quotation marks omitted),

cert. denied 525 U.S. 836 (1998)); see also Sanders, 211 F.3d at 717 ("A presumption of

vindictiveness generally does not arise in a pretrial setting.").

     C.     **Selective Prosecution**

     In order to establish selective prosecution, a defendant must demonstrate that a

"federal prosecutorial policy [1] 'had a discriminatory effect and [2] that it was motivated by a

discriminatory purpose.'"  Armstrong, 517 U.S. at 465 (quoting Wayte, 470 U.S. at 608); see

also United States v. Alameh, 341 F.3d 167, 173 (2d Cir. 2003); United States v. Fares, 978 F.2d

52, 59 (2d Cir. 1992); United States v. Moon, 718 F.2d 1210, 1229 (2d Cir. 1983).  The Supreme

Court has stated "that the standard [for proving a selective prosecution claim] is a demanding

one."  (Id. at 463).

     "To establish a discriminatory effect . . . , the [defendant] must show that

similarly situated individuals . . . were not prosecuted."  Id. at 465.  In other words, a defendant

must show that "others similarly situated have not generally been proceeded against because of

conduct of the type forming the basis of the charge against [the defendant, and that the

defendant] has been singled out for prosecution. . . ."  Fares, 978 F.2d at 59 (quoting Moon, 718

F.2d at 1229).

     To establish a discriminatory purpose, a defendant must show that "the

government's discriminatory selection of [the defendant] for prosecution has been invidious or in

bad faith, i.e., based upon such impermissible considerations as race, religion, or the desire to

prevent his exercise of constitutional rights."  Id. (quoting Moon, 718 F.2d at 1229).

"'[D]iscriminatory purpose' . . . implies more than . . . intent as awareness of consequences.  It

implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in

part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group."  Wayte,

470 U.S. at 610 (quoting Personnel Adm'r of Mass. v. Feeney, 442 U.S. 256, 279 (1979)

(footnotes, citations, and internal quotation marks omitted)).  Absent a showing that a defendant

was prosecuted "because of" protected status or conduct, a "claim of selective prosecution fails."

Id. at 610.

  **D.**  **When a Defendant Alleging Vindictive Prosecution**
     **or Selective Prosecution is Entitled to Discovery**

     The standard for discovery in aid of a claim of vindictive prosecution or selective

prosecution is the same.  Sanders, 211 F.3d at 717.  In either case, the standard is a "rigorous"

one, that is intended in "itself . . . [to be] a significant barrier to the litigation of insubstantial

claims."  Armstrong, 517 U.S. at 464, 468.  A high standard is set because of the costs associated

with permitting a defendant – pre-trial – to pursue an investigation of a Government

investigation, and thereby delay his prosecution:  "Whether a defendant claims selective

prosecution or vindictive prosecution, '[e]xamining the basis of a prosecution delays the criminal

proceeding, threatens to chill law enforcement by subjecting the prosecutor's motives and

decisionmaking to outside inquiry, and may undermine prosecutorial effectiveness by revealing

the Government's enforcement policy."  Sanders, 211 F.3d at 717 (quoting Armstrong, 517 U.S.

at 465 (quoting Wayte, 470 U.S. 598, 607) (internal quotation marks omitted)).

     In order to obtain discovery on a claim of vindictive or selective prosecution, a

defendant "must provide 'some evidence tending to show the existence of the essential elements

of the defense,'" Sanders, 211 F.3d at 717 (quoting United States v. Berrios, 501 F.2d 1207,

1211 (2d Cir. 1974); see also United States v. Bass, 536 U.S. 862, 863 (2002) (per curiam) (a

"defendant who seeks discovery on a claim of selective prosecution must show some evidence of

both discriminatory effect and discriminatory intent"), "and that the documents in the

government's possession would indeed be probative of these elements."  Berrios, 501 F.2d at

1211-12.  "Mere assertions and generalized proffers on information and belief are insufficient."

Fares, 978 F.2d at 59 (citing Berrios, 501 F.2d at 1211 (finding that a proffer stating that

defendant and his attorney "believe[d] that there [we]re hundreds of unprosecuted persons

situated similarly to defendant was insufficient for lack of identification of any unprosecuted

violators or affiliated organizations" (internal quotation marks omitted)).

## DISCUSSION

I.    **WHETHER AVENATTI HAS OFFERED PROOF THAT HE
      WAS VINDICTIVELY OR SELECTIVELY PROSECUTED**

The Court considers below each category of facts and circumstances that Avenatti

cites in contending "that he was targeted for prosecution in this case for unconstitutionally

vindictive and selective reasons."  (Def. Br. (Dkt. No. 29) at 7)

A.    **Inadequate Investigation**

As proof of U.S. Attorney Berman's alleged bias, malice, and vindictiveness

against him, Avenatti points to the speed with which a criminal complaint was filed.  According

to Avenatti, the initial charges were premised on an inadequate investigation "that lasted less

than four business days" and that was conducted at "breakneck speed."  (Id. at 7, 11; see also id.

at 9 (the U.S. Attorney's Office "arrested Mr. Avenatti before conducting a real investigation of

Coach Franklin's claim"); id. at 32 (the U.S. Attorney's Office "never bothered to seriously

investigate the facts before charging Mr. Avenatti").

Missing from Avenatti's narrative is, of course, any acknowledgement that the

timing of his demands on Nike largely determined the tempo and pace of the investigation and its

end date.  Avenatti's first meeting with Nike's counsel took place on March 19, 2019.  ((S1)

Indictment (Dkt. No. 72) at ¶ 11)  According to the (S1) Indictment, at that meeting, Avenatti

presented Coach Franklin's allegations concerning Nike's improper payments to the families of

top high school basketball players, as well as his demand that Nike pay Franklin $1.5 million and

hire Avenatti to conduct an internal investigation of Nike.  Avenatti made clear that Nike's counsel "would have to agree to accept [his] demands immediately or AVENATTI would hold his threatened press conference," at which Nike's alleged misconduct would be disclosed.  (Id. at ¶¶ 11(a)-(e) (emphasis in original))  According to the (S1) Indictment, Avenatti told Nike that he had chosen to approach Nike at that time because of an upcoming Nike quarterly earnings call and the annual NCAA men's college basketball tournament.  (Id. at ¶ 11(b)) After the meeting, Nike contacted the U.S. Attorney's Office about Avenatti's threats and demands.  (Id. at ¶ 12)

The next day – March 20, 2019 – Avenatti conducted a telephone call with Nike's counsel in which he reiterated his threats to take "ten billion dollars off [Nike's] market cap" unless Nike agreed to his financial demands.  Avenatti made clear that Nike would have to agree to pay him – for the internal investigation – in excess of $9 million.  Avenatti set a deadline of Monday, March 25, 2019, for Nike to make its decision.  If Nike did not agree to meet Avenatti's financial demands, Avenatti would hold his threatened press conference.  (Id. at ¶¶ 13(a)-(e))

On March 21, 2019 – the next day – Avenatti met with Nike's counsel.  As to his own compensation, Avenatti substantially increased his demand.  Avenatti sought "a $12 million retainer to be paid immediately," "with a minimum guarantee of $15 million" and a "maximum [fee] of $25 million."  He rejected Nike's overture to settle only with Franklin.  Indeed, according to the (S1) Indictment, Avenatti undercut his client's claims by stating that "he did not think it made sense for Nike to pay [Franklin] an 'exorbitant amount of money . . . in light of his role in this.'"  Avenatti also emphasized that one benefit to Nike of acceding to his demands is

that "it would be Nike's choice whether to disclose [its] alleged misconduct."  (Id. at ¶¶ 14(a)-
(b))

Avenatti agreed to one final meeting with Nike's counsel on March 25, 2019.
Avenatti "stated that Nike would have to agree to his demands at that meeting or he would hold
his threatened press conference": "'If this is not papered on Monday, we're done. . . .'"  (Id. at ¶
14(f))

Avenatti was arrested on March 25, 2019, when he arrived for the scheduled
meeting at the office of Nike's counsel.  (Id. at ¶ 17)

As this timeline makes clear, the brevity of the investigation was driven by the
timing of Avenatti's demands on Nike.  Given Avenatti's firm March 25, 2019 deadline for
Nike's capitulation to his demands, the end date for the Government's pre-arrest investigation
had to be March 25, 2019.

As to Avenatti's complaint that the Government did little investigation prior to his
March 25, 2019 arrest, it appears that much of the Government's evidence is tape or video-
recorded, and was obtained by the Government prior to Avenatti's arrest.  For example,
Avenatti's March 20, 2019 telephone call with Nike's counsel was recorded (id. at ¶ 13), and his
March 21, 2019 meeting with Nike's counsel was video and audio-recorded.  (Id. at ¶ 14)  The
Government also had access to the tweets posted by Avenatti in furtherance of his alleged
scheme.  (Id. at ¶¶ 15-16, 18)

In sum, the timing for Avenatti's arrest was driven by the timing of his demands
on Nike, and the deadline he set for Nike's capitulation to his demands.  Much of the
Government's most compelling evidence against Avenatti was obtained prior to his arrest.  The

brevity of the Government's pre-arrest investigation does not demonstrate that Avenatti is the victim of a vindictive or selective prosecution.

### B. Press Conference and Press Release

#### 1. Challenged Statements

As proof of U.S. Attorney Berman's alleged bias, malice, and vindictiveness against him, Avenatti cites a press conference conducted by the U.S. Attorney and the FBI's Assistant Director-in- Charge on March 25, 2019 – the day of Avenatti's arrest – and a press release issued that same day.  (See March 25, 2019 USAO-SDNY Press Conference Video[3]; Srebnick Decl., Ex. A (Dkt. No. 30-1) (Press Release))

Avenatti complains that during the press conference, and in the press release, U.S. Attorney Berman states that (1) "[w]hen lawyers use their law licenses as weapons, as a guise to extort payments for themselves, they are no longer acting as attorneys.  They are acting as criminals, and they will [be] held responsible for their conduct."; and (2) "Avenatti's conduct had nothing to do with zealous advocacy for a client or any other kind of legitimate legal work." (Def. Br. (Dkt. No. 29) at 7-8 (quoting Srebnick Decl., Ex. A (Dkt. No. 30-1) (Press Release) at 2; March 25, 2019 USAO-SDNY Press Conference Video at 08:31-08:45, 00:31-00:39)

Avenatti also objects to the following statements made by Assistant Director Sweeney in the press release and at the press conference:

> As alleged, Michael Avenatti approached Nike last week with a list of financial demands in exchange for covering up allegations of misconduct on behalf of the company. . . .This is nothing more than a straightforward case of extortion.  In the event anyone needs to be reminded, this type of behavior is illegal and it will not be tolerated – especially when committed by a lawyer who is supposed to use his license to practice law, not to willfully violate it.

---

[3]  The video of the March 25, 2019 press conference is available on the internet at https://www.youtube.com/watch?v=uuJM1FerHq8."  The Government provided a link to this YouTube video in its January 10, 2020 letter.  (See Jan. 10, 2020 Govt. Ltr. (Dkt. No. 133))

(Id. at 7-8 (quoting Srebnick Decl., Ex. A (Dkt. No. 30-1) (Press Release) at 2-3; see also March 25, 2019 USAO-SDNY Press Conference Video at 08:53-09:23 ("Earlier this afternoon, Michael Avenatti was arrested in Manhattan for the charges just outlined by the U.S. Attorney. This is nothing more than a straightforward case of extortion. And as a result, Mr. Avenatti was placed into custody and brought to the FBI Office of 26 Federal Plaza for arrest processing. In the event that anybody needs to be reminded, this type of behavior is illegal and it will not be tolerated, especially when committed by a lawyer who is supposed to use his license to practice law, not to willfully violate it.")))

According to Avenatti, these statements

demonstrate[] malice and personal animus toward [] Avenatti[,] . . . [and were made] [d]espite the language of Local Criminal Rule 23.1(d)(7) and the district court's warnings to the USAO-SDNY about extrajudicial statements in the Silver case[.]

(Id. at 43) Avenatti contends that these statements

constitute "opinion[s] as to the accused's guilt or innocence or as to the merits of the case or the evidence in the case," see Local Criminal Rule 23.1(d)(7), which under the rules of this court "presumptively involve a substantial likelihood that their public dissemination will interfere with a fair trial or otherwise prejudice the due administration of justice within the meaning of this rule." Id. The prejudicial effect of statements such as these is not "magically dispelled by sprinkling the words 'alleged' or 'allegations' liberally throughout the press release." United States v. Silver, 103 F. Supp.3d 370, 378 (S.D.N.Y. 2015).

(Id. at 8 n.3)

## 2. **Local Criminal Rule 23.1(d)(7)**

Local Criminal Rule 23.1(d)(7) provides that

(a) [i]t is the duty of a lawyer . . . and [of] government agents and police officers, not to release or authorize the release of . . . opinion which a reasonable person would expect to be disseminated by means of public communication, in connection with pending or imminent criminal litigation with which they are associated, if there is a substantial likelihood that such dissemination will interfere with a fair trial or otherwise prejudice the due administration of justice.

L.R. Crim. P. 23.1(a).

Rule 23.1 further provides that

(b) [w]ith respect to a grand jury or other pending investigation of any criminal matter, a lawyer participating in or associated with the investigation (including government lawyers . . . ) shall refrain from making any extrajudicial statement

which a reasonable person would expect to be disseminated by means of public communication that goes beyond the public record or that is not necessary to inform the public that the investigation is underway, to describe the general scope of the investigation, to obtain assistance in the apprehension of a suspect, to warn the public of any dangers or otherwise aid in the investigation, if there is a substantial likelihood that such dissemination will interfere with a fair trial or otherwise prejudice the administration of justice.

. . . .

(d) [s]tatements concerning the following subject matters presumptively involve a substantial likelihood that their public dissemination will interfere with a fair trial or otherwise prejudice the due administration of justice within the meaning of this rule:

. . .

> (7) [a]ny opinion as to the accused's guilt or innocence or as to the merits of the case or the evidence in the case.

L.R. Crim. P. 23.1(b), (d)(7).

### 3.   Analysis

As an initial matter, there is nothing unusual about the U.S. Attorney issuing a press release announcing an arrest.  The Office's website reflects approximately 1,740 press releases that were posted between 2016 and 2019.  See U.S. Att'y's Off., Southern District New York, Press Releases, https://www.justice.gov/usao-sdny/pr (last accessed Jan. 10, 2020).  Press conferences are less common, but they are conducted with regularity.  Indeed, the Office's website contains approximately twenty-five press conferences conducted over the same time period, see, e.g., U.S. Att'y's Off., Southern District New York, Press Conferences, https://www.justice.gov/usao-sdny/2019-press-conferences (last accessed Jan. 10, 2020), and sixty-seven press conferences are posted on the YouTube page used by the U.S. Attorney's Office.  See USAOSDNY, https://www.youtube.com/user/USAOSDNY/videos (last accessed Jan. 10, 2020).

The press conference at issue here ran for approximately twelve and a half minutes.  (March 25, 2019 USAO-SDNY Press Conference Video)  U.S. Attorney Berman spoke for about nine minutes, and Assistant Director Sweeney spoke for about a minute.  The remaining time was taken up with reporters' questions to Berman.  Berman's answers were almost invariably "no comment" or "the investigation is continuing."  (Id. at 09:39-12:27)

At the outset of the press conference, U.S. Attorney Berman announces that "criminal extortion charges" have been brought against Avenatti, based on his "scheme to extract more than $20 million in payments from a public company by threatening to use his ability to garner publicity to inflict financial and reputational harm on the company."  (Id. at 00:10-00:31)  Berman asserts that "Avenatti used illegal and extortionate threats for the purpose of obtaining millions of dollars in payments for himself."  (Id. at 00:39-00:50)

Berman then describes the alleged extortion scheme, tracking the factual allegations set forth in the detailed Criminal Complaint, and quoting certain of Avenatti's tape-recorded statements.  See Criminal Cmplt. (Dkt. No. 1).[4]  The gist of Berman's presentation is that Avenatti is charged with having "used illegal and extortionate threats for the purpose of obtaining millions of dollars in payments for himself [from Nike]."  (Id. at 00:39-00:50)  According to the U.S. Attorney, in connection with his representation of a high school basketball coach who "had information about potential misconduct by [Nike] employees," Avenatti threatened to hold a press conference at which he would disclose Nike employees' misconduct – misconduct similar to that at issue in "a prior criminal prosecution brought by [the U.S. Attorney's Office], that payments were made to families of high school basketball players."  (Id.

---

[4]  The Criminal Complaint mirrors the factual allegations set forth in the (S1) Indictment, which are discussed in detail above.  Compare id. at ¶¶ 11, 12 with (S1) Indictment (Dkt. No. 72) at 7-13.

at 01:37-01:44, 01:56-02:10) "Avenatti repeatedly pressured the company to agree to pay, or risk having Avenatti hold a press conference that he claimed would dramatically drive down the stock price of the company and its market value." (Id. at 00:50-01:03)

The U.S. Attorney reports that Avenatti had demanded that Nike retain him to "conduct a multi-million dollar internal investigation . . . that the company did not request," and that "Avenatti made clear that he was approaching the company at a time intended to maximize the financial damage of such a press conference, namely, on the eve of the annual NCAA tournament and the company's quarterly earnings call." (Id. at 02:27-03:10) Berman quotes a number of Avenatti's statements to Nike's counsel, including his threat to "take 10 billion dollars off [of Nike's] market cap." (Id. at 03:20-03:26) The factual allegations cited by Berman at the press conference and in the press release were lifted directly from the Criminal Complaint. Indeed, the press release contains extensive quotes from Avenatti's tape-recorded statements, which are likewise reflected in the Criminal Complaint. Compare Srebnick Decl., Ex. A (Dkt. No. 30-1) (Press Release) at 3-5, and March 25, 2019 USAO-SDNY Press Conference Video with Criminal Cmplt. (Dkt. No. 1) at ¶¶ 11-12.

The press release states that "the entirety of the text of the Complaint and the description of the Complaint set forth below constitute only allegations, and every fact described should be treated as an allegation." (Srebnick Decl., Ex. A (Dkt. No. 30-1) (Press Release) at 5). The U.S. Attorney also states during the press conference that the illegal scheme he describes is "alleged." (See, e.g., March 25, 2019 USAO-SDNY Press Conference Video at 01:22-01:27, 06:58-07:01)

During the press conference, the U.S. Attorney makes clear that Avenatti's conduct took place in the context of his representation of a high school basketball coach

22

whose team had a contract with Nike that had been recently cancelled.  (Id. at 01:37-01:56)  It was in that context that Berman states that "Avenatti's conduct had nothing to do with zealous advocacy for a client or any other kind of legitimate legal work."  Berman also states, more broadly, that "when lawyers use their law licenses as weapons, as a guise to extort payments for themselves, they are no longer acting as attorneys.  They are acting as criminals."  (Id. at 08:31-08:45; see also Srebnick Decl., Ex. A (Dkt. No. 30-1) (Press Release) at 2)

This Court does not read the local rule to bar the Government from briefly setting forth its theory of the case at a post-arrest press conference, particularly where that theory may not be obvious to the public.[5]  In the vast majority of cases, it is obvious why the Government believes that a defendant committed a crime.  But Avenatti's alleged criminal conduct took place under highly unusual circumstances – during his legal representation of a client who believed that he had a claim against Nike.  In this context, an obvious question is why the Government believes that Avenatti's conduct is criminal, and not simply zealous advocacy on behalf of a client.

The U.S. Attorney's remarks about whether Avenatti was acting in the traditional role of a lawyer address that issue.  Berman told the attendees of the press conference, in substance, that Avenatti was not acting on behalf of his client when he demanded millions of dollars from Nike, but instead was using threats of economic and

---

[5]  Avenatti cites no case suggesting that a brief articulation of the Government's theory of the case at a post-arrest press conference violates the local rule.

reputational harm to extort money for himself.  That is the theory of the case as laid out

in detail in the Criminal Complaint.  See Criminal Cmplt. (Dkt. No. 1).[6]

Berman's attempt to distinguish Avenatti's conduct was not extensive or

belabored, and does not reflect an opinion so much as an articulation of the

Government's theory of the case in circumstances where that theory may not be obvious

to members of the public.  The Court does not regard Berman's comments as

impermissibly expressing a view as to the merits of the case or the weight of the

evidence.[7]  Finally, Berman's brief remarks – made ten months ago and in the context of

a twelve-minute post-arrest press conference – present no risk to Avenatti's right to a fair

trial.[8]

---

[6]  The Criminal Complaint's allegations suggest that Avenatti's alleged threats had no
connection to any injury suffered by Franklin.  For example, the Criminal Complaint asserts that
Avenatti demanded that – if Nike hired another firm to conduct an internal investigation – Nike
would be obligated to pay Avenatti and Geragos "at least twice the fees of any other firm hired."
(Id. at ¶ 10(c)(iii))  And Avenatti demanded "a $12 million retainer to be paid immediately and
to be 'deemed earned when paid.'"  (Id. at ¶ 12(a))  And Avenatti rejected Nike's proposal that
Nike pay Franklin rather than pay an enormous retainer to Avenatti, stating "that he did not think
it made sense for Nike to pay [Franklin] an 'exorbitant sum of money . . . in light of his role in
this.'"  (Id. at ¶ 12(c)).

[7]  Berman does not personally vouch for the validity of the charges, nor does he offer an opinion
as to Avenatti's guilt or the weight of the evidence.  Inherent in every announcement of criminal
charges is, of course, an implicit message that the prosecutor believes that the defendant is guilty.
That implicit message does not violate a defendant's rights.

[8]  In the unlikely event that a potential juror recalls the ten-month-old press conference and press
release statements challenged by Avenatti, that prior knowledge is likely to emerge during the
voir dire process.  This Court will utilize a juror questionnaire that is designed to elicit what, if
anything, a panel member has heard, seen, or read about Avenatti and the criminal charges
pending against him, including the charges in this case.  See Dec. 17, 2019 Conf. Tr. (Dkt. No.
102) at 4; see also United States v. Skelos, 15-CR-317 (KMW), 2018 WL 2849712 at *10
(S.D.N.Y. June 8, 2018) ("[T]he acting U.S. Attorney claimed that there was 'overwhelming
evidence of Dean Skelos and Adam Skelos's guilt' and remarked that '[c]leaning up corruption
is never easy'"; the court concluded that "it is highly likely that [it would] will be able to find
jurors who have not been prejudiced by . . . these statements[.]"); United States v. Gotti, No. 04
CR 690(SAS), 2004 WL 2757625 at *4 (S.D.N.Y. Dec. 3, 2004) ("A voir dire that focuses on
screening out those veniremen who . . . have been influenced by [a potential witness's statements

United States v. Silver, 103 F. Supp. 3d 370 (S.D.N.Y. 2018) – cited by Defendant (see Def. Br. (Dkt. No. 29) at 8 n.3, 43) – is not to the contrary.  In Silver, the speaker of the New York Assembly was arrested on a complaint, and U.S. Attorney Preet Bharara conducted a press conference – and issued a press release – in which he associated Silver with a "culture of corruption" in Albany.  The U.S. Attorney asserted that the charges against Silver "go to the very core of what ails Albany – a lack of transparency, lack of accountability, and lack of principle joined with an overabundance of greed, cronyism, and self-dealing." Silver, 103 F. Supp. 3d at 374.  In subsequent tweets, the U.S. Attorney repeated his assertion that Silver had "monetized his position as Speaker," using the position to obtain a "secret retainer," pursuant to which he did "favors" for "wealthy special interests."  In a speech at New York Law School the day after the arrest – a speech that was widely covered by the press – Bharara repeated his claim that Silver had "monetize[d] his . . . position," and linked Silver to other politicians, in "[c]ase after case after case," who had "sought ways to monetize his or her position."  Two weeks later, during an interview on MSNBC, Bharara stated that Silver had "sold his office to line his pockets," that Silver's conduct constituted a "big problem for democracy," and that the U.S. Attorney's Office had "convicted many, many people" – "in public corruption prosecutions" – "before this case." (Id. at 374-76)

The statements Avenatti challenges here are not comparable to the U.S. Attorney's public commentary in connection with Silver, nor does Silver address the same legal issue.

---

regarding the defendant] can adequately ensure that an impartial jury is selected. . . . Any residual taint can be cured by carefully admonishing the jury not to consider extrajudicial statements.").

As to the legal issue, Silver argued that the U.S. Attorney's public comments – all of which were made pre-indictment – had improperly influenced the grand jury (see id. at 375), while Avenatti contends that the U.S. Attorney's public statements are evidence of a vindictive and selective prosecution.

As to the nature of the public commentary, in Silver, U.S. Attorney Bharara "bundle[d] together unproven allegations regarding the Defendant with broader commentary on corruption and a lack of transparency in certain aspects of New York State politics," and did so in a manner that could have been understood "as a commentary on the character or guilt of the Defendant." (Id. at 378-79). The commentary was offered in a variety of venues and over a period of weeks. Finally, U.S. Attorney Bharara's "[r]emarks . . . associate[d] the accused with a long line of convicted criminals or a broader pattern of recognized wrongdoing[.]" In doing so, the Bharara's remarks "tend[ed] to blur the distinction between legitimate public commentary and improper opinion." (Id. at 379) The court nonetheless denied the motion to dismiss, finding that "there [was] no evidence that the U.S. Attorney's comments substantially influenced the grand jury's decision to indict." (Id. (internal citation and quotation marks omitted))

The press conference and press release at issue here do not involve the type of conduct that troubled the Silver court. U.S. Attorney Berman did not link Avenatti to a long line of convicted felons; he did not link Avenatti to larger problems in our society; and he did not repeat the challenged statements in a variety of venues and over a period of weeks. In sum, nothing in Silver supports Avenatti's argument that he was subjected to a vindictive and selective prosecution.

The Court concludes that the press conference and press release statements challenged by Avenatti do not suggest that the U.S. Attorney and the FBI Assistant Director are

biased against Avenatti, that the charges brought against Avenatti are the product of malice or personal animus, or that Avenatti was otherwise the target of a selective or vindictive prosecution.[9]

### C.        The Failure to Charge Mark Geragos

As discussed above, in order to establish selective prosecution, a defendant must show that "others similarly situated have not generally been proceeded against because of conduct of the type forming the basis of the charge against [the defendant, and that accordingly the defendant] has been singled out for prosecution."  Fares, 978 F.2d at 59; see also Armstrong, 517 U.S. at 465.

Here, Avenatti argues that Mark Geragos – who is the "Attorney-1" referenced in the (S1) Indictment and the unindicted co-conspirator referenced in the original Indictment – is similarly situated to Avenatti, and was not charged.  Avenatti contends that Geragos was involved at the inception of Avenatti's representation of Franklin, and that he and Geragos "advocated in unison and shared the same strategy."  (Def. Br. (Dkt. No. 29) at 9-11, 24-25, 30-32)

In his brief in support of his motion to dismiss, Avenatti presents the following chronology concerning his dealings with Geragos:

> Mr. Avenatti contacted his colleague, attorney Mark Geragos, a criminal defense lawyer with decades of experience because, among other reasons, Geragos had a relationship with Nike's General Counsel as a result of Geragos's recent representation of Colin Kaepernick, a former NFL quarterback and Nike-sponsored athlete who had just settled his lawsuit against the NFL.  Mr. Avenatti and Mr. Geragos agreed to work together on behalf of Coach Franklin and

---

[9]  Assistant Director Sweeney's brief comment that (1) the charges reflect a "straightforward case of extortion"; and (2) that Avenatti presented a list of demands to Nike in exchange for "covering up" Nike's misconduct, merely reflect the Government's theory of the case, as set forth in the Criminal Complaint.  They do not demonstrate animus suggesting that Avenatti was targeted for prosecution by Sweeney.

approach Nike's General Counsel to discuss a pre-lawsuit settlement of Coach
Franklin's claims. They also discussed the need for an internal investigation.

On March 12, 2019, Geragos initiated communication with Casey Kaplan, Nike's
Assistant General Counsel for Litigation and Internal Investigations for the
purpose of setting up a "confidential mediation discussion." Following Mr.
Geragos's communication with Kaplan, Mr. Avenatti and Mr. Geragos discussed
the scope of a potential internal investigation of Nike and began researching what
other law firms typically charge for investigations of large multi-national
corporations. . . .

Mr. Geragos thereafter communicated with Nike's attorney Scott Wilson of
[Boies Schiller & Flexner] several times by telephone and text message before the
parties agreed to the first in-person settlement meeting, on March 19, 2019, at Mr.
Geragos's law office in Manhattan. The attorneys present at that first meeting . . .
included both Mr. Avenatti and Mr. Geragos[, along with Nike's counsel.]
Whereas Mr. Geragos had communicated with the lawyers for Nike multiple
times by text and telephone before this meeting, Mr. Avenatti had not. . . .

(<u>Id.</u> at 24-25)

       Avenatti does not dispute that he – rather than Geragos – took the lead at the

March 19, 2019 meeting. Avenatti says that he told Nike's counsel that "he represented Coach

Franklin, a whistleblower who was directed by [Nike employees] DeBose and James to make

multiple payments for the benefit of high school players." Avenatti told Nike that "he would

claim in the lawsuit that Mr. Franklin had been targeted by Nike and that Franklin would say

'that he was threatened that he would lose his program if he refused to make these payments.'"

(<u>Id.</u> at 25) Avenatti further admits that he "proposed a settlement with two components: a) that

Nike pay $1.5 million to Coach Franklin for damages caused to him. . . and b) that Nike

commence a thorough internal investigation to be led by Mr. Avenatti and Mr. Geragos." (<u>Id.</u> at

26 (citing Srebnick Decl., Ex. O (Dkt. No. 30-15) at USAO373_26192, 26197). Avenatti

likewise does not dispute that he "stated that he would go public with his evidence if Nike did

not meet those conditions." (Id. at 26 (citing Srebnick Decl., Ex. O (Dkt. No. 30-15) at USAO373_26196)).

Avenatti likewise does not dispute that, in a March 20, 2019 telephone call with Nike's counsel, he demanded that Nike hire him to perform an internal investigation, for which he would be paid more than $9 million. Nor does Avenatti dispute that he told Nike's counsel that if Nike did not agree to his demands, he would "take ten billion dollars off your client's market cap. . . . I'm not fucking around." Nor does Avenatti dispute that he said, "it's worth more in exposure to me to just blow the lid off this thing. A few million dollars doesn't move the needle for me. I'm just being really frank with you." Nor does Avenatti dispute that he agreed to meet with Nike's counsel the next day "to present the exact amount AVENATTI demanded from Nike and under what terms it would have to be paid." ((S1) Indictment (Dkt. No. 72) at ¶¶ 13(a)-(e)) (emphasis in original).

Avenatti further acknowledges that "[a] second, in-person, settlement meeting was held at Mr. Geragos's office on March 21, 2019." (Def. Br. (Dkt. No. 72) at 29) The attendees at this meeting were Avenatti, Geragos, and Nike's counsel. (Id. at 30) Avenatti does not dispute that he also took the lead at this meeting. For example, Avenatti does not deny that he demanded that Nike "immediately" pay "a $12 million retainer," and agree to "a minimum guarantee of $15 million in billings" for the proposed internal investigation. ((S1) Indictment (Dkt. No. 72) at ¶ 14(a)). Nor does he deny that he told Nike that one benefit of his proposal is that Nike could decide whether to "self-report" its misconduct. (Id.) Nor does Avenatti deny that he rejected Nike's proposal that Nike merely pay Franklin, as oppose to retaining Nike. (Id. at ¶ 14(b)) Nor does Avenatti deny that he set Monday, March 25, 2019, as the deadline for

Nike's capitulation, failing which Avenatti would hold his threatened press conference:  "If this is not papered on Monday, we're done. . . ."  (Id. at ¶ 14(f))

In response to Avenatti's selective prosecution argument, the Government cites the allegations in the Indictment.  The Government offers no explanation for why it (1) charged conspiracy counts in the original indictment; (2) referenced Geragos as an unindicted co-conspirator in the original indictment; and (3) then decided to drop the conspiracy counts in the (S1) Indictment.  The Government also offers no explanation for its apparent decision not to charge Geragos.

The Government does point to the substantially different roles Avenatti and Geragos played in the alleged illegal scheme, as set forth in the (S1) Indictment.  (Govt. Opp. (Dkt. No. 57) at 27).  For example, as the factual recitation above makes clear, the threats and demands for payment were articulated almost exclusively by Avenatti.  It was Avenatti who repeatedly threatened to hold a press conference at which Nike's misconduct would be disclosed; it was Avenatti who repeatedly threatened to take billions off of Nike's market cap; it was Avenatti who rejected Nike's proposal to settle with Franklin; it was Avenatti who made the steadily escalating financial demands on Nike; it was Avenatti who determined the timing of the initial approach to Nike; and it was Avenatti who set the deadline for Nike's capitulation.

Given these facts, Avenatti and Geragos are not similarly situated.  Accordingly, the Government's failure to charge Geragos does not constitute evidence of selective or vindictive prosecution.[10]

---

[10]  In support of his selective prosecution argument, Avenatti contends that "[i]f Mr. Avenatti were attorney Doe[,] . . . he would not have been arrested or charged."  (Def. Br. (Dkt. No. 29) at 47)  But as the (S1) Indictment alleges, Avenatti is not the typical John Doe attorney.  He is, instead, an attorney "with a large public following as a result of, among other things, his representation of celebrity and public figure clients, as well as frequent media appearances and

### D.   Evidence that Franklin Wanted an Internal <u>Investigation to be Performed at Nike</u>

Avenatti contends that the charges against him must be dismissed, because Franklin's contemporaneous text messages and emails show that "Avenatti's demand to spearhead an investigation of Nike was consistent with, and in furtherance of, the expressly-stated and <u>legitimate</u> litigation objectives that Coach Franklin sought to pursue long before he first contacted Mr. Avenatti."  (Def. Br. (Dkt. No. 29) at 10 (emphasis in original); <u>see also id.</u> at 29 n.14).

As an initial matter, the (S1) Indictment does not allege that Avenatti's demand for an internal investigation was inconsistent with Franklin's "legitimate litigation objectives." Instead, the (S1) Indictment charges that Avenatti – without Franklin's consent or knowledge – demanded, <u>inter alia</u>, that Nike pay him $15 to $25 million to conduct an internal investigation at Nike, and rejected Nike's counter-proposal that instead the company pay Franklin and not retain Avenatti.  ((S1) Indictment (Dkt. No. 72) at ¶¶ 13-14)

Moreover, on a motion to dismiss for selective or vindictive prosecution, a court does not conduct a mini-trial aimed at determining whether a jury is likely to render a guilty verdict, or to accept a defendant's evidence.  Stated another way, selective or vindictive prosecution is not established by proffering evidence that may be inconsistent with the Government's charges or with the Government's theory of the case.  Instead, as discussed above, a defendant must proffer evidence showing that similarly situated individuals were not

---

use of social media." ((S1) Indictment (Dkt. No. 72) at ¶ 2)  Indeed, in making his alleged threats to Nike, Avenatti bragged about his access to the <u>Washington Post</u>, <u>The New York Times</u>, and ESPN.  (<u>Id.</u> at ¶ 14 (e))  Accordingly, for purposes of Avenatti's motion to dismiss, his conduct is to be evaluated – not as if it were committed by a John Doe lawyer – but rather as if it were engaged in by someone who could, and allegedly did, threaten to cause multi-billion dollar damage to a large multinational company, merely by holding a press conference.

prosecuted for the same conduct, or that the prosecutor was motivated by animus and malice towards the defendant, or was acting at the behest of someone else who was motivated by animus and malice towards the defense.[11]  Accordingly, evidence that Franklin wanted an internal investigation performed at Nike does not demonstrate that Avenatti was selectively or vindictively prosecuted.

### E.   Animosity Between President Trump and Avenatti

Avenatti contends that his vindictive prosecution claim is established by evidence of personal animosity between him and President Trump arising out of Avenatti's prior representation of porn star Stephanie Clifford, a/k/a "Stormy Daniels."  (Def. Br. (Dkt. No. 29) at 33-37)  According to Avenatti, President Trump's personal lawyer Michael Cohen orchestrated a $130,000 payment to Daniels in order to secure her silence concerning her alleged affair with President Trump.  Cohen came under investigation for "alleged campaign finance violations," and U.S. Attorney Berman recused himself from that investigation.  Moreover, "President Trump hired Rudy Giuliani, USA Berman's former law partner, as his personal counsel in connection with the Cohen investigation."  (Id. at 33-34, 38)

As discussed above, Southern District prosecutors pursuing the Cohen investigation scheduled an interview with Avenatti's then-client Daniels, but prosecutors cancelled the meeting the night before, "accusing Mr. Avenatti in an e-mail of leaking to the

---

[11]  For similar reasons, Avenatti's argument that he suggested, during his first meeting with Nike's counsel, that "[w]e . . . include express language in the settlement agreement that will not prevent my client from giving any future testimony to the government," (Def. Br. (Dkt. No. 29) at 26; see also id. at 31-32; Srebnick Decl., Ex. O (Dkt. No. 30-15) at 3), does not demonstrate selective or vindictive prosecution.

press the fact and location of the meeting." (Id. at 33-34)  Avenatti argues that this cancelled

interview provides a motive for his current prosecution.

Avenatti also argues that "[w]hile the FBI was conducting its criminal

investigation into the illegal payment to Daniels, Mr. Avenatti was President Trump's chief

antagonist in the civil arena and in the court of public opinion.  Mr. Avenatti represented Daniels

in connection with two lawsuits against Trump. . . . Mr. Avenatti was interviewed on television

hundreds of times about President Trump's behavior and became, in many ways, the foil for

President Trump. . . . President Trump did not take kindly to Mr. Avenatti's advocacy for his

client. . . ." (Id. at 34-35)

Avenatti also points out that in September and October 2018 tweets, President

Trump referred to Avenatti as "a total low-life," and "a third rate lawyer" who makes "false

accusations." (Id. at 35-36)

Acknowledging the animosity between Avenatti and President Trump, Avenatti

has not proffered evidence suggesting that this prosecution was initiated at President Trump's

behest, or that U.S. Attorney Berman brought this prosecution out of animus or malice towards

Avenatti.

As an initial matter, it is undisputed that the U.S. Attorney's Office did not seek

out this case, and that instead Nike – the alleged victim – brought claims of extortion to the U.S.

Attorney's Office. (Def. Br. (Dkt. No. 29) at 29; (S1) Indictment (Dkt. No. 72) at ¶ 12)  As a

result of the deadlines set by Avenatti, the investigation proceeded swiftly.  The Government

rapidly obtained tape-recorded evidence making out a prima facie case of extortion, and acted on

that evidence.  In sum, there is nothing about the inception of this prosecution that suggests it

was motivated by animus and malice that President Trump bears towards Avenatti.

Nor is there "evidence," as opposed to "mere assertions," that Avenatti was prosecuted because of animosity on the part of Berman or other Southern District prosecutors. Sanders, 211 F.3d at 717; Fares, 978 F.2d at 59.  For example, there is no evidence for the implausible suggestion that this case arises from prosecutors' pique related to a cancelled interview of Stormy Daniels.

Although Avenatti has proffered ample evidence of the animosity President Trump feels towards him, Avenatti has not offered any evidence suggesting that that animosity played any role in the U.S. Attorney's decision to prosecute him.

**F.**      **The Relationship Between President Trump and U.S. Attorney Berman**

Avenatti contends that U.S. Attorney Berman's "ties to President Trump" demonstrate that this case is a vindictive prosecution.  (Def. Br. (Dkt. No. 29) at 37-38)  Avenatti points out that (1) President Trump "personally interviewed" Berman prior to appointing him as U.S. Attorney; (2) Berman's appointment was not confirmed by the Senate, and that he serves as U.S. Attorney only by virtue of the approval of the judges of this District, "pursuant to 28 U.S.C. § 546(d); (3) "[p]rior to his appointment, . . . Berman was a partner at the law firm of Greenberg Traurig, where he practiced law with [Rudolph] Giuliani, Trump's personal lawyer"; (4) Berman "held a position in the General Counsel's Office of the Donald J. Trump Presidential Transition Team"; (5) Berman "contributed $5,400 to the Trump campaign for president"; and (6) Berman recused himself from the Cohen investigation, but did not recuse himself from the Avenatti investigation.  (Id.)  None of these facts and circumstances support Avenatti's assertion that he has been vindictively prosecuted.

The significance of President Trump's interview of Berman prior to his appointment in January 2018 as U.S. Attorney is not entirely clear.  Whatever the two talked

about, it wasn't Avenatti's alleged extortion of Nike, because that alleged extortion did not occur

until March 2019.  There is no evidence that the interview involved any discussion of Avenatti.

Similarly, the significance of the Justice Department's failure to arrange for

Berman's Senate confirmation is not clear.  According to the Justice Department's website, none

of the four U.S. Attorneys currently serving in New York State have been confirmed by the

Senate.  See Dep't Justice, U.S. Attorneys Listing, https://www.justice.gov/usao/us-attorneys-

listing (last updated Dec. 13, 2019).  The U.S. Attorney for New Jersey has likewise not been

confirmed.  (Id.)  In short, the fact that Berman's appointment as U.S. Attorney has not been

confirmed by the Senate does not suggest that Avenatti is the target of a vindictive prosecution.

Avenatti also cites the fact that Berman was – prior to his appointment as U.S.

Attorney – a partner at Greenberg Traurig, where President Trump's personal lawyer, Rudolph

Giuliani, was briefly a partner.  Greenberg Traurig has more than 2100 lawyers in 41 cities

throughout the United States, Europe, Asia, and elsewhere.  See GreenbergTraurig,

https://www.gtlaw.com/en (last accessed Jan. 10, 2020).  While Berman and Giuliani were

partners at the same large, multi-national law firm, Avenatti has not offered evidence that the

two "practiced law" together in any meaningful sense (see Def. Br. (Dkt. No. 29) at 37), much

less that Giuliani played any role in the decision to bring charges against Avenatti.

Similarly, Avenatti does not explain how Berman's donation to then-candidate

Trump's campaign, and his participation in the Trump "Presidential Transition Team,"

demonstrates that Berman bears animus, malice and ill will towards Avenatti, such that he

brought this prosecution vindictively.

Finally, Avenatti complains that Berman recused himself from the Cohen

investigation and prosecution, but has not recused himself from the Avenatti prosecution.  There

are obvious differences between the Cohen case and the instant prosecution.  Cohen dealt directly with President Trump, was a potential witness against him, and implicated the President in criminal conduct that Cohen pleaded guilty to.  Berman was appointed by President Trump. Accordingly, it is understandable that Berman would recuse himself from the Cohen investigation.

The facts here are not comparable.  Avenatti is not a potential witness against the President, and he has not implicated the President in criminal conduct.  Avenatti is being prosecuted for activities wholly unrelated to the political arena.

In sum, the relationship between U.S. Attorney Berman and President Trump does not support Avenatti's arguments regarding vindictive or selective prosecution.

*        *        *        *

Because Avenatti has offered no evidence that he is the target of a vindictive or selective prosecution, he has no right to dismissal of the (S1) Indictment and no right to the extensive discovery he seeks.

## CONCLUSION

For the reasons stated above, Avenatti's motion to dismiss the (S1) Indictment or, in the alternative, for discovery on his claims of vindictive or selective prosecution (Def. Mot. (Dkt. No. 28)) is denied.

Dated:  New York, New York
        January 14, 2020

SO ORDERED.

_____
Paul G. Gardephe
United States District Judge