NICOLA T. HANNA
United States Attorney
BRANDON D. FOX
Assistant United States Attorney
Chief, Criminal Division
JULIAN L. ANDRÉ (Cal. Bar No. 251120)
Assistant United States Attorney
Major Frauds Section
     1100 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-6683
     Facsimile: (213) 894-6269
     Email:    Julian.L.Andre@usdoj.gov

BRETT A. SAGEL (Cal. Bar No. 243918)
Assistant United States Attorney
     Ronald Reagan Federal Building
     411 West Fourth Street, Suite 8000
     Santa Ana, California 92701
     Telephone:  (714) 338-3598
     Facsimile:  (714) 338-3708
     Email:    Brett.Sagel@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>       Plaintiff,<br><br>         v.<br><br>MICHAEL JOHN AVENATTI,<br><br>       Defendant. | SA CR No. 19-061-JVS<br><br>DOCUMENT<br><br>**[IN CAMERA]**<br><br>**[UNDER SEAL]** |

1  NICOLA T. HANNA
   United States Attorney
2  BRANDON D. FOX
   Assistant United States Attorney
3  Chief, Criminal Division
   JULIAN L. ANDRÉ (Cal. Bar No. 251120)
4  Assistant United States Attorney
   Major Frauds Section
5       1100 United States Courthouse
        312 North Spring Street
6       Los Angeles, California 90012
        Telephone: (213) 894-6683
7       Facsimile: (213) 894-6269
        Email:     Julian.L.Andre@usdoj.gov
8
   BRETT A. SAGEL (Cal. Bar No. 243918)
9  Assistant United States Attorney
        Ronald Reagan Federal Building
10      411 West Fourth Street, Suite 8000
        Santa Ana, California 92701
11      Telephone:  (714) 338-3598
        Facsimile:  (714) 338-3708
12      Email:     Brett.Sagel@usdoj.gov
13 Attorneys for Plaintiff
   UNITED STATES OF AMERICA
14
                   UNITED STATES DISTRICT COURT
15
              FOR THE CENTRAL DISTRICT OF CALIFORNIA
16
                        SOUTHERN DIVISION
17
   UNITED STATES OF AMERICA,          SA CR No. 19-061-JVS
18
             Plaintiff,               GOVERNMENT'S MOTION FOR AN ARREST
19                                    WARRANT, ORDER REVOKING PRETRIAL
                  v.                  RELEASE, AND ORDER OF DETENTION
20
   MICHAEL JOHN AVENATTI,             [*Declaration of Remoun Karlous
21                                    Filed Concurrently Herewith*]
             Defendant.
22                                    [**IN CAMERA**]
23                                    [**UNDER SEAL**]
24
25
26
27
28

**GOVERNMENT'S MOTION FOR AN ARREST WARRANT,**

**ORDER REVOKING PRETRIAL RELEASE, AND ORDER OF DETENTION**

Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorneys Julian L. André and Brett A. Sagel, hereby moves under seal and in camera for: (1) a warrant for the arrest of defendant MICHAEL JOHN AVENATTI ("defendant"); (2) an order revoking defendant's order of pretrial release; and (3) an order detaining defendant pending further proceedings in the instant prosecution, United States v. Avenatti, SA CR No. 19-061-JVS.

This motion is made pursuant to Title 18, United States Code, Section 3148, and is based on the following grounds:

1. There is probable cause to believe that defendant has committed federal offenses while on pretrial release, namely, (a) mail fraud, in violation of Title 18, United States Code, Section 1341; (b) wire fraud, in violation of Title 18, United States Code, Section 1343, and (c) structuring of currency transactions to evade reporting requirements, in violation of 31 U.S.C. § 5324(a)(3).

2. There is probable cause to believe that defendant committed multiple state offenses while on pretrial release, namely, (a) defendant or judgment debtor fraudulently removing, concealing, or disposing of personal property sought to be recovered, in violation of California Penal Code § 155(a); (b) money laundering, in violation of California Penal Code § 186.10; and (c) fraudulent removal of property, in violation of Revised Code of Washington § 9.45.080.

3. In doing so, defendant has violated the terms of his pretrial release order by violating federal and state law.

2

4.   There is no condition or combination of conditions that will ensure the safety of the community.

5.   It is unlikely that defendant will abide by any condition or combination of conditions of release.

Alternatively, the government requests that the Court issue an order to show cause as to why defendant's bond should not be revoked, and schedule a bond revocation hearing as soon as possible.

This motion is based on the attached memorandum of points and authorities, the declaration of Internal Revenue Service – Criminal Investigation Special Agent Remoun Karlous and exhibits thereto, the record and file in this case, and such other evidence and argument as the Court may receive.

Dated: January 14, 2020          Respectfully submitted,

NICOLA T. HANNA
United States Attorney

BRANDON D. FOX
Assistant United States Attorney
Chief, Criminal Division

_JULIAN L. ANDRÉ_
BRETT A. SAGEL
Assistant United States Attorneys

Attorneys for Plaintiff
UNITED STATES OF AMERICA

# TABLE OF CONTENTS

DESCRIPTION                                                        PAGE

TABLE OF AUTHORITIES.................................................iii

MEMORANDUM OF POINTS AND AUTHORITIES..................................1

I.    INTRODUCTION...................................................1

II.   PROCEDURAL HISTORY.............................................5

      A.    Defendant's Arrest and Bond Conditions...................5

      B.    The Indictment...........................................7

            1.    False Declarations and Statements in the EA LLP
                  Bankruptcy Proceeding..............................8

            2.    Endeavoring to Obstruct the Administration of the
                  Internal Revenue Code.............................10

      C.    Defendant's Prior Alleged Bond Violation................12

      D.    Defendant's May 2019 Request for Appointment of
            Counsel.................................................12

III.  STATEMENT OF FACTS............................................14

      A.    Defendant's Debts.......................................14

            1.    $15 Million Debts to JFL..........................14

            2.    $2.2 Million Debt to William Parrish..............20

            3.    $2.5 Million Spousal and Child Support Debt to
                  Storie............................................21

            4.    $1.5 Million Debt to Washington Department of
                  Revenue...........................................24

      B.    Defendant's Efforts to Conceal His Assets from His
            Creditors...............................................25

            1.    Defendant's Receipt of a $1,000,000 Settlement
                  Payment in Early-May 2019.........................25

            2.    Defendant Opened a Chase Bank Account in May 2019...26

            3.    Carlin Opened a U.S. Bank Account in May 2019.......27

            4.    Defendant Used Carlin as a Nominee to Purchase a
                  2014 Mercedes Benz S550 in May 2019...............28

**TABLE OF CONTENTS (CONTINUED)**

<u>DESCRIPTION</u>                                                                 <u>PAGE</u>

        5.    Defendant Opened a U.S. Bank Account in May 2019
            and Began Flipping Cashier's Checks in June 2019....30

        6.    Defendant's Exclusive Resorts Membership...........36

IV.   ARGUMENT...................................................37

    A.    Applicable Legal Standards..............................37

    B.    There is Probable Cause to Believe that Defendant Has
        Committed Federal Crimes While on Pretrial Release.......38

        1.    Mail and Wire Fraud................................38

        2.    Structuring........................................39

    C.    There is Probable Cause to Believe Defendant Committed
        State Crimes While on Pretrial Release...................40

        1.    Defendant's Violation of California Law............40

        2.    Defendant's Violation of Washington State Law.......41

    D.    There Are No Conditions or Combination of Conditions
        that Will Ensure the Safety of the Community............42

        1.    There is a Rebuttable Presumption that Defendant
            Poses a Danger to the Community....................42

        2.    Defendant Is a Danger the Community................43

        3.    Defendant Is Unlikely to Comply with the
            Conditions of His Release..........................48

    E.    Issuance of an Arrest Warrant for Defendant Is
        Appropriate.............................................48

V.    CONCLUSION.................................................50

**TABLE OF AUTHORITIES**

<u>DESCRIPTION</u>                                                                 <u>PAGE</u>

**FEDERAL CASES**

<u>In re Eagan Avenatti LLP</u>,
        No. 8:17-bk-11961-CB (C.D. Cal.)...........................8, 14

<u>In re Eagan Avenatti, LLP</u>,
        No. 8:18-cv-1644-VAP-KES (C.D. Cal.)..............15, 16, 17, 19

<u>In re The Trial Group, LLP a/k/a Eagan Avenatti, LLP</u>,
        No. 8:19-BK-10822 (C.D. Cal.)................................17

<u>United States v. Aron</u>,
        904 F.2d 221 (5th Cir. 1990)................................38

<u>United States v. Avenatti</u>,
        No. 1:19-CR-373-PGG (S.D.N.Y.).....................1, 46, 50

<u>United States v. Avenatti</u>,
        No. 1:19-CR-374-DAB (S.D.N.Y.).........................1, 46

<u>United States v. Cardenas</u>,
        784 F.2d 937 (9th Cir. 1986)................................44

<u>United States v. Cohen</u>,
        No. C 10-00547 SI,
        2010 WL 5387757 (N.D. Cal. Dec. 10, 2010)..................45

<u>United States v. Cook</u>,
        880 F.2d 1158 (10th Cir. 1989).....................38, 43, 45

<u>United States v. Gotti</u>,
        794 F.2d 773 (2d Cir. 1986).................................38

<u>United States v. Jalloh</u>,
        SA CR No. 15-129-CJC,
        2016 WL 4939102 (C.D. Cal. Sep. 13, 2016)..................38

<u>United States v. MacPherson</u>,
        424 F.3d 183 (2d Cir. 2005).................................39

<u>United States v. Motamedi</u>,
        767 F.2d 1403 (9th Cir. 1985)...............................44

<u>United States v. Pang</u>,
        362 F.3d 1187 (9th Cir. 2004)...............................39

<u>United States v. Possino</u>,
        No. CR 13-0048-SVW-3 (JEM),
        2013 WL 1415108 (C.D. Cal. Apr. 8, 2013)...................45

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                          PAGE

United States v. Reynolds,
    956 F.2d 192 (9th Cir. 1992)....................................45

United States v. Townsend,
    897 F.2d 989 (9th Cir. 1990)....................................44

United States v. Woods,
    335 F.3d 993 (9th Cir. 2003)....................................39

**STATE CASES**

Jason Frank Law, PLC v. Michael J. Avenatti,
    Los Angeles Superior Court, Case No. BC706555.................15

Parrish v. Avenatti,
    Santa Barbara Superior Court Case No. 18CV04106...............20

**FEDERAL STATUTES**

18 U.S.C. § 1028A(a)(1)..............................................7

18 U.S.C. § 1341.................................................1, 38

18 U.S.C. § 1343..........................................1, 5, 7, 38

18 U.S.C. § 1344(1)..................................................7

18 U.S.C. § 152(2)...................................................7

18 U.S.C. § 152(3)...................................................7

18 U.S.C. § 3142(g).............................................44, 45

18 U.S.C. § 3148........................................37, 42, 43, 48

26 U.S.C. § 7202.....................................................7

26 U.S.C. § 7203.....................................................7

26 U.S.C. § 7212(a)..................................................7

31 U.S.C. § 5324(a)(3)....................................2, 1, 38, 39

**STATE STATUTES**

California Penal Code § 155......................................2, 40

California Penal Code § 186.10...............................2, 40, 41

Revised Code of Washington § 9.45.080........................2, 41

iv

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.  INTRODUCTION

Defendant MICHAEL JOHN AVENATTI ("defendant") is charged in a 36-count indictment in this district with wire fraud; willful failure to pay over withheld payroll taxes; endeavoring to obstruct the administration of the Internal Revenue Code; willful failure to file tax returns; bank fraud; aggravated identity theft; and making false declarations and providing false testimony in bankruptcy.  (CR 16.) Defendant is separately charged in the Southern District of New York with extortion-related offenses in United States v. Avenatti, No. 1:19-CR-373-PGG (the "SDNY Extortion Case") and fraud-related offenses in United States v. Avenatti, No. 1:19-CR-374-DAB (the "SDNY Fraud Case" and, collectively with the SDNY Extortion Case, the "SDNY Cases")

On March 25, 2019, defendant was arrested pursuant to a criminal complaint (CR 1) and released on an unsecured $300,000 appearance bond pending trial.  (CR 38; CR 13.)  Defendant's first ex-wife, Christine Avenatti Carlin ("Carlin"), and Carlin's current husband, Brian Carlin, are the third-party sureties for defendant's bond in this district.  (CR 14.)

The conditions of defendant's pretrial release state that defendant "must not violate federal, state, or local law while on release."  (CR 13 at 14.)  Defendant has violated this condition by engaging in a scheme to defraud his creditors, in violation of 18 U.S.C. § 1341 (mail fraud), and 18 U.S.C. § 1343 (wire fraud), by structuring currency transactions to evade reporting requirements, in violation of 31 U.S.C. § 5324(a)(3) (structuring), and by concealing his personal assets from his creditors, in violation of California

Penal Code § 155 (defendant or judgment debtor fraudulently removing, concealing, or disposing of personal property sought to be recovered), California Penal Code § 186.10 (money laundering), and Revised Code of Washington § 9.45.080 (fraudulent removal of property).[1]

Among other debts, as of May 2019, defendant personally owed: (1) a former law partner, Jason Frank Law PLC ("JFL"), approximately $5 million pursuant to a judgment issued in the Los Angeles Superior Court; (2) a former client, William Parrish ("Parrish"), approximately $2.2 million pursuant to a judgment issued in Santa Barbara Superior Court; (3) his second wife Lisa Storie Avenatti ("Storie") approximately $2.5 million pursuant to spousal and child support orders issued in Orange County Superior Court; and (4) the Washington Department of Revenue approximately $1.5 million pursuant to a tax warrant.[2]  Since at least May 2019, defendant has brazenly attempted to defraud and conceal his assets from these creditors.

In early-May 2019, while on pre-trial release, defendant received a $1,000,000 payment in connection with a settlement his law firm, Avenatti & Associates, APC ("A&A"), obtained for a client, E.S. To prevent his creditors from discovering this $1,000,000 payment, on May 7, 2019, defendant deposited the payment into a new bank account he had opened with J.P. Morgan Chase ("Chase") that same day.  Then, on May 8, 2019, defendant fraudulently transferred to Carlin

---

[1] The government discovered that defendant was likely engaged in the ongoing criminal conduct described herein last month.  The government has worked diligently to obtain and present the relevant evidence to the Court for its consideration as soon as possible.

[2] The government uses these individuals' names, rather than initials, as each of them have public judgments against defendant.

approximately $717,000 of the $1,000,000 payment in a further effort to defraud and conceal his assets from his creditors, including a number of the victims of the alleged criminal conduct in this case.[3] Five days later, on May 13, 2019, Carlin returned $500,000 of the $717,000 to defendant, which he later deposited into a different bank account that he had opened at U.S. Bank on May 22, 2019.

Defendant also engaged in a number of other fraudulent transactions designed to defraud his creditors and conceal his assets.  For example, in May 2019, defendant arranged for his ex-wife to use a portion of the $717,000 payment to purchase a $50,000 Mercedes Benz in her name that defendant and defendant's personal driver, J.C., repeatedly used to transport defendant.  As noted below, defendant completed the paperwork to purchase the Mercedes Benz in his own name on or about May 6, 2019, but returned with Carlin on May 9, 2019, for Carlin to purchase the car in her name.

Additionally, between June 2019 and September 2019, defendant "flipped" cashier's checks to himself in order to limit the amount of funds available in his U.S. Bank account on at least eight separate occasions.  Specifically, defendant would purchase cashier's checks payable to himself so as to drain his bank accounts of any remaining funds, would hold onto the cashier's checks, would briefly "redeposit" the cashier's checks to immediately access the funds, and would then purchase additional cashier's checks payable to himself to again drain any remaining funds in the account.  By doing so,

---

[3] As noted herein, on May 14, 2019, approximately one week after he obtained a $1,000,000 payment and fraudulently transferred $717,000 of those funds to Carlin, defendant sought to have the Federal Public Defender's Office appointed to represent him in this case, but requested that he not be required to submit the required financial affidavit.  (CR 28.)

1  defendant was clearly attempting to limit his creditors' ability to

2  levy his accounts and recover the debts defendant owed to his

3  creditors.

4      Finally, on several occasions, more fully described below,

5  defendant structured his financial transactions at U.S. Bank to evade

6  currency reporting requirements.  Specifically, defendant would

7  withdraw cash in an amount just below the $10,000 reporting

8  requirement and simultaneously purchase a cashier's check for a

9  similar amount – resulting in a total withdrawal amount that, if

10 withdrawn entirely in cash, would have been greater than $10,000.

11 Defendant would then cash the cashier's checks soon thereafter.  By

12 doing so, he prevented U.S. Bank from filing currency transaction

13 reports, which would likely have alerted the government to

14 defendant's bank account information and suspicious banking

15 activities.[4]

16     The fact that defendant continued to engage in criminal conduct

17 after he had been indicted in this case and while on bond

18 demonstrates that defendant remains a substantial economic danger to

19 the community.  In April 2019, defendant was indicted for, among

20 other things, making false statements and declarations during

21 bankruptcy proceedings in order to conceal his assets, and for

22 obstructing the IRS efforts to collect unpaid payroll taxes by

23 evading liens and levies.  Yet, between at least April 2019 and

24

25     [4] The conditions of defendant's pretrial release further state
that defendant must not spend or transfer $5,000 or more in a single
26 transaction to or from any account defendant controls without first
notifying pretrial services.  Although defendant may have violated
27 this condition, possibly numerous times, the government believes
defendant's actions violated federal and state law.  The government,
28 therefore, does not yet know whether defendant notified Pre-Trial
Services of the financial transactions discussed in this motion.

October 2019, defendant continued to engage in similar conduct in a continued effort to defraud his creditors, including some of the very same creditors who are victims of the bankruptcy fraud allegations in the indictment.

Defendant has also repeatedly demonstrated that he is unlikely to comply with any conditions imposed by this Court and has a long history of violating court orders.  Because there are no conditions or combinations of conditions that will ensure the safety of the community, defendant's bond should be revoked and he should be detained pending trial.

Accordingly, the government respectfully requests that the Court issue a warrant for defendant's arrest so that he can be brought before the Court for an immediate bond revocation hearing, revoke defendant's order of pretrial release, and detain defendant pending the trial in this case.[5]  Alternatively, the government requests that the Court issue an order to show cause as to why defendant's bond should not be revoked, and schedule a hearing on the government's motion as soon as possible.

## II.   PROCEDURAL HISTORY

### A.   Defendant's Arrest and Bond Conditions

On March 22, 2019, the Honorable Douglas F. McCormick, United States Magistrate Judge for the Central District of California, issued a warrant for defendant's arrest based on a criminal complaint charging defendant with one count of bank fraud, in violation of 18 U.S.C. § 1344(1), and count of wire fraud, in violation of 18 U.S.C.

---

[5] If this Court does not detain defendant pending trial, the government, alternatively, believes defendant's conditions of release must be significantly modified.  Additionally, the government believes that Carlin is no longer an appropriate surety.

5

§ 1343.  (CR 1.)  The affidavit in support of the criminal complaint
set forth extensive evidence of the charged offenses, but also
incorporated by reference a prior search warrant affidavit (the
"February 2019 affidavit") detailing other alleged criminal conduct
dating back to as early as 2011, including numerous tax offenses.
(CR 1.)  Along with the criminal complaint, the government filed a
notice for request of detention.  (CR 4.)

On March 25, 2019, defendant was arrested in New York on the
criminal complaint.  (CR 13; CR 15.)  Simultaneously, defendant was
arrested on a separate criminal complaint and arrest warrant issued
in the Southern District of New York, which alleged that defendant
attempted to extort NIKE, Inc. ("Nike").  At defendant's initial
appearance that same day, the Honorable Katharine H. Parker, United
States Magistrate Judge for the Southern District of New York,
released defendant on conditions, including the posting of a $300,000
unsecured appearance bond.  (CR 13.)  The conditions of defendant's
release also included the following:

> The defendant must not violate federal, state, or local law
> while on release.

(CR 13 at 14.)  The conditions of defendant's release further
required that defendant must not spend or transfer $5,000 or more in
a single transaction to or from any account defendant controls
without first notifying pretrial services.  (CR 13 at 16.)  The bond
paperwork, which defendant signed, explicitly advised defendant of
the consequences of violating the conditions of his release, stating:

> Violating any of the foregoing conditions of release may
> result in the immediate issuance of a warrant for your
> arrest, a revocation of your release, an order of
> detention, a forfeiture of any bond, and prosecution of for

6

1      contempt of court and could result in imprisonment, a fine,
2      or both.

3  (CR 13 at 17.)

4      On April 1, 2019, defendant made his initial appearance in this
5  district before the Honorable John D. Early, United States Magistrate
6  Judge for the Central District of California, and Judge Early ordered
7  that defendant remain on bond under the conditions previously set in
8  the Southern District of New York.  (CR 10.)[6]  Defendant's first ex-
9  wife, Carlin, and Carlin's husband are the third-party sureties for
10 defendant's bond.  (CR 14.)

11      **B.    The Indictment**

12      On April 10, 2019, a federal grand jury returned a 36-count
13 indictment charging defendant with: (a) ten counts of wire fraud, in
14 violation of 18 U.S.C. § 1343; (b) eight counts of willful failure to
15 pay over withheld taxes, in violation of 26 U.S.C. § 7202; (c) one
16 count of endeavoring to obstruct the administration of the Internal
17 Revenue Code, in violation of 26 U.S.C. § 7212(a); (d) ten counts of
18 willful failure to file tax return, in violation of 26 U.S.C. § 7203;
19 (e) two counts of bank fraud, in violation of 18 U.S.C. § 1344(1);
20 (f) one count of aggravated identity theft, in violation of 18 U.S.C.
21 § 1028A(a)(1); (g) three counts of false declaration in bankruptcy,
22 in violation of 18 U.S.C. § 152(3); and (h) one count of false
23 testimony under oath in bankruptcy, in violate of 18 U.S.C. § 152(2).
24 (CR 16 (the "Indictment").)  The bankruptcy fraud charges and the tax
25 charges relating to defendant's efforts to evade the collection of

26
27 ───────────────────
28      [6] Although Judge Early modified defendant's conditions of
release related to travel (CR 42), all other conditions have remained
the same.

payroll taxes are particularly relevant to the instant motion as

defendant's ongoing criminal conduct is nearly identical to the

allegations set forth in those charges.

1.   False Declarations and Statements in the EA LLP
Bankruptcy Proceeding

Counts Thirty-Three through Thirty-Six of the Indictment charge

defendant with making false declarations and a false oaths in a

bankruptcy proceeding relating to defendant's former law firm, Eagan

Avenatti LLP ("EA LLP"), In re: Eagan Avenatti LLP, No. 8:17-bk-

11961-CB (C.D. Cal.) (the "2017 EA Bankruptcy").  (Indictment ¶¶ 50-

63.)

In February 2016, JFL filed an arbitration claim against EA LLP

and defendant (the "JFL Arbitration").  (Indictment ¶ 51.)  In or

about February 2017, the arbitration panel ordered the deposition of

defendant and his office manager, J.R., to take place on March 3,

2017.  (Id.)  On or about March 1, 2017, a creditor of EA LLP filed

an involuntary Chapter 11 bankruptcy petition in the Middle District

of Florida.[7]  (Id. ¶ 52)  By law, the filing of the bankruptcy caused

an automatic stay of the JFL Arbitration. (Id.)

On or about March 8, 2017, the bankruptcy court stated that

unless EA LLP consented to the bankruptcy by March 10, 2017, the

court would grant relief from the automatic stay and allow the JFL

---

[7] The Chapter 11 involuntary bankruptcy petition was filed by a
single creditor, Gerald Tobin, who claimed that EA LLP owed him
approximately $28,000.  The filing of the petition was itself
fraudulent.  Additional evidence collected during the government's
investigation demonstrates that Tobin filed the petition at the
direction of defendant and with assistance from an attorney working
with defendant.  The government will be seeking to admit this
evidence at trial as it is inextricably intertwined with the
bankruptcy charges and is direct evidence of defendant's fraudulent
intent.

arbitration to proceed. (Id. ¶ 53.) On or about March 10, 2017, EA LLP consented to the order for relief, (id. ¶ 54), and, as a result, the automatic stay of the JFL arbitration remained in place. In April 2017, the 2017 EA Bankruptcy was transferred to the Central District of California. (Id. ¶ 56.) JFL was one of the largest creditors of EA LLP. The IRS was also a large creditor of EA LLP.

From approximately March 2017 through March 2018, defendant failed to report as required, among other information, all revenues of EA LLP and payments and distributions defendant, as an insider, received from EA LLP funds. (Indictment ¶¶ 50-63.) Additionally, between March 2017 and March 2018, defendant defrauded the bankruptcy court, the Office of the United States Trustee, and the creditors of EA LLP, by concealing bank accounts controlled by EA LLP, the true revenues generated by EA LLP, and the sources of revenue to EA LLP. (Id.)

For example, on June 12, 2017, defendant falsely testified under oath during a Section 341(a) debtor's examination that EA LLP had not received any attorney's fees from the Super Bowl Litigation, when EA LLP had in fact received two wire transfers totaling approximately $1,361,000, including attorneys' fees on May 17, 2017. (Indictment ¶ 67.) Indeed, in order to conceal EA LLP's receipt of the Super Bowl Litigation settlement funds, in May 2017, defendant instructed his co-counsel to wire approximately $952,995 of the funds from the Super Bowl NFL Litigation to a separate attorney trust account at City National Bank defendant had just recently opened in defendant's

own name.[8]  (Karlous Decl. Ex. 3 at ¶¶ 41-48.)  Defendant also failed to disclose the receipt of these funds in the May 2017 monthly operating report defendant submitted under penalty of perjury. (Indictment ¶ 61.)  Defendant also concealed and failed to disclose the $1.6 million settlement payment EA LLP received on behalf of "Client 3" in January 2018 and subsequently stole from Client 3. (See id. ¶¶ 7(r)-(x), 65; Karlous Decl. Ex. 1 at ¶ 76.)

## 2.   Endeavoring to Obstruct the Administration of the Internal Revenue Code

Count Nineteen of the Indictment alleges that between October 2016 and September 2018, defendant corruptly endeavored to obstruct and impede the due administration of the internal revenue laws of the United States.  (Indictment ¶¶ 19-26.)  As alleged in the Indictment, defendant's coffee company, Global Baristas US LLC ("GBUS"), doing business as "Tully's," failed to timely file employment tax returns (IRS Forms 941) and pay over to the IRS approximately $3,207,144 in federal payroll taxes, including approximately $2,390,048 in trust fund taxes, which had been withheld from GBUS employees' paychecks. (Indictment ¶ 16.)  Defendant was responsible for all of GBUS's significant financial and business decisions, including the decision not to pay the payroll and trust fund taxes that GBUS owed to the

---

[8]  As set forth in the May 2019 affidavit submitted by IRS-CI Special Agent Remoun Karlous, beginning in 2012, defendant and EA LLP represented approximately 200 individuals (the "Super Bowl Clients") in connection with litigation against the National Football League ("NFL") relating to the 2011 Super Bowl. (Karlous Decl. Ex. 3 at ¶¶ 41-48.)  The government has obtained extensive evidence demonstrating that defendant embezzled substantial portions of the settlement proceeds from the Super Bowl Litigation intended for the Super Bowl Clients.  (Id.)  The government will be seeking to admit this evidence at trial on the basis that this criminal conduct falls squarely within and is inextricably intertwined with the charged wire fraud offenses.

IRS.  (Indictment ¶¶ 14(c), 26(a).  Indeed, defendant was well aware of GBUS's outstanding tax obligations, yet repeatedly refused to authorize the required tax payments to the IRS.  (Indictment ¶ 26(a);see also Karlous Decl. Ex. 1 at ¶¶ 21-47; Karlous Decl. Ex. 2 at ¶¶ 12-17.)

After the IRS initiated a collection action relating to GBUS's outstanding payroll tax obligations in September 2016, issued an approximately $5,000,000 tax lien against GBUS in July 2017, and levied multiple GBUS bank accounts, defendant directed repeated attempts to evade collection of those payroll taxes and obstruct the IRS collection action.  (Indictment ¶¶ 19-26.)  Among other things, defendant: (a) directed GBUS employees to deposit the cash receipts from Tully's stores into a bank account associated with a different entity defendant controlled; (b) opened a new bank account for a different entity defendant controlled, and then changed the company name, Employer Identification Number, and bank account information associated with GBUS's merchant credit card processing accounts; (c) changed the company name on various contracts with The Boeing Company; and (d) caused significant amounts of GBUS's funds, which could and should have been used to pay GBUS's payroll taxes, to be transferred to other entities defendant controlled, including EA LLP and A&A, and then used the funds for his personal purposes and to make lulling payments to the wire fraud victims named in the indictment.  (Indictment ¶ 26; see also Karlous Decl. Ex. 1 at ¶¶ 21-47; Karlous Decl. Ex. 2 at ¶¶ 12-17.)  The clear purpose of this conduct was to evade levies issued against GBUS and to prevent the IRS from locating and collecting GBUS funds.  (Indictment ¶ 26; see

<u>also</u> Karlous Decl. Ex. 1 at ¶¶ 21-47; Karlous Decl. Ex. 2 at ¶¶ 12-17.)

### C.   Defendant's Prior Alleged Bond Violation

On or about April 24, 2019, the government advised defendant and pretrial services that it believed defendant had violated the conditions of his release by threatening to disclose confidential and personal information regarding a victim and government witness.  (<u>See</u> CR 25.)  However, neither the government nor pretrial services sought to revoke defendant's bond at that time.  (<u>Id.</u>)

### D.   Defendant's May 2019 Request for Appointment of Counsel

Although defendant was represented by retained counsel during his initial appearance in this district on April 1, 2019 (CR 10), defendant appeared for his post-indictment arraignment on April 29, 2019, without counsel (CR 23).  As a result, the Federal Public Defender represented him at that time (CR 23), and the Court scheduled a status conference on May 7, 2019, to address defendant's representation issues (CR 22).

On May 7, 2019, defendant appeared before this Court for a status conference to address defendant's representation issues, and was again represented by the Federal Public Defender at this hearing. (CR 27.)  At defendant's request, the Court continued the status conference until May 15, 2019, in order to allow defendant additional time to "finalize" his representation with retained counsel.  (CR 27.)  The Court, however, advised defendant that by May 15, 2019, defendant would have to choose one of three options:  (1) retain private counsel; (2) submit a financial affidavit and seek appointment of counsel; or (3) seek to represent himself after a <u>Faretta</u> inquiry.  (CR 27.)

On May 14, 2019, despite having just received a $1,000,000 payment (see infra § III.B.1.), defendant submitted an ex parte application for an order appointing the Federal Public Defender to represent him in this matter. (CR 28.) Defendant's ex parte application stated:

> The [Guide to Judiciary Policies and Procedures] indicates that a defendant is "financially unable to obtain counsel" under the Act if his or her "net financial resources and income are insufficient to obtain qualified counsel." However, even if a defendant's net resources and income are in excess of the amount needed to cover the necessities of life, the court should find the defendant eligible for the appointment of counsel and order contribution when those excess funds are insufficient to pay fully for retained counsel. Mr. Avenatti submits that he falls into the latter category of eligibility and requests an opportunity to contribute to his representation.

(CR 28 at 3-4 (internal citations omitted).)

Additionally, rather than submit the required financial affidavit, defendant requested "that the Court defer determination of the amount of contribution until the end of the case in light of the complexity of his financial situation and the case . . . ." (CR 28.) The Court denied defendant's ex parte application that same day. (CR 29.)

The next day, May 15, 2019, H. Dean Steward was retained to represent defendant in this matter and appeared on defendant's behalf at the status conference. (CR 33.) During the status conference, the Court ordered defendant to pay for all services rendered by the Federal Public Defender. (CR 33.) The government does not know whether defendant has complied with the Court's order and paid the Federal Public Defender.

1    **III. STATEMENT OF FACTS**

2        **A.   Defendant's Debts**

3        Defendant and his companies, including EA LLP, are currently

4    subject to numerous court judgments.  Indeed, as detailed below,

5    defendant personally owes at least $11,000,000 to four creditors

6    pursuant to valid judgments and tax warrants issued against him in

7    California and Washington.[9]  His former law-firm, EA LLP, is also

8    considerably in debt, including one $10,000,000 judgment relating to

9    the 2017 EA Bankruptcy.

10           1.   $15 Million Debts to JFL

11       In December 2017, in connection with the 2017 EA Bankruptcy,

12   defendant, both individually and on behalf of EA LLP, entered into a

13   settlement agreement with JFL (the "JFL Settlement").  (Karlous Decl.

14   Ex. 4); see also Motion for Order Approving Settlement, In re: Eagan

15   Avenatti LLP, No. 8:17-bk-11961-CB, Dkt. No. 343 (C.D. Cal. Jan. 30,

16   2018).  Under the terms of the settlement, JFL would consent to the

17   dismissal of the 2017 EA Bankruptcy,[10] and JFL would receive an

18   allowed general unsecured claim of $10,000,000.  Id.  at 3-4.  Absent

19   a default by EA LLP and defendant (as guarantor), JFL would be paid a

20   total of $4,850,000 in full for its allowed claim by EA LLP.  Id.

21   Payment would be made in two installments: (a) $2,000,000 to be paid

22   _____

23       [9] Although the government is aware of other debts and judgments
     against defendant and his companies, for purposes of this motion, the
24   government has focused on the four judgments referenced below.

25       [10] In order to obtain a dismissal of the 2017 EA Bankruptcy, EA
     LLP also entered into a settlement agreement with the IRS relating to
26   EA LLP's failure to pay to the IRS approximately $2,389,005 EA LLP
     owed, including approximately $1,288,277 in payroll taxes EA LLP had
27   withheld from EA LLP's paychecks.  (Karlous Decl. Ex. 1, ¶ 50.)  As
     alleged in the indictment, defendant used funds he stole from Client
28   4 to make EA LLP's initial settlement payment to the IRS, and then
     failed to make further required payments.  (See id.; Indictment
     ¶ 7(cc)(i).)

                                    14

within 60 days of the dismissal of the 2017 EA Bankruptcy; and (b)
$2,850,000 to be paid within 120 days of the dismissal.  Id.

EA LLP and defendant did not make any of the payments to JFL
required under the JFL Settlement.  As a result of EA LLP's and
defendant's failure to comply with the JFL Settlement, on May 22,
2018, the Bankruptcy Court issued a final judgment against EA LLP in
favor of JFL in the amount of $10,000,000 (the "$10 Million JFL
Federal Judgment").  (Karlous Decl. Ex. 5.)  The $10 Million JFL
Federal Judgment was subsequently registered with this Court and
judgment debtor proceedings were initiated in In re Eagan Avenatti,
LLP, No. 8:18-cv-1644-VAP-KES (C.D. Cal.) (the "Federal JFL Case").

Separately, as a result of defendant's failure to comply with
the JFL Settlement, on November 10, 2018, the Los Angeles Superior
Court entered a $5,054,287.75 judgment against defendant personally
(the "$5 Million JFL State Judgment") in Jason Frank Law, PLC v.
Michael J. Avenatti, Los Angeles Superior Court, Case No. BC706555
(the "State JFL Case").  (Karlous Decl. Ex. 6.)

Both before and after the indictment in this case, JFL engaged
in extensive efforts to enforce the judgments against EA LLP and
defendant personally.  Yet, in a clear effort to defraud JFL,
defendant repeatedly attempted to conceal his assets and provided
false testimony during judgment debtor examinations so as to prevent
JFL (and others) from enforcing these judgments and collecting the
funds defendant owes JFL.

On July 25, 2018, JFL conducted a judgment debtor examination of
defendant in connection with the 2017 EA Bankruptcy.  (Karlous Decl.
Ex. 7.)  During this examination, defendant was evasive and made
numerous false statements.  For example, defendant falsely claimed to

15

1   not know whether EA LLP had filed its tax returns and claimed to not

2   recall how EA LLP had fallen $2 million behind in its payroll tax

3   obligations. (Id. at 11-20, 27-30.) Defendant, however, was well

4   aware that EA LLP had not filed tax returns for any tax years since

5   2012 and had personally directed that EA LLP's payroll taxes no

6   longer be paid to the IRS.  (Indictment ¶¶ 32-36; Karlous Decl. Ex. 1

7   at ¶¶ 48-55.)

8        Defendant then attempted to avoid having to sit for a further

9   judgment debtor examination in January 2019 by, among other things,

10  moving to disqualify JFL's counsel.  Notably, on February 1, 2019,

11  the Honorable Virginia A. Phillips, Chief United States District

12  Judge, denied this motion finding that the motion was "tactically

13  abusive."  Minute Order, In re Eagan Avenatti, LLP, No. 8:18-CV-1644-

14  VAP (KES), Dkt. No. 45 (C.D. Cal. Feb. 1, 2019).  Judge Phillips also

15  found that defendant was "repeatedly evasive at the [July 2018]

16  examination" and had failed to bring subpoenaed documents.  (Id.)

17  Additionally, on February 4, 2019, United States Magistrate Judge

18  Karen E. Scott recommended that Judge Phillips initiate contempt

19  proceedings against defendant due to defendant's repeated refusals to

20  comply with a subpoena.  Order to Show Cause re Contempt, In re Eagan

21  Avenatti, LLP, No. 8:18-CV-1644-VAP (KES), Dkt. No. 48 (C.D. Cal.

22  Feb. 4, 2019).

23       On February 12, 2019, JFL filed a motion in the Federal JFL Case

24  seeking the appointment of a receiver for EA LLP and a restraining

25  order against EA LLP.  Among other things, JFL's motion accused

26  defendant and EA LLP of bankruptcy fraud and improperly diverting EA

27  LLP's assets to other companies or bank accounts defendant controlled

28  both during and after the 2017 EA Bankruptcy.  See Motion, In re:

Eagan Avenatti LLP, No. 8:18-CV-1644-VAP (KES), Dkt. 51 (Feb. 12, 2019).

On February 13, 2019, JFL and defendant, both individually and as Managing Partner of EA LLP, filed a joint stipulation seeking the appointment of the EA Receiver and the issuance of a restraining order against EA LLP and defendant. (See CR 55, Ex. 2.)  In exchange for defendant agreeing to the appointment of the EA Receiver and the terms of the Stipulated Receivership Order, JFL agreed to withdraw his motion. (Id.)  The parties also agreed to continue the judgment debtor examination of defendant from February 14, 2019, to March 8, 2019. (Id.)

Despite defendant previously stipulating to the Receivership Order that gave "sole authority regarding whether to file a petition for bankruptcy to the receiver" (see CR 55, Ex. 2 at ¶ 14(s)), on March 7, 2019, defendant filed a second bankruptcy petition on behalf of EA LLP in In re The Trial Group, LLP a/k/a Eagan Avenatti, LLP, No. 8:19-BK-10822 (C.D. Cal.) (the "2019 EA Bankruptcy").  This petition was filed for the specific purpose of avoiding the judgment debtor examination of defendant that had been scheduled for the following day.  On March 13, 2019, the Bankruptcy Court dismissed the 2019 EA Bankruptcy as defendant did not have the authority to file the bankruptcy petition.  In re The Trial Group LLP, No. 8:19-BK-10822, Dkt. No. 38.  The Bankruptcy Court also found that defendant had violated the terms of the order appointing the receiver in the JFL Litigation and scheduled an order to show cause hearing ("OSC")

1    for May 8, 2019, to determine whether defendant should be sanctioned.

2    Id., Dkt. No. 35.[11]

3        On March 15, 2019, JFL conducted a judgment debtor examination

4    of defendant in the State JFL Case.  (Karlous Decl. Ex. 8.)  During

5    this examination, defendant was again evasive and continued to make

6    false statements under oath.  For example, in response to the

7    question, "Who owns Augustus LLP?"  Defendant answered, "I'm not at

8    liberty to disclose that.  It's not me."  Defendant then answered

9    "no" to the question, "do you have any direct or indirect interest in

10   Augustus LLP?"  (Karlous Decl. Ex. 8 at 96-98.)

11       In December 2018, however, defendant established a company

12   called Augustus LLP, and on February 13, 2019, defendant caused

13   business bank accounts at Union Bank to be opened under the name

14   Augustus LLP.  (Karlous Decl. Ex. 3 at ¶ 49.)  The application to

15   open the accounts listed defendant's home address as the mailing

16   address for Augustus LLP and identified defendant as the

17   owner/partner of the business.  (Id.)  Defendant used this account to

18   make payroll payments to a number of EA LLP employees, as well as to

19   make further lulling payments to two of the wire fraud victims in

20   this case, Client 1 and Client 2.  (Id.)

21       On March 22, 2019, JFL conducted a judgment debtor examination

22   of defendant in the Federal JFL Case.  During this examination,

23   defendant was again evasive and made numerous false statements under

24   oath.  (Karlous Decl. Ex. 9.)  For example, defendant falsely

25   testified that "to best of [defendant's] knowledge" EA LLP had filed

26

27

28       [11]  On April 17, 2019, defendant moved to stay the OSC in the
     2019 EA Bankruptcy pending the resolution of this criminal case.  The
     OSC hearing has since been continued to May 27, 2020.

federal tax returns for each year since 2013, other than for the 2018 tax year (which had "not been filed yet"), and that copies of the tax returns were "in the files of the firm in storage."   (Karlous Decl. Ex. 9 at 31-33.)

After defendant was charged in this case, JFL continued its efforts to enforce the judgments against EA LLP and defendant.  Among other things, JFL issued a number of subpoenas in an attempt to locate defendant's remaining assets.  Defendant was well aware of JFL's enforcement efforts.

For example, on April 2, 2019, JFL served a subpoena on defendant's prior counsel, Bienert Katzman PC ("Bienert") requiring Bienert to produce "all checks, wire transfers or other documents reflecting any payments or retainers" Bienert received relating to its representation of defendant. See Motion to Compel, In re: Eagan Avenatti, LLP, No. 8:18-cv-1644-VAP (KES), Dkt. No. 76 (C.D. Cal. Apr. 29, 2019).  Defendant moved to quash the subpoena to Bienert and JFL moved to compel Bienert to comply.  See Minute Order, In re: Eagan Avenatti, LLP, No. 8:18-cv-1644-VAP (KES), Dkt. No. 95 (C.D. Cal. July 3, 2019).  On July 2, 2019, the Court granted JFL's motion to compel and denied defendant's motion to quash.  Id.

On July 18, 2019, JFL issued a subpoena to Chase and served notice to defendant. (Karlous Decl. Ex. 10.)  On July 19, JFL also issued a subpoena to the Intercontinental Hotel for payment records relating to a press conference defendant held at the hotel on July 18, 2019.  (Karlous Decl. Ex. 11.)  Defendant responded to the email attaching the notice of subpoena as follows:  "I see desperation has set in.  I paid cash.  Nice try."  (Karlous Decl. Ex. 12.)

1   In late-August 2019, JFL filed a motion for a turnover order in
2   the State JFL Case relating to certain artwork that defendant
3   purchased during a foreclosure auction brought by his second wife,
4   Storie, to satisfy a separate $2.5 million judgement due to
5   defendant's past-due child and spousal support obligations.  (Karlous
6   Decl. Ex. 13.)   In opposition to the motion, defendant submitted a
7   declaration indicating he had turned the artwork over to his first
8   ex-wife, Carlin, in order to satisfy a prior spousal and child
9   support judgment.  (Id.)  In his declaration, defendant said that "I
10  have several creditors, many of whom have judgments against me."
11  (Id.)  Although the Superior Court granted the turnover order on
12  August 29, 2019, defendant did not comply with the order because he
13  claimed he did not have possession, custody, or control of the
14  artwork at the time the order was issued.

15  On October 18, 2019, defendant testified in a further judgment
16  debtor examination in the State JFL Case.  (Karlous Decl. Ex. 14.)
17  Among other things, during the judgment debtor examination, defendant
18  was asked to identify the creditors that have judgements against
19  defendant.  Defendant responded:  "My first wife, my second wife,
20  [JFL], who's the plaintiff in this action, Mr. William Parrish,
21  various taxing authorities, and I'm sure that there are others that I
22  am – that I can't recall."  (Id. at 8-9.)

23              2.   $2.2 Million Debt to William Parrish

24  On October 26, 2018, the Santa Barbara Superior Court issued a
25  judgment against defendant in favor of William J. Parrish in the
26  amount of approximately $2,194,302 in Parrish v. Avenatti, Santa
27  Barbara Superior Court Case No. 18CV04106 (the "Parrish Case").
28  (Karlous Decl. Ex. 15.)  Although defendant initially appealed the

judgment, the California Court of Appeal dismissed defendant's appeal. (Karlous Decl. ¶ 16.)

On August 26, 2019, defendant was personally served with a notice for a judgment debtor examination in the Parrish Case. (Karlous Decl. Ex. 17.) Defendant, however, failed to appear for the judgment debtor examination on two separate occasions. (Karlous Decl. Exs. 18-19.) Accordingly, on or about October 8, 2019, the Superior Court issued a bench warrant for defendant's arrest.[12] (Karlous Decl. Exs. 19-20.) After defendant filed an _ex parte_ application seeking to have the warrant recalled, and agreeing to sit for a judgment debtor examination the following week (Karlous Decl. Ex. 21), the court recalled the bench warrant on October 23, 2019 (Karlous Decl. Ex. 22).

On October 29, 2019, defendant appeared for a judgment debtor examination in the Parrish Case. (Karlous Decl. Ex. 23.) Among other things, when defendant was asked whether he was "aware of any individuals or entities holding title to real property on [defendant's] behalf," he responded "[n]ot that I can think of." (Karlous Decl. Ex. 23 at 50.) As set forth further below, this testimony was false as defendant's first ex-wife, Carlin, was holding title to a Mercedes Benz that was purchased at defendant's direction with funds Carlin received from defendant. (See supra § III.B.4.)

       3.   $2.5 Million Spousal and Child Support Debt to Storie

Defendant married his second wife, Lisa Storie, on or about May 9, 2011, and they had one minor child born in August 2014. Defendant

_____

[12] The government does not currently know whether defendant disclosed the issuance of the bench warrant to his pretrial services officer.

21

and Storie separated in approximately October 2017, and a divorce proceeding in Orange County Superior Court commenced in or about January 2018.  On or about April 23, 2018, defendant and Storie stipulated to the custody and support terms in which both parties agreed that defendant would pay, among other required expenditures, approximately $9,000 per month in child support and $28,000 per month in spousal support to Storie.  (Karlous Decl. Ex. 24.)  The Honorable Carol L. Henson, Orange County Superior Court Judge, ordered the support payments pursuant to the stipulation of the parties.  (Id.)

On October 22, 2018, Judge Henson issued her Findings and Order After Hearing ("Support Order"), in which, among other findings, she ordered: defendant to pay child support on behalf of their minor son to Storie, retroactively to January 1, 2018, of $37,897 per month; and defendant to pay spousal support to Storie, retroactively to January 1, 2018, of $124,398 per month.  (Karlous Decl. Ex. 25.) Defendant was ordered to appear for a judgment debtor examination on December 7, 2018, as part of his divorce proceedings.  (Karlous Decl. Ex. 26.)  On or about November 30, 2018, defendant entered into a stipulation to postpone the examination and defendant agreed to turn over a Ferrari; five watches; at least thirteen pieces of artwork; and defendant's entire legal and equitable interest in Passport 420, LLC, which owned a Honda Jet, in which defendant held such interest through Avenatti and Associates, APC.[13]  (Id.)  Defendant further agreed to turn over all banking records related to EA LLP, A&A, and defendant individually by December 20, 2018.  (Id.)  Judge Henson

---

[13] Defendant purchased the Honda Jet using settlement funds he stole from Client 2.  (Indictment ¶ 7(p).)  In April 2019, the government seized the Honda Jet.

issued the Order pursuant to the parties' stipulation on December 4, 2018.  (Id.)

On or about January 17, 2019, a writ of execution was issued in in the divorce proceeding in the total amount, including principal, interest and cost of $2,053,332 against defendant and in favor of Storie.  (Karlous Decl. Ex. 27.)  The debt was based on the court's previously issued orders on April 23, 2018, and October 22, 2018. (Id.)  On or about January 25, 2019, the Honorable Nathan Vu, Orange County Superior Court Judge, issued a "Turnover Order," in which the court ordered defendant, the judgment debtor in the divorce proceedings, to immediately turn over, among other things: 100% of the shares in the corporation Avenatti & Associates; 100% of the funds due and owing to defendant from The Fight PAC; three watches; and all artwork at Orange County Fine Art Storage held in defendant's name or held under Avenatti & Associates.  The Order concluded with, "**FAILURE TO COMPLY WITH THE ORDER MAY SUBJECT THE JUDGMENT DEBTOR TO ARREST AND PUNISHMENT FOR CONTEMPT OF COURT.**"  (Id. (bold and caps in the original).)

Defendant sought to set aside the Turnover Order.  (Karlous Decl. Ex. 28.)  On February 14, 2019, Judge Vu ordered that during the pendency of the litigation, defendant was "prohibited from transferring, encumbering, hypothecating, concealing, or in any way disposing of the assets that are the subject of the [January 25, 2019] Turnover Order. . . ."  (Id.)  On April 4, 2019, Judge Vu issued an "Order To Deliver Specific Property," whereby Judge Vu determined defendant still owed over $2 million to Storie as of January 9, 2019, and required defendant to turn over to Storie the property previously ordered on January 25, 2019, as well as 100% of

1  defendant's interest in EA LLP held in defendant's name or held in

2  Avenatti & Associates to satisfy his outstanding debt to Storie.

3  (Karlous Decl. Ex. 29.)

4      On June 5, 2019, the Honorable Julie A. Palafox, Orange County

5  Superior Court Judge, ordered defendant to show cause why he should

6  not be found guilty of contempt for willfully disobeying the court's

7  orders, including defendant's continued failure to provide personal

8  and business tax returns and bank account statements that defendant

9  was ordered to produce as early as May 15, 2018.[14]  (Karlous Decl. Ex.

10 30.)  On or about October 28, 1019, Judge Vu denied defendant's

11 motion to set aside the Child and Spousal Support Orders filed on

12 October 22, 2018.  (Karlous Decl. Ex. 31.)  As of August 20, 2019,

13 when defendant bought the artwork at the foreclosure auction, his

14 outstanding debt to Storie on the April 23, 2018, and October 22,

15 2018, judgments rendered against defendant was approximately

16 $2,553,089.  (Karlous Decl. Ex. 33.)

17      4.   $1.5 Million Debt to Washington Department of Revenue

18      On January 17, 2019, the Washington Department of Revenue filed

19 a Warrant for Unpaid Taxes in Thurston County Superior Court.

20 (Karlous Decl. Ex. 34.)  The Warrant indicated that defendant

21 personally owed the Washington Department of Revenue approximately,

22 $1,530,216, including approximately $995,208 in unpaid taxes from

23 July 2017 through March 2018.  (Id.)  It appears that these unpaid

24 taxes directly relate to defendant's failure to pay state taxes in

25 connection with GBUS.  (See Karlous Decl. Ex. 2 at ¶ 14 (indicating

26

27 _____

28      [14] Citing defendant's ongoing federal criminal matters, defendant
   has obtained continuances of his contempt hearing until February
   2020.

1  that defendant was aware that GBUS had failed to make required tax

2  payments to the State of Washington).)

3        In an effort to enforce the Warrant, the Washington Department

4  of Revenue subsequently issued levies on a number of defendant's bank

5  accounts.  On or about June 14, 2019, the Washington Department of

6  Revenue issued a Notice and Order to Withhold and Deliver to Chase

7  Bank.  (Karlous Decl. Ex. 35.)  The Washington Department of Revenue

8  collected approximately $32,072 from defendant's Chase bank account

9  as a result of this levy.  (Karlous Decl. Ex. 39 at 24.)  On or about

10  July 1, 2019, and July 29, 2019, additional levies were served on

11  defendant's Chase account.  (Id. at 36, 43.)

12        On or about August 26, 2019, the Washington Department of

13  Revenue issued a Notice and Order to Withhold and Deliver to U.S.

14  Bank.  (Karlous Decl. Ex. 36.)  The Washington Department of Revenue

15  collected approximately $280 from defendant's U.S. Bank account as a

16  result of this levy.   (Karlous Decl. Ex. 40 at 59.)

17  **B.   Defendant's Efforts to Conceal His Assets from His**
      **Creditors**

18

19       1.   <u>Defendant's Receipt of a $1,000,000 Settlement Payment</u>
           <u>in Early-May 2019</u>

20        On March 14, 2019, defendant signed a letter on Avenatti &

21  Associates, APC (A&A) letterhead, to counsel representing a potential

22  defendant in a civil case, that "this office represents [E.S.]" in

23  connection with an incident that had occurred on March 3, 2019.

24  (Karlous Decl. Ex. 37.)  On April 17, 2019, defendant and E.S. signed

25  a settlement agreement in which the opposing party was to pay $2

26  million dollars to E.S. and $1 million to defendant on or before May

27  8, 2019.  (Id.)  Despite defendant claiming the previous month A&A

28  represented E.S., the settlement agreement called for the $1 million

1  payment be made payable to defendant, individually. (Id.)  On April
2  30, 2019, a $1 million cashier's check was issued to defendant
3  pursuant to the settlement agreement. (Karlous Decl. Ex. 38.)
4          2.  Defendant Opened a Chase Bank Account in May 2019
5          On May 7, 2019, defendant opened a personal checking account at
6  the Newport Center Fashion Island Branch of Chase Bank with an
7  initial deposit of $1 million, consisting solely of the $1,000,000
8  check issued to defendant in the E.S. matter on April 30, 2019.
9  (Karlous Decl. Ex. 39 at 1-4, 8-9.)  On May 8, 2019, defendant
10  withdrew $871,821.03 from the account to purchase the following
11  cashier's checks in the following amounts: $717,723 payable to Carlin
12  with "per judgment" in the memo section; $29,264 payable to Smart
13  Tuition for defendant's daughter's private school tuition; $50,000 to
14  Shulman Hodges & Bastian LLP, the law firm that represented defendant
15  in various bankruptcy-related proceedings; $26,218.67 to Stegmeier,
16  Gelbert, Schwartz, Benquente, the law firm that represented defendant
17  in his divorce proceedings with Storie; $34,425.36 to SM 10000 with
18  "2107" in the memo line; and $9,720 to CH Services with "2107" in the
19  memo line.[15]  (Id. at 4-5, 46-51.)
20          On May 13, 2019, defendant withdrew an additional $23,200 from
21  the account and with part of the withdrawal, purchased a cashier's
22  check for $19,200 to Stegmeier, Gelbert, Schwartz, Benquente. (Id.
23  at 52.)  On May 21, 2019, defendant withdrew $4,000 in cash and
24  withdrew an additional $40,000 to purchase a cashier's check made
25  payable to defendant. (Id. at 53.)  Defendant made numerous other
26  transactions throughout the month of May 2019. (Id. at 4-7.)  The

---

[15] Defendant lived at 10000 Santa Monica Boulevard, Unit 2107.

ending balance in the account as of May 31, 2019, was $4,150.56, despite an initial balance of $1 million on May 7, 2019.  (Id. at 7.)

On June 7, 2019, the account balance was $1,240.98, before defendant redeposited the $40,000 cashier's check he had purchased in own his name on May 21, 2019.  (Id. at 23.)  On June 14, 2019, the Washington Department of Revenue issued a levy on the Chase Bank account and obtained $32,071.90, the approximate balance in the Chase account.  (Id. at 24; Karlous Decl. Ex. 35.)  On or about July 1, 2019, and July 29, 2019, additional levies were served on defendant's Chase account, resulting in $955.94 and $70.78 being seized from defendant's account.  (Karlous Decl. Ex. 39 at 36, 43.)  As of at least July 24, 2019, defendant carried a negative balance in the account and basically had no further activity in the account.[16]  (Id. at 36.)

### 3.   Carlin Opened a U.S. Bank Account in May 2019

On May 8, 2019, defendant's first ex-wife, Carlin, opened an individual checking account in her name only at the Michelson Branch of U.S. Bank in Irvine, California.  (Karlous Decl. Ex. 40 at 4.) Carlin's initial deposit into the account was the $717,723 cashier's check that defendant purchased at Chase Bank the same day.[17]  (Karlous Decl. Ex. 39 at 46.)  On May 9, 2019, Carlin purchased the following two cashier's checks in the following amounts at the Arcadia Foothill Branch of U.S. Bank: $250,000 made payable to the Law Offices of Evan

---

[16] As described above, on July 18, 2019, JFL served a subpoena on Chase Bank and provided notice to defendant of the subpoena.

[17] For at least several years prior to the opening of this account at U.S. Bank, and at all times while Carlin used this account at U.S. Bank, Carlin had a joint checking account with her current husband at USAA.

A. Jenness;[18] and $52,983.28 made payable to Mercedes Benz of Arcadia.[19]  (Karlous Decl. Ex. 40 at 8-11.)  On May 13, 2019, Carlin purchased a $500,000 cashier's check made payable to defendant (id. at 12-13), which, as described below, defendant did not deposit until May 22, 2019 (supra § III.B.5).[20]  A review of the bank account appears to show Carlin spent the remainder of money in the account paying off credit cards and making personal expenditures.

4.   Defendant Used Carlin as a Nominee to Purchase a 2014 Mercedes Benz S550 in May 2019

Special Agent Karlous has obtained records from Mercedes Benz of Arcadia as well as interviewed Fleet Manager/Sales Representative J.O. responsible for the sale of a 2014 Mercedes Benz S550 with VIN ending in 8895 ("S550").  (Karlous Decl. ¶¶ 51-52.)  On May 6, 2019, defendant spoke with J.O. regarding the S550 that the dealership had for sale, and J.O. sent photographs of the car to defendant.  (Id. at ¶ 52.)  Defendant stated that he would come into the dealership to look at the car and defendant did so later that day.  That same day, May 6, 2019, defendant filled out the paperwork to purchase the S550. (Id.)  Defendant provided an Arizona Driver's License in defendant's name as well as an address in Arizona. (Karlous Decl. Ex. 43.)

---

[18] Evan Jenness had previously represented defendant at least in relation to his domestic violence arrest in November 2018.  Moreover, as described above, on May 7, 2019, defendant requested this Court to continue his matter for an additional week for him to finalize his "representation issues."  The cashier's check made payable to Ms. Jenness was redeposited the following day, May 10, 2019, with the note, "not used for purpose intended."

[19] The purchase of the Mercedes Benz and defendant being present with Carlin at the Arcadia Foothill Branch of U.S. Bank is described infra, Section III.B.4.

[20] As detailed above, on May 14, 2019, the Federal Public Defender's Office filed an ex parte application with this Court seeking to represent defendant without defendant having to file a financial affidavit.

Among the paperwork defendant completed, defendant signed a California Department of Tax and Fee Administration Form in which defendant certified that the car was being purchased for use outside of California, not for storage, use, or consumption in California, and would be used at the address in Arizona. (Id. at 6.) The certification defendant signed was for the purpose of waiving the California Sale and Use Tax. (Id.) Defendant signed the certification above the bold print that stated: "Fraudulent use of this statement to avoid the payment of California sales and use tax may result in severe penalties." (Id.) After defendant told J.O. that he would be registering the S550 out-of-state, J.O. told defendant that the dealership would need to transport the car to the state where the car is registered. (Karlous Decl. ¶ 52.) After defendant completed the paperwork to purchase the S550, defendant told J.O. that defendant's business manager would wire the money into the dealership to purchase the car. (Id.)

On May 8, 2019, J.O. called defendant because the money to purchase the car had not arrived to the dealership. (Id.) Defendant told J.O. that defendant was no longer interested in buying the car, but defendant knew someone that was interested in buying the S550. (Id.) Defendant returned to the dealership on May 9, 2019, with Carlin; defendant told J.O. that Carlin was defendant's ex-wife. (Id.) Carlin filled out the paperwork to buy the same S550 that defendant claimed to be purchasing two days prior.[21] (Karlous Decl. Ex. 43 at 16-21.) Because Carlin wanted to purchase the S550 with a

---

[21] Although the price for the car remained the same, because Carlin provided her actual residence in California, the final cost was approximately $3,800 more due to California taxes.

cashier's check, J.O. told her the dealership's policy required J.O. to accompany Carlin to the bank to purchase the cashier's check. (Karlous Decl. ¶ 52.)  J.O. followed Carlin and defendant to the Arcadia Foothill Branch of U.S. Bank and was present inside the bank when Carlin purchased the cashier's check to buy the S550 using the funds she had just received from defendant the day before.  (Id.)

On three occasions between December 17, 2019, and January 7, 2020, Special Agent Karlous observed and photographed the S550 purchased in Carlin's name parked at the house of J.C., and individual known to be defendant's personal driver, as well as observing J.C. driving the S550 on December 17, 2019.  (Karlous Decl. ¶ 53.)  Moreover, in declarations and photographs submitted in the State JFL Case, defendant was observed leaving the foreclosure auction on August 20, 2019, in the S550.  (Karlous Decl. Ex. 44.) Defendant also testified at his October 18, 2019, judgment debtor examination that he took an Uber to the courthouse for his testimony; however, after the examination concluded, J.C. was parked outside of the courthouse in the S550.

   5.   Defendant Opened a U.S. Bank Account in May 2019 and
        Began Flipping Cashier's Checks in June 2019

On May 22, 2019, defendant opened a Platinum Select Money Market Savings Account with U.S. Bank at its Century City Branch. Defendant's initial deposit to open the account was the $500,000 cashier's check Carlin purchased on May 13, 2019 and which was derived entirely from the $1,000,000 E.S. settlement payment. (Karlous Decl. Ex. 40 at 3; see also Karlous Decl. Ex. 42 (summarizing defendant's U.S. Bank transactions).)  On May 23, 2019, defendant made two wire transfers of $150,000, totaling $300,000, to

1  the two attorneys representing defendant at that time in defendant's
2  SDNY Extortion Case.  (Id.)  On June 7, 2019, defendant withdrew
3  $25,000 to purchase a cashier's check payable to H. Dean Steward, his
4  counsel of record in this case.  (Id.)  As of June 14, 2019,
5  defendant had approximately $170,000 available in his U.S. Bank
6  account.[22]  (Id.)

7       On June 17, 2019, the next banking day after the Washington
8  Department of Revenue located and levied defendant's Chase bank
9  account, defendant drained his U.S. Bank account and began flipping
10 cashier's checks to himself.  (Id.)  Defendant would purchase
11 cashier's checks payable to himself so as to drain his bank accounts
12 of any remaining funds, hold onto the cashier's checks, and would
13 then briefly "deposit" the cashier's checks to immediately access the
14 funds, and would then purchase additional cashier's checks payable to
15 himself.  (Id.)  Based on Special Agent Karlous's training and
16 experience, he knows that individuals that purchase cashier's checks
17 in their own name and hold on to the cashier's checks, often do so to
18 evade creditors and law enforcement, specifically to prevent the
19 seizure of the funds.  Karlous Decl. ¶ 49.)  Additionally, each time
20 defendant purchased or deposited a cashier's check, U.S. Bank would
21 necessarily have to transmit data electronically to U.S. Bank's
22 servers outside of California in order to complete the transactions.
23 (Karlous Decl. ¶ 50.)

24      As set forth below and in Exhibit 42 to the Declaration of Agent
25 Karlous, defendant engaged in this cashier's check flipping scheme on
26

27      [22] As described supra, on June 14, 2019, which was a Friday, the
   Washington Department of Revenue levied defendant's bank account at
28 Chase and seized the approximately $32,000 defendant had in that
   account.

at least nine different occasions between June 2019 and September 2019 in an effort to conceal his assets from his creditors:

- On Monday, June 17, 2019, defendant withdrew $169,000 from his U.S. Bank account, including $8,500 in cash and purchased two cashier's checks payable to himself in the amounts of $8,500 and $152,000. Defendant cashed the $8,500 cashier's check on June 21, 2019.

- On June 24, 2019, defendant "deposited" the $152,000 cashier's check defendant purchased the prior week payable to himself, and immediately withdrew the full amount by withdrawing $8,000 in cash and purchasing two new cashier's checks payable to himself in the amounts of $9,000 and $135,000.[23] Defendant cashed the $9,000 cashier's check on July 8, 2019.

- On July 16, 2019, defendant "deposited" the $135,000 cashier's check defendant purchased on June 24, 2019, payable to himself, and immediately withdrew the full amount by withdrawing $6,800 in cash and purchasing the following three cashier's checks in the following amounts: $12,500 made payable to Pansky Markle, the law firm representing defendant in his state bar disciplinary proceedings; $10,700 made payable to Exclusive Resorts;[24] and $105,000 payable to himself.

---

[23] Defendant actions of "depositing" the cashier's checks made payable to himself and immediately withdrawing cash and purchasing additional cashier's checks did not actually result in money being put in the account. On a few occasions, the manner in which defendant conducted his transactions caused the bank to not even account for defendant's transactions in his account.

[24] Defendant's payments and use of Exclusive Resorts is discussed infra.

- On July 22, 2019, defendant "deposited" the $105,000 cashier's check defendant purchased the prior week payable to himself, and immediately withdrew the full amount by withdrawing $4,500 in cash and purchasing two new cashier's checks payable to himself in the amounts of $8,000 and $92,500.  Defendant cashed the $8,000 cashier's check on July 31, 2019.  Notably, after defendant started purchasing cashier's checks payable to himself on June 17, 2019, he never had more than $2,284 in his account at any time, and by July 31, 2019, defendant never had more than $380 in his account.

- On August 16, 2019, defendant "deposited" the $92,500 cashier's check defendant purchased on July 22, 2019, payable to himself, and immediately withdrew the full amount by withdrawing $7,000 in cash and purchasing the following four cashier's checks in the following amounts: $10,000 made payable to Pansky Markle; $25,000 made payable to Exclusive Resorts; $11,200 payable to SM 10000, defendant's residence; and $39,300 payable to himself.

- On August 19, 2019, defendant "deposited" the $39,300 cashier's check defendant purchased the prior week payable to himself, and immediately withdrew the full amount by withdrawing $6,300 in cash and purchasing a new cashier's check payable to himself in the amounts of $33,000.

- On August 20, 2019, defendant "deposited" the $33,000 cashier's check defendant purchased the prior day payable to himself, and immediately withdrew the full amount by purchasing the following two cashier's checks in the

33

following amounts: $15,500 payable to the Orange County Sheriff; and $17,500 payable to himself.[25]

- On August 30, 2019, defendant "deposited" the $17,500 cashier's check defendant purchased on August 20, 2019, payable to himself, and immediately withdrew the full amount by withdrawing $4,700 in cash and purchasing the following two cashier's checks in the following amounts: $2,800 payable to J.C., defendant's driver; and $10,000 payable to himself.

- On September 10, 2019, defendant "deposited" the $10,000 cashier's check defendant purchased on August 30, 2019, payable to himself, and immediately withdrew the full amount by withdrawing $7,760 in cash and purchasing a new cashier's check payable to Anderson & Associates in the amount of $2,240.

(See Karlous Decl. Exs. 40-42.)  There does not appear to be any legitimate purpose for the manner in which defendant conducted these financial transactions, specifically his flipping of cashier's checks.

Defendant also appears to have structured his withdrawals and purchase of cashier's checks to evade currency transaction reporting requirements.  As detailed in Exhibit 42 to Agent Karlous's declaration, on the following ten occasions defendant either withdrew

---

[25] As noted above, defendant bought artwork from an Orange County Sheriff foreclosure auction on August 20, 2019; the funds went to pay an over $2.5 million judgement Storie.  Despite having made very limited payments towards his child or spousal support obligations in two years, resulting in the $2.5 million judgment, defendant used $15,500 cashier's check to buy his artwork back, and kept the other $17,500 cashier's check.

cash or cashed cashier's checks written to himself in amounts below the $10,000 reporting requirement:

- On June 17, 2019, defendant withdrew $8,500 in cash;
- On June 21, 2019, defendant cashed a $8,500 cashier's check he purchased on June 17, 2019;
- On June 24, 2019, the next business day, defendant withdrew $8,000 in cash;
- On July 8, 2019, defendant cashed a $9,000 cashier's check he purchased on June 24, 2019;
- On July 16, 2019, defendant withdrew $6,800 in cash;
- On July 22, 2019, defendant withdrew $4,500 in cash;
- On July 31, 2019, defendant cashed $8,000 cashier's check purchased on July 22, 2019;
- On August 16, 2019, defendant withdrew $7,000 in cash;
- On August 19, 2019, the next business day, defendant withdrew $6,300 in cash;
- On August 30, 2019, defendant withdrew $4,700 in cash; and
- On September 10, 2019, defendant withdrew $7,760 in cash.

(Karlous Decl. Exs. 40-42.)  On several occasions, defendant purchased the cashier's check simultaneously to withdrawing cash just below the $10,000 reporting requirement, and then merely cashed the cashier's check a few days later.

Additionally, on August 26, 2019, the Washington Department of Revenue levied defendant's account at U.S. Bank, which after fees were deducted, resulted in Washington Department of Revenue seizing approximately $280 in September 2019.  (See infra III.A.3.) Defendant largely stopped using the U.S. Bank account after the levy was issued and the funds were seized.  (Karlous Decl. Exs. 40, 42.)

35

Indeed, as of September 10, 2019, the account balance was zero.

(Karlous Decl. Ex. 40 at 57-59.)  In addition, as of September 2019,

none of the $1 million payment that defendant had obtained in the

E.S. settlement and initially deposited four months earlier on May 7,

2019, remained in any bank account in defendant's name.  (Karlous

Decl. Exs. 39, 40, 42.)

      6.  <u>Defendant's Exclusive Resorts Membership</u>

Exclusive Resorts is a company located in Colorado that

advertises itself as the world's elite private vacation club.

Defendant had a membership with Exclusive Resorts for years and

travelled numerous times domestically and internationally through

Exclusive Resorts.

On June 11, 2019, defendant electronically signed a new

agreement with Exclusive Resorts to modify his membership plan and

submitted it to Exclusive Reports in Colorado.  (Karlous Decl. Ex.

45.)  As described above, defendant also purchased $10,700 and

$25,000 cashier's checks -- in Century City, California -- made

payable to Exclusive Resorts on July 16, 2019, and August 18, 2019,

respectively, and were deposited into Exclusive Resorts' bank account

in Denver, Colorado; thus, the cashier's checks would have been

mailed to Exclusive Resorts in Colorado.  (<u>See</u> Karlous Decl. Exs. 42,

45.)  Defendant used Exclusive Resorts luxury properties in

California, Florida, and New York on four occasions between August

and November 2019.  (Karlous Decl. Ex. 45 at 19.)

From September 8-15, 2019, R.S., an individual identified in at

least two interviews as defendant's current girlfriend, stayed at an

Exclusive Resort in Tuscany, Italy, as a guest of defendant's on

defendant's membership.  (<u>Id.</u>)  The government notes R.S.'s travel as

36

it happened at the same time defendant's creditors found and levied defendant's bank accounts and defendant stopped using both his Chase and U.S. Bank accounts.  In addition, defendant's girlfriend travelled to Italy, a country that defendant obtained citizenship and had an Italian Passport upon arrest, which raises questions about whether defendant has any assets there.

**IV.   ARGUMENT**

**A.   Applicable Legal Standards**

Title 18, United States Code, Section 3148(a), provides that a defendant who has been ordered released pending trial pursuant to § 3142 of the Bail Reform Act, and "who has violated a condition of his release, is subject to a revocation of release, an order of detention and a prosecution for contempt of court."  The revocation proceedings may be initiated by motion of the government.  18 U.S.C. § 3148(b).  Section 3148(b) provides:

> The judicial officer <u>shall</u> enter an order of revocation and detention if, after a hearing, the judicial officer -
>
> (1) finds that there is -
>
>     (A) probable cause to believe that the person has committed a Federal, State, or local crime while on release;
>
>     . . . and
>
> (2) finds that -
>
>     (A) based on the factors set forth in section 3142(g) of this title, there is no condition or combination of conditions of release that will assure that the person will not flee or pose a danger to the safety of any other person or the community; or
>
>     (B) the person is unlikely to abide by any condition or combination of conditions of release.
>
> <u>If there is probable cause to believe that, while on release, the person committed a Federal, State, or local felony, a rebuttable presumption arises that no condition</u>

<u>or combination of conditions will assure that the person
will not pose a danger to the safety of any other person or
the community</u>.

18 U.S.C. § 3148(b) (emphases added); <u>see also</u> <u>United States v.
Jalloh</u>, SA CR No. 15-129-CJC, 2016 WL 4939102 (C.D. Cal. Sep. 13,
2016) (applying 18 U.S.C. § 3148(b)).  As discussed below, the
government's proof satisfies all of these conditions.

**B.    There is Probable Cause to Believe that Defendant Has
       Committed Federal Crimes While on Pretrial Release**

In <u>United States v. Cook</u>, 880 F.2d 1158, 1160 (10th Cir. 1989),
the Tenth Circuit held that probable cause to believe that a
defendant has committed a felony while on release is satisfied when
"the facts available to the judicial officer 'warrant a man of
reasonable caution in the belief' that the defendant has committed a
crime while on bail." <u>Id.</u> (<u>quoting</u> <u>United States v. Gotti</u>, 794 F.2d
773, 333 (2d Cir. 1986)); <u>see also</u> <u>United States v. Aron</u>, 904 F.2d
221, 224 (5th Cir. 1990) (adopting same standard).

There is probable cause to believe that defendant has continued
to commit federal felonies while on pretrial release, including, mail
fraud, in violation of 18 U.S.C. § 1341, wire fraud, in violation of
18 U.S.C. § 1343, and structuring of currency transactions to evade
reporting requirements, in violation of 31 U.S.C. § 5324(a)(3).

1.    <u>Mail and Wire Fraud</u>

To establish that defendant committed mail and/or wire fraud,
the government would be required to prove that: (1) defendant
knowingly devised or knowingly participated in a scheme or plan to
defraud, or a scheme or plan for obtaining money or property by means
of false or fraudulent pretenses, representations or promises; (2)
the statements made or the facts omitted as part of the scheme were

material; (3) defendant acted with the intent to defraud; and (4) in advancing or furthering or carrying out the scheme, the defendant used the mails/wires or caused the mails/wires to be used.  United States v. Woods, 335 F.3d 993, 997 (9th Cir. 2003).  The mail and wire fraud statutes encompass any scheme or artifice to defraud, regardless of whether the scheme involved a specific false statement. Id.

Here, defendant engaged in a scheme to defraud his creditors, including JFL and Storie, both before and after the issuance of the indictment in this case.  As noted above, defendant agreed to pay JFL and Storie millions of dollars to settle various claims and has since used the mail and interstate wirings to defraud his victim creditors, including JFL and Storie.  (Supra § III.A.)  Moreover, defendant concealed and fraudulently transferred his assets in order to avoid paying his creditors the money to which they were -- and are -- legally entitled. (Supra § III.B.)

      2.  Structuring

To establish that defendant committed structuring, the government would be required to prove: (1) defendant structured a currency transaction; (2) the transaction involved a domestic financial institution; (3) defendant did so with knowledge that the financial institution was legally obligated to report currency transactions in excess of $10,000; and (4) defendant acted with the intent to evade that reporting requirement.  31 U.S.C. § 5324(a)(3); United States v. Pang, 362 F.3d 1187, 1193-94 (9th Cir. 2004); United States v. MacPherson, 424 F.3d 183, 189 (2d Cir. 2005).  A pattern of structured transactions may, by itself, establish that defendant had

knowledge of any intent to evade currency reporting requirements. Id. at 195.

As detailed above, over the course of approximately six weeks between June 2019 and August 2019, defendant withdrew cash and/or purchased and subsequently cashed cashier's checks in amounts just below the $10,000 reporting requirement on ten separate occasions. (Supra § III.B.5; Karlous Decl. Ex. 42.)  Moreover, on June 17, June 24, and July 22, 2019, defendant structured his transactions to withdraw cash and purchase another "smaller" cashier's check, just under $10,000, which defendant subsequently cashed to avoid the currency reporting requirement.  (Karlous Decl. Ex. 42.)  Had defendant withdrawn all the cash simultaneously, the bank would have reported the financial transaction.  At no point during this time period, did defendant withdraw more than $10,000.  (Id.)

### C. There is Probable Cause to Believe Defendant Committed State Crimes While on Pretrial Release

#### 1. Defendant's Violation of California Law

There is also probable cause to believe that defendant's conduct constituted multiple violations of California law, including fraudulently removing, concealing, or disposing of personal property sought to be recovered, in violation of California Penal Code § 155(a) and money laundering, in violation of California Penal Code § 186.10.

California Penal Code § 155(a) states:

Every person against whom an action is pending, or against whom a judgment has been rendered for the recovery of any personal property, who fraudulently conceals, sells, or disposes of that property, with intent to hinder, delay, or defraud the person bringing the action or recovering the judgment, or with such intent removes that property beyond the limits of the county in which it may be at the time of the commencement of the action or the rendering of the

40

> judgment, is punishable by imprisonment in a county jail not exceeding one year, or by fine not exceeding one thousand dollars ($1,000), or by both that fine and imprisonment.

Cal. Penal Code § 155(a).  Each violation of § 155(a) would be considered a misdemeanor.  Id.

California Penal Code § 186.10(a)(1) states:

> (a) Any person who conducts or attempts to conduct a transaction or more than one transaction within a seven-day period involving a monetary instrument or instruments of a total value exceeding five thousand dollars ($5,000), or a total value exceeding twenty-five thousand dollars ($25,000) within a 30-day period, through one or more financial institutions (1) with the specific intent to promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on of any criminal activity . . . is guilty of the crime of money laundering.

Cal. Penal Code § 186.10(a)(1).  Each violation of § 186.10 could be charged as either a felony or misdemeanor.  Id.

As set forth above, defendant was well aware of the pending judgments against him, as well as his creditors' efforts to enforce those debts.  (See supra § III.A.)  Yet, defendant repeatedly attempted to conceal his assets to prevent them from enforcing those judgments and recovering the funds to which they were legally entitled, and conducted financial transactions for the specific purpose of carrying out such criminal activity.  (See supra § III.B.)

### 2.   Defendant's Violation of Washington State Law

Defendant's conduct also constituted a misdemeanor violation of the Revised Code of Washington § 9.45.080.  Section 9.45.080 states:

> Every person who, with intent to defraud a prior or subsequent purchaser thereof, or prevent any of his or her property being made liable for the payment of any of his or her debts, or levied upon by an execution or warrant of attachment, shall remove any of his or her property, or secrete, assign, convey, or otherwise dispose of the same,

1  or with intent to defraud a creditor shall remove, secrete,
2  assign, convey, or otherwise dispose of any of his or her
   books or accounts, vouchers or writings in any way relating
3  to his or her business affairs, or destroy, obliterate,
   alter, or erase any of such books of account, accounts,
4  vouchers, or writing or any entry, memorandum, or minute
   therein contained, shall be guilty of a gross misdemeanor.

5  RWC § 9.45.080.

6      Defendant would necessarily have been aware of the outstanding

7  Washington Department of Revenue tax warrant by no later than June

8  14, 2019, when the Washington Department of Revenue levied

9  defendant's Chase bank account and seized approximately $32,072 from

10 defendant's account.  (Karlous Decl. Exs. 36, 39.)  After the

11 Washington Department of Revenue levied defendant's Chase bank

12 account, defendant only used the Chase bank account for smaller

13 transactions and never maintained a balance greater than $2,000.

14 (Id.)  As noted above, defendant also immediately withdrew almost all

15 of the funds from his U.S. Bank account after the levy was issued to

16 his Chase bank account and defendant started his cashier's check

17 flipping scheme. (See supra § III.B.5.)

18     The Washington Department of Revenue also levied defendant's

19 U.S. Bank on August 26, 2019 (Karlous Decl. Ex. 37), resulting in

20 $280.44 being withdrawn from his account on September 6, 2019

21 (Karlous Decl. Ex 42).  After September 10, 2019, however, defendant

22 largely stopped using the U.S. Bank account.  (Karlous Decl. Ex. 42.)

23     **D.   There Are No Conditions or Combination of Conditions that**
        **Will Ensure the Safety of the Community**
24
           1.   <u>There is a Rebuttable Presumption that Defendant Poses</u>
25              <u>a Danger to the Community</u>

26     Where there is probable cause to believe that a defendant has

27 committed a felony while on release, Section 3148(b) creates a

28 rebuttable presumption that the defendant poses a danger to the

                                     42

community.  In <u>United States v. Cook</u>, 880 F.2d 1158, 1160 (10th Cir. 1989), the Tenth Circuit held that the district court erred in refusing to revoke a defendant's bond because the district court failed to take into account the rebuttable presumption established by § 3148(b).  In analyzing the rebuttable presumption, the court emphasized that:

> [T]he establishment of probable cause to believe that the defendant has committed a serious crime while on release constitutes compelling evidence that the defendant poses a danger to the community, and, once such probable cause is established, it is appropriate that the burden rest on the defendant to come forward with evidence indicating that this conclusion is not warranted in his case.

<u>Cook</u>, 880 F.2d at 1161 (emphasis omitted).  Even if the defendant does come forward with evidence to rebut the presumption, "the presumption does not disappear, but rather remains as a factor for consideration in the ultimate release or detention determination."  <u>Id.</u> at 1162.

As discussed above, there is probable cause to believe that defendant, while on pretrial release, committed federal felonies, specifically, mail fraud, wire fraud, and structuring, as well as committing multiple state misdemeanor offenses.  Thus, there is a presumption in this case that defendant poses a danger to the community.  Defendant cannot rebut the presumption that defendant poses a danger to the community because, as discussed further below, there is ample evidence that he is an ongoing threat to the community.

2.   <u>Defendant Is a Danger the Community</u>

Separate and apart from the rebuttable presumption discussed above, Section 3148(b) requires detention where the Court, after considering the factors enumerated in Section 3142(g), finds that

"there is no condition or combination of conditions of release that will assure that the [defendant] will not flee or pose a danger to the safety of any other person or the community."  18 U.S.C. § 3148(b)(2)(A).[26]

Section 3142(g) lists a variety of factors to be considered in determining whether detention is appropriate.  These factors include the nature of the charges and the weight of the evidence against the defendant; the defendant's character, community ties, employment, past conduct and criminal history; and the danger to the community that would be created by releasing the defendant on bail.  See 18 U.S.C. § 3142(g).  Of these factors, the weight of the evidence is the least significant, and the nature of the offense and evidence of guilt are relevant only in so far as they bear on the likelihood that the defendant will fail to appear or may pose a threat to the community.  See United States v. Cardenas, 784 F.2d 937, 939 (9th Cir. 1986); United States v. Motamedi, 767 F.2d 1403, 1408 (9th Cir. 1985).

Additionally, for purposes of the Bail Reform Act, the term "danger to the community" is construed broadly.  "[T]he concern about safety is to be given a broader construction than the mere danger of

---

[26]  Although the government's primary concern is that defendant is a danger to the community, the government also believes that defendant presents a risk of flight due to the seriousness of the charges defendant is facing.  See, e.g., United States v. Townsend, 897 F.2d 989, 995 (9th Cir. 1990) (noting that the district court may consider possible punishment as an incentive for defendant to flee in assessing a defendant's risk of flight).  For example, if convicted at trial, defendant would likely face an advisory sentencing guideline range of at least 168 to 210 months' imprisonment, plus a two-year mandatory consecutive sentence for the violation of 18 U.S.C. § 1028A.  The government, however, recognizes that there are likely conditions of release, at this time, which could mitigate the risk of flight in this case.

physical violence.  Safety to the community 'refers to the danger that the defendant might engage in criminal activity to the detriment of the community.'"  Cook, 880 F.2d at 1161 (quoting Comprehensive Crime Control Act of 1984, S. Rep. No. 98-225; 1984 U.S.C.C.A.N. 3195).  Furthermore, for purposes of the Act, "danger may, at least in some cases, encompass pecuniary or economic harm." United States v. Reynolds, 956 F.2d 192 (9th Cir. 1992); see also United States v. Possino, No. CR 13-0048-SVW-3 (JEM), 2013 WL 1415108 (C.D. Cal. Apr. 8, 2013) (detaining defendant based on "economic danger to the community"); United States v. Cohen, No. C 10-00547 SI, 2010 WL 5387757 (N.D. Cal. Dec. 10, 2010) (affirming pretrial detention order based on economic harm where "fraudulent activity is ongoing or defendant has a propensity to continue fraudulent activity").

Here, the pertinent 3142(g) factors, including the nature and circumstances of the offense charged, the weight of the evidence against defendant, and defendant's history and characteristics, all support detention.  Most notably, there is extensive evidence that defendant would pose a serious and continuing economic danger to the community if allowed to remain on bond pending trial.  18 U.S.C. § 3142(g)(4).

As detailed in the indictment and in the affidavits attached to Agent Karlous's declaration (Exs. 1-3), defendant has engaged in an extensive pattern of criminal conduct since as early as 2011.  In this case, defendant is charged in this case with embezzling at least $9 million from his legal clients; failing to pay to the IRS at least $3.2 million that had been withheld from GBUS employee' paychecks; obstructing the IRS's efforts to collect the payroll taxes GBUS owed to the IRS; failing to file federal tax returns for himself and his

companies; committing bank fraud and aggravated identity theft in order to obtain millions of dollars of loans; and making false and fraudulent statements in the 2017 EA Bankruptcy.[27]  Defendant has also been indicted in the Southern District of New York for attempting to use information he obtained during his representation of a legal client to extort Nike out of approximately $20 million, see United States v. Avenatti, No. 1:19-CR-373, and stealing approximately $148,750 from another former legal client, see United States v. Avenatti, No. 1:19-CR-374-DAB.

The similarities between defendant's prior criminal conduct and his ongoing criminal conduct while on pretrial release is also deeply troubling.  As detailed herein, there is overwhelming evidence that defendant had attempted to defraud his creditors in the 2017 EA Bankruptcy and conceal funds and obstruct the IRS's collection efforts prior to his indictment.  This is precisely the same type of conduct defendant has engaged in while on pretrial release.  The fact that he has continued to engage in such efforts while on pretrial release proves that defendant remains a substantial economic danger to the community.

Moreover, the fact that defendant continues to go to great lengths to conceal his assets suggests that defendant may be engaged in further fraudulent conduct.  The Court imposed a condition of release requiring defendant to give notice of financial transactions over $5,000, however, this condition did not prevent defendant from continuing to engage in the criminal conduct described herein.  To

---

[27]  Notably, the indictment alleges that defendant had been engaged in criminal conduct as recently as March 24, 2019 – the day before defendant was arrested.  (Indictment ¶ 7(c).)

46

the best of the government's knowledge, defendant continues to reside in a luxury condominium in Los Angeles that costs approximately $11,000 per month, is still employing a personal driver and being transported in a $50,000 Mercedes-Benz defendant purchased in his ex-wife's name, and staying at luxury hotels when he travels.  Although defendant received $1 million dollars from a settlement shortly after defendant was indicted in the present case, the bank records show defendant spending and using almost the full $1 million within a few months on himself, and not to pay any portion of the substantial judgments ordered against defendant.

In addition, the records of the $1 million dollar judgment itself further evidence defendant's scheme, and mirror allegations in the indictment.  Although defendant initially advised opposing counsel in March 2019, prior to any charges in this case, that Avenatti & Associates represented E.S., defendant signed the settlement agreement in April 2019 and instructed the payment be made to defendant individually.  (Karlous Decl. Ex. 37.)  Defendant's failure to pay over this amount was in violation of several judgments against defendant, but was specifically in violation of various Superior Court Orders from defendant's divorce case with Storie prohibiting defendant from transferring, concealing, or disposing in any way of assets subject to prior orders.  (See supra § III.A.3.)

In sum, defendant's extensive pattern of criminal conduct and the overwhelming evidence supporting those charges demonstrate that defendant is a substantial danger to the community.  If allowed to remain on bond, defendant will almost certainly continue to engage in further fraudulent and obstructive conduct.

3.  <u>Defendant Is Unlikely to Comply with the Conditions of His Release</u>

There is also ample evidence to suggest that defendant is unlikely to comply with the conditions of his release.  Crucially, the ongoing criminal conduct set forth herein occurred despite the fact that he was required to report such financial transactions to his pretrial services officer.  The conduct also demonstrates a complete lack of respect for the law.  Indeed, as detailed in Section III.A.1 above, defendant has a long history of refusing to comply with and/or violating court orders.

**E.   Issuance of an Arrest Warrant for Defendant Is Appropriate**

Title 18, United States Code, Section 3148 provides that:

> A judicial officer may issue a warrant for the arrest of a person charged with violating a condition of release, and the person shall be brought before a judicial officer in the district in which such person's arrest was ordered for a proceeding in accordance with this section.

18 U.S.C. § 3148(b).  Issuance of an arrest warrant is appropriate and necessary for three reasons.

First, as set forth above, defendant has violated the terms of his pretrial release by attempting to defraud his creditors and conceal his assets in violation of federal and state law.  Defendant has engaged in this ongoing criminal conduct while on pretrial release, with the apparent assistance of his surety, and despite being required to report all financial transactions over $5,000 to his pretrial services officer.  An arrest warrant is therefore entirely appropriate.

Additionally, if defendant is not immediately arrested there is a substantial likelihood that defendant will continue his efforts to defraud his creditors, conceal his assets, and fraudulently transfer

48

property to others.  If defendant is alerted to the instant motion prior to being brought before this Court, there will be nothing to stop defendant from immediately hiding any remaining assets or making arrangements for others to do so.  Such actions could prevent his creditors from ever recovering the funds to which they are legally entitled, or significantly hinder the government's ability to complete its ongoing investigation regarding defendant's fraudulent conduct.

Indeed, defendant has a lengthy history of attempting to conceal his criminal conduct when he is alerted to allegations of wrongdoing. For example, on March 22, 2019, defendant testified under oath during a judgment debtor examination in the Federal JFL Case.  (Indictment ¶ 7(k); Karlous Decl. Ex. 3, § IV.D.1)  During his testimony, defendant was specifically asked whether he embezzled Client 1's $4,000,000 settlement payment from 2015 and denied doing so. (Indictment ¶ 7(k); Karlous Decl. Ex. 3, § IV.D.1.)  After the judgment-debtor examination ended, defendant drove to Client 1's residence and told Client 1 that Client 1 would finally begin receiving the settlement payments from the County of Los Angeles. (Indictment ¶ 7(k); Karlous Decl. Ex. 3, § IV.D.1.)  In order to attempt to establish a defense against any claims Client 1 could bring against defendant, defendant then returned to Client 1's residence on March 23 and March 24, 2019, to have Client 1 sign a document defendant claimed was necessary for Client 1 to receive the settlement proceeds, and another document stating that Client 1 was

satisfied with defendant's representation.  (Indictment ¶ 7(k); Karlous Decl. Ex. 3, § IV.D.1.)[28]

Finally, the government notes that defendant's trial in the Nike extortion case in the Southern District of New York is scheduled to commence on January 21, 2020.[29]  The government believes it is important that this issue be resolved immediately, before defendant leaves this district, and in a manner that does not negatively impact defendant's trial date in the Southern District of New York.

Accordingly, the government requests that the Court issue a warrant for defendant's arrest so that defendant can be immediately brought before the Court for a hearing on the instant motion. Alternatively, the government requests that the Court issue an order to show cause as to why defendant's bond should not be revoked, and schedule a hearing on the government's motion as soon as possible.

## V.   CONCLUSION

For the foregoing reasons, the government respectfully requests that this Court either: (1) issue a warrant for defendant's arrest, schedule an immediate bond revocation hearing, revoke his pretrial release order, and order him detained pending further proceedings in this matter; or (2) issue an order to show cause as to why

---

[28] Similarly, on March 25, 2019, immediately after defendant learned that law enforcement had approached the client identified in the Nike extortion case and shortly before defendant's arrest, defendant posted derogatory information regarding Nike on Twitter. Superseding Indictment, United States v. Avenatti, No. 1:19-cr-373-PGG, Dkt. No. 72 at ¶ 18 (S.D.N.Y. Nov. 13, 2019).

[29] On January 12, 2020, defendant's counsel in the Nike extortion case filed a request for exclusion of evidence or in the alternative, a thirty-day continuance of the trial due to defendant's claim that the government failed to turn over certain discovery in a timely manner.  Defendant's request is pending.

defendant's bond should not be revoked and schedule a bond revocation
hearing as soon as possible.