**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

January 17, 2020

**BY ECF**

The Honorable Paul G. Gardephe
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

> Re:   ***United States v. Michael Avenatti,***
>        **S1 19 Cr. 373 (PGG)**

Dear Judge Gardephe:

The Government respectfully writes in response to the defendant's letter of last night (Dkt. No. 159, re-filed at Dkt. No. 161) ("Def. Ltr."), styled as a "supplemental reply memorandum of law," in which the defendant asserts that this Court should hold a "*Daubert/Kumho* hearing" to resolve a so-called "choice of law" question before trial.  This claim is both belated and meritless.

As an initial matter, the defendant offers no explanation as to why he waited nearly three months to make such a claim, failing to raise it, in any form, prior to the deadline for motions *in limine*, in any of the prior (and extensive) submissions regarding expert testimony, or at oral argument on the same subject.

- The Government provided initial expert notice on November 22, 2019 (Dkt. No. 83-1), the date agreed upon by the parties.  That notice stated, among other things, that the "Government further presently expects that each of Professor Engstrom and Mr. Tuft would testify that the California Rules [of Professional Conduct] apply to the conduct set forth in the Superseding Indictment."  (*Id.* at 3.)

- The defendant asked certain questions of the Government in response; none concerned this point.  (Dkt. No. 83-2.)

- The Government responded on November 27, 2019.  (Dkt. No. 83-3.)  The defendant had asked the Government to identify specific rules not listed in its initial notice, and Government noted, among others, Rule 8.5, which concerns what jurisdiction's rules apply when the Bar of the State of California disciplines a lawyer.  (*Id.* at 2.)

- Later the same day, the defendant moved *in limine* to preclude expert testimony on duties or rules in any form.  (Dkt. No. 82.)  He did not express a concern about so-called choice of law or mention Rule 8.5.  (*Id.*)

Honorable Paul G. Gardephe
United States District Judge
January 17, 2020
Page 2

- The defendant thereafter gave notice of his own expert.  (Dkt. No. 96-1.)  The only rules mentioned were those of the State of California.  (*Id.*)

- The Government filed its opposition to the defendant's motion *in limine* on December 13, 2019.  (Dkt. No. 98.)

- The defendant filed a reply on December 15, 2019.  (Dkt. No. 99.)  It too did not express any concern about so-called choice of law or mention Rule 8.5.  (*Id.*)

- The parties appeared before the Court on December 17, 2019.  (Dkt. No. 102.)  Among the subjects discussed, at some length, was the propriety and scope of expert testimony, and the adequacy of disclosures to date.  (Transcript of Dec. 17, 2019 (Exhibit A), at 7-23.)  The defendant again did not express any concern about so-called choice of law or mention Rule 8.5.  (*Id.*)

- The Government provided supplemental expert notice on December 29, 2019.  (Dkt. No. 110.)  In a 15-plus page letter, the Government outlined its expert's expected testimony on all relevant subjects, including Rule 8.5, and stated that its expert was of the opinion: "Assuming that Client-1 lived in California, the defendant met with Client-1 in California, the defendant communicated with Client-1 in California, and Client-1's potential claim(s) concerned conduct in and affecting Client-1 in California (or if most but not all of these things were true), the California Rules would apply to the allegations in the Superseding Indictment.  Generally, where a client lives in California and meets with a lawyer in California who is licensed to practice law in California, the California Rules applies to the representation, regardless of where else, if anywhere, the lawyer takes action on behalf or to the detriment of the client.  This is particularly the case where the client's matter or potential claim also concerns conduct in or affecting California." (*Id.* at 15.)  The same letter noted that the "Government does not understand the defendant to disagree, as his expert notice appears to be premised on the applicability of the California Rules to the charged conduct.  (*See* Dkt. No. 96-1, at 1-3.)." (*Id.* at 15 n.5.)

- The defendant responded on January 2, 2020.  (Dkt. No. 113.)  The defendant did not express any concern about so-called choice of law, mention Rule 8.5, or respond to the Government's statement about his expert's apparent agreement on this point.  (*Id.*)

- The Government responded to the defendant's letter on January 6, 2020.  (Dkt. No. 125.)

- Earlier this week, in the context of discussing the potential need for funds following the defendant's arrest, defense counsel stated that there is "only one area of expert testimony at issue that both sides have noticed.  And that's on California Bar rules [and] ethics." (Transcript of Jan. 15, 2020 (Exhibit B), at 14.)  Defense counsel then noted that the Court had not yet ruled on the admissibility of such testimony, to which the Court responded in pertinent part: "I've given you a preview that my inclination is that the subject matter is an appropriate one for expert testimony because the average juror is not going to be conversant with the responsibilities of attorneys under the California rules of ethics and professional

Honorable Paul G. Gardephe
United States District Judge
January 17, 2020
Page 3

responsibility. So that's my general view, which I think I shared with you a long time ago. And then there were some issues about whether the government's disclosure had been appropriate, and the government supplemented its disclosure, and then, you're correct, you put in a letter that's still *sub judice*, opposing the expert testimony." (*Id*. at 15.)

This record provides the Court with an ample basis to reject the defendant's latest challenge to expert testimony in this case. *Cf., e.g.*, *Centeno v. City of New York*, No. 16 Civ. 2393 (VSB), 2019 WL 1382093, at *5 n.13 (Mar. 27, 2019) ("I decline to consider Defendants' challenge to Plaintiff's experts as arguments raised for the first time in a reply memorandum are waived and need not be considered." (internal quotation marks omitted)); *see generally United States v. Yu-Leung*, 51 F.3d 1116, 1120 (2d Cir. 1991) ("To be timely, an objection must be made as soon as the ground of it is known, or reasonably should have been known to the objector." (internal quotation marks omitted; alterations incorporated)). In any event, assuming that the Court proceeds to the merits, the defendant's claim fails for multiple reasons.

*First*, the defendant's claim ignores the central thrust of the Government's expert's expected testimony, namely, that there are overarching duties incumbent upon all lawyers, which are neither tethered to any particular state's rules of professional responsibility nor unique to the State of California. As the Government's supplemental notice stated, these duties derive from multiple sources, and do not rest solely on the authorities of any particular jurisdiction. (*See* Dkt. No. 110, at 3-5). Indeed, they pre-date the California Rules of Professional Conduct (the "California Rules"). *See, e.g.*, *Stockton v. Ford*, 11 How. 232, 247 (1850) (cited at Dkt. No. 110, at 4).

*Second*, the defendant's claim assumes that, if the California Rules do not formally apply (a claim that, as discussed below, is incorrect), then they are entirely irrelevant. But as the Government has previously explained (Dkt. Nos. 98, at 4-6; Dkt. No. 125, at 2-3), the duties and rules help to demonstrate that the defendant—who is licensed and practiced in California, and both had to and did certify his compliance with continuing legal education, including with respect to ethics—acted wrongfully.[1] They also help to rebut arguments that it is apparent the defendant intends to press at trial, including asking the jury to infer that because he previously held press conferences, it was proper to threaten to do so here (*see* Def. Opp'n to Gov't MIL (Dkt. No. 109) 17). These bases for offering testimony concerning the California Rules do not turn on the degree to which they apply formally to any or all of the defendant's conduct.

---

[1]    As the State Bar of California states on its website, "[t]he California Rules of Professional Conduct are intended to regulate professional conduct of attorneys licensed by the State Bar through discipline. . . . The rules and any related standards adopted by the Board are binding on all attorneys licensed by the State Bar." Rules of Professional Conduct, State Bar of California, *at* https://www.calbar.ca.gov/Attorneys/Conduct-Discipline/Rules/Rules-of-Professional-Conduct (last visited Jan. 17, 2020); *see also* California Rule 1.0(a) ("These rules together with any standards adopted by the Board of Trustees pursuant to these rules shall be binding upon all lawyers."); Dkt No. 163, at 1 (defendant stating, in the context of seeking to quash a subpoena to The George Washington University, that he "has consistently satisfied state ethics requirements").

Honorable Paul G. Gardephe
United States District Judge
January 17, 2020
Page 4

*Third*, the defendant's claim rests on the unsupported proposition that the question of which set or sets of professional responsibility rules apply is for the Court, akin to the elements of the offenses with which the defendant is charged. (Def. Ltr. 2.) But as the Government has previously explained (Dkt. Nos. 98, at 12-13; Dkt. No. 125, at 2), testimony concerning the standards and rules of a complex profession, offered to assist a lay jury to understand the context and wrongfulness of a defendant's conduct, and to weigh properly arguments he offers, is no different from any other testimony. It is not the law that the jury will be asked to apply; it is *evidence* offered to assist the jury in applying the law.[2]

*Fourth*, the defendant's assertion in support of his claim that the California Rules do not apply to his conduct is wrong. At its core, as the Court is aware, the Government's theory of this case turns on the defendant's ostensible representation of a client based in California, whose representation the defendant undertook in California, and that concerned potential claims and conduct that occurred principally, if not exclusively, in California. To the extent that the defendant violated his duties with respect to his client—and, in particular, misused confidential information provided to him by that California-based client in California—it could hardly be surprising that the "'predominant effect'" (Def. Ltr. 3) of that conduct would be felt in California. Indeed, as noted above, the defendant's own expert appears to disagree with the defendant, who has not provided a supplemental notice in support of his asserted position (notwithstanding that the Government has repeatedly asked him to identify any areas of disagreement between the Government's expert and his own (*see* Dkt. No. 110, at 15-16; Dkt. No. 125, at 4-5)).

In any event, the degree to which Government's expert's opinion on this issue is persuasive to the defendant is beside the point. If the defendant disagrees with qualified opinion testimony offered at trial, the remedy is cross-examination at trial, not a pretrial hearing. The purpose of a pretrial hearing is "to ensure that the courtroom door remains closed to junk science." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002). Plainly, the opinion of Professor Engstrom (the Government's case-in-chief expert) and Mark Tuft, Esq. (the Government's rebuttal expert)—each of whom is indisputably qualified—that the California Rules apply to the conduct of lawyer admitted to the Bar of the State of California, affecting a client in the State of California, concerning claims arising in the State of California, is not "junk science."

*Finally*, the defendant states that certain of the California Rules do not match certain of the Model Rules or New York's rules. (Def. Ltr. 3-4.) This argument appears to rest on invented or exaggerated differences. To choose one example, the defendant states that California Rule 1.6 provides that "[a] lawyer shall not reveal information protected from disclosure by Business and Professions Code section 6068, subdivision (e)(l) unless the client gives informed consent, or the disclosure is permitted by paragraph (b) of this rule [which concerns a disclosure necessary to

---

[2]   As the Government has also previously explained (Dkt. No. 125, at 3), to the extent that there is any appreciable risk that the jury might misapprehend the purpose of the admission of expert testimony, the Government has no objection to an appropriate limiting instruction, were the defendant to request one, and the Government has itself proposed an instruction for the jury charge that places such testimony in context. (*See* Gov't Requests to Charge (Dkt. No. 95) 25; *see also* Gov't Letter, dated Dec. 30, 2019 (Dkt No. 111), at 12-13.)

Honorable Paul G. Gardephe
United States District Judge
January 17, 2020
Page 5

prevent a criminal act likely to result in death of or substantial bodily harm to someone]," while "New York Rule of Professional Conduct l.6(b)(5)(i) . . . allows a lawyer to reveal confidential information in a variety of additional circumstances, including the right to 'reveal or use confidential information to the extent that the lawyer reasonably believes necessary to defend the lawyer . . . against an accusation of wrongful conduct.'" (Def. Ltr. 3.)  But there is no such defense here; Nike did not "accus[e]" the defendant of "wrongful conduct" such that the defendant had to "defend" himself by using and threatening to make public Client-1's confidential information without consent.[3]  And the defendant omits that New York Rule 1.6 provides, just like California Rule 1.6, that a "lawyer shall not knowingly reveal confidential information, as defined in this Rule, or use such information to the disadvantage of a client . . . , unless . . . the client gives informed consent," or the disclosure is otherwise permitted for specified purposes, none of which applies here.  To be sure, the "language" of rules in different states may "differ."  (Def. Ltr. 4.) But the core prohibitions do not, much less to an extent that matters in this case.

In any event, as with the argument above, the degree to which the Government's expert's opinions are persuasive to the defendant is beside the point.  If the defendant wishes to probe those opinions, the forum in which to do so is trial, not a pretrial hearing.  The Government has no objection to the defendant cross-examining the Government's expert concerning the degree to which the California Rules differ from those of other, potentially relevant states.  Similarly, if the defendant wishes to present admissible evidence—if any exists—that he believed that his conduct was solely governed by the rules of such a state (*see* Def. Ltr. 2), he is free do so.  That is the proper manner in which to question or challenge the persuasiveness of testimony, not a pretrial hearing where a party may test out lines of cross-examination.  *See, e.g.*, *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 596 (1993) ("[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence"); *Amorgianos*, 303 F.3d at 267 ("our adversary system provides the necessary tools for challenging reliable, albeit debatable, expert testimony"); *Ambrosini v. Labarraque*, 101 F.3d 129, 141 (D.C. Cir. 1996) (it is error to "conflate[] the questions of the admissibility of expert testimony and the weight appropriately to be accorded such testimony"); *United States v. 14.38 Acres of Land, More or Less Situated in Leflore City, State of Miss.*, 80 F.3d 1074, 1077 (5th Cir. 1996) ("[a]s a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration"); *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1044 (2d Cir. 1995) ("Disputes as to the strength of [an expert's] credentials, faults in his use of differential etiology as a methodology, or lack of textual authority for his opinion, go to the weight, not the admissibility, of his testimony.").

---

[3]   To the extent that the defendant suggests (Def. Ltr. 3 & n.3) that it was permissible under the New York rules for him subsequently to publicly disclose, via Twitter and against the explicitly communicated desire of his client, his client's confidential information (including documents that expressly had been marked privileged and confidential), the defendant offers no plausible basis to find that it was reasonable to believe the such public disclosure was "necessary" to any defense of the defendant, as required under the New York rules.  In any event, even if the defendant were correct, that is a potential basis to cross-examine the Government's expert at trial, not a basis to demand to do so before trial.

Honorable Paul G. Gardephe
United States District Judge
January 17, 2020
Page 6

                                    Respectfully submitted,

                                      GEOFFREY S. BERMAN
                                      United States Attorney

By:   s/ Daniel C. Richenthal
                                      Matthew D. Podolsky
                                      Daniel C. Richenthal
                                      Robert B. Sobelman
                                      Assistant United States Attorneys
                                      (212) 637-1947/2109/2616

Enclosures

cc:      (by ECF)

        Counsel of Record

JCH7AVEC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

          v.                          19 Cr. 373 (PGG)

MICHAEL AVENATTI,

            Defendant.

------------------------------x

                          New York, N.Y.
                          December 17, 2019
                          12:30 p.m.


Before:

                 HON. PAUL G. GARDEPHE
                             District Judge


                    APPEARANCES

GEOFFREY S. BERMAN
      United States Attorney for the
      Southern District of New York
BY:  MATTHEW PODOLSKY
      ROBERT SOBELMAN
      DANIEL RICHENTHAL
      Assistant United States Attorneys

SCOTT SREBNICK
E. DANYA PERRY
JOSE QUINON (via phone)
      Attorneys for Defendant

JCH7AVEC

1       (In open court)

2       (Case called)

3       MR. PODOLSKY:  Good afternoon, your Honor.  Matthew

Podolsky, Robert Sobelman and Daniel Richenthal for the

government.

6       MR. SREBNICK:  Good afternoon, your Honor.  Scott

Srebnick on behalf of Michael Avenatti who is present before

the court.  Also with me at counsel table is E. Danya Perry who

has joined the defense.  And on the line is Mr. Jose Quinon.

10      THE COURT:  All right.  The first order of business is

to arraign Mr. Avenatti on the superseding indictment.

12      Mr. Avenatti, you are here this afternoon with Mr.

Srebnick and Ms. Perry as your attorneys; is that correct?

14      THE DEFENDANT:  Yes, sir.

15      THE COURT:  Have you received a copy of the

superseding indictment which reflects the charges against you?

17      THE DEFENDANT:  I have, your Honor.

18      THE COURT:  And have you read the superseding

indictment?

20      THE DEFENDANT:  I have.

21      THE COURT:  And have you discussed it with your

attorney?

23      THE DEFENDANT:  Yes, I have.

24      THE COURT:  You should understand that you are charged

in Count One with transmitting interstate communications with

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1   intent to extort.  In Count Two you are charged with committing

2   extortion.  In Count Three you are charged with honest services

3   wire fraud.  You understand those are the charges against you

4   in the superseding indictment?

5               THE DEFENDANT:  Yes, sir.

6               THE COURT:  Do you wish me to read the superseding

7   indictment to you now here in open court?

8               THE DEFENDANT:  No.

9               THE COURT:  With respect to Count One of the

10  superseding indictment, how do you plead, guilty or not guilty?

11              THE DEFENDANT:  Not guilty, your Honor.

12              THE COURT:  As to Count Two, how do you plead, guilty

13  or not guilty?

14              THE DEFENDANT:  Not guilty.

15              THE COURT:  As to Count Three, guilty or not guilty?

16              THE DEFENDANT:  Not guilty, your Honor.

17              THE COURT:  You may be seated.

18              The parties have previously given me an estimate of

19  one week for trial.  Is that still viewed as a reliable

20  estimate?

21              MR. PODOLSKY:  Your Honor, I think that is a reliable

22  estimate as to the government's case in chief, again starting

23  at whenever we complete jury selection, but I believe that is

24  still accurate as to the government's case.

25              THE COURT:  All right.  Mr. Srebnick, do you have any

1    thoughts?

2              MR. SREBNICK:  That seems accurate to me.  If we're

3    starting on a Tuesday, I would anticipate the entire case would

4    be completed by the end of the following week.

5              THE COURT:  OK.  I am going to talk to you a minute

6    about how I intend to pick the jury.

7              I am going to use a jury questionnaire.  The primary

8    purpose of the questionnaire will be to elicit information from

9    panel members about exposure to press accounts and other

10   material concerning Mr. Avenatti concerning this case, other

11   cases in which Mr. Avenatti is involved, to determine whether

12   the panel members can set aside that material in considering

13   the evidence in this case.  Given how much press there has been

14   about Mr. Avenatti, it appears obvious to me that a

15   questionnaire is necessary.

16             The process will be as follows:  I'm going to arrange

17   for a panel of 120.  They will be summoned for Tuesday morning,

18   January 21.  I will give them a very brief introduction about

19   the case, and then they will receive the questionnaire and

20   complete it and leave for the day.

21             We will copy the completed questionnaires and

22   distribute them to the lawyers.  We will reconvene at about 2

23   o'clock that afternoon to discuss the completed questionnaires,

24   and attempt to reach a consensus on which jurors should be

25   excused based on their answers to the questionnaire.

1          We will resume the voir dire on Wednesday morning.  We

2     will address any lingering issues regarding panel members,

3     answers on the questionnaires.  We will then conduct a regular

4     voir dire.  Accordingly, the questionnaire will be very focused

5     on the matters that are identified:  Prior exposure to the

6     press or otherwise to Mr. Avenatti, any knowledge about the

7     case, knowledge about other cases Mr. Avenatti is involved in,

8     etcetera.  The standard voir dire matters will be addressed on

9     Wednesday during the standard voir dire.

10          I have seen a filing in which the government objects

11    to a number of the defendants' proposed questions for the

12    questionnaire.  The government suggested that the two sides

13    should confer about the content of the questionnaire and make a

14    joint submission concerning the areas of agreement as well as

15    any areas of disagreement.  That makes sense to me.

16    Accordingly, the parties are directed to so confer and to make

17    a submission by Monday, December 23, concerning the jury

18    questionnaire, what they agree on, what they don't agree on.

19          We will be selecting 12 jurors and three alternates.

20    The defendant will have ten peremptory challenges, and the

21    government will have six.  Peremptory challenges will be

22    exercised simultaneously.  After I have qualified the panel

23    members, they will be excused for about 15 minutes or so.  I

24    will then hear any challenges for cause.  The parties will then

25    prepare lists of panel members against whom they wish to

JCH7AVEC

exercise peremptory challenges.  Those lists will be submitted
to the Court simultaneously.  We will then agree on who are the
12 lowest numbered jurors who survived that process.  We will
then proceed to the selection of alternates.  Each side will
have two peremptory challenges as to alternates.  The parties
will prepare a list of the two panel members against whom they
wish to exercise peremptory challenges.  Those lists will also
be submitted simultaneously.  The next three lowest numbered
panel members who survive that process will be the alternates.

I'm not entirely sure what courtroom we will be in; it
will not be my courtroom; it will not be this courtroom.  My
hope is it will be one of the oversized courtrooms in this
building, which are the first, third and fifth floor.

Any questions about the jury questionnaire or the
process for jury selection before I move on?

MR. PODOLSKY:  Not from the government, your Honor.

MR. QUINON:  Yes, your Honor.  This is Jose Quinon for
the record.  Your Honor, since we're not familiar with the
manner that you select the jurors, can you go over again the
part that we submit challenges simultaneously?  Again, how does
that process go?

THE COURT:  Sure.  So, I will conduct the traditional
voir dire, and once we have completed that process I will
excuse the panel members for 15 or 20 minutes, and then you and
Ms. Perry and Mr. Srebnick will consult about what panel

1    members you want to exercise your ten peremptory challenges

2    against, and the government will do the same.  In the case of

3    defense they will prepare a list of as many as ten panel

4    members against whom the defendant wishes to exercise a

5    peremptory challenge.  The government will prepare a similar

6    list of as many as six panel members it wishes to exercise

7    peremptory challenges against.  The two lists will be submitted

8    simultaneously to me.  I will then read the list to the

9    lawyers.  By panel number I will read the list of who each side

10   has excused.  We will then announce the 12 lowest numbered

11   jurors who survive the exercise of peremptory challenges.  They

12   will make up the jury.

13            MR. QUINON:  OK.

14            THE COURT:  Any other questions, Mr. Quinon?

15            MR. QUINON:  No, sir.  That clears it up.  Thank you,

16   sir.

17            THE COURT:  OK.  Let me turn to the matter of expert

18   discovery and testimony.

19            The government has indicated that it wishes to present

20   expert testimony concerning legal ethics and professional

21   responsibility.  They gave notice to the defendant back in

22   November of that.

23            The superseding indictment alleges that Mr. Avenatti

24   violated his professional obligations as an attorney, his

25   obligations to his client, by seeking to extract a 15 to $20

million payment from Nike for himself to the detriment of his

client's interest and without the client's knowledge.  The

government seeks to rely on proof regarding legal ethics and

professional responsibility in particular for purposes of

demonstrating that Mr. Avenatti committed honest services wire

fraud, which is Count Three of the superseding indictment.

In the government's November 22, 2019 letter it says

that it wants to call or that it may call two experts in

California professional responsibility and legal ethics.  The

first person is Nora Engstrom, who is a professor at Stanford

Law School, and the second person is Mark Tuft, who is a

partner in a San Francisco law firm.

Professor Engstrom has published in the area of legal

ethics, and Mr. Tuft's primary area of practice is in the area

of professional responsibility and legal malpractice.  Mr. Tuft

has coauthored a California Practice Guide on Professional

Responsibility.  He is a certified specialist in legal

malpractice, and is former president of Association of

Professional Responsibility Lawyers.

In its November 22, 2019 letter the government informs

defense counsel that it expects the expert witnesses "would

testify that at all times relevant to the charges in this case

the state of California imposed a number of legal duties,

ethical rules and professional responsibility requirements on

lawyers, including duties of confidentiality, loyalty, honesty,

1    fair dealing and reasonable communications with respect to all

2    clients, and that certain of these same duties also apply with

3    respect to individuals conferring with a lawyer regarding

4    potential legal claims and retaining the lawyer."  Citing the

5    government's November 22, 2019 letter, docket number 83-1 at

6    page 2.

7              The government goes on to state in its letter that it

8    wants to elicit from these expert witnesses that, assuming the

9    truth of the allegations in the superseding indictment, Mr.

10   Avenatti violated a number of California Rules of Professional

11   Responsibility.

12             Mr. Avenatti has moved to exclude the proposed expert

13   testimony under Federal Rule of Evidence 702, 704 and 403.  He

14   also complains that the government's notice under Federal

15   Criminal Procedure 16(a)(1)(G) is deficient, citing the

16   defendant's brief, docket number 82 at pages 9 through 13.

17             Mr. Avenatti's primary complaint, it appears to me, is

18   that the proposed expert testimony usurps the role of the jury

19   in applying the law to the facts.  Id. at pages 10 to 11.  Mr.

20   Avenatti also seeks a Daubert hearing that would address the

21   methodology and reliability of the experts' opinions.  Id. at

22   pages 9 through 13.

23             I'm going to give you now my views as to what I've

24   read so far.

25             First, both sides appear to agree that for purposes of

1    the honest services wire fraud count the government must prove

2    that Mr. Avenatti breached a duty that he owed to his client.

3    See, e.g, defendant's brief, docket number 82 at page 8.

4         Accordingly, it appears to me that areas of inquiry

5    identified by the government in its November 22, 2019 letter,

6    including the professional obligations and duties of lawyers,

7    the ethical rules that govern the practice of law, professional

8    responsibility requirements that apply to lawyers, including

9    the duties of confidentiality, loyalty, honesty and fair

10   dealing, the duty to reasonably communicate with clients, and

11   the fact that certain of these duties apply to individuals who

12   are conferring with a lawyer for purposes of determining

13   whether they will retain a lawyer, it does seem to me that

14   these matters are relevant to the case.  It also strikes me

15   that these matters are beyond the ken of the average juror and

16   thus are an appropriate subject for expert testimony.

17        Accordingly, I am inclined to permit testimony by one

18   expert concerning relevant rules of California professional

19   responsibility as they apply in these areas of the duty of

20   confidentiality, loyalty, honesty and fair dealing, etcetera.

21        It is highly unlikely that I will permit two experts

22   to testify about these matters, because ultimately the trial is

23   not an attorney grievance proceeding; it's about whether the

24   government can prove beyond a reasonable doubt that Mr.

25   Avenatti violated certain federal criminal statutes.  So, while

1    I believe that testimony on these points that I've cited is

2    relevant, I'm not going to allow it to take over the trial.

3            The government also wishes to elicit opinions from

4    these experts about whether -- assuming the allegations in the

5    superseding indictment are proven true -- Mr. Avenatti violated

6    one or more rules of California professional responsibility.

7            It is highly unlikely that I will permit such

8    testimony.  I do believe that the proposed opinions would usurp

9    the jury's function.  It's up to the jury whether Mr. Avenatti

10   violated one or more rules of California professional

11   responsibility, and if so whether the government has proven

12   beyond a reasonable doubt all of the elements of honest

13   services wire fraud.  I would not be inclined to permit an

14   expert to opine on whether the government's allegations in the

15   superseding indictment -- assuming that they are true -- make

16   out violations of California's rules of professional

17   responsibility.  I believe that permitting such an approach

18   presents a significant risk of jury confusion.

19           I will, of course, be instructing the jury that the

20   allegations in the superseding indictment are proof of nothing.

21   That is a standard instruction.  Permitting witnesses to assume

22   the truth of the allegations in the superseding indictment, and

23   then offering opinions based on their assumptions, runs counter

24   to that instruction as well as other instructions I will give

25   regarding, for example, the presumption of innocence.

JCH7AVEC

1          Accordingly, it is highly likely that I will preclude

2     the proposed opinions on these matters as more prejudicial than

3     probative under Federal Rule of Evidence 403.

4          Accordingly, it is my present inclination to permit

5     expert testimony generally about the duties and obligations of

6     lawyers, vis-a-vis their clients, under the California rules of

7     professional responsibility, but it is my intention to leave it

8     up to the jury to conclude whether Mr. Avenatti violated his

9     obligations under those rules of professional responsibility.

10         Now, Mr. Srebnick, assuming I was to rule consistent

11    with what I just said, do you have any continuing concerns

12    about the proposed expert testimony?

13         MR. SREBNICK:  I do, your Honor, in the following

14    sense.  I understand that the Court -- essentially it's a

15    bifurcated situation.  The first is are the rules themselves

16    relevant, and can an expert testify about the rules.  And I

17    understand the Court to be saying yes.  And on the second

18    issue, whether they were violated, no.

19         But on the first issue, is it the Court's intention to

20    allow the experts to merely testify that the rules exist and

21    then the government would offer the rules in evidence?  Or

22    would the experts be permitted to actually interpret the rules

23    and answer hypotheticals about the rules, and things of that

24    nature?  Because if that's the case, then, you know, I have a

25    more strident objection than if it were simply allowing the

1    experts to say the rules exist, California lawyers are bound by

2    them and then the government offers the relevant rules in

3    evidence.

4              THE COURT:  What are the government's intentions with

5    respect to this first category that we are been talking about?

6              MR. PODOLSKY:  Yes, your Honor.  And then I'm happy to

7    also follow up on some other comments the Court made.

8              But just directing to that question, we certainly

9    haven't written our examination of the proposed experts at this

10   time, so it's a little bit difficult for me to say with

11   absolute certainty what we would elicit.  With that said, we

12   certainly do imagine that the testimony would go beyond simply

13   offering into evidence a document that describes the rules.

14             First of all, as your Honor alluded to, the duties of

15   a lawyer really are beyond the ken of an average juror, and

16   it's not sufficiently helpful and will not sufficiently assist

17   the trier of fact to simply read to them or put on a screen the

18   written rules of the state bar of California.

19             In addition, as the notice makes clear, there is

20   testimony that is relevant to the jury that goes to

21   understanding what the duties owed to a client are, for

22   example, duties of loyalty, honesty and fair dealing.  Many of

23   those are captured in the practical rules that are written down

24   and apply to lawyers in California, but some of those go beyond

25   what is actually on the page, and so the government's intention

JCH7AVEC

would be to have one of the experts testify as to what those

duties mean, generally how they operate.  Whether we would

elicit hypothetical questions or intend to it's a little bit

too early to tell.  I will note that the court in the Second

Circuit in Bilzerian permitted such questioning, provided it's

not simply a repetition of the allegations in the indictment.

So, we think it's certainly proper, but I can't say

sitting here today what the precise contours of our questions

would be, but it would go beyond simply offering into evidence

the rules and saying that they exist.

MR. SREBNICK:  So, to be clear, we do object to that.

I think in Bilzerian what happened, my recollection, is that

professor Coffey was given a copy of a blank form, a disclosure

form, a 13(d) form, not the one signed by Mr. Bilzerian but

just a blank form and was allowed to tell the jury what the

form actually requires.

I think this is an area that's really fraught with

serious danger to go down this road, because if the expert

starts interpreting the rules and the Court determines that the

interpretation of the rules -- which is really just a question

of judicial interpretation, because these rules are interpreted

by courts -- if the Court determines that the expert has

interpreted the rules incorrectly, then the Court would be in a

position of having to instruct the jury differently than what

the expert has testified to.

JCH7AVEC

1    So, once the expert goes beyond simply saying that

2    this is what the rules are, it becomes very, very dangerous

3    that we will end up getting competing views of the law among

4    the different experts.  And that's what essentially motivated

5    Judge Caproni in the Jaffe case to not allow that type of

6    testimony, because she didn't want that case to turn into a

7    mini trial about different competing interpretations of the

8    rules.

9        And let me give you an example.  The expert can

10   testify for the government and testify that, well, a lawyer has

11   a duty of confidentiality and has to hold client confidences

12   secret.  OK, as a general proposition we all agree with that;

13   that's not controversial at all.  But the question of whether

14   or not the duty of confidentiality was violated in this case --

15   which I guess is maybe not an ultimate issue but it's a sub

16   issue that the jury will be apparently considering --

17       THE COURT:  I have already told you that my

18   inclination is to not permit an expert to offer an opinion

19   about whether Mr. Avenatti violated a particular rule of

20   professional responsibility, so it sounds like you're headed

21   towards that.  I have already told you what my inclination is

22   on that, so I'm not sure that extended discussion on that point

23   is really helpful to me.

24       MR. SREBNICK:  I understand.

25       THE COURT:  So, what I want us to stay focused on is

1        my inclination is that it is relevant for the jury to learn

2        what the relevant rules of professional responsibility are in

3        California, and nobody has given me the rules that it's

4        expected will be introduced at trial, so I'm not sure exactly

5        how clear they are.  It may be that they are very clear.  I

6        don't know.  It also may be that some would benefit from

7        extrapolation.  I don't know because again I don't know what

8        the specific rules are.

9            But the point is that it does seem to me that these

10       rules have some relevance here because the government is going

11       to have to show that Mr. Avenatti breached a duty.  So, it does

12       seem to me that the rules are -- there are rules of

13       professional responsibility that are relevant here.  It does

14       seem to me that those rules are, as I said, beyond the ken of

15       the average juror and so, therefore, they are appropriate

16       subject matter for expert testimony.

17           It seems that you generally agree with that but you're

18       concerned that the expert may interpret the rules and go beyond

19       that presentation of what the rules actually are.

20           MR. SREBNICK:  Well, actually I don't agree on the

21       relevance because of the following reasons.  Skilling made it

22       clear that the only fiduciary duty that's relevant in an honest

23       services fraud case is the duty not to engage in bribery or

24       kickbacks.  Duties about self dealing, confidentiality,

25       consultation, communication, are not what Skilling was talking

1   about when it talked about a paradigmatic case of bribery or

2   kickbacks.  So, just to be clear, my position is that the rules

3   are not relevant at all, but to the extent the Court has

4   overruled that --

5          THE COURT:  Well, I haven't ruled on anything.  We're

6   having a discussion here.  I want to be very clear my purpose

7   is to tell you my reactions to what I've read and then give you

8   an opportunity to respond to it.

9          MR. SREBNICK:  Fair enough.

10          THE COURT:  That's what we're doing here.  And I have

11   a number of issues that we're going to discuss today, and this

12   is one of them, and this is your opportunity to say what you

13   want to say, and if you want to follow it up with a written

14   submission obviously you're welcome to do that.

15          But what I've told you so far about the area of expert

16   testimony -- and we're going to be talking about the honest

17   services fraud claim in just a minute -- but what I have told

18   you with respect to the proposed expert testimony is that it

19   does seem to me that the case presents an issue about whether

20   Mr. Avenatti breached the duties he owes to clients -- or to

21   one particular client -- and that the government is going to be

22   required to prove that.  And in that context it seemed to me

23   that rules of professional responsibility that go to these

24   issues, that they're relevant.  I understand you disagree --

25   and again it's because of your views on the honest services

1    wire fraud claim, which we'll get into in just a minute.

2              But what I'm trying to do here is to find out, you

3    know, more specifically what your remaining objections are,

4    because I interpreted your papers as primarily concerned about

5    the experts testifying about essentially whether an element of

6    the offense had been satisfied here or not.  And your argument

7    was this usurped the role of the jury, etcetera, and I had some

8    sympathy with that position.  But now what I'm trying to find

9    out from you is what else you really care about with respect to

10   the expert.

11             MR. SREBNICK:  Yes.  Thank you, Judge.  And what I

12   care about is how on that first issue how the rules apply, how

13   that's actually going to come in.  And I hear the government

14   saying as of now it hasn't yet formulated its questions, and so

15   what I would I guess suggest or request to the Court -- because

16   the Court is under Kumho Tire not just the gatekeeper on

17   reliability but the gatekeeper on relevance, both, and can

18   fashion a mechanism not bound by any particular factors under

19   Daubert but can actually on its own decide how it can assess

20   relevance and reliability, to hear from the expert and

21   understand from the government exactly what it's going to do

22   just because of the nature of the testimony and how perilous it

23   can be in a case like this.  So, that would be my request to

24   the Court.

25             THE COURT:  OK.  Given what's been said, I need more

1    specificity about what the expert is going to say.  You gave a

2    general description of Mr. Srebnick has concerns about it, and

3    so I'm going to need more detail about what he or she is

4    actually going to say.  And so you can think of it in terms of

5    an expert report.  And that would be a summary of the opinion

6    he or she is going to offer that go beyond the simple

7    presentation of what the rules are.

8               When can you get me that?

9               MR. PODOLSKY:  Just one moment, your Honor.

10              I'm just trying to factor in the holidays here.  I

11   would ask for a week but I realize we have additional briefing

12   due I believe a week from today followed by the holiday.  And

13   frankly, your Honor, I don't know our witnesses' availability

14   to confer during the holidays.  I think we would ask for at

15   least the end of next week so that we can make sure that we

16   have time with them but, of course, we want to do it on a

17   schedule that's useful to the Court.

18              THE COURT:  I'd like it from you in a week's time,

19   because Mr. Srebnick is going to have to respond to it.

20              MR. PODOLSKY:  OK, very well.

21              THE COURT:  So that would mean that you would submit

22   to me a more detailed description of what you expect the

23   testimony would be in greater detail than the summary you

24   previously provided, such that Mr. Srebnick has a better

25   understanding of exactly what will be elicited and so that he

1    can present any continuing concerns that he has to me and I can

2    rule on the issue.

3         MR. PODOLSKY:  That's fine, your Honor.  What I am

4    envisioning -- and please let me know if that's consistent with

5    what you have in mind -- is essentially a letter from the

6    government that spells out in greater length precisely the

7    areas of inquiry.  We certainly don't plan to submit questions

8    but something that gives additional focus on each area that we

9    intend to inquire as to the expert.

10        THE COURT:  Right.  I think, you know, Mr. Srebnick

11   has given you some sense of what his concerns are.  He's

12   concerned about questions that go beyond the mere language of

13   the rules and may call for interpretation, and he is worried

14   about hypothetical questions.  So, I want your response to be

15   sufficiently detailed that it will put him on notice of those

16   areas that he has expressed discomfort about, and then he can

17   make whatever arguments he wants, and then I can rule on the

18   issue.

19        And, so, in trying to figure out how detailed it would

20   be, what I would say to you is make it detailed enough so that

21   I don't have to do an ex parte examination of the expert to

22   figure out what he or she is going to say.  Make it detailed

23   enough so that's not going to be necessary.

24        MR. PODOLSKY:  Very well, your Honor.  We will

25   endeavor to give a sufficient amount of detail so that the

1    Court can consider any objections ahead of trial.

2            I will note, of course, that to the extent the defense

3    just disagrees with the opinion offered by the expert, they are

4    entitled to cross-examine and to call their own expert, which

5    they have noticed at this time.  But certainly we will endeavor

6    to provide sufficient detail for the Court to assess the areas

7    of testimony and what the Court will permit.

8            THE COURT:  They have identified a rebuttal expert,

9    and they've made disclosures of the opinions that they seek to

10   elicit.  Do you have any complaints or concerns about the

11   disclosure that's been made with respect to the rebuttal

12   expert?

13           MR. PODOLSKY:  Your Honor, in the following respect.

14   First of all, we understand that your ruling with respect to

15   opining on the conduct -- or I suppose the defense's version of

16   the defendant's conduct -- would similarly be off limits.

17           We would also frankly request the same that Mr.

18   Srebnick has just requested, some further report so we can

19   understand what the subjects that he would intend to inquire as

20   to his expert witness so that we could make similar objections,

21   especially as to whether the expert is going to say anything

22   other than "read the rules" if he calls a rebuttal expert.

23           THE COURT:  Well, I'm looking at Mr. Srebnick's

24   disclosure of the rebuttal expert, and I mean he does give --

25   first of all, he lists -- he doesn't represent it as

JCH7AVEC

exhaustive, but he does list the particular rules of

professional conduct that he expects his witness would testify

about.

MR. PODOLSKY:  Your Honor, just to make one note, I

believe we did as well.  In fact, we listed several in our

initial disclosure.  The defense requested clarity as to

whether there were others, and then we followed up with a

supplemental notice listing I believe just a couple of extra

rules.

THE COURT:  But he goes through them one by one, and

there is a little explanatory paragraph under each designation,

you know, Rule 1.2, Rule 1.4, etcetera, etcetera, and he talks

about what the rule says, and he gives a little squib on what

the witness would say about the rule, and I think this actually

gives me more detail than you gave me -- or gave him, I should

say.

MR. PODOLSKY:  Your Honor, if that's what you have in

mind, for us to supplement our report or letter next week, we

can certainly provide that, that type of information without a

problem.

THE COURT:  OK.  And if you intend to present

hypothetical questions to the witness that go to the issues in

this case or go to the alleged conduct in this case, if you

seek to do that, that should be part of your letter as well,

because Mr. Srebnick has expressed concerns about that, and I

JCH7AVEC

1   have indicated that I am troubled by the notion that the expert

2   witness would in essence apply the rules to the conduct that's

3   alleged in the indictment and then make pronouncements about

4   whether Mr. Avenatti did or did not violate particular rules.

5   I am concerned about that and, obviously, depending on the

6   hypothetical, they could essentially be the equivalent.

7           So, if you do have aspirations in that regard, please

8   let me know, and let Mr. Srebnick know, and he can make

9   whatever arguments he wishes, and I will rule on the subject.

10          MR. PODOLSKY:  That's fine.  And we will provide

11  additional clarity on that.  I am comfortable saying now that

12  although we thought our position asking about the allegation of

13  the indictment was legally permissible, given what your Honor

14  said this morning, to the extent we're asking hypotheticals, I

15  do not believe we would ask hypotheticals that go to the

16  specific conduct alleged in this case.  We understand your

17  Honor's view on that, and we certainly wouldn't try to sub rosa

18  bring in the allegations in the indictment simply by couching

19  them as not including the defendant's name.  But to the extent

20  we can provide additional clarity in our letter, we will.

21          THE COURT:  OK.  Thank you.

22          Mr. Srebnick, anything else you want to say about the

23  expert witness issue before we move on?

24          MR. SREBNICK:  No, your Honor.

25          THE COURT:  OK.  So, as the parties know, Mr. Avenatti

JCH7AVEC

1   has moved to dismiss Count Three, which is the honest services

2   wire fraud count, and I wanted to have some discussion about

3   the defendant's arguments today.

4           So, the background is that after the Skilling case it

5   is clear that an honest services fraud charge brought under 18

6   U.S.C. Section 1346 is limited to schemes that involve bribes

7   or kickbacks.  Citing Skilling 130 S.Ct. at 2931.

8           I further understand an honest services fraud charge

9   under Section 1346 to require proof of the following:  First, a

10  scheme or artifice to defraud; second, that the scheme was for

11  the purpose of depriving another of the intangible right to

12  honest services; third, that the misrepresentation or omission

13  was material; and, fourth, that in this case the wires were

14  used in furtherance of the scheme.  Citing United States v.

15  Rybicki, 354 F.3d 124, 145-46 (2d Cir. 2003 (en banc).

16          Here, Count Three of the superseding indictment

17  alleges that Mr. Avenatti solicited payments from Nike, in

18  violation of the duty of honest services he owed his client and

19  without the client's knowledge.  Other paragraphs of the

20  superseding indictment made clear that the government is

21  claiming that Mr. Avenatti told Nike that he and his client

22  would not take certain action -- for example, publicizing

23  alleged misconduct by Nike employees -- if Nike agreed to pay

24  15 to $20 million to Mr. Avenatti.  And the government further

25  alleges that Mr. Avenatti made these representations without

1    his client's knowledge or consent.

2           Now, Mr. Avenatti points out in his motion that the

3    word "bribe" or "kick-back" doesn't appear in a superseding

4    indictment.  The government refers to payment.  And it is also

5    true that the bribe theory is different than the extortion

6    theory that's set forth in Counts One and Two, and it's also

7    true that most of the allegations in what is a speaking

8    indictment appear to relate to an extortion, but the question

9    is whether that simply means that the honest services fraud

10   charge is an additional theory of liability.

11          And, Mr. Srebnick, I want to understand again sort of

12   what your principal problem with the charge is.  There is a

13   number of ideas that are floating through your papers.  One

14   idea is that it seems to me that the government has presented

15   this as an extortion case, and now it has introduced this idea

16   of bribery in it, and that somehow it shouldn't be permitted to

17   do that because, first, the word bribe doesn't appear in the

18   indictment, and then, secondly, it's inconsistent with the

19   extortion theory that we have been proceeding with up to the

20   filing of this superseding indictment.

21          So, tell me what you want to say about the honest

22   services fraud charge in addition to what you have told me in

23   your papers.

24          MR. SREBNICK:  Yes, your Honor.  So, first on the last

25   point about inconsistency.  So for years legal scholars have

1    debated are the crimes of extortion and bribery mutually

2    exclusive.  Right?  And I know I didn't highlight that in my

3    papers, but just sort of as a background that's been a debate

4    that's gone on for years.  And the way the courts have sort of

5    come out on it is when somebody is charged with extortion under

6    color of official right -- obviously a public official -- that

7    concept is not mutually exclusive with bribery because there is

8    not necessarily any kind of overt fear or threat of force or

9    anything of that nature.

10          There is an open question actually under the law about

11   when the theory of extortion is one of fear that Mr. Avenatti

12   is, according to the government, threatening Nike and striking

13   fear in their hearts, that that whole theory is inconsistent

14   with the idea that he is soliciting a bribe from them at the

15   same time that he is trying to scare them into paying him.

16          THE COURT:  Now, let's assume it is inconsistent.  Why

17   is that a problem?  I mean let's accept your argument that

18   extortion is inconsistent with bribery, so we will accept that.

19   Tell me why it's a problem for the government to allege an

20   alternative theory, in other words, well, members of the jury,

21   if you conclude that there was an extortion here, there was no

22   threat, etcetera, etcetera, then we argue to you that Mr.

23   Avenatti was soliciting a bribe from Nike in exchange for him

24   violating the duty of honest services he owed his client.  Why

25   would that be a problem?

1          MR. SREBNICK:  The truth is I don't know the answer to

2     the question about whether or not the government -- certainly

3     the government can plead, for example, lesser included offenses

4     or offenses that may not be entirely consistent with one count

5     and the other.  But to charge a theory that on its face is

6     mutually exclusive with another theory in the same indictment,

7     I just have never encountered that in any case I have ever

8     handled.

9          I know that there is case law out there -- and I think

10    there is a case out of the First Circuit called Kattar.  It's

11    at 840 F.2d.  I don't remember the case cite, but I think it

12    stands for the proposition that in separate cases the

13    government can't adopt two different theories because there is

14    a due process issue.

15         And I would wonder whether or not we would be entitled

16    to a severance of the counts if the government can go to a jury

17    on two theories that are just completely inconsistent with each

18    other, assuming that that's the case under the law, which is,

19    you know, I think the courts are still sort of debating that

20    issue.

21         But, you know, you've got to read an indictment with

22    common sense, and the government's whole theory in this case

23    was Avenatti was shaking down Nike, and now in order to fit it

24    into some honest services theory they have morphed into the

25    idea that this is some solicitation of a bribe.

1              Now, we all sort of know what a bribe is when we see

2      it.  We know what a kickback is, and I think that this is a

3      very tortured way of trying to identify some quid pro quo that

4      simply doesn't exist.  I mean I had to ask the government for

5      more particulars.  What is exactly the quid pro quo in this

6      case?

7              So when the Supreme Court in Skilling reversed the

8      conviction and found that the honest services fraud was vague,

9      the statute, unless it was limited to simply paradigmatic

10     offenses of bribery and kickbacks, what it was saying is that

11     the defendant really has to know when he is doing something

12     that he is engaged in some kind of illegal quid pro quo, some

13     illegal type of bribery or kickback arrangement.  And it's just

14     hard from this indictment to really know what exactly that

15     bribery scheme actually was.

16             You know, most cases that have dealt with 1346

17     historically have dealt with public sector types of cases.

18     Skilling was a private sector case, but in a public sector case

19     you can actually look to a bribery statute, 201 or 666, and you

20     can define by statute, well, it has to be, for example, money

21     in exchange for an official act.  We know McDonnell held that

22     it had to be limited to an official act.  And there is actually

23     elements of a bribery statute that you can look to to determine

24     whether a defendant's conduct meets the elements of bribery or

25     meets the elements of kickback.  But in the private sector if

1    you were to take the honest services element out of this case

2    entirely and ask could Nike or Mr. Avenatti be charged with

3    solicitation of a bribe, under what statute, under what federal

4    statute or state statute would this constitute bribery?  And I

5    just haven't been able to find one.

6          And I think what that does, Judge, is it highlights

7    the vagueness of this count, whereas, you know, when you read

8    the count and you read the indictment and you apply a common

9    sense analysis of it, it's not easy to identify what is the

10   actual bribe, kickback, what is the quid pro quo.  And if you

11   have to strain to find it, I think it tells you something about

12   the vagueness of the charge and the fact that it shouldn't

13   stand.

14         THE COURT:  Well, the government has added some

15   language in the superseding indictment about Mr. Avenatti

16   allegedly not informing his client of the demands he was making

17   on Nike.  The government argues that he had a duty to disclose

18   to his client these demands that he was making.  The government

19   says he didn't do it.  And the government says that he made

20   certain representations to Nike about actions that he and the

21   client would not take in the event that Nike agreed to pay him

22   15 to $20 million.  And the government says, as I understand

23   it -- and I'm going to give them an opportunity in a moment to

24   explain the bribery theory -- but as I understand it, at this

25   stage the government alleges that Mr. Avenatti essentially said

to Nike that he and a client would not make public alleged
misconduct by Nike employees if Nike agreed to pay Mr. Avenatti
15 to $20 million.  So, as I understand it, the government is
claiming that that was a solicitation of a bribe, that is, that
Mr. Avenatti, in detriment to his client, and without the
client's knowledge, agreed not to take certain actions which
could be taken if he received this payment.  That's what I
understand the bribery theory to be.  But rather than my
speculating, why don't I ask the assistant to lay out what the
government's bribery theory is.

MR. PODOLSKY:  Yes, your Honor.  I think you
understand it.  Let me just add an additional fact or
observation, which is, as I believe is clear, and certainly
alleged in the superseding indictment, Mr. Avenatti also
explained that he would settle his client's claim if he was
paid a bribe, a side payment, and that he would not settle that
claim if he were not paid.

Now, Mr. Srebnick wants to basically eliminate the
crime of honest services fraud by saying that you can only have
this crime if it is also covered by a bribery statute.  But
this isn't 666, this isn't 201, this is wire fraud, and it's an
instance where a lawyer defrauded his client to whom he owes a
duty of honest services of those honest services.  The way he
did that is by demanding a payment in exchange for action taken
with respect to the client.

JCH7AVEC

1          Now, Mr. Srebnick keeps wanting to focus on the word

2     bribe and input all sorts of meanings on bribe, so that bribe

3     can only be interpreted as something that a public official

4     takes and, therefore, there is no honest services unless there

5     is a bribe in the public official sort of vein.  But that's not

6     what honest services fraud is.  And we can go back to where

7     your Honor started, which is with the elements of honest

8     services wire fraud, and what the classic explanation of what

9     needs to be proved is -- and this is contained in the

10    government's request to charge -- is that the government needs

11    to prove a quid pro quo.  They need to prove a solicitation or

12    a demand of money in exchange for action, in violation of the

13    fiduciary duty owed in the private area to an employer or here

14    to a client.  And that's exactly what we have.  That's exactly

15    what we have alleged, that Mr. Avenatti demanded payment, and

16    in exchange for that payment he would keep confidential and not

17    expose certain conduct of which his client potentially had

18    relevant facts, and he would agree to settle his client's

19    claims in exchange for those payments.  I mean that is exactly

20    what honest services fraud gets at both when a defendant is a

21    public official and when a defendant is engaged in an honest

22    services fraud in the private sector.

23          So, I hope that provides some additional clarity, but

24    you asked Mr. Srebnick towards the beginning whether if there

25    is any inconsistency whether that's a problem.  We don't think

1    it's a problem.  But I really want to focus back on the premise

2    of that question, which is there is no inconsistency in the

3    charges here whatsoever.  Mr. Avenatti used client information

4    to make demands of Nike of money to which he was not entitled

5    wrongfully, and that's an extortion.  He also defrauded his

6    client of his right to Mr. Avenatti's honest services, and he

7    did that by demanding that Nike pay him in exchange for taking

8    action or not taking action with respect to his client, not

9    disclosing that to his client.  And that is a classic honest

10   service fraud.

11         So, I just want to emphasize that there is no

12   inconsistency.  It just turns out that Mr. Avenatti in the

13   course of his conduct attempted to victimize both Nike and his

14   client, and we anticipate that we will prove that up at trial

15   in January.

16         THE COURT:  All right.  Mr. Srebnick, anything else

17   you want to say about this charge?

18         MR. SREBNICK:  Yes.  One last point on the issue of

19   the confidential information.  So I think we can agree that

20   under Skilling even for 1346 a quid pro quo is required.  And

21   the government's theory is that Mr. Avenatti was demanding a

22   payment in exchange for doing nothing, not releasing

23   confidential information.

24         The client, according to the government's theory,

25   didn't want the confidential information disclosed, so the

1    so-called quid pro quo is you give me money and I do nothing.

2    That's not a quid pro quo, and so there has to be some other

3    theory.  So, as I understand --

4            THE COURT:  Well, but isn't their theory that Mr.

5    Avenatti said to Nike I will settle the client's claim for I

6    think it was a million and a half dollars but only if you agree

7    to pay me 15 to $20 million.  If you don't agree to pay me 15

8    to $20 million, then there is not going to be a settlement of

9    the client's claim.

10           MR. SREBNICK:  I disagree with that just because the

11   government's own indictment says that at the end Mr. Avenatti

12   proposed a settlement of $22 to 22 and a half million to settle

13   all of the claims.

14           But beyond that, I just think again back to the issue

15   of common sense.  Is their theory -- and if that's their

16   theory, then that's the theory they should have to go to the

17   jury with -- that Mr. Avenatti said I won't let you settle for

18   a million and a half with the client unless you pay me $15

19   million?  You can pay me 15 and the client one and a half.  For

20   the right to settle for one and a half you have to pay me 15?

21   If that's the theory that they're going with to the jury -- and

22   still don't think it makes it out in the indictment under Count

23   Three -- I would like them to be married to that theory, that

24   that is their theory, and I'm entitled to know if that's the

25   bribe we're talking about.

1          THE COURT:  Well, it's combined with the agreement not

2     to disclose the alleged misconduct, right?

3          MR. SREBNICK:  But there is no -- that's a promise to

4     do nothing.  There is no presumption that it's going to be

5     disclosed.  According to the government's theory, he actually

6     has a duty of confidentiality not to disclose it.  That's their

7     theory.  So the quid pro quo is you pay me this, and the quo is

8     I do nothing?  That just is not a paradigmatic case of bribery

9     or kickbacks, which I think is required under Skilling.

10          I think the Court is obviously familiar with the

11     issues, and unless your Honor has any other questions.

12          THE COURT:  Does the government want to respond to

13     that last point Mr. Srebnick made?

14          MR. PODOLSKY:  Your Honor, it seems to me that the

15     Court certainly understands the theory.  I will observe that it

16     doesn't make something not bribery if what you are paying

17     someone to do is not to take an action, to not hire somebody

18     else or anything like that.  The question is whether you are

19     making a decision or taking an action with respect to the

20     person to whom you owe the duty of honest services.

21          And Mr. Srebnick is welcome to argue to the jury that

22     the government hasn't proved the elements because we haven't

23     proven the defendant's intent to defraud his client of his

24     honest services, and the jury can decide.  But it's clear that

25     the government has properly alleged in Count Three a violation

1    of the wire fraud statute, and we are entitled to go to the

2    jury on it.

3              THE COURT:  All right.  So I want to turn to the

4    government's motion in limine.  The government has moved to

5    exclude many different categories of evidence.  The time for

6    the defendant to respond hasn't been set yet, I don't think,

7    but I wanted to just run through with you, Mr. Srebnick, these

8    various categories and find out whether we actually have a

9    genuine dispute.

10             So, these are laid out in the government's motion in

11   limine, which is docket number 96.  Do you have that list in

12   front of you, Mr. Srebnick?

13             MR. SREBNICK:  I do, your Honor.

14             THE COURT:  OK.  The first category is evidence that

15   the charges were politically motivated.  And this goes to the

16   vindictive prosecution motion that you have made, which is

17   still pending.

18             But let me ask you this.  If I were to reject your

19   arguments that the indictment should be dismissed for

20   vindictive prosecution, would you agree that evidence regarding

21   that would be irrelevant?

22             MR. SREBNICK:  Yes.  May I qualify that?  And I'm

23   going to be filing something in writing, so I don't want

24   anything I say here -- but based on research and the law, if I

25   can just have the Court's patience.

1           THE COURT:  Yes.  This is a practical enterprise we're

2      engaged in here.

3           MR. SREBNICK:  And it's a nuanced issue, and that's

4      why I need to address it, so let me give the Court an example

5      with respect to number one.

6           THE COURT:  OK.

7           MR. SREBNICK:  Certainly we would not argue to the

8      jury that any of the prosecutors here were politically

9      motivated against Mr. Avenatti, or Geoffrey Berman, and that's

10     why the case was brought.  I understand that the law is clear

11     on that, and it was in that context that I was answering the

12     Court's question for purposes of trial.  But let me give the

13     Court an example where I think it might be relevant, and this

14     is why I'm saying it's nuanced.

15          The Nike lawyers who were engaged in the negotiations

16     with Mr. Avenatti beginning on March 19, on the 19th decided --

17     knowing that Nike was itself under investigation -- went to the

18     U.S. Attorney's office to report Mr. Avenatti.  I think it's

19     relevant their motivations, the Nike lawyers' motivations --

20     and I'm going to address this in writing -- as to why they

21     decided to go to the U.S. Attorney's office knowing that Mr.

22     Avenatti was a high profile individual, knowing that it might

23     get a little bit more traction at the U.S. Attorney's office,

24     that they could possibly entice the U.S. Attorney's office to

25     be interested in a civil or what we believe was a civil

1    settlement dispute where it's unprecedented that this type of

2    case gets prosecuted; and I think we would be able to question

3    the Nike lawyers about their motivations and their

4    understanding of who Mr. Avenatti was when they decided to go

5    to the U.S. Attorney's office.  So, that's why I say it's

6    somewhat nuanced.  We wouldn't argue that these gentlemen at

7    the table, you know, were politically motivated.

8              THE COURT:  Let me just give you my gut reaction.  My

9    gut reaction is I'm not sure why it's relevant what the Nike

10   lawyers thought.  I'm not sure why we care why the Nike lawyers

11   did what they did.

12             You seem to be saying that it's important for the jury

13   to understand that the Nike lawyers decided to take this to the

14   U.S. Attorney's office because Mr. Avenatti was the subject of

15   their complaint.  And my reaction is I don't know why we care

16   what the Nike lawyers thought.  Why is that relevant exactly?

17             MR. SREBNICK:  This is going to be the subject of

18   extensive briefing, your Honor, but to summarize, it takes a

19   little bit -- you know, stepping back, September of 2017,

20   Adidas gets brought into -- not the company being charged

21   itself -- but Adidas executives were charged, including a

22   former director of the Nike Basketball League were charged here

23   in the Southern District of New York.  At the same time Nike

24   receives a grand jury subpoena for documents.  Over the course

25   of the next year and a half I believe Nike -- and I don't have

1   all the details -- was responding to the grand jury subpoena,

2   and certainly on March the 25th, the date of Mr. Avenatti's

3   arrest, Mr. Berman in a press conference said that the

4   investigation of Nike is continuing.

5          So, when the Nike lawyers on March 19 decided to go to

6   the U.S. Attorney's office, they were doing that in cooperation

7   mode because they knew their own client was under

8   investigation, that their own client had responded to grand

9   jury subpoenas that we have outlined for the Court all of the

10  arguable misconduct that was in their production to the

11  government, and they had a motive to --

12         THE COURT:  That much I understand.  I understand

13  that.  But again you said that it was about Mr. Avenatti, that

14  somehow it's important for the jury to understand the

15  motivations for the Nike lawyers vis-a-vis Mr. Avenatti.

16         I totally understand your point that Nike itself was

17  under investigation and had a motive to curry favor with the

18  government.  That is obvious and I acknowledge that, but the

19  piece that's missing for me is the "it's important for the jury

20  to understand the connection with Mr. Avenatti," you know, and

21  that's why they went to the U.S. Attorney's office.  And that

22  goes beyond the motive of entity that's under investigation to

23  curry favor with the government.  That's a different point, and

24  it's that point that I am trying to understand.

25         MR. SREBNICK:  Understood.  Fair question.  I think

1   the best way I can answer it is if it was Joe Smith instead of

2   Michael Avenatti, I think the Nike lawyers would have thought

3   it would be less likely to get traction with the U.S.

4   Attorney's office, and the reason for that is Mr. Avenatti had

5   already been publicly spatting with the U.S. Attorney's office

6   over the Stormy Daniels case, and there were some issues back

7   and forth about whether one party had leaked to the media an

8   interview that was about to take place.  You know, the reality

9   is Mr. Avenatti was a higher profile individual, and I think

10  it's a fair question or fair area of inquiry of the Nike

11  lawyers whether the fact that he was who he was was something

12  that they thought would get more traction with the U.S.

13  Attorney's office.  So that's really the thrust of the

14  argument.

15           THE COURT:  OK.  Well, I'm dubious, but I look forward

16  to your submission, and I'd like it by a week from today.

17           But let's run through the rest of them.  The second

18  one was evidence or argument that Mr. Avenatti's conduct can or

19  should be dealt with solely as an administrative or civil

20  matter.  Do you anticipate making arguments or offering

21  evidence that goes to that issue?

22           MR. SREBNICK:  No, your Honor.

23           THE COURT:  Evidence or argument concerning whether

24  the charges in this case are unconstitutionally vague.  Again,

25  that's the subject of one of your motions, but assuming my

JCH7AVEC

1   ruling on the point is adverse to you, would you be arguing to

2   the jury that it's unconstitutionally vague?  I gather this

3   would be the honest services wire fraud count.  I mean do you

4   intend to stand up in front of the jury and say, ladies and

5   gentlemen, this is unconstitutionally vague?

6            MR. SREBNICK:  No, your Honor.

7            THE COURT:  Punishment or consequences.  It's standard

8   that there won't be any evidence or argument about punishment.

9   You don't intend to get into that, do you?

10           MR. SREBNICK:  No, your Honor.

11           THE COURT:  Evidence or argument concerning the

12  defendant's prior commission of good acts and/or failure to

13  commit other bad acts.  Do you have anything in mind in that

14  area?

15           MR. SREBNICK:  I don't anticipate putting on any

16  affirmative evidence in the defense case.  There might be

17  evidence in the discovery that already deals with that.  I

18  think it's better if I leave that for writing, so I can

19  articulate it better.

20           THE COURT:  All right.  Evidence or argument

21  concerning whether other threatened or actual civil lawsuits

22  have achieved positive things for clients or society.  Does

23  anything come to mind in that area that you might be seeking to

24  introduce or to argue?

25           MR. SREBNICK:  Nothing that comes to mind.  I think

1    what is motivating this, Judge, is that we had submitted in

2    reciprocal discovery to the government a number of civil

3    complaints that Mr. Avenatti had filed in cases in the last

4    five years, federal complaints.  And I'm OK to say that the

5    relevance of that is to show that Mr. Avenatti actually is a

6    lawyer who files civil complaints; he actually sues; and he's

7    not somebody who is just making threats about it.  So, we think

8    that's going to be relevant.  We're not doing it to show that

9    he achieved positive results, only to show that he is an actual

10   trial lawyer who files lawsuits.

11        MR. RICHENTHAL:  That is difficult to understand.

12   It's not in dispute he is a lawyer.  In fact, we had a long

13   argument earlier about what the duties and contours of those

14   duties are as a lawyer.  There is not going to be a dispute

15   from anyone, including a government witness, that Mr. Avenatti

16   is a lawyer and he didn't start becoming one yesterday.  This

17   seems to us like a backdoor way of getting in prior acts for

18   their alleged positive contributions, and we object to it.

19        THE COURT:  So what I hear from you, Mr. Srebnick, is

20   it's important to you to establish that Mr. Avenatti was a real

21   lawyer, did real things, he tries cases, he brings lawsuits.

22   I'm not sure the government is going to be disputing any of

23   that.  Do you intend to get into the details of lawsuits that

24   he has actually brought?

25        MR. SREBNICK:  No, your Honor.

1      THE COURT:  OK.  I don't think this is an issue, but

2   if the government has concerns, after we see Mr. Srebnick's

3   response you will let me know.

4      Evidence or argument concerning whether Nike engaged

5   in misconduct of which the defendant was unaware at the time of

6   the defendant's charged actions.  So, there is a couple of

7   areas like this, and the government is saying that it's not

8   relevant if Mr. Avenatti was not aware of certain things at the

9   time.  So, they're saying both in this category and in the next

10  one that unless it's connected with something he knew at the

11  time it's irrelevant.  Do you have a problem with that basic

12  proposition?

13     MR. SREBNICK:  I do, and I'd prefer to address this in

14  writing, if I could.

15     THE COURT:  All right.  So for these next two you will

16  give me something in your submission.

17     So, the one was misconduct Nike was engaged in that

18  Mr. Avenatti was unaware of at the time.  Then the next one is

19  evidence or argument concerning whether Client One's potential

20  legal claims had value and/or the coast of an internal

21  investigation without a connection to the defendant's

22  contemporaneous knowledge.

23     So, what the government is saying is that again if

24  there is no tie to what Mr. Avenatti knew at the time, it's

25  irrelevant.  Same issue.  So you will address that, Mr.

1    Srebnick.

2          MR. SREBNICK:  Yes, your Honor.

3          THE COURT:  Out of court statements made by Attorney

4    One to the government after the defendant was arrested.  I

5    assume -- and I don't know who is going to be a witness in the

6    case, but I assume this is outside cross-examination, right?  I

7    mean this is direct evidence that we're talking about, right?

8          MR. SREBNICK:  I think this argument assumes that

9    Attorney One will be unavailable at trial.

10          THE COURT:  OK.

11          MR. SREBNICK:  I think that may be an issue.  I have

12    subpoenaed Attorney One.

13          THE COURT:  OK.

14          MR. SREBNICK:  I don't know what Attorney One is going

15    to be doing in response to the subpoena.

16          THE COURT:  All right.

17          MR. SREBNICK:  And so I think that issue needs to sort

18    of play out depending on what he wants to do.  But I think the

19    government's motion is a response to a notice I gave under Rule

20    807.  There may be other rules of evidence -- statements

21    against penal interest, things of that nature that might

22    support any out-of-court statements that he made if he is

23    unavailable.

24          THE COURT:  OK.  I think I saw someplace in the

25    briefing of the correspondence some issue about the assertion

1    of the Fifth Amendment in front of the jury.  Is that an issue

2    that people are concerned about?

3         MR. PODOLSKY:  That was actually raised I think in a

4    prior conference.  Mr. Srebnick actually asserted that he had

5    an intent to try to call people for the purpose of having them

6    assert their Fifth Amendment right.

7         THE COURT:  Is that still your intention, Mr.

8    Srebnick?

9         MR. SREBNICK:  Let me just research the law on that.

10        THE COURT:  I will tell you that my inclination would

11   be not to permit that, that is to say not to permit someone to

12   be called to the stand solely for purposes of asserting their

13   Fifth Amendment rights.  I would not be inclined to permit

14   that.  Obviously, I'm happy to take a look at any law you want

15   to submit on the subject, Mr. Srebnick, but that would be my

16   inclination.

17        Finally, the government argues that the defendant

18   should be precluded from offering expert testimony without

19   providing sufficient notice, and his proffered expert should be

20   precluded from opining on what a lawyer's ethical duties should

21   be, the allegedly negative consequences of the government's

22   theory of guilt and/or what statements made to the defendant

23   meant.

24        So that's one of the reasons why I asked the

25   government are you troubled by anything in Mr. Srebnick's

1   disclosure about the rebuttal expert?

2          MR. PODOLSKY:  Sorry, your Honor, yes.  We still do

3   rest on the arguments in here about that.  The disclosure seems

4   to suggest there be arguments that go to what the rules really

5   ought to be, whether this is good for lawyers to have criminal

6   law in this area.  And there is also a portion of the notice,

7   as I recall, that essentially contains an interpretation of

8   what one of the recorded statements by not Mr. Avenatti but

9   another person on the recording meant.  And that would be for

10  the jury obviously to determine.

11         THE COURT:  All right.  Mr. Srebnick, do you have any

12  reaction today about the government's concerns that are set

13  forth in that last paragraph?

14         MR. SREBNICK:  I don't.  I think it's best to see what

15  their enhanced notice looks like, and then I will be able to

16  assess what we want to do with our expert witness.

17         THE COURT:  OK.  So again, Mr. Srebnick, your response

18  to the government's motion in limine will be due on December

19  24.

20         The defendant had made a motion for a bill of

21  particulars which is docket number 31.  That was aimed at the

22  conspiracy counts which are no longer in the case.  Mr.

23  Srebnick, I assume that motion is moot at this point.

24         MR. SREBNICK:  Yes, your Honor.

25         THE COURT:  I'm going to schedule a final pretrial

JCH7AVEC

| | |
|---|---|
| 1 | conference for 2 p.m. on January 17.  That's the Friday before |
| 2 | the trial.  Obviously if we need to meet before then, we will, |
| 3 | but we will have this final pretrial conference on the calendar |
| 4 | if we need it. |
| 5 | Are there matters that the parties want to raise? |
| 6 | MR. PODOLSKY:  I just couldn't quite hear.  Is it 2 |
| 7 | p.m. on that Friday, your Honor? |
| 8 | THE COURT:  Yes. |
| 9 | MR. PODOLSKY:  Thank you. |
| 10 | THE COURT:  Mr. Srebnick, anything else you want to |
| 11 | raise? |
| 12 | MR. SREBNICK:  No, your Honor. |
| 13 | THE COURT:  Nothing else for the government? |
| 14 | MR. PODOLSKY:  Your Honor, we will also file |
| 15 | oppositions to the defense's remaining motions in limine that |
| 16 | we haven't discussed today on Tuesday.  We may also file |
| 17 | something regarding basically a supplemental motion in limine |
| 18 | in response to one of the defendant's request to charge that |
| 19 | raised an issue that we thought was not an issue, but assuming |
| 20 | we do that, we will do it expeditiously so that your Honor can |
| 21 | have that. |
| 22 | THE COURT:  Do you think again by Tuesday? |
| 23 | MR. PODOLSKY:  Probably sooner.  We're actually hoping |
| 24 | to do it quite soon. |
| 25 | THE COURT:  All right. |

 1          MR. SREBNICK:  Your Honor, there was actually one

 2   other matter I do want to bring up.  In view of what I believe

 3   are more complexities in this case -- despite that there is

 4   only three charges -- than the average case, we would ask that

 5   the Court consider scheduling a pretrial charge conference in

 6   the case so that we have a better understanding of what the

 7   Court's intentions are with respect to the jury instructions.

 8          There is quite divergent views of what the

 9   instructions ought to be, especially on the definitions of what

10   is wrongful under the extortion statute, the requirement of

11   what the act needs to be under 1346.  So, I think it would

12   certainly be useful to engage in that process so that we have

13   an idea of what we shouldn't be arguing to the jury and what we

14   can be arguing to the jury.

15          MR. PODOLSKY:  May I respond, your Honor?  Let me

16   first raise this:  We have read certainly the defense's request

17   to charge.  We think they're wrong in numerous respects and

18   involve numerous misstatements of law, and we are considering

19   whether we want to put something in writing to assist the

20   Court.

21          We certainly don't want to get in the way of anything

22   that will help move things along in this case, but candidly I

23   don't think that a pretrial charge conference is just a useful

24   process or a good use of the time as we're trying to prepare

25   for trial.  And I think that for several reasons.

JCH7AVEC

1          One, to the extent it's useful, we can provide some

2     additional reactions in writing, but so much, as the Court

3     knows, about what goes into the charge is going to be dependent

4     on what happens at trial.  We will have, I am confident, a

5     charge conference at the normal time, and I'm just not sure

6     sitting around and hashing it out on another half day is really

7     helpful to anyone.

8          And I will make one other comment.  It is true that

9     the defense has thrown in any number of additional charges or

10    changes to charges that are given based on, in our view, not on

11    legal authority, but that doesn't actually mean that the

12    charges in this case are very complicated.  They have been

13    given before.  Honest services fraud is a charge that is given

14    routinely in this courthouse.

15         THE COURT:  But generally in the context of public

16    officials.

17         MR. PODOLSKY:  That's true, as well as though in the

18    private sector.  I had a private sector honest services fraud

19    trial earlier this year, and the principles really apply

20    equally.

21         I'm not trying to suggest, your Honor, that there

22    won't be anything to discuss at the charge conference -- there

23    always is -- but as we were preparing the requests to charge

24    there is clear legal precedent on each of these charges.  We

25    think that we can certainly elucidate any particularly knotty

JCH7AVEC

1    questions in writing ahead of time, and we are going to have a

2    charge conference.  So, I just don't think it's a profitable

3    use of time, although clearly we will provide the Court with

4    whatever the Court would like in terms of assistance in

5    determining the charge in this case.

6            THE COURT:  Well, I think the place to start would be

7    a response from the government to the charges that you said

8    that the defendant seeks that are supported by the law, so that

9    I have some sense of the universe of disagreement between the

10   parties.  And once I have a sense of that, it will be easier

11   for me to decide whether it would be productive for us to have

12   this pretrial discussion about the charge.

13           I tend to agree with the government that it's very

14   difficult to have a discussion about what the jury instructions

15   are going to be before the judge has heard the evidence.

16           I will say that in this case a lot of the evidence has

17   already been disclosed, and so maybe that's somewhat unusual --

18   disclosed in the sense that much of the evidence is product of

19   taped conversations and messages that are in black and white.

20   But I won't really have a sense of whether it would be useful

21   for us to speak before the trial begins until I get the

22   government's reaction to the instructions of the defendant as

23   sought and have a better understanding of what the areas of

24   disagreement are.

25           So, can you get me that by Tuesday or earlier?

JCH7AVEC

1          MR. PODOLSKY:  Your Honor, I will say this, if the

2     Court will indulge us.  We will try, but we would ask the

3     Court's indulgence in terms of setting a deadline to the

4     following week.  And the reason I'm asking for that is simply

5     the number of filings in addition to some we have discussed

6     today due Tuesday, and we certainly want to have enough time to

7     make it a useful submission to the Court.  We will endeavor to

8     get it to you quickly, but if the Court would indulge us not to

9     set a strict deadline of Tuesday, we would find that useful.

10          THE COURT:  All right.  Do the best you can.  The

11     sooner I get it, obviously the better it is for me, but I

12     understand you do have a number of other submissions that

13     you're required to make.

14          MR. SREBNICK:  When would the Court be inclined to

15     share its proposed instructions?  Would that be before trial

16     starts, or is that at the end of the government's case?

17          THE COURT:  It's never before the trial starts, I can

18     tell you that.  I mean I have never that I can remember given

19     the parties my charge before I have heard any of the evidence.

20     That would be unprecedented.  The government is right, you

21     know, of the people sitting in the room I have probably the

22     least understanding of what the evidence is going to be.  So,

23     the judge needs to hear the evidence, understand what the

24     factual issues are generally speaking before you can address

25     the substantive instructions.

1          Of course there are instructions that are given in

2     practically every case, and I am sure the lawyers aren't

3     concerned about that, and they have a good idea of what those

4     instructions will look like, but the substantive instructions

5     about the charges in this case, those typically would be

6     developed at some point during the trial and given to the

7     parties maybe a couple days before their summations would be a

8     possibility.  But generally the judge needs to hear the

9     evidence before he or she can make decisions about the specific

10    language that will be used in the jury instructions.

11         So, Mr. Srebnick, it would be unprecedented for me to

12    disseminate the charge before I've heard any of the evidence,

13    and I don't think that's going to happen in this case.  But if

14    you want me to consider giving the draft charge out than I

15    otherwise might, I certainly will consider that.  Again, what I

16    need is sort of the predicate, to get this submission from the

17    government and have a better understanding of where the parties

18    are at odds, and then I will certainly think about whether it

19    would be helpful to have a conference with you earlier than I

20    otherwise might about the legal instructions.

21         And what I'm hearing from you is that if you had a

22    sense of what the legal instructions were going to be, it might

23    have a bearing on what evidence you chose to elicit, and it

24    might address objections that will be raised during a trial due

25    to a lack of uncertainty about what the ultimate jury

JCH7AVEC

1    instructions are going to be.

2            So, I'm sensitive to that issue; I will think about

3    it.  I will start by looking at the government's response to

4    what you've submitted, and I will continue to consider whether

5    it might make sense for us to have an earlier conversation

6    about the law than I otherwise would.

7            MR. SREBNICK:  Understood.

8            THE COURT:  OK.  Anything else?

9            MR. PODOLSKY:  Not from the government, your Honor.

10           MR. SREBNICK:  No, your Honor.

11           THE COURT:  All right.  Thank you.

12           (Adjourned)

13

14

15

16

17

18

19

20

21

22

23

24

25

K1FKAVEC                          TELEPHONE CONFERENCE

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                          19 CR 373 (PGG)

5   MICHAEL AVENATTI,

6              Defendant.

7   ------------------------------x

8                                          New York, N.Y.
                                           January 15, 2020
9                                          4:15 p.m.

10  Before:

11                   HON. PAUL G. GARDEPHE,

12                                         District Judge

13                        APPEARANCES

14

15  GEOFFREY S. BERMAN,
         United States Attorney for the
16       Southern District of New York
    MATTHEW D. PODOLSKY
17  DANIEL RICHENTHAL
    ROBERT SOBELMAN
18       Assistant United States Attorneys

19  JOSE M. QUINON
    SCOTT A. SREBNICK
20  DANYA PERRY
         Attorneys for Defendant

21

22

23

24

25

1              (In chambers; parties present telephonically)

2              THE COURT:  Hello.  This is Judge Gardephe.  Who do I

3    have on the line?

4              MR. PODOLSKY:  For the government, you have Matthew

5    Podolsky, Daniel Richenthal, and Robert Sobelman.  Good

6    afternoon, your Honor.

7              THE COURT:  Good afternoon.

8              MR. QUINON:  Good afternoon, your Honor.  On the line,

9    for the defense, you have Jose Quinon, Scott Srebnick, and

10   Danya Perry.  Howard Srebnick could not make it, but the rest

11   of us are on the line.

12             THE COURT:  All right.

13             So I take it defense counsel is waiving Mr. Avenatti's

14   presence for purposes of this call?

15             MR. S. SREBNICK:  We do, your Honor.

16             THE COURT:  Okay.

17             So I have been informed by the government that the

18   court in California ordered Mr. Avenatti detained.  The

19   government's letter tells me that the California judge ordered

20   the Marshals Service to bring Mr. Avenatti to this district

21   forthwith.

22             Let me ask the government:  Is there anything I need

23   to do?  Do you need an order from me to facilitate this?

24             MR. PODOLSKY:  We don't believe it's necessary at this

25   time, your Honor.  We're going to be in touch with the Marshals

K1FKAVEC                    TELEPHONE CONFERENCE

1    Service, and to the extent we need any further assistance from

2    the Court in the next day to make sure he's here in a timely

3    fashion, we will follow up, but our current understanding is

4    that the district judge's order in California is sufficient to

5    ensure that the defendant will be transported here by next

6    week.

7              THE COURT:  Now, I'm hoping he's going to be here by

8    Friday.  Is that unrealistic?

9              MR. PODOLSKY:  That's our hope as well, your Honor.  I

10   don't think I have a guarantee as to what day from the

11   marshals, but I believe Friday -- my understanding is Friday

12   was included in the district court in California's order, so

13   it's certainly our hope and belief that he will be here by

14   Friday.  And to the extent we can help, we will be working to

15   make sure that happens.

16             THE COURT:  I spoke with someone from the marshals

17   office earlier today and came away from that conversation with

18   the understanding that Mr. Avenatti would be here by Friday.

19   So I am going to operate on that presumption.

20             Let me ask the lawyers whether -- we have to talk

21   about the trial date, obviously.  I'm wondering whether it's

22   reasonable to move the date for distributing the jury

23   questionnaires to Thursday, doing the voir dire on Friday, and

24   then beginning with the evidence the following Monday.

25             Mr. Quinon, Mr. Srebnick, Ms. Perry, what's your

1    reaction?

2           MR. QUINON:  Judge, this is Jose Quinon.  The problem

3    that we're having here goes much beyond just the movement of

4    starting the voir dire, Judge.  Here's the -- the more

5    fundamental problem that we're having is one that we normally

6    do not have representing clients, and that is, as we're ready

7    to start the trial, we don't have the wherewithal, we don't

8    have the resources, to have the tools that we need to represent

9    the client.  In this case, we are not going to be able to bring

10   our expert.  We have no way to assure the expert or to pay the

11   expert to appear at trial.  We cannot also pay for the

12   witnesses that we have subpoenaed, and they, of course, are

13   entitled to their mileage, their flights, lodging.

14          So we have some very, very difficult problems here.

15   Apart from that, we have also had contracted with somebody for

16   technical assistance and being able to make the presentation

17   necessary at trial in order to competently represent

18   Mr. Avenatti.  So, as we're getting ready to tee the trial up,

19   to start this trial, we find ourselves that the rug has been

20   pulled from under us because this was absolutely totally

21   unexpected, and now we just don't have a way of doing it.

22          Now, what I suggest is that we need time to be able to

23   speak with Mr. Avenatti about these issues.  I don't know if he

24   has resources, but based on what little I know about the

25   California case, we have also problems there, insofar as

K1FKAVEC                    TELEPHONE CONFERENCE

1   Mr. Avenatti coming up with any type of resources, because the

2   California case seems to be rather broad in scope in terms of

3   embracing all of Mr. Avenatti's potential resources.

4           So, nonetheless, we need to talk with Mr. Avenatti

5   about that issue.  We may need, eventually -- and I don't know

6   this until we speak to Mr. Avenatti.  We may need to have

7   Mr. Avenatti come before the Court and have an indigency

8   hearing.

9           So, it's a long answer, but it is an answer that we

10  need to ponder and we need to deal with in this case, is what

11  are we going to do with this issue of the finances, because

12  without that, we can't move forward the way that we see it

13  because we don't have the tools, we don't have the weapons.

14  It's like going to war without weapons on our side right now.

15  Only the government has resources.  We don't have any.

16          And, as Mr. Srebnick explained before, we were dealing

17  with very little resources and now we have none.  So that's the

18  issue, Judge.  And I think that unless this issue with the

19  resources is resolved, we cannot move forward.  At least that's

20  the way we see it.  And so, it may be that, at this point, we

21  may have to do kind of a hard reset, so to speak, because I

22  don't see -- unless -- I ask the Court for assistance here

23  because, quite frankly, after 40-some years of practicing law,

24  I've never encountered a situation like this.  On the eve of

25  trial, we're just left out naked in the street and no way to

1    defend ourselves.

2            THE COURT:  Well, what exactly is your application?

3            MR. QUINON:  I think we need to just adjourn the

4    trial, reset it, give us an opportunity to speak with

5    Mr. Avenatti, come before you sometime, hopefully, next week,

6    Tuesday or Wednesday, with Mr. Avenatti in court, and select a

7    new trial date after we resolve the issues of the finances

8    because that is the key right now.

9            THE COURT:  What does the government say?

10           MR. PODOLSKY:  Your Honor, we oppose that application.

11   Let me first say this:  We're not unsympathetic, as we said

12   this morning, to the sort of interim hardship caused by

13   Mr. Avenatti's arrest in terms of the defense's ability to

14   communicate with him and prepare their case.  We understand

15   that.

16           But with respect to the notion that there's a

17   financial hardship that should cause him sort of adjournment

18   sine die or a hard reset, whatever that may mean, we simply

19   don't understand how the arrest has any bearing on that.  The

20   defendant was arrested, but, to our understanding, no money was

21   seized from him.  His financial condition is exactly the same

22   today as it was yesterday and the day before.

23           If the defense needs to seek CJA resources, we

24   understand that that may be an avenue available to them, but we

25   don't see how the defendant's arrest really is relevant to the

1    concerns that Mr. Quinon has articulated now.  So, I'm happy to

2    respond to the Court's proposal regarding jury selection and

3    the first day of trial, but we do oppose the application that

4    there should be some sort of reset or adjournment without a

5    deadline.  The government, as well as the public, has an

6    interest in a trial here, and we don't see any reason that it

7    can't proceed along the lines of the schedule that the Court

8    has proposed.

9         MR. QUINON:  May I respond to -- let me say that the

10   government does not understand how it affects Mr. Avenatti.  He

11   had the same amount of money yesterday as he does today, and

12   that may be true, but the circumstances have changed radically.

13        As an attorney, now you're on notice that there is a

14   case in California that deals with the money in this case, and

15   there's allegations that use of the money and the way that it

16   has been used has obviously given rise to criminal charges.

17   Under no circumstances -- I know that we would be very, very,

18   very reluctant to use that money or advise Mr. Avenatti how to

19   or whether to use the money.  As a lawyer, you're walking on

20   really, really thin ice here, and one has to be very careful.

21        Second of all, it is doubtful that the vendors in this

22   case are going to take the money without inquiry, whether they

23   can take the money without any problems, meaning any legal

24   problems.

25        Now, the only way this can be resolved is

1    Mr. Podolsky, on behalf of the government, says to us, okay,

2    Mr. Avenatti can use the money, and there will be no legal

3    problems for either Mr. Avenatti or for any of the vendors,

4    then, fine, we'll move ahead and do it, but we have to have

5    that assurance.  And I cannot, and neither will any of the

6    defense lawyers, take it upon ourselves to give assurance to

7    other people, whether Mr. Avenatti or any vendor, that there's

8    no problem with the money.

9            Now, if Mr. Podolsky, on behalf of the government,

10   gives us that assurance, then, yes, we can move forward.  So

11   I'll put the ball in his park and let him say it.  If he can

12   give us the assurance, then we'll move ahead, no problem.

13           MR. S. SREBNICK:  Let me just interject one thing.

14   This is Scott Srebnick.  We also have to find out -- none of us

15   knows Mr. Avenatti's finances, so we need to have a

16   conversation with him about his ability, in light of the new

17   allegations, to fund the resources, witness fees, et cetera,

18   trial tech support, to move forward.  Until we have a

19   conversation with him, we have really no way of knowing.

20           THE COURT:  When do you expect to have that

21   conversation?

22           MR. S. SREBNICK:  As soon as he's brought to New York.

23   I'm scheduled to fly up tomorrow, and I will meet with him as

24   soon as he is brought to New York, whenever that is.  I think

25   there's a separate issue, and that is, I don't know if he has

1    anybody on the outside who handles finances that can make any

2    such arrangements.  I just don't have the answer to that

3    question.

4           So as a lawyer, I don't get involved in my client's

5    finances, and so I don't know, in custody, what his ability is

6    to make arrangements.  If he has the finances, if he has the

7    funds to pay, I just don't know.  So I need to have that

8    conversation with him to find out.

9           All of this is, of course, against the backdrop that

10   Mr. Quinon mentioned, which is the government in California has

11   apparently taken the position that certain payments, certain

12   expenditures, constituted mail or wire fraud.  I suppose that

13   they're alleging that the way it was structured constitutes

14   evidence of criminality.  I just don't have personal knowledge

15   of that, but, as Mr. Quinon said, we have to tread very

16   carefully under these circumstances.

17         THE COURT:  Well, I think the first step is,

18   obviously, for defense counsel to have an opportunity to speak

19   with Mr. Avenatti about these matters.  I think the next step

20   is for defense counsel to have a conversation with the

21   government here to see whether some comfort can be given about

22   the expenditure of funds for purposes of trial preparation and

23   then take stock of where we are after those conversations have

24   taken place.

25         It's clear that the trial date for Tuesday has to be

K1FKAVEC                        TELEPHONE CONFERENCE

1    adjourned.  What I'm hearing from counsel is that my proposal

2    to at least try to make progress on jury selection next week is

3    a nonstarter.  So, instead, I'm going to put it down for a

4    conference at 10:00 a.m. Tuesday morning, by which time I

5    expect that Mr. Avenatti will not only have been brought to

6    this district, but that there will have been an opportunity for

7    substantive conversations between him and his counsel.

8            We have a conference scheduled for later today at 5:30

9    that's obviously not going to happen.  We had scheduled a

10   conference for what was supposed to be our last pretrial

11   conference for Friday at 2:00.  That will be adjourned.

12   Instead, we will have our conference on Tuesday morning,

13   10:00 a.m.

14           With respect to the trial date, the adjourned trial

15   date, I'm going to leave that in abeyance for now.  I will tell

16   you that I would be very reluctant to push the trial date

17   beyond the following Monday, so I would be very reluctant to

18   push the trial date beyond Monday, January 27th.

19           So understanding we're not going to be able to make

20   any progress next week, I want the trial to begin at least by

21   January 27th.

22           There are a number of outstanding submissions.  I

23   assume that until defense counsel has an opportunity to speak

24   with Mr. Avenatti, there's not going to be any progress on that

25   front, but just to keep them as markers, I'm waiting for a

K1FKAVEC                    TELEPHONE CONFERENCE

1    submission from defense counsel as to the financial condition

2    evidence and, in particular, the various judgments that the

3    government has made reference to.  So, in the defendant's

4    opposition papers to the financial condition evidence, it said

5    that Mr. Avenatti disputes the government's claim that he was

6    $15 million in debt as of March 2019, but as I've spent time

7    with the papers, it seems that there are a number of judgments

8    that have been entered against Mr. Avenatti, and so I'm not

9    really clear what the basis would be to dispute those

10   judgments, which is one of the reasons why I've asked the

11   defense to comment.

12          So, as I understand it, there's a personal judgment

13   against Mr. Avenatti for approximately $5 million that was

14   entered on November 20th, 2018, by the Los Angeles Superior

15   Court; there was a judgment of 2.1 million entered by the Santa

16   Barbara Superior Court on or about October 26th; on or about

17   January 17, 2019, the Orange County Superior Court, in

18   connection with Mr. Avenatti's divorce proceedings, issued a

19   writ of execution against him in the amount of $2,053,332; and

20   then on January 17, 2019, the State of Washington filed a

21   warrant for unpaid taxes in Superior Court Thurston County

22   against Mr. Avenatti in the amount of $1,530,216.

23          So, I'm not sure how those amounts could be disputed,

24   and so I'm looking to the defense to tell me whether they

25   dispute those numbers, and, if they do, what their basis is.

1          I want to tell the government that I did receive the

2     government's motion for an arrest warrant in the California

3     case.  I would like to see the exhibits that were attached to

4     that brief.  So what I have now is the brief; I don't have the

5     exhibits.  I'd like to see the exhibits.

6          Mr. Srebnick, you had mentioned that you want to file

7     a motion regarding Mr. Geragos, so that's an outstanding

8     matter.  And then, finally, Nike has moved to quash a subpoena

9     issued for certain documents, and I assume that the defendant

10    opposes that motion, so I'll need a response, I'll need

11    opposition to that, if the defendant opposes that motion.

12         So I understand there's a delay -- there's going to be

13    a delay associated in this briefing, in light of the arrest and

14    detention of Mr. Avenatti, but I just wanted to remind everyone

15    that these are outstanding matters that I am going to need

16    briefing on.

17         MR. PODOLSKY:  Your Honor, this is Matthew Podolsky,

18    for the government.  Just in response to your request for the

19    exhibits, we did docket them a little bit later than the

20    motion, but the exhibits, I believe, are docketed now at Docket

21    No. 155.  So, hopefully, that satisfies the Court's request for

22    the exhibits underlying the motion for an arrest warrant filed

23    in California yesterday.

24         THE COURT:  All right.  I'll look for that.

25         MR. S. SREBNICK:  Your Honor, it's Scott Srebnick.

1    May I address one matter?

2                THE COURT:  Yes, go right ahead.

3                MR. S. SREBNICK:  Does the Court anticipate that it

4    would rule on the entire expert witness issue before the

5    commencement of trial?  I ask that only because, as far as

6    anticipated expenses are concerned, that would be the largest,

7    and so I would want to address that with Mr. Avenatti as soon

8    as I see him.

9                THE COURT:  When you say the expert -- as I understand

10   it, you want to put on an expert with respect to California Bar

11   matters, right?  That's one expert that you were going to call,

12   or not?

13               MR. S. SREBNICK:  No, no.  We had moved to exclude the

14   government's expert.

15               THE COURT:  Okay.

16               MR. S. SREBNICK:  We engaged, on a very limited basis,

17   an expert as a rebuttal expert to the government's, but it's

18   our position that California Bar rules ought not to be the

19   subject of expert testimony.  That's something we talked about

20   at the December 17th hearing, the Court gave us its sort of

21   inclination view, and then the government supplemented with a

22   notice, I filed a letter to exclude it, and that matter is

23   pending before the Court.

24               THE COURT:  Okay.  So the expert you're talking about

25   is on these financial matters?

1         MR. S. SREBNICK:  No, no, no.  There's only one
2    expert.  It's the California -- I'm sorry, there's only one
3    expert at issue -- only one area of expert testimony at issue
4    that both sides have noticed.  And that's on California Bar
5    rules ethics.
6         THE COURT:  All right.  We're getting confused here.
7         First of all, I was just trying to figure out whether
8    the expert you were referring to was on California Bar matters.
9    I gather that's not what you're talking about, right?
10        MR. S. SREBNICK:  That is the only thing we're talking
11   about.
12        THE COURT:  Okay.  In your papers opposing the
13   government's financial condition evidence, you said that it
14   might be necessary for you to retain an expert to testify about
15   Mr. Avenatti's financial condition.
16        MR. S. SREBNICK:  Yes, that was one point, but we
17   don't know what the Court's ruling is yet on that, and,
18   certainly, we'd have to talk to Mr. Avenatti.  But, no, the
19   only experts that either side has retained at this point is on
20   California Bar rules.  And I can just tell the Court that we
21   have not paid our expert to actually travel to New York and to
22   testify.  That would be an anticipated expense of probably in
23   excess of $20,000, given the amount of time, et cetera.
24        So the government has its expert, a professor from
25   Stamford, and that issue is teed up for the Court, as to

1    whether or not any expert testimony on ethics, legal

2    principles, et cetera, ought to be part of this trial.  And so

3    that's the issue I was referring to, and I'm sorry if I wasn't

4    clear.

5              THE COURT:  Okay.

6              So your concern that -- well, first of all, I mean,

7    I've given you a preview that my inclination is that the

8    subject matter is an appropriate one for expert testimony

9    because the average juror is not going to be conversant with

10   the responsibilities of attorneys under the California rules of

11   ethics and professional responsibility.  So that's my general

12   view, which I think I shared with you a long time ago.  And

13   then there were some issues about whether the government's

14   disclosure had been appropriate, and the government

15   supplemented its disclosure, and then, you're correct, you put

16   in a letter that's still sub judice, opposing the expert

17   testimony.

18             I understand what you're saying, that if I were to

19   rule that the expert testimony about lawyers' responsibilities

20   in California, under California law, if I were to rule that

21   evidence on that point is admissible, you would then need to

22   put on your expert, and you're concerned that you don't have

23   the funds available to do that.

24             MR. S. SREBNICK:  That's correct.

25             THE COURT:  Okay.

1        So, as I said, you're going to have your conversations

2    with Mr. Avenatti when he arrives here, you will then have a

3    conversation with the government about whether, as has been

4    done in many other cases, over many years, whether some amount

5    of money could be released to pay for defense costs, and if you

6    don't receive satisfaction in that regard, then you'll bring

7    the matter to my attention on Monday, I guess -- I'm sorry,

8    Tuesday.

9        MR. PODOLSKY:  This is Matthew Podolsky, for the

10   government.  I just want to follow up on one thing the Court

11   said to make sure there's no misimpression.  There is no money

12   that is being held or seized for forfeiture or anything like

13   that by the government.  We aren't holding any of the

14   defendant's assets.  The issue isn't whether we would release

15   them so that he can provide for his defense.  As I understood

16   the defense's request, they wanted some kind of warrant that he

17   can do whatever he wants with his money and the government

18   wouldn't view it as a crime.  So I just want to make sure that

19   we're not talking past each other.  It's a slightly different

20   issue than the matter of the release of money.

21        It may be -- I don't know the answer to this,

22   candidly, your Honor -- that the Central District of California

23   has seized some assets, I'm not sure what the answer to that

24   is, but we -- from its earlier case, but this office did not

25   seize any of Mr. Avenatti's assets, we're not holding them to

1    prevent him from using them or anything like that.  So I want

2    to make sure the record is clear on that.

3           THE COURT:  I'm aware of that.  But it's not that

4    dissimilar from a situation where funds have been frozen in the

5    sense that what defense counsel has said today is that, given

6    the allegations in the government's motion for the arrest

7    warrant, which were the predicate for Mr. Avenatti's detention

8    in California, given those allegations, which focus primarily

9    on Mr. Avenatti's financial transactions over the past year,

10   what defense counsel is saying, is that given those allegations

11   in the government's brief, it presents practical difficulties,

12   in the sense that anyone reading -- any vendor reading those

13   allegations is going to have a level of concern about whether

14   the money that Mr. Avenatti provides is going to be viewed,

15   essentially, as the proceeds of fraud, such that they might

16   later face a demand on the government's part to disgorge the

17   money they receive from Mr. Avenatti.

18          So I take your point that it isn't a situation where

19   funds have been frozen, but the concern is very similar to that

20   scenario because an issue has been raised about whether funds

21   that Mr. Avenatti has control over, whether they're tainted and

22   whether a vendor who takes those funds does so at some risk.

23   And that presents a practical problem.

24          MR. PODOLSKY:  Your Honor, I certainly understand the

25   practical problem, and we'll continue to confer both internally

K1FKAVEC                      TELEPHONE CONFERENCE

1    and with the defense.  The issue I foresee, your Honor, is the

2    allegations, as I understand them, or the concern here, is that

3    if Mr. Avenatti spends money that somebody -- that is owed to

4    somebody else, that could constitute a crime or where that

5    person may be able to go after the money, and it's hard for us

6    to sort of prospectively immunize him for what that conduct

7    might constitute.  I'm just not sure I immediately see even a

8    mechanism for doing that.  But we understand your Honor's

9    analogy, and we're happy to confer internally and with the

10   defense to see if there's something we can do.

11             THE COURT:  Well, I do think we have to be practical

12   here.  We've had significant disruption with respect to the

13   trial date already.  It remains entirely unclear to me why it

14   was decided to arrest Mr. Avenatti a week before the trial

15   based on allegations that go back primarily to last summer.  So

16   I read the government's brief in support of the arrest warrant.

17   It was chockful of events that happened between June and August

18   of 2019.  So it raises the obvious question of why did someone

19   wait until January 14th to seek an arrest warrant?  So that's

20   created enormous disruption.  And unless the parties cooperate

21   effectively, I really have no idea when this case is going to

22   get tried.  Mr. Avenatti has a trial scheduled in April, he has

23   a trial scheduled in May.  I have 600 other cases I'm

24   responsible for.  And so what I'm asking is that people be

25   practical here, given the hand we have been dealt, which is a

1   bad one.  That's what I'm asking for.

2              MR. PODOLSKY:  Your Honor, this is Matthew Podolsky

3   again.  We absolutely will be practical.  Let me say this:  We

4   agree with you, your Honor.  We were prepared to try this case

5   next week.  As you know, we did not know that an arrest warrant

6   was sought until after it was.  The hand that the Court has

7   been dealt, unfortunately, is also the hand that we've been

8   dealt, and so we're in full agreement with the Court.  We will

9   make every effort to be practical and move this case along.

10             As I said, our only interest, which we believe is a

11  public interest, is to try this case as expeditiously as

12  possible, and we will absolutely do everything in our power to

13  do that.  But I want to emphasize, your Honor, we're in full

14  agreement with the Court.

15             THE COURT:  All right.

16             Mr. Srebnick, Mr. Quinon, anything else anyone wants

17  to say?

18             MR. S. SREBNICK:  No, your Honor.  Thank you.

19             MR. QUINON:  No, your Honor.  Thank you.

20             THE COURT:  All right.  So we will regroup at

21  10:00 a.m. on Tuesday morning.  If there are any issues that

22  arise in terms of Mr. Avenatti's transport or if you need

23  anything else from me, let me know.

24             MR. S. SREBNICK:  Judge, while we're on the line, may

25  I just ask the government to, to the extent they can, let me

K1FKAVEC                            TELEPHONE CONFERENCE

1    know as soon as they expect Mr. Avenatti to be in New York, so

2    that I can make arrangements to travel up there immediately.

3              THE COURT:  So, Mr. Podolsky, will you keep

4    Mr. Srebnick apprised of what's going on in terms of transport?

5              MR. PODOLSKY:  Yes, your Honor, to the extent we know

6    and are able to, we will continue to confer with defense

7    counsel, as we have been.  The answer is, yes, to the full

8    extent of our ability.

9              THE COURT:  All right.

10             I assume we'll be in 705 on Tuesday, so you should

11   report to courtroom 705 Tuesday morning, 10:00 a.m.

12             MR. S. SREBNICK:  Thank you, your Honor.

13             MR. QUINON:  Thank you, Judge.

14             MR. PODOLSKY:  Thank you, your Honor.

15             THE COURT:  All right.  Thank you, all.

16                              *  *  *

17

18

19

20

21

22

23

24

25