**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

      v.

MICHAEL AVENATTI,

      *Defendant*.

No. S1 19 Cr. 373 (PGG)

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S**
**<u>MOTION TO COMPEL THE TESTIMONY OF MARK GERAGOS</u>**

Scott A. Srebnick
SCOTT A. SREBNICK, P.A.
201 South Biscayne Boulevard
Suite 1210
Miami, FL 33131
Telephone: (305) 285-9019
Facsimile: (305) 377-9937
E-Mail: Scott@srebnicklaw.com

Jose M. Quinon
JOSE M. QUINON, P.A.
2333 Brickell Avenue, Suite A-1
Miami, FL 33129
Telephone: (305) 858-5700
Facsimile: (305) 358-7848
E-Mail: jquinon@quinonlaw.com

E. Danya Perry
PERRY GUHA LLP
35 East 62nd Street
New York, New York 10065
Telephone: (212) 399-8340
Facsimile: (212) 399-8331
E-mail: dperry@perryguha.com

*Attorneys for Defendant Michael Avenatti*

## I.     PRELIMINARY STATEMENT

Over the course of several days in March 2019, two attorneys met with Nike's outside lawyers in an effort (so they thought) to negotiate a settlement on behalf of a client.  One of those attorneys was Michael Avenatti, who has been charged in this case; the other was Mark Geragos, who has not been charged and – importantly, for the purposes of this motion – never will be.

Mr. Geragos initially also had been under investigation by the government, until he was able to persuade prosecutors of his innocence.  In two "innocence proffer" meetings with the government last June, Mr. Geragos waived any and all privileges that he enjoyed, including his Fifth Amendment privilege.  In those proffers, Geragos – explicitly and in writing – waived his right against self-incrimination in exchange for the opportunity to speak with the government, rebut its characterization of him as an unindicted co-conspirator in the criminal complaint and initial indictment, and proclaim his innocence.  Mr. Geragos' gambit proved successful: the government subsequently amended its allegations against Mr. Avenatti to withdraw the allegations of a conspiracy involving the joint conduct of Mr. Geragos and Mr. Avenatti.

Mr. Geragos has provided information to the government that is exculpatory both as to him and as to Mr. Avenatti.[1]  Having served Mr. Geragos with a trial subpoena, Mr. Avenatti seeks to compel Mr. Geragos to provide the jury with that same exculpatory information.  Mr. Geragos' response has been that he will invoke his Fifth Amendment privilege and refuse to testify.  Under the *sui generis* circumstances of this case, there is no merit to Mr. Geragos' attempt to assert his Fifth Amendment privilege.  First, Mr. Geragos, who was advised by one of the world's pre-

---

[1] The government recently stated in a filing that Mr. Geragos told the government that he expressed to Mr. Avenatti that Mr. Geragos was concerned that Mr. Avenatti had "'crossed a[ ] line.'" (Dkt. No. 118:18).  As set forth below in greater detail, this simply is not true.  Not only did it never occur, but the government's own notes from the proffer sessions reflect that Mr. Geragos never told the government that he expressed such a concern to Mr. Avenatti.

eminent law firms and who is a highly skilled and sophisticated criminal defense attorney in his own right, knowingly waived all privileges and elected to provide information to the government about his own conduct and Mr. Avenatti's conduct.  Second, the government has credited Mr. Geragos' claim of innocence, thereby extinguishing any theoretical claim of privilege.  Here, the Court need not speculate as to whether or not Mr. Geragos can have any lingering concern about potential prosecution.  The government initially alleged in two separate charging instruments that Mr. Avenatti acted in concert with a co-conspirator ("CC-1"), whom the multiple search warrant applications expressly identified as Mr. Geragos, and the government also referenced a "co-conspirator" in the press conference given by the United States Attorney at the time of Mr. Avenatti's arrest.  Then, after Mr. Geragos' innocence proffers, it reversed course to exclude any reference to "CC-1" from the subsequent superseding Indictment.  This rare election by the government speaks to the force of Mr. Geragos' innocence proffer – testimony that Mr. Avenatti expects will have equal force as to his own innocence when presented to the jury.

In that regard, Mr. Geragos' testimony is pivotal to Mr. Avenatti's defense.  Mr. Avenatti stands charged with serious federal crimes – two counts of extortion and one count of honest services fraud – in connection with his attempt, *jointly with Mr. Geragos*, to negotiate a settlement with Nike on behalf of a client.  The evidence indisputably shows, among other things, that it was Mr. Geragos who first reached out to Nike and to its outside lawyers; that Messrs. Avenatti and Geragos presented their opening negotiation salvos together as a team; that Mr. Geragos was fully committed to the idea of a press conference if Nike did not settle the claims, and that Mr. Geragos insisted on the internal investigation and to be paid for it.  Moreover, interview reports recently disclosed to the defense pursuant to 18 U.S.C. §3500 confirm that, in the view of the Nike lawyers,

Mr. Geragos was engaged as a full participant in the negotiations and was supportive of Mr. Avenatti's statements during those negotiations.

Mr. Geragos does not have a legitimate basis to resist compliance with the subpoena: given his innocence proffers to the government and the government's acceptance of his claims of innocence, he has no valid Fifth Amendment or other cognizable privilege.   Moreover, Mr. Avenatti is in full agreement with Mr. Geragos that neither he nor Mr. Geragos did anything improper, let alone criminal, in their short-lived settlement discussions with Nike on behalf of Coach Franklin.   On this basis, Mr. Avenatti respectfully requests that the Court compel Mr. Geragos to comply with the subpoena and provide trial testimony to the jury.

The government can resolve this issue without requiring the Court to so rule by simply seeking an Order compelling Mr. Geragos under 18 U.S.C. §6002, thereby granting Mr. Geragos immunity co-extensive with any Fifth Amendment privilege he may claim.   Doing so would formalize what the government has already done. Having walked away from its prior characterization of Mr. Geragos as a "co-conspirator" in the superseding Indictment against Mr. Avenatti, the government's current refusal to seek an Order immunizing him can only be seen as unfair gamesmanship in its quest to convict Mr. Avenatti.   To be sure, even were the government to make the implausible claim that it wants to reserve the ability to prosecute Mr. Geragos, compelling him to testify under §6002 would do nothing to limit or jeopardize that ability because §6002 does not confer transactional immunity.   And, considering that: 1) the government is ready to try its criminal case against Mr. Avenatti without Mr. Geragos' immunized testimony; and 2) Mr. Geragos has already proffered multiple times to the government without immunity, it would be utterly frivolous for Mr. Geragos, if indicted, to claim that the government cannot prove "that the evidence it proposes to use [against Mr. Geragos] is derived from a legitimate source wholly

independent of the compelled testimony." *Kastigar v. United States*, 406 U.S. 441, 460 (1972). To be sure, by the time Mr. Geragos would testify in the defense case, the government would have already presented its entire case-in-chief against Mr. Avenatti, thus establishing beyond any doubt that its evidence is derived from a legitimate source independent of Mr. Geragos' trial testimony. Stated simply, compelling Mr. Geragos' testimony presents no *Kastigar* problem for the government.

By contrast, allowing Mr. Geragos to avoid his obligation to testify *will* deprive Mr. Avenatti of his own rights under the Fifth Amendment – his Due Process right to properly defend himself against serious criminal charges – as well as his Sixth Amendment right to compulsory process. Mr. Avenatti respectfully requests that this Court compel Mr. Geragos' testimony pursuant to the trial subpoena. In the alternative, we request that the Court order the government to determine whether it will immunize Mr. Geragos.  If Mr. Geragos does not comply and the government does not take steps to ensure that the jury receive the benefit of Mr. Geragos' testimony, Due Process compels the dismissal of the Indictment against Mr. Avenatti.

## II.    RELEVANT BACKGROUND

### A.  The Partnership Between Messrs. Geragos and Avenatti in the Charged Conduct

Mr. Geragos is a key figure in this case and is critical to Mr. Avenatti's defense against the charges in the Superseding Indictment.[2]  It is beyond dispute that Mr. Geragos has first-hand knowledge of the events relevant to Mr. Avenatti's defense, which Mr. Geragos already has shared

---

[2] A portion of this factual recitation also is contained in Mr. Avenatti's recently filed Reply to the Government's Supplemental Motion *in Limine* (Dkt. No. 107), but certain facts are repeated herein for the convenience of the Court.

with the government in establishing his own innocence and debunking the government's theory of a criminal conspiracy.

Mr. Geragos is a criminal defense attorney and civil litigator with a national reputation and storied career; relevant experience conducting internal investigations; and a history of negotiating as an aggressive counter-party to Nike, the alleged "victim" in this case.  Mr. Avenatti had great faith in Mr. Geragos and contacted him immediately after speaking with Coach Gary Franklin in order to team up in that representation, texting: "I got called on a very big case against Nike. This might make a lot of sense together." Mr. Geragos readily acquiesced, responding: "Did I mention my relationship with the General Counsel is fantastic," to which Mr. Avenatti stated: "Yes. Which is why I thought of you."  Mr. Avenatti partnered with Mr. Geragos in this matter for good reason: Mr. Geragos had recently negotiated with Nike a settlement of former NFL quarterback Colin Kaepernick's claims against Nike in which Mr. Geragos secured a payment to Mr. Kaepernick from Nike and – importantly – an entitlement to a generous royalty stream for Mr. Geragos personally. Mr. Avenatti had so much faith in Mr. Geragos that he also retained Mr. Geragos to represent him personally in several matters.  Indeed, when Mr. Avenatti was arrested in this matter and asked by the agents if he had a lawyer to call, Mr. Avenatti requested that he be permitted to call Mr. Geragos as his attorney.

As noted, Mr. Geragos immediately joined Mr. Avenatti in pursuing Coach Franklin's claims.  Mr. Geragos initially took the lead, reaching out to his contact at Nike (the in-house lawyer in charge of internal investigations), and subsequently connecting with Nike's outside attorneys at Boies Schiller Flexner ("BSF"). Indeed, Mr. Geragos had many exchanges (by text, e-mail, and telephone) with Nike's in-house and outside lawyers in March 2019 in which Mr. Avenatti was not involved; conversely, Mr. Avenatti had one telephone call and two meetings with Nike's

outside lawyer, all jointly with Mr. Geragos (and a total of *zero* communications with them on his own).

Prior to the initial meeting with the Nike lawyers on March 19, 2019 – set up by Mr. Geragos and hosted by Mr. Geragos – Mr. Geragos well understood that among the client's goals were "justice" and to "expose" Nike's corruption, and Messrs. Geragos and Avenatti agreed that the terms they would present to Nike would include that they be jointly retained to conduct an internal investigation.  Mr. Geragos also understood – and indeed repeatedly communicated to Nike's attorneys – that Mr. Avenatti would not hesitate to use his platform to publicize his client's allegations of systemic corruption within Nike (to which, in his conversations with Nike, Mr. Geragos referred – not very cryptically – as Nike's "Adidas problem").

In both the March 19 and March 21 meetings, Messrs. Geragos and Avenatti were seated side-by-side and acted in lock-step as they presented the demand to Nike, including an internal investigation to be led by them, *together*. Mr. Geragos was also completely unfazed by the alleged "threat" to hold a press conference. Indeed, Mr. Geragos doubled down on it: when BSF attorney Scott Wilson requested the identity of the client and Mr. Avenatti initially hesitated (he provided it a short time later) and stated that he would hold a press conference and that the New York Times would publish the story "with or without the identity of my client," Mr. Geragos retorted to Mr. Wilson: "wouldn't the identity of the individuals at Nike drive the story?"  (Dkt. No. 30-15:4).

In the March 20 three-way phone call involving Messrs. Geragos, Avenatti and Wilson, Mr. Wilson repeatedly pressed for a price for the internal investigation.  They discussed how much an internal investigation might cost, with Mr. Wilson positing that "an investigation like this

[could] hit the $10 to 20 million range."[3] They discussed how the retainer would be papered and arranged as between the respective law firms of Mr. Geragos and Mr. Avenatti, with Mr. Geragos chiming in to note that "we can figure that out" and "that is hardly the speedbump here."[4]

In the March 21, 2019 meeting, and mindful of Mr. Wilson's estimate of a $10 to $20 million price tag for the investigation, Messrs. Avenatti and Mr. Geragos agreed that they would both be engaged. Mr. Avenatti proposed a "12 million-dollar retainer upon signing, evergreen. Um, that's going to be deemed earned when paid. We'll cap it at 25 million dollars, minimum of 15 million dollars unless the scope changes," with Mr. Geragos adding: "I anticipate that there would be a contract for, subcontract for a PI and things of that nature… There would be people on the ground to do interviews and things of that nature to bring along as witnesses." Mr. Geragos made clear that he and Mr. Avenatti had previous discussions about the internal investigation ("I was explaining to Michael beforehand…") and that it made sense for Messrs. Avenatti and Geragos to conduct the investigation together to ensure that it would not be a "whitewash" and to "ensure[] that we'll get to the bottom of it, it's not going to happen again." Mr. Geragos later added that it made sense for him personally to do the investigation because "they [Nike] do know me" and "I've dealt with them in sensitive situations which is why I picked up the phone and called." He concluded: "And if there's something that's going on there and it's more widespread than we even suspect, it would be a good idea, I think, to root it out and fix it."

---

[3] It is undisputed that Mr. Avenatti stated that the investigation would "cost what it costs" and also repeated multiple times that he and Mr. Geragos would conduct the investigation at whatever price that Mr. Wilson's firm would charge Nike.

[4] As in previous filings by Mr. Avenatti, quotes from the March 20 and March 21 recorded conversations are from the defense's working drafts and do not reflect any input from the government. The parties have now exchanged drafts of transcripts and are working toward an agreement on a final joint transcript for trial.

When Wilson asked for an alternative to the settlement proposal that Messrs. Avenatti and Geragos conduct the internal investigation, Messrs. Avenatti and Geragos caucused privately for approximately five minutes at Mr. Avenatti's request. They then together returned to the meeting room, where Mr. Avenatti announced that Nike could settle the case by *paying Coach Franklin* $22.5 million, *via a settlement agreement to be signed by Coach Franklin*. Mr. Avenatti stated that they would leave it to Nike to "hire Boies or whoever else they want to hire" to conduct its own internal investigation. Mr. Avenatti was also clear that he believed that at the end of that internal investigation, Nike would have to self-report. The BSF attorneys told Messrs. Avenatti and Geragos that Nike would make its counterproposal at a meeting to be held on March 25, 2019.

That counterproposal was never made; the meeting never happened. Instead of receiving the counter-offer he expected, Mr. Avenatti was arrested by federal agents. Recognizing the partnership between Messrs. Avenatti and Geragos, the government referred to Mr. Geragos in the criminal Complaint and original Indictment as "CC-1," and it initially charged Mr. Avenatti in a conspiracy for having worked together with "CC-1." Although the government decided to charge only Mr. Avenatti, it plainly then viewed Mr. Geragos as his confederate in the alleged extortionate conspiracy.

### B. **Mr. Geragos' Waiver of His Fifth Amendment Privilege**

Between April 8, 2019 and June 24, 2019, Mr. Geragos' attorneys proffered with the government on at least five occasions and Mr. Geragos himself met with the government on two occasions. The purpose for these proffers were (i) to proclaim Mr. Geragos' innocence and (ii █

█

█                                         *The significance of these proffers cannot be overstated.* The government had made its position clear that Mr. Geragos was a co-conspirator. The conventional

strategy in such a situation would have been for Mr. Geragos to remain silent and preserve all information to defend himself in the event that he might subsequently be charged.

Here, however, Mr. Geragos took a starkly different course – and there are consequences that flow from the path he chose.  Advised by highly experienced counsel at WilmerHale, Mr. Geragos made the considered decisions to waive his attorney-client privilege and, later, his Fifth Amendment privilege.  First, he allowed his attorneys to share his percipient observations regarding the events underlying the charges against Mr. Avenatti.  The novelty of Mr. Geragos' strategy – as well as the government's unusually high degree of interest in this matter – is highlighted by the fact that the final attorney proffer on behalf of Mr. Geragos was attended by the United States Attorney for the Southern District of New York himself; the Deputy United States Attorney; the Chief Counsel to the United States Attorney; the Chief of the Criminal Division; the two Chiefs of the Public Corruption Unit; and two line Assistant United States Attorneys.  *This alone is unique – if not unprecedented.*

Most extraordinary of all, on June 3 and June 24, 2019, Mr. Geragos attended meetings with government agents and lawyers (including, once again, some of the top brass at the United States Attorney's Office), known as "innocence proffers" – and successfully persuaded them of his innocence.  Mr. Geragos' decision, with WilmerHale's advice, flew in the face of conventional strategy for an individual then considered by the government to be a co-conspirator.  In so doing, Mr. Geragos explicitly waived all legal protections that he may have otherwise enjoyed, including his Fifth Amendment rights. Specifically, in the form innocence proffer agreement that he signed, Mr. Geragos agreed "*that he shall assert no claim under the United States Constitution, any statute, Rule 410 of the Federal Rules of Evidence, or any other federal rule, that such statements or any leads therefrom should be suppressed*" and that "*he is waiving any and all rights in the*

*foregoing respects*." (Emphasis added).  Over the course of these attorney and innocence proffers, Mr. Geragos made clear that: (i) he had no criminal intent; (ii) he had a reasonable expectation that there was "a claim of right" in this case; (iii) at no point did he feel he was crossing a line or doing anything wrong; (iv) he believed that he and Mr. Avenatti should insist upon an internal investigation; (v) Mr. Geragos had conducted a number of internal investigations for companies and it was not unusual for "remedial action" to be a part of a negotiated settlement; (vi) it also was not unusual in his practice for the attorney to be paid exponentially more than the client; (vii) in his previous negotiations with Nike on behalf of Colin Kaepernick, Geragos himself had threatened Nike that he would "expose treatment of Kaepernick if no deal"; and (viii) the meetings with Nike's attorneys were simply part of a standard negotiation involving proposals and counterproposals.[5]  The fact that Mr. Geragos, a highly respected criminal defense lawyer, was a full participant with Mr. Avenatti is relevant to Mr. Avenatti's state of mind and defense that it was not wrongful for him to insist upon an internal investigation – and to be paid for it -- as a component of the settlement of Coach Franklin's claims.



---

[5] These statements, and those that follow, are derived from notes taken at the attorney proffers and innocence proffers.

Understanding that the above-stated facts do not advance its case, the government now claims that Mr. Geragos' statements – *which were produced to the defense as* **exculpatory** *materials under Brady* – are not in fact as exculpatory as they appear on the four corners of the proffer notes.  The government goes so far as to tender that Mr. Geragos told the government that he expressed to Mr. Avenatti that Mr. Geragos was concerned that Mr. Avenatti had "'crossed a[ ] line'" – even supplying quotation marks to create the appearance that these words came out of Mark Geragos' mouth.  (Dkt. No. 118:18).  *They did not.* The only comments that were made about line-crossing were made by Mr. Geragos' attorneys in a meeting with USA Berman and a host of other executive and line prosecutors, in which the attorneys stated that "[a]t no point did Geragos feel he was crossing the line. Did not believe he was doing anything wrong."

Along the same lines, the government goes on to tell the Court that "Attorney-1 was concerned about and uncomfortable with the situation (and in particular the lump sum payment with no internal investigation to follow) which Attorney-1 believed may have become extortionate." (Dkt. No. 118:18-19). The government next states that, according to Mr. Geragos, "notwithstanding his expressed concern about a lump-sum payment," Mr. Avenatti then, "on video, demanded a lump-sum payment of $22.5 million to purchase his silence." *Id.* This, too, *did not happen*. According to the proffer notes, what Mr. Geragos apparently said at the proffers was that the individual who made him "uncomfortable" was BSF attorney Scott Wilson – not Mr. Avenatti – because he thought that Mr. Wilson was proposing that Nike make a lump-sum payment to them to buy their silence.  Nowhere in any of the attorney proffer or innocence proffer notes is there *any* indication that the discomfort was with Mr. Avenatti, and in fact, Mr. Geragos continued

to work with Mr. Avenatti to try to come to agreement with Nike.  Moreover, it is clear that Mr. Avenatti told Nike's lawyers that Nike would have to "self-report," and the draft settlement agreement prepared by Mr. Avenatti expressly did ***not*** restrict disclosure of the agreement in response to a request by a governmental body, nor did it limit the ability of either side to speak publicly about the underlying facts of the case.[6]  (Dkt. No. 30-17).

Finally, the government claims that Mr. Geragos stated that he told Mr. Avenatti that he "must inform his client. . . of Nike's offer [of the lump-sum payment], which the defendant said he would do (but did not, as demonstrated by evidence independent of Attorney-1)." (Dkt. No. 118:19). But this proffer by Geragos is exculpatory insofar as Mr. Avenatti *agreed* with Mr. Geragos that any settlement would require client approval. Toward that end, the draft settlement agreement that Mr. Avenatti prepared and provided to BSF left the amount of the settlement blank and contained two lines for Gary Franklin's signature.  (Dkt. No. 30-17:5).   In the end, Nike never made any offer, in any amount, of a lump-sum payment prior to Mr. Avenatti's arrest.  There was no offer to present to Coach Franklin.

It is important to note that at no point in his innocence proffers did Mr. Geragos provide new information that meaningfully distinguished his conduct from Mr. Avenatti's. Yet, when the government subsequently superseded the Indictment on November 13, 2019 (Dkt. No. 72), it removed entirely the conspiracy charges and all references to Mr. Geragos as "CC-1."  It even excised Mr. Geragos from the March 19, 2019 meeting altogether—alleging that the participants included the lawyers for Nike and Mr. Avenatti, but omitting Mr. Geragos' participation and even

---

[6] The entire theory of "buying" Mr. Avenatti's silence is misguided.  Mr. Avenatti had no affirmative duty to report Nike's conduct to anyone.  If any entity had such an obligation, it was Nike, and Mr. Avenatti clearly told Nike that it would have to do so, notwithstanding any civil settlement with Coach Franklin.

his very presence. The government's treatment of Mr. Geragos is a clear acknowledgement that it no longer views him as having criminal exposure related to this matter. Yet, Mr. Geragos, through counsel has confirmed that he will assert his Fifth Amendment privilege if called.  And, in what can only be viewed as a tactical maneuver in its prosecution of Mr. Avenatti, the government has informed counsel for Mr. Avenatti that it will not immunize Mr. Geragos "at this time."

As set forth above, and among many other things, Mr. Geragos – a trusted counselor to Mr. Avenatti and a renowned criminal defense attorney with relevant experience in conducting internal investigations and in negotiating with Nike – initiated the discussions with Nike, insisted upon the internal investigation, endorsed the proposed fee structure for the internal investigation, and continued to participate in the settlement negotiations.  Moreover, Mr. Geragos' testimony would establish that the proposed internal investigation would have been thorough, comprehensive, and appropriately staffed, and that they would have worked for every penny they earned. For these and other reasons, Mr. Geragos' testimony will be exculpatory to Mr. Avenatti and thus critical to Mr. Avenatti's defense.

### III.     LEGAL STANDARDS

#### A.     The Court May Compel A Witness to Testify Whose Invocation of the Fifth Amendment is Not Justified

The Sixth Amendment grants Mr. Avenatti "compulsory process for obtaining witnesses in his favor." U.S. Const. Amend VI.  The right of a defendant to compulsory process to obtain witnesses for the defense is also a component of due process under the Fifth Amendment. *See*, *e.g., Washington v. Texas*, 388 U.S. 14, 19 (1967) ("The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies . . . is a fundamental element of due process of law.").While

witnesses may invoke their privilege against self-incrimination under the Fifth Amendment, any

such invocation must be legally and factually supported. Generally, "where there can be no further

incrimination, there is no basis for the assertion of the privilege." *Mitchell v. United States,* 526

U.S. 314, 326, 119 S. Ct. 1307, 1314, 143 L. Ed. 2d 424 (1999).  Instead, a witness may invoke

the Fifth Amendment only "when the individual has reasonable cause to apprehend that answering

the question will provide the government with evidence to fuel a criminal prosecution." *Carrier v.*

*Micha, Inc.,* No. 06 Civ. 4699 (DC), 2008 WL 2061386, at *2 (S.D.N.Y. May 12, 2008) (internal

quotation omitted).

Invocation of the Fifth Amendment "protection must be confined to instances where the

witness has reasonable cause to apprehend danger from a direct answer. The witness is not

exonerated from answering merely because he declares that in so doing he would incriminate

himself—his say-so does not of itself establish the hazard of incrimination." *Hoffman v. United*

*States*, 341 U.S. 479, 486, 71 S. Ct. 814, 818, 95 L. Ed. 1118 (1951) (internal quotation and citation

omitted).  Rather, "[i] t is for the court to say whether his silence is justified, and to require him to

answer if it clearly appears to the court that he is mistaken. The trial judge in appraising the claim

must be governed as much by his personal perception of the peculiarities of the case as by the facts

actually in evidence." *Id.* at 487; *see also United States v. Barile*, No. 1:06-MC-137 (LEK), 2007

WL 3534261, at *2 (N.D.N.Y. Nov. 13, 2007) ("the judge's perception of the facts come into play

as he assesses the credible basis of the party's invocation of the right"); *Hansen v. Wwebnet, Inc.*,

No. 1:14-CV-2263 (ALC), 2017 WL 1032268, at *2 (S.D.N.Y. Mar. 16, 2017).

The witness claiming the privilege has the burden of demonstrating that he is "confronted

by substantial and 'real,' and not merely trifling or imaginary, hazards of incrimination." *United*

*States v. Apfelbaum*, 445 U.S. 115, 128, 100 S. Ct. 948, 956, 63 L. Ed. 2d 250 (1980) (internal

quotation and citation omitted). The witness must, therefore, "offer tangible evidence that they are truly exposed to further prosecution" to substantiate their entitlement to plead the Fifth Amendment.   The danger of self-incrimination must be real, not remote or speculative. *See Zicarelli v. New Jersey State Comm'n of Investigation*, 406 U.S. 472, 478, 92 S. Ct. 1670, 1675, 32 L. Ed. 2d 234 (1972). The revealed information must "furnish a link in the chain of evidence needed to prosecute." *Hoffman*, 341 U.S. at 486.

Once a witness invokes the Fifth Amendment, that claim is subject to pressure-testing by the court.  The court may compel a witness' testimony "if it clearly appears he is mistaken as to the justification for the privilege or is advancing his claim as a subterfuge." *U.S.S.E.C. v. Militano*, No. 89 Civ. 0572 (JFK), 1991 WL 270116, at *3 (S.D.N.Y. Dec. 9, 1991) (internal quotation and citation omitted).   "When the danger [of self-incrimination] is not readily apparent from the implications of the question asked or the circumstances surrounding the inquiry, the burden of establishing its existence rests on the person claiming the privilege." *Estate of Fisher v. Comm'r of Internal Revenue*, 905 F.2d 645, 6449 (2d Cir. 1990) (the court determines whether "the danger of self-incrimination is real, not remote or speculative"). In conducting the necessary inquiry, "[a] judge must determine, 'from the implications of the question, in the setting in which it is asked, whether a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result.'" *OSRecovery, Inc., v. One Groupe Intern., Inc.*, 262 F.Supp.2d 302, 305 (S.D.N.Y. 2003) (internal quotation and citation omitted).

### B.   The Court May Dismiss an Indictment Where the Government's Refusal to Immunize a Witness Violates a Defendant's Right to Due Process

Where a witness satisfies the Court that he or she has a valid Fifth Amendment right to assert, the government has the ability to moot a proper invocation by exercising its discretion to

seek a compulsion order to immunize the witness.  *See* 18 U.S.C. §§ 6001-6003.  The statutory grant of use and derivative use immunity fully extinguishes a Fifth Amendment claim of privilege.  *Kastigar,* 406 U.S. at 453. While the decision to immunize typically lies within the discretion of the government, the federal Courts of Appeal have widely acknowledged that due process may require a court to compel the government to choose between granting immunity for an essential defense witness or facing dismissal of the charges (or entry of a judgment of acquittal). *See United States v. Quinn,* 728 F.3d 243, 251-52 (3d Cir. 2013) (collecting cases). The Second Circuit repeatedly has held that while such cases are unusual, such a remedy may be in order when, first, the "government has used immunity in a discriminatory way, has forced a potential witness to invoke the Fifth Amendment through overreaching, or has deliberately denied immunity for the purpose of withholding exculpatory evidence and gaining tactical advantage through such manipulation." *United States v. Ebbers*, 458 F.3d 110, 119 (2d Cir. 2006) (internal quotation marks and citations omitted). Second, the defendant must also "show that the evidence to be given by an immunized witness will be material, exculpatory and not cumulative and is not obtainable from any other source." *Id.  See also United States v. Bahadar*, 954 F.2d 821, 826 (2d Cir. 1992); *Blissett v. Lefevre*, 924 F.2d 434, 442 (2d Cir. 1991).

Courts will scrutinize efforts by the government to "distort[] the fact-finding process" by taking actions that result in critical witnesses invoking Fifth Amendment privileges.  *See United States v. Lord*, 711 F.2d 887, 891 (9th Cir. 1983).  Moreover, if the Court determines that the government caused a witness to invoke in a manner that frustrated a defendant's Due Process rights, a court may threaten the government with entering a judgment of acquittal unless the prosecution invokes §§ 6002-6003 to secure the testimony of recalcitrant but necessary witnesses. *Id*. at 892; *cf. United States v. Straub*, 538 F.3d 1147, 1162 (9th Cir. 2008) (for a defendant to

compel use immunity, he must show relevance and that either (a) the prosecution intentionally caused a distortion of the fact-finding process, or (b) the prosecution's actions had the effect of "so distorting the fact-finding process that the defendant was denied his due process right to a fundamentally fair trial" by selective grant of immunity).

## IV.   ARGUMENT

### A.  Mr. Geragos Must Be Made Available to Testify in Mr. Avenatti's Defense

It is clear enough that the government has credited Mr. Geragos' innocence and attorney proffers and that it has exonerated him. Its refusal to formally immunize him should not excuse Mr. Geragos from his obligation to testify in this case. Mr. Geragos long ago waived his Fifth Amendment privilege and the government's exoneration of him mooted any privilege he may otherwise have enjoyed.

### 1.    Because Mr. Geragos Has No Credible Fear of Prosecution, And His Truthful Testimony Will Not Incriminate Him, He Must Be Compelled to Testify

Here, the Court is presented with a truly unique circumstance, in which fundamental fairness and due process require Mr. Geragos' testimony.  *Mr. Geragos has waived his Fifth Amendment privilege* to disclaim any criminal responsibility based on the conduct initially alleged, and *the government has accepted Mr. Geragos' claim of innocence.*  The Court need not guess as to the potential exposure Mr. Geragos may have regarding the conduct at the heart of the charges faced by Mr. Avenatti.  Mr. Geragos waived all legal protections that he may have otherwise enjoyed and submitted himself to unprivileged innocence proffers with the prosecutors in this case. Mr. Geragos' fully informed decision to proceed, especially in light of the public allegations at the time implicating him in the conduct underlying the Complaint and initial Indictment, was highly unusual – and it paid off.  Mr. Geragos did so knowing full well that his statements would be used

against him by the government if it did not credit his claim of innocence.  While it is true that "a waiver of the privilege in one proceeding does not affect the rights of a witness or the accused in another independent proceeding," *United States v. Miranti*, 253 F.2d 135, 139 (2d Cir. 1958), the important point is that the government has credited Mr. Geragos' claims of innocence in those unprotected proffers.  Even though the government has not issued a formal declination or agreement not to prosecute, the government has obviously decided not to prosecute him, publicly removing previously inculpatory references to him from its charging instruments.

Should Mr. Geragos persist in his invocation of the Fifth Amendment against this backdrop, the Court can and should assess the validity of his invocation.  Mr. Avenatti respectfully submits that the record before the Court – Mr. Geragos' previous waivers of his privileges and the government's rare implicit concession in its publicly-filed superseding Indictment exonerating Mr. Geragos – form a sufficient predicate for the Court to reject Mr. Geragos' invocation and compel his testimony.

### 2.   Alternatively, the Government Should Immunize Mr. Geragos or Face Dismissal of the Charges Against Mr. Avenatti

Against this backdrop, the government's tactical refusal to immunize Mr. Geragos would "distort the fact-finding process" to such a degree as to compel dismissal of the Indictment.  Here, where Mr. Geragos is unquestionably the critical defense witness at trial – the partner who worked side by side with Mr. Avenatti in implementing the settlement strategy in question and the fee structure proposed – his absence will leave the jury with an incomplete picture of the facts necessary to assess fairly the allegations against Mr. Avenatti.  The government's theory is that threatening a press conference while also demanding payment for oneself to conduct an internal investigation was*, ipso facto*, extortion.  Mr. Geragos was lock-step with Mr. Avenatti on both fronts.  Yet, Mr. Geragos, a seasoned criminal defense lawyer, expressed no reservations to Mr.

Avenatti about that combination of acts and never felt that such conduct crossed the line.  This evidence is highly relevant to Mr. Avenatti's state of mind.  If the Court determines that it will not compel Mr. Geragos to testify, it can and should determine that Mr. Avenatti's right to due process will be violated unless either (i) the government immunizes Mr. Geragos, or (ii) the Indictment against Mr. Avenatti is dismissed.  As other courts have done in similarly unusual circumstances, this Court may offer the government the choice of begrudgingly immunizing Mr. Geragos or foregoing its prosecution of Mr. Avenatti. *See, e.g., Lord*, 711 F.2d at 891-92.

Under the Second Circuit's two-part test, a defendant seeking compelled immunity also must show that the evidence to be given by an immunized witness "will be material, exculpatory and not cumulative and is not obtainable from any other source." *Burns,* 684 F.2d at 1077. In that regard, exculpatory evidence is material when it "tends to show that the accused is not guilty." *United States v. Gil,* 297 F.3d 93, 101 (2d Cir. 2002) (citing *In re United States (Coppa),* 267 F.3d 132, 139 (2d Cir. 2001)).  "The bottom line at all times is whether the non-immunized witness's testimony would materially alter the total mix of evidence before the jury." *Ebbers*, 458 F.3d at 119 (internal quotations and citations omitted).  Mr. Geragos' projected testimony is both material and exculpatory: as set forth in detail above, it would, at a minimum, create reasonable doubt about Mr. Avenatti's state of mind with respect to the alleged extortion scheme.

Nor would Mr. Geragos' testimony be cumulative.  Indeed, its absence would leave critical and conspicuous gaps in the defense.  Because Mr. Geragos was Mr. Avenatti's partner in this matter, Mr. Geragos is the only witness who can provide the jury with critical factual and state-of-mind testimony.  In short, Mr. Geragos' testimony is material, exculpatory, non-cumulative, and

unobtainable from any other source, and its exclusion from trial would distort the fact-finding process to such an extent as to violate Mr. Avenatti's constitutional rights.

## V.    CONCLUSION

Because no privilege or other reason exists to warrant Mr. Geragos' avoidance of the subpoena and its obligations, Mr. Geragos must be compelled to testify. In the alternative, the government should be forced to choose between immunizing Mr. Geragos or facing dismissal of the Indictment.

Dated:    New York, New York                          Respectfully submitted,
          January 17, 2020

                                                      /s/
                                                      Scott A. Srebnick
                                                      SCOTT A. SREBNICK, P.A.
                                                      201 South Biscayne Boulevard
                                                      Suite 1210
                                                      Miami, FL 33131
                                                      Telephone: (305) 285-9019
                                                      Facsimile: (305) 377-9937
                                                      E-Mail: Scott@srebnicklaw.com

                                                      /s/
                                                      Jose M. Quinon
                                                      JOSE M. QUINON, P.A.
                                                      2333 Brickell Avenue, Suite A-1
                                                      Miami, FL 33129
                                                      Telephone: (305) 858-5700
                                                      Facsimile: (305) 358-7848
                                                      E-Mail: jquinon@quinonlaw.com

                                                      /s/
                                                      E. Danya Perry
                                                      PERRY GUHA LLP
                                                      35 East 62nd Street
                                                      New York, New York 10065
                                                      Telephone: (212) 399-8340
                                                      Facsimile: (212) 399-8331
                                                      E-mail: dperry@perryguha.com

                                                      *Attorneys for Defendant Michael Avenatti*

**CERTIFICATE OF SERVICE**

I, Scott A. Srebnick, hereby certify that on January 17, 2020, I caused a true and correct copy of the foregoing to be served by electronic means, via the Court's CM/ECF system, on all counsel registered to receive electronic notices.

/s/ Scott A. Srebnick
Scott A. Srebnick
