LAW OFFICES
# SCOTT A. SREBNICK, P.A.

SCOTT A. SREBNICK*
* ALSO ADMITTED IN NEW YORK

201 S. Biscayne Boulevard
Suite 1210
Miami, Florida 33131

Tel: 305-285-9019
Fax: 305-377-9937
E-mail: scott@srebnicklaw.com
www.srebnicklaw.com

January 24, 2020

**Via ECF**
Honorable Paul G. Gardephe
United States District Judge
Thurgood Marshall U.S. Courthouse
40 Foley Square
New York, NY 10007

Re:   *United States v. Avenatti*, No. S1 19 Cr. 373 (PGG)
      **Letter Motion to Exclude Certain Evidence and Arguments
      and to Admit Evidence of Colin Kaepernick's Name**

Dear Judge Gardephe:

Pursuant to Rules 402, 403, and 404(b), Mr. Avenatti respectfully moves the Court to exclude certain evidence and to preclude the government from referring to this evidence in its opening statement, pending the Court's ruling on this motion. Mr. Avenatti also moves the Court to permit him to reference Colin Kaepernick's name during the trial as it is a relevant part of the evidence in this case.

### 1. Excluding certain search history and web results (GX 119, 126, 127)

The government has listed a number of exhibits as "Avenatti Search History" and as "Avenatti Web History." These exhibits were obtained by the government from Mr. Avenatti's Apple iCloud account. In its draft summary exhibit, the government included the following specific search terms and web history, among others:

- Google search for "nike put options" on March 10, 2019 (GX 126 & S6)
- Visit to website "Nasdaq.com – Nike, Inc. (NKE) Option Chain on March 10, 2019 (GX 126 & S6)
- Google searches related to "insider trading" on March 10, 2019 (GX 119, 127 & S6)

This evidence of Mr. Avenatti's internet searches in **GX 119, 126, and 127** is irrelevant, and the unfair prejudice from its introduction would substantially outweigh any probative value. The obvious implication is that Mr. Avenatti illegally traded in Nike stock based upon information obtained from Coach Franklin. That did not happen, the government has no evidence that it did, and Mr. Avenatti is not charged with insider trading. The government also never gave notice under Rule 404(b) that it would seek to offer evidence that Mr. Avenatti

1

researched "insider trading." Ironically, the government has urged that the court preclude the defense from introducing certain search terms and results (such as the David Boies article discussed at length at the January 22, 2020 conference) in its case based on a Rule 403 analysis; presumably, it would apply that same reasoning to these search terms. In short, there is no probative value to such evidence and, it goes without saying, there is substantial danger of unfair prejudice. We respectfully request that it be excluded.

### 2. Excluding evidence relating to post-arrest outreach by Coach Franklin's new counsel

Within the torrent of newly produced materials, the government has included a March 27, 2019, letter sent by Michael Proctor, a lawyer for Gary Franklin, to Mr. Avenatti's email address after Mr. Avenatti's arrest. (See GX 313, attached to Dkt. No. 205 as Exh. I). Mr. Avenatti did not respond and there is no evidence that Mr. Avenatti saw that letter. Moreover, the letter is a self-serving statement by an attorney for Coach Franklin, who, by the time the letter was sent was of course well aware of Mr. Avenatti's arrest and was doubtlessly motivated to distance himself at that point. And the letter is classic hearsay for which no exception applies. Accordingly, Mr. Avenatti requests that it be excluded.

### 3. Excluding Argument that Mr. Avenatti demanded payment in exchange for his "silence"

The Superseding Indictment alleges that Mr. Avenatti demanded to be paid a large sum of money, or "[a]lternatively, and in lieu of such a retainer, AVENATTI demanded a total payment of $22.5 million from Nike to resolve any claims that Client-1 might have and to buy AVENATTI's silence." (Dkt. No. 72 at ¶ 1). The only conceivable support for that allegation is Mr. Avenatti's remark at the March 21 meeting, in which he stated: "If [Nike] wants to have one confidential settlement and we're done, they can buy that for twenty-two and a half million dollars and we're done. . . Full confidentiality, we ride off into the sunset." (*Id.* at ¶ 14(d)). In a press release issued upon Mr. Avenatti's arrest, FBI Assistant Director in Charge Sweeney stated: "[a]s alleged, Michael Avenatti approached Nike last week with a list of financial demands in exchange for covering up allegations of misconduct on behalf of the company." (Dkt. No. 30-1). To the extent that the government seeks to argue that Mr. Avenatti sought money in exchange for his "silence," the defense objects on both the law and the facts and seeks to preclude such argument.

As a threshold matter, Mr. Avenatti never promised silence *from the authorities* and, more importantly, never agreed to prohibit Nike from reporting the misconduct to the authorities. To the contrary, when Mr. Wilson asked, in the March 21 meeting, "[i]f the money went higher, could we do it all under one civil settlement?" (See draft tr. of 3/21/19 meeting at 19, provided to the Court by the government today), Mr. Avenatti made clear that Nike was "gonna have to do an internal investigation" in any event and that it would "have to self-report." (*Id.* at 19-20, 27). Moreover, the draft settlement that Mr. Avenatti provided to BSF contained a completely garden-variety confidentiality provision providing that "nothing herein shall restrict the disclosure of this Agreement and its terms . . . in connection with responding

2

to a lawfully issued subpoena or request by a governmental body." (GX 205). Even more to the point, however: there is simply nothing wrong with this, and the government should not be permitted to argue or insinuate that there is. Mr. Avenatti and Coach Franklin had absolutely no legal or ethical obligation to disclose any information about Nike's misconduct to authorities. *See United States v. Potik,* No. 17 Cr. 232 (AKH), 2017 WL 4315011, at *3 (S.D.N.Y. 2017) (citing "legal presumption that ordinary citizens do not have an affirmative obligation to report crimes that they become aware of"). Parties alleging misconduct settle matters every day with confidentiality provisions. There is nothing wrong with that, and the government should not be permitted to argue or even imply that there is.

### 4. Excluding Evidence of Post-arrest texts and tweets

Mr. Avenatti has moved to preclude the government from offering evidence of two texts sent by Mr. Auerbach to Mr. Avenatti following his arrest that he did not receive, as well as evidence of a number of tweets that Mr. Avenatti posted after his arrest. (Dkt. No. 197). In its reply to the defense's motion, the government states that the post-arrest texts "are highly probative evidence of Mr. Auerbach's then-existing state-of-mind and of the nature and content of the conversations" with Mr. Avenatti. (Dkt. No. 205:2). First, it is hard to take this argument seriously when only one day earlier, government counsel stated that "the only state of mind relevant to this trial is the gentleman behind me, Mr. Avenatti, not Mr. Franklin, not Mr. Auerbach, no one else. So we don't agree with the principle that what Mr. Auerbach was thinking or what Mr. Franklin was thinking matters, unless it was shared in some form with Mr. Avenatti." (1/22/20 tr. at 83). While this statement is mistaken as a matter of law, here, the fact remains that (i) Mr. Auerbach sent them after Mr. Avenatti's arrest and certainly after he was aware that the FBI had paid a visit to Mr. Franklin's home, and therefore his state of mind *at that time* has no bearing on what his state of mind was at the meetings with Mr. Avenatti, and (ii) Mr. Avenatti had not seen the text messages in question and therefore they can also have no bearing on *his* state of mind.

With respect to the post-arrest tweets, the government once again professes an inability to comprehend another of Mr. Avenatti's arguments, claiming that his relevance argument is "nonsensical." (Dkt. No. 205:3). The government claims that the post-arrest tweets are "highly relevant" to Mr. Avenatti's intent. Respectfully, *that* argument makes no sense. Notably, the defense does not seek to preclude Mr. Avenatti's pre-arrest tweets. But while the post-arrest tweets might be probative of his state of mind *after* his arrest, they speak not at all to his state of mind *during the time of the charged conduct*, and it is obvious that his mental state would have differed a great deal from one time to the other, especially after the FBI arrested him and USA Berman had a very public media campaign to trumpet the arrest. In short, the post-arrest tweets fail a simple Rule 403 balancing test and should be excluded.

### 5. Excluding Evidence of the Amount Demanded for the Internal Investigation

At the pretrial conference on Wednesday, January 22, 2020, the parties discussed whether the range allegedly demanded by Mr. Avenatti at the March 21, 2019 meeting to conduct the internal investigation ($15-25 million) was relevant. (Tr. 1/22/20, at pp. 124-31).

3

The Court itself noted that "this case doesn't turn on the amount sought to conduct an internal investigation. I don't think that's what the charges are about. The charges are about, and what the government needs to prove, is that Mr. Avenatti made these demands for, could have been any amount of money, without the knowledge and consent of his client." (Tr. 1/22/20, at p.124). The government agreed. (Tr. 1/22/20, at p.126). Accordingly, Mr. Avenatti orally proposed a motion *in limine* to exclude evidence of the amounts demanded as being irrelevant. (Tr. 1/22/20, at p.127). We formally make that motion now in view of the discussion at the pretrial conference.

### 6. Admission of References to Colin Kaepernick

The government has moved to exclude references to the name "Colin Kaepernick" in the defense's opening statement. At the conference held on January 22, 2020, the Court stated that, while its preference was to omit a reference to Mr. Kaepernick's specific name based on "the understanding that it's not on the tape the jury is going to hear anyway," the Court told the defense that "if you're insistent on using the name and it's going to be on a tape that's going to come into evidence, I'll revisit the issue." (1/22/20 tr. at 149). The defense stated that it would "check the transcript" and revert to the Court.

Having now reviewed the evidence, we can report back to the Court that Mr. Kaepernick's name does indeed come up in the government's evidence a number of times. First, in a March 15, 2019 call between Mr. Geragos and BSF attorneys, Mr. Wilson informed Mr. Geragos that Nike in-house attorney Rob Leiwand would attend the meeting on March 19 and noted (according to notes taken by a BSF lawyer on the call): "You probably knew of him from the Kaepernick discussion." (*See* notes of 3/15/19 call, attached hereto as **Exhibit A**). Mr. Geragos confirmed this. Mr. Geragos later stated: "Avenatti came to me because he knew of my Colin representation. Most people's perception is that that was a win on both sides." Likewise, in the March 19 meeting, Mr. Geragos stated (according to notes drafted by a BSF lawyer at the meeting) that he had "seen documents implicating Nike that were concerning" and that "I thought that Nike did the 'right thing' in dealing with Colin Kaepernick." (*See* Dkt. No. 30-15: 4). Finally, Mr. Geragos made a more veiled referenced to Mr. Kaepernick during the March 21 meeting. In response to Mr. Wilson's statement that it was a "sensitive thing" for Nike to undertake the "separate hiring of attorneys they don't know," Mr. Geragos rejoined: "First of all they do know me. Second of all, I dealt with them in sensitive situations, uh, which is why I picked up the phone and called – in situations where they did not want a certain story to be told…". (See draft tr. of 3/21/19 meeting at 22, provided to the Court by the government today). We expect that the BSF attorneys will testify that they understood the "sensitive" situation to refer to the Kaepernick negotiation, so his name necessarily will come up once again. In short, Mr. Kaepernick's name will be featured in the main pieces of evidence that will be introduced by the government.

Beyond that, it is important to Mr. Avenatti's defense that the jury understand the true nature of Mr. Geragos' relationship with Nike. It is precisely because Mr. Geragos was a

known quantity to Nike, having resolved a case *as sensitive as Kaepernick's* with Nike, that Mr. Avenatti approached Mr. Geragos, believing that Nike would trust a lawyer as serious as Mr. Geragos (together with Mr. Avenatti) to conduct a legitimate investigation. It is not enough for Mr. Avenatti to be able to argue that Mr. Geragos represented an unnamed high-profile football player. Many lawyers and agents represent "high-profile players" in negotiations with Nike. Kaepernick's case was different; the fact that Mr. Avenatti enlisted Mr. Geragos to conduct the investigation proves that Mr. Avenatti intended it to be a serious investigation, thereby rebutting the argument that the government intends to advance that Mr. Avenatti was engaging in a pure shakedown and that Nike was going to receive no services in return. *See* Tr. 1/22/20, at p.128 (AUSA Richenthal "We are going to argue, because I think it's relevant to his mental state or to put a fine point on it, was this really an ask for an internal investigation or was it just an ask for a payoff."). Significantly, the government has not articulated any real prejudice to the government that would result if the jury learned that Mr. Geragos represented Kaepernick. There is no prejudice and the jury should be able to hear it. The government's motion to exclude should be denied.

    Respectfully,

    /s/ Scott A. Srebnick
    Scott A. Srebnick
    Jose M. Quinon
    E. Danya Perry

Privileged & Confidential
Attorney Work Product

### Notes of March 15, 2019 Call with Mark Geragos

**Participants:** Scott Wilson (BSF), Valecia Battle (BSF), Mark Geragos

**Time:** Approximately 10:15 a.m. EST.

These notes were drafted by Ms. Battle on 3/15/19. These notes are not a verbatim transcript.

Mr. Wilson called Mr. Geragos at (917) 558-2150 around 10:15 a.m. EST. The call was not answered and the following message was left.

Mr. Wilson: Hi Mark. It's Scott at Boies. (212) 446-2370. Happy to speak as soon as you're available.

Mr. Wilson then received a message from Mr. Geragos that he would call back.

Mr. Geragos returned the call around 11:42 a.m. EST.

**Time:** Approximately 11:42 a.m. EST.

Mr. Wilson: Hi Mark. This is Scott. How was mediation?

Mr. Geragos: I'm still in it. Had some time; thought I'd give you a buzz.

Mr. Wilson: My colleague Valecia Battle is also in the room. You wanted to meet on Tuesday?

Mr. Geragos: If you could make Tuesday, you and Nike will thank me. Could make an issue. That's as strongly as I will put it.

Mr. Wilson: Okay. That's as strongly as you will put it? Since you feel so strongly, we will come to your office.

Mr. Geragos: (Laughter) I've come to yours, so you can come to me, and Avenatti will bring what he showed me.

Mr. Wilson: It will be me and Robert Leinwand, a VP at Nike. You probably knew of him from the Kaepernick discussions.

Mr. Geragos: I do. I do. Perfect.

Mr. Wilson: Let me ask this: Is Avenatti the client? According to Google, you represented him in some personal matters, and that can be wrong, but…

Mr. Geragos: Yes, I previously represented Avenatti, but no, there is another client. Avenatti came to me because he knew of my Colin representation. Most people's perception is that that was a win on both sides. I teased Casey [dropped off]

Produced Subject to FRCP 6(e)
FOIA Confidential Treatment Requested

NCBB-5000046

USAO373_00026217

Privileged & Confidential<br>Attorney Work Product

Mr. Wilson: I'm sorry Mark. Could you repeat that? You broke up a bit.

Mr. Geragos: I said it was shocking that the ad agency got the credit when everyone knows it was Gino.

Mr. Wilson: Yeah, those publications exist to blow smoke….

Mr. Geragos: (Laughter) Yeah, blow smoke like legal industry publications

Mr. Wilson: So you demanded we meet on Tuesday. What time works for you on Tuesday?

Mr. Geragos: I have an appearance in Brooklyn at 4:00, so 12:00 or 1:00.

Mr. Wilson: Do you need to ask Avenatti?

Mr. Geragos: No, he will have to rearrange his schedule. He already knew Tuesday would be hard for me.

Mr. Wilson: Okay, so let's say 12:00, so you can make it to court. At your office?

Mr. Geragos: Yes, 256 5th Ave.

Mr. Wilson: So I am extending you the courtesy of bringing my client. Who is the client on your end? Will he be there?

Mr. Geragos: You will meet Avenatti and me. The client is someone who is on the receiving end.

Mr. Wilson: Receiving end?

Mr. Geragos: From Nike

Mr. Wilson: I am not sure what you're meaning, and I understand you are trying…

Mr. Geragos: Yes, I am trying to be discreet.

Mr. Wilson: Okay. We will see you on Tuesday.

The call ended.

# # #

Produced Subject to FRCP 6(e)
FOIA Confidential Treatment Requested

NCBB-5000047

USAO373_00026218