UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| -against- | **MEMORANDUM OPINION & ORDER** |
| MICHAEL AVENATTI, | |
| Defendant. | (S1) 19 Cr. 373 (PGG) |

PAUL G. GARDEPHE, U.S.D.J.:

On January 17, 2020, Defendant Avenatti moved to compel the testimony of Mark Geragos at trial.  (Jan. 17, 2020 Def. Mot. (Dkt. No. 168))  Avenatti asks the Court to rule that Geragos may not assert a Fifth Amendment privilege at trial.  In the alternative, Avenatti asks this Court to order the Government to seek an immunity order for Geragos, on pain of having the (S1) Indictment dismissed.  (Def. Br. (Dkt. No. 169) at 2-5)[1]

Avenatti summarizes his arguments as follows:

Over the course of several days in March 2019, two attorneys met with Nike's outside lawyers in an effort (so they thought) to negotiate a settlement on behalf of a client.  One of those attorneys was Michael Avenatti, who has been charged in this case; the other was Mark Geragos, who has not been charged and – importantly, for the purposes of this motion – never will be.

Mr. Geragos initially also had been under investigation by the government, until he was able to persuade prosecutors of his innocence.  In two "innocence proffer" meetings with the government last June, Mr. Geragos waived any and all privileges that he enjoyed, including his Fifth Amendment privilege.  In those proffers, Geragos – explicitly and in writing – waived his right against self-incrimination in exchange for the opportunity to speak with the government, rebut its characterization of him as an unindicted co-conspirator in the criminal complaint and initial indictment, and proclaim his innocence.  Mr. Geragos'[s] gambit proved successful:  the government subsequently amended its allegations against Mr. Avenatti to withdraw the allegations of a conspiracy involving the joint conduct of Mr. Geragos and Mr. Avenatti.

---

[1] Citations to page numbers of docketed materials correspond to the pagination generated by this District's Electronic Case Filing ("ECF") system.

Mr. Geragos has provided information to the government that is exculpatory both as to him and as to Mr. Avenatti.[]  Having served Geragos with a trial subpoena, Mr. Avenatti seeks to compel Mr. Geragos to provide the jury with that same exculpatory information.  Mr. Geragos'[s] response has been that he will invoke his Fifth Amendment privilege and refuse to testify.  Under the sui generis circumstances of this case, there is no merit to Mr. Geragos'[s] attempt to assert his Fifth Amendment privilege.  First, Mr. Geragos . . . knowingly waived all privileges and elected to provide information to the government about his own conduct and Mr. Avenatti's conduct.  Second, the government has credited Mr. Geragos'[s] claim of innocence, thereby extinguishing any theoretical claim of privilege.

. . . .

The government can resolve this issue without requiring the Court to [rule on Geragos's Fifth Amendment privilege] by simply seeking an Order compelling Mr. Geragos under 18 U.S.C. § 6002, thereby granting Mr. Geragos immunity co-extensive with any Fifth Amendment privilege he may claim.  Doing so would formalize what the government has already done.  Having walked away from its prior characterization of Mr. Geragos as a "co-conspirator" in the superseding Indictment against Mr. Avenatti, the government's current refusal to seek an Order immunizing him can only be seen as unfair gamesmanship in its quest to convict Mr. Avenatti.

(Jan. 17, 2020 Def. Br. (Dkt. No. 169) at 2-4)

Avenatti contends that, pursuant to the Due Process Clause, the Court must either compel Geragos to testify, or direct the Government to obtain an immunity order for Geragos. Failing such action, the charges against Avenatti should be dismissed.  (Id. at 2, 20 (citing United States v. Lord, 711 F.2d 887, 891-92 (9th Cir. 1983)))

## BACKGROUND

### I.  TREATMENT OF GERAGOS IN CRIMINAL COMPLAINT AND ORIGINAL INDICTMENT

A criminal complaint was filed against Avenatti on March 24, 2019.  (Cmplt. (Dkt. No. 1))  The Criminal Complaint contains four charges:  conspiracy to transmit interstate communications with intent to extort; conspiracy to commit extortion; transmission of interstate communications with intent to extort; and extortion.  (Id. at ¶¶ 1-6)  In the two conspiracy

2

counts, the Government references two conspirators: "AVENATTI and a co-conspirator not named as a defendant herein ('CC-1')." (See, e.g., id. at ¶¶ 2, 4 (emphasis in original)) It is undisputed that the uncharged conspirator referenced by the Government in the Criminal Complaint is Mark Geragos. (See, e.g., Def. Br. (Dkt. No. 29) at 10; Govt. Br. (Dkt. No. 172) at 4) In the Criminal Complaint, the Government describes Geragos as "an attorney licensed to practice in the state of California, and [like Avenatti], known for representation of celebrity and public figure clients." (Id. at ¶ 9(b))

The Criminal Complaint presents Geragos as a full and active participant in the charged extortion conspiracies, and a potential beneficiary of the extortion. For example, the Complaint alleges that

> AVENATTI and a co-conspirator not named as a defendant herein ("CC-1") devised a scheme to extort a company by means of an interstate communication by threatening to damage the company's reputation if the company did not agree to make multi-million dollar payments to AVENATTI **and CC-1**, and further agree to pay an additional $1.5 million to a client of AVENATTI's" (Cmplt. (Dkt. No. 1) at ¶ 2) (emphasis added);

> On or about March 19, 2019, in Manhattan, MICHAEL AVENATTI, the defendant, **and CC-1** met with attorneys for NIKE, Inc. ("Nike") and threatened to release damaging information regarding Nike if Nike did not agree to make multi-million dollar payments to AVENATTI **and CC-1** . . . (id. at ¶ 3(a)) (emphasis added);

> On or about March 20, 2019, AVENATTI **and CC-1** spoke by telephone with attorneys for Nike, during which AVENATTI stated, with respect to his demands for payment of millions of dollars, that if those demands for payment were not met "I'll go take ten billion dollars off your client's market cap . . . (id. at ¶ 3(b)) (emphasis added);

> In or about March 2019. . . . on an interstate telephone call, AVENATTI **and CC-1** used threats of economic harm in order to obtain multi-million dollar payments from Nike to AVENATTI **and CC-1** . . . (id. at ¶ 4) (emphasis added);

> . . . AVENATTI, the defendant, **and CC-1** used threats of economic and reputational harm to extort Nike, a multinational corporation engaged in, among other things, the marketing and sale of athletic apparel, footwear and equipment.

3

Specifically, AVENATTI threatened to hold a press conference on the eve of Nike's quarterly earnings call and the start of the annual [NCAA] tournament at which he would announce allegations of misconduct by employees of Nike. AVENATTI stated that he would refrain from holding the press conference and harming Nike only if Nike made a payment of $1.5 million to a client of AVENATTI's in possession of information damaging to Nike . . . and agreed to "retain" AVENATTI **and CC-1** to conduct an "internal investigation" – an investigation that Nike did not request – for which AVENATTI **and CC-1** demanded to be paid, at a minimum, between $15 and $25 million.  Alternatively, and in lieu of such a retainer agreement, AVENATTI **and CC-1** demanded a total payment of $22.5 million from Nike . . . (id. at ¶ 8) (emphasis added);

On or about March 15, 2019, . . . **CC-1** stated [to a lawyer representing Nike] that he and MICHAEL AVENATTI, the defendant, wished to speak with representatives of Nike in person (id. at ¶ 10(b)) (emphasis added);

On or about March 19, 2019, . . . [Nike lawyers] met with AVENATTI **and CC-1 at CC-1's office** in New York, New York . . . (id. at ¶ 10(c)) (emphasis added);

[During the March 19, 2019 meeting,] AVENATTI further stated . . . that he would refrain from holding that press conference and damaging Nike if Nike agreed to two demands:  (1) Nike must pay $1.5 million to [Avenatti's client] . . . and (2) Nike must hire AVENATTI **and CC-1** to conduct an internal investigation of Nike, with a provision that if Nike hired another firm to conduct such an internal investigation, Nike would still be required to pay AVENATTI **and CC-1** at least twice the fees of any other firm hired (id. at ¶ 10(c)(iii)) (emphasis added);

At the end of the meeting, AVENATTI **and CC-1** indicated that . . . Nike would have to agree to accept those demands immediately or AVENATTI would hold his press conference.  In particular, **CC-1 indicated** that he and AVENATTI would contact [Nike's lawyers] later that afternoon to discuss Nike's response (id. at ¶ 10(c)(iv)) (emphasis added);

Later that day, [a Nike lawyer] left a voicemail for **CC-1** indicating that Nike needed time.  **CC-1** subsequently returned [the Nike lawyer's] call and stated . . . that AVENATTI had agreed to give Nike . . . two days . . . to consider the demands before holding the threatened press conference (id. at ¶ 10(d)) (emphasis added);

On or about March 20, 2019 . . . [a Nike lawyer] sent **CC-1** a text message to schedule a telephone call for later that day (id. at ¶ 11(a)) (emphasis added);

On or about March 20, 2019, . . . [Nike lawyers] spoke to **CC-1** on a telephone call. . . . [and] asked CC-1 for more time to consider the demands made by MICHAEL AVENATTI, the defendant, and **CC-1** the day before . . . . **CC-1** . . .

stated . . . that he would speak to AVENATTI to discuss the possibility of delaying the deadline for Nike's response . . . (id. at ¶ 11(b)) (emphasis added);

Less than an hour later . . . [the Nike lawyers] again spoke to **CC-1** on a telephone call . . . . **CC-1** stated . . . that [the Nike lawyers] would need to provide some justification for delaying the deadline and that **CC-1** would attempt to set up another call with AVENATTI . . . (id. at ¶ 11(c)) (emphasis added);

Shortly thereafter . . . [the Nike lawyers] engaged in a three-way phone conversation with AVENATTI and **CC-1** . . . (id. at ¶ 11(d)) (emphasis added);

During that call . . . AVENATTI . . . reiterated threats made during the previous in-person meeting along with his demand for a multi-million dollar retainer to do an internal investigation (id. at ¶ 11(d)(ii));

AVENATTI and **CC-1** continued to discuss how much AVENATTI expected to be paid by Nike for doing an "internal investigation."  AVENATTI made clear his view that an internal investigation of conduct at a company like Nike could be valued at "tens of millions of dollars, if not hundreds" . . . (id. at ¶ 11(d)(iv)) (emphasis added);

[O]n or about March 21, 2019, MICHAEL AVENATTI, the defendant, **CC-1**, [and Nike lawyers] met at **CC-1's office** in New York (id. at ¶ 12) (emphasis added);

[At the meeting,] AVENATTI stated . . . that he and **CC-1** would require a $12 million retainer to be paid immediately and to be "deemed earned when paid," with a minimum guarantee of $15 million in billings and a maximum of $25 million. . . . During the meeting, AVENATTI and **CC-1** also stated . . . that an "internal investigation" could benefit Nike, by, among other things, allowing Nike to "self-report" any misconduct, and that it would be Nike's choice whether to do so (id. at ¶ 12(a)) (emphasis added);

[A Nike lawyer] . . . asked whether there would be any way to avoid AVENATTI carrying out the threatened press conference without Nike retaining AVENATTI **and CC-1**.  In particular, [the Nike lawyer] asked . . . whether Nike could resolve the demands just by paying [Avenatti's client], rather than retaining AVENATTI **and CC-1**.  **CC-1** indicated that **CC-1** understood that Nike might like to get rid of the problem in "one fell swoop," rather than have it "hanging over their head." AVENATTI noted that he did not think it made sense for Nike to pay [his client] an "exorbitant sum of money . . . in light of his role in this."  AVENATTI **and CC-1** then left the room to confer privately (id. at ¶ 12(c)) (emphasis added);

After returning, AVENATTI stated . . . "If [Nike] wants to have one confidential settlement and we're done, they can buy that for twenty-two and a half million dollars and we're done[] . . ." (id. at ¶ 12(d));

Finally, AVENATTI and **CC-1** agreed to meet at [the Nike lawyer's] office on Monday, March 25, 2019.  (Id. at ¶ 12(f)) (emphasis added).

As these quotations make clear, in the Criminal Complaint the Government presented Geragos – "CC-1" – as a full, active, and key participant in the charged extortion conspiracies, and as a potential beneficiary of the extortion.

On May 22, 2019, the Government obtained an indictment charging Avenatti with the same four crimes set forth in the Criminal Complaint:  conspiracy to transmit interstate communications with intent to extort; conspiracy to commit extortion; transmission of interstate communications with intent to extort; and extortion.  (Indictment (Dkt. No. 8))

The original indictment also tracks the factual allegations set forth in the Criminal Complaint.  Geragos is once against presented as "CC-1," "a co-conspirator not named as a defendant herein."  (Id. at ¶ 1)  As in the Complaint, the Government alleges that Avenatti and CC-1 "demanded tens of millions of dollars in payments from NIKE, Inc.," and

> threatened to hold a press conference on the eve of Nike's quarterly earnings call and the start of the annual [NCAA] men's college basketball tournament, at which AVENATTI would make allegations of misconduct by Nike employees, unless Nike agreed to make a payment of $1.5 million to a client of AVENATTI's . . . in possession of information damaging to Nike, and further agreed to "retain" AVENATTI and CC-1 to conduct an "internal investigation" that Nike had not requested and for which AVENATTI and CC-1 demanded to be paid, at a minimum, between $15 million and $25 million.  Alternatively, and in lieu of such a retainer agreement, AVENATTI and CC-1 demanded a total payment of $22.5 million from Nike to resolve any claims [Avenatti's client] might have and additionally to buy AVENATTI and CC-1's silence.

(Id.)  The Indictment then goes on to repeat the same allegations set forth in the Complaint concerning Avenatti and CC-1's conduct.  (Id. at ¶¶ 3, 8, 10-18, 20-23, 27-28, 30, 32)

In sum, in the May 22, 2019 Indictment – obtained nearly two months after Avenatti's arrest, and after the Government had had ample time to review the tape recordings and related evidence – the Government continued to present Geragos – "CC-1" – as a full, active,

and key participant in the charged extortion conspiracies, and as someone who was a potential beneficiary of the extortion.

## II.    THE GERAGOS "INNOCENCE PROFFERS"

On June 3, 2019, Geragos and his attorneys met with members of the United States Attorney's Office.  The purpose of the meeting was an "innocence proffer."  Prior to the meeting, Geragos, his lawyers, and representatives of the U.S. Attorney's Office executed a document that governed the meeting.  The document read as follows:

> This is to confirm that with respect to the meeting of [Mark Geragos] ("Client"), whom you represent, with Assistant United States Attorney [], to be held at the Office of the United States Attorney for the Southern District of New York on [] ("the meeting") the following understandings exist:
>
> The Client has requested the opportunity to provide information to the Government about his involvement in the charges contained in [Indictment 19 Cr. 373 (PGG)] and to respond to questions, so that the Government may be in a position to evaluate Client's information and responses in making prosecutive decisions.  In any prosecution brought against Client, the Government may offer at any stage of the criminal proceeding for any purpose any statement made by Client during the meeting.  Client agrees that he shall assert no claim under the United States Constitution, any statute, Rule 410 of the Federal Rules of Evidence, or any other federal rule, that such statements or any leads therefrom should be suppressed.  Client understands that he is waiving any and all rights in the foregoing respects.

(Jan. 20, 2020 Govt. Ltr. (Dkt. Nos. 175, 175-1))[2]

Based on notes taken at the June 3, 2019 innocence proffer, Geragos stated that he had met first met Avenatti in April or May 2018.  (GX 3557-010 at 2)  In September 2018, at the request of a colleague, Geragos loaned Avenatti $250,000.  In March 2019, Geragos loaned an additional amount to Avenatti.  (Id. at 3-4)  Geragos then received a text message from Avenatti

---

[2]  The Government represents that this standard form document was executed by Geragos, but it has not been able to find an executed version of the agreement.  (Jan. 20, 2020 Govt. Ltr. (Dkt. No. 175))

stating that he had been asked to represent someone who had complained about Nike paying

players.  Nike had terminated the individual.  Avenatti said that the client's contract with Nike

was worth about $75,000 a year.  Avenatti described the nature of the client's claim as an

"Adidas problem."  Geragos never spoke with Avenatti's client and did not ask Avenatti what his

client wanted.  (Id. at 4)  Geragos denied having any discussion with Avenatti about his goals or

strategy for the representation, and denied that he ever had any intent to extort Nike.  Geragos

believed that Avenatti had good information and wanted to give Nike a "heads up."  (Id.)

      Avenatti told Geragos that he wanted to do an internal investigation of Nike, and

that that could be worth hundreds of millions of dollars.  Geragos thought that Avenatti's

discussion about he and Geragos conducting an internal investigation of Nike was fanciful.

While he believed that Nike had an obligation to conduct an internal investigation, he did not

believe that Nike had a legal obligation to hire Avenatti or Geragos to conduct the internal

investigation.  Geragos assumed that Avenatti included Geragos in the proposed internal

investigation to make it more palatable to Nike.  (Id. at 4-5)

      Geragos did not discuss holding a press conference with Avenatti, nor did he

discuss Nike's earnings call or other timing issues with Avenatti.  (Id. at 4)

      Geragos was not troubled by the discussion at the first meeting with Nike, but

became concerned at the second meeting, when a Nike lawyer proposed a lump sum payment.

Geragos said that he pulled Avenatti out of the meeting because Geragos was uncomfortable

with that notion.  Geragos told Avenatti that that "was going down a road he did not think they

could go down."  Geragos told Avenatti that Avenatti had to convey to his client the amount of

the payoff.  Avenatti said that Nike was merely trying to create a conflict.  Geragos believed that

he and Avenatti could not be paid to stay silent in regard to the client's claims.  Geragos told

Avenatti during the break, after the meeting, and in a text message that he was not comfortable, and that they might be "treading close to the line." (Id. at 5) Geragos never had any intention of going to the scheduled March 25, 2019 meeting with Nike. (Id. at 6)

Geragos never had any interest in holding a press conference. A press conference or lawsuit would end any negotiation. (Id.)

Geragos appeared for another "innocence proffer" on June 24, 2019. The second proffer was conducted pursuant to the same innocence proffer agreement. (3557-011 at 1) At the second proffer session, Geragos repeated that he had pulled Avenatti out of the room during the March 21, 2019 meeting because "an alarm went off in Geragos'[s] mind due to the lump sum payment request." (Id. at 2) Geragos denied that there was any link between the money he had loaned Avenatti and the Nike demand. Geragos said that he had introduced Avenatti to Nike because he thought that Nike had an "Adidas problem." (Id. at 3)

Geragos never discussed a potential complaint or lawsuit with Avenatti, and never discussed a potential press conference with Avenatti. Geragos believed that Franklin had some sort of wrongful termination claim against Nike, although he did not know whether Franklin had been an actual employee of Nike. Geragos believed that Avenatti was using Geragos's relationship with Nike for leverage to obtain a larger payoff for Avenatti and the client. Geragos never discussed with Avenatti whose idea it was to conduct an internal investigation of Nike. (Id. at 4)

## III.    THE (S1) INDICTMENT

The Government obtained the (S1) Indictment on November 13, 2019. The extortion conspiracies charged in the original indictment are dropped from the superseding indictment, and an honest services wire fraud charge against Avenatti is added. ((S1) Indictment

(Dkt. No. 72))  In the superseding indictment, all references to "CC-1" are eliminated, and Geragos is referred to as "Attorney-1" rather than "CC-1."  (Id. at ¶ 3)  Geragos's alleged extortionate communications with Nike's lawyers are eliminated from the (S1) Indictment, although the Government still alleges that Avenatti demanded that Nike hire Avenatti and Geragos to conduct an internal investigation.  (Id. at ¶ 1, 11(c),

## DISCUSSION

Avenatti contends that Geragos may not assert a Fifth Amendment privilege because (1) he "knowingly waived all privileges and elected to provide information to the government about his own conduct and Mr. Avenatti's conduct"; and (2) "the government has credited Mr. Geragos'[s] claim of innocence, thereby extinguishing any theoretical claim of privilege."  (Def. Br. (Dkt. No. 169) at 3).  Avenatti further argues that

> Geragos'[s] testimony is pivotal to Mr. Avenatti's defense. . . . The evidence indisputably shows . . . that it was Mr. Geragos who first reached out to Nike and to its outside lawyers; that Messrs. Avenatti and Geragos presented their opening negotiation salvos together as a team; that Mr. Geragos was fully committed to the idea of a press conference if Nike did not settle the claims, and that Mr. Geragos insisted on the internal investigation and to be paid for it.  Moreover, interview reports recently disclosed to the defense pursuant to 18 U.S.C. § 3500 confirm that, in the view of the Nike lawyers, Mr. Geragos was engaged as a full participant in the negotiations and was supportive of Mr. Avenatti's statements during those negotiations.

(Id. at 3-4)

As discussed above, Avenatti further contends that if this Court concludes that Geragos has not waived his Fifth Amendment privilege for all purposes, the Court must direct the Government to obtain an immunity order for Geragos.  "If . . . the government does not take steps to ensure that the jury receive[s] the benefit of Mr. Geragos'[s] testimony, Due Process compels the dismissal of the Indictment against Avenatti.  (Id. at 5)

## I.    WHETHER GERAGOS MAY ASSERT A FIFTH AMENDMENT PRIVILEGE

Avenatti contends that Geragos has waived any right to assert a Fifth Amendment privilege here.  (Id. at 3)  Avenatti further argues that he will be "deprive[d] . . . [of his] Fifth Amendment . . . Due Process right to properly defend himself against serious criminal charges[,] as well as his Sixth Amendment right to compulsory process," if Geragos is "allow[ed] . . . to avoid his obligation to testify."  (Id. at 5)  According to Avenatti,  his Fifth and Sixth Amendment rights to due process and compulsory process outweigh Geragos's interest in not testifying, because "Geragos is a key figure in this case and is critical to Mr. Avenatti's defense against the charges in the Superseding Indictment."  (Id.)

### A.    Applicable Law

#### 1.    Circumstances in which a Witness Claiming Innocence May Assert a Fifth Amendment Privilege

The Fifth Amendment to the United States Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself."  U.S. Const., amend. V.  Because "the privilege protects the innocent as well as the guilty," Ohio v. Reiner, 532 U.S. 17, 18 (2001) (per curiam), an assertion of innocence is not necessarily inconsistent with an assertion of the Fifth Amendment privilege.  See also Reiner, 532 U.S. at 21 ("[O]ne of the Fifth Amendment's 'basic functions . . . is to protect innocent men [and women] . . . "who otherwise might be ensnared by ambiguous circumstances."'" (quoting Grunewald v. United States, 353 U.S. 391, 421 (1957) (quoting Slochower v. Board of Higher Ed. of New York City, 350 U.S. 551, 557-58 (1956)) (emphasis in Grunewald))).  Reiner is instructive on this point.

In Reiner, the respondent was charged with involuntary manslaughter in connection with the death of his two-month-old son.  The two main suspects were Reiner and the family's babysitter, Susan Batt, because both had cared for the baby during the relevant time

period.  Reiner argued that it was Batt who had injured the baby.  At Reiner's trial, Batt stated

that – although she had nothing wrong – she intended to assert her Fifth Amendment privilege.

At the prosecutor's request, the trial court issued an order granting Batt transactional immunity.

Batt went on to testify, and Reiner was convicted of involuntary manslaughter.  Reiner, 532 U.S.

at 18-19.

On appeal, Reiner argued that the immunity order was unlawful, because Batt had

no valid Fifth Amendment privilege.  The Supreme Court of Ohio agreed (id. at 19), but the

United States Supreme Court reversed, finding that "it was reasonable for Batt to fear that

answers to possible questions might tend to incriminate her," and that accordingly she "had a

valid Fifth Amendment privilege against self-incrimination."  Id. at 21-22.

In addition to observing that "the privilege protects the innocent as well as the

guilty," the Court reaffirmed that the

> privilege not only extends "to answers that would in themselves support a
> conviction . . . but likewise embraces those which would furnish a link in the
> chain of evidence needed to prosecute [the witness]." . . . "[I]t need only be
> evident from the implications of the question, in the setting in which it is asked,
> that a responsive answer to the question or an explanation of why it cannot be
> answered might be dangerous because injurious disclosure could result."

Id. at 20-21 (quoting Hoffman v. United States, 341 U.S. 479, 486-87 (1951).

Accordingly, a witness seeking to assert his or her Fifth Amendment privilege

may likewise assert innocence.  Such a witness must have a "'reasonable cause to apprehend

danger from a direct answer[, however].'"  Id. at 21 (quoting Hoffman, 341 U.S. at 486).

Moreover, "[t]hat inquiry is for the court; the witness'[s] assertion does not by itself establish the

risk of incrimination. . . . A danger of 'imaginary and unsubstantial character' will not suffice."

Id. at 21 (quoting Mason v. United States, 244 U.S. 362, 366 (1917)); see also United States v.

Apfelbaum, 445 U.S. 115, 128 (1980) (witness asserting Fifth Amendment privilege must

demonstrate that he or she is "confronted by substantial and 'real,' and not merely trifling or imaginary, hazards of incrimination" (internal quotation marks and citation omitted)).  In sum, the Fifth Amendment privilege "is grounded on a reasonable fear of danger of prosecution." United States v. Rodriguez, 706 F.2d 31, 36 (2d Cir. 1983) (citing Hoffman, 341 U.S. at 485-86; Rogers v. United States, 340 U.S. 367, 372-73 (1951)); see also Kastigar v. United States, 406 U.S. 441, 444-45 (1972) ("[T]he Fifth Amendment privilege against compulsory self-incrimination . . . protects against any disclosures which the witness reasonably believes could be used in a criminal prosecution or could lead to other evidence that might be so used.").

### 2.    The Effect of Prior Statements on Assertion of a Fifth Amendment Privilege in Another Proceeding

"[I]t is well established that a waiver of the privilege in one proceeding does not affect the rights of a witness or the accused in another independent proceeding."  United States v. Miranti, 253 F.2d 135, 139 (2d Cir. 1958) (noting that it would be "frivolous" to contend that, in making statements to FBI agents, witness had waived his right to assert his Fifth Amendment privilege in connection with subsequent grand jury proceeding; any "[s]uch contention would be frivolous because it is well established that a waiver of the privilege in one proceeding does not affect the rights of a witness or the accused in another independent proceeding")[3]; see also United States v. James, 609 F.2d 36, 45 (2d Cir. 1979) ("waiver of the privilege [against self-incrimination] in one proceeding does not affect a witness['s] rights in another proceeding");.

---

[3]  The Miranti court ruled that the witness's "disclosure of information to the FBI . . . , while admissible as evidence in a subsequent trial of the witness, if voluntarily made, does not constitute a waiver of the witness'[s] privilege against self-incrimination even in response to the same questions before a grand jury.  It can be argued that reiteration of the prior voluntary statement is not incriminating because that statement would be admissible against the witness at trial.  But reiteration adds to the credibility of the statement, . . . and if construed as a waiver could lead to additional questions requiring answers which further implicate the witness." Miranti, 253 F.2d at 139-40 (citation omitted).

United States v. Housand, 550 F.2d 818, 821 n.3 (2d Cir. 1977) ("His voluntary testimony in the Grand Jury, by the weight of authority, did not waive his right to claim privilege at trial[,] a separate proceeding."); United States v. Longstreet, 567 F.3d 911, 923 (7th Cir. 2009) (noting that the district court "considered and appropriately rejected" defendant's argument that a witness had "relinquished or waived his Fifth Amendment privilege by voluntarily making his prior proffer to the government"); United States v. Lawrenson, 315 F.2d 612, 613 (4th Cir. 1963) ("[Defendant's] claim that [a witness], having given a statement, has waived his fifth amendment privilege, and so should be forced to testify, is without merit."); Boucher v. DiLorenzo, No. 84 Civ. 7868(CBM), 1986 WL 14971, at *1-2 (S.D.N.Y. Dec. 15. 1986) ("waiver of the fifth amendment privilege in one proceeding does not affect one[']s right to assert the privilege in another").

### 3. Interplay Between Witness's Fifth Amendment Right Against Self-Incrimination, and Defendant's Sixth Amendment Right to Compulsory Process and Fifth Amendment Right to Due Process

The Sixth Amendment grants criminal defendants "[t]he right to offer the testimony of witnesses, and to compel their attendance, if necessary . . . . Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense.  This right is a fundamental element of due process of law."  Washington v. Texas, 388 U.S. 14, 19 (1967); see also Michigan v. Lucas, 500 U.S. 145, 158 n.5 (1991) (quoting Washington v. Texas, 388 U.S. at 19); Taylor v. Illinois, 484 U.S. 400 (1988) (same); United States v. Mi Sun Cho, 713 F.3d 716, 721

(2d Cir. 2013) ("A defendant has a fundamental due process right to present a defense." (citing Washington v. Texas, 388 U.S. at 19)).

"That right, of course, is not absolute, for a defendant 'must comply with established rules of procedure and evidence designed to assure both fairness and reliability.'" Mi Sun Cho, 713 F.3d at 721 (2d Cir. 2013) (quoting Washington v. Schriver, 255 F.3d 45, 56 (2d Cir. 2001) (internal quotation marks omitted)); Cruz v. Greiner, No. 98 CIV. 7939(AJP), 1999 WL 1043961, at *32 (Nov. 17, 1999) ("[T]he right to present relevant testimony is not without limitation." (quoting Michigan v. Lucas, 500 U.S. 145, 149 (1991))). "Restrictions on a defendant's presentation of evidence are constitutional if they serve 'legitimate interests in the criminal trial process,' and are not 'arbitrary or disproportionate to the purposes they are designed to serve.'" Id. (quoting United States v. Almonte, 956 F.2d at 30 (quoting Rock v. Arkansas, 483 U.S. 44, 55-56 (1987))). Moreover, "[t]here are a number of exemptions from the testimonial duty, the most important of which is the Fifth Amendment privilege against compulsory self-incrimination. . . , [which] protects against any disclosures which the witness reasonably believes could be used in a criminal prosecution or could lead to other evidence that might so be used." Kastigar, 406 U.S. at 444-45.

Acknowledging that the Sixth Amendment right to compulsory process is designed to "ensure[] that a defendant has subpoena power to summon witnesses so that the jury may hear the defendant's version of the facts," United States v. Taylor, 728 F.2d 930, 934 (7th Cir. 1984) (citing Washington v. Texas, 388 U.S. at 19), the Sixth Amendment "'does not suggest a right to super[s]ede a witness'[s] invocation of his own [F]ifth [A]mendment privilege or the right to demand that the government shield a witness from the consequences of his own testimony.'" Taylor, 728 F.2d at 935 (quoting United States v. Chagra, 669 F.2d 241, 260 (5th

Cir. 1982) and citing Washington v. Texas, 388 U.S. at 23 n.21 (although the Sixth Amendment invalidated Texas statutes that prohibited persons charged or convicted as co-participants in the same crime from testifying for one another, the Court noted that "[n]othing in [its] opinion should be construed as disapproving testimonial privileges, such as the privilege against self-incrimination").

**B.** **Analysis**

Avenatti argues that, in providing the "innocence proffers" discussed above, Geragos "knowingly waived all privileges."  (Def. Br. (Dkt. No. 169) at 3)

As discussed above, Geragos provided his "innocence proffers" pursuant to a written agreement, in which he agreed that

> [i]n any prosecution brought against [Geragos], the Government may offer at any stage of the criminal proceeding for any purpose any statement made by [Geragos] during the meeting.  [Geragos] agrees that he shall assert no claim under the United States Constitution, any statute, Rule 410 of the Federal Rules of Evidence, or any other federal rule, that such statements or any leads therefrom should be suppressed.  [Geragos] understands that he is waiving any and all rights in the foregoing respects.

(Jan. 20, 2020 Govt. Ltr. (Dkt. Nos. 175, 175-1))  While this agreement makes clear that the Government may use any of the statements Geragos makes during the innocence proffers against him (see id.), Geragos does not agree – in the innocence proffer agreement – to never assert his Fifth Amendment privilege in a subsequent proceeding.  Accordingly, the innocence proffer agreement does not, standing alone, prevent Geragos from asserting his Fifth Amendment privilege at trial.[4]  It merely prevents him from objecting to the Government's introduction of his

---

[4]  A proffer agreement "is, after all, a contract that must be interpreted 'to give effect to the intent of the parties.'"  United States v. Barrow, 400 F.3d 109, 117 (2d Cir. 2005) (quoting United States v. Liranzo, 944 F.2d 73, 77 (2d Cir. 1991) (internal quotation marks omitted)); United States v. Rosemond, 841 F.3d 95, 107 (2d Cir. 2016) ("Proffer agreements are contracts to be interpreted according to ordinary principles of contract law."); United States v. Gomez, 210 F. Supp. 2d 465, 475 (S.D.N.Y. 2002) (same).

proffer statements against him.  And, as discussed above, the fact that Geragos waived his Fifth

Amendment privilege during the innocence proffers does not prevent him from asserting his

Fifth Amendment privilege at trial.  See Miranti, 253 F.2d at 139.

Avenatti argues, however, that "the government has accepted Mr. Geragos'[s]

claim of innocence" (Def. Br. (Dkt. No. 169) at 18) (emphasis in original):

> It is clear enough that the government has credited Mr. Geragos'[s] innocence and
> attorney proffers and that it has exonerated him.  Its refusal to formally immunize him
> should not excuse Mr. Geragos from his obligation to testify in this case.  Mr. Geragos
> long ago waived his Fifth Amendment privilege and the government's exoneration of him
> mooted any privilege he may otherwise have enjoyed. . . .
>
> . . . [T]he government has credited Mr. Geragos'[s] claims of innocence in those
> unprotected proffers.  Even though the government has not issued a formal declination or
> agreement not to prosecute, the government has obviously decided not to prosecute him,
> publicly removing previously inculpatory references to him from its charging
> instruments. . . .

(Id. at 18-19)

While – as this Court outlined above – the Government has dropped its

conspiracy charges and purged nearly all references to Geragos from the (S1) Indictment, it has

not exonerated him, nor has it told him – either formally or informally – that he will not be

prosecuted.  Geragos'[s] lawyer states that Geragos "continues to maintain his innocence but

must assert his Fifth Amendment privilege because he has not been provided any assurance from

the government."  (Jan. 21, 2020 Geragos Ltr. (Dkt. No. 188) at 2)  "[A]t no time from the date

of the defendant's arrest to the present has the government provided Mr. Geragos with any

assurance as to his status, including a representation that he will not be prosecuted.  As a non-

party to this case, Mr. Geragos has not agreed to assist the government or the defendant."  (Id. at

1)  The Government has made similar representations:  "Nor is the defendant's assertion accurate

that the Government has somehow formally 'exonerated' [Geragos] . . . by not charging him in

the Superseding Indictment. . . . To be clear, the Government has at no time represented publicly or to any party that, under no circumstances, might [Geragos] be charged."  (Govt. Br. (Dkt. No. 172) at 8-9 and 9 n. 5)

Avenatti argues that even if the Government has not told Geragos that he will not be prosecuted, "the government has obviously decided not to prosecute him."  (Def. Br. (Dkt. No. 169) at 19)  As many defense lawyers have found out to their chagrin, however, it is dangerous to predict in what cases the Government will proceed with a criminal prosecution. One reason is that criminal investigations are dynamic and not static; a new witness or a new document can change a prosecutor's evaluation of an individual, and move that person from the witness category to the target category, or vice versa.

In any event, the Second Circuit has made clear that it is a fool's errand for a district judge weighing a witness's assertion of his Fifth Amendment privilege to attempt to predict the likelihood of prosecution:

> We are thus faced with the novel question whether or not a witness can invoke his privilege against self-incrimination where practically there is only a slight possibility of prosecution. . . . We find no justification for limiting the historic protections of the Fifth Amendment by creating an exception to the general rule which would nullify the privilege whenever it appears that the government would not undertake to prosecute.  Such a rule would require the trial court, in each case, to assess the practical possibility that prosecution would result from incriminatory answers.  Such assessment is impossible to make because it depends on the discretion exercised by a United States Attorney or his successor.

Miranti, 253 F.2d at 139; see also United States v. Edgerton, 734 F.2d 913, 921 (2d Cir. 1984) ("[O]nce the court determines that the answers requested would tend to incriminate the witness, it should not attempt to speculate whether the witness will in fact be prosecuted." (quoting United States v. Jones, 703 F.2d 473, 478 (10th Cir. 1983) (internal quotation marks omitted)).

The Court must instead apply the standard set long ago:  whether Geragos has demonstrated that he is "confronted by substantial and 'real,' and not merely trifling or imaginary, hazards of incrimination," Apfelbaum, 445 U.S. at 128 (internal quotation marks and citation omitted), and whether his assertion of his Fifth Amendment privilege "is grounded on a reasonable fear of danger of prosecution."  Rodriguez, 706 F.2d at 36.  Measured under this standard, it is clear that Geragos's assertion of his Fifth Amendment privilege is appropriate.

Geragos has faced a significant risk of criminal prosecution since the outset of this case.  He is referenced as an unindicted co-conspirator in both the Criminal Complaint and in the original indictment, and his conduct is discussed at length in both charging instruments. He made the initial call to Nike, he participated in the meetings with Nike that are at the core of the Government's case, and he and Avenatti put themselves forward as the lawyers who would perform the internal investigation at Nike.  He was at the table when Avenatti demanded a $15 to $25 million fee.

Together with his counsel, Geragos decided to meet with the Government in an attempt to persuade the Government not to charge him.  Even after those proffer sessions – which took place in June 2019 – the allegations against him remained in place for another five months, until the Government obtained a superseding indictment in November 2019 that dropped the conspiracy counts and most of the allegations referencing him.  While it is reasonable to view the changes the Government made in the (S1) Indictment as favorable to Geragos, the Government has not disclosed whether it took these steps because it (1) believed that Geragos was innocent; or (2) was concerned about whether it could prove his guilt beyond a reasonable doubt.

In sum, the Government has not exonerated Geragos, and it has not given him any assurances that he will not be prosecuted.  He was personally involved with conduct that the Government has identified as criminal.  And although Geragos gave detailed proffers to the Government about these matters, were he to testify at trial, he would face different questions, which could lead to different or inconsistent answers that could heighten the risk of prosecution he still faces.  Finally, Geragos's claim of innocence does not undermine his assertion of his Fifth Amendment privilege.

Given these circumstances, the Court concludes that Geragos is "confronted by substantial and 'real,' and not merely trifling or imaginary, hazards of incrimination," Apfelbaum, 445 U.S. at 128, and that his assertion of his Fifth Amendment privilege "is grounded on a reasonable fear of danger of prosecution."  Rodriguez, 706 F.2d at 36.  The Court further concludes that Geragos's assertion of his Fifth Amendment privilege trumps Avenatti's Sixth Amendment right to compulsory process.  Accordingly, Avenatti's motion to compel Geragos'[s] testimony will be denied.  United States v. Stewart, 907 F.3d 677, 685 (2d Cir. 2018) ("Where the hazards of self-incrimination are readily apparent, a witness's invocation of the privilege against self-incrimination need not be tested by the rote recitation of questions that have obvious answers of which the judge is already aware.").

## II.   WHETHER THE GOVERNMENT SHOULD BE COMPELLED TO OBTAIN AN IMMUNITY ORDER FOR GERAGOS

Avenatti contends that, in the event that this Court permits Geragos to assert his Fifth Amendment privilege, it should order the Government to obtain an immunity order for Geragos, on pain of dismissal of the charges against Avenatti.  (Def. Br. (Dkt. No. 169) at 21)  According to Avenatti, "the government's tactical refusal to immunize Mr. Geragos [will] 'distort the fact-finding process' to such a degree as to compel dismissal of the Indictment."  (Id.

at 19)  "Geragos is unquestionably the critical defense witness at trial," because he "worked side

by side with Mr. Avenatti in implementing the settlement strategy in question and the fee

structure proposed."  (Id.)

> Avenatti maintains that Geragos's absence
>
> will leave the jury with an incomplete picture of the facts necessary to assess fairly the allegations against Mr. Avenatti.  The government's theory is that threatening a press conference while also demanding payment for oneself to conduct an internal investigation was, ipso facto, extortion.  Mr. Geragos was lock-step with Mr. Avenatti on both fronts.  Yet, Mr. Geragos, a seasoned criminal defense lawyer, expressed no reservations to Mr. Avenatti about that combination of acts and never felt that such conduct crossed the line.  This evidence is highly relevant to Mr. Avenatti's state of mind.  If the Court determines that it will not compel Mr. Geragos to testify, it can and should determine that Mr. Avenatti's right to due process will be violated unless either (i) the government immunizes Mr. Geragos, or (ii) the Indictment against Mr. Avenatti is dismissed.

(Id. at 19-20)

## A.      Applicable Law

### 1.      The Statutory Scheme

> Pursuant to 18 U.S.C. § 6003, the Government may request a court to
>
> issue . . . an order requiring [an] individual to give testimony or provide other information which he refuses to give or provide on the basis of his privilege against self-incrimination . . . when in [the Government's] judgment (1) the testimony or other information . . . may be necessary to the public interest; and (2) such individual has refused or is likely to refuse to testify or provide other information on the basis of his privilege against self-incrimination.

18 U.S.C. § 6003(a)-(b).

> Where a court issues such an order,
>
> the witness may not refuse to comply with the order on the basis of his privilege against self-incrimination; but no testimony or other information compelled under the order (or any information directly or indirectly derived from such testimony or other information) may be used against the witness in any criminal case, except a prosecution for perjury, giving a false statement, or otherwise failing to comply with the order.

18 U.S.C. § 6002(3).

As the Supreme Court has recognized, "[n]o court has authority to immunize a witness.  That responsibility . . . is peculiarly an executive one, and only the Attorney General or a designated officer of the Department of Justice has authority to grant use immunity."  Pillsbury Co. v. Conboy, 459 U.S. 248, 261 (1983) (citing 18 U.S.C. §§ 6002, 6003); see also United States v. Taylor, 728 F.2d 930, 934 (7th Cir. 1984) ("Congress has delegated the authority to grant use immunity solely to the executive branch of government.").

In exercising that authority, executive branch personnel

> must balance "the public need for the particular testimony or documentary information in question against the social cost of granting immunity and thereby precluding the possibility of criminally prosecuting an individual who has violated the criminal law."  In re Daley, 549 F.2d 469, 478-79 (7th Cir. [1977).  Both the exclusive nature of Congress's delegation and the fact that the balancing process is wholly within the expertise of the executive branch foreclose the federal courts from taking more than a ministerial role in prosecutorial immunity decisions that are made properly under 18 U.S.C. § 6003.  Id. at 479.

Taylor, 728 F.2d at 934.

### 2.   Due Process Limitations on a Prosecutor's Exercise of Immunity Authority

The Government's exercise of its authority to request immunity is, of course, subject to the Due Process Clause of the Fifth Amendment.  While

> "[t]he Government is under no general obligation to grant use immunity to witnesses the defense designates as potentially helpful to its cause but who will invoke the Fifth Amendment if not immunized[,]" United States v. Ebbers, 458 F.3d 110, 118 (2d Cir. 2006)[,] [n]evertheless, "under 'extraordinary circumstances,' due process may require that the government confer use immunity on a witness for the defendant."  United States v. Praetorius, 622 F.2d 1054, 1064 (2d Cir. 1979).

Stewart, 907 F.3d at 685.

A defendant requesting such relief must make a two-pronged showing:

> First, the defendant must show that the government has used immunity in a discriminatory way, has forced a potential witness to invoke the Fifth Amendment

22

through overreaching, or has deliberately denied immunity for the purpose of withholding exculpatory evidence and gaining tactical advantage through such manipulation. . . . Second, the defendant must show that the evidence to be given by an immunized witness will be material, exculpatory[,] and not cumulative and is not obtainable from any other source.  Ebbers, 458 F.3d at 119 (internal quotation marks and citations omitted).

Stewart, 907 F.3d at 685.

### B.   **Analysis**

Avenatti's Due Process argument fails for multiple reasons.  As an initial matter, he has not shown that Geragos has exculpatory information.

Avenatti's primary argument is that proof of Geragos's state of mind constitutes proof of Avenatti's state of mind:

Mr. Geragos was lock-step with Mr. Avenatti [in threatening a press conference while demanding payment to conduct an internal investigation].  Yet, Mr. Geragos, a seasoned criminal defense lawyer, expressed no reservations to Mr. Avenatti about that combination of acts and never felt that such conduct crossed the line.  This evidence is highly relevant to Mr. Avenatti's state of mind.

(Def. Br. (Dkt. No. 169) at 19-20; see id. at 20 (testimony from Geragos about his state of mind "would, at a minimum, create reasonable doubt about Mr. Avenatti's state of mind with respect to the alleged extortion scheme"); see id. ("Geragos is the only witness who can provide the jury with critical . . . state-of-mind testimony").

This argument is entirely misplaced.  Geragos's state of mind is not at issue, because he is not on trial.  Absent evidence that Geragos conveyed to Avenatti his view that the alleged scheme was lawful, whether or not Geragos believed that he and Avenatti were engaged in criminal conduct is irrelevant.  Stated another way, Avenatti cannot premise arguments about his own alleged lack of criminal intent on evidence of Geragos's state of mind, and Avenatti cannot prove his state of mind by attempting to show what was in Geragos's mind.  Avenatti likewise cannot prove that he did not intend to extort Nike by showing that Geragos did not

23

intend to extort Nike.  This is a fortiori true here, given that Geragos and Avenatti were not similarly situated:  it is undisputed that Gary Franklin was Avenatti's client, and that Geragos never met or communicated with Franklin.[5]

       The core allegations in the (S1) Indictment are that Avenatti – using confidential information supplied by Franklin – demanded $15 to $25 million from Nike for himself, without Franklin's knowledge, and to Franklin's detriment.  ((S1) Indictment (Dkt. No. 72) at ¶¶ 1, 9-10, 11(c), 11(f), 14(b), 14(g))  Indeed, the Indictment alleges that when Nike's counsel asked whether Nike could resolve Avenatti's demands simply by paying Franklin – rather than by retaining Avenatti – Avenatti rejected that proposal, stating that it would not make sense for Nike to pay his client "'an exorbitant sum of money . . . in light of his role in this.'"  (Id. at ¶ 14(b))

       Given that most of the communications between Avenatti and the Nike lawyers were recorded, the trial is likely to turn on the communications that took place between Franklin and Avenatti.  But Geragos never met or spoke with Franklin, and he attended no meetings between Franklin and Avenatti.  Accordingly, he has no firsthand knowledge of what Franklin said to Avenatti, or what Avenatti disclosed to Franklin.

       Because Avenatti has not shown that Geragos has exculpatory information, he cannot show that the Government has acted in bad faith in refusing to seek an immunity order for Geragos.[6]

---

[5]  The Geragos proffer notes indicate (GX 3557-010 at 4; GX 3557-011 at 5) – and the Government argues (Govt. Br. (Dkt. No. 172) at 12-13) – that Geragos never met or spoke with Franklin.  Avenatti does not dispute this point.

[6]  Indeed, it appears that testimony from Geragos would be inculpatory of Avenatti.  The proffer notes indicate that Geragos told the Government that he told Avenatti – during and after the March 21, 2019 meeting with the Nike lawyers – that Geragos was "uncomfortable" with Nike's proposal that Nike make a lump-sum payment to Avenatti and Geragos.  Geragos allegedly told Avenatti that such an approach was "going down a road he did not think they could go down."  Geragos also told Avenatti that he had to convey to Franklin the amount of the payment.  (GX

Avenatti likewise cannot show that the Government "has used immunity in a discriminatory way." Stewart, 907 F.3d at 685.  The Government has not sought immunity for anyone connected to this case, and has not entered into a non-prosecution agreement or deferred prosecution agreement with any witness.  (Govt. Br. (Dkt. No. 172) at 11)[7]

Avenatti has also not shown that the relevant evidence he wishes to offer is not available from any other source.  See Stewart, 907 F.3d at 685.  To the extent that Avenatti wishes to offer evidence that "Geragos, a highly respected criminal defense lawyer, was a full participant with Mr. Avenatti," and to argue that this evidence "is relevant to Mr. Avenatti's state of mind and defense that it was not wrongful for him to insist upon an internal investigation – and to be paid for it – as a component of the settlement of Coach Franklin's claims" (see Def. Br. (Dkt. No. 169) at 4, 7, 11), Geragos's participation will be evident from the videos of the meetings that are introduced into evidence.  The Nike witnesses will likewise testify about the calls that Geragos first made to Nike about Franklin's claim.  In sum, there will be ample evidence at trial concerning Geragos's participation in the charged scheme.

The Court concludes that Avenatti has not demonstrated that the Government used its immunity authority in a discriminatory way; that it forced Geragos to invoke the Fifth

---

3557-010 at 5-6; GX 3557-011 at 5)  Despite Geragos's warning – conveyed during a break in the March 21, 2019 meeting – Avenatti endorsed the idea of a lump-sum settlement, telling the Nike lawyers that "[i]f [Nike] wants to have one confidential settlement and we're done, they can buy that for twenty-two and [a] half million dollars and we're done. . . . Full confidentiality, we ride off into the sunset. . . ." ((S1) Indictment (Dkt. No. 72) at ¶ 14(d))

[7]  Avenatti argues that, during an attorney proffer, Geragos's counsel – in an effort to persuade the Government not to charge Geragos – told the Government that if Geragos was not charged, he would not make any public statements about the case, would avoid contact with Avenatti, and – if called to testify – would invoke his Fifth Amendment privilege and not assist in Avenatti's defense.  (Def. Br. (Dkt. No. 169) at 11-12; see also GX 3557-004 at 1)  A finding of Government manipulation cannot be premised on statements made by a defense lawyer who was trying to persuade the Government not to indict his client.

Amendment through overreaching; or that it deliberately refused to seek immunity for Geragos

in order to suppress exculpatory evidence or to obtain a tactical advantage.  Indeed, Avenatti has

not demonstrated that Geragos's testimony would be exculpatory as to Avenatti.  For all of these

reasons, Avenatti's motion, in the alternative, for an order directing the Government to seek an

immunity order for Geragos, will be denied.

## **CONCLUSION**

Aveantti's motion to compel Geragos to testify at trial (Dkt. No. 168) is denied.

Avenatti's motion, in the alternative, for an order compelling the Government to seek an

immunity order for Geragos (see id.) is likewise denied.

Dated:  New York, New York
           January 26, 2020

SO ORDERED.

_____
Paul G. Gardephe
United States District Judge