**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

January 29, 2020

**BY ECF**

The Honorable Paul G. Gardephe
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

    **Re:**   ***United States v. Michael Avenatti,***
          **S1 19 Cr. 373 (PGG)**

Dear Judge Gardephe:

    The Government respectfully writes with two requests in light of the defendant's opening statement this afternoon.  First, the Government requests that the Court preclude the defendant from describing or making arguments based on the content of text messages between Jeffrey Auerbach and Gary Franklin, Sr., not seen by the defendant, unless (i) a witness testifies in a manner that is materially inconsistent with those messages, and (ii) the Court determines that a specific message may offered as a prior inconsistent statement.  Second, the Government requests that the Court rule that the defendant has opened the door to the admission of two text messages sent by Mr. Auerbach to the defendant.

    I.    <u>Text Messages Between Mr. Auerbach and Mr. Franklin</u>

    Earlier this week, the Court explained:

> Information that was never conveyed to Avenatti and communications that he never saw are irrelevant because the trial is about his state of mind.  The prerequisite for admission of such information in communications is proof that the information in communications was shared with him; in other words, that the information and communications could have influenced his thinking and state of mind during the relevant time period.  Text messages, e-mail statements, and other documentary information that Avenatti never saw at the time may be useful to refresh the recollection of other witnesses or to impeach witnesses, such as Franklin and Auerbach, as to what they said to Avenatti about their goals for the approach to Nike.  But I see no role for such information and communications as direct evidence.

Honorable Paul G. Gardephe
United States District Judge
January 29, 2020
Page 2

(Transcript of Jan. 27, 2020 (enclosed as Exhibit A), at 5.)

The Court also ruled that the defendant could not refer to such messages in his opening statement:

> . . . If they testify in a manner that's inconsistent with their text messages, I will allow you to cross-examine and to use the text messages to impeach them.  I cannot predict that that's how they're going to testify.  I don't know.  So, therefore, I don't know whether the text messages are going to come in or not, and so, therefore, there will not be a reference to text messages in the defense opening.

> Now, if you want to say to the jury, ladies and gentlemen, I expect the evidence will show that Auerbach and Franklin spent a year and a half talking about what they wanted to accomplish vis-a-vis Nike, that they wanted justice, etc., etc., you are welcome to do that.  But you're not going to refer to text messages that I don't know are ever coming in.

(*Id.* at 70.)

Whether intentional or inadvertent, the defense opening repeatedly violated the Court's unambiguous ruling that "there will not be a reference to text messages in the defense opening." Among other things, defense counsel stated:

> [Franklin] felt bullied, he felt strong-armed, in his own words.

> . . .

> To use their words, they wanted justice.  Nike executives had lied. Nike had irreparably harmed—these are their words—irreparably harmed Coach Franklin.  Nike had bullied him, abused him, cheated, lied, colluded, committed fraud, corruption, strong arm.  Those were the words, the sentiments of Coach Franklin and his advisor, Mr. Auerbach.

> . . .

> Quote, they wanted Nike to do the right thing.  They wanted Nike to take swift action and to, quote, investigate, investigate their words, and fire the rogue executives.

> . . .

> They reach out to attorney Copeland and they tell him, Franklin's words, what I'm looking for is justice.

Honorable Paul G. Gardephe
United States District Judge
January 29, 2020
Page 3

. . .

*That's why they chose [the defendant].  And we can prove it.  We can prove it because we have the exchange of communications between those two men.*

. . .

Franklin was concerned that Mr. Avenatti wouldn't take the case.  Copeland wouldn't take the case.  Auerbach said: No.  I think Avenatti will take the case because, quote, what will attract Avenatti is the opportunity to expose the injustice, to go after Nike, to really light the next fuse in the sneaker company scandal.  A lot at play here for a guy like Avenatti.  Those were the words of Auerbach and Franklin.  Quote:  A high profile case which can lead to good press for Mr. Avenatti and help Avenatti net other defendants.

. . .

They like Mr. Avenatti's bravado.  They termed him the heavy artillery.

(Transcript of Jan.  29, 2020 (enclosed as Exhibit B), at 159, 160, 161, 163, 164 (emphasis added); *see also id.* at 176.)

In light of what the Government views as the defendant's repeated violation of the Court's ruling of only two days ago, and the serious confusion and distraction that may result from the defendant continuing to suggest to the jury that the state of mind of persons other than he matters, the Government asks this Court to preclude the defendant from further describing (including in posing questions) or making arguments based on the content of text messages between Mr. Auerbach and Mr. Franklin, not seen by the defendant, unless (i) a witness testifies in a manner that is materially inconsistent with those messages, and (ii) the Court determines that a specific such message may offered as a prior inconsistent statement.  To be sure, to avoid drawing the attention of the jury to inadmissible and confusing material, the Government did not object to these

Honorable Paul G. Gardephe
United States District Judge
January 29, 2020
Page 4

statements when made, but that does not render them proper or permit the defendant to continue making them.[1]

## II.   Two Text Messages Sent From Mr. Auerbach to the Defendant on March 25, 2019

As the Court is aware, the parties previously litigated whether the Government would be permitted in its case-in-chief to offer two text messages sent by Mr. Auerbach to the defendant, the first of which was in reaction to a Twitter posting of the defendant, and the second of which was in reaction to the allegation that the defendant sought money for himself from NIKE, Inc.  (*See* Dkt. Nos. 196, 197, 205; *see also* Dkt. No. 211, at 6-7.)

Yesterday, the Court ruled:

> To the extent that these text messages have some bearing on Auerbach's state of mind, their admission must await an attack on Auerbach's credibility, and I can't anticipate whether there will be an attack on his credibility or not.
>
> In the event there is an attack on his credibility and a claim of recent fabrication, I will consider then whether these text messages have some possible relevance.  But for present purposes there is to be no reference to the text messages [at issue].

(Ex. A, at 7-8.)

Earlier today, the defendant argued that the jury should disbelieve both Mr. Auerbach and Mr. Franklin for multiple reasons, including because they were not approached by law enforcement until after the defendant was arrested.  Defense counsel stated:

> They have spoken to Gary Franklin since then.  They have spoken to Jeff Auerbach since then.  You can imagine how those two men

---

[1]   Nor is mere inconsistency a basis for admissibility.  *See United States v. Ghailani*, 761 F. Supp. 2d 114, 117-18 (S.D.N.Y. 2011) (describing requirements and citing cases).  Rather, the party seeking to use the statement must, among other things, identify a "variance" between it and testimony that "has a reasonable bearing on credibility," *United States v. Trzaska*, 111 F.3d 1019, 1025 (2d Cir. 1997) (internal quotation marks omitted), and the statement must relate to a material matter, *see, e.g.*, *United States v. Rivera*, 273 F. App'x 55, 58 (2d Cir. 2008).  Admission or use of the statement must also satisfy Federal Rule of Evidence 403.  *See, e.g.*, *United States v. Surdow*, 121 F. App'x 898, 899 (2d Cir. 2005); *United States v. King*, 560 F.2d 122, 128 n. 2 (2d Cir. 1977).  And even if the defendant could otherwise meet all of these requirements for certain statements, it would remain improper for him to base arguments on what Mr. Franklin or Mr. Auerbach allegedly told a different lawyer in a privileged conversation.  (*See* Ex. B, at 161.)

Honorable Paul G. Gardephe
United States District Judge
January 29, 2020
Page 5

> reacted when they found out that Avenatti was arrested.  They, of
> course, became worried because they saw the media.
>
> And you will likely find out that their testimony may change since
> they met with Mr. Avenatti.  And this courtroom will be a fight for
> credibility.  It will be a search for the truth by you.  Your job will be
> to watch them as they testify and compare what they say now to
> what they said back then, when they were meeting with
> Mr. Avenatti, because we have it in hard paper, what they were
> telling each other, what they shared with lawyers, what they shared
> with Avenatti.

(Ex. B, at 175-76.)

The Government believes that the defendant has now opened the door, by attacking Mr. Auerbach's credibility, to each of the two text messages sent by Mr. Auerbach that were the subject of the Court's prior ruling.

That is certainly true of the first such message, in which Mr. Auerbach, in response to a Twitter post of the defendant prior to his arrest (GX 107, filed at Dkt. No. 205-1, and the admissibility of which the defendant has not challenged), stated that the post was "very upsetting" and that the defendant should "call me before going public in any way" (Dkt. No. 197-1, at 2). This message—sent at a time when Mr. Auerbach did *not* know that the defendant had been arrested, much less the details of charges against him—squarely rebuts the argument, which the defendant has now made to the jury, that Mr. Auerbach only later told federal agents what he allegedly thought would assist this case or that his statements to federal agents should be viewed with skepticism because he somehow feared that he might have criminal exposure at that time.

It is also true of the second message, because the defendant has now asked the jury to "imagine how these two men [Mr. Auerbach and Mr. Franklin] reacted when they found out that Avenatti was arrested."   The defendant cannot reasonably both suggest to the jury that the "reaction" of a witness at that time somehow is consistent with his theory of defense while blocking the Government from offering evidence of the actual reaction (*id.*), which is not consistent with his theory.

Honorable Paul G. Gardephe
United States District Judge
January 29, 2020
Page 6

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney

By:  s/ Daniel C. Richenthal
Matthew D. Podolsky
Daniel C. Richenthal
Robert B. Sobelman
Assistant United States Attorneys
(212) 637-1947/2109/2616

Enclosures

cc:  (by ECF)

Counsel of Record

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
     UNITED STATES OF AMERICA,
 3
                   v.                          19 CR 373 (PGG)
 4
     MICHAEL AVENATTI,
 5
                   Defendant.                  Trial
 6   ------------------------------x
                                               New York, N.Y.
 7                                             January 27, 2020
                                               10:15 a.m.
 8   Before:

 9
                        HON. PAUL G. GARDEPHE,
10
                                               District Judge
11                                             -and a Jury-

12                          APPEARANCES

13   GEOFFREY S. BERMAN
          United States Attorney for the
14        Southern District of New York
     BY:  MATTHEW D. PODOLSKY
15        DANIEL RICHENTHAL
          ROBERT B. SOBELMAN
16        Assistant United States Attorneys

17   BLACK SREBNICK KORNSPAN & STUMPF, P.A.
          Attorneys for Defendant
18   BY:  HOWARD M. SREBNICK
          -and-
19   SCOTT A. SREBNICK
     JOSE M. QUINON
20        -and-
     PERRY GUHA, LLP
21   BY:  E. DANYA PERRY

22   Also Present:
     DeLeassa Penland, Special Agent (USAO)
23   Andrew Hamilton, Paralegal
     Juliana Manrique, Paralegal
24   Michael Dunlavy
     Michael Lyon, Trial Technician
25
```

1                   (Case called)

2                   MR. PODOLSKY:  Good morning, your Honor, Matthew

3    Podolsky, Robert Sobelman, Daniel Richenthal for the

4    government.  With us at counsel table are Special Agent

5    DeLeassa Penland of the U.S. Attorney's Office and paralegal

6    Andrew Hamilton.

7                   MR. H. SREBNICK:  On behalf of the defense, Howard

8    Srebnick; my brother, Scott Srebnick standing next to

9    Mr. Avenatti; Ms. Perry; Mr. Stabile; Mr. Quinon; Mr. Dunlavy;

10   and Mr. Lyon.

11                  THE COURT:  Please be seated.

12                  Mike, do we have an estimate on when the jury panel is

13   going to be here?

14                  THE DEPUTY CLERK:  10:30, your Honor, but I will give

15   them a call to make sure.

16                  THE COURT:  Mr. Srebnick, you had told me about three

17   additional lawyers.  Are they going to be at the table?  Let me

18   ask you this.  Are they going to have a speaking role at the

19   trial?

20                  MR. H. SREBNICK:  No, your Honor.

21                  THE COURT:  I want to return to an issue that we

22   talked about last week, which was the cost of internal

23   investigations.  We had a discussion about this last week.  The

24   government represented at that time that it did not intend to

25   argue to the jury that the cost of the proposed internal

1  investigation was unreasonable, and we talked through the

2  government's theory at that time.  And the government confirmed

3  that in its view the defendant would have committed extortion

4  even if the demand was a million dollars, as opposed to the 50

5  and the $25 million that's alleged in the indictment.

6         I do remain somewhat concerned that someone on the

7  jury may nonetheless feel that the amount referenced in these

8  conversations was unreasonable, regardless of whether the

9  demand had been authorized by Franklin or not.

10         I do think we will need a jury instruction to the

11  effect that the government does not contend that the amount

12  that Avenatti sought to do the internal investigation at Nike

13  was unreasonable or, stated another way, that the jury can't

14  find Avenatti guilty of extortion or honest services fraud

15  based merely on the amount he was seeking to perform an

16  internal investigation.  I want the lawyers to think about that

17  and, if they agree, propose language.

18         I also want to return to this issue of Colin

19  Kaepernick.  On January 20, the government had moved for an

20  order precluding the defendant from referring to Colin

21  Kaepernick either in opening or witness examinations or jury

22  arguments, citing the government's January 20 letter, docket

23  No. 173 at pages 6-7.

24         At the January 22 conference, I indicated that there

25  shouldn't be any reference to Kaepernick because the only

1    relevance of his name was that Geragos had represented him in

2    connection with a dispute that Kaepernick had with Nike and

3    that explained why Geragos knew Nike's general counsel and

4    other lawyers that worked at Nike.  However, as I said at that

5    conference, Geragos' prior interaction with Nike and the fact

6    that he had a relation with Nike could be explained merely by

7    eliciting that he had contact with Nike through his

8    representation of a prominent football player who had a claim

9    against Nike, citing the January 22, 2020 conference

10   transcript, docket No. 205-2 at pages 149-50.

11        In a January 24 letter, Avenatti argues that

12   references to Kaepernick's name should be allowed because there

13   are references to his name in tape-recorded evidence that will

14   be introduced at trial, citing the defendant's January 24, 2020

15   letter, docket No. 210 at pages 1 and 4.

16        I am not persuaded.  To the extent there are passing

17   references to Kaepernick's name in tape-recorded conversations,

18   they will be redacted.  Kaepernick is a divisive figure who has

19   nothing to do with the charges in this case.  There is no

20   probative value to the use of his name.  And there is the

21   potential for jury distraction, confusion, and unfair prejudice

22   under Rule 403.

23        To the extent that Avenatti argues that the use of

24   Kaepernick's name has some bearing on the request for an

25   internal investigation, Geragos did not perform an internal

1    investigation of Nike in connection with his representation of

2    Kaepernick and, therefore, there is no connection.  So there is

3    to be no reference to Kaepernick.

4         I also want to lay out some rules of general

5    application which will hopefully aid us in resolving the

6    countless motions *in limine* that have been filed and continue

7    to be filed on a daily basis.  I am going to make some general

8    points that have general application here.

9         Information that was never conveyed to Avenatti and

10   communications that he never saw are irrelevant because the

11   trial is about his state of mind.  The prerequisite for

12   admission of such information in communications is proof that

13   the information in communications was shared with him; in other

14   words, that the information and communications could have

15   influenced his thinking and state of mind during the relevant

16   time period.  Text messages, e-mail statements, and other

17   documentary information that Avenatti never saw at the time may

18   be useful to refresh the recollection of other witnesses or to

19   impeach witnesses, such as Franklin and Auerbach, as to what

20   they said to Avenatti about their goals for the approach to

21   Nike.  But I see no role for such information and

22   communications as direct evidence.

23        As to the time period that is relevant here, the

24   relevant time period ended when Avenatti blew up the alleged

25   scheme by announcing on March 25, 2019, at about 12:16 p.m.,

1    that he intended to hold a press conference to disclose Nike's

2    alleged criminal conduct.  The government contends that he took

3    this step after learning that the FBI had approached Franklin.

4    The government will argue that Avenatti knew then that Nike

5    wouldn't be paying any money to him and that, to use his

6    colorful phrase, he would not be riding off into the sunset.

7         Because the alleged unlawful scheme was predicated on

8    alleged threats to damage Nike's reputation, and on an alleged

9    corrupt overture in which Avenatti allegedly offered to betray

10   his client and suppress evidence of Nike's alleged misconduct

11   in exchange for a bribe, his announcement of the press

12   conference marked the effective termination of the alleged

13   scheme, which was, of course, predicated on secrecy.

14        Another rule of general application here is that "when

15   a threat is made to injure the reputation of another, the truth

16   of the damaging allegations underlying the threat is not a

17   defense to a charge of extortion under Section 875(d)." Citing

18   *United States v. Jackson*, 180 F.3d 55-66 (2d Cir. 1999)

19   (collecting cases).  Accordingly, as I have told the parties

20   before, it matters not whether Nike was engaged in a

21   large-scale effort to corrupt amateur basketball.

22        Accordingly, the trial will not involve an exploration

23   of whether Nike was engaged in a large-scale effort to corrupt

24   amateur basketball.

25        The focus of the trial will instead be on, among other

1     things, whether Gary Franklin, Avenatti's client, authorized

2     him to make the financial demands that he allegedly made on

3     Nike during the meetings and calls at issue.

4               In the limited time we have available now let's try to

5     make progress on the motions *in limine* that I have before me.

6               There were letters filed today which I have not read,

7     so we won't be addressing them today, or at least not right

8     now.

9               I have a letter from the government, dated January 23.

10    It's docket No. 205.  It has to do with communications from

11    Jeffrey Auerbach to the defendant and these are text messages

12    from Auerbach to Avenatti on March 25, 2019.

13              There is to be no reference to Auerbach's text

14    messages in the government's opening.  As I've indicated from

15    the government's perspective, the crimes were complete before

16    the text messages were sent.  Indeed, as I have said,

17    Avenatti's announcement of the press conference, in effect,

18    marked the termination of the alleged criminal scheme which, as

19    I've said, were premised on secret threats to Nike as well as

20    an alleged promise to keep Nike's misconduct a secret.

21              To the extent that these text messages have some

22    bearing on Auerbach's state of mind, their admission must await

23    an attack on Auerbach's credibility, and I can't anticipate

24    whether there will be an attack on his credibility or not.

25              In the event there is an attack on his credibility and

1    a claim of recent fabrication, I will consider then whether

2    these text messages have some possible relevance.  But for

3    present purposes there is to be no reference to the text

4    messages that are the subject of the government's January 3,

5    2020 letter.

6          There is also a discussion in the government's letter

7    about certain postarrest tweets that Mr. Avenatti engaged in

8    and, in particular, the government says that Mr. Avenatti

9    posted a great deal of confidential information that he had

10   obtained from his client after his arrest.  And the government

11   argues that this shows Mr. Avenatti's state of mind and that he

12   breached his duties under the relevant California rules of

13   professional conduct.

14         Same ruling with respect to these postarrest Tweets.

15   The posting of the alleged confidential documents didn't

16   further any of the charged crimes because, again, the charged

17   crimes are premised on a theory that it was necessary to keep

18   Nike's misconduct a secret.  It was the secrecy that provided

19   the leverage for extracting money from Nike.  So the posting of

20   the confidential documents after Mr. Avenatti's arrest did not

21   further the alleged crimes.

22         With respect to the argument that the posting of the

23   documents violated Avenatti's duty of confidentiality under

24   rules of professional conduct, assuming arguendo that that's

25   true, this breach cannot be the basis for an honest services

1   wire fraud conviction because, as I've said, the alleged breach

2   was not in furtherance of that crime or the other crimes that

3   are charged in the indictment.

4           The theory of the honest services wire fraud charge is

5   that Mr. Avenatti breached his duty to his client by not

6   disclosing that he was demanding money for himself to the

7   detriment of his client, and so his action postarrest to put

8   these confidential documents on the Internet, it has no bearing

9   on whether he committed honest services wire fraud, and

10  introducing evidence of this postarrest breach obviously poses

11  a risk of juror confusion as to exactly what Mr. Avenatti is

12  charged with doing.

13          There is not to be any reference to these postarrest

14  Tweets in the government's opening either.

15          There are countless other issues that are raised in

16  the letters that have been filed.  I don't know at this point

17  whether these are live issues or not.  It might be that the

18  most efficient way is to just page through the various letters

19  and find out whether there is still an issue or not.

20          Going back to January 20, docket No. 173, the

21  government raised a litany of subjects and topics that it

22  believes should be excluded from the trial.  Much of this

23  reflects items that the defense has marked as exhibits.

24          I'll start with law firm biographies.

25          Mr. Srebnick, do you intend to introduce the law firm

1     biographies that the government references in its January 20

2     letter?

3              MR. H. SREBNICK:  Your Honor, we are not going to open

4     on it.  To the extent that it becomes relevant, we will let you

5     know before we offer it, so it's not an issue in openings.

6              THE COURT:  Fair enough.  Same as to the complaint

7     that you marked as exhibits.

8              MR. H. SREBNICK:  Correct.

9              THE COURT:  Same as to the NCAA manual.

10             MR. H. SREBNICK:  Correct.

11             THE COURT:  Same as to the Nike and Tyco 10-Ks?

12             MR. H. SREBNICK:  Correct.

13             THE COURT:  Same as to Nike's code of conduct?

14             MR. H. SREBNICK:  Correct.

15             THE COURT:  I've already ruled on the David Boies

16    letter.

17             What about the statements that Nike made to the media

18    in 2017?

19             MR. H. SREBNICK:  I think you had already ruled that

20    we would not be discussing that in opening statement.

21             THE COURT:  At the end of the letter there is a whole

22    list of topics that the government has asked that the defense

23    not reference.  Most of them have some political connection.

24             I don't know if you have the letter in front of you,

25    Mr. Srebnick, but there is a list of 15 items.

```
 1            Are you going to be going into these in your opening
 2   or do you intend to?
 3            MR. H. SREBNICK:  I apologize.  I don't have the
 4   letter in front of me.  If I can have a moment to locate it.
 5            THE COURT:  If it's more effective, I'll just read it
 6   to you.
 7            Item No. 1 is Stormy Daniels.  Item No. 2 is Donald
 8   Trump.  The government had asked me to preclude any references
 9   to the Stormy Daniels lawsuit against the president.  I
10   expressed the view last week that given Mr. Avenatti's
11   notoriety and his ability to leverage media attention, it
12   seemed to me it would be very difficult to preclude any
13   reference to his prior representation of Stormy Daniels against
14   the president.
15            Unless the government has anything more to say on that
16   point, I will allow you, Mr. Srebnick, to allude to the fact
17   that Mr. Avenatti had gained prominence as a result of his
18   representation of Stormy Daniels in lawsuits against the
19   president.
20            MR. PODOLSKY:  Your Honor, I want to just raise a
21   related point, which we could address now.  It's been briefed
22   elsewhere.
23            I understand your ruling with respect to the lawsuit
24   between Stormy Daniels and the president.  There has also been
25   litigation or letter writing about the defense's theory that
```

1   it's somehow relevant that a Nike witness -- the reason, they

2   say, and I'll add some more color to this, one of the reasons

3   Nike reached out to the government is somehow Nike thought the

4   government would be interested in pursuing Mr. Avenatti because

5   he is, to use their language, a nemesis of the president.  We

6   understand your ruling with respect to the Stormy Daniels

7   lawsuit.  We do object, and I'm happy to speak about this at

8   greater length, to reference to that notion in the opening or

9   at any other time in the trial.

10          THE COURT:  I have previously expressed the view that

11   I was having difficulty understanding why the motive of the

12   Nike lawyers -- why their motive in contacting the U.S.

13   Attorney's Office about Mr. Avenatti's approach, I was having

14   difficulty understanding why that mattered.  I continue to be

15   concerned about that.

16          Mr. Srebnick.

17          MR. H. SREBNICK:  Your Honor, what I would intend to

18   open on is simply that after the first unrecorded meeting

19   between lawyers from Nike and Boies, they decided, since they

20   were already under a grand jury subpoena investigation

21   involving these very same matters involving payments to amateur

22   players, Boies and Nike decided to, quote, get out in front of

23   the issue of Mr. Avenatti going public with the allegations of

24   his client, Mr. Franklin, and that the Nike lawyers and Boies

25   decided it best to report this to the authorities as a way of

1   currying favor with the government because some of the matters

2   that were brought to Nike lawyers' attention during the meeting

3   with Mr. Avenatti were matters that had not been revealed as

4   part of the grand jury investigation, and that's what motivated

5   Nike lawyers to run to the U.S. Attorney's Office to get out in

6   front of Avenatti disclosing that which we believe Nike should

7   have disclosed during the grand jury investigation.

8           THE COURT:  You know, I suppose it's conceivable that

9   this theory could have some relevance to the credibility of the

10  Nike lawyers.  I guess that's possible.  As I've said before, I

11  don't think it provides any sort of defense to Avenatti that

12  Nike's motive in reporting this to the U.S. Attorney's Office

13  was to further their own interests.  I don't see the

14  connection.

15          Let's assume that was their motivation.  What bearing

16  does that have on whether Mr. Avenatti committed the crimes he

17  is charged with?

18          MR. H. SREBNICK:  The elephant in the courtroom is

19  that you have lawyers for Nike calling the Southern District of

20  New York after a settlement conference and characterizing it in

21  the way that they chose to characterize it to the Southern

22  District prosecutors.  It was an unrecorded meeting.  So the

23  description of that meeting by the Nike lawyers and Boies is

24  what prompted the Southern District of New York to authorize

25  the tape recording of Mr. Avenatti.

14

 1          I worry that the jury will be wondering what prompted

 2     the Southern District of New York to initiate the

 3     investigation.  Naturally, it was relying on the statements

 4     made by the Nike Boies lawyers to the Southern District

 5     prosecutors and the credibility of their allegations to those

 6     prosecutors.  And so the jury would naturally wonder why did

 7     the Federal Government start recording Mr. Avenatti suddenly

 8     based solely on the description of the events of the Boies

 9     lawyers.  Note that the Southern District of New York had not

10     spoken to Mr. Franklin or Mr. Auerbach at that point in time.

11          THE COURT:  Let me say that, as I've indicated, I do

12     think the background here has some credibility.  It has some

13     credibility implications.  It is a fair point that the first

14     meeting wasn't tape recorded, and we are going to hear about it

15     from the Nike lawyers.  And the defense argument is that they

16     had a motive to paint themselves as the victim and to paint

17     Mr. Avenatti as someone who is engaged in criminal behavior.

18     And so I don't see how I can take that totally out of the case.

19          Mr. Podolsky.

20          MR. PODOLSKY:  Yes, your Honor.  I think there is

21     actually two separate points at work here.  Let me first

22     respond to what your Honor has just said.

23          We are not seeking to preclude the defense from

24     cross-examining the witnesses as to their credibility here when

25     they describe the unrecorded meeting.  Of course, they are

K1RMAVE1

1    entitled to challenge the recollection or credibility of a

2    witness who is recounting a meeting that's not recorded.

3         What Mr. Srebnick has just described is that he thinks

4    he is entitled to talk to the jury about the motivations of the

5    prosecutors in deciding to investigate and record meetings with

6    Mr. Avenatti.  That's not for the jury.  They have made their

7    selective prosecution motion and it was denied, and it would be

8    entirely improper to suggest to the jury or argue to the jury

9    that the defendant should be acquitted because of the decision

10   to pursue this investigation.

11        The second point --

12        THE COURT:  Before we leave that, did I misunderstand

13   you, Mr. Srebnick?  Because that's not what I understood you to

14   be arguing or requesting permission to argue.

15        MR. H. SREBNICK:  Your Honor understood me and

16   apparently the prosecutor did not.

17        MR. PODOLSKY:  Your Honor, I disagree.  I'm looking at

18   the transcript.  What he said is:  The jury will wonder why the

19   prosecutors chose to pursue these recordings.  That is not

20   something the jury should wonder.  If they are, they should be

21   instructed not to.  In fact, they will.  It is a normal

22   instruction to tell the jury that the government is not on

23   trial.

24        THE COURT:  I am not sure that that's a normal

25   instruction.  In fact, I'm confident it's not.  But, in any

1   event, Mr. Srebnick, I will allow you to make arguments that go

2   to the motive of the Nike lawyers in contacting the government.

3   I will not allow you, to the extent the assistant read that

4   portion, it sounded like you want to challenge the government's

5   motives for bringing the investigation or prosecution.  That I

6   cannot permit because I have ruled on the issue of vindictive

7   and selective prosecution.

8          MR. H. SREBNICK:  I'm abiding by the ruling that you

9   made pretrial.  I think you understood, and I reiterate again,

10  that the only thing I will say in opening statement relates to

11  the motives of the Nike Boies lawyers in getting out in front

12  of Mr. Avenatti and going to the Southern District prosecutor.

13         MR. PODOLSKY:  Your Honor, first of all, I think there

14  is a distinction between the motives in calling the prosecutors

15  versus their motive to be truthful in this trial.  The former

16  motive is not relevant.

17         I do want to direct our attention back to what this

18  discussion began with, which is the theory that has been

19  advanced multiple times, in writing and in court, that that

20  motive, or the Nike lawyers' thinking had to do with this idea

21  that that Avenatti was Trump's nemesis and that the government

22  would somehow want to pursue him because of that.

23         Mr. Srebnick did not answer your Honor's question,

24  which is whether he intends to describe that motive and that

25  victim.

 1          MR. H. SREBNICK:  I will answer the question.  I will

 2   not say that in opening statement.  I will abide by the judge's

 3   ruling.

 4          THE COURT:  Did you have another point, Mr. Podolsky?

 5          MR. PODOLSKY:  That's what I wanted to focus our

 6   attention on.

 7          THE COURT:  That's 1 and 2.  And then we have a whole

 8   list of other people.  R. Kelly.  Are you going to get into R.

 9   Kelly?

10          MR. H. SREBNICK:  The only issue with regard to R.

11   Kelly that could come up is the press conference that Auerbach

12   and Franklin observed before they met Mr. Avenatti.  One of the

13   reasons they were interested in choosing Mr. Avenatti as a

14   lawyer is precisely because they were impressed by the press

15   conference he had held with regard to the R. Kelly matter.

16          THE COURT:  I understand that.  They had ample

17   motivation, based on, I think you said, 130 videos that they

18   observed of Avenatti talking about Stormy Daniels and the

19   president.  So, no.  We are not going to get into R. Kelly.  We

20   are not going to get into Jeffrey Epstein.  We are not going to

21   get into Rudy Giuliani.  I have already ruled on Colin

22   Kaepernick.  And there is a whole bunch of other political

23   references.  Republicans, democrats, conservatives, liberals,

24   progressives, the left, the right, etc.

25             You are not going to get into that, are you?

KLRMAVE1

1           MR. H. SREBNICK:  Correct, I am not.

2           THE COURT:  I don't want any reference to those

3  matters:

4           Then the last two items that the government lists, and

5  I quote:  "Any other current or former public official or

6  representative thereof or term for a political affiliation or

7  group."

8           Are you going to get into that?

9           MR. H. SREBNICK:  No, your Honor.

10          THE COURT:  And then, finally:  Any other specific

11  former client or adversary or person involved in a lawsuit

12  brought or threatened to be brought by the defendant or Mark

13  Geragos.

14          I think what the government is getting at is they

15  don't have any problem with you telling the jury that

16  Mr. Avenatti is a prominent lawyer.  He is a real lawyer.  He

17  litigates things.  He files lawsuits, etc., etc.  But they

18  don't want you to get into who he has represented in the past.

19  They don't want names like Harvey Weinstein and Elizabeth

20  Holmes to be brought up in the opening.

21          Do I have anything to worry about?

22          MR. H. SREBNICK:  Judge, you have absolutely nothing

23  to worry about.

24          THE COURT:  And then, finally, the last point is,

25  cross-examination regarding witnesses' prior political work,

1    alleged political views, or campaign donations.  You are not

2    going to get into that?

3         MR. H. SREBNICK:  You have nothing to worry about,

4    Judge.

5         MR. RICHENTHAL:  One brief point, your Honor.  As I

6    think the Court correctly just described, our request on the

7    penultimate point, that is, with respect to Mr. Avenatti's

8    prior clients, also extended to Mr. Geragos' prior clients.  We

9    just want to confirm the defense doesn't intend to name or

10   otherwise describe Mr. Geragos' prior clients.

11        MR. H. SREBNICK:  As to Mr. Geragos, we would like to

12   develop his prominence in the legal community to include

13   celebrity A-list clients, Michael Jackson and others, in his

14   career, long career, high-profile, lot of press conferences,

15   lots of television appearances, a known figure in the legal

16   community.  We would like to develop him as a lawyer who was a

17   well known and also known for being a person who appears

18   frequently on national television.

19        MR. RICHENTHAL:  I think your Honor probably knows

20   what I am going to say, but I'll just say it anyway.

21   Mr. Srebnick just named another very controversial and deceased

22   individual.  We don't know who else he intends to name.  None

23   of those names or representations has anything to do with this

24   trial.  They are not mentioned in any contemporaneous

25   communications of which I'm aware of between Mr. Avenatti and

1    Mr. Geragos.  They are not mentioned in any meetings of which

2    I'm aware of between Nike with its representatives.  It has no

3    place whatsoever in this trial.  Even if one wants to theorize

4    a modicum of relevance, it would be extraordinarily confusing,

5    distracting and, depending on the argument, inflammatory for

6    Mr. Srebnick to go there in opening or, for that matter, in our

7    view, any time at trial.

8              THE COURT:  I will allow you, Mr. Srebnick, to refer

9    to Mr. Geragos as a highly prominent lawyer, both in the area

10   of criminal defense and celebrity clients, but I will not allow

11   you in your opening to reference particular representations

12   that Mr. Geragos had.

13             MR. H. SREBNICK:  Understood, Judge.

14             THE COURT:  Why don't we start bringing them in.

15             (Continued on next page)

16

17

18

19

20

21

22

23

24

25

K1RMAVE3

1           THE COURT:  I want to turn to this issue about advice

2      of counsel.

3           Mr. Srebnick, are you intending to raise any sort of

4      advice of counsel defense here?

5           MR. H. SREBNICK:  Yes, your Honor.

6           THE COURT:  Have you given notice of that?

7           MR. H. SREBNICK:  I think so.  We proposed jury

8      instructions to that effect.

9           MR. RICHENTHAL:  As we said in writing several weeks

10     ago, we don't think that that instruction is applicable, nor do

11     we think it constitutes notice.  On the contrary, we remain

12     deeply confused about what this defense is and how Mr. Avenatti

13     could possibly meet it, given that there are several very

14     strict requirements here.  I'm happy to talk further, but for

15     now, with respect to notice, no, we remain cofounded how this

16     possibly could be appropriate in this case.

17          THE COURT:  Mr. Srebnick, would you tell me what kind

18     of advice of counsel defense you think you have here?

19          MR. H. SREBNICK:  Your Honor, my brother will handle

20     the legal argument.

21          MR. S. SREBNICK:  I would certainly acknowledge for

22     the Court that it's not a conventional advice of counsel

23     defense in the sense that a client goes to a lawyer,

24     specifically asks for advice about prospective conduct.  We

25     acknowledge that.

1          What we indicated to the government is that our view

2     is that Mr. Geragos' presence throughout the entire process,

3     his involvement not only in discussions about whether

4     Mr. Avenatti intended to hold a press conference, whether they

5     would demand an internal investigation, the cost of the

6     investigation, all of the things that your Honor actually laid

7     out in the memorandum opinion that the Court issued this

8     morning about Mr. Geragos being lockstep with Mr. Avenatti, all

9     of that is going to come out before the jury.

10         Whether that merits at the end of the day a

11    traditional advice of counsel instruction, I don't know.  That

12    will be an argument that I suppose we will make at the time of

13    the jury instruction.  We don't intend to open on some

14    misrepresentation that Avenatti went and sought Mr. Geragos'

15    advice in the traditional sense.  But we certainly intend to

16    argue that Geragos' presence throughout, his status as a

17    criminal defense lawyer, his reputation, all of those things,

18    the fact that Mr. Avenatti texted with him, discussed it,

19    strategized with him is all relevant to Mr. Avenatti's state of

20    mind, whether he intended to extort Nike.

21         In that sense is it a traditional advice of counsel?

22    No.  Does it go to good faith and will we seek some instruction

23    at the end of the trial that reflects the evidence?  We will.

24    And so it's not any surprise to the government.

25         When we had these discussions early on with the

1    government, they actually asked, was there some outside lawyer.

2    And I said no, there is not some outside lawyer that

3    Mr. Avenatti went to.  They were asking me that because there

4    was a case in Georgia, a district court case, in which the

5    government dismissed an indictment after it was filed where a

6    client was able to show that on an 875 case, I think it was,

7    the client had gone to a lawyer and had gotten advice.  I said,

8    no, there is no such outside lawyer, but I did say at that time

9    that Mr. Geragos' presence, involvement, participation is

10   relevant to Mr. Avenatti's state of mind.  We do intend to

11   argue that and what type of instruction we merit at the end of

12   the day will be up to your Honor.

13          THE COURT:  I don't need to hear a lot from you.  If

14   you want to make some comments you can.

15          MR. RICHENTHAL:  For the record, that was not the

16   question we asked the defense.  It was not the answer we were

17   given.  But we are where we are.  Let's talk about where we

18   are.

19          With respect to the facts, I agree with probably about

20   99 percent of Mr. Srebnick said, which is to say the jury will

21   be aware of basically everything he said.  The question, and

22   this I think is going to occur throughout the trial in various

23   ways is, what is the defense allowed to argue from that?  And

24   our concern is what the defense is trying to do is tell the

25   jury Mr. Avenatti has a defense that the Second Circuit has

1   basically said he does not have.  There are four very strict

2   requirements for advice of counsel.

3          THE COURT:  We don't need to have a long conversation

4   about this.  He doesn't really have an advice-of-counsel

5   defense.  He has sort of an atmospheric defense, which is,

6   Geragos was a prominent lawyer.  He has actually practiced in

7   the criminal field.  And so his involvement, you know, gave me

8   some comfort.  It's not an advice-of-counsel defense.  He is

9   not going to argue that he retained Geragos or that Geragos and

10  he discussed the legality of what they were doing.  I don't

11  think there is any claim of that sort.  So there isn't an

12  advice-of-counsel defense.

13         Now, having said that, Geragos was at the table.  He

14  participated fully.  And we can't sort of airbrush him out of

15  the facts here.  He is part of the story.

16         What I hear from Mr. Srebnick is that he is not going

17  to open or his brother is not going to open on Geragos advised

18  that this was lawful or any sort of advice-of-counsel type

19  defense.  He is going to mention, I take it, that Geragos was

20  there, that Geragos was a very prominent person, very prominent

21  lawyer who was experienced in the criminal area, among other

22  things, and that he was a full participant in the meetings that

23  bring us here today.

24         MR. RICHENTHAL:  I agree with everything with your

25  Honor just said.  We do have however, two concerns.  Let me try

```
 1      to be granular about it.

 2              First, in at least one of the defense prior

 3      submissions -- it may actually be two, but in at least one --

 4      the defense suggested it is actually going to put in front of

 5      jury prior legal relationships between Mr. Geragos and

 6      Mr. Avenatti, notwithstanding that Mr. Avenatti has not waived

 7      privilege with respect to them, so neither your Honor nor the

 8      government is able to probe their relevance, if any.

 9              THE COURT:  Stop.

10              You are not going to get into that, are you?

11              MR. H. SREBNICK:  It only came up because in the tape

12      recording, I believe, Wilson, the lawyer for Boies, asks about

13      Geragos having previously represented Mr. Avenatti.

14              THE COURT:  That sounds like something that we might

15      want to redact.

16              MR. H. SREBNICK:  Forgive me, Judge.  I think it was

17      in the notes of the first meeting that is not recorded.

18              THE COURT:  So we don't need to redact it.

19              Let me state the obvious.  For us to get into the fact

20      that Geragos actually represented Avenatti in some other

21      litigation, that's going to be sort of wildly confusing to the

22      jury, so I don't think we are going to be getting into that,

23      right?

24              MR. H. SREBNICK:  Understood.

25              MR. RICHENTHAL:  I said there were two.
```

1           The second is, in Mr. Srebnick's remarks, maybe he

2    didn't mean it this way, he said he was going to talk about

3    Mr. Geragos' state of mind.  That's irrelevant, as your Honor

4    ruled last night and your Honor ruled again this morning.

5           He can talk about his client's state of mind, that is,

6    to the extent Geragos' physical presence informed that.  We

7    don't object to that argument.  But he can't say or suggest

8    that the jury should find that Mr. Geragos is guilty in order

9    to find Mr. Avenatti is guilty.  That's wrong as a matter of

10   fact and it's deeply confusing.  Excuse me.  Wrong as a matter

11   of law.

12          THE COURT:  The issue, and I address this in the

13   decision I gave to the lawyers last night and I gather was

14   posted on the docket this morning, that is, whether

15   Mr. Avenatti can argue that he did not have a criminal state of

16   mind because Mr. Geragos didn't have a criminal state of mind.

17   And given that Mr. Geragos is not going to be a witness here,

18   because he has asserted his Fifth Amendment rights, we are not

19   going to hear from him as to what he was thinking.

20          So it's hard to see how Geragos' state of mind, it's

21   hard to see how there is going to be evidence on that point.

22   Let me hear from the defense of what they intend to argue in

23   this vain.

24          MR. H. SREBNICK:  What I think the evidence will show

25   is that Mr. Geragos, as you described, was a full participant

1  and did not at any point in any of the conversations oppose the

2  proposal that Mr. Avenatti and Geragos made to Nike to settle

3  the case.  There were ultimately two proposals, as you may

4  recall.  One is a million and a half to Mr. Franklin with an

5  internal investigation of 15 to 25 million.  The Boies lawyers

6  asked for a separate -- let me say it this way.  The Boies

7  lawyers asked whether there could be a different kind of

8  settlement, which would just be one lump sum settlement, and

9  Geragos and Avenatti caucused and then proposed a lump sum

10  settlement figure of 22.5 million.  That was the proposal that

11  was made at the request of the Boies lawyers, what would be the

12  amount for Mr. Franklin if it was just one lump-sum payment.

13         Geragos was a full participant, voiced no objection,

14  appeared to embrace the two proposals, and that's what I would

15  intend to argue to the jury or present to the jury.

16         MR. RICHENTHAL:  Two problems with that.

17         One is the defense lacks good-faith basis for a lot of

18  what was just said.  As your Honor knows, Mr. Geragos did voice

19  an objection to Mr. Avenatti at a key moment.  The jury isn't

20  going to know about that.

21         THE COURT:  Let's be clear.  Geragos says that he

22  boasts an objection.  That is a very big difference.  Geragos,

23  in the context of trying to convince the government not to

24  indict him, said, by the way, I told Avenatti, this is a really

25  bad idea, this whole lump sum thing, bad idea.

1          Of course, Mr. Avenatti disputes that, right?

2          MR. H. SREBNICK:  Of course.  And the tape speaks for

3    itself.  Mr. Geragos and Mr. Avenatti come back from their

4    five-minute caucus and together they present this to Boies, and

5    Geragos does not appear at all at that point in time to find

6    any problem with a lump-sum payment being made to settle the

7    case.  And it's relatively clear the lump-sum payment is for

8    Mr. Franklin and whatever attorneys' fees flow from that flow

9    from that.  In fact, I didn't even know the government had ever

10   made that part of the charge in the case.  I thought the charge

11   was asking for the internal investigation, that that was the

12   problem.  I never imagined that proposing a 22 and a half

13   million dollar settlement that would be signed off by

14   Mr. Franklin is somehow part of this extortion theory of

15   theirs.  In any event, Mr. Geragos seemingly embraced it in

16   real time.

17         MR. RICHENTHAL:  I accept your Honor's distinction.  I

18   think I spoke too flippantly about Mr. Geragos' statements.

19         Mr. Srebnick, though, still hasn't answered, I think,

20   your Honor's inquiry, which I asked your Honor to pose, which

21   is, does he intend to argue about Mr. Geragos' state of mind?

22   In our judgment, and I think the Court has already ruled on

23   this, that is irrelevant.  He can only argue about his client's

24   state of mind, informed by what Mr. Geragos told him or didn't

25   tell him.  He can't ask the jury to opine what is in

1  Mr. Geragos' head and then infer, because something is in

2  Mr. Geragos' head, it must be in Mr. Avenatti's head.

3          THE COURT:  Actually, the account that Mr. Srebnick

4  just gave was purely factual.  I don't know if his intentions

5  are to go beyond what he said, but everything that he recounted

6  is purely factual.

7          Mr. Srebnick, do you intend to go beyond what you

8  said?

9          MR. H. SREBNICK:  The only thing I would go beyond in

10  terms of what was in Mr. Geragos' head is the witnesses in the

11  room from Boies and Nike saying they saw Mr. Geragos, not in

12  his head, approving the proposals that were being made that

13  day, and that's a fact that will be proven through the

14  witnesses without having to even ask Mr. Geragos a single

15  thing.

16          MR. RICHENTHAL:  We obviously have no objection to

17  that.  That's not what's in his head.  That's a visual cue as

18  to what may have been happening.  Mr. Avenatti, for all I know,

19  perhaps picked on such a cue, assuming that it occurred.

20          Our point is very precise, which is the defense keeps

21  talking about how Mr. Geragos knows the criminal law so well.

22  The suggestion is apparent, that Mr. Geragos would never have

23  committed the charged offense.  That is an improper argument.

24  It does not matter whether Mr. Geragos is guilty or not for

25  this trial.  All that matters is whether Mr. Avenatti is.

 1              THE COURT:  Just to be clear, everything I've heard

 2    Mr. Srebnick say that he intends to open on just reflects the

 3    facts of what was said and what was observed at the meetings

 4    that we have been talking about.  Certainly Mr. Srebnick has

 5    every right to say that Mr. Geragos was a full participant in

 6    the activity.  If there is evidence that he was nodding along

 7    with what Avenatti was proposing, then the jury will hear that.

 8              Beyond that, Mr. Srebnick, I don't think there is much

 9    you can do because there is not going to be evidence from

10    Mr. Geragos about what was in his mind.

11         MR. H. SREBNICK:  We do have the text messages between

12    Mr. Geragos and Mr. Avenatti that precede the meetings and some

13    during the course of the meetings, so we do have that available

14    as evidence.  But you are right.  Beyond that, given the

15    Court's ruling, over which we object, of course, we don't have

16    anything else.

17         MR. RICHENTHAL:  I assume, consistent with everything

18    we have been talking about, the defense also does not, for

19    example, suggest Mr. Geragos had ever been in trouble before.

20    In other words, Mr. Geragos' character is also not appropriate

21    for the jury.

22              THE COURT:  Well, as I said, Mr. Srebnick will be

23    allowed to say that Mr. Geragos was a prominent lawyer and that

24    he was someone who was experienced in criminal law.  Those are

25    just facts.  He is a known lawyer.  He was a very prominent

lawyer.

Mr. Srebnick, you are not going to try to prove that Mr. Geragos was a great guy, are you?

MR. H. SREBNICK:  Certainly not in opening statement, Judge.

THE COURT:  Anything else anyone wants to say about the advice-of-counsel issue?  I must say, I have not looked at the charge yet.  Suffice it to say, I don't see any advice of counsel defense here.  I don't think there is any claim that Mr. Avenatti retained Mr. Geragos or that he sought him out for legal advice or that Mr. Geragos offered legal advice.  I am not aware of any evidence of that.  I'm extremely dubious that any sort of charge about advice of counsel defense would be appropriate.

MR. S. SREBNICK:  Your Honor, may I address one matter that relates to Mr. Geragos and Mr. Avenatti.

Your Honor ruled earlier about, last week and again this morning, about the Boies/Theranos article and that not coming in, and we understand the Court's ruling.

There is a series of text messages back and forth between Mr. Geragos and Mr. Avenatti about internal investigations on or about March 12, March 13.  That article is the subject of one of the text messages that Mr. Geragos sends to Mr. Avenatti and it's a link to the article.

The government has put on its exhibit list Government

1   Exhibit 103A through I don't remember, but that is the exchange

2   of text messages right around that period about internal

3   investigations.  I think they have excluded that particular

4   text message.  It seems like Mr. Avenatti is almost having a

5   conversation with himself about internal investigations, if the

6   jury doesn't have the context of at least Geragos sending that

7   text message back to Mr. Avenatti.

8            What I would ask that the Court allow us to do is at

9   least have that text message in the chain for context without

10  the jury hearing what's the content of the article itself.

11           MR. RICHENTHAL:  This is a motion for reconsideration.

12  Your Honor dealt with this five days ago.  The text messages

13  were on the screen.  If your Honor recalls, we showed your

14  Honor the text exchange.  There is a reference to trying to

15  keep Boies out of jail.  And your Honor redacted viscerally, as

16  I think the jury would, that that is confusing and inflammatory

17  and has nothing to do with this case.

18           So we did what we are supposed to do.  We redacted the

19  exchange about that article.  We can easily show your Honor the

20  exchange.  I think the Court already has our exhibits.  Nothing

21  in that redaction remotely is inconsistent with what is not

22  redacted.  What Mr. Srebnick is trying to do is put in front of

23  the jury what your Honor has already ruled manifestly correctly

24  does not belong in this trial.

25           THE COURT:  I would need to see the text messages so I

1    can have some understanding of what it is you're talking about.

2         MR. S. SREBNICK:  I'll locate it, Judge.  It may take

3    me a few minutes.

4         THE COURT:  The government has also asked me to

5    preclude any suggestion that the charges against Mr. Avenatti

6    were brought in haste.  This is outlined in the government's

7    reply brief, docket No. 118 at ECF page 19.

8         Let me inquire of the defense.  Do you intend to argue

9    that the government, there was sort of a rush to judgment here

10   in connection with the bringing of charges against

11   Mr. Avenatti.  Is that going to be part of your presentation?

12        MR. H. SREBNICK:  Judge, may I have 30 second with my

13   colleagues?

14        THE COURT:  Yes.

15        (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1              (Pause)

2              MR. H. SREBNICK:  Your Honor, the answer is yes.  Let

3      me explain why, if I could.

4              As your Honor has noted, the central issue in the case

5      is whether Mr. Avenatti had the authorization of his client,

6      Mr. Franklin, to make the demands that were made during the

7      settlement conferences.  Mr. Avenatti was arrested on March 25

8      based on a complaint that had been returned several days

9      earlier -- before the government had ever spoken to Gary

10     Franklin, before the government had ever spoken to Jeff

11     Auerbach.  The arrest was made without any information in the

12     government's possession about conversations between Avenatti

13     and his client.

14             In our view, that establishes a rush to judgment,

15     given, as the Court has noted, the central issue in the case is

16     whether Mr. Avenatti acted with or without the authorization of

17     his client.  At that point, after Mr. Avenatti is arrested,

18     days and weeks later the government committed to the arrest of

19     Avenatti, high-profile arrest.  Now the government interviews

20     Franklin.  Now the government interviews Auerbach.  And as

21     we've shown you through the text messages, we know what their

22     state of mind was before Mr. Avenatti got arrested.  And to the

23     extent that now those witnesses will say something different

24     about their state of mind, we believe it is motivated by their

25     own self-preservation interest, by their own fears, not by the

1    truth.  And so the government, having arrested Avenatti,

2    without having investigated the authorization given to him by

3    his client, does establish, as the government would like to

4    call it, haste, and it does frame the entire post-arrest

5    investigation in this case.

6              MR. RICHENTHAL:  What Mr. Srebnick is arguing is that

7    the three individuals sitting at this table representing the

8    United States should have spent more time and that the agents

9    assisting us should have spent more time before charging the

10   defendant.  That is not for the jury.

11             It is also, by the way, factually false.  The

12   complaint was sworn out on March 24th, not March 21st.  But to

13   rebut the other falsity of that argument, we would have to

14   present, among other things, how criminal investigations work,

15   how many search warrants were obtained in this case, which the

16   defense has labored to keep out of this case and we've agreed,

17   but we wouldn't agree if this comes in, that Mr. Avenatti was

18   indicted by a grand jury twice, that it is not unusual to

19   supersede.  All of this would have to be presented to this lay

20   jury to understand why the argument that this was hasty is

21   frivolous.  It has no business in front of the jury.

22             The only reason the government acted with alleged

23   haste was to prevent Mr. Avenatti from completing his crime.

24   It has no business before this jury.

25             Obviously, we have the burden of proof.  The defendant

1   is allowed to say we have failed to discharge that burden, in

2   whole or in part, including, but not limited to, our alleged

3   failure to demonstrate a lack of authorization.  All of that is

4   fair.

5        What isn't fair is to say they charged him too

6   quickly, they charged him thoughtlessly, they charged him about

7   taking certain steps.  The government is not the defendant in

8   this case.

9        THE COURT:  All right.  It's a very standard argument

10  in criminal cases for a defendant to argue that the government

11  conducted a sloppy and an inadequate investigation and that's

12  why it brought the charges.  So I'm going to allow the

13  defendant to proceed with this argument and to elicit evidence

14  concerning it.

15       With respect to the argument that it was driven by

16  dates that Mr. Avenatti set, I've already written on that.

17  Obviously, that is an argument that is available to the

18  government, which is to say that the timing here was determined

19  by Mr. Avenatti because he's the one that set the deadline of

20  March 25th.  So that's not a difficult -- it is not going to be

21  difficult for the government to respond to the argument that

22  the case was taken down too quickly.  The obvious response is

23  we took the case down on March 25th because that was the

24  deadline that was set by Mr. Avenatti.

25       So there is nothing unusual about a defendant arguing

1    that the government did an incomplete, sloppy, inadequate

2    investigation.  That comes up frequently.  I am not going to

3    bar Mr. Srebnick from making that kind of argument, and the

4    government can respond as it deems necessary.

5           MR. RICHENTHAL:  Well, I assume that, to the extent

6    necessary, we can demonstrate the thoroughness of the

7    investigation.  For example, the number of search warrants, the

8    number of investigators, the number of agents.

9           THE COURT:  I'm not going to speak to what proof you

10   will be allowed to offer, but clearly if he makes an argument

11   that the government did an inadequate investigation, I am going

12   to allow the government to respond.

13          MR. RICHENTHAL:  Let me just note for the record that

14   our response may include the number of search warrants

15   authorized by judicial officials, the number of investigators

16   involved in the investigation, the number of witnesses

17   interviewed in the investigation, the hours put into the

18   investigation, the fact that Mr. Avenatti was charged twice by

19   a grand jury, that the honest services fraud charge came after

20   all of that.  And that's not meant to be exhaustive, it is

21   meant to be illustrative.

22          THE COURT:  Do we have those text messages yet that we

23   were talking about?

24          MR. S. SREBNICK:  I have them on my screen and I am

25   hooked up.

1          THE COURT:  So I think your argument, Mr. Srebnick,

2   was that if this message that includes The New York Times

3   article, if that is kept out, that it's going to be confusing

4   or incomplete in some fashion; is that the argument?

5          MR. S. SREBNICK:  Yes, your Honor.

6          So if you look at -- I don't know if it is up on your

7   screen yet.

8          THE COURT:  Yes, I have various instant messages on my

9   screen.

10          MR. S. SREBNICK:  OK.  So --

11          THE COURT:  I guess we should say for the record what

12   it is I am looking at.

13          MR. S. SREBNICK:  So this is an extraction report from

14   Mr. Geragos' cell phone.

15          THE COURT:  Does this have an exhibit number?

16          MR. S. SREBNICK:  It doesn't because the government

17   exhibits don't have the full text exchange.

18          THE COURT:  It looks like it is Government Exhibit

19   103.

20          MR. H. SREBNICK:  Judge, we have a technology issue.

21   It is only showing on your screen for the moment.

22          THE COURT:  OK.  Can we fix the technology issue?

23          (Pause)

24          Are we all set?

25          MR. S. SREBNICK:  So, your Honor, you are correct this

1   does have a government exhibit notation.  This was the former

2   GX103.  The government has now taken certain of these text

3   messages and labeled them 103A, B, C, D, etc.  I think 103B or

4   C is essentially number 186 in which Mr. Avenatti is making the

5   point about Boies never stepping aside and allowing him and

6   Mr. Geragos to conduct an investigation.  But that's really

7   part of and entire conversation that begins maybe 182 or 183.

8   Geragos is outgoing.  Avenatti is incoming.

9           Outgoing, Geragos is saying:  It has got to be our

10   place or no place.

11           Mr. Avenatti responds, 183:  Bigger issue is they want

12   us to go to Boies and not meet with Nike directly.

13           Avenatti says again:  That will be a disaster.

14           Mr. Geragos responds at 185:  Totally agree.  Where

15   are you?

16           And then Mr. Avenatti makes a comment about –– I'm not

17   going to read the whole thing, but at the end he says:  Boies

18   will never step aside and allow us to run an investigation.

19           To which Mr. Geragos then sends three text messages in

20   a row in which he agrees with that, references The New York

21   Times article that the Court has excluded, and makes a comment

22   about it.

23           And so we –– and I don't profess to remember exactly

24   what the Court's ruling was last week, but I left there

25   thinking that the article itself wasn't coming in, not that the

1   Court was pretending like the exchange didn't occur.

2          THE COURT:  No.  I mean, the article is chock full of

3   inflammatory material, including references to Harvey

4   Weinstein, etc.  So it was obvious to me that The New York

5   Times article did not come in.

6          But why don't you tell me.  So what is the government

7   proposing to introduce and what are they proposing to leave

8   out?

9          MR. RICHENTHAL:  If Mr. Srebnick could scroll down

10  briefly, please?

11         MR. S. SREBNICK:  Yes.  Of course.

12         MR. RICHENTHAL:  Thank you.

13         So what we've done, your Honor, is we've just removed

14  the entire back and forth on that particular issue, because we

15  do not want to mislead the jury in any way, shape or form.

16         To be precise, we removed 187, 188 and 189.  And 189,

17  by the way, is itself deeply inflammatory.  So it really isn't

18  just the article, which I think --

19         THE COURT:  Let me suggest this.  How about with 187

20  we leave in "not only won't but they will sell Nike out," and

21  then redacted the rest?

22         MR. RICHENTHAL:  That certainly would substantially I

23  think ameliorate our concern.  The problem is -- I guess it

24  depends on what the defense were to say about that, so maybe

25  the issue isn't ripe.  But it certainly would substantially

1    ameliorate the concern that your Honor has raised and with

2    which we strongly agree.

3              MR. S. SREBNICK:  We object to that.  This goes to the

4    heart of why Mr. Avenatti and Mr. Geragos jointly decided that

5    it would be better to have them conduct the internal

6    investigation and not Boies, Schiller.  They both agreed, they

7    both communicated, they both conferred about how Boies would

8    not do a conflict-free investigation for reasons that

9    Mr. Geragos expressed as well.  I think it is important to our

10   defense that 186 come in.  That is Mr. Avenatti's state of

11   mind.

12             MR. RICHENTHAL:  We have no objection to that.

13             MR. S. SREBNICK:  And it is important --

14             THE COURT:  Could you try to focus on what I proposed?

15   And if you have a problem with it, that's fine.  But we need to

16   actually address what I proposed as a solution.  And if you

17   find it unacceptable, you know, you can say that.

18             But what's currently on the table is 186 would come

19   in.  187, the first line would come in until the words "to get

20   Boies himself out of harm's way;" that would be redacted.  188

21   would not come in because that is the newspaper article that

22   contains all the inflammatory information.  And 189 would not

23   come in because it is more about Harvey Weinstein, etc.

24             You are not seriously arguing I should drag in Harvey

25   Weinstein here, are you?

1          MR. S. SREBNICK:  No, sir.

2          THE COURT:  Good.

3          MR. S. SREBNICK:  Nope.

4          THE COURT:  So what is the problem with my proposal?

5          MR. S. SREBNICK:  We'll take the proposal rather than

6    nothing, but we don't think that just simply having a reference

7    to it, that's what Mr. Geragos told Mr. Avenatti.  We're not

8    just dragging Mr. Weinstein in, we're putting it in for

9    Mr. Avenatti's state of mind where he is agreeing with

10   Mr. Geragos.

11         THE COURT:  I'm sorry, sir.  Mr. Geragos and

12   Mr. Avenatti's views about Mr. Boies and Harvey Weinstein --

13   irrelevant, inflammatory, more prejudicial than probative --

14   will be excluded.

15         MR. S. SREBNICK:  Understood.

16         THE COURT:  The government in its reply memorandum,

17   docket number 118, ECF page 22, moves to preclude evidence or

18   argument that Mr. Avenatti's conduct should be dealt with

19   solely as an administrative or civil matter.  And I think what

20   is at issue here is an argument by the defense that, well, this

21   is really just a bar disciplinary matter and should not be the

22   subject of a criminal case.

23         Is that what you are concerned about?

24         MR. RICHENTHAL:  Effectively, yes.  I mean, the

25   defense is obviously allowed to argue he is not guilty as

1   charged.  What we don't think he should be allowed to do, in

2   words or substance, is suggest that even if he did something

3   wrong, the jury should acquit him because that can be dealt

4   with elsewhere.  It the second part we have an objection to.

5   Obviously, we have no objection to the first.  Indeed, we've

6   proposed in our own requests to charge an instruction telling

7   the jury that a mere violation of rules does not make the

8   defendant guilty.  We obviously don't quibble with that

9   proposition.

10              THE COURT:  So does the defense intend to argue that

11   the facts here really just present something for bar discipline

12   and that's how this should have been addressed?

13              MR. H. SREBNICK:  No, Judge.  I certainly am not

14   opening on that at all, so I think we can table it until we get

15   to the jury instruction phase of the case.

16              THE COURT:  OK.  The next point in the government's

17   brief was whether the charges are unconstitutionally vague.  I

18   have of course addressed that at an earlier point.

19              Is the defense going to be arguing that?

20              MR. H. SREBNICK:  Certainly not opening on that.

21              THE COURT:  Yes.

22              The next argument in the government's brief has to do

23   with the government's charging decisions and specifically the

24   decision not to charge Geragos.  Does the government wish to be

25   heard on that?

1           MR. RICHENTHAL:  I think our position is pretty clear.

2    It has come up, you know, a couple of different ways this

3    morning, which is that our decision making simply is

4    irrelevant.  It would also be extraordinary confusing to the

5    jury without just abundant other evidence and legal

6    instructions.  I can go on but I don't know it is necessary.

7    It just has no place in the trial.

8           THE COURT:  Who wants to address this for the defense?

9           MR. S. SREBNICK:  One moment, your Honor.

10          (Pause)

11          MR. H. SREBNICK:  Judge, if you are asking about

12   opening, I won't open on it, but we will be proposing jury

13   instructions in matters relating to Mr. Geragos' absence from

14   the courtroom.  We don't want the jury to draw the opposite

15   inference, that he was indicted, that he is guilty, or anything

16   like that.

17          MR. RICHENTHAL:  If what Mr. Srebnick is saying is he

18   will not touch this issue until the charge conference, then we

19   need not go any further.  If what he is saying is he intends to

20   try to elicit on cross-examination the witness's awareness, or

21   lack thereof, of who we charge, when and why, we object to

22   that.  Even that question would be confusing and inflammatory

23   to the jury.

24          MR. H. SREBNICK:  Judge, I assure you that if I intend

25   to go into that, or any of us do, we will preview that for the

1    Court before we do.

2              THE COURT:  OK.  So we'll table the issue for now.  It

3    is not going to come up in the opening.  And if the defense

4    wishes to pursue this road, it will take it up with me ahead of

5    time and we'll have a conversation about it.

6              The government also moves to preclude evidence or

7    argument concerning the defendant's prior commission of good

8    acts or failure to commit other bad acts.  I'm not sure what

9    exactly the parties have in mind with this, but let me hear

10   from the government.  What are you worried about?

11             MR. RICHENTHAL:  Perhaps it is moot, I don't know.

12   Our concern, which I think we described a bit in our reply, is

13   that the defense was going to try to offer Mr. Avenatti's own

14   prior press conferences, his own prior complaints.  Indeed,

15   they've marked, I think, 600-plus pages of the prior

16   complaints, etc., etc.  In our view, that is improper.  That is

17   a way of getting in specific instances.  There is a very

18   limited way in which the defendant is permitted to offer

19   character evidence.  That is not that way.

20             MR. H. SREBNICK:  Your Honor, we are not getting into

21   that in opening.

22             THE COURT:  OK.

23             MR. RICHENTHAL:  I don't mean to sound like a broken

24   record, your Honor, but Mr. Srebnick keeps saying not getting

25   into it in opening, which leaves me concerned that in front of

1    the jury he will try to cross-examine witnesses about, for

2    example, complaints Mr. Avenatti filed in unrelated matters.

3            Just to be clear, our motion in limine was a motion in

4    limine.  It wasn't just about opening.  If Mr. Srebnick commits

5    that when he says not in opening, he also means he will not

6    raise any such issue in front of the jury without first talking

7    to your Honor, then we don't need to pursue this further, but

8    he keeps saying that and we keep having the same concern.

9            MR. H. SREBNICK:  Again, I assure the Court any of the

10   issues they flag for the Court, I have already told them that

11   if I intend or any of us intend to get into it, we will ask for

12   permission.

13           THE COURT:  OK.  All right.  Are there other issues

14   that the lawyers want to raise?

15           MR. RICHENTHAL:  There were, I think, some other

16   outstanding motions in limine.  I think they may have largely

17   been subsumed in your Honor's sort of explanation of the

18   general principles of this morning, and I'm referring, for

19   example, to alleged misconduct of Nike generally and in

20   particular alleged misconduct in which the defendant was not

21   contemporaneously aware.

22           I think we also moved in limine with respect to sort

23   of the general idea that lawsuits or, you know, hard-nosed

24   negotiations are good for society.  My understanding is the

25   defense at least doesn't presently intend to go there.  So I

1    think it is largely moot.  We would like to confirm that with

2    the defense, and we have a couple of additional issues for the

3    Court's consideration.

4            THE COURT:  OK.  I received some filings this morning.

5    I haven't had time to read them.  One has to do with the

6    testimony of Nora Engstrom, the professor from Stanford Law

7    School.  I had asked the government if they wish to call

8    Professor Engstrom, in light of the ruling that I had

9    previously issued, whether they would make a proffer as to what

10   testimony they wish to elicit from her, and the government sent

11   a letter this morning, which is docket number 214, in which it

12   summarizes what Professor Engstrom would say.

13           They want her to testify about the fact that lawyers

14   have to take courses in professional responsibility and legal

15   ethics.  They want to elicit that the bar exam involves

16   questions about ethics.  They want to bring out that there are

17   continuing legal education obligations for attorneys in

18   California.  And they want to elicit from her that the

19   California bar publishes the California Rules of Professional

20   Conduct on its website, and that these rules would generally be

21   known to lawyers who practice in California.  And then they

22   also want to elicit that lawyers are obligated to be loyal to

23   their clients and to observe duties of confidentiality and

24   reasonable communication.

25           So the question is whether the defense objects to what

1    is set forth in the government's January 27th letter?

2            MR. S. SREBNICK:  The answer is yes, from an expert.

3    This is now fact testimony.  The best evidence that it's fact

4    testimony is that virtually all of these same facts that the

5    government is seeking to elicit from the expert, they sent over

6    to me in a stipulation that a representative of the California

7    bar would testify that lawyers have to pass exams, that lawyers

8    have to comply with CLE requirements, that they must complete

9    ongoing legal training, that the bar publishes the Rules of

10   Professional Conduct, all of those matters, or I think

11   virtually all -- and I hadn't compared the two -- were in the

12   nature of a stipulation in which I actually agreed to, with the

13   exception of one point about the ethics hotline that we were

14   having a discussion about.  So what I worry about here is that

15   this is going to be fact testimony in expert clothing, and that

16   it looks like it has some greater degree of importance because

17   a Stanford law professor is going to come in to testify about

18   these things.  And so I just don't think it -- under 702, 403,

19   I don't think it is really appropriate for a Stanford dean to

20   come in here and talk about these things.

21           THE COURT:  Let me say that the letter -- the summary

22   that's set forth in the government's letter seems pretty

23   innocuous to me, and I would hope that the parties can reach a

24   stipulation and thereby avoid dragging Professor Engstrom here,

25   and because it's pretty innocuous stuff and I think the jury

Kleinman3

1    would wonder, well, why did we bring in this Stanford law

2    professor to tell us that lawyers have CLE obligations?  Is

3    that really necessary?

4         Anyway, I would hope that you would continue your

5    discussions about a possible stipulation of these matters, and

6    if you can't reach an agreement, then you will bring it before

7    me and I will rule on it, but that's my reaction.

8         MR. RICHENTHAL:  We agree.  It is going to have to be

9    meaningfully broader that what we proposed to the defense,

10   which the defense declined to sign, things that we can flag

11   from your Honor's order and gave you our sense of what's

12   admissible.  We have no desire whatsoever to interrupt

13   Professor Engstrom's professional and personal life and drag

14   her across the country for what we also agree is innocuous; we

15   think relevant and admissible but certainly not frankly

16   disputable.

17        THE COURT:  All right.  I've got another letter from

18   the government dated today.  It is docket number 212.  It

19   contains some discussion about the office manager, but more

20   than that, I don't really know.

21        Does someone want to acquaint me with what the

22   contents of the letter are?

23        MR. SOBELMAN:  Yes, your Honor.  I think you are

24   looking at the letter filed this morning about the office

25   manager's testimony?

1            THE COURT:  I am.

2            MR. SOBELMAN:  Just to briefly summarize, the letter

3    is not lengthy because we don't anticipate the office manager's

4    testimony would be particularly lengthy.  We expect that the

5    office manager would testify, as we said in a prior letter and

6    in court, that she worked for the defendant for a number of

7    years, she assisted him in managing his professional finances

8    and, to a limited extent, his personal finances.  She had very

9    frequent conversations with him over the years, but

10   particularly in the few weeks before his arrest, about the

11   current finances of the firm and his own personal finances.

12   Those conversations were almost exclusively about the

13   defendant's frustrations, expressing how upset he was that

14   they -- the business and him personally were in substantial

15   debt.

16           In addition, as your Honor knows, there is a

17   conversation that occurred just a few days -- within a few days

18   before his arrest where he told her about a deal that he was

19   about to close that he expected would be able to pay off the

20   debts and that he would be able to live the lifestyle he wanted

21   to live.

22           There are juts a couple of exhibits we were hoping to

23   use with her.  One is a document that was on the defendant's

24   laptop at the time of his arrest.  That's Government Exhibit

25   129, which is a list of vendors that the law firm owed money to

1    at the time of his arrest.

2            A second exhibit is a letter that was in the

3    defendant's briefcase at the time of his arrest.  It is

4    actually addressed to the office manager.  And she will explain

5    that at that time his law firm had been evicted from their

6    offices and that she was retrieving the law firm's mail from a

7    Post Office box, scanning the mail, and then e-mailing it to

8    the defendant, including likely that letter, and that that

9    letter --

10           THE COURT:  What does that letter say, Government

11   Exhibit 111?

12           MR. SOBELMAN:  It is a one-page letter that says that

13   a recent payment that was attempted to be made by the law firm

14   to their health insurance provider of an $11,000 premium had

15   been rejected due to insufficient funds in the account.

16           And then the other points that we expect her to

17   testify about and that we will propose a stipulation to the

18   defense, in accord with your Honor's ruling from last week, is

19   the $10 million judgment against the law firm.  That is

20   something that was of frequent conversation between her and the

21   defendant and was something that she understood based on her

22   conversations with the defendant to be a real impediment to the

23   defendant's continuing practice of law and his attempts to

24   start a new law firm under a new name.

25           Again, we don't think this is particularly lengthy or

1    controversial testimony, and it is just a couple of exhibits.

2    We don't think her direct would go on forever, and we are

3    trying to keep it as narrow and cabined as possible in respect

4    of your Honor's ruling from last week.

5           MR. S. SREBNICK:  So, obviously, we just got it this

6    morning, and I haven't had a chance to really sit down with

7    Mr. Avenatti and talk about it.

8           But I would note for the Court, as I sat through the

9    Court's rulings last week, in which the Court articulated its

10   view just about motive and generally about the case law that

11   the Court reviewed, that the government had cited and how a

12   payday of -- supposedly a 15 to $25 million payday is motive

13   enough.  Where I thought the Court was headed with the ruling

14   on the issue is if the parties could reach a stipulation on the

15   personal judgments, that that would make really a lot of

16   headway with the Court about excluding the other dozens and

17   dozens of exhibits that the government wants to put in evidence

18   and really moot out all of the disputed debt type of evidence.

19          Over the weekend -- I forgot what day it is today, it

20   is now Monday -- the end of last week and over the weekend, we

21   did reach a tentative stipulation with the government.  We

22   agreed to stipulate about the Jason Frank judgment, the $5

23   million judgment.  We agreed to stipulate about the William

24   Parrish $2 million judgment.  We did agree to stipulate about

25   the Washington tax lien, even though the government hadn't even

1    mentioned that that was one -- in its letter, that that was one

2    of the judgments that it would seek to offer.  We did agree to

3    stipulate about the Court-ordered support to get to the

4    government to roughly $11 million.  We entered into those

5    stipulations believing what that would to is moot out much of

6    the disputed debt testimony and much of the anecdotal testimony

7    about, well, Mr. Avenatti was concerned about his law firm or

8    the health insurance of employees and is he going to make

9    payroll this week and that sort of thing.

10           And now I'm hearing the government to be saying, well,

11   notwithstanding our agreement to stipulate on the personal

12   judgments that can be proved and authentic and all of that,

13   that it nonetheless wants to try this case as if it is a

14   financial case.  And so we would object to that.  We object to

15   all of this other evidence coming in about vendors that need to

16   be paid, about debts of corporate -- the corporate debts that

17   are not his personal responsibility.  And that was the takeaway

18   that I had from the Court's ruling last week.  If I

19   misunderstood, then I misunderstood, but my understanding was

20   that the Court was encouraging us to agree on the personal

21   judgments to avoid a lengthy, complicated trial on financial

22   matters.

23           THE COURT:  No, you didn't misunderstand me.  That's

24   where I was at.  And part of what we're dealing with here is

25   the evidence is coming out in drips and drabs and that's

1    unfortunate.  I'm going to have to take a look at Government

2    Exhibit 129 and Government Exhibit 111.

3              Do I have those exhibits?  Are they in the binders

4              MR. SOBELMAN:  They should be, your Honor, but I can

5    hand them up if your Honor wants to look at them right now.

6    They are attached to the letter.

7              THE COURT:  I'm sorry.  I do have the exhibits.

8              MR. SOBELMAN:  Your Honor, may I just briefly respond

9    to Mr. Srebnick?

10             THE COURT:  No.

11             MR. SOBELMAN:  OK.  That's fine.

12             THE COURT:  So I just want to look at the exhibits.

13             So I'm looking at Government Exhibit 111, and it is

14   dated February 26th.  I should say for the record it is docket

15   number 212-2.  And it has a bolded heading at the top of the

16   letter.  It says, "Your premium payment was returned by your

17   bank."  And then the first two lines of the letter read:

18   "Thank you for choosing Anthem Blue Cross for your healthcare

19   coverage.  We're sorry to tell you that your premium of

20   $11,626.24 for January was returned by your bank for the reason

21   listed below.  To avoid cancellation, you'll need to send us

22   your payment within 20 business days."

23             And then it says:  "reason for return:  Insufficient

24   funds."

25             And then --

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1        MR. SOBELMAN:  Your Honor, may I speak to this before

2   we move on?

3        THE COURT:  Speak to that letter?

4        MR. SOBELMAN:  Yes, your Honor.

5        THE COURT:  OK.

6        MR. SOBELMAN:  Your Honor, two things I want to note

7   about this letter.  One is it was in hardcopy in the

8   defendant's briefcase at the time he was arrested.  This is not

9   a letter that was plucked from somewhere else or gotten from

10  the health insurance company that we're trying to kind of jam

11  into this case.  This is something that goes directly to the

12  defendant's state of mind at the time that he was undertaking

13  the conduct in this case.

14        The second is the office manager will testify, if your

15  Honor permits, that she had several conversations in the days

16  and weeks preceding the defendant's arrest with the defendant

17  about their difficulty paying their health insurance premiums

18  and how frustrated he was and how he was trying to get money to

19  cover those payments.  This is one of just a couple of examples

20  the government wants to offer.  There are literally dozens of

21  debts, even aside from the ones listed in the vendor list, that

22  we could go into with the office manager.  We have slimmed down

23  the presentation of this evidence as much as we could while

24  trying to focus just on a couple of the most salient and

25  relevant points that are linked directly to the defendant's

1   state of mind while pushing aside the rest in light of your

2   Honor's view of the motive evidence and the scope that you want

3   us to take at this trial.  But this is an exhibit that we see

4   as particularly relevant to illustrate and provide a basis for

5   the office manager's description of her conversations with the

6   defendant in the relevant time period.

7           THE COURT:  So I'll just give you my reaction,

8   Mr. Srebnick.  I understand you need to talk with your client

9   about it and think about it more.  So my reaction is that proof

10  that Mr. Avenatti was carrying around a letter in his briefcase

11  at the time of his arrest reporting that the premium check for

12  the health insurance had been returned for insufficient funds,

13  I think that's highly probative as to financial distress.  And,

14  also, to the extent there were conversations between him and

15  the office manager about whether payroll could be met in

16  mid-March of 2019, my reaction is that is highly probative as

17  well, including the text message which is marked as Government

18  Exhibit 102, which reads, and I quote:  "No, you don't need

19  this today but let me know what to tell people on payroll."

20          So with respect to those two items, the returned check

21  for the health insurance and the email -- or the text message

22  about a concern about whether payroll could be met as well as

23  conversations between the office manager and Mr. Avenatti about

24  whether payroll could be met in mid-March, it seems to me that

25  that is relevant and pertinent.

1          With respect to the whole list of vendors that are

2     owed money, I would not be inclined to admit that.  And as I

3     explained earlier, I'm not inclined to admit the debt that the

4     former law firm as a whole owed.  I think it is sufficient to

5     introduce the $5 million that Mr. Avenatti was personally

6     liable for with respect to the law firm debt.

7          MR. SOBELMAN:  Your Honor, can I just address those

8     two issues?  First of all, with respect to the law firm debt,

9     this would be a very artificial redacting of her memory and

10    testimony.  The conversations --

11         THE COURT:  I'm sorry.

12         MR. SOBELMAN:  I'm sorry, your Honor.

13         THE COURT:  I thought you were talking about the law

14    firm debt.

15         MR. SOBELMAN:  I am, your Honor.  The conversations

16    that the office manager had with the defendant, that was by far

17    the largest debt and biggest problem that the office manager

18    and that the defendant were facing at that time.  There were in

19    the --

20         THE COURT:  He had $11 million of problems, right, and

21    then he couldn't pay his health insurance and he couldn't make

22    payroll.

23         MR. SOBELMAN:  Yes, your Honor.

24         THE COURT:  I think he had a lot of problems.  I think

25    what I've proposed is completely adequate to demonstrate his

1   financial problems, combined with the fact, as I've said many

2   times before, that everyone understands that 15 to $25 million

3   is a very strong motive.  So we're getting to the point of

4   cumulative, excessive waste of time.  That's the problem.

5   There is plenty -- if you could reach agreement on the matters

6   I've previously identified, combined with the fact that he

7   couldn't pay the health insurance and he couldn't make payroll,

8   I think that's adequate.

9            MR. SOBELMAN:  Your Honor, we take your point and we

10   will slim down our presentation even further.

11            THE COURT:  And try to reach agreement with

12   Mr. Srebnick about these matters, and if you can't come back.

13            MR. SOBELMAN:  We have reached -- on these matters,

14   they've objected whenever we had a discussion about the office

15   manager's testimony at all, they will not discuss the substance

16   with us, but --

17            THE COURT:  Mr. Srebnick is expressing disbelief.

18            In any event, you will carry on those conversations,

19   and I want to know pretty quickly whether you can reach

20   agreement or not, and if you can't, then I will have to rule.

21            MR. SOBELMAN:  To be clear, reach agreement on the

22   permissible scope of the office manager's testimony or on the

23   judgments' stipulation?

24            THE COURT:  I think the two are related, right?

25            MR. SOBELMAN:  Yes, your Honor.

1          THE COURT:  I think the two are related.

2          MR. SOBELMAN:  I think I understand your Honor's view,

3    and we'll consult with the defense to make sure that we have a

4    mutual understanding of your Honor's view.

5          THE COURT:  I mean, I had previously ruled that the

6    office manager was going to be allowed to testify.  I've

7    already issued that ruling.

8          MR. SOBELMAN:  Yes.

9          THE COURT:  I've ruled that to the extent he said to

10   her that he was going to get a big payday and that was going to

11   allow him to pay off all the debts, that's coming in.  I've

12   already ruled on that.  So there is not an issue here about

13   whether the office manager will be allowed to testify.  I've

14   already ruled she can.  We're just getting into the details

15   about what she can testify to.

16         MR. SOBELMAN:  Yes, your Honor.  That was the

17   government's view.  When we consulted with the defense, I think

18   it was yesterday, their view was that if they signed the

19   stipulation about his personal debts, there might be some

20   issue.  But here we understand your Honor's ruling that she is

21   permitted to testify, that your Honor at least at this point is

22   inclined to let the government admit the health insurance

23   letter, that the government can admit the text message that the

24   office manager sent him on March 15th.

25         THE COURT:  As well as related conversations about are

1   we going to be able to make payroll.

2          MR. SOBELMAN:  Your Honor, we understand the Court's

3   ruling and we will abide by it.

4          MR. S. SREBNICK:  Let me just clear up one thing.

5   We've had many, many ongoing conversations, more so than I

6   think I have had in any other case, frankly, and they have

7   productive and we've tried to reach resolutions.  What I

8   explained to the government yesterday was we can reach a

9   stipulation on the judgments.  I just simply wasn't waiving my

10  objection to the office manager's testimony.

11          I understand the Court's ruling and so -- and the

12  extent of it I guess we hadn't yet sort of figured out.  But I

13  made it very clear that the stipulation was not conditioned

14  upon the government changing its tune, it was simply that I

15  wasn't waiving my objection in front of the Court.

16          MR. PODOLSKY:  Your Honor, we don't disagree at all

17  with that characterization.  We have worked together, and with

18  your Honor's ruling today, we'll continue to do so to speed the

19  presentation for the jury.

20          THE COURT:  All right.

21          MR. S. SREBNICK:  The only other thing with respect to

22  the health insurance is I think that particular term "health

23  insurance" creates the specter that he is denying health

24  insurance to employees, and so I would ask that at least the

25  word "health" be redacted and it just be "insurance" or some

1    other way of -- maybe we can work it out with the government --

2    that the debt is -- obviously we object to it coming in at all,

3    but to the extent it comes in, that we could try to sanitize it

4    in some way that doesn't seem like he was not paying health

5    insurance for employees.

6           MR. SOBELMAN:  Your Honor, the substance of the

7    testimony actually I think is going to cut the other way, that

8    I expect the office manager to say that the defendant was

9    highly troubled by the fact that he couldn't make payroll and

10   health insurance for himself and his employees.  And that if

11   they want to ask the office manager how, you know, the

12   defendant felt about that, or it might come out on direct, I

13   think that is not going to be an issue.  We are not going to

14   suggest that the defendant was not trying to do his best for

15   the employees in that situation.

16          MR. S. SREBNICK:  We'll have an ongoing conversation,

17   Judge.

18          Can I raise one issue?  The Court imposed a 5 p.m.

19   deadline for the revised jury instructions.  Given that we are

20   going to be in court and I don't have access to Wi-Fi at this

21   point, can we have an extension until 7 p.m. for the revised

22   jury instructions?

23          THE COURT:  Sure.  Absolutely.

24          MR. S. SREBNICK:  Thank you, your Honor.

25          THE COURT:  So are there other legal issues -- well,

1  are there other motions in limine we should be talking about

2  now?

3       MR. SOBELMAN:  Your Honor, the balance of the letter

4  addressed very briefly, just in a couple of sentences, because

5  it really is going to be that brief, the forensic accountant's

6  expected testimony.  We think this is not reasonably subject to

7  dispute, it is fairly vanilla, and is offered in a lot of cases

8  that involve economic or financial evidence.  We simply want to

9  show a summary chart pursuant to Rule 1006.  Again, we expect

10 to be very brief and it is essentially uncontested testimony.

11      THE COURT:  I don't know if you have had time to look

12 at this, Mr. Srebnick, but I think the government wants to

13 demonstrate that the defendant didn't have much money coming in

14 in the first four months of 2019.

15      Mr. Sobelman, you haven't actually given us the chart,

16 right, that you want to use?

17      MR. SOBELMAN:  Your Honor, we've given the defense

18 obviously the underlying evidence and exhibits as well as --

19 and some 3500 material from the forensic accountant that has

20 more of a rough version of this.  We intend to make it a little

21 more presentable for the jury.  And if it turns on exactly what

22 that chart looks like, we will try to get that to the Court and

23 the defense soon, but we think it doesn't really turn on the

24 graphic design.

25      THE COURT:  Do you have a reaction, Mr. Srebnick?

1          MR. S. SREBNICK:  My reaction is I really need to

2     speak to Mr. Avenatti about it.

3          THE COURT:  Sure.  OK.  All right.  So we'll talk

4     about it later.

5          Other motions in limine?

6          MR. RICHENTHAL:  They are not motions in limine.  We

7     have three issues to tee up that we anticipate might come up

8     with respect to openings, but they are unfortunately new

9     issues.  They are not motions as such.  I am happy to raise

10    them now.  I don't know that any of the motions need to be

11    resolved at this time, at least from this round.

12         THE COURT:  Mr. Srebnick, do you have something you

13    want to say before I hear from Mr. Richenthal?

14         MR. H. SREBNICK:  I do have an issue that I would like

15    to raise in light of the ruling you issued this morning about

16    the communications between Franklin and Auerbach that precede

17    their meeting with Mr. Avenatti and that Mr. Avenatti would not

18    have had access to their internal communications.  I will just

19    refer to them as "internal communications."

20         As I've indicated, I do believe that during the course

21    of the trial we will develop that both Auerbach and Franklin

22    had expressed, between themselves and then to Mr. Avenatti,

23    Mr. Franklin's desire for what he described as justice and

24    which Mr. Avenatti understood to be an investigation into the

25    so-called corruption at Nike.

64

K1rdave3

1          To the extent that we have a wealth of realtime text

2     messages between the two men, Franklin and Auerbach, confirming

3     that that is exactly what those two men discussed and defined

4     to be justice and, that is, an investigation, it is my

5     intention, if the Court will permit, for me to develop,

6     without, I suppose given your ruling, publishing the text

7     messages to the jury.  I had intended to, if the Court would

8     have permitted, to publish some of the best examples of the

9     expression between themselves of their definition of justice to

10    include an investigation.  I hope I would still be allowed to

11    discuss that that was their state of mind, that was their

12    intention, that when they went to see Mr. Avenatti, that

13    intention had congealed and it had been expressed not only to

14    Mr. Avenatti but it had been expressed to other -- another

15    lawyer before they met with Mr. Avenatti, to prove, consistent

16    with our theory of defense, that when they met with

17    Mr. Avenatti -- there is no tape recording of that meeting, but

18    what they said to Mr. Avenatti and how Mr. Avenatti proceeded

19    was entirely consistent with their one-and-a-half year

20    interaction between the two of them in an effort to achieve

21    justice through an investigation.

22         I just don't want to run afoul of any of your rulings.

23    If you will permit me, then I won't publish the text.  I think

24    they are going to come out during the course of the trial

25    through cross-examination eventually, if you permit it.  But I

1    would like to be able to at least say that this didn't just

2    come up in their minds on the first day they met Mr. Avenatti;

3    this had been in their minds for, I think, for 18 months.

4            THE COURT:  Right.  So both Auerbach and Franklin are

5    going to be witnesses, and undoubtedly their direct

6    examination, and if not their direct examination, their cross,

7    will explore what their desires were with respect to the

8    approach to Nike and what they hoped to accomplish and what

9    they felt was necessary.

10           And you say that they talked about for a year and a

11   half that they wanted justice, etc., etc., and presumably they

12   will testify in conformance with that in their direct

13   examination.  If they do not, then obviously you would be

14   permitted to cross-examine them with respect to their prior

15   text messages that are inconsistent with what their direct

16   testimony is.

17           But as I sit here today, I'm not sure why I should

18   anticipate that they're going to testify in a manner that's

19   inconsistent with their year-and-a-half record of text

20   messages, as you present it to me.

21           MR. H. SREBNICK:  Well, it is not just to impeach,

22   it's to corroborate Mr. Avenatti's understanding of their own

23   definition of justice, their own definition of what they wanted

24   Mr. Avenatti to do.  And I will present, I think without

25   objection -- the government's going to introduce it -- several

1    memoranda, a PowerPoint presentation that was in Mr. Avenatti's

2    briefcase when he was arrested, one of which he showed to the

3    Boies, Schiller lawyers to describe the evidence that he had.

4         But I just want to be sure that I abide by the Court's

5    intentions.  For example, I have a copy of an email between

6    Auerbach, Franklin and a lawyer named Trent Copeland, who those

7    two men, Franklin and Auerbach, contacted to try to retain him

8    to take on Nike, and it again expresses their desire for

9    justice.  I'm understanding from the Court's ruling that I

10   can't for now publish that to the jury, for example, as a

11   demonstrative in opening statement, but it is just a fact that

12   that was going on and it leads up to the meeting with

13   Mr. Avenatti.  So that what I would like to be able to tell the

14   jury in opening statement, that when they met with Mr. Avenatti

15   in March of 2019, there was no doubt in their minds, and their

16   expression to Mr. Avenatti was consistent with their own

17   expectation that a lawyer would be retained to go ask Nike to

18   investigate itself and rout out corruption.

19        It wasn't something that Mr. Avenatti invented.  This

20   was something that was in their minds long before they ever met

21   Mr. Avenatti, and the proof is in the text messages.  The proof

22   is in the email with Trent Copeland, the lawyer.  I have hard

23   evidence to prove it.  And I want to be sure the jury knows

24   that at the appropriate time, even if I can't publish it to the

25   jury in opening statement.

1          MR. SOBELMAN:  Your Honor, we think that the defense

2     here is conflating two different things that your Honor very

3     clearly delineated this morning.  One is text messages that

4     occurred a year before or a year-and-a-half before that were

5     never shared with the defendant -- to be clear, the text

6     messages between Mr. Auerbach and Mr. Franklin, not one of

7     them -- there are hundreds of pages of them -- not one was

8     shared with the defendant before his arrest.  None of those

9     should be mentioned in opening.  None of the substance of them

10    should be mentioned in opening.

11         Your Honor's ruling is absolutely correct, that if

12    they testify inconsistently with them, to the extent there is a

13    material inconsistency, we can go down that road if and when we

14    get there.  But the idea that the defense can just assume what

15    the testimony is going to be and then assume that your Honor is

16    going to rule that something is both inconsistent and

17    materially inconsistent we think is improper.

18         With respect to the letter with an attorney or any of

19    the other things that the defense is talking about that the

20    defendant did not see, the ruling should be the same, and your

21    Honor very articulately laid out the principle this morning

22    that we should be following.

23         With respect to the documents that were shown by

24    Mr. Auerbach and Mr. Franklin to the defendant, the government

25    is going to offer the entire universe of those ourselves.  We

1   have no issue with the defense using them, you know, consistent

2   with the rules of evidence in this trial.

3         But things that were said between two people a year

4   before or a day before they met with the defendant are not

5   necessarily admissible in this trial, and unless and until they

6   are, we do not think it is appropriate for the defense to

7   reference them, to describe them, or show them to the jury.

8         MR. S. SREBNICK:  Can I give the Court a concrete

9   example that I think will perhaps eliminate what we are talking

10  about?  We've read through Mr. Auerbach and Mr. Franklin's

11  302s.  Mr. Auerbach is taking the position now that he didn't

12  want this to go public.  He has told the government that on

13  several occasions.

14        We have text messages.  We have emails.  We have

15  communications between Mr. Auerbach and Mr. Franklin in which

16  Mr. Auerbach is repeatedly saying he wants to expose this, he

17  wants this to be -- he wants to go after them, let's go get

18  them, let's bring it to Nike's attention, let's bring it to the

19  FBI's attention, let's bring it to the world's attention.  And

20  that's why they voted Mr. Avenatti, hire him, with his public

21  platform.

22        For the government to be able to present that

23  narrative to the jury -- and I don't know if they plan to do it

24  in opening statement, but to suggest that Mr. Auerbach, as he

25  is now telling the government, didn't want this to be public,

1    how can we not go into a year's worth of communications between

2    him and Mr. Franklin saying that's exactly what he wanted?  And

3    that is just one example.  There are other examples in the

4    302s, the 3500 material, in which Mr. Auerbach and Mr. Franklin

5    are now redefining what justice means to them.  In order to fit

6    the government's theory, they're now saying, no, justice only

7    meant, for example, firing two of the Nike employees.  That's

8    now what they're telling the government.  And it has actually

9    evolved over the 302s, between the first time they met with the

10   government and the last time they met with the government.

11          How can we not get into, as a defense, that for a year

12   justice meant something totally different to them?  Not just

13   firing the two employees, but cleaning up Nike, cleaning up the

14   EYB.  This is our defense.

15          And I got to tell you, Judge, when I heard the Court's

16   ruling this morning, my heart sank because I know that that's

17   our defense.  It's a year's worth of communications that

18   clearly demonstrate --

19          THE COURT:  You are missing the point, which I tried

20   to make clear but I guess I didn't make it clear enough.  Even

21   if Franklin and Auerbach spent a year and a half talking about

22   this every day, 24/7, if they didn't communicate that to

23   Avenatti, it is irrelevant -- irrelevant.  That's the problem.

24   And I am not in a position to predict what these men are going

25   to say in the witness stand.

1          I take your proffer that the 302s suggest they're not

2     going to testify in a manner consistent with their text

3     messages.  Maybe/maybe not.  Neither you nor I know what

4     they're going to say.  If they testify in a manner that's

5     inconsistent with their text messages, I will allow you to

6     cross-examine and to use the text messages to impeach them.  I

7     cannot predict that that's how they're going to testify.  I

8     don't know.  So, therefore, I don't know whether the text

9     messages are going to come in or not, and so, therefore, there

10    will not be a reference to text messages in the defense

11    opening.

12          Now, if you want to say to the jury, ladies and

13    gentlemen, I expect the evidence will show that Auerbach and

14    Franklin spent a year and a half talking about what they wanted

15    to accomplish vis-a-vis Nike, that they wanted justice, etc.,

16    etc., you are welcome to do that.  But you're not going to

17    refer to text messages that I don't know are ever coming in.

18          MR. S. SREBNICK:  OK.

19          THE COURT:  OK?

20          MR. H. SREBNICK:  I have something that relates to

21    Mr. Avenatti's conditions of confinement.  I don't know if they

22    have any other in limine issues that they want to raise

23    beforehand.

24          MR. RICHENTHAL:  We have a couple.  May I just have

25    one minute to confer with the defense?

K1rdave3

1          THE COURT:  Yes.

2          MR. RICHENTHAL:  I though we could have a one- or

3     two-minute review.

4          THE COURT:  Go ahead.

5          (Pause)

6          (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MR. H. SREBNICK:  Judge, may we approach for one issue

2     at sidebar.

3          THE COURT:  OK.

4          (At the sidebar)

5          MR. H. SREBNICK:  Given your Honor's ruling that we

6     are not going to get into the issue of the ongoing

7     investigation of Nike, as I understand the Court's ruling,

8     something to that effect, there is also an SEC inquiry.

9          THE COURT:  I'm sorry.  I don't understand what you

10    mean by the ongoing investigation of Nike.  I don't know what

11    you're talking about.

12         MR. H. SREBNICK:  Forgive me.  Nike is under

13    continuing investigation by the Southern District of New York,

14    other prosecutors, and your Honor issued a ruling, I believe,

15    today that limits our ability to delve into those issues.

16         THE COURT:  Not that I'm aware of.

17         MR. RICHENTHAL:  We concur, your Honor.  My

18    understanding of the Court's ruling is that Mr. Avenatti's

19    team, if they wish, is allowed to elicit whether Nike witnesses

20    understand there to be an investigation and to try to

21    demonstrate, if they so wish, that their testimony may be

22    colored by that view.

23         We have actually never asked your Honor to preclude

24    that.  We have asked your Honor to preclude his demonstrating

25    the truth or lack thereof, the existence or lack thereof of the

underlying facts and the underlying investigation, not their

views as to whether their company may or may not have exposure.

They may or may not have such views.

THE COURT:  Right.  That's why I was nonplussed by

your statement that I had barred something about Nike being

under investigation.  I have not ruled on anything relating to

that.  All I've said is, it's black-letter law that it doesn't

matter whether the material underlying the threat is true or

false.  That's all I said.  There is nothing controversial

about that.

In other words, the basis for an extortion conviction

can be a threat to reputation that was based on true facts.

Hence, my statement that it doesn't matter whether Nike was in

fact engaged in large-scale corruption in amateur basketball,

that doesn't provide a defense to Mr. Avenatti.  That's all I

said.  I didn't say anything about an ongoing investigation of

Nike about which I know nothing.  Until you said they were

still in an investigation, I had no idea whether they were

under investigation or not.

Anyway, what's your application?

MR. H. SREBNICK:  Given that we have learned from the

government that Nike is likewise under an SEC inquiry, out of

Texas, I believe, the Texas office, although there has been no

disclosure made as to what that is about, and so that's yet

another example of Nike having a motive to curry favor with the

KLRMAVF4

1    government.

2              MR. RICHENTHAL:  Two responses.

3              One, let me just be clear.  We are not conceding Nike

4    is under investigation.  That's irrelevant.  All that matters

5    is what witnesses believe.  The defense keeps saying Nike as an

6    entity is under investigation.  I'm not aware of any basis for

7    the defense to assert that and we are not conceding that, nor

8    are we denying it.  It's not relevant.

9              With respect to the SEC, the way this came about, your

10   Honor, is that we were informed that subsequent to

11   Mr. Avenatti's arrest, I believe in or about April of last

12   year, the Securities and Exchange Commission, an office in

13   Dallas, Texas approached Nike and asked for certain materials,

14   and Nike in turn intended to and, to our knowledge, did provide

15   those materials.  The United States Attorney's Office for the

16   Southern District of New York has zero involvement in that

17   investigation.  As I noted, it's being run in Texas.  We

18   continue to have no involvement in it.  And because it

19   postdates the events at issue, meaning Nike's awareness of it,

20   we think, unlike the alleged other investigation, it couldn't

21   even conceivably bear on whether witnesses allegedly turned to

22   Mr. Avenatti for improper reasons because they weren't aware of

23   it.

24             The only way in which this argument would make any

25   sense would be to argue that very sophisticated lawyers for a

1    very sophisticated company believed, contrary to fact, that if

2    they testify in this particular trial in a particular way, the

3    SEC in Texas will have a different view than Nike.  That piles

4    inference on inference on inference to the point where we don't

5    think it's relevant.  In order for us to rebut it we would have

6    to present, among other things, how the Department of Justice

7    and the Securities & Exchange Commission interact.

8                THE COURT:  That does not even matter.  All that

9    matters is really what the lawyer thinks.  Anyway, does the SEC

10   investigation have anything to do with these allegations about

11   corruption and amateur basketball?

12               MR. RICHENTHAL:  We don't really know.  What we know

13   is that another team at our office was informed that the SEC

14   had asked, in sum, to our knowledge, for the materials that

15   Nike had previously produced to our office.  In that sense I

16   think one can infer there is a connection.  The degree of the

17   connection we are unaware.

18               I can represent to the Court the defense has it in

19   their material.  We asked one of the lead lawyers for Nike,

20   Mr. Wilson, his understanding.  His understanding, in sum, was

21   that this investigation doesn't pertain only to NIKE.  I think

22   he said it pertains to other companies as well.  He did not

23   express an understanding as to its exact contours.  We don't

24   have such an understanding.

25               I think our view, as I said, is that the alleged bias

1    of Nike's witnesses with respect to the Department of Justice,

2    we have never asked to preclude that.  With respect to this,

3    there is just literally no basis in the record to say they have

4    such bias and it would be deeply confusing to the jury, which

5    might think, contrary to fact, that we are talking to the SEC

6    when we are not.

7            MR. H. SREBNICK:  Apparently, Mr. Wilson is talking to

8    the SEC, as I'm hearing, and he's a witness in the case.

9            THE COURT:  I don't think it matters whether the U.S.

10   Attorney's Office in the Southern District of New York is

11   talking to the SEC or not.  What matters is whether one of the

12   Nike lawyers who is going to testify would have in the back of

13   his mind that there is some kind of SEC investigation going on

14   about these same matters and whether that could color the

15   testimony that he gives here.

16           MR. RICHENTHAL:  I agree that's the right question.

17   Let me say we have asked Mr. Wilson if he believes two matters

18   to be connected.  He has said he does not.  I can say to the

19   Court, he is right, they are not.

20           We understand, also, that while Nike was asked to

21   produce the materials in connection with what I'll call the

22   NCAA investigation to the investigation, the Nike's counsel did

23   not believe the SEC's inquiry to encompass in this case

24   anything about Mr. Avenatti.  Truly we don't actually know what

25   the inquiry is about.  It's not clear that even Nike's lawyers

1          really know.  They know what they were asked for.

2                  MR. H. SREBNICK:  I would simply bring out exactly

3          what he said.  The SEC asked for exactly the same materials

4          produced to the Department of Justice.  Mr. Wilson is involved

5          in that, and they can draw the inference that it has some

6          connection to the events involving amateur basketball.

7                  MR. RICHENTHAL:  The problem, from our perspective, is

8          that inquiry came after the events in this case, not before.

9                  THE COURT:  I understand that.  But he is testifying

10         now.

11                 So the argument is that whoever it is who is

12         testifying -- again, they can say I have no idea what the SEC

13         investigation is about.  They can say whatever they want.  But

14         the point is, he is testifying now, and he is aware that there

15         is a government investigation, not conducted by you, but

16         conducted by another government agency, that, by the way, works

17         closely with the Department of Justice and is usually there at

18         the press conference.  I don't see why I should preclude

19         defense counsel from exploring with a witness whether their

20         testimony could be affected by the knowledge that Nike has

21         gotten a subpoena for the same documents from the SEC.

22                 I'm overruling the objection.

23                 MR. H. SREBNICK:  Judge, I have an issue about

24         conditions, but I would like to do that on the record.

25                 THE COURT:  Do you have anything else to say?

KLRMAVT4

1          MR. SOBELMAN:  I will note that the reason we asked

2     for a sidebar is because, to our knowledge, the SEC inquiry is

3     not public, obviously.  If there is testimony about it, it will

4     be become public.  At this point we didn't want to make it

5     public in this forum.

6          MR. RICHENTHAL:  Relatedly, as I said, and now it

7     sounds like this is going to come out, Mr. Wilson I expect will

8     say he doesn't think it's limited to Nike, so it would also, I

9     think, out potentially a broader investigation of which we

10    have --

11         THE COURT:  I don't really know how that's relevant,

12    so you should focus your question on Nike.  There is no reason

13    to get into it, whether other companies were involved or not.

14    I understand from what you are saying that the SEC

15    investigation of Nike is not public, but because it presents a

16    possibility that it could -- the knowledge of that

17    investigation could influence one of the Nike's lawyer's

18    testimony, I can't prevent the defense lawyer from inquiring

19    about it.

20         The other thing I would say is that to the extent a

21    public company receives a subpoena from a government agency, it

22    is usually disclosed in an SEC filing.  If it's not public now,

23    it's going to become public whenever their next filing is due.

24         MR. RICHENTHAL:  The only point I was trying to make,

25    your Honor, I am not sure it's accurate that Nike is actually

K1RMAVE4

1    under investigation.  All we know, and I think all the

2    witnesses believe that Nike has been asked for materials.

3    That's a distinction lawyers recognize that a lay jury may not.

4            THE COURT:  That's a fair point.  But the lawyer can

5    say that.  The lawyer can say, we got a request for documents,

6    but we don't have any reason to believe we are under

7    investigation.  That's fair comment.  I am not going to prevent

8    the defense lawyer from exploring with Nike lawyers who know

9    that Nike got a subpoena from the SEC for the same documents.

10   I am not going to preclude him from questioning the witness

11   about that.

12           MR. RICHENTHAL:  Can we ask whether defense intends to

13   go there in opening.  Because when we raised this yesterday,

14   the defense advised us they, A, intended to do this in opening

15   and, B, intended to say that the fact of the investigation

16   meant that Nike engaged in misconduct.  That argument is

17   obviously wrong and an investigation doesn't equal misconduct.

18           MR. H. SREBNICK:  I won't be saying that, Judge.  I

19   will be saying exactly what your Honor said.

20           THE COURT:  Any other concerns?

21           MR. H. SREBNICK:  At sidebar, no.  There are matters

22   from the podium.

23           THE COURT:  OK.

24           (In open court)

25           MS. PERRY:  Your Honor, we had a few cleanup items

1   that remain outstanding just to raise and hope hopefully get

2   rulings.

3            The first issue, your Honor, is one that the defense

4   raised over the weekend and that is that the government has

5   provided us with a number of exhibits and also with references

6   in a summary chart to certain search terms and web results for

7   Mr. Avenatti's iCloud account in the period right after he met

8   with Mr. Auerbach and Coach Franklin.

9            I think we have made our position pretty clear.  We

10  think that's highly prejudicial and probative of nothing.  He

11  didn't do anything as a result of that in that it shouldn't

12  have a place in the trial.  Your Honor, our letter is docket

13  No. 210.  The government filed its response last evening at 5

14  p.m. and docket No. 211.

15           THE COURT:  I am going to need a copy of 210.

16           MS. PERRY:  Your Honor, I have a copy.  I have some

17  scribbled notes on the bottom, but --

18           MR. S. SREBNICK:  You can put it on the screen, if you

19  want.

20           THE COURT:  How many pages is it?

21           MR. S. SREBNICK:  It's a five-page document.

22           THE COURT:  Can you print it out.

23           MR. S. SREBNICK:  It's that argument.

24           THE COURT:  This is the insider trading --

25           MS. PERRY:  Yes, your Honor.

1          THE COURT:  Is the government going to get into this?

2          MR. PODOLSKY:  Not in opening, but we certainly intend

3     to put forth evidence of the Google searches and web page

4     visits referenced here.  We do.

5          THE COURT:  No reference is going to be made to it in

6     openings.  I have not had an opportunity to read the letter or

7     the government's response.  I'll have to do that before we can

8     have a substantive conversation.  I understand that the defense

9     is objecting to it.  There won't be any reference to it in

10    opening, and we will have another conference about it.

11         MS. PERRY:  The only other issue that I think we had

12    was that we had subpoenaed Nike for a *duces tecum* subpoena.  We

13    have narrowed down the issues that we are looking for.  One of

14    them is notes that Mr. Holmes took of two meetings, and we

15    think he is going to be one of the first witnesses.  We just

16    wanted to tee it up before his testimony.

17         Mr. Holmes took notes of several of the unrecorded

18    conversations and the March 19, unrecorded meeting.  He then

19    also took contemporaneous notes during the March 20 phone

20    conversation that was recorded and the March 21 meeting that

21    was recorded.  And so we would like to, for example, explore

22    any tensions or differences between the contemporaneous notes

23    and the recorded conversations, some of which are

24    unintelligible in parts and so could be useful for those

25    reasons.

 1              THE COURT:  Who is Holmes?

 2              MS. PERRY:  Ben Holmes is an associate at Boies

 3    Schiller who was present for many of the meetings in question

 4    and took notes, almost verbatim notes, it seems, at many of

 5    them.

 6              MR. SOBELMAN:  Your Honor, the only notes that the

 7    government has been provided have been produced to the

 8    defendant.  The notes that the defense references now, the

 9    government understands and from Nike's papers they have

10    asserted attorney work product privilege among other defenses

11    or arguments in support of their motion to quash.  The

12    government has no reason to doubt Nike's assertion of that

13    privilege.

14              THE COURT:  Did you say that Holmes is going to be a

15    witness?

16              MS. PERRY:  Yes.

17              THE COURT:  Then I'm confused.  If Holmes is going to

18    be a witness, it sounds like they are waiving the privilege.

19              MR. SOBELMAN:  Your Honor, I am not sure if an Nike

20    attorney is here to speak to this.  I can try.  It's not really

21    our privilege to protect.  But my understanding of their

22    argument would be that even if Mr. Holmes were to testify about

23    the substance of the meeting -- and obviously there is no

24    attorney-client privilege over that meeting because they are

25    meeting with Mr. Avenatti.  The issue is it is going to be

1    attorney work product privilege as it pertains to the notes

2    that he took.  It is a completely separate inquiry.  And

3    speaking about the substance of the meeting, my understanding,

4    has no bearing on the analysis of the assertion of attorney

5    work product privilege.  To be clear, the government has never

6    seen these notes.  We have not inquired about them.  We don't

7    know what they contain and whether they are verbatim or not.

8              THE COURT:  Obviously, I need to read the papers and I

9    will do so.

10             I guess I would comment that to the extent his notes

11   are verbatim and a factual account of what was said at the

12   meeting, I am not sure that the work product privilege is going

13   to prevail.  But I need to read the papers and then I'll look

14   at it.  And I understand the urgency of the matter.

15             MR. SOBELMAN:  Your Honor, in case it helps the Court,

16   we don't expect that Mr. Homes, if called to testify, would be

17   early in the trial.  So we don't think this issue will be ripe

18   for at least the next few days.

19             THE COURT:  You don't think he will testify this week?

20             MR. SOBELMAN:  No, your Honor.

21             THE COURT:  That's helpful.  Thank you.

22             Mr. Srebnick, you had some conditions of confinement

23   issues you wanted to raise?

24             MR. H. SREBNICK:  Yes, your Honor.

25             State of affairs remains virtually the same.

1    Mr. Avenatti is still in solitary confinement 14 days later

2    with no social interaction, no access to really the outside

3    world with the exception of when he's outside the cell to see

4    the lawyers and to come to court.  No access to television,

5    newspapers, anything.  He has been staring at four walls and

6    the discovery in the case.  He has had very limited phone usage

7    for a few phone calls with family.

8           He is there apparently -- without revealing what might

9    be sealed, he is not there as a threat to anyone.  He is there

10   for, according to the warden, for his own benefit, not to

11   protect anyone else from him.  And so the conditions that he is

12   being subjected to treat him as if he is the threat when in

13   fact the warden has confirmed he is not.

14          It is making his life difficult in his ability to

15   participate meaningfully in these proceedings very difficult.

16          THE COURT:  I'm sorry.  The background here is that I

17   raised concerns about the conditions of confinement for

18   Mr. Avenatti last week, and in response to that I received a

19   letter from the warden stating that, in his view or her view,

20   the conditions of confinement were necessary to ensure

21   Mr. Avenatti's safety and security, and I found the warden's

22   explanation for that to be compelling.

23          And so the reason why I didn't disturb the conditions

24   of his confinement were that I found the reasons offered by the

25   warden for those conditions were compelling in the areas of

KLRMAVE4

1    ensuring Mr. Avenatti's safety and security.  I don't think

2    there has ever been an issue in the case about whether

3    Mr. Avenatti represents a threat of some sort and that's why

4    it's necessary for him to be held in the conditions he is.

5         The condition from the outset, the reason for the

6    conditions has been from the outset a concern about maintaining

7    his safety and security.  And it was for that reason that I

8    didn't disturb the conditions that the Bureau of Prisons had

9    put in place for him because, first of all, they are the

10   experts in determining what measures are necessary to protect

11   the inmates that they are responsible for, and I'm not equipped

12   to make the difficult decisions they have to make about what's

13   necessary to protect the inmates they are responsible for.

14        Secondly, the warden offered, as I said, compelling

15   reasons for why that level of security was necessary.  However,

16   I also told defense counsel last week that if those conditions

17   interfered with providing a defense to Mr. Avenatti, presented

18   difficulties with him obtaining access to the evidence and the

19   3500 material, etc., that they should bring that to my

20   attention and that I would address it.  I didn't hear anything

21   from you, so I assumed that he was being given access to the

22   evidence and the 3500 material as well as appropriate access to

23   his lawyers.

24        Now, are you telling me that's not true, that he is

25   not getting access to the evidence and the 3500 material and

86

KJLRMAVE4

1    the lawyers and, therefore, is not being able to prepare in an

2    appropriate way.

3              MR. H. SREBNICK:  I am not saying that.

4              THE COURT:  What are you saying?

5              MR. H. SREBNICK:  We, of course, have a disagreement

6    over the reasons why he is being held the way he is.  I don't

7    know if I'm permitted to highlight the inconsistency in the

8    warden's position.  I just don't want to run afoul that it was

9    provided to the Court in camera, so I could go in camera if

10   necessary.  Maybe we can do that in a moment.  Let me just

11   finish my thought.

12             The problem with the SHU is that it is a

13   one-size-fits-all kind of condition.  It's the same conditions

14   for someone who is a perceived terrorist and poses threats to

15   others, is housed in the same exact conditions as Mr. Avenatti,

16   who is supposedly there for his own protection, and yet he is

17   handcuffed behind his back, three guards moving him around the

18   facility, and then he's in his cell without the similar access

19   to the outside world that the general population gets.  It

20   becomes de facto punitive because he is not someone who is

21   there for anything that he is presented in terms of as a risk

22   to the outside world.

23             THE COURT:  What is your application?

24             MR. H. SREBNICK:  He would like to have conditions

25   similar to those in general population.  If he can't be in

1    general population, which was our first ask, if he is going to

2    be in his own cell to protect him from another inmate who could

3    pose a danger to him, he shouldn't be treated as if he is the

4    danger.  He should be treated as if he is just like anyone else

5    who just needs to be kept away from other inmates for his own

6    safety, if that's the theory, but he is not being treated that

7    way.  To make a phone call he has got to wait long periods of

8    time to get access to a phone, limited access to the phone.

9    And so he doesn't have contact, regular contact with the

10   outside world.  That's going to now become an issue during the

11   course of the trial, and here is what's most important to us as

12   defense counsel.

13        I know for Mr. Avenatti being subjected to these

14   conditions are oppressive.  And then during the course of the

15   trial he wants to be and he should be an active participant in

16   these proceedings.  And we have had an excellent relationship

17   with the marshals.  Sam has been extremely accommodating.  I

18   think we can work something out during the lunch hour, that we

19   can meet with Mr. Avenatti and talk to him about the

20   proceedings and obtain his input for the day's proceedings.

21        At the end of the day may be the issue.  I don't know

22   what time your Honor intends to break the jury, but our request

23   would be to give us up to one hour after the jury leaves so we

24   can meet with Mr. Avenatti and plan for the next day because

25   there is a hard stop at the MCC for us to be in there.  Not

 1  going to be practical for us after court, late in the evening,

 2  to be able to meet with Mr. Avenatti every day.  It's taken us

 3  roughly 45 minutes each time we go there for us to be processed

 4  to get into the visiting area.

 5       My request would be, my understanding is the marshals

 6  need to have Mr. Avenatti back to the MCC sometime around

 7  5:30ish he would be leaving court.  We would ask if we could

 8  have the Court break for the day in terms of the jury at 4:30

 9  so we can meet with Mr. Avenatti every day and have him

10  meaningfully participate in the trial.

11       THE COURT:  If that's your application, to break at

12  4:30, I will grant it.

13       MR. H. SREBNICK:  Thank you, Judge.  I think the

14  marshals said they can work with us so that we can meet with

15  him for an hour in a certain conference room.

16       THE COURT:  I appreciate the marshal's indulgence.

17       Other issues.

18       MR. SOBELMAN:  None from the government, your Honor.

19       MR. S. SREBNICK:  None, your Honor.

20       THE COURT:  We will distribute the completed

21  questionnaires to you and as soon as you've had an opportunity

22  to review them and are prepared to discuss them, we will

23  resume.  We will, as I said, give those copies of the

24  questionnaires to you and then wait to hear from you as to when

25  you are in a position to talk about them.

```
1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x
     UNITED STATES OF AMERICA,
3
                  v.                          19 CR 373 (PGG)
4
     MICHAEL AVENATTI,
5
                     Defendant.               Trial
6    ------------------------------x
                                              New York, N.Y.
7                                             January 29, 2020
                                              9:35 a.m.
8    Before:

9
                        HON. PAUL G. GARDEPHE,
10
                                              District Judge
11                                            -and a Jury-

12                            APPEARANCES

13   GEOFFREY S. BERMAN
          United States Attorney for the
14        Southern District of New York
     BY:  MATTHEW D. PODOLSKY
15        DANIEL RICHENTHAL
          ROBERT B. SOBELMAN
16        Assistant United States Attorneys

17   BLACK SREBNICK KORNSPAN & STUMPF, P.A.
          Attorneys for Defendant
18   BY:  HOWARD M. SREBNICK
          -and-
19   SCOTT A. SREBNICK
     JOSE M. QUINON
20   MICHAEL D. DUNLAVY
          -and-
21   PERRY GUHA, LLP
     BY:  E. DANYA PERRY
22        GEORGE BARCHINI

23   Also Present:
     DeLeassa Penland, Special Agent (USAO)
24   Andrew Hamilton, Paralegal
     Juliana Manrique, Paralegal
25   Michael Lyon, Trial Technician
```

1              (Trial resumed)

2              THE COURT:  Ladies and gentlemen, we are still waiting

3    for a few more people, so as soon as they arrive we will get

4    started and finish up the jury selection process.

5              I'll see the lawyers at sidebar.

6              (At the sidebar)

7              THE COURT:  I want to address some of the outstanding

8    matters.  I have received correspondence from the government

9    dated January 26, docket No. 211.  It raises a number of issues

10   about certain evidence that the government either wants to

11   offer or wants to preclude.

12             The first issue is a search that the defendant did on

13   his iPhone for the term Nike put options and the subsequent

14   search, I guess, for inside trading.  And the government wants

15   to introduce evidence of these searches to show that

16   Mr. Avenatti intended to capitalize on a drop in Nike's stock

17   in the event that he disclosed the evidence of misconduct that

18   he brought to Nike's attention later and that was the focus of

19   this case.

20             I'm excluding the proposed evidence under Rule 403 of

21   the Federal Rules of Evidence for a variety of reasons.  I

22   guess at the outset I would say if I was teaching a class in

23   law school, if I was a law professor, which I am most assuredly

24   not, if I was and I was trying to demonstrate to a class what

25   is Rule 403 evidence, I would use something like this.  I would

1    make a big poster of it.

2          First of all, nothing ever happened.  The government

3    is not telling us that he ever traded or did anything other

4    than these random searches about these matters.

5          Secondly, insider trading is, of course a very, very

6    complicated crime.  So if I was to introduce evidence of this,

7    I would have to have evidence about what it is, what the crime

8    is, as well as probably a jury instruction about what it means

9    so they could understand put options and what insider training

10   is, etc., etc.

11         This would be very confusing to the jury because,

12   obviously, that's not what Mr. Avenatti is charged with and

13   it's far afield from what he actually is charged with, which is

14   extortion, honest services wire fraud.

15         Let me say parenthetically that these crimes are very

16   complicated in and of themselves, and so I don't need to

17   introduce another crime that he's not charged with that is

18   equally complicated in what is already going to be an extremely

19   complicated jury charge.

20         And, also, in a context where while he apparently did

21   these Internet searches, his thoughts about this were never

22   consummated in the sense that following actually ever happened.

23         There is also ample evidence here that Mr. Avenatti

24   sought to profit, sought to extract money from Nike through

25   threats to damage the company's reputation, so the government

1    doesn't need more proof that Mr. Avenatti sought to profit from

2    these threats.  They have ample evidence of that already.

3           Finally, there is the significant risk that the jury

4    would give this inflammatory evidence more weight than it

5    deserves.  And so for all of those reasons, I will exclude the

6    evidence.

7           MR. PODOLSKY:  Your Honor, may I put on one part of

8    this.  I understand the Court's ruling.  I just want to raise

9    one point.  There are multiple searches for Nike put options

10   and for Nike option change and then for insider trading.

11          THE COURT:  I don't know what Nike option chain means.

12   I don't know what that means.  I have no idea what it means and

13   that's another thing that would have to be explained to the

14   jury if you were going to introduce it.

15          Do you want to tell me what it means?

16          MR. PODOLSKY:  Yes, your Honor.  And I think this will

17   come out the during that testimony.

18          THE COURT:  It is not going to come out because I am

19   not going to allow it to come out.

20          MR. PODOLSKY:  My understanding is that's a way to

21   search for how to purchase options.  And let me leave aside the

22   insider trading search, which I fully understand your Honor's

23   decision on, and I am not going to address it.

24          But the timing of searching for put options, setting

25   aside any notion of insider trading, which is the just the

1   search for put options is relevant and not unfairly

2   prejudicial.  And the reason is, I believe after the first

3   meeting with Franklin Auerbach, it's six minutes after Auerbach

4   sends him the follow-up e-mail and they have a conversation.

5   And what we have the burden to show is that he was beginning to

6   profit for himself, not for Gary Franklin, and the defense is

7   very clear.  Their defense, in large measure, is, he thought he

8   was advancing Gary Franklin's interests.

9           THE COURT:  I understand that, sir.  There are

10  tape-recorded conversations in which he says you need to pay me

11  15 to $25 million.  That's not difficult to understand.  Am I

12  missing something?

13          MR. PODOLSKY:  Of course not, your Honor.  We have to

14  prove his intent.

15          THE COURT:  You think it's going to be difficult to

16  prove his intent that he was trying to get 15 to $25 million

17  from Nike for himself?  You think that's going to be difficult?

18  Because I don't understand that.

19          MR. PODOLSKY:  I certainly hope it's not difficult.  I

20  agree with you.  I hope the jury convicts and we certainly

21  think they will.

22          THE COURT:  I'm not talking about a conviction.  I'm

23  talk about a different point, which is whether Mr. Avenatti had

24  a desire to obtain 15 to $25 million from Nike.  That's what we

25  are talking about here.  On that point I'm mystified by your

1    position.

2           MR. PODOLSKY:  As I understand the defense, that he

3    was authorized to seek an internal investigation, that he was

4    asking for that money because that's how much it cost.  And

5    what we want to argue in response to that is, he was not

6    looking to get money because of some interest of his client.

7    He was looking to get money for his own interests.  We think

8    that this evidence, which is early, right after --

9           THE COURT:  I don't think the timing really makes any

10   difference, honestly.  I understand it's March 10.  I read the

11   letter.  I know the point.  It doesn't have any force to me.  I

12   might say I'm ruling strictly for purposes of the government's

13   direct case.  Obviously, if Mr. Avenatti took the stand, we

14   would be having a different conversation.  But for purposes of

15   the government's direct case, I don't see it.

16          MR. PODOLSKY:  Your Honor, I respectfully --

17          THE COURT:  I don't see it in terms of weighing the

18   prejudicial effect.  You want to introduce evidence that he

19   committed or was thinking about committing another crime,

20   insider trading?  That's what you asked me to do.

21          MR. PODOLSKY:  Your Honor, what I'm trying to focus on

22   right now, respectfully is, setting aside any search for

23   insider trading, no argument --

24          THE COURT:  In order to explain the whole put option

25   thing that you just tried to explain to me, you'd have to

1  explain the larger context, that this is about insider trading,

2  which is a crime.

3      MR. PODOLSKY:  Respectfully, your Honor, I don't think

4  so.  What we seek to argue is after Mr. Avenatti sought out

5  that information he thought how can I capitalize for myself.

6  One thing I can do, I can trade on that.  You wouldn't say

7  that's insider trading.  Frankly, your Honor, his first idea

8  was against Gary Franklin's wishes I am going to hold a press

9  conference and damage Nike.  We wouldn't argue that is insider

10 trading.  We would argue it was his intent to damage Nike, make

11 a profit.  No suggestion of insider trading without the insider

12 trading search.

13      THE COURT:  As I say, I think there is ample evidence

14 here that Mr. Avenatti was seeking to extract millions of

15 dollars from Nike.  I don't think the government needs any more

16 evidence on that point.  And I think this is an incredibly

17 inflammatory allegation, and I have ruled.

18      The government also wants to introduce a letter from

19 Mr. Franklin's lawyer that was sent after Mr. Avenatti's

20 arrest.  In the letter, which is dated March 27, that is docket

21 No. 205-9, the lawyer says that he represents Gary Franklin.

22 He says to Mr. Avenatti:  Please be advised you don't represent

23 Mr. Franklin anymore.  And, by the way, you are not authorized

24 to release any information, and you never were authorized to

25 release any confidential information.

1          This is a letter from someone who has no personal

2     knowledge about anything.  It's a lawyer's letter.  It's

3     written after Mr. Avenatti's arrest.  I don't see the probative

4     value.

5          MR. SOBELMAN:  Your Honor, if I may address that,

6     under your Honor's ruling of the other day, where your Honor

7     precluded at least at this point the postarrest Tweets that the

8     defendant made, we think that under similar analysis this will

9     not be offered on our direct case at this point.  It's part of

10    the same group of exhibits that we anticipated offering that

11    your Honor indicated we may not at this point.

12         However, I will note that we think that the defense is

13    likely to attack the credibility and truthfulness of

14    Mr. Franklin on the stand and that this would be admissible as

15    a prior consistent statement of the agent.  It's the agent's

16    statement, your Honor.

17         THE COURT:  No, no, no.  This is a statement by a

18    lawyer who has no personal knowledge about anything.  He didn't

19    sit in any meetings, as far as I know.  Did he sit in on any

20    meetings between Franklin and Avenatti?

21         MR. SOBELMAN:  No, your Honor.  Mr. Proctor was

22    retained at some point very shortly after Mr. Avenatti's

23    arrest.  Mr. Proctor's statement is written on behalf of and in

24    the scope of his authorization.  It's a post hoc explanation of

25    what the status was before.

 1          THE COURT:  I'm excluding it.  I'm excluding it.

 2          MR. SOBELMAN:  I understand, your Honor.  One more

 3     brief point.  In the event the door is opened to the postarrest

 4     Tweets, we would seek to offer this at that point as part of

 5     the same group of exhibits.

 6          THE COURT:  Obviously.  I can't predict what course

 7     the trial is going to take and what the defendant is going to

 8     do.  And for most things that we talk about in terms of

 9     evidence, it's going to depend on what the flow of evidence is.

10     To the extent that defendant makes their arguments, that may

11     open the door to issues that I'm currently saying we shouldn't

12     get into.

13          And everything I say is without prejudice to more

14     information and possibly opening the door steps that the

15     defense may take.  I'm just telling you what my current view

16     is.  If on any these points you think the defendant has opened

17     the door on something, you come back, you tell me that, and we

18     will have a conversation about it.

19          MR. SOBELMAN:  Thank you, your Honor.  Understood.

20          THE COURT:  The defendant has moved to exclude an

21     argument that Mr. Avenatti sought to obtain money in exchange

22     for silence.  That's the way the issue is sort of framed in

23     that the government wants to argue that he offered silence in

24     exchange for money and in doing that he betrayed his client.

25     That's the general thought.

K1TMAVE1

1           At one point in his discussions with Nike,

2   Mr. Avenatti used the term full confidentiality and the

3   government says, full confidentiality means full

4   confidentiality.  The defense says no, it doesn't mean full

5   confidentiality because there was going to be a settlement

6   agreement that said that if anyone received a subpoena they

7   could respond to the government agency.

8           When someone says full confidentiality, my view of

9   that gives the government a good-faith basis to argue that full

10  confidentiality means full confidentiality and it means silence

11  and the defense can seek to put in contrary evidence, if it

12  wishes.  I am not going to bar the government from making the

13  silence argument it wants to make.

14          I think I've already addressed the Tweets, right?

15          MR. PODOLSKY:  Yes, your Honor.

16          THE COURT:  I don't need to talk about that.

17          The defendant wants to preclude the sums of money that

18  Mr. Avenatti requested at these meetings with Nike.  I believe

19  that these monetary demands are central to the government's

20  case, and I am not going to exclude them.

21          We had a conversation in a completely different

22  context, which is I asked the lawyers is there going to be a

23  dispute about how much internal investigations cost.  And I had

24  suggested to them that maybe they could reach some type of

25  stipulation because, in my view, the case wasn't really about

K1TMAVE1

1    the amounts that we demanded.

2           I just commented that I thought the government would

3    probably take the same position as to the criminal charges

4    whether Mr. Avenatti was seeking a million dollars or the 15 to

5    $25 million that's discussed.  And so it was in that context

6    that I talked about the amounts.  But nothing in that

7    conversation was meant to suggest that I was going to preclude

8    the government from offering these tapes in which Mr. Avenatti

9    seeks specific amounts of money.  To the extent the defense is

10   asking me to preclude any reference to the sums of money that

11   Mr. Avenatti demanded, that application is denied.

12          There is also something in this letter, which is

13   docket No. 211, about Colin Kaepernick, and I already ruled on

14   that.  There are so many letters and there are so many issues,

15   that have been raised, I want to make sure I'm addressing

16   everything.

17          Is anyone aware of something else that is out there

18   that they need a ruling on?

19          MS. PERRY:  I think there is one piece that remains on

20   the defense side, which is a subpoena duces tecum to Nike which

21   I think is going to become relevant before Scott Wilson's

22   testimony.

23          I think there are only two items that we requested

24   that we are still requesting.  The first are notes taken by Ben

25   Homes, the Boies associate who was present for almost all of

1   the conversations that are in question.  They produced notes of

2   some meetings.

3          But the two key critical meetings on the case, the

4   March 20 phone call and the March 21 meeting, he took

5   contemporaneous notes that we have not received, and we

6   continue to request those.  They are another version of the

7   most important evidence that the government is introducing.

8   Some of the conversations that are recorded are unintelligible

9   in parts, and so we would like to see that, for that reason

10  alone.  And we think it will also become relevant for

11  impeachment purposes because he was the sole note taker at the

12  March 19 meeting.

13         The one argument I really heard in opposition is this

14  is work product privilege.  We don't believe that they have

15  waived any privilege that they had by disclosing any number of

16  notes and selectively disclosing and communications.  We think

17  that argument is meritless.  That's the first request that I

18  think is outstanding

19         THE COURT:  We are going to have to set a time for

20  Nike to show up here and argue these points.  I just want to

21  make sure I understand the background, I think you told me

22  Homes is going to be a witness, right?  He is going actually

23  going to testify?

24         MR. SOBELMAN:  Your Honor, he is our first witness.

25  We have not made a decision whether to call him or not.  We

K1TMAVE1

 1    will make that decision at some point in the trial.

 2           To be clear, to the extent we have been provided

 3    materials that he wrote, like notes that he took, those have

 4    been provided to the defense.  There is nothing that they are

 5    seeking that is in the possession of the government.  This was

 6    Nike's motion.  I do note that --

 7           THE COURT:  We need to have a pattern that whenever a

 8    lawyer is talking, they need to be standing next to the court

 9    reporter.

10           MR. SOBELMAN:  I do note that the attorney who

11    represents Nike and filed the motion in this case is in the

12    courtroom.  If your Honor wishes, I can go --

13           THE COURT:  I don't think I want to take the time to

14    argue it now.  I would rather set a time.  I understand I am

15    going to have to talk with the Nike lawyer at some point.

16           Just so I have some basic understanding, even though

17    attorney-client privilege was waived, the sense is that

18    materials were provided by Boies Schiller to the government,

19    right?

20           MR. SOBELMAN:  Yes, your Honor.

21           THE COURT:  They are arguing that there is a work

22    product piece of this that they still have the privilege on.

23           MR. SOBELMAN:  That is one of their arguments, and I

24    believe there are others that are outlined in their motion.  Of

25    course they are not really our arguments.

1          THE COURT:  I understand.  I'll have to find the time

2     to read these papers, and then I will issue an order scheduling

3     time to argue.  I'm aware of the urgency and I'll try to focus

4     on it.

5          MS. PERRY:  To close that loop, there are a couple of

6     other items that we requested that will also be relevant, I

7     think, in that argument, including notes -- drafts of the final

8     notes of the March 19 meeting.  We have asked for any drafts,

9     input from other lawyers.

10          Finally, there are notes from the Boies to the U.S.

11    Attorney's Office on March 19, and there were notes taken

12    during that meeting and we have not received them.  Boies has

13    not produced them to the government, and I trust the government

14    would have produced them to us.  But it's one of the items that

15    Boies has chosen not to produce, and we think that is probably

16    the most important piece of evidence that we would like in this

17    case, what exactly was said by Boies to the government directly

18    following the March 19 --

19          MR. RICHENTHAL:  Just a quick note.  We produced the

20    notes of the United States Attorney's Office of that same call,

21    and we don't frankly see this call as relevant at all other

22    than the fact that it occurred.  It would be hearsay.  It's not

23    through any witness we intend to call.  It was led by a lawyer

24    who was not our witness.  But, in any event, we produced the

25    United States Attorney's Office notes of that call.  I don't

K1TMAVE1

 1    think the content of the call is terribly disputed, but this is

 2    not our motion.

 3              MS. PERRY:  It's terribly disputed, to be clear.

 4    Thank you, Judge.

 5              THE DEFENDANT:  Your Honor, can I have one minute?

 6              THE COURT:  Sure.

 7              THE DEFENDANT:  Thank you, your Honor.  I appreciate

 8    it.

 9              MS. PERRY:  Just to be clear, just to make sure it was

10    clear to your Honor, we would love to schedule this, if it's

11    convenient for your Honor, before Wilson testifies.  We just

12    learned last night he is the first witness.

13              THE COURT:  Is that true?

14              MR. RICHENTHAL:  He is, your Honor.  It is correct he

15    is the first witness, but we don't understand how notes he did

16    not take and, to our knowledge, has not reviewed could be

17    pertinent to his testimony.  They may well be pertinent to Mr.

18    Homes' testimony if he testifies, absolutely, but only a subset

19    would be actually of Mr. Homes.  We don't think they are

20    pertinent to Mr. Wilson who didn't take them and, to our

21    knowledge, has not reviewed them.

22              MS. PERRY:  We do, your Honor, and that's something we

23    can flesh out with the Boies lawyer.  But we think it's highly

24    relevant to Mr. Wilson's testimony.  He was the person who was

25    in that meeting on the 19th.  He was the person who then sought

1    to reach out to the U.S. Attorney's Office.  Presumably, he

2    reviewed the notes of the March 19 meeting before turning them

3    over to the U.S. Attorney's Office.  It's almost unimaginable.

4    It's possible, and the Boies lawyer can tell us that, but it's

5    hard to see that he wouldn't have done that.

6               MR. RICHENTHAL:  Our understanding is that Mr. Wilson

7    has not reviewed those notes, period.

8               If I may respond to the Court's questions about other

9    outstanding arguments we would make, there is one, but we do

10   not think it needs to be resolved this morning, or maybe ever,

11   which is to say, the defense gave us notice under Rule 807 of

12   certain statements that Mr. Geragos made in a proffer.  We

13   opposed the introduction of those statements under Rule 807 as

14   a residual hearsay exception.  I don't think your Honor has

15   formally ruled on the application of the defendant.  Your Honor

16   has obviously ruled on other matters involving Mr. Geragos.

17              It's our understanding the defense does not intend to

18   raise these statements in its opening statement.  I just began

19   my remarks saying I don't think it needs to be resolved this

20   morning.  We continue to oppose the introduction in whole or in

21   part Mr. Geragos' proffers statements under Rule 807 or

22   otherwise.

23              THE COURT:  I'll have to look at that issue.

24              We are going to have to go back to jury selection.

25              (Jury selection occurred)

 1            THE COURT:  I want to make sure I have everything I

 2   need to resolve this issue about Homes, the Homes notes that we

 3   have been talking about.  I know you told me that some notes

 4   have been produced by the U.S. Attorney's Office to you.

 5            MS. PERRY:  Yes.

 6            THE COURT:  Do I have those notes?

 7            MR. RICHENTHAL:  Not my personal notes.  But, yes,

 8   your Honor.  We have produced, and by we I mean our paralegals

 9   have produced to the Court all of the 3500 material we have

10   given to the defense.  Not just for those people we intend to

11   call.  There are actually two separate sections or folders.

12   One is for testifying witnesses, which includes those on our

13   witness list, and it's purposefully overinclusive and for

14   nontestifying witnesses, which includes basically everyone

15   else.

16            THE COURT:  Which category is Homes in?

17            MR. RICHENTHAL:  Mr. Homes is on our witness list.  We

18   have not made a decision whether to call him.  There is a

19   section from all of Mr. Homes' notes and anything else that

20   would be 3500.

21            I believe that Ms. Perry also referenced Ms. Battle,

22   who is an associate with Boies Schiller.  Ms. Battle is not on

23   our witness list, so she would appear in the other section that

24   is nontestifying witnesses.  Everything we have with respect to

25   her was still produced, that is to say, we didn't divide the

K1TMAVE1

 1   world.  We gave the defense everything, and your Honor has

 2   everything as well.

 3          THE COURT:  In Homes' 3500 material would be these

 4   notes that Ms. Perry was talking about.

 5          MR. RICHENTHAL:  I can't speak for Ms. Perry.

 6   Everything we have that Mr. Homes has written, to our

 7   knowledge, or adopted or in some way reflects his statements,

 8   including any witness preps we have, are all in that

 9   subsection.

10          MS. PERRY:  Your Honor, I agree that the government

11   has not provided them all, but I think Nike and Boies have.

12   They produced certain notes that Mr. Homes has taken and

13   certain notes that Ms. Battle has taken.

14          What they have not given us are the notes that Mr.

15   Homes took, two key conversations on the 20th and the 21st, and

16   they have not given us what we also believe is a very key

17   conversation between the Boies lawyers and the U.S. Attorney's

18   Office on March 19.  We know those notes exist, both sets of

19   them.  We have seen the 3500 material that the government has

20   produced.  But we don't have that.  And I think that's the only

21   thing that we don't have from Boies.  As we discussed, they

22   have waived the privilege, but they have selectively chosen to

23   withhold these very key sets of documents.

24          THE COURT:  Is it going to be clear to me when I look

25   at the submissions the lawyers have made, is it going to be

1   clear to me what's at issue here, what has been produced and

2   what has not been produced?

3          MS. PERRY:  The world has narrowed a little bit since

4   our briefing.  I think there is really two key sets of

5   documents that we continue to request.  The first relate to Mr.

6   Homes and those are the notes of the two conversations that I

7   mentioned, the 20th and 21st, as well as drafts of typewritten

8   notes that he wrote for the meeting on March 19.  There are the

9   Homes set of documents that relate to the conversations

10  involving Mr. Avenatti, and then there is the Battle set of

11  documents.  I believe there were two conversations on March 19

12  for which she took notes, both between Boies lawyers and the

13  AUSAs, on the NCAA investigation.  That's the sort of outcry or

14  that's the first conversation in which Boies reported the

15  so-called extortion attempt by Mr. Avenatti.  So the way that

16  they framed it, the way that they characterized the statements

17  that he made are key to our defense.

18         MR. RICHENTHAL:  We are not privy to conversations

19  which we understand have occurred between the defense team and

20  the Boies firm.  So I can't represent one way or another what

21  has or has not been said.  What I can say is we don't

22  understand the relevance of, quote, how they described it when,

23  to be clear, the how is not human beings we are calling at

24  trial, point one.  Point two, two of the three sets of notes,

25  if they exist, and I have no personal knowledge one way or

1     another, if they exist, two of the three sets pertain to video

2     and audio-recorded meetings.

3          Ms. Perry earlier today made the comment that they

4     need them anyway because portions are unintelligible, a word

5     here and there is unintelligible, and of course the defendant

6     was present at those meetings.  We still don't understand the

7     relevance.

8          Beyond that, I think the papers speak for themselves,

9     but I can't speak for Boies, and I don't know what they have

10    said or not said or what they have.

11         THE COURT:  I tell you.  At this point I'm more

12    focused on waiver.  In all honesty, I have not read the papers

13    yet.  I can tell you that I am going to be looking at the

14    question of waiver.  More than that, I can't really say.

15         MR. RICHENTHAL:  What I will say on that point, and I

16    don't purport to be an expert on waiver, I don't believe that

17    Boies has produced any notes from recorded meetings, any.  They

18    have been selected.  I believe they simply have not produced

19    any.  With unrecorded meetings I think Ms. Perry's

20    representation may be accurate, although I am not sure there

21    any other notes exist.

22         March 19, as the Court knows, was an unrecorded

23    meeting.  We did receive notes from Boies of that meeting, and

24    they have been produced to the Court and produced to the

25    defense.

1          I think the only set that may exist that has not been

2   given is what I started with, which is the recorded meetings.

3   I don't know that that bears on the waiver question.  I want to

4   go clear about our understanding of the facts.  Our

5   understanding is admittedly a little limited on this.

6          THE COURT:  Is that consistent with your

7   understanding?  They say they have produced to you Boies notes

8   of the March 19 meeting.  Is that consistent with your

9   understanding?

10          MS. PERRY:  Yes, they produced handwritten notes.

11   They produced two sets of the notes from that meeting.  The

12   first is the handwritten ones and that was converted into

13   typewritten form, two versions of the same conversation.  We

14   are basically asking for that as well, for the other two

15   meetings.  We have the audio-recorded conversations, and they

16   are unintelligible in many areas.  On March 20, I think I

17   counted 85 unintelligible bracketed areas.

18          THE COURT:  On that transcript.

19          MS. PERRY:  Correct.  That I believe the parties have

20   agreed to.

21          On the March 19 notes we have the handwritten ones,

22   the final typed.  What we don't have, I believe the typewritten

23   notes were memorialized the day after the meeting, so on March

24   20.  And Mr. Homes said there was input from other attorneys.

25   He has drafts of that typewritten memo.  And so we would like

K1TMAVE1

1   to see the drafts.  We would like to see the drafting process.

2   We asked for the metadata as well and for any drafts that went

3   into the final product.  So that's the first category of Homes.

4           MR. RICHENTHAL:  I obviously can't speak to Mr. Homes'

5   practice in putting a memo together.

6           With respect to the alleged unintelligible moments,

7   your Honor has the transcripts.  I urge your Honor to look.

8   They are utterly immaterial, miniscule, interspersed throughout

9   a conversation.  Mr. Avenatti was in that conversation.  He

10  knows what he said.  To the extent that witnesses have a

11  failure of recollection on the stand, or the defense suggests

12  that they do, they are free to cross-examine him.  The notes

13  taken by another human being do not help with that

14  cross-examination.

15          THE COURT:  It's about 20 of.  I want to meet back

16  with you at 10 past one to collect your peremptory challenges.

17  Once we have the jury set, then we will turn to the alternates

18  and I will take your peremptories with respect to the

19  alternates, and we will agree who the alternates are.

20          MR. H. SREBNICK:  Can I have 30 seconds on opening

21  statement?

22          THE COURT:  Sure.

23          MR. H. SREBNICK:  I think I was able to devise two

24  visuals that I think the government finds acceptable.  I would

25  like to show them to the Court.

K1TMAVE1

 1             One is a picture of the lawyers involved in the Nike

 2     side for Mr. Geragos and Mr. Avenatti.  The other is a visual

 3     showing the three questions that were asked by Auerbach and

 4     Franklin in their Power Point.  I would remove any indication

 5     that they came from the Power Point.  It would be just as if I

 6     was reading them and putting them on the blackboard.  I think

 7     the government might agree finally.

 8             MR. RICHENTHAL:  No.

 9             MR. H. SREBNICK:  I ask for your permission.

10             THE COURT:  Do you have a problem with these

11     photographs?

12             MR. SOBELMAN:  Your Honor, let me just say this.  We

13     don't have serious concerns about these in the way that we did

14     about the Power Point, and I don't want to be draconian.

15             We asked that the defense counsel raise this with your

16     Honor simply because, first of all, these photos will not be in

17     evidence, and your Honor yesterday, I thought, indicated that

18     only things that are going to come in evidence later should be

19     shown once they are in evidence.

20             Those people are those people.  One of the pictures is

21     quite old.  We actually only expect one of those photographs to

22     come in evidence.  The others are not, as far as we know,

23     marked as exhibits.  On the slide of the questions, it's an

24     excerpt from an exhibit that we expect to offer and will be

25     admitted.  It's a little out of context in the way it's

K1TMAVE1

 1   presented, but it certainly doesn't pose the same concerns to

 2   the significant degree that the others did.

 3          THE COURT:  If these photographs aren't going to come

 4   in evidence, I am not going to let you use them.  For example,

 5   Geragos is not going to be here, so I gather the jury is going

 6   to see the other people.  Are these other people -- Scott

 7   Wilson I know you mentioned.  He is going to be a witness.

 8          MR. SOBELMAN:  Scott Wilson will testify.

 9          THE COURT:  Andrew Michaelson.

10          MR. SOBELMAN:  Andrew Michaelson, we are not going to

11   call him to testify, although that photograph is part of a

12   larger exhibit.

13          THE COURT:  That the jury will see?

14          MR. SOBELMAN:  Yes, your Honor.

15          THE COURT:  Is the jury going to see any pictures of

16   Mark Geragos?

17          MR. SOBELMAN:  No photographs, your Honor, although he

18   is depicted on parts of the video recording of the meeting.

19          THE COURT:  Because he is there.

20          MR. SOBELMAN:  Yes, your Honor.

21          MR. RICHENTHAL:  With respect to Mr. Leinwand, we do

22   anticipate he will be a witness.  That photo is -- I don't mean

23   to demean Mr. Leinwand -- quite old.

24          MR. H. SREBNICK:  It is the best we can find, Judge,

25   and I think I can offer them in evidence.  All the witnesses

1    can be asked to identify these people.  This is nothing

2    controversial, Judge.

3           THE COURT:  I'm reminded that Geragos' image is going

4    to be shown because he's on video.  Effectively, I think the

5    jury is going to see these images in some form that people

6    might look a little bit different.  I take the point that

7    Mr. Leinwand is not going to look like what he looks like

8    there.

9           I don't see any prejudice.  I am going to let you use

10   the photographs.

11          With respect to question 1, 2, and 3, if there is

12   agreement that these questions are definitely coming in, I'm

13   not disposed to prevent the defense from using one slide that

14   everyone agrees is definitely come into evidence.  I am going

15   to permit use of both of these.

16          MR. H. SREBNICK:  Thank you, Judge.

17          THE COURT:  We are clear on the schedule.  10 past we

18   are going to reconvene.

19          (Luncheon recess)

20

21

22

23

24

25

1              (A jury of 12 and three alternates were selected and

2    sworn)

3              THE COURT:  Ladies and gentlemen, you are now a jury.

4    There is no higher function in our legal system.  From now on,

5    whenever you enter or leave the courtroom as a jury, Mr. Ruocco

6    will instruct the parties and the audience to rise, the same as

7    he does for me, because you are every bit as powerful and

8    important as any judge.

9              Let me reintroduce you to some of the people we have

10   here in the courtroom.  As I told you, my name is Paul

11   Gardephe, and I will be the judge presiding over the trial.  We

12   are in Courtroom 110.  If you forget what courtroom we are in,

13   or how to get here, just ask one of the marshals at the

14   entrance of the building and they will be happy to direct you.

15             I've already introduced you to Mr. Avenatti and his

16   lawyers, Scott and Howard Srebnick, Mr. Quinon, Ms. Perry,

17   Mr. Stabile, Mr. Dunlavy, Mr. Barchini.  You've also met Mr.

18   Podolsky, Mr. Richenthal and Mr. Sobelman, the Assistant United

19   States Attorneys who are prosecuting the case.

20             In front of me sits Mr. Michael Ruocco, who is my

21   courtroom deputy.  He is the person to speak with if you have

22   any questions or have any difficulties during the trial.

23             At our next break, Mr. Ruocco will show you back to

24   the jury room.  It is right behind this door.  That's where you

25   will report each morning.  He will give you his telephone

1    number, where you can reach him if there is an emergency.  I

2    ask you to give him a telephone number where you can be reached

3    in the evening.

4            Our trial days, generally speaking, will begin at

5    9:30.  I told you before that we would end at 4:30.  I am

6    contemplating a schedule that would have us on some days at

7    least end at 2:30 but have no lunch break.  So, in other words,

8    we would start at 9:30, take a brief recess at, say, 11/11:15

9    of no more than 15 minute, and then go for another couple of

10   hours, take another 15-minute break, and then adjourn for the

11   day at 2:30.  I'm thinking about that schedule and will tell

12   you more about that at the end of today's proceedings.

13           We will take a recess, as I said, in the morning and

14   then in the afternoon.  But I want to emphasize that if any of

15   you need a recess at any other time, you just raise your hand

16   and we'll take a recess.

17           I would ask you to be on time in the morning and after

18   breaks, because if one of you is late, you'll keep everyone

19   else waiting.

20           I have some preliminary instructions that I am going

21   to give you now.  They will take no more than ten minutes or

22   so.  After that, we will hear opening statements on behalf of

23   the government and the defense, and then we will begin hearing

24   testimony.

25           So let me turn to my preliminary instructions.

K1tdave42

         1          Ladies and gentlemen of the jury, in the American

         2     system of justice, as I've told you, the judge and the jury

         3     have separate roles.  My job is to instruct you as to the law

         4     that governs or controls the case.  I'm going to give you some

         5     instructions now.  I may give you other instructions during the

         6     trial.  At the end of the trial, I will give you detailed

         7     instructions about the law you will need to apply when you

         8     deliberate.

         9          Your job, as jurors, is to determine the facts based

        10     on the evidence that will be presented at this trial.  You are

        11     the only triers of fact, and your decisions on the factual

        12     issues will determine the outcome of the case.

        13          You must not take anything I may say or do during the

        14     trial as indicating what your verdict should be.  Don't be

        15     influenced by my taking notes.  What I write down may have

        16     nothing to do with this trial or with those matters that you

        17     have to be concerned about.

        18          You must pay close attention to the evidence.

        19     Evidence consists only of the testimony of witnesses,

        20     documents, and other things that are received in evidence.  And

        21     you will hear me say "received," and at that point that item

        22     becomes evidence; it becomes something that you can consider in

        23     your deliberations.

        24          Sometimes the lawyers reach agreements as to certain

        25     facts, and those agreements are referred to as "stipulations,"

1    and they are also evidence.

2           There are certain things that are not evidence, and

3    you must not consider them as evidence.  For example,

4    statements and arguments by lawyers are not evidence.  They are

5    simply arguments in which the lawyers will tell you what they

6    think the evidence proves or how they think you should go about

7    analyzing the evidence.  You should give the lawyers' arguments

8    only as much weight as is consistent with your own common

9    sense, and you should under no circumstances consider lawyers'

10   arguments as evidence.

11          Any statement I may make to you is not evidence.

12          Questions by lawyers are not evidence.  Only the

13   answers given by the witness are evidence.  The question that

14   the attorney asks is only important insofar as it places the

15   witness' answer in context.  For example, if a witness is asked

16   "It was raining on June 2nd, wasn't it?" and the witness

17   answers, "No," then based on that exchange, there is no

18   evidence in the case that it was raining on June 2nd.

19          Objections to questions are also not evidence.

20   Lawyers have an obligation to make an objection when they

21   believe that evidence being offered is improper under the Rules

22   of Evidence.  You should not be influenced by the mere making

23   of an objection.  If I sustain the objection, you'll hear me a

24   "Sustained," and you should ignore the question and any answer

25   that may have been given.  If I overrule the objection, you'll

1    hear me say "Overruled," and you should treat the answer just

2    like any other.

3          From time to time, I may exclude or strike testimony

4    or tell you to disregard it.  If I do so, any answer that may

5    have been given is not evidence and you may not consider it.

6    If I instruct you that some evidence is only to be considered

7    for a certain purpose, you must follow that instruction.

8          Anything you may have seen or heard or will see or

9    hear about this case outside the courtroom is not evidence and

10   must be disregarded.  You are to decide the case based solely

11   on the evidence presented here in this courtroom.

12         In deciding the facts of the case, you will have to

13   make decisions concerning the credibility of the witnesses,

14   that is, how truthful and believable they are.  How do you

15   decide what to believe and what not to believe?  You listen

16   carefully to the witnesses.  You will watch them and observe

17   them, and then decide as you would decide such questions in

18   your ordinary lives:  Did the witness know what he or she was

19   talking about?  Was the witness candid, honest, open, and

20   truthful?  Or did the witness appear to be falsifying,

21   exaggerating, or distorting what happened?  Is there any reason

22   to think that the witness might be lying or just plain mistaken

23   about what they're telling you?

24         Sometimes it's not so much what a witness says but how

25   he or she says it that may give you a clue as to whether or not

 1   you can accept that witness' version of an incident or an event

 2   as credible or believable.  In short, the way a witness

 3   testifies may play an important part in your reaching a

 4   judgment as to whether or not you can accept the witness'

 5   testimony as reliable.  You need to use your common sense and

 6   your life experience in evaluating each witness' testimony.

 7          As the trial proceeds, you may develop impressions of

 8   a witness or of a particular issue.  You must not allow these

 9   impressions to become fixed or hardened.  In other words, you

10   can't make up your mind right away.  If you do, you will

11   prevent yourself from considering the testimony of other

12   witnesses or other evidence that may be presented after the

13   witness or witnesses you have heard.  This would be unfair to

14   one side or the other.  A case can only be presented

15   step-by-step, witness-by-witness.

16          We know from experience that frequently one person's

17   initial description of an event might sound impressive and even

18   compelling, but when we hear another person's version of the

19   same event, or even the same witness cross-examined about that

20   event, what seemed to be very compelling and impressive may

21   fall apart or become less convincing.  Please remember that

22   there may be another side to any witness' story.

23          You will use your common sense and your good judgment

24   to evaluate each witness' testimony based on all the

25   circumstances.  You must keep an open mind.  Until the trial is

1    over, you should not reach any conclusions until you have heard

2    all the evidence.

3         Some of you may wish to take notes during the trial,

4    and you are welcome to do so.  If you do take notes, be sure

5    that your note taking does not interfere with your listening to

6    and considering all the evidence.  Also, if you do take notes,

7    don't discuss your notes with anyone before or during your

8    deliberations.  Your notes are to be used solely to assist you,

9    and they are not to substitute for your recollection of the

10   evidence in the case.

11        The fact that a particular juror has taken notes does

12   not entitle that juror's views to any greater weight than the

13   views of any other juror, and your notes are not to be shown to

14   any other juror during your deliberations.

15        If during your deliberations you have any doubt as to

16   any of the testimony, you will be permitted to request that the

17   relevant portion of the trial transcript be sent back to you in

18   the jury room.

19        There are three basic rules about a criminal case that

20   you must keep in mind:

21        First, a defendant is presumed innocent until proven

22   guilty.  The indictment brought by the government against the

23   defendant is only an accusation.  It's proof of nothing.  It is

24   not proof of guilt or anything else.  The defendant, therefore,

25   starts out with a clean slate.

1          Second, the burden of proof is on the government until

2     the very end of the case.  A defendant has no burden to prove

3     his innocence, or to present any evidence, or to testify.

4     Since the defendant has the right to remain silent, the law

5     prohibits you from arriving at your verdict by considering that

6     the defendant may not have testified.

7          Third, the government must prove a defendant's guilt

8     beyond a reasonable doubt.  I will give you further

9     instructions on this point later, but, as I have said, please

10    bear in mind that in a criminal case the standard is much

11    higher, a much higher standard of proof than that which applies

12    in a civil case.

13         In order to ensure that you decide the case based

14    solely on the evidence and that you not be influenced in any

15    way by anything that might occur outside the courtroom, I must

16    give you the following instructions.

17         First, don't discuss this case among yourselves or

18    with anyone else, including any members of your family or your

19    friends.  You may tell your family that you are a juror in the

20    case, but don't tell them anything else until after you have

21    been discharged by me at the end of the trial.  Also, you may

22    discuss the case amongst yourselves only after all the evidence

23    is in and the case has been given to you to discuss and to

24    decide in the jury room.

25         This rule is important because experience has shown

1   that when someone expresses an opinion about a witness or about

2   the larger case, that person begins to identify more strongly

3   with that opinion.  And since it's critically important that

4   you keep an open mind until you have heard all the evidence,

5   you should not discuss the case with anyone, including your

6   fellow jurors, or communicate about the case in any fashion

7   with anyone until the case is given to you at the end of the

8   trial for you to reach your verdict.

9          As I told you earlier, it is vitally important that

10   you not read anything in the newspapers, over the Internet, or

11   anyplace else about the case, including any posts, blogs, any

12   type of social media, whether it be Twitter, Facebook,

13   LinkedIn, Instagram, or something else.  Don't listen to or

14   watch any reporting about the case if it should be broadcast on

15   TV or the radio or on video on a site like YouTube or anyplace

16   else.

17          Don't let anyone speak to you about the case.  If you

18   are approached by someone to speak about it, tell them that the

19   Judge has directed you not to do so.  If anyone seeks to

20   contact you or contacts you about the case, you must

21   immediately report that to me.

22          Next, and this is also critically important, don't do

23   any research about the case.  Don't try to investigate it on

24   your own.  Again, what is evidence is what comes in from the

25   witness stand and nothing else.

1          Be sure that I'm told if someone you know comes into

2     the courtroom.  This is a public trial so that could happen.

3     But it's important you do not hear from them what may have

4     happened in the courtroom when the jury was not present.  So if

5     you should see a friend or relative come into the courtroom,

6     please send a note to me through Mr. Ruocco at your first

7     convenience.

8          The attorneys, the parties, and the witnesses are not

9     supposed to talk to the jury outside the courtroom, even to

10    offer a friendly greeting.  So if you happen to see any of them

11    outside the courtroom, they will not, and should not, speak to

12    you.  Please don't take any offense.  They will only be acting

13    properly by not speaking to you.

14         The parties are entitled to have you render a verdict

15    in this case on the basis of your independent evaluation of the

16    evidence presented here in this courtroom.  Obviously, speaking

17    to others about the case or exposing yourself to information

18    about the case outside the courtroom would compromise your jury

19    service and the duty of fairness that you owe to both sides.

20         Finally, let me say a few words about trial procedure.

21    The trial essentially has three parts:  First, the lawyers have

22    the opportunity to make opening statements to you.  These

23    statements are not evidence.  The purpose of opening statements

24    is for the lawyers to give you a preview or a roadmap of what

25    they think the evidence will be.  Actual evidence, however,

1   comes from the witnesses and the exhibits that are received in

2   evidence.

3          After the opening statements, you will hear testimony

4   from witnesses.  Because the government has the burden of

5   proof, the government will call its witnesses first.  Each

6   witness will first give direct testimony, and then he or she

7   may be cross-examined by the defendant's lawyers.  Sometimes

8   there is redirect testimony and recross-examination.

9          Exhibits and stipulations or agreements as to facts

10  may be received in evidence.

11         After the government's case, the defendant may, but is

12  not required to, present witnesses and other evidence.  If the

13  defense calls witnesses, those witnesses will be examined and

14  cross-examined, just as the government's witnesses were.  If

15  the defendant presents evidence, it is possible that the

16  government may then present some rebuttal to that evidence.  Of

17  course, the defendant never has to testify or to present any

18  evidence at all, because the burden of proof at all times

19  remains on the government.

20         After all the evidence has been received, the

21  government and the defendant will have an opportunity to make

22  closing arguments to you.  The lawyers will review the evidence

23  with you and make arguments as to what conclusions they think

24  you should or should not draw from the evidence.  These

25  arguments also are not themselves evidence, but they may be

K1tdave4                           Opening - Mr. Sobelman

 1    helpful to you in reviewing the evidence during your

 2    deliberations.

 3              After these closing arguments, or summations, as they

 4    are called, I will give you detailed instructions as to the law

 5    that you must apply in deliberating and reaching your verdict.

 6              Then you will go into the jury room to deliberate and

 7    discuss the evidence in order to decide the facts and render

 8    your verdict.

 9              From time to time during the trial, it may be

10    necessary for me to talk with the lawyers outside the hearing

11    of the jury either by having a conference up here at the bench,

12    if the jury is present in the courtroom, or by calling a

13    recess.  The lawyers and I will do this as little as possible.

14    Please understand that while you are waiting, we are working.

15    The purpose of any conference outside your hearing is not to

16    keep relevant information from you but, rather, for me to

17    decide procedural issues or how proposed evidence should be

18    treated under the Rules of Evidence.

19              Ladies and gentlemen, that complete my preliminary

20    instructions to you, and we will now hear the government's

21    opening statement.

22              Mr. Sobelman.

23              MR. SOBELMAN:  This is a case about a shakedown.  This

24    case is about how this man, Michael Avenatti, the defendant,

25    betrayed his client.  Like all lawyers, he was supposed to look

1    out for his client.  Instead, he sold out his client and

2    threatened to harm a major company.  All to line his own

3    pockets.

4              How did he do that?  Extortion and fraud.

5              You see, the defendant had a weapon, a very modern

6    weapon.  He had a big following on social media and a big

7    presence on TV and in the news, and he found a way to use that

8    weapon.  You will learn that that an amateur basketball coach

9    came to the defendant looking for help.  The coach had lost his

10   sponsorship from Nike, the shoe company, and wanted it back.

11   But the coach also told the defendant that Nike employees had

12   given him money to pay to the families' amateur players.  The

13   coach told the defendant that he was afraid that what he and

14   those Nike employees had done was illegal.

15             But when the defendant looked at the coach, he did not

16   see a client to help.  He saw dollar signs for himself.

17             The defendant knew that he could go on the news, get

18   on the Internet, and tell people that Nike had done something

19   wrong or broke the law.  If he did that, it would really hurt

20   Nike's image and value as a company.  And he figured that Nike

21   might pay up to keep him from hurting the company -- and pay up

22   big.  So the defendant made a threat.  He told Nike that it

23   better pay him or he was going to hold a press conference and

24   accuse Nike of breaking the law.

25             The scheme is simple:  Pay me and I'll keep quiet.

 1   Don't pay me, and I'll hurt you.

 2       The defendant may have been wearing a suit and a tie

 3   and using some legal terms, but make no mistake, it was

 4   extortion.  There was a threat to harm Nike unless they pay up.

 5       And it was also fraud.  Who didn't the defendant tell

 6   about his plan?  The coach.  His own client.  The one who

 7   wanted help from the defendant.  The one who told him the

 8   information in the first place.

 9       Why didn't he tell the coach?  Well, first of all, the

10   coach was not going to go along with this plan.  The coach

11   wanted to work with Nike again.  But he also couldn't tell the

12   coach because that was part of his scheme.  He told Nike that

13   he would get the coach to enter into a settlement only if Nike

14   paid him, the defendant.  He demanded a payoff to get his

15   client to settle, and that's a crime.  That's honest services

16   fraud.

17       But the defendant didn't bet on Nike going straight to

18   the authorities, and he didn't know that his threats would be

19   recorded -- recordings that you will hear during this trial.

20       That's why we're here, because the defendant was

21   caught on tape committing extortion and fraud.

22       Members of the jury, this is the government's

23   opportunity to provide you a preview of what we expect the

24   evidence will show.  I'm going to do that in three parts:

25       First, I'm going to talk about the evidence that we

 1    expect you are going to see and hear.

 2          Second, I'll give you a brief description of the

 3    charges in this case.

 4          Third, I'll describe how we're going to prove beyond a

 5    reasonable doubt that the defendant is guilty as charged.

 6          I'm now going to tell you a little bit about the

 7    defendant's client and his relationship with Nike, because it

 8    will help you understand how the defendant committed fraud and

 9    extortion.

10          But before I do, I want to remind you of something.

11    You will not be asked to decide whether the coach or anyone at

12    Nike did something wrong or broke the law.  There is only one

13    person on trial here -- the defendant -- and two wrongs would

14    not make a right.

15          So let's start with the coach who went to the

16    defendant for help.  His name is Gary Franklin.  He runs a

17    basketball program for kids in middle school and high school.

18    The program is called California Supreme, or Cal Supreme for

19    short.

20          Franklin built Cal Supreme from nothing into a

21    nationally-recognized program with some of the best middle and

22    high school players in the country.  For more than ten years,

23    Nike was Cal Supreme's sponsor.  Nike gave basketball shoes and

24    athletic clothing for Cal Supreme's players and coaches.  Nike

25    also gave Cal Supreme about $72,000 a year to help pay for

 1    their program.

 2            Franklin's relationship with Nike was going well until

 3    a few years ago, when two Nike employees had him give money to

 4    family members and other people connected to some of his

 5    players.  They also had him create invoices, or bills, so that

 6    Nike would pay him back for those payments.  But the Nike

 7    employees told Franklin to put things in the invoices that were

 8    not true, so that's what he did.  Those two Nike employees also

 9    pressured Franklin to let a parent of one of his players coach

10    Cal Supreme's top team instead of Franklin.

11            Then at the end of 2018, Nike did not renew its

12    sponsorship of Cal Supreme.  Nike stopped providing shoes,

13    clothes, and funding.

14            Franklin was upset.  He was loyal to Nike but felt

15    mistreated over the last couple years.

16            He was also uncomfortable with the payments to

17    families and the false invoices, and he was angry that control

18    of his most important team had been taken away from him.  He

19    wanted to get back that team and the sponsorship.

20            So Franklin reached out to a friend, who knew the

21    team, that had a contact at Nike.  Franklin told his friend

22    about the payments he made and the false invoices he submitted

23    to Nike.  He realized that this sounded like something that

24    employees of another shoe company, Adidas, had recently gotten

25    in trouble for.  Those Adidas employees were convicted for

1    committing fraud by secretly paying amateur players to go to

2    colleges that were sponsored by Adidas.  Franklin became

3    worried that he, too, could be in trouble.

4           For almost a year, Franklin and his friend talked and

5    emailed and texted about their frustrations and tried to figure

6    out what to do.  In March 2019, Franklin's friend thought they

7    should get a lawyer to help protect Franklin and to talk to

8    Nike on his behalf.  That's where the defendant came into the

9    picture.

10          Franklin's friend had read about the defendant in the

11   news.  He saw the defendant on TV talking about a woman named

12   Stormy Daniels, who brought a lawsuit against President Trump.

13   He felt the defendant seemed willing to stand up to the

14   powerful.  So they reached out to the defendant.  He agreed to

15   meet with Franklin and his friend.

16          When they met, Franklin and his friend told the

17   defendant that Franklin wanted justice.  What did Franklin mean

18   by "justice"?  Franklin told the defendant that he wanted Nike

19   to renew Cal Supreme's sponsorship and pay some compensation,

20   money, for losses that Cal Supreme had suffered.  Franklin also

21   told the defendant that he wanted Nike to fire the two

22   employees who had mistreated him and maybe committed crimes.

23          Franklin and his friend told the defendant about the

24   two Nike employees who had directed Franklin to make payments

25   to the families of a few of Cal Supreme's players and to make

 1   false invoices, and they shared some bank records and text

 2   messages that helped explain what had happened.  But they

 3   didn't want those materials made public, because they thought

 4   it might embarrass Franklin, the players' families, and Nike,

 5   or worse, so they marked the materials confidential.

 6           The defendant told Franklin he would try to get him a

 7   million dollars from Nike.  The defendant had other plans, too.

 8           (Continued on next page)

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MR. SOBELMAN:  Franklin was his client, but he didn't

2     tell Franklin about those other plans.  Why?  Because those

3     plans were for himself, not Franklin.  You see, the defendant

4     realized that publicly broadcasting the payments that Franklin

5     had made would make Nike look bad, maybe really bad.  He

6     thought Nike might be willing to pay and pay a lot to keep it

7     all under raps, and he wanted that pay day for himself.

8          Without telling Franklin, his client, the defendant

9     went to Mark Geragos, another TV lawyer who had been involved

10    in high-profile cases, Geragos had a direct connection to

11    someone high up inside Nike and set up a meeting for the

12    defendant with Nike's lawyers.  The defendant and Geragos met

13    with Nike's lawyers here in Manhattan.  The defendant told them

14    they had a big problem.  He said that he had evidence of

15    widespread and serious criminal misconduct by Nike of payments

16    made to youth basketball players, and he said he would hold a

17    press conference to damage Nike's brand and stock price unless

18    his demands were met immediately.

19          What were the defendant's demands?  First, he told

20    Nike's lawyers that they had to pay Franklin one and a half

21    million dollars.  Second, the defendant demanded a far larger

22    payment for himself and Geragos, the lawyer who helped him get

23    the meeting with Nike.  He demanded that Nike hire him and

24    Geragos to conduct a so-called internal investigation of Nike

25    for millions of dollars.  You will learn that an internal

1   investigation involves conducting interviews, reviewing

2   documents, and writing reports on behalf of a company.

3          The defendant also told Nike's lawyers that if they

4   didn't hire him, if they hired other lawyers to do an

5   investigation, Nike would have to pay the defendant and Geragos

6   twice the money that Nike paid to anyone else for doing no work

7   at all.

8          Why should Nike do this?  The defendant made clear

9   that if he was not paid, he would hold a press conference to

10  embarrass and harm Nike, and he would do so quickly.  He would

11  not let Nike just settle with Franklin, the defendant's client.

12  Nike had to pay the defendant, too, and a lot more, more than

13  $10 million more than the defendant was trying to get for

14  Franklin.

15         As part of his threat the defendant warned them that

16  this was a sensitive time for Nike because it was the same week

17  as two important events.

18         First, Nike had an announcement of its corporate

19  earnings coming up, which would be important to its

20  shareholders, the people who owned Nike's stock.  Second, March

21  Madness, the NCAA men's college basketball tournament was

22  beginning and Nike was a sponsor of many of the teams competing

23  in that event.  The defendant had them write where he wanted

24  them.  It was a shakedown.  It was extortion.  And Franklin,

25  the defendant's own client, had no idea what he was up to.

 1          Nike's lawyers could tell the defendant's threats were

 2     dead serious, and they were afraid he was going to damage the

 3     company.  Within hours Nike reported the defendant's threats to

 4     the authorities.

 5          After that, the defendant's conversations with Nike's

 6     lawyers were recorded by federal agents.  In those

 7     conversations the defendant repeated his threats to Nike.  He

 8     told Nike's lawyers that if they didn't pay up fast, he would

 9     damage Nike's values by billions of dollars.  That's billions

10     with a B.  Nike had to hire him and Geragos and pay them $12

11     million right away.  He also demanded up to 25 million if he

12     actually did some work for Nike, whether Nike wanted it or not.

13     If Nike refused, the defendant would hold his press conference.

14          You will hear how the defendant talked, how he spoke

15     to Nike's lawyers behind closed doors, when he thought no one

16     was listening.  For example, this is how he told them they had

17     to pay him millions to keep from holding his press conference,

18     to keep him quiet.

19          You guys know enough now to know you've got a serious

20     problem and it's worth more in exposure to me to just blow the

21     lid on this thing.  A few million dollars doesn't move the

22     needle for me.  I'm just being really frank with you.  If

23     that's what -- if that's what is being contemplated, then let's

24     just say it was good to meet you and we are done.  And I will

25     proceed with my press conference tomorrow, and I will hang up

1    with you now and I will call the New York Times, who are

2    awaiting my call.  I'm not fucking around with this thing

3    anymore.

4         That is what you will hear the defendant say.  He was

5    shaking them down.  He was saying, give me money or I will harm

6    your company, money that he had no right to demand.  It had

7    nothing to do with his client.  It was all about the defendant.

8    It was extortion.

9         What if Nike didn't want to hire him and Geragos and

10   pay for an investigation that Nike was not asking for?  Well,

11   the defendant had an answer for that, too.  He said that if

12   Nike just wanted him to just keep quiet and go away, Nike could

13   pay one lump sum right away of more than $20 million.  The

14   defendant called it a settlement and typed up a document with

15   some blanks to fill in.  He showed it to Nike's lawyers, but he

16   never told Franklin about it.

17        Ultimately, the defendant agreed to hold off on his

18   press conference for just a few more days, but he wanted his

19   money at that next meeting or else.  You will hear exactly how

20   the defendant ended that meeting.  This is what he said.  I

21   don't want to hear about somebody on a bike trip.  I don't want

22   to hear that somebody has -- somebody's grandmother passed away

23   or something.  I don't -- look.  The dog ate my homework.  I

24   don't want to hear -- none of it is going to go anywhere unless

25   somebody is killed in a plane crash.

```
 1            Members of the jury, this was nothing like the tough
 2   negotiating lawyers sometimes do.  The defendant had not just
 3   crossed the line, he had leaped over it with a running start.
 4   He was not acting like a lawyer.  He was not trying to help his
 5   client.  He was trying to take advantage of his client.  What
 6   he did was criminal.  Fortunately, federal agents were
 7   recording those conversations, so they moved in and arrested
 8   him.
 9            Why did the defendant do what he did?  Simple.  Money,
10   lots of money, millions of dollars.
11            Also, you will learn that the defendant was deeply in
12   debt and his law firm had trouble paying its employees.  He
13   owed a ton of money.  And the scheme stood to make him the very
14   millions he needed.
15            That is a summary of what the evidence will show.  The
16   defendant threatened Nike to pay him money or else he would
17   inflict serious damage on its reputation and value, money for
18   silence, and he did it without considering what Franklin wanted
19   or what was best for Franklin, all to line his own pockets.
20            For what he did the defendant is charged with three
21   crimes:  First, he is charged with transmitting in interstate
22   communication with the intent to extort; second, he is charged
23   with attempting to extort Nike; third, he is charged with
24   defrauding Gary Franklin by using his client's information to
25   seek a payoff for himself.
```

1            Now, let's talk about how we are going to prove that

2     the defendant is guilty of those crimes.  The evidence will

3     come in different forms, including recordings, witness

4     testimony, and documents.

5            First, you are going to hear the defendant's own

6     words.  You will see and hear video and audio recordings of the

7     defendant making threats to Nike and demanding money to keep

8     quiet.  You will hear for yourselves what the defendant said

9     what happened to Nike if it didn't pay up and he held his press

10    conference.  He said, the company will die.  Not die.  But they

11    are going to incur cut after cut after cut after cut.  And

12    that's what's going to happen as soon as this thing becomes

13    public.  That is how he said pay me or else.

14           Second, you are going to hear from witnesses,

15    including some of the Nike lawyers who met with the defendant.

16    You will hear how they felt threatened by the defendant.  You

17    will learn about how they recorded the defendant's threats to

18    the authorities.

19           What happened next?  You are also going to hear from

20    the defendant's client, Gary Franklin, and Franklin's friend.

21    You will hear how they told the defendant about misconduct by

22    two employees at Nike and what they wanted from Nike, including

23    having those two employees fired.

24           Let me pause here for a moment.  You will hear how

25    Franklin felt wronged by those two Nike employees.  He thought

 1   some of what they had him do was improper and potentially even

 2   criminal, but that's not what this trial is about.  This trial

 3   is not about whether Franklin was mistreated by Nike.  This

 4   trial is not about whether anyone at Nike did anything wrong.

 5   Nike is not on trial.

 6          What is this trial about?  This trial is about how

 7   Franklin was mistreated by the defendant, his own lawyer.  This

 8   trial is about how Nike was victimized by the defendant.  Even

 9   if Nike did wrong, that did not give the defendant the right to

10   do what you will learn he did.  This trial is about how the

11   defendant misused Franklin's information and threatened Nike

12   for his own benefit.  Franklin was the person who felt wronged

13   by Nike, not the defendant, but the defendant used Franklin in

14   an attempt to make millions for himself.

15          Both Franklin and his friend will tell you that the

16   defendant never mentioned his scheme to them, never mentioned

17   demanding to be paid millions.  He never mentioned an internal

18   investigation.  He never mentioned a press conference.  And

19   Franklin did not want one.  Just the opposite.  The materials

20   he gave the defendant were marked confidential for a reason.

21          Who else will you hear from?  You will also hear from

22   the defendant's former assistant.  You will learn how desperate

23   the defendant was for money at the time he committed these

24   crimes.  You will hear about the debts the defendant owed, many

25   millions of dollars in debts.  And you will also see documents.

 1    One of those documents is a post the defendant put on Twitter.

 2    It was a veiled threat to Nike that the defendant called a

 3    warning shot in a text message to Geragos.  You will see that

 4    text message, too.  That is some of the evidence you will see

 5    and hear.

 6              After you see and hear the evidence, we will have a

 7    chance to speak with you again and to talk with you about how

 8    the evidence shows the defendant is guilty because he abused

 9    his client's trust and tried to extort Nike, all to make

10    millions of dollars for himself.

11              Before then, I ask you to do three things:  First, pay

12    close attention to the evidence; second, follow Judge

13    Gardephe's instructions on the law; and, third, use your common

14    sense as you consider the evidence, the same common sense you

15    use every day.  If you do those three things, the defendant

16    will get a fair trial and the government will get a fair trial,

17    and you will return the only verdict supported by the law and

18    the evidence.  The defendant is guilty.

19              THE COURT:  Ladies and gentlemen, we will now hear the

20    defense opening.  Mr. Srebnick.

21              MR. H. SREBNICK:  When Michael Avenatti met with the

22    lawyers from Nike and the law firm of Boies Schiller here in

23    New York City, he was there to settle the claims of his client.

24    When Michael Avenatti made demands of Nike, he did so to

25    achieve the goals of his client, the goals as his client had

1    stated to him, a client who had claimed that he had been

2    bullied by Nike, that he had been asked to do improper things

3    by Nike, a client who Coach Franklin explained to Mr. Avenatti

4    that Nike had sidelined him, had taken away his team, and left

5    him disreputed in the basketball community, a client who wanted

6    justice, a client who was going to be a whistleblower and let

7    the corruption be exposed, a client who wanted Nike executives

8    who had participated in this corruption terminated, a client

9    who, to use the words of Coach Franklin and his advisor,

10   Mr. Jeff Auerbach, they wanted to light the fuse.  They wanted

11   answers.

12           In preparation for meeting with Mr. Avenatti, Coach

13   Franklin and his advisor, Mr. Auerbach, presented Mr. Avenatti

14   questions they wanted answers for.

15           Question No. 1:  Is this a case of rogue executives

16   from Nike committing egregious criminal acts on their own or

17   was Nike, a Fortune 100 company, complicit in the corruption?

18           Question 2:  Is Nike a company which tolerates

19   workplace bullying and abuse by its senior executives?

20           Question 3.  Is Nike's enterprise, the Nike Elite

21   Youth Basketball, the racket, guilty of racketeering, having

22   committed acts of fraud, bribery, coercion, conspiracy, illegal

23   cash payments, wire fraud, mail fraud, bank fraud, money

24   laundering, etc.?

25           Coach Franklin and his advisor, Mr. Auerbach, they

1    wanted answers.  They did not want to whitewash.  They had

2    spent over a year trying to get answers, over a year where Nike

3    blew them off.  They wanted Michael Avenatti, their lawyer, to

4    demand that an investigation occur so that they could bring

5    justice to the situation.

6         And so when Michael Avenatti met with the lawyers of

7    Nike, when Michael Avenatti met with the lawyers from Boies

8    Schiller, former prosecutor no less that he met with, he made

9    it very clear what his client wanted, no. 1, compensation,

10   restitution, money and, No. 2, justice, an investigation, an

11   internal investigation, a private internal investigation to

12   root out the corruption at Nike.

13        This was a prelawsuit settlement conference.  It

14   occurred in a law office.  And Michael Avenatti was asking for

15   what his client wanted at that time, as evidenced by those

16   three questions and the other items that were given to

17   Mr. Avenatti by his client.

18        If Nike was willing to settle, they would reach a

19   settlement agreement.  It would all be put in writing.  The

20   lawyers from Boies Schiller, a 300 plus law firm here in New

21   York City, a law firm that bills hundreds of millions of

22   dollars a year to its clients, they would have to approve the

23   settlement agreement.  Nike, a Fortune 100 company, sales in

24   the 30-billion-dollar-a-year range, their lawyers in-house

25   would approve the settlement agreement.

1    But Mr. Avenatti made it clear, he was fighting for a

2    client who wanted these remedies.  And if Nike was unwilling to

3    provide the remedies that Coach Franklin wanted, well, then

4    Mr. Franklin's claims, the truth, would become public because,

5    as we know, lawsuits are public filings.  A complaint could be

6    filed exposing in court, as we are here today in front of the

7    world, in front of the media, Mr. Franklin's claims.  That's

8    not extortion.  That's not fraud.  That was litigation.  That's

9    exactly what it was.

10    Mr. Avenatti wasn't alone.  He was accompanied by a

11    colleague, a senior lawyer, Mark Geragos.  I'll talk more about

12    him in a moment, a very high-profile lawyer with a lot of

13    experience.  So when they made their request, their ask of

14    Nike, it was done in the spirit of getting the client what the

15    client wanted.

16    Who was the client you heard a bit from the

17    prosecutor, Coach Gary Franklin, built up a youth team,

18    basketball in California?  Part of a Nike sponsored league of

19    40 teams.  Coach Franklin had worked hard.  He built loyalty.

20    He built up a brand.  He obtained a sponsorship from Nike of

21    $72,000 a year.  Developed a good reputation.

22    Why does Nike sponsor these teams?  Nike is hoping

23    that maybe one of the kids will become the next Lebron, the

24    next Michael Jordan.  So too does under Armour, so too does

25    Adidas, sponsor youth leagues.

 1           But out came the sneakers war, as it was called by

 2    Coach Franklin and his advisor, Mr. Auerbach.  Nike executives

 3    suspected that Adidas was paying players, paying handlers to

 4    bring young kids to these basketball teams, paying the family

 5    members of basketball players, kids.

 6           Two Nike executives, a Mr. DeBose and Mr. James, began

 7    directing Coach Franklin to do the same thing that was

 8    happening over at Adidas, paying handlers, paying family

 9    members, creating false invoices to conceal the cash payments.

10    When I say cash, I include cash cash, structuring withdrawals

11    to give green dollar bills to family members.

12           At one time the two Nike executives directed

13    Mr. Franklin to get on an airplane from California, fly to

14    Arizona to give cash to the family member of a kid who is

15    playing basketball who, as it turns out, turned out to be the

16    No. 1 draft pick in the NBA a few years later.  Not a

17    coincidence.  These payments were concealed.  The books and

18    records of Nike did not reveal that cash payments, wire

19    transfers to handlers, false invoices were being created to

20    accomplish Nike's illicit objective.

21           At one point Nike was so eager, so eager to get the

22    right players on a Nike team, they had a handler pay the

23    handler to bring a seven-foot basketball player, a high school

24    kid from Kansas.  The handler would become the guardian of the

25    kid.  He would move to California and play basketball on the

1    California Supreme team, and by then Coach Franklin was no

2    longer going to be in command of that team.  The handler and

3    this other person, two people, took over the team, and you can

4    imagine how Coach Franklin felt about it back then.

5           Indeed, Franklin lost his sponsorship from Nike and

6    felt he had been wronged.  He wasn't going to participate any

7    longer in those activities and now he was left out.  He felt

8    bullied, he felt strong-armed, in his own words.

9           He had begun tape-recording the Nike executives

10   because he knew something wrong was going on.  This is two

11   years before they ever met Michael Avenatti.  For a year,

12   together with his advisor, Mr. Auerbach, they were trying to

13   get Nike to do right by Coach Franklin, reaching out to Nike.

14   They were ignored.  And they expressed their sentiments to each

15   other.  As the prosecutor said, they spoke, they texted, and

16   their sentiments were very clear.

17          By then Adidas was already under investigation and

18   indeed Adidas executives had been indicted.  This was huge

19   news.  Nike supposedly was cooperating with the Federal

20   Government because Nike had received a grand jury subpoena.

21   Now, Nike was under investigation.  And still a year after the

22   grand jury subpoena, a year after Nike supposedly cooperating

23   with the government, the two Nike executives, DeBose and James,

24   are still working at Nike.

25          So the advisor, Mr. Auerbach, and Mr. Franklin decide

1    they are going to go on a quest to expose what has happened.

2    To use their words, they wanted justice.  Nike executives had

3    lied.  Nike had irreparably harmed -- these are their words --

4    irreparably harmed Coach Franklin.  Nike had bullied him,

5    abused him, cheated, lied, colluded, committed fraud,

6    corruption, strong arm.  Those were the words, the sentiments

7    of Coach Franklin and his advisor, Mr. Auerbach.

8            They wanted justice above all else.  More important

9    than the money, according to them, was achieving justice.  And

10   to them justice meant exposing the corruption in the youth

11   basketball league.  Quote, they wanted Nike to do the right

12   thing.  They wanted Nike to take swift action and to, quote,

13   investigate, investigate their words, and fire the rogue

14   executives.  They wanted to stop further corruption.

15           Auerbach, the advisor, and you will hear more about

16   Mr. Auerbach, a sophisticated guy, he had taken credit for

17   putting together the NFL with the Jerry Maguire movie back when

18   I was a younger man.  You might remember the movie about an NFL

19   agent.  Auerbach on his profile takes credit for that.  He had

20   a relationship, so he said, with the founder of Nike, and

21   Auerbach the advisor tells Coach Franklin, we are going to do

22   this together, we are going to draft justice.  We are going to

23   write up what justice means.  And they wrote it down to try to

24   find a lawyer who would take the case.

25           No. 1, they wanted justice to be defined as preventing

1    Nike from taking any future illegal acts of corruption

2    beginning with -- not ending with -- beginning with terminating

3    the two rogue Nike executives, DeBose and James, to use their

4    words for starters.

5           No. 2, they wanted fair and reasonable reparations,

6    money for Coach Franklin.

7           In October of 2018, about five months before they meet

8    Mr. Avenatti for the first time, they start the preparation of

9    this effort to expose Nike.  They contact a lawyer in early

10   January of 2019, two months before they contact Mr. Avenatti,

11   January 2019, about a year ago.  His name was Trent Copeland.

12   They reach out to attorney Copeland and they tell him,

13   Franklin's words, what I'm looking for is justice.  Clean up

14   and reorganize Nike Elite Youth Basketball.  Install new

15   management.  Install new procedures to prevent this type of

16   abuse and criminal activity in the future.

17          It wasn't just about money.  It wasn't just about his

18   team.  They wanted an investigation.  They wanted new

19   procedures.  They wanted to uproot the corruption in youth

20   basketball.  And they wanted Nike to pay for all my legal and

21   other related expenses in this matter.  Three things:

22   Compensation, justice through exposing and investigating the

23   corruption, Nike pays all of the legal expenses associated with

24   this.

25          Attorney Copeland doesn't take the case.  And so

 1    Auerbach says:  I am going to call a high-level Nike executive

 2    named Slusher.  Auerbach reaches out to Slusher at Nike and

 3    tells Slusher:  We want justice.  The word of the case,

 4    justice.  Slusher asks:  What does justice mean to you?  Does

 5    that mean just firing the two executives from Nike?  Answer:

 6    Yes, for starters.  All of this is documented in memoranda by

 7    Auerbach.

 8            What does Slusher say?  Call the lawyers over at Boies

 9    Schiller.  Go talk to them.  You imagine Mr. Auerbach,

10    Mr. Franklin, now they are going to call the 300-lawyer law

11    firm and try to negotiate with them.  Really?  Auerbach decides

12    the plan is, we are going to find a lawyer who can take on

13    Nike, take on Boies Schiller and get justice, a lawyer with a

14    high profile, a lawyer with a public platform, a lawyer who

15    people listen to.

16            And so in 2019, in March, they contact Michael

17    Avenatti who by then was the lawyer in America with the highest

18    profile of any other lawyer, a lawyer who became nationally

19    recognized because with 800,000 Twitter followers, having

20    represented Stormy Daniels against the president of the United

21    States, having appeared on national television more often than

22    any lawyer perhaps in the history of the United States, the

23    lawyer with the largest platform in the media, that's who they

24    wanted.  That's who they chose.  That's who Coach Franklin

25    wanted.  That's who Auerbach wanted to take on Nike.  Not

K1TMAVE3                Opening - Mr. Srebnick

because he spends his days in the library researching case law.
He does that, too.  He brings lawsuits.  He represents people
in court.  But they wanted this man right here because he had
the platform to expose what had happened at Nike.  That's why
they chose him.  And we can prove it.  We can prove it because
we have the exchange of communications between those two men.

Auerbach sent 119 videos of Mr. Avenatti on
television, in social media, and said:  Hey, Coach Franklin,
this is Auerbach telling Coach Franklin, watch these.  800,000
Twitter followers, Coach Franklin.  He has got the platform,
Mr. Avenatti does.  He had the skill set they wanted, the
ability to expose the corruption, the ability to expose
Franklin's claims.  Franklin found it impressive.

Franklin was concerned that Mr. Avenatti wouldn't take
the case.  Copeland wouldn't take the case.  Auerbach said:
No.  I think Avenatti will take the case because, quote, what
will attract Avenatti is the opportunity to expose the
injustice, to go after Nike, to really light the next fuse in
the sneaker company scandal.  A lot at play here for a guy like
Avenatti.  Those were the words of Auerbach and Franklin.
Quote:  A high profile case which can lead to good press for
Mr. Avenatti and help Avenatti net other defendants.  It was
clear.  What attracted Franklin and Auerbach to Mr. Avenatti
was Avenatti's ability to get the attention of Nike because he
had the platform in the media to do that.  The claim would be

1    exposed if it would not settle, as lawyers do by way of a

2    lawsuit.

3            They like Mr. Avenatti's bravado.  They termed him the

4    heavy artillery.  Now, it is true, Mr. Avenatti is brash.  He

5    is aggressive, tenacious, bullish, hard charging, sometimes

6    he's outrageous, and sometimes he might even be offensive.

7            But that's not what we put people in prison for.  It's

8    not a crime to be offensive.  It's not a crime to use foul

9    language from time to time, to use the F word.  Mr. Avenatti

10   has done it.  It is what it is.  But it's not extortion because

11   you use harsh language in the course of negotiating for your

12   client.

13           Franklin and Auerbach meet face to face with

14   Mr. Avenatti in California.  They express what they want.  They

15   share with him a Power Point presentation that's called

16   Franklin v. Nike.  It's what a lawsuit looks like.  Gary

17   Franklin v. Nike.  They present Mr. Avenatti with a copy of a

18   complaint, a lawsuit that had been filed against Adidas by a

19   player, civil case, claiming racketeering by Adidas in which

20   that plaintiff, the person asking for the money, was asking for

21   all sorts of relief, including injunctions and attorney's fees.

22           They meet with Avenatti in person and they say to him,

23   Michael, let me tell you what we want.  To use their words, we

24   want justice.  We want to prevent this from happening again.

25   That's what we want.  And never once do they say to him, never

1       once do they say to him, you are not to expose this to the

2       world.  To the contrary.  That's why they hired him.

3               They posed the three questions that I shared with you

4       on the board.  They give Mr. Avenatti the evidence that proves

5       what had happened in California Supreme.  The evidence of the

6       fake invoices, the evidence of the cash withdrawals, the wire

7       transfers to handlers, the text messages from Nike executives

8       directing the coach to make fake invoices.  Avenatti gets all

9       of that.  And he knows the claim is real.  He knows it is the

10      truth based on the evidence he has seen.

11              Now, Mr. Avenatti never takes one dollar from Gary

12      Franklin or Mr. Auerbach, doesn't ask for any money up front,

13      none.  The truth is, Mr. Franklin didn't have the money to hire

14      a lawyer.  But as Auerbach said what was going to attract

15      Mr. Avenatti financially to a case like this, getting justice

16      through an investigation of Nike and, No. 2, the publicity that

17      a case like this brings if it goes public.  They understood

18      that.

19              Mr. Avenatti agrees to take the case.  No money down.

20      Not even the expense money to get on an airplane to fly to New

21      York to meet with the lawyers for Nike here in New York City.

22              Avenatti contacts attorney Mark Geragos, a

23      high-profile lawyer who, as it turns out, had had a case with

24      Nike.  Geragos, the lawyer, had represented a very high-profile

25      NFL football player who had a major controversy with Nike,

 1    potentially an explosive situation, and Geragos representing

 2    that NFL football player, reached a very favorable settlement

 3    on behalf of that NFL football player.  And to Michael Avenatti

 4    it seemed to him Geragos, the lawyer, was the right person to

 5    bring in to work this case with him, to conduct this

 6    investigation that Michael Avenatti understood the clients

 7    wanted.

 8         Geragos, who knew people at Nike, contacts his

 9    counterpart at Nike, a guy named Kaplan, and says, hey, I just

10    spoke to Mr. Avenatti.  He has got a client.  His client has

11    claims against Nike.  It could be explosive.  I think you are

12    going to want to meet us about it.  And Nike agrees to set up a

13    meeting with Avenatti and Geragos in New York City.

14         You will recall perhaps there was a lawyer named

15    Michaelson on behalf of Boies.  He was the first lawyer

16    referred to Mr. Auerbach.  Now, another lawyer, Mr. Wilson was

17    introduced into the conversation.  A Mr. Homes was another

18    lawyer who ends up attending the meeting on behalf of Nike.  We

19    don't have a picture of Mr. Homes.  We apologize.

20         And Nike sends its No. 2 lawyer in-house, a guy name

21    Leinwand.  When you meet Mr. Leinwand, you will realize we have

22    an older picture of him.  He is a little older than he appears

23    there.  And on behalf of Mr. Franklin, Michael Avenatti and

24    Mark Geragos.  And this meeting occurs at Mr. Geragos' office

25    here in New York.  By then Avenatti and Geragos had discussed

1    an internal investigation, how much it would cost to do that

2    which they believed certainly Michael Avenatti believed the

3    clients wanted.  These are internal investigations.  I don't

4    think there will be any dispute.  When you have to hire private

5    investigators, accountants, forensics, paralegals, lawyers.

6    Boies Schiller itself admitted that these investigations cost

7    upwards of tens and tens of millions of dollars.

8         The money doesn't go to Mr. Avenatti's pocket.  It

9    goes into an account to pay for the investigation.  It would

10   include Mr. Avenatti getting paid for sure.  That's how he will

11   make money.  It will include Mr. Geragos getting paid for sure.

12   That's how they will make money.

13        So Geragos sets up the meeting.  It occurs at the

14   offices of Mr. Geragos in New York.  Nike, the

15   3500-billion-dollar-a-year company represented by Boies

16   Schiller on the one side.  Avenatti and Geragos at the other

17   side.  Mr. Wilson, the lawyer for Boies, you see him in the

18   picture, a former prosecutor.  Mr. Michaelson, who is not at

19   the meeting, but is connected with this negotiation, also a

20   former prosecutor.  Avenatti knows he is going into the room

21   with a former prosecutor.

22        What Michael Avenatti did not know was that the Boies

23   lawyers had already conferred among themselves.  To use their

24   words, they were, quote, on red alert that Michael Avenatti was

25   coming to make an ask on behalf of a client.  They knew who

1   Michael Avenatti was.  They also knew what Coach Franklin had

2   been complaining about, because by then Coach Franklin had been

3   blown off so many times by Nike, they knew who he was.  They

4   were on red alert.

5        Their mission on that first meeting wasn't to settle a

6   claim, which is what Michael Avenatti thought he was going to.

7   Their mission was to contain Michael Avenatti.  Their mission

8   was to make sure that they got out in front of Michael Avenatti

9   and Coach Franklin and Geragos because what Nike was worried

10  about was the truth coming out.  That's what Nike was worried

11  about.

12       You will recall, as I mentioned earlier, that grand

13  jury subpoena.  That federal investigation still hadn't closed.

14  Nike was still in the process of cooperating, whatever that

15  means, with the Federal Government producing records.  You will

16  hear they hadn't produced all the records relating to this

17  matter by March of 2019.

18       To them Nike had been successful in containing the

19  truth.  There had been no exposure of all the payments to the

20  handlers Nike was up to.  In fact, Nike was saying they had

21  done nothing wrong.  Nike was telling the feds they had done

22  nothing wrong.  We know that's not true.  We know that now.

23       Now, Avenatti goes to that meeting with the authority

24  of his client to try to see what he can get on behalf of his

25  client.  All it was was a negotiation asking Nike on behalf of

         1   his client for remedies, for relief, what lawyers do every day.

         2          And I believe the instructions of law will tell you

         3   there is absolutely nothing wrong for Gary Franklin, on his own

         4   behalf, to demand from Nike that they pay him for any plausible

         5   claims he has.  He can ask them to investigate.  He can ask

         6   them whatever he wants as an ask if he has a claim of right.

         7   or he can hire a lawyer to do that for him.

         8          That's what he did.  He hired Michael Avenatti.  So

         9   Michael Avenatti goes to a meeting in New York on March 19 and

        10   let's Nike know exactly what Gary Franklin wants.  Mr. Geragos

        11   starts the meeting, the lawyer who is working with Avenatti.

        12   And Geragos said:  Hey, I spoke to Michael.  Michael has got

        13   claims on behalf of a client that would go public if there is a

        14   lawsuit.  I, Geragos, suggested to Avenatti, let's meet with

        15   the Nike lawyers.  They can maybe reach a settlement, just like

        16   Geragos had done on behalf of the NFL football player not long

        17   before.

        18          Avenatti starts the meeting by saying:  We all

        19   understand this is a settlement conference.  He invokes a rule

        20   of evidence regarding settlement conferences.  He makes two

        21   demands.  No. 1, the client agrees to cooperate.  Nothing that

        22   is settled here will prevent the client from talking to the

        23   government if the government wants to hear about these things.

        24   He makes that very clear up front.  We are not buying anybody's

        25   silence here.  Client gets compensated and Nike agrees to an

1    internal investigation conducted by Avenatti and Geragos.

2         See, Avenatti and Geragos by then realize that there

3    must have been some sort of whitewash, whitewash meaning the

4    so-called investigation Nike was doing wasn't producing any

5    kind of investigation.  The two Nike executives were still

6    employed at Nike, the ones who had done wrong to Coach

7    Franklin.

8         The ask for Mr. Franklin, $1.5 million of compensation

9    to Mr. Franklin.  The investigation, direct quote from

10   Mr. Avenatti.  Quote:  Whatever it costs, it costs.  He insists

11   that the investigation, however, be run by Franklin's team,

12   Avenatti and Geragos.  Don't go hiring some other law firm

13   that's going to do a whitewash.  If you do that, it's going to

14   be more expensive, and he disincentivizes Nike from trying to

15   do a whitewash.  He doesn't think Boies Schiller can do it

16   because Boies Schiller is Nike's lawyer.  They are not

17   incentivized to find anything wrong at Nike.  They have been

18   running this investigation for two years.  Produced nothing for

19   about a year and a half.

20        Wilson for Boies responds.  Quote:  We have an

21   interest in conducting an internal investigation surrounding

22   these allegations.  So Boies Schiller tells Michael, that

23   sounds like a fair request.  We know now that they were trying

24   to set up Michael Avenatti.  But what does Michael Avenatti

25   hear?  Hey, Boies Schiller appreciates that Mr. Franklin's

1   claims are real.

2          The inhouse attorney for Nike, Mr. Leinwand, who I

3   think is on the screen in a younger form.  He says:  I want to

4   see the evidence.  What have you got?  Mr. Avenatti produces

5   the evidence in the form of the documents that coach and

6   advisor Auerbach had provided Avenatti.

7          At no time in the meeting on March 19, the meeting

8   attended by the lawyers for Nike and Mr. Avenatti, do the Nike

9   people deny the accusation.  They don't say:  Hey, Avenatti,

10  what are you talking about?  This is a bunch of BS.  Get out of

11  the office.  You got no claim.  Your client has got no claim

12  here.  Skedaddle.  They don't do that.  They don't deny it.

13         In fact, after seeing the evidence, Leinwand says to

14  Avenatti:  I get the claims.  We just need more time to try to

15  settle it.  Avenatti is a tough negotiator.  He understands the

16  power of urgency.  You don't let the other side:  Hey, take all

17  the time you need.  Talk to me in a few weeks.  No.  Avenatti

18  says:  We are going to do business.  We are going to do it

19  soon.

20         And, as the prosecutor read, in a less animated tone,

21  I admit, Avenatti uses this harsh language.  I ain't F'g

22  around.  If you guys aren't ready, I will just call the press

23  and tell them we are going to move forward.  Again, the press

24  reports lawsuits every day of the week.  If the lawsuit is

25  public, you can talk about it.  It's in the media.  The Adidas

1  lawsuit was in the public.  For God's sake, Michael Avenatti's

2  indictment is in the media.  We have heard all about that here.

3  Lawsuits are public and there is absolutely nothing wrong with

4  Michael Avenatti telling the truth, which is if we don't sell

5  the case, this is going to be all over the media.  If it's all

6  over the media, the stock market might react.  That's the

7  truth.  That's reality.

8          Now, he gave a prediction.  He doesn't really know

9  what the stock market will do.  Nobody does.  But he said, it

10  could knock off billions of dollars of market cap, creating

11  urgency.  You all want to settle this case.

12          In a recorded meeting the next day the Boies lawyers

13  want to get Michael Avenatti to put a number on that internal

14  investigation.  How much?  I think we will show the FBI and

15  Boies were going to say:  How do we get Avenatti to give a

16  number so we can get it on tape?  Avenatti says:  I'll take

17  whatever Boies Schiller would charge.  He lets them set the

18  price.  You will hear five times Avenatti says to Boies

19  Schiller lawyers:  Hey, stop.  How much would Boies Schiller

20  charge?  That's good enough for me.  Boies Schiller won't give

21  a number.  He asks again.  He asks a third, a fourth, a fifth

22  time.  How much would Boies Schiller charge?

23          Now, in truth, Boies Schiller has done investigations

24  in the tens of millions of dollars.  They did an internal

25  investigation on this matter.  We will find out during the

1    course of the trial how much Boies Schiller charged Nike for

2    the internal investigation that produced not a single person

3    being fired, not a single finding of wrongdoing, what we call a

4    whitewash.

5            Finally, finally, Boies Schiller lawyer Scott Wilson

6    says:  It can cost 10 to $20 million.  Well, if you're the

7    lawyer for the other side, Mr. Avenatti here is 10 to $20

8    million.  That's what my opposing counsel was saying it would

9    cost.  So Avenatti comes back and says:  OK, here is the deal.

10   A million five for my client, internal investigation is going

11   to cost a minimum of 15 million right in the middle of that

12   sweet spot that Boies Schiller had said was what they could

13   charge for something like this.  It will be a maximum of 25

14   million.  12 million down.  Take that back to your client.

15           Remember, these are negotiations.  I think a dozen

16   times the lawyers for Boies Schiller said:  Hey, we don't have

17   authority here.  We are just chitchatting.  This is just talk.

18   We have got to talk to corporate.  We have got to talk to the

19   board.  We have got to talk to the whole world before we can

20   get approval.  But just tell us, Mr. Avenatti, what is your

21   ask.  We don't have any authority to give you what you want and

22   what your client wants.  Avenatti gives the ask.  And still no

23   one from Boies Schiller is denying the truth of the allegations

24   that Michael Avenatti advances on behalf of his client.

25           So a third time, a third time they meet, March 21, in

1   person.  And that's when Avenatti puts the number on it based

2   on what Boies Schiller said they would charge.

3           But that's not good enough for Boies Schiller and the

4   FBI.  They want to get more.  They want to get him on tape

5   again.  So now Boies Schiller says:  Hey, Avenatti, listen.

6   What if you and Geragos don't do the internal investigation?

7   Why don't we just do one big number, no internal investigation?

8   Avenatti and Geragos say stand by and step outside of the

9   negotiating room.  They spend five minutes caucusing, the two

10  lawyers.

11          They come back and they say:  Look, if you want a

12  settlement where you all handle the investigation, Boies

13  Schiller deals with it, Boies Schiller has to self-report to

14  the feds, you want Franklin's claims to be settled, he throws a

15  number out, 22 and a half million dollars.  That would be a

16  great payday for Mr. Franklin, wouldn't it.  And it would be

17  paper.  Avenatti brings a settlement document, a draft, a

18  settlement agreement that leaves the number blank.  Insert here

19  number.  Again, no one on the other side has the authority to

20  settle.

21          So Avenatti and Geragos propose 22 and a half million

22  dollars.  The confidentiality clause would still allow Franklin

23  to speak to the feds.  Nothing would be concealed from the

24  Federal Government.  The only thing that would be confidential

25  are the terms of the settlement, how much.  But even that would

1    be available to the feds by way of a subpoena.  This was not

2    buying silence.  This was simply settling Gary Franklin's

3    claims.

4          This would have to be signed off by everyone at Nike,

5    signed off by everyone at Boies Schiller, signed off by Mr.

6    Franklin, signed off by Avenatti.  It would all be paper.  It

7    would be real.  It wouldn't be like those fake invoices that

8    Nike had been doing and no heads had rolled over up until then.

9          That was March 21 and the arrangement was that

10   Avenatti would come back on a Monday -- I think the 21st was a

11   Thursday -- Avenatti was scheduled to come back on Monday to

12   hear the reaction of Boies Schiller to the two proposals, 22

13   and a half million, you guys do the internal investigation,

14   Boies, or one and a half million plus 15 million, whatever the

15   terms were if we have to do the internal investigation.  Get

16   back to us.

17         But they didn't get back to Michael Avenatti because

18   Avenatti gets arrested.  The FBI arrests him as he is going to

19   the offices of Boies Schiller to hear what Boies Schiller has

20   to say.  The FBI and Boies Schiller had worked together, got

21   Avenatti arrested so they could get out in front of Gary

22   Franklin's claims.  They could get out in front of the truth.

23         And yet no one from the FBI had ever spoken to Gary

24   Franklin at that point about what his wishes were.  They have

25   spoken to Gary Franklin since then.  They have spoken to Jeff

1   Auerbach since then.  You can imagine how those two men reacted

2   when they found out that Avenatti was arrested.  They, of

3   course, became worried because they saw the media.

4          And you will likely find out that their testimony may

5   change since they met with Mr. Avenatti.  And this courtroom

6   will be a fight for credibility.  It will be a search for the

7   truth by you.  Your job will be to watch them as they testify

8   and compare what they say now to what they said back then, when

9   they were meeting with Mr. Avenatti, because we have it in hard

10  paper, what they were telling each other, what they shared with

11  lawyers, what they shared with Avenatti.

12         And I believe the truth is, they wanted Avenatti.

13  They wanted Avenatti to be Avenatti.  They were hiring Michael

14  Avenatti to be Michael Avenatti.  And everybody knew who

15  Michael Avenatti was.  Boies Schiller knew who Michael Avenatti

16  was.  That is why they were on red alert.

17         You will also find out that the SEC, the Securities

18  and Exchange Commission, since Avenatti was arrested and all

19  this became public, have opened an SEC investigation of Nike.

20  SEC, the Securities and Exchange Commission, they regulate

21  public companies making sure that they are honest in their

22  filings.  That investigation has begun.  And the SEC, which is

23  not the Department of Justice, the SEC is looking into the same

24  evidence.  Whatever the Department of Justice got from Nike has

25  been turned over to the SEC.

1             And who is coming to testify?  Lawyers who still work

2     for Nike.  To whom do you think they owe their allegiance to

3     when they take the witness stand?  They are here supposedly to

4     tell the truth.  But you know to whom they owe their

5     allegiance.  The people who butter their bread.

6             The government will try to paint a picture of Michael

7     Avenatti.  That because he had debts you should conclude that

8     he wasn't Avenatti, that he didn't perform the way that he

9     should have, his judgment was clouded by the debts that he

10    needed to make money.  Avenatti in that room was Avenatti,

11    whether he had debts or didn't have debts.  He was doing what

12    Avenatti does.  That's what Franklin, that's what Auerbach

13    wanted.

14            Avenatti's debts are not the issue in this case.  This

15    is not a civil case.  This is not debt court.  We are in a

16    courtroom in a criminal case where someone's freedom is on the

17    line.  Michael Avenatti was hired by Franklin and Auerbach

18    because they wanted him to be himself.  They knew what they

19    were buying for free, by the way, since they didn't give him

20    any money.  They knew what they were getting and they knew that

21    he was going to get paid by Nike, not by them.

22            Now, let me just say Mr. Avenatti is a courtroom

23    lawyer.  He is sitting here at my side.  You will see him from

24    time to time passing me notes.  My brother Scott, part of the

25    defense team; Danya Perry; Mr. Lyon, who is handling the

K1TMAVE3                    Wilson - direct

1    technology; Jose Quinon; Mike Dunlavy; George Barchini, you

2    will see us all confer, and he is going to be Avenatti because

3    he is a lawyer, so he will participate with us, and you should

4    expect to see him passing notes.  Nothing wrong with that.

5            At the end of the trial it is for you to decide

6    whether Michael Avenatti's aggressive, tenacious, demanding

7    behavior that you will listen to, you will hear about,

8    constitutes a crime.  Michael Avenatti was being a lawyer

9    fighting for what he believed his client wanted.  And if it

10   meant he had to go up and grab the tiger by the tail and if it

11   meant he could make a living doing it, so be it.  That's OK.

12           Ladies and gentlemen, that's all I have.  Thank you.

13           THE COURT:  Is the government prepared to proceed?

14           MR. PODOLSKY:  Your Honor, at this time the government

15   calls Scott Wilson.

16   SCOTT RONALD WILSON,

17       called as a witness by the government,

18       having been duly sworn, testified as follows:

19   DIRECT EXAMINATION

20   BY MR. PODOLSKY:

21   Q.  Good afternoon, Mr. Wilson.

22   A.  Good afternoon.

23   Q.  What do you do for a living?

24   A.  I'm an attorney.

25   Q.  Where do you work?

 1   A.   I work at the law firm of DLA Piper here in Manhattan.

 2   Q.   Where did you work previously to working at DLA Piper?

 3   A.   Immediately prior to joining DLA Piper I worked at the law

 4   firm of Boies Schiller Flexner, also here in Manhattan.

 5   Q.   Are you familiar with the company Nike?

 6   A.   Yes, I am.

 7   Q.   How are you familiar with Nike?

 8   A.   Nike has been a client of mine for several years.

 9   Q.   Have you met an individual named Michael Avenatti?

10   A.   Yes, I have.

11   Q.   About when did you meet him?

12   A.   I met Mr. Avenatti in March of 2019.

13   Q.   And where were you?

14   A.   I was in the offices of another attorney on Fifth Avenue in

15   Manhattan.

16   Q.   Why were you there?

17   A.   I was there because I had been asked to meet with

18   Mr. Avenatti and the other attorney at the request of my

19   client, Nike.

20   Q.   We will get into detail, but at a high level, what happened

21   when you met Mr. Avenatti?

22   A.   When I met Mr. Avenatti, he threatened to hold a press

23   conference and go public with allegations that Nike had been

24   involved in corruption in amateur basketball unless we paid him

25   off to the tune of millions of dollars.

1    Q.  Did you speak with him more than once?

2    A.  I spoke with Mr. Avenatti on three occasions.

3    Q.  Were any of those conversations recorded?

4    A.  The second and third were.

5    Q.  Do you see Michael Avenatti in the courtroom today?

6    A.  I do.

7    Q.  Can you identify him by describing where he is sitting and

8    an article of clothing he is wearing.

9    A.  He is standing and he is wearing a blue tie.

10         MR. PODOLSKY:  Your Honor, may the record reflect that

11   the witness has identified the defendant.

12         THE COURT:  The record will so reflect.

13   Q.  Before we talk about those meetings or discussions in March

14   2019, I want to get into a little bit of background.

15   A.  Sure.

16   Q.  When did you graduate from law school?

17   A.  In 2007.

18   Q.  Where did you work after you graduated?

19   A.  Immediately after graduating I joined the law firm of Boies

20   Schiller.

21   Q.  What was your position at that time?

22   A.  An associate attorney.

23   Q.  What does it mean to be an associate at a law firm?

24   A.  Associate is a junior attorney who works on cases, usually

25   under the supervision of the partners.

K1TMAVE3                          Wilson-Direct

 1   Q.   How long were you an associate at Boies Schiller?

 2   A.   From 2007 until the beginning of 2011.

 3   Q.   What did you do at that point?

 4   A.   I joined the New York Attorney General's office.

 5   Q.   What was your position at the New York Attorney General's

 6   office?

 7   A.   I was, from 2011 to 2013, senior advisor and special

 8   counsel to the Attorney General.

 9   Q.   What were your duties and responsibilities in that

10   position?

11   A.   I was involved in overseeing criminal and civil

12   investigations by the office, conducting investigations, and

13   trying cases in court.

14   Q.   What types of criminal investigations were you involved in?

15   A.   A variety of things.  Money laundering, public corruption,

16   charities fraud.

17   Q.   You mentioned civil investigations as well.  What did you

18   mean by that?

19   A.   Everything from investigations into securities fraud, to

20   environmental protection matters, to consumer protection cases.

21   Q.   Just so we understand, what is the difference between a

22   criminal investigation and a civil investigation?

23   A.   Sure.  In both cases the office was investigating

24   violations of laws.  The criminal cases involved violations of

25   laws that were punishable with criminal penalties, like fines

1    or imprisonment.

2    Q.  And in the case of civil investigations, what are the

3    consequences?

4    A.  Those are cases, again, where we would be investigating

5    potential violation of laws.  The remedies that the office

6    could obtain on behalf of the public would include restitution,

7    changes in behavior by defendants, but not criminal fines or

8    imprisonment.

9    Q.  I believe you said that that office that you've been

10   referencing is the New York Attorney General's office.  Is that

11   separate from the United States Attorney's Office?

12   A.  It is.  The New York Attorney General's office is a state

13   agency, not a federal agency.

14   Q.  And approximately how long did you spend at the New York

15   State Attorney General's office?

16   A.  Approximately three years.

17   Q.  What did you do at that point?

18   A.  I rejoined the law firm of Boies Schiller.

19   Q.  What was your position when you rejoined the firm?

20   A.  When I went back to the firm I was a partner.

21   Q.  What does it mean to be a partner of a law firm?

22   A.  It can mean different things at different firms.  It

23   generally means you are in charge of overseeing cases on behalf

24   of the clients of the law firm.

25   Q.  Just a couple of background questions.  Where is Boies

1   Schiller located?

2   A.   It's located at 55 Hudson Yards in Manhattan, which is on

3   34th Street between Tenth and Eleventh Avenues.

4   Q.   What type of work did you do as a partner at Boies

5   Schiller?

6   A.   I primarily represented companies in connection with

7   government investigations.  I conducted internal investigations

8   for companies.  And I also represented companies in civil

9   litigation.

10  Q.   Let me follow up first on the internal investigations.  Can

11  you explain what an internal investigation is.

12  A.   Sure.  A company that has a sense that it may have been

13  involved in wrongdoing one way or another may hire lawyers to

14  gather facts through taking various steps within the company to

15  gather those facts and then provide advice to the company about

16  the company's legal risk and whether the law has been violated.

17  Q.   So we understand, when you're conducting an internal

18  investigation, who is the client?  Who are you working for?

19  A.   The client is generally the company itself.

20  Q.   What's the ultimate point or goal of an investigation,

21  generally speaking?

22  A.   There may be different perspectives.  From my perspective,

23  the ultimate point is for the senior leadership of the company

24  to obtain an understanding of what's happened at the company

25  and legal advice regarding whether what's happened would

1    violate laws or otherwise expose the company to risk.

2    Q.  Before we go on, let me ask one other question about

3    internal investigation.  What types of techniques or steps

4    would you take, generally speaking, in an internal

5    investigation of the type you conducted?

6    A.  Sure.  First of all, it's generally internal, meaning

7    you're looking at documents within the company, various

8    categories of documents.  Everything from payment records to

9    e-mails, potentially to text messages on employees' phones.

10   You're conducting interviews of employees who are asked to meet

11   with counsel for the company by the company.  Those would be

12   the principal steps that are generally taken as part of an

13   internal investigation.

14   Q.  You referenced that you also, while at Boies Schiller, did

15   some work in civil litigation?

16   A.  I did, yes.

17   Q.  Just generally, so we can understand, what do you mean by

18   civil litigation?

19   A.  Sure.  Referring to when two parties in a dispute go to

20   court to seek judicial resolution of that dispute and are

21   represented by attorneys before the Court in that dispute.

22   Q.  Do all disputes end up in court?

23   A.  No.

24   Q.  Are you occasionally brought in to help a client with a

25   dispute that's not in court?

 1    A.  Yes.  Frequently.

 2    Q.  And, generally, what steps might one take in that instance?

 3    A.  Sure.  Generally, I work with the client to understand

 4    their perspective on the dispute, potentially communicate with

 5    the other side regarding the opponent's view of the dispute,

 6    and it's certainly possible that the party could work out their

 7    differences before either side has decided to file a lawsuit

 8    and go to court.

 9    Q.  Are you familiar with the term settlement or settlement

10    negotiations?

11    A.  Sure, yes.

12    Q.  Can you just explain what that means?

13    A.  Sure.  These refer to discussions between two parties that

14    have a legal dispute about whether or not they can reach a

15    consensual resolution of that dispute without the need for

16    litigation or without the need to continue litigation if it has

17    already been filed.

18    Q.  Have you been involved in settlement negotiations in your

19    line of work?

20    A.  A number of times, yes.

21    Q.  Are you familiar with the term mediation?

22    A.  I am, yes.

23    Q.  What is a mediation?

24    A.  Mediation could be viewed as a subcategory of settlement

25    disputes -- excuse me -- settlement discussions where there is,

K1TMAVE3                          Wilson - Direct

however, a third party neutral present in the discussions,

meaning it's not just the two parties arguing with each other.

There is a neutral third party who has been invited to

participate and mediate the parties' dispute.

Q.  Who pays for that third party to come in and help resolve

the dispute?

A.  In a private dispute it's usually -- the question of who

pays for the mediator's time is usually resolved by agreement

by the parties before the mediator is brought in.  And what's

typical in my experience is the parties split the cost of the

mediator.

Q.  Generally, how would parties select a mediator to help

resolve a dispute?

A.  Again, by agreement.  Each party might propose names of

mediators they would like to work with or, in some instances,

would go to a consulting firm that employ often retired judges

who are available to serve as mediators.

Q.  I believe you said the mediator was a third-party neutral,

or something along those lines.  Can you explain what that

means, neutral?

A.  Sure.  What would be typical is that the mediator is not

affiliated with either party, and so it's a neutral arbiter of

the dispute.

Q.  Now, a few minutes ago you testified that Nike was a client

of yours.

K1TMAVE3                        Wilson - Direct

1              Do you recall that?

2    A.  Yes, I do.

3    Q.  Was Nike a client of yours while you were at Boies

4    Schiller?

5    A.  It was, yes.

6    Q.  Can you just explain, what does it mean to be a client?

7    A.  Sure.  So client is an individual or a company who has

8    entered into an agreement with a law firm to represent that

9    client's interests, whether in dispute or settlement talk or

10   any other endeavor.

11   Q.  Who was your main contact at Nike?

12   A.  Principally, a gentleman named Robert Leinwand.

13   Q.  And, generally, what was his position at Nike?

14   A.  Mr. Leinwand is chief litigation counsel for the company

15   charged with overseeing the litigation and investigations work

16   for Nike.

17   Q.  Is he an attorney?

18   A.  He is, yes.

19   Q.  Is he an attorney in a law firm or is he employed directly

20   by Nike?

21   A.  He's an in-house attorney.  He is employed by the company.

22   He works at the company.

23   Q.  Just so for avoidance of doubt, what type of company is

24   Nike?

25   A.  Nike is a large publicly traded American company engaged in

1   the business of manufacturing and selling footwear and athletic

2   apparel.

3   Q.   Where does Nike do business?

4   A.   Nike is headquartered outside of Portland, Oregon, but it

5   does business throughout the United States and around the

6   world.

7   Q.   You mentioned a few moments ago that it's publicly traded.

8   What did you mean by that?

9   A.   So I meant by that that it is a company whose shares are

10  available for purchase by members of the public on public

11  securities markets.

12  Q.   Who can buy or own shares of Nike stock?

13  A.   Anyone who buys stock from an individual to a large public

14  pension fund, anyone who is in the market.

15  Q.   You mentioned earlier that you currently work at DLA Piper.

16  What is that?

17  A.   DLA Piper is a law firm, a large global law firm with

18  offices in more than 40 countries.

19  Q.   Approximately when did you join DLA Piper?

20  A.   At the beginning of November of last year, 2019.

21  Q.   Did you go directly from Boies Schiller to DLA Piper?

22  A.   I did, yes.

23  Q.   Did your leaving Boies Schiller and joining DLA Piper have

24  anything to do with the circumstances of this case?

25  A.   No, it did not.

1   Q.  Is Nike still a client of yours at DLA Piper?

2   A.  It is, yes.

3   Q.  Now, at the beginning of your testimony you mentioned that

4   the defendant threatened to harm your client, Nike, in March of

5   2019.

6           Do you recall that?

7   A.  I do, yes.

8   Q.  How did he threaten to harm?  What sort of harm did he

9   threaten?

10  A.  He threatened specifically to take billions of dollars off

11  the market cap of the company by engaging in a media war to

12  publicize these allegations of corruption.

13  Q.  And so we understand, what was the subject matter of the

14  allegations?

15  A.  Sure.  He suggested that he had come into possession of

16  evidence, that there were Nike employees who had been involved

17  in making payments to young basketball players that were

18  corrupt.

19  Q.  Before we get further into that, I want to ask you some

20  background so I can understand why that might harm Nike.

21          What involvement does Nike have, if any, with amateur

22  basketball?

23  A.  Nike certainly sells shoes and apparel to basketball

24  players all around the country, including amateur players, and,

25  more specifically, it sponsors a prominent league for youth

K1TMAVB3                          Wilson - Direct

 1   basketball players called the Elite Youth Basketball League.

 2   Q.  What does it mean to sponsor that league?  What does Nike

 3   do?

 4   A.  So the league is a tournament-style league in which 40

 5   different teams participate, and Nike had sponsorship

 6   agreements with each of those programs that field the teams.

 7   And under the sponsorship agreements Nike provides product for

 8   the kids to wear and also money in many cases to defray the

 9   expenses of those programs and having their kids participate in

10   the events.

11   Q.  So you mentioned that it's kids playing in these leagues.

12   What ages are we talking about?

13   A.  The EYBL teams that compete are 17-and-under teams.  But

14   the programs from which they are drawn also have children

15   playing in earlier age brackets, so teenagers generally.

16   Q.  Are you familiar with what's known as the National

17   Collegiate Athletic Association?

18   A.  I have heard of it, yes.

19   Q.  Also usually called the NCAA?

20   A.  Right, yes.

21   Q.  Generally, what is the NCAA?

22   A.  The NCAA is an organization that organizes competition

23   among college basketball teams.

24   Q.  Does the NCAA have any rules regarding who may play

25   basketball in the competitions you have described that it

K1TMAVF3                    Wilson - Direct

1    organizes?

2    A.  To my knowledge, it has a thick book of rules governing

3    that subject matter.

4    Q.  At a very high level, may any player play for an NCAA team,

5    or are there particular rules about who may play?

6    A.  One of the principal rules that I'm familiar with is that

7    the player has to have maintained their amateur status to

8    participate in the NCAA basketball.

9    Q.  What does amateur status mean?

10   A.  Amateur status is defined under a number of NCAA rules that

11   contain exceptions and subparts, but in general the player

12   can't have been paid to play basketball.  That would generally

13   cause the player to lose his amateur status.

14   Q.  You say generally.  Are there some instances in which an

15   amateur player can receive money but still not lose amateur

16   status?

17   A.  Yes.  There is a particular exception that I'm aware of for

18   players receiving money in connection with the reasonable

19   expenses that they incur in participating in something like the

20   EYBL, the Elite Youth Basketball League.

21   Q.  Just so I understand, as long as an EYBL player, that is, a

22   17-and-under player, maintains amateur status, that player

23   could go on to play an at an NCAA school, is that correct?

24   A.  That's my understanding, yes.

25   Q.  Did there come a time when you learned of an investigation

1   by the United States Attorney's Office in the Federal Bureau of

2   Investigation here in New York into payments made by athletic

3   companies to amateur basketball players?

4   A.   Yes.

5   Q.   Generally, how did you learn of that investigation?

6   A.   I learned of the investigation from news reports of the

7   arrest of an Adidas executive.

8   Q.   What is Adidas?

9   A.   Adidas is a company that, like Nike, is engaged in the

10  manufacture and sale of shoes and athletic apparel.

11  Q.   Do you recall approximately when you learned of the arrest

12  of an Adidas executive?

13  A.   I do.  It was in September of 2017.

14  Q.   And can you explain what your understanding of what that

15  investigation was concerned with?

16  A.   My understanding of what the government charged in that

17  case is that the Adidas executive was involved in secretly

18  bribing a player or the family of a player in exchange for that

19  player agreeing to go to an NCAA school sponsored by Adidas.

20       THE COURT:  When you say a particular school, you mean

21  a college or a university?

22       THE WITNESS:  That's correct.

23  Q.   And, to your understanding of that case, why would an

24  Adidas executive or employee pay a player to go to a particular

25  college or university?

1   A.  My understanding is that among the colleges and

2   universities considered to be strong in basketball, only a

3   couple of them are sponsored by Adidas and, therefore, I

4   suppose that the motivation that the government described in

5   its charge was that it would contribute to the success of that

6   school in competition and potentially lead that talented player

7   to sign with Adidas as a sponsorship when that player went pro,

8   if indeed that player went pro.

9   Q.  To your understanding of the theory of that case, would it

10  always be unlawful for Nike to give money to an EYBL player or

11  family of an EYBL player?

12  A.  No.  My understanding under the theory of that case is that

13  it would have had to have been a secret payment in exchange for

14  a player agreeing to go to a particular NCAA school.

15  Q.  Now, did there come a time when Nike received a subpoena

16  from the United States Attorney's Office here in the Southern

17  District of New York relating to its investigation into

18  Payments to amateur basketball players?

19  A.  Yes, it did.

20  Q.  Do you recall when that was?

21  A.  I do.

22  Q.  When was it?

23  A.  It was within 24 to 48 hours of the news of the Adidas

24  executive arrests breaking in the press.

25  Q.  And just, first, can you explain what a subpoena is?

A.   Yes.  A subpoena is a written document that requests the

recipient to produce documents or sometimes testimony to the

law enforcement agency that's issuing the subpoena.

Q.   And for anyone who has not seen a subpoena, what does it

look like?  What is it?

A.   It's usually pretty short.  The cover page would tell you

what agency is requesting the documents or testimony, when they

are due, to whom you should deliver them.  And after that cover

page there are usually instructions about how to bundle up

electronic documents to the extent that the documents being

sought are electronic.  And then following that there is

typically a list of topics, meaning these are the topics of the

documents that the government wants you to give them.

Q.   Let's talk first at a general level.  When a company like

Nike receives a subpoena, generally, what steps are taken in

response?

A.   Large companies receive any number of subpoenas.  Depending

on the perceived seriousness of it, they might engage outside

counsel to help respond to the subpoena, or they might respond

to it internally using their own lawyers employed at the

company.

Q.   Let's take the example of asking about an outside firm to

help.  Was Boies Schiller engaged in that kind of assistance

for companies like Nike?

A.   Yes.  In fact, we were engaged by Nike to assist in

1  responding to this.

2  Q.   Again, generally, what steps are taken to respond to a

3  subpoena like this?

4  A.   Sure.  There are internal steps and there are external

5  steps.  On the internal side, counsel works with in-house

6  counsel to locate documents that might respond to the subpoena

7  and collect them and review them.  And externally counsel may

8  interact with the law enforcement office that's issued the

9  subpoena to find out essentially what they are looking for.

10 Q.   In the case of the subpoena to Nike concerning amateur

11 basketball, were you involved in responding to that subpoena?

12 A.   Yes, I was.

13 Q.   Did attorneys interact with the United States Attorney's

14 Office regarding what was requested by that subpoena?

15 A.   Yes.

16 Q.   At a high level what types of documents was that subpoena

17 looking for?

18 A.   The subpoena had approximately eight or nine numbered

19 items, topics, excuse me, that it was looking for.  But, in

20 general, they related to the topic of payments to amateur or

21 NCAA players.

22 Q.   Did Nike provide documents to the government in response to

23 that subpoena?

24 A.   With the assistance of counsel, yes, it did.

25 Q.   Did it provide all those documents at once or provide it

1    over time?

2    A.   No.   The company made what we call rolling production,

3    meaning an initial production, and then as more documents were

4    identified and ready to be produced, those were sent over as

5    well.

6    Q.   I believe you testified a few moments ago that Nike

7    received the subpoena just after the Adidas executive was

8    arrested in September 2017.

9         Do you recall approximately when Nike began producing

10    documents to the government?

11    A.   I do.   Our first production was within several weeks of the

12    company's receipt of the subpoena.

13    Q.   Now, did there come a time when Nike believed it had

14    complied with the subpoena and produced all the documents

15    requested?

16    A.   Yes.   In May of 2018, we informed the United States

17    Attorney's Office for the Southern District of New York that

18    Nike had substantially completed its production of documents

19    that the subpoena called for.

20    Q.   Now, if that was in May of 2018, did Nike at any time after

21    that produce additional documents?

22    A.   There were subsequent occasions on which we produced more

23    documents.

24    Q.   Do you remember approximately when after May 2018 Nike

25    produced further documents?

1    A.   There were additional document productions in very early

2    2019, I believe February.

3    Q.   And what prompted the production that you recall began in

4    February?

5    A.   There was very little contact with the U.S. Attorney's

6    Office in the second half of 2018.  But in January 2019, a

7    prosecutor with the office reached out to Boies Schiller and

8    asked for production of additional documents with respect to

9    some specific youth basketball programs.

10   Q.   Were there any productions after that?

11   A.   Yes.

12   Q.   What caused later production?

13   A.   In addition to producing the documents sought by that

14   request, there were some small additional follow-up requests

15   from the prosecution.  And then later, after I met

16   Mr. Avenatti, we produced additional documents as well.

17   Q.   We will come back to that a little bit later.

18           I'll just ask one other bit of background quickly,

19   which is, has Nike been asked for documents relating to amateur

20   basketball by any other government agency?

21   A.   Yes, it has.

22   Q.   What agency is that?

23   A.   The United States Securities and Exchange Commission.

24   Q.   What is the Securities and Exchange Commission?

25   A.   The Securities and Exchange Commission, or the SEC, is a

1   level regulator.  It's a federal agency charged with enforcing

2   the nation's securities laws.

3   Q.  And do you recall approximately when the SEC asked for

4   documents?

5   A.  I believe it was April of 2019.

6   Q.  And, generally, what did they ask for?

7   A.  Not too dissimilar from the U.S. Attorney's Office

8   subpoena.  The SEC asked for documents relating to payments to

9   players.

10  Q.  What is your understanding, if you have one, of what that

11  SEC inquiry or request is about?

12  A.  I understand it to be focused on the topic of the subpoena,

13  payments to amateur players.  Beyond that, I don't know.

14  Q.  Do you know whether documents were requested only of Nike

15  in that investigation?

16  A.  When we received the subpoena, I noted that the caption on

17  the subpoena, including the name of the case or the name of the

18  matter under which they issued the subpoena, was called in re

19  or in the matter of something like athletic companies or

20  athletic apparel companies, which led me to believe that this

21  was a request in connection with an investigation broader than

22  just Nike.

23  Q.  With that background in mind, let's now focus on March of

24  2019.

25          I want to start by asking you, are you familiar with

1  somebody named Mark Geragos?

2  A.   Yes, I am.

3  Q.   Who is that?

4  A.   Mr. Geragos is the attorney whose office I mentioned

5  earlier on Fifth Avenue in Manhattan, which is where I met

6  Mr. Avenatti.

7  Q.   Did there come a time when you spoke to him?

8  A.   I first spoke to Mark Geragos in March of last year.

9  Q.   Had you heard of Mark Geragos before the first time you

10  spoke to him in March?

11  A.   Yes, I had.

12  Q.   Just generally, what did you know about him?

13  A.   I knew that he had represented celebrities in criminal

14  defense matters in Los Angeles for at least the past couple of

15  decades, and I also knew that he had interacted with Nike in

16  connection with the sponsorship agreement for an athlete that

17  he represented.

18        MR. PODOLSKY:   Let's pull up just for the witness for

19  the moment what has been marked for identification as

20  Government Exhibit 203.

21  Q.   Mr. Wilson you should be able to see it on your screen.

22  Can you?

23  A.   I do, yes.

24  Q.   Do you recognize this document?

25  A.   Yes.

 1   Q.   What type of document is it?

 2   A.   It's an e-mail chain between myself and Mr. Geragos.

 3   Q.   And what's the date of the top e-mail?

 4   A.   The last e-mail is dated Thursday, March 14, 2019.

 5            MR. PODOLSKY:  Your Honor, at this time the government

 6   offers Government Exhibit 203.

 7            THE COURT:  Is there any objection?

 8            MR. H. SREBNICK:  No objection.

 9            THE COURT:  Government Exhibit 203 is received.

10            (Government Exhibit 203 received in evidence)

11            MR. PODOLSKY:  May I publish, your Honor?

12            THE COURT:  Yes.

13   Q.  Mr. Wilson, now that everyone can see what we are looking

14   at, can you explain, what is this document?

15   A.  This is an e-mail chain that began when I reached out to

16   Mr. Geragos on Wednesday, March 13.

17            MR. PODOLSKY:  So just to orient ourselves to the

18   timeline here, Mr. Hamilton, can you bring up the bottom of the

19   first page and the top of the second page.

20   Q.  Is what we are looking at now on the screen that goes over

21   the first to the second page the first e-mail in this chain,

22   Mr. Wilson?

23   A.  The first and the second, yes.

24   Q.  Let's focus on the first.  Who wrote that bottom e-mail,

25   the very first e-mail in the chain?

1   A.  I did.

2   Q.  And what's the date and time on that e-mail?

3   A.  It's dated Wednesday, March 13, 2019, at 10:20 a.m.

4   Q.  Who is this e-mail to?

5   A.  It was to Mark Geragos.

6   Q.  Why don't you go ahead and read, if you don't mind, the top

7   of the second page, what you wrote to Mr. Geragos.

8   A.  Sure.  I wrote:  Dear Mr. Geragos, we are counsel to Nike,

9   and I am reaching out in response to your call to Casey Kaplan.

10  Please let us know when today would be convenient to speak and

11  what number to call.  We should have some availability in the

12  early afternoon.  Regards, followed by my signature block.

13  Q.  Let me ask first, who is Casey Kaplan?

14  A.  Casey Kaplan is a lawyer in the legal department of Nike.

15  Q.  Why did you write this e-mail to Mark Geragos?

16  A.  I understood at this time that Mr. Geragos had reached out

17  to Mr. Kaplan indicating that Mr. Avenatti wanted a meeting

18  with the company.

19  Q.  At this point had you ever spoken or met with Mr. Avenatti?

20  A.  No.

21  Q.  What did you know about him at this time?

22  A.  I was aware that he was an attorney in private practice in

23  California and that he had represented individuals in a couple

24  of high-profile matters.  And in connection with one or both of

25  those matters he had appeared on television dozens of times.

 1   Q.  Now, did you speak to Mr. Geragos after you sent this

 2   e-mail?

 3   A.  I did.  I was impatient to speak to him, so I called after

 4   I sent the e-mail and he had not responded.

 5   Q.  Why were you impatient to speak with him?

 6   A.  We were pretty concerned and eager to find out what it was

 7   that these guys wanted to talk to the company about.

 8   Q.  Why were you concerned and eager to find out?

 9   A.  Well, I understood that when Mr. Geragos had reached out to

10   Mr. Kaplan, he had indicated that Mr. Avenatti was insisting on

11   meeting with someone from the company.  And, in my experience,

12   when a plaintiff's attorney wants a meeting, it's not to give

13   you something.  It's to ask you for something.

14   Q.  Let me just ask one or two follow-ups on what you just

15   said.

16       First of all, you mentioned plaintiff's attorney.

17   What did you mean by that?

18   A.  I meant an attorney who typically represents plaintiffs,

19   rather than defendants, in civil litigation.

20   Q.  Who is the plaintiff's attorney you were referring to?

21   A.  Mr. Avenatti.

22   Q.  You mentioned that it was your understanding that he had

23   insisted on meeting with someone from the company.  Did I get

24   that right?

25   A.  Yes.

```
1    Q.  What did you understand that to mean?

2    A.  Well, I understood that he had said he wouldn't meet with

3    Boies Schiller.  He wanted to meet with someone from the

4    company.  Usually, one of the benefits of sending your outside

5    lawyer to meet with someone is that that outside lawyer can

6    always say, I have to check with my client before I can agree

7    to anything.  So it suggested to me that he would have a

8    demand, and he wanted someone in the room from the company to

9    hear that demand directly or potentially to be able to agree to

10   it or to respond to it on the spot.

11   Q.  Now, who participated in the call that you referenced a few

12   moments ago with Mr. Geragos after you sent this e-mail?

13   A.  I called Mr. Geragos on speaker phone, and I had a junior

14   associate in my office sit in on the call to take notes.

15   Q.  Is that common practice, to have a note taker?

16   A.  I don't know if it is everyone's practice.  It's certainly

17   my practice.

18   Q.  And what did Geragos say on that phone call?

19   A.  Mr. Geragos said that he was in Rhode Island participating

20   in a mediation, that he was going to be back in New York the

21   next day, and that he had something that we should talk about

22   that was too sensitive to discuss over the phone.

23   Q.  What was your reaction to him saying that it was too

24   sensitive to discuss over the phone?

25   A.  I think my pulse accelerated, and I was concerned.
```

1   Q.   Why?

2   A.   In my experience, one of the only reasons to insist that

3   something can't be discussed over the phone is that you are

4   concerned that the FBI or someone else may be listening to your

5   phone calls.

6   Q.   Did he tell you anything about what he wanted to speak to

7   you about?

8   A.   All Mr. Geragos was willing to say is that he had been

9   shown some stuff or some documents, I don't remember which word

10  he used, that suggested that Nike might have an Adidas problem.

11  Q.   What did you understand Adidas problem to mean?

12  A.   He didn't elaborate on the call, but the context I had was

13  that the arrest and subsequent conviction of the Adidas

14  executive that we were talking about earlier was in the press

15  around this time.

16  Q.   Now, what, if anything, else do you recall Geragos saying

17  about the meeting or discussion he wanted to have?

18  A.   He suggested that we would have a mediated discussion.

19  Q.   What did you understand mediated discussion to mean?

20  A.   At that time I didn't know what he meant and I didn't ask.

21  Q.   Did you understand the meeting that he was proposing to be

22  a mediation?

23  A.   Since there had not been a client or claim identified, I

24  didn't know what possibly we could be mediating, so no.

25  Q.   Let me follow up on that.  Did he mention a client?

K1TMAYE3                        Wilson - Direct

```
 1    A.  No.

 2    Q.  Did he mention any legal claim?

 3    A.  No, he did not.

 4    Q.  How were things left at the end of the call?

 5    A.  It was left that we would follow up over e-mail to set the

 6    location and time of the meeting he had requested.

 7    Q.  Why don't we look back at the e-mail to orient ourselves.

 8    Who wrote the very next e-mail on the chain?

 9    A.  The next e-mail was written by Mr. Geragos.

10    Q.  What did he say?

11    A.  He wrote:  Thanks for reaching out and does late tomorrow

12    a.m. work.

13    Q.  Was that sent before or after your phone call?

14    A.  This was after he and I had gotten off the phone.

15         MR. PODOLSKY:  If we can go back to the e-mail.  Maybe

16    we can just blow up the top half.

17    Q.  Do you see that you then responded to his e-mail:  Yes.

18    Could you do 11:30 a.m. at our offices at 55 Hudson Yards?

19    A.  I see that, yes.

20    Q.  What is 55 Hudson Yards?

21    A.  That's the name of the office building where my office was.

22    Q.  Do you see that Geragos responds:  Can you do 11:30 at my

23    office at 256 Fifth Avenue?

24    A.  Yes, I see that.

25    Q.  You respond.  How do you respond?
```

1    A.  I wrote back:  Due to our schedules tomorrow, we will need

2    to meet here if you would like to meet in person.

3    Q.  Who wrote the next e-mail?

4    A.  I wrote again the next day when I had not heard back from

5    him.

6    Q.  What did you write?

7    A.  I wrote:  Hi, Mark.  Should we expect you at 11:30 today or

8    do we need to reschedule.  Regards, Scott.

9    Q.  Did he respond?

10   A.  He responded in the afternoon also on Thursday.

11   Q.  To summarize, can you explain what happened between the

12   call you have on the morning of Wednesday, March 13 and the

13   following day, March 14?

14   A.  Yeah.  We were supposed to meet on Thursday, but after I

15   had responded to his request that we do the meeting in his

16   office by saying I want to do it in my office, he just didn't

17   get back to me then before Thursday at 11:30 had come and gone.

18   Q.  Did you speak to him again?

19   A.  I spoke to him again the next day after his last e-mail

20   here.  We spoke on Friday, March 15.

21   Q.  Who was on that call?

22   A.  I had the call with Mr. Geragos on speaker phone and I had,

23   I believe, a different junior associate at my law firm to sit

24   in and take notes.

25   Q.  What did Geragos say on that call?

K1TMAVE3                    Wilson - Direct

1   A.  On that call I think we talked a little bit where we were

2   going to meet, and I asked him who was going to attend.  He

3   said that it would be Mr. Avenatti and him.  I asked him if

4   Mr. Avenatti was his client.  He said no.  There was a client.

5   But that that client wasn't attending the meeting.

6   Q.  Did you say who would attend from your side?

7   A.  I told him that Mr. Leinwand would join me at the meeting.

8   Q.  Where did you understand this meeting would take place?

9   A.  He was insisting it take place at his office at that

10  address on Fifth Avenue we were looking at.

11  Q.  Is that here in morning?

12  A.  It is.  In the twenties.

13  Q.  Where was Mr. Leinwand located at that time?

14  A.  Mr. Leinwand was in Portland, Oregon.

15  Q.  Why were you going to have Mr. Leinwand fly across the

16  country for this meeting?

17  A.  As I mentioned earlier, we were pretty much on red alert

18  because we were concerned, what do these guys want to meet

19  about, what's the subject matter.  We wanted to find out what

20  they had to say.  And so if he was going to insist on me

21  bringing a client representative to the meeting, if that was

22  the price of admission to the room to hear what they had to

23  say, we decided we would do that.

24  Q.  Do you recall Geragos saying anything else on that call

25  about the subject matter of the meeting?

K1TMAVF3                    Wilson - Direct

1   A.  Only, again, that he was trying to be discreet, that it was

2   too sensitive to discuss over the phone, but that Nike would

3   thank him or it would be good for Nike to take the meeting.

4   Q.  How were things left at the end of that call?

5   A.  It was left that we would meet at his offices on Tuesday of

6   the following week.

7   Q.  And did you meet at his office on the Tuesday the following

8   week?

9   A.  I did, yes.

10  Q.  Do you happen to recall the date of that meeting?

11  A.  It was Tuesday, March 19, 2019.

12  Q.  Who was at that meeting?

13  A.  I was accompanied by my client, Mr. Leinwand, and a junior

14  associate from my firm.  Also at the meeting were Mr. Avenatti

15  and Mr. Geragos.  There may have been someone else in

16  Mr. Geragos' firm on the floor, but not attending the meeting

17  that we were having.

18  Q.  Can you describe the room that you were in?

19  A.  Sure.  It was a conference room on the fourth floor of his

20  building.  He told me at some point that he owned the building

21  with a conference room table parallel to Fifth Avenue, big,

22  tall, bright windows overlooking Fifth Avenue and with an

23  office adjacent to the conference room but blocked off by a

24  glass as a see-through wall.

25  Q.  Was there anyone in that office while you were meeting?

K1TMAVE3                        Wilson - Direct

1    A.  There may have been an assistant coming in and out.  I

2    don't have a strong recollection.

3    Q.  Can you describe how people were arranged at the meeting,

4    where people were sitting?

5    A.  I sat at the head of the table, so the north end of the

6    table.  My client and my colleague sat to my left with their

7    backs facing the windows, their backs at Fifth Avenue.

8    Mr. Geragos sat to my immediate right and next to him further

9    down the table was where Mr. Avenatti was sitting.

10   Q.  Who did most of the talking at this meeting?

11   A.  I would say Mr. Avenatti and I did most of the talking.

12   Q.  Do you remember word for word everything that was said at

13   this meeting?

14   A.  No, I do not.

15   Q.  Do you remember some of the words that were said?

16   A.  I do, yes.

17   Q.  Why do you remember some of the words that were said?

18   A.  This was a very unusual meeting for me to be taking.  Some

19   of the language was shocking.  Some of the language involved

20   expletives.  I was already very focused going into the meeting

21   that I might be required to remember what was said because we

22   were dealing with a potentially volatile situation.

23   Q.  Let's start talking about what happened at that meeting.

24   To your recollection, what happened first when you sat down?

25   A.  So as we were getting situated, I think there was some

1    chitchat about our offices, Hudson Yards versus Fifth Avenue.

2    And the first thing I really remember is saying to Mr. Geragos

3    and Mr. Avenatti:  Look, I'm here now.  I don't know what this

4    is about.  What's it about?

5    Q.  What was the response?

6    A.  Mr. Avenatti responded by asking me if this would be a 408

7    discussion.

8    Q.  What was your understanding of that phrase, 408 discussion?

9    A.  I understood him to be referring to Rule 408 of the Federal

10   Rules of Evidence.

11   Q.  Just generally, what did you understand that would mean in

12   this context?

13   A.  Rule 408 is a rule that governs the admissibility of offers

14   and demands for settlement in a settlement talk.  So if you

15   have a settlement conversation and you offer to settle a case

16   for a hundred bucks and then later in court you are arguing

17   that the case is worth a million dollars, the other side can't

18   say, aha, when we were having our settlement discussion you

19   agreed the case was worth $100.  It's a rule that provides some

20   confidentiality with respect to offers and demands made in a

21   settlement talk.

22   Q.  Did you understand at this point that this was a settlement

23   discussion?

24   A.  Absolutely not.

25   Q.  Why not?

1  A.  Because I didn't know who the client might be.  I didn't

2  know what claim we might potentially be discussing settling.  I

3  have never been asked to engage in a Rule 408 discussion

4  without knowing at least those things.

5  Q.  Now, after asking about the meeting being a 408 discussion,

6  what did Avenatti say next?

7  A.  Well, the next thing that happened was I responded yes,

8  that I would agree to it being a 408 discussion.

9  Q.  Why did you do that?

10  A.  Again, just as our reasoning behind flying Mr. Leinwand

11  across the country, I wanted to get these guys to say whatever

12  it was they wanted to say.

13  Q.  And what happened after you agreed this was a Rule 408

14  discussion?

15  A.  So once I said that, Mr. Avenatti launched into what felt

16  like a rehearsed speech.  He began by saying he represented a

17  whistleblower, a whistleblower who had information about

18  payments to amateur players by Nike, including in particular

19  the top pick in the 2018 NBA Draft.

20  Q.  How did you respond?

21  A.  I asked him who was the top pick in the 2018 NBA Draft.

22  Q.  Why did you ask him that?

23  A.  To throw him off because he seemed like he was about to

24  launch into a speech.

25  Q.  What did he say next?

K1TMAYE3                    Wilson - Direct

```
 1   A.  He seemed a little surprised that I asked, and he said it

 2   was DeAndre Ayton.

 3   Q.  What happened after that?

 4   A.  Then he resumed his remarks.  He said that he had documents

 5   and other information from his whistleblower indicating that

 6   specific named Nike employees were involved in this misconduct,

 7   in this corruption.  He named two employees who he said were

 8   involved.  He said a third employee was involved and a fourth

 9   employee might have been involved.  He said that the payments

10   related to other players as well and later named two other

11   players.

12           And then I started to talk about -- he told me that he

13   was aware that Nike had received a grand jury subpoena in 2017,

14   that he suspected that Nike had not been forthcoming with the

15   government in its response to that subpoena and that could be a

16   big problem for Nike as well.

17   Q.  Now, a little bit ago you testified about your

18   understanding of the government's theory in the Adidas case and

19   investigation.

20           Do you recall that?

21   A.  I do, yes.

22   Q.  You recall testifying regarding that the theory had to do

23   with payments to get a player to go a particular college or

24   university?

25   A.  Secret payments, hidden payments to the player or the
```

K1TMAVE3                    Wilson - Direct

1  family of the player in exchange for that player agreeing to go

2  to a college or university sponsored by Adidas, yes.

3  Q.  During this speech that you have described, what, if

4  anything, did Mr. Avenatti say about the purpose of the

5  payments that he was identifying as corrupt?

6  A.  He didn't say anything about their purpose.

7  Q.  What happened next after he laid out the speech and

8  described -- named the employees that you mentioned?

9  A.  What I recall next, and the order of my recollection might

10 not be perfect, was that he said Nike was going to do two

11 things.  Nike was going to pay a civil settlement to his

12 client, who he said had breach of contract, tort, or other

13 claims, and Nike was going to hire Mr. Avenatti and Mark

14 Geragos to conduct an internal investigation into corruption in

15 basketball.

16 Q.  Did he at that point explain any further what he meant by

17 those two requests or demands?

18 A.  Not at that point in the conversation, no.

19 Q.  You mentioned that he said that there was some kind of

20 breach of contract or tort claim.  Did he provide any other

21 information about what legal claims his client might have?

22 A.  He literally just used those words, the phrase breach of

23 contract, the phrase tort or tortious conduct or other claims.

24 There was no elaboration or detail offered I remember because I

25 was very focused on hearing what he might be trying to explain.

1   Q.  What was your reaction to his description of his client's

2   claim?

3   A.  It sounded like he didn't know whether or not his client in

4   fact had claims.

5   Q.  What did you understand him to be saying when he said that

6   Nike would hire him and Geragos to do an internal

7   investigation?

8   A.  I had initially no idea.  I was flabbergasted.  My jaw

9   nearly hit the table.

10  Q.  Why were you flabbergasted by that request?

11  A.  I have never asked a company to hire me that I'm adverse

12  to.  This is someone who is sitting down with me saying, I have

13  a client that's adverse to.  I'm opposing counsel.  One of the

14  things I want from you is for your client to hire me.  That

15  would be extremely unusual, in my experience.

16              (Continued on next page)

17

18

19

20

21

22

23

24

25

```
 1   BY MR. PODOLSKY:

 2   Q.  Before we go on, you had testified that the beginning --

 3   the conversation began with a speech about corruption at Nike

 4   and that Avenatti's client was a whistleblower.  Do I recall

 5   that correctly?

 6   A.  Yes.

 7   Q.  Did he -- Avenatti explain what connection his client had

 8   to this so-called corruption?

 9   A.  I asked a couple of times who the client was, and he

10   initially declined to identify him.  He said that he was the

11   head of a program or a program director who had been involved

12   in these payments in connection with the Nike employees making

13   the payments.

14   Q.  What was your reaction to him telling you that his client

15   was involved in these payments that he was describing?

16   A.  Again, I -- it made me highly suspicious that he might not

17   be representing his client, he might not be acting in the best

18   interest of his client because --

19              MR. H. SREBNICK:  Objection, your Honor.

20              THE COURT:  Sustained.

21              MR. H. SREBNICK:  Move to strike.

22              THE COURT:  Yes, the motion is granted.

23   BY MR. PODOLSKY:

24   Q.  Without going into what you thought Mr. Avenatti might be

25   thinking, what about describing a client as being involved in
```

1    these payments surprised you?

2    A.   I said it out loud in response to him.  I said that if you

3    believe your client has been involved in criminal activity,

4    have you contacted the Department of Justice or the Securities

5    and Exchange Commission.  I was shocked that he was, seemingly

6    out of the bat with somebody he has just met, implicating his

7    own client in criminal activity.  That struck me as an

8    incredibly odd thing for the representative of a client to do

9    on that client's behalf, saying my client is a criminal.

10   Q.   What -- how did he respond to your question about whether

11   he had gone to one of the government agencies you referenced?

12   A.   He seemed surprised and indicated that he had not.

13   Q.   What happened next at this meeting?

14   A.   When he said that, I asked him, "How do I know you're not

15   wearing a wire?"

16   Q.   And how did he respond to that?

17   A.   He responded by laughing and opening his jacket and saying,

18   in essence, or sum and substance, I'm not.

19   Q.   Why did you ask him if he was wearing a wire?

20   A.   Again, because I felt like what was happening was he was

21   saying I have someone with information that could be relevant

22   to a criminal investigation by the Department of Justice and

23   I'm not going to go public with that if you pay me off.  So I

24   felt like he was asking me to engage in something improper.

25   Q.   Now, how did you respond to the demands that you laid out

1    earlier, the settlement and the internal investigation?

2    A.   Well, initially I just started talking to buy myself time

3    to think.   And the first thing I remember saying is, You know,

4    there's an Adidas executive who has been charged but the

5    company, Adidas, hasn't been charged with any criminal conduct.

6    Q.   And how did he respond to that?

7    A.   I recall that he said that he was going to blow the lid on

8    this scandal, that it was going to be a major scandal, that he

9    had a reporter, Rebecca Ruiz, at the New York Times either on

10   speed dial or on call and that he could reach out to her and

11   have her write a story at a moment's notice.

12            He also said, when I was asking him for the identity

13   of his client, that the identity of his client wasn't going to

14   drive the news coverage, that he could generate this negative

15   news coverage without him.

16   Q.   What did you understand him to mean by that?

17   A.   I understood him to be threatening -- and he elaborated on

18   this later in the meeting -- that he would go to the press, use

19   his other abilities and platforms to generate negative media

20   attention to Nike on the basis not of his client's purported

21   claim but, rather, on the basis of there being scandalous

22   evidence of Nike employees participating in criminal conduct.

23   Q.   When he explained that, what was your reaction?   Were you

24   concerned by that?

25   A.   Based on what I had seen in the past of his ability to

Kildare4                       Wilson - direct

 1   generate media attention, I was very concerned, yes.

 2   Q.  And what concerned you?

 3   A.  I felt like we had a full-blown corporate communications

 4   crisis through it, and the reason it concerned me was twofold.

 5   One, Nike is a consumer goods company with an exceptionally

 6   strong brand, and it depends on the strength of its brand and

 7   its popularity with consumers to sell shoes and T-shirts and

 8   other athletic apparel.  So damaging the company's reputation

 9   in the press could hurt its business.  And he had also

10   specifically threatened to harm the share price, to take

11   billions of dollars off the company's market cap.

12   Q.  Did he say that?

13   A.  He did.

14   Q.  What do you recall him saying?

15   A.  That he would hold a press conference the next day and he

16   would -- he could and would take billions of dollars off the

17   company's market cap.

18   Q.  I think used the term "market cap."  Did I hear that

19   correctly?

20   A.  Yes.

21   Q.  What does that mean?

22   A.  "Market cap" refers to the value of a company calculated by

23   multiplying the number of shares outstanding times the dollar

24   value of the shares.  So if you had ten shares worth $100 each,

25   the company's market cap would be a thousand bucks.

1     THE COURT:  Mr. Podolsky, whenever you reach a

2  convenient point.  We're currently at 4:30, but whenever is

3  convenient.

4     MR. PODOLSKY:  Your Honor, this meeting does go on for

5  quite some time, so I am happy to break whenever the -- now if

6  it is preferable to the Court, it is fine for me.

7     THE COURT:  OK.  So, ladies and gentlemen, I am going

8  to break for the evening.  It's currently 4:30.

9     As you will hear me say many times during the trial,

10  don't discuss the case with anyone.  Don't do any research.

11  Don't read anything about it.  Don't listen to anything about

12  it.  Keep an open mind because there is more evidence to hear.

13     We'll resume at 9:30 tomorrow morning.

14     Mr. Ruocco will lead you to the jury room.  Thank you

15  all very much.

16     THE CLERK:  All rise.

17     (Continued on next page)

18

19

20

21

22

23

24

25

220

```
 1                 (Jury not present)

 2                 THE COURT:  Please be seated.

 3                 All right.  What do we need to discuss now?

 4                 MR. RICHENTHAL:  I don't know that we need to discuss

 5      anything.  I have one administrative question and then just one

 6      note for the record.  I don't think either of them affects him,

 7      but I am happy to wait for him to leave.

 8                 MR. H. SREBNICK:  Judge, could we just invoke the rule

 9      at this time --

10                 MR. RICHENTHAL:  I'm sorry, Mr. Srebnick, I don't know

11      what rule you are referring to.

12                 MR. H. SREBNICK:  The rule that when the witness is on

13      the witness stand --

14                 THE COURT:  No, that doesn't apply until the witness

15      is on cross.  The government is free to talk to Mr. Wilson as

16      much as they want between now and when he is on

17      cross-examination.

18                 MR. H. SREBNICK:  Understood.  I just wanted to invoke

19      it now for the trial.  I understand how it applies.

20                 THE COURT:  So I think it's generally understood, at

21      least in this district, that when a witness is on

22      cross-examination, it is not permitted for them to speak with

23      their lawyer.  So it sort of goes without saying that until the

24      witness is on cross-examination, the lawyer is free to talk

25      with their witness as much as they want.
```

1           Mr. Richenthal.

2           MR. RICHENTHAL:  Then the two matters to which I

3  referred.  This will be very brief.

4           First, our team hasn't had a trial before your Honor.

5  Is it your Honor's expectation we should ask for permission to

6  publish, but once an exhibit is in evidence, we presume, absent

7  some other reason --

8           THE COURT:  I prefer that the lawyer ask before they

9  put something up.  So, if you wouldn't mind --

10          MR. RICHENTHAL:  Of course.

11          THE COURT:  In 99.99 percent of the cases, I'm sure

12  there won't be any problem, but I would prefer that you ask.

13          MR. RICHENTHAL:  No problem.

14          Then, second, consistent with an agreement that the

15  parties reached some time ago that I think was actually

16  docketed, I just wanted to put on the record we transmitted to

17  the defense last night by email a complete list of all the

18  exhibits that we intend to offer during Mr. Wilson's direct

19  examination.

20          THE COURT:  All right.  Now, I wanted to ask Ms. Perry

21  about this pending motion to quash a subpoena for documents

22  that was addressed to Boies Schiller.

23          And I wanted to understand from you, Ms. Perry, when

24  you thought the documents that you are seeking, when it would

25  be necessary for you to have them?  And the reason why I'm

1    asking is I thought you suggested that you needed them for

2    purposes of Mr. Wilson.

3            Did I misunderstand you?

4            MS. PERRY:  No, your Honor.

5            THE COURT:  OK.  So as I understand it, these are

6    notes that junior associates made of certain conversations.

7            These aren't notes of Mr. Wilson's, right?

8            MS. PERRY:  I don't know, your Honor.  I think he said

9    that they were produced by his junior associates.  We don't

10   know yet the extent, if any, to which he was involved in the

11   drafts or editing.

12           MR. SOBELMAN:  Your Honor, they were not his notes.

13           THE COURT:  I am sorry?

14           MR. SOBELMAN:  Our understanding is they are not his

15   notes, and there has been no suggestion from Boies Schiller or

16   otherwise.  I think their motion set this out was in great

17   detail.

18           THE COURT:  All right.  So just so I'm clear, you

19   think that your application, your motion, implicates Mr. Wilson

20   in some fashion?  Or you think -- to put it another way, you

21   think you have a right to these notes to use in some fashion

22   with Mr. Wilson?  Is that the theory?  Because the reason I'm

23   struggling is that if they are not his notes, obviously they

24   couldn't be used to impeach him.  I'm not sure what the purpose

25   is.

 1           Now, if Mr. Homes is going to testify and Mr. Homes

 2    took notes, then I understand; but I'm struggling with

 3    understanding how notes that junior associates took of

 4    conversations, struggling to understand how those could be used

 5    to examine Mr. Wilson in some way.

 6           MS. PERRY:  Yes, your Honor.

 7           Well, first, with respect to the notes right after the

 8    March 19th meeting, those will reflect his reaction to that

 9    meeting.  He was just talking about it on direct, he will talk

10    about it more.  He has already said he was very concerned, he

11    felt threatened.  The notes immediately follow the meeting, and

12    the government has said he was present at at least one of those

13    phone calls with the U.S. Attorney's Office.

14           In any event, clearly his input went into the content

15    of those calls.  So his reaction, his take on these meetings

16    would have been incorporated into the calls.  But they will

17    reflect what he thought in almost realtime about what happened

18    at that meeting.  So, was he actually concerned?  Did he feel

19    threatened?  And is that reflected in the almost, you know, I

20    think the immediate transmission of what he says happened?

21           THE COURT:  The problem is they are not his notes.

22    And so I don't understand what you would propose to do with

23    them.  They are not his notes.

24           So suppose the associate wrote something different

25    than what Mr. Wilson just testified to.  Let's just assume that

1    arguendo.  So what exactly do you do with that?  You can't

2    impeach him with somebody else's notes.

3         MS. PERRY:  Well, your Honor, if he's testifying on

4    direct how frightened and concerned he felt personally, you

5    know, as a result of the conversation, and then if, you know,

6    within a matter of moments or hours he's saying something very

7    different to the U.S. Attorney's Office, according to notes of

8    the conversation in which he was present, and if they reflect

9    something different, then I think we have a good faith basis to

10   try and impeach him.  If he testifies different than what the

11   notes say, then, you know, we can handle that in our case in

12   chief.  But I think it's highly relevant to his state of mind.

13        MR. RICHENTHAL:  This is like basic rules of evidence.

14   You can't confront one witness with another witness' notes.

15        THE COURT:  Yes.  I just -- that's why I'm asking the

16   question, because I still am struggling to understand how

17   Mr. Homes' notes could be used to impeach Mr. Wilson.  But I

18   need to read the papers more carefully, and I will try to rule

19   on the motion tomorrow morning before we begin.  So I want the

20   lawyers here at 9 o'clock so I can rule.  I mean, obviously

21   that is predicated on the -- the premise for that is that the

22   papers tell me everything I need to know about the application.

23   If they do, I will rule on it at 9 tomorrow.

24        MR. SKINNER:  Your Honor.

25        THE COURT:  Yes.

```
 1              MR. SKINNER:  Peter Skinner.  I am a lawyer for Nike.

 2              THE COURT:  Yes.

 3              MR. SKINNER:  We will be here tomorrow.  If you have

 4    questions about those notes, I am happy to answer them.

 5              THE COURT:  You are welcome to be here, and if you

 6    want to say something at 9 o'clock, I am happy to hear you at

 7    that time.

 8              MR. SKINNER:  Thank you, your Honor.

 9              THE COURT:  OK.

10              MS. PERRY:  Thank you, your Honor.

11              MR. H. SREBNICK:  Your Honor, are we on the same

12    schedule, 9:30 to -- or 9 until what time tomorrow?

13              THE COURT:  So let me tell you that for tomorrow I

14    would like to sit a regular day.  For Friday we will do the

15    9:30 to 2:30 that I told you about, and I want to see how much

16    progress we make.  And then depending on the progress, we'll

17    make a decision about what our trial days are going to look

18    like from that point forward.

19              Anything else?

20              MR. H. SREBNICK:  One moment, your Honor.

21              THE COURT:  Yes.

22              MR. H. SREBNICK:  Judge, we are going to remain here

23    until 5:30 with Mr. Avenatti with the marshals.

24              THE COURT:  I hope so.

25              MR. H. SREBNICK:  Thank you.
```

1            THE COURT:  Is that all right with the marshals?

2            A MARSHAL:  Yes.

3            THE COURT:  Thank you, sir.

4            Anything else?

5            MR. RICHENTHAL:  No, your Honor.

6            THE COURT:  Anything else from the defense?

7            MR. H. SREBNICK:  No, your Honor.

8            THE COURT:  All right.  So we will resume at 9 a.m.

9    tomorrow.  Thank you.

10            (Adjourned to 9 a.m. January 30, 2020)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

INDEX OF EXAMINATION

Examination of:                                    Page

SCOTT RONALD WILSON

Direct By Mr. Podolsky . . . . . . . . . . . 178

GOVERNMENT EXHIBITS

Exhibit No.                                    Received

 203   . . . . . . . . . . . . . . . . . . . 200