UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>-against-<br><br>MICHAEL AVENATTI,<br>                                  Defendant. | **ORDER**<br><br>(S1) 19 Cr. 373 (PGG) |

PAUL G. GARDEPHE, U.S.D.J.:

On December 31, 2019, Defendant Avenatti served identical Rule 17(c) subpoenas duces tecum on Gary Franklin and Jeffrey Auerbach.  (Joint Ltr. (Dkt. No. 158), Exs. A and B)  Franklin and Auerbach are expected to be important witnesses at trial, which began on January 27, 2020.

On January 16, 2020, Franklin and Auerbach – together with Avenatti – filed a joint letter asking the Court to resolve a dispute concerning the scope of the subpoenas.  (Jan. 16, 2020 Joint Ltr. (Dkt. No. 158) at 1-2)  The dispute concerns Defendant's request for

> [a]ll text messages and emails (without redaction) between (to/from) Jeffrey Auerbach and Gary Franklin relating to, mentioning or concerning Michael Avenatti, from February 13, 2019 through December 27, 2019.

(Id. at 2; see also id. at 9)  The key events in this case took place between March 19, 2019 and March 25, 2019.

Franklin and Auerbach have produced all messages and e-mails between them relating to, mentioning or concerning Avenatti for the period February 13, 2019 through March 24, 2019.  (Id. at 4 n.2)  Accordingly, the instant dispute concerns only text messages and emails transmitted between March 25, 2019 – the date of Avenatti's arrest – and December 27, 2019, between Franklin and Auerbach, that mention Avenatti.

## BACKGROUND

Indictment (S1) 19 Cr. 373 charges Michael Avenatti with transmitting interstate communications with intent to extort, in violation of 18 U.S.C. § 875(d) (Count One); Hobbs Act extortion, in violation of 18 U.S.C. § 1951 (Count Two); and honest services wire fraud, in violation of 18 U.S.C. §§ 1343 and 1346 (Count Three).  The Government charges that Avenatti – who is licensed to practice law in California – transmitted in interstate commerce threats "to cause financial harm to Nike and its reputation if Nike did not agree to make multimillion dollar payments to Avenatti"; "used threats of economic and reputational harm in an attempt to obtain multimillion dollar payments from Nike"; and used interstate communications to "engage[] in a scheme to obtain payments for himself from Nike based on confidential information provided to AVENATTI by [his client, Gary Franklin] for the purpose of furthering AVENATTI's representation of [Franklin], without [Franklin's] knowledge or approval," thereby depriving Franklin of the "duty of honest services" he was owed by Avenatti.  ((S1) Indictment (Dkt. No. 72) ¶¶ 20, 22, 24 (emphasis in original))

According to the Government, Franklin is the director and head coach of an amateur youth basketball program (the "Basketball Program") based in California.  "For a number of years, the Basketball Program . . . had a sponsorship program with Nike[,] pursuant to which Nike paid [the] program approximately $72,000 annually."  (Id. ¶ 5)  In the spring of 2018, Nike informed "the Basketball Program . . . that its annual contractual sponsorship would not be renewed."  (Id. ¶ 8)  According to the Government, Franklin – acting at the suggestion of Jeffrey Auerbach – approached Avenatti about possible representation after Nike announced that

it would not renew its sponsorship of the Basketball Program. (See Def. Br. (Dkt. No. 29) at 14, 21-22; Srebnick Decl., Ex. K (Dkt. No. 30-11) at 2)

Avenatti and Franklin met on March 5, 2019. "During that meeting and in subsequent meetings and communications, [Franklin] informed AVENATTI . . . that [he] wanted Nike to reinstate its $72,000 annual contractual sponsorship of the Basketball Program." "During the [March 5, 2019] meeting, [Franklin] [also] provided AVENATTI with information regarding what [Franklin] believed to be misconduct by certain employees of Nike involving the alleged funneling of illicit payments from Nike to the families of certain highly ranked high school basketball prospects." ((S1) Indictment (Dkt. No. 72) ¶ ¶ 9) (emphasis in original).

The Government further alleges that,

> at no time during the March 5, 2019 meeting or otherwise did AVENATTI inform [Franklin] that AVENATTI also would and did seek or demand payments from Nike for himself in exchange for resolving any potential claims made by [Franklin] and not causing financial and reputational harm to Nike, or that AVENATTI would and did seek to make any agreement with Nike contingent upon Nike making payments to AVENATTI himself. Furthermore, at no time did AVENATTI inform [Franklin] that AVENATTI intended to threaten to publicize the confidential information that [Franklin] had provided to AVENATTI, nor did AVENATTI obtain [Franklin's] permission to publicize any such information.

(Id. ¶ 10)

According to the Government, after his March 5, 2019 meeting with Franklin, Avenatti – in both face-to-face meetings and telephone calls with Nike's counsel – threatened to cause financial and reputational harm to Nike by holding a press conference at which he would disclose the illicit payments Nike had made to the families of highly ranked high school basketball prospects. (Id. at ¶¶ 11, 13, 14) The Government further alleges that Avenatti told Nike that it could escape the financial and reputational harm he threatened by agreeing to hire Avenatti to perform an internal investigation of Nike, for which Nike would have to pay Avenatti

$15 to $25 million.  (Id. ¶¶ 11(c), 13(b)-(d), 14(a)-(c), 24)  The Government claims that Avenatti solicited Nike for "payments to himself . . . without [Franklin's] knowledge or consent" (id. ¶ 1), and that he used Franklin's confidential information to solicit Nike for "payments from Nike to himself."  (Id. ¶10)  The Government further alleges that, in seeking payments to himself from Nike without Franklin's knowledge, Avenatti acted to the detriment of Franklin.[1]

Avenatti contends that the demands he made on Nike were "consistent with" the instructions he received from Franklin and Jeffrey Auerbach, who advised Franklin during the period that Franklin was represented by Avenatti.  (Def. Br. (Dkt. No. 75) at 9 ("The government is well aware of the overwhelming evidence that Coach Franklin's objective was to root out corruption at Nike, which is entirely consistent with Mr. Avenatti's demand to conduct an internal investigation."))

As noted above, Franklin and Auerbach are expected to be important witnesses at trial.

## DISCUSSION

Franklin and Auerbach object to the production of emails and text messages transmitted between them after Avenatti's arrest, contending that they are irrelevant.  They further contend that Avenatti's request is not sufficiently specific and constitutes an impermissible "fishing expedition."  Finally, Franklin and Auerbach contend that Avenatti seeks to use the text messages and emails listed in the subpoena for purposes of impeachment, and they argue that there is "an absolute prohibition on the use of a [Rule] 17(c) subpoena solely for impeachment purposes."  (Jan. 16, 2020 Joint Ltr. (Dkt. No. 158) at 3-4 (citing United States v.

---

[1]  The Indictment alleges that Avenatti rejected Nike's offer to resolve the dispute simply by paying Franklin, stating that "he did not think it made sense for Nike to pay [Franklin] an 'exorbitant sum of money . . . in light of his role in this.'"  (Id. ¶ 14(b))

Weissman, No. 01-CR-529 (BSJ), 2002 WL 31875410, at *1 (S.D.N.Y. Dec. 26, 2002) (internal citations and quotation marks omitted))

Avenatti contends that "[t]he texts and emails will necessarily contain verbatim statements of Messrs. Franklin and Auerbach [and] [a]ny such communications are certain to contain relevant information about this case because the only logical reason they would be mentioning Mr. Avenatti is in relation to the charges in this case." (Id. at 4-5) Avenatti further argues that his request is sufficiently specific, "in that it is limited to communications between two government witnesses about a specific subject matter – Mr. Avenatti." (Id. at 5)

I.  **APPLICABLE LAW**

Federal Rule of Criminal Procedure 17(c) provides that "[a] subpoena may order the witness to produce any books, papers, documents, data, or other objects the subpoena designates. The court may direct the witness to produce the designated items in court before trial or before they are to be offered in evidence." Fed. R. Crim. P. 17(c)(1).

"Rule 17(c) was not intended to provide an additional means of discovery" to a defendant in a criminal case. Bowman Dairy Co. v. United States, 341 U.S. 214, 220 (1951). "Its chief innovation was to expedite the trial by providing a time and place before trial for the inspection of the subpoenaed materials." Id. (citing United States v. Md. & Va. Milk Producers Ass'n, 9 F.R.D. 509, 510 (D.D.C. 1949)).

Rule 17(c) authorizes the use of "pre-trial subpoenas" to obtain admissible evidence, as well as "service of subpoenas that are returnable at trial ('trial subpoenas') to obtain impeachment material." United States v. Percoco, No. 16 Cr. 776(VES), 2018 WL 9539131, at *1 (S.D.N.Y. June 14, 2018) (citing United States v. Skelos, No. 15-CR-317 (KMW), 2018 WL 2254538, at *2 (S.D.N.Y. May 17, 2018); United States v. Seabrook, No. 16-CR-467 (ALC),

2017 WL 4838311, at *2 (S.D.N.Y. Oct. 23, 2017); United States v. Cuthbertson, 630 F.2d 139, 144 (3d Cir. 1980). "Unlike subpoenas that are returnable prior to trial, however, subpoenas for impeachment material are only returnable 'if and when[ ] the witness who has made the statement takes the stand and testifies. The defendant only then is entitled to inspect [these] statements. . . .'" Id. (quoting United States v. James, No. 02-CV-0778 (SJ)(CLP), 2007 WL 914242, at *29 (E.D.N.Y. Mar. 21, 2007) (quoting United States v. Palermo, 21 F.R.D. 11, 13 (S.D.N.Y. 1957))).

United States v. Nixon, 418 U.S. 683 (1974) provides the standard of review for both "pre-trial subpoena[s]" seeking admissible evidence and "trial subpoenas for impeachment material." As the Percoco court noted,

> [a]lthough the Nixon case addressed a pre-trial subpoena, the same standard has been applied to trial subpoenas for documents. See Seabrook, 2017 WL 4838311, at *2 (applying Nixon to a trial subpoena for impeachment material); United States v. Pac. Gas & Elec. Co., No. 14-CR-175 (TEH), 2016 WL 3365754, at *3 (N.D. Cal. June 17, 2016) ("the same standard applies" to Rule 17(c) trial subpoenas as Rule 17(c) pre-trial subpoenas) (citing United States v. Pac. Gas & Elec. Co., No. 14-CR-175 (TEH), 2016 WL 3350326, at *2 n.5 (N.D. Cal. June 16, 2016) (citing United States v. Fields, 663 F.2d 880, 881 (9th Cir. 1981))); United States v. Peavler, No. 15-CR-14-GFVT-REW, 2017 WL 1018304, at *2 (E.D. Ky. Mar. 10, 2017) ("The same general standard applies to subpoenaed production of documents at the time of trial.").

Percoco, 2018 WL 9539131, at *2.

A Rule 17(c) subpoena must meet the tests of "(1) relevancy; (2) admissibility; [and] (3) specificity." Nixon, 418 U.S. at 700; see also Seabrook, 2017 WL 4838311, at *1 (Rule 17(c) "subpoena must meet three criteria: '(1) relevancy; (2) admissibility; [and] (3) specificity'" (quoting United States v. Ulbricht, 858 F.3d 71, 109 (2d Cir. 2017) (citing Nixon, 418 U.S. at 700))); United States v. Barcelo, No. 13-CR-38 RJS, 2014 WL 4058066, at *4, *15 (S.D.N.Y. Aug. 15, 2014) (denying Rule 33 motion premised on quashing of Rule 17(c)

6

subpoena that did not meet Nixon standards for admissibility and specificity), aff'd, 628 F. App'x 36 (2d Cir. 2015)).

Accordingly, a party seeking a Rule 17(c) subpoena

> must show:  (1) that the documents are evidentiary and relevant; (2) that they are not otherwise procurable reasonably in advance of trial by exercise of due diligence; (3) that the party cannot properly prepare for trial without such production and inspection . . . and that the failure to obtain such inspection may tend unreasonably to delay the trial; and (4) that the application is made in good faith and is not intended as a general "fishing expedition."

Nixon, 418 U.S. at 699-700 (citing United States v. Iozia, 13 F.R.D. 335, 338 (S.D.N.Y. 1952) (Weinfeld, J.)) (footnote omitted).

While the specificity requirement is intended "'to provide the subpoenaed party or other party having standing with enough knowledge about what documents are being requested so as to lodge any objections on relevancy or admissibility,'" this requirement also "ensures that a Rule 17(c) subpoena will not be used as a 'fishing expedition to see what may turn up.'" United States v. Libby, 432 F. Supp. 2d 26, 32 (D.D.C. 2006) (quoting United States v. Anderson, 31 F. Supp. 2d 933, 945 (D. Kan. 1998); United States v. King, 164 F.R.D. 542, 545 (D. Kan. 1996)).

> In order to avoid speculation that the moving party is using Rule 17(c) to circumvent normal discovery requirements, the party's Rule 17(c) subpoena "must be able to 'reasonably specify the information contained or believed to be contained in the documents sought' rather than 'merely hop[e] that something useful will turn up.'" Subpoenas seeking "any and all" materials, without mention of "specific admissible evidence," justify the inference that the defense is engaging in the type of "fishing expedition" prohibited by Nixon.

United States v. Mendinueta-Ibarro, 956 F. Supp. 2d 511, 512-513 (S.D.N.Y. 2013) (quoting United States v. Louis, No. 04 Cr. 203(LTS), 2005 WL 180885, at *5 (S.D.N.Y. Jan. 27, 2005)) (alteration in Louis) (quashing subpoena that requested "'any and all writings and records' related to the [police department's] contact with a particular confidential witness").

7

As a general rule, "the need for evidence to impeach witnesses is insufficient to require its production in advance of trial." Nixon, 418 U.S. at 701-02 (citing United States v. Carter, 15 F.R.D. 367, 371 (D.D.C. 1954)); see also United States v. Weissman, No. 01 CR. 529 (BSJ), 2002 WL 31875410, at *1 (S.D.N.Y. Dec. 26, 2002) ("[S]everal cases articulate an absolute prohibition on the use of a Rule 17(c) subpoena solely for impeachment purposes."); United States v. Cherry, 876 F. Supp. 547, 553 (S.D.N.Y. 1995) ("Courts have consistently interpreted the admissibility standard of Rule 17(c) to preclude production of materials whose evidentiary use is limited to impeachment.") (collecting cases).

As to impeachment material sought for use at trial,

> [e]vidence showing a witness's motive to cooperate, showing bias, or containing prior inconsistent statements . . . does not become relevant until the witness testifies. For this reason, many courts have held that production of impeaching evidence pursuant to Rule 17(c) is not required until after the witness testifies. United States v. Seabrook, No. 16-CR-467, 2017 WL 4838311, at *2 (S.D.N.Y. Oct. 23, 2017) (Carter, J.) ("[D]espite the fact that it is a virtual certainty that [the witness] will testify in this matter, the weight of the authority in this Circuit favors production when the witness testifies."); United States v. Giampa, No. S 92 CR. 437 (PKL), 1992 WL 296440, at *4 (S.D.N.Y. Oct. 7, 1992) (Leisure, J.) (modifying subpoenas for impeachment materials "to make them returnable at the time when [the witness] testifies at trial"). To avoid delay in trial, courts sometimes require production of impeaching material to the court (but not to counsel), with the court reviewing these documents in camera and then disclosing any admissible documents only after the witness testifies. United States v. Cuthbertson, 630 F.2d 139, 145 (3d Cir. 1980) (affirming decision of district court requiring "pretrial production to the court" in order "to avoid unnecessary delay and disruption of the trial").

United States v. Skelos, No. 15-CR-317 (KMW), 2018 WL 2254538, at *2 (S.D.N.Y. May 17, 2018).

"[T]he rationale behind the well-established rule that impeachment materials are generally not subject to pretrial production applies with equal force to a request that such documents be produced on the first day of trial. Impeachment statements are generally not subject to pretrial production under Rule 17(c) because such statements ripen into evidentiary

8

material for purposes of impeachment only if and when the witness testifies at trial." United States v. Giampa, No. S 92 CR. 437 (PKL), 1992 WL 296440, at *3 (S.D.N.Y. Oct. 7, 1992) (internal citations and quotation marks omitted). "Once a witness has testified at trial, however, prior inconsistent statements of the witness become admissible against him on cross-examination to undermine his credibility." United States v. Ferguson, No. 3:06-CR137(CFD), 2007 WL 4577303, at *1 (D. Conn. Dec. 26, 2007).

## II.   ANALYSIS

### A.   Relevancy and Specificity

Avenatti contends that email and text message communications between Franklin and Auerbach that (1) mention Avenatti, and (2) were transmitted after Avenatti's March 25, 2019 arrest,

> are certain to contain relevant information about this case because the only logical reason they would be mentioning Mr. Avenatti is in relation to the charges in this case. Neither one had any prior relationship with Mr. Avenatti. . . . Moreover, this request is sufficiently specific in that it is limited to communications between two government witnesses about a specific subject matter – Mr. Avenatti. See United States v. Skelos, No. 15 Cr 317, 2018 WL 22545438, *6-7 (S.D.N.Y. May 17, 2018) ("This request meets the specificity requirement of Nixon in that it specifies communications with a particular person on a particular subject matter.").

(Jan. 16, 2020 Joint Ltr. (Dkt. No. 158) at 4-5)

Auerbach and Franklin contend, however, that emails and text messages they sent to each other after Avenatti's arrest are irrelevant, because "[n]either Mr. Franklin nor Mr. Auerbach . . . had any communication with Mr. Avenatti subsequent to his arrest," and post-arrest communications will not shed light on what Franklin and Auerbach told Avenatti prior to his arrest. (Id. at 3) Franklin and Auerbach further contend that Avenatti has not "put forward a narrowly tailored request":

9

> [T]he request is not specific. The Defendant could have sought text messages or emails tending to show that Mr. Franklin knew of and consented to Defendant's proposal to Nike, but rather than doing so, he embarked on "the proverbial 'fishing expedition' prohibited under the case law." . . . This request . . . seeks communications transmitted <u>after</u> the alleged conduct forming the basis of the government's operative indictment.

(Id. at 3 (emphasis in original))

This Court agrees that Avenatti's request is not sufficiently specific. In seeking all communications that reference Avenatti over a nine-month period following Avenatti's March 25, 2019 arrest, the Defendant sweeps too broadly. His request has the earmarks of a "fishing expedition" premised on a "'mere[] hop[e] that something useful will turn up.'" Mendinueta-Ibarro, 956 F. Supp. 2d at 512-13 (quoting Louis, 2005 WL 180885, at *5). Indeed, Avenatti has offered only speculation as to what Franklin and Auerbach might have said about Avenatti in text messages and emails transmitted in the nine months following Avenatti's arrest.[2]

---

[2] Moreover, as this Court has noted in a different context, text messages and emails that Avenatti never saw cannot be used to prove his statement of mind, and communications that took place on or after March 25, 2019 have little probative value, because Avenatti terminated his alleged illegal scheme shortly before his March 25 arrest:

> Information that was never conveyed to Avenatti and communications that he never saw are irrelevant, because the trial is about his state of mind. The prerequisite for admission of such information and communications is proof that the information and communications was shared with him; in other words, that the information and communications could have influenced his thinking and state of mind during the relevant time period. Text messages, e-mail statements, and other documentary information that Avenatti never saw at the time may be useful to refresh the recollection of other witnesses or to impeach witnesses, such as Franklin and Auerbach, as to what they said to Avenatti about their goals for the approach to Nike. But I see no role for such information and communications as direct evidence.
>
> As to the time period that is relevant here, the relevant time period ended when Avenatti blew up the alleged scheme by announcing on March 25, 2019, at about 12:16 p.m., that he intended to hold a press conference to disclose Nike's alleged criminal conduct. The government contends that he took this step after learning that the FBI had approached Franklin. The government will argue that Avenatti knew then that Nike wouldn't be paying any money to him and that, to use his colorful phrase, he would not be riding off into the sunset. Because the alleged unlawful scheme was predicated on alleged threats to damage

Because Avenatti can only speculate about what might be in communications between Franklin and Auerbach that took place during the nine months after his arrest, he does not even assert that these communications contain impeachment material. See Jan. 16, 2020 Joint Ltr. (Dkt. No. 158) at 4-5.  And Avenatti's suggestion that the Court conduct an in camera review of any text messages or emails that Franklin and Auerbach might have exchanged between March 25, 2019 and December 27, 2019, see id. at 5, does not cure the defect in his application.  In order to obtain enforcement of a Rule 17(c) subpoena, Avenatti must demonstrate that the emails and text messages he seeks either contain admissible evidence or impeachment material.  See Nixon, 418 U.S. at 700 (a defendant must show that "the materials sought" are "admissible"); Skelos, 2018 WL 2254538, at *2 ("[D]ocuments containing prior statements of a witness that are inconsistent with that witness's testimony at trial can be admissible under Federal Rule of Evidence 613, and so can be the proper subject of a Rule 17(c) subpoena." (citing United States v. Ferguson, No. 3:06-CR137(CFD), 2007 WL 4577303, at *3 (D. Conn. Dec. 26, 2007) (holding that prior inconsistent statements of testifying witnesses are "properly within the scope of [a] Rule 17(c) subpoena").  Because Avenatti has not met this standard, Franklin and Auerbach's motion to quash will be granted.

---

Nike's reputation, and on an alleged corrupt overture in which Avenatti allegedly offered to betray his client and suppress evidence of Nike's alleged misconduct in exchange for a bribe, his announcement of the press conference marked the effective termination of the alleged scheme, which was, of course, predicated on secrecy.

(Jan. 27, 2020 Conf. Tr. (Dkt. No. 221) at 5-6)  Accordingly, Avenatti has not demonstrated that post-March 25, 2019 communications between Franklin and Auerbach are likely to contain admissible evidence.

11

## **CONCLUSION**

For the reasons stated above, Franklin and Auerbach's motion to quash Defendant's Rule 17(c) subpoena (Dkt. No. 158) is granted.

Dated: New York, New York
January 30, 2020

SO ORDERED.

*Paul G. Gardephe*

Paul G. Gardephe
United States District Judge