February 4, 2020

**Via ECF**
Honorable Paul G. Gardephe
United States District Judge
Thurgood Marshall U.S. Courthouse
40 Foley Square
New York, NY 10007

>           Re:    *United States v. Avenatti,* **No. S1 19 Cr. 373 (PGG)**
>                  **Supplemental Letter Regarding "Motive" Evidence**

Dear Judge Gardephe:

In light of the government's proffer of the testimony of Judith Regnier (Dkt. No. 212), Mr. Avenatti's former office manager, Mr. Avenatti renews his request that it be excluded.

The Court has previously ruled that certain limited evidence of Mr. Avenatti's financial condition may be offered in the government's case-in-chief, over defense objection. As the Court held, the government already has abundant motive evidence of Mr. Avenatti, ruling that the allegation that he "sought to extort $15 to $25 million from Nike" shows that a "powerful motive exists whether or not Avenatti was in debt." (1/22/20 tr. at 7). It also held that, given "that Avenatti does not intend to put his financial condition at issue, the Government's proposed financial condition evidence has limited probative value." (*Id*.). Finally, the Court held that the "Government's proposed evidence carries a significant risk of unfair prejudice to Avenatti." (*Id.* at 13).

The Court also held, however, that "[t]his is not to say that the proposed evidence has no probative value," given the allegations that the nearly $11 million in financial obligations "became pressing within a few months of March 2019," and given the proffered testimony of Mr. Avenatti's former office manager "that he linked his activities in March 2019 to a desire and plan to pay off his debts." (*Id.* at 7-8). Ultimately, the Court ruled that it would allow the government to introduce evidence regarding judgments against Mr. Avenatti, redacted to omit how those specific obligations arose. It excluded evidence regarding any debt owed to Mr. Geragos (*id.* at 14, 16) and it excluded testimony from Ms. Regnier regarding her estimate that Mr. Avenatti's debts totaled $20-$25 million. (*Id.* at 16-17). The issue of the contours of Mr. Regnier's testimony was left open, with the government stating that it would provide a supplemental proffer of her testimony, which it provided on January 27, 2020. (*See* Dkt. No. 212).

In light of that proffer, the defense renews its objection to *any* testimony from Ms. Regnier. As a preliminary matter, Mr. Avenatti continues to object, under Rule 403, to the admission of any

evidence of his financial condition as evidence of his purported "motive." As the Court has held, the probative value of such evidence is limited and the risk of unfair prejudice is high, and there is also a concern that the admission of such evidence will be cumulative and excessive and create a mini-trial within this trial.

As the Court has held, the allegations alone provide "powerful" evidence of "motive." Further, in keeping with the Court's ruling (but while maintaining our objection), the parties have agreed to stipulate to the authenticity of certain financial obligations. Moreover, the government has marked as an exhibit a text exchange between Messrs. Avenatti and Geragos that gives the government all the more evidence from which to argue "motive." In a text message on March 18, 2019 – the day before the first meeting with BSF – Messrs. Avenatti and Geragos discuss a retainer from a joint client that Mr. Avenatti states that he "need[s]", Mr. Avenatti wrote:

> I need real money. Real money. And if I can't get that then I'm not going to waste my time. I would rather have the exposure than some promise of money some day in the future. $250k is nothing to this woman.[1] I can't keep counting on significant money that doesn't materialize. I'm in a bind.

(See GX 103F). The next text from Mr. Avenatti to Mr. Geragos reads: "I met with the Nike client this evening. They are dead to rights." (*Id.*). This series of text messages more than makes the point that the government seeks to make with the financial obligations evidence and Ms. Regnier's testimony. The Court has already stated its concern about "getting to the point of cumulative, excessive waste of time" (1/27/20 tr. at 58) and that it "cannot permit the trial to devolve into a lengthy analysis of Avenatti's financial condition." (1/22/20 tr. at 15). Allowing Ms. Regnier's testimony on top of this series of text messages and on top of the evidence regarding $11 million of debt is the very definition of evidence that is cumulative and excessive.

In a January 27, 2020 letter, the government indicated that it will seek to admit several pieces of testimony and evidence through Ms. Regnier. That specific evidence, and Mr. Avenatti's specific objections, are set forth below.

First, the government seeks to admit evidence about the "poor financial state" of Mr. Avenatti's former law firm, including that it had $11,000 in overdue health insurance; "about how difficult it was for the law firm to continue to function given its outstanding debts;" and about how the defendant's new law firm would not be able to engage appropriately and efficiently in the practice of law if Eagan Avenatti's debts were not paid, because vendors would not be willing to do business with the defendant and/or his firm." (Dkt. No. 212:2).[2]

This proffered testimony about the law firm's general financial state should be excluded. Again, it is excessive, cumulative and will raise numerous questions to which the defense will need

---

[1] The government proposes to redact this last sentence pertaining to the $250k, to which we object.

[2] The government initially sought to include testimony about a $10,000,000 judgment and approximately $2.4 million in unpaid bills to vendors (Dkt. No. 212:1-2). As we understand it, the government no longer seeks to introduce this evidence in light of the Court's rulings.

to respond. For example, by March 2019, the $11,000 in overdue health insurance premiums may have been a firm obligation that was payable not by Mr. Avenatti, but by a receiver who was in place as of February 2019. And Ms. Regnier proffered to the government that, in fact, the notice that the government seeks to introduce (GX 111) was at least partially in error: "The healthcare company claimed they didn't make payments since December but they did pay until January, so they weren't that far behind in payments, so it was partly a mix-up." (See 3514-001 at 12). Thus, there are factual questions that the defense may now have to address that are thorny and will take up excessive time to address. Moreover, the introduction of such evidence of lapsed health insurance for employees would be highly prejudicial and could prompt an emotional reaction from the jury.

Second, the government seeks to admit Ms. Regnier's testimony that she spoke with Mr. Avenatti in March 2019 about whether or not the firm would be able to meet its March 15, 2019 payroll obligation, as well as a text message that she wrote to the defendant on March 15, stating: "let me know what to tell people on payroll." Further, the government proposes to introduce evidence that, after the firm received a $100,000 wire transfer from Mr. Geragos' firm for a new joint client, it paid payroll, four days late (on March 19, 2019).

This testimony is also highly prejudicial and evidence of lapsed payroll likewise could provoke an emotional reaction from the jurors. In addition, it also raises a host of questions that will have to be addressed and that will risk causing the trial to "devolve" into a mini-trial. The March 15 text message is of very limited probative value because it comes right before a number of incoming wire transfers and right before payroll *was in fact paid*, according to the Union Bank records that the government will seek to offer as GX 540. And to tell this full story, it will be necessary to show that one of those wires is from Mr. Geragos' firm – evidence that the Court already has excluded. Should the Court reconsider its prior ruling and now permit the government to offer evidence of this incoming wire from Mr. Geragos, it will be necessary for the defense to explain the relationship of Messrs. Geragos and Avenatti as co-counsel with respect to a joint engagement for a client in a matter that was pending in the Eastern District of New York in March 2019.

Finally, the government seeks to admit Mr. Regnier's testimony that, sometime between March 15 and March 25, 2019, Mr. Avenatti called her to say "that he was about to receive enough money to pay off his personal and business debts," that he sounded "enthusiastic and excited" and that he "indicated that, after receiving that money, he would be able to live his life the way he wanted to."  While the Court has previously ruled that this evidence may be offered, it did so because of the proffer that this testimony linked his financial condition to his activities in March 2019. (See, e.g., 1/22/20 tr. at 49).  Indeed, it was based on this "link" that the Court allowed any of the financial condition evidence. (*See* 1/22/20 tr. at 15: "Given that the government has proffered testimony from the office manager that links Avenatti's alleged criminal conduct to debts that he owed at the time, I will allow the government to introduce evidence that has not been seriously disputed.").  Yet, on closer inspection, the proffered testimony provides no such link. The defense has found only two references to such testimony within the 3500 materials. First, on March 25, 2019 (the day of Mr. Avenatti's arrest), Ms. Regnier stated that she "did not know why

AVENATTI was currently in New York. She wasn't aware of what was going on with Nike. AVENATTI did tell her he was working on something and if he got, then he could set up a new firm." (3514-001 at p.14). Second, on November 26, 2019, Ms. Regnier stated:

> Sometime mid-march, Avenatti called Regnier and told her that he had an arrangement with Geragos and that it would bring in a large source of income. Avenatti said it would settle all their debts and bring in a continuing source of income. Avenatti may have said something about "in-house" or "internal investigation." Avenatti was enthusiastic and excited, and indicated this would allow him to live his life the way he wanted to… Regnier does not recall if he mentioned Nike during this time… Regnier does not believe that Avenatti mentioned he had a new client. Regnier thought that Geragos was the one bringing Avenatti into the case. Avenatti never mentioned a settlement.

(3514-003 at p. 4, 5). Further, Ms. Regnier stated that she had never heard of Gary Franklin or any of the BSF or Nike lawyers. (*Id.* at p.5). Finally, Ms. Regnier stated repeatedly throughout her proffers that there was much about Mr. Avenatti's finances, clients, and practice of which she was unaware. (See, e.g., 354-001 at p.2, 3, 7).

Ms. Regnier thus provides no clear link between Mr. Avenatti's financial condition and his alleged criminal conduct involving Nike. Ms. Regnier was not even aware of Mr. Franklin, Nike, or any of Nike's lawyers.  Messrs. Avenatti and Geragos had several litigation matters in which they were either involved or were discussing doing together, including representing a client in a pending case in the Eastern District of New York, whom Mr. Geragos was already representing, about whom the two had a number of discussions in mid-March 2019 (and, indeed, which is the subject of the text message quoted above), and which ultimately resulted in an engagement of Mr. Avenatti via Mr. Geragos on or about March 19, 2019. And indeed, Mr. Geragos did wire Mr. Avenatti funds in connection with the EDNY matter – which allowed Mr. Avenatti's firm to pay its payroll and other debts, and which would have continued to be a source of income going forward. This is more consistent with Ms. Regnier's testimony and her belief that it was Mr. Geragos who referred the matter to Mr. Avenatti.  The closest the testimony comes to providing a link to the conduct at issue here is Ms. Regnier's statement (not at the March 25 proffer but many months later), in which she said that "Avenatti *may* have said something about 'in-house' or 'internal investigation.'" Just as with her earlier-proffered speculative testimony about her estimate that Mr. Avenatti had $20-$25 million in debt (which the Court excluded), this speculative testimony is highly objectionable and should not be admitted.  In short, the proffered testimony is confusing, could refer to other matters with Mr. Geragos, and does not clearly link to the Nike meetings.

Given the low probative value of Mrs. Regnier testimony – particularly in light of the evidence of "motive" that the government already has in the form of evidence of $11 million of debt, the March 18 text message with Mr. Geragos that Mr. Avenatti needed "real money" quickly, and the allegation itself of a $15-$25 million demand – and the high prejudicial value of that testimony, the defense submits that it should be excluded altogether.

4

Respectfully,

/s/ Scott A. Srebnick
Scott A. Srebnick
Jose M. Quinon
E. Danya Perry