February 8, 2020

**Via ECF**
Honorable Paul G. Gardephe
United States District Judge
Thurgood Marshall U.S. Courthouse
40 Foley Square
New York, NY 10007

    Re:    *United States v. Avenatti*, No. S1 19 Cr. 373 (PGG)
            **Defense Proffers of Testimony**

Dear Judge Gardephe:

    Pursuant to the Court's directive yesterday, we proffer the expected testimony of the defense witnesses that Mr. Avenatti proposes to call in his defense case. None of them have volunteered for a pre-trial interview, so the proffers below are based in large measure on the discovery and Jencks material available to Mr. Avenatti.

**Tina Glandian**:

1. She joined Geragos & Geragos in 2005 and is now a partner.
2. She works in the areas of criminal defense and civil litigation. Mr. Geragos began as a criminal defense lawyer but also has a civil practice.
3. Both Ms. Glandian and Mr. Geragos have represented clients in many litigations and negotiations.
4. As of March 2019, the firm had offices in Los Angeles, Las Vegas, New York and Rhode Island, employing upwards of 20 attorneys, is highly profitable, and has sufficient active clients that the firm can decline to accept new cases, yet remain profitable.
5. By March 2019, Mr. Geragos had amassed substantial personal wealth, including real estate holdings worth millions of dollars.
6. The firm has settled more than one case in which the firm's fees exceeded the award/settlement to the client, and the settlement included an agreement for the defendant to implement reforms.
7. The firm has conducted a number of internal investigations, including with regard to concerns about back-dating of stock options and another regarding toxic waste at a shipyard.

8. Ms. Glandian was personally acquainted with Mr. Avenatti and spoke with him on multiple occasions about the Geragos firm.
9. Mr. Avenatti and Mr. Geragos knew each other personally and had at least one joint client.
10. Mr. Avenatti discussed referring "overflow cases" to the firm.
11. During conversations she and Mr. Geragos had with Mr. Avenatti they made Mr. Avenatti aware of the firm's capabilities.
12. In connection with Geragos' representation of a high-profile NFL football player (Kaepernick) who had a dispute with Nike over an endorsement relationship, the Geragos firm initially threatened to sue Nike, including a threat to publicly expose Nike for its treatment of the NFL football player.  Mr. Geragos worked directly with the Nike in-house legal team to reach a favorable resolution on behalf of the NFL football player.
13. Mr. Geragos developed a collaborative relationship with Nike and felt that the successful negotiation of that dispute is a part of his legacy.
14. On the March 20, 2019 call, Ms. Glandian listened to a few minutes of the call that Geragos and Avenatti had with Nike; she heard Michael being pushy and aggressive; she told Mr. Geragos something to the effect that it was just "Michael being Michael."
15. Ms. Glandian was present for short, non-substantive portions of the March 19 and March 21 meetings at the firm's offices and spoke with both Avenatti and Geragos afterwards; Glandian did not ever hear Geragos tell Avenatti that Geragos disapproved anything Avenatti said during the meetings and call with Nike.

**John Slusher**

1. Slusher participated in a phone call with Jeff Auerbach on February 6, 2019, during which Mr. Auerbach presented Mr. Franklin's claims and request for relief, which included cleaning up Elite Youth Basketball, root out the corruption and terminate the corrupt executives at Nike, starting with, but not limited, to Carlton DeBose and Jamal James.
2. Slusher's only notes of the conversation were memorialized on a single post-it note, which, similar to Auerbach's "Memo to File" (GX 304), does not mention reinstatement.  The post-it note mentions "corruption."
3. To confirm the allegations of corruption and identify / terminate any employees complicit in the alleged corruption, a company like Nike would typically need to conduct an investigation of the allegations to make an independent determination as to the truth of the allegations and whether the misconduct warranted termination and/or some other action by the company.

**Casey Kaplan**

1. Geragos contacted Kaplan to report a sensitive matter (Franklin's claims) that could present a public relations problem for Nike.

2. Geragos knew Kaplan from Geragos's representation of a high-profile NFL football player (Kaepernick), itself a sensitive matter, in which Geragos's firm threatened to publicly expose and litigate the NFL football player's allegations against Nike.
3. Geragos achieved a favorable resolution for the NFL football player.
4. Kaplan believed Geragos handled the representation of the NFL football player in a professional manner.

**Carlton Debose**

1. Debose arranged for Nike to pay handlers and family members of amateur basketball players, including players on California Supreme.
2. Debose directed Coach Franklin to create and submit to Nike false invoices that concealed those payments.
3. When debriefed by attorneys for Nike during its internal investigation, Debose advanced a false narrative regard to those payments.
4. Debose advanced the narrative as part of Nike so-called cooperation with the government investigation.
5. Debose knew that Nike might proffer his narrative to federal prosecutors and agents who were investigating Nike, in an effort to persuade the government to take no action against Nike.
6. As a result, in part, of Debose's false narrative, Nike has not satisfied its commitment to the government to provide full and truthful cooperation.

        Respectfully,

        /s/ Scott A. Srebnick
        Scott A. Srebnick
        Jose M. Quinon
        E. Danya Perry