

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

February 8, 2020

**BY ECF**

The Honorable Paul G. Gardephe
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

    Re:    *United States v. Michael Avenatti*,
                 S1 19 Cr. 373 (PGG)

Dear Judge Gardephe:

       The Government respectfully submits this letter in response to the defendant's descriptions of the testimony that he anticipates and would seek to elicit from Tina Glandian, an attorney in private practice with Mark Geragos, and Nike employees Carlton DeBose, Casey Kaplan, and John Slusher.[1] (Dkt. No. 248) ("Def. Ltr."). Glandian, DeBose, Kaplan, and Slusher have moved to quash the defendant's testimonial subpoenas. (Dkt. Nos. 226, 229, 246-47, 250.) The Government joins in Glandian's, DeBose's, Kaplan's, and Slusher's motions.[2]

    **A.  Carlton DeBose**

       DeBose's proffered testimony falls into two categories, both of which are irrelevant to the issues before the jury, and provide no defense to the crimes charged. The first category is that DeBose allegedly "arranged for Nike to pay handlers and family members of amateur basketball players, including players on California Supreme," and that he "directed Coach Franklin to create and submit to Nike false invoices that concealed those payments." (Def. Ltr. 3.) Such testimony is of the same type that this Court has repeatedly and unambiguously ruled is not admissible because (1) "it's not a defense to any charge here that Nike was engaged in corruption in connection with amateur youth basketball" and (2) "[i]n general, information about which

---

[1]  Defense counsel has represented to the Government that they have withdrawn the subpoenas that had been issued to Valecia Battle, an attorney with Boies Schiller Flexner LLP, and to Jamal James, a Nike employee.

[2]  The Government has independent standing to move to quash such subpoenas, *see, e.g.*, *United States v. Giampa*, No. 92 Cr. 437 (PKL), 1992 WL 296440, at *1-2 (S.D.N.Y. Oct. 7, 1992), and its views may in any event be considered, *see, e.g.*, *United States v. Weissman*, No. 01 Cr. 529 (BSJ), 2002 WL 31875410, at *1 n.1 (S.D.N.Y. Dec. 26, 2002). The Government previously joined in DeBose's motion. (Dkt. No. 245.)

Honorable Paul G. Gardephe
United States District Judge
February 8, 2020
Page 2

Mr. Avenatti was unaware at the time is not relevant to his state of mind." (Tr. 445.[3]) No fact to be determined by the jury's determination could be properly affected by whether DeBose would testify that he actually engaged in the conduct that the defendant now believes DeBose might have actually engaged in. What is relevant, simply put, is what the defendant himself knew at the time of the charged conduct, which already is in evidence in the form of numerous documents provided to him by Auerbach (GX 301-09, 311-12), and Franklin's and Auerbach's testimony about their conversations with the defendant. DeBose, by comparison, never interacted with the defendant at any time. In short, regardless of whether DeBose's testimony would reveal any alleged corruption at NIKE, Inc. ("Nike"), such testimony would supply no defense for the defendant, and therefore would be irrelevant. It would also be highly confusing, distracting, and materially lengthen the trial, because the Government would have no choice but to seek to place such alleged evidence in context.

The second category of testimony that the defendant seeks to elicit is the substance of what DeBose said to Nike's attorneys in the course of an internal investigation. (Def. Ltr. 3.) Setting aside the complicated question of the applicability, in whole or in part, of the attorney-client privilege to such communications, the substance of what DeBose said to Nike's attorneys during the course of an internal investigation is again entirely irrelevant to the issues before the jury, for reasons this Court already has articulated several times. For example, during the cross-examination of Robert Leinwand, a Nike in-house attorney, the Court ruled that defense counsel was permitted to inquire of Leinwand about "what Nike lawyers said to the U.S. Attorney's Office," but that questions regarding "the DeBose investigation" were impermissible. (Tr. 1251.) Specifically, the Court explained that it "d[i]dn't think the jury has to know what the source for the information [conveyed to the U.S. Attorney's Office by Nike's lawyers] was," and that "we're not going to go there because it doesn't matter what their basis was" because "[i]t just doesn't matter whether DeBose provided the information or someone else did. It really doesn't matter at all." (Tr. 1255.) The defendant's attempt to call DeBose as a witness at this trial is another attempt to "go back to the adequacy of the of the Boies internal investigation of Nike." (Tr. 1252.) But "for reasons [this Court has] explained many, many, many times, [it] can't allow the trial to turn into an examination of whether Boies Schiller did an adequate investigation of Nike. That's not the issue here." (Tr. 1252.) For the same reasons why such cross-examination of Leinwand was precluded, DeBose's testimony as to those same issues should not be permitted.

Moreover, even if DeBose had made false statements to the attorneys conducting the internal investigation, that too would have no bearing on any material issue at this trial. The Court permitted questioning of both Leinwand and of Nike outside counsel Scott Wilson concerning communications with the United States Attorney's Office regarding the internal investigation because it might conceivably provide a basis for the defendant to argue that Wilson and/or Leinwand have some bias to curry favor with the Government. Nothing DeBose might say could provide such a basis. And the defendant plainly is speculating that DeBose would testify that he "advanced a false narrative" to Nike's attorneys. (Def. Ltr. 3.) Far more likely is that DeBose would deny doing so—which provides no basis whatsoever for the argument that the defendant

---

[3] "Tr." refers to the trial transcript.

wishes to make.  Indeed, it is difficult to imagine any outcome from testimony on this point other than deep confusion by the jury as to why the testimony was being permitted by the Court at all.

**B. Casey Kaplan**

Yesterday, the Court explained that because many witnesses had testified about Mark Geragos's calls with Casey Kaplan, the defendant would have to explain "what evidence that [Kaplan has] to offer that could either make it less likely or more likely that Mr. Avenatti is guilty of the crimes he's charged with." (Tr. 1678.) The defendant has failed to make such a showing. Kaplan's proffered testimony would be of marginal relevance, at best, and would be entirely cumulative of undisputed evidence already in the record.

Wilson, as is relevant here, testified as follows:

- Kaplan is an in-house lawyer for Nike. (Tr. 400-01.)

- Geragos represented an NFL player and interfaced with Kaplan during that representation about the player's sponsorship agreement. (Tr. 199, 388-89.) Those interactions led to a continuing commercial relationship between Nike and the NFL player. (Tr. 389.)

- Geragos and Kaplan had been in contact prior to Wilson becoming involved in the purported Franklin matter. (Tr. 395.) Specifically, Wilson understood Geragos had told Kaplan that Nike had an "Adidas problem," which Wilson understood to be a "reference to the very public arrest and criminal charges of an Adidas executive for corruption related to amateur basketball." (Tr. 395-96.)

Leinwand, as is relevant here, testified as follows:

- Kaplan reports to Leinwand and is Nike's senior director of investigations and litigation. (Tr. 1146.)

- Geragos had represented an NFL player in a sports marketing deal with Nike. (Tr. 1222.) In the course of Geragos's representation of the NFL player, Geragos interacted with Kaplan and sports marketing executives at Nike. (Tr. 1224.) Specifically, Kaplan handled that matter for Nike, and Kaplan personally met with Geragos and the NFL player. (Tr. 1223.)

- In the course of Geragos's representation of the NFL player, Geragos told Kaplan that Nike had a deal with the player and that Nike was supposed to produce a signature shoe, and claimed that Nike had breached its deal with the player because it had not done so. (Tr. 1225.) Geragos also told Kaplan that if a sports marketing deal was not reached, Nike might end up in a lawsuit. (Tr. 1225.) Ultimately, Nike "concluded a sports marketing deal with the player," which was an amicable resolution. (Tr. 1225-26.)

- Kaplan was contacted by Geragos on or about March 12, 2019. (Tr. 1146, 1215, 1221.) Geragos told Kaplan that Geragos and another attorney, who had

information of an Adidas-like problem, wanted to meet right away. (Tr. 1146, 1222, 1279.) Leinwand understood that the "Adidas-like problem" referred to "information that the company was bribing specific individuals to attend a specific university." (Tr. 1146.)

- At a later point, Geragos told Kaplan that the other attorney with whom Geragos was working was the defendant. (Tr. 1147.) Kaplan then relayed that information to Leinwand. (Tr. 1147.)

- "[T]he premise of the meeting was when Mr. Geragos was talking to Mr. Kaplan that Mr. Avenatti was planning to go public with stuff. And so it was brought up on the phone about him going public." (Tr. 1277.)

Benjamin Homes, another Nike outside lawyer, testified that Geragos stated that Geragos had represented a high-profile NFL player in negotiations with Nike on a past occasion and that Geragos had initially reached out to Kaplan. (Tr. 1452-53, 1479.)

None of the above-referenced testimony by Wilson, Leinwand, and Homes is disputed. The proffered testimony by Kaplan, which would be consistent with Wilson's, Leinwand's, and Homes's testimony, provides no potential defense to the charged conduct, is of only marginal relevance, at best, and would be wholly cumulative, and therefore a waste of time. Moreover, unlike the other witnesses who have testified on this subject, Kaplan never interacted with the defendant at any point. Even if some portion of his testimony might be viewed as additive (which it is not), it is irrelevant because the defendant has suggested no connection to the defendant's state of mind. (*See* Tr. 445 ("In general, information about which Mr. Avenatti was unaware at the time is not relevant to his state of mind.").)[4]

**C. Tina Glandian**

Yesterday, the Court explained that Glandian's testimony about "the alleged competence of the Geragos firm to conduct an internal investigation" would be relevant only if, among other things, the defendant could establish that he "knew about that, [that is,] knew that they had done internal investigations in the past of large corporations such as Nike." (Tr. 1805.) The defendant seems to have ignored entirely the Court's comment. In the defendant's letter, only two of the 15 paragraphs of proffered testimony involve information purportedly conveyed to the defendant. (Def. Ltr. 2.) The defendant proffers that Glandian "spoke with [the defendant] on multiple occasions about the Geragos firm" and that "during conversations she and Mr. Geragos had with Mr. Avenatti they made Mr. Avenatti aware of the firm's capabilities." (Def. Ltr. 2.) Tellingly, the defendant does *not* claim that Glandian ever spoke to the defendant about the Geragos firm's experience, if any, in conducting internal investigations, or was present for Geragos doing so. Indeed, the Government has confirmed with Glandian, through her counsel, that she has no recollection of ever speaking with the defendant about the Geragos firm's capabilities, if any, to

---

[4] That the Government may offer certain text messages between Geragos and Kaplan (GX 206) does not change the foregoing analysis. The text messages speak for themselves, and are not offered for the state of mind of either man, but because they demonstrate that the defendant was directing and/or editing them, as shown in text messages between the defendant and Geragos. (GX 103C.)

conduct an internal investigation, and never spoke with the defendant about the concept of an internal investigation at any point. Even if she did, any such testimony should be precluded under Rule 403. The defendant is no less guilty if Geragos's firm had performed an internal investigation in the past, particularly absent any evidence whatsoever that any such investigation was akin to what he demanded Nike should pay him to do.

Glandian's proffered testimony regarding Geragos's general experience and status as a successful attorney (Def. Ltr. 1), even setting aside both hearsay concerns and a lack of connection to the defendant's contemporaneous knowledge, would also be of marginal relevance, if any, and would also be entirely cumulative.

Wilson testified as follows:

- Geragos is a "high-profile" attorney (Tr. 423) based in Los Angeles, who also has an office in New York (Tr. 388), and "had represented celebrities in criminal defense matters . . . for at least the past couple of decades" (Tr. 199). (*See also* Tr. 454 (Geragos was attorney with "national profile"); Tr. 455 ("I was familiar from the media that he had represented celebrities in Los Angeles in shoplifting or other high-profile criminal cases").)

- Geragos said he owned the office building in which Wilson met with the defendant and Geragos in New York. (Tr. 484.)

- A few days before the March 19, 2019 meeting between the defendant, Geragos, and Nike's lawyers, "Geragos said he was in Rhode Island participating in a mediation." (Tr. 203.)

Leinwand testified that Geragos "had [a] media presence," and was a "TV lawyer[] who appear[s] on TV a lot." (Tr. 1178.)

None of the above-referenced testimony by Wilson and Leinwand is disputed. The proffered testimony by Glandian on this topic, which would be consistent with prior testimony, provides no potential defense to the charged conduct, is of only marginal relevance, if any, and would be wholly cumulative, and therefore a waste of time.

The proffered testimony regarding Glandian's listening to a portion of a telephone call between the defendant, Geragos, and Nike's lawyers (Def. Ltr. 2) is also cumulative because a recording of that call already is in evidence as GX 1. To the extent that Glandian made a statement to Geragos about the portion of the call she heard ("Michael being Michael" (Def. Ltr. 2)), her out-of-court statement to Geragos expressing some type of apparent opinion about his statements or tone is inadmissible hearsay, irrelevant, and has no connection whatsoever to the defendant's state of mind. Even if Glandian's statement were taken to mean that, in her personal view, the defendant often acts in whatever manner she thought she heard on the portion of the call she heard, such an opinion would be probative of no issue in this case.

Glandian's proffered testimony that the defendant and Geragos "had at least one joint client" (Def. Ltr. 2) is equally irrelevant. The Court already has ruled that because the defendant has represented "that the financial relationship between him and Geragos is 'nuanced,' given that they serve as co-counsel in an unrelated matter and have referred matters to one another," evidence

of the defendant's and Geragos's financial relationship is inadmissible "as more prejudicial than probative under Rule 403." (Jan. 22, 2019 Tr. 16.) The Court also has precluded "reference [to] particular representations that Mr. Geragos had" (Tr. 20) and evidence that "Geragos actually represented Avenatti in some other litigation," because such evidence would be "wildly confusing to the jury" (Tr. 25). The fact that Geragos and the defendant had a "joint client," even if true, would similarly be extraordinarily confusing to the jury and would not be probative of any issue to be decided by the jury. It would also require the trial to lengthen, because the Government would have to provide context for this alleged evidence.

The other categories of Glandian's proffered testimony, such as Geragos's wealth or a prior settlement Geragos's firm had reached (Def. Ltr. 2), would similarly only conceivably be relevant if there were a connection to the defendant's contemporaneous knowledge. The defendant suggests no such connection. Accordingly, such testimony should be precluded on that ground alone. (*See* Tr. 445 ("In general, information about which Mr. Avenatti was unaware at the time is not relevant to his state of mind.").) And even if there were such a connection, any such testimony should be precluded under Rule 403. Geragos is not a defendant, and the degree to which he had a motive to commit the charged offenses is irrelevant and would be highly confusing and distracting to the jury.[5]

**D. John Slusher**

Yesterday, the Court noted that many witnesses already had testified about Jeffery Auerbach's call with John Slusher on February 6, 2019. (Tr. 1678.) In light of that undisputed record, the Court directed the defendant to establish what Slusher's testimony could "offer that could either make it less likely or more likely that Mr. Avenatti is guilty of the crimes he's charged with." (Tr. 1678.) The defendant has failed to do so. Slusher's proffered testimony is irrelevant, and to the extent that his interactions with Auerbach even arguably have some relevance, any testimony regarding those communications would be entirely cumulative of undisputed evidence already in the record.

Auerbach's memorandum describing his call with Slusher is in evidence at page six of GX 304. In addition, Auerbach testified at length regarding his communications and prior relationship with Slusher. (Tr. 710-11, 724-25, 743, 765-71, 773, 786-87, 792, 892-96, 898-902, 915, 929, 932, 943, 948-52, 1058.) Gary Franklin, Sr., also testified at length regarding his understanding from Auerbach regarding Auerbach's communications and prior relationship with Slusher. (Tr. 1533-34, 1536, 1558, 1594-99, 1636-37, 1657, 1688, 1700-01, 1704-11, 1713-17.) Wilson also testified about his knowledge of Slusher's communications with Auerbach (Tr. 403-05, 453), as did Leinwand (Tr. 1212, 1214). In light of this extensive testimony, Slusher's

---

[5] The defendant also seeks testimony from Glandian regarding Geragos's representation about the NFL player. (Def. Ltr. 2.) Such testimony would be entirely cumulative, for the reasons discussed above in the section addressing Kaplan's proffered testimony, and, in any event, should be precluded under Rule 403. The details of that representation would be confusing and distracting to the jury. Nor is there any basis to believe that the defendant contemporaneously knew or cared about those details.

Honorable Paul G. Gardephe
United States District Judge
February 8, 2020
Page 7

proffered testimony regarding his interactions with Auerbach, which is not alleged to be inconsistent with the evidence already in the record, much less materially so, would be cumulative, and therefore a waste of time.  In any event, Slusher's interaction with Auerbach—which preceded Auerbach meeting the defendant—is itself of little, if any, relevance.  And, notably, Slusher never spoke with the defendant.

The proffered testimony regarding Slusher's opinion about whether an internal investigation might be required in certain circumstances also is irrelevant and confusing.  Again, Slusher never communicated with the defendant at any point.  Slusher's own personal view, if any, about whether an internal investigation might be prudent in certain circumstances is entirely irrelevant, would be confusing and distracting to the jury, and, in any event, provides no defense to the charged crimes.

\* \* \*

For the foregoing reasons, and the reasons set forth in Glandian's, DeBose's, Kaplan's, and Slusher's motions, the Court should grant their motions to quash.

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney

By:  *Robert B. Sobelman*
 Matthew D. Podolsky
 Daniel C. Richenthal
 Robert B. Sobelman
 Assistant United States Attorneys
 (212) 637-1947/2109/2616

cc:   (by ECF)

 Counsel of Record