UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,        :

vs.                            :           S1 19 Cr. 373 (PGG)

MICHAEL AVENATTI,           :

            Defendant.       :
_____

## **DEFENDANT AVENATTI'S POST-TRIAL MOTIONS**
## **AND MEMORANDUM OF LAW IN SUPPORT**

Scott A. Srebnick
SCOTT A. SREBNICK, P.A.
201 South Biscayne Boulevard
Suite 1210
Miami, FL 33131
Telephone: (305) 285-9019
Facsimile:  (305) 377-9937
E-Mail:  Scott@srebnicklaw.com

## <u>TABLE OF CONTENTS</u>

I.      BACKGROUND ...................................................................................................1

II.     MOTION FOR JUDGMENT OF ACQUITTAL.....................................................21

        A.  There was Insufficient Evidence that Mr. Avenatti Acted "Wrongfully"
            and with "Intent to Defraud" ............................................................22

        B.  The Statutes of Conviction are Vague-as-Applied ............................................25

III.    MOTION FOR NEW TRIAL .....................................................................................30

        A.  The Court Improperly Excluded Text Messages and E-mails .........................30

        B.  The Court Abused its Discretion in its Response to a Jury Note ....................34

IV.     CONCLUSION .........................................................................................................38

Defendant Michael Avenatti, through counsel, and pursuant to Fed.R.Crim.P. 29(c) and 33, respectfully moves the Court for a judgment of acquittal on all counts or, in the alternative, for a new trial.

## I.   <u>BACKGROUND</u>

The grand jury charged Mr. Avenatti in a Superseding Indictment with a substantive violation of 18 U.S.C. §875(d) (Count One) and attempted extortion under §1951 (Count Two). The essence of those charges was that Mr. Avenatti allegedly engaged in a scheme to extort Nike by threatening to damage Nike's reputation and property and cause Nike economic harm if Nike did not agree to make multi-million-dollar payments to Mr. Avenatti while Mr. Avenatti was representing Coach Gary Franklin.  (Dkt. No. 72:4-16).

Title 18, United States Code, Section 875(d) provides that

> Whoever, with intent to extort from any person, firm, association, or corporation, any money or other thing of value, transmits in interstate or foreign commerce any communication containing any threat to injure the property or reputation of the addressee or of another … shall be fined under this title or imprisoned not more than two years, or both.

Title 18, United States Code, Section 1951(a) provides that

> Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, … shall be fined under this title or imprisoned not more than twenty years, or both.

(Emphasis added).  The grand jury also charged Mr. Avenatti in a third count with honest services wire fraud under 18 U.S.C. §§1343 and 1346.  The essence of that charge was that Mr. Avenatti allegedly defrauded Coach Franklin of his intangible right to Mr. Avenatti's honest services, by seeking payment for himself based on confidential information provided by Coach Franklin, without Coach Franklin's knowledge or approval.  (Dkt. No. 72:17).

Prior to trial, Mr. Avenatti moved to dismiss all three counts on various grounds, including that the statutes were vague as applied to Mr. Avenatti. (Dkt Nos. 28, 29, 34, 35, 74, 75). The Court denied the pretrial motions to dismiss. (Dkt. Nos. 120, 129, 146).

Jury trial commenced on January 27, 2020. The evidence[1] showed that, in or about 2006, Nike began to sponsor the California Supreme, a basketball travel team of elite high school age players coached by Gary Franklin, Sr. By 2010, Nike had created the Elite Youth Basketball League ("EYBL"), an organized league of travel teams for the top high school players, featuring more than 40 teams from around the country, including the California Supreme, with whom Nike executed sponsorship contracts. (GX 305). California Supreme attracted many talented players, including Deandre Ayton, Bol, and Brandon McCoy.

Carlton Debose was the Director of Nike Elite Youth Basketball ("EYB") and Jamal James was the Manager of Nike EYB. (GX311:4). In 2016-17, Nike executives Debose and James pressured Coach Franklin to engage in a pattern of misconduct. (Tr.1622-28). Among other things, they directed Coach Franklin to make multiple payments for the benefit of amateur players. (GX312; Tr.1622-28). They directed Coach Franklin to submit false invoices to Nike to disguise the payments as travel expenses and sponsorships. (GX312; Tr.1749, 1759). They successfully pressured him to allow two other individuals (Bol Bol's handler Mel McDonald and a California lawyer named Bryan Freedman) to take over the California Supreme "17U" team. (GX311:25-27; Tr.1627-34). Freedman's goal was to ensure that his own son would be able to play on a top 17U Elite EYB team alongside Bol Bol. (GX311:25-

---

[1] The Court is obviously very familiar with the evidence in the case, having sat through the trial and ruled on many issues throughout. Thus, this recitation of the evidence does not purport to summarize all of the evidence in the case.

27; Tr.1629-34).[2]   By 2018, DeBose and James had squeezed Coach Franklin out of his contract involving his 17U team and informed Coach Franklin that they would not renew the contract for any of the California Supreme teams for the following season.  (Tr.1629-34).

Beginning in February 2018, after suffering considerable damage to his brand and reputation as the leader of California Supreme, Coach Franklin solicited advice from Jeffrey Auerbach, the Managing Director of Bedford Consulting and an entertainment industry consultant with considerable prior experience in professional sports management.  (GX 301:2-4; Tr.1634).   By then, the USAO-SDNY had brought a criminal case against several Adidas executives in connection with a scheme to bribe high school basketball players to attend and play for universities that had contracts with Adidas.  (*E.g.,* Tr.349, 1654, 1707, GX601). Moreover, the USAO-SDNY had served a grand jury subpoena on Nike EYBL in September 2017, in connection with that investigation, seeking production of documents related to payments to amateur players.  (DX OO).

Over the course of the next year – long before they first approached Mr. Avenatti to get involved in early March 2019 – Mr. Auerbach and Coach Franklin strategized how to hold Nike and its executives accountable for the corruption so that the Nike executives could not harm any other coaches.  (*E.g.,* Tr.717, 914-15, 1072).   Mr. Auerbach, on behalf of and in conjunction with Coach Franklin, began to compile substantial evidence related to Nike's misconduct. They discussed contacting John Slusher, the number two executive at Nike, to

---

[2] According to Coach Franklin, between approximately 2014 and 2016, attorney Freedman made multiple offers of payment (totaling more than $100,000) to Coach Franklin for Freedman's son to start on California Supreme's 16U and 17U elite teams.  (GX 311:25-27).  Coach Franklin rejected those offers, so Freedman enlisted the assistance of the Nike executives to pressure Coach Franklin and help wrest control of the 17U team from him.  (Tr.1630-32).

arrange a meeting to report the misconduct and seek restitution and justice from Nike. (*E.g.,* Tr.1638-39). They prepared a Memorandum of Actions outlining the misconduct and assembled other documents relevant to Coach Franklin's grievance. (GX312). They communicated by text and e-mail on a regular basis, almost daily during some months, and had lengthy phone conversations. (Tr.1638-39). They contemplated retaining counsel, approaching the FBI to report Nike's extortionate conduct, and/or suing Nike. Mr. Auerbach reviewed the civil racketeering lawsuit that had been filed by a basketball player named Brian Bowen against Adidas and the individuals who had been criminally charged and convicted in the Adidas scandal. *See Bowen v. Adidas America, Inc., et al*, Case No. 3:18-cv-03118-JFA (D.S.C. Nov. 19, 2018) (Tr.778-79, GX306).

In January 2019, Coach Franklin sent an e-mail/letter to attorney Trent Copeland to get advice regarding his dispute with Nike. (Tr.952-54, Tr.1683-89). In the letter, Coach Franklin told Mr. Copeland that he, Coach Franklin, wanted to inform Nike's senior management of excessive corporate corruption, that the corruption was perpetrated by Nike EYB executives in 2016-17, and that he wanted to demand that Nike immediately terminate the executives involved and report the wrongdoings to the FBI. (Tr.1684-85). Coach Franklin also told Mr. Copeland that Coach Franklin wanted Nike to clean up and reorganize Nike EYB and grassroots basketball and commit to installing new management and procedures to best prevent this abuse and criminal activity from happening in the future. (Tr.1685-86). Coach Franklin told Mr. Copeland that he, Coach Franklin, wanted Nike to commit to full financial restitution to California Supreme and pay for all of his legal and other related expenses in this matter. (Tr.1686). Coach Franklin told Mr. Copeland that he, Coach Franklin, would seek justice by immediately going to the FBI if Nike did not promptly agree to his demands. Coach Franklin

told Mr. Copeland that Mr. Auerbach was ready to call the number two guy at Nike (John Slusher). (Tr.1688).

On or about February 6, 2019 – after a year of proposing to contact John Slusher -- Mr. Auerbach finally called Slusher and prepared a memorandum of his conversation. (GX 304:6). Among other things, Mr. Auerbach told Slusher that:

- Coach Franklin "endured workplace bullying and abuse for over 2 years" by Nike executives DeBose and James;

- "There was ongoing corruption and illicit schemes being carried out by DeBose and James and how they brought this corruption into California Supreme, directing Gary to submit fake invoices, make cash and bank-wire payments to handlers and family members of top Nike elite players … similar to those in the recent DOJ-Adidas case;

- Coach Franklin had "suffered a great deal and his program severely harmed by the corruption, the abuse and the aftermath,"

- Coach Franklin "now wants ***Justice***. In addition, he's always been loyal to Nike ***and wants to help the company clean-up EYB, get rid of the corruption and corrupt execs***."

- "Justice" for Coach Franklin meant "firing DeBose and James … ***for starters.***"

(GX304:6) (emphasis added). Despite Mr. Auerbach's request that Slusher meet with Coach Franklin, Slusher instead referred them to Nike's outside counsel at Boies Schiller Flexner ("BSF") for "[a]ny additional conversation." (GX304:3).

After Slusher referred Mr. Auerbach and Coach Franklin to the BSF lawyers, Mr. Auerbach began sending videos to Coach Franklin of Mr. Avenatti appearing on television and holding press conferences, suggesting that the high-profile nature of the case might be of interest to an attorney like Mr. Avenatti. (Tr.904-08). Recognizing the expense of retaining an attorney on an hourly basis, Auerbach told Coach Franklin that:

+ ███████ Jeffrey Auerbach - Hudson 2020

Will all do respect, we're taking the approach, you can't afford ANY of these attorneys… This is a pro-bono case, or percentage of settlement (which won't move any of them). Pierre, Avenetti, and even a sole practitioner like Trent, it costs too much money to hire them… (to do it right) my gut is that the injustice to you and to the high school players, their families, schools, by Nike is the part that will attract an Avenatti (and several other factors I'll discuss with you later). It's worth reaching our and trying to meet with him… Can't hurt. (Please dear God, have him dislike Freedman! If so, that alone, will get him onboard…)

Status: Read
Read: 2/14/2019 2:30:26 PM(UTC-8)

2/14/2019 2:19:48 PM(UTC-8)

\* \* \*

+ ███████ Jeffrey Auerbach - Hudson 2020

We will appeal to their sense of justice and duty. Also the opportunity to really light the next fuse (Racketeering) in the Sneaker Company Scandal, and answer a BIG question which NIKE will not want asked, WHY HASN'T THE DOJ INDICT EXECS AT NIKE WHO COMMITTED THE SAME  CRIMES?!! WHY JUST ADIDAS?! THere's a lot at play here for a guy like Avenatti. I feel very bad John and Nike wasn't proactive and reached out to you. It forces me to devise a strategy that goes after Nike, which I NEVER intended or wanted to do. But now they are forcing the issue and acting very badly. I can only hoe once we contact their Lawyer they pony up and do the right thing, get rid of the crooks, etc. If not, they need to be exposed. And if for some strange reason the FBI and DOJ aren't pursing them like Adidas—then the question needs to be asked in a big way—WHY?

Status: Read
Read: 2/14/2019 2:30:26 PM(UTC-8)

2/14/2019 2:27:32 PM(UTC-8)

(DX FF-1; DX FF-1A).

On March 1, 2019, Mr. Auerbach contacted Mr. Avenatti for the first time; they spoke for approximately twenty minutes and, based on that conversation, Mr. Auerbach later e-mailed Mr. Avenatti that he (Avenatti) was "a source of hope for me – in a time of much despair" and "look[ed] forward to further discussing *Gary Franklin, Found/Program Director of California Supreme Youth Basketball v. Nike Elite Youth Basketball & Nike, Inc.*" (GX301). On March 4, 2019, Mr. Avenatti contacted his colleague, attorney Mark Geragos, a criminal defense lawyer with decades of experience.  (GX103A)  Mr. Geragos had a relationship with

Nike's General Counsel as a result of Geragos's recent representation of a high-profile NFL football player. Mr. Avenatti and Mr. Geragos agreed to work together on behalf of Coach Franklin and approach Nike's General Counsel to discuss a pre-lawsuit settlement of Coach Franklin's claims. (*E.g.,* GX103C).

On March 5, 2019, Mr. Avenatti met with Mr. Auerbach and Coach Franklin for the first time. During that meeting, Coach Franklin and Mr. Auerbach told Mr. Avenatti about the history of mistreatment of Coach Franklin at the hands of Nike EYB executives DeBose and James, that Coach Franklin was pressured into making payments to players families and submitting false invoices to Nike, and that DeBose and James took control over Coach Franklin's elite 17 and under team. (Tr.728-29; Tr.1622-28, 1782). Mr. Auerbach told Mr. Avenatti at the meeting that Nike had engaged in racketeering and corporate bullying, and that he wanted Nike to "self-report" to the authorities. (Tr.1750-51). Mr. Auerbach and Coach Franklin also described Coach Franklin's goals to achieve justice, which to Coach Franklin meant "ridding Nike EYB of the bad actors, meaning Carlton and Jamal, so nobody else got harmed, financial compensation for Gary for the brand and his club and his program and what he has – his losses, and working with Nike to report this to the authorities was very important to him, and then assisting them in any way in helping, you know, change the situation again so nobody could be bullied and abused like this." (Tr.1072); *see also* (Tr.717) (Auerbach: "Gary wanted to advise the company what had gone on and rid the company of what we called the bad operators in Nike EYBL executives, Carlton DeBose and Jamal James, and stop them from doing this with other people.").

On March 12, 2019, Mr. Geragos initiated communication with Casey Kaplan, Nike's Assistant General Counsel for Litigation and Internal Investigations for the purpose of setting

up a "confidential mediation discussion." (GX206). Mr. Avenatti texted Mr. Geragos a link to an article entitled "The Mounting Costs of Internal Investigations." (GX103B).

On March 18, 2019, Mr. Avenatti again met with Coach Franklin and Mr. Auerbach. Prior to that meeting, Mr. Auerbach emailed the following documents to Mr. Avenatti: a) the Memorandum of Actions (GX308); b) a copy of the "Memo to the File" summarizing Auerbach's telephone conversation with Nike executive Slusher (GX304:6); c) a file-stamped copy of the civil RICO complaint filed against Adidas in the District of South Carolina, which included claims for money damages and injunctive relief, (GX306); d) a number of media articles about the Adidas case and the NCAA investigation (GX307), and e) the California Supreme travel team contracts. (GX305). Moreover, at the meeting, Mr. Auerbach and Coach Franklin provided Mr. Avenatti with a 28-page PowerPoint presentation, captioned *Gary Franklin, California Supreme Elite Youth Basketball v. Nike USA, Inc., Nike, Inc., Nike EYB*, that they had prepared regarding their claims against Nike. (GX311). One of the slides of the PowerPoint presentation posed the following three questions:

## Question 1:

Is this a case of rogue executives Carlton DeBose & James James committing egregious criminal acts on their own, or was Nike, a fortune 100 company, complicit in the corruption?

## Question 2:

Is Nike a company which tolerates workplace bullying and abuse by its senior executives?

## Question 3:

Is Nike's enterprise, Nike EYB ("the Racket") guilty of racketeering, having committing acts of fraud, bribery, coercion, conspiracy, illegal cash payments, wire fraud, mail fraud, bank fraud, money laundering, etc.?





USAO373_00024871
FRANKLIN0081

(GX311:5).

Mr. Avenatti told Coach Franklin and Mr. Auerbach that he had a meeting set up for the following day with Nike's lawyers in New York.  Mr. Avenatti told Coach Franklin that he (Mr. Avenatti) did not believe he could get Coach Franklin's contract reinstated; instead, Mr. Avenatti told Coach Franklin that he would try to achieve three goals: 1) get Nike executives DeBose and James fired; 2) obtain a monetary settlement of $1 million for Coach Franklin; and 3) obtain whistleblower protection for Coach Franklin.  (Tr.1758-59).  Mr. Avenatti did not promise he would seek reinstatement of Coach Franklin's contract, and Coach Franklin never insisted to Mr. Avenatti that he seek reinstatement.  Mr. Auerbach estimated that the reasonable value of Coach Franklin's claim was $1 million, (Tr.967), and Coach Franklin would have been satisfied with such a monetary settlement.  (Tr.1765).

According to both Mr. Auerbach and Coach Franklin, Mr. Avenatti never mentioned in either of the two in-person meetings (March 5 & 18) or in their telephone conferences (March

19 & 21) that Mr. Avenatti would: 1) demand that Nike hire and pay him to conduct an internal investigation; 2) hold or threaten to hold a press conference; or 3) file a lawsuit.  (Tr.745-46; 797-98, 801-808; 1552-68).   Those matters were never discussed.  (*Id.*).  However, neither Mr. Auerbach nor Coach Franklin specifically told Mr. Avenatti that they did not want publicity, an internal investigation, or a lawsuit.  Both of them testified that they communicated with ***each other*** about Coach Franklin's potential lawsuit (Tr.945, 971, 1004, 1720-22, 1737-38), and Auerbach acknowledged that a lawsuit would have been filed down the road if the case did not settle.  (Tr.945).

Regardless, Coach Franklin and Mr. Auerbach agreed with each other to allow the first round of negotiations to "play out" Mr. Avenatti's way, meaning, according to Mr. Auerbach, to "let [Mr. Avenatti" deal with it the way he sees fit to get Gary's goals and accomplish his goals."  (Tr.1008-09; *see also* Tr.1766).  Moreover, Coach Franklin acknowledged telling Mr. Auerbach that he would rather obtain a higher monetary settlement than have his contract reinstated.  (Tr.1765).[3]

The first in-person meeting between Mr. Avenatti and Mr. Geragos and Nike's lawyers was held on March 19, 2019, at Mr. Geragos's law office in Manhattan.  The attorneys present at that first meeting, which was not recorded, included both Mr. Avenatti and Mr. Geragos, attorneys Scott Wilson and Ben Homes from BSF, and Rob Leinwand, an attorney at Nike with the title Vice President of Global Litigation and Employment Counsel.  BSF attorney Homes took handwritten notes at the meeting; he thereafter prepared typewritten notes of the

---

[3]  Mr. Auerbach acknowledged that neither the e-mail/letter to attorney Copeland nor the memorandum of his conversation with Slusher mentions anything about reinstatement.  (Tr.950-54).  In fact, Mr. Auerbach did not recall even asking Slusher for reinstatement.  (Tr.950-51).

same meeting.  (Tr.401).  At that meeting, Mr. Avenatti informed Nike's counsel that he represented Coach Franklin, a whistleblower who was directed to make multiple payments for the benefit of amateur players and was then squeezed out of his contract by Nike.  (Tr.211-12, 1470-71).  Mr. Avenatti told Nike's counsel that Coach Franklin had claims for breach of contract, tortious interference, and potentially other claims.  (Tr.419).  Mr. Avenatti allowed Nike's counsel to review the documentary evidence that he had brought to the meeting in support of Coach Franklin's legal claims, including but not limited to the bank statements, false invoices, and text messages.  (Tr.253).

Mr. Avenatti proposed a settlement with two components: a) that Nike pay $1.5 million to Coach Franklin for damages caused to him, understanding that the money would not preclude Coach Franklin from giving testimony to the government; and b) that Nike retain Mr. Avenatti and Mr. Geragos to conduct an internal investigation of Nike.  (Tr.267).  Mr. Avenatti stated that he would hold a press conference and publicize the allegations regarding the bribing of amateur players by Nike employees if Nike did not meet those conditions.  (Tr.244).  At that March 19, 2019, meeting, none of the Nike lawyers denied that Nike EYB was fraught with misconduct and, indeed, BSF attorney Wilson professed to have an interest in conducting an internal investigation surrounding the allegations.  (Tr.249, 415).

Immediately after the March 19, 2019, meeting, in the face of evidence of a government investigation of its own client Nike, BSF attorneys contacted the USAO-SDNY prosecutors overseeing the investigation of Nike.  (Tr.271-72).  Thereafter, over the course of the next two days, BSF attorney Scott Wilson, at the behest of the FBI, audio-recorded several telephone conversations with Mr. Geragos and one with Mr. Avenatti, on March 20, 2019, and also video-recorded an in-person meeting on March 21, 2019, again at Mr. Geragos' law office.

The court has listened to the recordings.  They do not need to be summarized in detail because the recordings speak for themselves and because Mr. Avenatti does not challenge the sufficiency of evidence that: 1) he demanded, as part of a settlement, that he and Mr. Geragos be retained to lead an internal investigation of Nike; 2) he threatened to hold a press conference if a settlement was not reached; and 3) he told Nike's lawyers that public revelation of Nike's misconduct would wipe billions of dollars off Nike's market cap.[4]

Rather, the principal dispute at trial concerned the elements of "wrongfulness" and "intent to defraud," that is whether Mr. Avenatti believed he was authorized by virtue of his representation of Coach Franklin to demand that Nike hire and pay him to conduct an internal investigation of Nike.  The government claimed that Mr. Avenatti was acting for his own benefit and, therefore, his demand for money *for himself* in connection with Coach Franklin's claim against Nike constituted both extortion and honest services fraud.  Mr. Avenatti, by contrast, contended that he believed his demand to conduct an internal investigation and be paid for it by Nike was in furtherance of Coach Franklin's overall objective of seeking justice from Nike and holding its executives accountable.

This dispute permeated the trial and, as explained below, affected all three counts.[5] Both Mr. Auerbach and Coach Franklin testified in sum and substance that: 1) Coach Franklin wanted diplomacy, not war, with Nike; 2) Coach Franklin's primary goal was simply to have

---

[4] These post-trial motions are focused on the issues relating to whether Mr. Avenatti believed he was authorized by Coach Franklin to demand to be retained by Nike to conduct an internal investigation. Thus, the contents of the recordings are largely irrelevant to the issues in this motion.

[5] There were many objections and issues raised before and at trial that were (and remain) preserved for appellate review.  In this post-trial motion, Mr. Avenatti does not seek to re-litigate all, or even most, of them.  Rather, Mr. Avenatti will focus on a few select issues regarding his state of mind that impact both his post-trial motions for judgment of acquittal and for a new trial.

his contract reinstated, not to sue Nike or cause Nike any problems; 3) Coach Franklin did not want his allegations to be made public; and 4) Coach Franklin did not want an internal investigation of Nike.  (*E.g.,* Tr.712-17, 730, 9091, 915, 962, 1534, 1543-44, 1575).  Mr. Auerbach testified that Mr. Avenatti never discussed with him demanding that Nike hire Mr. Avenatti to conduct an internal investigation. (Tr.1072-73).

But the relevant inquiry is what they told Mr. Avenatti about Coach Franklin's goals and what Mr. Avenatti understood and believed about Coach Franklin's objectives.  In that regard, there was no evidence that either Coach Franklin or Mr. Auerbach ever told Mr. Avenatti, prior to March 19-21, that they did ***not*** want an internal investigation to be led by Mr. Avenatti or a press conference exposing Nike's misconduct.  Mr. Avenatti sought to demonstrate at trial that an internal investigation and publicity were squarely within Coach Franklin's objectives, as Mr. Avenatti understood them.  To that end, on cross-examination of Coach Franklin and Mr. Auerbach, Mr. Avenatti sought to question them about, and introduce in evidence, multiple electronic communications between Mr. Auerbach and Coach Franklin (and between them and attorney Copeland and Nike executives DeBose and James) that shed light on Coach Franklin's mindset and stated objectives over the entire year immediately before Coach Franklin retained Mr. Avenatti.  (*See generally* Tr.881-1053, Tr.1639-1770; *see also* Dkt. No. 253).  Although the Court allowed Mr. Avenatti's counsel to question Mr. Auerbach and Coach Franklin generally about their recollection of the written electronic communications with each other and with others, the Court denied admission of the vast

13

majority of those written communications, with few exceptions.[6]  The Court also admonished

defense counsel to not question witnesses about whether their communications with each other

were "by way of text."  (*E.g.,* Tr.956, 960).  The Court accepted the government's argument

that, because Mr. Avenatti was not copied on the text and e-mail messages, they could be used

only to impeach Coach Franklin and Mr. Auerbach as inconsistent statements or refresh their

recollection about the communications contained within the messages.  (*E.g.,* Tr.1386-1392).

The Court reasoned that the text messages would be cumulative of the witnesses' testimony

about the communications; the Court rejected the defense arguments that the written

communications themselves were admissible as substantive evidence of the witnesses' state of

mind under Fed.R.Evid. 803(3) and as the "best evidence" of their recollection under

Fed.R.Evid. 1002.  (*E.g.,* Tr.921-927, 956, 987-997, 1386-92; Dkt. Nos. 243, 253).

      Thus, witnesses were limited to testifying about their (imperfect) recollection of text

messages and e-mails from many months earlier, and the defense was relegated to refreshing

their recollection of the text messages and e-mails; the jury was not permitted to actually see

the vast majority of those written messages.  As to the four text messages that were admitted

(DX FF-1, FF-1A, FF-911, and MM-02), the Court instructed the jury that it could consider

them only for purposes of the state of mind of Coach Franklin and Mr. Auerbach.  (Tr.2312).

      Those excluded written communications evinced Coach Franklin's desire to root out

corruption at Nike, hold Nike executives accountable, file a lawsuit against Nike corporate,

---

[6] The admitted text messages were DX FF-1, FF-1A, FF-911, and MM-02.  The excluded text messages and e-mails were DX FF-02, FF-07, FF-611, FF-613, FF-623, FF-633, FF-638, FF-647, FF-713, FF-741, FF-777, FF-886, FF-915, FF-926, FF-962, GG-2, GG-25778, MM-03, MM-04, MM-05, BBB, and EEE.  (*See* Dkt. No. 253).  The Court agreed to file the excluded exhibits under seal so that they could be a part of the record for appeal.  (Tr.1925-27).  It appears (based on the timing of the filing) that Dkt. No. 260 contains the excluded defense exhibits under seal.

and publicly expose Nike's misconduct.  For example, in the excluded e-mail from Coach

Franklin to attorney Copeland on January 8, 2019, summarized above, Coach Franklin wrote:

Begin forwarded message:

From: Gary Frank in <███████████████████
Subject: Nike EYB Business
Date: January 8, 2019 at 6:31:32 PM PST
To: Trent Cope and <█████████████
Cc: Jeffrey Auerbach ████████████████████████

Hi Trent,

In response to your question about Nike, what I'm looking for is justice and restitution.

With Jeff's help, I want to inform Nike senior management of the excessive corporate corruption, abuse
and crimes perpetrated by Nike EYB executives in 2016 and 2017 —and demand Nike immediately
terminate the executives involved, and (in coordination with me) report THESE wrongdoings and
remedies to the FBI and other federal authorities.

Further, I want Nike to commit to the following:

1. Clean up and reorganize Nike EYB and grassroots basketball by installing new management and
procedures to best prevent this type of abuse and criminal activity from happening in the future.

2. Full financial and other restitution to me and California Supreme.

3. Nike to fully indemnify me and California Supreme from any and all wrongdoing and pay for all my
legal and other related expenses in this matter.

I will make it clear to Nike, that if they don't promptly agree and/or we can't come to terms re the above,
I will seek justice by immediately going to the FBI to report the following federal crimes (with evidence)
committed by Nike EYB and its executives, including, but not limited to:

- Racketeering
- Conspiracy to commit bribery
- Bribery
- Money-laundering
- Fraud
- Extortion
- Conspiracy to commit wire fraud
- Conspiracy to commit mail fraud
- Wire fraud
- Mail fraud
- Coercion

Trent, Jeff's ready to call his friend/associate, the number #2 guy at Nike, but first we would really
appreciate your meeting with us once more for some clarity on the crimes involved and the legal
process moving forward. We'll make it work to accommodate your schedule day or night, and promise
to keep it short.

Thanks

G

(DX GG-2) (excluded).  In other excluded text messages and e-mails, Coach Franklin and Mr.

Auerbach discussed:

- "nail[ing] these corrupt EYBL execs, send them packing!" (DX FF611);

- wanting "'justice' above all else" and "turning to Nike first, in an effort to expose the illicit acts and behavior bestowed on you and your program by these certain rogue Nike EYBL executives, with the hope Nike Corporate will do the right thing and swiftly take action, investigate and fire these rogue Nike EYBL executives, who have no place in youth and amateur basketball.  If not, your plan is to go directly to the FBI within the next 5-10 days to expose everything that's transpired and seek the justice you deserve and stop further corruption and harm to others…"  (DX FF 613).

- That, in October 2018, it would be a "good time to call Slusher" because there would be "some press" while they were picking jurors in the Adidas case being prosecuted by the USAO-SDNY.  (DX FF-638).

- That Nike executive Nico Harrison would be included in the "got to go" list they would present to Slusher because Harrison "clearly can't have oversight or involvement in a reconfigured Nike EYBL."  (DX FF-741).

- That they would "giv[e] Slusher and Nike an opportunity to right their wrong, have a say in how this plays out, and control the outcome, timing and message … Something they don't deserve and will have to earn."  (DX FF-777).

- That they would "go to John Slusher and Nike to report these criminals, liars and the widespread, ongoing, corruption and abuse taking place at Nike EYB … tell John your whole story, show him proof, relay your demand for justice *and willingness to fall on the sword to get it, and ask for his/Nike's help – in return for your cooperation and their ability to control the process.*"  (DX FF-886).

- That Coach Franklin had a "much better civil racketeering case than" Brian Bowen.  (DX FF-915).[7]

- That Coach Franklin's "claim (and any potential suit) is against Nike & Nike EYB – not against Carlton, Jamal, etc.," (DX FF-962), and that Coach Franklin's "case and claim against Nike is not criminal but civil."  (DX FF-07).

- That they "need[ed] to move quickly" because once Nike executives "see Avenatti (or anyone good at this point) with what evidence you have, they will get nervous, and settle."  (DX FF-926).

---

[7] In an excluded email, Mr. Auerbach sent Coach Franklin a copy of the "Racketeering complaint and suit against Adidas by Bowen." (DX GG25778).

- That they "[g]ot to go after Nike." (DX FF-02).

- That Coach Franklin and Mr. Auerbach were pointing "heavy artillery" toward Slusher. (DX MM-03).

- That Coach Franklin and Mr. Auerbach wanted to "drop the hammer on this MTF!" (DX MM-04).

- That Coach Franklin "would much rather take the bigger settlement" than being reinstated and continue with Nike. (DX MM-03).

- That Coach Franklin and Mr. Auerbach agreed that they should "let [Mr. Avenatti's] first round of discussions play out his way. We can always visit this prior to the next round of talks." (DX MM-03).

At the close of the government's case, and again at the close of all the evidence, Mr. Avenatti moved for a judgment of acquittal on all three counts; the Court reserved ruling. (Tr.1902-1917, 2127). On February 11, 2020, the government and defense gave their summations.

On February 12, 2020, the Court instructed the jury. Among other instructions on Counts 1 and 2, the Court instructed the jury as follows:

> In order to conclude that Mr. Avenatti acted wrongfully, you must find that the government has proven beyond a reasonable doubt either that (1) in demanding that he be hired and paid to conduct an internal investigation, Avenatti understood that he was acting in furtherance of his own interests, and was not pursuing Franklin's objectives; or [(2)] Avenatti's threat of harm and demand that he be hired and paid to perform an internal investigation had no nexus to any claim of Franklin's that Avenatti reasonably believed he had been authorized by Franklin to pursue. As you can see from how these issues are posed, they do not turn on the precise amount of money that Mr. Avenatti was demanding to perform the internal investigation.

(Tr.2329-30). Among other instructions on Count 3, the Court instructed the jury on good faith as follows:

> Since an essential element of the honest services wire fraud charge is an intent to defraud, it follows that good faith on the part of Mr. Avenatti is a complete defense to this charge. Accordingly, if you find that Mr. Avenatti honestly

> believed that Mr. Franklin authorized him to demand that Nike hire him and pay
> him millions of dollars to conduct an internal investigation of Nike, then Mr.
> Avenatti acted in good faith and he did not have a specific intent to defraud.
> Moreover, the government, and not Mr. Avenatti, bears the burden of proof on
> this issue. Mr. Avenatti has no burden to prove his good faith. The burden is
> instead on the government to prove beyond a reasonable doubt that Mr. Avenatti
> acted with fraudulent intent, and did not act in good faith.

(Tr.2343-44).

On February 12, 2020, toward the end of the first day of their deliberations, the jury

demonstrated that they were laser-focused on the text messages when they asked the following

question (among a few others):

*"Were text messages in evidence only for state of mind?"*

(Court Exh. 2) (Tr.2388) (emphasis added). The following day, February 13, 2020, the Court

answered the question as follows:

> So I'm going to list for you now the text message exhibits that were
> received for state of mind. They are as follows:
>
> Government Exhibit 308, Government Exhibit 310, Government Exhibit
> 312, Defense Exhibit D1, Defense Exhibit D3, Defense Exhibit D4, Defense
> Exhibit D6, Defense Exhibit FF-1, Defense Exhibit FF-1A, Defense Exhibit FF-
> 911, Defense Exhibit I-2, Defense Exhibit MM-2.
>
> So all of those exhibits were received for purposes of state of mind.
> There are no limitations as to other text messages that were received in evidence;
> they can be considered by you for any purpose.
>
> I'm going to reread to you now the instruction in my charge about
> evidence that was received for a limited purpose.
>
> From time to time during the trial, I you [sic] told you that certain
> evidence could be considered only for a limited purpose. Where I gave you such
> an instruction, you may consider that evidence only for the purpose I identified.
> Many exhibits were admitted for purposes of Mr. Avenatti's state of mind.
> Statements and allegations contained in these exhibits cannot be relied on for
> their truth but only to the extent they shed light on Mr. Avenatti's state of mind,
> what he was thinking and what he understood at the time.

18

> I'll give you some examples.  This is not an exhaustive list.  During Mr. Auerbach's testimony, I instructed you that Government Exhibit 312, Mr. Auerbach's Memorandum of Actions, was admitted only to the extent that it sheds light on Mr. Avenatti's state of mind.  Government Exhibit 312 was not admitted for the truth of any of the allegations contained in the memorandum.
>
> Other examples of the text messages between Franklin and Auerbach that were admitted as DX FF-1, DX FF-1A and MM-2, these exhibits were admitted to the extent they shed light on Auerbach's and/or Franklin's state of mind, because their state of mind could have affected what they communicated to Avenatti and thus affected his state of mind.  You should be aware that statements, information, thoughts and desires never communicated to or reviewed by Mr. Avenatti could not have affected his statement of mind.

(Tr.2388-2389).  At 4:23 pm on February 13, 2020, the Court announced that it had received another note from the jury which, among other things, posed the following question:

> Can we draw inferences from state-of-mind documents, or only exhibits admitted for evidence?

(Tr.2391-2393) (Court Exh. 4).  The Court initially proposed that it tell the jury that "with respect to exhibits received only as to state of mind, you can consider them only to the extent you find that they shed light on state of mind, as I have explained on … pages 10 to 11 of the instructions.  As for exhibits that were received, or were admitted into evidence, with no limitation, you can consider them for all purposes."  (Tr.2398).

Defense counsel objected to this proposed response, asking the Court to instead instruct the jury as follows: "Yes, you may draw inferences from state-of-mind documents, and you may draw inferences from exhibits admitted into evidence."  (Tr.2398-99). The Court stated that defense counsel was "clearly wrong" and that the jury needed to know that they cannot "rely on state-of mind exhibits for their truth, so I have to get at that distinction."  (Tr.2399). Defense counsel explained their concern that "the jury may be asking whether they may infer, for example, from the fact that Auerbach and Franklin shared with each other certain text

messages, may they infer, logically, reasonably, that Auerbach and Franklin shared that with

Mr. Avenatti?"  (Tr.2399).  The Court rejected a simple "yes" answer because the jury "cannot

rely on state-of-mind documents as to their truth."  (Tr.2400).  Given that it was already 5pm,

and in view of the "critical importance" of the issue to Mr. Avenatti, defense counsel asked

the Court to allow counsel to research the issue overnight and answer the question for the jury

in the morning.  (Tr.2404-05).  Defense counsel stressed that "[w]e're not looking for the jury

to draw an inference as to truth from any state-of-mind exhibits.  We're looking for the jury to

draw an inference that certain states of mind were communicated to Mr. Avenatti."  (Tr.2406).

The Court overruled the request that the response be postponed until the following morning.

(Tr.2406).  Thus, over defense objection, the Court answered question 1.B in Court Exhibit 4

as follows:

> You can draw inferences from exhibits that were admitted to demonstrate state
> of mind, but only as to state of mind.  Exhibits received without any limitation
> may be considered by you for all purposes, including for their truth.  But where
> I admitted an exhibit for purposes of demonstrating state of mind, that exhibit
> can only be considered for purposes of state of mind, and not for the truth of the
> statements that were made in that exhibit.  This area is discussed in pages 10
> and 11 of the instructions.  So there is an instruction number 8 that says,
> "Evidence Received for a Limited Purpose."  So that's the instruction that
> addresses, among other things, state-of-mind evidence.  I'm going to read that
> to you in just a minute.
>
> And then the next instruction is "Direct and Circumstantial Evidence," and that
> is the instruction that addresses, among other things, the drawing of inferences
> from certain facts.  So I'm going to read that to you again also.

(Tr.2408).  The Court then proceeded to re-read the jury instructions contained at pages 10-11

of the Court's instructions.  (Tr.2408-11).  The jury did not deliberate further on February 13,

2020.

Before the jury resumed its deliberations the following morning of February 14, 2020, defense counsel filed a letter requesting that the Court further instruct the jury as follows in response to question 1.B in Court Exhibit 4:

> I instruct you that from state of mind documents, you may draw inferences, including an inference that the person who made the statement thereafter acted in accordance with the stated intent.

(Dkt. No. 264:2).  Defense counsel argued that the jury should be permitted to draw the inference from a "state of mind" document that the declarant then ***acted upon*** the state of mind. (Dkt. No. 264:1) (citing *United States v. Best*, 219 F.3d 192, 198 (2d Cir. 2000)).  That is, the jury could infer from the text messages between Mr. Auerbach and Coach Franklin that, for example, Mr. Auerbach did in fact communicate to Mr. Avenatti that they (Franklin and Auerbach) wanted Avenatti to "really light the next fuse (Racketeering) in the Sneaker Company Scandal, and answer a BIG question which Nike will not want asked, "WHY HASN'T THE DOJ INDICT EXECS AT NIKE WHO COMMITTED THE SAME CRIMES?!!  WHY JUST ADIDAS?!  There's a lot at play here for a guy like Avenatti…"

The district court declined to further instruct the jury as requested by defense counsel. Later that afternoon, on February 14, 2020, the jury returned a verdict of guilty on all counts.

## II.   <u>MOTION FOR JUDGMENT OF ACQUITTAL</u>

"A defendant challenging the sufficiency of the evidence bears a heavy burden, because the reviewing court is required to draw all permissible inferences in favor of the government and resolve all issues of credibility in favor of the jury verdict."  *United States v. Kozeny*, 667 F.3d 122, 139 (2d Cir. 2011).  A conviction must stand if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Id.*

### A.  There was Insufficient Evidence that Mr. Avenatti Acted "Wrongfully" and with "Intent to Defraud"

The evidence was insufficient to prove that Mr. Avenatti acted "wrongfully" under Counts 1 and 2 by demanding that he be hired and paid by Nike to conduct an internal investigation.  The evidence was likewise insufficient to prove that Mr. Avenatti acted with the "intent to defraud" Coach Franklin by making the same demand of Nike.  As the Court instructed the jury, the inquiry as to all three counts was basically the same: whether Mr. Avenatti understood that he was not pursuing Coach Franklin's objectives (Counts 1-2) and honestly believed he was acting without authority from Coach Franklin.  (Tr.2329-30, 2343-44).

The evidence was uncontroverted that Coach Franklin wanted to root out corruption so that what happened to him would not happen to other coaches.  Coach Franklin and his advisor, Jeffrey Auerbach, told Mr. Avenatti that Nike had engaged in racketeering and corporate bullying and that they wanted Nike to self-report.  The memorandum of the February 6, 2019, conversation between Mr. Auerbach and Nike executive John Slusher, which Mr. Auerbach provided to Mr. Avenatti, made it clear that Coach Franklin wanted justice, which meant to "***help the company clean-up EYB, get rid of the corruption and corrupt execs***."  (GX304:6).  Moreover, the PowerPoint presentation (GX311) posed three – and only three – questions, which any lawyer would reasonably understand could be answered only through an internal investigation.

Regarding how these objectives might be accomplished, Mr. Avenatti knew that Nike had been served with a federal grand jury subpoena by the USAO-SDNY in 2017.  Yet, notwithstanding the corruption of amateur athletics by Nike executives DeBose and James,

they were still employed by Nike nearly two years later.  The evidence suggested that Mr. Avenatti believed that BSF was not capable of conducting an independent investigation, and Coach Franklin did not have the power to force Nike to terminate DeBose and James, nor the money to conduct his own investigation of Nike EYBL.  Neither Mr. Auerbach nor Coach Franklin placed any restrictions on how Mr. Avenatti might seek to achieve those objectives. To the contrary, Coach Franklin and Mr. Auerbach agreed that they would allow the first round of negotiations play out Mr. Avenatti's way.  Thus, Mr. Avenatti demanded that he be retained to conduct the internal investigation.

The government presented insufficient evidence that Mr. Avenatti believed that he was exceeding the authority granted to him by Coach Franklin by demanding that he, Mr. Avenatti, be retained by Nike to conduct an internal investigation.  To be sure, it was reasonable for a lawyer in Mr. Avenatti's shoes to believe that an internal investigation was a necessary prerequisite to the ultimate firing of DeBose and James.  Ironically, Mr. Avenatti could have been faulted for not pursuing such a remedy.  The dual components of Mr. Avenatti's settlement demand in the first round of negotiations -- an internal investigation of Nike and $1.5 million for Coach Franklin – was consistent with, and in furtherance of, the goals and objectives articulated by Coach Franklin.  Importantly, Mr. Avenatti never signed any settlement agreement without Coach Franklin's approval and never did anything to impair Coach Franklin's substantive rights; any settlement would have required Coach Franklin's signature.  (GX205).

In deciding whether Mr. Avenatti honestly believed he was acting within the scope of his authority as Coach Franklin's lawyer, the jury considered the following instruction from the Court on the allocation of authority between lawyer and client.[8]

> Under California law, it is the client who defines the objectives of the representation and not the lawyer.  A lawyer cannot act without the client's authorization, and a lawyer may not take over decision-making for a client, unless the client has authorized the lawyer to do so.  A lawyer must abide by a client's decisions concerning the objectives of the representation and shall reasonably consult with the client as to the means by which the objectives are to be pursued.  Subject to requirements of client confidentiality, a lawyer may take such actions on behalf of the client as is impliedly authorized to carry out the representation.  The client has the ultimate authority to determine the purposes to be served by the legal representation, however, within the limits imposed by law and the lawyer's professional obligations.  A lawyer retained to represent a client is authorized to act on behalf of the client, such as in procedural matters and in making certain tactical decisions.  A lawyer is not authorized merely by virtue of the lawyer's retention to impair the client's substantive rights or the client's claim itself.

(Tr.2338).   Under this standard, it is clear that Mr. Avenatti took such actions as were "impliedly authorized to carry out the representation."  The evidence was insufficient to prove the contrary.

The convictions on Counts 1 and 2 cannot be saved on the theory that "Avenatti's threat of harm and demand that he be hired and paid to perform an internal investigation had no nexus to any claim of Franklin's that Avenatti reasonably believed he had been authorized by Franklin to pursue."  (Tr.2329-2330).   The government did not even argue a lack of nexus in its summation.  Plainly, Mr. Avenatti's threat and demand to conduct an internal investigation had a nexus to Coach Franklin's claim.  This case did not even remotely involve a situation like the "marital infidelity" example used by the Court in its instructions.  (Tr.2328).

---

[8] Mr. Avenatti objected to any instructions regarding the California Rules of Professional Conduct. The Court overruled that objection.

In sum, the evidence was insufficient to prove that Mr. Avenatti acted "wrongfully" or with "intent to defraud" Coach Franklin.  Accordingly, the Court should grant a judgment of acquittal on all three counts.

### B.  <u>The Statutes of Conviction are Vague-as-Applied</u>

That the jury's determination of Mr. Avenatti's guilt on all three counts turned on their application of the California Rules of Professional Conduct on the allocation of authority underscores the vagueness of this prosecution.  Mr. Avenatti was not on notice that the negotiating tactics he employed during confidential settlement negotiations – which were designed to further Coach Franklin's stated objectives of obtaining monetary relief and justice – could expose him to criminal prosecution under the extortion and honest services wire fraud statutes.

A criminal statute "must 'define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement.'"  *United States v. Rahman*, 189 F.3d 88, 116 (2d Cir. 1999) (quoting *Kolender v. Lawson*, 461 U.S. 352, 357 (1983)). The "statute must give notice of the forbidden conduct and set boundaries to prosecutorial discretion."  *United States v. Brunshtein*, 344 F.3d 91, 98 (2d Cir. 2003).  When analyzing a vagueness challenge, "[a] court must first determine whether the statute gives the person or ordinary intelligence a reasonable opportunity to know what is prohibited and then consider whether the law provides explicit standards for those who apply it."  *United States v. Strauss*, 999 F.2d 692, 697 (2d Cir. 1993).  A "void for vagueness " challenge "does not necessarily mean that the statute could not be applied in some cases but rather that, as applied to the conduct at issue in the criminal case, a reasonable person would not have notice that the conduct was unlawful and there are

no explicit standards to determine that the specific conduct was unlawful." *United States v. Sattar*, 272 F.Supp.2d 348, 357 (S.D.N.Y. 2003).

Prior to trial, Mr. Avenatti moved to dismiss all three counts because the extortion and honest services statutes were vague as applied to his conduct. (Dkt. No. 35:21-22; Dkt. No. 75:16). The Court denied the motions as premature. (Dkt. No. 120:17-18; Dkt. No. 129:19-20). Now that a factual record has been developed, the Court should grant the motions and acquit Mr. Avenatti under Fed.R.Crim.P. 29.

"The Hobbs Act does not define 'wrongful;' instead, courts have been left to determine on a case-by-case basis whether the Hobbs Act extends to the conduct at issue." *United States v. Albertson*, 971 F.Supp. 837, 842-43 (D.Del. 1997). Because the crime of extortion may be committed in multiple ways (violence, force, economic fear, color of official right), courts have had occasion to consider, and grapple with, the element of "wrongfulness" in various contexts. In the classic extortion case, involving threatened *force* or *violence*, the "wrongfulness" element is easy to analyze and apply because the law is clear that it is inherently wrongful to threaten force or violence as a means of collecting payment, even payment to which one might be entitled. *See, e.g., Barbaro v. United States*, No. 04-Cv-1500 (TPG), 2005 WL 991908, *3 (S.D.N.Y. Apr. 27, 2005) ("Physical injury and violence are inherently wrongful and to threaten or use them in order to obtain property is what is made criminal under the Hobbs Act."); *see also United States v. Jackson*, 180 F.3d 55, 69 (2d Cir. 1999) (noting that under the Hobbs Act definition of extortion, "the use of a threat can be wrongful because it causes the victim to fear a harm that is itself wrongful, such as physical

injury, or because the means is wrongful, such as violence."), *on reh'g*, 196 F.3d 383 (2d Cir.

1999).[9]  After all, threats to use force and cause physical injury are *mala in se.*

In the context of a charge of extortion using ***economic*** fear (§1951) or reputational

threats (§875(d)), however, the analysis becomes more complicated because "the line

separating the legitimate economic threat from the wrongful (and hence extortionate) demand

can be a fine one indeed." *Albertson*, 971 F.Supp. at 843.  The lack of clarity stems from the

fact that the use of ***economic*** fear or a threat to injure the reputation of another is not ***inherently***

***wrongful***. *United States v. Clemente*, 640 F.2d 1069, 1077 (2d Cir. 1981) ("It is obvious that

the use of fear of financial injury is not inherently wrongful."); *Jackson*, 180 F.3d at 70

(observing that, "as we discussed in [*Clemente*], a threat to cause economic loss is not

inherently wrongful").   There is a societal danger inherent in criminalizing threats to

reputation, or the exploitation of fear, by individuals pursuing economic settlements during

settlement discussions.   For that reason, the courts have crafted exceptions to the

"wrongfulness" requirement, thereby exempting certain categories of economic fear inducing

behavior from the reach of the extortion statutes as a matter of law.  *See, e.g., United States v.*

*Pendergraft*, 297 F.3d 1198, 1206 (11th Cir. 2002); *Viacom Intern. Inc. v. Icahn*, 747 F.Supp.

205, 213 (S.D.N.Y. 1990); *Albertson, supra*.

Indeed, "the fear of economic loss is an 'animating force of our economic system, and,

therefore, is not inherently wrongful." *Pendergraft*, 297 F.3d at 1206 (citations omitted).  In

---

[9] Even in the violence context, there is an exception for violence used in labor disputes. *See United States v. Enmons*, 410 U.S. 396, 401 (1973) (holding that the "use of force to achieve legitimate labor ends" was not punishable under the Hobbs Act to avoid the scenario where it might be applied to "[t]he worker who threw a punch on a picket line, or the striker who deflated the tires on his employer's truck…").

the economic context, "[t]he law of extortion has always recognized the paradox that extortion often criminalizes the contemporaneous performance of otherwise independently lawful acts." *United States v. Coss*, 677 F.3d 278, 285 (6th Cir. 2012). Legal scholars have unsuccessfully "struggled to reconcile this paradox" by attempting to adduce a "principled explanation for the distinction between lawful bargaining and criminal extortion…" *Id.* Thus, "the precise contours of what does and does not constitute extortion remain undefined and often riddled with inconsistency and circularity in a variety of criminal contexts." *Id*; *see also Albertson*, 971 F.Supp. at 849 ("Tying the law to the facts of each case necessitates judicial line-drawing. All can agree that the Hobbs Act has been expanded to cover conduct beyond that contemplated by Congress in drafting the statute. The question then becomes: what is the principled basis for drawing the line between legality and illegality? Further, is not a criminal defendant entitled to fair warning his conduct will transgress that line?"). The difficulty in defining the contours of "wrongful" extortion using economic fear stems from the risk that the statute will be applied to punish hard and lawful bargaining.

This case presents a prime example of that paradox. Every one of the acts attributed to Mr. Avenatti in the Superseding Indictment was independently lawful and protected by the First Amendment. He had the right to publicly expose Nike's misconduct. He had the right to demand from Nike a settlement of his client's claims, as attorneys do across the country every day. He had the right to demand a settlement on terms that may seem extraordinary to some, as is often the case when attorneys make opening settlement demands. He had the right to demand attorney's fees for himself as part of the overall settlement of his client's claims. And, Nike had no inherent right to be free from exposure of its own misconduct.

The analysis must be informed by the principle that a criminal statute "must be strictly construed, and any ambiguity must be resolved in favor of lenity." *United States v. Enmons*, 410 U.S. 396, 411 (1973). The rule of lenity "promotes fair notice of prohibited conduct and reduces the likelihood that unintentionally criminal conduct will be penalized." *United States v. Kozminski*, 487 U.S. 931, 952 (1988). The risk of arbitrary enforcement would be intolerable if prosecutors were permitted to draw lines in deciding whether a settlement demand, made in agreed-upon settlement discussions, was outside the implied authorization provided by a client to his lawyer. The extortion statutes failed to provide clear guidance that Mr. Avenatti could face criminal prosecution by making a settlement demand involving two components that, if agreed to by Nike, would have fulfilled Coach Franklin's objectives of seeking compensation and justice.[10]

Vagueness also plagues the honest services wire fraud statute as applied to Mr. Avenatti in Count 3. That statute applies only to "paradigmatic cases of bribes and kickbacks." *Skilling v. United States*, 561 U.S. 358, 411 (2010). Based on the record developed at trial, it is clear that this case was not a "paradigmatic" bribery case. In the wake of *Skilling*, Mr. Avenatti did not have fair notice that he could be convicted of honest services wire fraud for demanding that Nike retain him and Mr. Geragos to conduct an internal investigation to root out corruption at Nike.

---

[10] Mr. Avenatti's settlement demand of $1.5 million was 50% higher than Mr. Auerbach's estimate of the reasonable value of Coach Franklin's claim. (Tr.967). The evidence showed that Coach Franklin would have been satisfied with a monetary settlement of $1 million even without reinstatement. (Tr.1765).

### III.    MOTION FOR NEW TRIAL

Rule 33 motions "are granted only in 'extraordinary circumstances,' and are committed to the trial court's discretion." *United States v. McCourty*, 562 F.3d 458, 475 (2d Cir. 2009 (citation omitted). A trial court has "considerable discretion in determining how to respond to communications indicating that the jury is experiencing confusion." *United States v. Parker*, 903 F.2d 91, 101 (2d Cir. 1990). "[A] trial court responding to a note from a deliberating jury is only required to answer the particular inquiries posed. The trial court enjoys considerable discretion in construing the scope of a jury inquiry and in framing a response tailored to the inquiry." *United States v. Rommy*, 506 F.3d 108, 126 (2d Cir. 2007). The court "is not required to reference specific arguments advanced or defenses raised by counsel in urging particular outcomes." *Id.* A supplemental charge given by the trial court must be considered "in its context and under all the circumstances." *Lowenfield v. Phelps*, 484 U.S. 231, 237 (1988) (internal quotation marks omitted).

### A.  <u>The Court Improperly Excluded Text Messages and E-Mails</u>

The Court improperly excluded text messages and e-mails from evidence, thereby depriving Mr. Avenatti of his Fifth and Sixth Amendment rights to present a defense and his right to a fair trial. The excluded text messages and e-mails included DX FF-02, FF-07, FF-611, FF-613, FF-623, FF-633, FF-638, FF-647, FF-713, FF-741, FF-777, FF-886, FF-915, FF-926, FF-962, GG-2, GG-25778, MM-03, MM-04, MM-05, BBB, and EEE. (*See* Dkt. No. 253).

At trial, Coach Franklin and Mr. Auerbach repeatedly testified that Coach Franklin's principal goal was to re-forge and re-establish Coach Franklin's relationship with Nike. (Tr.713, 715, 717, 730, 901, 915, 962, 1534, 1543-44). They testified that they did not want

Mr. Avenatti to hold a press conference or seek publicity because that would have been detrimental and damaging to the relationship. (Tr.713-15, 1575). They testified that the hope was that Mr. Avenatti would be "diplomatic" with Nike. (Tr.712). They also testified that there was no reason for Mr. Avenatti to create a sense of urgency to resolve the matter with Nike because there was no urgency and they never discussed any urgency with Mr. Avenatti. (Tr.744, 791, 797, 1551). Auerbach also repeatedly testified that Coach Franklin had no problem with Nike, but rather only with DeBose and James. (*E.g,*. Tr.731, 794, 951, 1030).

Their testimony at trial was belied by dozens of the text and e-mail messages, summarized above. Those text messages showed, among other things, that they wanted to "expose" the misconduct at Nike; that justice meant cleaning up and reorganizing Nike EYBL; that Coach Franklin was willing "to fall on the sword to get justice;" that they wanted to take advantage of the press surrounding the Adidas case to call Slusher; that their desire to clean up corruption included Nico Harrison on the "got to go" list; that they were contemplating a major civil racketeering case against Nike; that their contemplated lawsuit was ***against Nike*** and Nike EYBL, not individually against DeBose and James; that they "need[ed] to move quickly" so that Nike would "get nervous and settle;" that they wanted to "go after Nike," point "heavy artillery" toward Nike executive Slusher, "drop the hammer on this MTF;" and that they wanted to allow the first round of negotiations play out Mr. Avenatti's way.

The text messages and emails were obviously relevant and the government did not contemporaneously object to any of them on hearsay grounds. Plainly, many of the text messages and emails were not hearsay at all, *see, e.g., United States v. Rodriguez-Lopez*, 565 F.3d 312, 314-15 (6th Cir. 2009 ("if the statements were questions or commands … they would not be assertive speech at all. They would not assert a proposition that could be true or false."),

and those that were hearsay were nonetheless admissible as substantive evidence of the declarant's (Franklin or Auerbach) state of mind under Fed.R.Evid. 803(3).   These text messages and emails were admissible as substantive evidence, for publication to the jury, without any need for defense counsel to establish that they also constituted prior inconsistent statements of Mr. Auerbach and Coach Franklin.

Yet, instead of allowing these admissible written communications in evidence, the Court first required defense counsel to question Mr. Auerbach and Franklin about their recollection of the contents of the communications.   Almost invariably, given that the text messages and e-mails that had been written 1-2 years earlier, the witness either did not recall the specific communication or testified that he "possibly" made the statement; counsel then had to refresh the witnesses' recollection with the contents of the communications.   The Court repeatedly warned counsel not to refer to communications as texts or e-mails or to read from the texts or emails.   But without quoting the text message or e-mail in defense counsel's question, it would have been impractical or impossible for defense counsel to directly impeach the witness with the written communication itself.   What ensued was a lengthy and cumbersome process by which defense counsel had to repeatedly refresh the witness's recollection about a written communication that itself was admissible but that the jury was not allowed to see.   The evidence that was then put forth before the jury was the witness's current oral disjointed recollection of what he might have written 1-2 years earlier instead of the actual "best evidence" of the communication – the writing itself.

> "The elementary wisdom of the best evidence rule rests on the fact that the document is a more reliable, complete and accurate source of information as to its contents and meaning than anyone's description...." *Gordon v. United States*, 344 U.S. 414, 421, 73 S.Ct. 369, 374, 97 L.Ed. 447 (1953). Thus, pursuant to the best evidence rule, this Court finds that the correspondence and other

documents speak for themselves and therefore the affidavits, to the extent that they are submitted to show subjective intent, are neither necessary nor relevant, and will therefore be disregarded.

*In re Chateaugay Corp*., 116 B.R. 887, 905 (Bankr. S.D.N.Y. 1990).  To be sure, the Supreme

Court in *Gordon* wrote as follows:

> The Court of Appeals affirmed on the ground that Marshall's admission, on cross-examination, of the implicit contradiction between the documents and his testimony removed the need for resort to the statements and the admission was all the accused were entitled to demand. We cannot agree. We think that an admission that a contradiction is contained in a writing should not bar admission of the document itself in evidence, providing it meets all other requirements of admissibility and no valid claim of privilege is raised against it. The elementary wisdom of the best evidence rule rests on the fact that the document is a more reliable, complete and accurate source of information as to its contents and meaning than anyone's description and this is no less true as to the extent and circumstances of a contradiction. We hold that the accused is entitled to the application of that rule, not merely because it will emphasize the contradiction to the jury, but because it will best inform them as to the document's impeaching weight and significance.

*Gordon, supra*, 344 U.S. at 420-21.

Mr. Avenatti's defense was severely impeded by the exclusion of the text messages and

e-mails.  In closing argument, for example, defense counsel was unable to actually display the

excluded exhibits reflecting Coach Franklin's true intent and desire, as communicated between

him and Mr. Auerbach (and attorney Copeland) over the course of a year.  Instead, defense

counsel had to resort to quoting the choppy cross-examination questions and answers about

the witness's refreshed recollection of the excluded exhibits.  There was simply no legal basis

or rationale, rooted in the rules of evidence, for forcing Mr. Avenatti to proceed in that fashion.

As explained in more detail below, it is clear from the jury's questions during

deliberations that the jury was keenly focused on the relatively few text messages between

Coach Franklin and Mr. Auerbach that the Court saw fit to admit in evidence.  The exclusion

of the many other text messages and e-mails deprived Mr. Avenatti of a fair trial and his right to present a defense.

### B. <u>The Court Abused its Discretion in its Response to a Jury Note</u>

Defense counsel's (Scott Srebnick's) summation focused heavily on the year-long communications between Mr. Auerbach and Coach Franklin as evidence of Coach Franklin's true objectives vis-à-vis Nike.

> Why are the text messages and the PowerPoint presentation and the memorandum to the file that Auerbach drafted of his conversation with John Slusher and the Brian Bowen lawsuit that Mr. Auerbach forwarded both to Coach Franklin and to Mr. Avenatti, why are those relevant? Why are they not a distraction? Because they are the best evidence of what Jeffrey Auerbach and Gary Franklin wanted in March of 2019 and what they communicated to Mr. Avenatti. Not what they say a year later on the witness stand after multiple meetings with the prosecutors, and anybody would be nervous under those circumstances. It's what they said at the time to each other, to Mr. Avenatti. It's what evidence they showed Mr. Avenatti. That proves what they wanted.

> You heard Mr. Sobelman ask a question of Jeffrey Auerbach: How many text messages did you exchange with Gary Franklin during the time period of over 13 months. He said 2300 text messages. Not a single one offered by the government. Not one to suggest that they wanted diplomacy in March of 2019. [Objection overruled]. Not a single one to show that they were hoping to keep this quiet. Not a single one to suggest that matters weren't urgent for Gary Franklin in March of 2019 with no sponsorship. His teams -- the number of his teams had dwindled. It was your urgent for him. All of the evidence, all of the documentary evidence is to the contrary. Evidence we had to bring out on cross-examination. This is not a distraction. It's an extraction, an extraction of the truth.

(Tr.2190-92). Defense counsel focused a significant portion of his summation on the four Auerbach/Franklin text messages that the Court allowed in evidence. (DX FF-1, FF-1A, FF-911, and MM-02). (*E.g.,* Tr.2207, 2210-14). For example, defense counsel argued that Mr. Auerbach and Coach Franklin wanted Mr. Avenatti to "light the next fuse" in the Sneaker Company Scandal and "devise a strategy that goes after Nike" and "expose" Nike's conduct,

(Tr.2211-13), which proved that they were not interested in diplomacy.  Defense counsel also discussed at length the Auerbach/Franklin communications that they testified about from recollection (but which were excluded in written form).  (*E.g.,* Tr.2229) ("I say we let his first round of discussions play out his way.").  Defense counsel argued that the Auerbach/Franklin communications were the best evidence of what they later communicated to Mr. Avenatti, (Tr.2207), and proved that they authorized Mr. Avenatti to handle the negotiations his way. (Tr.2229).

In its instructions to the jury, the Court explained how the jury could consider the text messages, referenced above, that were admitted for purposes of state of mind.

> From time to time during the trial, I told you that certain evidence could be considered only for a limited purpose.  Where I gave you such an instruction, you may consider that evidence only for the purpose I identified.
>
> Many exhibits were admitted for purposes of Mr. Avenatti's state of mind. Statements and allegations contained in these exhibits cannot be relied on for their truth, but only to the extent they shed late on Mr. Avenatti's state of mind -- what he was thinking or what he understood at the time.  I'll give you some examples, and this is not an exhaustive list.
>
> During Mr. Auerbach's testimony, I instructed you that Government Exhibit 312 -- Mr. Auerbach's Memorandum of Actions -- was admitted only to the extent that it sheds light on Mr. Avenatti's state of mind.  Government Exhibit 312 was not admitted for the truth of any of the allegations contained in the memorandum.
>
> ***Other examples are the text messages between Franklin and Auerbach that were admitted as Defense Exhibit FF-1, FF-1A, and MM-2.  These exhibits were admitted to the extent they shed light on Auerbach's and/or Franklin's state of mind, because their state of mind could have affected what they communicated to Avenatti, and thus affected his state of mind.***
>
> ***You should be aware that statements, information, thoughts, and desires never communicated to or reviewed by Mr. Avenatti could not have affected his state of mind.***

(Tr.2311-2312) (emphasis added).

During their deliberations, the jury asked questions that sought further clarity and elaboration on these instructions.  First, on February 12, 2020, the jury asked: "Were text messages in evidence only for state of mind?"  (Court Exh. 2) (Tr.2388).  After the Court answered that question, the jury followed up with another question the following day: "Can we draw inferences from state-of-mind documents, or only exhibits admitted for evidence? (Court Exh. 4, Question 1.B) (Tr.2391-2411).   This latter question demonstrated, unmistakably, that the jury had listened carefully to the defense summation and were focused on whether they could infer from the text messages that Mr. Auerbach and Coach Franklin communicated the objectives they discussed in those text messages to Mr. Avenatti – for example, that they wanted him to be aggressive toward Nike and "really light the next fuse," and that they had authorized him to negotiate with Nike as he saw fit.

The Court answered the latter question by instructing the jury, tautologically, that it could "draw inferences from exhibits that were admitted to demonstrate state of mind, but only as to state of mind.  Exhibits received without any limitation may be considered by you for all purposes, including for their truth.   But where I admitted an exhibit for purposes of demonstrating state of mind, that exhibit can only be considered for purposes of state of mind, and not for the truth of the statements that were made in that exhibit."  (Tr.2408).  The Court then repeated the same original instructions that prompted the jury's request for clarity in the first place.

The Court abused its discretion by placing strict limitations on the jury's consideration of inferences that could be drawn from the text messages.  To be clear, Mr. Avenatti was not seeking to have the jury consider the text messages for their truth.  (Tr.2406) (S. Srebnick:

"We're not looking for the jury to draw an inference as to truth from any state-of-mind exhibits. We're looking for the jury to draw an inference that certain states of mind were communicated to Mr. Avenatti.").  The Court, however, should have explained to the jury that they were permitted to infer from a "state of mind" document that the declarant then **acted upon** the state of mind and communicated his state of mind to Mr. Avenatti.  Instead, the jury was left to believe that, absent evidence that a particular text message was actually shown to Mr. Avenatti, they could not **infer** that Mr. Auerbach and Coach Franklin communicated their stated desires to him.  In *United States v. Best*, 219 F.3d 192, 198 (2d Cir. 2000), the Second Circuit wrote:

> A declarant's out-of-court statement as to his intent to perform a certain act in the future is not excludable on hearsay grounds. See Fed.R.Evid. 803(3) ("[a] statement of the declarant's then existing state of mind ... such as intent" is "not excluded by the hearsay rule"). If relevant, such a statement may be introduced to prove that the declarant thereafter acted in accordance with the stated intent. *See, e.g., Mutual Life Insurance Co. v. Hillmon*, 145 U.S. 285, 295-96, 12 S.Ct. 909, 36 L.Ed. 706 (1892); see also Fed.R.Evid. 803 Advisory Committee Note to Paragraph (3) (1972) ("The rule of *Mutual Life Ins. Co. v. Hillmon*, 145 U.S. 285, 12 S.Ct. 909, 36 L.Ed. 706, ... allowing evidence of intention as tending to prove the doing of the act intended, is ... left undisturbed.").

Thus, for example, from Mr. Auerbach's text to Coach Franklin that "[w]e will appeal to their sense of justice and duty" and "the opportunity to really light the next fuse (Racketeering) in the Sneaker Company Scandal, and answer a BIG question which NIKE will not want asked, WHY HASN'T THE DOJ INDICT EXECS AT NIKE WHO COMMITTED THE SAME CRIMES?!! WHY JUST ADIDAS?!," the jury should have been permitted to draw the inference that, in fact, Mr. Auerbach did communicate that intent to Mr. Avenatti. *See* Def. Exh. FF-1.  Similarly, the jury should have been permitted to draw the inference that Mr. Auerbach and Coach Franklin told Mr. Avenatti to execute their "strategy that goes after Nike" and "expose[s]" Nike's conduct.  Def. Exh. FF-1.

The Court's response to the jury note improperly restricted the inferences that the jury should have been permitted to draw.  In so doing, the Court abused its discretion.  The error deprived Mr. Avenatti of a fair trial.

### IV.  <u>CONCLUSION</u>

For the foregoing reasons, Mr. Avenatti respectfully requests that the Court grant a judgment of acquittal on all counts.  In the alternative, Mr. Avenatti respectfully requests that the Court grant him a new trial.

Respectfully submitted,

By:     /s/Scott A. Srebnick
        Scott A. Srebnick, P.A.
        201 South Biscayne Boulevard
        Suite 1210
        Miami, FL 33131
        Telephone: (305) 285-9019
        Facsimile:  (305) 377-9937
        E-Mail:  Scott@srebnicklaw.com