UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------- x
                                            :
  UNITED STATES OF AMERICA                  :
                                            :
          - *v.* -                          :          S1 19 Cr. 373 (PGG)
                                            :
  MICHAEL AVENATTI,                         :
                                            :
                        Defendant.          :
                                            :
------------------------------------------------- x


**MEMORANDUM OF LAW OF THE UNITED STATES OF AMERICA
IN OPPOSITION TO THE DEFENDANT'S POST-TRIAL MOTIONS**


                                   GEOFFREY S. BERMAN
                                   United States Attorney
                                   Southern District of New York


Matthew D. Podolsky
Daniel C. Richenthal
Robert B. Sobelman
Assistant United States Attorneys
- *Of Counsel* -

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ............................................................................................ 1

ARGUMENT .................................................................................................................... 1

I.  The Defendant's Rule 29 Motion Should Be Denied ........................................ 1

  A.  The Evidence Was Sufficient to Support the Jury's Verdict ............................. 1

    1.  Applicable Law............................................................................................. 1

      a.  Sufficiency of the Evidence Review ........................................................ 1

      b.  Extortion .................................................................................................. 2

      c.  Honest Services Wire Fraud ..................................................................... 3

    2.  Discussion ................................................................................................... 4

  B.  The Statutes of Conviction Are Not "Vague-as-Applied" ............................ 9

    1.  Applicable Law............................................................................................. 9

    2.  Discussion ................................................................................................. 10

      a.  Extortion and Interstate Threats ............................................................ 10

      b.  Honest Services Wire Fraud .................................................................. 12

II.  The Defendant's Rule 33 Motion Should Be Denied ...................................... 13

  A.  Legal Standard ............................................................................................ 13

  B.  The Court Properly Excluded Irrelevant, Confusing, and Unfairly Prejudicial
      Evidence ...................................................................................................... 14

    1.  Applicable Law........................................................................................... 14

    2.  Discussion ................................................................................................. 15

  C.  The Court Did Not Abuse Its Discretion in Response to a Jury Note............... 20

    1.  Applicable Law........................................................................................... 20

    2.  Discussion ................................................................................................. 21

CONCLUSION.............................................................................................................. 25

# TABLE OF AUTHORITIES

## Cases

*Bandler v. BPCM NYC, Ltd.*, No. 12 Civ. 3512 (PGG), 2014 WL 5038407 (S.D.N.Y. Sept. 29, 2014) ............................................................................................................................... 16

*Gordon v. United States*, 344 U.S. 414 (1953) .................................................................. 16, 17

*Illinois ex rel. Madigan v. Telemarketing Assocs., Inc.*, 538 U.S. 600 (2003) ............................ 11

*Jackson v. Virginia*, 443 U.S. 307 (1979) .................................................................................. 2

*Maynard v. Cartwright*, 486 U.S. 356 (1988) ...................................................................... 9, 11

*Neder v. United States*, 527 U.S. 1 (1999) .............................................................................. 21

*Shepard v. United States*, 290 U.S. 96 (1933) ..................................................................... 14, 15

*Skilling v. United States*, 561 U.S. 358 (2010) ............................................................. 3, 12, 13

*United States v. Bahel*, 662 F.3d 610 (2d Cir. 2011) ................................................................. 3

*United States v. Best*, 219 F.3d 192 (2d Cir. 2000) ................................................................. 15

*United States v. Binday*, 804 F.3d 558 (2d Cir. 2015) ............................................................. 24

*United States v. Canova*, 412 F.3d 331 (2d Cir. 2005) ......................................................... 14, 20

*United States v. Capo*, 817 F.2d 947 (2d Cir. 1987) ................................................................. 2

*United States v. Chavez*, 549 F.3d 119 (2d Cir. 2008) ............................................................... 1

*United States v. Crowley*, 318 F.3d 401 (2d Cir. 2003) ............................................................ 23

*United States v. Desinor*, 525 F.3d 193 (2d Cir. 2008) ............................................................ 21

*United States v. Edwards*, 631 F.2d 1049 (2d Cir. 1980) ......................................................... 18

*United States v. Gambino*, 59 F.3d 353 (2d Cir. 1995) ............................................................ 14

*United States v. Gaskin*, 364 F.3d 438 (2d Cir. 2004) ............................................................... 1

*United States v. Guadagna*, 183 F.3d 122 (2d Cir. 1999) .......................................................... 2

*United States v. Gupta*, 747 F.3d 111 (2d Cir. 2013) .............................................................. 15

*United States v. Halloran*, 821 F.3d 321 (2d Cir. 2016)....................................................... 9, 10, 13

*United States v. Halloran*, 664 F. App'x 23 (2d Cir. 2016)……………………………………13

*United States v. Hassan*, 578 F.3d 108 (2d Cir. 2008) ................................................................ 1

*United States v. Holmes*, 44 F.3d 1150 (2d Cir. 1995) ............................................................ 18

*United States v. Jackson*, 180 F.3d 55 (2d Cir. 1999) ....................................................... 3, 10, 11

*United States v. Jackson*, 196 F.3d 383 (2d Cir. 1999) ............................................................. 9

*United States v. Jackson*, 986 F. Supp. 829 (S.D.N.Y. 1997) ...................................................... 10

*United States v. Lesniewski*, No. 11 Cr. 1091 (VM), 2013 WL 3776235 (S.D.N.Y. July 12, 2013) ................................................................................................................................................ 14

*United States v. Locascio*, 6 F.3d 924 (2d Cir. 1993) ............................................................... 14

*United States v. Margiotta*, 688 F.2d 108 (2d Cir. 1982) ............................................................ 13

*United States v. Matthews*, 20 F.3d 538 (2d Cir. 1994)............................................................... 2

*United States v. McCourty*, 562 F.3d 458 (2d Cir. 2009) ........................................................... 14

*United States v. McDermott*, 245 F.3d 133 (2d Cir. 2001) ........................................................... 2

*United States v. Nadi*, 996 F.2d 548 (2d Cir. 1993)....................................................................... 9

*United States v. Nektalov*, 461 F.3d 309 (2d Cir. 2006) ............................................................ 21

*United States v. Nouri*, 711 F.3d 129 (2d Cir. 2013) .................................................................... 3

*United States v. Olano*, 507 U.S. 725 (1993)....................................................................... 23, 24

*United States v. Parker*, 903 F.2d 91 (2d Cir. 1990) ................................................................. 20

*United States v. Rommy*, 506 F.3d 108 (2d Cir. 2007) ........................................................ 20, 24

*United States v. Rosen*, 716 F.3d 691 (2d Cir. 2013)................................................................... 9

*United States v. Rybicki*, 354 F.3d 124 (2d Cir. 2003) ........................................................... 9, 13

*United States v. Sanchez*, 969 F.2d 1409 (2d Cir. 1992) ........................................................... 14

*United States v. Spencer*, 4 F.3d 115 (2d Cir. 1993) ................................................................. 14

*United States v. Tracy*, 12 F.3d 1186 (2d Cir. 1993) ................................................. 20

*United States v. Van Hise*, No. 12 Cr. 847 (PGG), 2017 WL 3425750 (S.D.N.Y. Aug. 8, 2017) . 5

*United States v. Zagari*, 111 F.3d 307 (2d Cir. 1997) ................................................. 14

**Statutes**

18 U.S.C. § 1343 ....................................................................................................... 3

18 U.S.C. § 1346 ....................................................................................................... 3

18 U.S.C. § 1951 ................................................................................................... 2, 10

18 U.S.C. § 875 .................................................................................................... 3, 10

**Rules**

Fed. R. Crim. P. 30(d) ............................................................................................. 23

Fed. R. Crim. P. 33(a) ............................................................................................. 13

Fed. R. Evid. 403 ..................................................................................................... 15

## PRELIMINARY STATEMENT

On February 14, 2020, the defendant, Michael Avenatti, was convicted after trial of all three counts charged in the Superseding Indictment: (1) interstate threats with intent to extort, in violation of 18 U.S.C. § 875(d); (2) extortion, in violation of 18 U.S.C. § 1951; and (3) honest services wire fraud, in violation 18 U.S.C. §§ 1343 and 1346. The defendant has now moved for a judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure, and, in the alternative, a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure. (Dkt. No. 291 ("Def. Mot.").) The defendant's arguments are meritless.

## ARGUMENT

### I.    The Defendant's Rule 29 Motion Should Be Denied

The defendant contends that the Court should enter a judgment of acquittal on the bases that (1) the evidence adduced at trial was insufficient as a matter of law to sustain his convictions and (2) in any event, the statutes of conviction are vague as applied to his conduct. Neither argument finds support in the record.

### A.    The Evidence Was Sufficient to Support the Jury's Verdict

#### 1.    Applicable Law

##### a.    Sufficiency of the Evidence Review

A defendant challenging the sufficiency of the evidence bears a "heavy burden," *United States v. Gaskin*, 364 F.3d 438, 459 (2d Cir. 2004), as the standard of review is "exceedingly deferential," *United States v. Hassan*, 578 F.3d 108, 126 (2d Cir. 2008). Courts "must view the evidence in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor, and deferring to the jury's assessment of witness credibility and its assessment of the weight of the evidence." *United States v. Chavez*, 549 F.3d 119, 124 (2d

Cir. 2008) (citations, brackets, and internal quotation marks omitted), *abrogated on other grounds by Dean v. United States*, 137 S. Ct. 1170 (2017).   Ultimately, "the task of choosing among competing, permissible inferences is for the [jury], not for the reviewing court."   *United States v. McDermott*, 245 F.3d 133, 137 (2d Cir. 2001).

A conviction must therefore be affirmed if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."   *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see also United States v. Guadagna*, 183 F.3d 122, 130 (2d Cir. 1999) (a jury's verdict may be overturned only if the evidence supporting it is "nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt" (internal quotation marks omitted)). In addition, in assessing the proof at trial, the Court must analyze each piece of evidence "not in isolation but in conjunction," *United States v. Matthews*, 20 F.3d 538, 548 (2d Cir. 1994), and must apply the sufficiency test "to the totality of the government's case and not to each element, as each fact may gain color from others," *Guadagna*, 183 F.3d at 130.

### b.    Extortion

The Hobbs Act provides, in relevant part, that "[w]hoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do" shall be guilty of a crime.   18 U.S.C. § 1951(a).  The Hobbs Act further defines "extortion" as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear."   *Id.* § 1951(b)(2).  The Second Circuit has "repeatedly stressed that the element of 'fear' required by the [Hobbs] Act can be satisfied by putting the victim in fear of economic loss."   *United States v. Capo*, 817 F.2d 947, 951 (2d Cir. 1987) (en banc) (internal quotation marks omitted).

2

Similarly, 18 U.S.C. § 875(d) prohibits extortion through the use of interstate communications. That statute provides that "[w]hoever, with intent to extort from any person . . . any money or other thing of value, transmits in interstate or foreign commerce any communication containing any threat to injure the property or reputation of the addressee or of another" shall be guilty of a crime.

As the Second Circuit has explained with respect to both provisions, "a threat to cause economic loss [or reputational harm] is not inherently wrongful; it becomes wrongful only when it is used to obtain property to which the threatener is not entitled." *United States v. Jackson*, 180 F.3d 55, 70 (2d Cir. 1999). Accordingly, a threatener may be found guilty of extortion based on a threat of economic or reputational harm where the threatener "seeks money or property to which the threatener does not have, and cannot reasonably believe she has, a claim of right, or where the threat has no nexus to a plausible claim of right." *Id.* at 71.

### c.     Honest Services Wire Fraud

The wire fraud statute prohibits the use of interstate wires by one who has "devised or intend[ed] to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises," 18 U.S.C. § 1343, or "a scheme or artifice to deprive another of the intangible right of honest services," *id.* § 1346. Section 1346 proscribes "fraudulent schemes to deprive another of honest services through bribes or kickbacks supplied by a third party who had not been deceived." *Skilling v. United States*, 561 U.S. 358, 404 (2010). "[T]o violate the right to honest services, the charged conduct must involve a *quid pro quo*, *i.e.*, an 'intent to give or receive something of value in exchange for an . . . act.'" *United States v. Nouri*, 711 F.3d 129, 139 (2d Cir. 2013) (quoting *United States v. Bruno*, 661 F.3d 733, 743-44 (2d Cir. 2011)); *see also United States v. Bahel*, 662 F.3d 610, 635-36 (2d Cir. 2011) ("the

'corrupt' intent necessary to a bribery conviction is in the nature of a *quid pro quo* requirement; that is, there must be a specific intent to give something of value in exchange for an official act." (internal quotation marks and alterations omitted)).

## 2. Discussion

There neither is nor could be any real dispute that the evidence adduced at trial was more than sufficient to demonstrate that, (1) with respect to transmission of interstate communications with intent to extort, the defendant knowingly and intentionally transmitted a threat to injure property or reputation; (2) with respect to attempted extortion, the defendant attempted to obtain money through use of fear in a manner that would and did affect interstate commerce; and (3) with respect to honest services wire fraud, the defendant, using an interstate wire, solicited a *quid pro quo* payment in exchange for making decisions and taking action with respect to his client's matter. In fact, there existed sufficient proof of each of these facts on the recordings introduced at trial alone. (*See* GX 1; GX 1T; GX 2; GX 2T[1]; *see also* Def. Mot. 12 ("Mr. Avenatti does not challenge the sufficiency of evidence that: 1) he demanded, as part of a settlement, that he and Mr. Geragos be retained to lead an internal investigation of Nike; 2) he threatened to hold a press conference if a settlement was not reached; and 3) he told Nike's lawyers that public revelation of Nike's misconduct would wipe billions of dollars off Nike's market cap.").)

The defendant argues instead that the evidence at trial was insufficient to prove that his demands for money from NIKE, Inc. ("Nike") were wrongful or that he intended to defraud Gary Franklin, Sr. (Def. Mot. 22-24.) As the Court observed on the record, "it is hard to think of anything that is more of a jury issue than whether the defendant acted with criminal intent" (Tr.

---

[1]     "GX" refers to a Government Exhibit admitted at trial.

1917[2]).  *See United States v. Van Hise*, No. 12 Cr. 847 (PGG), 2017 WL 3425750, at *26 (S.D.N.Y. Aug. 8, 2017) ("Ordinarily, '[t]he question of whether criminal intent is inferable from the facts proved is a question for the jury.'" (quoting *United States v. Speare*, 297 F.2d 408, 410 (2d Cir. 1962))), *aff'd*, 797 F. App'x 618 (2d Cir. 2020).  The jury here found that the defendant acted wrongfully and with intent to defraud, and the record is replete with support for those findings.

*First*, the defendant's recorded statements to Nike's attorneys made his intentions crystal clear—and certainly a rational jury could so find.  For example, the defendant repeatedly threatened that he would harm Nike if he were not hired and paid—something to which he had no entitlement.  (*See, e.g.*, GX 1; GX 1T at 4-5, 14-15; GX 2; GX 2T at 14.)  At no time did the defendant connect his hiring or conducting an internal investigation to any putative lawsuit by Franklin, let alone the firing of any Nike employees, as the defendant now counter-factually suggests.  (*See* Def. Mot. 22-23.)  In fact, none of those topics was even mentioned by the defendant to any of Nike's attorneys.  Instead, the defendant threatened that he would refrain from holding a press conference and causing significant economic damage to Nike, and would cause his client to enter into some form of agreement with Nike, only if Nike acceded to the defendant's demands not just to be hired, but to be paid money in amounts untethered to anything other than how much the defendant wanted.  (*See, e.g.*, GX 1T at 4 ("A few million dollars doesn't move the needle for me."); GX 2T at 14 ("12 million dollar retainer upon signing . . . that's gonna be deemed earned when paid, we'll cap it at 25 million dollars, minimum of 15 million dollars, unless the scope changes.").)  The defendant was explicit about the nature of his wrongful threats, explaining

---

[2]        "Tr." refers to the trial transcript.

the basis of his demands by asking, "Have you ever held the balls of the client in your hand where you can take 5, 6 billion dollars in market cap off of 'em?"  (GX 2T at 23.)

The defendant was similarly clear about his intent to engage in a *quid pro quo*, refusing not only to permit any claims to be settled by his client without a payment to himself, but also to back down from the amount of money demanded for himself, stating, "I don't think that it makes any sense for Nike to be paying, um, an exorbitant sum of money to Mr. Franklin, in light of his role in this . . . I mean, imagine that."  (GX 2T at 19-20.)  In short, the defendant wanted money for himself in exchange for settling any claims held by his client, and at the expense of his client.

*Second*, the defendant repeatedly misled Franklin, both directly and through Auerbach, and the record was unambiguous that the defendant's demands were in no way authorized or requested by Franklin or Auerbach.  Despite devoting nearly the entirety his communications with Nike to his demands that he be hired and paid by Nike, and making clear that he would not accept increased payment to Franklin if that meant less for himself, the defendant at no time discussed with Franklin or Auerbach an internal investigation or Nike hiring the defendant (much less for millions of dollars) or Nike hiring Mark Geragos (about whom the defendant never told Franklin either).  (*See, e.g.*, Tr. 1553, 1567-70, 1577-78 (testimony of Franklin).)  Nor did the defendant say anything to Franklin or Auerbach regarding his threats to disclose Franklin's confidential information—indeed, information potentially damaging to Franklin—through a press conference (*see, e.g.*, Tr. 1542 (testimony of Franklin)), despite having not only repeatedly threatened to do so, but in fact having contacted the press on multiple occasions (*see, e.g.*, GX 1; GX 1T at 14; GX 103C; GX 103D; GX 107; GX 310; GX 702).

The defendant argues that his conduct was not wrongful because Franklin and Auerbach did not instruct him *not* to demand to be hired by Nike, relying on a text message exchange between

Franklin and Auerbach suggesting that "they would allow the first round of negotiations to play out Mr. Avenatti's way." (Def. Mot. 22-23.) This argument is nonsensical. As an initial matter, the defendant never saw this text message, and it is therefore irrelevant to his *mens rea*. In any event, "allowing[ing] the first round of negotiations" regarding *Franklin's* claim "to play out [the defendant's] way" certainly had nothing to do with the defendant demanding that Nike hire *him* for millions of dollars, much less at the expense of Franklin—something that Franklin and Auerbach knew nothing about. (*See, e.g.*, Tr. 1764-66 (testimony of Franklin).) Moreover, that text message was a specific reference to not focusing in the first instance on Franklin's sponsorship agreement being renewed. (Tr. 1765-66.) That Franklin and Auerbach, in the same exchange, did not say that they were going to instruct the defendant not to demand something for himself or cheat Franklin did not give permission to the defendant to do so, and the jury was free to and did reject any argument to the contrary. That the jury rejected it, based on far more than sufficient evidence, is not a basis to overturn its verdict.

*Third*, the defendant's conduct, and his demands, indisputably violated his core ethical duties as an attorney. The defendant contends that "it is clear that [he] took such actions as were 'impliedly authorized to carry out the representation.'" (Def. Mot. 23.) This assertion finds no basis whatsoever in the record and is directly contravened not only by the record evidence but also by the applicable California Rules of Professional Responsibility. It was palpably clear, including to non-lawyers, that using Franklin's information to demand payments for the defendant, and indeed making any settlement with Franklin contingent on the defendant being paid, created a conflict of interest requiring, at a minimum, informed written consent. (*See* Tr. 747 (testimony of Auerbach); Tr. 1572 (testimony of Franklin); Tr. 2337-38 (jury instructions explaining conflicts of interest).) The defendant was not "impliedly authorized" by anyone or anything to demand

payments for himself, particularly not to the detriment of his client.  It was similarly apparent—
and indeed obvious to all of the attorneys threatened by the defendant—that his demand to be hired
by Nike was entirely improper and his hiring by Nike would have created a further conflict of
interest, and therefore neither "impliedly authorized" nor permissible.[3]  (*See* Tr. 312 (testimony of
Scott Wilson); Tr. 1155-56 (testimony of Robert Leinwand).)

     *Finally*, contrary to the defendant's assertion (Def. Mot. 24), the evidence was more than
sufficient to demonstrate a lack of nexus between the defendant's demands and any claim of right
on the part of his client.  Indeed, the evidence compelled that finding.  Most notably, the sums
demanded by the defendant—$15 million with $12 million upfront "deemed earned when paid"
(GX 2T at 14)—bore no conceivable relationship to Franklin's claims, which were based on a
contract worth $72,000.  (*See* Tr. 266 (testimony of Wilson); Tr. 1158-59 (testimony of Leinwand
that "the value of Mr. Franklin's claim was not linked to the internal investigation in any way");
GX 201.)  Nor did the defendant even attempt to connect the sums he demanded to the cost of
conducting any internal investigation.

     The defendant was explicit that the bases for the amount of his demands were that the
payments would have to exceed what he would personally benefit were he to publicize Franklin's
information, and that he could harm Nike through his press power if Nike did not give him the
amount he wanted.  (*See, e.g.*, GX 1T at 14 ("[I]t's worth more in exposure to me to just blow the
lid on this thing.  A few million dollars doesn't move the needle for me."); GX 2T at 23 ("Have
you ever held the balls of the client in your hand where you can take 5, 6 billion dollars in market

---

[3]     For this and other reasons, the defendant's suggestion (Def. Mot. 23) that it was reasonable
for a lawyer in his shoes to think that he could or should demand that he be hired to conduct an
internal investigation of the company about which his client was purportedly blowing the whistle
is nothing short of fantastic.

8

cap off of 'em?").)  The evidence further demonstrated that the amounts demanded were calculated

to allow the defendant to pay off extraordinary and pressing debts.  (*See* Tr. 1405-06 (testimony

of Judy Regnier); GX S-4.)  Indeed, this proof is substantially greater than what the Second Circuit

relied upon in *Jackson* in concluding that no reasonable juror could have found a nexus between

the sums demanded by the defendant there and her potentially lawful claims to support.  *See United*

*States v. Jackson*, 196 F.3d 383, 387-88 (2d Cir. 1999) (proffer that evidence would demonstrate

that defendant would be entitled to millions in child support insufficient for rational juror to find

nexus to $40 million demand).  Plainly, the evidence was sufficient for a jury here to convict.

### B.    The Statutes of Conviction Are Not "Vague-as-Applied"

#### 1.    Applicable Law

"The void-for-vagueness doctrine requires that a penal statute define the criminal offense

with sufficient definiteness that ordinary people can understand what conduct is prohibited and in

a manner that does not encourage arbitrary and discriminatory enforcement."  *United States v.*

*Halloran*, 821 F.3d 321, 337 (2d Cir. 2016) (internal quotation marks omitted).  "Although a law

has to provide minimal guidelines in the form of explicit standards regarding what conduct is

unlawful, it need not achieve meticulous specificity, which would come at the cost of flexibility

and reasonable breadth."  *United States v. Rosen*, 716 F.3d 691, 699 (2d Cir. 2013) (internal

quotation marks omitted).  Accordingly, "one whose conduct is clearly proscribed by the statute

cannot successfully challenge it for vagueness."  *United States v. Nadi*, 996 F.2d 548, 550 (2d Cir.

1993); *see also Maynard v. Cartwright*, 486 U.S. 356, 361 (1988) ("Objections to vagueness under

the Due Process Clause rest on the lack of notice, and hence may be overcome in any specific case

where reasonable persons would know that their conduct is at risk."); *United States v. Rybicki*, 354

F.3d 124, 129 (2d Cir. 2003) (en banc).

2. **Discussion**

a. **Extortion and Interstate Threats**

As noted above, the Hobbs Act prohibits "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear" or attempting to do so, 18 U.S.C. § 1951(b)(2), and 18 U.S.C. § 875(d) prohibits extortion through the use of interstate communications and provides that "[w]hoever, with intent to extort from any person . . . . any money or other thing of value, transmits in interstate or foreign commerce any communication containing any threat to injure the property or reputation of the addressee or of another . . . shall be" guilty of a crime. "[A] threat to cause economic loss [or reputational harm] is not inherently wrongful; it becomes wrongful only when it is used to obtain property to which the threatener is not entitled." *Jackson*, 180 F.3d at 70.

Nothing about these provisions is unclear, least of all when applied to the circumstances of this case. To the contrary, these statutes are sufficiently definite "that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Halloran*, 821 F.3d at 337; *see also United States v. Coss*, 677 F.3d 278, 289-90 (6th Cir. 2012) (rejecting vagueness challenge to extortion by threat of reputational harm charges); *United States v. Jackson*, 986 F. Supp. 829, 835-37 (S.D.N.Y. 1997) (rejecting substantially similar vagueness challenge to extortion prosecution). It is pellucid that an attorney may not use his client's confidential information to threaten harm and demand money for himself.

The facts here make it obvious not just that that rule would be clear to anyone, but that it was clear to the defendant himself. As described above, the defendant did not discuss his demands for payments with his client, or that he had brought in Geragos, while at the same time suggesting, falsely, that his client's interests were being advanced—leading to the inescapable conclusion that

10

he purposefully misled his client and knew full well the wrongfulness his conduct.  Moreover, the ethical and professional responsibilities prescribed by California law that the defendant was bound to understand and follow similarly demonstrate that the defendant knew he could not make the demands he made, at least without informed written consent.  In short, when the defendant, an experienced California lawyer, sought to enrich himself to the detriment of his client, without his client's knowledge or consent, he engaged in conduct that "reasonable persons would know" placed them "at risk."  *Maynard*, 486 U.S. at 361.

The defendant nevertheless argues that the extortion statutes were be vague as applied to him because "[e]very one of the acts attributed to [him] in the Superseding Indictment was independently lawful and protected by the First Amendment."  (Def. Mot. 28.)  That argument is baseless.  The First Amendment protects neither fraud nor extortion.  *See, e.g.*, *Illinois ex rel. Madigan v. Telemarketing Assocs., Inc.*, 538 U.S. 600, 612 (2003) ("[T]he First Amendment does not shield fraud."); *Jackson*, 180 F.3d at 64 (noting district court's decision that First Amendment protections do not extend to extortionate threats).  Nor does it make any difference that it might be lawful separately to engage in each element of extortion, any more than it renders, for example, wire fraud unconstitutionally vague because it is not a crime, without more, to obtain property or to transmit a wire or to make a misleading statement.  As is relevant here, what the law prohibits is a threat "used to obtain property to which the threatener is not entitled."  *Jackson*, 180 F.3d at 70.  An ordinary person (not to mention an attorney) can perfectly well understand that when he threatens to disclose harmful information obtained from a client unless the victim makes payments to him (and, indeed, at the expense of the client), that is wrong.

11

### b.      Honest Services Wire Fraud

The defendant's claim with respect to honest services wire fraud is similarly meritless.  The jury was properly instructed (and the defendant does not contend otherwise) that "the government must show a quid pro quo" and therefore "must prove beyond a reasonable doubt that Mr. Avenatti solicited a bribe from Nike in the course of his representation of Mr. Franklin in exchange for which he offered to take actions regarding the settlement of Mr. Franklin's claims."  (Tr. 2342.) The jury was also instructed that it is not "sufficient for the government merely to demonstrate that a defendant was engaged in undisclosed self-dealing or that he failed to disclose a conflict of interest."  (*Id.*)

In light of the instructions, and the record evidence, the defendant's claim of vagueness, under *Skilling*, as to the honest services wire fraud charge must be rejected.  As the Supreme Court explained, "it has always been as plain as a pikestaff that bribes and kickbacks constitute honest-services fraud, and the statute's *mens rea* requirement further blunts any notice concern."  *Skilling*, 561 U.S. at 412 (citation and internal quotation marks omitted).  "A criminal defendant who participated in a bribery or kickback scheme, in short, cannot tenably complain about prosecution under § 1346 on vagueness grounds."  *Id.* at 413.  Moreover, for much the same reasons as articulated above, an attorney cannot credibly claim that he was not on notice that he might be defrauding his client where the attorney premises the client's settlement on a secret side payment to the attorney (worth millions more than the client's putative settlement).

The defendant's only argument to the contrary is that his case "was not a 'paradigmatic' bribery case," by which he apparently means that the facts of his case were, in his view, not the typical facts of a bribery scheme.  (Def. Mot. 29.)  But the Supreme Court's opinion in *Skilling* makes plain that the use of the word "paradigmatic" means nothing more than that honest services

wire fraud is confined to "bribery and kickback schemes," *Skilling*, 561 U.S. at 412, and it has been clear for decades that such schemes include kickback and bribery schemes perpetrated by anyone owing a fiduciary duty to the victim, *see, e.g.*, *United States v. Halloran*, 664 F. App'x 23, 27 (2d Cir. 2016); *Halloran*, 821 F.3d at 337-39; *Rybicki*, 354 F.3d at 141-42 & n.17; *United States v. Margiotta*, 688 F.2d 108, 125 (2d Cir. 1982). Furthermore, the inquiry as to whether a statute is vague as applied does not require a court to decide whether each case is "paradigmatic," but whether "ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Halloran*, 821 F.3d at 337. As discussed above, the evidence amply demonstrated that the defendant knew what he was doing was wrong, and the *quid pro quo* requirement, as the Supreme Court concluded in *Skilling*, suffices to ensure that the statute is not arbitrarily and discriminatorily enforced.

## II.      The Defendant's Rule 33 Motion Should Be Denied

The defendant moves for a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure on the bases that (1) the Court improperly excluded text messages and emails between Franklin and Auerbach that were never shared with the defendant and (2) the Court incorrectly responded to a jury note regarding the several written communications between Franklin and Auerbach that were admitted in evidence. (Def. Mot. 30-38.) The defendant is wrong. The Court's exclusion of the exhibits at issue was well within the Court's discretion, and as was the Court's response to the jury note.

### A.      Legal Standard

Rule 33 provides, in relevant part, that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). "The defendant bears the burden of proving that he is entitled to a new trial under

Rule 33." *United States v. McCourty*, 562 F.3d 458, 475 (2d Cir. 2009). Because motions for a new trial are strongly disfavored, "the standard for granting such a motion is strict," *United States v. Gambino*, 59 F.3d 353, 364 (2d Cir. 1995), and it should be granted only in "extraordinary circumstances," *McCourty*, 562 F.3d at 475 (internal quotation marks omitted); *United States v. Zagari*, 111 F.3d 307, 322 (2d Cir. 1997); *United States v. Locascio*, 6 F.3d 924, 949 (2d Cir. 1993); *United States v. Spencer*, 4 F.3d 115, 118 (2d Cir. 1993). The "ultimate test [in deciding a Rule 33 motion] is whether letting a guilty verdict stand would be a manifest injustice . . . . There must be a real concern that an innocent person may have been convicted." *United States v. Canova*, 412 F.3d 331, 349 (2d Cir. 2005) (internal quotation marks omitted); *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992). In short, a new trial should not be granted where "[i]t . . . cannot be said . . . that the evidence preponderate[s] heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand." *Sanchez*, 969 F.2d at 1415 (internal quotation marks omitted) (reversing grant of new trial based on trial court's determination that government witnesses gave perjured testimony).

> ### B. The Court Properly Excluded Irrelevant, Confusing, and Unfairly Prejudicial Evidence

> #### 1. Applicable Law

An out-of-court statement offered for the truth of the matter asserted generally is not admissible, Fed. R. Evid. 801(c), 802, subject to certain exceptions. To be admissible under Federal Rule of Evidence 803(3), an out-of-court statement must be relevant to a then-existing state of mind or intent regarding a relevant fact. *See, e.g.*, *United States v. Lesniewski*, No. 11 Cr. 1091 (VM), 2013 WL 3776235, at *5 (S.D.N.Y. July 12, 2013). This exception to the hearsay bar permits only the limited admission of statements of future intent, not those concerning past intent and/or motive. *Shepard v. United States*, 290 U.S. 96, 105-06 (1933); *see also, e.g.*,

*United States v. Best*, 219 F.3d 192, 198 (2d Cir. 2000).  "There would be an end, or nearly that, to the rule against hearsay if the distinction [between past and future intent] were ignored." *Shepard*, 129 U.S. at 105-06.

Where a declarant's out-of-court statement is not otherwise inadmissible hearsay, it "must meet the requirements of, *inter alia*, relevance, and it must not be excludable on the grounds of undue confusion or prejudice under Rule 403."  *United States v. Gupta*, 747 F. 3d 111, 139 (2d Cir. 2013).  Rule 403 provides: "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  Fed. R. Evid. 403.

### 2. Discussion

The Court properly excluded as irrelevant, confusing, and/or unfairly prejudicial several exhibits containing text messages and emails between Franklin and Auerbach.  Those exhibits contained inadmissible hearsay and irrelevant and inflammatory statements, were cumulative of the Franklin's and Auerbach's testimony, and, if admitted, would have led to confusion as to what evidence could be relied upon to establish the defendant's state of mind.  Nor is there any basis to believe that the admission of these cumulative documents would have altered the jury's verdict, let alone that an innocent person may have been convicted due to their exclusion.

The defendant argues that additional text messages and emails between Franklin and Auerbach were admissible pursuant to the state-of-mind exception to hearsay preclusion set forth in Rule 803(3).  (Def. Mot. 32, 37.)  But the materials at issue do not demonstrate a meaningful "state of mind," inasmuch as the text messages and emails do not suggest that Franklin or Auerbach then-intended to take any relevant action, such as instructing the defendant to demand money for

himself.  Indeed, the text messages and emails that the defendant points to express little more than the generalized notion of pursuing justice by contacting Nike regarding the conduct of certain Nike employees.  (*See, e.g.*, DX FF 611; DX FF 613.)  It is thus unsurprising that the defendant's arguments on trial, and in his brief, make clear that his intended use of these documents was not for any discernible "state of mind" relevant to a fact of consequence, but rather to attempt to impeach the testimony of Franklin and Auerbach.  (*See* Def. Mot. 30-31.)

In any event, whether one or more of the messages reflected Auerbach's or Franklin's then-existing states of mind did not render them admissible, as the Court explained at trial.  In short, the bar against hearsay, even if surmountable, was beside the point.  As an initial matter, these messages could not bear on the *defendant's* state of mind because they were never shared with the defendant, and the messages themselves were therefore not actually probative of any fact of consequence.  (*See* Tr. 523 (Court explaining that "material that Mr. Avenatti was not aware of at the time in March of 2019 could not have had any effect on his state of mind whatsoever").)

Moreover, even if certain of their content were probative, the so-called "best evidence rule" (Def. Mot. 32) would not render the messages themselves admissible.  In invoking this "rule," the defendant relies principally on *Gordon v. United States*, 344 U.S. 414 (1953).  (Def. Mot. 32-33.) However, the modern "best evidence rule" has been "codified at Rules 1002 through 1004 of the Federal Rules of Evidence" (and has been since 1975).  *Bandler v. BPCM NYC, Ltd.*, No. 12 Civ. 3512 (PGG), 2014 WL 5038407, at *8 (S.D.N.Y. Sept. 29, 2014) (quoting *Burt Rigid Box, Inc. v. Travelers Prop. Cas. Corp.*, 302 F.3d 83, 91 (2d Cir. 2002)) (alterations incorporated).  (*See also* Tr. 1923 (Court referring to "the so-called best evidence rule set forth in Federal Rule of Evidence 1002").)  The defendant fails to invoke any of the operative Federal Rules of Evidence in his motion, and the Court correctly ruled that none applies to these circumstances.  (*See* Tr. 1924

16

(Court stating "I don't believe that Rule 1002 has any application here").)  Furthermore, *Gordon* has no possible application here, as it considered the theoretical admissibility of prior statements that had not been produced in discovery, and even that inquiry turned on the existence of a factual contradiction between the prior statement and the witness's testimony.  344 U.S. at 420-21 & n.15. None of the text messages or emails excluded here in fact contradicted any witness's testimony, not least of which because the Court admitted those text message exhibits that contained statements that arguably conflicted with a witness's testimony.  (*See* Tr. 994 (Court explaining that "[i]f the witness denies [making a statement in a text message], then it may be offered"); Tr. 1922 (Court explaining that where witness "fought with the questioner about whether certain things were said," it "admitted the text message if I believed it was relevant" and also "admitted text messages that contained a visual display that I thought went beyond the plain words").)

In any event, the potential applicability of a hearsay exception or other evidentiary rule is irrelevant in light of the Court's appropriate exercise of discretion in excluding the text messages under Rule 403.  (*See* Tr. 911 ("I understand you're either contending that it's not hearsay at all or you're contending that it's subject to a hearsay exception.  I understand your point on that.  But what I'm asking you to consider is two points: One, why isn't it cumulative when the witness has already said yes, I said that; and two, given that these text messages are chock-ful[l] of material that the jury should not see, I couldn't possibly admit the text messages in whole anyway.").)  This is so for at least three independent reasons articulated by the Court.

*First*, the proffered exhibits were "cumulative of Auerbach and Franklin's testimony because they essentially duplicate what the two men testified to."  (Tr. 1924; *see also* Tr. 989 (Court explaining that text messages "wouldn't be admissible anyway other than for the precise words that the defense has wanted to bring out, which, again, the witness has already admitted").)

17

To be sure, the Court admitted some of Franklin's and Auerbach's text messages—over the Government's objections—where the Court determined that one of the witnesses "did not clearly concede that he had said the things in the text message, and the text message was relevant." (Tr. 1387.)  But where a witness admitted making or receiving the statement contained in a text message, the Court appropriately exercised its discretion to deny "admission of the text message [as] cumulative and unnecessary" (Tr. 1387).  *See United States v. Holmes*, 44 F.3d 1150, 1157 (2d Cir. 1995) ("a trial judge retains wide latitude to exclude irrelevant, repetitive, or cumulative evidence"); *United States v. Edwards*, 631 F.2d 1049, 1051 (2d Cir. 1980) ("district court has broad discretion to exclude evidence that is irrelevant or cumulative").[4]

*Second*, as the Court repeatedly and properly explained, the proffered text message and email exhibits "have limited relevance . . . given that they were never seen by Mr. Avenatti," and therefore "could confuse the jury as to what evidence can be relied on to establish Mr. Avenatti's state of mind."  (Tr. 1923-24.)  The Court further explained that it was "concerned that dumping scores of these text messages into the record would confuse the jury under Rule 403 because it would suggest that they are supposed to determine Mr. Avenatti's state of mind based on text messages that he actually never saw."  (Tr. 1924.)  Indeed, at the charge conference, the Court stated that it was "concerned that the jury has been exposed to an extraordinary amount of text messages and other material that Mr. Avenatti was never aware of.  I'm extremely concerned about

---

[4]     At trial, the Court repeatedly invited the defendant to explain why the proffered text message exhibits were not cumulative, and he never did.  (*E.g.*, Tr. 989 ("what is the basis for admitting the text message that contains that statement, why isn't it cumulative[?]"); Tr. 991 ("why isn't it cumulative when the witness has already said yes, I said that[?]"); Tr. 993 ("Where the witness admits having made the statement, why isn't it cumulative to introduce a document that says the same thing?  And I haven't gotten an answer to it yet.  Haven't gotten an answer.  I'm waiting for one but I haven't gotten an answer.").)  Even in his motion, the defendant has not cogently done so.

that." (Tr. 1932.)  In light of the defendant spending "so much of the trial . . . on an examination of what was going on between Auerbach and Franklin," which is "only relevant to the extent it somehow made its way to Mr. Avenatti," the Court felt obligated "to tell the jury that to the extent statement or information of others was never communicated to him or reviewed by him, that it could not have affected his state of mind." (Tr. 1932.)

Accordingly, the Court gave a jury instruction targeted to mitigating confusion on this point. (*See* Tr. 2311-12.) That was entirely proper. Admitting additional text messages and emails would have only exacerbated the problem about which the Court was rightly concerned, and increased the already-significant risk of jury confusion. In short, the documents that the defendant claims were erroneously precluded had vanishingly little probative value as to the defendant's guilt or innocence and were offered to seek to distract and confuse the jury as to the issues at stake— precisely the circumstances that the hearsay rules and Rule 403 were designed to prevent.

*Third*, the excluded text messages and emails were replete with extraneous and provocative statements and information. The Court explained that the proffered "text messages are chock-ful[l] of all kinds of other information that's irrelevant and inflammatory and shouldn't be laid before the jury to start with." (Tr. 989.) Accordingly, the Court ruled that "given that these text messages are chock-ful[l] of material that the jury should not see, I couldn't possibly admit the text messages in whole anyway." (Tr. 991; *see also* Tr. 1397 ("To state the obvious, or should be obvious, it is not proper to simply dump the text messages into evidence in their entirety. Indeed, on every page there is material that is irrelevant to the issues before us."); Tr. 1919 (Court noting that it observed "no effort made [by the defendant] to eliminate irrelevant and sometimes inflammatory material from the text messages")). The Court appropriately exercised its discretion because the unfair prejudice that would have flowed from such evidence substantially outweighs

19

its exceedingly limited, if any, probative value.  *See United States v. Tracy*, 12 F.3d 1186, 1195 (2d Cir. 1993) ("Rule 403 gives the trial judge discretion to exclude relevant evidence on the ground that its potential for unfair prejudice substantially outweighs its probative value.").

*Finally*, even if there were some error in the preclusion of this evidence, which there is not, the defendant has offered nothing to support his request for the extraordinary remedy of a new trial.  Indeed, the fact that the evidence was cumulative demonstrated that the defendant suffered no prejudice from the evidence's exclusion, much less such sufficient prejudice that he is entitled to a new trial.  All the defendant offers to the contrary is that "defense counsel was unable to actually display the excluded exhibits" and "had to resort to quoting the choppy cross-examination questions and answers."  (Def. Mot. 33.)  The defendant does not elaborate, and even if one were to suppose that it disadvantaged the defendant's attorneys to rely on the sworn testimony of witnesses that the Government itself argued were credible, any conceivable disadvantage falls well short of the "manifest injustice" required to justify a new trial.  *Canova*, 412 F.3d at 349.

### C.    The Court Did Not Abuse Its Discretion in Response to a Jury Note

#### 1.    Applicable Law

A district court "has considerable discretion in determining how to respond to communications indicating that the jury is experiencing confusion."  *United States v. Parker*, 903 F.2d 91, 101 (2d Cir. 1990).  In particular, "the court has discretion to respond to jury communications, preferably after consultation with counsel, with supplemental instructions designed to remedy the confusion."  *Id.* at 102.

In "responding to a note from a deliberating jury," a district court "is only required to answer the particular inquiries posed."  *United States v. Rommy*, 506 F.3d 108, 126 (2d Cir. 2007).  Consistent with its overall discretion in responding to jury notes, a district court "enjoys

considerable discretion in construing the scope of a jury inquiry and in framing a response tailored

to the inquiry." *Id*. The district court "is not required to reference specific arguments advanced

or defenses raised by counsel in urging particular outcomes." *Id*. The district court should,

moreover, "proceed circumspectly in responding to inquiries from the jury." *Id*. at 127 (internal

quotation marks omitted).

A conviction will not be reversed based on a trial court's refusal to issue a defendant's

requested jury instruction "unless the requested instruction was legally correct, represented a

theory of defense with a basis in the record that would lead to acquittal, and the charge actually

given was prejudicial." *United States v. Desinor*, 525 F.3d 193, 198 (2d Cir. 2008); *see also United*

*States v. Nektalov*, 461 F.3d 309, 313-14 (2d Cir. 2006) (defendant who "requested a different jury

instruction from the one actually given . . . bears the burden of showing that the requested

instruction accurately represented the law in every respect and that, viewing as a whole the charge

actually given, he was prejudiced"). Thus, a conviction should be affirmed despite instructional

error if it "appears beyond a reasonable doubt that the error complained of did not contribute to

the verdict obtained." *Neder v. United States*, 527 U.S. 1, 15 (1999).

## 2.     Discussion

On February 13, 2020, in response to a jury note regarding the proper use of documents

admitted for purpose of state of mind, the Court, following consultation with the parties, referred

the jury back to the Court's instructions regarding "Evidence Received for a Limited Purpose,"

and provided additional guidance:

> You can draw inferences from exhibits that were admitted to
> demonstrate state of mind, but only as to state of mind. Exhibits
> received without any limitation may be considered by you for all
> purposes, including for their truth. But where I admitted an exhibit
> for purposes of demonstrating state of mind, that exhibit can only be

> considered for purposes of state of mind, and not for the truth of the
> statements that were made in that exhibit.

(Tr. 2408.)

This instruction was manifestly correct, and there is no merit to the notion, advanced by the defendant (Def. Mot. 37), that it somehow limited the jury from inferring that Franklin or Auerbach might have acted on a particular state of mind, as the defendant baldly asserts. The Court's supplemental instruction limited the jury only from using an exhibit admitted for state-of-mind purposes "for the truth of the statements that were made in that exhibit." (Tr. 2408.) This limitation was correct and the defendant does not argue otherwise. The defendant's suggestion that some other limitation was imposed finds no support in the record.

In fact, the record directly contradicts the defendant's claim. The Court had previously instructed the jury with respect to so-called "state-of mind exhibits" as follows:

> These exhibits were admitted to the extent they shed light on
> Auerbach's and/or Franklin's state of mind, because their state of
> mind could have affected what they communicated to Avenatti, and
> thus affected his state of mind.

(Tr. 2312.) The Court explained further that

> [t]here are times when different inferences may be drawn from the
> evidence. The government may ask you to draw one set of
> inferences, while the defendant asks you to draw another. It is for
> you, and for you alone, to decide what inferences you will draw from
> the evidence.

(Tr. 2314.) Particularly in light of these instructions, to which the Court referred back answering the jury's note, there is no risk whatsoever that the jury somehow thought that it could not draw inferences from exhibits, much less is there merit to the defendant's contention that the Court "plac[ed] strict limitations on the jury's consideration of inferences that could be drawn from the text messages." (Def. Mot. 36.) The Court did just the opposite. The Court told the jury, as noted

22

above, that "Auerbach's and/or Franklin's state of mind. . . . could have affected what they communicated to Avenatti, and thus affected his state of mind" (Tr. 2312), which was precisely what the defendant wanted the jury to believe (*see* Def. Mot. 37). That the jury disagreed with the defendant's argument is yet again not a basis to overturn its verdict.

Similarly, there is no merit to the defendant's claim that the Court should have gone farther and "explained to the jury," again, "that they were permitted to infer from a 'state of mind' document that the declarant then ***acted upon*** the state of mind and communicated his state of mind to Mr. Avenatti." (Def. Mot. 37 (emphasis in original).) The defendant did not request this instruction at the time, and its omission is therefore reviewed for plain error only.[5] *See* Fed. R. Crim. P. 30(d). "For an error to be a 'plain error[ ] or [a] defect[ ] affecting substantial rights,' Fed. R. Crim. P. 52(b), it must be a 'clear' or 'obvious' deviation from current law that 'affected the outcome of the district court proceedings.'" *United States v. Crowley*, 318 F.3d 401, 414-15 (2d Cir. 2003) (quoting *United States v. Olano*, 507 U.S. 725, 734 (1993)). "Even when an error is plain and affects substantial rights, a reviewing court should only exercise its remedial discretion under Rule 52(b) if the error 'seriously affect[s] the fairness, integrity or public reputation of [the] judicial proceedings.'" *Id.* at 415 (quoting *Olano*, 507 U.S. at 736).

The defendant cannot demonstrate any error in the failure to provide the instruction belatedly suggested, let alone error that is plain. The Court had already made perfectly clear that

---

[5]     Notably, the defendant does not now request the instructions that he sought at the time, which, the Court observed, were "clearly wrong." (Tr. 2399; *see also* Tr. 2398-99 (requesting that the Court instruct the jury, "Yes, you may draw inferences from state-of-mind documents, and you may draw inferences from exhibits admitted into evidence."); Tr. 2400 ("We want the Court to answer the question 'Yes' as to both, that it can draw—the jury can draw inferences from state of mind and from exhibits admitted into into evidence."); Tr. 2403 ("So, Judge, our alternative request would be for the Court to instruct, in response to question 1B, the answer is: 'yes, subject to the instructions at pages 10 through 12.'").)

the jury could draw inferences from the evidence—including the very inference the defendant wished the jury to draw—and was "not required to reference specific arguments advanced or defenses raised by counsel in urging particular outcomes." *Rommy*, 506 F.3d at 126.  Rather, "'[i]t is the task of the jury, not the court, to choose among competing inferences.'"  *United States v. Binday*, 804 F.3d 558, 589 (2d Cir. 2015) (quoting *United States v. Martinez*, 54 F.3d 1040, 1043 (2d Cir. 1995)).

Even if the Court should have provided the additional instruction requested by the defendant, the defendant still could not demonstrate prejudice, much less that the omission "seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings," *Olano,* 507 U.S. at 736, as he must in order to be entitled to a new trial.  The defendant argued at great length (as he points out (Def. Mot. 34-35)) regarding inferences he wished the jury to draw from the "state-of-mind exhibits," and, as noted, the Court's instructions expressly permitted the jury to consider such inferences and to draw them if appropriate.  The jury simply and correctly rejected the inferences the defendant asked it to draw.  There is no plausible basis to conclude that, had the Court read the additional sentence now requested by the defendant, the jury would have rejected the testimony of two witnesses it evidently found credible and instead surmised that Franklin and Auerbach must have made statements to the defendant found nowhere in the so-called "state-of-mind exhibits," such as statements requesting an internal investigation or requesting that the defendant demand payment for himself as a condition and even in lieu of payment to Franklin, and then, on that basis, acquitted the defendant.

24

## **CONCLUSION**

For the foregoing reasons, the defendant's motions should be denied.

Dated:  New York, New York
      April 13, 2020

                            Respectfully submitted,

                            GEOFFREY S. BERMAN
                            United States Attorney

         By:    s/ Matthew D. Podolsky
                      Matthew D. Podolsky
                      Daniel C. Richenthal
                      Robert B. Sobelman
                      Assistant United States Attorneys
                      (212) 637-1947/2109/2616