Case 1:19-cr-00373-PGG Document 315 Filed 06/04/21 Page 1 of 28

LAW OFFICE OF
BENJAMIN SILVERMAN
224 WEST 30TH ST., SUITE 302
NEW YORK, NY 10001

TEL (212) 203-8074
FAX (646) 843-3938
Benjamin@bsilvermanlaw.com

MEMO ENDORSED
The Government will respond to this letter by June 11, 2021.

SO ORDERED:
Paul G. Gardephe
Paul G. Gardephe, U.S.D.J.
Dated: June 4, 2021

June 4, 2021

**By ECF**
Honorable Paul G. Gardephe
United States District Judge
Southern District of New York
40 Foley Square
New York, NY 10007

Re: *United States v. Michael Avenatti*, 19 Cr. 373 (PGG)

Your Honor:

I represent Michael Avenatti in the above-captioned case and write respectfully to move (1) to compel the government to disclose witness statements that were not produced pretrial and to explain why they were not produced and (2) to inquire about a reported meeting between the Court and a *New York Post* reporter who, we are told, stood with the government at sidebar during voir dire after receiving prospective jurors' questionnaire responses.

As to the first request, the government recently acknowledged to counsel, following repeated queries, that it did not produce certain notes created during its meetings with trial witness Judy Regnier and will not produce them even today. To defend this position, the government argues that the notes are only possessed by prosecutors in the Central District of California (CDCA), the other Department of Justice (DOJ) office jointly prosecuting Mr. Avenatti. Even if true, that is not a reason to withhold the notes under this Court's precedent. In another recent letter, the government indicated that an agent did not preserve text messages that Ms. Regnier sent before the trial. The government should be compelled to produce Ms. Regnier's complete 3500 material; explain why it did not produce it sooner; endeavor to identify text messages that were not preserved; and explain why they were not preserved.

Second, a *New York Post* reporter recently stated on Twitter that she "met with Judge Gardephe" to ask to attend sidebars during *voir dire* and that the Court "thought about it and approved the request." In her tweets, which are excerpted at Exhibit A and attached in full at Exhibit B, the reporter added that "all media were provided copies of the [jury] questionnaires, courtesy [of] the judge." *Id.* The government likewise stated in a recent letter to Judge Furman in a second case against Mr. Avenatti in this District (the

Daniels Case) that the reporter attended sidebars during *voir dire* in this case "with apparent permission and acknowledgment by Judge Gardephe's chambers." *United States v. Avenatti*, 19 Cr. 374 (JMF) (S.D.N.Y. Apr. 22, 2021), Dkt. 111 at 3 n.3. We respectfully inquire whether the reporter's and the government's statements are accurate and, if they are, we respectfully inquire about the circumstances of any such meetings.

## I. The government did not produce statements by its trial witness, Judy Regnier. We request relief to assess the prejudice to Mr. Avenatti.

Three weeks ago, following inquiries by Mr. Avenatti's counsel in the Daniels Case, the government disclosed that it did not produce certain handwritten notes from its interviews with trial witness Judy Regnier. Although the government acknowledges that DOJ lawyers in CDCA possess the notes, it refuses to produce them. The government also indicated that its agent did not preserve text messages it received from Ms. Regnier just weeks before the trial. The government should be compelled to produce all 3500 material, including notes from witness interviews; explain why it did not do so before the trial; and account for what was not preserved.

### A. The government emphasized Ms. Regnier's testimony in its pretrial filings and during summation.

The government pushed strenuously before the trial to offer Ms. Regnier's testimony and emphasized it during both its opening and rebuttal summations. Dkts. 148, 186, 212; T. 2156-66, 2280. Ms. Regnier was the office manager at Mr. Avenatti's former law firm. The government filed three pretrial letters arguing that her testimony went to "the central disputed issue at trial" about whether Mr. Avenatti "sought money for himself at the expense of his client." Dkt. 186; *see also* Dkts. 148, 212. It insisted that her testimony was "not cumulative" and was offered to address the core questions of Mr. Avenatti's "knowledge, intent, and charged conduct." Dkt. 212.

Ms. Regnier testified that Mr. Avenatti and his firm were in dire financial straits and described a conversation that the government argued proved his criminal intent. T. 1398-1407. The government then highlighted her testimony in both summations to argue that Mr. Avenatti's finances motivated his approach to Nike. T. 2165-66, 2280.

### B. The Court should compel the government to produce Ms. Regnier's Jencks Act statements.

Following discovery requests in Mr. Avenatti's other cases, the government recently acknowledged to counsel that it did not – and will not – produce certain notes from DOJ meetings with Ms. Regnier and other written statements she made to the government's agents. It should be required to disclose them promptly.

**1. The Government should produce all handwritten notes reflecting Ms. Regnier's statements.**

Ms. Regnier met with the government at least seven times before she testified, meetings attended variously by prosecutors from DOJ's offices in both the Southern District of New York (SDNY) and CDCA. Counsel understands that handwritten notes were taken at each meeting and typewritten summaries were prepared after some. For several meetings, the government produced as 3500 material both handwritten notes and typewritten summaries. But for several meetings – including Ms. Regnier's first two meetings with DOJ lawyers on March 25 and March 26, 2019, and a long meeting on November 19, 2019 – the government did not produce the handwritten notes and refuses to provide them to counsel.[1]

The government should promptly produce all notes reflecting what Ms. Regnier said – notes that should have been disclosed before trial per the government's express commitment to comply with the Jencks Act, Dkt. 68. The government wrote to counsel last month that "[w]e do not and have never had in our possession handwritten notes" from five DOJ meetings with Ms. Regnier from March through December 2019. It then conceded two weeks later in an email that those notes exist and attempted to justify its failure to produce them by arguing that they are only possessed in CDCA and are not accessible to SDNY's "prosecution team." The government's argument fails on both the law and the facts.

The law is clear that the government must produce discovery possessed by government lawyers outside SDNY when there is a "joint investigation." *United States v. Martoma*, 990 F. Supp. 2d 458, 460 (S.D.N.Y. 2014) (Gardephe, J.); *United States v. Finnerty*, 411 F. Supp. 2d 428, 432 (S.D.N.Y. 2006) (collecting cases) ("Courts have typically required the prosecution to disclose under Rule 16 documents material to the defense that (1) it has actually reviewed, or (2) are in the possession, custody, or control of a government agency so closely aligned with the prosecution so as to be considered part of the prosecution team."). This principle applies even to lawyers who work in agencies outside DOJ. *United States v. Gupta*, 848 F. Supp. 2d 491, 493 (S.D.N.Y. 2012) ("[A]ny argument that the Government's duty does not extend so far merely because another agency, not the USAO, is in actual possession of the documents created or obtained as part of the joint investigation is both 'hypertechnical and unrealistic.") (quoting *United States v. Shakur*, 543 F. Supp. 1059, 1060 (S.D.N.Y.

---

[1] Before trial, as part of its 3500 disclosure, the government produced typewritten memos prepared three to eight days after several DOJ meetings with Ms. Regnier. Some of the memos state that they are based on handwritten notes.

1982)). Here, the two offices jointly prosecuting Mr. Avenatti were both within DOJ and therefore even more closely related than the United States Attorney's Office is to outside agencies like the SEC.[2]

The facts in this case are equally clear that DOJ's offices worked jointly to prosecute Mr. Avenatti and to manage a central witness, Ms. Regnier:

- When Ms. Regnier was interviewed by a CDCA prosecutor in her home in California on the day that Mr. Avenatti was arrested in New York, she answered questions about Mr. Avenatti's work pertaining to both Nike and Stormy Daniels, which underlie the SDNY indictments.
- Three SDNY prosecutors then flew to Los Angeles with their agents to join CDCA for the government's first meeting with Ms. Regnier at the United States Attorney's Office.
- On December 5, 2019, two CDCA prosecutors called Ms. Regnier about obtaining court-appointed counsel. She was accompanied at her next meeting by a member of SDNY's Criminal Justice Act panel.
- When Ms. Regnier flew to New York for a meeting on January 9, 2020, the lead CDCA prosecutor was present on the phone for the meeting.
- The lead CDCA prosecutor was present on the phone to help prepare her two nights before she testified in this case.
- A senior CDCA prosecutor was present in person at Saint Andrew's Plaza to participate in Ms. Regnier's final witness prep meeting the night before she testified.
- Counsel understands that the lead CDCA prosecutors were in the courtroom for Ms. Regnier's trial testimony on February 6, 2020.

---

[2] Although it does not create binding authority, DOJ's Justice Manual essentially codifies the joint investigation doctrine articulated in this District's case law. U.S. Dep't of Justice, Justice Manual § 165 ("In most cases, 'the prosecution team' will include the agents and law enforcement officers within the relevant district working on the case. In multi-district investigations, investigations that include both the Assistant United States Attorneys and . . . other Untied States Attorney's Offices . . . this definition will necessarily be adjusted to fit the circumstances.").

DOJ's broader team effort to prosecute Mr. Avenatti in multiple jurisdictions at the same time is similarly clear:

- Charges against Mr. Avenatti were unsealed in New York and Los Angeles on the same day – March 25, 2019 – with press conferences timed to follow each other in quick succession.

- Certain 3500 material in this case was reproduced as Rule 16 discovery in the California Case.

- The government's 3500 production in this case included witness statements created in CDCA at which no SDNY personnel were present according to the notes and memos.

Given the close working relationship between DOJ lawyers in New York and California to investigate and prosecute Mr. Avenatti, and in particular to manage Ms. Regnier, the government's claim that CDCA's notes and other 3500 material are not accessible to its "prosecution team" is both "hypertechnical and unrealistic." *Martoma*, 990 F. Supp. 2d at 460. It must promptly produce all of Ms. Regnier's statements to allow counsel to assess, *inter alia*, the extent to which Mr. Avenatti was prejudiced by this discovery lapse.[3]

**2. The Government should produce all text messages from Ms. Regnier in its possession.**

Following inquiries by counsel in the Daniels Case, the government wrote to counsel on May 12, 2021, indicating that at least two of its agents did not preserve their text messages with Ms. Regnier. Specifically, the government stated that Mr. Avenatti's counsel in the Daniels Case asked about a line in Special Agent (SA) Penland's notes from a meeting with Ms. Regnier stating, "Concern RE: twitter posts. Sent Screenshot to SA Penland." According to the government, after "a diligent search of available emails and text message," it was unable to "locate any record" of the text message that was,

---

[3] The government also recently suggested that its failure to produce these statements should be excused because counsel did not request the missing 3500 material sooner. But while the Jencks Act requires a defense motion for witness statements, 18 U.S.C. § 3500(b), there was no need to file a motion in this case because the government agreed to produce 3500 material by January 14, 2020, Dkt. 68. As the government was affirmatively required to produce its witnesses' statements, the question now is whether the failure to produce was inadvertent or deliberate. *See* Section I.B.3 below.

according to SA Penland's notes, "sent" to her less than two weeks before trial. The government then asked Ms. Regnier's counsel if his client preserved the message that she sent to the agent. Although she did not, she remembered sending a screen shot from a tweet that concerned her to another agent, SA Karlous. Two weeks ago, her counsel provided the government with the screen shot but not the original text message. The government in turn provided the screen shot to counsel.

The government's May 12 letter is notable because it concedes, albeit implicitly, that at least one agent did not preserve text messages with a trial witness: the New York-based agent who wrote in her notes that Ms. Regnier "sent" her a message expressing "concern." The government cannot locate the text message, which was sent from its witness to its agent two weeks before trial. As discussed in the next section, the government must assess what messages were not preserved and explain why they were not preserved.

The government informed counsel yesterday that it has not even asked SA Karlous to provide the text message that Ms. Regnier recalls sending to him shortly before trial, or to ask him if there are others, because it insists that he was not a part of the prosecution team, an untenable position for the reasons discussed in the previous section.

In short, the government should be compelled to search for all written exchanges with Ms. Regnier and produce promptly whatever still exists. *E.g.*, *United States v. Carroll*, 2020 WL 104813, at *3 (S.D.N.Y. Jan. 9, 2020) ("To the extent the Government has in its possession emails containing statements by its witnesses, that information is 3500 material and will be produced several weeks prior to trial and not before.").

**3. The Court should require the government to explain its failure to disclose (or even preserve) all 3500 material.**

The Court should require the government to disclose the circumstances surrounding its apparent failure to comply with the Jencks Act – a prerequisite before counsel can assess appropriate remedies. "The legal standard to be applied in determining whether a new trial should be granted when the government fails to produce Jencks Act material, 18 U.S.C. § 3500, depends on whether the suppression was deliberate or inadvertent." *United States v. Hilton*, 521 F.2d 164, 166 (2d Cir. 1975); *accord United States v. Morgenstern*, 933 F.2d 1108, 1116 (2d Cir. 1991). If evidence was withheld or destroyed deliberately, then the government bears "the heavy burden of demonstrating that no prejudice resulted to the defendant." *United States v. Bufalino*, 576 F.2d 446, 449 (2d Cr. 1978).

The government should be compelled to explain why it did not produce all witness

statements, including handwritten meeting notes and text messages; why it declines even today to produce handwritten notes – that it acknowledges exist – from several of Ms. Regnier's meetings with the government; and why text messages that Ms. Regnier sent to agents were not preserved. *United States v. Morell*, 524 F.2d 550, 555 (2d Cir. 1975) (remanding "with directions to hold an evidentiary hearing for the purpose of examining the government's conduct with respect to this material"); *United States v. Ortega*, 2001 WL 1588930, at *8 (S.D.N.Y. Dec. 13, 2001) (granting hearing to examine government's discovery lapses); *United States v. Nguyen*, 1996 WL 26635, at *2 (S.D.N.Y. Jan. 24, 1996) (granting post-trial hearing to examine the government's 3500 compliance).

Further, because the government now acknowledges that it did not produce text messages that its own witness, Ms. Regnier, recalls sending to agents, the government should be asked to (1) search the agents' devices and accounts for any other written statements from Ms. Regnier that were not been produced; (2) state whether it believes communications were unpreserved beyond the text messages specifically requested by counsel in the Daniels Case, and describe what it has done to investigate this matter; (3) identify the time periods and estimated volume of unpreserved communications; and (4) explain what, if any, guidance it provided its agents about preserving 3500 material.

### C. Counsel has endeavored to resolve these matters without asking the Court to intervene.

Counsel certifies under Local Criminal Rule 16.1 that the undersigned conferred with the government in a good faith effort to resolve these disputes. Mr. Avenatti's counsel first raised these matters with the government nearly two months ago, in a letter dated April 8, 2021, and discussed them in subsequent phone calls and in writing with the government; but the government declines to produce the statements sought herein. It insists that it will not, and need not, produce 3500 material possessed by DOJ lawyers in CDCA. It has not disclosed what, if any, steps it has taken to address its agent's failure to preserve communications sent shortly before trial, and whether its investigation reveals a broader problem that may encompass additional communications.

## II. We respectfully inquire about a *New York Post* reporter's claim that she "met with" the Court, was permitted to attend sidebars during *voir dire*, and received jury questionnaires "courtesy of the court."

We further respectfully inquire about a *New York Post* reporter's recent claims that she "met with Judge Gardephe" and attended sidebars during *voir dire* with the Court's permission. The tweets are excerpted at Exhibit A and attached in full at Exhibit B. In an April 15, 2021 tweet, part of a series of tweets concerning her attendance at sidebars during *voir dire*, Emily Saul, a *New York Post* reporter during the trial, wrote, "I made the

request [to be present at sidebar during *voir dire*] ahead of trial, met with Judge Gardephe, and he thought about it and approved the request" and "all media were provided copies of the questionnaires, courtesy [of] the judge." Ex. A.

We do not know whether the reporter's account is accurate; but given her public statement, we feel compelled to inquire.

When the parties recently litigated whether reporters may attend sidebars during *voir dire* in the Daniels Case, the government told Judge Furman that this Court permitted the *New York Post* reporter to attend sidebars in this case:

> [N]either party moved to preclude press from sidebar during *voir dire* or to seal the transcript or otherwise close the courtroom, and the Government observed a member of the press move from the press pool to sidebar in open court **with apparent acknowledgment and permission by Judge Gardephe's chambers**.

*United States v. Avenatti*, 19 Cr. 374 (JMF) (S.D.N.Y. Apr. 22, 2021), Dkt. 111 at 3 n.3. (emphasis added). The government's letter does not state that it told defense counsel that a reporter was present.

The government is mistaken insofar as it suggests that defense counsel would understand sidebars to be open to the media absent a motion to "seal the transcript or otherwise close the courtroom." On the contrary, the government itself requested sidebars during *voir dire* in this case to discuss matters it wished to keep from the public. T. 78:2-78:5 ("The reason we asked for a sidebar is because, to our knowledge the SEC inquiry is not public.").

When counsel raised Mr. Avenatti's own request to appear at sidebar during *voir dire* in this case, T. 69-71, the government did not mention that a reporter would be there. The defense's proposed *voir dire* contemplated *in camera* sidebars, Dkt. 87 at 3, and counsel would have objected if the *New York Post* had publicly requested to attend.[4]

---

[4] *E.g.*, *Globe Newspaper Co. v. Superior Ct. for Norfolk Cty.*, 457 U.S. 596, 609 n.25 (1982); *United States v. King*, 140 F.3d 76, 81 (2d Cir. 1988) (affirming decision to exclude a reporter from sidebar in light of the defendant's right to a fair trial); *United States v. Loera*, 2018 WL 5624143, at *4 (E.D.N.Y. Oct. 30, 2018) (deeming request by reporters to attend sidebars "unreasonable" considering sidebar's function "to allow the prospective juror to speak candidly about a topic that they do not feel comfortable

The reporter's recent tweets also state that "all media were provided copies of the jury questionnaires" – a claim that is supported by two articles published the night before oral *voir dire*, one of which quoted a prospective juror's written questionnaire response that Mr. Avenatti "should already be in prison." *See* Emily Saul, "'Notorious Scumbag': Potential jurors tossed for bashing Michael Avenatti," N.Y. Post (January 27, 2019 7:57 pm), attached hereto as Exhibit C; Emily Saul, "Koby Bryant fan says they're too sad to serve on Michael Avenatti's Nike extortion trial," N.Y. Post (Jan. 27, 2020 7:53 pm), attached hereto as Exhibit D. We do not see a ruling in the record permitting reporters to read prospective jurors' responses to the questionnaire during *voir dire*, and we would have objected.

**III. Conclusion**

Before Mr. Avenatti is sentenced, we respectfully request an opportunity to review the undisclosed 3500 material and examine why it was not disclosed sooner – two necessary steps before Mr. Avenatti and his counsel can determine whether to request further relief. Specifically, the government should be compelled to:

1. Disclose all Jencks Act statements for Ms. Regnier and other witnesses including, without limitation, all notes and text messages possessed by DOJ lawyers prosecuting Mr. Avenatti and their agents;

2. Explain why it did not produce complete 3500 material before the trial; and

3. Identify 3500 material that was not preserved and explain why it was not preserved.

In addition, we respectfully inquire whether the Court met with a *New York Post* reporter concerning this case and whether it is accurate that the Court permitted the reporter to receive prospective jurors' questionnaire responses and join sidebars.

Thank you for your consideration.

Respectfully submitted,

/s/ Benjamin Silverman
Benjamin Silverman
*Attorney for Michael Avenatti*

cc: Counsel of Record (by ECF)

---

discussing in public.").