**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

UNITED STATES OF AMERICA,

        *Plaintiff,*

    v.

MICHAEL AVENATTI

        *Defendant.*

S1 19 Cr. 373 (PGG)

## <u>DEFENDANT MICHAEL AVENATTI'S SENTENCING MEMORANDUM</u>

Scott A. Srebnick
SCOTT A. SREBNICK, P.A.
2214 N.W. 1st Place, 2nd Floor
Miami, FL 33127
Telephone: (305) 285-9019
Facsimile: (305) 377-9937
E-Mail: scott@srebnicklaw.com

E. Danya Perry
PERRY GUHA LLP
35 East 62nd Street
New York, New York 10065
Telephone: (212) 399-8340
Facsimile: (212) 399-8331
E-mail: dperry@perryguha.com

*Attorneys for Defendant Michael Avenatti*

**TABLE OF CONTENTS**

Introduction ........................................................................................................................ 1

    I.      Guidelines Objections ......................................................................................... 2

           A.      The PSR Should Have Grouped all Counts under U.S.S.G. §3D1.2 ................................................................................................. 2

           B.      The PSR Applies the Wrong Guideline for Count 3 and, as a Result, Miscalculated the Loss Amount on that Count ........................... 5

           C.      The PSR Miscalculates the Aggregate Harm ............................................. 6

           D.      The Appropriate Guidelines Range ........................................................... 7

    II.     The §3553 Factors .............................................................................................. 8

           A.      Avenatti's Personal History and Characteristics ........................................ 9

           B.      The Nature and Circumstances of the Offense ......................................... 10

           C.      Deterrence, Punishment, and Protection of the Public ............................ 11

           D.      The Types of Sentences Available ............................................................ 12

           E.      The Sentencing Guidelines Range ............................................................ 12

           F.      The Need to Avoid Unwarranted Sentence Disparities ............................ 12

           G.      There Is No Restitution ............................................................................. 17

           H.      Additional Factors That Support a Variance ............................................ 18

    CONCLUSION ............................................................................................................... 26

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*Beckles v. United States*,
    137 S.Ct. 886 (2017)..................................................................................................8

*Dillon v. United States*,
    560 U.S. 817 (2010)..................................................................................................8

*Gall v. United States*,
    552 U.S. 38 (2007)....................................................................................................8

*Kimbrough v. United States*,
    552 U.S. 85 (2007)....................................................................................................8

*Skilling v. United States*,
    561 U.S. 358 (2010)..................................................................................................5

*United States v. Abbott*,
    No. 19-10117, 2019 WL 4394934 (D. Mass. Sept. 13, 2019)..................................5

*United States v. Aracena De Jesus*,
    No. 20 Cr. 19 (PAE) (S.D.N.Y. July 1, 2020), ECF No. 27...................................25

*United States v. Carty*,
    264 F. 3d 191 (2d Cir. 2001)...................................................................................23

*United States v. Casillas*,
    No. 19 Cr. 863 (VSB) (S.D.N.Y. May 4, 2020), ECF No. 27 ................................24

*United States v. Cavera*,
    550 F.3d 180 (2d Cir. 2008)......................................................................................8

*United States v. Dino Gaudio*,
    No. 3:21-cr-52-BJB-1 (W.D.Ky. 2021), ECF No. 9.........................................1, 17

*United States v. Douglas*,
    634 F.3d 852 (6th Cir. 2011) ....................................................................................6

*United States v. Francis*,
    129 F. Supp. 2d 612 (S.D.N.Y. 2001).....................................................................24

*United States v. Jackson*,
    180 F.3d 55 (2d Cir. 1999)............................................................................1, 13, 14

*United States v. Jackson*,
    No. 1:97-cr-00121-BSJ (S.D.N.Y. 1997), ECF No. 86 .........................................13

*United States v. Jervis Cerino*,
    19 Cr. 323 (S.D.N.Y. July 21, 2020) ................................................25

*United States v. Kincheloe*,
    No. 3:20-cr-00014-NKM-JCH (W.D. Va. 2020), ECF No. 27 ...........................................1, 15

*United States v. Leung*,
    360 F.3d 62 (2d Cir. 2004)................................................................................3

*United States v. Litzenburg*,
    No. 3:20-cr-00013-NKM-JCH (W.D. Va. 2020), ECF No. 50 ...........................15

*United States v. Litzenburg*,
    No. 3:20-cr-00013-NKM-JCH (W.D. Va. 2020), ECF No. 68 ...................1, 15, 16

*United States v. Mateo*,
    299 F. Supp. 2d 201 (S.D.N.Y. 2004)...................................................23

*United States v. Morgan*,
    No. 19 Cr. 209 (RMB) (S.D.N.Y. May 5, 2020), ECF No. 90 ................................24

*United States v. Pierson*,
    No. 14 Cr. 855 (LTS) (S.D.N.Y. May 4, 2020), ECF No. 73 .................................24

*United States v. Salvador*,
    2006 WL 2034637 (S.D.N.Y. 2006) ........................................................24

*United States v. Sedoma*,
    332 F.3d 20 (1st Cir. 2003)................................................................3

**Rules & Statutes**

18 U.S.C. §875...............................................................................2, 17

18 U.S.C. §1343.............................................................................2, 5

18 U.S.C. §1346.............................................................................2, 5

18 U.S.C. §1951.............................................................................2

18 U.S.C. §3553................................................................. *passim*

18 U.S.C. §3561.............................................................................12

Fed. R. Crim. P. 11(c)(1)(C) ........................................................17

U.S.S.G. §2B1.1................................................................. *passim*

U.S.S.G. §2B3.3.............................................................................3, 7

U.S.S.G. §2B4.1 .................................................................................................................5

U.S.S.G. §3B1.3 .............................................................................................................3, 8

U.S.S.G. §3C1.1 ................................................................................................................3

U.S.S.G. §3D1.2 ........................................................................................................ *passim*

U.S.S.G. §3D1.3 ................................................................................................................2

U.S.S.G. §3D1.4 ................................................................................................................2

## Other Authorities

Arun Kundnani, *The Guantánamo in New York You're Not Allowed to Know
    About*, The Intercept (Feb. 5, 2016), https://theintercept.com/2016/02/05/
    mahdi-hashi-metropolitan-correctional-center-manhattan-guantanamo-
    pretrial-solitary-confinement ...........................................................................................19

Aviva Stahl, *Prisoners Endure a Nightmare 'Gulag' in Lower Manhattan, Hidden
    in Plain Sight*, Gothamist (June 19, 2018), https://gothamist.com/news/
    prisoners-endure-a-nightmare-gulag-in-lower-manhattan-hidden-in-plain-sight ...................19

Benjamin Weiser, *Autumn Jackson Receives 26-Month Term in Cosby Case*, N.Y.
    Times (Dec. 13, 1997) https://www.nytimes.com/1997/12/13/nyregion/
    autumn-jackson-receives-26-month-term-in-cosby-case.html ..............................................15

*Evidence from US experts to the House of Lords Select Committee on the
    Extradition Law*, Center for Constitutional Rights (Sept. 12, 2014),
    https://ccrjustice.org/sites/default/files/assets/files/US%20experts%
    20submission%20to%20House%20of%20Lords%20extradition%
    20committee.pdf (accessed June 8, 2021) ...........................................................................19

*Ex-Louisville Hoops Assistant Dino Gaudio Pleads Guilty on Extortion Charge,
    Will Avoid Prison Time*, Associated Press (June 4, 2021),
    https://www.espn.com/mens-college-basketball/story/_/id/31566177/ex-
    louisville-hoops-assistant-dino-gaudio-pleads-guilty-extortion-charge-avoid-
    prison..................................................................................................................................17

Jeanne Theoharis, *I Tried to Tell the World About Epstein's Jail. No One Wanted
    to Listen*, The Atlantic (Aug. 16, 2019), https://www.theatlantic.com/ideas/
    archive/2019/08/real-scandal-mcc/596257 .........................................................................19

Joseph Goldstein, *Manhattan Jail That Holds El Chapo Is Called Tougher Than
    Guantánamo Bay*, N.Y. Times (Jan. 23, 2017), https://www.nytimes.com/
    2017/01/23/nyregion/el-chapo-guzman-manhattan-jail.html ................................................19

Larry Neumeister and Michael Biesecker, *For Inmates Like Epstein, Suicide Watch is Meant to be Short*, Associated Press (Aug. 14, 2019), https://apnews.com/article/6bd16a2216664ca1bf8eabbfebc72c7c ..........................................19

Mary Emily O'Hara, *NYC's 'Little Gitmo' Holds Terrorism Suspects in Extreme Isolation for Years*, Vice (Apr. 7, 2014), https://www.vice.com/en_us/article/vbnpg9/nycs-little-gitmo-holds-terrorism-suspects-in-extreme-isolation-for-years ...................................................................................................................................19

Sally Eberhardt and Jeanne Theoharis, *Five Years Ago, Obama Pledged to End Torture. He Still Hasn't*, The Nation (Jan. 22, 2014), https://www.thenation.com/article/archive/five-years-ago-obama-pledged-end-torture-he-still-hasnt ......................................................................................19

*Virginia Attorneys Sentenced for Attempting to Extort a Multinational Chemicals Company*, U.S. Department of Justice (Sept. 18, 2020), https://www.justice.gov/opa/pr/virginia-attorneys-sentenced-attempting-extort-multinational-chemicals-company .............................................................15

Defendant MICHAEL AVENATTI ("Avenatti"), through counsel, respectfully submits this Sentencing Memorandum, incorporating his objections to the guidelines calculations recommended by the Probation Office in the Presentence Report ("PSR"), and his arguments in mitigation of sentence pursuant to 18 U.S.C. §3553.

## INTRODUCTION

On June 30, 2021, Avenatti will appear before the Court for sentencing as a first-time offender in a white-collar case. The offenses of conviction did not involve violence. They did not cause an actual financial loss to any victim; indeed, restitution is not an issue in the case. Thus, while we recognize that the offenses require punishment, the length of incarceration should be dictated by reason and fairness, and by reference to similar sentences in non-violent "economic extortion" cases that caused no identifiable financial loss.

We are aware of few "economic extortion" prosecutions with fact patterns similar to this one, and the Court should look for guidance to the sentences imposed in those cases. Specifically, we respectfully submit that the Court should consider the most notable and on-point precedent from this district, *see United States v. Jackson,* 180 F.3d 55, 67-71 (2d Cir. 1999), *on reh'g*, 196 F.3d 383 (2d Cir. 1999) (26 months, in the form of a 6 month custodial sentence, followed by home incarceration), as well as a recent economic extortion case from Virginia involving two attorneys who attempted to extort over $200 million, over a period of some months. *See United States v. Litzenburg*, No. 3:20-cr-00013-NKM-JCH (W.D. Va. 2020) (24 months in prison); *United States v. Kincheloe*, No. 3:20-cr-00014-NKM-JCH (W.D. Va. 2020) (12 months in prison); *see also United States v. Dino Gaudio*, No. 3:21-cr-52-BJB-1 (W.D.Ky. 2021), ECF No. 9 (sentence of probation recommended for University of Louisville assistant basketball coach).

1

The appropriate sentence should also consider the particularly brutal punishment that Avenatti already suffered during his largely solitary confinement at MCC-New York.  In the end, we respectfully submit that a sentence of ***no more than eighteen (18) months*** – six months in prison followed by 12 months of home confinement – is "sufficient, but not greater than necessary" to achieve the purposes of sentencing in our justice system.  18 U.S.C. §3553(a)(2).

## I.   GUIDELINES OBJECTIONS

### A.   The PSR Should Have Grouped all Counts under U.S.S.G. §3D1.2

The PSR computes a Total Offense Level of 33 by dividing the three offenses of conviction into two Groups.  Group 1 consists of Counts 1 and 2 (which charged extortion-related offenses in violation of 18 U.S.C. §§875(d) and 1951) and, with various adjustments, yields an adjusted offense level of 31.  PSR, ¶¶31-36.  Group 2 consists of Count 3 (which charged honest services wire fraud in violation of 18 U.S.C. §§1343 and 1346) and, with various adjustments, yields an adjusted offense level of 30.  PSR, ¶¶37-42.  The PSR then applies U.S.S.G. §3D1.4 to compute the number of Units and, as a result, increases the offense level for Group 1 by 2 levels to arrive at a total adjusted offense level of 33.  PSR, ¶43.

Avenatti objects to the PSR's failure to treat all three offenses as a single Group under §3D1.2(c).  Grouping of all three counts as a single Group would eliminate the 2-level increase under §3D1.4.  *See* U.S.S.G. §3D1.3(a).  Grouping is required under §3D1.2(c) "when one of the counts embodies conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to another of the counts."

Here, there is no doubt that the "honest services wire fraud" charged in Count 3 "embodies conduct that is treated as a[n] … other adjustment" to the guideline applicable to Counts 1 and 2.  Specifically, the offense level for the extortion offenses in Group 1 was already enhanced by two

levels based on a finding that Avenatti abused his position of trust vis-à-vis his client, Coach Gary Franklin, under U.S.S.G. §3B1.3.  *See* PSR, ¶34.  That "abuse of trust" is the essence of the honest services fraud charged in Count 3.

Likewise, the extortion offenses charged in Counts 1 and 2 embody "conduct that is treated as specific offense characteristic" in Count 3.  Namely, the alleged demand for payment from Nike that forms the basis for the twenty-level enhancement under §2B1.1(b)(1)(K) for Counts 1 and 2, *see* PSR, at ¶32, is precisely the same demand for payment that enhances Avenatti's offense level by twenty levels in Count 3.  *See* PSR, at ¶38.  Thus, Counts 1 and 2 necessarily embody "conduct that is treated as a specific offense characteristic" in Count 3.

The PSR is plainly recommending enhancements to each group based on conduct charged in the other group, in violation of §3D1.2(c).  Avenatti should not receive another two-level enhancement by treating the three counts as two separate groups.  *See, e.g., United States v. Leung*, 360 F.3d 62, 68 (2d Cir. 2004) (vacating sentence for failure to group counts under U.S.S.G. §3D1.2(c), noting that "[t]he District Court's enhancement of the New York passport count by two levels for obstruction of justice under section 3C1.1, while at the same time separately grouping an obstruction count predicated on the same underlying behavior, violated section 3D1.2(c)."); *United States v. Sedoma*, 332 F.3d 20, 25-26 (1st Cir. 2003) (vacating defendant's sentence as plain error under §3D1.2(c) for failure to group drug conspiracy and conspiracy to commit honest services fraud, where abuse of trust that formed basis for honest services count embodied conduct that was used to enhance defendant's offense level for drug conspiracy).  Finally, the Probation Office's position that offenses sentenced under U.S.S.G. §2B3.3 are "precluded from grouping under 3D1.2(d)," *see* PSR, at p.38, is misplaced because "subsection (d) has no bearing on whether subsection (c) mandates grouping in this case."  *Leung*, 360 F.3d at 69.

The Court's jury instructions provide the clearest evidence that each of the three counts charges conduct embodied in the others. The Court instructed the jury that to find that Avenatti acted "wrongfully" for purposes of both extortion offenses, the jury must find either that "(1) in demanding that he be hired and paid to conduct an internal investigation, Avenatti understood that he was acting in furtherance of his own interests, *and was not pursuing Franklin's objectives*; or Avenatti's threat of harm and demand that he be hired and paid to perform an internal investigation had no nexus to any claim of Franklin's *that Avenatti reasonably believed he had been authorized by Franklin to pursue*." Trial Tr. 2/12/20, p.2329 (emphasis added). Indeed, the very essence of the "wrongful" conduct, as instructed by the Court, was Avenatti's purported failure to act in furtherance of Franklin's objectives or to obtain Franklin's authorization for the settlement demand. *Id.* Likewise, as to Count 3, the Court instructed the jury on a lawyer's duties, including duties to keep the client informed and to avoid conflicts of interest, and further instructed the jury that the government had to prove that Avenatti acted without Franklin's authorization. Trial Tr. 2/12/20, pp. 2335-2344. These points were repeatedly hammered home by the government in summation, as the prosecutor argued multiple times that Avenatti committed extortion by "taking advantage of Gary Franklin" and using what Gary Franklin told him to get Nike to "cough up that money." Trial Tr. 2/11/20, p.2184. The three counts were clearly intertwined and should have been grouped.

The three counts should also have been grouped together under §3D1.2(d). The offense level for all three counts "is determined largely on the basis of the total amount of harm or loss, the quantity of a substance of involved, or some other measure of aggregate harm…". In this case, the same specific offense characteristic for all three counts – *i.e.,* the measure of harm under §2B1.1 – is determined on the basis of the same demand for payment from Nike. *Compare* PSR,

at ¶32 *with* ¶38, both of which use the same language ("Pursuant to 2B1.1(b)(1)(L), and 2B3.3(b)(1)(B), because the amount demanded was more than $9.5 million but not more than $25 million, the offense level is increased by 20 levels.").  Logic dictates the counts should also be grouped as a single Group under §3D1.2(d).

> **B.**      **The PSR Applies the Wrong Guideline for Count 3 and, as a Result, Miscalculated the Loss Amount on that Count**

In Count 3, Avenatti was convicted of defrauding Coach Franklin of his right to Avenatti's honest services, in violation of 18 U.S.C. §§1343 and 1346.  Yet, rather than apply the fraud guideline (U.S.S.G. §2B1.1) and determine the amount of loss that Avenatti caused or intended to cause to Coach Franklin, the PSR recommends a cross-reference to U.S.S.G. §2B4.1, the commercial bribery guideline, and calculates the sentence based on the amount demanded from Nike.  The PSR cites U.S.S.G. §2B1.1(c)(3), which requires the Court to apply another guideline if "the conduct set forth in the count of conviction establishes an offense specifically covered by another guideline in Chapter Two."

The PSR, however, fails to cite "an offense" committed by Avenatti that is covered by U.S.S.G. §2B4.1, the commercial bribery guideline.   Section 2B4.1 applies to "various federal bribery statutes that do not involve government officials."  See §2B4.1, Background.  Avenatti's conduct did not violate a federal bribery statute.  Although the application of §1346 is limited to paradigmatic cases of kickbacks and bribery under *Skilling v. United States*, 561 U.S. 358 (2010), it is a fraud statute, *not* a federal bribery statute.  Because the charge is a scheme to defraud Coach Franklin of honest services, Avenatti submits that the law requires the use of the fraud guideline, §2B1.1, not the commercial bribery guideline.  *See United States v. Abbott*, No. 19-10117, 2019 WL 4394934, *2 (D. Mass. Sept. 13, 2019).  Thus, any specific offense characteristic adjustment to the offense level under §2B1.1(b)(1) should be based not on the amount demanded from Nike,

but rather on the actual or intended loss to Coach Franklin under the fraud guideline. In that regard, there was no actual or intended loss to Coach Franklin. To be sure, in the government's view, Coach Franklin's legal claim, if any, was worth no more than $72,000, the value of his contract with Nike. And, in any event, Avenatti did not cause Coach Franklin to lose that contract, nor did he cause him to lose the ability to sue Nike for damages stemming from the loss of that contract, as evidenced by the absence of any recommendation for restitution in this case. Even though the government argued at trial that Avenatti took advantage of Coach Franklin by utilizing confidential information to demand money for himself, the government never identified any loss to Coach Franklin caused by that demand. Indeed, as the Court noted at trial, there was never any settlement offer from Nike, real or imagined, that Avenatti rejected on behalf of Coach Franklin or failed to communicate to Coach Franklin. *See* Trial Tr. 2/11/20, at pp. 2107 (Court: "I mean everyone here knows there was no offer from Nike. So what is the problem with just stipulating to that?").[1]

### C.    The PSR Miscalculates the Aggregate Harm

Avenatti objects to the twenty-level adjustment applied to all three counts under §2B1.1(b)(1)(K) based on the "amount demanded" by Avenatti from Nike to conduct an internal investigation. PSR, at ¶¶32, 38. Because Nike admittedly needed to (and in fact did) conduct an internal investigation of the allegations that were raised in the Adidas scandal – even if Nike did not need Avenatti himself to conduct it – the amount demanded must be reduced by the amount that an internal investigation would have cost Nike. *See, e.g., United States v. Douglas*, 634 F.3d 852, 863 (6th Cir. 2011) (affirming district court's finding of no loss in an extortion case, noting

---

[1] In the event the Court determines that the offense levels should be grouped under §3D1.2, then the issue of which guideline applies to Count 3 is rendered moot because the extortion guideline will necessarily dictate the offense level.

that "General Motors might not have hired the unqualified relatives were it not for the threat, but the company would have filled these positions with other applicants regardless.").

The evidence at trial was that Avenatti demanded a $12 million retainer, with a minimum of $15 million and a maximum of $25 million, which was dependent on the amount of work that would be required during the investigation.  Avenatti and Mark Geragos repeatedly discussed in a recorded conversation that they actually intended to conduct an internal investigation, employ staff, and hire investigators to get to the bottom of Nike's corruption of amateur basketball. Moreover, government witness Scott Wilson, the Boies Schiller attorney representing Nike, admitted that a legitimate internal investigation of the allegations raised regarding Nike's corruption of college basketball could cost up to $20 million.  Trial Tr. 1/31/20, pp.540-541.  Thus, the amount "demanded" should be reduced by $20 million, the amount that an internal investigation could have cost Nike.[2]

### D.      The Appropriate Guidelines Range

In the event the Court determines that all counts should be grouped but that no other corrections need be made to the PSR, then the adjusted offense level would be 31, corresponding to a guidelines range of 108-135 months.  Of course, if the Court determines (as argued in Section I.C., *supra*) that the aggregate harm under the extortion guideline should be reduced because Nike had to conduct an internal investigation in any event – an investigation that, by Wilson's own estimation, would cost in the same range demanded by Avenatti – then the "loss" under the §2B1.1 guidelines range should be reduced to zero.  The base offense level under §2B3.3(a) would be nine

---

[2] The evidence at trial further showed that, when pressed by Scott Wilson for a settlement number to avoid having Avenatti conduct an internal investigation, Avenatti (1) demanded $22.5 million to be paid to Coach Franklin in order to settle his claim and (2) provided a revised settlement agreement that required two signatures of Coach Franklin and a signature by an authorized Nike executive.

(9) which, coupled with a two level adjustment under §3B1.3, would yield a total offense level of 11 and a guidelines range of *8-14 months*.

## II.   <u>THE §3553 FACTORS</u>

In sentencing a defendant, a district court must "begin [its] analysis with the Guidelines and remain cognizant of them throughout the sentencing process." *Gall v. United States*, 552 U.S. 38, 50 n.6 (2007). However, a sentencing court "may not presume that the Guidelines range is reasonable." *Id.* at 50. The system "requires a court to give respectful consideration to the Guidelines," but it "permits the court to tailor the sentence in light of other statutory concerns as well." *Kimbrough v. United States*, 552 U.S. 85, 101 (2007) (*quoting United States v. Booker*, 543 U.S. 220, 245-46 (2005)). "Although the Guidelines remain 'the starting point and the initial benchmark' for sentencing, a sentencing court may no longer rely exclusively on the Guidelines range; rather, the court 'must make an individualized assessment based on the facts presented' and the other statutory factors." *Beckles v. United States*, 137 S.Ct. 886, 894 (2017) (*quoting Gall*, 552 U.S. at 49-50) (internal citation omitted).

"The Guidelines thus continue to guide district courts in exercising their discretion by serving as 'the framework for sentencing,' but they 'do not constrain th[at] discretion.'" *Id.* (*quoting Peugh v. United States*, 133 S.Ct. 2072, 2083 (2013)). A "sentencing court may not presume [the Guidelines] correct or reasonable when it considers an individual sentencing decision." *Dillon v. United States*, 560 U.S. 817, 841 (2010). In exercising discretion, a sentencing judge "has very wide latitude to decide the proper degree of punishment for an individual offender and a particular crime." *United States v. Cavera*, 550 F.3d 180, 188 (2d Cir. 2008) (en banc). District judges are "generally free to impose sentences outside the recommended range" and an appellate court "will not substitute our own judgment for the district court's on the question of

what is sufficient to meet the §3553(a) considerations in any particular case." *Id.* at 189. Ultimately, the district court is guided by the requirement to impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in 18 U.S.C. §3553(a)(2). *Id.*

This memorandum incorporates Avenatti's request for a downward variance from the PSR-recommended guidelines range pursuant to the factors outlined in 18 U.S.C. §3553(a). Avenatti respectfully requests a sentence of ***no greater than 18 months*** (6 months of prison, 12 months of home confinement) because such a sentence is "sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. §3553(a). Such a sentence is reasonable when compared to other economic extortion cases that involved no financial loss and no threats of violence or physical injury.

### A.      Avenatti's Personal History and Characteristics

Avenatti's personal and family history is laid out extensively in the PSR. *See* PSR, at ¶¶59-105. Rather than regurgitate the summary of his childhood contained in the PSR, we ask the Court to pay particular attention to paragraphs 61-63 to understand Avenatti's upbringing and the challenges he faced from a young age.

During his formative years, Avenatti took considerable steps to support himself financially, and he developed the "unmatched" work ethic described by his childhood friend Jay Manheimer. PSR, at ¶79. Beginning at 15, and through his high school years, Avenatti worked odd jobs, including at McDonald's, Marshall's Department Store, and a supermarket. He worked as a front desk clerk and pin setter at local bowling alleys, and as an accounting clerk at an orthopedics center. He managed the Creve Couer Athletic Association complex in Missouri, and umpired more than 500 youth baseball games, all in an effort to support himself.

Avenatti's drive for success allowed him to pay his own way through college and law school. During those years of higher education, he worked for multiple political campaigns and as a law clerk for various law firms. He was the first person in his family to graduate college, earning a Bachelor of Arts degree from the University of Pennsylvania. He later attended and graduated *Order of the Coif* from the evening program at George Washington University Law School, which he attended because he had to work during the day to support himself. While in law school, Avenatti was a member of the law review and assisted elderly and ill older prison inmates as part of the law school's pro bono "Project for Older Prisoners (POPS)," work he continued for over ten years after graduation. He received little to no financial support from others; he overcame significant challenges and was self-made.

Notwithstanding the challenges of his youth, Avenatti is a loving and devoted father, adored by his two minor daughters from the union with his first wife, Christine Carlin. Avenatti has a healthy co-parenting relationship with Christine; they share joint legal and physical custody. Avenatti sees and speaks with his daughters regularly. Avenatti also has a six-year-old son from the marriage to his second wife. Immediately after Avenatti's release from custody into house arrest in April 2020, he petitioned the family court for the right to regularly see his son. Avenatti won visitation rights and, as a result, is able to have frequent visits with his young son.

### B.   The Nature and Circumstances of the Offense

The nature and circumstances of the offenses of conviction neither compel a lengthy sentence of incarceration nor preclude a minimal sentence. Avenatti was convicted of non-violent offenses that caused no direct loss to either Nike or Coach Franklin; as noted, neither restitution nor forfeiture is an issue in the case. Virtually all of the charged criminal conduct involved: (1) verbal statements made to opposing lawyers in the context of discussions related to the settlement

of an actual claim and civil action contemplated by Coach Franklin; and (2) the attempt by Avenatti to misuse confidential information from his client for his own personal benefit.

Although the jury concluded that Avenatti crossed the line, the line was not so clear to Mark Geragos, a veteran criminal defense lawyer who participated in every conversation that Avenatti had with the Nike lawyers, as well as several others outside of Avenatti's presence. Geragos never once expressed any reservations about Avenatti's demands for money to conduct an internal investigation or threats to publicize Nike's misconduct. Instead, Geragos was a willing and active participant. If the line was so clear in this case between aggressive negotiating and criminal conduct, Geragos – who had previously represented Avenatti in a criminal matter (which was wholly without basis and was dismissed with no charges) – presumably would have not allowed Avenatti to cross it. Moreover, if the line was so clear and the need for deterrence so great, then the government would have charged Geragos. This is not the type of offense conduct that merits a guidelines sentence or a sentence of incarceration approximating the one being recommended by the Probation Office.

### C.   Deterrence, Punishment, and Protection of the Public

The principals of deterrence, punishment, and protection of the public do not warrant a lengthy sentence in this case. Avenatti will never practice law again, so there is no risk that he will use his law license in the fashion that resulted in the charges and convictions in this case. Specific deterrence is not a genuine consideration.

As for general deterrence, Avenatti's epic fall and public shaming has played out in front of the entire world. The Court may take judicial notice of this fact, as Avenatti's cataclysmic fall has been well-documented. He is openly mocked by the former President of the United States and his preferred media outlets, to the glee of millions of the former President's followers and

supporters.  He spent months in horrific conditions of solitary confinement and isolation, as discussed in more detail *infra*.  He cannot go anywhere in public without inducing and subjecting himself to vitriolic comments and abuse.  These circumstances alone would deter anyone in Avenatti's shoes from engaging in similar conduct.  Finally, while punishment is also a consideration, a sentence of no more than 18 months is sufficient for the reasons articulated in this memorandum.

### D.  The Types of Sentences Available

The offenses of conviction are Class C and E felonies, which means that Avenatti is statutorily eligible for a sentence of probation, 18 U.S.C. §3561(a)(1) and (c)(1), although we are not suggesting that he receive such a sentence.  But, as discussed in the section on sentencing disparities below, an analysis of white-collar sentences that caused no financial loss – as well as economic extortion cases from this district and others – suggests that a sentence of no greater than 18 months (6 months in prison, 12 months of home confinement) is appropriate.

### E.  The Sentencing Guidelines Range

The Probation Office calculates a guidelines range of 135-168 months.  Avenatti contends that the guidelines range should be less: 108-135 months if the Court sustains only his "grouping" objection, and 8-14 months if the Court accepts that the amount demanded should be reduced to zero because Nike would have had to conduct an internal investigation in any event (as they did).

### F.  The Need to Avoid Unwarranted Sentence Disparities

18 U.S.C. §3553(a)(6) mandates that the court consider "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct."  Although no other defendants have been sentenced in this case, again, the Court should first consider who is not before the Court: Mark Geragos.  He has not been charged with a

single offense, almost certainly will not be, and will face no time in prison as a result of his conduct. He continues to practice law and maintains a national profile, including by recently speaking at a CLE event for at least one State Bar.

Given the variables that factor into a sentencing decision in a particular case, it is not always useful to compare sentences in unrelated cases. Here, however, the Court has the benefit of several highly publicized "economic extortion" cases that involved the same basic coupling of circumstances: a demand for money combined with a threat of public exposure and damage to reputation.

In *United States v. Jackson*, defendant Autumn Jackson was sentenced to ***26 months'*** imprisonment, not including adjustments discussed *infra*, after being found guilty of attempting to extort actor Bill Cosby of ***$40 million***.[3] Jackson repeatedly threatened to publicize in tabloids her claim that she was Cosby's daughter born out-of-wedlock, and to thereby harm Cosby's reputation unless Cosby agreed to pay her, despite that she had no claim of right to any money.[4] In connection with her demand for $40 million, Jackson went so far as to fax Cosby's attorney an unsigned copy of a contract that she received from a tabloid for the sale of her damaging story against Cosby.[5] Jackson's campaign of threats was carried out over a longer period of time than Avenatti's, through multiple media, and to multiple third parties, including Cosby's attorneys, corporate sponsors, and

---

[3] *See* Amended Judgment, *United States v. Jackson*, No. 1:97-cr-00121-BSJ (S.D.N.Y. 1997), ECF No. 86; *United States v. Jackson*, 180 F.3d 55, 58-59 (2d Cir.), *on reh'g*, 196 F.3d 383 (2d Cir. 1999).

[4] *See Jackson*, 180 F.3d at 59.

[5] *Id.* at 62.

CBS, the television network airing Cosby's TV show.[6]  In a letter faxed to the President of CBS, Jackson wrote:

> If my father, CBS, and you are not interested in this settlement, then I am quite sure that NBC, ABC, and other networks will have an interest in hearing my story of desperation reaching out for my father's love.... [Cosby's] show and his private life just happens [sic] to be one of your best properties and this disclosure ... could undoubtedly effect [sic] your ratings negatively.[7]

Critically, despite being warned expressly by Cosby's attorney that her actions amounted to extortion, Jackson claimed that "she knew what she was doing" and persisted.[8]

Ultimately, Jackson and one of her co-conspirators flew to New York to meet with Cosby's lawyer at his law offices.[9]  They traveled to New York, not as lawyers acting on behalf of a client, but as individuals in search only of personal gain.  After negotiating and signing a settlement agreement for $24 million, which was prepared by Cosby's lawyer under the direction of the FBI, Jackson and her co-conspirator were arrested in the law firm conference room while waiting for their settlement checks.[10]

Judge Barbara Jones imposed a sentence of 26 months after Jackson was convicted at trial. But Judge Jones recommended that Jackson enter a six-month boot camp program, which would then allow Jackson to be released into a community halfway house and serve the rest of her term

---

[6] *Id*. at 60-63.

[7] *Id*. at 63.

[8] *Id*. at 61.

[9] *Id*. at 63-64.

[10] *Id*.

in home detention.[11]  ***Thus, the intended incarceration portion of Jackson's sentence was a six-month boot camp program***.  When compared to Avenatti, Jackson's conduct was more egregious, occurred over a longer period of time, involved more money, and centered on threats to reveal information whose accuracy was not even confirmed.

The recent cases of *United States v. Litzenburg* and *United States v. Kincheloe*, are also particularly instructive.  There, two attorneys pled guilty and were sentenced to ***24 months'*** and ***12 months'*** imprisonment, respectively, for their roles in connection with a scheme to extort a multinational chemical company of over ***$200 million***.[12]  According to the government, the attorneys claimed to represent over 1,000 cancer patients in litigation involving a household weed killing product, and warned that the company had legal exposure for manufacturing allegedly carcinogenic chemical ingredients used in the herbicide.[13]  Specifically, the attorneys demanded that the company enter into a settlement with one purported client for $5 million, but separately enter into "consulting agreements" worth $200 million with the attorneys and their associates.[14] The attorneys threatened that, if the company did not accede to their demands, they would make public statements and commence litigation that they estimated would cost "well into the billions"

---

[11] Benjamin Weiser, *Autumn Jackson Receives 26-Month Term in Cosby Case*, N.Y. Times (Dec. 13, 1997), https://www.nytimes.com/1997/12/13/nyregion/autumn-jackson-receives-26-month-term-in-cosby-case.html.

[12] *See* Amended Judgment, *United States v. Litzenburg*, No. 3:20-cr-00013-NKM-JCH (W.D. Va. 2020), ECF No. 68; Judgment, *United States v. Kincheloe*, No. 3:20-cr-00014-NKM-JCH (W.D. Va. 2020), ECF No. 27; *see also Virginia Attorneys Sentenced for Attempting to Extort a Multinational Chemicals Company*, U.S. Department of Justice (Sept. 18, 2020), https://www.justice.gov/opa/pr/virginia-attorneys-sentenced-attempting-extort-multinational-chemicals-company.

[13] Government's Sentencing Memorandum, *United States v. Litzenburg*, No. 3:20-cr-00013-NKM-JCH (W.D. Va. 2020), ECF No. 50, at 2-3.

[14] *Id.* at 3.

to defend and cause "reputation damage" and "a 40 percent stock loss coming off the top" of the stock price of the company's parent, a publicly traded company.[15]   The attorneys also used aggressive language in conveying their threats and demonstrated acknowledgment of a clear conflict of interest, asserting that "we can be, um, your biggest problem. Right now we're your only problem or potential problem. . . . [O]r we can be an asset."[16]

Over a period of many months, and in discussions recorded by law enforcement, one or both of the attorneys made extortionate demands of the company and took a number of steps to harm the potential claims of their cancer patient clients.[17]   In exchange for being hired as consultants, the attorneys would not disclose to their clients the company's purported legal exposure, would discourage others from bringing suit against the company, and even indicated a willingness to "take a dive" and "ask the wrong questions" during a bogus deposition of a toxicology expert in order to create a favorable record for the company and deter potential future claims by additional cancer victims.[18]   The attorneys also set up a shell corporation to receive the $200 million in "consulting fees" that they admitted would not be distributed to their clients.[19]

Thus, *Litzenburg* and *Kincheloe* involved: (1) far more egregious and prolonged conduct; (2) attorneys demanding roughly 10 times the amount demanded by Avenatti; and (3) attorneys clearly acting against the best interests of their cancer patient clients.   Yet, Main Justice offered plea bargains to each lawyer with a statutory maximum of two years.

---

[15] *Id*. at 4-6.

[16] *Id.* at 6.

[17] *Id.* at 2-10.

[18] *Id.* at 2, 5, 9.

[19] *Id.* at 9-10.

In an even more recent economic extortion case filed in May, *United States v. Dino Gaudio*, No. 3:21-cr-52-BJB-1 (W.D.Ky. 2021), the government charged a University of Louisville assistant basketball coach with extortion under §875(d) for threatening to expose NCAA violations to the media unless the public university paid him 17 months of salary at $25,000 per month or a lump sum payment of $425,000. (ECF No. 9). In exchange for a binding Rule 11(c)(1)(C) sentencing recommendation of ***probation*** offered by the government, the defendant pleaded guilty.[20]

In addition to these "economic extortion" cases, the Court should look to sentences in other fraud cases that resulted in no loss to victims. These include the many "Varsity Blues" cases, in which the parents of college applicants received less than one year in prison for defrauding colleges during the application process. The Court should also consider the highly-publicized NCAA/Adidas cases from this district, where the defendants received sentences of less than a year in prison despite being found guilty of using payments to defraud colleges in connection with amateur basketball. A chart of various relevant cases – including economic extortion cases – is attached as Exhibit 1.

### G.   There Is No Restitution

There was no financial loss to any victims so there is no restitution in this case. *See* 18 U.S.C. §3553(a)(7). The fact that a white collar federal criminal case was brought despite this fact is itself an important mitigating factor.

---

[20] *Id.*; *see Ex-Louisville Hoops Assistant Dino Gaudio Pleads Guilty on Extortion Charge, Will Avoid Prison Time*, Associated Press (June 4, 2021), https://www.espn.com/mens-college-basketball/story/_/id/31566177/ex-louisville-hoops-assistant-dino-gaudio-pleads-guilty-extortion-charge-avoid-prison.

## H.    Additional Factors That Support a Variance

Avenatti requests a downward variance from the guidelines range recommended in the PSR due to the inhumane conditions of his confinement while at the MCC before, during, and after trial.  The degree of punishment inflicted on Avenatti before sentencing is unique in our justice system – and rightly so. It is intolerable and should not be inflicted on anyone.

On the evening of January 14, 2020, with the trial in this case scheduled to commence the following week, the U.S. Attorney's Office in California caused Avenatti to be arrested while he was attending a State Bar hearing in Los Angeles.  The Court noted that the timing of the arrest was especially troublesome, given that the alleged conduct used by the government to justify the arrest had been known to the government for months prior.[21]

Upon being booked in the Santa Ana jail that night, Avenatti was placed in solitary confinement in a wing of the jail generally reserved for violent inmates with disciplinary problems.[22]  Avenatti's request to take a shower upon his arrival was denied.  The following day, despite repeatedly asking to be housed in general population, Avenatti remained in solitary confinement.  He was again denied a shower.  On January 16, 2020, Avenatti spent the entire day in his cell with no ability to use the phone, or have any contact with his attorneys.

Early in the morning of Friday, January 17, 2020, Avenatti was removed from his cell and flown to Teterboro, New Jersey.  At all times, he was handcuffed, shackled at the waist and required to wear leg irons around his ankles.  He was permitted to use the toilet only with the door

---

[21] The timing of his arrest resulted in a substantial waste of taxpayer money because Avenatti subsequently had to be flown, accompanied by three U.S. Marshals, on a chartered private jet from Orange County to New York.

[22] Prior to March 2019, he had never been charged with any crime, let alone convicted of any crime.

open. He still had not been permitted to shower.  He was transported to the MCC, whose substandard conditions are widely considered among the worst, if not the worst, in the nation.

Despite Avenatti's repeated request that he not be placed in solitary confinement, the Bureau of Prisons placed him in the notorious "10 South" unit of the jail,[23] a unit of only six to seven individual cells that is considered the highest security pre-trial facility in the United States. It typically holds those individuals classified as the most dangerous and who pose dire national security threats to the United States (*e.g.,* international terrorists and drug kingpins, such as Joaquin "El Chapo" Guzman and Sayfullo Saipov, who currently faces eight murder charges and the death penalty for an alleged terror attack carried out in New York City in 2017).[24]  Avenatti's cell previously had been used to hold "El Chapo" Guzman before, during, and after his trial in Brooklyn, New York.  The abhorrent and brutal conditions of 10 South have been widely reported and routinely described by experts as being "diabolical," a form of torture, worse than those at Guantanamo Bay, and causing severe psychological trauma.[25]

---

[23] The extreme isolation and brutal conditions of 10 South have been described as "a punitive measure that is unworthy of the United States as a civilized democracy," according to a former special monitor on torture and punishment for the United Nations who investigated the case of one prisoner held in the unit.  *See Evidence from US experts to the House of Lords Select Committee on the Extradition Law*, Center for Constitutional Rights (Sept. 12, 2014), https://ccrjustice.org/ sites/default/files/assets/files/US%20experts%20submission%20to%20House%20of%20Lords% 20extradition%20committee.pdf (accessed June 8, 2021), Sally Eberhardt and Jeanne Theoharis, *Five Years Ago, Obama Pledged to End Torture. He Still Hasn't*, The Nation (Jan. 22, 2014), https://www.thenation.com/article/archive/five-years-ago-obama-pledged-end-torture-he-still-hasnt.

[24] The government has never adequately explained why Avenatti, a 48-year-old American attorney with no history of crime or violence and who had yet to be convicted of anything, was held in solitary confinement for 24 hours a day in the highest security pre-trial unit in the United States, which is almost uniformly reserved for suspected terrorists and those facing the death penalty for acts against the national interests of the United States.

[25] *See*, *e.g.*, Jeanne Theoharis, *I Tried to Tell the World About Epstein's Jail. No One Wanted to Listen*, The Atlantic (Aug. 16, 2019), https://www.theatlantic.com/ideas/archive/2019/08/real-scandal-mcc/596257, Arun Kundnani, *The Guantánamo in New York You're Not Allowed to Know*

Despite repeated requests by undersigned counsel and Avenatti that he be moved from 10 South, he was held in solitary confinement in the unit for nearly five weeks (except for time in court or in attorney meetings) until February 20, at which time Avenatti was finally placed in general population in Unit 5 South.  During the five weeks he was confined to 10 South, Avenatti was not permitted to go outside to breathe fresh air or see the sky.  For the first three weeks, a guard was stationed immediately outside the door of his cell 24 hours a day.  He was rarely permitted to view any television, was not allowed to use a radio, and was never permitted to read a newspaper.  He was not permitted a single social visit.[26]  His every move (including showers and use of the toilet) was recorded on two cameras located inside his cell, and he was told that if he tried to cover himself when using the toilet, he would be disciplined.  He could not control the lights within his cell, which were routinely left on without interruption.  The temperature inside his cell reached approximately 45 degrees Fahrenheit at night.  Attorney visits and access to discovery materials were also repeatedly delayed and often restricted.  Further, Avenatti was not

---

*About*, The Intercept (Feb. 5, 2016), https://theintercept.com/2016/02/05/mahdi-hashi-metropolitan-correctional-center-manhattan-guantanamo-pretrial-solitary-confinement, Mary Emily O'Hara, *NYC's 'Little Gitmo' Holds Terrorism Suspects in Extreme Isolation for Years*, Vice (Apr. 7, 2014), https://www.vice.com/en_us/article/vbnpg9/nycs-little-gitmo-holds-terrorism-suspects-in-extreme-isolation-for-years, Aviva Stahl, *Prisoners Endure a Nightmare 'Gulag' in Lower Manhattan, Hidden in Plain Sight*, Gothamist (June 19, 2018), https://gothamist.com/news/prisoners-endure-a-nightmare-gulag-in-lower-manhattan-hidden-in-plain-sight, Joseph Goldstein, *Manhattan Jail That Holds El Chapo Is Called Tougher Than Guantánamo Bay*, N.Y. Times (Jan. 23, 2017), https://www.nytimes.com/2017/01/23/nyregion/el-chapo-guzman-manhattan-jail.html, Larry Neumeister and Michael Biesecker, *For Inmates Like Epstein, Suicide Watch is Meant to be Short*, Associated Press (Aug. 14, 2019), https://apnews.com/article/6bd16a2216664ca1bf8eabbfebc72c7c.

[26] Avenatti was never permitted a social visit during his approximate 100 days at MCC, even though his family and close friends went to great lengths to attempt to see him, including traveling to New York only to be turned away at the facility.

allowed to have email access.  His calls, including attorney calls, were severely limited, and he was not permitted to use the law library.  He was generally cut off from the outside world.

On February 27, 2020 – a mere seven days after he was moved out of 10 South – the entire MCC was placed on lockdown status after it was discovered that a corrections officer had smuggled a loaded firearm into the facility and provided it to an inmate.  Attorney visits and contact were immediately and indefinitely suspended that day.  All inmates were locked in their cells 24 hours a day so that a search could begin prison-wide for the firearm.  "Sort" teams (*i.e.*, SWAT-like teams) and other corrections officers from maximum security United States Penitentiaries from across the country were brought to MCC to conduct repeated cell raids, often in the middle of the night.[27]  In the 13 days that followed, Avenatti was permitted only two showers, each five minutes in length.  He was locked in rat-infested cells 24 hours a day with no clean laundry;[28] he was cut off entirely from his counsel and family; he had no phone or email access; and he was not given a single hot meal.  Instead, he was fed frozen peanut butter and jelly sandwiches every night for 13 nights straight, to be later followed by an additional 32 nights straight.

On March 10, 2020, days after the firearm was recovered, MCC finally removed the lockdown status and Avenatti was transferred to Unit 11 South.  Only 12 days later, on March 22, 2020, his unit was again locked down for what was then described as a "staff shortage."  The next

---

[27] For instance, Avenatti had his cell searched *seven times* by officers in full tactical gear, often at 3:00 or 4:00 a.m., across thirteen days.  At one point, Avenatti, together with other inmates, was required to place his hands on his head for three consecutive hours and was told if he removed his hands, there would be "hell to pay" and he would get a "shot" (a disciplinary charge) and taken to the SHU.  He was also strip searched repeatedly.  Further, his personal property, including many of his legal documents, were taken and "lost."  During one strip search at approximately 3:30 in the morning on March 4, a corrections officer said to another "He doesn't look as tough now as he thought he did when he was going after Trump on TV."

[28] Avenatti was ultimately allowed one change of clothes and sheets across approximately five weeks.

day, March 23, 2020, MCC informed his unit that it would remain locked down and quarantined as a result of an inmate in the unit testing positive for COVID-19. All attorney visits were once again stopped; all law library/discovery access was immediately suspended; no inmate was permitted to leave the unit unless he was being released; and inmates were permitted to leave their cells only approximately three times per week for a total of five hours per week to use the phone or email system. Occasionally, a hot lunch would be served, but generally all meals were cold or frozen. Rats infested his unit. Toilets overflowed constantly, and Avenatti was told to use his hands to clean it up. The conditions were inhumane and beyond brutal.

In late March, Avenatti's counsel in California requested that the district judge in California order Avenatti's release to home confinement as a result of his underlying health conditions and risk for serious injury or death were he to contract COVID-19 while incarcerated. The government opposed this effort, and on March 21, 2020, the California district court denied the request.

On April 10, 2020, the district court in California reversed course and ordered the government to release Avenatti to home confinement under severe restrictions; however, the government demanded that Avenatti first be quarantined. On Saturday, April 11, 2020, the BOP moved Avenatti back to solitary confinement in 10 South and again placed him under unreasonably restrictive conditions. He was not permitted email access, access to a computer, or regular contact with his attorneys or family. Nor was he permitted to leave his cell on a single occasion until his release to home confinement two weeks later, on April 24, 2020.

In sum, the government placed Avenatti in custody for approximately 100 days, during which he was permitted to see the sky and breathe fresh air for one hour in total. For 80 of those days, he was held in solitary confinement or under lockdown status. During this time, he was

forced to endure abhorrent, brutal conditions almost unheard of even for inmates with long, violent criminal histories or serious disciplinary problems.

Since his temporary release due to COVID-19 over a year ago on April 24, 2020, Avenatti has remained confined to a two bedroom, one-bath apartment with his friend, Jay Manheimer, under substantial restrictions.  For more than 13 months, Avenatti has not been permitted to leave Mr. Manheimer's apartment, nor asked for the opportunity to leave, even for medical or dental care, with two exceptions – to receive the two doses of the COVID-19 vaccine.

Avenatti remains subject to the January 15, 2020 detention order and is presently on temporary release, in the custody of Mr. Manheimer.  While his conditions of confinement are better than prison, he is not on traditional home confinement and his liberty is severely restricted. On May 14, 2021, Pretrial Services submitted a report to the district court in California and stated that "[t]hroughout the period of temporary release, the defendant has remained in compliance and has been cooperative with directives from Pretrial Services."   According to Pretrial Services, Avenatti "has shown a pattern of consistently compliant behavior" and Pretrial "has not received any new information that would suggest [Avenatti] is a flight risk or danger to the community." *Id*.

The Second Circuit has held that "pre-sentence confinement conditions may in appropriate cases be a permissible basis for downward departures." *United States v. Carty*, 264 F. 3d 191, 196 (2d Cir. 2001).  District court judges in the Southern District of New York have previously granted departures on this basis.  In *United States v. Mateo*, 299 F. Supp. 2d 201 (S.D.N.Y. 2004), Judge Marrero downwardly departed nine levels from the guidelines range on the grounds of harsh pre-sentence confinement conditions and extraordinary family circumstances.  The defendant was pregnant while incarcerated.  She suffered labor pains for over 15 hours before assistance arrived.

She was afraid and in severe pain.  She eventually gave birth in the prison without medication. Judge Marrero found that the trauma suffered by the defendant during custody, "the full effects of which can never be comprehensively gauged, has inflicted forms of pain and suffering that have effectively enhanced, to a disproportionate degree, the level of punishment contemplated to be experienced by inmates in the typical case during the period of incarceration prescribed by the Guidelines for [the] offense." *Id.* at 212.

Similarly, in *United States v. Salvador*, 2006 WL 2034637 (S.D.N.Y. 2006), the Court found that unsanitary conditions and a lack of food were among the reasons justifying a departure for incarceration in the Dominican Republic while awaiting extradition to the United States.  And, in *United States v. Francis*, 129 F. Supp. 2d 612, 619 (S.D.N.Y. 2001), the district court downwardly departed due to the conditions of pre-sentence detention, finding that the defendant had suffered "extraordinary stress and fear" while incarcerated in a state correctional facility as a federal detainee.

Since the COVID-19 pandemic, judges within this district have considered the impact of the virus as a §3553(a) factor and granted downward variances based on the conditions endured by inmates at BOP facilities.  *See, e.g., United States v. Morgan*, 19 Cr. 209 (RMB) (S.D.N.Y. May 5, 2020), ECF No. 90 (cutting the sentence to less than half of the low end of the guidelines based in part on conditions at MDC during the pandemic and condemning the conditions at MCC and MDC prior to the current crisis); *United States v. Casillas*, 19 Cr. 863 (VSB) (S.D.N.Y. May 4, 2020), ECF No. 27 (reducing the length of the sentence in part based on conditions at MCC during the COVID-19 crisis); *United States v. Pierson*, 14 Cr. 855 (LTS) (S.D.N.Y. May 4, 2020), ECF No. 73 (same for defendant detained at MDC).

In the recent sentencing of *Tiffany Days*, 19 Cr. 619 (CM), held on April 29, 2021, former Chief Judge McMahon made the following comments about the MCC: "It is the finding of this Court that the conditions to which she was subjected are as disgusting, inhuman as anything I've heard about in any Colombian prison, but more so because we are supposed to be better than that." (ECF No. 35, at p. 19) (transcript attached hereto as Exhibit 2).  Similarly, Judge Engelmayer's thoughtful comments during the imposition of sentence in *United States v. Aracena De Jesus*, 20 Cr. 19 (PAE) (S.D.N.Y. July 1, 2020), ECF No. 27, speak volumes about the harsh conditions of detention and its impact on inmates.

> "Finally, I am mindful . . . that you have served most of your time in prison so far during the worst pandemic in this country during the past 100 years.  I'm mindful that you may have contracted COVID-19 while in prison.  I'm mindful that your experience in prison as a result of the pandemic, the preceding lockdown, the ensuing lockdown, and your own illness was frightful.  Prison is supposed to be punishment, but it is not supposed to be trauma of that nature or close.  My colleagues and I commonly informally credit prisoners who have served time awaiting extradition in dreadful prisons overseas with more time served than measured by the calendar.  The same logic applies here, and then some ….
>
> Bottom line, your time in the MCC was way harder than anyone intended when you were detained following your arrest.  Any mature system of justice, any thoughtful judge in imposing the reasonable sentence here would have to recognize the unexpected and regrettable ardors that you experienced since your arrest in December."

Tr. 7/1/20, at p. 36-37 (transcript attached hereto as Exhibit 3); *see also United States v. Jervis Cerino*, 19 Cr. 323 (S.D.N.Y. July 21, 2020) (Judge Rakoff) (district court granted a variance from a guideline range of 57-71 months for a Hobbs Act robbery and imposed a sentence of 10 months, noting: "[I]t is fair to say that conditions in the prison system now result in a harshness that is not the norm and that ought to be recognized by the court as a mitigating factor.  In effect, you are serving harder time every day you are in the federal prisons.").

In sum, in evaluating the §3553(a) factors in this case, the Court should consider the conditions and months of solitary confinement that Avenatti was forced to endure, the effects on him of the multiple lockdowns and the pandemic, and the terms of his home confinement over the last 13 months, beyond the ordinary credit he will receive for the time he served in prison.

## <u>CONCLUSION</u>

For the foregoing reasons, Mr. Avenatti respectfully submits that the Court should impose a sentence of no greater than 18 months, 6 months in prison followed by 12 months of home confinement.


Dated: June 9, 2021

Scott A. Srebnick                          E. Danya Perry
SCOTT A. SREBNICK, P.A.                     PERRY GUHA LLP
2214 N.W. 1st Place, 2nd Floor              35 East 62nd Street
Miami, FL 33127                            New York, New York 10065
Telephone: (305) 285-9019                  Telephone: (212) 399-8340
Facsimile: (305) 377-9937                  Facsimile: (212) 399-8331
E-Mail: scott@srebnicklaw.com              E-mail: dperry@perryguha.com

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on June 9, 2021, electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system. The filing will send notification of such filing to all counsel of record.

/s/ <i>Scott A. Srebnick, Esq.</i>
Scott A. Srebnick, Esq.
