

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

June 11, 2021

**BY ECF**

The Honorable Paul G. Gardephe
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

      Re:    *United States v. Michael Avenatti*,
              S1 19 Cr. 373 (PGG)

Dear Judge Gardephe:

      The Government respectfully submits this letter in opposition to defendant Michael Avenatti's letter filed on June 4, 2021 ("Def. Mot.") (Dkt. No. 315), in which he brings two motions. As set forth below, each motion fails for multiple, independent reasons. They should be denied.

**I.    The Defendant's Motion to Compel the Production of Alleged Witness Statements Is Meritless**

    **A.    Relevant Facts**

        **1.    The Government's Production of 18 U.S.C. § 3500 Material**

      In advance of trial, the parties agreed to a schedule with respect to the mutual exchange of certain material and information prior to and during trial. (Dkt. No. 68.) Specifically, the parties agreed that the Government would produce material covered by 18 U.S.C. § 3500 ("3500 material") on or before January 14, 2020. (*Id.* at 2.)

      On January 14, 2020, the Government produced to the defendant (1) 3500 material for approximately 17 individuals whom the Government considered to be potential testifying witnesses, and also, as a courtesy to the defendant, (2) prior statements of approximately 25 individuals and entities whom the Government did not intend to call to testify in its case-in-chief.[1] The initial production of 3500 material included, in pertinent part, an 18-page

---

[1] Subsequently, but still in advance of trial, the Government produced additional 3500 material—all of which was created or came into the Government's possession after January 14, 2020—for one additional individual whom the Government intended to call to testify and a small number of additional individuals whom the Government did not intend to call to testify.

Honorable Paul G. Gardephe
United States District Judge
June 11, 2021
Page 2

memorandum of interview, dated March 28, 2019 (the "March 28 MOI"), with respect to an interview of Judy Regnier on March 25, 2019, which was prepared by California-based Special Agents of Internal Revenue Service-Criminal Investigation ("IRS-CI"). [2] (3514-001.) [3] The March 28 MOI states that it was prepared after the agents "refresh[ed] [their] memory from notes made during and immediately after the interview." (*Id.* at 18.)

No member of the United States Attorney's Office for the Southern District of New York (the "Government" or the "USAO-SDNY"), or its partner in this case, the Federal Bureau of Investigation ("FBI"), was present for the interview that is the subject of the March 28 MOI. The USAO-SDNY and FBI do not have and never have had in their possession the notes referenced in the March 28 MOI.

On January 16, 2020, the Government produced to the defendant additional 3500 material, including a four-page set of handwritten notes (the "January Notes") of a meeting with Regnier that occurred that same day. (3514-010.) The notes were taken by a Special Agent with the USAO-SDNY, DeLeassa Penland, and the meeting was also attended by two prosecutors with the USAO-SDNY and two Special Agents with the New York Field Office of the FBI. The notes included, in pertinent part, the following: "Concern RE: twitter posts. Sent screenshot to SA Penland." (*Id.* at 1.)

On January 23, 2020, the Government produced to the defendant additional 3500 material, including, in relevant part:

- A one-page memorandum of interview, dated March 29, 2019 (the "March 29 MOI"), with respect to a brief interaction on March 26, 2019, between Special Agents of IRS-CI and Regnier during which certain materials were retrieved. (3514-014.) The March 29 MOI was prepared by IRS-CI and states that it was prepared after agents "refresh[ed] [their] memory from notes made during and immediately after the activity with Judy Regnier." (3514-014 at 1.)

- A 14-page memorandum of interview, dated November 25, 2019 (the "November MOI"), with respect to an interview with Regnier that occurred on November 19, 2019. (3514-012.) The November MOI was prepared by IRS-CI and states that it was prepared after agents "refresh[ed] [their] memory from notes made during and immediately after the interview with Regnier." (3514-012 at 14.)

These memoranda were provided to the Government by the United States Attorney's Office for the Central District of California ("USAO-CDCA"), following a request by the

---

[2] The Government understands that IRS-CI is the partner of the United States Attorney's Office for the Central District of California in the investigation and prosecution of the defendant in *United States v. Avenatti*, No. 19 Cr. 61 (JVS) (C.D. Cal.) (the "California Case").

[3] The Government will provide all 3500 material in its possession referenced herein, which is generally subject to a protective order, to the Court upon request.

Honorable Paul G. Gardephe
United States District Judge
June 11, 2021
Page 3

Government for statements of Regnier. In connection with providing the memoranda, the USAO-CDCA advised the Government that it would not be providing underlying notes, following the pertinent USAO-CDCA team's practice, and understanding of case law, of only disclosing such notes when they are inconsistent with a disclosed memorandum. The Government understands that the USAO-CDCA intends to follow this same practice in producing 3500 material to the defendant in the California Case.

No member of the USAO-SDNY or the FBI was present for the interaction with Regnier that is the subject of the March 29 MOI or for the interview that is the subject of the November MOI. The USAO-SDNY and the FBI do not have and never have had in their possession the notes referenced in either the March 29 MOI or the November MOI.

### 2. Regnier's Testimony at Trial

Trial began on January 29, 2020. Regnier testified briefly on February 6, 2020, regarding certain financial matters relevant to the defendant's motive. (Tr. 1398-1407.) The defendant elected not to ask Regnier a single question on cross-examination. (Tr. 1408.) Trial ended when the jury returned a verdict of guilty on all counts on February 14, 2020. At no time prior to or during trial, or at any time until recently, did the defendant's multiple counsel inquire with the Government or raise with the Court anything concerning the notes referenced in the March 28 MOI, the March 29 MOI, or the November MOI, or the Twitter posts referenced in the January Notes. On the contrary, no such inquiry was made for more than a year after the trial was completed, and long after the defendant filed his post-trial motions under Federal Rules of Criminal Procedure 29 and 33, which made no mention of any such notes or posts.

### 3. The Defendant's Recent Inquiry About the March 28 MOI, the March 29 MOI, and the November MOI

On April 9, 2021, almost 14 months after the defendant's trial was completed, the defendant's counsel in this case forwarded to the Government a letter from the defendant's counsel in the California Case addressed to the USAO-CDCA, and directed the Government's attention to certain of the requests contained therein, some of which related to Regnier.

On April 27, 2021, the Government responded by letter, in pertinent part:

> Paragraph 2 of Mr. Steward's letter requests handwritten notes relating to meetings between Ms. Regnier and prosecutors in the Central District of California. We do not have and have never had in our possession handwritten notes relating to these interviews. We note that we did produced to you, prior to trial, typewritten memoranda relating to each of these meetings. [Citations omitted]. We further observe that each of the typewritten memoranda corresponding to meetings on March 25, 2019, March 26, 2019, and November 19, 2019 (3514-001, 3514-012, 3514-014) references notes made during and immediately after the relevant interview, and

Honorable Paul G. Gardephe
United States District Judge
June 11, 2021
Page 4

> you were therefore aware of the possible existence of handwritten notes prior to trial. Notwithstanding those facts, you made no request at that time for any underlying handwritten notes, and we do not have, and have never had, possession of any such handwritten notes.

On April 30, 2021, counsel for the defendant in a different, and also unrelated case, *United States v. Avenatti*, No. 19 Cr. 374 (JMF) (S.D.N.Y.) (the "Fraud Case"), contacted the Government, by email, inquiring whether the prosecution team in that case (which includes certain members of the USAO-SDNY team in this case) was aware of whether "handwritten notes taken by folks out in CDCA during their interviews of Ms. Regnier" were preserved.

On May 12, 2021, the Government, after making an inquiry with the USAO-CDCA as a courtesy to the defendant, and to ensure that any response the Government provided was accurate, replied to the defendant's counsel in the Fraud Case, by email, stating that "we have been informed by the United States Attorney's Office for the Central District of California that the notes about which you inquire[d] have been and will continue to be preserved."

### 4. The Defendant's Recent Inquiry About the January Notes

On April 30, 2021, counsel for the defendant in the Fraud Case also inquired with the Government, by email, whether "the text message or email by which Ms. Regnier sent [the] screenshot to SA Penland," referenced in the document produced as 3500 material in this case as 3514-010, was "still available."

On May 12, 2021, the Government responded to the defendant's inquiry by letter to counsel in this case, on which the defendant's counsel in the Fraud Case were copied, in pertinent part:

> Although your client is not yet entitled to 3500 material in the unrelated [Fraud Case], and you did not ask for the referenced screenshot before or after trial, we nevertheless advise you that, since receiving the inquiry from your client's counsel, we conducted a diligent search of available emails and text messages and did not locate any record of Special Agent Penland's receipt of any such screenshot. As a courtesy, we thereafter inquired of Ms. Regnier's counsel whether Ms. Regnier has a copy of the referenced screenshot. Ms. Regnier's response, forwarded to us by her counsel, is enclosed. Please note that we understand the reference in the response to "Mr. Karlous" to refer to an agent working with the United States Attorney's Office for the Central District of California.

The enclosure to the Government's letter contained an email from Regnier to her counsel, attaching what appeared to be a screenshot from Twitter, and stating: "I sent the attached Twitter messages in January to Mr. Karlous. If I showed them anything during a meeting it would have been on my

phone – I do not have a Twitter account. If it is something else I don't recall." The Twitter screenshot attached to Regnier's email contained two posts dated January 12 and 13, 2020, in which Twitter users who were not witnesses or otherwise connected to this case made posts that appear to be attempts at humor regarding Regnier and Avenatti. The screenshot is enclosed as Exhibit A.

### 5. The USAO-SDNY and USAO-CDCA Prosecution Teams

As noted above, the investigation and prosecution of the defendant by the USAO-SDNY in this case has been undertaken in partnership with the FBI, and in particular, its New York Field Office. That is also true of the Fraud Case. By comparison, the investigation and prosecution of the defendant by the USAO-CDCA has been undertaken in partnership with the Los Angeles office of IRS-CI. The USAO-SDNY and the USAO-CDCA have conducted their respective investigations and prosecuted their respective cases separately. The interactions between the two offices principally have involved deconfliction, as well as accommodating a limited number of specific requests for information transfer between the offices and permitting members of the other office to join or listen to a small number of meetings with certain witnesses of mutual interest, so as to avoid duplication and to respect those witnesses' and their counsels' time.

### B. Applicable Law

#### 1. 18 U.S.C. § 3500

18 U.S.C. § 3500, also known as the Jencks Act, provides that, "[a]fter a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement . . . of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified." 18 U.S.C. § 3500(b). It is settled law that the Jencks Act, by its express terms, does not require production of witness statements that were "never in the possession of the prosecution or the federal investigators." *United States v. Bermudez*, 526 F.2d 89, 100 n.9 (2d Cir. 1975); *see also United States v. Brennerman*, 818 F. App'x 25, 29 (2d Cir. 2020) (rejecting Jencks Act claim regarding materials allegedly in victim's possession because "government's discovery and disclosure obligations extend only to information and documents in the government's possession"); *United States v. Hutcher*, 622 F.2d 1083, 1088 (2d Cir. 1980) ("Clearly the government cannot be required to produce that which it does not control and never possessed or inspected." (internal quotation marks and citation omitted)).

It is also settled law that a "statement" is not simply anything that is related to a witness or that another person reports the witness has said. Rather, "[t]he term 'statement' . . . means" "(1) a written statement made by said witness and signed or otherwise adopted or approved by him; (2) a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously with the making of such oral statement; or (3) a statement, however taken or recorded, or a transcription thereof, if any, made by said witness to a grand jury." 18 U.S.C. § 3500(e). In short, the Jencks Act reaches "only those statements which could properly be called

Honorable Paul G. Gardephe
United States District Judge
June 11, 2021
Page 6

the witness's own words." *Palermo v. United States*, 360 U.S. 343, 352 (1959); *see also, e.g.*, *United States v. Artis*, 523 F. App'x 98, 101 (2d Cir. 2013) ("because the notes were not shown to be 'signed or otherwise adopted and approved' by [the witness] and are not a substantially verbatim recital of [the witness's] words, the notes do not qualify as a statement under either the Jencks Act or Rule 26.2"); *United States v. Aviles*, 337 F.2d 552, 569 (2d Cir. 1964) ("The notes, however, were not verbatim but were handwritten accounts of selected portions of the interviews and hence, not 'statements' within the Jencks statute."); *accord, e.g.*, *United States v. Mincoff*, 574 F.3d 1186, 1200 (9th Cir. 2009).[4]

For substantially the same reasons, it has long been the law that where notes of an interview track a report of the interview, and the defendant is provided with the report, the defendant does not have a right also to be provided with the notes. *See United States v. Elusma*, 849 F.2d 76, 79 (2d Cir. 1988) ("Although the agents failed to produce their handwritten notes of interviews with potential witnesses, precedent in this circuit holds that they need not preserve such notes if the agents incorporate them into formal reports." (citations omitted)); *United States v. Barlin*, 686 F.2d 81, 92 (2d Cir. 1982) (where agent's notes were made part of report, the notes did not have to be preserved and their destruction did not violate Section 3500); *United States v. Covello*, 410 F.2d 536, 545 (2d Cir. 1969) (destruction of notes by FBI agents regarding interviews with government witnesses after the contents of these notes had been incorporated into reports did not violate the rights of a defendant who claimed that he was entitled to not only the typewritten reports but also the notes); *United States v. Greco*, 298 F.2d 247, 249 (2d Cir. 1962) (no violation of Section 3500 dealing with demands for production of statements and reports of witnesses because of failure of government to produce notes made by FBI agents during interviews with government witnesses, where notes had been destroyed after contents were incorporated in documents, which were given to the defendant); *accord, e.g.*, *United States v. Reed*, 575 F.3d 900, 920-21 (9th Cir. 2009).

### 2. The Prosecution Team

As noted above, Section 3500 refers to the material in the "possession of the United States." In this context, as in the context of other discovery or disclosure obligations, "the United States" refers not any component or member of the federal government, but to the prosecution team in the case at issue. *See, e.g.*, *United States v. Finnerty*, 411 F. Supp. 2d 428, 432 (S.D.N.Y. 2006). As the Second Circuit has explained, a contrary rule would be unworkable:

> [T]he imposition of an unlimited duty on a prosecutor to inquire of other offices not working with the prosecutor's office on the case in question would inappropriately require [courts] to adopt a monolithic view of government that would condemn the prosecution of criminal cases to a state of paralysis.

---

[4] To be sure, the Government in this district generally produces all reports, and all notes, of interviews in its possession, regardless of whether they satisfy the terms of Section 3500—just as the Government did in this case.

*United States v. Avellino*, 136 F.3d 249, 255 (2d Cir. 1998) (internal quotation marks omitted); *see also, e.g.*, *United States v. Stein*, 424 F. Supp. 2d 720, 723 (S.D.N.Y. 2006) ("The Court does not accept that the entire Internal Revenue Service is 'acting on the government's behalf' in this case.").

In short, entities or persons that are not part of the "prosecution team" or an "arm of the prosecutor" are not covered by the Government's discovery or disclosure obligations. *See, e.g.*, *United States v. Locasino*, 6 F.3d 924, 948-49 (2d Cir. 1993) (government not obligated to turn over records in possession of FBI agents who were not involved in investigation or prosecution of the defendant). Moreover, "[i]nteracting with the prosecution team, without more, does not make someone a team member. Instead, under the totality of the circumstances, the more involved individuals are with the prosecutor, the more likely they are team members. . . . [T]hese circumstances include whether the individual actively investigates the case, acts under the direction of the prosecutor, or aids the prosecution in crafting trial strategy." *United States v. Meregildo*, 920 F. Supp. 2d 434, 441-42 (S.D.N.Y. 2013), *aff'd sub nom. United States v. Pierce*, 785 F.3d 832 (2d Cir. 2015). Consistent with these principles, whereas "investigating case agents are part of the prosecution team," *Meregildo*, 920 F. Supp. 2d at 441, "cooperating witnesses are rarely members of the prosecution team," because typically "[p]rosecutors do not direct witnesses to investigate, and witnesses do not advise prosecutors on trial strategy," *id.* at 444.

### 3. Federal Rule of Criminal Procedure 12

Federal Rule of Criminal Procedure 12 provides that a party waives any motion required to be made prior to trial, absent a showing of good cause. *United States v. Klump*, 536 F.3d 113, 120 (2d Cir. 2008); *United States v. Yousef*, 327 F.3d 56, 124-25 (2d Cir. 2003); *United States v. Crowley*, 236 F.3d 104, 110 (2d Cir. 2000); *United States v. Schwartz*, 535 F.2d 160, 163 (2d Cir. 1976). A strategic decision not to pursue a claim until after trial is insufficient to establish "good cause." *Yousef*, 327 F.3d at 125. So is "inadvertence" to the potential existence of the claim. *Id.*; *see also United States v. Forrester*, 60 F.3d 52, 59 (2d Cir. 1995). Waiver under Rule 12 is "complete," barring review even for "plain error." *Yousef*, 327 F.3d at 125. One type of motion required to be made prior to trial, or else waived absent good cause, is a motion for "discovery under Rule 16." Fed. R. Crim. P. 12(b)(3)(E).

### 4. Waiver Under Section 3500

Similar to waiver under Rule 12(b)(3)(E)—and consistent with the plain language of Section 3500, which requires a "motion of the defendant"—a failure to request timely 3500 material about which a defendant knows results in a waiver of any claimed violation. *See United States v. Petito*, 671 F.2d 68, 73-74 (2d Cir. 1982); *United States v. Padilla*, No. S1 94 Cr. 313, 1996 WL 389300, at *1 (S.D.N.Y. July 11, 1996); *accord United States v. Johnson*, 200 F.3d 529, 535-36 (7th Cir. 2000); *United States v. Knapp*, 25 F.3d 451, 461 (7th Cir. 1994).

Honorable Paul G. Gardephe
United States District Judge
June 11, 2021
Page 8

### C.     Discussion

#### 1.     Handwritten notes

The defendant's first motion asserts that the Government should be ordered, under 18 U.S.C. § 3500, to "produce all handwritten notes reflecting Ms. Regnier's statements." (Def. Mot. 3.) But there is no dispute that the Government produced all notes in its possession before trial. The Government does not have (and never has had) what the defendant seeks.

To be sure, to the Government's knowledge, the USAO-CDCA has such notes, but that is a separate office, which performed a separate investigation, with a separate investigative agency, and brought separate charges, concerning separate conduct. And importantly, as described at some length above, these facts, including that the notes existed and were taken by the investigative agency working with the USAO-CDCA, were known to the defendant well before trial.[5] The defendant's claim that now, more than a year after trial, the Government should be compelled to obtain those notes and then to produce them appears to be an end-run around the USAO-CDCA's practice, consistent with Ninth Circuit case law. To the extent that is the goal, the defendant's request should be directed to the District Judge in the California case, in which the trial has not yet occurred. In any event, the claim fails for multiple, independent reasons.

*First*, the claim is waived. A claim that the team in this case and the team in the Central District of California are one "prosecution team" for the purposes of disclosure is indisputably a motion for discovery. Indeed, the defendant says in his letter that what he seeks is an order that the USAO-SDNY "must produce discovery possessed by government lawyers outside SDNY," and in making this request, he relies on cases involving Rule 16. (*Id.* at 3.) That is precisely the kind of claim barred by Rule 12(b)(3)(E). The defendant does not even attempt to explain why he should be excused from his failure to seek such materials in this case before trial, much less in the past year-plus. It does not matter whether the failure to make such a motion was because the defendant did not think it worth his time (which would not be surprising, since he declined to ask Regnier a single question on cross-examination), or knew such a motion would be without merit, or wanted to save such a claim in case he were convicted, or merely overlooked its potential existence. It is barred. *See Yousef*, 327 F.3d at 125.

Similarly, even if Rule 12(b)(3)(E) did not preclude his claim (and it does), the claim is barred under the plain language of Section 3500 itself. *See, e.g.*, *Petito*, 671 F.2d at 73-74. In a footnote, the defendant states that "there was no need to file a motion in this case because the government agreed to produce 3500 material." (Def. Mot. 5 n.3.) That statement does not make sense, and it is unsupported by citation to case law or any other authority. Here, the Government agreed to produce 3500 material, and did so, and that very material indicated—expressly, as the

---

[5]     Similarly, the defendant has long known that this case and the case in the Central District of California were investigated and prosecuted by separate teams, with separate discovery obligations. (*See, e.g.*, June 6, 2018 Tr. 9:2-12 (Government noting that it had not produced contents of a server in the possession of the USAO-CDCA because the server was not in the possession of and had never been reviewed by the USAO-SDNY).)

defendant acknowledges (*id.* at 3 n.1)—that notes existed. Yet the defendant never sought them. He is not permitted to do so now. *Cf. Johnson*, 200 F.3d at 536 ("Although there is no question that he initially requested Jencks documents, [the defendant] never pursued this request after he learned at trial about the alleged statements [at issue].").

*Second*, the claim that the two teams prosecuting the defendant, in different districts, are really one team is meritless. The USAO-CDCA did not "act[] under the direction of the prosecutor[s] here" or "aid[] the prosecution [here] in crafting trial strategy." *Meregildo*, 920 F. Supp. 2d at 441-42. Nor does the defendant contend otherwise. Instead, he principally points to the fact that certain members of the two teams were "present" on the phone or in person for some, but not all, meetings with Regnier. (Def. Mot. 4.) He ignores the numerous meetings, with other witnesses, at which USAO-CDCA was neither "present" nor otherwise involved. And vice-versa. Simply put, the presence of certain members of both prosecution teams at a handful of interviews of a witness does not establish a joint investigation, and the defendant fails to point to any facts of the sort that would support a contrary conclusion. *See United States v. Collins*, 409 F. Supp. 3d 228, 241-42 (S.D.N.Y. 2019); *United States v. Blaszczak*, 308 F. Supp. 3d 736, 742-43 (S.D.N.Y. 2018).

Moreover, the defendant ignores the lack of factual overlap between the California case and this case. The defendant repeatedly invokes this Court's decision in *United States v. Martoma*, 990 F. Supp. 2d 458, 460 (S.D.N.Y. 2014) (Def. Mot. 3, 5), but he notably does not compare the facts of the two cases—and they are nothing alike. In short, it is difficult to understand how the USAO-SDNY and the USAO-CDCA could be said to have "engaged in joint fact-gathering," *Martoma*, 990 F. Supp. 2d at 461 (internal quotation marks omitted), when they operated independently, to uncover distinct facts, resting on virtually entirely distinct witnesses, to bring distinct charges, with distinct investigative agencies, in distinct districts.

*Finally*, and in any event, even if the defendant's claim were not barred, and the two teams were really one, the defendant's claim still fails for the fundamental reason that, under the settled law discussed above, notes of an interview by an agent, who did not testify, underlying reports that were produced, are neither statements of the witness nor are otherwise required to be produced. *See, e.g.*, *Artis*, 523 F. App'x at 101; *Elusma*, 849 F.2d at 79. The defendant does not acknowledge this law, much less explain why it does not defeat his belated claim.

## 2. Twitter Screenshot

The defendant next asserts that the Government purportedly failed to comply with Section 3500 by not producing in advance of trial a screenshot of a Twitter post. (Def. Mot. 5.) This claim too is both waived and meritless.

*First*, as explained above, the Government produced to the defendant the January Notes, which include an explicit reference to the screenshot at issue, on January 16, 2020, nearly two weeks before trial began. Yet the defendant made no inquiry of the Government regarding the screenshot in advance of or during the trial, or at any time until recently. Rather, the first time that the reference to the screenshot was raised was on April 30, 2021, more than 14 months after the

Honorable Paul G. Gardephe
United States District Judge
June 11, 2021
Page 10

trial had ended, and not even by counsel for the defendant in this case, but instead by counsel for the defendant in the unrelated Fraud Case. Again, the defendant does not even attempt to explain his failure to raise this claim sooner, and the reason for that failure is legally irrelevant. The claim is barred. *See Yousef*, 327 F.3d at 125; *Petito*, 671 F.2d at 73-74.

While not citing Rule 12, the defendant appears to suggest that, in light of the steps the Government voluntarily took once he made his recent, belated inquiry, the Government should be ordered to do more, specifically, to search its files yet again. (*See* Def. Mot. 6.) However, the defendant does not identify the source of this alleged obligation, and the fact that the Government chose to go beyond what is required of it does not obligate it to do even more or to repeat the same steps a second time. Indeed, had the defendant inquired about the Twitter screenshot before or during trial, the Government would have taken the same steps that it did nearly 14 months after trial—undertake a diligent effort to locate any record of the screenshot and provide it, as a courtesy and beyond its obligations, to the defendant.[6]

*Second*, the claim has no merit. As explained above, Section 3500 requires production only of a witness's "statement" to the extent it falls into one of the categories set forth in 18 U.S.C. § 3500(e). Here, the defendant's claim is premised on the potential, prior existence of a screenshot of public Twitter posts made neither by Regnier nor any other witness, or even potential witness, in this case. Any such screenshot—not written or adopted by Regnier—plainly is not a "statement[] which could properly be called the witness's own words," and therefore is beyond the reach of the statute. *Palermo*, 360 U.S. 352.

*Finally*, and in any event, the Government has now produced the Twitter screenshot provided by Regnier along with her description, and the defendant is unable to articulate any even conceivable potential prejudice that he experienced as a result of not receiving the screenshot prior to his trial in this case, much less such sufficient prejudice that he might be entitled to a new trial. *See United States v. Gonzalez*, 110 F.3d 936, 943 (2d Cir. 1997) ("the failure to disclose [under the Jencks Act] may be disregarded if there is no reasonable probability that had the evidence been

---

[6] In making his argument, the defendant asserts that the Government "concedes, albeit implicitly, that at least one agent did not preserve text messages with a trial witness." (Def. Mot. 6.) The Government has not so conceded and has no basis to do so. On the contrary, as described above, Regnier has stated, in a communication shared with the defendant, that she sent a message to an agent working with the USAO-CDCA. The Government has no reason to believe that that agent has not preserved any such message, assuming one were sent. To the extent that the defendant has a non-speculative basis to believe otherwise, or to demand the message be produced to him as 3500 material in the California Case, such a claim should be brought in that case. In any event, the defendant's claim here fails even if his assertion were correct.

To the extent that the defendant appears to claim that the Government has conceded that Special Agent Penland failed to preserve the screenshot, the Government has not conceded that point either, and again has no basis to do so. Rather, as noted above, based on a diligent search, the Government has not found a record of Regnier sending a text message to Special Agent Penland, consistent with Regnier stating that she sent it to a different agent.

Honorable Paul G. Gardephe
United States District Judge
June 11, 2021
Page 11

disclosed, the result would have been different"). Regnier testified briefly on February 6, 2020, regarding financial matters that both were not reasonably subject to dispute and were unrelated to the Tweets now at issue (Tr. 1398-1407), and the defendant forwent the opportunity to cross-examine her (Tr. 1408), presumably because those matters were indisputable.

In light of the content of the pertinent Twitter screenshot—apparent attempts at humor by members of the Twitter-using public, at the defendant's and Regnier's expense—it is difficult to imagine what possible value or relevance such publicly-available posts would have had to the defense of this case. In short, the defendant suffered no prejudice by the Government not obtaining and producing this screenshot prior to Regnier's testimony, and he tellingly does not (and cannot) suggest otherwise. *See, e.g.*, *United States v. Jackson*, 345 F.3d 59, 78 (2d Cir. 2003) (rejecting Jencks Act claim because there was "no reasonable probability that disclosure of the additional [witness] materials in this case would have yielded a different outcome at trial"); *United States v. Mourad*, 729 F.2d 195, 199-200 (2d Cir. 1984) (rejecting Jencks Act claim because there was "no showing that the delay [in disclosure] resulted in any prejudice, or even that the evidence was material to the issue of guilt").[7]

Nor is there a basis for the defendant to be provided additional discovery about the screenshot or allegedly related matters, such as "what, if any, guidance [the Government] provided its agents about preserving 3500 material" (Def. Mot. 7). Contrary to the tone the defendant takes throughout his letter, the Government has been both responsive and transparent about the Twitter screenshot from the defendant's first inquiry about it a little more than a month ago. The Government also undertook diligent efforts to locate any such screenshot and—without being asked to do so—affirmatively sought and obtained materials from Regnier, and promptly produced both that material and her statement about it. There is no basis for the defendant's hyperbolic suggestion that there might be additional statements by Regnier, on unknown subjects, that were "destroyed" (*id.* at 6) and that the Court should order a "hearing" to determine whether there "may" be "a broader problem" (*id.* at 7).

A defendant is not entitled to a hearing merely because he requests one or may hope it might uncover alleged misconduct that he speculates could have occurred, much less when such speculation is both untimely and irrational. A hearing is warranted only where "the moving papers are sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that contested issues of fact" necessary to resolution of the motion are in question. *United States v. Pena*, 961 F.2d 333, 339 (2d Cir. 1992). The requirements that a defendant must meet to be entitled

---

[7] The defendant is correct (Def. Mot. 6) that where 3500 material has been intentionally suppressed, the standard governing the prejudice inquiry (assuming the Court reaches that stage of the analysis, which it need not do here) is less stringent. *See, e.g.*, *Gonzalez*, 110 F.3d at 943. But the defendant does not attempt to reconcile his inflammatory suggestion that such suppression occurred with what the Government did after he made his belated inquiry, including seeking to obtain relevant material from Regnier and promptly producing both it and her description to the defendant—the very material upon which he now rests his suggestion of alleged suppression. In any event, the defendant's claim fails under any prejudice standard.

to a hearing exist for good reason, "[t]o avoid fishing expeditions." *United States v. Falso*, 544 F.3d 110, 125 (2d Cir. 2008). The defendant's request for a hearing, filed more than a year after his trial, based on facts known to him before trial, but only made soon before his sentencing, is just that.

## II. The Defendant's Motion to "Inquire" Regarding a Reporter's Presence at Sidebar During *Voir Dire* Should Be Denied

### A. Relevant Facts

Jury selection commenced on January 27, 2020. To help ensure a fair, open, and efficient selection process, at the defendant's request, the Court used a juror questionnaire that the potential jurors completed prior to oral *voir dire*. On January 28, 2020, and continuing on January 29, 2020, the Court followed up at sidebar with potential jurors regarding certain issues raised in their juror questionnaires, before proceeding with traditional *voir dire* in open court, other than when a potential juror requested to answer a particular question at sidebar. During *voir dire*, one member of the news media, in view of the parties and the Court, attended sidebar discussions with potential jurors. Also during *voir dire*, the Court repeatedly admonished members of the venire not to conduct any research, or to read, watch, or listen to anything regarding the case. (*See* Tr. 254:23-255:2; 389:15-17.)

The juror questionnaires and *voir dire* process were the subject of several press reports; some appear to have been based on the Court's reading of certain responses to juror questionnaires in open court and another appears to have arisen from a *New York Post* reporter's attendance at a sidebar conference. *See, e.g.*, Emily Saul, *'Notorious Scumbag': Potential jurors tossed for bashing Michael Avenatti* N.Y. Post, Jan. 27, 2020, https://nypost.com/2020/01/27/notorious-scumbag-potential-jurors-tossed-for-bashing-michael-avenatti/ (describing questionnaire responses, and explaining that jurors dismissed based on their questionnaires "were kept anonymous"); *Michael Avenatti Greets Prospective Jurors at NYC Courtroom for Extortion Trial*, NBC New York, Jan. 27, 2020, https://www.nbcnewyork.com/news/local/crime-and-courts/michael-avenatti-greets-prospective-jurors-at-nyc-courtroom-for-extortion-trial/2269253/ (describing questionnaire responses); Stewart Bishop, *Harsh Words For Avenatti As Jury Selection Kicks Off*, Law360, Jan. 27, 2020, https://www.law360.com/articles/1237994 (same); Emily Saul, *Lawyer linked to Jared Kushner cut from jury pool in Michael Avenatti case*, N.Y. Post, Jan. 28, 2020, https://nypost.com/2020/01/28/lawyer-linked-to-jared-kushner-cut-from-jury-pool-in-michael-avenatti-case/ (describing sidebar colloquy regarding potential juror).

At no time before, during, or after jury selection did the defendant move to close the proceedings to the public in whole or in part, to seal or redact transcripts, or to otherwise to limit public or media access to any aspect of jury selection or the trial that followed. Rather, consistent with the press and public's First Amendment right to attend criminal trials and to access judicial documents, the proceedings were held in an open courtroom and a transcript was prepared daily. Trial proceeded before the jury, lasting approximately three weeks, at which time the jury returned a verdict of guilty as to each count in the Superseding Indictment.

Honorable Paul G. Gardephe
United States District Judge
June 11, 2021
Page 13

On February 26, 2020, the Honorable Jesse M. Furman, who is presiding over the unrelated Fraud Case, ordered the parties each to submit, in advance of trial, letter briefs addressing procedures for jury selection, "including but not limited to Defendant's presence at, and press access to, any inquiry of jurors outside the presence of the jury pool generally." (19 Cr. 374, Dkt. No. 41, at 2.) On March 13, 2020, the Government in that case filed, on behalf of the parties, a joint letter regarding procedures for jury selection (the "Joint Letter" (19 Cr. 374, Dkt. No. 46)). In that letter, "the parties propose[d] that [Judge Furman] adopt procedures substantially similar to those adopted in *Shkreli* and that impose modest and reasonable restrictions on the press and public's access to certain information and proceedings in order to adequately protect the rights of the defendant and potential jurors, while making the proceedings as accessible as possible in light of the circumstances." (Joint Letter 4.) In particular, and consistent with the procedures used at trial by this Court, "[t]he parties propose[d] that the defendant and, assuming more than one member of the press requests to be present at sidebar discussions, a single pool reporter be permitted to be present at sidebar discussions with potential jurors." (*Id.* at 5.)

On August 7, 2020, new counsel was appointed to represent the defendant in the Fraud Case. (19 Cr. 374, Dkt. No. 73.) On April 14, 2021, the defendant's new counsel in the Fraud Case filed a letter objecting to the proposal set forth in the Joint Letter to permit a single pool reporter be present at sidebar discussions with prospective jurors (19 Cr. 374, Dkt. No. 109)). In that letter, the defendant argued, among other things, that because there was no motion practice regarding the presence of a reporter at sidebar during *voir dire* in this trial (since the defendant did not, as noted above, move to partially or completely close the courtroom or otherwise to restrict public or media access), this Court did not really "permit" a reporter at sidebar. (*Id.* at 2-3.) On May 6, 2021, Judge Furman denied the defendant's request to exclude any representative of the press from sidebar during *voir dire*, observing:

> Contrary to the Defendant's suggestion, his trial before Judge Gardephe in early 2020 supports, rather than undermines, the case for press access to sidebars during *voir dire*. First, it is plain that Judge Gardephe did, in fact, "'permit[ ]' a reporter's presence at sidebar during *voir dire*" in that trial. Def.'s Ltr. 3. Indeed, the Defendant's own letters later reference a reporter's attendance at sidebar. *See id.* at 4 n.5; *see* Reply 5. Second, there is no evidence for the Defendant's assertion that the media engaged in "questionable conduct" during the trial before Judge Gardephe. Reply 5. The Defendant's sole support for that assertion is two articles written by a reporter regarding jury selection. *See id.* But that conduct is not "questionable"; it is core First Amendment activity and precisely what the right of press and public access to jury selection is designed to protect. Finally, and in any event, the Defendant provides zero evidence that the press coverage of jury selection in his trial before Judge Gardephe affected the fairness of that trial (or that any concerns could not be addressed through less

> restrictive measures, such as admonishing prospective jurors not to
> read any press about the case).

*United States v. Avenatti*, No. 19 Cr. 374 (JMF), 2021 WL 1819679, at *2 (S.D.N.Y. May 6, 2021).

On June 4, 2021, the defendant filed his motion in this case to "inquire whether the Court met with a *New York Post* reporter concerning this case and whether it is accurate that the Court permitted the reporter to receive prospective jurors' questionnaire responses and join sidebars." (Def. Mot. 9.)

### B.   Applicable Law

#### 1.   Federal Rule of Criminal Procedure 33

Federal Rule of Criminal Procedure 33 provides, in relevant part, that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). "The defendant bears the burden of proving that he is entitled to a new trial under Rule 33." *United States v. McCourty*, 562 F.3d 458, 475 (2d Cir. 2009). Because motions for a new trial are strongly disfavored, "the standard for granting such a motion is strict," *United States v. Gambino*, 59 F.3d 353, 364 (2d Cir. 1995), and it should be granted only in "extraordinary circumstances," *McCourty*, 562 F.3d at 475 (internal quotation marks omitted); *see also United States v. Zagari*, 111 F.3d 307, 322 (2d Cir. 1997); *United States v. Locascio*, 6 F.3d 924, 949 (2d Cir. 1993); *United States v. Spencer*, 4 F.3d 115, 118 (2d Cir. 1993). The "ultimate test [in deciding a Rule 33 motion] is whether letting a guilty verdict stand would be a manifest injustice . . . . There must be a real concern that an innocent person may have been convicted." *United States v. Canova*, 412 F.3d 331, 349 (2d Cir. 2005) (internal quotation marks omitted); *see also United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992).

Although the standard for obtaining discovery in support of a Rule 33 motion is not well settled, courts in this district have generally required prior to permitting such discovery "a showing of 'good cause,'" meaning that the defendant must "'present specific allegations that give the Court reason to believe that the [defendant] may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief.'" *United States v. Williams*, No. 02 Cr. 1372 (ALC), 2017 WL 3613661, at *3 (S.D.N.Y. Aug. 21, 2017) (quoting *Pizzuti v. United States*, 809 F. Supp. 2d 164, 176 (S.D.N.Y. 2011)); *see also United States v. Seabrook*, 467 F. Supp. 171, 179-80 (S.D.N.Y. 2020) (denying discovery in support of Rule 33 motion based on failure to show what the defendant seeks "will 'very likely lead to the discovery'" of evidence in support of motion (quoting *United States v. Velarde*, 485 F.3d 553, 560 (10th Cir. 2007))).

#### 2.   Closure of *Voir Dire* to the Press

The Second Circuit has held that there is a qualified "'right to attend criminal trials . . . implicit in the guarantees of the First Amendment.'" *ABC, Inc. v. Stewart*, 360 F.3d 90, 98 (2d Cir. 2004) (quoting *Richmond Newspapers, Inc. v. Virginia*, 488 U.S. 555, 580 (1980)). That right

of access extends to the examination of prospective jurors as part of the *voir dire* process. *Id.* (citing *Press-Enter. Co. v. Superior Court*, 464 U.S. 501, 504-10 (1984)).

In evaluating motions to exclude the press from *voir dire* of prospective jurors, courts employ a two-part balancing test: "[T]he [proceeding] shall be closed only if specific findings are made demonstrating that, first, there is a substantial probability that the defendant's right to a fair trial will be prejudiced by publicity that closure would prevent, and second, alternatives to closure cannot adequately protect the defendant's fair trial rights." *Press-Enter. Co. v. Superior Court*, 478 U.S. 1, 14 (1986) ("*Press-Enter. II*").

The Second Circuit has cautioned that, although in some circumstances availability of a transcript of *voir dire* proceedings may be sufficient, "[t]he provision of a transcript . . . does not somehow allow for a more lenient balancing test." *Stewart*, 360 F.3d at 100. In reversing a district court order precluding the press from all *voir dire*, the Second Circuit in *Stewart* concluded that the district court there had made insufficient factual findings to justify the order because (1) the district court did not find that members of the media violated any order of the court or conducted themselves improperly; (2) the district court's finding that many members of the venire may have prejudged one of the defendants was simply insufficient; and (3) the Court of Appeals could "discern no basis for the district court's conclusion that prospective jurors would have been unwilling to express for publication any preconceptions that they might have had about the defendants." *Id.* at 101. The Second Circuit also observed that the district court in *Stewart* should have considered more narrowly tailored procedures, including excluding the press only from portions of *voir dire* implicating subject matter for which the district court expressed concern regarding candor on the part of prospective jurors. *Id.* at 104-05.

C. Discussion

The defendant's request for an "inquiry" into communications the Court may have had with a reporter should be denied. Indeed, the defendant fails to provide any authority for what he seeks, or even to explain the ultimate purpose for his proposed "inquiry." Presuming, however, that the defendant seeks facts in support of a motion for a new trial under Rule 33, on the ground that sidebars during *voir dire* of potential jurors should have been closed to the press, the defendant has not offered any rational connection between the information sought, nor is there any plausible basis for such a motion.

As an initial matter, the defendant leaves entirely to the imagination what relevance communications, if any, between the Court and a reporter regarding access to public portions of a criminal trial might have to any cognizable claim for relief. The defendant alludes in a footnote to the possibility that the Court may have or should have excluded all reporters from sidebar conferences during *voir dire*. (Def. Mot. 8 n.4.) The defendant does not, however, explain what additional facts he needs to make such a claim, why he did make one sooner, or what connection his proposed "inquiry" has to such a theoretical claim. Even assuming a conversation did occur between the Court and a reporter, nothing about the content of that conversation, if any, has any bearing on any claim regarding whether it was error to permit a reporter to attend sidebars. In short, the defendant has not demonstrated "good cause" for his request, inasmuch as he has not

and cannot show that the supposed facts he seeks would support a motion under Rule 33. *See Williams*, 2017 WL 3613661, at *3.

But even if the proposed "inquiry" did have some pertinence to a potential new motion under Rule 33 claiming alleged error based on the presence of a reporter at sidebar, the request should still be denied because there is no possibility that such a motion would have any merit. This is so for multiple reasons (even assuming *arguendo* that such a motion would be timely, a matter on which there is at least substantial question).

*First*, the defendant cannot show that allowing a reporter to be present at sidebar was error. Not surprisingly, the procedures used by this Court were similar to those used by other courts. *See Avenatti*, 2021 WL 1819679, at *2; *United States v. Shkreli*, 260 F. Supp. 3d 257, 263 & n.3 (E.D.N.Y. 2017). And the defendant has not and cannot—particularly given that he at no time moved to restrict access of the press to portions of *voir dire* or the trial or the transcripts of either—make a plausible showing that the Court was compelled to find that "there [wa]s a substantial probability that the defendant's right to a fair trial w[ould] be prejudiced by publicity that closure would prevent, and [that] alternatives to closure c[ould not] adequately protect the defendant's fair trial rights." *Press-Enter. II*, 478 U.S. at 14.

*Second*, even if the defendant could demonstrate any error in the Court's decision, he could not show that such an error affected his substantial rights, Fed. R. Crim. P. 52, much less that there exists, as a result of the alleged error, "a real concern that an innocent person may have been convicted," *Canova*, 412 F.3d at 349. Indeed, surveying the record in this case, Judge Furman found "no evidence . . . that the media engaged in 'questionable conduct' during the trial" and "zero evidence that the press coverage of jury selection . . . affected the fairness of th[e] trial." *Avenatti*, 2021 WL 1819679, at *2. This Court also clearly and repeatedly instructed the potential jurors not to read, watch, or listen to anything regarding the case during *voir dire*, and jurors are presumed to observe the admonitions of the court. *E.g.*, *United States v. Baker*, 899 F.3d 123, 134 (2d Cir. 2018). Indeed, it is difficult to understand how the defendant could at once claim that neither he nor his multiple experienced, retained lawyers, and two jury consultants, present at sidebar had any awareness of any kind at any point that there was a reporter there, and yet allege that the presence of the reporter somehow materially influenced the prospective jurors.[8]

---

[8] In lieu of any legal support for his request for an "inquiry," the defendant resorts to the suggestion that the Government somehow engaged in nefarious conduct by not affirmatively highlighting for the defendant that a reporter was present. (*See* Def. Mot. 8 ("The government's letter does not state that it told defense counsel that a reporter was present."); *id.* ("When counsel raised Mr. Avenatti's own request to appear at sidebar during *voir dire* in this case, T. 69-71, the government did not mention that a reporter would be there.").) There is nothing in law or logic supporting the notion that representatives of the Government, observing a member of the press walking in open court from the press pool to the sidebar should, much less *are required to*, interrupt proceedings to ask whether the defendant or any of his multiple attorneys and jury consultants present at sidebar (numbering more than the representatives of the Government) observed the same uncontroversial and lawful event.

Honorable Paul G. Gardephe
United States District Judge
June 11, 2021
Page 17

      In sum, the defendant has neither offered a cogent basis for the form of discovery he requests, nor for any other form of relief relating to the presence of a reporter at sidebar during *voir dire* of prospective jurors. Rather, the motion appears similar to his other motion—an eleventh-hour attempt to seek to manufacture controversy by suggesting misconduct where there was none—and it should be denied.

## Conclusion

      For the foregoing reasons, the defendant's motions should be denied.

      Respectfully submitted,

      AUDREY STRAUSS
      United States Attorney

By:   s/ _____
      Matthew D. Podolsky
      Daniel C. Richenthal
      Robert B. Sobelman
      Assistant United States Attorneys
      (212) 637-1947/2109/2616

Enclosure

cc:    (by ECF)

      Counsel of Record