# EXHIBIT A



PETER M. SKINNER
Tel.: (212) 303-3654
E-mail: pskinner@bsfllp.com

June 14, 2021

The Honorable Paul G. Gardephe
United States District Judge
Southern District of New York
40 Foley Square
New York, NY 10007

Re:   *United States v. Avenatti*, 19 Cr. 373 (PGG)

Dear Judge Gardephe:

We submit this Victim Impact Statement on behalf of NIKE, Inc. ("Nike"), the victim of Michael Avenatti's extortion. The Court should impose a significant sentence to reflect the substantial and sustained harm that Mr. Avenatti caused to Nike, its shareholders, its employees, and to the hundreds of young athletes who compete in Nike's amateur "grassroots" basketball program.

Nike employs approximately 70,000 people. An entire division of the company is dedicated to building and protecting the company's brand, which is among the most recognized in the world. Nike's success depends upon their work: If the Nike brand is known, respected, and trusted by consumers, then Nike will sell more products and earn more profit for its shareholders. The company, which is a component of the S&P 500, has issued shares that are widely held by pension funds, retirement funds, mutual funds, institutional investors, and individual investors. Nike builds its brand to create value for these shareholders.

Mr. Avenatti recognized the value of Nike's brand and preyed on it. He threatened to accuse Nike of conduct that "makes the Adidas problem look small" and that reached the company's senior executives. In response, Nike faced a difficult choice: either pay Mr. Avenatti off to protect the brand and avoid being subjected to an onslaught of false smears, or decline to pay and suffer that onslaught of false smears—Nike, which had been cooperating with the Government's investigation of NCAA corruption, had already determined that it did *not* have an "Adidas problem." Nike's executives also feared irreparable damage to Nike's brand even if they could correct the record down the road, threatening thousands of employees and millions of shareholders. This fear, and the reputational damage that Mr. Avenatti ultimately inflicted on the company despite his arrest, distinguishes this case from the typical corporate crime, where the victim feels financial harm to its bottom line, but little else.

Mr. Avenatti began to harm Nike in his first meeting with Nike's counsel, on March 19, 2019. The injury, which was felt by all of Nike's leadership, was described at the trial by Robert Leinwand, a Nike Vice President and the company's Chief Litigation Officer. The meeting with Mr. Avenatti was unlike any other that he had attended in his career.[1] As Mr. Leinwand explained, he had "never been in a meeting where somebody told me that we had to hire them or else they

---

[1] Trial Tr. 1150:14–1151:5; *id.* 1354:4–9.



were going to destroy our company."[2] He was concerned that Mr. Avenatti would "cause[] brand damage by holding his press conference," and he felt "panic as to what we were going to do" because of the harm that Mr. Avenatti could cause to the brand that so many employees had worked so hard to build and protect.[3] Mr. Leinwand further understood that "there was no question" that Mr. Avenatti could "do what he said he was going to do" because of his media presence.[4]

From the very first meeting, Mr. Avenatti made clear that he was going to amplify the harm he would cause Nike with false accusations and the full weight of his media platform. Executives of Nike's competitor, Adidas, had recently been convicted of federal crimes in connection with amateur basketball. In contrast, Nike executives had *not* been charged, and Nike had *not* engaged in the criminal conduct perpetrated by those Adidas executives. Mr. Avenatti, however, threatened to falsely accuse Nike of a crime, and Nike feared that this would cause harm to its investors:

> Q. What specific concerns, if any, did you have about what this press conference could do?
>
> A. It would affect the value of the brand and the stock. And so, first of all, consumers could be affected by his press conference alleging that we were doing the same thing that Adidas was doing, and people would decide not to buy our basketball products or it could affect the value of the stock. And if it affects the value of the stock, individual investors and institutional investors and the like could be hurt.[5]

Mr. Avenatti ramped up his campaign in subsequent meetings during phone calls and a meeting that was recorded by the Government. His threats included:

- "I'm not fucking around with this, and I'm not continuing to play games."[6]

- "[I]t's worth more in exposure to me to just blow the lid on this thing. A few million dollars doesn't move the needle for me."[7]

- "I'll go take and I'll go take ten billion dollars off your client's market cap. But I'm not fucking around."[8]

- "Have you ever held the balls of the client in your hand where you can take 5, 6 billion dollars in market cap off of 'em? This is gonna be a major fucking scandal . . . ."[9]

---

[2] Trial Tr. 1151:21-23; *id.* 1354:5-9.
[3] Trial Tr. 1164:25-1166:20.
[4] Trial Tr. 1158:4-18.
[5] Trial Tr. 1165:23-1166:6.
[6] GX 001T 4:13-14.
[7] GX 001T 4:17-20.
[8] GX 001T 5:10-12.
[9] GX 002T 23:13-16.

2



- "[I]t's gonna snowball — and every time we get more information, that's gonna be The Washington Post, The New York Times, ESPN, a press conference — and the company will die, not die, but they're going to incur, cut after cut after cut after cut, and that's what's gonna happen. As soon as this thing becomes public."[10]

These threats, which were made to Nike's lawyers and were relayed to the Nike executives charged with protecting Nike's brand, did what they were intended to do: They induced anxiety that Nike would be substantially damaged through a false smear campaign.

The fact that the Government was investigating (and recording) Mr. Avenatti at the time did not lessen the impact because Nike's executives could not be certain that the Government would charge Mr. Avenatti, when it would do so, or whether Mr. Avenatti would make good on his threats. Nike's knowledge that the Government was investigating Mr. Avenatti therefore did not alleviate the fear that he caused as he continued to threaten the company with billions of dollars in losses after his initial meeting with Mr. Leinwand.

Before he could be arrested, Mr. Avenatti proceeded to inflict the precise kind of harm that Nike had feared and had been working to prevent or at least mitigate. In the last moments before his arrest, when he knew that the FBI had visited Gary Franklin's house in Los Angeles and that the FBI was likely looking for him, Mr. Avenatti sent a tweet that falsely alleged "criminal conduct [that] reaches the highest levels of Nike."[11] Nike's stock price immediately dropped by approximately a dollar per share, representing a loss of roughly $300 million in market value.[12]

Nike's executives were shocked. Nike had made a decision to not pay Mr. Avenatti, and now they were watching as he carried out what he had criminally threatened to do. Mr. Leinwand, who shared the decision not to pay off Mr. Avenatti in exchange for silence, describes watching the stock drop as among the worst moments of his professional career.

After his extortion of the company was ended by his arrest, Mr. Avenatti continued to harm Nike. He publicized a series of false claims against Nike, treating Nike employees—as well as young athletes and their families—as collateral damage. For weeks after his arrest, Mr. Avenatti issued a daily barrage of Twitter posts to his 800,000 followers, leveling provably false accusations against Nike and the high school athletes who competed in Nike's grassroots program.

Mr. Avenatti baselessly tweeted that Nike "has bribed over 100 high school players over the last 4 years to play college basketball at colleges affiliated with Nike as opposed to other schools."[13] In the same Twitter thread, Mr. Avenatti further falsely claimed that "Nike's most senior execs knew about it and looked the other way, as did many of the colleges. Nike also undertook large efforts to hide it from the NCAA & federal investigators. Some colleges lost out

---

[10] GX 002T 26:22-27:6.
[11] Trial Tr. 1870:12-21.
[12] Trial Tr. 1177:5-17. Nike's share value quickly recovered after Avenatti was arrested and news of his criminal prosecution became public.
[13] *See* Twitter post from @MichaelAvenatti (Apr. 5, 2019 7:08 PM), *available at* https://twitter.com/MichaelAvenatti/status/1114303777937530880.



on some of the best high school recruits because of Nike's bribes...."[14] Later the same day, Mr. Avenatti tweeted: "Was it fair for some colleges to lose out on recruits because Nike had bribed the recruits with illegal payments so they would play at other 'Nike' schools? Was it fair for Nike to take advantage of the players and their families by paying the bribes and then demanding loyalty?"[15]

Because of Mr. Avenatti's notoriety, these false claims were then amplified in the media.[16] The attacks harmed virtually every young player and Nike employee affiliated with Nike's grassroots basketball program. All of them were subject to public question as to whether they were paying or taking bribes.

Mr. Avenatti also falsely condemned Nike employees by name. For instance, Mr. Avenatti tweeted on April 10, 2019:

> Carlton Debose, Jamal James, John Slusher and other high ranking @Nike executives all participated in and/or helped cover-up the massive illegal bribes paid to rig the college recruitment process to benefit Nike. What has Nike done about it? Nothing - no suspensions or discipline[.][17]

Once again, this tweet was false. Nike's employees, unlike the Adidas executives who have been prosecuted in this District, never bribed high school players to attend Nike-sponsored colleges. Nevertheless, following this tweet, Mr. Slusher's children called him highly concerned that he could be arrested. Mr. Slusher, Mr. DeBose, and Mr. James suffered reputational harm and public embarrassment.

In addition to his Twitter campaign against Nike, Mr. Avenatti also falsely attacked the company in television, radio, and podcast interviews. For example, on March 27, 2019, Mr. Avenatti gave an interview on CBS News in which he lied about the nature of his extortionate demands, claiming:

> [F]rom the very first moment that we had any meeting with Nike, we made it clear that under no circumstances would we participate in anything that did not require full disclosure to investigators and the federal government.[18]

As was established at trial, this was false. In fact, during his first meeting with Nike, Mr. Avenatti said that it would be *up to Nike* whether to disclose anything about its conduct to

---

[14] *See* Twitter post from @MichaelAvenatti (Apr. 5, 2019 7:08 PM), *available at* https://twitter.com/MichaelAvenatti/status/1114303781661966336.
[15] *See* Twitter post from @MichaelAvenatti (Apr. 5, 2019 7:23 PM), *available at* https://twitter.com/MichaelAvenatti/status/1114307540236603392.
[16] *See, e.g.*, Footwear News: "Michael Avenatti Throws Zion Williamson's Name in With His Allegations of Nike Participating in Cash Payments Misconduct" (Apr. 5, 2019), *available at* https://www.yahoo.com/lifestyle/michael-avenatti-throws-zion-williamson-035719948.html.
[17] *See* Twitter post from @MichaelAvenatti (Apr. 10, 2019 10:18 AM), *available at* https://twitter.com/MichaelAvenatti/status/1115982438117801984.
[18] CBS News: "Michael Avenatti gives first interview since arrest" (Mar. 27, 2019), *available at* https://youtu.be/z2iYbRUbMNE?t=125.

4



investigators.[19] And in a later recorded meeting, he went so far as to promise that if he was paid, Nike would have "full confidentiality" and that he would "ride off into the sunset."[20]

These false attacks have taken a toll on the players, on Nike's employees, and on Nike. In the internet age, they will live on virtually in perpetuity. Although the Government's successful prosecution of Mr. Avenatti will lessen his credibility to past and future audiences, it is impossible to restore completely the reputational harm he has caused.

Lastly, the financial harm Mr. Avenatti caused Nike has been substantial. Nike's employees—including its senior leadership, its legal team, and its communications team—and its outside counsel have collectively devoted thousands of hours to (1) assisting the Government in its investigation and prosecution of Mr. Avenatti, and (2) responding to and mitigating the negative impact of Mr. Avenatti's false claims. The financial cost to Nike arising from Mr. Avenatti's criminal scheme, including legal fees, far exceeds the $1 million in restitution the company requests.[21]

Mr. Avenatti's attempt to reduce the aggregate harm at issue "by the amount that an internal investigation would have cost Nike" (Dkt. 317 at 6-7) should be rejected. The money Nike previously spent on an internal investigation in the years prior to Mr. Avenatti's extortionate demand should not offset or mitigate the size of the payment that Mr. Avenatti illegally demanded in exchange for refraining from publicizing false smears against Nike. As described at trial, Nike had already conducted an exhaustive investigation and had no need to retain Mr. Avenatti to conduct an entirely redundant investigation.[22] And even if Nike still had to conduct an investigation at that point, it could not have hired Mr. Avenatti, who had a clear conflict because of his representation of Mr. Franklin.[23]

---

[19] See, e.g., Trial Tr. 274:5-16, 1430:9-15.

[20] Trial Tr. 336:6-16, 653:4-13. See also Fox Sports Radio: "Michael Avenatti: Ignore What I Say, Look At The Documents" (May 17, 2019), available at https://foxsportsradio.iheart.com/content/2019-05-17-michael-avenatti-ignore-what-i-say-look-at-the-documents) (falsely claiming claim that Nike paid hundreds of players to attend Nike-sponsored colleges and that he approached Nike to try and settle a case on behalf of a client).

[21] Nike has requested that the Government seek $1 million in restitution on Nike's behalf, provided the restitution order can be structured so that Nike is paid only after full restitution is paid to the individual victims of Mr. Avenatti's crimes, in this case and others. See 18 U.S.C. § 3664(i); see also United States v. Avenatti, 19 Cr. 374 (S.D.N.Y.) (charging Avenatti with defrauding a client); United States v. Avenatti, 19 Cr. 61 (C.D. Cal.) (charging Avenatti with defrauding multiple clients).

[22] Trial Tr. 427:14-17, 563:10-14; see also id. 429:11-15 (Court: "The investigation had already been conducted, so actually what they were asking him to do was have the client do — pay for another internal investigation when one had been done already.")

[23] Trial Tr. 592:10-23 (Mr. Srebnick: What I would like to say is that the point of Wilson is that suggesting pejoratively that Avenatti and Geragos aren't competent to conduct an internal investigation compared to Boies Schiller, which is, was the implication. THE COURT: Well, actually he made a different point — which everyone standing here knows has enormous merit — which is that there is an obvious conflict. You can't both represent someone who is adverse to a company and purport to represent the company also. Everyone standing here knows that very basic proposition. That's what Mr. Wilson has said to the jury. So, it hasn't been so much that they're incompetent. What it has been is that they have an obvious conflict, and that is what it is.").



In sum, Nike respectfully submits that a significant sentence is warranted to reflect the substantial harm that Mr. Avenatti caused to Nike and its shareholders by criminally weaponizing his law degree. *First*, and perhaps most importantly, he threatened billions of dollars in harm to Nike's most valuable asset, its brand. *Second*, instead of threatening to publicize true facts backed up by evidence, he threatened Nike with false accusations of criminal conduct at the company's highest levels. *Third*, instead of threatening merely to make his allegations public, he threatened Nike with the full weight of an extensive, national media platform, right on the eve of Nike's earnings announcement and the annual NCAA basketball tournament. *Fourth*, instead of stopping his scheme when the FBI showed up to interview Mr. Franklin, Mr. Avenatti immediately tweeted falsehoods about criminal conduct reaching Nike's highest levels. *Fifth*, after his arrest, Mr. Avenatti continued to disparage Nike, its employees, and players affiliated with Nike, demonstrating zero contrition for his crime. Nike respectfully requests that the Court impose a sentence on Mr. Avenatti that takes into account this serious and sustained criminal conduct, which, on the spectrum of extortion, was particularly egregious.

Respectfully,

Peter M. Skinner
David L. Simons