LAW OFFICE OF

# BENJAMIN SILVERMAN

224 WEST 30TH ST., SUITE 302
NEW YORK, NY 10001

TEL (212) 203-8074
FAX (646) 843-3938
Benjamin@bsilvermanlaw.com

June 17, 2021

**By ECF**
Honorable Paul G. Gardephe
United States District Judge
Southern District of New York
40 Foley Square
New York, NY 10007

Re: *United States v. Michael Avenatti*, 19 Cr. 373 (PGG)

Your Honor:

I write in further support of our motion to compel (Mot., Dkt. 315) and in response to the government's June 11 letter (Opp., Dkt. 318). The government's 17-page response acknowledges the seriousness of the issues Mr. Avenatti raises but urges the Court to move forward without creating a record about what actually happened. It concedes that it decided before the trial not to disclose certain witness statements but does not want to be compelled to disclose them now – a necessary step to assess appropriate relief. It asks the Court to decline inquiry into a *New York Post* reporter's recent statements about meetings outside counsel's and Mr. Avenatti's presence and the reporter's access to questionnaire responses. For the reasons below, the government's arguments should be rejected.

**I.      The government decided pretrial not to disclose certain witness statements. It must produce them now so that we can assess the prejudice.**

Following months of inquiries, the government now acknowledges – for the first time in its response to Mr. Avenatti's motion to compel – that it knew before last year's trial that DOJ lawyers possessed witness statements that it deliberately withheld. It continues to refuse to produce these statements. Instead, it misstates the law and facts to claim that Mr. Avenatti's request is untimely and waived. And it asks the Court to presume that no prejudice arises from this continuing non-disclosure – something that cannot be determined without reviewing the undisclosed statements. The government should be compelled to produce all 3500 material possessed by DOJ to allow counsel to assess the prejudice caused by its failure to produce it when it should have.

Hon. Paul G. Gardephe
June 17, 2021
Page  2

A.      **The government made a deliberate decision not to disclose certain witness statements.**

The government acknowledges that it made a deliberate decision – together with its colleagues in the Central District of California (CDCA) – not to produce witness statements before the trial. It states that "following a request by the government for statements of Regnier," the government's colleagues in CDCA provided 3500 material, Opp. at 2-3, including interview memoranda and certain handwritten notes. But, "following the pertinent USAO-CDCA team's practice . . . . of only disclosing such notes when they are inconsistent with the disclosed memorandum," certain handwritten notes were not included in the 3500 production. *Id.* at 3. The Southern District of New York (SDNY) government attorneys and their CDCA colleagues apparently agreed that these notes would be withheld.

The government's recounting is significant for several reasons. First, it acknowledges that it was obliged to produce witness statements possessed by DOJ's lawyers in CDCA, which is presumably why it asked CDCA to provide statements relating to Regnier. Second, CDCA attorneys likewise recognized the need to disclose witness statements they possessed before trial in *this* case. Third, it confirms that SDNY and CDCA prosecutors conferred about their discovery obligations and decided, together, not to produce certain statements, contrary to what the government concedes is the standard practice in this district, *see* Opp. at 6 n.4. ("[T]he Government in this district generally produces all reports, and all notes, of interviews in its possession").[1]

To the extent the government's letter may suggest that it was confronted by CDCA lawyers who insisted on withholding witness statements, even if true, the government still had several appropriate options. It could have disclosed CDCA's position to defense counsel. It could have provided the statements to the Court under 18 U.S.C. § 3500(c). Or it could have decided not to call Regnier at trial. The government instead chose another option: agree with their CDCA colleagues not to produce the statements and remain silent.

Significantly, the government does not dispute the facts set forth in Mr. Avenatti's motion establishing that it conducted a joint investigation with its CDCA colleagues and jointly managed Ms. Regnier. Mot. at 4-5. Nor can it because CDCA prosecutors attended 14 out of the government's 16 meetings with Ms. Regnier. *See* Ex. A (listing DOJ's meetings with Ms. Regnier). The government concedes that it worked jointly with

---

[1]  The government's statement that CDCA said "it would not be providing underlying notes" is incorrect (Opp. at 3): the government in fact produced some, but not all, of the handwritten notes taken by CDCA agents and AUSAs.

Hon. Paul G. Gardephe
June 17, 2021
Page 3

CDCA to pool their collective statements for the 3500 production. Opp. at 2-3; *see also* Ex. A (indicating originating office for each document). Divvying them into separate "teams" is "hypertechnical and unrealistic." *United States v. Gupta*, 848 F. Supp. 2d 491, 493 (S.D.N.Y. 2012).[2] The government's conclusory statements that there was no joint prosecution team neither addresses these undisputed facts nor explains why prosecutors in both offices agreed to produce some, but not all, of their collective witness statements before this case's trial.

The government takes fundamentally inconsistent positions when it acknowledges that it needed to produce witness statements stored in California but insists that it did not have to produce all notes DOJ possesses, as it does in every other case.

In short, it is now clear that the government deliberately decided not to produce certain witness statements before trial and has not provided a satisfactory explanation. The next step is to obtain the statements and assess prejudice.

**B.    The government must produce all 3500 material to allow counsel to assess the prejudice.**

The government urges this Court to presume that its 3500 non-compliance did not prejudice Mr. Avenatti – while continuing to withhold the statements that support or rebut that contention.

The government does not dispute the legal standard to be applied in determining whether a new trial should be granted when the government fails to produce witness statements. *See* Mot. 6-7. It turns on "whether the suppression was deliberate or inadvertent." *United States v. Hilton*, 521 F.2d 164, 166 (2d Cir. 1975). "If the government deliberately suppresses evidence or ignores evidence of such high value that it could not have escaped its attention, a new trial is warranted if the evidence is merely material or favorable to the defense." *Hilton*, 521 F.2d at 166; *United States v. Jackson*, 345 F.3d 59, 77 n.14 (2d Cir. 2003); *United States v. Bin Laden*, 397 F. Supp. 2d 465, 509 n.52 (S.D.N.Y. 2005) ("[A]lthough the value of the actual 3500 Material is quite minimal, even this minimal value would likely require a new trial if the Government's failure to produce the statements had been truly intentional, or under circumstances

_____

[2] The government cites *United States v. Yousef*, a case about SDNY's obligations to collect discovery from foreign law enforcement agencies. 327 F.3d 56, 130-31 (2d Cir. 2003). *Yousef* does not provide the rule of law applying to two domestic United States Attorneys' Offices, both within DOJ; and the government does not explicitly contend otherwise.

Hon. Paul G. Gardephe
June 17, 2021
Page 4

justifying a presumption of intentional suppression.").df

The government contends that merely stating this applicable law is "inflammatory," Opp. at 11 n.7, and yet acknowledges that it made the deliberate decision, jointly with its CDCA colleagues, not to produce certain witness statements, Opp. at 2-3. The question now is whether those statements were "material or favorable to the defense." *Hilton*, 521 F.2d at 166. That, of course, requires counsel to review the unproduced statements.

The government invites the Court to commit error by denying this motion without establishing a record of what it failed to disclose. The approach urged by the government would likely result in a remand. *See United States v. Morell*, 524 F.2d 550, 555 (2d Cir. 1975) (remanding "with directions to hold an evidentiary hearing for the purpose of examining the government's conduct with respect to this material"); *cf. United States v. Ortega*, 2001 WL 1588930, at *8 (S.D.N.Y. Dec. 13, 2001) (granting hearing to examine government's discovery lapses); *United States v. Nguyen*, 1996 WL 26635, at *2 (S.D.N.Y. Jan. 24, 1996) (granting post-trial hearing to examine the government's 3500 compliance). The efficient and appropriate next step is to order the government to produce all of the undisclosed 3500 material to allow counsel (and the Court) to assess whether the deliberately withheld statements are material or helpful to the defense. Indeed, even if the Court were to determine that the government's failure was inadvertent – which is not what it contends in its letter (Opp. at 2-3) – we would still need to see the undisclosed statements to assess "if there is a significant chance that this added item, developed by skilled counsel, could have induced a reasonable doubt in the minds of enough jurors to avoid a conviction." *Hilton*, 521 F.2d at 166.

Finally, the government argues that there cannot be prejudice because Mr. Avenatti's counsel did not cross examine Ms. Regnier. That misses the point: we do not know what, if any, questions would have been asked based on the unproduced statements. Again, the standard is a low one: "*merely* material or favorable to the defense." *Id.* (emphasis added). Applying this standard requires the defense to review the undisclosed statements. There simply is no good reason for the continued non-disclosure.

## C.    The unproduced 3500 material include more than just handwritten notes.

Insofar as the government suggests that Mr. Avenatti faced no prejudice because the undisclosed notes are fully consistent with typed memoranda – something we cannot determine unless or until we review those notes – it is mistaken for yet another reason: the unproduced witness statements include more than just handwritten notes relating to the memoranda. Shortly after our motion was filed on June 4, CDCA produced in the California case additional pre-February 2020 witness statements by Ms. Regnier that were not produced in this case. Further, the government has failed to provide an adequate

Hon. Paul G. Gardephe
June 17, 2021
Page 5

response to concerns that a special agent did not preserve at least one message from Ms. Regnier sent just weeks before trial.

First, shortly after Mr. Avenatti's motion was filed on June 4, counsel learned that CDCA prosecutors had just produced multiple additional witness statements by Ms. Regnier, including a voice message and at least one email. In the newly-disclosed emails that Ms. Regnier sent to Special Agent Ramoun Karlous, on January 14, 2020 – only weeks before trial – she wrote that she "felt threatened" by the Twitter screenshot attached as Exhibit A to the government's papers speculating that Mr. Avenatti might harm her. The government describes the screenshot as an "apparent attempt[] at humor." Opp. at 11. But that was not Regnier's view at the time – she felt afraid that she might be harmed and was sufficiently concerned to send an email to the government about it. These fears could have led to biases on which to impeach her. Evidence that "impeaches a government witness . . . is generally called *Brady* material." *United States v. Gil*, 297 F.3d 93, 101 (2d Cir. 2002). That at least one of the undisclosed witness statements now appears to contain *Brady* disclosures further emphasizes the need to review all of the materials; and that the government should have produced them before trial and, having failed to do so, at the very least following the Court's October 30, 2020 *Brady* Order, Dkt. 305.

Second, the government is notably opaque about a text message that, according to Special Agent (SA) Penland's own notes, Ms. Regnier "sent" to her about a "concern" just weeks before trial. Mot. at 5-6; Opp. at 9-11. The government does not dispute what the agent's notes clearly state: that Regnier sent at least one text message to SA Penland that the government cannot find. Nor does it submit that the agent has a different understanding of what her own notes say; it does not even aver, one way or the other, whether SA Penland recalls receiving this message that the government cannot find. The government appears not to want to explain what happened to this text message. In a footnote, it states that it "has no basis to" confirm whether messages were unpreserved. Opp. at 10 n.6. If true, that is remarkable: it means that the government has not investigated why it cannot locate a witness statement that its own agent wrote had been sent to her. The government writes that Ms. Regnier "stat[ed] that she sent [the text messages] to a different agent" (*id.*) – an agent who the government apparently has not even contacted. But that is inconsistent with SA Penland's own notes stating that Ms. Regnier's messages were "sent" to her.[3]  We have no idea what Ms. Regnier sent to the

---

[3] It is also not an accurate description of what Ms. Regnier actually said. The government disclosed to counsel an email, which it describes on pages 4-5 of its opposition, in which Ms. Regnier told her own lawyer that she sent another Twitter screenshot to "Mr. Karlous" and that she used her phone to show items to agents during

Hon. Paul G. Gardephe
June 17, 2021
Page 6

New York-based agent. At the very least, the government should inquire of its agent whether she recalls receiving this text message; why it was not preserved; and the time period over which she did not preserve witness statements. The government again wants to move forward without establishing a record of what happened. The Court should not allow that.

### D.   The government distracts with flawed arguments about timeliness and its discovery obligations.

The government's remaining legal arguments are unsupported and, at times, flatly inconsistent with settled law.

### 1.   This motion is timely.

The government argues that this motion is untimely. The government does not even address the precedents cited in the motion to compel requiring the government to produce witness statements post-trial when it failed to provide them earlier. Mot. at 6-7. It instead invokes Fed. R. Crim. P. 12, Opp. at 7-8, which concerns Rule 16 disclosures, not the Jencks Act obligation at issue here. The government argues the following syllogism: it only had to produce witness statements from another office if it is jointly prosecuting Mr. Avenatti; case law concerning discovery obligations in joint prosecutions specifically addresses Rule 16 discovery; therefore this motion implicates Rule 16; and Rule 16 discovery motions must be made before trial; so therefore this motion is untimely. Opp. at 8. The government's argument makes no sense: this is a motion for undisclosed 3500 material and Rule 12 has no bearing. The fact that precedents addressing joint prosecution teams, *e.g.*, *United States v. Martoma*, 990 F. Supp. 2d 458 (S.D.N.Y. 2014), arose in the context of Rule 16 discovery is of no moment.

The government also cites cases in which the defendant did not make the necessary motion for witness statements. *United States v. Padilla*, 1996 WL 389300, at *2 (S.D.N.Y. July 11, 1996); *see United States v. Petito*, 671 F.2d 68, 73-74 (2d Cir. 1982). Here, no such motion was necessary because the government agreed to produce witness statements by January 14, 2020. Dkt. 68. This precise point was made in our motion. Mot. 5 n.3. The government derides it as not making "sense." Opp. at 8. But it is the government's argument that makes no sense: clearly no motion is necessary when the government has agreed to the disclosure in question and confirmed its obligation in an

---

meetings. Opp. at 4. It is unclear what question Ms. Regnier is responding to in this email, and she says nothing about what she sent to SA Penland (or whether she did or did not send anything at all). *Id.*

Hon. Paul G. Gardephe
June 17, 2021
Page 7


ECF-filed letter.

The government cites a June 2019 transcript in which it suggested that it did not possess items located in California. Opp. at 8 n.5. But defense counsel had not at that time seen the 3500 disclosures revealing the tight working relationship between SDNY and CDCA – a fact that the government does not dispute, *see* Mot. at 4-5. Counsel could not waive what it did not know. *Doe v. Marsh*, 105 F.3d 106, 111 (2d Cir. 1997) ("[W]aiver 'is ordinarily an intentional relinquishment or abandonment of a known right or privilege.'") (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)).

### 2.      The government is required to produce all witness statements, including all notes.

The government argues that it did not need to produce handwritten notes from its meetings with Ms. Regnier, but none of the cited case support that contention. For example, *Palermo v. United States* addresses notes that were outside the Jenck's Act's scope because they were based "on the memory of the agent" and were not "verbatim" recordings of what the witness said. 360 U.S. 343, 352-53 (1959). But the government does not suggest that the notes at issue here are anything other than the most precise, verbatim summaries of Ms. Regnier's oral statements. And in *United States v. Artis*, 523 F. App'x 98, 101 (2d Cir. 2013), a district judge performed an *in camera* review of notes before determining that the "sentence fragments" and "impressions" without any "direct quotes" were not 3500 material. Here, by contrast, the government never submitted the statements at issue for *in camera* review under § 3500(c). It instead remained silent about its decision not to produce them and withholds them even today. *Artis* is therefore inapposite.

The government also cites cases declining to impose sanctions for destroying notes either because there was no bad faith or the notes' contents were preserved in memoranda. *E.g.*, *United States v. Elusma*, 849 F.2d 76, 79 (2d Cir. 1988); *United States v. Barlin*, 686 F.2d 81, 92 (2d Cir. 1982); *United States v. Covello*, 410 F.2d 536, 545 (2d Cir. 1969); *United States v. Aviles*, 337 F.2d 552, 559 (2d Cir. 1964); *accord United States v. Reed*, 575 F.3d 900, 920-21 (9th Cir. 2009). These cases do not address the circumstances here where the government refuses to produce notes that exist but were deliberately withheld. The underlying notes, when extant, are clearly the most verbatim, contemporaneous recordations of the witness' statements. The government therefore concedes, as it must, that it ordinarily would produce the notes that it continues to withhold here. Opp. at 6 n.4.

Hon. Paul G. Gardephe
June 17, 2021
Page 8

\*\*\*\*

At its core, the government's letter attempts to put the cart before the horse. It asks the Court to presume there was no prejudice without allowing counsel or the Court to review the statements that were not produced and by refusing to explain or even investigate why others were not preserved. Given the government's deliberate decision not to produce at least certain witness statements, the defense must be allowed to see them to assess whether they are "material or favorable to the defense." *Hilton*, 521 F.2d at 166; *Jackson*, 345 F.3d at 77 n.14.

## II.    The government is mistaken when it argues that Mr. Avenatti is not entitled to know whether it provided questionnaire responses to a *New York Post* reporter or facilitated her presence at sidebars.

The government takes the extraordinary position that Mr. Avenatti is not entitled to know whether a reporter met with the Court outside counsel's presence, as the reporter claims, or otherwise permitted her to attend sidebars and receive prospective jurors' questionnaire responses the night before oral *voir dire*. Opp. at 12-17. The government is notably silent about what, if any, interactions it had with this reporter – including whether it facilitated her presence at sidebar or provided her with the questionnaire responses – knowing that she wrote for a newspaper that was firmly aligned with then-President Trump and against Mr. Avenatti, who was often portrayed in the media as the president's primary antagonist. This case's sensitivity to the media was indicated by the very fact of a questionnaire and questions within it about media exposure. The government continues to suggest that Mr. Avenatti should have foreseen that media would attend sidebars and review the questionnaire responses, Opp. at 12, even though the government itself told the Court and defense counsel on the first day of *voir dire* that it believed sidebars were *in camera*, Mot. at 8 (citing Trial Tr. at 78:2-78:5).

The government declines to address the reporter's access to questionnaire responses. *See* Mot. at 9. It instead uses notably stilted language to opine, in an incomplete matter, that "*some* [of the reporter's stories] appear to have been based on the Court's reading of certain responses to juror questionnaires in open court and *another* appears to have arisen from a *New York Post* reporter's attendance at a sidebar." Opp. at 12 (emphasis added). It omits that some of the reporting is based on information only found in the jurors' questionnaire responses and not stated in any court transcript. *See* Mot. a 9 (noting questionnaire response that Mr. Avenatti "should already be in prison"). And it remains silent about whether it provided the questionnaire responses to the reporter.

Attacking a strawman, the government works to dismantle a Rule 33 motion that

Hon. Paul G. Gardephe
June 17, 2021
Page 9

Mr. Avenatti has not filed or even suggested. The government's response to an unfiled Rule 33 motion should not distract from what this application actually concerns: a former *New York Post* reporter's recent claims that she "met with" the Court and that the Court "thought about" her request to attend sidebars, ultimately ruling that she could, and provided "all media" with the questionnaire responses. Mot., Ex. A. These statements implicate Mr. Avenatti's rights (1) to attend all stages of the trial under Fed. R. Crim. P. 43(a)(2); (2) to have counsel present at all stages and able to object to important pretrial and trial procedures as required by the Sixth Amendment; (3) to be tried and sentenced without any appearances of partiality; and (4) to have proceedings consistent with due process. In light of the *New York Post* reporter's recent public statements, we respectfully request a record of whether they are correct, and, if they are, the relevant circumstances. Mot. at 7-9. If they are incorrect, we respectfully request that the Court direct the government to describe its contacts with the reporter including whether it provided her with questionnaire responses. *See* Local Rule 23.1(b).

## III.    Conclusion

At base, the government urges that the Court should create no further record concerning the matters raised in Mr. Avenatti's motion, which pertain to the government's discovery obligations and Mr. Avenatti's important constitutional rights. The Court should compel the government to produce information necessary to assess prejudice attributable to its 3500 non-compliance and hold a hearing. It should reject the government's effort to block Mr. Avenatti from learning about the circumstances described in the *New York Post* reporter's recent statements. Mr. Avenatti cannot remain in the dark about what happened during and around jury selection.

We are available to answer any questions. Thank you for your consideration.

Respectfully submitted,

/s/ Benjamin Silverman
Benjamin Silverman
*Attorney for Michael Avenatti*

cc: Counsel of Record (by ECF)

# Exhibit A

## 3500 Material Produced by USAO-SDNY Prior to Judy Regnier Trial Testimony

| Date | Originating USAO Office | CDCA Present? | No. Pages | Description | Identifying No. |
|---|---|---|---|---|---|
| 3/25/2019 | CDCA | Yes | 18 | Typed summary of interview | 3514-001 |
| 3/26/2019 | CDCA | Yes | 1 | Custody receipt for retained/seized property | 3514-013 |
| 3/26/2019 | CDCA | Yes | 1 | Typed summary of interview | 3514-014 |
| 3/26/2019 | CDCA | Yes | 1 | Typed and handwritten memo of activity | 3514-015 |
| 4/9/2019 | CDCA | Yes | 1 | Typed memo of activity | 3514-016 |
| 6/14/2019 | CDCA | Yes | 2 | Handwritten notes from interview | 3514-017 |
| 7/15/2019 | CDCA | Yes | 3 | Handwritten notes from interview | 3514-018 |
| 7/15/2019 | CDCA | Yes | 1 | Typed notes from phone call | 3514-019 |
| 10/20/2019 | SDNY | Yes | 2 | Typed signed consent | 3514-002 |
| 10/28/2019 | CDCA | Yes | 1 | Typed memo of phone call | 3514-020 |
| 11/19/2019 | CDCA | Yes | 14 | Typed summary of interview | 3514-012 |
| 11/20/2019 | SDNY | Yes | 12 | Handwritten notes from interview | 3514-004 |
| 11/26/2019 | SDNY | Yes | 8 | Typed summary of interview | 3514-003 |
| 12/5/2019 | CDCA | Yes | 1 | Typed memo of phone call | 3514-021 |
| 1/8/2020 | unknown | N/A | 2 | Travel reservation | 3514-007 |
| 1/9/2020 | SDNY | Yes | 10 | Handwritten notes from interview | 3514-005 |
| 1/10/2020 | unknown | N/A | 5 | Travel reservation | 3514-006 |
| 1/15/2020 | unknown | N/A | 2 | Travel reservation | 3514-008 |
| 1/15/2020 | unknown | N/A | 8 | Travel reservation | 3514-009 |
| 1/16/2020 | SDNY | No | 4 | Handwritten notes from interview | 3514-010 |
| 1/17/2020 | SDNY | No | 1 | Handwritten notes from interview | 3514-011 |
| 2/1/2020 | unknown | N/A | 6 | Travel reservation | 3514-023 |
| 2/2/2020 | unknown | N/A | 2 | Travel reservation | 3514-022 |
| 2/4/2020 | SDNY | Yes | 2 | Handwritten notes from interview | 3514-024 |

| Date | Originating USAO Office | CDCA Present? | No. Pages | Description | Identifying No. |
|------|------------------------|---------------|-----------|-------------|-----------------|
| 2/5/2020 | SDNY | Yes | 1 | Handwritten notes from interview | 3514-025 |