**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>              v.<br><br>MICHAEL AVENATTI<br><br>                    *Defendant.* | S1 19 Cr. 373 (PGG) |

**DEFENDANT MICHAEL AVENATTI'S REPLY TO**
**GOVERNMENT'S SENTENCING MEMORANDUM**

Scott A. Srebnick
SCOTT A. SREBNICK, P.A.
2214 N.W. 1st Place, 2nd Floor
Miami, FL 33127
Telephone: (305) 285-9019
Facsimile: (305) 377-9937
E-Mail: scott@srebnicklaw.com

E. Danya Perry
PERRY GUHA LLP
35 East 62nd Street
New York, New York 10065
Telephone: (212) 399-8340
Facsimile: (212) 399-8331
E-mail: dperry@perryguha.com

i

Defendant MICHAEL AVENATTI ("Avenatti"), through counsel, respectfully submits this reply to the government's Sentencing Memorandum (ECF No. 321), and in further support of his Sentencing Memorandum (ECF No. 317).

## I. THE GUIDELINES OBJECTIONS

### A. The Three Counts Should Have Been Grouped

The government argues that the three counts should not be grouped together because, it now argues, the "abuse of trust" enhancement imposed in Group One (extortion) was based on receiving confidential information from his client, yet the honest services fraud conviction (Group Two) involved "soliticing a payment in exchange for violating his fiduciary duty." (ECF No. 321:5-6). The government overlooks the fact that one of the "fiduciary duties" on which it asked the Court to instruct the jury with respect to the honest services fraud count was the duty of confidentiality. Trial Tr. at 2177. And, the prosecutor expressly urged the jury to find Mr. Avenatti guilty of honest services fraud for violating that fiduciary duty by deciding to "go public" with Franklin's confidential information "and not informing Franklin." *Id*. at 2177-78.

The government also argues that the three counts should not be grouped because "special skill" was also a basis for the two-level enhancement under U.S.S.G. §3B1.3, in addition to "abuse of trust." (ECF No. 321:6). That argument, however, is irrelevant in light of the plain language of §3D1.2(c), which requires grouping "when one of the counts embodies conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to another of the counts." That there may be an alternative basis for the §3B1.3 enhancement does not undercut the fact that the honest services count embodies conduct – abuse of trust – that is treated as an upward adjustment to the offense level for extortion.

1

The government's argument with respect to the reverse – that the extortion offenses embody conduct treated as a specific offense characteristic for the honest services fraud count (ECF No. 321:6-7) – likewise ignores the plain language of §3D1.2(c). The government argues that the enhancement under the §2B1.1 loss table for extortion was meant to punish a different state of mind than same enhancement under the same loss table for the "value of the bribe." (ECF No. 321:6-7). But the text of §3D1.2(c) focuses on whether the defendant's **conduct** in one group is treated as a specific offense characteristic in another. The government cannot seriously deny that Mr. Avenatti's **conduct** – his demand for payment from Nike for himself – is the same **conduct** that forms the basis for the loss table enhancements in both groups. *Compare* PSR, at ¶32 *with* PSR, at ¶38.

### B. The PSR Applies the Wrong Guideline to Count 3

The government argues that the PSR correctly applied the guideline for commercial bribery – §2B1.4 – because that guideline more aptly covers Mr. Avenatti's conduct in this case. (ECF No. 321:7-8). That argument is belied by the way the government tried the case on the honest services fraud count. The government repeatedly argued to the jury that Avenatti defrauded Gary Franklin – i.e., that Avenatti took advantage of Franklin – by breaching legal and fiduciary duties owed to Franklin. *E.g.,* Trial Tr. at 2127, 2177, 2184. The conduct charged in Count 3, as tried by the government, is more aptly described as "fraud" than bribery. The holding in *Skilling v. United States*, 561 U.S. 358, 404-12 (2010) - that 18 U.S.C. §1346 must be limited to fraud prosecutions that also meet the definitions of bribery or kickbacks - does not alter the fact that §1346 is a fraud statute, which requires a scheme to defraud and the breach of a fiduciary duty, as instructed by this Court. Trial Tr., at 2336, 2341-42.

The government does not even attempt to distinguish *United States v. Abbott*, No. 19-10117, 2019 WL 4394934, *2 (D. Mass. Sept. 13, 2019), the District of Massachusetts case that squarely holds that U.S.S.G. §2B1.1, not §2B4.1, should be applied to private honest services fraud convictions under §1346. Instead, the government relies on four cases, including the Second Circuit's decision in *United States v. Rybicki*, 38 F. App'x 626, 633 (2d Cir. 2002), in which the defendants did not object to the application of §2B4.1 to an honest services fraud conviction and the courts did not have occasion to address, much less decide, the issue. (ECF No. 321:9). Moreover, as the district court explained in *Abbott*, cases such as *Rybicki* were decided under an earlier version of the Guidelines, and the statutory index in Appendix A to the current version (2018) does not list §2B4.1 as an offense guideline for mail or wire fraud. *Abbott*, 2018 WL 4394934, *2 & n.1.

    **C.** **The PSR Miscalculates the Aggregate Harm**

The government argues that Mr. Avenatti "provides ***no authority*** for the notion that the amount of the extortion demand under U.S.S.G. §2B3.3(b)(1) or the amount of the bribe under U.S.S.G. §2B4.1(b)(1) should be offset by the value of services purportedly to be provided by the defendant …" (ECF No. 321:9) (emphasis added). The government is mistaken. In his Sentencing Memorandum (ECF No. 317:6-7), Mr. Avenatti cited *United States v. Douglas*, 634 F.3d 852, 863 (6th Cir. 2011), which affirmed a district court's finding under §2B3.3 of no loss in an extortion case where the defendants, two union representatives, were convicted of pressuring General Motors to give highly-skilled jobs to non-qualified relatives of union members. The Sixth Circuit

agreed with the district court's reasoning that the loss amount should be offset by the value of services provided by the non-qualified workers.[1] *Id.*

Here, given the grand jury subpoena that was served on Nike on September 26, 2017, it is undisputed that Nike had to, and did in fact, retain counsel to conduct its own internal investigation. Indeed, Scott Wilson testified that he expressly told Avenatti early on during the first meeting on March 19, 2019, that Nike "had an interest in conducting an internal investigation . . ."[2] Trial Tr., at 459.[3] Thus, like General Motors in *Douglas*, Nike had to incur the expense for services that were going to be provided; the only issue was the ***identity of the persons*** to provide the service.[4] In that regard, contrary to the government's unsupported claim, it is clear from the record that had Mr. Avenatti and Mr. Geragos been retained to conduct the internal investigation, they would have provided the services, inasmuch as they openly discussed staffing and other logistics regarding the investigation during the recorded conversations. (*E.g.,* GX 2T:13-17).

---

[1] Although the Sixth Circuit held that the district court should have applied a different guideline (§2B3.2), it did not disturb the district court's decision that General Motors did not suffer any direct loss by hiring and paying the relatives of the union workers. *Douglas¸* 634 F.3d at 863.

[2] The evidence at trial further showed that no monetary demand for the investigation was made by Mr. Avenatti during the first meeting. It was only well into the telephone call the next day, after Mr. Wilson, then under the direction of the FBI, repeatedly pressed Mr. Avenatti for an estimate and after Mr. Avenatti repeatedly stated that he and Geragos would conduct the investigation for whatever Boies Schiller would charge, that Mr. Avenatti provided a monetary figure.

[3] The internal investigation was still ongoing during the trial, as was the government's investigation. Trial Tr., at 461.

[4] Moreover, as Boies attorney Scott Wilson testified, a legitimate internal investigation of the allegations raised regarding Nike's corruption of amateur basketball could cost up to $20 million, Trial Tr. at 540-541, which actually seems low when compared to the $2.7 million Boies charged Nike for less than a year of services related to this single criminal case against Avenatti, in which Nike was not even a party.

## II. THE §3553 FACTORS

### A. Conditions of Confinement

The government's sentencing memorandum does not address or refute any of the facts regarding Avenatti's conditions of confinement while housed at the MCC and, in particular, in 10 South. The government does not dispute that the conditions were unusually abhorrent, grotesque, and inhumane. Nor does the government dispute that the Court may take such conditions into account when imposing sentence upon Avenatti, as other courts in this district (and in many others) have with respect to other defendants who endured conditions that were less horrific than those suffered by Avenatti at the MCC.

### B. Comparable Sentences

In his Sentencing Memorandum, Avenatti asked the Court to consider the sentences imposed in several highly publicized "economic extortion" cases that involved the same basic coupling of circumstances: a demand for money combined with a threat of public exposure and damage to reputation. The government attempts to distinguish *United States v. Jackson*, No. 97 Cr. 121 (BSJ) (S.D.N.Y.) with one throwaway line, by arguing that it "involved an aggrieved daughter seeking money from her own father." (ECF No. 321:14-15) (citing *United States v. Jackson*, 180 F.3d 55, 59 (2d Cir. 1999)). But Cosby's paternity was never established and, in fact, the government repeatedly maintained in that case that there was no evidence that Ms. Jackson was actually Mr. Cosby's daughter and that, instead, she was attempting to take advantage of his generosity. In any event, the government cites no evidence that Jackson's purported relationship with Cosby influenced the district court's decision to impose a sentence of 26 months (with a recommendation that the incarceration portion be in a boot camp for 6 months and that the balance be under home confinement). To be sure, Jackson did not act like an aggrieved daughter. Instead,

she repeatedly attempted to extort $40 million directly from Cosby, over an extended period of time, threatening to publicly humiliate her supposed father without any lawful claim to the money and without providing any consideration in return. And all of this was after being warned a number of times that she was commiting extortion and that, if she continued, law enforcement would be contacted. Here, Avenatti's demand to be paid to conduct an internal investigation that Nike acknowledged it needed was directed at experienced attorneys over two meetings and one phone call, in the context of settlement discussions of a client's claim, with an experienced criminal defense lawyer, Mark Geragos, by his side – all across approximately one week. Trial Tr., at 1606.

The government's attempt to distinguish *United States v. Litzenburg*, No. 3:20-cr-00013-NKM-JCH (W.D. Va. 2020) (24 months) and *United States v. Kincheloe*, No. 3:20-cr-00014-NKM-JCH (W.D. Va. 2020) (12 months), is likewise unpersuasive. While it is true that both attorneys accepted responsibility and pleaded guilty as part of a plea agreement with the government that capped their incarceration exposure, the conduct in that case was far more egregious and prolonged. Over a three month period, Litzenburg and Kincheloe sought to extort $200 million – roughly ten times the amount demanded by Avenatti – from a multinational chemical company by threatening to destroy the reputation of that company unless it paid that money to the attorneys pursuant to a sham consulting arrangement. *See* Statement of Facts from *Litzenburg* and *Kincheloe* (attached hereto as Exhibit 1). Importantly, their scheme centered on selling out over 1,000 cancer victim clients. Moreover, contrary to the government's assertion, (ECF No. 321:15), the attorney defendants *did* seek to leverage public influence against the victim and also contravened the interests of their clients in the process. And, there was no evidence that either Litzenburg or Kincheloe intended to do any actual work for the money.

The government also does not attempt to distinguish any of the additional cases cited by Avenatti as precedent – and it certainly does not touch the fact that Mark Geragos has never been prosecuted, let alone sentenced.[5]

In sum, Mr. Avenatti respectfully requests that the Court impose a sentence in line with similar sentences imposed in economic extortion cases. The sentence recommended by the Probation Office – 8 years – far exceeds the sentences imposed in any comparable case.

### C. Harm to Gary Franklin

As of September 2018, long before meeting and retaining Mr. Avenatti in March 2019, Coach Gary Franklin had lost his California Supreme program. Trial Tr., at 1666. Word had gotten out in the community that he lost his Nike sponsorship; his basketball program was spiraling downward and his ability to attract players had changed "drastically." Trial Tr., at 1529-30; *see also e.g.*, Trial Tr. at 1668. And months before this, Mr. Franklin had lost his premier team, the 17-and-under team, after Nike executives had squeezed him out of managing the team in early 2018 (13 months before meeting Mr. Avenatti). Coach Franklin testified at trial that Nike's cornduct in 2018 greatly affected him and resulted in sleepless nights, physical illness, and his "brand" being hurt. Trial Tr., at 1633-34. Nike executives had bullied Coach Franklin into committing acts that he regretted, and he wanted justice, restitution from Nike and the exposure of the conduct. *E.g.*, Trial Tr., at 1627, 1706-12, 1735. By the time Mr. Auerbach first approached Mr. Avenatti on Coach Franklin's behalf, it was a "time of much despair" for Coach Franklin and

---

[5] The government likewise does not address the more recent economic extortion case, *United States v. Dino Gaudio*, No. 3:21-cr-52-BJB-1 (W.D.Ky. 2021), where the government agreed to a recommendation of probation for a University of Louisville assistant basketball coach charged with threatening to expose NCAA violations to the media unless paid $425,000. (ECF No. 9). Nor does the government address any of the other sentences reflected in the chart of cases attached as Exhibit 1 to Avenatti's Sentencing Memorandum. (ECF No. 317-1).

7

Mr. Auerbach. GX301. Despite numerous efforts by Coach Franklin and Mr. Auerbach over the prior 13 months, which included perceived threats from Mr. Auerbach to Nike executives Debose and James, Trial Tr., 1696-97, and Mr. Auerbach's call to one of the most senior executives at Nike (John Slusher), it was obvious that Nike had no interest in reinstating Coach Franklin into the Elite Youth Basketball League.[6] Indeed, upon information and belief, Nike has, to this day, not compensated Coach Franklin for any of his claims, reinstated his sponsorship, terminated any of the Nike executives involved in the misconduct, or expressed any interest in making amends with Coach Franklin. Plainly, the behavior of Nike and its executives caused significant harm to Coach Franklin in the first instance.

That being said, Mr. Avenatti accepts and acknowledges that his own conduct exacerbated the harm caused to Coach Franklin. By publicly disclosing, on Twitter, the documents provided to him by Coach Franklin (bank records, text messages, etc.), which he regrets, Avenatti understands that he hurt Coach Franklin. As a result of his arrest on March 25, 2019, the two DOJ press conferences that followed that same day, and the public statement(s) disseminated to the media by Nike, Avenatti was publicly humiliated and, in an effort to combat the wave of negative publicity and defend himself, he tweeted and publicly posted links to documents and information that had been provided to him by Jeffrey Auerbach. This is offered as an explanation, but not justification, for what Avenatti did. Avenatti never obtained specific permission from Coach Franklin after his arrest to publicly disclose those documents in that fashion. He should have. Avenatti accepts that those actions vis-à-vis Coach Franklin caused Coach Franklin substantial distress. Avenatti respectfully and sincerely apologizes to Coach Franklin for his conduct.

---

[6] Messrs. Debose and James even went so far as to mock Coach Franklin and Mr. Auerbach's efforts and threats designed to get Coach Franklin resinstated. *E.g.*, Trial Tr., at 1695-98.

8

Dated: July 5, 2021

| | |
|---|---|
| Scott A. Srebnick | E. Danya Perry |
| SCOTT A. SREBNICK, P.A. | PERRY GUHA LLP |
| 2214 N.W. 1st Place, 2nd Floor | 35 East 62nd Street |
| Miami, FL 33127 | New York, New York 10065 |
| Telephone: (305) 285-9019 | Telephone: (212) 399-8340 |
| Facsimile: (305) 377-9937 | Facsimile: (212) 399-8331 |
| E-Mail: scott@srebnicklaw.com | E-mail: dperry@perryguha.com |

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on July 5, 2021, electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system. The filing will send notification of such filing to all counsel of record.

/s/ *Scott A. Srebnick, Esq.*
Scott A. Srebnick, Esq.