UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

-against-

MICHAEL AVENATTI,

Defendant.

**MEMORANDUM
OPINION & ORDER**

(S1) 19 Cr. 373 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

Michael Avenatti is charged in the (S1) Indictment with transmitting interstate communications with intent to extort, in violation of 18 U.S.C. § 875(d) (Count One); Hobbs Act extortion, in violation of 18 U.S.C. § 1951 (Count Two); and honest services wire fraud, in violation of 18 U.S.C. §§ 1343 and 1346 (Count Three).  The Government charges that Avenatti – who is licensed to practice law in California – transmitted in interstate commerce threats "to cause financial harm to Nike and its reputation if Nike did not agree to make multimillion dollar payments to Avenatti"; "used threats of economic and reputational harm in an attempt to obtain multimillion dollar payments from Nike"; and used interstate communications to "engage[] in a scheme to obtain payments for himself from Nike based on confidential information provided to Avenatti by [client Gary Franklin] for the purpose of furthering Avenatti's representation of [Franklin], without [Franklin]'s knowledge or approval," thereby depriving Franklin of the "duty of honest services" he was owed.  ((S1) Indictment (Dkt. No. 72) ¶¶ 20, 22, 24 (emphasis omitted))

Avenatti proceeded to trial on January 27, 2020.  After a three-week trial, on February 14, 2020, the jury returned a verdict finding Avenatti guilty on all counts.  (Verdict (Dkt. No. 265))

Avenatti has moved for a judgment of acquittal or a new trial, pursuant to Rules 29 and 33 of the Federal Rules of Criminal Procedure.  (Def. Mot. (Dkt. No. 291))  Avenatti argues that (1) the evidence at trial is insufficient to prove that he acted "wrongfully" and with "intent to defraud"; and (2) the statutes under which he was convicted are unconstitutionally vague-as-applied.  (Id. at 24-31)[1]  Avenatti also contends that this Court erred in (1) excluding certain text messages and emails; and (2) responding to a jury note regarding permissible inferences from exhibits admitted to show state of mind.  (Id. at 32-40)

In a June 4, 2021 letter, Avenatti moves to compel the Government to produce Section 3500 material and alleged Brady/Giglio material concerning Judy Regnier, a Government witness at trial.  In a July 5, 2021 letter, Avenatti moves for a new trial on the same basis.  (July 5, 2021 Def. Ltr. (Dkt. No. 333))  In his June 4, 2021 letter, Avenatti also raises concerns regarding press access to voir dire.  (June 4, 2021 Def. Ltr. (Dkt. No. 315))

For the reasons stated below, Avenatti's post-trial motions will be denied.

## BACKGROUND

## I.     THE EVIDENCE AT TRIAL

### A.     Nike's Sponsorship of Franklin's Basketball Program

In 2005, Gary Franklin was the director and head coach of an amateur youth basketball program (the "Basketball Program") based in Los Angeles, California.  (Trial Transcript ("Tr.") 1520)  In 2006 or 2007, NIKE USA, Inc. ("Nike") began to sponsor Franklin's Basketball Program, which later became part of Nike's Elite Youth Basketball League (the "EYBL").  Nike formed the EYBL in 2010 as a collection of travel teams made up of talented high school basketball players.  (GX 305; Tr. 1524, 1529)  Some players from Franklin's

---

[1]  The page numbers referenced in this Order correspond to the page numbers designated by this District's Electronic Case Files ("ECF") system.

Basketball Program went on to compete at Division I or Division II universities, and some went on to play professionally in the National Basketball Association (the "NBA") or overseas. (Tr. 1521-22)

In 2016, Carlton Debose – Nike's director of Elite Youth Basketball ("EYB") – and Jamal James – Nike's manager of EYB – were two of Franklin's primary contacts at Nike. (GX 201; Tr. 1527, 1530, 1622) According to Franklin, DeBose and James pressured him to engage in misconduct, including making improper cash payments to players' families and submitting falsified invoices to Nike. (Tr. 716, 1622-27)

After the 2018 season, Nike did not renew its sponsorship contract with Franklin. (Tr. 266, 1528-30) Franklin also lost control of the team he had coached for boys who were 17 years old and younger. Franklin believed that DeBose and James displaced him from the 17 and under team in retaliation for Franklin's refusal to select certain players for the team. (Tr. 1628-32)

Prior to terminating the sponsorship, Nike had contributed $72,000 a year for Franklin's Basketball Program. (Tr. 266, 776, 1524-28) Of that sum, Franklin generally kept $30,000 to $35,000 as his salary for operating the program. (Tr. 1523) Nike also supplied Nike merchandise and other "gear" to the Basketball Program. The total value of Nike's sponsorship of the Basketball Program amounted to approximately $192,000 a year. (Tr. 720, 1528; GX 201)

Franklin was disappointed that Nike had decided to terminate its sponsorship of the Basketball Program, and he blamed James and DeBose for the lost sponsorship. (Tr. 1530, 1628-32) In February 2018, Franklin spoke with Jeffrey Auerbach about trying to regain the sponsorship. (Tr. 1530-31, 1634) Auerbach is a producer-writer and consultant in the entertainment industry, and his son had played on one of Franklin's basketball teams. (Tr. 1531,

3

1635-36)  Franklin also told Auerbach about James and DeBose's misconduct, and about what

Franklin perceived as rampant corruption in Nike's EYBL.  (Tr. 1534, 1637-38, 1651)  Franklin

wanted Nike to investigate James and DeBose, and to fire them.  (Tr. 1648-49)  For more than a

year, Franklin and Auerbach communicated about these issues in person, by telephone, and

through text messages and email.  (Tr. 713, 1635)

        In January 2019, Franklin sent a letter to Trent Copeland requesting legal advice

concerning his business relationship with Nike.  (Tr. 952-54, 1683-89)  Copeland was Franklin's

friend and an attorney.  During a January 2019 meeting, Franklin told Copeland that he wanted

(1) to be reinstated as the coach of his 17 and under team; (2) DeBose and James fired; and (3)

their wrongdoing reported to the FBI.  (Tr. 1655-56, 1683-85)  Franklin also told Copeland that

he wanted Nike to provide financial restitution to the Basketball Program, to indemnify Franklin

and his team from any wrongdoing, and to pay all related legal expenses.  (Tr. 1686)  Franklin

did not retain Copeland as his lawyer, however.  (Tr. 1688-89)

        At this time – early 2019 – Franklin wanted

> Nike to look into Jamal James' and Carlton DeBose's actions.  And I felt like, you
> know, they were mistreating me.  I felt that they were bullying me.  And so I
> wanted those guys to be looked into.  And I also wanted my program back, to be
> back with Nike.  And I felt that the activities that was going on with Jamal James
> and Carlton DeBose, that they had damaged my program in terms of, you know,
> the support financially, so I wanted, you know, also to seek that as well. . . .  Well,
> I mean, I wanted to have my relation – my contract back with Nike, I wanted to
> have my relationship back.  Because, you know, I had a great relationship with
> Nike over time so I wanted to have my relationship back.

(Tr. 1534)  Franklin told Auerbach that he wanted DeBose and James investigated and fired.

(Tr. 770, 1648)

        On February 6, 2019, Auerbach – acting on behalf of Franklin – contacted John

Slusher, a senior executive at Nike.  (Tr. 767-68, 893, 1533-34; GX 304)  Auerbach presented

Franklin's complaints about DeBose and James – and the loss of the Nike sponsorship – to

Slusher.  Slusher referred Auerbach and Franklin to Nike's outside counsel – Andrew

Michaelson at the law firm Boies Schiller Flexner.  (Tr. 745, 765-66, 771-73, 786; GX 304)

During his call with Slusher, Auerbach did not suggest that he and Franklin were planning on

calling a press conference, nor did he suggest that Nike pursue an internal investigation.  (Tr.

745-46, 771)

> After Auerbach's phone conversation with Slusher, Franklin felt that it was

necessary for him to retain an attorney, in part because Slusher had referred Auerbach and

Franklin to Nike's outside counsel.  (Tr. 901, 1536)

### B.     Auerbach Contacts Avenatti

> On February 28, 2019, Auerbach – acting on behalf of Franklin – contacted

Defendant Michael Avenatti.  Neither Auerbach nor Franklin had had any prior contact with

Avenatti.  (Tr. 713-14, 900)  Avenatti returned Auerbach's call the next day, and the two spoke

for twenty to twenty-five minutes.  (Tr. 714-16)  Auerbach

> told [Avenatti] a little bit about Gary [Franklin] and what he had endured, you
> know, over the last two years and basically asked him if he was familiar with the
> Adidas college basketball scandal and case and – yeah. . . . I told him that Gary
> had been directed and he was abused and bullied into carrying out certain acts that
> he was – he felt like he was going to lose his sponsorship if he didn't do it.  And
> he felt really terribly about it.  And was wanting to report it to the authorities,
> report it to Nike, and that he wanted to go with them to the authorities and that he
> also wanted to reestablish his relationship with Nike but he wanted justice above
> all and that to him meant making sure these two executives at Nike EYBL,
> Carlton [DeBose] and Jamal [James], did not hurt any other coaches and program
> directors.

(Tr. 715)

> Neither Auerbach nor Avenatti mentioned the possibility of holding a press

conference or of pressuring Nike to conduct an internal investigation.  According to Auerbach, a

press conference "would be damaging and detrimental to reaching Gary's goals," which included

reestablishing his relationship with Nike.  As to an internal investigation, Auerbach testified that

"Gary knew what happened and he didn't need an internal investigation."  Avenatti did not

suggest that a resolution of Franklin's dispute with Nike might include Nike making payments to

Avenatti.  (Tr. 717-18)

After the call, Auerbach sent Avenatti an email thanking him and stating that he

looked forward to "further discussing Gary Franklin founder/program director of California

Supreme Youth Basketball v. Nike Elite Youth Basketball and Nike, Inc."  (Tr. 722)

Auerbach next spoke with Avenatti on March 2, 2020.  (Tr. 725)  In this twenty

minute phone conversation, there was likewise no discussion of Avenatti holding a press

conference, filing a lawsuit against Nike, pressuring Nike to conduct an internal investigation, or

asking Nike to retain Avenatti.  (Tr. 725-26)  Instead, Auerbach and Avenatti continued their

discussion of Franklin's complaints about Nike.  (Tr. 726)

### C.     Avenatti Contacts Mark Geragos

On March 4, 2019, Avenatti contacted Mark Geragos, a well-known lawyer in

Los Angeles.  Avenatti told Geragos that he "got called on a very big case against Nike.  This

might make a lot of sense [to do] together."  (Tr. 1854; GX 103A)  Avenatti was aware that

Geragos had a relationship with Nike's general counsel (Tr. 1854; GX 103A), and Avenatti and

Geragos agreed that they would approach Nike together regarding Franklin's claims.  (See Tr.

1857; GX 103B)  Avenatti never told Franklin that he was working with Geragos on Franklin's

claims against Nike.  (Tr. 1567)

### D.     Avenatti's March 5, 2019 Meeting with Franklin and Auerbach

On March 5, 2019 – the day after he spoke with Geragos – Avenatti contacted

Franklin and Auerbach to schedule a meeting.  Avenatti suggested that the three meet later that

6

day at Avenatti's high-rise apartment building in Los Angeles.  The meeting took place in a

conference room and lasted thirty to forty-five minutes.  (Tr. 726-28, 1538-39)  During the

meeting, Auerbach detailed

> what Gary had endured at the hands of Carlton DeBose and Jamal James at Nike
> EYBL and we reiterated what he participated in and then went down what justice
> meant to Gary and what he wanted out of this. . . . [F]rom Gary's point of view he
> was coerced and pressured into making payments to players' families, accepting
> payments, wire payments from Nike to then pass onto handlers and make
> payments to the families of the players, resubmitting fake invoices to Nike and
> things of that nature.

(Tr. 728, 1539-40)  Franklin also complained about being forced to surrender control over his 17

and under team.  (Tr.1540)

At the meeting, Auerbach described "justice" for Franklin in the following terms:

> First and foremost, for Gary I think was making sure that Carlton and Jamal were
> no longer at Nike EYBL.  He was really concerned not so much what had been
> done to him but – at that point, but what others around the league, other coaches,
> other players would suffer because of their actions.  So he wanted to ensure that
> the company knew and wouldn't let that happen.
>
> He wanted to report his involvement and the actions to the government.  But
> because of wanting to forge and reestablish the relationship with Nike he wanted
> to do it with Nike.  And then he wanted to be financially compensated just to, you
> know, for the damage the club and the brand had suffered. . . . [Gary] had a
> fifteen-year great relationship with [Nike] and he wanted to continue that, and that
> meant hopefully signing a new contract [for Nike to sponsor the Basketball
> Program in the next season] and moving forward.

(Tr. 729-30)

Franklin testified that he told Avenatti at the meeting what he wanted:  "I . . .

reiterated what I wanted, what [Auerbach] had said, which is my team back, have Jamal James

and Carlton DeBose fired, and also let me have some, you know, some sort of restitution for . . .

what I've lost, the years, and also, you know get me covered."  (Tr. 1541)  By "covered,"

Franklin meant whistleblower protection:  "[g]et me covered as far as like some whistleblower or

something of that nature. . . . I was concerned about . . . getting my team back.  That was . . . the big focus, and also . . . trying to find out to see if I . . . did anything wrong as far as . . . legally or illegally."  Franklin told Avenatti that his most important objective was to "[g]et my team back." (Tr. 1541-42)

At the March 5, 2019 meeting, Auerbach showed Avenatti a 41-page "memorandum of actions" that Auerbach had prepared.  Auerbach's memorandum contained "all the evidentiary documents," including "bank wires, cash payments, invoices, and things of that nature," showing Nike's improper payments to players' handlers and parents.  (Tr. 731, 1543-44; GX 312)  Franklin understood that at some point Avenatti might share these documents with Nike, but assumed that Avenatti would obtain his permission first.  (Tr. 1546)  Franklin did not want these documents to be made public, because their disclosure could harm the reputations of Nike, the players he had coached and their parents, the Basketball Program, and Franklin himself.  (Id.)  Franklin and Auerbach also discussed with Avenatti certain recordings that Franklin had made of conversations he had had with DeBose and James.  (Tr. 1550-51)

Avenatti told Franklin at the March 5, 2019 meeting that Avenatti would serve as Franklin's lawyer, and that Avenatti would seek immunity for Franklin for his involvement in making payments to players' families and in falsifying invoices that were submitted to Nike for payment.  (Tr. 742, 752)  There was no discussion at the meeting about a retainer agreement, however, or about attorney's fees for Avenatti, or about Avenatti filing a lawsuit against Nike.[2] (Tr. 744-46, 1552-53)  There was likewise no discussion of a press conference, an internal

---

[2]  Although Avenatti told Franklin at this meeting that Avenatti was his lawyer, Franklin testified that Avenatti "never said, you know, yes, I'm going to take your case or anything, so I wasn't really sure."  (Tr. 1554)

investigation at Nike, or Nike retaining Avenatti to conduct an internal investigation.  (Tr. 745-46, 1553-54)

Auerbach and Avenatti communicated via text message, telephone, and email between March 10, 2019 and March 18, 2019.  (Tr. 753-55, 761-65, 777-79; GX 304, 305, 306, 307, 310R)  In a March 10, 2019 call, Avenatti asked Auerbach to re-send Auerbach's original March 1, 2019 email.  (Tr. 753-55)  And on March 18, 2019, Auerbach sent Avenatti a copy of the racketeering complaint filed against Adidas.  (GX 308)  These text messages, telephone calls, and emails did not contain any reference to an internal investigation of Nike, to Nike retaining Avenatti to perform such an investigation, or to Nike making payments to Avenatti.  (Tr. 753-55, 761-65, 777-79; GX 304, 305, 306, 307)

### E.      Geragos Contacts Nike, and Avenatti Contacts the *New York Times*

After speaking with Avenatti, on March 12, 2019, Geragos contacted Casey Kaplan, an attorney in Nike's legal department, about Franklin's claims.  (Tr. 201, 1856; GX 206)  On March 13, 2019, Geragos reported to Avenatti that Nike wanted the two to speak with Boies Schiller – Nike's outside counsel – about Franklin's claims.  (Tr. 1857-58; GX 103B)  Avenatti told Geragos to insist on dealing directly with Nike, in part because Boies Schiller would "never step aside and allow [Avenatti and Geragos] to run an investigation [at Nike]."  (Tr. 1858; GX 103B)

In a March 14, 2019 text message to Geragos, Avenatti asked for a status report on "Nike and whether I need to start arranging my presser."  (Tr. 1858-59; GX 103C)

Geragos told Kaplan that Avenatti insisted that at least one lawyer from Nike's in-house department attend a meeting to discuss Franklin's claims, and that Avenatti would not meet with only Boies Schiller lawyers.  (Tr. 1860; GX 206 at 3)

After speaking with Geragos, Kaplan contacted Robert Leinwand, Nike's vice president and chief litigation officer.  (Tr. 1125, 1146)  Kaplan relayed to Leinwand the substance of his conversation with Geragos.  (Tr. 1146-47)  Leinwand has been involved in numerous settlements during his time at Nike, and he agreed to meet with Geragos and Avenatti. (Tr. 1128, 1148-50)

In response to Geragos's communications with Kaplan, Scott Wilson, a partner at Boies Schiller, contacted Geragos via email and by telephone on March 13 and 15, 2019.  (Tr. 199-202, 1855; GX 203; GX 702)  During the telephone call, Geragos told Wilson that the matter was too sensitive to discuss in detail by telephone, but that he had seen documents suggesting that "Nike might have an Adidas problem."  (Tr. 203-04)  The two agreed to meet at Geragos's New York office on March 19, 2019, and that the meeting would be attended by Geragos, Avenatti, Wilson, and Leinwand.  (Tr. 207-08)

On March 16, 2019, Avenatti contacted Rebecca Ruiz, a <u>New</u> <u>York</u> <u>Times</u> reporter.  (Tr.1863, GX 702)  On March 17, 2019, Avenatti reported to Geragos that if the March 19, 2019 meeting with Nike "doesn't work out," Avenatti had arranged for a press conference on March 20, 2020, and a <u>New</u> <u>York</u> <u>Times</u> story concerning Nike's corrupt influence on youth basketball.  (Tr. 1863-64; GX 103D)

In discussing the scheduled March 19, 2019 meeting with Wilson, Avenatti did not mention Franklin, but merely stated that Nike had "a big fucking problem."  (Tr. 787, 1560)

### F.    <u>Avenatti's March 18, 2019 Meeting with Franklin and Auerbach</u>

On March 18, 2019, Avenatti met again with Franklin and Auerbach at a conference room in his apartment building.  (Tr. 78-85, 1555)  The meeting lasted approximately 20 to 45 minutes.  (Tr. 785, 1555)  At the beginning of the meeting, Auerbach handed Avenatti a

document that he had prepared that provided "an overview of the hierarchy of some of the

employees at Nike, the cast of characters that was involved in the actions, the coach, which is

[Franklin], and handlers and parents."  (Tr. 1556-57; GX 311)  Although the document includes

a number of questions about Nike's culpability,[3] there was no discussion at the meeting about

these questions.  (Tr. 1557)  Franklin did not authorize Avenatti to disclose or publicize the

contents of this document.  (Id.)

   During the March 18, 2019 meeting, Avenatti told Franklin and Auerbach that he

had scheduled a meeting with Nike's lawyers in New York City for the next day.  (Tr. 1558)

Franklin and Auerbach were "shocked" by Avenatti's announcement, because there had been no

discussion of the strategy that would be used in approaching Nike, and "no indication that

[Avenatti] had done anything on [Franklin's] behalf since [the] first meeting."  (Tr. 786, 1558-

59)

   Although Franklin and Auerbach understood – by March 18, 2019 – that Avenatti

was acting as Franklin's lawyer (Tr. 796-97, 1560), Franklin was not asked to sign a retainer

agreement.  (Tr. 1563)

   At the March 18, 2019 meeting, Avenatti told Franklin that he was "going to first

get you covered with some sort of whistleblower or immunity, and we're going to get James and

DeBose fired.  And I think I can get you a million dollars."  (Tr. 1560-61, 787-88)  Franklin said

---

[3]  "Question 1:  Is this a case of rogue executives Carlton DeBose and Ja[mal] James committing egregious criminal acts on their own, or was Nike, a [F]ortune 100 company, complicit in the corruption?
Question 2:  Is Nike a company [that] tolerates workplace bullying and abuse by its senior executives?
Question 3:  Is Nike's enterprise, Nike EYB ('the Racket') guilty of racketeering, having committ[ed] acts of fraud, bribery, coercion, conspiracy, illegal cash payments, wire fraud, mail fraud, bank fraud, money laundering, etc.?"  (GX 311 at 5)

that he thought that a $1 million settlement was reasonable – he had previously discussed this amount with Auerbach.  (Tr. 796)

Auerbach testified that Avenatti also said that he would try to get Franklin's Basketball Program "back in with Nike and reestablish that relationship."  (Tr. 788)  Franklin testified that when he asked Avenatti whether he could regain control over his 17 and under team and obtain a new sponsorship agreement with Nike, Avenatti replied, "[w]ell, after this, I don't think they're going to let you be back with them."  (Tr. 1561)  Franklin did not understand that Avenatti would make no effort to persuade Nike to permit Franklin to regain control over his team, however. (Tr. 1561-62)

There was no discussion at the March 18, 2019 meeting about Avenatti holding a press conference, performing an internal investigation at Nike, or being hired by or paid by Nike. (Tr. 797-98, 1563-64)  Moreover, Avenatti did not disclose to Franklin and Auerbach that he was working with Geragos on Franklin's claims.  (Tr. 799, 1565)

The March 18, 2019 meeting was Franklin and Auerbach's last in-person meeting with Avenatti.  (See Tr. 808, 1538)

### G.    **Avenatti and Geragos's March 19, 2019 Meeting with Nike's Lawyers**

On March 19, 2019, Avenatti and Geragos met with Leinwand, Wilson, and Benjamin Homes – a Boies Schiller associate – at Geragos's New York offices.  (Tr. 208, 1138-39, 1149-50, 1414)  The meeting lasted between an hour and an hour and a half.  (Tr. 271)  Avenatti and Wilson did most of the talking at the meeting.  (Tr. 209, 1173)

At the outset of the meeting, Avenatti asked whether the meeting would be "a 408 discussion," which Wilson understood to be a reference to Rule 408 of the Federal Rules of Evidence.  Although Wilson did not understand the meeting to be a settlement discussion (Tr.

210), he agreed that it would be governed by Rule 408, because he wanted to learn what claims Geragos and Avenatti were making. (Tr. 211)

Avenatti began by saying that he represented a whistleblower who had information about improper payments Nike had made to amateur basketball players, including the top pick in the 2018 NBA draft. (Id.) According to Avenatti, his client was "the head of a program or a program director who had been involved in these payments in connection with the Nike employees making the payments." (Tr. 215) Avenatti identified DeBose and James as the Nike employees involved in the misconduct, and he named several players who had received improper payments. (Tr. 212) Avenatti added that he was aware that Nike had received a grand jury subpoena in 2017, and that he suspected Nike had not been fully forthcoming with the Government in responding to that subpoena. (Id.)

Avenatti told Nike's attorneys that "Nike was going to do two things. Nike was going to pay a civil settlement to his client, who he said had breach of contract, tort, or other claims, and Nike was going to hire Mr. Avenatti and Mark Geragos to conduct an internal investigation into corruption in basketball." (Tr. 213, 242-43, 1155, 1418) Leinwand likened Avenatti's demand to the following: "somebody . . . walk[s] into your store and they mess it up and they say you need protection, you have to hire me to protect you. And then you say who are you going to protect us from, and they say me . . . because if not, I'm going to destroy your store." (Tr. 1156)

Avenatti told Nike's lawyers that "he was going to blow the lid on this scandal, that it was going to be a major scandal, that he had a reporter, Rebecca Ruiz, at the New York Times either on speed dial or on call and that he could reach out to her and have her write a story at a moment's notice." (Tr. 217, 1157, 1419, 1437) Avenatti said that if Nike did not comply

with his demands, he would "hold a press conference the next day," during which "he could and would take billions of dollars off the company's market cap." (Tr. 218, 244, 1163-64, 1419-20, 1422) Avenatti said nothing about filing a lawsuit. (Tr. 245-46)

Wilson or Leinwand sought more details concerning Avenatti's claims, and Avenatti eventually identified his client as Gary Franklin. (Tr. 251) Avenatti also permitted Wilson to examine "a small package of documents." (Tr. 253) The documents appeared to be "a collection of e-mails, text messages, invoices, redacted bank statements grouped behind a table of contents type, what I call cover sheets. . . . They looked like they were communications between Mr. Franklin and a Nike employee [and a ] family member of [the number one pick in the 2018 NBA draft] from 2016. And then there were other communications involving Mr. Franklin from 2017." (Tr. 253-54) Wilson asked for a break to confer with Leinwand about the documents. (Tr. 254)

During the break, Wilson described the documents "as best [he] could remember them" to his associate, so that Homes could take notes concerning the content of the documents.[4] (Tr. 350, 484-85, 1434-35) After Leinwand heard Wilson's description of the documents, he became less concerned that Nike's lawyers had missed something in conducting their internal review of relevant records, and more focused on the press conference that Avenatti was threatening to convene. (Tr. 1243)

After the break, Wilson asked for more time to consider Avenatti's demands. Avenatti responded that the next day was important, both because it was "the eve of March

---

[4] Homes took notes throughout the meeting, although at some point Avenatti told him to stop taking notes. (Tr. 369, 1162-63, 1414-15, 1420, 1434) After the meeting, Wilson instructed Homes to prepare a typewritten set of notes, and Homes prepared a typewritten set of his notes within an hour or two after the meeting. (Tr. 370, 1421)

Madness" and "the eve of a Nike earnings call."  Wilson, Leinwand, and Homes understood Avenatti to be saying that his threatened press conference would have a particularly damaging effect on Nike's stock price because of its timing.  (Tr. 255-58, 1166-67, 1423-24)  Although Avenatti did not ask that Nike fire any Nike employees, he made it clear that both of his demands – the settlement for Franklin, and the hiring of Avenatti and Geragos to conduct an internal investigation at Nike – would have to be met in order to forestall the threatened press conference.[5]  (Tr. 1163, 1425, 1431)

As to the settlement for Franklin, Avenatti demanded $1.5 million.  (Tr. 265, 1244)  As to the internal investigation, Avenatti said that if Nike hired another law firm to conduct the internal investigation, Avenatti and Geragos would have to "get paid two times the fees that Nike paid to that other law firm for actually doing [the] work."  (Tr. 266-67, 1159-60, 1246)

At no point during the March 19, 2019 meeting did Avenatti request that Nike enter into a new sponsorship agreement or any other type of business relationship with Franklin.  (Tr. 1162)

When the March 19, 2019 meeting ended, Wilson understood that Avenatti would proceed with his threatened press conference the next day if his demands were not met.  (Tr. 270)

---

[5]  Leinwand testified that Avenatti's threatened press conference presented a much more serious threat than a lawsuit.  In a lawsuit, Nike "would have an opportunity to go through the court process; . . . there would be – you know, there would be fact finding and ultimately, you know, some resolution in front of a jury.  But here it was – the threat was not a lawsuit, the threat was a press conference.  And . . . when you file a lawsuit, . . . [t]here are limits as to what you can put in a complaint.  It has to be truthful.  And in a press conference there is no such controls as in the legal system."  (Tr. 1168)

### H.    Telephone Calls After the March 19, 2019 Meeting

A few hours after the March 19, 2019 meeting ended, Wilson and Leinwand contacted the U.S. Attorney's Office for the Southern District of New York to "relay[] to the prosecutor the information, some of it new, that we had heard about Mr. Franklin and potentially payments involving Nike employees to players in [Mr. Franklin's] program, . . . and a description of Mr. Avenatti's and Mr. Geragos'[s] conduct and the demands that they [had] made."[6]  (Tr. 272, 1139, 1296)

Wilson also spoke with Geragos later that day.  Geragos stated that he had convinced Avenatti to delay his press conference until March 21, 2019.  (Tr. 272-73)

Avenatti spoke by telephone with Auerbach and Franklin after the March 19, 2019 meeting.  (Tr. 800-801, 1566)  Avenatti reported that the March 19, 2019 meeting with Nike "went great" and that Nike's lawyers wanted to meet again on March 21, 2019.  (Tr. 801, 1567)  During the call, Avenatti said nothing about a press conference, an internal investigation at Nike, or Nike hiring him to conduct an internal investigation.  (Tr. 806, 1568)  Avenatti also did not disclose that Geragos was assisting him in representing Franklin.  (Tr. 1567)

From March 20, 2019 on, Wilson's calls with Avenatti and/or Geragos were recorded by the FBI.  (Tr. 274-75, 509-10; GX1, 3, 4)  During a March 20, 2019 call with Avenatti and Geragos, Wilson reported that the issues Avenatti had raised at the March 19, 2019 meeting were being discussed at the "highest levels of the company."  (GX 1 at 01:10-01:17)

---

[6]  Wilson testified that in September 2017, the U.S. Attorney's Office for the Southern District of New York had served Nike with a grand jury subpoena seeking information concerning corruption in amateur basketball.  Pursuant to Nike's cooperation with that investigation, Nike and Boies Schiller lawyers had twice met with an SDNY Assistant U.S. Attorney, and Boies Schiller lawyers had had additional phone calls with the U.S. Attorney's Office.  (Tr. 371-75)  After the March 19, 2019 meeting with Avenatti, Wilson "called a member of the team [at the SDNY U.S. Attorney's Office] investigating Nike."  (Tr. 509, 1174-75)

Wilson told Avenatti, "we're not going to give you everything you want, but I think we can give you much of what you want." (Tr. 284-85; GX 1 at 02:07-02:10)

    In response, Avenatti said:

> [W]e're gonna get a million five for our guy, and we're gonna be hired to handle the internal investigation, and if you don't wanna do that, we're done. . . . I wanna be really clear with you. . . . I'm not fucking around with this, and I'm not continuing to play games. . . . You guys know enough now to know you've got a serious problem. And it's worth more in exposure to me to just blow the lid on this thing. A few million dollars doesn't move the needle for me. I'm just being really frank with you. So if that's what, if that's what is being contemplated, then let's just say it was good to meet you, and we're done. And I'll proceed with my press conference tomorrow and I'll hang up with you now and I'll call the New York Times, who are awaiting my call. I-I'm not fucking around with this thing anymore. So if you guys think that you know, we're gonna negotiate a million five [for Franklin], and we're gonna, you're gonna hire us to do an internal investigation, but it's gonna be capped at 3 or 5 or 7 million dollars, like let's just be done. . . . And I'll go and I'll go take and I'll go take ten billion dollars off your client's market cap. But I'm not fucking around.

(GX 1 at 02:33-03:57)

    Avenatti then asked Wilson what Boies Schiller would "ask for, for an internal investigation of this nature? . . . You tell me what Boies Schiller would quote. . . ." Wilson responded that Boies Schiller would "charge millions of dollars for an internal investigation like that." (Id. at 05:55-07:17) Avenatti responded that a number in the "single digit millions" – "five, six, eight, nine million dollars" – was "not in the ballpark" of what he was seeking for the internal investigation. (Id. at 09:01-09:20) He added, "do I think it's gonna be a hundred million? No. Do I think it's gonna be nine million? No." (Id. at 11:12-11:17)

    Wilson proposed another meeting at which "we're gonna hammer something out, we're gonna get terms on paper, you know, the releases that we want, all of the bells and whistles . . . it would be ideal to sit down and do that in person." (Id. at 12:20-12:31) Avenatti said that he would be "happy to sit down in a room" with Wilson on March 21, 2019, but that he

wanted Wilson to "not only have authority [to settle], but that we be prepared to paper it."  (Id. at 13:40-14:14)

Avenatti stated that "this is not gonna take longer than twenty-four hours to paper . . . . This is very straightforward. . . . I mean we're talking about a settlement agreement . . . on a million five with adequate releases etcetera, and we're talking about an engagement letter."  (Id. at 14:14-14:36)  Avenatti and Wilson agreed to meet the next day at 1:30 p.m., at Geragos's New York office, to prepare the settlement agreement.  (Id. at 18:38-19:41)

I.      **Avenatti and Geragos's March 21, 2019 Meeting with Nike's Lawyers**

On March 21, 2019, Avenatti and Geragos met with Wilson and Homes at Geragos's New York office.  (Tr. 303-05, 1441)  The FBI arranged for surreptitious audio and visual recording of the meeting.  (Tr. 303-04; GX 2)

At the outset of the meeting, Avenatti handed Wilson a draft settlement agreement and general release.  (GX 2 at 14:00-14:35)  Wilson responded:  "I don't think that that the um, one point five million dollars to settle [Franklin's] civil claims will be the sticking point."  (Id. at 15:01-06)

After discussing the release language and the parties to be released (id. at 14:00-15:59), Avenatti told Wilson that – for purposes of the internal investigation – he and Geragos "want[ed] to report directly" to Leinwand, to Nike's general counsel, or to an executive in Nike's corporate hierarchy above Leinwand and the general counsel.  (Id. at 16:07-16:32)  Avenatti further proposed that Nike's retention of Avenatti and Geragos "remain confidential . . . with the understanding that . . . over the course of us conducting our internal investigation we're gonna have to disclose that we're working for Nike."  (Id. at 16:37-17:07)  Avenatti emphasized that

any disclosure to the press would be determined by Nike, "[b]ecause Nike's our client." (Id. at 17:07-17:25)

   As to financial terms, Avenatti demanded a "12 million dollar retainer upon signing.  Evergreen.  Um, that's gonna be deemed earned when paid, we'll cap it at 25 million dollars, minimum of 15 million dollars, unless the scope changes." (Id. at 17:36-17:57)  When Wilson asked what Avenatti regarded as the scope of the internal investigation, Avenatti said that it was "payments made to players in order to  route them to various colleges, or shoe contracts, prior to them being eligible to receive any such payments." (Id. at 18:00-18:19)

   As to billing rates and costs, Avenatti proposed a blended hourly rate of $950 per hour for attorneys, $450 per hour for paralegals, and reimbursement of all out-of-pocket expenses. (Id. at 18:23-18:35)

   Avenatti told Wilson that – in addition to the settlement agreement with Franklin – the parties would need to enter into "[a] confidential retainer agreement."  Wilson asked "who would be the counterparty" in the retainer agreement.  Avenatti responded that the "counterparty" would "be either my firm, or Mark [Geragos's] firm, or a new entity that we then form." (Id. at 18:58-19:14)

   As to disclosure of the results of the internal investigation, Avenatti stated that "ultimately, it's gonna be up to the client as to whether they want to self-disclose . . . just like any other client. . . . those aren't our decisions to make"; we "report back to Nike, and then Nike makes a decision on what they wanna do." (Id. at 21:20-21:36)

   Wilson responded:  "as I said before[,] I don't think that the . . . settlement of Mr. Franklin's civil claims for 1.5 million dollars is going to be the stumbling block here.  Is there a way to avoid your press conference without hiring you and Mark [Geragos] to do an internal

investigation?"  (Id. at 21:50-22:09)  Avenatti said, "I'm not gonna answer that question."  (Id. at 22:09-22:10)

Wilson then asked, "[c]an we settle this under, could we do this all under the civil settlement agreement? . . . If the money went higher, could we do it all under the civil settlement agreement?"  (Id. at 22:22-34)  In response to Wilson's question as to whether the dispute could be resolved entirely through a settlement agreement between Franklin and Nike, Avenatti said: "I don't think it makes any sense for Nike to be paying, um, an exorbitant sum of money to Mr. Franklin, in light of his role in this. . . . I mean, imagine that."  (Id. at 23:20-23:41)

Wilson told Avenatti that it was difficult for him to explain to the Nike executives "at the top of the heap[] why is it that we have to both um, do a civil settlement, and hire plaintiff's counsel and his colleague . . . to do legal work, for the company. . . . [T]hat's not something we've ever seen before."  (Id. at 23:45-24:25)  "I am struggling with how to sell, to my client, something that is outside of the civil settlement, that is instead a separate um, separate hiring of attorneys they don't know, to conduct an internal investigation, which is a very sensitive thing."  (Id. at 30:57-31:14)  Wilson also told Avenatti that he had "never gotten a 12 million dollar retainer from [Nike]."  (Id. at 32:21-32:23)

Avenatti responded as follows:

Have you ever held the balls of the client in your hand where you can take 5, 6 billion dollars in market cap off of 'em?  This is gonna be a major fucking scandal, you said yourself, that you're surprised Adidas wasn't indicted – I'm going tell ya, if we don't – if we don't figure this out, from moment one, I'm gonna be asking, why Nike hasn't been indicted.

I'm gonna break, I'm gonna bring the power of my platform to bear – to expose what the fuck is goin' on here – appropriately[,] [i]f we can't reach a settlement in the next week.
. . . .
[L]et me just explain something to you.  This is not gonna be a single press conference, okay? . . . No, no this is gonna be, no this is gonna be a scandal.  This

is gonna be the biggest scandal in sports, in a long time.  That's what this is gonna be.

(Id. at 32:26-33:46)

Avenatti added that if Nike

wants to have one confidential settlement agreement – and we're done, they can buy that for 22 and a half million dollars.  And we're done. . . . Fully confidential, we can leave it to Nike and its other lawyers to figure out what to do with this and handle it appropriately – and full confidentiality, we ride off into the sunset, if you need assistance from us as it relates to Mr. Franklin, uh, we'd be happy to provide that, obviously we're not gonna do anything illegal – or he's not gonna do anything illegal – . . . and we can be done.

(Id. at 34:12-35:01)

Avenatti concluded by saying, "I just wanna share with you what's gonna happen, if we don't reach a resolution":

As soon as this becomes public, I'm gonna receive calls from all over the country, from parents, and coaches, and friends, and all kinds of people . . . and they're all going to say, "I've got an email, or text message or . . . . [N]ow 90% of that is gonna be bullshit. . . . But 10% of it is actually going to be true.  And then what's gonna happen is, this will snowball.  And then it will be 5 players, and then it will be 9, and then it will be 15, and then it will be 25, and it's gonna snowball – and every time we get more information, that's gonna be The Washington Post, The New York Times, ESPN, a press conference – and the company will die, not die, but they're going to incur, cut after cut after cut after cut, and that's what's gonna happen. . . . I don't know what they did relating to, responding to that subpoena.  I don't know what the scope of that subpoena was.  But, I mean, that – that could be a major fucking problem.

(Id. at 35:23-37:54)

Wilson said that he understood "the two scenarios.  There's the 1.5, plus the internal investigation and the parameters you described, or 22 and . . . a half."  (Id. at 38:10-38:30)

Avenatti, Geragos, and Wilson agreed to meet again at noon on Monday, March 25, 2019, at Wilson's Boies Schiller office at 55 Hudson Yards.  (Id. at 38:35-55, 1:01:17-28) Avenatti warned that "if this is not papered on Monday, we're done":

I don't wanna hear about somebody on a bike trip, I don't wanna hear that somebody has, somebody's grandmother passed away or something, I don't look – the dog ate my homework, I don't wanna hear, none of it is gonna go anywhere unless somebody was killed in a plane crash.  It's going to go to zero, no place[,] with me.

(Id. at 39:10-39:35)

Avenatti added that he had "assumed that for the sake of our discussion here today, that all of the parameters for 408, confidentiality and everything from before, carried over."[7]  (Id. at 38:52-40:00)

Before leaving the meeting, Wilson obtained a copy of the draft settlement agreement from Avenatti.  (Id. at 44:25-44:32, 58:53-58:54; Tr. 342, 655; GX 205)

The draft settlement agreement Avenatti gave to Wilson did not reference any specific claims Franklin had, or believed he had, against Nike, nor did it refer to an internal investigation.  The draft agreement had an effective date of March 25, 2019.  (Tr. 343-45; GX 205)

Within an hour of leaving the March 21, 2019 meeting, Avenatti sent the following "tweet":  "Something tells me we that we have not reached the end of this scandal.  It is likely far[,] far broader than imagined. . . ."  Avenatti attached a link to an article about the Adidas "[c]ollege basketball corruption trial."  (Tr. 347-49; GX 106)

**J.     Avenatti's Communications with Franklin and Auerbach After the March 21, 2019 Meeting**

Avenatti called Franklin and Auerbach "right after" his March 21, 2019 meeting with Wilson.  Avenatti reported that the meeting with Nike's lawyers "went great," and that Nike wanted to have one more meeting on Monday, March 25, 2019, to "wrap things up."  Avenatti

---

[7]  At trial, Wilson testified that his discussions with Avenatti were not settlement negotiations so much as a "stickup."  (Tr. 338)

emphasized that he was "not fucking around with this." (Tr. 807, 1569)  Because Avenatti "said everything was going well," neither Franklin nor Auerbach questioned him, and Avenatti did not provide any specific details as to what had been discussed at the meeting. (Tr. 807, 1570) During the call, Avenatti made no reference to a $22.5 million settlement, a press conference, an internal investigation, or Nike's retention of him to conduct an internal investigation. Avenatti also did not seek Franklin and Auerbach's permission to publicly disclose the information they had provided to him. (Tr. 808-09, 1571-73)

The March 21, 2019 call was the last time Auerbach and Franklin spoke with Avenatti. (Tr. 808)

After the March 21, 2019 call with Avenatti, Auerbach saw Avenatti's tweet about the Adidas case not being "the end of this scandal." (Tr. 809-10; GX 106)  Auerbach sent Franklin a screen shot of the tweet. (Tr. 1573-74)  Franklin was concerned by the tweet, because it seemed contrary to Avenatti's representation that everything had gone well at the meeting with Nike, and he thought it might hinder his efforts to rebuild a relationship with Nike. (Tr. 1574-76)

Avenatti called Franklin on March 23, 2019. (Tr. 1576)  Avenatti said that he was calling just to check-in, and that they should know something by Monday. (Id.)  Avenatti did not reference an internal investigation, and did not disclose that he had made a settlement for Franklin contingent on Nike's agreement to hire Avenatti and Geragos to conduct an internal investigation costing millions of dollars. (Tr. 1577-78)

### K. **Events of March 25, 2019**

On the morning of March 25, 2019, Franklin's son told him that FBI agents were at Franklin's front door. (Tr. 1578-79)  Franklin called Avenatti, told him that FBI agents were

at his front door, and asked what to do.  Avenatti told Franklin to turn off his phone and not to

speak with the FBI agents.  Avenatti also said that he hoped that "Nike is not trying to fuck you."

(Tr. 1579)  Avenatti then told Franklin that he thought he would "go public."  Avenatti hung up

before Franklin – who was confused and upset – had an opportunity to respond.  (Tr. 1580)

At about 9:15 a.m. Pacific Time, Avenatti tweeted that "[tomorrow] at 11 am

[Eastern Time], we will be holding a press conference to disclose a major high school/college

basketball scandal perpetrated by @Nike that we have uncovered.  This criminal conduct reaches

the highest levels of Nike and involves some of the biggest names in college basketball."  (GX

107; Tr. 813-14, 1175-76, 1583-84)  Auerbach testified that he had never told Avenatti that there

was criminal conduct at Nike that reached the highest levels of the company.  Auerbach also

believed that Avenatti's tweet was "[c]ompletely opposite" to Franklin's goals and objectives.

(Tr. 814-15)  Franklin likewise testified that he had never told Avenatti that there was criminal

conduct at Nike that reached the highest levels of the company.  Franklin also testified that he

had not discussed the tweet with Avenatti before it was posted, and that Avenatti had not sought

his permission before posting the tweet.  (Tr. 1584)

After Avenatti posted his tweet, Nike's stock price fell about a dollar a share,

representing a drop of "[s]omething like three hundred million dollars or more" in the value of

Nike's stock.  (Tr. 1177)

Avenatti was arrested on March 25, 2019, at about 12:39 p.m. Eastern Time, in

the vicinity of Boies Schiller's Hudson Yards office building.  (Tr. 1840-41, 1897; GX S-1)

\*          \*          \*          \*

Franklin and Auerbach testified that – throughout their interactions with Avenatti

– he never discussed (1) an internal investigation at Nike, or the possibility that Nike would

24

retain Avenatti to conduct such an investigation; (2) the possibility of a press conference; (3) the

filing of a lawsuit against Nike; or (4) a $22.5 million settlement.  (Tr. 808, 1585-86)

       **L.**      **<u>Evidence of Avenatti's Dire Financial Condition</u>**

           At trial, the Government offered evidence that Avenatti was in dire financial

straits at the time he was demanding that Nike pay him and Geragos $15 to $25 million.  The

evidence showed that Avenatti was approximately $11 million in debt (GX S-4), and that his law

firm had been evicted from its offices in November 2018 for a failure to pay rent.  Since that

time, the lawyers and other firm employees had been forced to work from home.  (Tr. 1401-02)

Between March 15, 2019 and March 25, 2019, Avenatti told his office manager – Judy Regnier –

that he was "working on something that could potentially provide [the firm with] a way to . . .

resolve a lot of the debt that had currently been hanging over the law firm," and allow Avenatti

to "start a new firm."  (Tr. 1405-06)

       **M.**      **<u>The Defense Case</u>**

           Avenatti did not testify and he called no witnesses.  He introduced a number of

exhibits that purportedly went to his state of mind, including travel team contracts, Auerbach's

"memorandum of actions," an article about the Adidas bribery scandal, a PowerPoint

presentation Auerbach had prepared, a memorandum from Auerbach concerning his call with

Slusher, and excerpts of Avenatti's web browsing and search history.  (Tr. 2115-26; DX I-1, I-2,

I-3, I-4, I-5, HHH, III, S-20)

**<u>DISCUSSION</u>**

**I.**      **<u>AVENATTI'S RULE 29 AND RULE 33 MOTIONS</u>**

           In moving for a judgment of acquittal or a new trial, Avenatti argues that (1) the

evidence is insufficient to prove that he acted "wrongfully" and with "intent to defraud"; and (2)

25

the statutes under which he was convicted are unconstitutionally vague-as-applied.  (Def. Mot. (Dkt. No. 291) at 24-31)  Avenatti also contends that this Court erred in (1) excluding certain text messages and emails; and (2) responding to a jury note regarding permissible inferences from exhibits admitted to show state of mind.  (Id. at 32-40)

### A.     Legal Standards

#### 1.     Rule 29 Sufficiency of Evidence Challenges

Federal Rule of Criminal Procedure 29(a) provides that a court shall, upon a defendant's motion, "enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."  Fed. R. Crim. P. 29(a).

"In evaluating a sufficiency challenge, [a court] 'must view the evidence in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor, and deferring to the jury's assessment of witness credibility and its assessment of the weight of the evidence.'"  United States v. Coplan, 703 F.3d 46, 62 (2d Cir. 2012) (quoting United States v. Chavez, 549 F.3d 119, 124 (2d Cir. 2008)); see also United States v. Mariani, 725 F.2d 862, 865 (2d Cir. 1984) ("The court should not substitute its own determination of the credibility of witnesses, the weight of the evidence and the reasonable inferences to be drawn for that of the jury.").  In assessing a sufficiency challenge, "[t]he evidence is to be viewed 'not in isolation but in conjunction.'"  Mariani, 725 F.2d at 865 (quoting United States v. Geaney, 417 F.2d 1116, 1121 (2d Cir. 1969)).  "So long as the inference is reasonable, 'it is the task of the jury, not the court, to choose among competing inferences.'"  United States v. Kim, 435 F.3d 182, 184 (2d Cir. 2006) (quoting United States v. Martinez, 54 F.3d 1040, 1043 (2d Cir. 1995)).

"The Second Circuit has observed that '[t]hese strict rules are necessary to avoid judicial usurpation of the jury function.'" United States v. DiPietro, No. S502 Cr. 1237 (SWK), 2005 WL 1863817, at *1 (S.D.N.Y. Aug. 5, 2005) (quoting Mariani, 725 F.2d at 865) (alterations in DiPietro). "[T]he task of choosing among competing, permissible inferences is for the fact-finder, not for the reviewing court." United States v. McDermott, 245 F.3d 133, 137 (2d Cir. 2001). Given this standard, "[a] defendant bears a 'very heavy burden' in challenging a conviction based on insufficient evidence." United States v. Goldstein, No. S2 01 Cr. 880 (WHP), 2003 WL 1961577, at *1 (S.D.N.Y. Apr. 28, 2003) (quoting United States v. Brewer, 36 F.3d 266, 268 (2d Cir. 1994)).

## 2.   Rule 33 Standard

Pursuant to Federal Rule of Criminal Procedure 33, a court may "vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33. "Rule 33 confers broad discretion upon a trial court to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice." United States v. Sanchez, 969 F.2d 1409, 1413 (2d Cir. 1992). Courts may not only grant a Rule 33 motion where the evidence is legally insufficient, see United States v. Leslie, 103 F.3d 1093, 1100-01 (2d Cir. 1997), but also where a jury's verdict is contrary to the weight of the evidence, United States v. Ferguson, 246 F.3d 129, 136 (2d Cir. 2001) ("We cannot say that the district judge abused her discretion when she concluded that the weight of the evidence showed that [the defendant] was an outside hit man and not a [gang] member acting to further that membership."). Moreover, in contrast to the analysis under Rule 29, a district court considering a Rule 33 motion need not view the evidence in the light most favorable to the Government. United States v. Lopac, 411 F. Supp. 2d 350, 359 (S.D.N.Y.

2006) (citing United States v. Ferguson, 49 F. Supp. 2d 321, 323 (S.D.N.Y. 1999), aff'd, 246

F.3d 129 (2d Cir. 2001)).

The Second Circuit has explained that

> [t]he ultimate test on a Rule 33 motion is whether letting a guilty verdict stand
> would be a manifest injustice.  The trial court must be satisfied that competent,
> satisfactory and sufficient evidence in the record supports the jury verdict.  The
> district court must examine the entire case, take into account all facts and
> circumstances, and make an objective evaluation.  There must be a real concern
> that an innocent person may have been convicted.  Generally, the trial court has
> broader discretion to grant a new trial under Rule 33 than to grant a motion for
> acquittal under Rule 29, but it nonetheless must exercise the Rule 33 authority
> sparingly and in the most extraordinary circumstances.

Ferguson, 246 F.3d at 134 (internal quotation marks and citations omitted).

Under Rule 33, "[i]n the exercise of its discretion, the court may weigh the

evidence and credibility of witnesses."  United States v. Autuori, 212 F.3d 105, 120 (2d Cir.

2000) (citing Sanchez, 969 F.2d at 1413).  However, "[t]he district court must strike a balance

between weighing the evidence and credibility of witnesses and not 'wholly usurp[ing]' the role

of the jury."  Ferguson, 246 F.3d at 133 (quoting Autuori, 212 F.3d at 120) (second alteration in

Ferguson).  "Because the courts generally must defer to the jury's resolution of conflicting

evidence and assessment of witness credibility, '[i]t is only where exceptional circumstances can

be demonstrated that the trial judge may intrude upon the jury function of credibility

assessment.'"  Id. at 133-34 (quoting Sanchez, 969 F.2d at 1414) (alteration in Ferguson).  Such

"exceptional circumstances" may exist "where testimony is 'patently incredible or defies

physical realities.'"  Id. at 134 (quoting Sanchez, 969 F.2d at 1414).

## B.    Avenatti's Arguments Under Rule 29

Avenatti contends that the evidence is insufficient as to all three counts of

conviction:  transmitting interstate communications with intent to extort, in violation of 18

U.S.C. § 875(d) (Count One); Hobbs Act extortion, in violation of 18 U.S.C. § 1951 (Count

Two); and honest services wire fraud, in violation of 18 U.S.C. §§ 1343 and 1346 (Count Three).

According to Avenatti, he is entitled to a judgment of acquittal on all counts because the

Government did not offer sufficient evidence that he acted "wrongfully" and with "intent to

defraud."  (Def. Mot. (Dkt. No. 291) at 24)

### 1.    <u>Wrongfulness</u>

Avenatti argues that he is entitled to a judgment of acquittal on Counts One and

Two because the evidence is insufficient to prove that he acted "wrongfully" in "demanding that

he be hired and paid by Nike to conduct an internal investigation."  (<u>Id.</u>)  According to Avenatti,

"[t]he evidence was uncontroverted that Coach Franklin wanted to root out corruption so that

what happened to him would not happen to other coaches."  (<u>Id.</u>)  "The evidence suggested that

Mr. Avenatti believed that [the Boies Schiller firm] was not capable of conducting an

independent investigation, and Coach Franklin did not have the power to force Nike to terminate

DeBose and James, nor the money to conduct his own investigation of Nike EYBL.  Neither Mr.

Auerbach nor Coach Franklin placed any restrictions on how Mr. Avenatti might seek to achieve

those objectives."  (<u>Id.</u> at 25)  Accordingly, "[t]he government presented insufficient evidence

that Mr. Avenatti believed that he was exceeding the authority granted to him by Coach Franklin

by demanding that he, Mr. Avenatti, be retained by Nike to conduct an internal investigation."

(<u>Id.</u>)

### a.    <u>Applicable Law and the Jury Charge</u>

A conviction for transmission of interstate communications with intent to extort

or for Hobbs Act extortion requires proof of "wrongfulness."  <u>See</u> <u>United States v. Jackson</u>, 180

F.3d 55, 65, 67 (2d Cir. 1999) ("<u>Jackson I</u>") (listing elements of Section 875(d) offense and

discussing "wrongfulness" requirement), <u>conviction</u> <u>reinstated</u>, 196 F.3d 383 (2d Cir. 1999)

("<u>Jackson II</u>") (threat to reputation found sufficient where defendant had no plausible claim to

the $40 million she sought); <u>United States v. Clemente</u>, 640 F.2d 1069, 1077 (2d Cir. 1981)

(discussing "wrongfulness" element of Hobbs Act extortion).

   To act with "intent to extort" means to act with the intent to obtain money from an

entity, with the entity's consent, but where that consent was caused or induced by the wrongful

use of fear of harm to that entity's reputation.  Although "a threat to cause economic loss [or

reputational harm] is not inherently wrongful," a threat to cause harm "becomes wrongful . . .

when it is used to obtain property to which the threatener is not entitled."  <u>Jackson I</u>, 180 F.3d at

70; <u>see also</u> <u>Clemente</u>, 640 F.2d at 1077 ("[T]he use of fear of economic loss to obtain property

to which one is not entitled is wrongful.").  A threat of harm to property or reputation combined

with a demand for money may also be "wrongful" where the individual making the threat has a

plausible claim of right to the funds, but the Government has shown beyond a reasonable doubt

that there is no nexus between the threat of harm to property or reputation and the claim of right.

<u>See</u> <u>Chevron Corp. v. Donziger</u>, 974 F. Supp. 2d 362, 579 (S.D.N.Y. 2014), <u>aff'd</u>, 833 F.3d 74

(2d Cir. 2016) ("The element of wrongfulness may be supplied by (1) the lack of a plausible

claim of entitlement to the property demanded, <u>or</u> (2) the lack of a good faith belief of

entitlement, <u>or</u> (3) the lack of a nexus between the threat and the claim of right.  It may be

supplied also, in this Court's view, by inherently wrongful conduct." (emphases in original)).

   At trial, this Court instructed the jury that,

> [i]n order to conclude that Mr. Avenatti acted wrongfully, you must find that the
> Government has proven beyond a reasonable doubt either that (1) in demanding
> that he be hired and paid to conduct an internal investigation, Avenatti understood
> that he was acting in furtherance of his own interests, and was not pursuing
> Franklin's objectives; or (2) Avenatti's threat of harm and demand that he be
> hired and paid to perform an internal investigation had no nexus to any claim of
> Franklin's that Avenatti reasonably believed he had been authorized by Franklin
> to pursue.  As you can see from how these issues are posed, they do not turn on

the precise amount of money that Mr. Avenatti was demanding to perform the internal investigation.

In determining whether Mr. Avenatti's threat to harm Nike's property or reputation was wrongful, you should be aware that it is irrelevant whether the factual allegations underlying the threat to harm Nike's reputation were true.

(Tr. 2329-30)

The Court also instructed the jury that,

[u]nder California law, it is the client who defines the objectives of the representation and not the lawyer.  A lawyer cannot act without the client's authorization, and a lawyer may not take over decision-making for a client, unless the client has authorized the lawyer to do so.  A lawyer must abide by a client's decisions concerning the objectives of the representation and shall reasonably consult with the client as to the means by which the objectives are to be pursued.

Subject to requirements of client confidentiality, a lawyer may take such actions on behalf of the client as is impliedly authorized to carry out the representation. The client has the ultimate authority to determine the purposes to be served by the legal representation, however, within the limits imposed by law and the lawyer's professional obligations.  A lawyer retained to represent a client is authorized to act on behalf of the client, such as in procedural matters and in making certain tactical decisions.  A lawyer is not authorized merely by virtue of the lawyer's retention to impair the client's substantive rights or the client's claim itself.

(Tr. 2338)

Avenatti contends that he honestly believed that he was acting within the scope of his authority as Franklin's lawyer, and that he "took such actions as were 'impliedly authorized to carry out the representation.'"  (Def. Mot. (Dkt. No. 291) at 26)  Under the jury instructions cited above, however, these issues were laid squarely before the jury, and in convicting Avenatti, the jury rejected his arguments.  As discussed below, this Court concludes that the jury's determination was supported by ample evidence.

**b.**   **Analysis**

Avenatti contends that the evidence does not demonstrate that he understood that he was exceeding the authority granted to him by Franklin.  According to Avenatti, his demands

that Nike retain him to conduct an internal investigation and pay him millions of dollars were "entirely consistent with Coach Franklin's goal of getting DeBose and James fired and assisting Nike to clean up EYB and self-report to authorities."  (Def. Reply (Dkt. No. 294) at 3-4)

Viewing "the evidence in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor, and deferring to the jury's assessment of witness credibility and its assessment of the weight of the evidence,'" Coplan, 703 F.3d at 62 (quotation marks and citation omitted), the evidence was more than sufficient to demonstrate that Avenatti acted wrongfully.

The evidence at trial showed that Franklin did not ask Avenatti to seek an internal investigation of Nike, and that Avenatti never told Franklin (or Auerbach) that he had made such a demand to Nike, much less that Avenatti had demanded that Nike pay him and Geragos millions of dollars to perform the internal investigation at Nike.  (Tr. 797-99, 807-09, 1553, 1567-73, 1577-78)  Nor did Avenatti tell Franklin and Auerbach that he intended to disclose confidential information that they had shared with him – information that could damage Franklin's reputation and that of his Basketball Program – with the press.  (Tr. 1545-47)

Moreover, during his meetings with Nike's lawyers, Avenatti repeatedly used threats of economic and reputational harm to demand millions of dollars for himself, to which he had no plausible claim of right.  Avenatti used Franklin's confidential information to demand that Nike pay him $15 to $25 million, and he did so without Franklin's knowledge and to Franklin's detriment.  (See GX 1 at 02:33-03:57, 09:01-09:20; GX 2 at 17:36-17:57)

Indeed, when Nike's lawyer asked whether Nike could resolve Avenatti's demands simply by paying Franklin – rather than by retaining Avenatti to perform the internal investigation – Avenatti rejected that proposal, stating that he "[didn't] think that it makes any

sense for Nike to be paying . . . an exorbitant sum of money to Mr. Franklin in light of his role in

this. . . . ."  (GX 2 at 23:20-23:41)  Avenatti made clear to Nike that his settlement offer to Nike

had two components:  a $1.5 million "civil settlement" for Franklin, and an agreement to retain

Avenatti and Geragos to perform an internal investigation, for which they would be paid $15 to

$25 million.  (Tr. 265, 1163, 1425, 1431)  Nike's refusal to agree to both components would

result in a press conference that would "take 5, 6 billion dollars in market cap off of [Nike's

stock]."  (GX 2 at 32:26-32:31)

        In sum, a reasonable jury could have found that Avenatti understood that he was

acting in furtherance of his own interests, that he was not pursuing Franklin's objectives, that he

had not been authorized – either explicitly or impliedly – to pursue the $15 to $25 million

internal investigation, and that Avenatti's demands for millions of dollars for himself had no

nexus to any claim of Franklin that Avenatti reasonably believed he had been authorized by

Franklin to pursue.

        To the extent that Avenatti argues that his conduct – in demanding that Nike

retain him to conduct an internal investigation – was in furtherance of Franklin's goal of

eliminating corrupt influences in Nike's youth basketball program, there was ample evidence

that Avenatti had no genuine interest in pursuing a legitimate internal investigation or in

eliminating any corrupt influence Nike might be wielding over youth basketball.  Avenatti

proposed a $12 million retainer, due upon signing, and "deemed earned when paid."

Accordingly, under Avenatti's proposed financial terms, he and Geragos would not have to

demonstrate that they performed any investigation in order to obtain the $12 million fee.  (GX 2

at 17:36-17:57)  Moreover, Avenatti told Wilson that while he and Geragos would "report [the

results of their investigation] back to Nike, . . . Nike makes a decision on what they want to do."

(Id. at 21:20-21:36)  Wilson understood Avenatti to be saying that he was not focused on "root[ing] out misconduct," but that "whatever work [Avenatti and Geragos] were going to do [on the internal investigation], if Nike wanted to stick [the results] in a drawer after they were done," it could.  (Tr. 322-23)  Later in the negotiations, Avenatti offered an alternative settlement proposal.  He told Wilson that Nike could obtain "full confidentiality" if it paid him $22.5 million.  There would be no investigation and no disclosure, and Avenatti would simply "ride off into the sunset."  (GX 2 at 34:12-35:01)

In short, the Government offered ample evidence of "wrongfulness."

## 2.   Intent to Defraud

In connection with the honest services wire fraud charged in Count Three, Avenatti contends that the Government did not demonstrate that he – in demanding that Nike pay him millions of dollars to perform an internal investigation – acted with the "intent to defraud" Franklin.  (Def. Mot. (Dkt. No. 291) at 24)

The Government responds that Avenatti solicited a bribe from Nike – without Franklin's knowledge or approval – and that Avenatti's bribe solicitation was based on confidential information that Franklin had provided to Avenatti for purposes of Avenatti's representation of Franklin.  The Government further argues that – in "using Franklin's information to demand payments for the defendant, and indeed [in] making any settlement with Franklin contingent on the defendant being paid," Avenatti "created a conflict of interest requiring, at a minimum, informed written consent."  (Govt. Opp. (Dkt. No. 292) at 12 (citing Tr. 747, 1572, 2337-38))

### a.   Applicable Law

Avenatti is a member of the California Bar, and he met with Franklin in his capacity as an attorney.  (Tr. 1579)  As an attorney, Avenatti owed Franklin certain duties under

California law, including duties of loyalty, confidentiality, and reasonable communication.  (Tr. 2336-40)

The honest services wire fraud statute applies to schemes involving bribes or kickbacks.  See Skilling v. United States, 561 U.S. 358, 409 (2010).  "[T]o violate the right to honest services, the charged conduct must involve a quid pro quo, i.e., an 'intent to give or receive something of value in exchange for an . . . act.'"  United States v. Nouri, 711 F.3d 129, 139 (2d Cir. 2013) (quoting United States v. Bruno, 661 F.3d 733, 743-44 (2d Cir. 2011)).  To demonstrate a quid pro quo agreement, the Government "ha[s] to prove, beyond a reasonable doubt, . . . that the defendant received, or intended to receive, something of value in exchange for an . . . act."  United States v. Silver, 864 F.3d 102, 111 (2d Cir. 2017) (citing Bruno, 661 F.3d at 743-44 (in a prosecution of honest services wire fraud under a bribery theory, "[t]he key inquiry is whether, in light of all the evidence, an intent to give or receive something of value in exchange for an . . . act has been proved beyond a reasonable doubt")).  The Government is not required to prove that the fraudulent scheme was successful.  See Pasquantino v. United States, 544 U.S. 349, 371 (2005) ("[T]he wire fraud statute punishes the scheme, not its success." (citation omitted)).

### b.    Analysis

Avenatti argues that he merely took such actions as were "impliedly authorized to carry out the representation," and that the Government "presented insufficient evidence that Mr. Avenatti believed that he was exceeding the authority granted to him by Coach Franklin by demanding that he, Mr. Avenatti, be retained by Nike to conduct an internal investigation." (Def. Mot. (Dkt. No. 291) at 25-26)

The Government responds that Avenatti proposed a quid pro quo arrangement to Nike, in which Avenatti offered to take certain action regarding the settlement of Franklin's

35

claims in exchange for Nike paying Avenatti millions of dollars.  (Govt. Opp. (Dkt. No. 292) at 17)

In his first meeting with Nike's lawyers, Avenatti demanded that Nike pay Franklin $1.5 million and retain Avenatti to conduct an internal investigation at Nike.  (Tr. 267, 1244-45)  In the event that Nike decided to use another firm to conduct the internal investigation, Avenatti proposed that he "get paid two times the fees that Nike paid to that other law firm for actually doing [the] work."  (Tr. 266-67, 1159-60, 1246)

In a phone call following that first meeting, Avenatti made clear that his payment for conducting the internal investigation would have to exceed "single digit millions."  "A few million dollars doesn't move the needle for me.  I'm just being really frank with you. . . . So if you guys think that you know, we're gonna negotiate a million five, and we're gonna, you're gonna hire us to do an internal investigation, but it's gonna be capped at 3 or 5 or 7 million dollars, like let's just be done. . . . And I'll go and I'll go take and I'll go take ten billion dollars off your client's market cap.  But I'm not fucking around."  (GX 1 at 02:33-03:57, 09:01-09:20)

At Avenatti's second meeting with Nike's lawyers, Wilson told Avenatti that a settlement of "Franklin's civil claims for 1.5 million dollars" would not be "the stumbling block here."  Wilson asked, however, whether there was a way "to avoid [Avenatti's] press conference without hiring [Avenatti] and [Geragos] to do an internal investigation."  (GX 2 at 21:50-22:09)  Avenatti refused to directly answer the question (id. at 22:09-22:10), but stated that he "[didn't] think that it makes any sense for Nike to be paying, um, an exorbitant sum of money to Mr. Franklin in light of his role in this. . . ."  (Id. at 23:20-23:41)  Avenatti thus made clear to Nike that the lion's share of any payment from Nike should go to him rather than to his client.

In making any settlement paid to Franklin contingent on Nike paying Avenatti millions of dollars, Avenatti acted with intent to defraud his client.  And in soliciting a multi-million dollar payment from Nike for himself in exchange for settling Franklin's claims, Avenatti was proposing a quid pro quo and soliciting a bribe.

The Government offered sufficient evidence that Avenatti acted with intent to defraud Franklin and that he solicited a bribe from Nike.

### 3.     Whether the Statutes of Conviction Are Vague-as-Applied

Avenatti contends that the statutes under which he was convicted are vague-as-applied.  According to Avenatti, "the jury's determination of Mr. Avenatti's guilt on all three counts turned on their application of the California Rules of Professional Conduct on the allocation of authority[, which] underscores the vagueness of this prosecution.  Mr. Avenatti was not on notice that the negotiating tactics he employed during confidential settlement negotiations . . . could expose him to criminal prosecution under the extortion and honest services wire fraud statutes."  (Def. Mot. (Dkt. No. 291) at 27)

"'The void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement.'" United States v. Halloran, 821 F.3d 321, 337-38 (2d Cir. 2016) (quoting United States v. Rosen, 716 F.3d 691, 699 (2d Cir. 2013)); see also United States v. Napout, 963 F.3d 163, 181 (2d Cir. 2020).  "'The doctrine addresses concerns about (1) fair notice and (2) arbitrary and discriminatory prosecutions.'"  Id. (quoting Rosen, 716 F.3d at 699).  "Under the 'fair notice' prong, a court must determine 'whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal.'"  Halloran, 821 F.3d at 338 (quoting Rosen, 716 F.3d at 699); see also Mannix v. Phillips, 619 F.3d 187, 197 (2d

Cir. 2010) ("The 'touchstone' of the notice prong 'is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal.'" (quoting United States v. Lanier, 520 U.S. 259, 267 (1997))).

Where "the interpretation of a statute does not implicate First Amendment rights, it is assessed for vagueness only 'as applied,' i.e., 'in light of the specific facts of the case at hand and not with regard to the statute's facial validity.'" United States v. Rybicki, 354 F.3d 124, 129-30 (2d Cir. 2003) (en banc) (quoting United States v. Nadi, 996 F.2d 548, 550 (2d Cir. 1993)). Moreover, "[o]ne whose conduct is clearly proscribed by the statute cannot successfully challenge it for vagueness." Id. (collecting cases) (quotation marks omitted).

"Although a law has to provide minimal guidelines in the form of explicit standards regarding what conduct is unlawful, it need not achieve meticulous specificity, which would come at the cost of flexibility and reasonable breadth." Rosen, 716 F.3d at 699 (quotation marks and citation omitted); see also Grayned v. City of Rockford, 408 U.S. 104, 110 (1972) (a statute need not define the offense with "mathematical certainty"). "[S]ome inherent vagueness" is inevitable and thus permissible. Rose v. Locke, 423 U.S. 48, 49-50 (1975). A statute must nonetheless provide "relatively clear guidelines as to prohibited conduct," Posters 'N' Things, Ltd. v. United States, 511 U.S. 513, 525 (1994), because "'[t]he underlying principle is that no man [or woman] shall be held criminally responsible for conduct which he [or she] could not reasonably understand to be proscribed.'" United States v. Genovese, 409 F. Supp. 2d 253, 257 (S.D.N.Y. 2005) (quoting United States v. Harriss, 347 U.S. 612, 617 (1954)).

### a.   Extortion Statutes

Avenatti was convicted of transmitting interstate communications with intent to extort, in violation of 18 U.S.C. § 875(d) (Count One), and Hobbs Act extortion, in violation of 18 U.S.C. § 1951 (Count Two). (Verdict (Dkt. No. 265)) Section 875(d) prohibits extortion

through the use of interstate communications and provides that "[w]hoever, with intent to extort from any person . . . any money or other thing of value, transmits in interstate or foreign commerce any communication containing any threat to injure the property or reputation of the addressee or of another . . . shall be [guilty of a crime]."  The Hobbs Act prohibits "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear" or attempting to do so.  18 U.S.C. § 1951(b)(2).

Avenatti argues that "the use of economic fear or a threat to injure the reputation of another is not inherently wrongful," and that "[e]very one of the acts attributed to Mr. Avenatti in the Superseding Indictment was independently lawful and protected by the First Amendment."  (Def. Mot. (Dkt. No. 291) at 29-30 (emphasis omitted))  "The extortion statutes failed to provide clear guidance that Mr. Avenatti could face criminal prosecution by making a settlement demand involving two components that, if agreed to by Nike, would have fulfilled Coach Franklin's objectives of seeking compensation and justice."  (Id. at 31)

### i.    **Analysis**

United States v. Jackson, 180 F.3d 55 (2d Cir. 1999), on reh'g, 196 F.3d 383 (2d Cir. 1999), is the leading case in this area.  (See Jan. 6, 2020 Order (Dkt. No. 120) at 9-14)  In Jackson, the Second Circuit instructed that

> not all threats to reputation are within the scope of § 875(d), that the objective of the party employing fear of economic loss or damage to reputation will have a bearing on the lawfulness of its use, and that it is material whether the defendant had a claim of right to the money demanded.
>
> We do, however, view as inherently wrongful the type of threat to reputation that has no nexus to a claim of right. . . .
>
> Where there is no plausible claim of right and the only leverage to force the payment of money resides in the threat, where actual disclosure would be counterproductive, and where compliance with the threatener's demands provides no assurance against additional demands based on renewed threats of disclosure,

we regard a threat to reputation as inherently wrongful.  We conclude that where a threat of harm to a person's reputation seeks money or property to which the threatener does not have, and cannot reasonably believe she has, a claim of right, or where the threat has no nexus to a plausible claim of right, the threat is inherently wrongful and its transmission in interstate commerce is prohibited by § 875(d).

Jackson, 180 F.3d at 70-71.

In sum, Section 875(d) and the Hobbs Act render unlawful the "wrongful" use of threats to extort a victim, and Jackson instructs district courts to look to the following factors in determining whether a "threat to reputation [is] inherently wrongful":

(1) did the defendant have a "plausible claim of right";

(2) did the defendant's leverage to force the payment of money reside solely in the threat, and would the leverage be lost if actual disclosure were made; and

(3) would compliance with the "threatener's demands" provide any assurance that additional demands premised on threats of disclosure would not be made.

Id. at 71.  Where "the threatener does not have, and cannot reasonably believe []he has, a claim of right, or where the threat has no nexus to a plausible claim of right, the threat is inherently wrongful . . . ."  Id.

Moreover, the First Amendment does not protect threats made in furtherance of an attempted extortion, or misrepresentations made in furtherance of a fraud scheme.  See, e.g., Illinois ex rel. Madigan v. Telemarketing Assocs., Inc., 538 U.S. 600, 612 (2003) ("[T]he First Amendment does not shield fraud."); Jackson, 180 F.3d at 64 (citing district court's ruling that Section 875(d) is not "unconstitutionally overbroad or vague . . . because [it] target[s] only extortionate threats, not expressions of ideas or advocacy that typically implicate First Amendment protections").

Avenatti contends that the extortion statutes did not provide fair notice to him that his conduct vis a vis Nike was illegal.  As discussed above, however, in addressing an as-applied

40

vagueness challenge, the "touchstone" of the inquiry as to "fair notice" is "'whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal.'"  Halloran, 821 F.3d at 338 (citation omitted); Mannix, 619 F.3d at 197.

   In Jackson and Clemente, the Second Circuit construed the "wrongfulness" element of the extortion statutes, and those decisions provide "fair notice" that the type of conduct Avenatti engaged in is criminal.

   Although Avenatti contends that his conduct amounts to no more than "lawful bargaining" (Def. Mot. (Dkt. No. 291) at 30), his conduct meets each of the Jackson criteria for "inherently wrongful" acts.

   As an initial matter, Avenatti used Franklin's potential claims against Nike as leverage to obtain millions of dollars for himself, to which he had no plausible claim of right. Although Avenatti characterizes his demands as "fulfill[ing] Coach Franklin's objectives of seeking compensation and justice" (id. at 31), Avenatti used Franklin's claims as a device to obtain a large windfall for himself, and he did so without his client's knowledge or consent. Indeed, Avenatti never told Franklin that he was demanding that Nike agree to an internal investigation, much less an internal investigation that Avenatti would be paid millions to perform.

   Moreover, in demanding that Nike agree to pay him $15 to $25 million to perform an internal investigation, Avenatti acted to the detriment of his client.  When Wilson stated that Nike was prepared to enter into a $1.5 million civil settlement with Franklin, Avenatti made clear that no settlement would be possible absent Nike's agreement to pay Avenatti $15 to $25 million.  But Avenatti had no plausible claim of right to these monies, particularly if his

insistence on obtaining the $15 to $25 million might result in Franklin obtaining nothing.  (See GX 2 at 17:36-17:57, 21:50-22:10)  And when Nike suggested a larger settlement for Franklin in exchange for Avenatti dropping his demand for an Avenatti-led internal investigation, Avenatti rejected the idea, saying that he "[didn't] think that it makes any sense for Nike to be paying . . . an exorbitant sum of money to Mr. Franklin in light of his role in this . . . ."  (Id. at 23:20-23:41)

And to the extent that Avenatti contends that his demand for an Avenatti-led internal investigation fulfilled Franklin's desire for "justice" – as discussed above – there is ample evidence that Avenatti had no genuine interest in performing a legitimate internal investigation and in disclosing Nike's alleged corrupt activities.  This inference is readily drawn from Avenatti's demand for a $12 million retainer that would be "deemed earned when paid" (GX 2 at 17:36-17:57); his statement that "Nike makes a decision on what they want to do" with respect to the results of an investigation (id. at 21:20-21:36), which meant that "if Nike wanted to stick [the results of the investigation] in a drawer after [Avenatti and Geragos] were done," it could do so (Tr. 322-23); and his alternative proposal that Nike simply pay him $22.5 million for "full confidentiality," after which Avenatti would "ride off into the sunset."  (GX 2 at 34:12-35:01, 38:10-38:30)

Jackson provided clear notice to Avenatti that his demand for $15 to $25 million from Nike was not premised on any plausible claim of right, and Avenatti could not have reasonably believed that he had a plausible claim of right to this money.  Avenatti instead hijacked Franklin's claims to pursue his own agenda, which was to obtain a multi-million windfall for himself.

Analysis of the other components of the Jackson test confirms that Avenatti was on notice that his conduct was "inherently wrongful," and thus unlawful and criminal.  "[T]he

only leverage to force the payment of money reside[d] in [Avenatti's] threat to [hold a press conference]." Jackson, 180 F.3d at 71. "[A]ctual disclosure would [have been] counterproductive," because Avenatti would thereby lose his leverage to demand that Nike hire him to conduct an internal investigation. Id. And had Nike complied with Avenatti's demands to pay him millions of dollars, it would have had little assurance that he would not later reappear – perhaps with another coach or a player – and make "additional demands based on renewed threats of disclosure." Id.

In sum, the extortion statutes are not unconstitutionally vague as applied to Avenatti's conduct. To the contrary, Jackson put Avenatii on clear notice that his conduct was unlawful and criminal.

### b. Honest Services Wire Fraud

At trial, Avenatti was convicted of honest services wire fraud, in violation of 18 U.S.C. §§ 1343 and 1346. (Verdict (Dkt. No. 265))

Title 18, United States Code, Section 1343 provides that

[w]hoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 1343.

Title 18, United States Code, Section 1346 provides that

the term "scheme or artifice to defraud" includes a scheme or artifice to deprive another of the intangible right of honest services.

18 U.S.C. § 1346.

As discussed above, in <u>Skilling v. United States</u>, 561 U.S. 358 (2010), the Supreme Court held that "§ 1346 criminalizes <u>only</u> the bribe-and-kickback core of the pre-<u>McNally</u> case law." <u>Skilling</u>, 561 U.S. at 409 (emphasis in original). Moreover, "to violate the right to honest services, the charged conduct must involve a <u>quid</u> <u>pro</u> <u>quo</u>, <u>i.e.</u>, an 'intent to give or receive something of value in exchange for an . . . act.'" <u>Nouri</u>, 711 F.3d at 139 (quoting <u>Bruno</u>, 661 F.3d at 743-44). The alleged fraudulent scheme need not have been successful to support a conviction, however. <u>See</u> <u>Pasquantino</u>, 544 U.S. at 371 ("'[T]he wire fraud statute punishes the scheme, not its success.'" (citation omitted)).

Here, Avenatti contends that the honest services wire fraud statute is vague as-applied, because "this case [is] not a 'paradigmatic' bribery case" as <u>Skilling</u> requires, and he "did not have fair notice that he could be convicted of honest services wire fraud for demanding that Nike retain him and Mr. Geragos to conduct an internal investigation to root out corruption at Nike." (Def. Mot. (Dkt. No. 291) at 31)

### i.        <u>Analysis</u>

As discussed above, as a member of the California Bar and as Franklin's attorney, Avenatti owed his client duties of, <u>inter alia</u>, loyalty, confidentiality, and reasonable communication. Cal. R. Prof'l Conduct 1.7 (Conflict of Interest: Current Clients); Cal. Bus. & Prof. Code § 6068(e)(1) ("It is the duty of an attorney to . . . maintain inviolate the confidence, and at every peril to himself or herself to preserve the secrets, of his or her client."); Cal. Bus. & Prof. Code § 6068(m); Cal. R. Prof'l Conduct 1.4. (<u>See also</u> Tr. 2336-40)

In his initial meeting with Avenatti on March 5, 2019, Franklin told Avenatti what he hoped to achieve through Avenatti's representation: he wanted his "team back"; he wanted "Jamal James and Carlton DeBose fired"; he wanted "some sort of restitution" for the lost Nike sponsorship; and he wanted to be "covered" as a "whistleblower." (Tr. 1541-42) In furtherance

of these objectives, Franklin and Auerbach provided confidential information to Avenatti concerning Nike's alleged corruption in connection with youth basketball. (Tr. 731, 1543-44; GX 312)

At the March 5, 2019 meeting, Avenatti told Franklin and Auerbach that he would serve as Franklin's lawyer, and that he would seek immunity for Franklin for his involvement in making improper payments to players' families and in falsifying invoices that were submitted to Nike for payment. (Tr. 742, 744-45)

In a March 18, 2019 meeting with Franklin and Auerbach, Avenatti represented that he was "going to first get [Franklin] covered with some sort of whistleblower or immunity," and that he was then "going to get James and DeBose fired." Avenatti also said that he thought he could obtain a $1 million settlement from Nike for Franklin. (Tr. 1560-61, 787-88)

There was no discussion at the March 5 and March 18, 2019 meetings about Avenatti (1) threatening to hold a press conference; (2) demanding that Nike commission an internal investigation; or (3) demanding that Nike retain Avenatti and Mark Geragos – at a cost of $12 million or more – to perform an internal investigation of Nike. Franklin and Auerbach were never told – either at these meetings or in telephone conversations with Avenatti – that Avenatti would make such demands, and Franklin never authorized Avenatti to make such demands. And Avenatti never told Franklin and Auerbach that he would hold a settlement for Franklin hostage to his demand that Nike agree to pay him millions of dollars to conduct an internal investigation.[8]

---

[8] There is also no evidence that Avenatti attempted to persuade Nike to revive its sponsorship relationship with Franklin, and to fire DeBose and James. Nor is there any evidence that Avenatti approached the authorities about whistleblower protection for Franklin.

Although Avenatti contends that the honest services fraud statutes and the case law construing these statutes did not give him fair notice that his conduct could subject him to criminal liability, application of these statutes here is straightforward.  Avenatti does not contest that – as Franklin's lawyer – he owed Franklin duties of loyalty, confidentiality, and reasonable communication.  The evidence at trial showed that Avenatti breached the duties he owed Franklin.  Instead of pursuing the objectives Franklin had identified, Avenatti devised an approach to Nike that was designed to enrich himself.  Avenatti used the confidential information Franklin had provided to demand that Nike retain him to conduct an internal investigation, for which Avenatti would be paid between $15 and $25 million.  And Avenatti made these demands without Franklin's knowledge or authorization and to Franklin's detriment, telling Nike that no settlement with Franklin could be reached absent Nike's agreement to pay Avenatti millions of dollars.

And while Avenatti contends that "this case [is] not a 'paradigmatic' bribery case," Avenatti proposed a quid pro quo arrangement to Nike, in which he agreed not to make public Franklin's claims against Nike, and to settle Franklin's claims against Nike, if Nike paid him millions of dollars.  And Avenatti proposed this quid pro quo arrangement to Nike without his client's knowledge or authorization.

The honest services fraud statutes provided fair notice to Avenatti that such conduct would expose him to criminal liability.

## C.    Avenatti's Arguments under Rule 33

In seeking a new trial pursuant to Fed. R. Crim. P. 33, Avenatti argues that "[t]he Court improperly excluded text messages and e-mails from evidence, thereby depriving Mr. Avenatti of his Fifth and Sixth Amendment rights to present a defense and his right to a fair trial.

(Def. Mot. (Dkt. No. 291) at 32)  Avenatti also contends that the Court committed error in responding to a jury note regarding permissible inferences that could be drawn from exhibits that had been admitted to show state of mind.  (Id. at 36)

> ### 1.    Exclusion of Text Messages and Emails Between Franklin and Auerbach that Avenatti Had Never Seen
>
> #### a.    Background

In the days and weeks preceding the January 27, 2020 trial date, the Court issued lengthy written orders and opinions addressing, inter alia, three motions to dismiss, motions for issuance of Rule 17(c) subpoenas, a motion to seal, and a motion to compel testimony from Mark Geragos.  (Dkt. Nos. 120, 121, 122, 129, 146, 201, 204, 215)  The Court also issued bench rulings concerning extensive motions in limine filed by the Government and the Defendant. (Dkt. Nos. 81, 88, 91, 96, 98, 99, 104, 107, 108, 109, 116, 118; Jan. 14, 2021 Conf. Tr. (Dkt. No. 192), Jan. 22, 2021 Conf. Tr. (Dkt. No. 235))

Much of the motion practice prior to trial concerned motions to quash subpoenas. The Government and Nike moved to quash subpoenas the Defendant had served on Nike employees.  (Dkt. Nos. 114, 115, 131, 137, 144)  Nike moved to quash defense subpoenas for production of various documents and recordings.  (Dkt. Nos. 138, 139, 185, 187)  And Franklin and Auerbach moved to quash defense subpoenas for production of various documents.  (Dkt. Nos. 158, 170)  In connection with a number of the motions to quash, the parties, the witnesses, and Nike argued about whether the information sought in the subpoenas was relevant.  Movants repeatedly argued that certain documents sought in the subpoenas were irrelevant because, inter alia, Avenatti had never seen these documents – and thus they could not have affected his state of mind – or because the materials fell outside the relevant time period, or because they went to the truth of Avenatti's claim that Nike had corrupted youth basketball.  (See, e.g., Nike Mot. (Dkt.

No. 114) at 8-9 (arguing that evidence of Nike's misconduct "beyond that directed at Coach Franklin" was irrelevant, because the truth of damaging allegations contained in a threat is not a defense against an extortion charge); Nike Mot. (Dkt. No. 139) at 7-8 (arguing that documents Avenatti had not seen at the time he threatened Nike are irrelevant); Franklin and Auerbach Mot. (Dkt. No. 158) at 3 (arguing that text messages between Franklin and Auerbach prior to January 1, 2019 are not relevant to Avenatti's state of mind))

At a January 22, 2020 conference, defense counsel stated that he wanted to refer, in his opening statement, to "a year-and-a-half worth of text messages and conversations where Franklin continues to express his desire to investigate, to root out corruption," in order to show how Franklin and Auerbach "define[d] justice" at the time they retained Avenatti.  (Jan. 22, 2021 Conf. Tr. (Dkt. No. 235) at 143-44)  The Government objected to the use of text messages between Franklin and Auerbach for purposes other than "being cross-examined on prior statements that are alleged to be materially inconsistent."  (Id. at 144)

In an effort to address the blizzard of pre-trial filings and the parties' disputes concerning the relevance of the Franklin-Auerbach text messages and Defendant's evidence that Nike had been engaged in a large-scale effort to corrupt youth basketball, on January 27, 2019 – the first day of trial – the Court set parameters for relevance and admissibility:

> I . . . want to lay out some rules of general application which will hopefully aid us in resolving the countless motions in limine that have been filed and continue to be filed on a daily basis.  I am going to make some general points that have general application here.
>
> Information that was never conveyed to Avenatti and communications that he never saw are irrelevant because the trial is about his state of mind.  The prerequisite for admission of such information [and] communications is proof that the information in communications was shared with him; in other words, that the information and communications could have influenced his thinking and state of mind during the relevant time period.  Text messages, e-mail statements, and other documentary information that Avenatti never saw at the time may be useful to refresh the recollection of other witnesses or to impeach witnesses, such as Franklin and Auerbach, as to what they said to

Avenatti about their goals for the approach to Nike.  But I see no role for such information and communications as direct evidence.

As to the time period that is relevant here, the relevant time period ended when Avenatti blew up the alleged scheme by announcing on March 25, 2019, at about 12:16 p.m., that he intended to hold a press conference to disclose Nike's alleged criminal conduct.  The government contends that he took this step after learning that the FBI had approached Franklin.  The government will argue that Avenatti knew then that Nike wouldn't be paying any money to him and that, to use his colorful phrase, he would not be riding off into the sunset.

Because the alleged unlawful scheme was predicated on alleged threats to damage Nike's reputation, and on an alleged corrupt overture in which Avenatti allegedly offered to betray his client and suppress evidence of Nike's alleged misconduct in exchange for a bribe, his announcement of the press conference marked the effective termination of the alleged scheme, which was, of course, predicated on secrecy.

Another rule of general application here is that "when a threat is made to injure the reputation of another, the truth of the damaging allegations underlying the threat is not a defense to a charge of extortion under Section 875(d)."  Citing United States v. Jackson, 180 F.3d 55[,] 66 (2d Cir. 1999) (collecting cases).  Accordingly, as I have told the parties before, it matters not whether Nike was engaged in a large-scale effort to corrupt amateur basketball.

Accordingly, the trial will not involve an exploration of whether Nike was engaged in a large-scale effort to corrupt amateur basketball.

The focus of the trial will instead be on, among other things, whether Gary Franklin, Avenatti's client, authorized him to make the financial demands that he allegedly made on Nike during the meetings and calls at issue.

(Tr. 5-7)

Despite these rulings, throughout the trial, Defendant repeatedly attempted to introduce as direct evidence text messages, email communications, and other documents that Avenatti had not seen during the relevant time period, and which could not have affected his state of mind.  Many of the text messages and emails between Franklin and Auerbach that Avenatti sought to introduce went to the issue of Nike's alleged corrupt influence on youth basketball.  The Government repeatedly objected to the admission of these communications as irrelevant and as inadmissible under Fed. R. Evid. 403.  (See, e.g., Jan. 29, 2020 Govt. Ltr. (Dkt.

No. 223); Feb. 4. 2020 Govt. Ltr. (Dkt. No. 239); Tr. 884-91, 912, 931, 954-55, 964, 971, 1023-24, 1034, 1039-40, 1645-46, 1696)  While this Court permitted Defendant to use Franklin and Auerbach's text messages and emails for purposes of cross-examination and impeachment (see, e.g., Tr. 70 ("If they testify in a manner that's inconsistent with their text messages, I will allow you to cross-examine and to use the text messages to impeach them.")), the Court repeatedly ruled that these materials were not admissible as direct evidence because they did not shed light on Avenatti's state of mind.

On January 27, 2020, during jury selection, defense counsel sought permission – in his opening – to "develop, without . . . publishing the text messages to the jury," Franklin and Auerbach's "state of mind [and] intention" based on the text messages they had sent to one another.  (Tr. 64)  The Court reiterated that information that Franklin and Auerbach "didn't communicate . . . to Avenatti . . . is irrelevant."  (Tr. 69 ("Even if Franklin and Auerbach spent a year and a half talking about this every day, 24/7, if they didn't communicate that to Avenatti, it is irrelevant – irrelevant."))  However, the Court repeated that "[i]f [Franklin and Auerbach] testify in a manner that's inconsistent with their text messages, I will allow you to cross-examine and to use the text messages to impeach them."  (Tr. 70)  Because the Court did not "know whether the text messages are going to come in or not," it prohibited defense counsel from reading the text messages in his opening.  (Id.)

On January 29, 2020, the Government complained that defense counsel's opening statement had "repeatedly violated the Court's unambiguous ruling" on January 27, 2020, and requested "that the Court preclude the defendant from describing or making arguments based on the content of text messages between Jeffrey Auerbach and Gary Franklin, Sr., not seen by [Avenatti]," unless a witness testifies in a manner "materially inconsistent with those messages"

or they can be offered as a prior inconsistent statement.  (Jan. 29, 2020 Govt. Ltr. (Dkt. No. 223) at 1-2)  The Court denied the Government's blanket application as premature, noting that it had "very little idea . . . what evidence the defendant will seek to introduce or what evidence will actually be admitted."  (Tr. 623)  The Court also ruled that, in his opening, defense counsel had not violated the Court's restriction on reading from text messages that might not be received in evidence.  (Tr. 624)

Once the presentation of evidence began, Defendant continued his efforts to introduce materials that Avenatti had never seen, much of which went to the issue of Nike's alleged corrupt influence on youth basketball.  Accordingly, on January 31, 2020 – early in the trial – the Court reiterated that (1) communications that Avenatti never saw could not have affected his state of mind and were thus irrelevant; and (2) Nike's alleged corrupt influence on youth basketball had no bearing on Avenatti's guilt or innocence:

> First, it's not a defense to any charge here that Nike was engaged in corruption in connection with amateur youth basketball.  Truth is not a defense to any of the charges here.  In other words, even if Mr. Avenatti was threatening to disclose misconduct that Nike employees had actually committed, that would not provide him with a defense to the charges against him.
>
> Whether or not Nike had or would conduct a meaningful internal investigation of whether its employees had engaged in misconduct in connection with amateur youth basketball is not a fact that makes it more or less likely that Mr. Avenatti committed extortion or honest services wire fraud, <u>particularly where Mr. Avenatti had no knowledge of the underlying facts at the time.  In general, information about which Mr. Avenatti was unaware at the time is not relevant to his state of mind.</u>

(Tr. 445 (emphasis added))

Although the Court's repeated rulings on this issue were clear, as trial progressed, defense counsel expressed "confusion . . . about the scope of what [they are] entitled to do with the text messages," noting that "it seems like every time . . . we might offer a text message the

government will argue that, as it has, at least generally that text messages between Auerbach and Franklin might not be admissible because Mr. Avenatti didn't learn about it."  (Tr. 921)  The Court reminded counsel that "a text message [provides a] good faith basis to ask [a] question" of the witness, but that defense counsel "can't make it obvious that you're reading from something that's not in evidence."  (Tr. 922)  The Court further observed that the text messages could be used to refresh a witness's recollection, and that Auerbach had "fairly consistently . . . been saying yeah, I said that" when shown text messages.  The Court also noted that it was "improper" to "introduce text messages that [a witness had] admitted to."  (Tr. 922-23)  The text messages would be "cumulative" to the admissions already made by the witness, and the text messages frequently contained "other information that's irrelevant and inflammatory and [that] shouldn't be laid before the jury."  (Tr. 989, 991)

Defense counsel argued that Franklin and Auerbach's text messages and emails were admissible to show "then-existing 'motive, intent, or plan.'"  (Feb. 6, 2020 Def. Ltr. (Dkt. No. 243) at 1, see also Tr. 923-27)  But Franklin and Auerbach's motives, intent and plans were relevant only to the extent that they were communicated to Avenatti.

Throughout the trial, defense counsel argued that the Court had "improperly restricted the defendant's use of text messages between Jeffrey Auerbach and Gary Franklin." (Tr. 1386)  While the Court permitted defense counsel to use these text messages and emails on cross-examination (see, e.g., Tr. 884-85, 892-93, 904-05, 907-08, 929-31, 936-37, 954, 961-65, 997-98, 1003-04, 1024-26, 1029-31, 1639-44, 1648-51, 1654-64, 1685-86, 1690-91, 1694-1700, 1704, 1711-12, 1715-16, 1717-19, 1721), and admitted a number of these communications where appropriate (see, e.g., DX FF-1A (Tr. 1083), FF-10 (Tr. 1029), FF-911 (Tr. 936-37), GG1 (Tr. 884-85), MM-2 (Tr. 1034)), the Court rejected defense counsel's efforts to admit the Franklin-

Auerbach text messages and emails en masse.  Prior to the cross-examination of Franklin, the

Court reiterated its reasons for rejecting Defendant's argument that all 2,300 text messages

between Franklin and Auerbach should be admitted:

> There are approximately 2300 text messages, as I understand it, between
> Auerbach and Franklin during the relevant time period.  I'm also told that they
> consume more than 440 pages when printed out.  To state the obvious, or should
> be obvious, it is not proper to simply dump the text messages into evidence in
> their entirety.  Indeed, on every page there is material that is irrelevant to the
> issues before us.  Accordingly, the procedure I asked the defense to follow during
> the Auerbach examination, which is the same procedure that I generally apply to
> out-of-court statements, is as follows:  Where a text message provides a good
> faith basis to ask a question, such as, Isn't it a fact that you and Franklin on a
> particular date discussed "going after Nike," to simply ask that question.  The
> possible responses are, yes, we did, we did discuss going after Nike – in which
> case admission of the text message is cumulative and unnecessary – or, no, we
> didn't discuss going after Nike, or, I don't recall whether we discussed going after
> Nike.  In the event that the answer is, we never discussed going after Nike, or, I
> don't recall whether we discussed going after Nike, the next step is to show the
> witness the text message.  That is what happened during Auerbach's cross, when
> the defense chose to do that.  And where Auerbach did not clearly concede that he
> had said the things in the text message, and the text message was relevant, I
> admitted the text message.
>
> . . . .
>
> But that's the procedure.  The procedure is not, Judge, there is 2300 text
> messages, they're between Auerbach and Franklin, so they all come in.  We're
> just going to dump them in front of the jury and let the jury figure it out, what's
> relevant and what's not.  No, I can't do that.  For reasons that have never been
> explained, the defense doesn't want to follow this procedure.  I don't know why.
> The witness must be given an opportunity to see the statement, to be confronted
> with the statement, and to say whether the witness said it, whether the witness did
> not say it, or doesn't recall one way or the other.  Given the quantity of text
> messages exchanged between Auerbach and Franklin, and the quantity of utterly
> irrelevant material these text messages contain, there is no other practical way to
> proceed.
>
> . . . .
>
> [T]he process of questioning about a statement in a text message has to begin with
> confronting the witness with the substance of the statement, and giving the
> witness the opportunity to either admit it, deny it, or say I don't remember.  If the
> witness denies making the statement, or denies recollection, the next step is to
> show the witness the text message, to confront the witness with the text message.
> In the event of continued denial, the text message can then be admitted, assuming
> it is relevant to an issue in this case.  But the examination doesn't start – the line
> of questioning does not begin by simply introducing the text message.  That is

improper, for reasons I explained during Auerbach's examination and reiterate now.

. . . .

I invited defense counsel to show me law demonstrating that my approach was wrong, that it is improper to first confront the witness with the out-of-court statement. They haven't done that. They didn't do it during Auerbach's examination, they don't do it in this letter, which is docket number 243.

(Tr. 1386-91)

Defendant continued to press for the admission of the Franklin-Auerbach text messages as the trial progressed. (Tr. 1639-41, 1648-49, 1649-53, 1654-55, 1656-59, 1660-63, 1663-64, 1685-86, 1690-91, 1694-1700, 1704, 1711-12, 1721, 1715-16, 1717-19, 1721). In a February 10, 2020 letter, defense counsel listed twenty-two exhibits containing texts and emails between Franklin and Auerbach that counsel argued should be admitted. (Feb. 10, 2020 Def. Ltr. (Dkt. No. 253) at 1) While defense counsel acknowledged "that the Court has articulated on the record several times" the basis for denying the admission of text messages between Franklin and Auerbach, counsel nevertheless argued that the text messages were admissible under the "best evidence rule," Fed. R. Evid. 1002. (Id. at 2)

In rejecting counsel's application, the Court noted that Franklin and Auerbach had testified extensively about "Franklin's view that Nike had abused him" and "about how to proceed and . . . Franklin's goals." (Tr. 1921) The Court described how defense counsel had used the text messages to refresh Franklin and Auerbach's recollection, and noted that where the witness "was less than one hundred percent clear in adopting the message shown to him by defense counsel," the Court had "admitted the text message" where "it was relevant." (Tr. 1921-22) The Court had also "admitted text messages that contained a visual display that . . . went beyond the plain words." (Tr. 1922)

The Court also noted that the Franklin-Auerbach text messages cited by defense counsel failed the balancing test of Fed. R. Evid. 403: they were of marginal relevance but

presented a significant risk of confusing the jury as to what evidence they could rely on in

determining Avenatti's state of mind:

> As I have said many times, the text messages between Mr. Auerbach and
> Mr. Franklin have only marginal relevance here because none of these text
> messages were shown to Mr. Avenatti and, thus, none of them could have affected
> Mr. Avenatti's state of mind.  The relevant evidence as to Mr. Avenatti's state of
> mind is the testimony concerning what Auerbach and Franklin said to Mr.
> Avenatti in their meetings and in their telephone calls and also the documents that
> Auerbach and Franklin provided to Mr. Avenatti.  And that evidence, the
> testimony from Auerbach and Franklin as well as the documents – extensive
> documents that were received in evidence that were given to Mr. Avenatti –
> provided ample basis from which the defense can argue Mr. Avenatti's state of
> mind.
>
> Dumping into the record scores of text messages between Mr. Auerbach and Mr.
> Franklin, text messages that Mr. Avenatti never saw, could confuse the jury as to
> what evidence can be relied on to establish Mr. Avenatti's state of mind.
>
> Now, I have permitted, as the lawyers know, I've permitted examination of
> Auerbach and Franklin on this point for purposes of cross-examination, for
> purposes of their credibility.  But, I did so always emphasizing that these
> messages – these text messages between Auerbach and Franklin were of slight
> relevance because Mr. Avenatti never saw them and, therefore, they could not
> have affected Mr. Avenatti's state of mind.
>
> I am excluding once again the text messages that are listed in the defense
> February 10, 2020 letter for a variety of reasons.  First of all, as I've said, they are
> cumulative of Auerbach and Franklin's testimony because they essentially
> duplicate what the two men testified to.  They have limited relevance for the
> reasons I've stated given that they were never seen by Mr. Avenatti.  I'm also
> concerned that dumping scores of these text messages into the record would
> confuse the jury under Rule 403 because it would suggest that they are supposed
> to determine Mr. Avenatti's state of mind based on text messages that he actually
> never saw.
>
> Finally, I don't believe that Rule 1002 has any application here.  So, for all of
> these reasons, the latest application to admit text messages set forth in docket 253
> is denied.

(Tr. 1923-25)

b.   <u>Analysis</u>

In his Rule 33 motion, Avenatti contends that he is entitled to a new trial because this Court excluded certain text messages and emails between Franklin and Auerbach.[9]  (Def. Mot. (Dkt. No. 291) at 32 (citing Dkt. No. 253))  Avenatti's arguments fail for the same reason they failed at trial:  views, desires, thoughts, ideas, and objectives that Franklin and Auerbach discussed between themselves but never shared with Avenatti are not relevant to proving Avenatti's state of mind.  Accordingly, while these materials could be used for purposes of cross-examining Franklin and Avenatti – and could be admitted where the witness denied their contents and the substance of the communication was relevant – they were not properly admissible <u>en masse</u>.

Avenatti contends that these text messages and emails contradict Franklin and Auerbach's statements at trial, and show that the two

> wanted to "expose" the misconduct at Nike; that justice meant cleaning up and reorganizing Nike EYBL; that Coach Franklin was willing "to fall on the sword to get justice;" that they wanted to take advantage of the press surrounding the Adidas case to call Slusher; that their desire to clean up corruption included Nico Harrison on the "got to go" list; that they were contemplating a major civil racketeering case against Nike; that their contemplated lawsuit was <u>against</u> <u>Nike</u> and Nike EYBL, not individually against DeBose and James; that they "need[ed] to move quickly" so that Nike would "get nervous and settle;" that they wanted to "go after Nike," point "heavy artillery" toward Nike executive Slusher, "drop the hammer on this MTF;" and that they wanted to allow the first round of negotiations play out Mr. Avenatti's way.

---

[9]  Avenatti contends that this Court improperly refused to admit DX FF-02, FF-07, FF-611, FF-613, FF-623, FF-633, FF-638, FF-647, FF-713, FF-741, FF-777, FF-886, FF-915, FF-926, FF-962, GG-2, GG-25778, MM-03, MM-04, MM-05, BBB, and EEE.  (Def. Mot. (Dkt. No. 291) at 32 (citing Feb. 10, 2020 Def. Ltr. (Dkt. No. 253))  These exhibits were filed under seal during trial.  (<u>See</u> <u>also</u> Tr. 1926-27 (agreeing to docket the exhibits under seal to permit defense counsel to create a record for purposes of an appeal))

(Id. at 33 (emphasis in original))  According to Avenatti, "[t]hese text messages and emails were admissible as substantive evidence, for publication to the jury, without any need for defense counsel to establish that they also constituted prior inconsistent statements of Mr. Auerbach and Coach Franklin."  (Id. at 34)

As discussed above, however, the text messages and emails were not admissible as direct evidence, because they were not shown to Avenatti (see Tr. 714, 1532-33), and thus could not have shed light on Avenatti's state of mind at the relevant time.

Avenatti complains that,

> instead of allowing these admissible written communications in evidence, the Court first required defense counsel to question Mr. Auerbach and Franklin about their recollection of the contents of the communications.  Almost invariably, given that the text messages and e-mails that had been written 1-2 years earlier, the witness either did not recall the specific communication or testified that he "possibly" made the statement; counsel then had to refresh the witnesses' recollection with the contents of the communications.  The Court repeatedly warned counsel not to refer to communications as texts or e-mails or to read from the texts or emails.  But without quoting the text message or e-mail in defense counsel's question, it would have been impractical or impossible for defense counsel to directly impeach the witness with the written communication itself.

(Def. Mot. (Dkt. No. 291) at 34)

This is nonsense.  Cross-examination in criminal trials is commonly premised on written materials previously prepared by the witness, whether a record, report, note, email, text message, or other document.  Indeed, nearly every criminal trial involves impeachment with some type of written record, report, or note.  The underlying written materials are generally not admissible unless the witness disputes having written what is recorded in the document.  Here, as discussed above, defense counsel made effective use of the text messages and emails in conducting cross-examinations, and the witnesses generally adopted what the text message or email said when shown the document.

Admission of the text messages and emails would have been cumulative where the witness had adopted their contents.  Moreover, many of the text messages and emails contained irrelevant and inflammatory material.  Finally, as discussed above, admission of these materials presented a significant risk of confusing the jury as to what materials could be relied on in determining Avenatti's state of mind.

The text messages and emails now cited by Defendant include correspondence with DeBose and James, correspondence with Slusher, and texts between Auerbach and Franklin in which the two discuss their desire for "justice."  (See DX BBB, EEE, FF-611, FF-886)  In a number of the text messages, there is discussion about "going to the FBI to report . . . federal crimes."  (DX GG-2; see DX FF-633, FF-886)  While in certain emails Franklin expresses a desire for "justice and restitution," Franklin and Auerbach testified about these objectives at length (see, e.g., Tr. 729-30, 769-70, 911-12, 950-51, 953-54, 1640-47, 1649, 1683-84, 1686-87, 1702, 1708-10, 1782), and these objectives are likewise discussed extensively in documents received in evidence.  (See, e.g., GX 312 (Auerbach Memorandum of Actions); DX FF-1A)  In short, the text messages and emails now cited by Avenatti add nothing to what is already in the record concerning Franklin's goals and objectives, do not shed light on Avenatti's state of mind, and fail the Rule 403 balancing test.

Only three of the exhibits cited by Defendant reference Avenatti.  (DX MM-03, MM-05, FF-926)  In DX MM-05, Auerbach tells Franklin that he has a plan for them to meet with Avenatti, and he shares a number of links to videos featuring Avenatti.  (DX MM-05)  In DX MM-03, Franklin and Auerbach discuss reminding Avenatti that Franklin wants Avenatti to request that Nike reinstate Franklin to Nike's youth basketball program.  The two ultimately decide to "let [Avenatti's] first round of discussions play out his way."  (DX MM-03)  In DX FF-

926, Auerbach tells Franklin that when it becomes known that Franklin is being represented by "Avenatti (or anyone good at this point) with what evidence [Franklin has], they will get nervous, and settle." (DX FF-926)[10]

These text messages add nothing to what is already in the trial record as to Franklin's goals for Avenatti's representation. Moreover, none of the text messages and emails now cited by Avenatti address the critical issue in this case: whether Franklin ever authorized Avenatti to threaten to hold a press conference if Nike did not agree to retain him – and to pay him many millions of dollars – to conduct an internal investigation at Nike.

Even if these text messages and emails did address Franklin's goals for Avenatti's representation, they would not be admissible to show Avenatti's state of mind. A person cannot prove his or her own state of mind by offering evidence of what other people thought. See, e.g., Savino v. City of New York, 331 F.3d 63, 74 (2d Cir. 2003) ("[O]ne cannot establish that an officer engaged in 'conduct undertaken in bad faith' simply by presenting evidence of another officer's knowledge or state of mind." (internal citation omitted)); United States v. Ceballos-Munoz, No. 98-1265, 2000 WL 357676, at *3 (2d Cir. 2000) (citing with approval jury instruction stating that "one person acknowledging that he had a certain state of mind is not evidence of anyone else's"); United States v. Avenatti, No. (S1) 19 Cr. 373(PGG), 2020 WL 418453, at *14 (S.D.N.Y. Jan. 26, 2020) (denying motion to compel testimony of Geragos; a defendant "cannot premise arguments about his own alleged lack of criminal intent on evidence

---

[10]  "They" is not defined in this exhibit, but assuming arguendo that "they" refers to Nike, there was – of course – ample evidence that Nike was prepared to settle Franklin's civil claim. The obstacle to settlement was Avenatti's insistence that Nike pay him millions of dollars to conduct an internal investigation.

of [someone else's] state of mind, and [a defendant] cannot prove his state of mind by attempting to show what was in [someone else's] mind").

Finally, the sheer mass of the Franklin-Auerbach communications that the Defendant sought to introduce at trial – totaling 2,300 messages and more than 400 pages (Tr. 1386), nearly all of which contained irrelevant and/or inflammatory information (Tr. 989, 991) – threatened to overwhelm any instruction by this Court that Avenatti's state of mind had to be determined based on information that had been communicated to him.

In short, the Franklin-Auerbach text messages and emails cited by Avenatti in his post-trial motions were properly excluded.

## 2.   Court's Response to Jury Note

Avenatti contends that this Court committed error in responding to a jury note asking whether the jury could "draw inferences from state of mind documents or only exhibits admitted for evidence?" (Def. Mot. (Dkt. No. 291) at 38; see also Court Ex. 4; Tr. 2391-93, 2398-2412)

### a.   Background

During the trial, the Court received certain exhibits into evidence only for purposes of state of mind. When such exhibits were received, the Court explained to the jury the limited purpose for which the exhibit was being received. (See, e.g., Tr. 719-20 ("I'm receiving [GX] 301. It's being offered not for the truth of the statements made in it but rather for the effect that this document had on Mr. Avenatti's state of mind."), 733 (GX 312 "is received not for the truth of any of the statements in the document but rather for the effect that these statements would have had on Mr. Avenatti's state of mind."), 760 (GX 302 "is received in evidence, again, to the extent that it bears on Mr. Avenatti's state of mind."), 764 (GX 304 "is received, again, for Mr. Avenatti's state of mind."), 774 (GX 305 "is received for purposes of Mr. Avenatti's state of

mind."), 777 (GX 306 "is received for purposes of Mr. Avenatti's state of mind."), 779 (same

with respect to GX 307), 781 (same with respect to GX 308), 790 (same with respect to GX

311), 880-81 (explaining to the jury that GX 312 was "admitted for purposes of state of mind,"

and that the Court "didn't admit the document for the truth of any of the statements made in the

memorandum, because, again, Mr. Auerbach testified that he has no personal knowledge of the

events that are discussed in the Memorandum of Actions and, instead, he was relying on what he

was told by Mr. Franklin.  So I wanted you to understand that's why I sustained objections to

questions yesterday that appeared to be premised on the truth of the statements in Auerbach's

Memorandum of Actions."), 2115 ("D[X] I-1 through D[X] I-5 are received in evidence.  And,

ladies and gentlemen, these exhibits are to be considered by you to the extent they sh[e]d light on

Mr. Avenatti's state of mind."))

               In the jury charge, the Court reminded the jury that certain evidence had been

received only for a limited purpose:

> From time to time during the trial, I told you that certain evidence could be
> considered only for a limited purpose.  Where I gave you such an instruction, you
> may consider that evidence only for the purpose I identified.
>
> Many exhibits were admitted for purposes of Mr. Avenatti's state of mind.
> Statements and allegations contained in these exhibits cannot be relied on for their
> truth, but only to the extent they shed light on Mr. Avenatti's state of mind – what
> he was thinking or what he understood at the time.  I'll give you some examples.
> This is not an exhaustive list.
>
> During Mr. Auerbach's testimony, I instructed you that GX 312 – Mr. Auerbach's
> Memorandum of Actions – was admitted only to the extent that it sheds light on
> Mr. Avenatti's state of mind.  GX 312 was not admitted for the truth of any of the
> allegations contained in the memorandum.  Other examples are the text messages
> between Franklin and Auerbach that were admitted as DX FF-1, FF-1A, and MM-
> 2.  These exhibits were admitted to the extent they shed light on Auerbach's

and/or Franklin's state of mind, because their state of mind could have affected what they communicated to Avenatti, and thus affected his state of mind.

You should be aware that statements, information, thoughts, and desires never communicated to or reviewed by Mr. Avenatti could not have affected his state of mind.

(Tr. 2311-12)

On February 12, 2020, during deliberations, the jury sent out a note – Court Ex. 2 – that contained four questions, the first three of which sought clarification of what was charged in Count One, the Section 875(d) charge.[11] The fourth question reads as follows: "Were text messages in evidence only for state of mind?" (Court Ex. 2; Tr. 2358-59) The Court read the jury's note to the lawyers (Tr. 2358-59), and a lengthy colloquy ensued as to how to respond to the jury's four questions. (Tr. 2359-2365) After reaching agreement with the lawyers about the response to the jury as to the first three questions, the Court turned to the fourth question. (Tr. 2365-69)

The Court asked the parties whether "there were any text messages that were offered for the truth of what was said?" Both sides agreed that certain text messages had been received for their truth, while others had been received for state of mind. (Tr. 2365-66) The Court then directed the parties to prepare a list of the text message exhibits that had been received for their truth and a list of the text message exhibits that had been received only for state of mind. (Tr. 2366-67) The Court also decided that because the end of the trial day was nearing, and there was no dispute that the Franklin-Auerbach text messages had been received for state of mind, the Court would tell the jury that the "text messages between Auerbach and Franklin were received as to their state of mind and that I will give them an answer later as to the remaining

---

[11] Avenatti's post-trial motions do not challenge the Court's response to these questions.

text messages."  (Tr. 2368-69)  Before bringing out the jury, the Court reviewed with the lawyers

what it would say in response to each question.  (Tr. 2368-70)

> As to the fourth question – "Were text messages in evidence only for state of

mind? – the Court gave the following response:

> The text messages between Auerbach and Franklin were received as to their state of
> mind.  As to the other text messages that were received in evidence, I need to consult
> with the lawyers and I'll give you the answer to that after I have spoken with them.
> . . . .
> So, ladies and gentlemen, as I said, when I have an answer – a complete answer to your
> question number 4 about the text messages, I'll bring you out and give you the rest of that
> answer.

(Tr. 2372, 2377)

> The next morning, the parties and the Court reached agreement on the exhibit

numbers of all of the text message exhibits that had been received solely for state of mind.

(Tr. 2383-87)  The Court then reviewed with the parties its proposed supplemental response to

the fourth question:

> THE COURT:  So what I would propose to do is list for them the exhibits that were
> received for purposes of state of mind, direct their attention to page 10 [of the jury
> charge], and remind them that I addressed there how state of mind exhibits could be used.
> Is everybody on board for that?
>
> MR. SOBELMAN:  The government is.  Thank you, your Honor.
>
> MR. S. SREBNICK:  Yes
> . . . .
> THE COURT:  Actually, what I'm going to do is just reread the instruction I gave about
> the state-of-mind exhibits.  I think that's probably the easiest way to do it.
>
> So I'm going to reread the instruction number 8, page 10 from beginning to end.

(Tr. 2387-88)

The Court then brought the jury out and said the following:

> Ladies and gentlemen, I'm responding to your last question that you sent yesterday. It's part of Court Exhibit 2. The question was: "Were text messages in evidence only for state of mind?"

> So I'm going to list for you now the text message exhibits that were received for state of mind. They are as follows: Government Exhibit 308, Government Exhibit 310, Government Exhibit 312, Defense Exhibit D1, Defense Exhibit D3, Defense Exhibit D4, Defense Exhibit D6, Defense Exhibit FF-1, Defense Exhibit FF-1A, Defense Exhibit FF-911, Defense Exhibit [I]-2, Defense Exhibit MM-2.

> So all of those exhibits were received for purposes of state of mind. There are no limitations as to other text messages that were received in evidence; they can be considered by you for any purpose.

> I'm going to reread to you now the instruction in my charge about evidence that was received for a limited purpose.

(Tr. 2388) The Court then re-read its instruction from the jury charge about evidence that was

received for a limited purpose. (Tr. 2388-89)

Later that day, the jury sent out another note (Court Ex. 4), which includes three

questions. Two of the questions read as follows:

> Q1A. Can we have examples of instructions p. 12 where it says "There are times…" Where appropriate/inappropriate? (inferences)

> Q1B. Can we draw inferences from state of mind documents or only exhibits admitted for evidence?"

(Court Ex. 4; Tr. 2391, 2193)

In citing page 12 of the jury instructions, the jury was referencing the Court's

charge on circumstantial evidence, which includes the following language:

> There are times when different inferences may be drawn from the evidence. The Government may ask you to draw one set of inferences, while the Defendant asks you to draw another. It is for you, and for you alone, to decide what inferences you will draw from the evidence.

(Jury Instructions (Dkt. No. 261) at 13)

In discussing Question 1A with the parties, this Court remarked,

I can't give them examples of inferences.  The point is simply the lawyers make arguments about what inferences can be drawn from the evidence.  The inferences the government argues for are usually different than the ones that the defendant is arguing for.  And the point is they have to make a decision which makes more sense based on all the evidence.  But I'm not going to be in a position where I can give them examples.

(Tr. 2392)

The Court told the lawyers that, as to Question 1A, the Court's charge as to drawing inferences was clear, and that it intended to re-read that instruction:  "So with respect to the first question, what I'm going to do is refer them back to my instructions and where I get into the subject of drawing inferences.  And where it comes up is on page 11, where I talk about circumstantial evidence."  (Tr. 2394-96)  Neither side objected to this approach.  (Tr. 2394-96, 2400, 2404)

As to Question 1B – "Can we draw inferences from state-of-mind documents or only exhibits admitted for evidence?" – the Court stated:

It seems to me that what I need to say on that is with respect to exhibits received only as to state of mind, you can consider them only to the extent you find that they shed light on state of mind, as I have explained on page. . . . 10 to 11 of the instructions.

(Tr. 2398)

Defense counsel objected:  "We think the response to the question should be simply:  Yes, you may draw inferences from state-of-mind documents, and you may draw inferences from exhibits admitted into evidence."  (Tr. 2398-99)

This Court disagreed:

This question gets at what – "For what purposes can state of mind documents be used for?"  I mean, the question is can we draw inferences from state-of-mind documents. Yes, but only as to state of mind.  I have to tell them that.  I cannot allow them to think

that they can rely on state-of-mind exhibits for their truth, so I have to get at that distinction.

And I think the best way to underline that is to refer to the pages where I've made that distinction, so that's what I'm going to do.

(Tr. 2399; <u>see</u> <u>also</u> Tr. 2401-02 ("State-of-mind exhibits can only be relied on for purposes of establishing state of mind.  They can't be relied on for their truth.  So to tell me that I should simply answer 'Yes,' I can't do that, because it would convey to the jury that they can rely on state-of-mind documents for all purposes.  They can't. . . . So, just to be very clear, the jury has set forth a dichotomy.  The dichotomy is 'state-of mind documents,' that's one category.  And then the second category is what they refer to as 'exhibits admitted for evidence,' which I think means for their truth.  And so they've created two categories.  So I need to tell them – the answer to them has to address those two categories and make clear that state-of-mind documents can be considered for purposes of state of mind, and exhibits received for all purposes can be considered for all purposes, including for their truth.  But I can't simply answer 'Yes' to the question.")))

Defense counsel said that he was concerned that the jury might not understand that it could infer, "from the fact that Auerbach and Franklin shared with each other certain text messages, may the[n] infer, logically, reasonably, that Auerbach and Franklin shared that with Mr. Avenatti."  The Court responded that it did not share that concern, "because, yes, they can do that, but, again, only to the extent it sheds light on Mr. Avenatti's state of mind."  (Tr. 2399-2400)  The Court pointed out that it intended to re-read the Court's instruction on evidence received for a limited purpose, which explicitly told the jury that the Franklin-Auerbach text messages "admitted as DX FF-1, FF-1A, and MM-2. . . . were admitted to the extent they shed light on Auerbach's and/or Franklin's state of mind, because their state of mind could have affected what they communicated to Avenatti, and thus affected his state of mind."  (Tr. 2399-

2400; see also Jury Instructions (Dkt. No. 261) at 11-12)  In other words, the jury had been

instructed – and would be instructed again – that it could consider the Franklin-Auerbach text

messages in determining what they had likely communicated to Avenatti.

            After extended colloquy, Defendant asked the Court to provide the following

response to Question 1B:  "yes, subject to the instructions at pages 10 through 12."  (Tr. 2403)

The Court then reviewed with counsel what its response would be.  (Tr. 2403-04)

            The Court then brought out the jury and provided the following response to

Questions 1A and 1B:

> So the first matter on your note is designated "Q1A," which I take to be Question
> 1A.  And it says: "Can we have examples of instructions, page 12, where it says,
> 'There are times...' where appropriate/inappropriate? (Inferences)"  So, first of all,
> I can't give you examples.  I have told you how to go about drawing inferences
> from the evidence, and those instructions are in the section of the charge that
> addresses direct and circumstantial evidence.  That's where the matter of drawing
> inferences is discussed, and I'm going to reread that instruction to you in just a
> moment.
> . . . .
> Then below that is question 1B, and question 1B reads:  "Can we draw inferences
> from state-of-mind documents, or only exhibits admitted for evidence?"  You can
> draw inferences from exhibits that were admitted to demonstrate state of mind,
> but only as to state of mind.  Exhibits received without any limitation may be
> considered by you for all purposes, including for their truth.  But where I admitted
> an exhibit for purposes of demonstrating state of mind, that exhibit can only be
> considered for purposes of state of mind, and not for the truth of the statements
> that were made in that exhibit.
>
> This area is discussed in pages 10 and 11 of the instructions.  So there is an
> instruction number 8 that says, "Evidence Received for a Limited Purpose."  So
> that's the instruction that addresses, among other things, state-of-mind evidence.
> I'm going to read that to you in just a minute.
>
> And then the next instruction is "Direct and Circumstantial Evidence," and that is
> the instruction that addresses, among other things, the drawing of inferences from
> certain facts.  So I'm going to read that to you again also.

So I'm going to start with "Evidence Received for a Limited Purpose," Instruction Number 8, which is on page 10 of your instructions:

(Tr. 2406-08)

The Court then re-read its instructions concerning these matters – found on pages 10 to 12 of the jury instructions.  (Tr. 2408-11; Jury Instructions (Dkt. No. 261) at 11-13)  In re-reading the "Evidence Received for a Limited Purpose" instruction, the Court again told the jury that it could consider the Franklin-Auerbach text messages "to the extent they shed light on Auerbach's and/or Franklin's state of mind, because their state of mind could have affected what they communicated to Avenatti, and thus affected his state of mind."  (Tr. 2409)

Before the jury resumed its deliberations the following morning, Avenatti submitted a proposed supplemental response to the jury's question.  (Feb. 14, 2020 Def. Ltr. (Dkt. No. 264) at 1), Avenatti requested that this Court instruct the jury that "from state of mind documents, you may draw inferences, including an inference that the person who made the statement thereafter acted in accordance with the stated intent."  (Id. at 2)  This Court denied that request, stating that the language in the jury instruction that the Court read the previous day

> is very clear, and the charge had to be very clear in the context of this case, because of the defense's extraordinary focus on numerous text messages between Franklin and Auerbach, none of which Mr. Avenatti ever saw.  The defense spent many hours cross-examining witnesses on these text messages, and one hour of defendant's two-hour summation was spent exclusively on reviewing the testimony concerning the text messages between Franklin and Auerbach, none of which Mr. Avenatti ever saw.
>
> Given the defense approach in this case, it is vitally important that the jury understand what the relevance is of Auerbach's and Franklin's state of mind.  I have given clear instructions on this point.
>
> The additional language proposed in the defendant's February 14, 2020 letter (Docket No. 264) adds nothing, because it states merely that the jury can infer from state-of-mind evidence that the speaker acted in accordance with the intent expressed in the state-of-mind evidence.  I have already told the jury, twice, that

they can consider Franklin and Auerbach's communications in determining "what they communicated to Avenatti."

(Tr. 2414-15)[12]

Avenatti now contends that when the jury asked, "Can we draw inferences from state of mind documents or only exhibits admitted for evidence?" (see Court Ex. 4, Question 1.B; Tr. 2393), the Court "abused its discretion by placing strict limitations on the jury's consideration of inferences that could be drawn from the text messages." (Def. Mot. (Dkt. No. 291) at 38)  Avenatti sought "for the jury to draw an inference that certain states of mind were communicated to Mr. Avenatti." (Id. at 38-39)  According to Avenatti, the Court "should have explained to the jury that they were permitted to infer from a 'state of mind' document that the declarant then acted upon the state of mind and communicated his state of mind to Mr. Avenatti. Instead, the jury was left to believe that, absent evidence that a particular text message was actually shown to Mr. Avenatti, they could not infer that Mr. Auerbach and Coach Franklin communicated their stated desires to him." (Id. at 39 (emphasis in original))

---

[12]  Although the Court stated that it had "twice" instructed the jury that the Franklin-Auerbach text messages could be considered in determining what they had communicated to Avenatti, the Court had actually delivered this instruction three times.  (Tr. 2312, 2388-89, 2408-09)

b.      **Applicable Law**

"It is the responsibility of the trial judge to provide the jury with sufficient instruction to enable it to assess the evidence within the proper legal framework and to reach a rational verdict." United States v. Parker, 903 F.2d 91, 101 (2d Cir. 1990).  In particular, "the court has discretion to respond to jury communications, preferably after consultation with counsel, with supplemental instructions designed to remedy the confusion." Id. at 102.  "The trial judge is in the best position to sense whether the jury is able to proceed properly with its deliberations, and he has considerable discretion in determining how to respond to communications indicating that the jury is experiencing confusion." Id. at 101.

"[A] trial court responding to a note from a deliberating jury is only required to answer the particular inquiries posed.  The trial court enjoys considerable discretion in construing the scope of a jury inquiry and in framing a response tailored to the inquiry." United States v. Rommy, 506 F.3d 108, 126 (2d Cir. 2007) (citing United States v. Young, 140 F.3d 453, 456 (2d Cir. 1998) (response to jury note "is a matter committed to the sound exercise of a trial court's discretion")).  "In doing so, it is not required to reference specific arguments advanced or defenses raised by counsel in urging particular outcomes." Id. at 126-27 (citation omitted).

"[I]nstructions in response to a jury request for clarification require careful consideration because they are likely to have special impact on the jury." King v. Verdone, 1 F. App'x 89, 90 (2d Cir. 2001) (citing Bollenbach v. United States, 326 U.S. 607, 611-12 (1946); Arroyo v. Jones, 685 F.2d 35, 39 (2d Cir. 1982) ("supplemental instructions enjoy special prominence in the minds of jurors because they are freshest in their minds, isolated from the

70

other instructions they have heard, received by the jurors with heightened alertness, and generally have been given in response to a question from the jury" (quotation marks omitted))).

"A jury charge is erroneous if it misleads the jury as to the correct legal standard, or if it does not adequately inform the jury of the law." Hathaway v. Coughlin, 99 F.3d 550, 552 (2d Cir. 1996). "Where a defendant has preserved his claim of error by a timely objection calling the district court's attention to the problem when the court would have the opportunity to fix the error," courts "review a district court's jury charge de novo, and will vacate a conviction for an erroneous charge unless the error was harmless." Nouri, 711 F.3d at 138.

### c.   **Analysis**

Avenatti argues that the jury should have been permitted to infer from the Franklin-Auerbach text messages that Franklin and Auerbach had communicated what they had discussed to Avenatti. According to Avenatti, "[t]he Court's response to the jury note improperly restricted the inferences that the jury should have been permitted to draw. In so doing, the Court abused its discretion. The error deprived Mr. Avenatti of a fair trial." (Def. Mot. (Dkt. No. 291) at 39-40)

The short answer to Avenatti's argument is that – as set forth above – the Court instructed the jury three times that in determining what Franklin and Auerbach had said to Avenatti, they could consider the Franklin-Auerbach text messages. (Tr. 2312, 2388-89, 2408-09)

As discussed above, after the Court responded to the jury's note by telling the jury that it could draw inferences from state of mind evidence, but only as to state of mind, Avenatti asked the Court to give a supplemental instruction telling the jury that "from state of mind documents, you may draw inferences, including an inference that the person who made the

statement thereafter acted in accordance with the stated intent."  (Feb. 14, 2020 Def. Ltr. (Dkt. No. 264) at 2)

The Court stated that it was denying Avenatti's requested supplemental instruction because the Court "ha[d] already told the jury, twice, that they can consider Franklin and Auerbach's communications in determining 'what they communicated to Avenatti.'" (Tr. 2415)  As discussed above, the Court had actually delivered this instruction three times. (Tr. 2312, 2388-89, 2408-09)  Given that this Court instructed the jury three times that they could consider the Franklin-Auerbach text messages in determining what they had communicated to Avenatti, there is no chance that the jury was confused on this score.  The jury was well aware that the Franklin-Auerbach text messages in evidence could be considered in determining what Franklin and Auerbach had communicated to Avenatti, and the effect of their communications on Avenatti's state of mind.  In arguing that "the jury was left to believe that, absent evidence that a particular text message was actually shown to Mr. Avenatti, they could not <u>infer</u> that Mr. Auerbach and Coach Franklin communicated their stated desires to him," (Def. Mot. (Dkt. No. 291) at 39 (emphasis in original)), Avenatti is flatly wrong.

There is another reason why the supplemental language sought by Avenatti was improper.  In asking that the jury be told that, "from state of mind documents, you may draw inferences, including an inference that the person who made the statement thereafter acted in accordance with the stated intent" (Feb. 14, 2020 Def. Ltr. (Dkt. No. 264) at 2), Avenatti suggested a response that went significantly beyond what the jury had asked.  The jury had asked simply, "Can we draw inferences from state of mind documents or only exhibits admitted for evidence?"  (Court Ex. 4; Tr. 2393)  Avenatti's supplemental language told the jury not only that inferences could be drawn from state of mind evidence, but also that a particular type of

inference could be drawn from state of mind evidence.  This suggested response was improper, because it went beyond the question that had been asked.  See Rommy, 506 F.3d at 126-27 ("[A] trial court responding to a note from a deliberating jury is only required to answer the particular inquiries posed.").

In sum, the Court's handling of the jury note marked as Court Exhibit 4 provides no basis for disturbing the jury's verdict.

## II.   AVENATTI'S SUPPLEMENTARY POST-TRIAL APPLICATIONS

In a June 4, 2021 letter, Avenatti complains that the Government improperly failed to produce certain prior statements of Judy Regnier, who was a Government witness at trial.  Avenatti also raises concerns regarding press access to voir dire.  (June 4, 2021 Def. Ltr. (Dkt. No. 315) at 1-2)  In a July 5, 2021 letter, Avenatti moves for a new trial based on the Government's failure to produce Regnier's statements.  (July 5, 2021 Def. Ltr. (Dkt. No. 333))

### A.   Motion to Compel Materials Related to Judy Regnier

Judy Regnier worked as the office manager at Avenatti's law firm for more than a decade.  (Tr. 1399-00)  At trial, Regnier testified that Avenatti's law firm was facing serious financial difficulties in March 2019.  (Tr. 1401-02)  The firm had been evicted from its offices in November 2018 for failure to pay rent, and as of March 2019, the firm's employees were all working from home.  (Tr. 1402)  Between March 15, 2019 and March 25, 2019, Avenatti told Regnier that he was "working on something that could potentially provide [the firm with] a way to . . . resolve a lot of the debt that had currently been hanging over the law firm," and would permit Avenatti to "start a new firm."  (Tr. 1405-06)

Regnier was not a significant witness at trial.  Her testimony spans nine pages of the nearly 2400-page trial transcript.  (Tr. 1398-1407)  The defense did not cross-examine her. (Tr. 1408)

Avenatti now moves to compel the production of "certain notes created during [the Government's] meetings with . . . Regnier," as well as "text messages that . . . Regnier sent [to an SDNY U.S. Attorney's Office agent] before the trial" that Avenatti contends that the agent failed to preserve.  Avenatti also seeks to compel the production of statements Regnier made to an Internal Revenue Service ("IRS") agent working with the U.S. Attorney's Office for the Central District of California on an unrelated prosecution of Avenatti.  (June 4, 2021 Def. Ltr. (Dkt. No. 315) at 1; June 17, 2021 Def. Reply Ltr. (Dkt. No. 323) at 5)

### 1.      **Background**

Charges against Avenatti were filed in Los Angeles on March 22, 2019 (Cmplt. (United States v. Avenatti, No. 19 Cr. 61 (JVS) (C.D. Cal.)), Dkt. No. 1) and in New York on March 24, 2019 (Dkt. No. 1), and Avenatti was arrested in New York on March 25, 2019.[13]  (Tr. 1897; GX S1)  Investigations had proceeded simultaneously in the two districts:  prosecutors in the Central District of California ("CDCA") worked with IRS agents, while prosecutors in this District worked with FBI agents as well as agents attached to the Southern District U.S.

---

[13]  In the Central District of California, Avenatti was charged with ten counts of wire fraud in violation of 18 U.S.C. § 1343, arising out of his alleged embezzlement and misappropriation of settlement funds relating to five clients he had represented; eight counts of tax evasion in violation of 26 U.S.C. § 7202; obstruction of federal tax laws arising out of transfers among bank accounts to hide income; ten counts of willful failure to file tax returns, in violation of 26 U.S.C. § 7203; two counts of bank fraud in violation of 18 U.S.C. §§ 1344(1); identity fraud in violation of 18 U.S.C. § 1028A(a)(1) arising out of his providing false and fraudulent information to obtain loans from Peoples Bank; and four counts of filing a false declaration or making a false oath in a 2017 bankruptcy action relating to his law firm.  (Indictment (United States v. Avenatti, No. 19 Cr. 61 (JVS) (C.D. Cal.)), Dkt. No. 16)  These charges were entirely unrelated to the charges pending against Avenatti in the Southern District of New York.

Attorney's Office.  (June 11, 2021 Govt. Ltr. (Dkt. No. 318) at 2)  The prosecution team in each

district interviewed Regnier before trial.  (See June 4, 2021 Def. Ltr. (Dkt. No. 315) at 4-5; June

17, 2021 Def. Reply Ltr., Ex. A (Dkt. No. 323) at 11-12)

      Members of the CDCA prosecution team interviewed Regnier on March 25, 2019

(3514-001 at 1; June 11, 2021 Govt. Ltr. (Dkt. No. 318) at 2), and IRS agents met briefly with

her again on March 26, 2019.  (3514-014; June 11, 2021 Govt. Ltr. (Dkt. No. 318) at 2)  On

November 19, 2019, members of the CDCA prosecution interviewed Regnier again.[14]  (3514-

012; June 11, 2021 Govt. Lr. (Dkt. No. 318) at 2)  No member of the SDNY prosecution team

was present for the meetings with Regnier on March 25, 2019, March 26, 2019, or November 19,

2019.  (See 3514-001, 3514-014, 3514-012; June 11, 2021 Govt. Ltr. (Dkt. No. 318) at 2)

      Prior to trial, the parties in the SDNY case agreed that the Government would

make an initial production of "material covered by 18 U.S.C. § 3500 on or before January 14,

2020."  (Oct. 17, 2019 Govt. Ltr. (Dkt. No. 68) at 2)  In its January 14, 2020 production, the

Government included, inter alia, an eighteen-page memorandum of interview, dated March 28,

2019, that an IRS agent working with the CDCA prosecution team had prepared based on "notes

made during and immediately after the [March 25, 2019] interview with Judy Regnier."  (3514-

001 at 18)

      On January 23, 2020, the Government produced an IRS agent's one-page March

29, 2019 report summarizing the March 26, 2019 meeting with Regnier.  The IRS agent's report

was based on "notes made during and immediately after the activity with Judy Regnier."  (3514-

014)  The Government also produced an IRS agent's fourteen-page November 25, 2019 report

---

[14]  The CDCA prosecution team questioned Regnier about settlement funds Avenatti had
obtained for clients, the deposit of those funds, and entries into the firm's accounting software.
(3514-012)

summarizing the November 19, 2019 interview of Regnier.  This report was likewise prepared

based on notes made during and after the November 19, 2019 interview of Regnier.  (3514-012

at 14)

The Government did not produce the underlying notes for the March 28, 2019,

March 29, 2019, and November 25, 2019 IRS agent reports, although the Government had

produced notes relating to other memoranda prepared by members of the CDCA prosecution

team.  (June 4, 2021 Def. Ltr. (Dkt. No. 315) at 5; see 3514-017, 3514-018)

On January 16, 2020, the Government produced four pages of handwritten notes

taken during a January 16, 2020 meeting with Regnier.  This meeting had been conducted by

members of the SDNY prosecution team, and the notes were taken by Agent DeLeassa Penland,

who is attached to the SDNY U.S. Attorney's Office.  (3514-010; June 11, 2021 Govt. Ltr. (Dkt.

No. 318) at 2)  Agent Penland's notes include the following statement:  "Concern RE: twitter

posts.  Sent screenshot to SA Penland."  (Id.)  No screenshot message from Regnier to Agent

Penland was produced to the defense.

Avenatti's counsel in United States v. Avenatti, 19 Cr. 374 (JMF) – another

prosecution of Avenatti pending in this District – recently inquired about the screenshot message

allegedly sent to Agent Penland.  The Government informed counsel that "after 'a diligent search

of available emails and text messages,' it was unable to 'locate any record' of the text message

that was, according to SA Penland's notes, 'sent' to [Agent Penland] less than two weeks before

trial."  (June 4, 2021 Def. Ltr. (Dkt. No. 315) at 5-6; see also June 11, 2021 Govt. Ltr. (Dkt. No.

318) at 4)

The Government "asked . . . Regnier's counsel if his client preserved the message

that she sent to the agent.  Although she did not, she remembered sending a screen shot from a

tweet that concerned her to another agent, SA Karlous," who is part of the CDCA prosecution team.  (June 4, 2021 Def. Ltr. (Dkt. No. 315) at 6; June 11, 2021 Govt. Ltr. (Dkt. No. 318) at 4) Regnier's counsel provided the screen shot of the tweet, but not the message, to the Government, who in turn provided it to Avenatti.  (June 4, 2021 Def. Ltr. (Dkt. No. 315) at 6; June 11, 2021 Govt. Ltr., Ex. A (Dkt. No. 318-1))  The tweet was posted by someone not involved with any prosecution of Avenatti, and reads as follows:  "I bet Michael Avenatti [poop emoji] his pants every time he hears Regnier's name [smiley face]."  Another Twitter user – also not involved in the prosecutions of Avenatti – tweeted a reply:  "She better be careful, she might end up like a Clinton witness, desperate man desperate measures. [crying laughing emojis]."  (June 11, 2021 Govt. Ltr., Ex. A (Dkt. No. 318-1))

Despite the reference in Agent Penland's handwritten notes indicating that Regnier said at the January 16, 2020 meeting, "[s]ent screenshot to SA Penland," it is not clear that Regnier in fact sent the screenshot to both Agent Penland and Agent Karlous.  (See June 11, 2021 Govt. Ltr. (Dkt. No. 318) at 10 n.6; 3514-010 at 1)

After Avenatti submitted the instant motion to compel, defense counsel learned that, on June 3, 2021, "CDCA prosecutors . . . produced multiple additional witness statements by Ms. Regnier, including a voice message and at least one email."  (June 17, 2021 Def. Reply Ltr. (Dkt. No. 323) at 5)  This production includes an email that Regnier sent to Agent Karlous on January 14, 2020, along with a screenshot of the tweets quoted above.  In her email, Regnier states that she "felt threatened" by the latter tweet.[15]  (Id.; June 29, 2021 Def. Ltr., Ex. A)

---

[15]  Avenatti does not contend that the other material produced by the CDCA prosecution team on June 3, 2021, is evidence of a Brady/Giglio violation.

2.      **Applicable Law**

a.      **Jencks Act – 18 U.S.C. § 3500**

The Jencks Act provides that, "[a]fter a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement . . . of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified." 18 U.S.C. § 3500(b).  "The term 'statement' . . . means"

> (1) a written statement made by said witness and signed or otherwise adopted or approved by [her];
>
> (2) a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously with the making of such oral statement; or
>
> (3) a statement, however taken or recorded, or a transcription thereof, if any, made by said witness to a grand jury.

18 U.S.C. § 3500(e).

b.      **The Government's *Brady/Giglio* Obligations**

"The government has a duty to disclose evidence favorable to the accused when it is material to guilt or punishment."  United States v. Madori, 419 F.3d 159, 169 (2d Cir. 2005) (citing Brady v. Maryland, 373 U.S. 83, 87 (1963)).  To prove a Brady violation, a defendant must establish that (1) the evidence at issue is "favorable to the accused"; (2) the evidence was "suppressed by the State, either willfully or inadvertently"; and (3) "prejudice . . . ensued" from the lack of disclosure such that it is "material."  Strickler v. Greene, 527 U.S. 263, 281-82 (1999); United States v. Coppa, 267 F.3d 132, 140 (2d Cir. 2001).

As to the first element, evidence that is "favorable to the accused "includes not only evidence that tends to exculpate the accused, but also evidence that is useful to impeach the

credibility of a government witness," that is, <u>Giglio</u> material.  <u>Coppa</u>, 267 F.3d at 139 (citing <u>Giglio v. United States</u>, 405 U.S. 150, 154 (1972)).

        As to the second element, a defendant must show that the Government suppressed evidence, meaning that the Government violated its "affirmative duty to disclose favorable evidence known to it."  <u>United States v. Payne</u>, 63 F.3d 1200, 1208 (2d Cir. 1995).  "'[T]he [G]overnment cannot be required to produce that which it does not control and never possessed or inspected.'"  <u>United States v. Hutcher</u>, 622 F.2d 1083, 1088 (2d Cir. 1980) (quoting <u>United States v. Canniff</u>, 521 F.2d 565, 573 (2d Cir. 1975)).  A prosecutor, however, is "presumed . . . to have knowledge of all information gathered in connection with his office's investigation of the case and indeed 'has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case.'"  <u>United States v. Avellino</u>, 136 F.3d 249, 255 (2d Cir. 1998) (quoting <u>Kyles v. Whitley</u>, 514 U.S. 419, 437 (1995)).

        As to prejudice and materiality, a defendant must show that "'there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different.'"  <u>Turner v. United States</u>, 137 S. Ct. 1885, 1893 (2017) (quoting <u>Cone v. Bell</u>, 556 U.S. 449, 469-70 (2009)).  "A reasonable probability of a different result is one in which the suppressed evidence undermines confidence in the outcome of the trial."  <u>Id.</u> (internal quotation marks omitted) (quoting <u>Kyles</u>, 514 U.S. at 434); <u>see also</u> <u>Strickler</u>, 527 U.S. at 281 ("[T]here is never a real '<u>Brady</u> violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict.").  "Where the evidence against the defendant is ample or overwhelming, the withheld <u>Brady</u> material is less likely to be material than if the evidence of guilt is thin."  <u>United States v. Gil</u>, 297 F.3d 93, 103 (2d Cir. 2002).

"Where impeachment evidence is at issue, such evidence generally is material when 'the witness at issue supplied the only evidence linking the defendant(s) to the crime, or where the likely impact on the witness's credibility would have undermined a critical element of the prosecution's case.'"  United States v. Teman, 465 F. Supp. 3d 277, 335 (S.D.N.Y. 2020) (quoting Payne, 63 F.3d at 1210).  "'In contrast, a new trial is generally not required when the testimony of the witness is "corroborated by other testimony" or when the suppressed impeachment evidence merely furnishes an additional basis on which to impeach a witness whose credibility has already been shown to be questionable.'"  Id. (quoting Payne, 63 F.3d at 1210).

    **3.**    **Analysis**

        **a.**    **Timeliness of Avenatti's Motion to Compel**

Avenatti argues that the Government "should promptly produce all notes reflecting what . . . Regnier said – notes that should have been disclosed before trial per the government's express commitment to comply with the Jencks Act."  (June 4, 2021 Def. Ltr. (Dkt. No. 315) at 3)

The Government argues that Avenatti's motion is untimely under Section 3500.[16] (June 11, 2021 Govt. Ltr. (Dkt. No. 318) at 8-9)  The Second Circuit has held that a defendant "is only entitled to production of [an agent's notes of a witness interview], or to a determination whether they must be produced, if he makes a timely and sufficient motion.  The plain language

---

[16]  The Government also argues that Avenatti waived his claim under Federal Rule of Criminal Procedure 12(b)(3)(e), which requires that a motion for discovery under Rule 16 be made before trial, absent a showing of good cause.  (June 11, 2021 Govt. Ltr. (Dkt. No. 318) at 7-8)  "Federal Rule of Criminal Procedure 16(a)(2) specifically exempt[s] statements [producible under Section 3500] from the scope of pre-trial discovery," however.  United States v. Lester, No. S1 95 CR. 216 (AGS), 1995 WL 656960, at *16 (S.D.N.Y. Nov. 8, 1995).

of . . . 18 U.S.C. § 3500(a) shows that the 'discovery procedure therein outlined applies only to statements that must be produced after a witness testifies at the trial.'" United States v. Scotti, 47 F.3d 1237, 1250 (2d Cir. 1995) (quoting United States v. Giuliano, 348 F.2d 217, 223 (2d Cir. 1965)).  Moreover, a defendant has an "obligation to request production of the statement within a reasonable time proximate to the direct testimony so as to alert the district judge and the government of the nature of his request.  Preferably, that request should be made immediately before, during, or immediately after the direct examination, although circumstances might permit requests at different points during the trial." Id. (quotation marks and citation omitted); see also United States v. Petito, 671 F.2d 68, 73-74 (2d Cir. 1982) (rejecting denial of fair trial claim premised on Government's failure to produce agent's surveillance report; defendant "did not . . . make a motion for production of the report until after trial and has therefore waived any right to relief based on his failure to receive the document at trial"); United States v. Padilla, No. S1 94 CR 313 CSH, 1996 WL 389300, at *1-2 (S.D.N.Y. July 11, 1996) (denying post-trial motion to compel production of Section 3500 material, because defendant had "waived any entitlement to such material by failing to make a timely motion for its production at trial").

Scotti is instructive here.  In Scotti, an FBI agent had taken handwritten notes during a witness interview, and then used those notes to create a formal interview report.  "While the formal interview report was disclosed to Scotti, the handwritten notes were not." Scotti, 47 F.3d at 1249.  "Upon timely motion, and a finding that the notes qualified as [the witness's] statement, the court clearly would have given Scotti the opportunity to use [the agent's] notes to impeach [the witness].  But Scotti's counsel did not move for production of the notes at any time right before or after, or during, the government's direct examination of [the witness], and he

completed his cross-examination without making a Rule 26.2 motion." Id. at 1250.  The Second Circuit held that, given these circumstances, Scotti was not entitled to relief.  Id. at 1251.

Here, the March 28, 2019, March 29, 2019, and November 25, 2019 CDCA IRS agent reports each expressly states that it is based on "notes made during and immediately after [meeting] with Judy Regnier."  (3514-001; 3514-014; 3514-012)  Accordingly, defense counsel was on notice – when counsel received these reports prior to trial – that these reports were premised on notes taken by an agent.  The Government had also produced agent handwritten notes in connection with other agent reports.  Despite having received (1) notice that the three agent reports addressing Regnier were premised on agent notes; and (2) notes in connection with other reports prepared by members of the CDCA prosecution team (see June 4, 2021 Def. Ltr. (Dkt. No. 315) at 5; 3514-018, 3514-019), Avenatti did not request the underlying notes for the Regnier reports.  Avenatti has offered no explanation as to why he did not request these notes before or during trial.

Avenatti instead contends that – contrary to the language of the Jencks Act – he had no obligation to request the notes, because "the government ha[d] agreed to the disclosure in question and confirmed its obligation in an ECF-filed letter."  (June 17, 2021 Def. Reply Ltr. (Dkt. No. 323) at 6-7)  Avenatti cites no case law in support of this assertion, however, and controlling law is to the contrary.  In Scotti, as here, "[t]he government . . .  represented to the court that [the defendant] had all the relevant witness statements."  Scotti, 47 F.3d at 1251.  The Second Circuit nonetheless found that "it was incumbent upon [the defendant] to state that he did not in fact have possession of all relevant witness statements and move that the court determine if the notes must be produced. . . ."  Id.

The cases cited by Avenatti (see June 4, 2021 Def. Ltr. (Dkt. No. 315) at 6-7) are not to the contrary. None of these cases address the circumstances here: a defendant with clear notice prior to trial of material he contends must be produced under Section 3500, but who takes no steps to compel production of such material until nearly sixteen months after the trial ended. See United States v. Hilton, 521 F.2d 164, 165-66 (2d Cir. 1975) (Government "fail[ed] to reveal, before cross-examination of its chief witness . . . , the existence of a letter" sent from the chief witness to the prosecutor); United States v. Bufalino, 576 F.2d 446, 448-49 (2d Cr. 1978) (involving evidentiary hearing – conducted prior to trial – concerning the destruction of interview tapes); United States v. Morell, 524 F.2d 550, 555 (2d Cir. 1975) ("[T]here is presently no indication that anyone in the United States Attorney's Office was aware of the [Brady material at issue] prior to trial."); United States v. Ortega, No. 00 CR. 432 (DLC), 2001 WL 1588930, at *6-7 (S.D.N.Y. Dec. 13, 2001) ("Government failed to notify defense counsel that there was a police-arranged photo identification of Ortega and failed to turn over prior to trial the photographs used in that identification"; Ortega "objected to Detective Santiago's testimony regarding the photo identification and later that same day moved to strike the testimony and for a mistrial on the ground that he had not been informed of the photo identification before trial"); United States v. Nguyen, No. S6 94 CR. 241 (LLS), 1996 WL 26635, at *2 (S.D.N.Y. Jan. 24, 1996) (defense counsel "asked for production of [witness interview] notes" "[b]efore completing his cross-examination" at trial).

Accordingly, to the extent that Avenatti's motion to compel production of agents' handwritten notes of interviews of Regnier is premised on Section 3500, his motion will be denied as untimely.

**b.      Whether the Government Violated *Brady/Giglio***

Avenatti contends that Regnier's messages about the second tweet reflect "fears [that] could have led to biases on which to impeach her," such that the Government was obligated to produce these communications pursuant to Brady/Giglio.  (June 17, 2021 Def. Reply Ltr. (Dkt. No. 323) at 5 (citing United States v. Gil, 297 F.3d 93, 101 (2d Cir. 2002)))

Assuming arguendo that Regnier in fact sent a text message to Agent Penland containing a screenshot of the second tweet, the Government produced notes regarding the January 16, 2020 meeting to Avenatti that same day.  Those notes state that Regnier was "concern[ed]" about "[T]witter posts," and that she had sent a screenshot of the tweet that concerned her to Agent Penland.  (3414-010 at 1)  Accordingly, prior to trial, Avenatti "knew or should have known the essential facts" about this statement by Regnier to the Government – i.e., that she was so concerned about a post on Twitter that she had raised it with the Government. See United States v. Gaggi, 811 F.2d 47, 59 (2d Cir. 1987) ("[N]o Brady violation occurs if the defendant knew or should have known the essential facts permitting him to take advantage of any exculpatory [and impeachment] evidence."); United States v. LeRoy, 687 F.2d 610, 619 (2d Cir. 1982) ("The rationale underlying Brady is not to supply a defendant with all the evidence in the Government's possession which might conceivably assist the preparation of his defense, but to assure that the defendant will not be denied access to exculpatory evidence only known to the Government.").  The Court concludes that Avenatti has not stated a Brady/Giglio violation based on the non-production of the alleged text message from Regnier to Agent Penland.

In support of his Brady/Giglio arguments, Avenatti also cites the Government's failure to produce a January 14, 2020 email from Regnier to Agent Karlous in which Regnier states that she "felt threatened" by the same tweet discussed in Agent Penland's notes.  This

email was produced by the CDCA prosecution team on June 3, 2021, but was not produced to

Defendant prior to trial in the instant case.  (June 17, 2021 Def. Reply Ltr. (Dkt. No. 323) at 5;

June 29, 2021 Def. Ltr.)

        The Government argues generally that it was not obligated to produce materials

held by the CDCA prosecution team.  "'The inquiry is not whether the United States Attorney's

Office physically possesses the discovery material[, however]; the inquiry is the extent to which

there was a "joint investigation" with another agency.'"  United States v. Martoma, 990 F. Supp.

2d 458, 460 (S.D.N.Y. 2014) (quoting United States v. Upton, 856 F. Supp. 727, 750 (E.D.N.Y.

1994)).  "'Where the USAO conducts a "joint investigation" with another state or federal agency,

courts in this Circuit have held that the prosecutor's duty extends to reviewing the materials in

the possession of that other agency for Brady evidence.'"  Id. (quoting United States v. Gupta,

848 F. Supp. 2d 491, 493 (S.D.N.Y. 2012)).

        Here, the Government asserts that the CDCA U.S. Attorney's Office is "a

separate office, which performed a separate investigation, with a separate investigative agency,

and brought separate charges, concerning separate conduct."  (June 11, 2021 Govt. Ltr. (Dkt. No.

318) at 8)  Setting aside the fact that the two offices are components of the same agency – the

U.S. Department of Justice – the two prosecution teams, at least as to Regnier, engaged in joint

and coordinated fact gathering.  On November 20, 2019, the SDNY prosecution team and the

CDCA prosecution jointly interviewed Regnier.  (3514-003)[17]  And on January 9, 2020,

February 4, 2020, and February 5, 2020, when Regnier met with members of the SDNY

prosecution team in New York, members of the CDCA prosecution team participated in these

_____

[17]  Although the memorandum of interview for this meeting refers to November 26, 2019 (see
3514-003), the content of this memorandum closely tracks the content of handwritten notes for a
November 20, 2019 meeting.  (3514-004)

interviews.  (3514-0005; June 4, 2021 Def. Ltr. (Dkt. No. 315) at 4; June 17, 2021 Def. Reply

Ltr., Ex. A (Dkt. No. 323) at 11-12)  Moreover, at an interview in which SDNY prosecutors were

not present, the CDCA prosecutors asked Regnier questions pertaining to Avenatti's interactions

with Nike.  (3514-001 at 14)  Finally, the CDCA prosecution team provided the SDNY

prosecution team with a copy of certain text messages between Regnier and Avenatti which the

CDCA prosecution team had obtained by search warrant.  (3514-003 at 7)

        Two prosecution teams "'are engaged in joint fact-gathering, even if they are

making separate investigatory or charging decisions,'" when the "'degree of cooperation

between agencies' . . . [involves] their coordination in conducting witness interviews and

otherwise investigating the facts of the case."  Martoma, 990 F. Supp. 2d at 461 (quoting Gupta,

848 F. Supp. 2d at 494, 495 ("A 'joint investigation' also does not require a coterminous

investigation. . . . An investigation may be joint for some purposes; it may be independent for

others.")) (determining that the USAO and the SEC were engaged in joint fact-gathering where

they had conferred about their parallel investigations and had jointly conducted interviews, and

where the SEC had provided the USAO with documents it had obtained during its investigation).

        Finally, in producing Regnier statements obtained by CDCA prosecutors at

interviews not attended by SDNY personnel, the Government appears to have acknowledged that

its discovery and Brady/Giglio obligations extended to interviews of Regnier in which the SDNY

prosecution team played no part.  (See June 4, 2021 Def. Ltr. (Dkt. No. 315) at 4-5)

        In short, this Court will go on to consider whether Regnier's statement to Agent

Karlous that she "felt threatened" by a tweet – a statement in the possession of the CDCA

prosecution team but not produced by the SDNY prosecution team – provides a basis to find a

Brady/Giglio violation.

This Court concludes that the Government's failure to produce Regnier's statement to Agent Karlous that she "felt threatened" by a tweet does not constitute a Brady/Giglio violation.  Acknowledging that defense counsel could have cross-examined Regnier as to this statement – including as to whether she was asking the Government to take some action on her behalf – Avenatti does not even argue that cross-examination of Regnier on this point could have changed the outcome of the trial.  See United States v. Bagley, 473 U.S. 667, 682 (1985) (holding that "[undisclosed] evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense the result of the proceeding would have been different").

As discussed above, Regnier was an inconsequential witness.  She had no direct knowledge of, and did not testify concerning, Avenatti's alleged crimes.  To the extent that Regnier's testimony suggests that Avenatti's law firm was in financial distress, there was abundant evidence that Avenatti was in financial distress, including a stipulation that unpaid judgments amounting to $11 million had been entered against Avenatti.  (GX S-4)  Regnier's testimony – which appears on nine pages of the trial transcript – was so inconsequential that defense counsel chose not to cross-examine her.

Given these circumstances, the Government's failure to produce Regnier's statement to Agent Karlous that she "felt threatened" by a tweet does not constitute a Brady/Giglio violation.

\*           \*           \*           \*

For the reasons stated above, Avenatti's motion to compel the production of handwritten notes under Section 3500 is denied.  To the extent that Avenatti argues that the Government's production regarding Regnier violates Brady and Giglio, his application for relief

87

on this point is likewise denied.[18]  Avenattti's motion for a new trial based on the Government's

failure to produce Regnier's statements (July 5, 2021 Def. Ltr. (Dkt. No. 333)) will be denied.

> ### B.  <u>Press Access to *Voir Dire*</u>

Avenatti was simultaneously represented by seven lawyers at trial, at least five of

whom had speaking roles before the jury and/or the Court.[19]  (<u>See</u>, <u>e.g.</u>, Tr. 129 (re-introducing

the defense team to the jury at the start of trial, including "Scott and Howard Srebnick, Mr.

Quinon, Ms. Perry, Mr. Stabile, Mr. Dunlavy, Mr. Barchini"))  In Defendant's June 4, 2021

letter, Benjamin Silverman – a new lawyer for Avenatti who to this Court's knowledge was not

present at trial – contends that the defense was not aware that a pool reporter from the <u>New York</u>

---

[18]  To the extent Avenatti requests an evidentiary hearing regarding his motion to compel the Government to produce 3500 material recently produced in the CDCA case – beyond the alleged <u>Brady/Giglio</u> statements at issue here (June 17, 2021 Def. Reply Ltr. (Dkt. No. 323) at 5, 8)), his application is denied.  Avenatti argues that an evidentiary hearing is required to determine "'whether the suppression [of 3500 material] was deliberate or inadvertent,'" and that if it were deliberate, "a new trial is warranted if the evidence is merely material or favorable to the defense.'"  (<u>Id.</u> at 3 (first quoting <u>United States v. Hilton</u>, 521 F.2d 164, 166 (2d Cir. 1975); then quoting <u>United States v. Jackson</u>, 345 F.3d 59, 77 n.14 (2d Cir. 2003)))

The Regnier 3500 materials produced on June 3, 2021 by the CDCA prosecution team do not satisfy even this low threshold of materiality.  <u>United States v. Bin Laden</u>, 397 F. Supp. 2d 465, 509 n.52 (S.D.N.Y. 2005) (explaining that the <u>Hilton</u> standard is satisfied if 3500 materials "provide for any impeachment of [the witness]"), <u>aff'd sub nom. In re Terrorist Bombings of U.S. Embassies in E. Afr.</u>, 552 F.3d 93 (2d Cir. 2008).  In addition to the email to Agent Karlous regarding the tweet, discussed above, the production contained (1) an email exchange between Regnier and the CDCA prosecution team that post-dated trial in the instant case, (2) a voicemail Regnier left for Agent Karlous that discusses the same information set forth in a memorandum produced in this case (3514-021), and (3) an email exchange between a CDCA prosecutor and Regnier's counsel sharing her contact information.  (June 29, 2021 Def. Ltr, Exs. A, B)  None of this material meets the <u>Hilton</u> standard.

[19]  Howard Srebnick, Scott Srebnick, Jose Quinon, and Danya Perry all had speaking roles before the jury and the Court.  (<u>See</u>, <u>e.g.</u>, Tr. 368 (Howard Srebnick cross-examination of Wilson), 821 (Jose Quinon cross-examination of Auerbach), 1178 (Danya Perry cross-examination of Leinwand), 1442 (Howard Srebnick cross-examination of Homes), 1593 (Scott Srebnick cross-examination of Franklin))  Renato Stabile had a speaking role during <u>voir dire</u>.  (<u>See</u> Tr. 394)

Post attended side bars during voir dire, and that "counsel would have objected if the New York

Post had publicly requested to attend."  (June 4, 2021 Def. Ltr. (Dkt. No. 315) at 8)  Silverman

also says that the Defendant was not aware that jury questionnaires were made available to the

press, and that defense counsel "would have objected" to this disclosure if counsel had known.

(Id. at 9)

   None of the lawyers who represented Avenatti at trial has submitted a declaration

concerning either the presence of the pool reporter at sidebar or the jury questionnaires.

   Neither side made an application prior to or during jury selection to restrict press

or public access to any aspect of the voir dire.

### 1. **Applicable Law**

   A presumption of public and press access applies to criminal proceedings,

including voir dire.  "[T]he Supreme Court has made clear that the presumption of openness

cannot easily be overcome.  In the specific context of access to voir dire examinations, . . . [t]he

presumption of openness may be overcome only by an overriding interest based on findings that

closure is essential to preserve higher values and is narrowly tailored to serve that interest."

ABC, Inc. v. Stewart, 360 F.3d 90, 98 (2d Cir. 2004) (quotation marks and citation omitted).

"The burden is heavy on those who seek to restrict access to the media, a vital means to open

justice."  Id. at 106.

> The Second Circuit has held that intense media attention alone (and the risk that
> prospective jurors will self-censor because of it) is not an adequate basis to completely
> close voir dire proceedings, even in a high-profile case.  [Stewart, 360 F.3d 90 at 106.]
> There must be something more to justify closure, such as previous incidents of improper
> conduct by the media in covering the case, see id., or a "controversial issue to be probed
> in voir dire that might [impair] the candor of prospective jurors," United States v. Shkreli,
> 260 F. Supp. 3d 257, 261 (E.D.N.Y. 2017).  This "something more" will depend on the
> unique circumstances of the case.  See United States v. King, 140 F.3d 76, 82 (2d Cir.
> 1998).

United States v. Loera, No. 09-CR-0466 (BMC), 2018 WL 5624143, at *2 (E.D.N.Y. Oct. 30, 2018).

        In Stewart, the district court had issued an order providing that the "'individual voir dire of each prospective juror will take place in the robing room,'" and that "'no member of the press [could] be present for any voir dire proceedings [to be] conducted in the robing room.'" Stewart, 360 F.3d at 95 (alterations in Stewart).  The Second Circuit ruled that the district court's approach was error, because the district court's "findings were not sufficient to establish a substantial probability that open voir dire proceedings would have prejudiced the defendants' rights to an impartial jury."  Id. at 101.  The court went on to "vacat[e] the portion of the [district court's order] that barred the media from attending the voir dire proceedings held in the district judge's robing room."  Id. at 106.

        To ensure press access to sidebar conferences during voir dire, courts often permit a pool reporter to attend sidebars.  See, e.g., United States v. Shkreli, 260 F. Supp. 3d 257, 261, 263 (E.D.N.Y. 2017) ("Given the interests to be protected at sidebar, including juror privacy, protection of the defendant's trial right to fully examine the juror, and the prevention of juror taint, the court concludes that the presence of an EDNY pool reporter at sidebar will not generally inhibit juror candor."); see also Stewart, 360 F.3d at 94-95 (noting presence of pool reporters during voir dire examinations in the prosecutions of Imelda Marcos and Sheik Omar Abdel Rahman).

        Because neither side had made application to limit press and public access to the voir dire, the voir dire was an open proceeding, and this Court was in no position to make "findings that closure [was] essential to preserve higher values."  Stewart, 360 F.3d at 98.

## 2.   **Background**

Recent Twitter posts from a <u>New York Post</u> reporter are the impetus for

Avenatti's "inquiry" regarding press access to <u>voir dire</u>.  (June 4, 2021 Def. Ltr. (Dkt. No. 315)

at 1-2, 7-9)

Emily Saul, a <u>New York Post</u> reporter who covered Avenatti's trial, recently

tweeted that she "made the request" to attend <u>voir dire</u> sidebars "ahead of trial, met with Judge

Gardephe, and he thought about it and approved the request."[20]  (June 4, 2021 Def. Ltr., Ex. A

(Dkt. No. 315) at 11)  In her tweet, Saul adds that "all media were provided copies of the

questionnaires, courtesy [of] the judge."  (<u>Id.</u>)  Avenatti asserts that he "do[es] not know whether

the reporter's account is accurate; but given her public statement, . . . feel[s] compelled to

inquire."  (<u>Id.</u> at 8)

Jury selection in this case commenced on the morning of January 27, 2020, with

the distribution of a written questionnaire to the jury panel.[21]  (<u>See</u> Dkt. No. 105; <u>Voir Dire</u> Tr. 3-

5 (describing to jurors the purpose of the questionnaire and instructing jurors how to complete

the form))  The Court instructed the panel that "it is critically important that [they] not read

anything about the case," "discuss it with anyone," "let anyone talk to [them] about the case," or

"do any research about the case on the Internet or anyplace else."  (<u>Voir Dire</u> Tr. 5-6)  Prior to

distributing the questionnaire, the Court also addressed confidentiality:  "[i]f you wish your

answers to remain confidential and that they not go beyond the judge, counsel, and the

---

[20]  Saul issued her Twitter posts in connection with Avenatti's efforts to bar press access to <u>voir dire</u> in <u>United States v. Avenatti</u>, 19 Cr. 374 (JMF), a prosecution arising out of Avenatti's representation of Stormy Daniels and his alleged scheme to defraud her of advances she was to receive from a book deal.  (<u>See</u> Indictment (19 Cr. 374, Dkt. No. 1))  Judge Furman has rejected Avenatti's application.  (May 6, 2021 Mem. Op. & Order (19 Cr. 374, Dkt. No. 120))

[21]  Avenatti requested that the Court use a written juror questionnaire.  (<u>See</u> Dkt. No. 76)

defendant, because the answers would subject you to embarrassment, please so indicate at the end of the questionnaire." (Voir Dire Tr. 6)  Accordingly, both the jury panel and counsel understood that the questionnaires were subject to public disclosure absent a request for confidentiality.

After the Court collected the completed questionnaires, it provided copies to both sides, and on the afternoon of January 27, 2020, the Court and counsel discussed the questionnaires.  (Voir Dire Tr. 11)  Many panel members were excused on the basis of their answers to the questionnaire.  (Voir Dire Tr. 14-15, 19-20, 22-26, 28-29, 34, 37, 39-41, 43-45, 47, 54, 56)

As to press access, the Court redacted personal identifying information as to all the potential jurors, and provided a redacted set of questionnaires to Saul, who had been designated by her colleagues as the pool reporter for purposes of the voir dire.

On January 28, 2020, the Court continued the voir dire in the courtroom, beginning with follow-up questions to certain panel members based on their responses to the questionnaire.  Follow-up questioning regarding answers to the questionnaire proceeded at sidebar, in order to avoid tainting the jury panel and/or embarrassing the juror.  (Voir Dire Tr. 83)  The Court then moved on to general questions.  When a panel member wished to discuss his or her answer to a particular question at sidebar, the Court conducted that dialogue at sidebar. (Voir Dire Tr. 206, 208-09)

Defense counsel informed the Court that Avenatti wanted to be present at sidebar conferences.  The Court responded that Avenatti "is welcome to come up.  That is not an issue. He is welcome to come up any time he wants. . . . It is not a problem.  He is welcome here any

92

time. . . . He has a right to be here, and he is welcome every time we have a sidebar." (Voir Dire

Tr. 68-69)

Defense counsel then expressed a concern that because of the presence of a

deputy U.S. marshal, the jury would perceive that Avenatti was in custody.[22] (Voir Dire Tr. 69)

Defense counsel proposed that, "if we're going to question jurors individually, that we do that in

the back . . . ." (Id.) Citing United States v. Martha Stewart, this Court denied that application,

noting that the Second Circuit had found error in a district judge's decision to conduct voir dire

in the robing room. (See Voir Dire Tr. 69-71)

The Court also rejected the notion that the jury panel would notice the presence of

the marshal who, like the lawyers, was dressed in a suit. As noted above, Avenatti was

represented by seven lawyers at trial. Accordingly, the defense team alone accounted for at least

a half-dozen people at sidebars, because Avenatti took up the Court's invitation to attend every

sidebar. The Government was represented by three assistant U.S. attorneys. Given the number

of lawyers at sidebar, it seemed highly unlikely that the jury panel would notice another person

dressed in a suit at sidebar. (Voir Dire Tr. 70-71)

This Court also permitted Ms. Saul – the pool reporter – to attend the sidebar

conferences. Although she was not a disruptive presence at sidebars, her presence was obvious.

She stood within a few feet of the lawyers and Avenatti and – other than Avenatti and the

marshal – she was the only non-advocate at the sidebars, of which there were many. (See Voir

Dire Tr. 84-118, 120-62, 164-205, 217, 226, 231, 260-80, 372, 389) For each sidebar, Saul

would leave the rows where the press was seated and join the lawyers and Avenatti up at the

---

[22] Although this Court had granted pretrial release to Avenatti, the CDCA judge had ordered him detained. (Jan. 14, 2020 Govt. Ltr. (Dkt. No. 145))

bench.  Saul also wrote at least one story that was premised on a sidebar conference.  (See June 4, 2021 Def. Ltr., Ex. E (Dkt. No. 315) at 27 (Emily Saul, Lawyer Linked to Jared Kushner Cut from Jury Pool in Michael Avenatti Case, N.Y. Post, Jan. 28, 2020); Voir Dire Tr. 138-43)  At no point was there any objection to Saul's presence at sidebar.

The background for Saul's presence at sidebars is as follows.  At a pretrial conference in some proximity to the trial, a lawyer informed the Court that the parties had agreed that a pool reporter would be present at sidebars during voir dire.  This representation was made in open court with all counsel present, and may have occurred at the end of a proceeding, when the Court was leaving the bench.  The Court has not been able to locate a transcript page reflecting this representation, and given the number of lawyers present, the Court cannot recall which lawyer made that representation.  The Court does recall that the lawyer stated that recent high-profile cases in this District had addressed press access to voir dire in this fashion.  Accordingly, the Court's understanding – prior to conducting voir dire – was that both sides had consented to the presence of a reporter at sidebar, and nothing that occurred during jury selection disabused the Court of that notion.  To the contrary, there had been no application to restrict press access to voir dire, and no one objected to Saul's obvious presence at sidebars.

The background for the meeting that Saul refers to in her Twitter posts is as follows.  At some point prior to trial, the Court's deputy informed the Court that a reporter wished to speak with the Court.  The reporter was Ms. Saul.  The Court met very briefly with her in the robing room.  There was not a substantive exchange.  She introduced herself as the pool reporter, and assured the Court that she would not be a disruptive presence at sidebars.  Although Saul's Twitter posts indicate that she believes that her presence at sidebar was the result of this brief meeting in the robing room (June 4, 2021 Def. Ltr., Ex. A (Dkt. No. 315) at 11), the Court's

decision on this point was premised on the lawyer's representation that the parties had agreed to the presence of a pool reporter at sidebar, as well as the law granting press access to <u>voir dire</u>.

### 3.   <u>Analysis</u>

Avenatti contends that the Court's disclosure of the jury questionnaires and Saul's presence at sidebars "implicate [his] rights (1) to attend all stages of the trial under Fed. R. Crim. P. 43(a)(2); (2) to have counsel present at all stages and be able to object to important pretrial and trial procedures as required by the Sixth Amendment; (3) to be tried and sentenced without any appearances of partiality; and (4) to have proceedings consistent with due process.  (June 17, 2021 Def. Reply Ltr. (Dkt. No. 323) at 9)  Avenatti does not articulate what relief, if any, he seeks.[23]

While the issue of press access to <u>voir dire</u> calls upon courts "to balance two weighty constitutional rights:  the First Amendment right of the press and of the public to access criminal proceedings and the Sixth Amendment right of criminal defendants to a fair trial," <u>Stewart</u>, 360 F.3d at 93, Avenatti has not articulated how he was prejudiced either by the distribution of redacted jury questionnaires or by a reporter's presence at sidebar.  Moreover, he made no effort prior to or during jury selection to restrict press access to <u>voir dire</u>, despite well-established Supreme Court and Second Circuit case law holding that a "presumption of openness" applies to criminal proceedings, including <u>voir dire</u>.  <u>Id.</u> at 98; <u>see also</u> <u>Press-Enterprise Co. v. Superior Court</u>, 464 U.S. 501, 504-10 (1984).  Indeed, as set forth above, this Court's understanding at trial was that Avenatti had consented to the presence of a reporter at sidebar, and what transpired at sidebar was entirely consistent with that understanding.

---

[23]  Avenatti does not argue that he is entitled to a new trial because of the press access to jury questionnaires and sidebars.  (June 17, 2021 Def. Reply Ltr. (Dkt. No. 323) at 9)

In any event, if Avenatti believed – prior to trial – that press access to <u>voir dire</u> presented a risk to his right to receive a fair trial, it was necessary for him to make an application to restrict press access to <u>voir dire</u>, so that this Court could perform the balancing analysis discussed in <u>Stewart</u>, 360 F.3d 90, <u>United States v. King</u>, 140 F.3d 76, 80-81 (2d Cir. 1998), and <u>Press-Enterprise Co. v. Superior Court</u>, 478 U.S. 1, 14 (1986).  Because he made no such application, this Court was never called upon to conduct such an analysis.

In sum, Avenatti's belated complaints about press access to <u>voir dire</u> provide no basis for this Court to disturb the jury's verdict.

## **<u>CONCLUSION</u>**

For the reasons stated above, Defendant's post-trial motions are denied.  The Clerk of Court is directed to terminate the motions  (Dkt. Nos. 291, 333).

Dated:  New York, New York
       July 6, 2020

SO ORDERED.

Paul G. Gardephe
United States District Judge