

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

December 10, 2021

**BY ECF**

The Honorable Paul G. Gardephe
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

     Re:   ***United States v. Michael Avenatti,***
            **S1 19 Cr. 373 (PGG)**

Dear Judge Gardephe:

     The Government respectfully submits this letter in opposition to the defendant's letter motion, dated December 2, 2021 ("Def. Mot.") (Dkt. No. 358), which asks for an indicative ruling that this Court would grant a motion for a new trial.  This motion is baseless.

     The defendant's motion rests on his repeated assertion that "the government" "suppressed" evidence, specifically, "analyses by an expert, Mr. John Drum, who it had paid over $600,000" to analyze financial records concerning the defendant's law firm.  (Def. Mot. 1.)  According to the defendant, "[t]he government first revealed these analyses in October 2021—eighteen months after the verdict was returned in this case, [and] three months after [the defendant] was sentenced."  (*Id.* at 2.)  This claim is misleading or mistaken at every level:

- The Government came into possession of excerpts of what the defendant terms the "Drum Reports" months *after* the defendant did, when the Government received the defendant's motion and exhibits on December 2, 2021. The defendant only opaquely alludes to this fact in a footnote stating that, by "the government," he is referring without distinction to the United States Attorney's Office for the Central District of California and the United States Attorney's Office for the Southern District of New York.  (*Id.* at 3 n.3.)

- The materials are not exculpatory.  They concern cash flow analyses for years prior and irrelevant to the conduct in this case, for a law firm that was in bankruptcy before the defendant committed the offenses charged in this case.

- The materials provide no information new to the defendant, given that he was well aware of "his own finances" (*id.* at 2 n.1) when he stipulated to the debt evidence offered by the Government at trial and that the Government produced to the defendant before trial records of his own and his law firm's bank accounts.

Honorable Paul G. Gardephe
United States District Judge
December 10, 2021
Page 2

- Even if the materials both were exculpatory and provided facts of which the defendant was not already aware, they still would not be material, as they neither undermine the Government's financial motive evidence nor do they call into question the audio and video files that recorded the defendant committing his crimes or the other evidence in this case.

## I.     Background

### A.     The Trial

On February 14, 2020, the defendant was convicted after trial of all three counts in the Superseding Indictment: (1) interstate threats with intent to extort, in violation of 18 U.S.C. § 875(d); (2) extortion, in violation of 18 U.S.C. § 1951; and (3) honest services wire fraud, in violation 18 U.S.C. §§ 1343 and 1346.  As alleged in the Superseding Indictment and proven at trial, the defendant's criminal conduct occurred entirely in March 2019.

The evidence at trial consisted primarily of video and audio recordings that captured the defendant committing his crimes, as well as testimony regarding the recorded conduct and communications between the defendant and his client, Gary Franklin, Sr.  *See generally United States v. Avenatti*, No. 19 Cr. 373 (PGG), 2021 WL 2809919, at *1-13 (S.D.N.Y. July 6, 2021).  The Government also offered evidence of the defendant's financial motive in the form of a stipulation agreed to by the parties, as well as brief testimony by the defendant's former office manager, Judy Regnier.  *Id.* at *13.  Ms. Regnier testified that, as of March 2019, the defendant's law firm was facing dire financial difficulties.  (Trial Tr. 1401-03.)  Ms. Regnier also testified that the defendant, for whom she worked for eleven years, was a "micromanager" when it came to his law firm's financials, "want[ed] to know everything that went on financially with the firm, whether it be large or small," and was sent the balances in the law firm's bank accounts every day.  (*Id.* at 1400-01.)  The defendant asked Ms. Regnier no questions on cross-examination.  *See Avenatti*, 2021 WL 2809919, at *46.

### B.     The "Drum Reports"

Although the defendant's motion is drafted in such a way as to make it difficult, if not impossible, to determine what relationship, if any, the prosecution team in this case had with John Drum (*see* Def. Mot. 3-4), the prosecution team here has never spoken to Mr. Drum, has no understanding of the results of any work Mr. Drum might have performed aside from what is said in the defendant's motion (and therefore the prosecution team cannot comment on whether what the defendant says in that respect is accurate), and does not have and has never had in its possession any communications with, or draft or final reports by, Mr. Drum, other than the materials appended to the defendant's motion.

In fact, the Government only became aware that Mr. Drum had performed work for the United States Attorney's Office for the Central District of California (the "USAO-CDCA") on March 11, 2020, after the trial in this case, when the Government contacted prosecutors in that office to deconflict with respect to the potential retention of a legal ethics expert—a different person, to testify on a different subject—for the separate prosecution of the defendant before Judge

Honorable Paul G. Gardephe
United States District Judge
December 10, 2021
Page 3

Furman, and in response, the USAO-CDCA provided the Government with a copy of an expert disclosure, dated March 1, 2020, sent to the defendant in connection with his prosecution in the Central District of California. In addition to identifying information for the USAO-CDCA's ethics expert, that letter, which had already been sent to the defendant, referred to Mr. Drum and his analysis. The Government never received Mr. Drum's reports, never had them described, never communicated with Mr. Drum, never paid Mr. Drum, and had no other awareness of Mr. Drum or his analysis save for the summary reference in the expert disclosure previously sent to the defendant by another office and thereafter sent to this office for an unrelated reason.

It appears, based on the defendant's submission, that Mr. Drum was retained as a consultant or expert by the USAO-CDCA and testified as a witness in that office's prosecution of the defendant for conduct not at issue in either of the prosecutions brought against the defendant by the United States Attorney's Office for the Southern District of New York ("USAO-SDNY"). Based on the exhibits attached to the defendant's motion, it appears that Mr. Drum's analysis concerned inflows and outflows from the defendant's prior law firm, Eagan Avenatti LLP, between 2009 and 2018, which was consistent with the time period of the conduct at issue in the USAO-CDCA's case. (*See* Indictment ¶ 6, *United States v. Avenatti*, No. 19 Cr. 61 (JVS) (Dkt. No. 16).)

C.     **The Two Prosecution Teams**

As the Court is aware from prior briefing in this matter, the USAO-SDNY and the USAO-CDCA have conducted their respective investigations and prosecuted their respective cases separately with separate agency partners (FBI-NY for this case, IRS-CI for the USAO-CDCA's investigation). The interactions between the two offices principally have involved deconfliction, as well as accommodating a limited number of specific requests for information transfer between the offices and permitting members of the other office to join or listen to a small number of meetings with certain witnesses of mutual interest, so as to avoid duplication and to respect those witnesses' and their counsels' time. Specifically, the USAO-SDNY and USAO-CDCA met, for mutual convenience, approximately four times together with Ms. Regnier,[1] and one time together with a second witness who did not testify in this case.[2] With respect to Ms. Regnier, as a courtesy and to assist the defendant's preparation for trial, the USAO-SDNY requested from the USAO-

---

[1]     *See* 3514-003 & 3514-004 (Nov. 20, 2019); 3514-005 (Jan. 9, 2020); 3514-024 (Feb. 4. 2020); and 3514-025 (Feb. 5, 2020). Prior to the trial in this case, the USAO-SDNY also met with Ms. Regnier on approximately two occasions without any representative of the USAO-CDCA, *see* 3514-010 (Jan. 16, 2020); 3514-011 (Jan. 17, 2020), and the USAO-CDCA met with Ms. Regnier on at least seven occasions without any representative of the USAO-SDNY, *see* 3514-001 (Mar. 25, 2019); 3514-014 (Mar. 26, 2019); 3514-017 (June 4, 2019); 3514-019 (July 25, 2019); 3514-020 (Oct. 24, 2019); 3514-012 (Nov. 19, 2019); 3514-021 (Dec. 5, 2019).

[2]     *See* 3565-005 (Nov. 20, 2019). Prior to trial in this case, the USAO-SDNY also met with this witness without any representative of the USAO-CDCA, *see* 3565-004 (June 5, 2019), and the USAO-CDCA met with the witness without any representative of the USAO-SDNY, *see* 3565-008 (July 24, 2019).

Honorable Paul G. Gardephe
United States District Judge
December 10, 2021
Page 4

CDCA, and produced to the defendant, the USAO-CDCA's notes of certain meetings it held with Ms. Regnier that the USAO-SDNY did not attend.  *See supra* n.1.

During the course of its investigation of the conduct underlying this prosecution, the USAO-SDNY met at least once with more than approximately 35 other witnesses for a total of more than 100 interviews.  No representative of the USAO-CDCA or its prosecution team had any involvement whatsoever with any of those interviews.  Similarly, the USAO-SDNY did not attend any other interviews conducted by any representative of the USAO-CDCA or its prosecution team. The USAO-SDNY also conducted its own financial analysis, and, as explained above, during the course of its investigation and the trial had no awareness of or involvement with Mr. Drum or any other expert or consultant of the USAO-CDCA and was not aware of any such analyses.

Although the defendant was aware that the USAO-SDNY understood that it was a separate prosecution team from the USAO-CDCA and therefore the USAO-SDNY was not obtaining and producing material that might be in the possession of the USAO-CDCA, the defendant chose not to seek such materials from the USAO-SDNY or make a joint prosecution team motion to obtain discovery until nearly 18 months after the trial here had ended.  (*See* Dkt. No. 315.)

## II.     Applicable Law

### A.     Federal Rules of Criminal Procedure 33 and 37

Rule 33 provides, in relevant part, that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33(a).   "The defendant bears the burden of proving that he is entitled to a new trial under Rule 33."  *United States v. McCourty*, 562 F.3d 458, 475 (2d Cir. 2009).  Because motions for a new trial are strongly disfavored, "the standard for granting such a motion is strict," *United States v. Gambino*, 59 F.3d 353, 364 (2d Cir. 1995), and it should be granted only in "extraordinary circumstances," *McCourty*, 562 F.3d at 475 (internal quotation marks omitted); *United States v. Zagari*, 111 F.3d 307, 322 (2d Cir. 1997); *United States v. Locascio*, 6 F.3d 924, 949 (2d Cir. 1993); *United States v. Spencer*, 4 F.3d 115, 118 (2d Cir. 1993).  The "ultimate test [in deciding a Rule 33 motion] is whether letting a guilty verdict stand would be a manifest injustice . . . .  There must be a real concern that an innocent person may have been convicted." *United States v. Canova*, 412 F.3d 331, 349 (2d Cir. 2005) (internal quotation marks omitted); *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992).  In short, a new trial should not be granted where "[i]t . . . cannot be said . . . that the evidence preponderate[s] heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand."  *Sanchez*, 969 F.2d at 1415 (internal quotation marks omitted) (reversing grant of new trial based on trial court's determination that government witnesses gave perjured testimony).

Federal Rule of Criminal Procedure 37 permits a court, when an appeal is pending, to "(1) defer considering [a Rule 33] motion; (2) deny the motion; or (3) state either that it would grant the motion if the court of appeals remands for that purpose or that the motion raises a substantial issue."  Fed. R. Crim. P. 37(a).  In other words, "the district court retains jurisdiction to deny a Rule 33 motion during the pendency of an appeal, even though it may not grant such

Honorable Paul G. Gardephe
United States District Judge
December 10, 2021
Page 5

motion unless the Court of Appeals first remands the case to the district court." *United States v. Camacho*, 302 F.3d 35, 36 (2d Cir. 2002).

**B.    *Brady v. Maryland*, 373 U.S. 83 (1963)**

"The government has a duty to disclose evidence favorable to the accused when it is material to guilt or punishment." *United States v. Madori*, 419 F.3d 159, 169 (2d Cir. 2005) (citing *Brady v. Maryland*, 373 U.S. 83, 87 (1963)).  To demonstrate a *Brady* violation, a defendant must establish three components: the evidence "must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed . . . either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999); *see Madori*, 419 F.3d at 169; *United States v. Rivas*, 377 F.3d 195, 199 (2d Cir. 2004).

Although the prosecution must disclose evidence known to it that is favorable to the defense, "the government cannot be required to produce that which it does not control and never possessed or inspected." *United States v. Hutcher*, 622 F.2d 1083, 1088 (2d Cir. 1980) (quoting *United States v. Canniff*, 521 F.2d 565, 573 (2d Cir. 1975)); *see also United States v. Rigas*, 583 F.3d 108, 126 (2d Cir. 2009).

"A defendant cannot satisfy the suppression requirement if the defendant, directly or through counsel, either knew, or should have known, of the essential facts permitting him to take advantage of [that] evidence." *Lamberti v. United States*, 22 F. Supp. 2d 60, 66 (S.D.N.Y. 1998), *aff'd, Badalamenti v. United States*, 201 F.3d 430 (2d Cir. 1999); *see also, e.g.*, *United States v. Gaggi*, 811 F.2d 47, 59 (2d Cir. 1987).  "The *Brady* rule is designed to 'assure that the defendant will not be denied access to exculpatory evidence only *known to the Government*.'" *Rigas*, 2008 WL 144824, at *1 (emphasis in original).  "The government must disclose only information which had been known to the prosecution but unknown to the defense." *Id.*

Even if a defendant proves that favorable information was suppressed, there can be no *Brady* violation unless the information at issue is "material," which in this context means that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Madori*, 419 F.3d at 169.  There "is never a real '*Brady* violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." *Strickler*, 527 U.S. at 281; *see also United States v. Payne*, 63 F.3d 1200, 1209 (2d Cir. 1995) ("[H]ence, the undisclosed evidence will be deemed material only if it could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."); *cf. Restrepo*, 533 F. Supp. 2d at 365 ("The test for reasonable probability is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.").  "To make that determination, [a] Court evaluate[s] the withheld evidence in the context of the entire record." *Turner v. United States*, 137 S. Ct. 1885, 1887 (2017).

Honorable Paul G. Gardephe
United States District Judge
December 10, 2021
Page 6

## III.     Discussion

There was no *Brady* violation in this case, and the defendant is not entitled to a new trial. Indeed, the defendant cannot establish any of the three prerequisites to a *Brady* violation, inasmuch as the material that the defendant relies in an effort to disturb the jury's verdict was not suppressed, exculpatory, or material.   Specifically, that material (1) was not in the possession of the Government; (2) is not exculpatory; (3) concerned facts known to the defendant prior to trial; and (4) was not material to the jury's verdict.  The defendant's motion should be denied.

### A.     The Drum Reports Are Not and Were Not in the Possession of the Government

The Government did not "suppress" the Drum Reports because it did not have the reports in its possession at any time prior to the defendant submitting them with his motion.

### 1.     Applicable Law

Discovery and disclosure obligations under Federal Rule of Criminal Procedure 16, *Brady*, 18 U.S.C. § 3500 (the Jencks Act), and otherwise apply only to the material in the possession of the United States.  *See, e.g.*, *United States v. Brennerman*, 818 F. App'x 25, 29 (2d Cir. 2020) (rejecting *Brady* and Jencks Act claim regarding materials allegedly in victim's possession because "government's discovery and disclosure obligations extend only to information and documents in the government's possession"); *Hutcher*, 622 F.2d at 1088 ("Clearly the government cannot be required to produce that which it does not control and never possessed or inspected." (internal quotation marks and citation omitted)); *United States v. Teman*, 465 F. Supp. 3d 277, 337 (S.D.N.Y. 2020) ("The Government's *Brady* obligation does not extend to evidence that it does not know of or that it does not have within its possession.); *Chacko v. United States*, No. 96 Cr. 519 (JGK), 2000 WL 1808662, at *5 (S.D.N.Y. Dec. 11, 2000) ("the Government had no obligation under *Brady* to produce a document it did not possess" (citing *United States v. Pena*, 227 F.3d 23, 27 n.3 (2d Cir. 2000))).  In this context, "the United States" refers not to any component or member of the federal government, but only to the prosecution team in the case at issue.  *See, e.g.*, *United States v. Finnerty*, 411 F. Supp. 2d 428, 432 (S.D.N.Y. 2006).  That individuals "fall under the broad umbrella of the Department of Justice" does not thereby render them part of a same prosecution team.  *Gist v. United States*, No. 16 Cr. 656 (GHW), 2021 WL 3774289, at *17 (S.D.N.Y. Aug. 24, 2021).

In determining the scope of the prosecution team, the pertinent question is whether the person possessing the material at issue "is an 'arm of the prosecutor.'"  *United States v. Blaszczak*, 308 F. Supp. 3d 736, 741 (S.D.N.Y. 2018) (quoting *United States v. Morell*, 524 F.2d 550, 555 (2d Cir. 1975)).  Courts in this district generally look to the following factors in determining whether the prosecution conducted a "joint investigation": (1) whether the other agency participated in the prosecution's witness interviews, (2) whether the other agency was involved in presenting the case to the grand jury, (3) whether the other agency reviewed documents gathered by or shared documents with the prosecution, (4) whether the other agency played a role in the development of prosecutorial strategy, or (5) whether the other agency accompanied the prosecution to court proceedings."  *United States v. Middendorf*, No. 18 Cr. 36 (JPO), 2018 WL

Honorable Paul G. Gardephe
United States District Judge
December 10, 2021
Page 7

3956494, at *4 (S.D.N.Y. Aug. 17, 2018); *see also, e.g.*, *Gist*, 2021 WL 3774289, at *17 (same); *United States v. Carroll*, No. 19 Cr. 545 (CM), 2020 WL 1862446, at *9-10 (S.D.N.Y. Apr. 14, 2020) (citing *Middendorf*); *United States v. Collins*, 409 F. Supp. 3d 228, 239 (S.D.N.Y. 2019) (same); *Blaszczak*, 308 F. Supp. at 741-43.

That certain members of a separate team may have attended interviews conducted by a prosecution team does not render the teams one and the same, particularly where the number of interviews conducted together is relatively small and where the teams do not make joint strategic or prosecutive decisions. *See Collins*, 409 F. Supp. 3d at 241 (no joint investigation where, *inter alia*, two teams "both participated in only 16 of 60 interviews of 37 distinct witnesses"); *see also, e.g.*, *Middendorf*, 2018 WL 3956494, at *4; *Blaszczak*, 308 F. Supp. 3d at 741-43. In any event, "[a]n investigation may be joint for some purposes; it may be independent for others," and therefore even where there are certain joint investigative activities, that does not, without more, give rise to an obligation for the Government to search the entire file of a separate team. *United States v. Gupta*, 848 F. Supp. 2d 491, 495 (S.D.N.Y. 2012) (explaining that even where there is some joint fact-finding, the entirety of the other team's file is not subject to *Brady* review, but rather only those files "arising from . . . joint efforts"); *see also Carroll*, 2020 WL 1862446, at *9 ("joint fact gathering" does not "give rise to an obligation by the Government to review [another team's] entire investigative file"); *United States v. Martoma*, 990 F. Supp. 2d 458, 462 (S.D.N.Y. 2014) (ordering production of specific subset of documents in possession of agency involved in joint fact-finding).

## 2.    Discussion

Throughout his motion, as stated above, the defendant refers repeatedly and without distinction to the USAO-SDNY and the USAO-CDCA as "the government." Yet, the entirety of the analysis supporting the premise that the Government here should be charged with failing to produce reports it never had in its possession is contained in a footnote, in which the defendant— who bears the burden on his motion—asserts without elaboration that "[t]he Court has held that the United States Attorney's Offices in the Southern District of New York (SDNY) and the Central District of California (CDCA) was jointly prosecuting [the defendant] at least as to a witness testifying about [his] finances." (Def. Mot. 3 n.3.) This characterization of the Court's prior decision is not accurate and in any event is not determinative of the issue the defendant now raises.

As the Court is aware, it previously considered whether the fact that a record of a particular statement made by Ms. Regnier to an agent on the USAO-CDCA prosecution team was not produced in this case (as it was not in the USAO-SDNY's possession) constituted a "*Brady/Giglio* violation." *Avenatti*, 2021 WL 2809919, at *44-46. The Court concluded that the statement was not material and no such violation occurred. *Id.* at *46. In deciding to consider the materiality of the statement, rather than resting on the fact that it was not in the prosecution team's possession, the Court observed that the USAO-SDNY and USAO-CDCA engaged in some joint fact-gathering with respect to Ms. Regnier, *id.* at *45, but also adverted to *Martoma*, 990 F. Supp. 2d at 461, and *Gupta*, 848 F. Supp. 2d at 494, 495, quoting *Gupta*'s language that "'[a] 'joint investigation' also does not require a coterminous investigation . . . . An investigation may be joint for some purposes; it may be independent for others." *Avenatti*, 2021 WL 2809919, at *45. In short, this Court did

Honorable Paul G. Gardephe
United States District Judge
December 10, 2021
Page 8

not hold that the USAO-SDNY and USAO-CDCA "were jointly prosecuting [the defendant]" (Def. Mot. 3 n.3), much less that the USAO-SDNY should be charged with failing to produce materials of which it had no awareness or possession and that did not involve Ms. Regnier.

In any event, the defendant is wrong that the Government was responsible for material in the possession of the USAO-CDCA, much less material of which the Government had no knowledge.[3] The USAO-SDNY and the USAO-CDCA did not engage in a joint investigation— and certainly not with respect to the economic analysis at issue here—and the USAO-CDCA was not "an arm of the" USAO-SDNY. *Blaszczak*, 308 F. Supp. 3d at 741. Indeed, of the approximately 120 interviews the USAO-SDNY conducted of over 35 witnesses, the USAO-CDCA attended approximately five interviews involving only two witnesses (*see supra* nn. 1 & 2). *See Collins*, 409 F. Supp. 3d at 241 (no joint investigation where, *inter alia*, two teams "both participated in only 16 of 60 interviews of 37 distinct witnesses"). The USAO-CDCA also had no role in the presentation of this case to the grand jury, and the two offices did not share documents other than in response to a small number of specific, discrete requests for certain materials. Further, the USAO-CDCA played no role in the development of the USAO-SDNY's prosecutorial strategy. Although representatives of the USAO-CDCA were present for the presentment of the defendant upon his arrest on both the USAO-SDNY's and the USAO-CDCA's separate charges in New York and observed a portion of the trial in this case from the public gallery, the USAO-CDCA did not "accompan[y] the prosecution to court proceedings" in this case, and the members of the USAO-SDNY prosecution team have never attended a court proceeding in the USAO-CDCA.[4] These circumstances present even less of a basis for a finding of a joint prosecution team than in other cases where no joint investigation was found. *See, e.g., Gist*, 2021 WL 3774289, at *17; *Carroll*, 2020 WL 1862446, at *9-10; *Collins*, 409 F. Supp. 3d at 239; *Middendorf*, 2018 WL 3956494, at *5; *Blaszczak*, 308 F. Supp. 3d at 741-43.

---

[3]     There is also at least some basis to conclude that the defendant has waived any claim that he should have received from the USAO-SDNY in this matter materials in the possession of the USAO-CDCA. Rule 12 requires that motions for Rule 16 discovery be made prior to trial or be waived. Fed. R. Crim. P. 12(b)(3)(E); *United States v. Klump*, 536 F.3d 113, 120 (2d Cir. 2008); *United States v. Yousef*, 327 F.3d 56, 124-25 (2d Cir. 2003). The defendant's claim that the Government here should have produced the Drum Reports rests on the premise that the Government was responsible for searching USAO-CDCA's files for potentially discoverable material. Yet the defendant never filed a motion in this case suggesting that the Government was obligated to obtain and produce any materials in the possession of the USAO-CDCA. *See, e.g., Collins*, 409 F. Supp. 3d at 241 (resolving pretrial motion seeking Government review of other agency files for *Brady*); *Middendorf*, 2018 WL 3956494, at *4 (same); *Martoma*, 990 F. Supp. 2d at 462 (same). Rather than timely raise the issue to seek discovery, the defendant appears to have "stood mute, gambling on an acquittal while holding this issue in reserve." *United States v. Gersh*, 328 F.2d 460, 463 (2d Cir. 1964) (Friendly, *J.*) (referring to a claim of alleged juror prejudice).

[4]     The defendant did, for reasons unclear to the USAO-SDNY, call as a witness at his trial in the Central District of California an FBI agent who was formerly part of the prosecution team here.

Honorable Paul G. Gardephe
United States District Judge
December 10, 2021
Page 9

Moreover, the USAO-SDNY and the USAO-CDCA did not in any fashion jointly analyze the defendant's former law firm's finances (or the defendant's finances). The Government here has never met or communicated with Mr. Drum regarding this case and, save for the expert disclosure letter the USAO-CDCA sent the USAO-SDNY after the defendant received it and after trial, described above, the Government had no awareness of the Drum Reports prior to the filing of the defendant's motion. That the USAO-SDNY did not communicate with Mr. Drum is not a surprise, because the Drum Reports focus on a time period that is wholly irrelevant to this prosecution. In short, even assuming *arguendo* that the USAO-SDNY engaged in joint fact-gathering with respect to Ms. Regnier, there is no basis whatsoever to conclude that the Government here thereby took on an obligation to search the entirety of the USAO-CDCA's files for financial analysis irrelevant to the case here. *See Carroll*, 2020 WL 1862446, at *9; *Martoma*, 990 F. Supp. 2d at 462; *Gupta*, 848 F. Supp. 2d at 495; *see also United States v. Avellino*, 136 F.3d 249, 255 (2d Cir. 1998) ("[T]he imposition of an unlimited duty on a prosecutor to inquire of other offices not working with the prosecutor's office on the case in question would inappropriately require us to adopt a monolithic view of government that would condemn the prosecution of criminal cases to a state of paralysis." (internal quotation marks and citation omitted)).

## B.      The Drum Reports Are Not Exculpatory

The defendant asserts that "[t]he Drum Reports include charts illustrating that [his] firm, Eagan Avenatti LLP (EA), netted over $75 million in the five years before [he] was arrested and that almost all of that money was transferred either to [him] personally or to entities under his control." (Def. Mot. 4-5.) The defendant emphasizes that "[o]ne chart illustrates that EA had net cash flow of over $20 million annually from 2016 through 2018." (*Id.* at 5.) The defendant does not explain what relevance—even accepting, for present purposes, his characterization of the Drum Reports as correct—positive net cash flows for the defendant's prior law firm during 2018 and before has to this case. The debt evidence offered by the Government in this case concerned the defendant's financial condition in March 2019 (*see* GX S-04; Trial Tr. 1401-03)—about which the Drum Reports are silent—which were indisputable, and to which the defendant stipulated. In any event, evidence that the defendant had previously had a successful law practice, which is what the defendant claims the Drum Reports are about, was put before the jury. (*See, e.g.*, Trial Tr. 902-04.)

The defendant suggests that there may be some inconsistency between those reports and the evidence of his debts, despite him having stipulated to them, because he allegedly could have accessed his firm's inflows. (Def. Mot. 4-5.) However, the defendant omits from his motion that the law firm the finances of which Mr. Drum analyzed—Eagan Avenatti LLP—was in bankruptcy proceedings during 2017 and 2018. The defendant, who bears the burden on his motion, does not even attempt to reconcile this fact with this suggestion of ready access to funds. Indeed, it was as part of those same bankruptcy proceedings that a civil judgment in the amount of $5,054,287.75 was entered against the defendant on November 20, 2018, and was still outstanding as of March 25, 2019, as stipulated to by the defendant at trial. (*See* GX S-04 ¶ 3.)

Moreover, far from being helpful to the defendant in this case, evidence relating to Eagan Avenatti LLP's finances during 2018 and prior would have resulted in the defendant opening the

Honorable Paul G. Gardephe
United States District Judge
December 10, 2021
Page 10

door to inculpatory evidence that he successfully fought to preclude at trial.  For example, had the
defendant introduced evidence to show that his firm had positive net income in those prior years,
the Government would have offered additional evidence regarding that firm's bankruptcy and
severe financial woes.  (*See, e.g.*, Dkt. No. 148 (Government motion seeking admission of
additional evidence regarding financial condition, including regarding debts by Eagan Avenatti
LLP; Dkt. No. 249 (defense motion seeking to preclude cross-examination regarding additional
evidence of financial condition); Dkt. No. 252 (Government opposition seeking to cross-examine
on financial topics).)  And perhaps most importantly, the Government would have offered evidence
of the defendant's theft of client funds during those years.  (*See, e.g.*, Dkt. Nos. 249, 252.)

        In short, the Drum Reports, which appear to analyze cash flows during 2018 and earlier of
a law firm that was bankrupt by the time of the defendant's conduct in this case, does not
undermine the Government's evidence of the defendant's financial condition in 2019, to which the
defendant stipulated, and the accuracy of which he does not contest.  Nor does it otherwise
exculpate the defendant, and would in all likelihood, if introduced by the defendant, have led to
the admission of additional inculpatory evidence.

## C.    The Essential Facts Were Known to the Defendant

        The defendant argues that the Drum Reports are *Brady* material.  The defendant's claim,
however, is not that Mr. Drum's charts and graphs are themselves exculpatory, but that what those
graphs and charges allegedly show about the finances of Eagan Avenatti LLP, and thus, in the
defendant's view, his own finances is.  Indeed, the defendant describes the Drum Reports as
summarizing "his own finances."  (Def. Mot. 2 n.1.)  Of course, the defendant was well aware of
his own finances, and of the records, if any, supporting his view of his finances.  For this reason
alone, the defendant has failed to identify any *Brady* violation.  *See, e.g.*, *United States v. LeRoy*,
687 F.2d 610, 618 (2d Cir. 1982) ("Evidence is not 'suppressed' if the defendant either knew, or
should have known, of the essential facts permitting him to take advantage of any exculpatory
evidence.").  In fact, not only could one reasonably presume that the defendant had an
understanding of his own, small law firm's financial situation, but also the uncontested evidence
in this case demonstrates that the defendant was a "micromanager" when it came to his law firm's
finances, and was provided the balances in the law firm's bank accounts on a daily basis.[5]  (Trial
Tr. 1400-01.)  And in any event, the Government here produced well before trial to the defendant
bank records going back to the beginning of 2018—more than year prior to his criminal conduct—

---

[5]        For the same and other reasons, while the defendant does not frame his motion as based on
newly discovered evidence, it would fail even if so framed.  The burden is on the defendant making
such a claim to satisfy five elements: (1) that the evidence is "newly discovered after trial"; (2) that
"facts are alleged from which the court can infer due diligence on the part of the movant to obtain
the evidence"; (3) that "the evidence is material"; (4) that the evidence "is not merely cumulative
or impeaching"; and (5) that "the evidence would likely result in an acquittal."  *United States v.
James*, 712 F.3d 79, 107 (2d Cir. 2013) (quoting *United States v. Owen,* 500 F.3d 83, 88 (2d Cir.
2007)).  The defendant cannot satisfy any of these elements.

Honorable Paul G. Gardephe
United States District Judge
December 10, 2021
Page 11

not only for Eagan Avenatti LLP,[6] but also for the defendant's other law firms or entities, Avenatti & Associates,[7] Avenatti LLP,[8] and Augustus LLP.[9]  In other words, the Government produced to the defendant the same substantive information that he now claims constitutes *Brady* for the time period remotely relevant to the issues in this case.[10]

Moreover, to the extent that evidence about the defendant's law firm's finances had any relevance at all to this case, it would be to seek to show that the law firm's income went to the defendant and thus provided him with the means to pay his debts.  Indeed, the defendant appears to argue precisely that inference.  (*See* Def. Mot. 4-7.)  But the Government produced the defendant's own bank records, as well as his law firm's, to him well before trial and he made no effort to offer these records into evidence, develop expert analysis of them, or argue that they demonstrated his financial solvency—all, it appears, for the simple reason that they did not support that claim.

### D.     The Drum Reports Are Not Material

In any event, even if the Government had "suppressed" the Drum Reports (and it did not), and the Drum Reports were exculpatory (and they are not), and the defendant were not already aware of the relevant facts underlying those reports (and he was), there would still be no *Brady*

---

[6]     USAO373_00010502-USAO373_00014710 (California Bank & Trust records, produced June 3, 2019); USAO373_00057186-USAO373_00057644, USAO373_00057885-USAO373_00057895, USAO373_00057900-USAO373_00057933 (People's Bank records, produced Jan. 17, 2020).

[7]     USAO373_00014711-USAO373_00014861 (California Bank & Trust records, produced June 3, 2019); USAO373_00048235-USAO373_00048239 (additional California Bank & Trust records, produced Sept. 30, 2019); USAO373_00056420-USAO373_00056928 (additional California Bank & Trust records, produced Jan. 15, 2020).

[8]     USAO373_00023464-USAO373_00023490 (City National Bank records, produced June 3, 2019); USAO373_00049193-USAO373_00049202; USAO373_00049203-USAO373_00049204 (additional City National Bank records, produced Dec. 18, 2019); USAO373_00058251-USAO373_00058355 (JPMorgan Chase records, produced Jan. 21, 2020).

[9]     USAO373_00028783-USAO373_00028824 (Union Bank records, produced June 3, 2019); USAO373_00048382 (additional Union Bank records, produced Oct. 11, 2019).

[10]     Although the Government is not aware of what discovery the USAO-CDCA produced to the defendant, based on the nature of the charges and indictment against the defendant in the Central District of California and the testimony that the defendant cites, it also appears likely that the defendant received bank records going farther back for Eagan Avenatti LLP in discovery in that case—and the defendant makes no claim to the contrary.  If the defendant had these records, for this additional reason, the defendant was aware of essential facts relating to the argument he advances here.  *See United States v. Tuzman*, No. 15 Cr. 536 (PGG), 2021 WL 1738530, at *57 (S.D.N.Y. May 3, 2021) (no *Brady* violation where separate agency produced records in question to the defendant prior to trial).

Honorable Paul G. Gardephe
United States District Judge
December 10, 2021
Page 12

violation in this case because there is no "reasonable probability that the suppressed evidence would have produced a different verdict."  *Strickler*, 527 U.S. at 281.

As an initial matter, as described above, the information contained in the Drum Reports does not undermine the evidence the Government offered at trial or the Government's arguments regarding the defendant's debts and financial condition in March 2019.  Indeed, it is perfectly consistent with the evidence received by the jury.  But even if the Drum Reports did in some way conflict with the evidence of the defendant's debts and financial condition in the time period after that covered by the reports, they certainly would not undermine confidence in the jury's verdict. Quite aside from the fact that the defendant stipulated to having outstanding personal debts of at least approximately $11 million as of March 2019 (GX S-04; *see also* Def. Mot. 6 ("The Drum Reports do not minimize Mr. Avenatti's debts.")), the predominant evidence at trial consisted of video and audio-recordings of the defendant committing his crimes.  There is no reasonable possibility that if the uncontested debt evidence, offered to show the defendant's motive, had been somehow diminished by evidence of earlier success by the defendant's law firm (which it would not have been), the jury would have reached another verdict.  *E.g.*, *Madori*, 419 F.3d at 169.

## IV.     Conclusion

For the foregoing reasons, the defendant's motion should be denied.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By:     s/ _____
Matthew D. Podolsky
Daniel C. Richenthal
Robert B. Sobelman
Assistant United States Attorneys
(212) 637-1947/2109/2616

cc:     (by ECF)

Counsel of Record