LAW OFFICE OF

# BENJAMIN SILVERMAN

224 WEST 30TH ST., SUITE 302
NEW YORK, NY 10001

TEL (212) 203-8074
FAX (646) 843-3938
Benjamin@bsilvermanlaw.com

December 15, 2021

**By ECF**
Honorable Paul G. Gardephe
United States District Judge
Southern District of New York
40 Foley Square
New York, NY 10007

     Re: *United States v. Michael Avenatti*, 19 Cr. 373 (PGG)

Your Honor:

     This reply is respectfully submitted in further support of Michael Avenatti's motion for an indicative ruling (Mot., Dkt. 358) and in response to the government's December 10 opposition (Opp., Dkt. 360). The reports by John Drum (the Drum Reports) contradict the government's trial argument that Mr. Avenatti was in "desperate" financial condition – evidence that the government told the Court went to the "central disputed issue at trial." Dkt. 186 at 1.

     This central part of the government's case was developed jointly with prosecutors in the Central District of California (CDCA). There can be no question about how closely the DOJ lawyers here and in California worked to investigate Mr. Avenatti's finances; the Southern District of New York (SDNY) was therefore required to produce the *Brady* materials that the DOJ lawyers in California possessed on this topic. To avoid this conclusion, the government misuses the "prosecution team" concept in a manner that is inconsistent with both the Court's July 6 ruling and common sense. And while it is true that the two DOJ branches worked separately where they did not have a common interest, they worked together to investigate Mr. Avenatti's finances, which was critical to both cases and which the Drum Reports analyze. Yet the government does not acknowledge any DOJ lawyers' obligation to produce the Drum Reports, which is an exculpatory product of this joint investigation.

     The government does not see why the Drum Reports are material and exculpatory because it does not confront what it argued at trial. Indeed, the government's letter does not even acknowledge its forceful and prominent trial arguments on this topic, including telling the jury that "we are here today" because Mr. Avenatti was in "desperate"

Hon. Paul G. Gardephe
December 15, 2021
Page 2

financial shape and saw "a light at the end of the tunnel." T. 153, 2127, 2280, 2286-2287. The government further feigns financial illiteracy to suggest that debts alone make a person's financial condition "desperate," when the real question is whether the debts are manageable after considering cash flow, income, assets, and expected earnings.

DOJ paid over $600,000 for the Drum Reports to analyze this core issue. But it did not notify Mr. Avenatti that Drum existed until after obtaining the verdict here and did not produce the reports until after the mistrial in California – suppressing analyses that counsel did not even know to request. Withholding the Drum Reports created a skewed view of Mr. Avenatti's finances, which the government then centrally featured at trial. For the foregoing reasons, the Court should issue an indicative ruling that a new trial would be granted under Rule 33 if the case is remanded from the Second Circuit.

I.      **The government should have produced the Drum Reports. Its artificially confined definition of the "prosecution team," which does not comport with either known facts or the law, is an attempt to evade *Brady* obligations and accountability.**

The government's argument that SDNY and CDCA-based DOJ lawyers did not conduct a joint investigation into Mr. Avenatti's finances is belied by undisputed facts and contrary to this Court's previously stated opinion that SDNY and CDCA "engaged in joint and coordinated fact gathering . . . at least as to" the witness called to testify about Mr. Avenatti's finances. *United States v. Avenatti*, 2021 WL 2809919, at *45 (S.D.N.Y. July 6, 2021). That is the very subject that is relevant here – the finances, which Drum analyzed, reaching conclusions that were suppressed. In fact, the government's trial case concerning Mr. Avenatti's finances was primarily developed by the DOJ lawyers in California, who provided the documents and the witness to lawyers in New York – except, the government contends, Drum's exculpatory analyses that DOJ paid to create.

A.      **The DOJ branch offices coordinated from the beginning.**

We know that each of the original criminal complaints against Mr. Avenatti – unsealed together on March 25, 2019 – were coordinated through DOJ's headquarters in Washington (Main Justice). First, DOJ lawyers based in New York and California each obtained search warrants for Eagan & Avenatti LLP's files, including client records, which required approval from a Deputy Attorney General in Washington. USAM § 9-13.410. Second, because the charges against Mr. Avenatti involved a high-profile antagonist of President Trump (*see generally* Dkt. 29 at 27-30), it is implausible that the charges were commenced without communicating with Main Justice.

Given their offices' simultaneous work with Main Justice to initiate this case, it is unsurprising that then-United States Attorneys Geoffrey Berman in SDNY and Nick

Hon. Paul G. Gardephe
December 15, 2021
Page 3

Hanna in CDCA coordinated successive press conferences on the same day, March 25, 2019, to announce Mr. Avenatti's arrest; clearly, their offices had planned that together in advance.

The coordinated press campaign is also demonstrated by the time chosen to arrest Mr. Avenatti. After CDCA obtained an arrest warrant on March 22, 2019 (Ex. B CDCA arrest warrant), FBI agents watched Mr. Avenatti appear in the CDCA courthouse that day in a civil matter, but did not arrest him, presumably because it was a Friday. They instead let him fly to New York – obtaining a search warrant for his phone's GPS data to track him – and then arrested him here on the Monday – with the coordinated press conferences following.

**B.   The government's case concerning Mr. Avenatti's finances was developed by DOJ lawyers in California, who shared their witness and provided their files to counterparts in New York – except, we are told, the Drum Reports.**

In addition to the coordinated press strategies and conferrals with Washington, the SDNY and CDCA lawyers continued to work closely following Mr. Avenatti's arrest, especially to investigate his finances. In fact, as far as we can tell, the case concerning Mr. Avenatti's finances was primarily developed by DOJ lawyers in California and provided to New York to present at this case's trial.

As the government concedes, its trial argument concerning Mr. Avenatti's finances rested on two pillars: (1) documents establishing his debts and (2) testimony by his firm's former office manager, Judy Regnier. Opp. at 2. As described below, it was CDCA-based DOJ personnel who gathered those documents and developed that witness, and who then shared their investigative fruits with colleagues in New York to use at this case's trial.

To establish Mr. Avenatti's debts, the government relied on documents obtained from California, many of which it produced in the ten discovery productions from January 10, 2020, and January 23, which was five days before jury selection. *See* Ex. C (collecting discovery letters). We know that these documents came from California for several reasons. First, when the government contemplated calling a case agent as a summary witness, it produced as her 3500 material an email from CDCA prosecutor Brett Sagel to DOJ personnel in New York concerning money owed to Mr. Avenatti's ex-wife. Ex. A. Sagel wrote to the New York-based prosecutors, "See attached/below from LSA's former attorney." *Id.* "LSA" is Lisa Storie-Avenatti, Mr. Avenatti's ex-wife. The email's use of initials demonstrates that DOJ lawyers in both offices were familiar with each other's shorthand, signaling regular communications among them. Notably, we only have

Hon. Paul G. Gardephe
December 15, 2021
Page  4

this email because one agent on the chain was contemplated as a trial witness; the email was not produced as Rule 16 discovery and we therefore do not know how many similar emails exist. Based on the email's familiar tone, we infer that there are many. Second, documents produced by SDNY from the California State Bar show that the files were first obtained by the CDCA prosecutors and then sent to SDNY prosecutors. *See* Ex. D. Third, most or all of these files are from financial institutions in California (*e.g.*, California Bank & Trust). *See* Ex. C (production letters). The government's own letter acknowledges that it coordinated with prosecutors in California and had accessed and obtained CDCA's documents: "The interactions between the two offices principally have involved . . . accommodating a limited number of specific requests for information transfer between the two offices . . . ." Opp. at 3.

In short, the documents that the government relied on to establish Mr. Avenatti's debts – which, at the Court's behest, led the parties to stipulate to the debts (*see* 1/22/20 Tr. at 17) – were gathered by DOJ personnel in California and then sent to New York. At the same time as these raw documents were being transferred from California to New York, DOJ lawyers were receiving, and suppressing, the Drum Reports – expert analyses that undermined what they were building to be used at the trial in this case.

The second component of the government's case concerning Mr. Avenatti's finances was testimony by Judy Regnier, the former office manager. Ms. Regnier was first interviewed by a CDCA prosecutor in her home in California on the day that Mr. Avenatti was arrested in New York. The CDCA lawyer asked her questions about Mr. Avenatti's work pertaining to both Nike and Stormy Daniels, which underlie the two SDNY indictments. Two months before this case was tried, in November 2019, all three SDNY counsel of record flew to Los Angeles with their agents to meet Regnier at CDCA's offices. Several of the DOJ personnel at those meetings – including Sagel and Karlous – had already received the Drum Reports. Regnier had, up until that time, exclusively interacted with DOJ personnel in California. After the November 2019 meeting, she began to communicate with personnel in New York, continuing for the next two months until her February 2020 trial testimony. In other words, CDCA personnel developed the witness who testified about Mr. Avenatti's finances and then made her available to their colleagues in New York. During this case's trial, CDCA lawyers continued to work with Regnier and their SDNY counterparts to prepare her to testify about Mr. Avenatti's finances – including during mid-trial meetings at Saint Andrew's Plaza. CDCA's role in preparing Regnier is documented in docket entries 315 and 323; the latter contains a summary chart attached as Exhibit A to that letter.

In short, each of the two pillars of the government's case concerning Mr. Avenatti's finances – the documents and the witness – were prepared in close collaboration with CDCA. The joint investigation on this topic is clear.

Hon. Paul G. Gardephe
December 15, 2021
Page 5

### C.    The joint investigation concerning Mr. Avenatti's finances was part of a broader collaboration.

The investigation into Mr. Avenatti's finances was part of a broader collaboration between the DOJ branch offices. According to the FBI 302 documenting Mr. Avenatti's arrest in New York on March 25, 2019, one of the agents who arrested him to face charges on the New York complaint was James Kim, a California-based agent. Ex. E. Kim is pictured in Exhibit F introducing himself to Mr. Avenatti in the interrogation room at Federal Plaza. Mr. Kim was also involved in the preparation and review of the Drum Reports in 2019. *See, e.g.*, Mot., Ex. A at 1144289.

Documents flowed both ways throughout the investigation. When CDCA sought a search warrant for Mr. Avenatti's phone, it told a judge in Los Angeles that documents retrieved by "federal agents in New York" during his arrest were shared with "IRS-CI," Search Warrant Application, *United States v. Avenatti*, 19 Cr. 61 (JVS) (C.D.C.A. Sept. 20, 2021), Dkt. 822-1 (excerpted at Ex. F). The government explains that IRS-CI was the agency handling the tax prosecution against Mr. Avenatti in CDCA. Opp. at 3. In a footnote, CDCA's warrant application states that "[f]ederal agents in New York also seized a black Apple X, a silver Apple MacBook Pro, and a black and grey Apple iPad" and added, "we anticipate receiving forensic images of [the devices]" if found to be accessible by the agents in New York. *Id.*

The government tries to minimize this constant flow of information between CDCA and SDNY by stating that it merely "accomdat[ed] a limited number of specific requests for information transfer between the offices." Opp. at 3. But even the spare documentary evidence that we have establishes more than "limited" or isolated sharing. The government's letter claims that there were only "a small number of specific, discrete requests for certain materials" to be transferred (Opp. at 8), but the emails between the DOJ lawyers suggest ongoing and continuous sharing of information about Mr. Avenatti's finances, Ex. A. Moreover, if the offices shared information that the AUSAs believed would help inculpate and convict Mr. Avenatti, it follows that they should have shared *Brady* materials that were inconsistent with their "central" argument about Mr. Avenatti's finances and favorable to him.

### D.    Four CDCA-based DOJ lawyers and agents received the Drum Reports and worked closely enough with New York that SDNY prosecutors were obligated to produce the reports for use in this case.

There is no question that DOJ lawyers in CDCA withheld the Drum Reports while SDNY prosecutors presented a trial case that was contradicted by those reports' conclusions – depriving Mr. Avenatti (and the jury) of the full context and analyses.

Hon. Paul G. Gardephe
December 15, 2021
Page 6

At least four DOJ personnel in California received the Drum Reports before this case was tried. Two were prosecutors – Brett Sagel and Julian Andre – and two were agents – James Kim and Remoun Karlous. Each of those four is documented to have had the Drum Reports emailed to them before this case's trial. Mot., Ex. A at 1144272, 1144289, 1144316. And each worked closely with lawyers in New York. They are also each at the center of the *Brady* violation requiring a mistrial in California.

Sagel and Andre were at Saint Andrew's Plaza at night during the trial and in the courtroom gallery. They communicated regularly with New York, as indicated by their casual, shorthand email forwarding information about Mr. Avenatti's finances. *See* Ex. A. Sagel and Karlous hosted six New York DOJ personnel (three prosecutors and three agents) at their California office two months before the trial to introduce their witness, Judy Regnier, who provided the trial testimony about Mr. Avenatti's finances. Sagel and Andre then helped to prepare Regnier for her trial testimony here, including in meetings at the USAO in New York the night before she testified about Mr. Avenatt's finances and alleged motive. Regnier was not the only witness who they interviewed together about Mr. Avenatti's finances; at least one other witness, Sean Macias, was also jointly interviewed about that topic.

Leading up to the trial, Sagel and Andre provided the New York-based prosecutors with the documents concerning Mr. Avenatti's debts. At the same time, by suppressing the Drum Reports, they created a distorted picture.

### E.   The government's arguments that there was no joint prosecution do not withstand scrutiny.

Without addressing any of this coordinated work or the central role that CDCA prosecutors played in developing the government's case about Mr. Avenatti's finances, the government makes the non-fact-based argument that there was no joint investigation. The government relies on cases concerning joint work between DOJ lawyers and other agencies; but as the Court has already observed, two United States Attorneys' Offices are "components of the same agency – the U.S. Department of Justice." *Avenatti*, 2021 WL 2809919, at *45.

It is true that "[a]n investigation may be joint for some purposes [and] it may be independent for others." Opp. at 7 (quoting *United States v. Gupta*, 848 F. Supp. 2d 491, 495 (S.D.N.Y. 2012)). That is precisely why the Drum Reports needed to be produced before the trial here. The SDNY and CDCA prosecutors worked closely to investigate Mr. Avenatti's finances – while suppressing the *Brady* material concerning Mr. Avenatti's finances.

To distract from the joint work, the government cites interviews conducted solely

Hon. Paul G. Gardephe
December 15, 2021
Page 7

by New York-based lawyers without their California counterparts present and vice versa – most if not all of them about matters *other than* Mr. Avenatti's finances. Opp. at 4. But the existence of some uncoordinated work does not diminish those topics that were investigated jointly – including the investigation into Mr. Avenatti's financial condition.

The government also tries to artificially exclude "economic analysis" from the scope of its work with CDCA. Opp. at 8. But the government argues that documents from CDCA that underlie the Drum Reports were used in this case, *see* Opp. at 11 & nn.6-9; the exculpatory analyses of those documents is clearly within the scope of the joint investigation.

The government contends that the defense argument is "misleading." Opp. at 1. First, it is supported by the documentary evidence – the two DOJ branch offices coordinated their investigation into Mr. Avenatti and developed their case together, at minimum concerning his finances. Second, the argument is explicit, made above and below the lines (Mot. at 3 n.3, 10), and consistent with the position taken in prior filings (*e.g.*, Dkt. 315 at 3-5, Dkt. 323 at 2-3).

The government is itself misleading when it writes that the CDCA lawyers watched this case's trial "from the public gallery" – suggesting that the DOJ prosecutors from California ambled into the courtroom, unconnected to the lawyers at counsel table and unaware of what Ms. Regnier would testify about. Opp. at 8. Yet the government does not dispute that those same CDCA lawyers were at Saint Andrew's Plaza at night helping to prepare for the next trial day. That they watched the trial from the gallery, where the line assistants' supervisors sit, does not minimize their role in developing the government's financial case.

### F.  The Government misstates the law to evade its *Brady* obligations and avoid accountability.

The government misstates the law when it suggests that Mr. Avenatti waived his right to *Brady* material. *See* Opp. at 4, 8 n.3. Unlike Rule 16 obligations, which generally arise upon a defendant's request, *see* Fed. R. Crim. P. 16(a), defense motions and requests are unnecessary to trigger the government's *Brady* obligations. *See United States v. Coppa*, 267 F.3d 132, 144 (2d Cir. 2001). Instead, the government is affirmatively obligated to produce *Brady* material sufficiently in advance of trial for the defense to investigate effectively. *See United States v. Agurs*, 427 U.S. 97, 110 (1976). Thus, Fed. R. Crim. P. 12(b)(3)(E) (cited at Opp. 8 n.3), is irrelevant, as it explicitly applies to Rule 16 requests. The applicable law here is *Brady* and its progeny, which imposes an affirmative obligation on the government to produce favorable material; no request is

Hon. Paul G. Gardephe
December 15, 2021
Page 8

required.[1]  The government notably declines to address this Court's Rule 5(f) Order reminding the government to abide by its *Brady* obligations. *See* Dkt. 305.

The government's position is contrary to the Supreme Court's directive that prosecutors have "a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case." *Kyles v. Whitley*, 514 U.S. 419, 437 (1995); *United States v. Avellino*, 136 F.3d 249, 255 (2d Cir. 1998) (same). The government protests that it did not know about the Drum Reports, but that is just another way of saying that it did not do what was required under *Kyles* and *Avellino*. DOJ lawyers in SDNY had a pipeline of incoming information from CDCA that they used to build their case about Mr. Avenatti's finances; the emails reveal that they relied on the California-based DOJ lawyers to develop this part of the case for them, *see* Exs. A, D. They were therefore obligated to obtain and produce the exculpatory information as well.

The government protests that SDNY prosecutors "had no knowledge" and "no awareness of the Drum Reports," Opp. at 8, 9, but that misses the point. The "constitutional obligation" to disclose exculpatory information is not "measured by the moral culpability, or willfulness, of the prosecutor." *Agurs*, 427 U.S. at 110. It is instead measured by whether the suppressed evidence was material and exculpatory. *Id.* ("If the suppression of evidence results in constitutional error, it is because of the character of the evidence, not the character of the prosecutor."); *Kyles*, 514 U.S. at 437-38 (regardless of whether the "failure to disclose is in good faith or bad faith[], the prosecution's responsibility for failing to disclose known, favorable evidence rising to a material level of importance is inescapable.").[2]

The Court touched on precisely this issue in its July 6 ruling: "the inquiry is not whether the United States Attorney's Office physically possesses the discovery material . . . . [T]he inquiry is the extent to which there was a 'joint investigation' with another agency" because, where there is a joint investigation, "the prosecutor's duty extends to reviewing the materials in the possession of that other agency for *Brady*

---

[1]  For the avoidance of doubt, the defense made a formal *Brady* request even though it is unnecessary.

[2]  Following a *Brady* violation in *United States v. Pizarro*, 17 Cr. 151 (AJN) (S.D.N.Y.), the government told the Honorable Alison J. Nathan that significant new training on disclosure issues would be instituted. The government's continued misunderstanding of the law – including its misguided suggestion that Mr. Avenatti waived his right to receive *Brady* material because he did not request what the government was obligated to collect and disclose – underscores the need.

Hon. Paul G. Gardephe
December 15, 2021
Page 9

evidence." *Avenatti*, 2021 WL 2809919, at *44 (internal quotation marks and citations omitted). That is why SDNY was obligated to produce Regnier 3500 material reflecting even meetings "in which the SDNY prosecution team played no part." *Id.* at *45.

Thus, given the joint investigation concerning Mr. Avenatti's finances, the government was in fact responsible "to produce materials of which it had no awareness or possession" (Opp. at 8) if DOJ lawyers in CDCA possessed that material and it undermined the government's case that Mr. Avenatti was in "desperate" financial condition.

The government states that it learned about Drum from its CDCA colleagues in March 2020; but contends that it only learned what was in the text of an expert notice, not the exculpatory reports that Drum had by then already produced to DOJ lawyers in California. Opp. at 2-3. That is an extraordinary concession. Although SDNY prosecutors knew, at least as of 18 months ago, that the DOJ colleagues with whom they investigated Mr. Avenatti's finances retained an expert to analyze that very subject, the SDNY prosecutors state that they made no effort to obtain the analyses. *See id.* That is a clear abdication of *Brady* responsibility. *Kyles*, 514 U.S. at 437; *Avellino*, 136 F.3d at 255.

Further still, even after this Court's July 6 ruling that there was a joint investigation at least as to Regnier, the government still did not produce the Drum Reports – even though they are clearly *Giglio* as to that witness because they contradict her testimony that Mr. Avenatti had no access to money. T. 1405-1406. The government failed to produce them before or after trial; and acknowledges its continued failure to obtain them (Opp. at 2) notwithstanding that its *Brady* obligations "are continuing in nature and apply to materials that become known to the Government in the future." Dkt. 305; *see also Kyles*, 514 U.S. at 437.

***

The government does not even address the substantial, documented *Brady* violations requiring a mistrial in California, which involved the same four CDCA prosecutors and agents who received the Drum Reports. *See* Mot. at 3-4. It argues, in effect, that it is not its brother's keeper and cannot be responsible for what its DOJ colleagues in California possessed – even though SDNY prosecutors built their trial argument concerning Mr. Avenatti's finances jointly with the same four prosecutors and agents who suppressed the exculpatory Drum analyses.

The government's argument – that it can benefit from the affirmative case built by its California colleagues while avoiding the consequences of suppressed *Brady* material concerning precisely the topics that it imported to New York – perverts the concept of a "prosecution team" and transforms it into a vehicle for avoiding accountability. *Kyles* and

Hon. Paul G. Gardephe
December 15, 2021
Page 10

*Avellino* do not allow that, and neither should the Court.

## II.    The Drum Reports are material and exculpatory.

Although previously the government described evidence of Mr. Avenatti's financial condition as "central," Dkt. 186 at 1, it now argues that it was immaterial, Opp. at 11-12. The government can only argue that the Drum Reports are not exculpatory by ignoring its central and persistent trial argument that Mr. Avenatti acted out of his "desperate" financial condition – a point that the Drum Reports directly rebut and contradict. As described below, the Drum Reports are both exculpatory and material.

The Drum Reports are exculpatory because they contradict the government's argument to the jury that Mr. Avenatti intended to extort and defraud others to escape his "desperate" financial shape. T. 153, 2127, 2280, 2286-2287. Not a single time in 12 pages does the government's letter even acknowledge that it told the jury, "[W]e are here today" because Mr. Avenatti was in "desperate" financial shape and saw "a light at the end of the tunnel." T. 2280. Nor does the government acknowledge that it stressed this point in all three jury addresses. T. 153, 2127, 2165-2266, 2280, 2286-2287; *see also* Ex. G (excerpts from government summation slides). It told the Court in *in limine* motions that this evidence foreclosed Mr. Avenatti's defense concerning his state of mind, Dkt. 252 at 3, and argued that it went to "***the central disputed issue at trial***." Dkt. 186 (addressing anticipated testimony by Regnier) (emphasis added).

The government also falsely states that Mr. Avenatti's law firm "was bankrupt by the time of the . . . conduct in this case." Opp. at 10. That is inaccurate. Mr. Avenatti communicated with Nike entirely during the week leading up to his arrest when the firm was not in bankruptcy, a fact the government tries to obscure with a muddled timeline. *See id.* at 9-10. And, as the Drum Reports state – directly contradicting what the government is now telling the Court – at least through September 4, 2019, Drum determined the Mr. Avenatti's firm "***is*** a profitable business, with large Net Flows . . . ." Mot., Ex. A at 144299 (quoted at Mot. at 4) (emphasis added). That is hardly a time period that is "irrelevant to this prosecution." Opp. at 9.

The government now tries to re-write its jury arguments by pretending that it focused solely on Mr. Avenatti's debts, rather than his ability to pay those debts (*i.e.*, desperation). Opp. at 9-10. The government refers to "[t]he debt evidence" (*id.*) but that is misleading. The case it presented was about Mr. Avenatti's supposedly "desperate" financial condition – meaning he had no other way out. Debts alone do not make a person desperate. For example, many families hold home mortgages several times the size of their annual incomes; but if the debt is manageable, then no one is desperate. Similarly, in civil litigation where punitive damages are determined in part on a defendant's financial

Hon. Paul G. Gardephe
December 15, 2021
Page 11

condition, judges and juries assess financial condition not just by looking at debts, but by also assets, income, cash flow, and other relevant factors. *See, e.g.*, *Patterson v. Balsamico*, 440 F.3d 104, 122 (2d Cir. 2006). Thus, Philip Morris, after losing a lawsuit, cannot attempt to cap a punitive damages award by claiming it has enormous corporate debt while ignoring its cash flow, revenue, and income. For these reasons, the government's claim not to understand why "positive net cash flows" are significant (Opp. at 9) can only be read as deliberately obtuse. The Drum Reports are exculpatory because they show that Mr. Avenatti's debts were manageable and his cash flow significant; they contradict the government's "central" trial argument that Mr. Avenatti acted out of "desperation."

The government's materiality argument (Opp. at 11-12) is similarly based on overlooking its trial case that Mr. Avenatti's finances are "why we are here today." T. 153, 2127, 2280, 2286-2287. Nor does the government address how the suppressed Drum Reports impacted Mr. Avenatti's ability to testify. *See* Mot. at 9. And it cannot reconcile its present position with what it told the Court before trial: that the financial condition evidence went to the "central disputed issue at trial." Dkt. 186 at 1. The government argued that the financial condition evidence established Mr. Avenatti's "knowledge, intent, and charged conduct." Dkt. 212. Only by ignoring its own jury addresses and prior statements to the Court, and the impact on Mr. Avenatti's decision to testify, can the government claim that the Drum Reports are immaterial.

The government spills much ink on what it says Mr. Avenatti should have done. But it does not address what ***it could not have done*** if it had disclosed the Drum Reports. If the defense were able to counter the government's "desperation" argument with DOJ's $640,000 expert reports, the government would not have been able to open on Mr. Avenatti's "desperation" and pursue that as its *leit motif* throughout the trial, including in its summations. Clearly the Drum Reports are material.

**III.    The government cannot blame Mr. Avenatti for its own failures.**

The government argues that Mr. Avenatti is to blame for not discovering the *Brady* material sooner. Opp. 10-11. It does not, however, dispute what Mr. Avenatti and his counsel did not know and could not have known: the government possessed a $640,000 study that, had it been disclosed, would have entirely undermined the government's opening statement and trial theme. The government opened by telling the jury that it would "learn how desperate the defendant was for money at the time he committed these crimes." T. 153. The government suppressed a report by its own expert showing that its arguments were false; there was no way for Mr. Avenatti or anyone else to know that. *Lewis v. Connecticut Comm'r of Corr.*, 790 F.3d 109, 121 (2d Cir. 2015) ("This requirement speaks to facts already within the defendant's purview, not those that

Hon. Paul G. Gardephe
December 15, 2021
Page  12

might be unearthed."). If the Drum Reports had been produced, the government's opening would have been undercut and its emphasis on Mr. Avenatti's "desperation" in its summations would have had no credibility with the jury.

The government tries to shift the focus from the reports and analyses, which were suppressed, to underlying raw data. It argues that because some, although not all, of the underlying raw data was produced, Mr. Avenatti could have reached Drum's conclusions on his own. *See* Opp. at 10-11 & nn.6-9. But it is the Drum Reports' analyses and conclusions that are exculpatory, not just the data buried in obscure bank statements reflecting thousands of financial transactions. A DNA analogy is illuminative: a murder suspect may know that he was not the person who was at the scene; but if the government has an analysis from its expert that shows the absence of the defendant's DNA, there is no question it would constitute *Brady* material. *Brady* does not allow the government to produce only raw data while withholding the analysis that shows that the government's theory is erroneous.[3]

In any event, the government's suggestion that Mr. Avenatti could have reached the Drum Reports' conclusions from documents that it already produced is mistaken. The key database on which Drum relied was not produced until after this case's trial. The government states that it learned about Drum by reading CDCA's March 1, 2020 expert disclosure. Opp. at 3. That expert disclosure reveals that Drum relied on the "Access database" to create his reports; and that the Access database was first produced to the defense in California on March 1, 2020 – weeks *after* the verdict was reached in this case.[4]  CDCA had provided that database to Drum nearly one year earlier. Ex. H (3/26/19

---

[3]  Similarly, in every DNA case, the government produces both (a) voluminous and complex raw data and (b) a statistic created by algorithmic software stating whether there is an inculpatory or exculpatory likelihood ratio. If the government produced only the raw DNA data while suppressing an exculpatory likelihood ratio, that would be a clear *Brady* violation. And yet that is precisely what the government is saying that it did here: producing voluminous raw data while suppressing the exculpatory analyses.

[4]  The entire passage reads as follows:

> [A]s part of its investigation, IRS-CI created a Microsoft
> Access database summarizing and indexing bank account and
> credit card records relating to defendant and defendant's
> various business entities. A copy of this Access database was
> provided to Mr. Drum to assist him in conducting his
> financial analysis, along with copies of the original bank

Hon. Paul G. Gardephe
December 15, 2021
Page 13

email from Julian Andre to John Drum).

The government suggests that Mr. Avenatti's counsel still could have pieced the analyses together from bank records that SDNY obtained from CDCA and produced – mostly in ten productions between January 10 and January 23, 2020 – just five days before jury selection began. Opp. at 11 nn.6-6; Ex. C. The Court will recall that Mr. Avenatti was remanded on January 15, 2020 – right when the government was obtaining financial documents from CDCA and turning them into eve-of-trial discovery productions. At a conference on January 22, 2020, Mr. Avenatti's counsel told the Court that Mr. Avenatti, who was remanded in Los Angeles and then transported to MCC Unit 10 South, had not been able to view the discovery since his arrest one week earlier. 1/22/20 Tr. at 65. That was the very period when the government was revealing its case concerning his financial condition. Indeed, on the morning that Regnier testified, the government stated that, following numerous *in limine* letters seeking to offer her testimony, it had disclosed the full contents of her anticipated testimony the previous evening (T. 1392-1395) when CDCA personnel were at Saint Andrew's Plaza to help prepare. After learning exactly what Regnier would say, defense counsel had only a few minutes to confer with Mr. Avenatti in the courtroom. *Id.* There was no meaningful opportunity for him to explain anything he knew to his lawyers under these conditions, much less to marshal the materials to establish his case.

The government comes dangerously close to faulting Mr. Avenatti for exercising his right not to testify. It does so with an insidious argument that because his partnership was small, therefore he must have been fully abreast of over $250 million in cash flow – based on thousands of transactions – and resulting net income. But a man can know that his business makes money without knowing the granular details about net inflows or even how to establish that – particularly while incarcerated.

In the end, DOJ paid an eye-popping $640,000 for the Drum Reports. If the analysis were as simple as looking at a few bank statements, there would be no need for an expert. While Mr. Avenatti knew his firm was successful, he did not have the

---

account and credit card records that IRS-CI obtained during its investigation. Mr. Drum and others acting under his supervision audited the Access database to confirm its accurate in all material respects and has confirmed that any specific conclusions he reached are consistent with eh underlying bank account and credit card records. To assist with your preparation for trial, we have also enclosed a copy of the Access database files.

Hon. Paul G. Gardephe
December 15, 2021
Page 14

materials or the analyses to prove it.[5]  The government had the means and the analyses but suppressed them.

## IV.    The Court should re-issue its *Brady* Order.

The government does not address our request that the Court re-issue its *Brady* Order, Mot. at 10, not even to provide a boilerplate response that it is aware of its *Brady* obligations.

Astonishingly, the government did not recalibrate its view of its *Brady* obligations following the Court's July 6 ruling that SDNY and CDCA "engaged in joint and coordinated fact gathering . . . at least as to" the witness called to testify about Mr. Avenatti's finances. *United States v. Avenatti*, 2021 WL 2809919, at *45 (*see* Opp. at 7-8). The Drum Reports are clearly *Giglio* as to the witness, Regnier, as they contradict her testimony about illiquidity. *See* T. 1403-1406. But the government still has not asked its colleagues in DOJ's California office to provide the Drum Reports (Regnier's *Giglio*) and whatever else it presumably possesses from Drum. *See* Opp. at 2 (stating that SDNY prosecutors still have not obtained full Drum Reports, much less other related materials). The government argued that it was not responsible to produce the Regnier *Giglio* material that CDCA possessed, but the Court ruled against it. Yet the government still did not obtain and produce the Drum Reports or other related information, contravening both this Court's decision and its *Brady* responsibilities. *Kyles*, 514 U.S. at 437-38; *Avellino*, 136 F.3d at 255; *see also* Dkt. 305 (admonishing that *Brady* obligations are "continuing in nature").

Given that the government still will not obtain the exculpatory material from its DOJ colleagues in California, and given the documented and extraordinary *Brady* violations emanating from that office, we believe there may be more exculpatory material available – if the government honors its obligations to acquire and produce it. We therefore respectfully request that the Court re-issue its *Brady* order – noting the government's obligation to obtain exculpatory information from its colleagues in California – and require the government to comply promptly.

---

[5]  The record in the California case demonstrates that Mr. Avenatti lost access to his law firm servers from his arrest until after the mistrial was declared. *See generally* Appellant's Brief, *United States v. Avenatti*, 21-50225 (9th Cir. Dec. 7, 2021), Dkt. 29 at 5-14.

Hon. Paul G. Gardephe
December 15, 2021
Page  15


**V.      Conclusion**

    For the foregoing reasons, Mr. Avenatti's motion for an indicative ruling should
be granted and the Court should re-issue its *Brady* Order admonishing the government to
comply with its obligations. In the alternative, we request that the Court order the
government to disclose all communications between the two DOJ offices concerning Mr.
Avenatti and hold a hearing about their joint investigation.

                 Respectfully submitted,

                 /s/ Benjamin Silverman
                 Benjamin Silverman
                 *Attorney for Michael Avenatti*

(Attachments)

cc: Counsel of Record (by ECF)

# Exhibit A

**REDACTED**

# Exhibit B

867363-054

ORIGINAL

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>PLAINTIFF,<br><br>v.<br><br>MICHAEL J. AVENATTI<br><br>DEFENDANT(S) | **WARRANT FOR ARREST**<br><br>*10843809*<br><br>ON COMPLAINT<br><br>CASE NO.: **SA 19 - 2 4 1M** |

To:   UNITED STATES MARSHAL AND ANY AUTHORIZED UNITED STATES OFFICER

**YOU ARE HEREBY COMMANDED** to arrest **MICHAEL J. AVENATTI** and bring

him forthwith to the nearest Magistrate Judge to answer a complaint charging him with

Bank Fraud, in violation of Title 18, United States Code, Section 1344(2), and Wire

Fraud, in violation of Title 18, United States Code, Section 1343.

REC: BY AUSAs Julian L. André and Brett A. Sagel       [Detention]

_March 22, 2019_
Date

Name of Magistrate Judge

DOUGLAS F. McCORMICK
Signature of Magistrate Judge

2019 APR -8 AM 9:12

FILED

CENTRAL DISTRICT COURT
CENTRAL DIST OF CALIF.
SANTA ANA

| RETURN | | |
|---|---|---|
| This warrant was received and executed with the arrest of the above-named defendant at (location): | | |
| DATE RECEIVED | NAME AND TITLE OF ARRESTING OFFICER | SIGNATURE OF ARRESTING OFFICER |
| DATE OF ARREST | | |

DESCRIPTIVE INFORMATION FOR DEFENDANT CONTAINED ON PAGE TWO

WARRANT FOR ARREST ON COMPLAINT                    Page 1 of 4



FILED
CLERK, U.S. DISTRICT COURT

MAR 22 2019

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

ORIGINAL

# SA 19 - 2 4 1M

FINDING RE PROBABLE CAUSE

On _March 22_ , at _4:10_ a/**p.m.**, Special Agent Remoun Karlous of the Internal Revenue Service-Criminal Investigation appeared before me regarding the probable cause arrest of defendant MICHAEL J. AVENATTI, occurring on March 22, 2019, at Los Angeles, California.

Having reviewed the agent's statement of probable cause, a copy of which is attached hereto, the Court finds that there **exists/does not exist** probable cause to arrest the defendant for a violation of  Title 18, United States Code, Section ~~922(g)(1)~~ _1344(1) AND 1343._ _PK_

/ **X** / It is ordered that defendant MICHAEL J. AVENATTI be held to answer for proceedings under Federal Rule of Criminal Procedure 5 / 40 on _March 25, 2019 at 10:00 a.m._

/_____/ It is ordered that defendant MICHAEL J. AVENATTI be discharged from custody on this charge forthwith.

DATED: _March 22, 2019, at 4:10_ a.m./**p.m.**

DOUGLAS F. McCORMICK
UNITED STATES MAGISTRATE JUDGE

LODGED

2019 MAR 22 PM 4:00

CLERK U.S. DISTRICT COURT
CENTRAL DIST OF CALIF.
SANTA ANA

BY _____

# Exhibit C



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

January 10, 2020

**By Email (without enclosure)**

**By USAfx (without cover letter)**

Scott A. Srebnick, Esq.
201 South Biscayne Boulevard, Suite 1210
Miami, FL 33131
Scott@srebnicklaw.com

    Re:    *United States v. Michael Avenatti,*
           **S1 19 Cr. 373 (PGG)**

Dear Mr. Srebnick:

        This letter provides certain materials from NIKE, Inc. ("Nike"), to which we believe your client is not entitled, as a courtesy. We also enclose certain other materials as supplemental discovery pursuant to Federal Rule of Criminal Procedure 16. Specifically, we enclose the following materials, which are stamped with control numbers USAO373_00055881 through USAO373_00055907.

| Files | Bates Range | Designation |
|---|---|---|
| 2019.10.09 Judy Regnier iPhone 8 Plus Clean Report | USAO373_00055881 | Confidential |
| CLE Compliance Certification & Log-in Information | USAO373_00055882-55888 | |
| Nike Documents | USAO373_00055889-55907 | Confidential |

        The production has been shared with you via USAfx.

                 Very truly yours,

                 GEOFFREY S. BERMAN
                 United States Attorney

By: *Robert B. Sobelman*
                 Robert B. Sobelman
                 Matthew D. Podolsky
                 Daniel C. Richenthal
                 Assistant United States Attorneys
                 (212) 637-2616/1947/2109

Enclosure



U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

January 13, 2020

**By Email (without enclosure)**

**By USAfx (without cover letter)**

Scott A. Srebnick, Esq.
201 South Biscayne Boulevard, Suite 1210
Miami, FL 33131
Scott@srebnicklaw.com

> Re:    *United States v. Michael Avenatti*,
>          **S1 19 Cr. 373 (PGG)**

Dear Mr. Srebnick:

This letter provides supplemental discovery in this matter pursuant to Rule 16(a) of the Federal Rules of Criminal Procedure.  Specifically, we enclose the following materials, which are stamped with control numbers USAO373_00055908 through USAO373_00056084.

| Files | Bates Range | Designation |
|---|---|---|
| AT&T Documents | USAO373_00055908-56062 | Confidential |
| Avenatti Tweet | USAO373_00056063 | |
| Sprint Documents | USAO373_00056064-56084 | Confidential |

The production has been shared with you via USAfx.

Very truly yours,

GEOFFREY S. BERMAN
United States Attorney

By: *Robert B. Sobelman*

Robert B. Sobelman
Matthew D. Podolsky
Daniel C. Richenthal
Assistant United States Attorneys
(212) 637-2616/1947/2109

Enclosure

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

January 14, 2020

**By Email (without enclosure)**

**By USAfx (without cover letter)**

Scott A. Srebnick, Esq.
201 South Biscayne Boulevard, Suite 1210
Miami, FL 33131
Scott@srebnicklaw.com

    **Re:**    *United States v. Michael Avenatti,*
             **S1 19 Cr. 373 (PGG)**

Dear Mr. Srebnick:

       This letter provides supplemental discovery in this matter pursuant to Rule 16(a) of the Federal Rules of Criminal Procedure.  We also enclose certain materials of NIKE, Inc. ("Nike") pursuant to the Court's directive of earlier this evening, and re-produce to you certain materials concerning the defendant's web history and searched items, as you requested earlier today.[1] Specifically, we enclose the following materials, which are stamped with control numbers USAO373_00056085 through USAO373_00056419.

| Files | Bates Range | Designation |
|-------|-------------|-------------|
| 2016 & 2017 Payments | USAO373_00056085-56087 | Confidential |
| CA Supreme Documents | USAO373_00056088-56092 | Confidential |
| Jack Guiragosian Documents | USAO373_00056093-56114 | |
| Karen Sunday Documents | USAO373_00056115-56210 | |
| Web History & Searched Items | USAO373_00056211-56212 | |
| Nike Documents | USAO373_00056213-56419 | Confidential |

---

[1]    These materials were emailed to you this afternoon, but we now enclose them in Bates-stamped form.

The production has been shared with you via USAfx.

Very truly yours,

GEOFFREY S. BERMAN
United States Attorney

By: _Robert B. Sobelman_____

Robert B. Sobelman
Matthew D. Podolsky
Daniel C. Richenthal
Assistant United States Attorneys
(212) 637-2616/1947/2109

Enclosure

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

January 15, 2020

**By Email (without enclosure)**

**By USAfx (without cover letter)**

Scott A. Srebnick, Esq.
201 South Biscayne Boulevard, Suite 1210
Miami, FL 33131
Scott@srebnicklaw.com

    **Re:**    *United States v. Michael Avenatti,*
              **S1 19 Cr. 373 (PGG)**

Dear Mr. Srebnick:

        This letter provides supplemental discovery in this matter pursuant to Rule 16(a) of the Federal Rules of Criminal Procedure.  Specifically, we enclose the following materials, which are stamped with control numbers USAO373_00056420 through USAO373_00056950.

| Files | Bates Range | Designation |
|---|---|---|
| California Bank & Trust Documents | USAO373_00056420-56928 | |
| JFL Settlement Agreement | USAO373_00056929-56947 | |
| Regnier Phone Materials | USAO373_00056948-56950 | Confidential |

        The production has been shared with you via USAfx.

            Very truly yours,

            GEOFFREY S. BERMAN
            United States Attorney

By: *Robert B. Sobelman*
            Robert B. Sobelman
            Matthew D. Podolsky
            Daniel C. Richenthal
            Assistant United States Attorneys
            (212) 637-2616/1947/2109

Enclosure

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

January 16, 2020

**By Email (without enclosure)**

**By USAfx (without cover letter)**

Scott A. Srebnick, Esq.
201 South Biscayne Boulevard, Suite 1210
Miami, FL 33131
Scott@srebnicklaw.com

> Re:   *United States v. Michael Avenatti,*
>        **S1 19 Cr. 373 (PGG)**

Dear Mr. Srebnick:

        This letter provides supplemental discovery in this matter pursuant to Rule 16(a) of the Federal Rules of Criminal Procedure.  Specifically, we enclose the following materials, which are stamped with control numbers USAO373_00056951 through USAO373_00056998.

| Files | Bates Range | Designation |
|---|---|---|
| Orange County DCSS Materials | USAO373_00056951-56998 | |

        The production has been shared with you via USAfx.

        Very truly yours,

        GEOFFREY S. BERMAN
        United States Attorney

By: *Robert B. Sobelman*
        Robert B. Sobelman
        Matthew D. Podolsky
        Daniel C. Richenthal
        Assistant United States Attorneys
        (212) 637-2616/1947/2109

Enclosure

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

January 17, 2020

**By Email (without enclosure)**

**By USAfx (without cover letter)**

Scott A. Srebnick, Esq.
201 South Biscayne Boulevard, Suite 1210
Miami, FL 33131
Scott@srebnicklaw.com

Re:     *United States v. Michael Avenatti,*
         **S1 19 Cr. 373 (PGG)**

Dear Mr. Srebnick:

This letter provides supplemental discovery in this matter pursuant to Rule 16(a) of the Federal Rules of Criminal Procedure.  Specifically, we enclose the following materials, which are stamped with control numbers USAO373_00056999 through USAO373_00057933.  Please note that the court documents are certified copies of materials previously produced to you.  If you would like to review the certified copies in hard copy, please let us know.

| Files | Bates Range | Designation |
|---|---|---|
| Avenatti GW Law Transcript | USAO373_00056999-57001 | |
| Certified Court Documents | USAO373_00057002-57184 | |
| California State Bar Recording | USAO373_00057185 | |
| The People's Bank Documents | USAO373_00057186-57933 | |

The production has been shared with you via USAfx.

Very truly yours,

GEOFFREY S. BERMAN
United States Attorney

By: _Robert B. Sobelman_____
    Robert B. Sobelman
    Matthew D. Podolsky
    Daniel C. Richenthal
    Assistant United States Attorneys
    (212) 637-2616/1947/2109

Enclosure



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

January 20, 2020

**By Email (without enclosure)**

**By USAfx (without cover letter)**

Scott A. Srebnick, Esq.
201 South Biscayne Boulevard, Suite 1210
Miami, FL 33131
Scott@srebnicklaw.com

> Re:   *United States v. Michael Avenatti,*
>        **S1 19 Cr. 373 (PGG)**

Dear Mr. Srebnick:

This letter provides certain materials from NIKE, Inc. ("Nike"), to which we believe your client is not entitled, as a courtesy.  We also enclose certain other materials as supplemental discovery pursuant to Federal Rule of Criminal Procedure 16.  Specifically, we enclose the following materials, which are stamped with control numbers USAO373_00057934 through USAO373_00058210.

| Files | Bates Range | Designation |
|---|---|---|
| Nike Meeting Binder Documents | USAO373_00057934-58208 | Confidential |
| Parrish v. Avenatti Judgment | USAO373_00058209-58210 | |

The production has been shared with you via USAfx.

Very truly yours,

GEOFFREY S. BERMAN
United States Attorney

By: *Robert B. Sobelman* _____
Robert B. Sobelman
Matthew D. Podolsky
Daniel C. Richenthal
Assistant United States Attorneys
(212) 637-2616/1947/2109

Enclosure

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

January 21, 2020

**By Email (without enclosure)**

**By USAfx (without cover letter)**

Scott A. Srebnick, Esq.
201 South Biscayne Boulevard, Suite 1210
Miami, FL 33131
Scott@srebnicklaw.com

  Re: *United States v. Michael Avenatti,*
    **S1 19 Cr. 373 (PGG)**

Dear Mr. Srebnick:

  This letter provides supplemental discovery in this matter pursuant to Rule 16(a) of the Federal Rules of Criminal Procedure. Specifically, we enclose the following materials, which are stamped with control numbers USAO373_00058211 through USAO373_00058357. Please note that the Parrish v. Avenatti Judgment is a certified copy of materials previously produced to you. If you would like to review the certified version in hard copy, please let us know.

| Files | Bates Range | Designation |
|---|---|---|
| Bank of America Documents | USAO373_00058211-58227 | |
| California State Bar, Converted Recording | USAO373_00058228 | |
| City National Bank Documents | USAO373_00058229-58250 | |
| JPMorgan Chase Documents | USAO373_00058251-58355 | |
| Parrish v. Avenatti Judgment (Certified Copy) | USAO373_00058356-58357 | |

The production has been shared with you via USAfx.

Very truly yours,

GEOFFREY S. BERMAN
United States Attorney

By: *Robert B. Sobelman*
Robert B. Sobelman
Matthew D. Podolsky
Daniel C. Richenthal
Assistant United States Attorneys
(212) 637-2616/1947/2109

Enclosure



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

January 23, 2020

**By Email (without enclosure)**

**By USAfx (without cover letter)**

Scott A. Srebnick, Esq.
201 South Biscayne Boulevard, Suite 1210
Miami, FL 33131
Scott@srebnicklaw.com

> Re:   ***United States v. Michael Avenatti,***
> **S1 19 Cr. 373 (PGG)**

Dear Mr. Srebnick:

This letter provides supplemental discovery in this matter pursuant to Rule 16(a) of the Federal Rules of Criminal Procedure.  Specifically, we enclose the following materials, which are stamped with control numbers USAO373_00058358 through USAO373_00058708.

| Files | Bates Range | Designation |
|---|---|---|
| Michael Proctor Emails | USAO373_00058358-58369, USAO373_00058422 | |
| Avenatti Tweets | USAO373_00058370-58421 | |
| Certified Court Documents | USAO373_00058423-58703 | |
| Nike Documents | USAO373_00058704-58708 | Confidential |

The production has been shared with you via USAfx.

Very truly yours,

GEOFFREY S. BERMAN
United States Attorney

By: *Robert B. Sobelman*
Robert B. Sobelman
Matthew D. Podolsky
Daniel C. Richenthal
Assistant United States Attorneys
(212) 637-2616/1947/2109

Enclosure

# Exhibit D

**REDACTED**

# Exhibit E



# Exhibit F

17.  On March 25, 2019, federal agents arrested AVENATTI in New York pursuant to a criminal complaint and arrest warrant issued in this district in case number 8:19-MJ-241, as well as pursuant to a separate criminal complaint and arrest warrant issued in the Southern District of New York in case number 19MAG2927.  Simultaneously with AVENATTI's arrest, IRS-CI executed search warrants issued in this district in case numbers 8:19-MJ-243, 8:19-MJ-244, and 8:19-MJ-247 at three locations associated with AVENATTI and EA LLP.  Upon AVENATTI's arrest, federal agents in New York seized several digital devices, forensic copies of which have been provided to IRS-CI (i.e., SUBJECT DEVICES 7 through 9), and miscellaneous documents found in AVENATTI's briefcase, scanned copies of which have been provided to IRS-CI (i.e., SUBJECT DEVICE 10).[9]  There is probable cause to believe that the digital devices and miscellaneous document found on AVENATTI at the time of his arrest (i.e., SUBJECT DEVICES 7 through 10) will contain evidence of the Subject Offenses, including business records, financial documents, and emails.

18.  Following AVENATTI's arrest and the execution of the March 2019 search warrants, IRS-CI learned that in or about November 2018 AVENATTI caused computer servers belonging to EA

---

[9] Federal agents in New York also seized a black Apple iPhone X, a silver Apple MacBook Pro, and a black and grey Apple iPad from AVENATTI upon his arrest.  Currently, the agents in New York are still attempting to gain access to the contents of these three digital devices.  If they are able to access these additional devices, we anticipate receiving forensic images of them and seeking a warrant to search the contents of these devices as well.

# Exhibit G

# Avenatti Had Crushing Debt

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v. -

MICHAEL AVENATTI,

Defendant.

IT IS HEREBY STIPULATED AND AGREED, by and between the United States of
America, by Geoffrey S. Berman, United States Attorney, Matthew D. Podolsky, Daniel C. Richenthal, Attorneys, of counsel, and MICHAEL AVENATTI, the defendant, and his attorney, Scott A. Srebnick, Esq., Jose M. Quiñon, Esq., E. Danya

1. On October 22, 2018, a civil order was entered in the Superior Court of California, County of Orange, against Michael Avenatti, the defendant, requiring Avenatti to pay amounts that totaled approximately $2,219,669.60 as of March 1, 2019, and remained outstanding as of March 25, 2019.

2. On October 26, 2018, a civil judgment was entered in the Superior Court of California, County of Santa Barbara, against Michael Avenatti, the defendant, requiring Avenatti to pay $2,194,301.87, which remained outstanding as of March 25, 2019.

3. On November 20, 2018, a civil judgment was entered in the Superior Court of the State of California, County of Los Angeles—Central District, against Michael Avenatti, the defendant, requiring Avenatti to pay $5,054,287.75, which remained outstanding as of March 25, 2019.

4. On January 4, 2019, a civil order was issued by the State of Washington requiring Michael Avenatti, the defendant, to pay $1,530,216.07, which remained outstanding as of March 25, 2019.

5. The above-referenced judgments represented separate obligations of Michael Avenatti, the defendant.

# Avenatti Had Crushing Debt



*Judy Regnier, Tr. 1569-1570*

# Avenatti Had Crushing Debt



K26dave1                    Regnier – direct                         1406

1  what was owed and start a new firm.
2  Q.  What did you understand him to mean by "clear the deck"?
3  A.  To resolve a lot of the debt that had currently been
4  hanging over the law firm and basically --

7  A.  He -- Michael had said -- we had multiple conversations
8  every day, always had, and he had said that if, you know, we
9  could start a new firm and then he could -- he would be able to
10 live his life as he wanted to live it.
11 Q.  What was the defendant's tone as he was discussing that
12 potential source of income that he told you about?
13 A.  It was upbeat.  He -- it was positive.  It was kind of like
14 he saw the light at the end of the tunnel.

23       MR. SOBELMAN:  No further questions.
24       THE COURT:  All right.
25       MS. PERRY:  Your Honor, may we have just a moment to

                 SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

*Judy Regnier, Tr. 1406*

# Exhibit H

**REDACTED**