LAW OFFICE OF

# BENJAMIN SILVERMAN

224 WEST 30TH ST., SUITE 302
NEW YORK, NY 10001

TEL (212) 203-8074
FAX (646) 843-3938
Benjamin@bsilvermanlaw.com

December 2, 2021

**Memo Endorsed:** The Defendant is directed to file the full transcripts of Exhibits B, C, and E (Dkt. 358).
Dated: December 30, 2021

SO ORDERED.

*/s/ Paul G. Gardephe*

Paul G. Gardephe
United States District Judge

**By ECF**
Honorable Paul G. Gardephe
United States District Judge
Southern District of New York
40 Foley Square
New York, NY 10007

Re: *United States v. Michael Avenatti*, 19 Cr. 373 (PGG)

Your Honor:

On August 24, 2021, after almost six weeks of trial against Michael Avenatti, the Honorable James V. Selna of the United States District Court for the Central District of California (CDCA) found a "*Brady* violation with respect to a very important range of documents relating to the financial affairs of Mr. Avenatti's firm" and declared a mistrial. 10/15/21 Transcript, *United States v. Avenatti*, 19 Cr. 61 (JVS) (C.D.C.A. Oct. 15, 2021), Dkt. 867 at 4. We have since discovered a similar *Brady* violation in this case, one that altered the outcome of the trial and requires a new one.

The government argued throughout the trial – in its opening and both summations, and through its witness examinations – that Mr. Avenatti was in "desperate" financial condition and that "facing a mountain of debts, [he] saw a light at the end of the tunnel." Trial Transcript (T.) 2127. This supposed "desperation" was a cornerstone of the government's case to establish Mr. Avenatti's motive and intent to extort and defraud.

Yet, at the same time, the government suppressed analyses by an expert, Mr. John Drum, who it had paid over $600,000, and who concluded (1) that Mr. Avenatti owned and ran a law practice that received hundreds of millions of dollars from 2009-2018 and generated millions of dollars in annual revenues, a practice that Drum described as "a profitable business with large Net Flows" and (2) Mr. Avenatti enjoyed financial circumstances that were far from "desperate." *See* Ex. A (Drum Reports excerpts) at

Hon. Paul G. Gardephe
December 2, 2021
Page 2

1144299, 1144320.[1]  The government first revealed these analyses in October 2021 – eighteen months after the verdict was returned in this case, three months after Mr. Avenatti was sentenced, and six weeks after the government's suppression of Brady material led to the mistrial in California.

      The suppressed materials powerfully undercut the government's trial theory that Mr. Avenatti acted with intent to extort and defraud. While it told the jury over and over that Mr. Avenatti was "desperate" and had no other way out, it withheld its expert's contrary opinion that Mr. Avenatti's practice was profitable and generated positive cash flow, meaning that he would have been able to generate the cash required to manage his debts without a penny from Nike; thus, the $12 million debt, while appreciable, was manageable given the millions in positive net flows that his firm consistently generated.[2] There is no question that these analyses – directly contradicting the government's trial theory about Mr. Avenatti's motive and intent – are *Brady* that should have been disclosed before the trial.

      We therefore respectfully move for an indicative ruling under Rules 33 and 37(a) addressing the *Brady* violation and informing the Second Circuit that a new trial is necessary. Although Mr. Avenatti's case is presently on direct appeal, which ordinarily precludes the Court from addressing a Rule 33 motion, *see* Fed. R. Crim. P. 33(b)(1), the Court is empowered under Rule 37 to assist the Second Circuit by providing an indicative ruling addressing how it would rule if the case were to be remanded. For the reasons set forth herein, the *Brady* violation warrants a new trial and an indicative ruling is appropriate.

---

[1] The Drum Reports are filed under seal because the government has designated them as "Sensitive" under the governing protective order. We see no reason why Mr. Avenatti should be disallowed from publicly filing the government's analyses of his own finances, but we nonetheless respectfully file the Drum Reports under seal to comply with the government's designation.

[2] Included among the materials were spreadsheets showing Mr. Avenatti's firm received over $250 million during the years 2011 to 2018, with some years totaling more than $40 million in cash inflow. Ex. A at 1144346-1144353, 114420-114427.

I. **John Drum was retained by the government in February 2019. His relevant analyses were sent to prosecutors on a rolling basis throughout 2019, but they were suppressed until two months ago.**

The government retained John Drum in February 2019 to examine Mr. Avenatti's and his firms' finances.[3] It ultimately paid him over $640,000 for his reports and analyses. Ex. B (8/12 transcript excerpts) at 52-53. Drum produced detailed charts and graphs that he provided to the government in 2019, well in advance of this case's January and February 2020 trial. The government did not, however, even disclose that it retained Drum until March 1, 2020, two weeks after it secured Mr. Avenatti's conviction in this case. And that disclosure was in the California case, not this one.

Drum ultimately testified for the government at Mr. Avenatti's July/August 2021 trial in CDCA. Under cross-examination, he disclosed for the first time that he had over two years of written communications between him and the government that had not been produced as required. *See* Motion for Mistrial, *United States v. Avenatti*, No. 19 Cr. 61 (JVS) (C.D.C.A. Aug. 14, 2021), Dkt. 705 at 4-5. When Mr. Avenatti raised this matter to the Court, the government claimed – falsely – that it had "virtually nothing" in its files from Drum, while simultaneously asserting that his materials were protected by the work product doctrine even though the Supreme Court established 45 years before that work product must be produced if it is covered by the Jencks Act, *Goldberg v. United States*, 425 U.S. 94 (1976). Ex. C (8/13 transcript excerpts) at 5. Mr. Avenatti, in turn, filed a motion to strike the Drum testimony and for a mistrial. *See* Motion for Mistrial, *United States v. Avenatti*, No. 19 Cr. 61 (JVS) (C.D.C.A. Aug. 14, 2021), Dkt. 705 at 4-5.

On August 15, the government filed 389 pages of undisclosed Drum documents for *in camera* review. *See* Ex. D. The next day, the defense received an email from a government lawyer stating: "Per the Court's order this afternoon, please see attached our *in camera* filing from this weekend. The Court directed us to file this under seal, which we will be doing shortly, and provide a copy to defendant." *Id.* The production contained hundreds of pages of undisclosed *Brady* and Jencks Act material. The court then deferred

---

[3] The Court has held that the United States Attorney's Offices in the Southern District of New York (SDNY) and the Central District of California (CDCA) were jointly prosecuting Mr. Avenatti at least as to a witness testifying about Mr. Avenatti's finances. *United States v. Avenatti*, 2021 WL 2809919, at *44-45 (S.D.N.Y. July 6, 2021). "The government" is therefore used to describe both offices of the Department of Justice.

Hon. Paul G. Gardephe
December 2, 2021
Page  4

ruling on the mistrial motion pending the government's opposition.

On August 24, the court granted a different mistrial motion relating to the government's failure to produce other financial information relating to Mr. Avenatti's firm, finding "a Brady violation with respect to a very important range of documents relating to the financial affairs of Mr. Avenatti's firm." 10/15/21 Transcript, *United States v. Avenatti*, 19 Cr. 61 (JVS) (C.D.C.A. Oct. 15, 2021), Dkt. 867 at 4 (attached hereto as Exhibit F). During the hearing, the court found that Mr. Avenatti suffered substantial prejudice due to the government's suppression of evidence:

> I find that prejudice occurred here in a number of ways. I think the defendant was denied an opportunity to craft his overall theory of the case and presentation, including the opening statement, by not having this additional material. I believe that the defense was prejudiced in its ability to cross-examine certain witnesses, in particular, Mr. Drum.
>
> At page 5 of his most recent report at Docket 775, Mr. Avenatti outlines a number of things that he could have done had he had the Tabs information, including cross-examination of certain witnesses, ability to question the government's preparation techniques generally, and so on. I won't repeat those.

Ex. E (8/24 transcript excerpts) at 62-63.

In October, following repeated demands by Mr. Avenatti and failures by the government to produce additional Drum materials, the government finally acquiesced and produced the Drum Reports – an additional 443 pages of information, including charts and tables that Drum created for the government throughout 2019. The previously unproduced documents include charts illustrating Mr. Avenatti's substantial net positive cash flow from 2009-2018, which often times was many millions per year, leading Drum to conclude as of September 4, 2019 – four months before this case's trial – that Mr. Avenatti's firm "is a profitable business, with large Net Flows . . ." Ex. A at 1144299.

## II.   The Drum Reports reveal Mr. Avenatti's access to enormous cash flow.

The Drum Reports include charts illustrating that Mr. Avenatti's firm, Eagan Avenatti LLP (EA), netted over $75 million in the five years before Mr. Avenatti was arrested and that almost all of that money was transferred either to Mr. Avenatti

Hon. Paul G. Gardephe
December 2, 2021
Page 5

personally or to entities under his direct control.[4]  Ex. A at 1144299, 1144399. One chart illustrates that EA had net cash flow of over $20 million annually from 2016 through 2018.

### III. The Drum Reports undercut the government's trial argument about Mr. Avenatti's motive and intent.

The Drum Reports contradict the government's core argument to the jury in this case that Mr. Avenatti acted with intent to extort and defraud. The government argued that Mr. Avenatti had to extort Nike because he was mired in debt, desperately seeking $12 million to cover expenses, with no way out. T. 2166. It told the jury during its opening that Mr. Avenatti extorted and defrauded others because "the scheme stood to make him the very millions he needed." T. 151 The government claimed the jury would "learn how desperate the defendant was for money at the time he committed these offenses" because of "the debts the defendant owed, many millions of dollars." T. 153.

It told the jury in summation that Mr. Avenatti was "[d]esperately in need of money," in "desperate times" and therefore approached Nike "to line his pockets." T. 2180, 2186-2187. It made this a centerpiece of its summation, telling the jury:

> And that is why we are here today. Because Michael Avenatti, facing a mountain of debts, saw a light at the end of the tunnel.

T. 2127

It then argued in its rebuttal summation that Mr. Avenatti faced "desperate times" and was "desperately in need of money – and, by the way that's undisputed." T. 2280, 2286-2287.

But it knew that the undisclosed Drum Reports indicated just the opposite – that Mr. Avenatti's practice had a history of positive cash flow, thus easily enabling him to manage these debts and establishing a state of mind consistent with this fact.

The government similarly argued in an *in limine* motion that if Mr. Avenatti were

---

[4] At all relevant times, Mr. Avenatti owned between 75-100% of his law practice and generated nearly all of the firm's business and revenues. EA was an established firm co-founded in 2007.

to testify, cross examination about his finances would be vital to proving his criminal intent:

> [I]t is notable that, to date, the defendant has repeatedly – and falsely – suggested to the jury, through the cross-examination of others, that at the relevant time, he had easy access to substantial sums of money. . . . [I]t is an entirely proper subject for cross-examination, including with respect to contemporaneous debts not in evidence, because these facts rebut any suggestion of an innocent explanation for the defendant's conduct.

Dkt. 252 at 3. Yet while the government derided as "false" Mr. Avenatti's claims that he was able to manage his debts and claimed that Mr. Avenatti had no other way out, it suppressed its own expert's reports and graphs concluding that Mr. Avenatti's practice generated enormous annual cash flow sufficient to manage even $12 million in debts.

The Court was persuaded by the government's argument and, accordingly, ruled that Mr. Avenatti could be cross examined about his finances if he testified:

> [E]vidence of Mr. Avenatti's desperate financial condition – the more than $11 million in debt he had accrued in the months immediately preceding March 2019 – is relevant to his motive for committing the charged offenses. As I have ruled multiple times, evidence of Mr. Avenatti's desperate financial condition – the more than $11 million in debt he had accrued in the months immediately preceding March 2019 – is relevant to his motive for committing the charged offenses. Indeed, the testimony of his office manager – Judy Regnier – indicates that in [a] conversation with her, Mr. Avenatti linked his allegedly criminal activity in March 2019 with his desire to "clear the decks" of his debt.

T. 1821-1822 (internal citations omitted). At the same time the government persuaded the Court that Mr. Avenatti's situation was "desperate" – implying that his debts were substantially greater than he could reasonably be expected to repay or manage – it kept to itself Drum's $640,000 charts and analyses revealing just the opposite.

The Drum Reports do not minimize Mr. Avenatti's debts; but they make clear that the cash flow that he received from his law practice prior to his indictments was

Hon. Paul G. Gardephe
December 2, 2021
Page  7

sufficient to manage them and that Mr. Avenatti was hardly in "desperate" shape or lacking means to pay his debts without extorting or defrauding Nike. Drum's analyses undermine the cornerstone of the government's argument about Mr. Avenatti's motive and intent when he approached Nike.

**IV.    The Court should issue an indicative ruling providing that a new trial would be ordered under Rule 33 if this case is remanded.**

**A.    The remedy for material *Brady* violations is a new trial.**

"The government has a duty to disclose evidence favorable to the accused when it is material to guilt or punishment." *United States v. Avenatti*, 2021 WL 2809919, at *41 (S.D.N.Y. July 6, 2021) (Gardephe, J.) (quoting *United States v. Madori*, 419 F.3d 159, 169 (2d Cir. 2005)). A new trial should be granted under Rule 33 when the government violates *Brady v. Maryland*, 373 U.S. 83, 87 (1963) where (1) the government engaged in "suppression" of evidence that (2) is favorable to defendant and (3) the evidence is material. *Moore v. Illinois*, 408 U.S. 786, 794–95 (1972); *United States v. Payne*, 63 F.3d 1200, 1208 (2d. Cir.1995). The government has an affirmative duty to disclose exculpatory evidence known to it even absent a specific request. *United States v. Agurs*, 427 U.S. 97, 108–110 (1976); *United States v. Bagley*, 473 U.S. 667, 682 (1985).). A Rule 33 motion is appropriate in "the most extraordinary cases," *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001), like the instant one in which the government suppressed expert analyses directly undercutting its jury argument.

**B.    The Court is empowered to issue an indicative, or advisory, ruling while the appeal is pending.**

Generally, a Rule 33 motion cannot be granted while an appeal is pending. Fed. R. App. P. 33(b)(1). Rule 37, however, provides that "[i]f a timely motion is made for relief that the court lacks authority to grant because of an appeal that has been docketed and is pending, the court may: (1) defer considering the motion; (2) deny the motion; or (3) state either that it would grant the motion if the court of appeals remands for that purpose or that the motion raises a substantial issue." Fed. R. Crim. P. 37(a).[5]

---

[5] Even absent an indicative ruling, the Rule 33 motion needs to be filed at this time to be entered within three years of the verdict and therefore timely under Fed R. Crim. P. 33(b)(1).

### C. The government suppressed material *Brady* documents and a new trial is necessary.

The government suppressed expert analyses that would have pulled the rug out from underneath its trial argument about Mr. Avenatti's state of mind – his motive and intent. The Drum Reports were emailed to government lawyers in May and September 2019 – well in advance of the 2020 trial in this case. Ex. A at 1144299, 1144399. Yet the government did not disclose them until after Mr. Avenatti was sentenced. In the interim, it made trial arguments that were directly contradicted by the undisclosed analyses. It argued to the jury that Mr. Avenatti was in a "desperate" situation because his debt was so large; but the undisclosed Drum Reports reveal that Mr. Avenatti regularly had access to huge sums of positive cash flow. The suppressed evidence is clearly favorable to the defense: it powerfully undercuts the government's argument about Mr. Avenatti's intent and state of mind when he approached Nike.

Critical charts were emailed to Assistant United States Attorney Julian Andre on May 16, 2019 – seven months before the trial in this case began. Ex. A at 1144272. Other charts were sent to Andre and AUSA Brett Sagel on November 4, 2019. *Id.* at 1144388. Both AUSAs are at the center of the *Brady* violation in California and they were at Saint Andrew's Plaza working on witness prep during the trial in this case and seated at times in the courtroom; they were firmly within the government's trial team. Yet the government told the Court at that time, in the middle of the trial, that Mr. Avenatti lacked "easy access to substantial sums of money." Dkt. 252 at 3. It argued to the jury that his conduct should be viewed through a skeptical lens because he acted out of desperation without any other way to pay his debts. T. 151, 2180, 2186-2187. It knew when making these arguments that its own expert had concluded the opposite was true, but it did not disclose that analysis – a plain *Brady* violation. *See United States v. Avellino*, 136 F.3d 249, 255 (2d Cir. 1998) (a prosecutor is "presumed . . . to have knowledge of all information gathered in connection with his office's investigation of the case and indeed has a duty to learn of any favorable evidence known to others acting on the government's behalf in the case.") (internal quotation marks omitted).

The government did not even provide notice that it had retained Drum until after the trial, even though he had been forwarding his analyses to the government throughout the discovery period in this case. There is therefore no way that counsel could have requested these materials or gained them through due diligence – the defense did not even know that Drum existed until after the trial was over and had no inkling about his

Hon. Paul G. Gardephe
December 2, 2021
Page 9

conclusions about Mr. Avenatti's positive cash flow until after sentence was imposed in July and after the mistrial was declared in the CDCA case in August. *See United States v. Alessi*, 638 F.2d 466, 479 (2d Cir. 1980).

The suppressed evidence is material because it "creates a reasonable doubt that did not otherwise exist." *United States v. Agurs*, 427 U.S. 97, 112 (1976). The government told the jury that Mr. Avenatti's "desperate" situation proved that he acted with criminal intent. T. 151, 2280, 2286-87. It told the Court that evidence that he could not repay his debts was foundational to its proof of intent because it "rebut[ted] any suggestion of an innocent explanation for the defendant's conduct." Dkt 252 at 3. It was a cornerstone of the government's case. Undermining this argument using the government's own $640,000 expert analyses and charts would have been powerful and created strong doubts that were not before the jury. Thus, "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the [trial] would have been different." *Kyles v. Whitley*, 514 U.S. 419, 433-34 (1995).[6]

Moreover, the suppressed evidence affected Mr. Avenatti's decision to testify. The government won an *in limine* ruling permitting cross examination about his financial situation. T. 1821-1822. This would have permitted the government to use their warped presentation of his finances against him at the same time that it withheld information showing the opposite. New trials are necessary when suppressed documents affect a defendant's decision to testify. *United States v. Thomas*, 239 F.3d 163, 168 (2d Cir. 2001) (new trial ordered where government withheld impeachment document until after defendant took the stand); *United States v. Lam Lek Chong*, 544 F.2d 58, 69 (2d Cir. 1976) (new trial unnecessary because defendant could not show that suppressed evidence affected decision to testify).

---

[6] The Supreme Court holds that the materiality test is not a matter of sufficiency and a defendant is not required to show "that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict." *Id*. at 434–35.

Hon. Paul G. Gardephe
December 2, 2021
Page 10

### V.       The Court should re-affirm its *Brady* Order.

The government's Drum disclosures two months ago demonstrate that it remained in substantial non-compliance with its *Brady* obligations well after this Court's October 30, 2020 *Brady* Order (Dkt. 305) and even after this Court opined that the SDNY and CDCA prosecutors "are components of the same agency – the U.S. Department of Justice" who "engaged in joint and coordinated fact gathering . . . at least as to" a witness called to testify about Mr. Avenatti's finances. *Avenatti*, 2021 WL 2809919, at *45. We of course do not know what other *Brady* material the government possesses but has failed to produce. We therefore respectfully request that the Court re-issue its *Brady* order and admonish the government to comply with its obligations promptly.

### VI.      Conclusion

For the foregoing reasons, the Court should issue an indicative ruling that a new trial would be ordered if the case is remanded from the Second Circuit.

                                          Respectfully submitted,

                                          /s/ Benjamin Silverman
                                          Benjamin Silverman
                                          *Attorney for Michael Avenatti*

cc: Counsel of record (by ECF)