LAW OFFICE OF

# BENJAMIN SILVERMAN

134 WEST 30TH ST., SUITE 302
NEW YORK, NY 10001

TEL (212) 203-8074
FAX (646) 843-3938
Benjamin@bsilvermanlaw.com

January 3, 2022

**By ECF**
Honorable Paul G. Gardephe
United States District Judge
Southern District of New York
40 Foley Square
New York, NY 10007

   Re: *United States v. Michael Avenatti*, 19 Cr. 373 (PGG)

Your Honor:

   Pursuant to the Court's Order of December 30, 2021 (Dkt. 368), which was docketed earlier today, attached please find:

- **Exhibit 1**: Transcript from August 12, 2021 in *United States v. Avenatti*, 19 Cr. 61 (JVS) (C.D.C.A.).

- **Exhibit 2**: Transcript from August 13, 2021 in *United States v. Avenatti*, 19 Cr. 61 (JVS) (C.D.C.A.).

- **Exhibit 3**: Transcript from August 24, 2021 in *United States v. Avenatti*, 19 Cr. 61 (JVS) (C.D.C.A.).

- **Exhibit 4**: Transcript from October 15, 2021 in *United States v. Avenatti*, 19 Cr. 61 (JVS) (C.D.C.A.).

Thank you for your consideration.

      Respectfully submitted,

      /s/ Benjamin Silverman
      Benjamin Silverman
      *Attorney for Michael Avenatti*

cc: Counsel of Record (by ECF)

# Exhibit 1

1              **UNITED STATES DISTRICT COURT**

2      **CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION**

3       **HONORABLE JAMES V. SELNA, U.S. DISTRICT JUDGE**

4

5 UNITED STATES OF AMERICA,        )
                             )  **CERTIFIED TRANSCRIPT**

6             Plaintiff,     )
                             )  Case No.

7       vs.                )  SACR-19-00061-JVS
                             )

8 MICHAEL JOHN AVENATTI,       )  **PUBLIC VERSION**
                             )

9           Defendant.     )  **TRIAL DAY 19**
                             )  **VOLUME 2**

10

11

12

13

14

15     REPORTER'S PARTIAL TRANSCRIPT OF PROCEEDINGS

16          THURSDAY, AUGUST 12, 2021

17             1:25 P.M.

18          SANTA ANA, CALIFORNIA

19

20

21

22

23

24       **DEBBIE HINO-SPAAN, CSR 7953, CRR**
      FEDERAL OFFICIAL COURT REPORTER

25      411 WEST 4TH STREET, ROOM 1-053
        SANTA ANA, CA 92701
        dhinospaan@yahoo.com

1                    **APPEARANCES OF COUNSEL:**

2

3    **FOR THE PLAINTIFF:**

4           NICOLA T. HANNA
             United States Attorney
5           BY:  BRETT SAGEL
                 Assistant United States Attorney
6           411 West 4th Street
             Suite 8000
7           Santa Ana, California 92701
             714-338-3598
8           brett.sagel@usdoj.gov

9           NICOLA T. HANNA
             United States Attorney
10          BY:  ALEXANDER WYMAN
                 Assistant United States Attorney
11          312 North Spring Street
             Suite 1100
12          Los Angeles, California 90012
             213-894-2435
13          alex.wyman@usdoj.gov

14   **FOR THE DEFENDANT IN PRO SE:**

15          MICHAEL JOHN AVENATTI, ESQ.

16

17   **STANDBY COUNSEL FOR MR. AVENATTI:**

18          H. DEAN STEWARD LAW OFFICES
             BY:  H. DEAN STEWARD, ESQ.
             17 Corporate Plaza
19          Suite 254
             Newport Beach, California 92660
20          949-481-4900
             deansteward7777@gmail.com

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

| | |
|---|---|
| 1 | **I N D E X** |
| 2 | **WITNESSES** |

**WITNESSES**                                                              **PAGE**

**MICHELLE PHAN, CALLED BY THE GOVERNMENT**
    Cross-Examination by Mr. Avenatti (resumed)            10
    Redirect Examination by Mr. Sagel                      18
    Recross-Examination by Mr. Avenatti                    22

**GEFFREY CLARK, CALLED BY THE GOVERNMENT**
    Direct Examination by Mr. Wyman                        24
    Cross-Examination by Mr. Avenatti                      31
    Redirect Examination by Mr. Wyman                      37
    Recross-Examination by Mr. Avenatti                    37

**ROBERTO AMENTA, CALLED BY THE GOVERNMENT**
    Direct Examination by Mr. Wyman                        39
    Cross-Examination by Mr. Avenatti                      42

**JOHN DRUM, CALLED BY THE GOVERNMENT**
    Direct Examination by Mr. Wyman                        49

**EXHIBITS**

| EXHIBIT | | IN EVIDENCE | WITHDRAWN OR REJECTED |
|---|---|---|---|
| 457 | Summary Exhibit of Wire Transfers in Indictment | 28 | |
| 420-450 | Summary Financial Tracing Analysis documents | 56 | |
| 456 | Summary Financial Tracing Analysis | 56 | |
| 384 | Statements - EA 2851 - 1.30.2015-3.30.2015 | 58 | |

**UNITED STATES DISTRICT COURT**

```
 1              SANTA ANA, CALIFORNIA; THURSDAY, AUGUST 12, 2021

 2                          1:25 P.M.

 3                           - - -

 4

 5              (Previous proceedings were sealed by

 6              the Court and under separate cover.)

 7              (Out of the presence of the jury.)

 8              THE COURT:  Juror Number 1 handed me a note just

 9       before we took the recess indicating some pretty extreme dental

01:25PM 10       problems and that she has an appointment at 3:45 today.  I want

11       to find out where she lives and where the appointment is, but

12       we're going to accommodate her.  I realize this keeps

13       prolonging things, but I don't want to lose the juror and I

14       think she has a legitimate need.

01:26PM 15              Mr. Sagel.

16              MR. SAGEL:  The only thing I would add to that in

17       the inquiry, if Your Honor is willing, is from the note it

18       appears she's going for the appointment hopefully to get x-rays

19       and antibiotics.  I guess the question is, is if she believes

01:26PM 20       she'd be able by tomorrow to --

21              THE COURT:  Let's bring her in individually and ask

22       her that.

23              MR. SAGEL:  And I'd say, as Your Honor knows, she

24       says that the -- and she is having trouble focusing because of

01:26PM 25       the pain, and we just need to know that by tomorrow she could
```

```
 1   do that, if that's the issue.
 2              THE COURT:  Okay.  Mr. Avenatti.
 3              MR. AVENATTI:  I agree 100 percent.
 4              THE COURT:  Anything else?
 5              MR. AVENATTI:  Yes.  One other issue, Your Honor,
 6   because it's going to come up on the continued
 7   cross-examination of Ms. Phan.
 8              I had the court reporter -- she was kind enough to
 9   print a question and answer that was a question and answer that
10   occurred during my cross-examination of Ms. Phan earlier today,
11   and I provided a copy to the Government and a copy to the
12   Court.  The reason why I provided this is because I anticipate
13   that there will be some questions asked very early in the
14   continued cross-examination of Ms. Phan where this will become
15   important, this question and answer.
16              THE COURT:  Fine.  I mean, you've asked everybody
17   else about their business with the Government.  Fine.
18              MR. AVENATTI:  I anticipate a hearsay objection,
19   Your Honor.  And this goes -- it goes to state of mind and
20   effect on the listener, and that's why I provided the question
21   and answer.  So I wanted to just preview it, that's all.
22              THE COURT:  Okay.  Thank you.
23              MR. SAGEL:  Your Honor, is there anything that we
24   need to know?  We, obviously, have Mr. Varani on his way.
25              THE COURT:  He's coming.
```

```
 1                    MR. SAGEL:  Okay.  I just want to make sure that
 2        he's --
 3                    THE COURT:  Mr. Avenatti made a very short but
 4        adequate offer of proof.
01:28PM  5                    MR. SAGEL:  That's fine.  Thank you, Your Honor.  I
 6        just wanted to make sure he's staying en route.
 7                    THE COURT:  Can we get Ms. B.Go, please, Juror
 8        Number 1.
 9                    THE COURTROOM DEPUTY:  Yes, she's right out here.
01:28PM 10                    (Juror Number 1 entered the courtroom.)
11                    THE COURT:  Thank you.
12                    Good afternoon, Ms. B.Go.  Where is your
13        appointment?
14                    JUROR NUMBER 1:  In Costa Mesa by my residence.
01:29PM 15                    THE COURT:  Okay.  What are they going to do, just
16        take x-rays today?
17                    JUROR NUMBER 1:  It seems like it, but there can be
18        a possibility that they might have to extract the tooth, if
19        possible, depending on the x-rays.  So they can't tell me until
01:29PM 20        they receive the x-rays.
21                    THE COURT:  Okay.  Well, why don't you report the
22        results to Ms. Bredahl.
23                    JUROR NUMBER 1:  Yeah.  Absolutely.
24                    THE COURT:  Okay.  So we're going to stop at
01:29PM 25        3:00 o'clock today.  That will get you there in time.
```

7

```
 1              JUROR NUMBER 1:  Thank you so much.  I appreciate
 2    it.
 3              THE COURT:  Are you able to concentrate this
 4    afternoon?
 5              JUROR NUMBER 1:  Yeah.  I took some pills right now
 6    at lunch today.  I should be fine until then.
 7              THE COURT:  Okay.  Very good.
 8              JUROR NUMBER 1:  Thank you.
 9              (Juror Number 1 left the courtroom.)
10              MR. SAGEL:  And in light of that, Your Honor, I
11    guess I want to inquire, if we're going until 3:00 today, which
12    is an hour and a half, based on the cross estimate that
13    defendant gave of our expert, I guess the question is, should
14    Mr. Varani still come tomorrow -- to be here tonight for
15    tomorrow when I think the estimate -- and every estimate has
16    undershot the actual time -- was four hours for cross for our
17    expert tomorrow, which will almost certainly take place
18    tomorrow based on what we've been told of what he has left on
19    this cross.  Should we now have Mr. Varani just come on
20    Tuesday?
21              THE COURT:  There's a possibility that we wouldn't
22    finish with Mr. Drum tomorrow.
23              MR. SAGEL:  Based on the estimates we've been
24    provided, I would agree, now that we only have an hour and a
25    half left of today.  We were told before lunch Mr. Avenatti
```

01:29PM (line 5)
01:29PM (line 10)
01:30PM (line 15)
01:30PM (line 20)
01:30PM (line 25)

         1    believes he has about an hour left of this cross, which

         2    would -- we still have two additional witnesses today or

         3    possibility tomorrow, and then I think about a one-hour direct

         4    of Mr. Drum and --

01:30PM  5               THE COURT:  Where does he live?

         6               MR. SAGEL:  Who, Mr. Drum?  I believe Denver,

         7    Colorado.  He's in from out of town.  Mr. Varani would be the

         8    person that would have to go after that.  So Mr. Drum is here.

         9    It's a matter of whether or not --

01:31PM 10               THE COURT:  Looks like he's going to be here for the

        11    weekend.

        12               MR. SAGEL:  Who?

        13               THE COURT:  Mr. Drum.

        14               MR. SAGEL:  Well, if that's the case, then is there

01:31PM 15    any reason for Mr. Varani to be here by tonight if possibly

        16    Mr. Drum isn't even going to finish tomorrow?

        17               MR. AVENATTI:  Your Honor, my position is as

        18    follows:  I have no problem with Mr. Varani coming on Tuesday

        19    so he doesn't have to come out here and then potentially stay

01:31PM 20    the weekend or fly back and forth.  I understand how

        21    inconvenient that can be.

        22               What I don't want to have is a situation where, for

        23    whatever reason, we wrap up a little earlier than expected

        24    tomorrow and you turn to me and say, "Where is your witness?

01:31PM 25    You've rested," or something like that.  So -- because I

```
 1  anticipate calling --
 2              THE COURT:  I don't think we're going to have that
 3  problem.
 4              MR. AVENATTI:  Okay.
 5              THE COURT:  If we have a slight problem, we'll break
 6  for the weekend.
 7              MR. AVENATTI:  Fair enough.  In light of that,
 8  Your Honor, then I have no problem with Mr. Varani coming on
 9  Tuesday.  I anticipate he's either going to be my first or
10  second witness.
11              THE COURT:  Okay.
12              MR. SAGEL:  We'll have him here Monday night.
13              THE COURT:  Sorry?
14              MR. SAGEL:  We'll make sure he's here by Monday
15  night.
16              THE COURT:  Okay.
17              **(In the presence of the jury.)**
18              THE COURT:  Good afternoon, ladies and gentlemen.
19              **(The jurors collectively responded "Good**
20              **afternoon.")**
21              THE COURT:  One of our jurors has some need for
22  immediate urgent dental care.  For that reason, we're going to
23  stop at 3:00 o'clock so the juror can get that attention.
24              Okay.  Mr. Avenatti.
25  ///
```

01:31PM 5
01:32PM 10
01:32PM 15
01:34PM 20
01:34PM 25

<u>**MICHELLE PHAN, WITNESS, RESUMED THE STAND**</u>

**CROSS-EXAMINATION (Resumed)**

BY MR. AVENATTI:

Q    Ms. Phan, before the lunch break we were discussing these text messages relating to a telegram immediately after that lunch that we had in New York.  Do you recall that generally?

A    Yes.

Q    And after I asked, "Is this Telegram?  Will do.  Thank you," you sent me a text message that said, "You don't need to set up a username.  I did so you can find me."  Right?

A    Yes.

Q    And then you sent me another text message that stated, "That way you can stay anon" -- a-n-o-n -- "as soon as possible"; correct?

A    Yes.

Q    And when you wrote "anon," you meant -- that is shorthand for "anonymous"; correct?

A    Yes.

        MR. AVENATTI:  Ms. Hernandez, can we pull this up electronically.  Can we get maybe the first half of the page at the top.

Q    You then instructed me:  "Just your number is all you need.  Add fake names or do letters like me."

        Did I read that correctly?

A    Yes.

11

```
 1    Q    And that was all around -- if we go back to the preceding
 2    page, that entire discussion that we're having there took place
 3    beginning at about 1:06 p.m.; correct?
 4    A    Correct.
01:38PM 5  Q    And then if we go back to the page we were just at,
 6    please, at about 2:30 p.m. New York time, 11 -- actually,
 7    2:29 p.m. New York time, 11:29 a.m. Pacific Time.  So this is
 8    about an hour and a half later; right?
 9    A    Yes.
01:38PM 10 Q    You sent me another text message that said, "Actually,
11    it's not Telegram"; right?
12    A    Yes.
13    Q    You said, "It's Signal, the app, private messaging app.
14    More private than Telegram."
01:39PM 15          That's what you wrote to me; right?
16    A    Yes.
17    Q    And you then sent me two screenshots of your account
18    on --
19          MR. SAGEL:  I ask that he not publish the second
01:39PM 20 shot that still has her numbers and identifiers on it.
21          MR. AVENATTI:  I believe it's been redacted.  It's
22    redacted.
23          MR. SAGEL:  We haven't been provided with those.
24          MR. AVENATTI:  Well, you can see it on the screen,
01:39PM 25 it's redacted.
```

```
 1   Q    You see that's redacted, right, Ms. Phan?

 2   A    Yes.

 3   Q    Okay.  And you then sent me two screenshots of your

 4   account on Signal; right?

 5   A    Yes.

 6   Q    And then below that you said, "Telegram if you sign up,

 7   anyone with your number will see you on there"; right?

 8   A    Yes.

 9   Q    And I said, "I'm on Signal.  Use it all the time.  Are

10   you?"

11            And you said:  "Yes.  Add me"; correct?

12   A    Yes.

13   Q    And then I sent you a link for Signal, and you said, "I

14   already have it.  Add me."

15            And you gave me your account; right?

16   A    Yes.

17   Q    And then let's go to the end of the chat.

18            And I responded, "Can you try and add me at" -- and

19   then my phone number -- "I can't find you."

20            And you said, "Messaged you"; right?

21   A    Yes.

22   Q    And that's the true message exchange relating to Telegram

23   via text; correct?

24   A    Yes.

25   Q    Now, did the Government ever ask you for any of your
```

01:39PM  5
01:40PM 10
01:40PM 15
01:40PM 20
01:41PM 25

```
  1   messages from Telegram or Signal relating to me or this matter?

  2   A     No.

  3   Q     Are you aware that Mr. Long Tran has testified in this

  4   case?

  5         MR. SAGEL:  Asked and answered.

  6         THE COURT:  I think I sustained the objection.

  7         MR. AVENATTI:  If you did, then I asked it in error

  8   and I apologize to the Court.

  9   Q     Ms. Phan, have you communicated with Mr. Tran about this

 10   case?

 11   A     No.

 12   Q     You've had no -- well, strike that.

 13         I noticed Mr. Tran out in the hallway during the

 14   lunch break.  Is he here, yes or no?

 15   A     His family lives here, yes.

 16   Q     They live here in the courthouse?

 17   A     They live pretty close by, yes.

 18   Q     Okay.  That's not my question.

 19         I noticed Mr. Tran in the hallway during lunch.  Is

 20   he physically here and has he been physically here in the

 21   courthouse while you've been testifying?  Yes or no?

 22   A     He's here today, not yesterday, just to make sure I'm okay

 23   mentally.

 24         MR. AVENATTI:  Move to strike the last part as

 25   nonresponsive, Your Honor.
```

01:42PM (lines 5, 10, 15, 20)
01:43PM (line 25)

```
 1              THE COURT:  Will be stricken.
 2    Q    BY MR. AVENATTI:  And it's your testimony, Ms. Phan, that
 3    at no point in time in the last two weeks have you had any
 4    communications with Mr. Tran about this case or his testimony
 5    or your testimony.  Is that your testimony under oath, Ms. --
 6    A    Yes.  We actually have not spoken about this case within
 7    the past two weeks.
 8    Q    Ms. Phan, isn't it true that when you met with the
 9    Newport Beach investigator in November of 2018, they repeatedly
10    told you that there was not enough evidence to charge me with a
11    crime.  Isn't that true?
12              MR. SAGEL:  Objection.  Hearsay, Your Honor.
13              THE COURT:  Sustained.
14              THE WITNESS:  It's my best knowledge --
15              THE COURT:  Just a minute.  When I sustain an
16    objection, you don't get to answer.  Okay?
17              THE WITNESS:  Sorry.
18              MR. AVENATTI:  Your Honor, effect on the listener's
19    state of mind.
20              THE COURT:  Denied.  Proceed.
21    Q    BY MR. AVENATTI:  Isn't it true that the investigator
22    from the Newport Beach Police Department told you that they
23    could not meet the burden of proof to show beyond a reasonable
24    doubt that any crime had ever been committed?  Didn't they tell
25    you and your attorneys that in November of 2018?
```

01:43PM  5
01:44PM 10
01:44PM 15
01:44PM 20
01:45PM 25

```
 1              MR. SAGEL:  Objection.  Hearsay.  Calls for a legal
 2   conclusion.  And attempting to ask an improper question a
 3   second time is not appropriate.
 4              THE COURT:  Objection sustained.  Move on to another
01:45PM 5   line of questioning, please.
 6   Q    BY MR. AVENATTI:  Ms. Phan, isn't it true that you
 7   weren't satisfied with what happened at the Newport Beach
 8   Police Department, which is why you contacted Mr. Sagel and his
 9   colleagues?  Isn't that true?  Yes or no?
01:46PM 10  A    I honestly don't recall.
11   Q    Following your meeting with the Newport Beach Police
12   Department, you filed a civil action against me; isn't that
13   true?
14   A    Yes.
01:47PM 15  Q    And the reason why you filed that civil action was
16   because the Newport Beach Police Department told you that this
17   belonged in civil court and not in a criminal court; isn't that
18   true?
19              MR. SAGEL:  Objection, Your Honor.  Same objections,
01:47PM 20  and ask that his --
21              THE COURT:  Sustained.
22              MR. SAGEL:  -- questioning be limited.
23   Q    BY MR. AVENATTI:  One of the things that led you to file
24   your civil action was what you were told when you met with the
01:47PM 25  Newport Beach --
```

```
 1              THE COURT:  Sir, sustained.  Move on to another line
 2    of questioning.
 3              MR. AVENATTI:  One moment, Your Honor.
 4              (Pause in proceedings.)
```
01:49PM  5    Q    BY MR. AVENATTI:  Ms. Phan, do you remember that the
```
 6    first time you met with individuals from the federal government
 7    relating to your claims was on April 4th, 2019?
 8    A    I don't remember the exact date, but I do remember meeting
 9    them, yes.
```
01:49PM 10    Q    And do you remember that you met with Mr. Kim,
```
11    Mr. Carlos, Mr. Andre, Mr. Sagel, and you had three attorneys
12    present on your behalf?  Do you remember that?
13    A    I don't remember all their names, but I do remember
14    meeting with my lawyers, yes.
```
01:50PM 15    Q    And with those agents; correct?
```
16    A    Yes.
17    Q    And do you recall when you met with the agents and the
18    AUSAs, that you were asked about what had happened with the
19    Newport Beach Police Department?
```
01:50PM 20              MR. SAGEL:  Objection.  Calls for hearsay,
```
21    Your Honor, and for the same reasons.
22              THE COURT:  Overruled.
23              THE WITNESS:  I honestly -- I don't remember.  I
24    just know I had to meet them.
```
01:51PM 25    Q    BY MR. AVENATTI:  Did you ever tell Mr. Sagel and his

1  colleagues what you had been told by the Newport Beach Police

2  Department?

3  A    I don't remember the exact conversations I had with them,

4  with the agents.  They just asked if I could just tell my side

01:51PM 5  of the story.  And that's all I can honestly remember.

6            MR. AVENATTI:  Move to strike everything after "They

7  just asked" -- or including "They just asked" as nonresponsive.

8            THE COURT:  It will be stricken.

9  Q    BY MR. AVENATTI:  Well, Ms. Phan, when you told the

01:52PM 10  agents your side of the story and what had happened, didn't you

11  think it was important to tell them what you had learned during

12  your Newport Beach interview?  Yes or no?

13  A    I told them everything to my best knowledge while the

14  memory was fresh.  But it's been two years and it's kind of

01:52PM 15  blurry for me right now.  That's my honest answer.

16            MR. AVENATTI:  Move to strike, Your Honor.

17            THE COURT:  Denied.

18  Q    BY MR. AVENATTI:  Ms. Phan, did you believe it was

19  important when you met with the investigators and the AUSAs

01:53PM 20  from the federal government to tell them what you had learned

21  during the Newport Beach interview?  Yes or no?

22  A    I don't remember everything I said.  I just -- whatever

23  they asked me is probably on record.  So that's all I can

24  remember.

01:53PM 25            MR. AVENATTI:  Move to strike, Your Honor.

**UNITED STATES DISTRICT COURT**

```
 1              THE COURT:  It will be stricken.

 2              MR. AVENATTI:  Can I have it read back, please?

 3              THE COURT:  Yes.

 4              (The record was read as follows:

 5              "Ms. Phan, did you believe it was important

 6          when you met with the investigators and the AUSAs

 7          from the federal government to tell them what you

 8          had learned during the Newport Beach interview?

 9          Yes or no.")

10              THE WITNESS:  I would believe it is important, yes.

11  Q    BY MR. AVENATTI:  But you just can't remember whether you

12  did it or not; right?

13  A    Well, it was two years ago when this all happened.  So I

14  can't recall exactly the details of my conversations with them.

15  Q    And as you sit there today, you don't have any

16  recollection of Mr. Sagel or Mr. Wyman or Mr. Carlos, or anyone

17  else, asking you what you learned from the Newport Beach Police

18  Department, do you?

19  A    No.

20              MR. AVENATTI:  Nothing further.

21              THE COURT:  Mr. Sagel.

22              MR. SAGEL:  Thank you, Your Honor.

23                        REDIRECT EXAMINATION

24  BY MR. SAGEL:

25  Q    Good afternoon, Ms. Phan.
```

01:52PM (line 5)
01:53PM (line 10)
01:54PM (line 15)
01:55PM (line 20)
01:55PM (line 25)

```
 1   A    Good afternoon.
 2   Q    When defendant showed you the Exhibit 294, the three
 3   pages of text messages in the book, he asked you where they
 4   came from, and I think your answer was from your phone; is that
 5   correct?
 6   A    Yes.
 7   Q    When defendant showed you Exhibit 1081, I believe five
 8   pages of text messages, do you know where those came from?
 9   A    No.  I believe they came from him, not from me.
10             MR. AVENATTI:  Objection, Your Honor.  Move to
11   strike everything after "No" as speculation.
12             THE COURT:  It will be stricken.
13   Q    BY MR. SAGEL:  They weren't provided by you?
14   A    No, sir.
15             MR. AVENATTI:  I'll stipulate to that.
16             MR. SAGEL:  I'm sorry.  Mr. Avenatti, what did you
17   want to say?
18             MR. AVENATTI:  I said I'll stipulate that she did
19   not provide them, sir.
20             MR. SAGEL:  Do you want to stipulate where they came
21   from?
22             MR. AVENATTI:  Do you want to ask your next
23   question?
24             MR. SAGEL:  If you want to interrupt --
25             THE COURT:  Just a minute.  Just a minute.
```

01:56PM (line 5)
01:57PM (line 10)
01:57PM (line 15)
01:57PM (line 20)
01:57PM (line 25)

```
            1              MR. AVENATTI:  Oh, you want to talk about

            2    interrupting?

            3              THE COURT:  Mr. Avenatti, address me, don't address

            4    counsel.

01:57PM     5              Proceed.

            6              MR. SAGEL:  Thank you, Your Honor.

            7    Q    When Mr. Avenatti showed you Exhibit 1081, he said,

            8    "These are the rest of the text messages from 2018."  Do you

            9    remember him saying that to you?

01:57PM    10              MR. AVENATTI:  Misstates the question.

           11              THE WITNESS:  Yes.

           12              THE COURT:  Just a minute.

           13              Overruled.

           14    Q    BY MR. SAGEL:  The additional text messages in

01:58PM    15    Exhibit 10- -- let me see -- 1081, what dates are those from?

           16    Starting on page 3 through 5.

           17    A    April 24th, 2018.

           18    Q    Defendant went over a lot of these text messages with

           19    you.  How many text messages did he send you where he told you

01:58PM    20    where the $4 million went?

           21    A    None.

           22    Q    Zero?

           23    A    Yes.  Zero.

           24    Q    And luckily, it's already written up there.

01:59PM    25              MR. AVENATTI:  Move to strike, Your Honor, the
```

```
 1   colloquy.
 2            THE COURT:  Be stricken.
 3   Q    BY MR. SAGEL:  How many text messages did defendant go
 4   over with you about why you didn't receive your $4 million?
 5   A    Zero.
 6   Q    Do you need a second, Ms. Phan?
 7   A    No, I'm okay.
 8   Q    Defendant asked you if you ever provided your Telegram or
 9   Signal messages to the Government or were asked if you provided
10   those to the Government.  Do you remember that?
11   A    Yes.
12   Q    How many Signal or Telegram messages that defendant sent
13   you told you why you did not receive your $4 million?
14            MR. AVENATTI:  Speculation.  Conjecture.
15   Foundation, Your Honor.
16            THE COURT:  Overruled.
17            THE WITNESS:  Zero.
18   Q    BY MR. SAGEL:  Defendant asked you questions, said when
19   you were looking to exit the company, whether you accomplished
20   your goals of getting your money out and getting EM Cosmetics
21   back.  Do you remember that question?
22   A    Yes.
23   Q    Then he said, "Did you get those two things?"
24            Do you remember that question?
25   A    Yes.
```

01:59PM 5
01:59PM 10
02:00PM 15
02:00PM 20
02:00PM 25

```
 1    Q     Did you get all of your money?
 2    A     No.
 3              MR. SAGEL:  No further questions, Your Honor.
 4              THE COURT:  Mr. Avenatti.
 5                      RECROSS-EXAMINATION
 6    BY MR. AVENATTI:
 7    Q     Ms. Phan, would you like to take a break?  It's really
 8    not a problem.  We can take a break if you'd like.
 9    A     It's okay.
10              MR. AVENATTI:  Your Honor, I'd ask for a break.
11              THE WITNESS:  No.  We can go.
12              THE COURT:  Proceed.
13              MR. AVENATTI:  I'm sorry, Your Honor, proceed?
14              THE COURT:  Proceed.
15    Q     BY MR. AVENATTI:  Ms. Phan, have you ever heard the
16    phrase "trust but verify"?
17              MR. SAGEL:  Objection, Your Honor.  Argumentative
18    and outside the scope.
19              THE COURT:  Sustained.
20    Q     BY MR. AVENATTI:  Ms. Phan, how many Telegram or Signal
21    messages did you provide to the Government?
22              MR. SAGEL:  Asked and answered, Your Honor.
23              THE COURT:  Just a minute.
24    Q     BY MR. AVENATTI:  Zero?
25    A     I deleted those apps.  Zero.  I didn't have anything to
```

02:01PM (line 5)
02:01PM (line 10)
02:01PM (line 15)
02:01PM (line 20)
02:02PM (line 25)

```
 1   give them.
 2            MR. AVENATTI:  Move to strike, Your Honor.
 3            THE COURT:  Will be stricken.
 4            MR. AVENATTI:  Can I have it read back, please?
 5            THE COURT:  Yes.
 6            (The record was read as follows:
 7            " Ms. Phan, how many Telegram or Signal messages
 8        did you provide to the Government?")
 9            THE WITNESS:  Zero.
10   Q   BY MR. AVENATTI:  How many text messages -- other than
11   the three pages that make up 294, how many text messages beyond
12   those did you provide to the Government?  Would that also be
13   zero?
14   A    I provided everything I had in my phone.
15            MR. AVENATTI:  Move to strike, Your Honor.
16            THE COURT:  Be stricken.
17   Q   BY MR. AVENATTI:  Ms. Phan, please just answer my
18   question.
19            Can I have it read back, Your Honor?
20            (The record was read as follows:
21            "How many text messages -- other than the
22        three pages that make up 294, how many text
23        messages beyond those  did you provide to the
24        Government?  Would that also be zero.")
25            THE WITNESS:  Yes.
```

02:02PM  (line 5)
02:02PM  (line 10)
02:02PM  (line 15)
02:03PM  (line 20)
02:03PM  (line 25)

```
 1  Q    BY MR. AVENATTI:  And how many times did you tell
 2  AUSA Sagel and his colleagues and the investigators about what
 3  the Newport Beach police had told you --
 4           THE COURT:  Sir.
 5  Q   BY MR. AVENATTI:  -- is that also zero?
 6           THE COURT:  Sir.
 7           MR. AVENATTI:  Nothing further.  Ask that she be
 8  available to recall.  Thank you.
 9           THE COURT:  You're released but you're subject to
10  recall.
11           Mr. Wyman.
12           MR. WYMAN:  Thank you, Your Honor.  The
13  United States calls Geff Clark.
14      GEFFREY CLARK, GOVERNMENT WITNESS, WAS SWORN
15           THE COURTROOM DEPUTY:  If you'll please state and
16  spell your first and last name.
17           THE WITNESS:  My name is Geffrey Clark, G, as in
18  "George," e-f-f-r-e-y, C-l-a-r-k.
19           THE COURT:  Mr. Wyman.
20           MR. WYMAN:  Thank you, Your Honor.
21                    DIRECT EXAMINATION
22  BY MR. WYMAN:
23  Q    Good afternoon.
24  A    Good afternoon.
25  Q    Where do you work?
```

02:04PM (line 5)
02:04PM (line 10)
02:05PM (line 15)
02:06PM (line 20)
02:06PM (line 25)

```
 1   A    I'm employed as a special agent with the Internal Revenue
 2   Service criminal investigation.
 3   Q    How long have you been a federal agent for?
 4   A    A federal agent for -- it will be 22 years next month.
 5   Q    Generally speaking, what are your duties and
 6   responsibilities as a special agent for the IRS?
 7   A    I investigate financial crimes specific to tax, money
 8   laundering, bank fraud, wire fraud, political corruption, some
 9   joint terrorism stuff, and other related crimes.
10   Q    Are you generally familiar with the Government's case
11   against the defendant, Michael Avenatti?
12   A    In a cursory, general sense, yes.
13   Q    Were you one of the primary investigative agents on this
14   case?
15   A    No, I was not.
16   Q    What was the extent of your involvement in this case?
17   A    No involvement.
18   Q    Well, prior to testifying, did you prepare any charts in
19   this case?
20   A    No, I did not.
21   Q    Fair enough.  Have you reviewed the Indictment in this
22   case?
23   A    Yes, I have.
24   Q    And does the Indictment charge ten separate counts of
25   wire fraud?
```

```
 1  A     Yes, it --

 2             MR. AVENATTI:  Objection, Your Honor.  Foundation.

 3  403.

 4             THE COURT:  Overruled.

02:07PM 5             THE WITNESS:  Yes, it does.

 6  Q    BY MR. WYMAN:  Does each of those wire fraud counts

 7  specify a particular wire transfer?

 8  A     Yes, it does.

 9  Q     Have you reviewed bank records obtained by the Government

02:07PM 10  as part of this investigation?

11  A     Yes, I have.

12  Q     For example, have you reviewed records provided by

13  California Bank & Trust and City National Bank?

14             MR. AVENATTI:  Objection.  Leading.

02:07PM 15             THE COURT:  Sustained.

16             THE WITNESS:  Yes.

17             THE COURT:  Answer is stricken.

18  Q    BY MR. WYMAN:  What financial institutions have you

19  reviewed bank records from?

02:08PM 20  A     I reviewed bank records from California Bank & Trust and

21  City National Bank.

22  Q     Do those bank records span thousands of pages in length?

23  A     Oh, yes.

24  Q     And regarding wire transfers, did you review any Excel

02:08PM 25  spreadsheets detailing incoming and outgoing wires?
```

```
 1   A     Yes, I did.
 2   Q     Did those spreadsheets contain hundreds of rows?
 3               MR. AVENATTI:  Objection.  Leading.
 4               THE COURT:  Sustained.
 5   Q     BY MR. WYMAN:  How lengthy were those spreadsheets?
 6   A     I believe 800 rows plus.
 7   Q     From your review of these voluminous records from City
 8   National Bank and California Bank & Trust, were you able to
 9   locate records for the ten wire transfers that you saw detailed
10   in the Indictment?
11   A     Yes.
12   Q     Using those records, did you verify the accuracy of a
13   chart provided to you that summarized the information regarding
14   those ten wires?
15   A     Yes, I did.
16   Q     Did another member of the prosecution team first create a
17   draft of that chart?
18   A     Yes, they did.
19   Q     And did you then verify the accuracy of all the
20   information on that chart by reviewing the underlying bank
21   records?
22               MR. AVENATTI:  Objection.  Leading.
23               THE COURT:  Overruled.
24               THE WITNESS:  Yes, I did.
25   Q     BY MR. WYMAN:  Based on your analysis of the bank
```

02:08PM (line 5)
02:09PM (line 10)
02:09PM (line 15)
02:09PM (line 20)
02:09PM (line 25)

**UNITED STATES DISTRICT COURT**

```
  1   records, do you adopt that chart as a true and correct summary
  2   of the wires and the bank records that you reviewed?
  3              MR. AVENATTI:  Objection.  Leading.
  4              THE COURT:  Overruled.
02:09PM  5              THE WITNESS:  Yes, I do.
  6   Q    BY MR. WYMAN:  Can you please take a look at Exhibit 457.
  7   It should be in Volume VII of the binders behind you.
  8              Do you recognize this chart?
  9   A    Yes, I do.
02:10PM 10   Q    Is this the chart that you reviewed and verified
 11   summarizing the wire transfers identified in the Indictment?
 12   A    Yes, it is.
 13   Q    And does Exhibit 457 fairly and accurately summarize the
 14   bank records you reviewed for those ten wire transfers?
02:11PM 15   A    Yes, it does.
 16              MR. WYMAN:  Your Honor, the Government offers
 17   Exhibit 457 pursuant to Rule 1006.
 18              MR. AVENATTI:  Objection, Your Honor.  Pursuant to
 19   1006, lack of foundation, as well as the previous objections
02:11PM 20   stated.
 21              THE COURT:  Overruled.
 22              **(Exhibit Number 457 received.)**
 23   Q    BY MR. WYMAN:  I want to ask you about just a few
 24   features of this chart, Special Agent Clark.
02:11PM 25              Focusing on page 1, in the left-hand column, what
```

```
 1    information is reflected there?
 2    A     In the left-hand column is the date.
 3    Q     And in the middle column, what information is provided
 4    there?
 5    A     It would be the particulars of the wire transfer.
 6    Q     And then on the right-hand column, what information is
 7    there?
 8    A     It's the Fedwire information for the output message
 9    accountability data or the input message accountability data.
10    Q     When you say -- it looks like it says "OMAD" and "IMAD."
11    Is that what you're referring to?
12    A     Yes.
13    Q     I want to ask you about just a few of these examples.
14    For the first row, what is the date of the wire transfer?
15    A     On the top, 1/30/15.
16    Q     And how much was the wire for, listed in this row?
17    A     $250,000.
18    Q     Who is the originator?
19    A     It's an account in the name of Avenatti & Associates, a
20    professional corp.
21    Q     And the beneficiary?
22    A     I'm sorry, I didn't hear you.
23    Q     I'm sorry.  The beneficiary of the wire transfer?
24    A     To an account at HomeStreet Bank account in the name of
25    Global Baristas US, LLC.
```

```
 1    Q     And then the third row, two below that, what's the date
 2    of that transfer?
 3    A     1/26/17.
 4    Q     And how much was that wire for?
 5    A     $2,500,000.
 6    Q     Who was the originator of that transfer?
 7    A     An account in the name of the State Bar of California,
 8    Eagan Avenatti, LLP, attorney-client trust account.
 9    Q     And the beneficiary?
10    A     The beneficiary is a Chase -- J.P.Morgan Chase account in
11    the name of The X-Law Group, PC.
12    Q     Can you please turn to page 2.  The second-to-the-last
13    row, what is the date of that wire transfer?
14    A     6/18/2018.
15    Q     How much is that wire for?
16    A     $16,000.
17    Q     And the beneficiary of that wire?
18    A     The beneficiary of that wire is Alexis Gardner.
19    Q     And last example, the last row, what is the date of that
20    wire transfer?
21    A     7/13/2018.
22    Q     And the beneficiary?
23    A     Geoffrey Johnson.
24    Q     Thank you, Special Agent Clark.
25               MR. WYMAN:  No further questions.
```

```
 1              THE COURT:  Mr. Avenatti.

 2                       CROSS-EXAMINATION

 3   BY MR. AVENATTI:

 4   Q    Mr. Clark, good afternoon.

 5   A    Good afternoon.

 6   Q    We have never met; is that true?

 7   A    That's correct.

 8   Q    What is the extent of your involvement with this case?

 9   A    I had no participation in the investigation of this case.

10   Q    Okay.  Have you had any role in the case whatsoever other

11   than preparing to come here to testify?

12   A    No.

13   Q    When did you first learn that you were going to be called

14   on to testify?

15              MR. WYMAN:  Objection.  Relevance.

16              THE COURT:  Overruled.

17              THE WITNESS:  Yesterday late morning.

18   Q    BY MR. AVENATTI:  You did not prepare Exhibit 457; am I

19   correct?

20   A    That is correct.

21   Q    Okay.  Who did?

22   A    Members of the investigative team.

23   Q    Okay.  But who?  Can you give the names to the jury of

24   the people that actually prepared this Exhibit 457 that they've

25   been shown?
```

```
  1  A    I know that Agent Ryan Roberson had some participation in

  2  it.  I know that AUSA Alex Wyman had some participation.  But I

  3  don't know if that's exclusive to who assisted in the

  4  preparation.

02:16PM  5  Q    So you know, at a minimum, while you did not prepare

  6  Exhibit 457, Mr. Roberson assisted in preparing it and

  7  Mr. Wyman.  Do I have that correct?

  8              MR. WYMAN:  Asked and answered.

  9              THE COURT:  Overruled.

02:16PM 10              THE WITNESS:  Correct.

 11  Q    BY MR. AVENATTI:  And you know that they assisted in

 12  preparing it because you conversed with them about it before

 13  you took the stand; is that right?

 14  A    Correct.

02:16PM 15  Q    Did you see Agent Roberson before you took the stand

 16  today?

 17              MR. WYMAN:  Objection.  Relevance.

 18              THE COURT:  Overruled.

 19              THE WITNESS:  Yes.  I've seen him many days before

02:16PM 20  today.  Absolutely.

 21  Q    BY MR. AVENATTI:  Yes.  And including today; right?

 22  A    Yes.

 23  Q    Did you see him out in the hallway?

 24  A    Yes.

02:16PM 25  Q    Do you have any idea why he wasn't called to testify
```

```
 1   about the chart that he helped prepare?
 2              MR. WYMAN:  Objection.  Relevance.
 3              THE COURT:  Overruled.
 4              THE WITNESS:  No.  I was called to testify because
 5   Agent Bellis could not testify.
 6              MR. AVENATTI:  Move to strike everything after "No"
 7   as nonresponsive.
 8              THE COURT:  Will be stricken.
 9   Q    BY MR. AVENATTI:  At any point in time after you got this
10   call yesterday about the fact that the Government wanted you to
11   come and testify about a chart that you had not prepared, did
12   you say to anybody, "Hey, guys, I don't understand why I'm
13   being called to testify.  I didn't have anything to do with
14   preparing the chart.  Why don't you just call Ryan or Alex."
15   Did you say anything like that?
16              MR. WYMAN:  Argumentative.
17              THE COURT:  Sustained.
18   Q    BY MR. AVENATTI:  Sir, prior to testifying here today,
19   did you ever suggest that maybe somebody else who actually
20   prepared the chart should be called to testify?
21              MR. WYMAN:  403.
22              THE COURT:  Overruled.
23              THE WITNESS:  No.
24   Q    BY MR. AVENATTI:  Now, not only did you not prepare the
25   chart, but you did not supervise the creation of the chart; am
```

**UNITED STATES DISTRICT COURT**

```
 1   I right?

 2   A    Correct.

 3   Q    By the time you were told that you were going to come in

 4   to testify about this chart, the chart was already done; is

 5   that right?

 6   A    The chart was complete, and I verified the data for

 7   accuracy on the report.

 8              MR. AVENATTI:  Move to strike everything after

 9   "complete" as nonresponsive.

10              THE COURT:  It will be stricken.

11   Q    BY MR. AVENATTI:  So after you were called to testify,

12   you had no role in editing the chart; am I correct about that?

13   A    The chart was not edited when I was called to testify.

14              MR. AVENATTI:  Can we have 457, please.

15   Q    Do you have 457?

16   A    I pulled it out of the binder.

17   Q    You were asked about a number of these rows on the chart.

18   Do you see that?  Do you remember that you were just asked

19   that?

20   A    Yes.

21   Q    Okay.  And the first one you were asked about was this

22   $250,000 wire transfer; right?

23   A    Yes.  Row 1.

24   Q    Row 1.  The amount of work that you put in to creating

25   row 1 on the chart, the amount of work that you put in creating
```

02:18PM (line 5)
02:18PM (line 10)
02:19PM (line 15)
02:20PM (line 20)
02:20PM (line 25)

```
 1    it, was zero; right?
 2    A      I didn't create the chart.
 3    Q      So the amount of work was zero; right?
 4    A      Correct.
 5    Q      Okay.  And the same answer, "zero," would be true for
 6    every row on the chart; correct?
 7    A      Correct.
 8    Q      Now, this $250,000 payment in row 1, you see that?
 9    A      Yes.
10    Q      Okay.  You don't know where that money came from before
11    it was wired, do you?
12    A      No, I do not.
13    Q      And do you know if that money was from attorney's fees or
14    costs for any of the clients?  Do you know?
15    A      Can you rephrase?
16              MR. AVENATTI:  Can I have it read back?
17              THE COURT:  Yes.
18              (The record was read as follows:
19              "And do you know if that money was from
20         attorney's fees or costs for any of the clients?  Do
21         you know.")
22              THE WITNESS:  Are you referring to the source of the
23    funds for the $250,000 wire transfer?
24    Q      BY MR. AVENATTI:  Correct.
25    A      No, I do not.
```

```
 1    Q    Okay.  So you don't know if this wire transfer is
 2    evidence of any crime, do you?
 3    A    This chart represents the --
 4    Q    Sir, just answer my question.
 5    A    No.
 6    Q    Okay.  Well, how about the second one, the second row, do
 7    you know whether this wire transfer is evidence of any crime?
 8    A    No.
 9    Q    Do you know if this money came from any cost or fees that
10    were legitimately owed?
11    A    No.
12    Q    How about the third row, is that evidence of any crime,
13    do you know?
14    A    No, I do not.
15    Q    Did it come from any cost or fees that were legitimately
16    owed?
17    A    I do not know the source.
18    Q    Same answer on row 4 and same answer on row 5; correct?
19    A    Correct.
20    Q    And same answer on every other row in this chart; isn't
21    that true?
22    A    Yes.
23    Q    So the total amount of evidence that you're aware of
24    relating to whether any of these payments constitute a crime,
25    the total amount of that evidence would be zero; is that
```

02:22PM (line 5)
02:22PM (line 10)
02:22PM (line 15)
02:22PM (line 20)
02:23PM (line 25)

```
 1   correct?

 2   A    I have no knowledge of the source of the funds for any of

 3   those transactions.

 4   Q    So it would be zero; right?

 5   A    Yes.

 6           MR. AVENATTI:  Your Honor, at this time I'd move to

 7   strike 457 as lacking adequate foundation pursuant to 1006.

 8           THE COURT:  Denied.

 9           MR. AVENATTI:  I'll pass the witness, Your Honor.

10                       REDIRECT EXAMINATION

11   BY MR. WYMAN:

12   Q    Special Agent Clark, based on your review of the bank

13   records, did you verify that every piece of information on this

14   chart was accurate?

15   A    Yes.

16   Q    Thank you.

17           MR. WYMAN:  No further questions.

18           THE COURT:  Mr. Avenatti?

19                     RECROSS-EXAMINATION

20   BY MR. AVENATTI:

21   Q    But you didn't verify any significance to any of it, did

22   you?

23           MR. WYMAN:  Asked and answered.  Outside the scope.

24           THE COURT:  Sustained.

25   Q    BY MR. AVENATTI:  Why didn't you recreate the chart from
```

02:23PM (line 5)
02:23PM (line 10)
02:23PM (line 15)
02:24PM (line 20)
02:24PM (line 25)

38

```
 1   your own work?
 2              MR. WYMAN:  Same objections.
 3              THE COURT:  Sustained.
 4   Q    BY MR. AVENATTI:  Well, you were asked if you verified
 5   the information, and you said that you had; correct?  That's
 6   what you were just asked; right?
 7   A    The information was verified, yes.
 8   Q    Uh-huh.  Why didn't you just create your own chart from
 9   your own work?
10              MR. WYMAN:  Same objections.
11              THE COURT:  Sustained.
12              MR. AVENATTI:  Nothing further.
13              THE COURT:  May the witness be excused?
14              MR. AVENATTI:  Yes, sir.
15              MR. WYMAN:  Yes, Your Honor.
16              THE COURT:  Sir, you may be excused.  Thank you.
17              MR. WYMAN:  Thank you, Your Honor.
18              The United States calls Robert Amenta.
19        ROBERTO AMENTA, GOVERNMENT WITNESS, WAS SWORN
20              THE COURTROOM DEPUTY:  If you'll please state and
21   spell your first and last name.
22              THE WITNESS:  Sure.  So it's Roberto Amenta,
23   A-m-e-n-t-a.
24              THE COURTROOM DEPUTY:  Thank you.
25              THE COURT:  Mr. Wyman.
```

02:24PM (line 5)
02:24PM (line 10)
02:24PM (line 15)
02:25PM (line 20)
02:26PM (line 25)

|   | |
|---|---|
| 1 | MR. WYMAN:  Thank you. |
| 2 | **DIRECT EXAMINATION** |
| 3 | BY MR. WYMAN: |
| 4 | Q    Good afternoon, Mr. Amenta. |
| 02:26PM 5 | A    Good afternoon. |
| 6 | Q    Where do you work? |
| 7 | A    I work at the Federal Reserve Bank of New York. |
| 8 | Q    What is the Federal Reserve Bank of New York? |
| 9 | A    The Federal Reserve Bank is one of 12 reserve banks that, |
| 02:26PM 10 | along with the board of governors, makes up the Federal Reserve |
| 11 | System, the central bank. |
| 12 | Q    And what is your title there? |
| 13 | A    I'm a deputy chief investigator. |
| 14 | Q    How long have you worked for the Federal Reserve Bank of |
| 02:26PM 15 | New York? |
| 16 | A    Since November of '93. |
| 17 | Q    And how long have you been in your current role? |
| 18 | A    The last two years. |
| 19 | Q    What are your general duties and responsibilities in that |
| 02:26PM 20 | role? |
| 21 | A    Among other things, I'm responsible for subpoena |
| 22 | compliance with regards to Fedwire Funds transfers. |
| 23 | Q    And what is the Fedwire Funds transfer system? |
| 24 | A    Sure.  It's a product that the Federal Reserve puts out to |
| 02:27PM 25 | the banking industry.  It's a wire transfer. |

1    Q    When a payment is processed through the Fedwire Funds

2    transfer system, does that payment cause an electronic wire

3    communication?

4    A    It does.

02:27PM 5    Q    Where is that wire communication initiated?

6    A    So it initiates at the originator, so the sender's

7    financial institution, and then it goes to the reserve bank.

8    Q    And in between the originating financial institution and

9    the Federal Reserve Bank, where does it go in between?

02:27PM 10   A    So there are two processing facilities at the Federal

11   Reserve that receive wire transfers.  So after April 27 of

12   '09, two Federal Reserve data centers are involved in all

13   Fedwire transactions:  Texas and New Jersey.

14   Q    And if a payment is sent through the system, the Fedwire

02:28PM 15   Funds transfer system, does it necessarily go through both of

16   those places?

17   A    Yes.  All transactions go through both sites.

18   Q    If a payment was sent in the Fedwire Funds transfer

19   system post 2009, does that mean it necessarily traveled to

02:28PM 20   Texas and New Jersey?

21   A    It did.

22   Q    As part of your duties and responsibilities, are you able

23   to review records regarding payments sent through the Fedwire

24   Funds transfer system?

02:28PM 25   A    I am.

**UNITED STATES DISTRICT COURT**

1         MR. WYMAN:  Can we please pull up what is already in

2    evidence as Exhibit 457.

3    Q    It should be right in front of you in that binder.

4    A    Okay.

02:28PM 5    Q    Do you have it front of you?

6    A    I do.

7    Q    Have you previously reviewed this chart?

8    A    I have.

9    Q    Generally speaking, what information is provided on this

02:28PM 10   chart?

11   A    So its date, wire transfer information, and Fedwire OMAD

12   or IMAD.  Those are unique identifiers that the Federal Reserve

13   puts on each transaction.

14   Q    Have you reviewed Fedwire records to determine whether

02:29PM 15   these ten wire transfers were processed through the Fedwire

16   Funds transfer system?

17   A    I have.

18   Q    And were they?

19   A    Yes.

02:29PM 20   Q    For all ten process --

21   A    All ten.

22   Q    Because these funds -- I'm sorry.  Because these wire

23   transfers were processed through the Fedwire Funds transfer

24   system, does that mean that they necessarily traveled to

02:29PM 25   New Jersey and Texas?

```
 1              MR. AVENATTI:  Objection.  Leading.

 2              THE COURT:  Overruled.

 3              THE WITNESS:  Yes.  Those transactions post April 27

 4   of '09 will go through those two facilities in Texas and

 5   New Jersey.

 6              MR. WYMAN:  One moment, Your Honor.

 7              Nothing further.  Thank you.

 8              THE COURT:  Mr. Avenatti.

 9                          CROSS-EXAMINATION

10   BY MR. AVENATTI:

11   Q    Mr. Amenta, good afternoon.

12   A    Good afternoon.

13   Q    You and I have never communicated; correct?

14   A    We have not.

15   Q    Now, prior to taking the stand here today, you've had

16   about three interviews with the government agents from this

17   case; is that right?

18   A    I believe two, I believe.

19   Q    Do you recall having a telephone conversation with them

20   on June 7, 2021?

21   A    Correct.

22   Q    And then June 16, 2021?

23   A    Correct.

24   Q    And then August 9, 2021?

25   A    Correct.
```

02:29PM  5
02:29PM 10
02:30PM 15
02:30PM 20
02:30PM 25

```
       1    Q     So three?

       2    A     Correct.

       3    Q     And then did you also have e-mail communications with the

       4    Government?

02:31PM  5    A     I did.

       6    Q     And those e-mail communications related to the subject

       7    matter of your testimony here today?

       8    A     Yes.

       9    Q     And what was the approximate time frame of your e-mail

02:31PM 10    communications with the -- with the government agents or

      11    prosecutors relating to your -- or the subject matter of your

      12    testimony here today?

      13    A     I believe they were in early July.

      14    Q     And were those e-mails and text messages or just e-mails?

02:31PM 15    A     Just e-mails.

      16    Q     And who did you -- who did you communicate with via

      17    e-mail about the subject matter of your testimony here today at

      18    that time?

      19    A     IRS Special Agent Roberson.

02:31PM 20    Q     Anyone else?

      21    A     I don't remember if the AUSA was cc'd.

      22    Q     I'm sorry?

      23    A     I don't remember if the AUSA was cc'd on those

      24    communications.

02:31PM 25    Q     And when you say "the AUSA," are you referring to
```

|   |   |
|---|---|
| 1 | Mr. Sagel or Mr. Wyman?  Because we have two of them here |
| 2 | today. |
| 3 | A    I believe it was Mr. Wyman. |
| 4 | Q    And as it relates to these e-mail communications you had |
| 02:32PM 5 | with Mr. Roberson, those were back and forth relating to the |
| 6 | topic that you're testifying here today? |
| 7 | A    No.  It was relating to the chart, yes. |
| 8 | Q    Oh, the chart, 457? |
| 9 | A    Correct. |
| 02:32PM 10 | Q    So he was providing you with a draft of the chart and |
| 11 | then you were responding? |
| 12 | A    Correct. |
| 13 | MR. AVENATTI:  Your Honor, can I have a sidebar, |
| 14 | please? |
| 02:32PM 15 | THE COURT:  No. |
| 16 | MR. AVENATTI:  Okay. |
| 17 | Q    Do you have a recollection of -- well, strike that. |
| 18 | And did you provide feedback on the chart? |
| 19 | A    I did. |
| 02:33PM 20 | Q    And did he incorporate -- well, strike that. |
| 21 | You just saw the chart, 457; right? |
| 22 | A    Correct. |
| 23 | Q    And did he incorporate some of your revisions and |
| 24 | feedback on the chart? |
| 02:33PM 25 | A    No. |

```
 1   Q    Did anyone ever ask you to compile those written
 2   communications before you testified here today?
 3   A    No.
 4   Q    I'd like to understand and have the jury -- have the
 5   benefit of understanding how it was that you verified that
 6   those ten wire transfers actually went through the system that
 7   you described.  So can you describe the process by which you
 8   verified that?
 9   A    Sure.  I was able to look at the Fedwire Funds system by
10   the IMAD numbers that are there.
11   Q    Who provided the IMAD numbers?
12   A    The IMAD numbers were provided -- some were provided by us
13   via subpoena and some were provided by bank records from the
14   agent.
15   Q    Mr. Roberson?
16   A    Correct.
17   Q    Was that by e-mail?
18   A    That was by e-mail.
19   Q    And was that in July or before July?
20   A    Well, the chart was seen in July.  I believe we talked
21   about transactions in June.
22   Q    So you had written communications back and forth in June
23   and July?
24   A    No.  Just July.
25   Q    So when you spoke about the transactions in June, it was
```

```
  1    by phone?
  2    A     Yes.
  3    Q     And then once you were given the IMAD number, what did
  4    you do next to verify that, in fact, they had gone through the
  5    Fedwire system?
  6    A     Well, I looked in the -- had them pulled in the system and
  7    I reviewed them.
  8    Q     What did you have pulled and how?
  9    A     We pulled the Fedwire Funds transfers for these IMADs.
 10    Q     And how did you go about doing that?
 11    A     I asked our wholesale product office for those records.
 12    Q     Where is that?
 13    A     In New Jersey.
 14    Q     And what exactly did you ask for?  I mean, you had an
 15    IMAD number.  Do you ask for a regional record or a local
 16    record?  Explain to the jury how --
 17    A     No.  So an IMAD is very unique.  It is unique by
 18    year/month/day, then a sequence that's an endpoint for a
 19    financial institution, and then it's that message for that day.
 20    There is no two IMADs or OMADs for a print transaction.
 21    They're very unique.
 22    Q     And when you asked for that information, was that in
 23    writing or by e-mail?
 24    A     In writing.
 25    Q     And --
```

47

```
          1    A      In e-mail.  I'm sorry.

          2    Q      So you received a request from the agent, and you then

          3    communicated in e-mail with others in order to verify the

          4    information?

02:36PM   5    A      Correct.

          6    Q      And that related to the subject matter of your testimony

          7    here today?

          8    A      Correct.

          9    Q      And then did they respond with the information by e-mail?

02:36PM  10    A      Yes.

         11    Q      Did anyone ever ask you to gather those e-mails before

         12    you testified here today?

         13    A      No.

         14    Q      And then when they -- when they sent -- well, strike

02:36PM  15    that.

         16            So did they verify that IMADs in these reports or

         17    did they send you the reports back for you to verify?

         18    A      No, I reviewed the reports and verified.

         19    Q      After they sent them back to you?

02:37PM  20    A      Correct.

         21    Q      And then how did you convey that information to either

         22    the AUSAs or Special Agent Roberson?

         23    A      I informed them that these were all Fedwire Funds

         24    transfers.

02:37PM  25    Q      Now, you are not aware -- strike that.
```

**UNITED STATES DISTRICT COURT**

```
 1              You did not have any knowledge of any evidence as to
 2    whether these ten wire transfers constitute any crime.  Am I
 3    correct about that?
 4    A     Correct.
 5    Q     You don't know one way or the other; is that right?
 6    A     Correct.
 7              THE REPORTER:  I'm sorry, can you get closer to the
 8    mic, please.
 9              THE WITNESS:  I'm sorry.  Correct.  My apologies.
10    Q     BY MR. AVENATTI:  You were simply asked to confirm that
11    the ten transfers went through the Fedwire system.  Do I have
12    that correct?
13    A     That's right.
14              MR. AVENATTI:  One moment, Your Honor.
15              Nothing further, Your Honor.  Thank you.
16              MR. WYMAN:  No further questions.
17              THE COURT:  May the witness be excused?
18              THE WITNESS:  Thank you.
19              THE COURT:  No, I'm not asking you.  Hang on a
20    second.
21              May the witness be excused?
22              MR. AVENATTI:  Your Honor, I'm going to reserve the
23    right to recall him, actually.
24              THE COURT:  Sir, you're excused for now but you're
25    subject to recall.
```

02:37PM 5
02:38PM 10
02:38PM 15
02:38PM 20
02:38PM 25

```
 1                 THE WITNESS:  Okay.

 2                 THE COURT:  Thank you.  You may step down.

 3                 MR. WYMAN:  Your Honor, the United States calls John

 4   Drum.

02:39PM  5        THE COURTROOM DEPUTY:  If you can stand behind the

 6   court reporter and raise your right hand.

 7            JOHN DRUM, GOVERNMENT WITNESS, WAS SWORN

 8                 THE COURTROOM DEPUTY:  If you'll please state and

 9   spell your first and last name.

02:40PM 10        THE WITNESS:  My name is John Drum, J-o-h-n,

11   D-r-u-m.

12                 THE COURTROOM DEPUTY:  Thank you.

13                 THE COURT:  Mr. Wyman.

14                 MR. WYMAN:  Thank you, Your Honor.

02:40PM 15                 DIRECT EXAMINATION

16   BY MR. WYMAN:

17   Q    Good afternoon, Mr. Drum.  Where do you work?

18   A    I work for Analysis Group.

19   Q    What is Analysis Group?

02:40PM 20   A    Analysis Group is an economic consulting company.  They

21   perform financial analyses in various settings.

22   Q    What is your title at Analysis Group?

23   A    Vice president.

24   Q    As vice president, what are your general job

02:40PM 25   responsibilities?
```

A     I oversee financial analyses primarily in some sort of
dispute setting.

Q     Are you regularly hired to conduct financial analysis in
connection with litigation?

A     Yes.

Q     Let's discuss your background and financial analysis.
Starting with your educational background, where did you attend
college?

A     I received undergraduate and graduate degrees from the
Ohio State University.

Q     And what degrees did you receive?

A     Bachelor of Science in Accounting and Finance, and a
Master of Accounting.

Q     After you received those degrees, did you obtain any
professional licenses?

A     Yes.

Q     Which licenses did you obtain?

A     I'm a licensed certified public accountant in Illinois.  I
also hold and am designated a Chartered Financial Analyst.

Q     When did you obtain those licenses?

A     The CPA in 2012, and the CFA in 2013.

Q     Do you continue to hold those licenses today?

A     Yes.

Q     Let's briefly discuss your work history now.  After
graduating, where did you work?

```
 1   A     I worked for the Financial Accounting Standards Board,
 2   which is a rulemaking organization that creates accounting
 3   standards.
 4   Q     What was your title there?
 5   A     Postgraduate technical assistant.
 6   Q     And in that role, what type of work did you perform?
 7   A     I assisted the board and the staff in researching and
 8   creating new accounting standards.
 9   Q     How long did you work there?
10   A     One year.
11   Q     After that, where did you work?
12   A     I worked for KPMG.  It's a large public accounting firm.
13   Q     What was your title at KPMG?
14   A     Senior associate.
15   Q     And what kind of work did you do there?
16   A     I assisted companies with complex transactions and how to
17   account for them, as well as perform business and intangible
18   asset valuation services.
19   Q     How long did you work at KPMG?
20   A     Approximately three years.
21   Q     After you left KPMG, where did you go?
22   A     I worked for Analysis Group.
23   Q     And that's where you currently work?
24   A     Yes.
25   Q     What year was it when you started at Analysis Group?
```

UNITED STATES DISTRICT COURT

```
 1   A     2011.
 2   Q     And in the past ten years, have you held other titles
 3   besides senior vice president or vice president?
 4   A     Yes.
 5   Q     And what other titles -- well, let me ask, how, if at
 6   all, have your job responsibilities changed in the past ten
 7   years?
 8   A     My job responsibilities have evolved from conducting one
 9   aspect of one analysis to overseeing the entirety of many
10   analyses.
11   Q     Sorry about that.
12         Has your job at Analysis Group always involved
13   conducting financial analysis?
14   A     Yes.
15   Q     Over the past ten years, what types of matters have you
16   performed financial analysis on?
17   A     I perform financial analyses in bankruptcy disputes,
18   commercial disputes, contract disputes, regulatory matters,
19   shareholder litigations.
20   Q     Now, were you and your company, Analysis Group, hired by
21   the Government to conduct financial analysis as part of the
22   Government's case against the defendant, Michael Avenatti?
23   A     Yes.
24   Q     And has the -- has Analysis Group been paid approximately
25   $640,000 by the Government?
```

02:43PM  (line 5)
02:43PM  (line 10)
02:43PM  (line 15)
02:44PM  (line 20)
02:44PM  (line 25)

 1    A      Yes.  We've been approved for approximately 640,000.

 2    Q      Does that payment include work that Analysis Group has

 3    done on other matters as well as this one?

 4    A      Yes.

02:44PM  5    Q      As part of your work for the Government, were you asked

 6    to analyze financial records related to the defendant's

 7    handling of funds concerning various clients of his?

 8    A      Yes.

 9    Q      Was one of these clients Geoffrey Johnson?

02:44PM 10    A      Yes.

11    Q      Was another Alexis Gardner?

12    A      Yes.

13    Q      Gregory Barela?

14    A      Yes.

02:44PM 15    Q      And Michelle Phan and Long Tran?

16    A      Yes.

17    Q      What kinds of records did you review in conducting your

18    analysis with respect to these clients?

19    A      I reviewed bank records, QuickBooks data, settlement

02:45PM 20    agreements primarily.

21    Q      When you say "QuickBooks data," what is that?

22    A      QuickBooks is a software used by firms to record

23    accounting transactions.

24    Q      And you said you reviewed settlement agreements as well?

02:45PM 25    A      Yes.

```
 1    Q     Did you also review fee agreements with the defendant?

 2    A     Yes.

 3    Q     And the materials you reviewed, who provided those to

 4    you?

 5    A     The government.

 6    Q     Now, the records you reviewed, were they voluminous in

 7    nature?

 8    A     They were.

 9    Q     How many pages would you say the bank records spanned,

10    approximately?

11    A     Many thousands of pages.

12    Q     As part of your review of these bank records, did you

13    also review spreadsheets produced by the bank reflecting wire

14    transfers?

15    A     I did.

16    Q     And how many rows would you say those spreadsheets

17    contained?

18    A     Again, thousands.

19    Q     Did it take a significant amount of time to review these

20    records?

21              MR. AVENATTI:  Objection.  Leading.

22              THE COURT:  Overruled.

23              THE WITNESS:  Yes, it took a significant amount of

24    time.

25    Q     BY MR. WYMAN:  Based on your review of these voluminous
```

02:45PM
02:45PM
02:46PM
02:46PM
02:46PM

```
 1   records, did you and others working at your direction at

 2   Analysis Group create various charts summarizing your financial

 3   analysis of these records?

 4               MR. AVENATTI:  Leading.  Objection.

 5               THE COURT:  Overruled.

 6               THE WITNESS:  Yes.

 7   Q   BY MR. WYMAN:  Directing your attention to the binder in

 8   front of you to what has been marked as Government's

 9   Exhibits 420 through 450 and Exhibit 456, could you please take

10   a minute to page through those.  My question is going to be

11   whether you recognize them.

12   A   Yes, I recognize this.

13   Q   Are these some of the summary charts that you and

14   Analysis Group prepared?

15   A   Yes.

16   Q   Do these charts fairly and accurately summarize the

17   voluminous financial and other records that you reviewed in

18   this case?

19   A   They do for the matters I was asked to summarize.

20               MR. WYMAN:  Your Honor, at this time the Government

21   moves to admit Exhibits 420 through 450 and Exhibit 456.

22               MR. AVENATTI:  Objection, Your Honor.  Hearsay.

23   Best evidence.  Violative of 1006, federal rule.  Foundation.

24   Authentication.  Violative of 401, 403 and 702.

25               THE COURT:  Overruled.  Exhibits 420 through 450 and
```

The timestamps in the left margin are: 02:46PM (line 5), 02:46PM (line 10), 02:48PM (line 15), 02:48PM (line 20), 02:48PM (line 25).

         1    456 shall be received.

         2              **(Exhibit Numbers 420-450 and 456 received.)**

         3    Q    BY MR. WYMAN:  Okay, let's start with Exhibits 420

         4    through 429.  Which client do these charts relate to?

02:48PM   5    A    Geoffrey Johnson.

         6              MR. WYMAN:  Okay.  Starting with Exhibit 420, if we

         7    can please blow up the content.

         8    Q    What is the title of this chart?

         9    A    "Total amount due to Geoffrey Johnson as of January 29th,

02:49PM  10    2015."

        11    Q    What does the first row in the chart say?

        12    A    "Total settlement amount paid on January 29th, 2015, for

        13    $4 million."

        14    Q    What is that information based on?

02:49PM  15    A    The settlement agreement that I reviewed and bank records.

        16    Q    And it says, "Paid January 29th, 2015"; is that right?

        17    A    That's right.

        18              MR. WYMAN:  Can we please pull up what is already in

        19    evidence as Government's Exhibit 41, page 1.

02:49PM  20    Q    During your review of bank records, did you review a

        21    check deposited in that amount?

        22    A    I did.

        23    Q    And is this the check that you reviewed?

        24    A    Yes.

02:50PM  25    Q    What is the date of this check?

```
 1   A     January 26, 2015.
 2   Q     And on -- if we go to page 2 now of the exhibit.  What is
 3   the date of the deposit slip for this check?
 4   A     January 29th, 2015.
 5              MR. WYMAN:  If we can return now to Exhibit 420.
 6   Actually, before we do that -- that's fine.  Let's pull up
 7   Exhibit 420.
 8   Q     The next line there below "settlement amount paid," what
 9   is listed there?
10   A     Less legal fees of 1.6 million.
11   Q     And where did that number come from?
12   A     From the retention agreement that outline the percentage
13   the legal fees will be based on.
14   Q     And when you say "retention agreement," who was the
15   agreement between that you reviewed?
16   A     Mr. Avenatti and Geoffrey Johnson.
17              MR. WYMAN:  Your Honor, at this point the Government
18   would move to admit Exhibit 384 pursuant to the custodian
19   declaration, which is Exhibit 394, page 2.
20              MR. AVENATTI:  One moment, Your Honor.
21              384?
22              MR. WYMAN:  Exhibit 384, and the custodian
23   declaration is Exhibit 394, page 2.
24              MR. AVENATTI:  Objection, Your Honor.  Hearsay.
25              THE COURT:  Overruled.  I previously ruled that the
```

02:50PM (line 5)
02:50PM (line 10)
02:51PM (line 15)
02:51PM (line 20)
02:51PM (line 25)

**UNITED STATES DISTRICT COURT**

58

```
 1   declaration in 394 is adequate to establish the business
 2   records exception.
 3              (Exhibit Number 384 received.)
 4              MR. WYMAN:  If we can please pull up Exhibit 384,
 5   page 1.
 6   Q    Mr. Drum, we'll put that on the screen.
 7              If we can please blow up the portion that says --
 8   we'll start with that.
 9              What is the name of the accountholder on this
10   statement?
11   A    Eagan Avenatti, LLP.
12   Q    And if we can go to the right, what is the account number
13   or the last four digits of the account number?
14   A    2851.
15   Q    Is this one of the accounts for which you reviewed the
16   bank records?
17   A    Yes.
18              MR. WYMAN:  And if we can please go down under the
19   Deposits and Credits section.
20   Q    Do you see a deposit for 1.6 million on January 30th?
21   A    Yes, I do.
22   Q    And is that the same amount that we were just discussing
23   of the attorney's fees?
24   A    Yes.
25              MR. WYMAN:  If we can please go back now to
```

02:52PM (5)
02:52PM (10)
02:52PM (15)
02:52PM (20)
02:53PM (25)

1    Exhibit 420.

2    Q    On the bank statement we just reviewed, was the defendant

3    a signatory to that account?

4    A    Yes.

02:53PM 5    Q    Below the row that says "less legal fees," what does the

6    next row say?

7    A    "Less case-related expenses for $532,062."

8    Q    What does that figure represent?

9    A    That represents the expenses that I identified that are

02:53PM 10    related to the Geoffrey Johnson case.

11    Q    As of what date?

12    A    As of January 29, 2015.

13    Q    The date that the settlement money was paid?

14    A    Yes.

02:53PM 15    Q    Does that figure include rental payments made by the

16    defendant and Eagan Avenatti?

17    A    Yes, it does.

18    Q    How did you calculate that figure?

19    A    I relied on two sources of information.  One is Eagan

02:54PM 20    Avenatti's QuickBooks records, which identify expenses

21    associated with particular matters the firm worked on, as well

22    as a spreadsheet that was e-mailed by Judy Regnier that

23    outlined expenses associated with the Geoffrey Johnson case.

24    Q    When you looked at the QuickBooks records, QuickBooks

02:54PM 25    records for Mr. Johnson's case, how did you determine which

```
  1    expenses datewise to include?

  2    A    I'm sorry, did you say "datewise"?

  3    Q    Yes.

  4    A    I limited the expenses to those that were incurred and

  5    recorded into QuickBooks on or before January 29, 2015.

  6    Q    And when you say "incurred," what do you mean?

  7    A    I mean that Eagan Avenatti would have known they either

  8    paid an amount or an expense or knew that they owed an amount.

  9          So, for example, if I saw an expense for a court

 10    reporter, whether or not the court reporter was paid on or

 11    before January 29, 2015, if they received the invoice and

 12    recorded it in QuickBooks, I included it in this amount.

 13    Q    Other than QuickBooks, you said there was a second source

 14    of information; is that right?

 15    A    Yes.

 16    Q    I believe you said an e-mail from Judy Regnier?

 17    A    Yes, that attached a spreadsheet.

 18          MR. WYMAN:  Can we please pull up what is already in

 19    evidence as Exhibit 48.  And if we can blow up the first

 20    portion, please.

 21    Q    What is the first page of this exhibit?

 22    A    This is a pdf of an e-mail from Judy Regnier to Michael

 23    Avenatti.

 24    Q    What is the date of this e-mail?

 25    A    February 4th, 2015.
```

02:54PM (line 5)
02:55PM (line 10)
02:55PM (line 15)
02:55PM (line 20)
02:55PM (line 25)

```
 1   Q     And going to page 2, what is the attachment?
 2   A     This is the spreadsheet that lists expenses associated
 3   with the Geoffrey Johnson case.
 4   Q     So a minute ago when you were saying the second source of
 5   the calculation for cost-related expenses in Exhibit 420, were
 6   you referring to this spreadsheet?
 7   A     Yes.
 8   Q     If you could please go to page 4.  Do you see a figure
 9   toward the bottom, or I guess halfway through, that says "total
10   expenses"?
11   A     Yes.
12   Q     And what is the amount listed there?
13   A     386,893.
14   Q     And then on page 8 of the exhibit, toward the bottom, do
15   you see a figure listed for total advances?  We'll pull it up
16   on the screen.
17   A     Yes.
18   Q     How much is that?
19   A     352,867, rounded.
20   Q     And right below that do you see a figure for total
21   expenses and advances?
22   A     Yes.
23   Q     And what is that number?
24   A     736,883.
25   Q     So what did you do with this spreadsheet and the
```

                1    QuickBooks data that you mentioned earlier to calculate the

                2    figure in Exhibit 420?

                3    A    So I paired the two spreadsheets and eliminated any

                4    duplicate entries so that I was not double-counting any

    02:57PM     5    expenses.

                6            This number, this 736,000, is higher than the number

                7    that I calculate, primarily because of the treatment of

                8    expenses related to CareMeridian.

                9    Q    And what do you mean by that?

    02:58PM    10    A    Payments -- so the QuickBooks records show expenses for

               11    amounts that were owed to CareMeridian.  And then the amounts

               12    that were owed and not paid to CareMeridian was ultimately

               13    settled for a different amount, a lower amount than the amounts

               14    accrued on the QuickBooks record.

    02:58PM    15            The QuickBooks records appropriately adjust the

               16    expenses associated with CareMeridian to reflect the amount

               17    that was ultimately paid to CareMeridian.  And this spreadsheet

               18    from Judy Regnier double-counts the amounts that were owed to

               19    CareMeridian along with the amount that was actually paid to

    02:58PM    20    CareMeridian.

               21            MR. WYMAN:  Your Honor, would you like to stop?

               22            THE COURT:  That's fine.

               23            Ladies and gentlemen, we're going to stop here for

               24    today.  We'll resume tomorrow at 9:00 o'clock, regular day.

    02:58PM    25            Please remember the admonition not to discuss the

63

```
          1  case with anyone, not to form any opinions on the issues in the
          2  case until it's submitted to you, and no research, please.
          3          So we'll see you 9:00 a.m. tomorrow.  Have a good
          4  evening.
02:59PM   5          THE COURTROOM DEPUTY:  All rise.
          6          (Out of the presence of the jury.)
          7          THE COURT:  As part of Mr. Avenatti's filing at
          8  Docket 679 concerning the Gardner testimony, one of the
          9  exhibits, the physical exhibit, the thumb drive, Exhibit B, how
03:00PM  10  was that prepared?
         11          MR. AVENATTI:  A video was taken, scrolling
         12  through -- a video was taken, scrolling through the tweets
         13  during the relevant time period as referenced in the motion, as
         14  opposed to taking umpteen screenshots and then stacking them as
03:00PM  15  an exhibit.
         16          THE COURT:  Does it purport to pick up any threads
         17  during the same period?
         18          MR. AVENATTI:  I'm going to answer that as best I
         19  can, if I think I understand what Your Honor is asking.
03:01PM  20          So on Twitter, if there is a successive tweet to a
         21  prior tweet by the author of the original tweet, they are
         22  stacked.  And then at the end of the day there's an un- --
         23  there's an unroll function on Twitter.  You can send a message
         24  to somebody and ask them -- or an account and ask them to
03:01PM  25  unroll it, and they then list it in a thread form.
```

1         I think that's what Your Honor is asking.  I do not

2    believe that those are included.  But whatever would be in a

3    thread role would be included, although in a different form

4    than what we provided to the Court.  I hope that answers your

03:01PM 5    question.

6         THE COURT:  I think so.  I think what you're telling

7    me is one way or another, if I went through those screenshots,

8    I would see everything, although some of those screenshots

9    might be duplicated in a thread.  But everything that took

03:02PM 10   place during that time period would be there in one form or

11   another.

12        MR. AVENATTI:  Yes, sir.  That's my understanding.

13   And you can pause the video if you want to read it.

14        THE COURT:  Right.

03:02PM 15        MR. AVENATTI:  We tried to make it as easy as

16   possible.  It wasn't easy to capture, Your Honor.

17        THE COURT:  Okay.  The video says "22K" at the top

18   as part of a -- part of a heading that appears on each shot.

19        MR. AVENATTI:  That's the total number of, I

03:02PM 20   believe, tweets or tweets and replies from that account since

21   inception to the present.  So it's not just during the trial.

22        THE COURT:  So the 22K is less than that total -- or

23   the screenshots captured are less than that 22K?

24        MR. AVENATTI:  Yes, Your Honor.

03:03PM 25        THE COURT:  Okay.

1          MR. AVENATTI:  Yes.

2          THE COURT:  Okay.

3          MR. AVENATTI:  That 22K would have been for however

4    long that account has been around, which is -- is a number of

03:03PM 5    years.

6          THE COURT:  Okay.  I've made a sampling of -- that

7    video runs approximately 18 minutes, so I think I understand

8    what's there.  I've not looked at every single frame, but I

9    believe I've looked at enough frames to understand what there

03:03PM 10   is in terms of types and frequency of various types of images.

11   Okay.

12         MR. AVENATTI:  If the Court desires it in some other

13   form, we'll endeavor to provide that to you.

14         THE COURT:  No.  I think that works.

03:03PM 15         MR. AVENATTI:  We tried to make it as user-friendly

16   as possible.

17         THE COURT:  Okay.  Anything else we ought to take up

18   at this time?

19         MR. AVENATTI:  I have a couple issues, Your Honor.

03:03PM 20         THE COURT:  Go ahead.

21         MR. AVENATTI:  First, I think in light of the

22   testimony that was elicited from Mr. Amenta, there are

23   significant concerns relating to whether we have all of the

24   *Jencks* materials from Mr. Amenta.

03:04PM 25         I used the magic words that Your Honor had pointed

out relating to subject matter of the testimony.  I don't -- I

have not had a chance to check.  Ms. Cummings-Cefali checked

while we were sitting here -- or while I was conducting the

examination, I should say.  I don't believe we have these

03:04PM  e-mails between him and --

THE COURT:  But you told me you haven't had a chance

to check.

MR. AVENATTI:  I agree.  I'm happy to report back to

the Court in the morning.

03:04PM  THE COURT:  Please.

MR. AVENATTI:  Happy to do that, Your Honor.

THE COURT:  Then I assume the Government will make a

similar review.  So let's take this up in the morning.

MR. WYMAN:  Yes, Your Honor.

03:04PM  MR. AVENATTI:  And then, Your Honor, I want to

revisit something that I raised earlier today, and there's

another issue that goes along with that.

The Government is now purporting to have an expert

testify in front of the jury who didn't review the relevant

03:05PM  data, in violation of 702.  He was asked what he reviewed in

preparation of these charts, Your Honor.  There was not a

single mention of Tabs.  They never had -- they spent

600-plus-thousand dollars with the expert.  They were on --

THE COURT:  But by his testimony, not all on

03:05PM  Counts 1 through 10.

1          MR. AVENATTI:  Well, Your Honor, that's up for

2     debate.  And I'd welcome that debate, frankly.

3          THE COURT:  Well, I'll welcome further inquiry based

4     upon what the Government's asked on that topic.

03:05PM 5          MR. AVENATTI:  Well, frankly, I thought that the

6     question asked by Mr. Wyman -- I frankly think that that was

7     not identical to what Your Honor had instructed them to say.

8     The way that they said "matters other than this one," it

9     suggested another criminal matter, frankly, but that's neither

03:06PM 10    here nor there.  I'm not raising that right now, Your Honor.

11         The point is this:  I don't care if they paid them

12    $1 or $650,000.  They didn't have him review the Tabs data

13    which reflects the actual costs incurred on the case.  That --

14         THE COURT:  Sir, in my view, that goes to the weight

03:06PM 15    of his evidence.  I'm not going to strike -- one, we don't have

16    a definitive answer as to the production of Tabs' data.

17    Assuming you're correct that it wasn't produced, I believe it's

18    a subject for cross-examination and it goes to the weight, not

19    the admissibility of his testimony.

03:06PM 20         MR. AVENATTI:  You have our objection relating to --

21    I believe the expert should be -- that there should be a

22    *Daubert* hearing as to whether he reviewed any of the Tabs data.

23    Although, I think at this point it's fairly clear that he did

24    not, which I think is violative of 702.

03:06PM 25         THE COURT:  Sir, you didn't ask him that.  You

```
 1   haven't asked him that yet.
 2              MR. AVENATTI:  Well, he was asked what he reviewed
 3   and he didn't say anything about Tabs.  And the reason is,
 4   Your Honor, because they never had him look at Tabs.
 5              THE COURT:  Well, sir --
 6              MR. AVENATTI:  I'm sorry.
 7              THE COURT:  Go ahead.
 8              MR. AVENATTI:  This --
 9              THE COURT:  This goes to the weight of his
10   testimony.  If you want to explore this further and make any
11   further motions based on what the testimony reveals, you're
12   entitled to do that.
13              MR. AVENATTI:  And, Your Honor, this goes hand in
14   hand with what I raised earlier.  And this is not -- it's not a
15   trick question or difficult question, okay?  We were entitled
16   to production of the Tabs data during the pendency of this case
17   pursuant --
18              THE COURT:  The Government hasn't responded on that.
19   Why don't we take it up -- you raised that this morning.
20              MR. AVENATTI:  Correct.
21              THE COURT:  Well, part of the day we were all
22   sitting here in court.  So why don't we give the Government a
23   chance to follow up on your objections, that specific
24   objection, and take it up tomorrow.
25              MR. AVENATTI:  I'll wait, Your Honor.  I've waited
```

```
 1    two-and-a-half years.  I can wait another night.
 2              THE COURT:  Sir, you don't know whether and I don't
 3    know whether you've been waiting two-and-a-half years for that
 4    data until somebody tells me definitively it was or was not
 5    produced.
 6              MR. AVENATTI:  We'll see what the morning brings.
 7              THE COURT:  Okay.  Anything else?
 8              MR. AVENATTI:  Nothing further from the defense.
 9              THE COURT:  Government have anything?
10              MR. WYMAN:  No, Your Honor.
11              THE COURT:  How much more do you have with Mr. Drum?
12              MR. WYMAN:  I'm still relatively early on.  I would
13    say probably an hour and a half.
14              THE COURT:  Okay.  I thought I had understood your
15    estimate to be an hour.
16              MR. WYMAN:  No, Your Honor.  An hour and a half to
17    two hours, I think, was my estimate.
18              THE COURT:  Okay.  Fine.  Well --
19              MR. SAGEL:  I think I misstated, and I apologize.  I
20    think I said an hour, and I said the wrong number, Your Honor.
21              THE COURT:  Okay.  Well, that clearly will take us
22    through the end of the day tomorrow with your cross.
23              MR. AVENATTI:  So we will not plan on having -- in
24    accordance with what Your Honor said earlier, we'll start our
25    case on Tuesday.
```

03:08PM (line 5)
03:08PM (line 10)
03:08PM (line 15)
03:08PM (line 20)
03:09PM (line 25)

**UNITED STATES DISTRICT COURT**

```
 1              THE COURT:  Right.  Maybe.

 2              MR. AVENATTI:  God willing.

 3              THE COURT:  Okay, if there's nothing further, we'll

 4    be in recess.

 5              THE COURTROOM DEPUTY:  All rise.  This court is in

 6    recess.

 7              (Proceedings concluded at 3:09 p.m.)

 8                          --oOo--

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

03:09PM

**UNITED STATES DISTRICT COURT**

1            *CERTIFICATE OF OFFICIAL REPORTER*

2

3    COUNTY OF LOS ANGELES   )
                             )
4    STATE OF CALIFORNIA     )

5            I, DEBBIE HINO-SPAAN, FEDERAL OFFICIAL REALTIME

6    COURT REPORTER, in and for the United States District Court for

7    the Central District of California, do hereby certify that

8    pursuant to Section 753, Title 28, United States Code that the

9    foregoing is a true and correct transcript of the

10   stenographically reported proceedings held in the

11   above-entitled matter and that the transcript page format is in

12   conformance with the regulations of the Judicial Conference of

13   the United States.

14

15   *Date:  August 12, 2021*

16

17

18

19                          */S/ DEBBIE HINO-SPAAN*

20                          *Debbie Hino-Spaan, CSR No. 7953*
                            *Federal Official Court Reporter*
21

22

23

24

25

**UNITED STATES DISTRICT COURT**

**$**

$16,000 [1] - 30:16
$2,500,000 [1] - 30:5
$250,000 [4] - 29:17, 34:22, 35:8, 35:23
$532,062 [1] - 59:7
$640,000 [1] - 52:25
$650,000 [1] - 67:12

**'**

'09 [2] - 40:12, 42:4
'93 [1] - 39:16

**/**

/S [1] - 71:19

**1**

1 [19] - 4:8, 6:8, 6:10, 6:14, 6:17, 6:23, 7:1, 7:5, 7:8, 7:9, 28:25, 34:23, 34:24, 34:25, 35:8, 56:19, 58:5, 66:25, 67:12
1-053 [1] - 1:24
1.30.2015-3.30.2015 [1] - 3:23
1.6 [2] - 57:10, 58:20
1/26/17 [1] - 30:3
1/30/15 [1] - 29:15
10 [3] - 3:3, 20:15, 66:25
100 [1] - 5:3
1006 [4] - 28:17, 28:19, 37:7, 55:23
1081 [3] - 19:7, 20:7, 20:15
11 [1] - 11:6
1100 [1] - 2:11
11:29 [1] - 11:7
12 [4] - 1:15, 4:1, 39:9, 71:15
16 [1] - 42:22
17 [1] - 2:18
18 [2] - 3:4, 65:7
19 [1] - 1:9
1:06 [1] - 11:3
1:25 [2] - 1:16, 4:2

**2**

2 [6] - 1:9, 30:12, 57:2, 57:19, 57:23, 61:1
2009 [1] - 40:19
2011 [1] - 52:1
2012 [1] - 50:21
2013 [1] - 50:21

2015 [9] - 56:10, 56:12, 56:16, 57:1, 57:4, 59:12, 60:5, 60:11, 60:25
2018 [4] - 14:9, 14:25, 20:8, 20:17
2019 [1] - 16:7
2021 [6] - 1:15, 4:1, 42:20, 42:22, 42:24, 71:15
213-894-2435 [1] - 2:12
22 [2] - 3:4, 25:4
22K [4] - 64:17, 64:22, 64:23, 65:3
24 [1] - 3:6
24th [1] - 20:17
254 [1] - 2:19
26 [1] - 57:1
27 [2] - 40:11, 42:3
28 [2] - 3:18, 71:8
2851 [2] - 3:23, 58:14
29 [3] - 59:12, 60:5, 60:11
294 [3] - 19:2, 23:11, 23:22
29th [4] - 56:9, 56:12, 56:15, 57:4
2:29 [1] - 11:7
2:30 [1] - 11:6

**3**

3 [1] - 20:16
30th [1] - 58:20
31 [1] - 3:6
312 [1] - 2:11
352,867 [1] - 61:19
37 [2] - 3:7, 3:7
384 [6] - 3:23, 57:18, 57:21, 57:22, 58:3, 58:4
386,893 [1] - 61:13
39 [1] - 3:9
394 [3] - 57:19, 57:23, 58:1
3:00 [3] - 6:25, 7:11, 9:23
3:09 [1] - 70:7
3:45 [1] - 4:10

**4**

4 [6] - 20:20, 21:4, 21:13, 36:18, 56:13, 61:8
401 [1] - 55:24
403 [3] - 26:3, 33:21, 55:24
41 [1] - 56:19

411 [2] - 1:24, 2:6
42 [1] - 3:9
420 [10] - 55:9, 55:21, 55:25, 56:3, 56:6, 57:5, 57:7, 59:1, 61:5, 62:2
420-450 [2] - 3:20, 56:2
429 [1] - 56:4
450 [3] - 55:9, 55:21, 55:25
456 [5] - 3:21, 55:9, 55:21, 56:1, 59:3
457 [14] - 3:18, 28:6, 28:13, 28:17, 28:22, 31:18, 31:24, 32:6, 34:14, 34:15, 37:7, 41:2, 44:8, 44:21
48 [1] - 60:19
49 [1] - 3:11
4th [3] - 2:6, 16:7, 60:25
4TH [1] - 1:24

**5**

5 [2] - 20:16, 36:18
56 [2] - 3:20, 3:21
58 [1] - 3:23

**6**

6/18/2018 [1] - 30:14
600-plus-thousand [1] - 66:23
640,000 [1] - 53:1
679 [1] - 63:8

**7**

7 [1] - 42:20
7/13/2018 [1] - 30:21
702 [3] - 55:24, 66:20, 67:24
714-338-3598 [1] - 2:7
736,000 [1] - 62:6
736,883 [1] - 61:24
753 [1] - 71:8
7953 [2] - 1:23, 71:20

**8**

8 [1] - 61:14
800 [1] - 27:6
8000 [1] - 2:6

**9**

9 [1] - 42:24
90012 [1] - 2:12

92660 [1] - 2:19
92701 [2] - 1:25, 2:7
949-481-4900 [1] - 2:20
9:00 [2] - 62:24, 63:3

**A**

A-m-e-n-t-a [1] - 38:23
a.m [2] - 11:7, 63:3
able [5] - 4:20, 7:3, 27:8, 40:22, 45:9
above-entitled [1] - 71:11
absolutely [2] - 6:23, 32:20
accommodate [1] - 4:12
accomplished [1] - 21:19
accordance [1] - 69:24
account [16] - 11:17, 12:4, 12:15, 29:19, 29:24, 30:7, 30:8, 30:10, 51:17, 58:12, 58:13, 59:3, 63:24, 64:20, 65:4
accountability [2] - 29:9
accountant [1] - 50:18
accountholder [1] - 58:9
Accounting [3] - 50:12, 50:13, 51:1
accounting [4] - 51:2, 51:8, 51:12, 53:23
accounts [1] - 18:15
accrued [1] - 62:14
accuracy [3] - 27:12, 27:19, 34:7
accurate [1] - 37:14
accurately [2] - 28:13, 55:16
action [3] - 15:12, 15:15, 15:24
actual [2] - 7:16, 67:13
add [5] - 4:16, 10:23, 12:11, 12:14, 12:18
additional [2] - 8:2, 20:14
address [2] - 20:3
adequate [3] - 6:4, 37:7, 58:1
adjust [1] - 62:15
admissibility [1] - 67:19
admit [2] - 55:21, 57:18
admonition [1] - 62:25

adopt [1] - 28:1
advances [2] - 61:15, 61:21
afternoon [15] - 6:12, 7:4, 9:18, 9:20, 18:25, 19:1, 24:23, 24:24, 31:4, 31:5, 39:4, 39:5, 42:11, 42:12, 49:17
agent [6] - 25:1, 25:3, 25:4, 25:6, 45:14, 47:2
Agent [8] - 28:24, 30:24, 32:1, 32:15, 33:5, 37:12, 43:19, 47:22
agents [7] - 16:15, 16:17, 17:4, 17:10, 25:13, 42:16, 43:10
ago [2] - 18:13, 61:4
agree [5] - 5:3, 7:24, 66:8
agreement [4] - 56:15, 57:12, 57:14, 57:15
agreements [3] - 53:20, 53:24, 54:1
ahead [2] - 65:20, 68:7
Alex [2] - 32:2, 33:14
alex.wyman@usdoj. gov [1] - 2:13
ALEXANDER [1] - 2:10
Alexis [2] - 30:18, 53:11
almost [1] - 7:17
AMENTA [2] - 3:8, 38:19
Amenta [6] - 38:18, 38:22, 39:4, 42:11, 65:22, 65:24
AMERICA [1] - 1:5
amount [20] - 34:24, 34:25, 35:3, 36:23, 36:25, 54:19, 54:23, 56:9, 56:12, 56:21, 57:8, 58:22, 60:8, 60:12, 61:12, 62:13, 62:16, 62:19
amounts [4] - 62:11, 62:13, 62:18
Ana [1] - 2:7
ANA [3] - 1:17, 1:25, 4:1
analyses [4] - 49:21, 50:1, 52:10, 52:17
analysis [9] - 27:25, 50:3, 50:6, 52:9, 52:13, 52:16, 52:21, 53:18, 55:3
Analysis [14] - 3:20,

3:22, 49:18, 49:19, 49:20, 49:22, 51:22, 51:25, 52:12, 52:20, 52:24, 53:2, 55:2, 55:14

**Analyst** [1] - 50:19
**analyze** [1] - 53:6
**Andre** [1] - 16:11
**Angeles** [1] - 2:12
**ANGELES** [1] - 71:3
**anon** [2] - 10:13, 10:16
**ANON** [1] - 10:13
**anonymous** [1] - 10:17
**answer** [16] - 5:9, 5:15, 5:21, 14:16, 17:15, 19:4, 23:17, 26:17, 35:5, 36:4, 36:18, 36:20, 63:18, 67:16
**answered** [4] - 13:5, 22:22, 32:8, 37:23
**answers** [1] - 64:4
**antibiotics** [1] - 4:19
**anticipate** [4] - 5:12, 5:18, 9:1, 9:9
**apologies** [1] - 48:9
**apologize** [2] - 13:8, 69:19
**app** [2] - 11:13
**APPEARANCES** [1] - 2:1
**appointment** [4] - 4:10, 4:11, 4:18, 6:13
**appreciate** [1] - 7:1
**appropriate** [1] - 15:3
**appropriately** [1] - 62:15
**approved** [1] - 53:1
**approximate** [1] - 43:9
**apps** [1] - 22:25
**April** [4] - 16:7, 20:17, 40:11, 42:3
**argumentative** [2] - 22:17, 33:16
**aspect** [1] - 52:9
**asset** [1] - 51:18
**Assistant** [2] - 2:5, 2:10
**assistant** [1] - 51:5
**assisted** [5] - 32:3, 32:6, 32:11, 51:7, 51:16
**associate** [1] - 51:14
**associated** [4] - 59:21, 59:23, 61:2, 62:16
**Associates** [1] - 29:19

**assume** [1] - 66:12
**assuming** [1] - 67:17
**attached** [1] - 60:17
**attachment** [1] - 61:1
**attempting** [1] - 15:2
**attend** [1] - 50:7
**attention** [2] - 9:23, 55:7
**Attorney** [4] - 2:4, 2:5, 2:9, 2:10
**attorney** [1] - 30:8
**attorney's** [3] - 35:13, 35:20, 58:23
**attorney-client** [1] - 30:8
**attorneys** [2] - 14:25, 16:11
**August** [2] - 42:24, 71:15
**AUGUST** [2] - 1:15, 4:1
**AUSA** [5] - 24:2, 32:2, 43:21, 43:23, 43:25
**AUSAs** [4] - 16:18, 17:19, 18:6, 47:22
**authentication** [1] - 55:24
**author** [1] - 63:21
**available** [1] - 24:8
**Avenatti** [25] - 3:3, 3:4, 3:6, 3:7, 3:9, 5:2, 6:3, 7:25, 9:24, 19:16, 20:3, 20:7, 22:4, 25:11, 29:19, 30:8, 31:1, 37:18, 42:8, 52:22, 57:16, 58:11, 59:16, 60:7, 63:7
**AVENATTI** [119] - 1:8, 2:15, 2:16, 5:3, 5:5, 5:18, 8:17, 9:4, 9:7, 10:3, 10:19, 11:21, 11:24, 13:7, 13:24, 14:2, 14:18, 14:21, 15:6, 15:23, 16:3, 16:5, 16:25, 17:6, 17:9, 17:16, 17:18, 17:25, 18:2, 18:11, 18:20, 19:10, 19:15, 19:18, 19:22, 20:1, 20:10, 20:25, 21:14, 22:6, 22:10, 22:13, 22:15, 22:20, 22:24, 23:2, 23:4, 23:10, 23:15, 23:17, 24:1, 24:5, 24:7, 26:2, 26:14, 27:3, 27:22, 28:3, 28:18, 31:3, 31:18, 32:11, 32:21, 33:6, 33:9, 33:18,

33:24, 34:8, 34:11, 34:14, 35:16, 35:24, 37:6, 37:9, 37:20, 37:25, 38:4, 38:12, 38:14, 42:1, 42:10, 44:13, 44:16, 48:10, 48:14, 48:22, 54:21, 55:4, 55:22, 57:20, 57:24, 63:11, 63:18, 64:12, 64:15, 64:19, 64:24, 65:1, 65:3, 65:12, 65:15, 65:19, 65:21, 66:8, 66:11, 66:15, 67:1, 67:5, 67:20, 68:2, 68:6, 68:8, 68:13, 68:20, 68:25, 69:6, 69:8, 69:23, 70:2
**Avenatti's** [2] - 59:20, 63:7
**aware** [3] - 13:3, 36:23, 47:25

**B**

**B.Go** [2] - 6:7, 6:12
**Bachelor** [1] - 50:12
**background** [2] - 50:6, 50:7
**bank** [21] - 25:8, 26:9, 26:19, 26:20, 26:22, 27:20, 27:25, 28:2, 28:14, 37:12, 39:11, 40:7, 45:13, 53:19, 54:9, 54:12, 54:13, 56:15, 56:20, 58:16, 59:2
**Bank** [12] - 26:13, 26:20, 26:21, 27:8, 29:24, 39:7, 39:8, 39:9, 39:14, 40:9
**banking** [1] - 39:25
**bankruptcy** [1] - 52:17
**banks** [1] - 39:9
**Bar** [1] - 30:7
**Barela** [1] - 53:13
**Baristas** [1] - 29:25
**based** [7] - 7:12, 7:18, 7:23, 27:25, 37:12, 54:25, 56:14, 57:13, 67:3, 68:11
**Beach** [14] - 2:19, 14:9, 14:22, 15:7, 15:11, 15:16, 15:25, 16:19, 17:1, 17:12, 17:21, 18:8, 18:17, 24:3
**become** [1] - 5:14
**beginning** [1] - 11:3
**behalf** [1] - 16:12

**behind** [2] - 28:7, 49:5
**believes** [2] - 4:19, 8:1
**Bellis** [1] - 33:5
**belonged** [1] - 15:17
**below** [5] - 12:6, 30:1, 57:8, 59:5, 61:20
**beneficiary** [7] - 29:21, 29:23, 30:9, 30:10, 30:17, 30:18, 30:22
**benefit** [1] - 45:5
**best** [4] - 14:14, 17:13, 55:23, 63:18
**between** [4] - 40:8, 40:9, 57:15, 66:5
**beyond** [3] - 14:23, 23:11, 23:23
**binder** [3] - 34:16, 41:3, 55:7
**binders** [1] - 28:7
**blow** [3] - 56:7, 58:7, 60:19
**blurry** [1] - 17:15
**board** [2] - 39:10, 51:7
**Board** [1] - 51:1
**book** [1] - 19:3
**bottom** [2] - 61:9, 61:14
**break** [6] - 9:5, 10:4, 13:14, 22:7, 22:8, 22:10
**Bredahl** [1] - 6:22
**BRETT** [1] - 2:5
**brett.sagel@usdoj. gov** [1] - 2:8
**briefly** [1] - 50:24
**bring** [1] - 4:21
**brings** [1] - 69:6
**burden** [1] - 14:23
**business** [3] - 5:17, 51:17, 58:1
**BY** [56] - 2:5, 2:18, 3:3, 3:5, 3:8, 3:10, 10:3, 14:2, 14:21, 15:6, 15:23, 16:5, 16:25, 17:9, 17:18, 18:11, 18:24, 19:13, 20:14, 21:3, 21:18, 22:6, 22:15, 22:20, 22:24, 23:10, 23:17, 24:1, 24:5, 24:22, 26:6, 26:18, 27:5, 27:25, 28:6, 28:23, 31:3, 31:18, 32:11, 32:21, 33:9, 33:18, 33:24, 34:11, 35:24, 37:11, 37:20, 37:25, 38:4, 39:3, 42:10, 48:10, 49:16, 54:25, 55:7, 56:3

**C**

**C-l-a-r-k** [1] - 24:18
**CA** [1] - 1:25
**calculate** [3] - 59:18, 62:1, 62:7
**calculation** [1] - 61:5
**California** [8] - 2:7, 2:12, 2:19, 26:13, 26:20, 27:8, 30:7, 71:7
**CALIFORNIA** [4] - 1:2, 1:17, 4:1, 71:4
**CALLED** [4] - 3:3, 3:5, 3:8, 3:10
**capture** [1] - 64:16
**captured** [1] - 64:23
**care** [2] - 9:22, 67:11
**CareMeridian** [7] - 62:8, 62:11, 62:12, 62:16, 62:17, 62:19, 62:20
**Carlos** [2] - 16:11, 18:16
**Case** [1] - 1:6
**case** [26] - 8:14, 13:4, 13:10, 14:4, 14:6, 25:10, 25:14, 25:16, 25:19, 25:22, 31:8, 31:9, 31:10, 42:17, 52:22, 55:18, 59:7, 59:10, 59:23, 59:25, 61:3, 63:1, 63:2, 67:13, 68:16, 69:25
**case-related** [1] - 59:7
**cc'd** [2] - 43:21, 43:23
**Cefali** [1] - 66:2
**centers** [1] - 40:12
**Central** [1] - 71:7
**CENTRAL** [1] - 1:2
**central** [1] - 39:11
**certainly** [1] - 7:17
**CERTIFICATE** [1] - 71:1
**certified** [1] - 50:18
**CERTIFIED** [1] - 1:5
**certify** [1] - 71:7
**CFA** [1] - 50:21
**chance** [3] - 66:2, 66:6, 68:23
**changed** [1] - 52:6
**charge** [2] - 14:10, 25:24
**chart** [38] - 27:13, 27:17, 27:20, 28:1, 28:8, 28:10, 28:24, 33:1, 33:11, 33:14, 33:20, 33:25, 34:4, 34:6, 34:12, 34:13, 34:17, 34:25, 35:2,

35:6, 36:3, 36:20, 37:14, 37:25, 38:8, 41:7, 41:10, 44:7, 44:8, 44:10, 44:18, 44:21, 44:24, 45:20, 56:8, 56:11
**Chartered** [1] - 50:19
**charts** [6] - 25:18, 55:2, 55:13, 55:16, 56:4, 66:21
**Chase** [2] - 30:10
**chat** [1] - 12:17
**check** [6] - 56:21, 56:23, 56:25, 57:3, 66:2, 66:7
**checked** [1] - 66:2
**chief** [1] - 39:13
**City** [3] - 26:13, 26:21, 27:7
**civil** [4] - 15:12, 15:15, 15:17, 15:24
**claims** [1] - 16:7
**CLARK** [2] - 3:5, 24:14
**Clark** [6] - 24:13, 24:17, 28:24, 30:24, 31:4, 37:12
**clear** [1] - 67:23
**clearly** [1] - 69:21
**client** [2] - 30:8, 56:4
**clients** [5] - 35:14, 35:20, 53:7, 53:9, 53:18
**close** [1] - 13:17
**closer** [1] - 48:7
**Code** [1] - 71:8
**colleagues** [3] - 15:9, 17:1, 24:2
**collectively** [1] - 9:19
**college** [1] - 50:8
**colloquy** [1] - 21:1
**Colorado** [1] - 8:7
**column** [4] - 28:25, 29:2, 29:3, 29:6
**coming** [3] - 5:25, 8:18, 9:8
**commercial** [1] - 52:18
**committed** [1] - 14:24
**communicate** [1] - 43:16
**communicated** [3] - 13:9, 42:13, 47:3
**communication** [2] - 40:3, 40:5
**communications** [8] - 14:4, 43:3, 43:6, 43:10, 43:24, 44:4, 45:2, 45:22
**companies** [1] - 51:16
**company** [3] - 21:19,

49:20, 52:20
**compile** [1] - 45:1
**complete** [2] - 34:6, 34:9
**complex** [1] - 51:16
**compliance** [1] - 39:22
**concentrate** [1] - 7:3
**concerning** [2] - 53:7, 63:8
**concerns** [1] - 65:23
**concluded** [1] - 70:7
**conclusion** [1] - 15:2
**conduct** [2] - 50:3, 52:21
**conducting** [4] - 52:8, 52:13, 53:17, 66:3
**Conference** [1] - 71:12
**confirm** [1] - 48:10
**conformance** [1] - 71:12
**conjecture** [1] - 21:14
**connection** [1] - 50:4
**constitute** [2] - 36:24, 48:2
**consulting** [1] - 49:20
**contacted** [1] - 15:8
**contain** [1] - 27:2
**contained** [1] - 54:17
**content** [1] - 56:7
**continue** [1] - 50:22
**continued** [2] - 5:6, 5:14
**contract** [1] - 52:18
**conversation** [1] - 42:19
**conversations** [2] - 17:3, 18:14
**conversed** [1] - 32:12
**convey** [1] - 47:21
**copy** [1] - 5:11
**corp** [1] - 29:20
**Corporate** [1] - 2:18
**correct** [45] - 10:14, 10:17, 11:3, 11:4, 12:11, 12:23, 16:15, 19:5, 28:1, 31:7, 31:19, 31:20, 32:7, 32:10, 32:14, 34:2, 34:12, 35:4, 35:6, 35:7, 35:24, 36:18, 36:19, 37:1, 38:5, 42:13, 42:21, 42:23, 42:25, 43:2, 44:9, 44:12, 44:22, 45:16, 47:5, 47:8, 47:20, 48:3, 48:4, 48:6, 48:9, 48:12, 67:17, 68:20, 71:9

**correctly** [1] - 10:24
**corruption** [1] - 25:8
**Cosmetics** [1] - 21:20
**cost** [3] - 36:9, 36:15, 61:5
**cost-related** [1] - 61:5
**Costa** [1] - 6:14
**costs** [3] - 35:14, 35:20, 67:13
**counsel** [1] - 20:4
**COUNSEL** [2] - 2:1, 2:16
**counting** [1] - 62:4
**Counts** [1] - 66:25
**counts** [3] - 25:24, 26:6, 62:18
**COUNTY** [1] - 71:3
**couple** [1] - 65:19
**COURT** [132] - 1:1, 1:24, 4:8, 4:21, 5:2, 5:4, 5:16, 5:22, 5:25, 6:3, 6:7, 6:11, 6:15, 6:21, 6:24, 7:3, 7:7, 7:21, 8:5, 8:10, 8:13, 9:2, 9:5, 9:11, 9:13, 9:16, 9:18, 9:21, 13:6, 14:1, 14:13, 14:15, 14:20, 15:4, 15:21, 16:1, 16:22, 17:8, 17:17, 18:1, 18:3, 18:21, 19:12, 19:25, 20:3, 20:12, 21:2, 21:16, 22:4, 22:12, 22:14, 22:19, 22:23, 23:3, 23:5, 23:16, 24:4, 24:6, 24:9, 24:19, 26:4, 26:15, 26:17, 27:4, 27:23, 28:4, 28:21, 31:1, 31:16, 32:9, 32:18, 33:3, 33:8, 33:17, 33:22, 34:10, 35:17, 37:8, 37:18, 37:24, 38:3, 38:11, 38:13, 38:16, 38:25, 42:2, 42:8, 44:15, 48:17, 48:19, 48:24, 49:2, 49:13, 54:22, 55:5, 55:25, 57:25, 62:22, 63:7, 63:16, 64:6, 64:14, 64:17, 64:22, 64:25, 65:2, 65:6, 65:14, 65:17, 65:20, 66:6, 66:10, 66:12, 66:24, 67:3, 67:14, 67:25, 68:5, 68:7, 68:9, 68:18, 68:21, 69:2, 69:7, 69:9, 69:11, 69:14, 69:18, 69:21, 70:1,

70:3, 71:6
**court** [8] - 5:8, 15:17, 49:6, 60:9, 60:10, 68:22, 70:5
**Court** [8] - 4:6, 5:12, 13:8, 64:4, 65:12, 66:9, 71:6, 71:20
**courthouse** [2] - 13:16, 13:21
**COURTROOM** [9] - 6:9, 24:15, 38:20, 38:24, 49:5, 49:8, 49:12, 63:5, 70:5
**courtroom** [2] - 6:10, 7:9
**cover** [1] - 4:6
**CPA** [1] - 50:21
**create** [4] - 27:16, 35:2, 38:8, 55:2
**creates** [1] - 51:2
**creating** [3] - 34:24, 34:25, 51:8
**creation** [1] - 33:25
**Credits** [1] - 58:19
**crime** [7] - 14:11, 14:24, 36:2, 36:7, 36:12, 36:24, 48:2
**crimes** [2] - 25:7, 25:9
**criminal** [3] - 15:17, 25:2, 67:9
**CROSS** [3] - 10:2, 31:2, 42:9
**cross** [9] - 5:7, 5:10, 5:14, 7:12, 7:16, 7:19, 8:1, 67:18, 69:22
**Cross** [3] - 3:3, 3:6, 3:9
**CROSS-EXAMINATION** [3] - 10:2, 31:2, 42:9
**cross-examination** [4] - 5:7, 5:10, 5:14, 67:18
**Cross-Examination** [3] - 3:3, 3:6, 3:9
**CRR** [1] - 1:23
**CSR** [2] - 1:23, 71:20
**Cummings** [1] - 66:2
**Cummings-Cefali** [1] - 66:2
**current** [1] - 39:17
**cursory** [1] - 25:12
**custodian** [2] - 57:18, 57:22

40:12, 53:19, 53:21, 62:1, 66:20, 67:12, 67:16, 67:22, 68:16, 69:4
**date** [12] - 16:8, 29:2, 29:14, 30:1, 30:13, 30:19, 41:11, 56:25, 57:3, 59:11, 59:13, 60:24
**Date** [1] - 71:15
**dates** [1] - 20:15
**datewise** [2] - 60:1, 60:2
**Daubert** [1] - 67:22
**DAY** [1] - 1:9
**days** [1] - 32:19
**DEAN** [2] - 2:17, 2:18
**deansteward7777@ gmail.com** [1] - 2:20
**debate** [2] - 67:2
**Debbie** [1] - 71:20
**DEBBIE** [3] - 1:23, 71:5, 71:19
**declaration** [3] - 57:19, 57:23, 58:1
**defendant** [13] - 7:13, 19:2, 19:7, 20:18, 21:3, 21:8, 21:12, 21:18, 25:11, 52:22, 54:1, 59:2, 59:16
**DEFENDANT** [1] - 2:14
**Defendant** [1] - 1:9
**defendant's** [1] - 53:6
**defense** [1] - 69:8
**definitive** [1] - 67:16
**definitively** [1] - 69:4
**degrees** [3] - 50:9, 50:11, 50:14
**deleted** [1] - 22:25
**denied** [3] - 14:20, 17:17, 37:8
**dental** [2] - 4:9, 9:22
**Denver** [1] - 8:6
**Department** [7] - 14:22, 15:8, 15:12, 15:16, 16:19, 17:2, 18:18
**deposit** [2] - 57:3, 58:20
**deposited** [1] - 56:21
**Deposits** [1] - 58:19
**DEPUTY** [9] - 6:9, 24:15, 38:20, 38:24, 49:5, 49:8, 49:12, 63:5, 70:5
**deputy** [1] - 39:13
**describe** [1] - 45:7
**described** [1] - 45:7
**designated** [1] - 50:19

**D**

**D-r-u-m** [1] - 49:11
**data** [13] - 29:9, 34:6,

desires [1] - 65:12
detailed [1] - 27:9
detailing [1] - 26:25
details [1] - 18:14
determine [2] - 41:14, 59:25
dhinospaan@yahoo. com [1] - 1:25
different [2] - 62:13, 64:3
difficult [1] - 68:15
digits [1] - 58:13
DIRECT [3] - 24:21, 39:2, 49:15
Direct [3] - 3:6, 3:9, 3:11
direct [1] - 8:3
directing [1] - 55:7
direction [1] - 55:1
discuss [3] - 50:6, 50:24, 62:25
discussing [1] - 10:4, 58:22
discussion [1] - 11:2
dispute [1] - 50:2
disputes [2] - 52:17, 52:18
DISTRICT [3] - 1:1, 1:2, 1:3
District [2] - 71:6, 71:7
DIVISION [1] - 1:2
Docket [1] - 63:8
documents [1] - 3:20
dollars [1] - 66:23
done [2] - 34:4, 53:3
double [2] - 62:4, 62:18
double-counting [1] - 62:4
double-counts [1] - 62:18
doubt [1] - 14:24
down [2] - 49:2, 58:18
draft [2] - 27:17, 44:10
drive [1] - 63:9
Drum [11] - 7:22, 8:4, 8:6, 8:8, 8:13, 8:16, 49:4, 49:10, 49:17, 58:6, 69:11
DRUM [2] - 3:10, 49:7
due [1] - 56:9
duplicate [1] - 62:4
duplicated [1] - 64:9
during [12] - 5:10, 13:13, 13:19, 17:11, 17:21, 18:8, 56:20, 63:13, 63:17, 64:10, 64:21, 68:16
duties [3] - 25:5,

39:19, 40:22

**E**

e-mail [14] - 43:3, 43:6, 43:9, 43:17, 44:4, 45:17, 45:18, 46:23, 47:1, 47:3, 47:9, 60:16, 60:22, 60:24
e-mailed [1] - 59:22
e-mails [5] - 43:14, 43:15, 47:11, 66:5
EA [1] - 3:23
Eagan [5] - 30:8, 58:11, 59:16, 59:19, 60:7
early [2] - 5:13, 43:13, 69:12
easy [2] - 64:15, 64:16
economic [1] - 49:20
edited [1] - 34:13
editing [1] - 34:12
educational [1] - 50:7
effect [2] - 5:20, 14:18
EFFREY [1] - 24:18
either [3] - 9:9, 47:21, 60:7
electronic [1] - 40:2
electronically [1] - 10:20
elicited [1] - 65:22
eliminated [1] - 62:3
EM [1] - 21:20
employed [1] - 25:1
en [1] - 6:6
end [3] - 12:17, 63:22, 69:22
endeavor [1] - 65:13
endpoint [1] - 46:18
entered [1] - 6:10
entire [1] - 11:2
entirety [1] - 52:9
entitled [2] - 68:12, 68:15, 71:11
entries [1] - 62:4
error [1] - 13:7
ESQ [2] - 2:15, 2:18
establish [1] - 58:1
estimate [5] - 7:12, 7:15, 69:15, 69:17
estimates [1] - 7:23
evening [1] - 63:4
EVIDENCE [1] - 3:17
evidence [12] - 14:10, 36:2, 36:7, 36:12, 36:23, 36:25, 41:2, 48:1, 55:23, 56:19, 60:19, 67:15
evolved [1] - 52:8

exact [2] - 16:8, 17:3
exactly [2] - 18:14, 46:14
examination [5] - 5:7, 5:10, 5:14, 66:4, 67:18
Examination [10] - 3:3, 3:4, 3:4, 3:6, 3:6, 3:7, 3:7, 3:9, 3:9, 3:11
EXAMINATION [10] - 10:2, 18:23, 22:5, 24:21, 31:2, 37:10, 37:19, 39:2, 42:9, 49:15
example [4] - 26:12, 30:19, 60:9
examples [1] - 29:13
Excel [1] - 26:24
exception [1] - 58:2
exchange [1] - 12:22
exclusive [1] - 32:3
excused [5] - 38:13, 38:16, 48:17, 48:21, 48:24
exhibit [5] - 57:2, 60:21, 61:14, 63:9, 63:15
EXHIBIT [1] - 3:17
Exhibit [31] - 3:18, 19:2, 19:7, 20:7, 20:15, 28:6, 28:13, 28:17, 28:22, 31:18, 31:24, 32:6, 41:2, 55:9, 55:21, 56:2, 56:6, 56:19, 57:5, 57:7, 57:18, 57:19, 57:22, 57:23, 58:3, 58:4, 59:1, 60:19, 61:5, 62:2, 63:9
exhibits [1] - 63:9
Exhibits [4] - 55:9, 55:21, 55:25, 56:3
EXHIBITS [1] - 3:15
exit [1] - 21:19
expected [1] - 8:23
expense [2] - 60:8, 60:9
expenses [14] - 59:7, 59:9, 59:20, 59:23, 60:1, 60:4, 61:2, 61:5, 61:10, 61:21, 62:5, 62:8, 62:10, 62:16
expert [5] - 7:13, 7:17, 66:18, 66:23, 67:21
explain [1] - 46:16
explore [1] - 68:10
extent [2] - 25:16, 31:8

extract [1] - 6:18
extreme [1] - 4:9

**F**

facilities [1] - 40:10, 42:4
fact [2] - 33:10, 46:4
fair [2] - 9:7, 25:21
fairly [3] - 28:13, 55:16, 67:23
fake [1] - 10:23
familiar [1] - 50:19
family [1] - 13:15
features [1] - 28:24
February [1] - 60:25
Federal [11] - 39:7, 39:8, 39:9, 39:10, 39:14, 39:24, 40:9, 40:10, 40:12, 41:12, 71:20
federal [6] - 16:6, 17:20, 18:7, 25:3, 25:4, 55:23
FEDERAL [2] - 1:24, 71:5
Fedwire [17] - 29:8, 39:22, 39:23, 40:1, 40:13, 40:14, 40:18, 40:23, 41:11, 41:14, 41:15, 41:23, 45:9, 46:5, 46:9, 47:23, 48:11
fee [1] - 54:1
feedback [2] - 44:18, 44:24
fees [8] - 35:13, 35:20, 36:9, 36:15, 57:10, 57:13, 58:23, 59:5
few [2] - 28:23, 29:13
figure [3] - 59:8, 59:15, 59:18, 61:8, 61:15, 61:20, 62:2
file [1] - 15:23
filed [2] - 15:12, 15:15
filing [1] - 63:7
Finance [1] - 50:12
financial [16] - 25:7, 26:18, 40:7, 40:8, 46:19, 49:21, 50:1, 50:3, 50:6, 52:13, 52:16, 52:17, 52:21, 53:6, 55:2, 55:17
Financial [4] - 3:20, 3:21, 50:19, 51:1
fine [5] - 5:16, 5:17, 6:5, 7:6, 57:6, 62:22, 69:18
finish [2] - 7:22, 8:16
firm [2] - 51:12, 59:21

firms [1] - 53:22
first [14] - 9:9, 10:20, 16:6, 24:16, 27:16, 29:14, 31:13, 34:21, 38:21, 49:9, 56:11, 60:19, 60:21, 65:21
five [1] - 19:7
fly [1] - 8:20
focusing [2] - 4:24, 28:25
follow [1] - 68:23
following [1] - 15:11
follows [3] - 8:18, 18:4, 23:6, 23:20, 35:18
FOR [2] - 2:3, 2:14, 2:16
foregoing [1] - 71:9
form [3] - 63:1, 63:25, 64:3, 64:10, 65:13
format [1] - 71:11
forth [3] - 8:20, 44:5, 45:22
foundation [5] - 21:15, 26:2, 28:19, 37:7, 55:23
four [2] - 7:16, 58:13
frame [2] - 43:9, 65:8
frames [1] - 65:9
frankly [4] - 67:2, 67:5, 67:6, 67:9
fraud [4] - 25:8, 25:25, 26:6
frequency [1] - 65:10
fresh [1] - 17:14
friendly [1] - 65:15
front [4] - 41:3, 41:5, 55:8, 66:19
function [1] - 63:23
funds [4] - 35:23, 37:2, 41:22, 53:7
Funds [1] - 39:22, 39:23, 40:1, 40:15, 40:18, 40:24, 41:16, 41:23, 45:9, 46:9, 47:23

**G**

Gardner [3] - 30:18, 53:11, 63:8
gather [1] - 47:11
Geff [1] - 24:13
GEFFREY [2] - 3:5, 24:14
Geffrey [1] - 24:17
general [3] - 25:12, 39:19, 49:24
generally [4] - 10:6, 25:5, 25:10, 41:9

gentlemen [1] - 9:18, 62:23
Geoffrey [8] - 30:23, 53:9, 56:5, 56:9, 57:16, 59:10, 59:23, 61:3
George [1] - 24:18
given [1] - 46:3
Global [1] - 29:25
goals [1] - 21:20
God [1] - 70:2
government [7] - 16:6, 17:20, 18:7, 42:16, 43:10, 54:5, 69:9
Government [22] - 5:11, 5:17, 12:25, 21:9, 21:10, 22:21, 23:8, 23:12, 23:24, 26:9, 28:16, 33:10, 43:4, 52:21, 52:25, 53:5, 55:20, 57:17, 66:12, 66:18, 68:18, 68:22
GOVERNMENT [7] - 3:3, 3:5, 3:8, 3:10, 24:14, 38:19, 49:7
Government's [5] - 25:10, 52:22, 55:8, 56:19, 67:4
governors [1] - 39:10
graduate [1] - 50:9
graduating [1] - 50:25
Gregory [1] - 53:13
Group [13] - 30:11, 49:18, 49:19, 49:20, 49:22, 51:22, 51:25, 52:12, 52:20, 52:24, 53:2, 55:2, 55:14
guess [4] - 4:19, 7:11, 7:13, 61:9
guys [1] - 33:12

## H

half [8] - 7:12, 7:25, 10:20, 11:8, 69:1, 69:3, 69:13, 69:16
halfway [1] - 61:9
hallway [3] - 13:13, 13:19, 32:23
hand [6] - 28:25, 29:2, 29:6, 49:6, 68:13, 68:14
handed [1] - 4:8
handling [1] - 53:7
hang [1] - 48:19
HANNA [2] - 2:4, 2:9
happy [2] - 66:8, 66:11
heading [1] - 64:18
hear [1] - 29:22

heard [1] - 22:15
hearing [1] - 67:22
hearsay [4] - 5:18, 16:20, 55:22, 57:24
Hearsay [2] - 14:12, 15:1
held [2] - 52:2, 71:10
helped [1] - 33:1
hereby [1] - 71:7
Hernandez [1] - 10:19
higher [1] - 62:6
HINO [1] - 1:23, 71:5, 71:19
Hino [1] - 71:20
HINO-SPAAN [3] - 1:23, 71:5, 71:19
Hino-Spaan [1] - 71:20
hired [2] - 50:3, 52:20
history [1] - 50:24
hold [2] - 50:19, 50:22
HomeStreet [1] - 29:24
honest [1] - 17:15
honestly [3] - 15:10, 16:23, 17:5
Honor [72] - 4:17, 4:23, 5:5, 5:19, 5:23, 6:5, 7:10, 8:17, 9:8, 13:25, 14:12, 14:18, 15:19, 16:3, 16:21, 17:16, 17:25, 18:22, 19:10, 20:6, 20:25, 21:15, 22:3, 22:10, 22:13, 22:17, 22:22, 23:2, 23:15, 23:19, 24:12, 24:20, 26:2, 26:16, 28:18, 37:6, 37:9, 38:15, 38:17, 42:6, 44:13, 48:14, 48:15, 48:22, 49:3, 49:14, 55:20, 55:22, 57:17, 57:20, 57:24, 62:21, 63:19, 64:1, 64:16, 64:24, 65:19, 65:25, 66:11, 66:14, 66:15, 66:21, 67:1, 67:7, 67:10, 68:4, 68:13, 68:25, 69:10, 69:16, 69:20, 69:24
HONORABLE [1] - 1:3
hope [1] - 64:4
hopefully [1] - 4:18
hour [9] - 7:12, 7:24, 8:1, 8:3, 11:8, 69:13, 69:15, 69:16, 69:20
hours [2] - 7:16, 69:17
hundreds [1] - 27:2

## I

idea [1] - 32:25
identical [1] - 67:7
identified [2] - 28:11, 59:9
identifiers [2] - 11:20, 41:12
identify [1] - 59:20
Illinois [1] - 50:18
IMAD [8] - 29:10, 41:12, 45:10, 45:11, 45:12, 46:3, 46:15, 46:17
IMADs [3] - 46:9, 46:20, 47:16
images [1] - 65:10
immediate [1] - 9:22
immediately [1] - 10:5
important [5] - 5:15, 17:11, 17:19, 18:5, 18:10
improper [1] - 15:2
IN [2] - 2:14, 3:17
inception [1] - 64:21
include [3] - 53:2, 59:15, 60:1
included [3] - 60:12, 64:2, 64:3
including [2] - 17:7, 32:21
incoming [1] - 26:25
inconvenient [1] - 8:21
incorporate [2] - 44:20, 44:23
incurred [3] - 60:4, 60:6, 67:13
indicating [1] - 4:9
Indictment [5] - 3:19, 25:21, 25:24, 27:10, 28:11
individually [1] - 4:21
individuals [1] - 16:6
industry [1] - 39:25
information [18] - 27:13, 27:20, 29:1, 29:3, 29:6, 29:8, 37:13, 38:5, 38:7, 41:9, 41:11, 46:22, 47:4, 47:9, 47:21, 56:14, 59:19, 60:14
informed [1] - 47:23
initiated [1] - 40:5
initiates [1] - 40:6
input [1] - 29:9
inquire [1] - 7:11
inquiry [2] - 4:17, 67:3
institution [3] - 40:7, 40:8, 46:19

institutions [1] - 26:18
instructed [2] - 10:22, 67:7
intangible [1] - 51:17
Internal [1] - 25:1
interrupt [1] - 19:24
interrupting [1] - 20:2
interview [3] - 17:12, 17:21, 18:8
interviews [1] - 42:16
investigate [1] - 25:7
investigation [3] - 25:2, 26:10, 31:9
investigative [2] - 25:13, 31:22
investigator [3] - 14:9, 14:21, 39:13
investigators [3] - 17:19, 18:6, 24:2
invoice [1] - 60:11
involved [2] - 40:12, 52:12
involvement [3] - 25:16, 25:17, 31:8
IRS [2] - 25:6, 43:19
issue [3] - 5:1, 5:5, 66:17
issues [2] - 63:1, 65:19

## J

J.P.Morgan [1] - 30:10
JAMES [1] - 1:3
January [9] - 56:9, 56:12, 56:16, 57:1, 57:4, 58:20, 59:12, 60:5, 60:11
Jencks [1] - 65:24
Jersey [5] - 40:13, 40:20, 41:25, 42:5, 46:13
job [4] - 49:24, 52:6, 52:8, 52:12
JOHN [5] - 1:8, 2:15, 3:10, 49:7, 49:10
John [2] - 49:3, 49:10
Johnson [8] - 30:23, 53:9, 56:5, 56:9, 57:16, 59:10, 59:23, 61:3
Johnson's [1] - 59:25
joint [1] - 25:9
JUDGE [1] - 1:3
Judicial [1] - 71:12
Judy [4] - 59:22, 60:16, 60:22, 62:18
July [6] - 43:13, 45:19, 45:20, 45:23, 45:24
June [5] - 42:20,

42:22, 45:21, 45:22, 45:25
juror [4] - 4:8, 4:13, 9:23
Juror [3] - 6:7, 6:10, 7:9
JUROR [6] - 6:14, 6:17, 6:23, 7:1, 7:5, 7:8
jurors [2] - 9:19, 9:21
jury [7] - 4:7, 9:17, 31:23, 45:4, 46:16, 63:6, 66:19

## K

keeps [1] - 4:12
Kim [1] - 16:10
kind [3] - 5:8, 17:14, 51:15
kinds [1] - 53:17
knowledge [4] - 14:14, 17:13, 37:2, 48:1
known [1] - 60:7
knows [1] - 4:23
KPMG [4] - 51:12, 51:13, 51:19, 51:21

## L

lack [1] - 28:19
lacking [1] - 37:7
ladies [2] - 9:18, 62:23
large [1] - 51:12
last [10] - 13:24, 14:3, 24:16, 30:12, 30:19, 38:21, 39:18, 49:9, 58:13
late [1] - 31:17
laundering [1] - 25:8
LAW [1] - 2:17
Law [1] - 30:11
lawyers [1] - 16:14
Leading [6] - 26:14, 27:3, 27:22, 28:3, 42:1, 54:21
leading [1] - 55:4
learn [1] - 31:13
learned [4] - 17:11, 17:20, 18:8, 18:17
led [1] - 15:23
left [7] - 7:9, 7:18, 7:25, 8:1, 28:25, 29:2, 51:21
left-hand [2] - 28:25, 29:2
legal [4] - 15:1, 57:10, 57:13, 59:5
legitimate [1] - 4:14

**legitimately** [2] - 36:10, 36:15
**length** [1] - 26:22
**lengthy** [1] - 27:5
**less** [5] - 57:10, 59:5, 59:7, 64:22, 64:23
**letters** [1] - 10:23
**licensed** [1] - 50:18
**licenses** [4] - 50:15, 50:17, 50:20, 50:22
**light** [3] - 7:10, 9:7, 65:21
**limited** [2] - 15:22, 60:4
**line** [3] - 15:5, 16:1, 57:8
**link** [1] - 12:13
**list** [1] - 63:25
**listed** [4] - 29:16, 57:9, 61:12, 61:15
**listener** [1] - 5:20
**listener's** [1] - 14:18
**lists** [1] - 61:2
**litigation** [1] - 50:4
**litigations** [1] - 52:19
**live** [3] - 8:5, 13:16, 13:17
**lives** [2] - 4:11, 13:15
**LLC** [1] - 29:25
**LLP** [2] - 30:8, 58:11
**local** [1] - 46:15
**locate** [1] - 27:9
**look** [3] - 28:6, 45:9, 68:4
**looked** [4] - 46:6, 59:24, 65:8, 65:9
**looking** [1] - 21:19
**looks** [2] - 8:10, 29:10
**Los** [1] - 2:12
**LOS** [1] - 71:3
**lose** [1] - 4:13
**lower** [1] - 62:13
**luckily** [1] - 20:24
**lunch** [6] - 7:6, 7:25, 10:4, 10:6, 13:14, 13:19

**M**

**magic** [1] - 65:25
**mail** [14] - 43:3, 43:6, 43:9, 43:17, 44:4, 45:17, 45:18, 46:23, 47:1, 47:3, 47:9, 60:16, 60:22, 60:24
**mailed** [1] - 59:22
**mails** [5] - 43:14, 43:15, 47:11, 66:5
**marked** [1] - 55:8
**Master** [1] - 50:13

**materials** [2] - 54:3, 65:24
**matter** [9] - 8:9, 13:1, 43:7, 43:11, 43:17, 47:6, 66:1, 67:9, 71:11
**matters** [6] - 52:15, 52:18, 53:3, 55:19, 59:21, 67:8
**mean** [7] - 5:16, 40:19, 41:24, 46:14, 60:6, 60:7, 62:9
**meant** [1] - 10:16
**meet** [2] - 14:23, 16:24
**meeting** [3] - 15:11, 16:8, 16:14
**member** [1] - 27:16
**members** [1] - 31:12
**memory** [1] - 17:14
**mentally** [1] - 13:23
**mention** [1] - 66:22
**mentioned** [1] - 62:1
**Mesa** [1] - 6:14
**message** [8] - 10:9, 10:12, 11:10, 12:22, 29:8, 29:9, 46:19, 63:23
**Messaged** [1] - 12:20
**messages** [18] - 10:5, 13:1, 19:3, 19:8, 20:8, 20:14, 20:18, 20:19, 21:3, 21:9, 21:12, 22:21, 23:7, 23:10, 23:11, 23:21, 23:23, 43:14
**messaging** [1] - 11:13
**met** [8] - 14:8, 15:24, 16:6, 16:10, 16:17, 17:19, 18:6, 31:6
**mic** [1] - 48:8
**MICHAEL** [2] - 1:8, 2:15
**Michael** [3] - 25:11, 52:22, 60:22
**MICHELLE** [2] - 3:3, 10:1
**Michelle** [1] - 53:15
**middle** [1] - 29:3
**might** [2] - 6:18, 64:9
**million** [6] - 20:20, 21:4, 21:13, 56:13, 57:10, 58:20
**mind** [2] - 5:19, 14:19
**minimum** [1] - 32:5
**minute** [7] - 14:15, 19:25, 20:12, 22:23, 55:10, 61:4
**minutes** [1] - 65:7
**misstated** [1] - 69:19
**misstates** [1] - 20:10

**moment** [4] - 16:3, 42:6, 48:14, 57:20
**Monday** [2] - 9:12, 9:14
**money** [8] - 21:20, 22:1, 25:7, 35:10, 35:13, 35:19, 36:9, 59:13
**month** [1] - 25:4
**morning** [5] - 31:17, 66:9, 66:13, 68:19, 69:6
**motion** [1] - 63:13
**motions** [1] - 68:11
**move** [14] - 13:24, 15:4, 16:1, 17:6, 17:16, 17:25, 19:10, 20:25, 23:2, 23:15, 33:6, 34:8, 37:6, 57:18
**moves** [1] - 55:21
**MR** [201] - 2:16, 4:16, 4:23, 5:3, 5:5, 5:18, 5:23, 6:1, 6:5, 7:10, 7:23, 8:6, 8:12, 8:14, 8:17, 9:4, 9:7, 9:12, 9:14, 10:3, 10:19, 11:19, 11:21, 11:23, 11:24, 13:5, 13:7, 13:24, 14:2, 14:12, 14:18, 14:21, 15:1, 15:6, 15:19, 15:22, 15:23, 16:3, 16:5, 16:20, 16:25, 17:6, 17:9, 17:16, 17:18, 17:25, 18:2, 18:11, 18:20, 18:22, 18:24, 19:10, 19:13, 19:15, 19:16, 19:18, 19:20, 19:22, 19:24, 20:1, 20:6, 20:10, 20:14, 20:25, 21:3, 21:14, 21:18, 22:3, 22:6, 22:10, 22:13, 22:15, 22:17, 22:20, 22:22, 22:24, 23:2, 23:4, 23:10, 23:15, 23:17, 24:1, 24:5, 24:7, 24:12, 24:20, 24:22, 26:2, 26:6, 26:14, 26:18, 27:3, 27:5, 27:22, 27:25, 28:3, 28:6, 28:16, 28:18, 28:23, 30:25, 31:3, 31:15, 31:18, 32:8, 32:11, 32:17, 32:21, 33:2, 33:6, 33:9, 33:16, 33:18, 33:21, 33:24, 34:8, 34:11, 34:14, 35:16, 35:24,

37:6, 37:9, 37:11, 37:17, 37:20, 37:23, 37:25, 38:2, 38:4, 38:10, 38:12, 38:14, 38:15, 38:17, 39:1, 39:3, 41:1, 42:1, 42:6, 42:10, 44:13, 44:16, 48:10, 48:14, 48:16, 48:22, 49:3, 49:14, 49:16, 54:21, 54:25, 55:4, 55:7, 55:20, 55:22, 56:3, 56:6, 56:18, 57:5, 57:17, 57:20, 57:22, 57:24, 58:4, 58:18, 58:25, 60:18, 62:21, 63:11, 63:18, 64:12, 64:15, 64:19, 64:24, 65:1, 65:3, 65:12, 65:15, 65:19, 65:21, 66:8, 66:11, 66:14, 66:15, 67:1, 67:5, 67:20, 68:2, 68:6, 68:8, 68:13, 68:20, 68:25, 69:6, 69:8, 69:10, 69:12, 69:16, 69:19, 69:23, 70:2

**N**

**name** [10] - 24:16, 24:17, 29:19, 29:24, 30:7, 30:11, 38:21, 49:9, 49:10, 58:9
**names** [3] - 10:23, 16:13, 31:23
**National** [3] - 26:13, 26:21, 27:8
**nature** [1] - 54:7
**necessarily** [3] - 40:15, 40:19, 41:24
**need** [7] - 4:14, 4:25, 5:24, 9:21, 10:9, 10:23, 21:6
**never** [4] - 31:6, 42:13, 66:22, 68:4
**new** [1] - 51:8
**New** [11] - 10:6, 11:6, 11:7, 39:7, 39:8, 39:15, 40:13, 40:20, 41:25, 42:5, 46:13
**Newport** [14] - 2:19, 14:9, 14:22, 15:7, 15:11, 15:16, 15:25, 16:19, 17:1, 17:12, 17:21, 18:8, 18:17, 24:3
**next** [5] - 19:22, 25:4, 46:4, 57:8, 59:6
**NICOLA** [2] - 2:4, 2:9

**night** [3] - 9:12, 9:15, 69:1
**none** [1] - 20:21
**nonresponsive** [4] - 13:25, 17:7, 33:7, 34:9
**North** [1] - 2:11
**note** [2] - 4:8, 4:17
**nothing** [7] - 18:20, 24:7, 38:12, 42:7, 48:15, 69:8, 70:3
**noticed** [2] - 13:13, 13:19
**November** [3] - 14:9, 14:25, 39:16
**number** [15] - 10:22, 12:7, 12:19, 34:17, 46:3, 46:15, 57:11, 58:12, 58:13, 61:23, 62:6, 64:19, 65:4, 69:20
**Number** [6] - 4:8, 6:8, 6:10, 7:9, 28:22, 58:3
**NUMBER** [6] - 6:14, 6:17, 6:23, 7:1, 7:5, 7:8
**numbers** [4] - 11:20, 45:10, 45:11, 45:12
**Numbers** [1] - 56:2

**O**

**o'clock** [3] - 6:25, 9:23, 62:24
**oath** [1] - 14:5
**objection** [26] - 5:18, 13:6, 14:12, 14:16, 15:1, 15:4, 15:19, 16:20, 19:10, 22:17, 26:2, 26:14, 27:3, 27:22, 28:3, 28:18, 31:15, 32:17, 33:2, 42:1, 54:21, 55:4, 55:22, 57:24, 67:20, 68:24
**objections** [5] - 15:19, 28:19, 38:2, 38:10, 68:23
**obtain** [3] - 50:14, 50:17, 50:20
**obtained** [1] - 26:9
**obviously** [1] - 5:24
**occurred** [1] - 5:10
**OF** [7] - 1:2, 1:5, 1:14, 2:1, 71:1, 71:3, 71:4
**offer** [1] - 6:4
**offers** [1] - 28:16
**office** [1] - 46:11
**OFFICES** [1] - 2:17

**Official** [1] - 71:20
**OFFICIAL** [3] - 1:24, 71:1, 71:5
**Ohio** [1] - 50:10
**OMAD** [2] - 29:10, 41:11
**OMADs** [1] - 46:20
**once** [1] - 46:3
**one** [25] - 5:5, 8:3, 9:21, 15:23, 16:3, 25:13, 34:21, 36:6, 39:9, 42:6, 48:5, 48:14, 51:10, 52:8, 52:9, 53:3, 53:9, 57:20, 58:15, 59:19, 63:8, 64:7, 64:10, 67:8, 67:15
**one-hour** [1] - 8:3
**oOo** [1] - 70:8
**opinions** [1] - 63:1
**opposed** [1] - 63:14
**OR** [1] - 3:17
**order** [1] - 47:3
**organization** [1] - 51:2
**original** [1] - 63:21
**originating** [1] - 40:8
**originator** [3] - 29:18, 30:6, 40:6
**ought** [1] - 65:17
**outgoing** [1] - 26:25
**outline** [1] - 57:12
**outlined** [1] - 59:23
**output** [1] - 29:8
**outside** [2] - 22:18, 37:23
**overruled** [17] - 16:22, 20:13, 21:16, 26:4, 27:23, 28:4, 28:21, 31:16, 32:9, 32:18, 33:3, 33:22, 42:2, 54:22, 55:5, 55:25, 57:25
**oversee** [1] - 50:1
**overseeing** [1] - 52:9
**owed** [6] - 36:10, 36:16, 60:8, 62:11, 62:12, 62:18
**own** [3] - 38:1, 38:8, 38:9

**P**

**P.M** [2] - 1:16, 4:2
**p.m** [4] - 11:3, 11:6, 11:7, 70:7
**Pacific** [1] - 11:7
**PAGE** [1] - 3:2
**page** [17] - 10:20, 11:2, 11:5, 20:16, 28:25, 30:12, 55:10,

56:19, 57:2, 57:19, 57:23, 58:5, 60:21, 61:1, 61:8, 61:14, 71:11
**pages** [7] - 19:3, 19:8, 23:11, 23:22, 26:22, 54:9, 54:11
**Paid** [1] - 56:16
**paid** [10] - 52:24, 56:12, 57:8, 59:13, 60:8, 60:10, 62:12, 62:17, 62:19, 67:11
**pain** [1] - 4:25
**paired** [1] - 62:3
**part** [10] - 13:24, 26:10, 40:22, 52:21, 53:5, 54:12, 63:7, 64:18, 68:21
**PARTIAL** [1] - 1:14
**participation** [3] - 31:9, 32:1, 32:2
**particular** [2] - 26:7, 59:21
**particulars** [1] - 29:5
**pass** [1] - 37:9
**past** [4] - 14:7, 52:2, 52:6, 52:15
**pause** [1] - 64:13
**Pause** [1] - 16:4
**payment** [6] - 35:8, 40:1, 40:2, 40:14, 40:18, 53:2
**payments** [4] - 36:24, 40:23, 59:15, 62:10
**PC** [1] - 30:11
**pdf** [1] - 60:22
**pendency** [1] - 68:16
**people** [1] - 31:24
**percent** [1] - 5:3
**percentage** [1] - 57:12
**perform** [4] - 49:21, 51:6, 51:17, 52:17
**performed** [1] - 52:16
**period** [3] - 63:13, 63:17, 64:10
**person** [1] - 8:8
**PHAN** [2] - 3:3, 10:1
**Phan** [21] - 5:7, 5:10, 5:14, 10:4, 12:1, 13:9, 14:2, 14:8, 15:6, 16:5, 17:9, 17:18, 18:5, 18:25, 21:6, 22:7, 22:15, 22:20, 23:7, 23:17, 53:15
**phone** [4] - 12:19, 19:4, 23:14, 46:1
**phrase** [1] - 22:16
**physical** [1] - 63:9
**physically** [2] - 13:20

**pick** [1] - 63:16
**piece** [1] - 37:13
**pills** [1] - 7:5
**place** [3] - 7:17, 11:2, 64:10
**places** [1] - 40:16
**Plaintiff** [1] - 1:6
**PLAINTIFF** [1] - 2:3
**plan** [1] - 69:23
**Plaza** [1] - 2:18
**plus** [1] - 4:25
**point** [5] - 14:3, 33:9, 57:17, 67:11, 67:23
**pointed** [1] - 65:25
**police** [1] - 24:3
**Police** [7] - 14:22, 15:8, 15:11, 15:16, 16:19, 17:1, 18:17
**political** [1] - 25:8
**portion** [2] - 58:7, 60:20
**position** [1] - 8:17
**possibility** [3] - 6:18, 7:21, 8:3
**possible** [4] - 6:19, 10:14, 64:16, 65:16
**possibly** [1] - 8:15
**post** [2] - 40:19, 42:3
**postgraduate** [1] - 51:5
**potentially** [1] - 8:19
**preceding** [1] - 11:1
**preparation** [2] - 32:4, 66:21
**prepare** [5] - 25:18, 31:18, 32:5, 33:1, 33:24
**prepared** [5] - 31:24, 33:11, 33:20, 55:14, 63:10
**preparing** [4] - 31:11, 32:6, 32:12, 33:14
**presence** [3] - 4:7, 9:17, 63:6
**present** [2] - 16:12, 64:21
**president** [4] - 49:23, 49:24, 52:3
**pretty** [2] - 4:9, 13:17
**preview** [1] - 5:21
**previous** [1] - 28:19
**Previous** [1] - 4:5
**previously** [2] - 41:7, 57:25
**primarily** [3] - 50:1, 53:20, 62:7
**primary** [1] - 25:13
**print** [2] - 5:9, 46:20
**private** [2] - 11:13, 11:14

**PRO** [1] - 2:14
**problem** [5] - 8:18, 9:3, 9:5, 9:8, 22:8
**problems** [1] - 4:10
**proceed** [5] - 14:20, 20:5, 22:12, 22:13, 22:14
**PROCEEDINGS** [1] - 1:14
**Proceedings** [1] - 70:7
**proceedings** [3] - 4:5, 16:4, 71:10
**process** [2] - 41:20, 45:7
**processed** [3] - 40:1, 41:15, 41:23
**processing** [1] - 40:10
**produced** [3] - 54:13, 67:17, 69:5
**product** [2] - 39:24, 46:11
**production** [2] - 67:16, 68:16
**professional** [2] - 29:20, 50:15
**prolonging** [1] - 4:13
**proof** [2] - 6:4, 14:23
**prosecution** [1] - 27:16
**prosecutors** [1] - 43:11
**provide** [7] - 19:19, 22:21, 23:8, 23:12, 23:23, 44:18, 65:13
**provided** [19] - 5:11, 5:12, 5:20, 7:24, 11:23, 19:13, 21:8, 21:9, 23:14, 26:12, 27:13, 29:3, 41:9, 45:11, 45:12, 45:13, 54:3, 64:4
**providing** [1] - 44:10
**public** [2] - 50:18, 51:12
**PUBLIC** [1] - 1:8
**publish** [1] - 11:19
**pull** [7] - 10:19, 41:1, 56:18, 57:6, 58:4, 60:18, 61:15
**pulled** [4] - 34:16, 46:6, 46:8, 46:9
**purport** [1] - 63:16
**purporting** [1] - 66:18
**pursuant** [6] - 28:17, 28:18, 37:7, 57:18, 68:17, 71:8
**put** [3] - 34:24, 34:25, 58:6
**puts** [2] - 39:24, 41:13

**Q**

**questioning** [3] - 15:5, 15:22, 16:2
**questions** [6] - 5:13, 21:18, 22:3, 30:25, 37:17, 48:16
**QuickBooks** [13] - 53:19, 53:21, 53:22, 59:20, 59:24, 60:5, 60:12, 60:13, 62:1, 62:10, 62:14, 62:15

**R**

**raise** [1] - 49:6
**raised** [3] - 66:16, 68:14, 68:19
**raising** [1] - 67:10
**rays** [4] - 4:18, 6:16, 6:19, 6:20
**read** [10] - 10:24, 18:2, 18:4, 23:4, 23:6, 23:19, 23:20, 35:16, 35:18, 64:13
**realize** [1] - 4:12
**really** [1] - 22:7
**REALTIME** [1] - 71:5
**reason** [5] - 5:12, 8:15, 8:23, 9:22, 15:15, 68:3
**reasonable** [1] - 14:23
**reasons** [1] - 16:21
**receive** [5] - 6:20, 21:4, 21:13, 40:11, 50:11
**received** [8] - 28:22, 47:2, 50:9, 50:14, 56:1, 56:2, 58:3, 60:11
**recess** [3] - 4:9, 70:4, 70:6
**recognize** [3] - 28:8, 55:11, 55:12
**recollection** [2] - 18:16, 44:17
**record** [9] - 17:23, 18:4, 23:6, 23:20, 35:18, 46:15, 46:16, 53:22, 62:14
**recorded** [2] - 60:5, 60:12
**records** [36] - 26:9, 26:12, 26:19, 26:20, 26:22, 27:7, 27:9, 27:12, 27:21, 28:1, 28:2, 28:14, 37:13, 40:23, 41:14, 45:13, 46:11, 53:6, 53:17, 53:19, 54:6, 54:9,

54:12, 54:20, 55:1,
55:3, 55:17, 56:15,
56:20, 58:2, 58:16,
59:20, 59:24, 59:25,
62:10, 62:15
**recreate** [1] - 37:25
**RECROSS** [2] - 22:5,
37:19
**Recross** [2] - 3:4, 3:7
**RECROSS-**
**EXAMINATION** [2] -
22:5, 37:19
**Recross-**
**Examination** [2] -
3:4, 3:7
**redacted** [4] - 11:21,
11:22, 11:25, 12:1
**REDIRECT** [2] - 18:23,
37:10
**Redirect** [2] - 3:4, 3:7
**referenced** [1] - 63:13
**referring** [4] - 29:11,
35:22, 43:25, 61:6
**reflect** [1] - 62:16
**reflected** [1] - 29:1
**reflecting** [1] - 54:13
**reflects** [1] - 67:13
**regarding** [3] - 26:24,
27:13, 40:23
**regards** [1] - 39:22
**regional** [1] - 46:15
**Regnier** [4] - 59:22,
60:16, 60:22, 62:18
**regular** [1] - 62:24
**regularly** [1] - 50:3
**regulations** [1] - 71:12
**regulatory** [1] - 52:18
**REJECTED** [1] - 3:17
**relate** [1] - 56:4
**related** [8] - 25:9,
43:6, 47:6, 53:6,
59:7, 59:10, 61:5,
62:8
**relates** [1] - 44:4
**relating** [11] - 10:5,
12:22, 13:1, 16:7,
36:24, 43:11, 44:5,
44:7, 65:23, 66:1,
67:20
**relatively** [1] - 69:12
**released** [1] - 24:9
**Relevance** [3] - 31:15,
32:17, 33:2
**relevant** [2] - 63:13,
66:19
**relied** [1] - 59:19
**remember** [21] - 16:5,
16:8, 16:10, 16:12,
16:13, 16:23, 17:3,
17:5, 17:22, 17:24,

18:11, 20:9, 21:10,
21:21, 21:24, 34:18,
43:21, 43:23, 62:25
**rental** [1] - 59:15
**repeatedly** [1] - 14:9
**rephrase** [1] - 35:15
**replies** [1] - 64:20
**report** [3] - 6:21, 34:7,
66:8
**reported** [1] - 71:10
**REPORTER** [4] - 1:24,
48:7, 71:1, 71:6
**reporter** [2] - 5:8,
49:6, 60:10
**Reporter** [1] - 71:20
**REPORTER'S** [1] -
1:14
**reports** [2] - 47:16,
47:17, 47:18
**represent** [1] - 59:8
**represents** [2] - 36:3,
59:9
**request** [1] - 47:2
**research** [1] - 63:2
**researching** [1] - 51:7
**Reserve** [10] - 39:7,
39:8, 39:9, 39:10,
39:14, 39:24, 40:9,
40:11, 40:12, 41:12
**reserve** [3] - 39:9,
40:7, 48:22
**residence** [1] - 6:14
**respect** [1] - 53:18
**respond** [1] - 47:9
**responded** [3] - 9:19,
12:18, 68:18
**responding** [1] -
44:11
**responsibilities** [6] -
25:6, 39:19, 40:22,
49:25, 52:6, 52:8
**responsible** [1] -
39:21
**rest** [1] - 20:8
**rested** [1] - 8:25
**results** [1] - 6:22
**resume** [1] - 62:24
**resumed** [1] - 3:3
**RESUMED** [1] - 10:1
**Resumed** [1] - 10:2
**retention** [2] - 57:12,
57:14
**return** [1] - 57:5
**reveals** [1] - 68:11
**Revenue** [1] - 25:1
**review** [15] - 26:24,
27:7, 37:12, 40:23,
53:17, 54:1, 54:12,
54:13, 54:19, 54:25,
56:20, 66:13, 66:19,

67:12
**reviewed** [25] - 25:21,
26:9, 26:12, 26:19,
26:20, 28:2, 28:10,
28:14, 41:7, 41:14,
46:7, 47:18, 53:19,
53:24, 54:3, 54:6,
55:17, 56:15, 56:23,
57:15, 58:15, 59:2,
66:20, 67:22, 68:2
**reviewing** [1] - 27:20
**revisions** [1] - 44:23
**revisit** [1] - 66:16
**right-hand** [1] - 29:6
**rise** [2] - 63:5, 70:5
**Roberson** [7] - 32:1,
32:6, 32:15, 43:19,
44:5, 45:15, 47:22
**Robert** [1] - 38:18
**ROBERTO** [2] - 3:8,
38:19
**Roberto** [1] - 38:22
**role** [6] - 31:10, 34:12,
39:17, 39:20, 51:6,
64:3
**ROOM** [1] - 1:24
**rounded** [1] - 61:19
**route** [1] - 6:6
**row** [18] - 29:14,
29:16, 30:1, 30:13,
30:19, 34:23, 34:24,
34:25, 35:6, 35:8,
36:6, 36:12, 36:18,
36:20, 56:11, 59:5,
59:6
**rows** [4] - 27:2, 27:6,
34:17, 54:16
**rule** [1] - 55:23
**Rule** [1] - 28:17
**ruled** [1] - 57:25
**rulemaking** [1] - 51:2
**runs** [1] - 65:7
**Ryan** [2] - 32:1, 33:14

---

**S**

**SACR-19-00061-JVS**
[1] - 1:7
**sagel** [1] - 18:21
**SAGEL** [35] - 2:5,
4:16, 4:23, 5:23, 6:1,
6:5, 7:10, 7:23, 8:6,
8:12, 8:14, 9:12,
9:14, 11:19, 11:23,
13:5, 14:12, 15:1,
15:19, 15:22, 16:20,
18:22, 18:24, 19:13,
19:16, 19:20, 19:24,
20:6, 20:14, 21:3,
21:18, 22:3, 22:17,

22:22, 69:19
**Sagel** [8] - 3:4, 4:15,
15:8, 16:11, 16:25,
18:16, 24:2, 44:1
**sampling** [1] - 65:6
**SANTA** [3] - 1:17,
1:25, 4:1
**Santa** [1] - 2:7
**satisfied** [1] - 15:7
**saw** [3] - 27:9, 44:21,
60:9
**Science** [1] - 50:12
**scope** [2] - 22:18,
37:23
**screen** [3] - 11:24,
58:6, 61:16
**screenshots** [6] -
11:17, 12:3, 63:14,
64:7, 64:8, 64:23
**scrolling** [2] - 63:11,
63:12
**SE** [1] - 2:14
**sealed** [1] - 4:5
**second** [10] - 9:10,
11:19, 15:3, 21:6,
30:12, 36:6, 48:20,
60:13, 61:4
**second-to-the-last** [1]
- 30:12
**Section** [1] - 71:8
**section** [1] - 58:19
**see** [15] - 11:24, 12:1,
12:7, 20:15, 32:15,
32:23, 34:18, 35:8,
58:20, 61:8, 61:15,
61:20, 63:3, 64:8,
69:6
**SELNA** [1] - 1:3
**send** [3] - 20:19,
47:17, 63:23
**sender's** [1] - 40:6
**senior** [2] - 51:14,
52:3
**sense** [1] - 25:12
**sent** [12] - 10:9, 10:12,
11:10, 11:17, 12:3,
12:13, 21:12, 40:14,
40:18, 40:23, 47:14,
47:19
**separate** [2] - 4:6,
25:24
**sequence** [1] - 46:18
**Service** [1] - 25:2
**services** [1] - 51:18
**set** [1] - 10:10
**setting** [1] - 50:2
**settings** [1] - 49:21
**settled** [1] - 62:13
**settlement** [5] - 53:19,
53:24, 56:12, 56:15,

57:8, 59:13
**shall** [1] - 56:1
**shareholder** [1] -
52:19
**short** [1] - 6:3
**shorthand** [1] - 10:16
**shot** [2] - 11:20, 64:18
**show** [2] - 14:23,
62:10
**showed** [3] - 19:2,
19:7, 20:7
**shown** [1] - 31:25
**side** [2] - 17:4, 17:10
**sidebar** [1] - 44:13
**sign** [1] - 12:6
**Signal** [9] - 11:13,
12:4, 12:9, 12:13,
13:1, 21:9, 21:12,
22:20, 23:7
**signatory** [1] - 59:3
**significance** [1] -
37:21
**significant** [3] - 54:19,
54:23, 65:23
**similar** [1] - 66:13
**simply** [1] - 48:10
**single** [2] - 65:8, 66:22
**sit** [1] - 18:15
**sites** [1] - 40:17
**sitting** [2] - 66:3,
68:22
**situation** [1] - 8:22
**slight** [1] - 9:5
**slip** [1] - 57:3
**software** [1] - 53:22
**soon** [1] - 10:13
**sorry** [14] - 9:13,
14:17, 19:16, 22:13,
29:22, 29:23, 41:22,
43:22, 47:1, 48:7,
48:9, 52:11, 60:2,
68:6
**sort** [1] - 50:1
**source** [5] - 35:22,
36:17, 37:2, 60:13,
61:4
**sources** [1] - 59:19
**SOUTHERN** [1] - 1:2
**Spaan** [1] - 71:20
**SPAAN** [3] - 1:23,
71:5, 71:19
**span** [1] - 26:22
**spanned** [1] - 54:9
**speaking** [2] - 25:5,
41:9
**special** [3] - 25:1,
25:6, 37:12
**Special** [4] - 28:24,
30:24, 43:19, 47:22
**specific** [2] - 25:7,

68:23
**specify** [1] - 26:7
**speculation** [2] -
19:11, 21:14
**spell** [3] - 24:16,
38:21, 49:9
**spent** [1] - 66:22
**spoken** [1] - 14:6
**spreadsheet** [6] -
59:22, 60:17, 61:2,
61:6, 61:25, 62:17
**spreadsheets** [6] -
26:25, 27:2, 27:5,
54:13, 54:16, 62:3
**Spring** [1] - 2:11
**stacked** [1] - 63:22
**stacking** [1] - 63:14
**staff** [1] - 51:7
**STAND** [1] - 10:1
**stand** [4] - 32:13,
32:15, 42:15, 49:5
**Standards** [1] - 51:1
**standards** [2] - 51:3,
51:8
**STANDBY** [1] - 2:16
**start** [3] - 56:3, 58:8,
69:24
**started** [1] - 51:25
**starting** [3] - 20:16,
50:7, 56:6
**State** [2] - 30:7, 50:10
**STATE** [1] - 71:4
**state** [5] - 5:19, 14:19,
24:15, 38:20, 49:8
**statement** [2] - 58:10,
59:2
**Statements** [1] - 3:23
**States** [10] - 2:4, 2:5,
2:9, 2:10, 24:13,
38:18, 49:3, 71:6,
71:8, 71:13
**STATES** [2] - 1:1, 1:5
**stay** [2] - 8:19, 10:13
**staying** [1] - 6:6
**stenographically** [1] -
71:10
**step** [1] - 49:2
**STEWARD** [2] - 2:17,
2:18
**still** [4] - 7:14, 8:2,
11:20, 69:12
**stipulate** [3] - 19:15,
19:18, 19:20
**stop** [4] - 6:24, 9:23,
62:21, 62:23
**story** [2] - 17:5, 17:10
**STREET** [1] - 1:24
**Street** [2] - 2:6, 2:11
**stricken** [10] - 14:1,
17:8, 18:1, 19:12,

21:2, 23:3, 23:16,
26:17, 33:8, 34:10
**strike** [17] - 13:12,
13:24, 17:6, 17:16,
17:25, 19:11, 20:25,
23:2, 23:15, 33:6,
34:8, 37:7, 44:17,
44:20, 47:14, 47:25,
67:15
**stuff** [1] - 25:9
**subject** [8] - 24:9,
43:6, 43:11, 43:17,
47:6, 48:25, 66:1,
67:18
**submitted** [1] - 63:2
**subpoena** [2] - 39:21,
45:13
**successive** [1] - 63:20
**suggest** [1] - 33:19
**suggested** [1] - 67:9
**Suite** [3] - 2:6, 2:11,
2:19
**summarize** [3] -
28:13, 55:16, 55:19
**summarized** [1] -
27:13
**summarizing** [2] -
28:11, 55:2
**Summary** [3] - 3:18,
3:20, 3:21
**summary** [2] - 28:1,
55:13
**supervise** [1] - 33:25
**sustain** [1] - 14:15
**sustained** [12] - 13:6,
14:13, 15:4, 15:21,
16:1, 22:19, 26:15,
27:4, 33:17, 37:24,
38:3, 38:11
**SWORN** [3] - 24:14,
38:19, 49:7
**System** [1] - 39:11
**system** [13] - 39:23,
40:2, 40:14, 40:15,
40:19, 40:24, 41:16,
41:24, 45:6, 45:9,
46:5, 46:6, 48:11

## T

**Tabs** [6] - 66:22,
67:12, 67:22, 68:3,
68:4, 68:16
**Tabs'** [1] - 67:16
**tax** [1] - 25:7
**team** [2] - 27:16, 31:22
**technical** [1] - 51:5
**Telegram** [10] - 10:8,
11:11, 11:14, 12:6,
12:22, 13:1, 21:8,

21:12, 22:20, 23:7
**telegram** [1] - 10:5
**telephone** [1] - 42:19
**ten** [13] - 25:24, 27:9,
27:14, 28:14, 41:15,
41:20, 41:21, 45:6,
48:2, 48:11, 52:2,
52:6, 52:15
**terms** [1] - 65:10
**terrorism** [1] - 25:9
**testified** [3] - 13:3,
45:2, 47:12
**testify** [12] - 31:11,
31:14, 32:25, 33:4,
33:5, 33:11, 33:13,
33:20, 34:4, 34:11,
34:13, 66:19
**testifying** [2] - 13:21,
25:18, 33:18, 44:6
**testimony** [15] - 14:2,
14:4, 14:5, 43:7,
43:12, 43:17, 47:6,
63:8, 65:22, 66:1,
66:24, 67:19, 68:10,
68:11
**Texas** [4] - 40:13,
40:20, 41:25, 42:4
**text** [17] - 10:5, 10:9,
10:12, 11:10, 12:23,
19:3, 19:8, 20:8,
20:14, 20:18, 20:19,
21:3, 23:10, 23:11,
23:21, 23:22, 43:14
**THE** [174] - 2:3, 2:14,
3:3, 3:5, 3:8, 3:10,
4:8, 4:21, 5:2, 5:4,
5:16, 5:22, 5:25, 6:3,
6:7, 6:9, 6:11, 6:15,
6:21, 6:24, 7:3, 7:7,
7:21, 8:5, 8:10, 8:13,
9:2, 9:5, 9:11, 9:13,
9:16, 9:18, 9:21,
10:1, 13:6, 14:1,
14:13, 14:14, 14:15,
14:17, 14:20, 15:4,
15:21, 16:1, 16:22,
16:23, 17:8, 17:17,
18:1, 18:3, 18:10,
18:21, 19:12, 19:25,
20:3, 20:11, 20:12,
21:2, 21:16, 21:17,
22:4, 22:11, 22:12,
22:14, 22:19, 22:23,
23:3, 23:5, 23:9,
23:16, 23:25, 24:4,
24:6, 24:9, 24:15,
24:17, 24:19, 26:4,
26:5, 26:15, 26:16,
26:17, 27:4, 27:23,
27:24, 28:4, 28:5,

28:21, 31:1, 31:16,
31:17, 32:9, 32:10,
32:18, 32:19, 33:3,
33:4, 33:8, 33:17,
33:22, 33:23, 34:10,
35:17, 35:22, 37:8,
37:18, 37:24, 38:3,
38:11, 38:13, 38:16,
38:20, 38:22, 38:24,
38:25, 42:2, 42:3,
42:8, 44:15, 48:7,
48:9, 48:17, 48:18,
48:19, 48:24, 49:1,
49:2, 49:5, 49:8,
49:10, 49:12, 49:13,
54:22, 54:23, 55:5,
55:6, 55:25, 57:25,
62:22, 63:5, 63:7,
63:16, 64:6, 64:14,
64:17, 64:22, 64:25,
65:2, 65:6, 65:14,
65:17, 65:20, 66:6,
66:10, 66:12, 66:24,
67:3, 67:14, 67:25,
68:5, 68:7, 68:9,
68:18, 68:21, 69:2,
69:7, 69:9, 69:11,
69:14, 69:18, 69:21,
70:1, 70:3, 70:5
**they've** [1] - 31:24
**third** [2] - 30:1, 36:12
**thousands** [3] - 26:22,
54:11, 54:18
**thread** [3] - 63:25,
64:3, 64:9
**threads** [1] - 63:16
**three** [7] - 16:11, 19:2,
23:11, 23:22, 42:16,
43:1, 51:20
**thumb** [1] - 63:9
**THURSDAY** [2] - 1:15,
4:1
**Title** [1] - 71:8
**title** [5] - 39:12, 49:22,
51:4, 51:13, 56:8
**titles** [2] - 52:2, 52:5
**today** [26] - 4:10, 5:10,
6:16, 6:25, 7:6, 7:11,
7:25, 8:2, 13:22,
18:15, 32:16, 32:20,
32:21, 33:18, 42:15,
43:7, 43:12, 43:17,
44:2, 44:6, 45:2,
47:7, 47:12, 50:22,
62:24, 66:16
**tomorrow** [14] - 4:20,
4:25, 7:14, 7:15,
7:17, 7:18, 7:22, 8:3,
8:16, 8:24, 62:24,
63:3, 68:24, 69:22

**tonight** [2] - 7:14, 8:15
**took** [7] - 4:9, 7:5,
11:2, 32:13, 32:15,
54:23, 64:9
**tooth** [1] - 6:18
**top** [3] - 10:21, 29:15,
64:17
**topic** [2] - 44:6, 67:4
**total** [9] - 36:23,
36:25, 56:9, 56:12,
61:9, 61:15, 61:20,
64:19, 64:22
**toward** [2] - 61:9,
61:14
**town** [1] - 8:7
**Tracing** [2] - 3:20,
3:21
**Tran** [6] - 13:21, 13:9,
13:13, 13:19, 14:4,
53:15
**transaction** [2] -
41:13, 46:20
**transactions** [8] -
37:3, 40:13, 40:17,
42:3, 45:21, 45:25,
51:16, 53:23
**TRANSCRIPT** [2] -
1:5, 1:14
**transcript** [2] - 71:9,
71:11
**transfer** [21] - 26:7,
29:5, 29:14, 29:23,
30:2, 30:6, 30:13,
30:20, 34:22, 35:23,
36:1, 36:7, 39:23,
39:25, 40:2, 40:15,
40:18, 40:24, 41:11,
41:16, 41:23
**Transfers** [1] - 3:19
**transfers** [14] - 26:24,
27:9, 28:11, 28:14,
39:22, 40:11, 41:15,
41:23, 45:6, 46:9,
47:24, 48:2, 48:11,
54:14
**traveled** [2] - 40:19,
41:24
**treatment** [1] - 62:7
**trial** [1] - 64:21
**TRIAL** [1] - 1:9
**trick** [1] - 68:15
**tried** [2] - 64:15, 65:15
**trouble** [1] - 4:24
**true** [13] - 12:22, 14:8,
14:11, 14:21, 15:6,
15:9, 15:13, 15:18,
28:1, 31:6, 35:5,
36:21, 71:9
**trust** [2] - 22:16, 30:8
**Trust** [3] - 26:13,

26:20, 27:8
**try** [1] - 12:18
**Tuesday** [4] - 7:20,
8:18, 9:9, 69:25
**turn** [2] - 8:24, 30:12
**tweet** [3] - 63:20,
63:21
**tweets** [3] - 63:12,
64:20
**Twitter** [2] - 63:20,
63:23
**two** [21] - 8:2, 11:17,
12:3, 14:3, 14:7,
17:14, 18:13, 21:23,
30:1, 39:18, 40:10,
40:12, 42:4, 42:18,
44:1, 46:20, 59:19,
62:3, 69:1, 69:3,
69:17
**two-and-a-half** [2] -
69:1, 69:3
**type** [1] - 51:6
**types** [3] - 52:15,
65:10

## U

**U.S** [1] - 1:3
**ultimately** [2] - 62:12,
62:17
**umpteen** [1] - 63:14
**under** [3] - 4:6, 14:5,
58:18
**undergraduate** [1] -
50:9
**underlying** [1] - 27:20
**undershot** [1] - 7:16
**understood** [1] -
69:14
**unique** [4] - 41:12,
46:17, 46:21
**United** [10] - 2:4, 2:5,
2:9, 2:10, 24:13,
38:18, 49:3, 71:6,
71:8, 71:13
**UNITED** [2] - 1:1, 1:5
**University** [1] - 50:10
**unroll** [2] - 63:23,
63:25
**up** [25] - 5:6, 8:23,
10:10, 10:19, 12:6,
20:24, 23:11, 23:22,
39:10, 41:1, 56:7,
56:18, 57:6, 58:4,
58:7, 60:18, 60:19,
61:15, 63:16, 65:17,
66:13, 67:1, 68:19,
68:23, 68:24
**urgent** [1] - 9:22
**US** [1] - 29:25

**user** [1] - 65:15
**user-friendly** [1] -
65:15
**username** [1] - 10:10

## V

**valuation** [1] - 51:18
**Varani** [7] - 5:24, 7:14,
7:19, 8:7, 8:15, 8:18,
9:8
**various** [4] - 49:21,
53:7, 55:2, 65:10
**verified** [7] - 28:10,
34:6, 38:4, 38:7,
45:5, 45:8, 47:18
**verify** [9] - 22:16,
27:12, 27:19, 37:13,
37:21, 46:4, 47:3,
47:16, 47:17
**VERSION** [1] - 1:8
**via** [3] - 12:23, 43:16,
45:13
**vice** [4] - 49:23, 49:24,
52:3
**video** [5] - 63:11,
63:12, 64:13, 64:17,
65:7
**view** [1] - 67:14
**VII** [1] - 28:7
**violation** [1] - 66:20
**violative** [3] - 55:23,
55:24, 67:24
**VOLUME** [1] - 1:9
**Volume** [1] - 28:7
**voluminous** [4] - 27:7,
54:6, 54:25, 55:17
**vs** [1] - 1:7

## W

**wait** [2] - 68:25, 69:1
**waited** [1] - 68:25
**waiting** [1] - 69:3
**WAS** [3] - 24:14,
38:19, 49:7
**weekend** [3] - 8:11,
8:20, 9:6
**weeks** [2] - 14:3, 14:7
**weight** [3] - 67:14,
67:18, 68:9
**welcome** [2] - 67:2,
67:3
**West** [1] - 2:6
**WEST** [1] - 1:24
**whatsoever** [1] -
31:10
**wholesale** [1] - 46:11
**willing** [2] - 4:17, 70:2
**wire** [32] - 25:8, 25:25,

26:6, 26:7, 26:24,
27:9, 28:11, 28:14,
29:5, 29:14, 29:16,
29:23, 30:4, 30:13,
30:15, 30:17, 30:18,
30:20, 34:22, 35:23,
36:1, 36:7, 39:25,
40:2, 40:5, 40:11,
41:11, 41:15, 41:22,
45:6, 48:2, 54:13
**Wire** [1] - 3:18
**wired** [1] - 35:11
**wires** [3] - 26:25,
27:14, 28:2
**WITHDRAWN** [1] -
3:16
**witness** [6] - 8:24,
9:10, 37:9, 38:13,
48:17, 48:21
**WITNESS** [32] - 10:1,
14:14, 14:17, 16:23,
18:10, 20:11, 21:17,
22:11, 23:9, 23:25,
24:14, 24:17, 26:5,
26:16, 27:24, 28:5,
31:17, 32:10, 32:19,
33:4, 33:23, 35:22,
38:19, 38:22, 42:3,
48:9, 48:18, 49:1,
49:7, 49:10, 54:23,
55:6
**WITNESSES** [1] - 3:2
**witnesses** [1] - 8:2
**words** [1] - 65:25
**works** [1] - 65:14
**wrap** [1] - 8:23
**writing** [2] - 46:23,
46:24
**written** [3] - 20:24,
45:1, 45:22
**wrote** [2] - 10:16,
11:15
**Wyman** [14] - 3:6, 3:7,
3:9, 3:11, 18:16,
24:11, 24:19, 32:2,
32:7, 38:25, 44:1,
44:3, 49:13, 67:6
**WYMAN** [51] - 2:10,
24:12, 24:20, 24:22,
26:6, 26:18, 27:5,
27:25, 28:6, 28:16,
28:23, 30:25, 31:15,
32:8, 32:17, 33:2,
33:16, 33:21, 37:11,
37:17, 37:23, 38:2,
38:10, 38:15, 38:17,
39:1, 39:3, 41:1,
42:6, 48:16, 49:3,
49:14, 49:16, 54:25,
55:7, 55:20, 56:3,

56:6, 56:18, 57:5,
57:17, 57:22, 58:4,
58:18, 58:25, 60:18,
62:21, 66:14, 69:10,
69:12, 69:16

## X

**X-Law** [1] - 30:11
**x-rays** [4] - 4:18, 6:16,
6:19, 6:20

## Y

**year** [1] - 51:10, 51:25
**year/month/day** [1] -
46:18
**years** [11] - 17:14,
18:13, 25:4, 39:18,
51:20, 52:2, 52:7,
52:15, 65:5, 69:1,
69:3
**yesterday** [3] - 13:22,
31:17, 33:10
**York** [6] - 10:6, 11:6,
11:7, 39:7, 39:8,
39:15

## Z

**zero** [15] - 20:22,
20:23, 21:5, 21:17,
22:24, 22:25, 23:9,
23:13, 23:24, 24:5,
35:1, 35:3, 35:5,
36:25, 37:4

**UNITED  STATES  DISTRICT  COURT**

# Exhibit 2

```
 1                   UNITED STATES DISTRICT COURT

 2          CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION

 3            HONORABLE JAMES V. SELNA, U.S. DISTRICT JUDGE

 4

 5   UNITED STATES OF AMERICA,           )
                                         )   CERTIFIED TRANSCRIPT
 6                     Plaintiff,        )
                                         )   Case No.
 7           vs.                         )   SACR-19-00061-JVS
                                         )
 8   MICHAEL JOHN AVENATTI,              )
                                         )   TRIAL DAY 20
 9                     Defendant.        )   VOLUME 2
     _____)

10

11

12

13

14

                REPORTER'S PARTIAL TRANSCRIPT OF PROCEEDINGS
15
                      FRIDAY, AUGUST 13, 2021
16
                           1:27 P.M.
17
                     SANTA ANA, CALIFORNIA
18

19

20

21

22

23   _____

                 DEBBIE HINO-SPAAN, CSR 7953, CRR
24             FEDERAL OFFICIAL COURT REPORTER
             411 WEST 4TH STREET, ROOM 1-053
25                 SANTA ANA, CA 92701
                   dhinospaan@yahoo.com
```

1                   **APPEARANCES OF COUNSEL:**

2

3   **FOR THE PLAINTIFF:**

4           NICOLA T. HANNA
            United States Attorney
5           BY:  BRETT SAGEL
                  Assistant United States Attorney
6           411 West 4th Street
            Suite 8000
7           Santa Ana, California 92701
            714-338-3598
8           brett.sagel@usdoj.gov

9           NICOLA T. HANNA
            United States Attorney
10          BY:  ALEXANDER WYMAN
                  Assistant United States Attorney
11          312 North Spring Street
            Suite 1100
12          Los Angeles, California 90012
            213-894-2435
13          alex.wyman@usdoj.gov

14  **FOR THE DEFENDANT IN PRO SE:**

15          MICHAEL JOHN AVENATTI, ESQ.

16

    **STANDBY COUNSEL FOR MR. AVENATTI:**
17

18          H. DEAN STEWARD LAW OFFICES
            BY:  H. DEAN STEWARD, ESQ.
            17 Corporate Plaza
19          Suite 254
            Newport Beach, California 92660
20          949-481-4900
            deansteward7777@gmail.com

21

22

23

24

25

3

```
 1                        I N D E X

 2   WITNESSES                                          PAGE

 3   JOHN DRUM, CALLED BY THE GOVERNMENT
         Cross-Examination by Mr. Avenatti (resumed)      7
 4       Redirect-Examination by Mr. Wyman              68
         Recross-Examination by Mr. Avenatti            77
 5

 6   In-camera hearing transcribed in a separate volume  87

 7

 8

 9

10

11

12

13

14

15

16                          EXHIBITS

17                       (None offered.)

18

19

20

21

22

23

24

25
```

**UNITED STATES DISTRICT COURT**

SANTA ANA, CALIFORNIA; FRIDAY, AUGUST 13, 2021

1:27 P.M.

- - -

01:27PM  **(Out of the presence of the jury.)**

MR. AVENATTI:  I have an issue to raise before he takes the stand, please.

THE COURT:  Mr. Avenatti.

MR. AVENATTI:  Yes, Your Honor.  Following up on what I raised before the break, I'm entitled to these e-mails and these statements from Mr. Drum.  I was entitled to them before I started my cross-examination.  I'd like them produced immediately, and I would like an adjournment so that I can review them before I continue my cross-examination of Mr. Drum.

During the break we had occasion to look for any case law that provides that an expert called by the Government, that somehow that exempts the Government from complying with 26.2 and *Jencks*.  We can find no such case and no such statute.

I also -- and I'll represent I placed calls to three attorneys with a collective of about 100 years criminal law experience who never heard such a thing.

There's no question that the materials exist.  The witness's testimony could not be more clear.  And none of the information was produced, Your Honor.  I was entitled to that information before I began my cross-examination so I could

```
 1    tailor my cross-examination accordingly.
 2              THE COURT:  No, sir.  You were entitled to it by
 3    statute after he finishes his direct.
 4              MR. AVENATTI:  Yes.  If I misspoke, I apologize,
 5    Your Honor.  I thought I said before I started my
 6    cross-examination.
 7              THE COURT:  All right.
 8              Mr. Wyman.
 9              MR. WYMAN:  Your Honor, over the lunch break we
10    looked for any e-mails of substance relating to his testimony
11    for Mr. Drum.
12              And, again, I haven't had a chance research the
13    issue.  My understanding with an expert is that substantive
14    work product like the exchange of drafts, for example, falls
15    within the work product exception.  But with regard to
16    substantive e-mails, what we were able to find was virtually
17    nothing, and the stuff that we had found was like -- you know,
18    I was asking for the extent of their payment and the breakdown
19    of what that payment was for, and we had copied and pasted that
20    and put that into a disclosure letter to the defense.
21              We're happy to provide in camera what we were able
22    to find, which was, as I said, virtually nothing that I don't
23    think has already been disclosed.  We're happy to provide that
24    in camera to the Court.
25              THE COURT:  Why don't you do that.  We're not going
```

**UNITED STATES DISTRICT COURT**

6

```
       1  to take an adjournment.  If Mr. Drum needs to stay over the
       2  weekend, so be it.
       3          MR. AVENATTI:  Your Honor, I would ask that the
       4  Court direct the witness, Mr. Drum, to provide to the Court all
01:29PM  5  written communications with the Government, whether it be the
       6  prosecutors or the agents, relating to his testimony in this
       7  case.  Because, Your Honor, the witness could not have been
       8  more clear, for two-and-a-half years he has been communicating
       9  by e-mail with the Government relating to this case.  Any of
01:30PM 10  those written communications we're entitled to.  Those are
      11  statements of a witness.
      12          There is no -- there is no work product exception to
      13  the Jencks Act and Rule 26.2.  And if counsel has any authority
      14  for this proposition, I would ask for it.  And, again, you
01:30PM 15  know, I'm repeating myself, but this morning I made this --
      16          THE COURT:  Please don't repeat yourself because the
      17  jury is waiting.
      18          MR. AVENATTI:  Well, I made this point this morning,
      19  Your Honor.  It's not my job to elicit testimony from witnesses
01:30PM 20  on cross-examination that show that the Government hasn't
      21  given --
      22          THE COURT:  Sir, we had this discussion.  We had it
      23  in detail before we took the recess.  Thank you.
      24          Bring the jury in, please.
01:31PM 25          (In the presence of the jury.)
```

```
 1          THE COURT:  Good afternoon, ladies and gentlemen.

 2          Mr. Avenatti.

 3          JOHN DRUM, WITNESS, RESUMED THE STAND

 4               CROSS-EXAMINATION (resumed)

 5   BY MR. AVENATTI:

 6   Q    Mr. Drum, before the break, we were talking about the

 7   mock cross-examinations that you and Ms. Carter had conducted

 8   over the last two-and-a-half weeks.  Do you recall that?

 9   A    Yes, I do.

10   Q    Who else was present when these mock cross-examinations

11   were occurring?

12   A    Nobody.

13   Q    So for every mock cross-examination that occurred in

14   connection with this case, the only two people present were you

15   and Ms. Carter.  Is that your testimony?

16   A    I believe that's right.

17   Q    Do you have any doubt as to that?

18          MR. WYMAN:  Objection.  Asked and answered.

19          THE COURT:  Sustained.

20   Q    BY MR. AVENATTI:  Were any of the government agents or

21   prosecutors ever privy to any of those cross-examinations?

22   A    No.

23   Q    Did you ever have any communications with any of the

24   government agents or prosecutors about some of the questions

25   you might be asked?
```

01:31PM (line 5)
01:32PM (line 10)
01:32PM (line 15)
01:32PM (line 20)
01:32PM (line 25)

```
 1   A     Yes.
 2   Q     Did those communications include them telling you
 3   questions you might be asked on cross-examination?
 4   A     Certainly they covered topics that might be covered in
 5   cross-examination, but I don't think we had any specific
 6   questions.
 7   Q     Well, when you say they covered topics that might be
 8   asked on cross-examination, what do you mean?
 9   A     For example, a topic that might be covered in cross might
10   be Analysis Group's fees.
11   Q     What other topics did they mention to you that they
12   thought might be covered on cross?
13         MR. WYMAN:  Objection.  Relevance.
14         THE COURT:  Overruled.
15         THE WITNESS:  I don't recall.
16   Q     BY MR. AVENATTI:  So there were none other -- no other
17   topics other than your fees that were discussed as possible
18   cross topics, sir?
19         MR. WYMAN:  Asked and answered.  403.  Calls for
20   hearsay.
21         THE COURT:  Sustained.
22   Q     BY MR. AVENATTI:  Sir, do you have a recollection of you
23   conversing with the Government before you took the stand about
24   any topics that might be covered in cross?  You conversing.
25         MR. WYMAN:  Same objections.
```

01:33PM  5
01:33PM 10
01:33PM 15
01:34PM 20
01:34PM 25

**UNITED STATES DISTRICT COURT**

```
 1                    THE COURT:  Overruled.

 2                    THE WITNESS:  Yes.

 3    Q    BY MR. AVENATTI:  Okay.  What topics were those?

 4    A    I recall discussing Analysis Group's fees being covered in

01:34PM 5    cross.

 6    Q    What else?

 7    A    I don't recall the other topics.

 8    Q    But there were other topics?

 9    A    I believe so.

01:34PM 10   Q    Okay.  Well, when did you discuss these other topics that

11    you now can't recall?

12    A    When we met on Monday, and we had a call a few weeks

13    earlier.

14    Q    So you can't recall what you discussed four days ago with

01:34PM 15   the Government when you had the call on Monday?

16                    MR. WYMAN:  Asked and answered.  Argumentative.

17                    THE COURT:  Sustained.

18    Q    BY MR. AVENATTI:  Sir, are you unable to recall the

19    details of the conversation that you had Monday?

01:35PM 20                    MR. WYMAN:  Same objections.

21                    THE COURT:  Overruled.

22                    THE WITNESS:  I recall some details of that

23    conversation.

24    Q    BY MR. AVENATTI:  Okay.  Do you recall the details about

01:35PM 25   the cross topics?
```

```
 1   A    Only covering the fees, is the only topic I recall
 2   specifically.
 3   Q    How long was the call?
 4   A    I think we met for an hour or so.
 5   Q    Who was on the call?
 6   A    This was a -- are you talking about our meeting on Monday?
 7   Q    Yep.
 8   A    Okay.  Alex Wyman, Brett Sagel, I believe James Kim was
 9   there.
10   Q    Ms. Carter?
11   A    Yes.
12   Q    Has Ms. Carter had e-mail communications with the
13   government prosecutors and the agents, to the best of your
14   knowledge, in connection with your testimony?
15              MR. WYMAN:  Calls for speculation.  403.
16              THE COURT:  Overruled.
17              THE WITNESS:  Yes.
18   Q    BY MR. AVENATTI:  Has that been a fairly regular
19   occurrence over the last six months?
20   A    Fairly regular, I guess is a way you can describe it,
21   yeah.
22   Q    And that generally has been at your direction as part of
23   your work in the case; correct?
24   A    Yes.  It's been at my direction.
25   Q    And have you been copied on those communications?
```

01:35PM 5
01:35PM 10
01:36PM 15
01:36PM 20
01:36PM 25

1    A     Yes, I believe so.

2    Q     And have those communications, done at your direction,

3    been by e-mail?

4    A     Yes.

01:36PM  5    Q     And those have been directed at both the AUSAs and the

6    government agents?

7    A     I believe so.

8    Q     Have you maintained all of -- copies of all of the

9    e-mails that you and Ms. Carter have sent to the AUSAs or the

01:37PM 10    agents in connection with your -- with the subject matter of

11    your testimony?

12    A     No.  I don't believe I have.

13    Q     You deleted some?

14    A     There's an automatic system that deletes e-mails.

01:37PM 15    Q     After how long?

16    A     After 30 days.

17    Q     You don't have the ability -- well, strike that.

18          In your software program, you don't have the ability

19    to suspend that deletion function?

01:37PM 20    A     I do have that ability.

21    Q     But you didn't exercise it in connection with your work

22    in this case; is that right?

23    A     I don't know if I saved every e-mail to prevent it from

24    being deleted.

01:37PM 25    Q     My question is a little different.

**UNITED STATES DISTRICT COURT**

```
 1              In connection with your work in this case, do you
 2   have a recollection of going into the software program and
 3   disabling the deletion function as it relates to your written
 4   communications with the Government?
 5   A     No, I did not disable it.
 6   Q     So for the last two-and-a-half years, every 30 days your
 7   communications with the Government relating to the subject
 8   matter of your testimony have been deleted by the software
 9   program.  Do I have that right?
10   A     Not exactly.
11   Q     Okay.  Well, what part of it is not right?
12   A     I have the ability to save e-mails so that they won't be
13   deleted by the system.  And I have saved e-mails associated
14   with this matter.  I don't know whether I saved all of them.
15   Q     How would you determine which e-mails to save as it
16   relates to your communications with the Government?
17   A     I would save e-mails that I think I might want to refer
18   back to at a later time.
19   Q     But you didn't save all the e-mails?
20   A     Correct.  For example, I would not have a reason to
21   refer --
22              MR. AVENATTI:  Move to strike everything after
23   "correct" as nonresponsive.
24              THE COURT:  Be stricken.
25   Q     BY MR. AVENATTI:  Did anyone ever ask you, "You know,
```

01:38PM (line 5)
01:38PM (line 10)
01:38PM (line 15)
01:39PM (line 20)
01:39PM (line 25)

```
 1    you're involved in a serious federal criminal matter.  Please

 2    don't delete any e-mails"?

 3    A    Nobody asked me that.

 4    Q    Did anybody ever ask you -- and by "anybody," I am

 5    including Mr. Sagel, Mr. Wyman, and Special Agent Carlos.  Did

 6    any of these three gentlemen ever advise you that you shouldn't

 7    be deleting the e-mails during the pendency of a federal

 8    criminal matter?

 9    A    I don't believe so.

10    Q    Do you know of any way to recover those e-mails?

11    A    That's not my area of expertise.

12    Q    So that would be a "no"?

13    A    Correct.

14    Q    Correct?

15    A    Yes.

16    Q    Do you know if Ms. Carter has saved her e-mails?

17    A    I don't know.

18    Q    Is she subject generally to the same deletion policy that

19    you mentioned earlier?

20    A    Yes.

21    Q    Did you ever instruct Ms. Carter to preserve e-mails?

22    A    I don't believe I did.

23    Q    Did you ever instruct anyone on your team, any of the

24    four people that you mentioned earlier, did you ever instruct

25    any of them to preserve your communications relating to your
```

**UNITED STATES DISTRICT COURT**

1   work in this matter?

2   A     I don't believe I did.

3   Q     Prior to taking the stand, did anybody ask you to gather

4   the written communications from your firm to the Government in

01:41PM 5   connection with this case?

6   A     No.

7   Q     To the best of your knowledge, did Ms. Evan Carter ever

8   review any trial testimony in connection with this case?

9   A     To the best of my knowledge, no.

01:42PM 10   Q     Did you ever converse with Ms. Evan Carter relating to

11   Tabs?

12   A     I conversed with Ms. Carter about the case-related

13   expenses that I analyzed.

14   Q     You mean the hard copy documents?

01:42PM 15   A     The PDFs, yes.

16   Q     The ones that said "Draft" across the page in big

17   letters, those?

18   A     I don't recall if it said "Draft" or not.

19   Q     All right.  Well, we're going to get to them in a minute.

01:42PM 20         But you never conversed with her about the software

21   program or the electronic data; am I right?

22   A     I did not converse with her about Tabs, no.

23   Q     What are work papers?

24   A     Work papers are a written record of an analysis typically

01:42PM 25   associated with an audit function.

| | |
|---|---|
| 1 | Q    They're not only typically used in connection with |
| 2 | audits, though, are they? |
| 3 | A    No.  That term can be used in other settings. |
| 4 | Q    Other accounting engagements; right? |
| 01:43PM 5 | A    Yes. |
| 6 | Q    Do you have any work papers -- well, strike that. |
| 7 | Does your firm have any work papers that were |
| 8 | prepared in connection with your work that was done in this |
| 9 | case? |
| 01:43PM 10 | A    Yes. |
| 11 | Q    Where are those maintained? |
| 12 | A    On Analysis Group's servers. |
| 13 | Q    And what was the purpose of those work papers? |
| 14 | A    To document the procedures and analyses that I performed. |
| 01:43PM 15 | Q    So they reflect statements by you, effectively; right? |
| 16 | A    I'm not sure I understand that. |
| 17 | Q    Well, they're documents that you prepared; am I correct? |
| 18 | A    Yes. |
| 19 | Q    Did you bring any of those work papers with you today? |
| 01:44PM 20 | A    No, I did not. |
| 21 | Q    How about yesterday? |
| 22 | A    No, I did not. |
| 23 | Q    Did you bring any of them to California in connection |
| 24 | with your testimony? |
| 01:44PM 25 | A    No. |

**UNITED STATES DISTRICT COURT**

```
 1   Q      Is there a reason why you didn't bring them?
 2   A      I --
 3   Q      Well, strike that.
 4          I think we established earlier that you prepare
01:44PM  5   witnesses to testify in cases; right?
 6   A      Yes.  That's part of my job.
 7   Q      All right.  And how many times have you done that over
 8   the last ten years?
 9   A      I'd estimate a dozen.
01:44PM 10   Q      And have those other individuals who have been prepared
11   to testify, has that been in a deposition or at a trial?
12   A      Both.
13   Q      And have you been present for those depositions and
14   trials?
01:45PM 15   A      Some of them, yes.
16   Q      Has there ever been an instance where you prepared
17   another expert to testify and that expert has brought with him
18   or her notebooks full of their work papers?
19   A      No, I don't think I've seen that.
01:45PM 20   Q      You've never done that, sir?
21   A      No.
22   Q      You've never seen an expert that you prepared on the
23   stand demonstrate for the jury where the actual work came from?
24   Am I correct about that?
01:45PM 25          MR. WYMAN:  Asked and answered and 403.
```

```
 1              THE COURT:  Overruled.
 2              THE WITNESS:  Witnesses that I've helped prepare
 3      demonstrate how they perform their analyses.
 4      Q    BY MR AVENATTI:  And they do that through the work
01:45PM  5      papers, don't they?
 6      A    No.
 7      Q    They don't refer to any of the actual work that they did
 8      on the stand, in your experience?
 9      A    They refer to their work product.
01:46PM 10      Q    How voluminous are your work papers for your engagement
11      in connection with this case?
12      A    That's tough to estimate.
13      Q    Five pages?  A thousand pages?
14      A    Closer to a few hundred.
01:46PM 15      Q    Okay.  Do they have tick marks on them, these work
16      papers, like little notes on them?
17      A    No.
18      Q    What form are the work papers that you put together in
19      connection with your analysis in this case?
01:46PM 20      A    There would be Microsoft Excel files, PDFs, and Microsoft
21      Word documents.
22      Q    And they contain your notes that you built over the last
23      two-and-a-half years supporting these summaries that you were
24      asked about; is that right?
01:47PM 25      A    They contain details and calculations that underlie the
```

1    analyses that I performed, yes.

2    Q    Now, before you took the stand yesterday, what did you do

3    to prepare to testify before this jury?

4    A    I reviewed the exhibits that we discussed earlier.  And I

01:47PM  5    spoke with counsel, the Government, and I spoke with Evan

6    Carter.

7    Q    And you've been preparing to testify in this case for

8    about the last month.  Is that fair?

9    A    That's a good estimate.

01:47PM 10    Q    And during that month, I take it you also referred back

11    to your work papers from time to time; is that true?

12    A    Yes.

13    Q    And when you referred back to those work papers over the

14    last month to prepare to testify, did that help you refresh

01:48PM 15    your recollection as to certain calculations and certain work

16    that you did?

17    A    It did.

18    Q    That helped you refresh your recollection so that you

19    could come to court and testify as you did on direct; right?

01:48PM 20    A    Yes.

21         MR. AVENATTI:  Your Honor, one moment, please.

22         **(Pause in proceedings.)**

23         BY MR. AVENATTI:  Sir, have you ever heard the

24    phrase "garbage in, garbage out"?

01:49PM 25    A    I've heard that phrase.

19

Q    What do you understand the phrase "garbage in, garbage
out" to mean?

A    It means that if you were performing an analysis or
building a financial model, if the inputs to that model are

01:50PM  5  unreliable, the outputs would also be unreliable.

Q    That's a widely understood principle, to the best of your
knowledge, in public accounting; is it not?

A    Yes.

Q    If the inputs are not reliable, you can't rely on the

01:50PM 10  output.  Fair?

A    That's fair.

Q    And you've understood at all times over the last two and
a half years that this case was a very serious matter; right?

A    Yes.

01:50PM 15  Q    And you understood at all times that your work had to be
spot-on, 100 percent correct; right?

A    I always aim for my work to be spot-on, 100 percent
correct.

Q    Well, and you especially understood it in connection with

01:51PM 20  this serious criminal matter; right?

A    I understood it in connection with this matter and all my
other cases, yes.

Q    You understood over the last two years that close was not
good enough; is that fair?

01:51PM 25          MR. WYMAN:  Objection.  Argumentative.  Irrelevant.

**UNITED STATES DISTRICT COURT**

1          THE COURT:  Overruled.

2          THE WITNESS:  I always aim to be as accurate as

3   possible.

4   Q    BY MR. AVENATTI:  Yeah, my question is a little

01:51PM 5   different.

6          You understood that in connection with this very

7   serious criminal matter, close was not good enough; right?

8   A    I think that -- that would be a legal interpretation.  I

9   don't know if I'm --

01:51PM 10  Q    Sir, I'm not asking you for a legal interpretation.  I'm

11  asking you what you've understood over the last two and a half

12  years while you've been -- you and your colleagues have been

13  billing upwards of $600,000.

14         Here's my question, very simple:  You understood in

01:51PM 15  connection with this serious criminal matter that close was not

16  good enough, your work had to be 100 percent?

17         MR. WYMAN:  Objection.  Vague as to "good enough."

18         THE COURT:  Overruled.

19         THE WITNESS:  I'm sorry, I'm not sure how to answer

01:52PM 20  the question, because I don't know what -- "good enough" seems

21  like a standard, potentially a legal interpretation.

22  Q    BY MR. AVENATTI:  Mr. Drum, I'm not asking for a legal

23  interpretation.  My question is this:  In connection with your

24  work over the last two and a half years and the work that you

01:52PM 25  did on these charts, you understood that they had to be

```
 1   100 percent accurate, especially because of how serious this
 2   matter is; right?
 3   A    All of my work, in every setting, I am to be 100 percent
 4   accurate, yes.
 5   Q    Including this one?
 6   A    Including this one, yes.
 7   Q    And you also understood that before you could perform any
 8   analysis or reach any conclusions, you had to understand how
 9   the financial accounting worked at the law firm, Eagan
10   Avenatti; right?
11   A    I think I was provided the information that I needed to
12   do -- needed in order to perform the analyses that I was asked
13   to perform.
14              MR. AVENATTI:  Move to strike as nonresponsive.
15              THE COURT:  Denied.
16   Q    BY MR. AVENATTI:  Sir, my question is, did you have the
17   understanding that in order to reach your conclusions and
18   provide your opinions to the jury, that you had to understand
19   how the financial accounting software at the law firm worked?
20              MR. WYMAN:  Asked and answered.
21              THE COURT:  Sustained.
22   Q    BY MR. AVENATTI:  Sir, isn't it true that if you don't
23   know how the law firm tracked expenses for clients, you can't
24   determine how much a client was owed?
25              MR. WYMAN:  Asked and answered.  Argumentative.
```

01:52PM  5
01:53PM 10
01:53PM 15
01:53PM 20
01:54PM 25

```
 1              THE COURT:  Sustained.
 2   Q    BY MR. AVENATTI:  Sir, how important was it for you to
 3   understand what the expenses were for any particular client?
 4   A    It was one of the inputs that is part of my exhibits.
 5   Q    It was critically important, was it not?
 6   A    The exhibit would be incomplete without that information,
 7   yes.
 8   Q    So you would agree it's critically important?
 9   A    Yes.
10   Q    Sir, I want to show you some testimony that the jury has
11   already heard in the case, and I'm going to ask you a couple
12   questions about it.  I'm waiting for the Elmo.
13              Do you see this transcript, sir?
14   A    Yes, I can see it.
15   Q    And I'll represent to you that this is some of the
16   testimony from Ms. Judy Regnier.  You know who that is; right?
17   A    Yes.
18   Q    Page 93:
19              "Well, do you remember yesterday you were
20         asked about -- you were asked a question, and you
21         said that there was another program that was used
22         but you couldn't remember the name of it and you
23         thought it might be Timeslips.
24              "ANSWER:  Yes, I remember that.
25              "QUESTION:  Now, is your recollection
```

01:54PM (line 5)
01:54PM (line 10)
01:56PM (line 15)
01:56PM (line 20)
01:56PM (line 25)

```
 1              refreshed that, in fact, it was Tabs?
 2                   "ANSWER:  Yes.
 3                   "QUESTION:  When you had to figure out costs
 4              for a case, you would look at Tabs, would you not?
 5                   "ANSWER:  No.  I would look at both Tabs and
 6              QuickBooks.
 7                   "QUESTION:  Why would you look at both
 8              QuickBooks and Tabs?
 9                   "ANSWER:  To make sure that we had
10              encompassed all of the costs.
11                   "QUESTION:  You couldn't rely on just one.
12              You had to look at both; right?
13                   "ANSWER:  Yes.
14                   "QUESTION:  Otherwise, the calculation could
15              be off?
16                   "ANSWER:  Correct."
17                   Did I read that correctly?
18  A     Yes.
19  Q     Did you, sir, in connection with your $600,000-plus
20  analysis, ever make any efforts to look at both QuickBooks and
21  Tabs, meaning the electronic data?
22                   MR. WYMAN:  Asked and answered several times,
23  Your Honor.
24                   THE COURT:  Overruled.
25                   THE WITNESS:  My estimate of case-related expenses
```

**UNITED STATES DISTRICT COURT**

```
 1   reflects both QuickBooks and the spreadsheets from Judy

 2   Regnier, which I understand are an output from Tabs.

 3   Q     BY MR. AVENATTI:  Sir, that's not what I asked you.

 4   We're going to get to what Ms. Regnier said about these

 5   spreadsheets momentarily.  I'm asking you about the data --

 6   strike that.

 7             You looked at the data from QuickBooks; am I right?

 8   A     Yes, I looked at data in QuickBooks.

 9   Q     But you never looked at the electronic data from Tabs,

10   did you?

11   A     That's correct.

12   Q     The only information that Tabs -- from Tabs you ever

13   looked at was the hard copy draft printouts that you were

14   provided by the Government; am I right?

15   A     That's correct.

16   Q     You understand that the costs for a case --

17             THE COURT:  Mr. Avenatti, hold your voice down a

18   little, please.

19             MR. AVENATTI:  I'm sorry, Your Honor.

20   Q     Sir, you understand that the cost for any particular

21   case, what's reflected in QuickBooks, is not identical to

22   what's reflected in Tabs; right?  You understand that?

23   A     Yes.  My review --

24   Q     Thank you.

25   A     -- when I compared the two, I saw they were different.
```

01:58PM (lines 5, 9, 15)
01:59PM (lines 20, 25)

```
         1          MR. AVENATTI:  Move to strike everything after "yes"
         2   as nonresponsive.
         3          THE COURT:  Be stricken.
         4   Q    BY MR. AVENATTI:  Sir, the reason why you never looked --
02:00PM  5   you never asked to look at the Tabs electronic data was because
         6   nobody ever told you it existed; isn't that true?
         7   A    I knew of the outputs -- the spreadsheets that were
         8   e-mailed by Judy Regnier, but other than that, no.
         9   Q    Every time I ask you about the electronic data, you want
02:00PM 10   to mention the spreadsheets.  Please just listen to my
        11   question.
        12          MR. WYMAN:  Objection.  Argumentative.
        13          THE COURT:  Sir, just ask questions.
        14          MR. AVENATTI:  I will.
02:00PM 15   Q    Mr. Drum, I'm asking about the electronic data of Tabs.
        16   Here's my question:  The reason why you never asked to look at
        17   the electronic data of Tabs was because you didn't even know it
        18   existed; isn't that true?
        19   A    That's correct.
02:00PM 20   Q    And you never did anything to find out, even though your
        21   firm billed over $600,000; isn't that true?
        22   A    I never did anything to find out what?
        23   Q    To find out whether there was electronic data from Tabs.
        24   A    That's correct.
02:01PM 25   Q    Now, let's talk about the data that you reviewed from
```

```
     1   QuickBooks.  Where did you get that from?

     2   A    That data came from the Government.  Was provided to me

     3   from the Government.

     4   Q    Did you look at any of the identifying information on

02:02PM  5   that electronic -- well, strike that.  Let me lay some

     6   foundation.

     7            When you got it from the Government, was it an

     8   electronic file?

     9   A    Yes, it was.

02:02PM 10   Q    Did you look at any of the identifying information on the

    11   electronic file to try to figure out where it came from?

    12   A    I'm not sure what you mean by "identifying information."

    13   Q    When you received the electronic file, it was a

    14   QuickBooks database; am I right?

02:02PM 15   A    Yes.

    16   Q    And you loaded it in QuickBooks; right?

    17   A    Yes.

    18   Q    Did you try to find out any information about what

    19   electronic information was in the file showing where it came

02:03PM 20   from or the last time it had been updated?

    21   A    No, I did not.

    22   Q    So when you -- and that's the QuickBooks data that you

    23   used; right?

    24   A    Yes.

02:03PM 25   Q    So you made no effort to see how current it was, did you?
```

```
 1  A     No.  I relied on it as given to me.

 2  Q     So when you used that -- well, strike that.

 3        You used that because that's what the Government

 4  told you to use; right?

 5  A     I used that because that's the data the Government

 6  provided me, yes.

 7  Q     But you have no idea how complete or incomplete that data

 8  is; right?

 9  A     I had no way to verify how complete or incomplete the data

10  was.

11  Q     And you undertook no effort to do so; right?

12  A     I had no information that would allow me to do that.

13  Q     And, therefore, you didn't take any steps to do it;

14  right?

15  A     That's right.

16  Q     Did you ever ask to see any of the cost invoices for any

17  particular client?  By "cost invoice" -- let me ask a better

18  question.  Strike that.

19        Did you ever ask to see the actual invoices from

20  vendors in connection with any particular client?

21  A     No, I did not.

22  Q     And just to be clear, what I mean by that is, did you

23  ever ask the Government, just as an example, "I'd like to see

24  all of the invoices from the law firm that may relate to an

25  expense associated with Mr. Johnson's case."  And by "invoices"
```

02:03PM 5
02:04PM 10
02:04PM 15
02:05PM 20
02:05PM 25

```
     1    I'm talking about third-party invoices.

     2            Did you ever do that?

     3    A    No.  I didn't review any third-party invoices.

     4    Q    And you never asked for any?

02:05PM  5    A    I don't believe I did.

     6    Q    And that was true for Mr. Johnson, Mr. Barela, Ms. Phan,

     7    Mr. Tran, and Ms. Gardner; right?

     8    A    Yes.

     9    Q    So you assumed the QuickBooks file was accurate, and you

02:06PM 10    assumed that all of the expenses were in QuickBooks; right?

    11            MR. WYMAN:  Objection.  Compound.

    12            THE COURT:  Sustained.

    13    Q    BY MR. AVENATTI:  Okay.  We already established that you

    14    assumed QuickBooks was accurate; true?

02:06PM 15    A    I relied on QuickBooks as it was provided to me.

    16    Q    And you assumed it was accurate; right?

    17    A    I had no reason to believe otherwise.

    18            MR. AVENATTI:  Move to strike, Your Honor.

    19            THE COURT:  Be stricken.

02:06PM 20    Q    BY MR. AVENATTI:  Sir, you assumed the QuickBooks file

    21    was accurate.  That's why you used it; correct?

    22    A    I summarized the information in QuickBooks, yes.

    23    Q    Because you assumed it was accurate?

    24    A    Yes.

02:06PM 25    Q    You generally don't use information that you don't
```

```
 1   believe is accurate; is that right?
 2   A      That's a good practice.
 3   Q      Okay.  Now, and you also assumed as part of your analysis
 4   that every expense the firm had incurred for a client was put
 5   in QuickBooks; correct?
 6   A      No.  That's why I relied on the Judy Regnier spreadsheets
 7   that were available and QuickBooks.
 8   Q      Sir, what if an expense was incurred but was not input in
 9   QuickBooks or on the spreadsheet, would your analysis reflect
10   that?
11   A      It would not.
12   Q      Do you know what the practice of the law firm was
13   relating to when invoices would come in and how much time would
14   pass before they were actually put into QuickBooks or Tabs?
15   A      No, I do not.
16   Q      Did you make any effort in connection with your analysis
17   to discover what that protocol was and whether there was any
18   lag time?
19   A      No.  I relied on the information that was inputted in
20   QuickBooks and provided to me.
21   Q      So, for instance, since you're here in an expert
22   capacity, I can ask you to assume various things.  I want you
23   to assume that there was $100,000 expert invoice on one of the
24   client's -- client matters that you have testified about.
25           Do you have that assumption in mind?
```

02:07PM (lines 5, 10, 15)
02:08PM (lines 20, 25)

**UNITED STATES DISTRICT COURT**

```
 1    A     Okay.
 2    Q     And I want you to assume that it was not input into
 3    QuickBooks, or at least the version that you had, or on one of
 4    the spreadsheets.
02:08PM  5          Do you have that assumption in mind?
 6    A     I'm sorry, can you repeat that?
 7                MR. AVENATTI:  Can I have it read back?
 8                THE COURT:  Fine.
 9                (The record was read as follows:
02:08PM 10               "And I want you to assume that it was not
11          input into  QuickBooks, or at least the version
12          that you had, or on one of the spreadsheets.
13               "Do you have that assumption in mind?")
14                THE WITNESS:  Okay.
02:09PM 15    Q     BY MR. AVENATTI:  Your analysis, then, would be wrong,
16    because it would not account for the $100,000 invoice that you
17    made no effort to find out about in connection with your
18    analysis; right?
19    A     My analysis would omit that expense that was omitted from
02:09PM 20    the data that was provided to me.
21    Q     Is that a long way of saying, "Yes, it would be wrong"?
22    A     My analysis is an accurate summary of the information that
23    was provided to me.
24    Q     It would be wrong, correct, sir?
02:09PM 25    A     What would be wrong?  Can you be specific?
```

```
 1  Q    I want you to assume there's $100,000 invoice.  I thought
 2  we just went through this.  Let me go through it again.
 3        I want you to assume there's $100,000 invoice.  It's
 4  not in the version of QuickBooks that you have.  It was also
 5  not included in the spreadsheets that the Government provided
 6  you.
 7        Your analysis would be wrong because it would not
 8  account for the $100,000 invoice, cost for a client; true?
 9  A    Under that hypothetical, yes.
10  Q    And you don't know if there's any examples of that for
11  any of the clients, do you?
12  A    I would have no way of knowing that.
13  Q    And the reason is because you never made any effort to
14  find out.  That's why you don't know that; isn't that true?
15  A    I would have no way of knowing that.
16  Q    Sir, did you make any effort to find out about any other
17  legal work that was done for any of the clients beyond the work
18  on the particular settlement amounts?
19  A    No.  That was not in the scope of my assignment.
20  Q    It was not in the scope?
21  A    That's correct.
22  Q    And who determined the scope, the Government?
23  A    Yes.  The Government provided me my assignment.
24  Q    So you understood that you couldn't -- you couldn't even
25  make inquiry about that topic -- was that it? -- because it was
```

02:10PM (lines 5)
02:10PM (line 10)
02:10PM (line 15)
02:11PM (line 20)
02:11PM (line 25)

```
 1   outside the scope?

 2   A     No, I don't think so.

 3   Q     "No," you don't think so what?

 4   A     I could have asked about that, yeah.

 5   Q     But you did not?

 6   A     No, I didn't.

 7   Q     All right.  I want to ask you some questions about the

 8   charts.  Let's go to Exhibit 420.

 9              Can we please blow up 420?

10              Can you see that, sir?

11   A     Yes.

12   Q     Now, if you're wrong about either the legal fees or the

13   case-related expenses, then the total due to the client is

14   wrong; correct?

15   A     That's how the math works, yes.

16   Q     Pretty simple; right?

17   A     Yes.

18   Q     And as it relates to the case-related expenses, we were

19   just talking about that, you did nothing to verify that other

20   than look at QuickBooks and the spreadsheets; right?

21   A     Correct.  Those were the two sources of information I

22   used.

23              MR. AVENATTI:  Your Honor, one moment.  I'm sorry.

24              **(Counsel conferred off the record.)**

25   Q     BY MR. AVENATTI:  Now, Mr. Drum, you understand in this
```

```
          1   criminal case, this case is about what's called counts; right?

          2   A    Did you say "counts"?

          3   Q    Counts.

          4   A    Yes.

02:14PM   5   Q    Okay.  And you understand that there's ten counts or

          6   criminal charges in connection with this case; right?

          7   A    I don't think I had that number in mind.

          8   Q    Okay.  Well, the Government can correct me if I'm wrong,

          9   but I'll represent to you that there's ten counts.  All right?

02:14PM  10            Now, I want to show you 457, and we're going to take

         11   a look at Count One.  This is a Government exhibit.  Can you

         12   see that?

         13   A    Yes, I see that.

         14   Q    Okay.  And you see that this is a transfer of $250,000;

02:15PM  15   right?

         16   A    Yes.

         17   Q    What's the date?

         18   A    January 30th, 2015.

         19   Q    And you understand that this is one of the charges by the

02:15PM  20   Government; namely, that they allege that this money was

         21   improperly taken from Mr. --

         22            I didn't even finish the question.  Strike that.

         23            You understand that the Government alleges that this

         24   was improper?

02:15PM  25            MR. WYMAN:  Objection.  Foundation.  Argumentative
```

```
 1    and calls for a legal conclusion.
 2              THE COURT:  Sustained.
 3    Q    BY MR. AVENATTI:  Sir, I want to ask you about this
 4    $250,000 transfer.
 5    A    Okay.
 6    Q    Did you see this $250,000 transfer over the course of
 7    your analysis?
 8    A    I saw a transfer of $250,000 from A&A 0061 to GB 9962 on
 9    that same day.
10    Q    Where did the money come from before AA transferred the
11    $250,000?
12    A    It came from EA 2851.
13    Q    Where is that reflected so we can show the jury?
14    A    I'm looking at Exhibit 424.
15              MR. AVENATTI:  Why don't -- Ms. Hernandez, I'll just
16    switch it over.  Keep that up there, please, if you don't mind.
17    I'm just going to use this.
18    Q    There's the $250,000 deposit into the EA account; right?
19    A    Yes.  And on the same day a $200,000 deposit was made.
20              MR. AVENATTI:  Move to strike the second part as
21    nonresponsive.
22              THE COURT:  Be stricken.
23    Q    BY MR. AVENATTI:  Sir, please just answer my question.
24              This is the $250,000 deposit into the AA account;
25    right?
```

```
 1   A    Yes.

 2   Q    And it came from EA 2851; right?

 3   A    Yes.

 4   Q    Okay.  Where did EA 2851 get the money to send it to AA?

 5   A    From EA 8541.

 6   Q    What exhibit?

 7   A    423.

 8   Q    That's it right there; correct?

 9   A    Yes.  That's the transfer to AA O661.

10   Q    And this $250,000 payment came out of this $1.6 million

11   that had been deposited into EA's account; right?

12   A    Yes.

13   Q    And where did the $1.6 million come from?

14   A    From EA 8541.

15   Q    What exhibit?

16   A    423 and 422.

17   Q    That's it right there; right?

18   A    Yes.

19   Q    Well, look at 422.  The $1.6 million; right?

20   A    Yes.

21   Q    That was the legal fee associated with the Geoff Johnson

22   matter, wasn't it?

23   A    Yes.

24   Q    So Count One charges me with a $250,000 transfer that

25   came directly out of the $1.6 million legal fee that the firm
```

02:18PM 5
02:19PM 10
02:20PM 15
02:21PM 20
02:21PM 25

```
 1   was entitled to in connection with the Johnson matter; isn't

 2   that true?

 3           MR. WYMAN:  Objection.  Foundation.  Argumentative.

 4   Lacks personal knowledge.

 5           THE COURT:  Overruled.

 6           THE WITNESS:  The $250,000 withdraw on January 30th,

 7   2015, that we pointed to on 424 came from the $1.6 million

 8   legal fees.

 9           MR. AVENATTI:  Ms. Hernandez, can we have row 2.

10   Q    We're looking at row 2 of Exhibit 457.

11   A    Okay.

12   Q    Do you see that?

13   A    Yes.

14   Q    What's the date?

15   A    February 10th, 2015.

16   Q    What's the amount?

17   A    $50,000.

18   Q    From which account to which account?

19   A    From CB&T 0661 to Bank of America account in the name of

20   Michael John Avenatti.

21   Q    What exhibits reflect where that money came from?

22   A    I believe it would be the same exhibits we were just

23   looking at.

24   Q    Let's show the jury.  Can you direct me, please.

25   A    424.
```

|      |   |                                                              |
|------|---|--------------------------------------------------------------|
| 1    | Q | What's the date again?                                       |
| 2    | A | February 10th, 2015.                                         |
| 3    | Q | Which one?                                                    |
| 4    | A | The one just above your fingernail.  Yeah.                   |
| 02:24PM 5 | Q | That one; right?                                        |
| 6    | A | The one that your finger is covering.  Yeah.                 |
| 7    | Q | This one?                                                     |
| 8    | A | Yes.                                                          |
| 9    | Q | Okay.  And where did the money come from this pay -- for     |
| 02:25PM 10 | | this payment?                                              |
| 11   | A | Looks like it came from the $100,000 deposit from 2851.      |
| 12   | Q | Okay.  Where is that reflected?                              |
| 13   | A | That would be in Exhibit 423.  Yes.                          |
| 14   | Q | That's it right there; right?                                |
| 02:26PM 15 | A | Yes.                                                     |
| 16   | Q | And where did that money come from?                          |
| 17   | A | So prior to that withdrawal, there were three deposits       |
| 18   |   | from EA 8541 and one deposit that's not identified.          |
| 19   | Q | And the three deposits from 8541 were the $1.6 million       |
| 02:27PM 20 | | that we've already established was the legal fee; correct? |
| 21   | A | Yes.                                                         |
| 22   | Q | The $2,776 that related to Mr. McNicholas's cost; right?     |
| 23   | A | Yes.                                                         |
| 24   | Q | This cost amount, which you claim was not accurate,          |
| 02:27PM 25 | | although you don't have the Tabs data; right?             |

**UNITED STATES DISTRICT COURT**

38

1    A    I have the output in the Judy Regnier e-mail.

2    Q    Sir, do you know anything about that output as to its

3    accuracy or what Judy Regnier testified to about it?  Do you

4    have any idea?

02:27PM 5    A    I don't know what Judy Regnier testified.

6    Q    Okay.  And you don't have any idea as to how accurate it

7    is either, do you?

8    A    I believe it double-counted certain expenses, so it was

9    not accurate.

02:28PM 10   Q    Sir, you're not understanding my question.

11           You don't know whether that was a final cost amount

12   or not, do you?

13   A    I don't know whether that was a final cost or not.

14   Q    Okay.  And we're going to come back to this number

02:28PM 15   momentarily.

16           And there's this number of $15,637; right?

17   A    Yes.

18   Q    And after this $100,000 payment was made, what was the

19   balance in the account?

02:28PM 20   A    708,031.

21   Q    So are you able to tell the jury that any of that $50,000

22   came from money stolen from Geoffrey Johnson?

23   A    The $100,000?  No, I can't say one way or another.

24   Q    But we know the $250,000 was not; right?

02:29PM 25   A    The source of the $250,000 withdrawal was the 1.6 million.

```
 1    Yes.

 2    Q    So do you have any idea why they charged me with a

 3    federal crime over that payment?

 4             MR. WYMAN:   Objection.  Argumentative.

 5             THE COURT:   Sustained.

 6    Q    BY MR. AVENATTI:  By the way, in connection with the over

 7    $600,000 worth of work that your firm did and you did, did the

 8    Government ever ask you to engage in this type of analysis,

 9    where they took the charges and actually traced them through to

10    see if an actual crime had been committed?  Did they ever ask

11    you to do that?

12    A    That was not part of my assignment.

13    Q    So I'll take that as a "No."  Is that fair?

14    A    Yes.

15    Q    Now, you were also asked about -- and we're going to come

16    back to that count chart here momentarily, but you were also

17    asked about Exhibit 48.

18             Can you please pull that up.

19             You recall that Mr. Wyman asked you about

20    Exhibit 48?

21    A    Yes.

22    Q    And you understand that this is a draft printout from

23    Tabs; right?

24    A    Yes.

25    Q    And I wrote this down, but I may have written it down
```

02:29PM 5
02:30PM 10
02:30PM 15
02:31PM 20
02:31PM 25

**UNITED STATES DISTRICT COURT**

```
 1   wrong.  You correct me if I'm wrong.  But I believe that during

 2   your direct, Mr. Wyman asked you if you had confirmed that

 3   these expenses had actually been incurred, and you said that

 4   you had.  And the way that you had confirmed it was you had

 5   looked at the underlying bank records to see if the payments

 6   had been made.  Do you recall that testimony?

 7   A     I think so.  Yes.

 8   Q     And was that truthful when you told the jury that that's

 9   how you confirmed that these payments had been made?

10   A     That was my recollection.

11   Q     Sir, do you know why some costs were kept in QuickBooks

12   versus Tabs?

13   A     No, I don't.

14   Q     Isn't it true that sometimes the law firm would get an

15   invoice that would have a lot of different cases billed on the

16   same invoice, and the total amount would go into QuickBooks,

17   but then it had to be broken down in Tabs.  Isn't that true?

18              MR. WYMAN:  Objection.  Foundation.

19              THE COURT:  Overruled.

20              THE WITNESS:  That could be.

21   Q     BY MR. AVENATTI:  So I want to ask you about page 4 of 9

22   on this Exhibit 48.  This is the one that you said you went to

23   the banking records and you confirmed the payments, page 4 of

24   9.

25              We can just blow up the bottom half, please.
```

```
 1              Sir, do you see all these entries to Nationwide?
 2     A     Yes, I do.
 3     Q     And many of them are fairly small numbers there.  Do you
 4     see that?  For instance, there's one, "Delivery of envelope,
 5     $18."
 6     A     I see that.
 7     Q     There's another one, "Delivery of envelope, $72."
 8              Do you see that?
 9     A     Yes.
10     Q     So, sir, is it your testimony that if you went into the
11     bank records of Eagan Avenatti, that you would see a check for
12     each one of these small amounts made payable to Nationwide and
13     that -- I mean, I think you testified that's how you confirmed
14     that the expenses were paid; right?
15     A     I should clarify that.  I confirmed the CareMeridian
16     amounts in here.  They were actually paid.
17     Q     Well, sir, that wasn't the question.  I wrote it down.
18              Mr. Wyman asked you if you had confirmed all of the
19     expenses on 48 by checking the bank records, and you testified
20     to the jury that you had.
21              Do you wish to now change that testimony?
22     A     I confirmed the amounts that were paid to CareMeridian.
23     Q     Because there would be no way to confirm the other
24     expenses merely by going to the bank records, because very
25     often the payment made in the bank records would account for a
```

02:34PM (line 5)
02:35PM (line 10)
02:35PM (line 15)
02:35PM (line 20)
02:36PM (line 25)

1    number of different cases, i.e., for Nationwide; right?

2    A    That could be a reason, yes.

3    Q    So other than CareMeridian, you made no confirmation of

4    any of these expenses on 48; right?

02:36PM 5    A    I don't recall making a confirmation of the others.

6    Q    And you don't recall asking Ms. Carter or any of the

7    other people working with you to do so; right?

8    A    I don't recall one way or the other.

9    Q    You were asked about this line item in red, "Total client

02:37PM 10   received from settlement," and you have nothing listed there.

11   Right?

12   A    That's correct.

13   Q    Did Mr. Johnson receive any monies before -- strike that.

14          Did Mr. Johnson receive any monies from Eagan

02:38PM 15   Avenatti before January 29, 2015, as an advance on his

16   settlement, yes or no?

17   A    I don't recall.

18   Q    Well, you would agree that if he did receive such

19   advances, this number would be wrong; right?

02:38PM 20   A    Yes, if he received advances, I would expect that to be in

21   the case-related expenses.

22          MR. AVENATTI:  Move to strike as nonresponsive.

23          THE COURT:  Be stricken.

24   Q    BY MR. AVENATTI:  Sir, if he received advances before his

02:39PM 25   settlement, this statement that he received no monies would be

1    wrong, wouldn't it?

2    A    No, I don't think that's right.

3    Q    Well, did he receive any money after January 29th, 2015,

4    from Eagan Avenatti?

02:39PM 5    A    Yes.

6    Q    None of those monies are shown on this page; correct?

7    A    That's correct.

8    Q    Sir, you were asked a question about what kinds of

9    expenses that you noticed out of the Avenatti & Associates

02:40PM 10   account.  Do you recall that?  You were asked this general

11   question by Mr. Wyman?

12   A    Yes, I recall that.

13   Q    And you said that it was a mix of personal and business

14   expenses.  Do you recall that?

02:40PM 15   A    Yes, I recall that.

16   Q    Who owned Avenatti & Associates?

17   A    I believe it was -- I believe it was you, and I don't

18   recall if there was another interest in it.

19   Q    You understood, sir, that Avenatti & Associates was a

02:40PM 20   company that I owned 100 percent of, did you not?  You

21   understood that when you were doing your analysis; right?

22   A    I don't recall that offhand, but I can accept that.

23   Q    It wasn't a publicly traded company?

24   A    No.

02:41PM 25   Q    Okay.  Did you understand that I owed any money in

**UNITED STATES DISTRICT COURT**

44

```
 1   Avenatti & Associates to other people who were my partners in
 2   Avenatti & Associates?
 3   A    I don't know whether Avenatti & Associates had any debt,
 4   no.
 5   Q    I'm sorry, any debt?
 6   A    Yes.
 7   Q    I wasn't asking about debt.  I was just asking about
 8   partners.
 9            Are you aware of any other partners or people that
10   owned equity interest in Avenatti & Associates?
11   A    No, I'm not aware.
12   Q    So are you aware of anything improper in -- when you have
13   a wholly owned personal corporation, having the company pay
14   personal expenses from time to time as long as it's accounted
15   for?  Are you aware something improper in that?
16   A    As long as it's accounted for properly.  That's up to the
17   sole proprietor to do.
18   Q    Happens all the time, doesn't it?
19   A    It does.
20   Q    Now, when you were asked about 422, Mr. Wyman didn't ask
21   you about a particular line item, and I want to ask you about
22   it.
23            This is the EA trust account exhibit.  Do you see
24   that?
25   A    Yes, I see that.
```

```
 1   Q    And there's the $1.6 million fee.  We already talked
 2   about that; right?
 3   A    Yes.
 4   Q    And then there's a $3 million deposit on March 31st, and
02:43PM  5   the payor is Mark Calvert.  Do you see that?
 6   A    I see that.
 7   Q    Do you know what that relates to?
 8   A    No.  I don't know who Mark Calvert is.
 9   Q    Did you ever ask anybody?
02:43PM 10   A    I don't believe so.
11   Q    And then out of that amount of money there was an amount
12   paid to Eagan Avenatti of over $2 million; is that right?
13   A    I see that withdrawal to Eagan Avenatti.
14   Q    And that largely came from the amount of money deposited
02:44PM 15   from Mr. Mark Calvert.  Do you see that?
16   A    Yes.  Before the deposit from Mark Calvert, the account
17   did not have sufficient funds to make that transfer.
18   Q    And then there was a $350,000 payment made to
19   McNicholas & McNicholas.  Do you see that?
02:44PM 20   A    Yes, I see that.
21   Q    And that was the same firm that was working on the Geoff
22   Johnson matter, wasn't it?
23   A    That's my understanding.
24   Q    Now, we're back to Exhibit 423 and we're talking about
02:45PM 25   this $1.6 million that was deposited into the account.  Do you
```

46

1   remember that?

2   A     Yes.

3   Q     We already talked about the $250,000 payment that the

4   federal government is charging me with; right?

02:45PM 5   A     We talked about that payment.

6   Q     And what's this payment right here?

7   A     That's a $5,000 payment to Sunrise of West Hills.

8   Q     And the firm actually deducted this amount from the

9   amount of the $1.6 million legal fee that the firm got.  Do I

02:46PM 10   have that correct?

11   A     The -- yes, the source of the $5,000 payment was the

12   balance which reflects the $25,000 balance and the $1.6 million

13   deposit.

14   Q     And you understood that that related to Mr. Johnson;

02:46PM 15   right?

16   A     Yes, I understand that.

17   Q     By the way, in connection with your analysis, did you

18   ever ask to see any of the client banking records to see what

19   money they may have received?

02:47PM 20   A     No.  I never saw the client records.

21   Q     And you never asked to do so; right?

22   A     I don't believe so.

23   Q     And how do you know that these are -- that the accounts

24   that Mr. Wyman asked you about, how do you know that those are

02:47PM 25   all of the Eagan Avenatti or Michael Avenatti bank accounts?

**UNITED STATES DISTRICT COURT**

     1   Or do you know?

     2   A    It's possible there are other accounts that I don't know

     3   about.

     4   Q    You only used what the Government gave you?

02:47PM 5   A    I used the information that was provided me by the

     6   Government, yes.

     7   Q    Let's take a look at Exhibit 430, please.  Do you see

     8   Exhibit 430?

     9   A    Yes.

02:49PM 10  Q    You have case-related expenses, $65,615; right?

     11  A    That's correct.

     12  Q    Do you know whether that number is accurate?

     13  A    That's an accurate depiction of the case-related expenses

     14  that are recorded in QuickBooks for Alexis Gardner.

02:49PM 15  Q    What about Tabs?

     16  A    I asked if there was a similar spreadsheet, as I reviewed

     17  for Geoffrey Johnson and Greg Barela, and I understand there

     18  was not.

     19  Q    Did you ask if there was any electronic data from Tabs

02:49PM 20  for this matter?

     21  A    I don't believe so.

     22  Q    If the cost amount is different, the calculation would be

     23  wrong; isn't that true?

     24  A    If the cost amount was different, the calculation would be

02:50PM 25  different, yep.

**UNITED STATES DISTRICT COURT**

|     |   |
|-----|---|
| 1 | Q    It would be different than the calculation that you |
| 2 | produced in connection with your $600,000 worth of work; right? |
| 3 | A    Yes. |
| 4 | Q    And then I notice that you have plus settlement amount |
| 02:50PM 5 | due November 2020, $250,000; right? |
| 6 | A    Yes. |
| 7 | Q    And then you have total due to client as of November |
| 8 | 2020, $1,944,385.  Do I have that correct? |
| 9 | A    Yes. |
| 02:50PM 10 | Q    And then you have total client received from settlement, |
| 11 | nothing; right? |
| 12 | A    Yes. |
| 13 | Q    Did Ms. Gardner receive any advances before her |
| 14 | settlement was received? |
| 02:51PM 15 | A    I don't recall. |
| 16 | Q    You don't know, do you? |
| 17 | A    I know there were expenses paid for. |
| 18 | Q    Sir, I didn't ask you about expenses. |
| 19 |        Did Ms. Gardner receive any advances before |
| 02:51PM 20 | settlement was paid? |
| 21 | A    I don't know. |
| 22 | Q    Did Ms. Gardner receive any monies after her settlement |
| 23 | was paid? |
| 24 | A    Yes, she did. |
| 02:51PM 25 | Q    Those are not reflected on your sheet, are they? |

```
 1   A    That's correct.  Those --

 2   Q    Thank you.

 3   A    -- came from other accounts.

 4        MR. AVENATTI:  Move to strike after "correct" as

02:51PM  5   nonresponsive, Your Honor.

 6        THE COURT:  It will be stricken.

 7   Q    BY MR. AVENATTI:  Now, let's talk about the $250,000 that

 8   you listed -- well, strike that.

 9        Whose idea was it to put this $250,000 amount on

02:51PM 10   your chart?  Was that the Government's idea or your idea?

11   A    I would say that was my idea.

12   Q    So after you put the $250,000 on your chart as an amount

13   that was due, what did you do to figure out if Ms. Gardner ever

14   got any part of the money?  Did you do anything?

02:52PM 15   A    I didn't have records for that time period that would

16   allow me to analyze that.

17   Q    So you put that the amount would be due her, but you then

18   did nothing to figure out whether she ever got any of the

19   money; is that true?

02:52PM 20   A    I was not provided any information that would allow me to

21   do that.

22   Q    Nor did you ever ask for any information about whether

23   she had actually been paid any of the money; isn't that true,

24   sir?

02:52PM 25   A    I did not ask for any information about the 250,000 on
```

1   November 2020.

2   Q     If she did receive some of that money, your calculation

3   would be wrong; isn't that true?

4   A     If she received some of the $250,000 payment in November

02:53PM 5   2020, yes, the value in the red should reflect that.

6   Q     And your calculation would be wrong; isn't that true?

7   A     Yes.

8               MR. AVENATTI:  Now is a good time.

9               THE COURT:  Okay.  We'll take the midafternoon break

02:53PM 10   here, ladies and gentlemen.  We'll be in recess for 15 minutes.

11              Please remember the admonition not to discuss the

12   case with anyone, not to form any opinions on the issues in the

13   case until it's submitted to you, and, as always, no research,

14   please.

02:53PM 15              THE COURTROOM DEPUTY:  All rise.

16              **(Recess from 2:54 p.m. to 3:14 p.m.)**

17              MR. AVENATTI:  Your Honor, for the Court's

18   information, plus or minus 30 minutes on cross.  I'm going to

19   try to eliminate some.  Obviously reserving my rights on the

03:12PM 20   other issues.

21              **(In the presence of the jury.)**

22              THE COURT:  Ladies and gentlemen, this is the

23   toughest hour of the week, so if any of you feel the need to

24   stretch, please go ahead.

03:14PM 25              THE COURTROOM DEPUTY:  I told them the same thing,

**UNITED STATES DISTRICT COURT**

51

```
     1   ironically.
     2          THE COURT:  Now you know where I get all my good
     3   ideas.
     4          Mr. Avenatti.
03:14PM  5          MR. AVENATTI:  Thank you, Your Honor.
     6   Q    Before the break, sir, we were talking about Exhibit 430,
     7   this chart you prepared.  Do you recall that?
     8   A    Yes, sir, I recall that.
     9   Q    Did Ms. Gardner ever agree to accept monthly payments in
03:15PM 10   connection with the Whiteside settlement?
    11          MR. WYMAN:  Objection.  Calls for speculation.
    12          THE COURT:  Overruled.
    13          THE WITNESS:  I don't know.
    14   Q    BY MR. AVENATTI:  Did you ever ask anybody if Ms. Gardner
03:15PM 15   had agreed to accept monthly payments in connection with the
    16   settlement amount that you put on 430?
    17   A    I don't believe I did.
    18   Q    And nobody ever told you one way or the other, did they?
    19   A    No.
03:15PM 20   Q    Let's take a look at 439.  439 relates to Mr. Barela.  Do
    21   you see that?
    22   A    Yes, it does.
    23   Q    And you have a case-related expense amount here of
    24   $180,797.  Do you see that?
03:16PM 25   A    Yes.
```

```
 1    Q     And you got that off of the QuickBooks file, which you

 2    don't know where it came from or how current it was, and the

 3    draft spreadsheet.  Do I have that correctly?

 4    A     Yes.  The two sources of information are the QuickBooks

 5    files and the spreadsheet from Judy Regnier.

 6    Q     And you don't know if either one of those two sources of

 7    information are accurate, do you?

 8    A     I wasn't able to -- no.  I wasn't able to do anything to

 9    verify the accuracy.

10    Q     So the answer is, "No," you do not?

11    A     That's correct.  I accepted them as they were provided to

12    me.

13    Q     By the Government?

14    A     By the Government, yes.

15    Q     And you would agree that if the case-related expense

16    amount is wrong, then this calculation would not be accurate;

17    right?

18    A     That's how the math works, yes.

19    Q     Again, pretty simple; right?

20    A     Yes.

21    Q     Can you see this?

22    A     Yes, I can see that.

23    Q     At the top it says "calculation," and then it has,

24    "Settlement amount, minus attorney's fees, minus out-of-pocket

25    expenses, minus advances, minus interest, minus fees for other
```

53

```
 1   work -- for other work, equals net amount due client."
 2           Do you see that?
 3   A    I see that in there.
 4   Q    This, too, is pretty simple math; right?
03:18PM 5   A    Yes.
 6   Q    And this is essentially what you have attempted to do;
 7   right?
 8   A    Yes.
 9   Q    But you haven't accounted for all of the advances, if
03:19PM 10   any, paid to any of the clients or any interest or any legal
11   fees for other work.  Is that fair?
12   A    I believe advances were included in the spreadsheet from
13   Judy Regnier.
14   Q    Sir, do you understand that those spreadsheets, when they
03:19PM 15   say "advances," that they're referring to advances to clients?
16   A    There's a line that says "advances" in those spreadsheets.
17   Q    All right.  Well, let's take a look at it.  Let's go back
18   to 48.
19           When I wrote "advances" on here, I referred to --
03:20PM 20   what I meant was advances to clients.
21   A    Payments directly to the clients?
22   Q    Yes.  Or someone that the client directed the money to go
23   to.  Does that clarify your answer?
24   A    I don't think so.
03:20PM 25   Q    Okay.  Let's take a look at 48.  Here's the first page
```

54

```
          1    with that big-old "Draft" across the page.  Do you see that?
          2    A     Yes.
          3    Q     And this says "expenses"; right?
          4    A     Yes.
03:20PM    5    Q     And this is a Tabs printout, we already established that;
          6    right?
          7    A     Yes.
          8    Q     And then there's another category here called "advances";
          9    right?
03:21PM   10    A     Yes.
         11    Q     But you don't see any payments to client -- to a client
         12    under "advances," do you?
         13    A     No, I don't see that.
         14    Q     Do you know the differences in Tabs between an advance
03:21PM   15    and an expense?
         16    A     That distinction didn't affect my analysis.
         17              MR. AVENATTI:  Move to strike as nonresponsive.
         18              THE COURT:  Be stricken.
         19    Q     BY MR. AVENATTI:  Sir, I'm just asking you if you know
03:21PM   20    why Tabs lists some items under "expense" and some under
         21    "advances"
         22    A     No, I don't know that.
         23    Q     And the reason is because you don't know anything about
         24    Tabs, do you?
03:22PM   25    A     No.
```

**UNITED STATES DISTRICT COURT**

55

1    Q    And before this case, you'd never even heard of Tabs?

2    A    Before this case I had not heard of Tabs.  That's correct.

3    Q    Did you ever Google it?

4    A    I don't believe I did.

03:22PM 5    Q    And you never attempted to buy the software either, did

6    you?

7    A    No, I did not buy the software.

8    Q    So going back to the question that led us down this path,

9    we were talking about simple math and I was asking you about

03:23PM 10   this sheet on the flip chart.  Do you recall that?

11   A    Yes.

12   Q    Okay.  And going back to what I asked, this is

13   essentially what you have attempted to do, although you have

14   not accounted for some of the categories that I listed on my

03:23PM 15   flip chart.  Is that fair?

16   A    That's fair.

17   Q    Do you know if any other legal work was done for

18   Mr. Barela for which the firm was entitled to be paid, other

19   than this amount that you've listed of $760,000?

03:24PM 20   A    No, I don't know one way or the other.

21   Q    And you never asked anyone if any other legal work had

22   been paid; is that correct -- I'm sorry.

23        You never asked anyone if any other legal work had

24   been done for Mr. Barela for which the firm was entitled to

03:24PM 25   money; is that true?

1    A    That's correct.

2    Q    And you then have the settlement amounts listed, three of

3    them, $100,000.  Do you see that?

4    A    Yes.

03:24PM 5    Q    And then you calculated a total amount due to Mr. Barela

6    of $959,203, including these three $100,000 amounts; is that

7    right?

8    A    That's correct.

9    Q    And then you have in red, "Total client received from

03:24PM 10   settlement," and you have nothing listed there; is that right?

11   A    That's correct.

12   Q    By the way, whose idea was it to put this in red on the

13   bottom of these charts?  Was that your ideas or the

14   Government's idea?

03:25PM 15   A    I don't recall where that idea originated.

16   Q    Sir, did Mr. Barela receive any portion of this $300,000

17   that you put on the chart?

18   A    I don't know.

19   Q    Did you ever ask anybody?

03:25PM 20   A    I don't believe I did.

21   Q    If Mr. Barela received any portion of that $300,000, then

22   your calculation would be wrong; is that correct?

23   A    My calculation would have to be updated, yes.

24   Q    And the calculation that you provided to the jury would

03:25PM 25   be wrong if that was true; is that accurate?

```
 1   A     Under that hypothetical, it would have to be updated, yes.

 2   Q     Not only would it have to be updated, but the one that

 3   you put before this jury would be wrong; correct?

 4   A     Under that hypothetical, yes.

03:25PM 5   Q     Now, Mr. Drum, I want to ask you about some of the -- I

 6   want to ask you some questions, and we're going to use your

 7   Exhibit 439 as if it's accurate.  Okay?

 8   A     Okay.

 9   Q     All right.  Now, according to you and your analysis, the

03:27PM 10  total amount of money from the $1.6 million that the law firm

11   was entitled to was 760,000 plus 180,797; right?

12   A     Yes.

13   Q     Putting aside the other issues that we already talked

14   about relating to the cost and other things, the Tabs software

03:28PM 15  and, again, other issues, 760,000 plus $180,797 is how much,

16   about $940,797?  Is that about right?

17   A     Yes.

18   Q     Okay.  I want to ask you about Dillanos Coffee because

19   we've heard a lot about Dillanos Coffee.  Okay?

03:29PM 20  A     All right.

21   Q     All right.  So let's talk about Dillanos Coffee.

22         Here is the $1,600,000 that came in in connection

23   with the Brock settlement.  Do you see that?

24   A     Yes.

03:29PM 25  Q     Now, it's not on this page, but what was the number that,
```

58

```
         1    according to you, even though you never looked at Tabs,

         2    according to you that the firm, Eagan Avenatti, was entitled to

         3    from the Brock settlement?  What's the amount?

         4    A    940,747, I believe.

03:30PM   5    Q    Did I write that amount correctly?

         6    A    Yes.

         7    Q    After the Dillanos Coffee payment --

         8    A    Sorry, -797.

         9    Q    Does that look good (indicating)?

03:30PM  10    A    Yes.

        11    Q    Okay.  So a million-six came into the account.  There was

        12    a bank fee.  You understand that was for receipt of the wire;

        13    right?

        14    A    That seems reasonable.

03:30PM  15    Q    And then there's this $41,885 payment to Dillanos Coffee;

        16    right?

        17    A    I see that.

        18    Q    Mr. Wyman asked you about that, didn't he?

        19    A    He did.

03:31PM  20    Q    Okay.  And how much money was in -- left in the account

        21    after the payment to Dillanos Coffee?

        22    A    1,558,100.

        23    Q    Is that amount of money more or less than the balance

        24    that would be in the account after the deduction of Eagan

03:31PM  25    Avenatti's fees and expenses?
```

|      |     |
|------|-----|
| 1 | A    That amount is more than what would be in the account had |
| 2 | 940,797 been deducted. |
| 3 | Q    So this Dillanos Coffee came in -- this didn't come out |
| 4 | of Mr. Barela's share of the settlement, did it, sir? |
| 03:32PM 5 | MR. WYMAN:  Objection.  Calls for a legal |
| 6 | conclusion. |
| 7 | THE COURT:  Overruled. |
| 8 | THE WITNESS:  It came from the $1.6 million. |
| 9 | Q    BY MR. AVENATTI:  Of which Eagan Avenatti was entitled to |
| 03:32PM 10 | $940,797, even according to your calculation; right? |
| 11 | A    Yes.  That's correct. |
| 12 | Q    So are you aware of any evidence that this Dillanos |
| 13 | Coffee payment came from any money owed to Greg Barela? |
| 14 | A    At this point, the -- before the Dillanos Coffee |
| 03:32PM 15 | deduction, the only amounts in this account were the |
| 16 | $1.6 million. |
| 17 | MR. AVENATTI:  Can I have the question read back, |
| 18 | please? |
| 19 | THE COURT:  You may. |
| 03:32PM 20 | **(The record was read as follows:** |
| 21 | **"So are you aware of any evidence that this** |
| 22 | **Dillanos Coffee payment came from any money owed to** |
| 23 | **Greg Barela?")** |
| 24 | Q    BY MR. AVENATTI:  Do you know, sir? |
| 03:33PM 25 | A    It came from the $1.6 million balance in the account. |

```
 1   Q      Sir, you understand Greg Barela wasn't entitled, even

 2   under your calculation, to the entire 1.6 million; right?

 3   A      Yes.  Of course.

 4   Q      Okay.  So are you aware of any evidence that this

 5   Dillanos Coffee payment came from money that was due to Greg

 6   Barela net of the fees and the costs, even under your

 7   calculation?

 8   A      I'm sorry, can you repeat the question.

 9   Q      Are you aware of any evidence that Mr. Barela was

10   entitled to monies net of the fees and costs and that this

11   Dillanos Coffee payment came from those monies?

12   A      At this point, that distinction can't be made because it's

13   just the 1.6 million in the account.

14   Q      So you don't know?

15   A      That's correct.  It can't be determined.

16   Q      And again, you don't know what the costs were for

17   Mr. Barela's matter, you just looked at the QuickBooks account

18   and the spreadsheet; right?

19             MR. WYMAN:  Asked and answered.

20             THE COURT:  Sustained.

21   Q      BY MR. AVENATTI:  What is 1,600,000 minus $940,797?

22             I'll shortcut it for you.  It's on your chart.

23   A      Thank you.  Yeah, 659,203.  Thank you.

24   Q      Okay.  659,203; right?

25   A      That's correct.
```

**UNITED STATES DISTRICT COURT**

1   Q    We've heard a lot about this guy, too, Edward Ricci.  Do

2   you see that?

3   A    I see that.

4   Q    $617,840 payment; right?

03:36PM 5   A    I see that.

6   Q    After the payment to Mr. Ricci, was the amount in this

7   account greater than the amount that you claim Mr. Barela was

8   due, $659,203, or less?

9   A    That amount is greater than 659,000.

03:36PM 10   Q    So are you aware of any evidence that this $617,000

11   payment to Mr. Ricci came from the money that was due Greg

12   Barela?

13   A    Again, that came from the $1.6 million balance or slightly

14   less than that.

03:36PM 15   Q    So you don't know, do you?

16   A    I don't believe that's a meaningful distinction to make to

17   balance -- before making that it was 1.5 million.

18         MR. AVENATTI:  Your Honor, move to strike as

19   nonresponsive.

03:37PM 20         THE COURT:  Be stricken.

21   Q    BY MR. AVENATTI:  Sir, we already established that even

22   under your calculation the firm was entitled to the first

23   $940,797.

24         MR. WYMAN:  Objection.  Misstates the testimony.

03:37PM 25         THE COURT:  Overruled.

```
 1    Q    BY MR. AVENATTI:  Right?

 2    A    They were entitled to 940,797.  Whether that comes out

 3    first or last, I don't have an opinion.

 4    Q    You don't know if the firm's money was supposed to come

 5    out first or last or in between?  You don't know?
03:37PM
 6    A    No, I don't know that.

 7    Q    Did you ever ask anybody that?

 8    A    I don't think I did.

 9    Q    Let's talk about Exhibit 444.  Now, before we get into

10    the nitty-gritty on Exhibit 444 relating to Ms. Phan and
03:38PM
11    Mr. Tran and Promise Phan, I think I saw somewhere that you

12    used to do valuation work.  Is this valuation work?

13    A    Yes.

14    Q    Can you explain generally to the jury what business

15    valuation work is.
03:39PM
16              MR. WYMAN:  Objection.  Relevance.

17              THE COURT:  Sustained.

18    Q    BY MR. AVENATTI:  Sir, were you ever asked --

19              MR. AVENATTI:  Just two-question leeway, please,

20    Your Honor.
03:39PM
21              THE COURT:  Okay.

22    Q    BY MR. AVENATTI:  Were you ever asked to do any valuation

23    in connection with your work in this case relating to any

24    business associated with Michelle Phan?

25    A    No, I was not.
03:39PM
```

```
         1   Q     That was not in the scope of work that you were engaged
         2   to do; correct?
         3              MR. WYMAN:  Relevance.
         4              THE COURT:  Overruled.
03:39PM  5              THE WITNESS:  No, that was not in the scope of my
         6   work.
         7   Q     BY MR. AVENATTI:  Now, when you were determining the
         8   legal costs that were due, the legal fees in connection with
         9   Michelle Phan and Long Tran and Promise Phan's matter, what did
03:40PM 10   you rely on in connection with that?
        11   A     The fee agreement and the total repurchase amount.
        12   Q     And so when you were determining what the legal fees due
        13   the law firm for that transaction, what the amount would be,
        14   you read the fee agreement, you interpreted the agreement, and
03:40PM 15   then you calculated the amount based on your interpretation of
        16   the fee agreement; right?
        17   A     I pulled the 7 and a half percent from the legal agreement
        18   and applied that to the total repurchase amount.
        19   Q     Sir, you read the fee agreement; correct?  Let's go step
03:41PM 20   by step.  You read the fee agreement?
        21   A     I did.
        22   Q     You interpreted the fee agreement?
        23   A     I saw that included a 7 and a half percent fee.
        24   Q     You interpreted the fee agreement; right?  Part of your
03:41PM 25   interpretation was this application of 7 and a half percent;
```

```
 1   right?
 2   A    The fee agreement indicated that the law firm was entitled
 3   to 7 and a half percent of the settlement.
 4   Q    The fee agreement indicated a lot of things, did it not,
 5   sir?  I mean, it's, like, three pages.
 6   A    Yeah, there are other content.
 7   Q    And there's other terms; right?
 8   A    Yes, there are other terms.
 9   Q    Okay.  So you read the fee agreement, you interpreted it,
10   and your takeaway was that the fees due the firm were 7 and a
11   half percent.  Do I have that correct?
12              MR. WYMAN:  Objection.  Vague as to "interpret."
13              THE COURT:  Overruled.
14              THE WITNESS:  I used the 7 and a half percent that
15   was indicated in the fee agreement and applied it, yes.
16   Q    BY MR. AVENATTI:  Sir, there were other numbers in the
17   agreement.  You applied 7 and a half percent; am I right?
18   A    I applied 7 and a half percent, yes.
19   Q    Okay.  And then you took the 7 and a half percent times
20   the amount, and that's how you came to this number; right?
21   A    Yes.
22   Q    Now, do you have any legal training?
23   A    I do not.
24   Q    Would you agree with me that if your interpretation of
25   the fee agreement was wrong, that your calculation as it
```

03:41PM  5
03:41PM 10
03:42PM 15
03:42PM 20
03:42PM 25

```
 1   relates to the legal fees would also be wrong?
 2   A     Yes.  If an interpretation of the fee agreement suggested
 3   a different amount, my amount would be wrong.
 4   Q     And the total due to client amount would also be wrong;
 5   correct?
 6   A     That's how the math works.
 7   Q     And the total -- well, the total clients receive number
 8   would remain the same, even if your interpretation was wrong;
 9   correct?
10   A     That number would remain the same on the timetable.  Yes.
11   Q     Did you ever ask any lawyer to interpret the fee
12   agreement for you in connection with your analysis?
13   A     I discussed my analysis with the Government, and part of
14   that would have been the application of 7 and a half percent.
15   Q     So the Government told you to apply 7 and a half percent?
16   A     I pulled the 7 and a half percent from the fee agreement
17   and discussed it with the Government.
18   Q     And they said, "Yes, John, use the 7 and a half percent"?
19   A     They agreed with that application.  Yes.
20   Q     I just have a few more questions.  I just want to ask you
21   some general questions.
22         We've been talking about Exhibits 420 through 450
23   and 456; right?
24   A     Yes.
25   Q     Are all of these charts in these exhibits that you and
```

Timestamps (left margin): 03:43PM (line 5), 03:43PM (line 10), 03:44PM (line 15), 03:44PM (line 20), 03:45PM (line 25)

        1    your colleagues prepared, do they all have the same degree of

        2    accuracy, to the best of your knowledge?

        3    A    To the best of my knowledge, yes.

        4    Q    They are all, to the best of your knowledge, 100 percent

03:45PM  5    accurate; is that right?

        6    A    They are -- yes, to the best I could do with the

        7    information that was provided me.

        8    Q    They're all, according to you, 100 percent accurate;

        9    right?  I mean, we're not talking about the best you can do.

03:45PM 10    We're talking about a federal criminal case.

        11            THE COURT:  We're talking about asking a question.

        12   Please give your question to the witness without further

        13   comment.

        14   Q    BY MR. AVENATTI:  Mr. Drum, are they 100 percent

03:46PM 15   accurate, to the best of your knowledge?

        16   A    To the best of my knowledge, they're 100 percent accurate.

        17   Q    And did you take the same degree of carefulness and

        18   thoroughness when you were preparing each of the exhibits?

        19   A    Yes.

03:46PM 20   Q    Sir, you were asked a question about whether any of the

        21   clients had received any amount of money from any of their

        22   settlements.  Do you remember that?

        23   A    Yes, I remember that.

        24   Q    You would agree, would you not, that if the clients were

03:46PM 25   advanced money before the settlement was paid or received money

```
 1    after the settlement was paid, it would be inaccurate to say

 2    that they had not received any money from any of their

 3    settlements, if that were true.  You would agree with that,

 4    would you not?

 5    A     No, I would not agree with that.

 6    Q     Sir, do you know if any of the clients received any of

 7    the advances before their settlement was paid?  Yes or no?

 8    A     No, I don't know.

 9    Q     Do you know if any of the clients received any of the

10    money from their settlements after the initial settlement

11    payment was made?

12    A     For Geoffrey Johnson, Alexis Gardner, Greg Barela, none of

13    the money that was deposited into the trust accounts.

14          MR. AVENATTI:  Move to strike.  That's not my

15    question.

16          THE COURT:  Be stricken.

17          MR. AVENATTI:  Can I have it read back please.

18          THE COURT:  Yes.

19          MR. AVENATTI:  Please listen to my question, sir.

20          (The record was read as follows:

21          "Do you know if any of the clients received

22          any of the money from their settlements after the

23          initial settlement payment was made?")

24    Q     BY MR. AVENATTI:  Yes or no?  I'm talking about receiving

25    money.  I'm not talking about what account it came from.  I'm
```

03:47PM (line 5)
03:47PM (line 10)
03:47PM (line 15)
03:47PM (line 20)
03:48PM (line 25)

**UNITED STATES DISTRICT COURT**

```
 1    talking about receiving money.  That's my question.
 2    A    The clients received money after the initial settlement
 3    was paid, yes.
 4              MR. AVENATTI:  One moment, please.
03:48PM  5         Nothing further, Your Honor.
 6              THE COURT:  Mr. Wyman.
 7              MR. WYMAN:  Thank you, Your Honor.
 8                    REDIRECT EXAMINATION
 9    BY MR. WYMAN:
03:48PM 10    Q    Good afternoon, Mr. Drum.
11              During cross-examination, the defendant asked you to
12    assume a cost of about $100,000 for an expert.  Do you recall
13    that?
14    A    I recall that.
03:49PM 15    Q    And I believe it was in the context of asking you, if
16    that amount wasn't reflected on Tabs or QuickBooks, would that
17    make your calculation wrong.  Is that generally right?
18    A    Yes, I recall that.
19    Q    And I think you then said something to the effect of you
03:50PM 20    don't know if there are examples of that.  Do you remember
21    that?
22    A    Yes.
23    Q    Did he provide you with any examples of that?
24    A    No, he did not.
03:50PM 25    Q    He just provided you with a hypothetical?
```

| | |
|---|---|
| 1 | A    That was a hypothetical, yes. |
| 2 | MR. WYMAN:  Can we please pull up Exhibit 439. |
| 3 | Q    What is the amount of costs and the case-related expenses |
| 4 | that you listed for Mr. Barela's matter? |
| 03:50PM 5 | A    180,797. |
| 6 | MR. WYMAN:  Can we please pull up what is already in |
| 7 | evidence as Exhibit 193. |
| 8 | Q    Do you see an amount listed here? |
| 9 | A    I do. |
| 03:51PM 10 | Q    What is the amount? |
| 11 | A    111,113. |
| 12 | Q    And what does it say for the remitter at the top? |
| 13 | A    "Case costs." |
| 14 | Q    And what is the account -- the last four digits of the |
| 03:51PM 15 | account listed at the bottom? |
| 16 | A    5566. |
| 17 | Q    Is that the trust account that the Greg Barela settlement |
| 18 | money was deposited into? |
| 19 | A    Yes. |
| 03:52PM 20 | Q    The amount listed here, 111,000 and some change, is that |
| 21 | more or less than the amount you gave the defendant credit for |
| 22 | in your chart? |
| 23 | A    That is less. |
| 24 | MR. WYMAN:  Can we please pull up Exhibit 48 and |
| 03:52PM 25 | page 2 of the exhibit. |

1  Q    Do you recall a number of questions from the defendant

2  about this exhibit?

3  A    Yes.

4  Q    And I think he asked you a bunch of questions about how

03:52PM 5  you don't know whether this Tabs printout was accurate; is that

6  right?

7  A    Yes.

8  Q    I think he pointed out that it had it and said the

9  big-old "Draft" mark on it; is that right?

03:52PM 10  A    That's correct.

11         MR. WYMAN:  If we could go to page 8.

12  Q    What is the total listed there of expenses and advances?

13  A    736,884, rounded.

14         MR. WYMAN:  And then if we could go to page 1 of

03:53PM 15  this exhibit, please.  If we could pull up the date.

16  Q    What is the date that this e-mail with this spreadsheet

17  was sent?

18  A    February 4th, 2015.

19  Q    Now, if we could please pull up Exhibit 420, the chart

03:53PM 20  that you prepared -- I'm sorry.  I got my charts mixed up.

21  422, please.

22         What is the amount withdrawn there on February 4th

23  of 2015?

24  A    736,884.

03:54PM 25  Q    Is that the same amount on the spreadsheet with the

**UNITED STATES DISTRICT COURT**

```
 1    big-old "Draft" on it?

 2    A    Yes, it is.

 3    Q    Now, the defendant also asked you about that spreadsheet,

 4    about the other costs listed.  I think he had Nationwide as an

 5    example.  And I think you said that you weren't able to verify

 6    whether or not those costs were paid; is that right?

 7    A    That's right.

 8    Q    In reaching your calculation on Exhibit 420, which I

 9    think you calculated case-related expenses of about 543,000,

10    did you give him credit for those costs that you weren't able

11    to verify?

12    A    Yes.

13         MR. WYMAN:  Can we please pull up Exhibit 457.

14    Q    Do you remember the defendant asking you about this

15    chart?

16    A    Yes, I do.

17    Q    And specifically the first two rows only?

18    A    Yes.

19    Q    Did he ask you about any of rows 3 through 10?

20    A    No, he did not.

21         MR. WYMAN:  Can we blow up row 3, please.

22    Q    What is the wire payment listed in this row?

23    A    It's a $2.5 million payment sent from account 8671 to The

24    X-Law Group.

25    Q    Do you recognize that wire transfer?
```

```
 1   A     I do.

 2              MR. AVENATTI:  Objection, Your Honor.  Asked and

 3   answered.  Outside the scope.

 4              THE COURT:  Overruled.

 5              THE WITNESS:  I recognize that.

 6   Q     BY MR WYMAN:  Where did that money come from?

 7   A     That came from the Alexis Gardner settlement.

 8   Q     Let's take a look at row 4.  What wire payment is

 9   described in that row?

10   A     $1.6 million sent from Brock USA to Account 5566.

11   Q     And do you recognize that payment?

12   A     Yes.

13   Q     What does that payment represent?

14   A     That represents the Greg Barela settlement.

15              MR. WYMAN:  Can we please pull up Exhibit 441.

16   Actually, before we move on, I'm sorry, can we please pull up

17   Exhibit 457 again.

18   Q     The first two rows there, do you recall the defendant

19   asked you about how the payments listed there came from the

20   1.6 million that was withdrawn from the Geoffrey Johnson

21   settlement?

22   A     Yes, I remember that.

23   Q     Of the remaining 2.4 million that was not withdrawn, at

24   that $1.6 million payment time, how much of the 2.4 million

25   went to Geoffrey Johnson?
```

(Timestamps in left margin: 03:55PM at line 5, 03:56PM at line 10, 03:56PM at line 15, 03:57PM at line 20, 03:57PM at line 25)

```
 1   A     None.
 2             MR. WYMAN:  Now can we please pull up Exhibit 441.
 3   Q     Do you remember being asked questions about Dillanos
 4   Coffee Roasters?
 5   A     I do.
 6   Q     And at each point he would ask you about a payment and
 7   then ask you to confirm whether the balance was still more than
 8   the amount he was owed in attorney's fees.  Do you remember
 9   that?
10   A     Yes.
11   Q     Now, you testified on direct that these red entries in
12   parentheticals, those are withdrawals?
13   A     That's correct.
14   Q     I'm going to scroll through, and let me know if you see
15   any deposits.
16   A     There are no deposits on this page.
17   Q     Page 1.
18   A     There's one interest deposit.
19   Q     Interest deposit, $13.  Any others on page 2?
20   A     No.
21   Q     On page 3?
22   A     One interest deposit of $2.
23   Q     Now, the defendant asked you about this first payment to
24   Dillanos Coffee Roasters; right?
25   A     Yes.
```

03:58PM (lines 5, 10, 15)
03:59PM (lines 20, 25)

```
 1   Q    And the balance after that was still a sizable amount,
 2   $1.5 million and change?
 3   A    Yes.
 4   Q    Page 2, do you see -- well, there are a bunch of them,
 5   but do you see a Dillanos Coffee Roasters transfer there for
 6   27,000 and change at the bottom of page 2?
 7   A    Yes, I see that.
 8   Q    That's on February 12, 2018?
 9   A    Yes.
10   Q    What is the balance after that transfer?
11   A    123,412.
12   Q    And at the end of the chart, how much is left?
13   A    $610.
14   Q    Are there any payments to Gregory Barela in this chart?
15   A    No.
16   Q    He also asked you about Ed Ricci in this chart.  Do you
17   remember that?
18   A    Yes.
19   Q    Do you know whether the defendant testified in public
20   court that Ed Ricci was co-counsel on one of his cases?
21   A    I don't know what the defendant has testified.
22   Q    Exhibit 441 that we've been looking at with all the
23   withdrawals and the payments to Dillanos and Alki Bakery and
24   Global Baristas, is that an attorney-client trust account?
25   A    Yes.
```

**UNITED STATES DISTRICT COURT**

 1          MR. WYMAN:  Can you please pull up Exhibit 444.  Can

 2   you blow up the content.  Thank you.

 3   Q     During the end of your cross-examination, the defendant

 4   asked you if -- a hypothetical, which is, if you were

04:01PM 5   interpreting the fee contract incorrectly, would the amount due

 6   to the client be incorrect.  Do you remember that?

 7   A     Yes, I remember that.

 8   Q     If the -- if your interpretation of the fee contract was

 9   incorrect, would the number that you list on this chart for

04:01PM 10   legal fees be incorrect?

11   A     Yes.

12   Q     Are you aware that the defendant withdrew that precise

13   amount on or about September 18, 2017?

14   A     I think I recall that.  Yes, I see that in Exhibit 446.

04:02PM 15   Q     If we can please pull up Exhibit 430 now, your similar

16   chart for Alexis Gardner.

17          Now, the defendant asked you about your inclusion of

18   the $250,000 payment from November of 2020 in this chart.  Do

19   you recall that?

04:02PM 20   A     I recall that.

21   Q     There are two payments reflected on this chart.  One

22   January 25th, 2017, and one November 2020; is that right?

23   A     That's right.

24   Q     When you calculated the legal fee owed to the defendant,

04:02PM 25   did you use the total of both of those two payments?

**UNITED STATES DISTRICT COURT**

| | |
|---|---|
| 1 | A    I did. |
| 2 | Q    I have the same question for you on Exhibit 439. |
| 3 |      Can we please pull that up? |
| 4 |      He asked you about the three $100,000 payments in |
| 04:03PM 5 | later years on that chart; is that right? |
| 6 | A    Yes.  The three amounts in later years. |
| 7 | Q    And when you calculated the legal fees owed to the |
| 8 | defendant for Mr. Barela's matter, did you include that |
| 9 | $300,000 in the amount? |
| 04:03PM 10 | A    I did. |
| 11 | Q    The last row in this chart and the related charts for the |
| 12 | other clients, it says, "Total client received from |
| 13 | settlement."  And with the exception of Michelle Phan and Long |
| 14 | Tran, the other three charts all have that dash mark for zero; |
| 04:03PM 15 | is that right? |
| 16 | A    That's correct. |
| 17 | Q    Now, does that mean that they got zero dollars from the |
| 18 | defendant? |
| 19 | A    No, it does not. |
| 04:04PM 20 | Q    What does it mean? |
| 21 | A    It means that none of the amounts that were deposited into |
| 22 | the client trust account were transferred to the clients. |
| 23 | Q    That's the settlement money? |
| 24 | A    That's correct. |
| 04:04PM 25 | Q    Thank you, Mr. Drum. |

```
 1              No further questions.

 2              THE COURT:  Mr. Avenatti.

 3                   RECROSS-EXAMINATION

 4   BY MR. AVENATTI:

 5   Q    Mr. Drum, is it your position that the law firm was not

 6   entitled to deduct its legal fees and costs from the settlement

 7   amounts?  Is that your position, yes or no?

 8   A    That is not my position.

 9   Q    And the only way that you would have been able to

10   determine what legal fees and costs were owed was based on the

11   information the Government provided you; right?

12   A    That's correct.  They provided me the fee agreements, and

13   they discussed it.

14   Q    But your analysis was confined, as it related to

15   determining the fees and costs, to whatever the Government

16   provided you; right?

17   A    Correct.  I have no other source of information.

18   Q    And you didn't ask for any?

19              MR. WYMAN:  Objection.  Asked and answered.  Beyond

20   the scope.

21              THE COURT:  Sustained.

22   Q    BY MR. AVENATTI:  Now, you were just asked about 193.  Do

23   you remember that?

24   A    Yes, I remember that.

25   Q    Sir, you have no idea whether this was an interim draw on
```

```
          1    costs or a final deduction for cost, do you?

          2    A     I only know what's depicted on this sheet.

          3    Q     Sir, please answer my question.

          4            Can I have it read back, Your Honor?

04:06PM   5            THE COURT:  You may.

          6            (The record was read as follows:

          7            "Sir, you have no idea whether this was an

          8            interim draw on costs or a final deduction for

          9            cost, do you?")

04:06PM  10            THE WITNESS:  I don't know whether it was interim or

         11    final.

         12    Q     BY MR AVENATTI:  And who would be more knowledgeable

         13    about whether this was an initial withdraw of cost or a final

         14    withdraw of cost, you or Judy Regnier?

04:06PM  15    A     Judy Regnier.

         16    Q     You were asked about Exhibit 48.

         17    A     Yes.

         18    Q     Do you know if this was an interim amount or a final

         19    amount for cost in the Barela matter?  I'm sorry, it's on the

04:07PM  20    Johnson matter.

         21    A     Can I see the top of this in the e-mail?

         22    Q     (Indicating.)

         23    A     Nothing indicates whether it's interim or final.

         24    Q     Who would be more knowledgeable if it was interim or

04:08PM  25    final, you or Judy Regnier?
```

```
       1    A     Judy Regnier.

       2    Q     Now, you're certain that you read the -- well, strike

       3    that.

       4          Mr. Wyman asked you about the Michelle Phan fee

04:09PM  5    agreement.  Do you remember that?

       6    A     Yes, I remember that.

       7    Q     And you're certain you read that before you did your

       8    analysis; right?

       9    A     Yes.

04:09PM 10    Q     And you're certain that the firm was only entitled to

      11    7.5 percent of the money from IPSY; right?

      12    A     I'm sorry, what is IPSY?

      13    Q     I'm sorry, did you just ask me "what is IPSY"?

      14    A     Yes.

04:10PM 15          MR. AVENATTI:  No further questions.  Ask that he

      16    remain on recall.

      17          THE COURT:  Sir, you may be excused but you're

      18    subject to recall.  Thank you.

      19          MR. SAGEL:  Subject to verifying the exhibits that

04:10PM 20    have come into evidence, Your Honor, the Government rests.

      21          THE COURT:  Okay.

      22          Ladies and gentlemen, we're going to stop here for

      23    the day.  We'll resume Tuesday, 9:00 o'clock, regular day.

      24          Please remember the admonition not to discuss the

04:10PM 25    case with anyone, not to form any opinions on the issues in the
```

```
 1    case until it's submitted to you, and please don't do any

 2    research.

 3              Thanks very much.  Have a good weekend.

 4              THE COURTROOM DEPUTY:  All rise.

 5              (Out of the presence of the jury.)

 6              THE COURT:  Anything for the record before we

 7    adjourn?

 8              MR. SAGEL:  I don't believe from the Government,

 9    Your Honor.

10              THE COURT:  Mr. Avenatti.

11              MR. AVENATTI:  Your Honor, the defense would move

12    pursuant to Rule 29.  What I would propose is that I -- if it's

13    acceptable, obviously, to the Court, that I be permitted to

14    argue it either on Monday sometime that's convenient to the

15    Court or on Tuesday morning.  I know I still need to provide a

16    proffer to Your Honor for the two agents as well.

17              THE COURT:  Well, we're going to do that today.

18              MR. AVENATTI:  Understood.

19              THE COURT:  That's fine.  8:00 o'clock Tuesday.  If

20    you want to make a written submission as well, that's fine.

21              MR. AVENATTI:  We probably will file something in

22    advance, Your Honor.

23              THE COURT:  Okay.

24              If there's nothing else, let's adjourn to an

25    in-camera session.
```

04:11PM 5
04:11PM 10
04:12PM 15
04:12PM 20
04:12PM 25

```
       1              MR. AVENATTI:  Well, I have a couple things, but go
       2    ahead if the Government has something.
       3              THE COURT:  Go ahead.
       4              MR. AVENATTI:  Your Honor, the other request that I
04:13PM 5    would make is, right now the terms of my temporary release
       6    expire on Tuesday, the 17th.  Judge Gardephe has ordered me to
       7    self-surrender on September 15th.  I'm waiting for my
       8    designation.  I expect to have it probably within the next
       9    week.  So I would ask that the temporary release be extended to
04:13PM 10   September 15th.
      11              THE COURT:  Any -- well, I know the Government's
      12    position.
      13              MR. AVENATTI:  On the same terms and conditions,
      14    Your Honor, obviously.
04:13PM 15              MR. SAGEL:  I mean, I think our position is --
      16    subject to all of our prior objections, Your Honor, our
      17    position would be until the end of this trial.  The last
      18    request he made for temporary release was for preparation of
      19    trial.  There's nothing between the end of this trial and
04:13PM 20   September 15th that would require any further temporary
      21    release.
      22              MR. AVENATTI:  Well, actually, Your Honor, we don't
      23    know what's going to happen with the other counts yet.  So
      24    there would be a preparation issue.
04:14PM 25              THE COURT:  Well, let's address that.  I think our
```

```
 1    trial date for the second phase is October 12.

 2              MR. AVENATTI:  But, in any event, Your Honor, I'm

 3    not --

 4              THE COURT:  Let's deal with the immediate question

 5    you posed.  I'll continue you on the same terms and conditions

 6    until Friday, September 3.

 7              MR. AVENATTI:  September?

 8              THE COURT:  3.

 9              MR. AVENATTI:  3?

10              THE COURT:  3.

11              MR. AVENATTI:  Thank you, Your Honor.

12              THE COURT:  Okay.  If there's nothing further, let's

13    adjourn to the in-camera session.

14              MR. SAGEL:  Your Honor, one quick question, just for

15    timing or practicalitywise.

16              With regards to what we said we would submit in

17    camera related to Mr. Drum, I can send that via e-mail to your

18    CRD probably over the weekend or after.

19              THE COURT:  That's fine.

20              MR. SAGEL:  I didn't know if it would get to you

21    over the weekend.

22              THE COURT:  It will.

23              MR. SAGEL:  Thank you.  We'll do that then.

24              THE COURT:  Okay.

25              MR. AVENATTI:  And then, Your Honor, we have five
```

 1   witnesses that we intend on calling on Tuesday.  I'll provide

 2   that list to the Government now.

 3              THE COURT:  Okay.

 4              MR. AVENATTI:  Along with the time estimates.

04:15PM 5              THE COURT:  Okay.  I think they're listening.

 6              MR. AVENATTI:  Well, I'm not going to do it orally.

 7   I'll hand it to them once Your Honor is done.

 8              THE COURT:  Okay.  Why don't you hand it to them.

 9              MR. AVENATTI:  I'm just going to write the time

04:15PM 10   estimates.  It will be two minutes, Your Honor.  Thank you.

 11              **(Pause in proceedings.)**

 12              MR. AVENATTI:  Your Honor, one other issue, in

 13   looking through the list and providing the time estimates.  I

 14   anticipate that Attorney Evan Jenness will testify on Tuesday.

04:16PM 15   Ms. Jenness previously represented me in connection with the --

 16   with the arrest on the domestic violence allegation for which

 17   there were never any charges.

 18              We're going to have to figure out some fencing or

 19   parameters relating to the cross-examination.  Obviously, I

04:17PM 20   don't believe that that should go before the jury.  I'm happy

 21   to deal with it on Tuesday morning, but I want --

 22              THE COURT:  Well, you structure your direct such

 23   that that topic is not opened.

 24              MR. AVENATTI:  Understood, Your Honor.  I just

04:17PM 25   wanted to raise it for the Court, alert the Government.  We can

1    talk about it on Tuesday morning.

2              THE COURT:  Fine.

3              MR. AVENATTI:  I anticipate her testimony is going

4    to be very brief.  She's going to address this claim by

04:17PM 5  Mr. Barela, the phone call in which she was never on.

6              THE COURT:  Okay.  What's your current estimate for

7    your case-in-chief?  I'd like to be able to tell the jurors

8    something Tuesday.

9              MR. AVENATTI:  I will most likely be done with the

04:17PM 10 case-in-chief, Your Honor, by the close of court on Thursday.

11   So two to three days.

12             THE COURT:  Okay.

13             MR. SAGEL:  Your Honor, obviously, seeing this for

14   the first time, our only comment would be, is there's a very

04:18PM 15 good chance that two hours of what he just provided us is

16   inappropriate.  That witness wouldn't be able to testify are

17   not a basis for him to call for two hours.  He would need to

18   have -- and that being someone who worked at the expert's firm,

19   which he hasn't noticed up as an expert, there's no basis for a

04:18PM 20 two-hour calling of someone who worked for the firm who has no

21   percipient fact knowledge in this case.

22             So if he's planning on filling up two of his hours

23   on Tuesday with a witness that probably couldn't be called --

24             THE COURT:  Well, has she been served?  Ms. Carter?

04:19PM 25             MR. AVENATTI:  Yeah.  She dodged service for a week,

1  but we finally got her served because we got ahold of an

2  attorney who agreed to accept service.  So she's served.

3         MR. SAGEL:  That's only part one of the equation,

4  but I...

04:19PM 5         THE COURT:  You'd better have enough witnesses to

6  fill up the day, Mr. Avenatti.

7         MR. AVENATTI:  Understood, Your Honor.

8         THE COURT:  Okay.

9         MR. AVENATTI:  I've already indicated to the Court

04:19PM 10  that I'm sensitive to that issue, because I understand the

11  Court's sensitive to the issue.

12         THE COURT:  Okay.  I think you committed by noon

13  Monday to provide your additional comments on the jury

14  instructions.

04:19PM 15         MR. AVENATTI:  If I didn't, I have now.

16         THE COURT:  Okay.  I mean, I think that's what you

17  meant.

18         MR. AVENATTI:  I think you're right, Your Honor.  No

19  problem.

04:19PM 20         THE COURT:  Okay.  Then probably at the end of the

21  day on Tuesday we'll spend some time on the jury instructions.

22  If you conclude your case on Thursday, I'll instruct, and

23  you'll argue on Friday.

24         MR. AVENATTI:  Understood.

04:20PM 25         THE COURT:  Okay.  Estimate for closing?  Just

```
         1   preliminary.
         2           MR. WYMAN:  About an hour half to hour 45.
         3           MR. SAGEL:  And that's just for opening-close.
         4           MR. WYMAN:  Yeah.  I'm sorry.
04:20PM  5           MR. SAGEL:  Not including rebuttal.
         6           THE COURT:  Say, again, your estimate.
         7           MR. WYMAN:  Estimate for the opening-close is about
         8   an hour 30 to an hour 40.
         9           THE COURT:  What's rebuttal?
04:20PM 10           MR. SAGEL:  Very hypothetical, but I'm assuming 30
        11   minutes or less.
        12           THE COURT:  Okay.  Mr. Avenatti.
        13           MR. AVENATTI:  Your Honor, is the Government
        14   planning on splitting the closing and the rebuttal?
04:20PM 15           MR. WYMAN:  Yes, Your Honor.
        16           MR. AVENATTI:  I'll contemplate how I feel about
        17   that, whether I have any objection.
        18           But, in any event, in answer to your question,
        19   Your Honor, my estimate for the close is two and a half to
04:21PM 20   three hours.
        21           THE COURT:  Okay.
        22           MR. SAGEL:  Unless we're needed, we will leave.
        23           THE COURT:  You're excused.
        24           MR. SAGEL:  Thank you, Your Honor.
04:21PM 25           MR. WYMAN:  Thank you, Your Honor.
```

**UNITED STATES DISTRICT COURT**

1          THE COURT:  As is everyone else.

2             **(The following proceedings were sealed by**

3          **the Court and transcribed under separate cover.)**

4             **(Proceedings concluded at 4:21 p.m.)**

5                           --oOo--

```
 1                    CERTIFICATE OF OFFICIAL REPORTER

 2

 3    COUNTY OF LOS ANGELES   )
                              )
 4    STATE OF CALIFORNIA     )

 5              I, DEBBIE HINO-SPAAN, FEDERAL OFFICIAL REALTIME

 6    COURT REPORTER, in and for the United States District Court for

 7    the Central District of California, do hereby certify that

 8    pursuant to Section 753, Title 28, United States Code that the

 9    foregoing is a true and correct transcript of the

10    stenographically reported proceedings held in the

11    above-entitled matter and that the transcript page format is in

12    conformance with the regulations of the Judicial Conference of

13    the United States.

14

15    Date:  August 13, 2021

16

17

18

19                              /S/ DEBBIE HINO-SPAAN

20                              Debbie Hino-Spaan, CSR No. 7953
                                Federal Official Court Reporter
21

22

23

24

25
```

**UNITED STATES DISTRICT COURT**

**$**

**$1,600,000** [1] - 57:22
**$1,944,385** [1] - 48:8
**$100,000** [12] - 29:23, 30:16, 31:1, 31:3, 31:8, 37:11, 38:18, 38:23, 56:3, 56:6, 68:12, 76:4
**$13** [1] - 73:19
**$15,637** [1] - 38:16
**$18** [1] - 41:5
**$180,797** [2] - 51:24, 57:15
**$2** [1] - 73:22
**$2,776** [1] - 37:22
**$200,000** [1] - 34:19
**$25,000** [1] - 46:12
**$250,000** [19] - 33:14, 34:4, 34:6, 34:8, 34:11, 34:18, 34:24, 35:10, 35:24, 36:6, 38:24, 38:25, 46:3, 48:5, 49:7, 49:9, 49:12, 50:4, 75:18
**$300,000** [3] - 56:16, 56:21, 76:9
**$350,000** [1] - 45:18
**$41,885** [1] - 58:15
**$5,000** [2] - 46:7, 46:11
**$50,000** [2] - 36:17, 38:21
**$600,000** [4] - 20:13, 25:21, 39:7, 48:2
**$610** [1] - 74:13
**$617,000** [1] - 61:10
**$617,840** [1] - 61:4
**$65,615** [1] - 47:10
**$659,203** [1] - 61:8
**$72** [1] - 41:7
**$760,000** [1] - 55:19
**$940,797** [4] - 57:16, 59:10, 60:21, 61:23
**$959,203** [1] - 56:6

**/**

**/S** [1] - 88:19

**0**

**0061** [1] - 34:8
**0661** [1] - 36:19

**1**

**1** [2] - 70:14, 73:17
**1,558,100** [1] - 58:22
**1,600,000** [1] - 60:21

**1-053** [1] - 1:24
**1.5** [2] - 61:17, 74:2
**1.6** [21] - 35:10, 35:13, 35:19, 35:25, 36:7, 37:19, 38:25, 45:1, 45:25, 46:9, 46:12, 57:10, 59:8, 59:16, 59:25, 60:2, 60:13, 61:13, 72:10, 72:20, 72:24
**10** [1] - 71:19
**100** [11] - 4:20, 19:16, 19:17, 20:16, 21:1, 21:3, 43:20, 66:4, 66:8, 66:14, 66:16
**10th** [2] - 36:15, 37:2
**1100** [1] - 2:11
**111,000** [1] - 69:20
**111,113** [1] - 69:11
**12** [2] - 74:8, 82:1
**123,412** [1] - 74:11
**13** [3] - 1:15, 4:1, 88:15
**15** [1] - 50:10
**15th** [3] - 81:7, 81:10, 81:20
**17** [1] - 2:18
**17th** [1] - 81:6
**18** [1] - 75:13
**180,797** [2] - 57:11, 69:5
**193** [2] - 69:7, 77:22
**1:27** [2] - 1:16, 4:2

**2**

**2** [8] - 1:9, 36:9, 36:10, 45:12, 69:25, 73:19, 74:4, 74:6
**2.4** [2] - 72:23, 72:24
**2.5** [1] - 71:23
**20** [1] - 1:8
**2015** [8] - 33:18, 36:7, 36:15, 37:2, 42:15, 43:3, 70:18, 70:23
**2017** [2] - 75:13, 75:22
**2018** [1] - 74:8
**2020** [6] - 48:5, 48:8, 50:1, 50:5, 75:18, 75:22
**2021** [3] - 1:15, 4:1, 88:15
**213-894-2435** [1] - 2:12
**250,000** [1] - 49:25
**254** [1] - 2:19
**25th** [1] - 75:22
**26.2** [2] - 4:18, 6:13
**27,000** [1] - 74:6
**28** [1] - 88:8

**2851** [4] - 34:12, 35:2, 35:4, 37:11
**29** [2] - 42:15, 80:12
**29th** [1] - 43:3
**2:54** [1] - 50:16

**3**

**3** [8] - 45:4, 71:19, 71:21, 73:21, 82:6, 82:8, 82:9, 82:10
**30** [5] - 11:16, 12:6, 50:18, 86:8, 86:10
**30th** [2] - 33:18, 36:6
**312** [1] - 2:11
**31st** [1] - 45:4
**3:14** [1] - 50:16

**4**

**4** [3] - 40:21, 40:23, 72:8
**40** [1] - 86:8
**403** [2] - 8:19, 10:15, 16:25
**411** [2] - 1:24, 2:6
**420** [5] - 32:8, 32:9, 65:22, 70:19, 71:8
**422** [4] - 35:16, 35:19, 44:20, 70:21
**423** [4] - 35:7, 35:16, 37:13, 45:24
**424** [3] - 34:14, 36:7, 36:25
**430** [5] - 47:7, 47:8, 51:6, 51:16, 75:15
**439** [5] - 51:20, 57:7, 69:2, 76:2
**441** [3] - 72:15, 73:2, 74:22
**444** [3] - 62:9, 62:10, 75:1
**446** [1] - 75:14
**45** [1] - 86:2
**450** [1] - 65:22
**456** [1] - 65:23
**457** [4] - 33:10, 36:10, 71:13, 72:17
**48** [3] - 39:17, 39:20, 40:22, 41:19, 42:4, 53:18, 53:25, 69:24, 78:16
**4:21** [1] - 87:4
**4th** [3] - 2:6, 70:18, 70:22
**4TH** [1] - 1:24

**5**

**543,000** [1] - 71:9

**5566** [2] - 69:16, 72:10

**6**

**600,000-plus** [1] - 23:19
**659,000** [1] - 61:9
**659,203** [2] - 60:23, 60:24

**7**

**7** [13] - 63:17, 63:23, 63:25, 64:3, 64:10, 64:14, 64:17, 64:18, 64:19, 65:14, 65:15, 65:16, 65:18
**7.5** [1] - 79:11
**708,031** [1] - 38:20
**714-338-3598** [1] - 2:7
**736,884** [2] - 70:13, 70:24
**753** [1] - 88:8
**760,000** [2] - 57:11, 57:15
**7953** [2] - 1:23, 88:20
**797** [1] - 58:8

**8**

**8** [1] - 70:11
**8000** [1] - 2:6
**8541** [4] - 35:5, 35:14, 37:18, 37:19
**8671** [1] - 71:23
**8:00** [1] - 80:19

**9**

**9** [2] - 40:21, 40:24
**90012** [1] - 2:12
**92660** [1] - 2:19
**92701** [2] - 1:25, 2:7
**93** [1] - 22:18
**940,747** [1] - 58:4
**940,797** [2] - 59:2, 62:2
**949-481-4900** [1] - 2:20
**9962** [1] - 34:8
**9:00** [1] - 79:23

**A**

**A&A** [1] - 34:8
**AA** [4] - 34:10, 34:24, 35:4, 35:9
**ability** [4] - 11:17, 11:18, 11:20, 12:12
**able** [10] - 5:16, 5:21,

38:21, 52:8, 71:5, 71:10, 77:9, 84:7, 84:16
**above-entitled** [1] - 88:11
**accept** [4] - 43:22, 51:9, 51:15, 85:2
**acceptable** [1] - 80:13
**accepted** [1] - 52:11
**according** [5] - 57:9, 58:1, 58:2, 59:10, 66:8
**accordingly** [1] - 5:1
**account** [30] - 30:16, 31:8, 34:18, 34:24, 35:11, 36:18, 36:19, 38:19, 41:25, 43:10, 44:23, 45:16, 45:25, 58:11, 58:20, 58:24, 59:1, 59:15, 59:25, 60:13, 60:17, 61:7, 67:25, 69:14, 69:15, 69:17, 71:23, 74:24, 76:22
**Account** [1] - 72:10
**accounted** [4] - 44:14, 44:16, 53:9, 55:14
**accounting** [4] - 15:4, 19:7, 21:9, 21:19
**accounts** [5] - 46:23, 46:25, 47:2, 49:3, 67:13
**accuracy** [3] - 38:3, 52:9, 66:2
**accurate** [24] - 20:2, 21:1, 21:4, 28:9, 28:14, 28:16, 28:21, 28:23, 29:1, 30:22, 37:24, 38:6, 38:9, 47:12, 47:13, 52:7, 52:16, 56:25, 57:7, 66:5, 66:8, 66:15, 66:16, 70:5
**Act** [1] - 6:13
**actual** [4] - 16:23, 17:7, 27:19, 39:10
**additional** [1] - 85:13
**address** [2] - 81:25, 84:4
**adjourn** [3] - 80:7, 80:24, 82:13
**adjournment** [2] - 4:13, 6:1
**admonition** [2] - 50:11, 79:24
**advance** [3] - 42:15, 54:14, 80:22
**advanced** [1] - 66:25
**advances** [18] - 42:19, 42:20, 42:24, 48:13,

48:19, 52:25, 53:9, 53:12, 53:15, 53:16, 53:19, 53:20, 54:8, 54:12, 54:21, 67:7, 70:12

**advise** [1] - 13:6

**affect** [1] - 54:16

**afternoon** [2] - 7:1, 68:10

**Agent** [1] - 13:5

**agents** [7] - 6:6, 7:20, 7:24, 10:13, 11:6, 11:10, 80:16

**ago** [1] - 9:14

**agree** [8] - 22:8, 42:18, 51:9, 52:15, 64:24, 66:24, 67:3, 67:5

**agreed** [3] - 51:15, 65:19, 85:2

**agreement** [19] - 63:11, 63:14, 63:16, 63:17, 63:19, 63:20, 63:22, 63:24, 64:2, 64:4, 64:9, 64:15, 64:17, 64:25, 65:2, 65:12, 65:16, 79:5

**agreements** [1] - 77:12

**ahead** [3] - 50:24, 81:2, 81:3

**ahold** [1] - 85:1

**aim** [2] - 19:17, 20:2

**alert** [1] - 83:25

**Alex** [1] - 10:8

**alex.wyman@usdoj. gov** [1] - 2:13

**ALEXANDER** [1] - 2:10

**Alexis** [4] - 47:14, 67:12, 72:7, 75:16

**Alki** [1] - 74:23

**allegation** [1] - 83:16

**allege** [1] - 33:20

**alleges** [1] - 33:23

**allow** [3] - 27:12, 49:16, 49:20

**America** [1] - 36:19

**AMERICA** [1] - 1:5

**amount** [54] - 36:16, 37:24, 38:11, 40:16, 45:11, 45:14, 46:8, 46:9, 47:22, 47:24, 48:4, 49:9, 49:12, 49:17, 51:16, 51:23, 52:16, 52:24, 53:1, 55:19, 56:5, 57:10, 58:3, 58:5, 58:23, 59:1, 61:6, 61:7, 61:9, 63:11, 63:13,

63:15, 63:18, 64:20, 65:3, 65:4, 66:21, 68:16, 69:3, 69:8, 69:10, 69:20, 69:21, 70:22, 70:25, 73:8, 74:1, 75:5, 75:13, 76:9, 78:18, 78:19

**amounts** [10] - 31:18, 41:12, 41:16, 41:22, 56:2, 56:6, 59:15, 76:6, 76:21, 77:7

**Ana** [1] - 2:7

**ANA** [3] - 1:17, 1:25, 4:1

**analyses** [4] - 15:14, 17:3, 18:1, 21:12

**Analysis** [3] - 8:10, 9:4, 15:12

**analysis** [23] - 14:24, 17:19, 19:3, 21:8, 23:20, 29:3, 29:9, 29:16, 30:15, 30:18, 30:19, 30:22, 31:7, 34:7, 39:8, 43:21, 46:17, 54:16, 57:9, 65:12, 65:13, 77:14, 79:8

**analyze** [1] - 49:16

**analyzed** [1] - 14:13

**ANGELES** [1] - 88:3

**Angeles** [1] - 2:12

**answer** [6] - 20:19, 34:23, 52:10, 53:23, 78:3, 86:18

**ANSWER** [6] - 22:24, 23:2, 23:5, 23:9, 23:13, 23:16

**answered** [7] - 7:18, 8:19, 9:16, 16:25, 21:20, 21:25, 23:22, 60:19, 72:3, 77:19

**anticipate** [2] - 83:14, 84:3

**apologize** [1] - 5:4

**APPEARANCES** [1] - 2:1

**application** [3] - 63:25, 65:14, 65:19

**applied** [4] - 63:18, 64:15, 64:17, 64:18

**apply** [1] - 65:15

**area** [1] - 13:11

**argue** [1] - 80:14, 85:23

**Argumentative** [2] - 19:25, 39:4

**argumentative** [5] - 9:16, 21:25, 25:12, 33:25, 36:3

**arrest** [1] - 83:16

**aside** [1] - 57:13

**assignment** [3] - 31:19, 31:23, 39:12

**Assistant** [2] - 2:5, 2:10

**associated** [5] - 12:13, 14:25, 27:25, 35:21, 62:24

**Associates** [7] - 43:9, 43:16, 43:19, 44:1, 44:2, 44:3, 44:10

**assume** [7] - 29:22, 29:23, 30:2, 30:10, 31:1, 31:3, 68:12

**assumed** [7] - 28:9, 28:10, 28:14, 28:16, 28:20, 28:23, 29:3

**assuming** [1] - 86:10

**assumption** [3] - 29:25, 30:5, 30:13

**attempted** [3] - 53:6, 55:5, 55:13

**attorney** [2] - 74:24, 85:2

**Attorney** [5] - 2:4, 2:5, 2:9, 2:10, 83:14

**attorney's** [2] - 52:24, 73:8

**attorney-client** [1] - 74:24

**attorneys** [1] - 4:20

**audit** [1] - 14:25

**audits** [1] - 15:2

**August** [1] - 88:15

**AUGUST** [2] - 1:15, 4:1

**AUSAs** [2] - 11:5, 11:9

**authority** [1] - 6:13

**automatic** [1] - 11:14

**available** [1] - 29:7

**Avenatti** [28] - 3:3, 3:4, 4:8, 7:2, 21:10, 24:17, 36:20, 41:11, 42:15, 43:4, 43:9, 43:16, 43:19, 44:1, 44:2, 44:3, 44:10, 45:12, 45:13, 46:25, 51:4, 58:2, 59:9, 77:2, 80:10, 85:6, 86:12

**AVENATTI** [106] - 1:8, 2:15, 2:16, 4:6, 4:9, 5:4, 6:3, 6:18, 7:5, 7:20, 8:16, 8:22, 9:3, 9:18, 9:24, 10:18, 12:25, 17:4, 18:23, 20:4, 20:22, 21:16, 21:22, 22:2, 24:3, 25:4, 28:13, 28:20, 30:15, 32:25, 34:3, 34:23, 39:6, 40:21, 42:24, 49:7, 51:14, 54:19, 59:9, 59:24, 60:21, 61:21, 62:1, 62:18, 62:22, 63:7, 64:16, 66:14, 67:24, 68:9, 72:6, 77:4, 77:22, 78:12

25:14, 28:13, 28:18, 28:20, 30:7, 30:15, 32:23, 32:25, 34:3, 34:15, 34:20, 34:23, 36:9, 39:6, 40:21, 42:22, 42:24, 49:4, 49:7, 50:8, 50:17, 51:5, 51:14, 54:17, 54:19, 59:9, 59:17, 59:24, 60:21, 61:18, 61:21, 62:1, 62:18, 62:19, 62:22, 63:7, 64:16, 66:14, 67:14, 67:17, 67:19, 67:24, 68:4, 72:2, 77:4, 77:22, 78:12, 79:15, 80:11, 80:18, 80:21, 81:1, 81:4, 81:13, 81:22, 82:2, 82:7, 82:9, 82:11, 82:25, 83:4, 83:6, 83:9, 83:12, 83:24, 84:3, 84:9, 84:25, 85:7, 85:9, 85:15, 85:18, 85:24, 86:13, 86:16

**Avenatti's** [1] - 58:25

**aware** [10] - 44:9, 44:11, 44:12, 44:15, 59:12, 59:21, 60:4, 60:9, 61:10, 75:12

---

**B**

**Bakery** [1] - 74:23

**balance** [10] - 38:19, 46:12, 58:23, 59:25, 61:13, 61:17, 73:7, 74:1, 74:10

**Bank** [1] - 36:19

**bank** [7] - 40:5, 41:11, 41:19, 41:24, 41:25, 46:25, 58:12

**banking** [2] - 40:23, 46:18

**Barela** [21] - 28:6, 47:17, 51:20, 55:18, 55:24, 56:5, 56:16, 56:21, 59:13, 59:23, 60:1, 60:6, 60:9, 61:7, 61:12, 67:12, 69:17, 72:14, 74:14, 78:19, 84:5

**Barela's** [1] - 59:4, 60:17, 69:4, 76:8

**Baristas** [1] - 74:24

**based** [2] - 63:15, 77:10

**basis** [2] - 84:17, 84:19

**Beach** [1] - 2:19

**began** [1] - 4:25

**best** [11] - 10:13, 14:7, 14:9, 19:6, 66:2, 66:3, 66:4, 66:6, 66:9, 66:15, 66:16

**better** [2] - 27:17, 85:5

**between** [3] - 54:14, 62:5, 81:19

**beyond** [2] - 31:17, 77:19

**big** [4] - 14:16, 54:1, 70:9, 71:1

**big-old** [3] - 54:1, 70:9, 71:1

**billed** [2] - 25:21, 40:15

**billing** [1] - 20:13

**blow** [4] - 32:9, 40:25, 71:21, 75:2

**bottom** [4] - 40:25, 56:13, 69:15, 74:6

**break** [6] - 4:10, 4:15, 5:9, 7:6, 50:9, 51:6

**breakdown** [1] - 5:18

**BRETT** [1] - 2:5

**Brett** [1] - 10:8

**brett.sagel@usdoj. gov** [1] - 2:8

**brief** [1] - 84:4

**bring** [4] - 6:24, 15:19, 15:23, 16:1

**Brock** [3] - 57:23, 58:3, 72:10

**broken** [1] - 40:17

**brought** [1] - 16:17

**building** [1] - 19:4

**built** [1] - 17:22

**bunch** [2] - 70:4, 74:4

**business** [3] - 43:13, 62:14, 62:24

**buy** [2] - 55:5, 55:7

**BY** [49] - 2:5, 2:18, 3:3, 7:5, 7:20, 8:16, 8:22, 9:3, 9:18, 9:24, 10:18, 12:25, 17:4, 18:23, 20:4, 20:22, 21:16, 21:22, 22:2, 24:3, 25:4, 28:13, 28:20, 30:15, 32:25, 34:3, 34:23, 39:6, 40:21, 42:24, 49:7, 51:14, 54:19, 59:9, 59:24, 60:21, 61:21, 62:1, 62:18, 62:22, 63:7, 64:16, 66:14, 67:24, 68:9, 72:6, 77:4, 77:22, 78:12

# C

**CA** [1] - 1:25
**calculated** [5] - 56:5, 63:15, 71:9, 75:24, 76:7
**calculation** [18] - 23:14, 47:22, 47:24, 48:1, 50:2, 50:6, 52:16, 52:23, 56:22, 56:23, 56:24, 59:10, 60:2, 60:7, 61:22, 64:25, 68:17, 71:8
**calculations** [2] - 17:25, 18:15
**CALIFORNIA** [4] - 1:2, 1:17, 4:1, 88:4
**California** [5] - 2:7, 2:12, 2:19, 15:23, 88:7
**CALLED** [1] - 3:3
**Calvert** [4] - 45:5, 45:8, 45:15, 45:16
**camera** [5] - 5:21, 5:24, 80:25, 82:13, 82:17
**capacity** [1] - 29:22
**carefulness** [1] - 66:17
**CareMeridian** [3] - 41:15, 41:22, 42:3
**Carlos** [1] - 13:5
**Carter** [13] - 7:7, 7:15, 10:10, 10:12, 11:9, 13:16, 13:21, 14:7, 14:10, 14:12, 18:6, 42:6, 84:24
**case** [47] - 4:16, 4:18, 6:7, 6:9, 7:14, 10:23, 11:22, 12:1, 14:5, 14:8, 14:12, 15:9, 17:11, 17:19, 18:7, 19:13, 22:11, 23:4, 23:25, 24:16, 24:21, 27:25, 32:13, 32:18, 33:1, 33:6, 42:21, 47:10, 47:13, 50:12, 50:13, 51:23, 52:15, 55:1, 55:2, 62:23, 66:10, 69:3, 69:13, 71:9, 79:25, 80:1, 84:7, 84:10, 84:21, 85:22
**Case** [1] - 1:7
**case-in-chief** [2] - 84:7, 84:10
**case-related** [11] - 14:12, 23:25, 32:13, 32:18, 42:21, 47:10, 47:13, 51:23, 52:15,

69:3, 71:9
**cases** [5] - 16:5, 19:22, 40:15, 42:1, 74:20
**categories** [1] - 55:14
**category** [1] - 54:8
**CB&T** [1] - 36:19
**CENTRAL** [1] - 1:2
**Central** [1] - 88:7
**certain** [6] - 18:15, 38:8, 79:2, 79:7, 79:10
**certainly** [1] - 8:4
**CERTIFICATE** [1] - 88:1
**CERTIFIED** [1] - 1:6
**certify** [1] - 88:7
**chance** [2] - 5:12, 84:15
**change** [4] - 41:21, 69:20, 74:2, 74:6
**charged** [1] - 39:2
**charges** [5] - 33:6, 33:19, 35:24, 39:9, 83:17
**charging** [1] - 46:4
**chart** [20] - 39:16, 49:10, 49:12, 51:7, 55:10, 55:15, 56:17, 60:22, 69:22, 70:19, 71:15, 74:12, 74:14, 74:16, 75:9, 75:16, 75:18, 75:21, 76:5, 76:11
**charts** [7] - 20:25, 32:8, 56:13, 65:25, 70:20, 76:11, 76:14
**check** [1] - 41:11
**checking** [1] - 41:19
**chief** [2] - 84:7, 84:10
**claim** [3] - 37:24, 61:7, 84:4
**clarify** [2] - 41:15, 53:23
**clear** [3] - 4:23, 6:8, 27:22
**client** [23] - 21:24, 22:3, 27:17, 27:20, 29:4, 29:24, 31:8, 32:13, 42:9, 46:18, 46:20, 48:7, 48:10, 53:1, 53:22, 54:11, 56:9, 65:4, 74:24, 75:6, 76:12, 76:22
**client's** [1] - 29:24
**clients** [16] - 21:23, 31:11, 31:17, 53:10, 53:15, 53:20, 53:21, 65:7, 66:21, 66:24, 67:6, 67:9, 67:21,

68:2, 76:12, 76:22
**close** [7] - 19:23, 20:7, 20:15, 84:10, 86:3, 86:7, 86:19
**closer** [1] - 17:14
**closing** [2] - 85:25, 86:14
**co** [1] - 74:20
**co-counsel** [1] - 74:20
**Code** [1] - 88:8
**Coffee** [15] - 57:18, 57:19, 57:21, 58:7, 58:15, 58:21, 59:3, 59:13, 59:14, 59:22, 60:5, 60:11, 73:4, 73:24, 74:5
**colleagues** [2] - 20:12, 66:1
**collective** [1] - 4:20
**comment** [2] - 66:13, 84:14
**comments** [1] - 85:13
**committed** [2] - 39:10, 85:12
**communicating** [1] - 6:8
**communications** [12] - 6:5, 6:10, 7:23, 8:2, 10:12, 10:25, 11:2, 12:4, 12:7, 12:16, 13:25, 14:4
**company** [1] - 43:20, 43:23, 44:13
**compared** [1] - 24:25
**complete** [2] - 27:7, 27:9
**complying** [1] - 4:17
**Compound** [1] - 28:11
**conclude** [1] - 85:22
**concluded** [1] - 87:4
**conclusion** [2] - 34:1, 59:6
**conclusions** [2] - 21:8, 21:17
**conditions** [2] - 81:13, 82:5
**conducted** [1] - 7:7
**Conference** [1] - 88:12
**conferred** [1] - 32:24
**confined** [1] - 77:14
**confirm** [2] - 41:23, 73:7
**confirmation** [2] - 42:3, 42:5
**confirmed** [8] - 40:2, 40:4, 40:9, 40:23, 41:13, 41:15, 41:18, 41:22
**conformance** [1] -

88:12
**connection** [34] - 7:14, 10:14, 11:10, 11:21, 12:1, 14:5, 14:8, 15:1, 15:8, 15:23, 17:11, 17:19, 19:19, 19:21, 20:6, 20:15, 20:23, 23:19, 27:20, 29:16, 30:17, 33:6, 36:1, 39:6, 46:17, 48:2, 51:10, 51:15, 57:22, 62:23, 63:8, 63:10, 65:12, 83:15
**contain** [2] - 17:22, 17:25
**contemplate** [1] - 86:16
**content** [2] - 64:6, 75:2
**context** [1] - 68:15
**continue** [2] - 4:14, 82:5
**contract** [2] - 75:5, 75:8
**convenient** [1] - 80:14
**conversation** [2] - 9:19, 9:23
**converse** [2] - 14:10, 14:22
**conversed** [2] - 14:12, 14:20
**conversing** [2] - 8:23, 8:24
**copied** [2] - 5:19, 10:25
**copies** [1] - 11:8
**copy** [2] - 14:14, 24:13
**Corporate** [1] - 2:18
**corporation** [1] - 44:13
**correct** [55] - 10:23, 12:20, 12:23, 13:13, 13:14, 15:17, 16:24, 19:16, 19:18, 23:16, 24:11, 24:15, 25:19, 25:24, 28:21, 29:5, 30:24, 31:21, 32:14, 32:21, 33:8, 35:8, 37:20, 40:1, 42:12, 43:6, 43:7, 46:10, 47:11, 48:8, 49:1, 49:4, 52:11, 55:2, 55:22, 56:1, 56:8, 56:11, 56:22, 57:3, 59:11, 60:15, 60:25, 63:2, 63:19, 64:11, 65:5, 65:9, 70:10, 73:13, 76:16, 76:24, 77:12, 77:17, 88:9
**conformance** [1] -

**correctly** [3] - 23:17, 52:3, 58:5
**cost** [17] - 24:20, 27:16, 27:17, 31:8, 37:22, 37:24, 38:11, 38:13, 47:22, 47:24, 57:14, 68:12, 78:1, 78:9, 78:13, 78:14, 78:19
**costs** [18] - 23:3, 23:10, 24:16, 40:11, 60:6, 60:10, 60:16, 63:8, 69:3, 69:13, 71:4, 71:6, 71:10, 77:6, 77:10, 77:15, 78:1, 78:8
**Counsel** [1] - 32:24
**counsel** [3] - 6:13, 18:5, 74:20
**COUNSEL** [2] - 2:1, 2:16
**Count** [2] - 33:11, 35:24
**count** [1] - 39:16
**counted** [1] - 38:8
**counts** [6] - 33:1, 33:2, 33:3, 33:5, 33:9, 81:23
**COUNTY** [1] - 88:3
**couple** [2] - 22:11, 81:1
**course** [2] - 34:6, 60:3
**COURT** [97] - 1:1, 1:24, 4:8, 5:2, 5:7, 5:25, 6:16, 6:22, 7:1, 7:19, 8:14, 8:21, 9:1, 9:17, 9:21, 10:16, 12:24, 17:1, 20:1, 20:18, 21:15, 21:21, 22:1, 23:24, 24:17, 25:3, 25:13, 28:12, 28:19, 30:8, 34:2, 34:22, 36:5, 39:5, 40:19, 42:23, 49:6, 50:9, 50:22, 51:2, 51:12, 54:18, 59:7, 59:19, 60:20, 61:20, 61:25, 62:17, 62:21, 63:4, 64:13, 66:11, 67:16, 67:18, 68:6, 72:4, 77:2, 77:21, 78:5, 79:17, 79:21, 80:6, 80:10, 80:17, 80:19, 80:23, 81:3, 81:11, 81:25, 82:4, 82:8, 82:10, 82:12, 82:19, 82:22, 82:24, 83:3, 83:5, 83:8, 83:22, 84:2, 84:6, 84:12, 84:24, 85:5,

85:8, 85:12, 85:16, 85:20, 85:25, 86:6, 86:9, 86:12, 86:21, 86:23, 87:1, 88:6
**court** [3] - 18:19, 74:20, 84:10
**Court** [10] - 5:24, 6:4, 80:13, 80:15, 83:25, 85:9, 87:3, 88:6, 88:20
**Court's** [2] - 50:17, 85:11
**COURTROOM** [3] - 50:15, 50:25, 80:4
**cover** [1] - 87:3
**covered** [7] - 8:4, 8:7, 8:9, 8:12, 8:24, 9:4
**covering** [2] - 10:1, 37:6
**CRD** [1] - 82:18
**credit** [2] - 69:21, 71:10
**crime** [2] - 39:3, 39:10
**criminal** [9] - 4:20, 13:1, 13:8, 19:20, 20:7, 20:15, 33:1, 33:6, 66:10
**critically** [2] - 22:5, 22:8
**Cross** [1] - 3:3
**CROSS** [1] - 7:4
**cross** [23] - 4:12, 4:14, 4:25, 5:1, 5:6, 6:20, 7:7, 7:10, 7:13, 7:21, 8:3, 8:5, 8:8, 8:9, 8:12, 8:18, 8:24, 9:5, 9:25, 50:18, 68:11, 75:3, 83:19
**Cross-Examination** [1] - 3:3
**CROSS-EXAMINATION** [1] - 7:4
**cross-examination** [13] - 4:12, 4:14, 4:25, 5:1, 5:6, 6:20, 7:13, 8:3, 8:5, 8:8, 68:11, 75:3, 83:19
**cross-examinations** [3] - 7:7, 7:10, 7:21
**CRR** [1] - 1:23
**CSR** [2] - 1:23, 88:20
**current** [3] - 26:25, 52:2, 84:6

### D

**dash** [1] - 76:14
**data** [20] - 14:21, 23:21, 24:5, 24:7,

24:8, 24:9, 25:5, 25:9, 25:15, 25:17, 25:23, 25:25, 26:2, 26:22, 27:5, 27:7, 27:9, 30:20, 37:25, 47:19
**database** [1] - 26:14
**date** [6] - 33:17, 36:14, 37:1, 70:15, 70:16, 82:1
**Date** [1] - 88:15
**DAY** [1] - 1:8
**days** [4] - 9:14, 11:16, 12:6, 84:11
**deal** [2] - 82:4, 83:21
**DEAN** [2] - 2:17, 2:18
**deansteward7777@gmail.com** [1] - 2:20
**Debbie** [1] - 88:20
**DEBBIE** [3] - 1:23, 88:5, 88:19
**debt** [3] - 44:3, 44:5, 44:7
**deduct** [1] - 77:6
**deducted** [2] - 46:8, 59:2
**deduction** [4] - 58:24, 59:15, 78:1, 78:8
**DEFENDANT** [1] - 2:14
**defendant** [15] - 68:11, 69:21, 70:1, 71:3, 71:14, 72:18, 73:23, 74:19, 74:21, 75:3, 75:12, 75:17, 75:24, 76:8, 76:18
**Defendant** [1] - 1:9
**defense** [2] - 5:20, 80:11
**degree** [2] - 66:1, 66:17
**delete** [1] - 13:2
**deleted** [4] - 11:13, 11:24, 12:8, 12:13
**deletes** [1] - 11:14
**deleting** [1] - 13:7
**deletion** [3] - 11:19, 12:3, 13:18
**Delivery** [2] - 41:4, 41:7
**demonstrate** [2] - 16:23, 17:3
**denied** [1] - 21:15
**depicted** [1] - 78:2
**depiction** [1] - 47:13
**deposit** [11] - 34:18, 34:19, 34:24, 37:11, 37:18, 45:4, 45:16, 46:13, 73:18, 73:19, 73:22

**deposited** [6] - 35:11, 45:14, 45:25, 67:13, 69:18, 76:21
**deposition** [1] - 16:11
**depositions** [1] - 16:13
**deposits** [4] - 37:17, 37:19, 73:15, 73:16
**DEPUTY** [3] - 50:15, 50:25, 80:4
**describe** [1] - 10:20
**described** [1] - 72:9
**designation** [1] - 81:8
**detail** [1] - 6:23
**details** [4] - 9:19, 9:22, 9:24, 17:25
**determine** [3] - 12:15, 21:24, 77:10
**determined** [2] - 31:22, 60:15
**determining** [3] - 63:7, 63:12, 77:15
**dhinospaan@yahoo.com** [1] - 1:25
**differences** [1] - 54:14
**different** [11] - 11:25, 20:5, 24:25, 40:15, 42:1, 47:22, 47:24, 47:25, 48:1, 65:3
**digits** [1] - 69:14
**Dillanos** [16] - 57:18, 57:19, 57:21, 58:7, 58:15, 58:21, 59:3, 59:12, 59:14, 59:22, 60:5, 60:11, 73:3, 73:24, 74:5, 74:23
**direct** [7] - 5:3, 6:4, 18:19, 36:24, 40:2, 73:11, 83:22
**directed** [2] - 11:5, 53:22
**direction** [3] - 10:22, 10:24, 11:2
**directly** [2] - 35:25, 53:21
**disable** [1] - 12:5
**disabling** [1] - 12:3
**disclosed** [1] - 5:23
**disclosure** [1] - 5:20
**discover** [1] - 29:17
**discuss** [3] - 9:10, 50:11, 79:24
**discussed** [6] - 8:17, 9:14, 18:4, 65:13, 65:17, 77:13
**discussing** [1] - 9:4
**discussion** [1] - 6:22
**distinction** [2] - 54:16, 60:12, 61:16
**DISTRICT** [3] - 1:1,

1:2, 1:3
**District** [2] - 88:6, 88:7
**DIVISION** [1] - 1:2
**document** [1] - 15:14
**documents** [3] - 14:14, 15:17, 17:21
**dodged** [1] - 84:25
**dollars** [1] - 76:17
**domestic** [1] - 83:16
**done** [9] - 11:2, 15:8, 16:7, 16:20, 31:17, 55:17, 55:24, 83:7, 84:9
**double** [1] - 38:8
**double-counted** [1] - 38:8
**doubt** [1] - 7:17
**down** [6] - 24:17, 39:25, 40:17, 41:17, 55:8
**dozen** [1] - 16:9
**Draft** [5] - 14:16, 14:18, 54:1, 70:9, 71:1
**draft** [3] - 24:13, 39:22, 52:3
**drafts** [1] - 5:14
**draw** [2] - 77:25, 78:8
**Drum** [15] - 4:11, 4:14, 5:11, 6:1, 6:4, 7:6, 20:22, 25:15, 32:25, 57:5, 66:14, 68:10, 76:25, 77:5, 82:17
**DRUM** [2] - 3:3, 7:3
**due** [15] - 32:13, 48:5, 48:7, 49:13, 49:17, 53:1, 56:5, 60:5, 61:8, 61:11, 63:8, 63:12, 64:10, 65:4, 75:5
**during** [6] - 4:15, 13:7, 18:10, 40:1, 68:11, 75:3

### E

**e-mail** [8] - 6:9, 10:12, 11:3, 11:23, 38:1, 70:16, 78:21, 82:17
**e-mailed** [1] - 25:8
**e-mails** [15] - 4:10, 5:10, 5:16, 11:9, 11:14, 12:12, 12:13, 12:15, 12:17, 12:19, 13:2, 13:7, 13:10, 13:16, 13:21
**EA** [8] - 34:12, 34:18, 35:2, 35:4, 35:5, 35:14, 37:18, 44:23
**EA's** [1] - 35:11

**Eagan** [10] - 21:9, 41:11, 42:14, 43:4, 45:12, 45:13, 46:25, 58:2, 58:24, 59:9
**Ed** [2] - 74:16, 74:20
**Edward** [1] - 61:1
**effect** [1] - 68:19
**effectively** [1] - 15:15
**effort** [6] - 26:25, 27:11, 29:16, 30:17, 31:13, 31:16
**efforts** [1] - 23:20
**either** [5] - 32:12, 38:7, 52:6, 55:5, 80:14
**electronic** [14] - 14:21, 23:21, 24:9, 25:5, 25:9, 25:15, 25:17, 25:23, 26:5, 26:8, 26:11, 26:13, 26:19, 47:19
**elicit** [1] - 6:19
**eliminate** [1] - 50:19
**Elmo** [1] - 22:12
**encompassed** [1] - 23:10
**end** [5] - 74:12, 75:3, 81:17, 81:19, 85:20
**engage** [1] - 39:8
**engaged** [1] - 63:1
**engagement** [1] - 17:10
**engagements** [1] - 15:4
**entire** [1] - 60:2
**entitled** [19] - 4:10, 4:11, 4:24, 5:2, 6:10, 36:1, 55:18, 55:24, 57:11, 58:2, 59:9, 60:1, 60:10, 61:22, 62:2, 64:2, 77:6, 79:10, 88:11
**entries** [2] - 41:1, 73:11
**envelope** [2] - 41:4, 41:7
**equals** [1] - 53:1
**equation** [1] - 85:3
**equity** [1] - 44:10
**especially** [2] - 19:19, 21:1
**ESQ** [2] - 2:15, 2:18
**essentially** [2] - 53:6, 55:13
**established** [5] - 16:4, 28:13, 37:20, 54:5, 61:21
**estimate** [6] - 16:9, 17:12, 18:9, 23:25, 84:6, 85:25, 86:6,

86:7, 86:19
**estimates** [3] - 83:4, 83:10, 83:13
**Evan** [4] - 14:7, 14:10, 18:5, 83:14
**event** [2] - 82:2, 86:18
**evidence** [7] - 59:12, 59:21, 60:4, 60:9, 61:10, 69:7, 79:20
**exactly** [1] - 12:10
**EXAMINATION** [3] - 7:4, 68:8, 77:3
**examination** [13] - 4:12, 4:14, 4:25, 5:1, 5:6, 6:20, 7:13, 8:3, 8:5, 8:8, 68:11, 75:3, 83:19
**Examination** [3] - 3:3, 3:4, 3:4
**examinations** [3] - 7:7, 7:10, 7:21
**example** [5] - 5:14, 8:9, 12:20, 27:23, 71:5
**examples** [3] - 31:10, 68:20, 68:23
**Excel** [1] - 17:20
**exception** [3] - 5:15, 6:12, 76:13
**exchange** [1] - 5:14
**excused** [2] - 79:17, 86:23
**exempts** [1] - 4:17
**exercise** [1] - 11:21
**exhibit** [8] - 22:6, 33:11, 35:6, 35:15, 44:23, 69:25, 70:2, 70:15
**Exhibit** [29] - 32:8, 34:14, 36:10, 37:13, 39:17, 39:20, 40:22, 45:24, 47:7, 47:8, 51:6, 57:7, 62:9, 62:10, 69:2, 69:7, 69:24, 70:19, 71:8, 71:13, 72:15, 72:17, 73:2, 74:22, 75:1, 75:14, 75:15, 76:2, 78:16
**EXHIBITS** [1] - 3:14
**Exhibits** [1] - 65:22
**exhibits** [7] - 18:4, 22:4, 36:21, 36:22, 65:25, 66:18, 79:19
**exist** [1] - 4:22
**existed** [2] - 25:6, 25:18
**expect** [2] - 42:20, 81:8
**expense** [8] - 27:25,

29:4, 29:8, 30:19, 51:23, 52:15, 54:15, 54:20
**expenses** [27] - 14:13, 21:23, 22:3, 23:25, 28:10, 32:13, 32:18, 38:8, 40:3, 41:14, 41:19, 41:24, 42:4, 42:21, 43:9, 43:14, 44:14, 47:10, 47:13, 48:17, 48:18, 52:25, 54:3, 58:25, 69:3, 70:12, 71:9
**experience** [2] - 4:21, 17:8
**expert** [9] - 4:16, 5:13, 16:17, 16:22, 29:21, 29:23, 68:12, 84:19
**expert's** [1] - 84:18
**expertise** [1] - 13:11
**expire** [1] - 81:6
**explain** [1] - 62:14
**extended** [1] - 81:9
**extent** [1] - 5:18

### F

**fact** [2] - 23:1, 84:21
**fair** [8] - 18:8, 19:10, 19:11, 19:24, 39:13, 53:11, 55:15, 55:16
**fairly** [3] - 10:18, 10:20, 41:3
**falls** [1] - 5:14
**February** [5] - 36:15, 37:2, 70:18, 70:22, 74:8
**FEDERAL** [2] - 1:24, 88:5
**Federal** [1] - 88:20
**federal** [5] - 13:1, 13:7, 39:3, 46:4, 66:10
**fee** [27] - 35:21, 35:25, 37:20, 45:1, 46:9, 58:12, 63:11, 63:14, 63:16, 63:19, 63:20, 63:22, 63:23, 63:24, 64:2, 64:4, 64:9, 64:15, 64:25, 65:2, 65:11, 65:16, 75:5, 75:8, 75:24, 77:12, 79:4
**fees** [22] - 8:10, 8:17, 9:4, 10:1, 32:12, 36:8, 52:24, 52:25, 53:11, 58:25, 60:6, 60:10, 63:8, 63:12, 64:10, 65:1, 73:8, 75:10, 76:7, 77:6,

77:10, 77:15
**fencing** [1] - 83:18
**few** [3] - 9:12, 17:14, 65:20
**figure** [5] - 23:3, 26:11, 49:13, 49:18, 83:18
**file** [8] - 26:8, 26:11, 26:13, 26:19, 28:9, 28:20, 52:1, 80:21
**files** [2] - 17:20, 52:5
**fill** [1] - 85:6
**filling** [1] - 84:22
**final** [9] - 38:11, 38:13, 78:1, 78:8, 78:11, 78:13, 78:18, 78:23, 78:25
**finally** [1] - 85:1
**financial** [3] - 19:4, 21:9, 21:19
**fine** [5] - 30:8, 80:19, 80:20, 82:19, 84:2
**finger** [1] - 37:6
**fingernail** [1] - 37:4
**finish** [1] - 33:22
**finishes** [1] - 5:3
**firm** [27] - 14:4, 15:7, 21:9, 21:19, 21:23, 25:21, 27:24, 29:4, 29:12, 35:25, 39:7, 40:14, 45:21, 46:8, 46:9, 55:18, 55:24, 57:10, 58:2, 61:22, 63:13, 64:2, 64:10, 77:5, 79:10, 84:18, 84:20
**firm's** [1] - 62:4
**first** [8] - 53:25, 61:22, 62:3, 62:5, 71:17, 72:18, 73:23, 84:14
**five** [2] - 17:13, 82:25
**flip** [2] - 55:10, 55:15
**following** [2] - 4:9, 87:2
**follows** [4] - 30:9, 59:20, 67:20, 78:6
**FOR** [3] - 2:3, 2:14, 2:16
**foregoing** [1] - 88:9
**form** [3] - 17:18, 50:12, 79:25
**format** [1] - 88:11
**foundation** [2] - 26:6, 33:25
**Foundation** [2] - 36:3, 40:18
**four** [3] - 9:14, 13:24, 69:14
**Friday** [2] - 82:6, 85:23

**FRIDAY** [2] - 1:15, 4:1
**full** [1] - 16:18
**function** [3] - 11:19, 12:3, 14:25
**funds** [1] - 45:17

### G

**garbage** [4] - 18:24, 19:1
**Gardephe** [1] - 81:6
**Gardner** [11] - 28:7, 47:14, 48:13, 48:19, 48:22, 49:13, 51:9, 51:14, 67:12, 72:7, 75:16
**gather** [1] - 14:3
**GB** [1] - 34:8
**general** [2] - 43:10, 65:21
**generally** [5] - 10:22, 13:18, 28:25, 62:14, 68:17
**gentlemen** [5] - 7:1, 13:6, 50:10, 50:22, 79:22
**Geoff** [2] - 35:21, 45:21
**Geoffrey** [5] - 38:22, 47:17, 67:12, 72:20, 72:25
**given** [2] - 6:21, 27:1
**Global** [1] - 74:24
**Google** [1] - 55:3
**GOVERNMENT** [1] - 3:3
**Government** [42] - 4:16, 4:17, 6:5, 6:9, 6:20, 8:23, 9:15, 12:4, 12:7, 12:16, 14:4, 18:5, 24:14, 26:2, 26:3, 26:7, 27:3, 27:5, 27:23, 31:5, 31:22, 31:23, 33:8, 33:11, 33:20, 33:23, 39:8, 47:4, 47:6, 52:13, 52:14, 65:13, 65:15, 65:17, 77:11, 77:15, 79:20, 80:8, 81:2, 83:2, 83:25, 86:13
**government** [5] - 7:20, 7:24, 10:13, 11:6, 46:4
**Government's** [3] - 49:10, 56:14, 81:11
**greater** [2] - 61:7, 61:9
**Greg** [9] - 47:17, 59:13, 59:23, 60:1, 60:5, 61:11, 67:12,

69:17, 72:14
**Gregory** [1] - 74:14
**gritty** [1] - 62:10
**Group** [1] - 71:24
**Group's** [3] - 8:10, 9:4, 15:12
**guess** [1] - 10:20
**guy** [1] - 61:1

### H

**half** [23] - 6:8, 7:8, 12:6, 17:23, 19:13, 20:11, 20:24, 40:25, 63:17, 63:23, 63:25, 64:3, 64:11, 64:14, 64:17, 64:18, 64:19, 65:14, 65:15, 65:16, 65:18, 86:2, 86:19
**hand** [2] - 83:7, 83:8
**HANNA** [2] - 2:4, 2:9
**happy** [3] - 5:21, 5:23, 83:20
**hard** [2] - 14:14, 24:13
**heard** [8] - 4:21, 18:23, 18:25, 22:11, 55:1, 55:2, 57:19, 61:1
**hearsay** [1] - 8:20
**held** [1] - 88:10
**help** [1] - 18:14
**helped** [2] - 17:2, 18:18
**hereby** [1] - 88:7
**Hernandez** [2] - 34:15, 36:9
**Hills** [1] - 46:7
**HINO** [3] - 1:23, 88:5, 88:19
**Hino** [1] - 88:20
**HINO-SPAAN** [3] - 1:23, 88:5, 88:19
**Hino-Spaan** [1] - 88:20
**hold** [1] - 24:17
**Honor** [47] - 4:9, 4:24, 5:5, 5:9, 6:3, 6:7, 6:19, 18:21, 23:23, 24:19, 28:18, 32:23, 49:5, 50:17, 51:5, 61:18, 62:20, 68:5, 68:7, 72:2, 78:4, 79:20, 80:9, 80:11, 80:16, 80:22, 81:4, 81:14, 81:16, 81:22, 82:2, 82:11, 82:14, 82:25, 83:7, 83:10, 83:12, 83:24, 84:10, 84:13, 85:7, 85:18, 86:13, 86:15, 86:19,

86:24, 86:25
**HONORABLE** [1] - 1:3
**hour** [7] - 10:4, 50:23, 84:20, 86:2, 86:8
**hours** [4] - 84:15, 84:17, 84:22, 86:20
**hundred** [1] - 17:14
**hypothetical** [7] - 31:9, 57:1, 57:4, 68:25, 69:1, 75:4, 86:10

## I

**I..** [1] - 85:4
**i.e** [1] - 42:1
**idea** [13] - 27:7, 38:4, 38:6, 39:2, 49:9, 49:10, 49:11, 56:12, 56:14, 56:15, 77:25, 78:7
**ideas** [2] - 51:3, 56:13
**identical** [1] - 24:21
**identified** [1] - 37:18
**identifying** [3] - 26:4, 26:10, 26:12
**immediate** [1] - 82:4
**immediately** [1] - 4:13
**important** [3] - 22:2, 22:5, 22:8
**improper** [3] - 33:24, 44:12, 44:15
**improperly** [1] - 33:21
**IN** [1] - 2:14
**in-camera** [2] - 80:25, 82:13
**inaccurate** [1] - 67:1
**inappropriate** [1] - 84:16
**include** [2] - 8:2, 76:8
**included** [3] - 31:5, 53:12, 63:23
**including** [5] - 13:5, 21:5, 21:6, 56:6, 86:5
**inclusion** [1] - 75:17
**incomplete** [3] - 22:6, 27:7, 27:9
**incorrect** [3] - 75:6, 75:9, 75:10
**incorrectly** [1] - 75:5
**incurred** [3] - 29:4, 29:8, 40:3
**indicated** [4] - 64:2, 64:4, 64:15, 85:9
**indicates** [1] - 78:23
**indicating** [2] - 58:9, 78:22
**individuals** [1] - 16:10
**information** [26] -

4:24, 4:25, 21:11, 22:6, 24:12, 26:4, 26:10, 26:12, 26:18, 26:19, 27:12, 28:22, 28:25, 29:19, 30:22, 32:21, 47:5, 49:20, 49:22, 49:25, 50:18, 52:4, 52:7, 66:7, 77:11, 77:17
**initial** [4] - 67:10, 67:23, 68:2, 78:13
**input** [2] - 29:8, 30:2, 30:11
**inputs** [3] - 19:4, 19:9, 22:4
**inputted** [1] - 29:19
**inquiry** [1] - 31:25
**instance** [3] - 16:16, 29:21, 41:4
**instruct** [4] - 13:21, 13:23, 13:24, 85:22
**instructions** [2] - 85:14, 85:21
**intend** [1] - 83:1
**interest** [7] - 43:18, 44:10, 52:25, 53:10, 73:18, 73:19, 73:22
**interim** [6] - 77:25, 78:8, 78:10, 78:18, 78:23, 78:24
**interpret** [2] - 64:12, 65:11
**interpretation** [10] - 20:8, 20:10, 20:21, 20:23, 63:15, 63:25, 64:24, 65:2, 65:8, 75:8
**interpreted** [4] - 63:14, 63:22, 63:24, 64:9
**interpreting** [1] - 75:5
**invoice** [8] - 27:17, 29:23, 30:16, 31:1, 31:3, 31:8, 40:15, 40:16
**invoices** [7] - 27:16, 27:19, 27:24, 27:25, 28:1, 28:3, 29:13
**involved** [1] - 13:1
**IPSY** [3] - 79:11, 79:12, 79:13
**ironically** [1] - 51:1
**irrelevant** [1] - 19:25
**issue** [6] - 4:6, 5:13, 81:24, 83:12, 85:10, 85:11
**issues** [5] - 50:12, 50:20, 57:13, 57:15, 79:25
**item** [2] - 42:9, 44:21

**items** [1] - 54:20

## J

**James** [1] - 10:8
**JAMES** [1] - 1:3
**January** [5] - 33:18, 36:6, 42:15, 43:3, 75:22
**Jencks** [2] - 4:18, 6:13
**Jenness** [2] - 83:14, 83:15
**job** [2] - 6:19, 16:6
**JOHN** [4] - 1:8, 2:15, 3:3, 7:3
**John** [2] - 36:20, 65:18
**Johnson** [3] - 28:6, 35:21, 36:1, 38:22, 42:13, 42:14, 45:22, 46:14, 47:17, 67:12, 72:20, 72:25, 78:20
**Johnson's** [1] - 27:25
**Judge** [1] - 81:6
**JUDGE** [1] - 1:3
**Judicial** [1] - 88:12
**Judy** [13] - 22:16, 24:1, 25:8, 29:6, 38:1, 38:3, 38:5, 52:5, 53:13, 78:14, 78:15, 78:25, 79:1
**jurors** [1] - 84:7
**jury** [21] - 4:5, 6:17, 6:24, 6:25, 16:23, 18:3, 21:18, 22:10, 34:13, 36:24, 38:21, 40:8, 41:20, 50:21, 56:24, 57:3, 62:14, 80:5, 83:20, 85:13, 85:21

## K

**keep** [1] - 34:16
**kept** [1] - 40:11
**Kim** [1] - 10:8
**kinds** [1] - 43:8
**knowing** [2] - 31:12, 31:15
**knowledge** [11] - 10:14, 14:7, 14:9, 19:7, 36:4, 66:2, 66:3, 66:4, 66:15, 66:16, 84:21
**knowledgeable** [2] - 78:12, 78:24

## L

**lacks** [1] - 36:4

**ladies** [4] - 7:1, 50:10, 50:22, 79:22
**lag** [1] - 29:18
**largely** [1] - 45:14
**last** [17] - 7:8, 10:19, 12:6, 16:8, 17:22, 18:8, 18:14, 19:12, 19:23, 20:11, 20:24, 26:20, 62:3, 62:5, 69:14, 76:11, 81:17
**Law** [1] - 71:24
**LAW** [1] - 2:17
**law** [12] - 4:16, 4:20, 21:9, 21:19, 21:23, 27:24, 29:12, 40:14, 57:10, 63:13, 64:2, 77:5
**lawyer** [1] - 65:11
**lay** [1] - 26:5
**least** [2] - 30:3, 30:11
**leave** [1] - 86:22
**led** [1] - 55:8
**leeway** [1] - 86:22
**left** [2] - 58:20, 74:12
**legal** [28] - 20:8, 20:10, 20:21, 20:22, 31:17, 32:12, 34:1, 35:21, 35:25, 36:8, 37:20, 46:9, 53:10, 55:17, 55:21, 55:23, 59:5, 63:8, 63:12, 63:17, 64:22, 65:1, 75:10, 75:24, 76:7, 77:6, 77:10
**less** [6] - 58:23, 61:8, 61:14, 69:21, 69:23, 86:11
**letter** [1] - 5:20
**letters** [1] - 14:17
**likely** [1] - 84:9
**line** [3] - 42:9, 44:21, 53:16
**list** [3] - 75:9, 83:2, 83:13
**listed** [14] - 42:10, 49:8, 55:14, 55:19, 56:2, 56:10, 69:4, 69:8, 69:15, 69:20, 70:12, 71:4, 71:22, 72:19
**listen** [2] - 25:10, 67:19
**listening** [1] - 83:5
**lists** [1] - 54:20
**loaded** [1] - 26:16
**look** [19] - 4:15, 23:4, 23:5, 23:7, 23:12, 23:20, 25:5, 25:16, 26:4, 26:10, 32:20, 33:11, 35:19, 47:7,

51:20, 53:17, 53:25, 58:9, 72:8
**looked** [9] - 5:10, 24:7, 24:8, 24:9, 24:13, 25:4, 40:5, 58:1, 60:17
**looking** [5] - 34:14, 36:10, 36:23, 74:22, 83:13
**looks** [1] - 37:11
**LOS** [1] - 88:3
**Los** [1] - 2:12
**lunch** [1] - 5:9

## M

**mail** [8] - 6:9, 10:12, 11:3, 11:23, 38:1, 70:16, 78:21, 82:17
**mailed** [1] - 25:8
**mails** [15] - 4:10, 5:10, 5:16, 11:9, 11:14, 12:12, 12:13, 12:15, 12:17, 12:19, 13:2, 13:7, 13:10, 13:16, 13:21
**maintained** [2] - 11:8, 15:11
**March** [1] - 45:4
**Mark** [3] - 45:5, 45:8, 45:16
**mark** [3] - 45:15, 70:9, 76:14
**marks** [1] - 17:15
**materials** [1] - 4:22
**math** [5] - 32:15, 52:18, 53:4, 55:9, 65:6
**matter** [23] - 11:10, 12:8, 12:14, 13:1, 13:8, 14:1, 19:13, 19:20, 19:21, 20:7, 20:15, 21:2, 35:22, 36:1, 45:22, 47:20, 60:17, 63:9, 69:4, 76:8, 78:19, 78:20, 88:11
**matters** [1] - 29:24
**McNicholas** [2] - 45:19
**McNicholas's** [1] - 37:22
**mean** [20] - 8:8, 14:14, 19:2, 26:12, 27:22, 41:13, 64:5, 66:9, 76:17, 76:20, 81:15, 85:16
**meaning** [1] - 23:21
**meaningful** [1] - 61:16
**means** [2] - 19:3,

76:21
**meant** [2] - 53:20, 85:17
**meeting** [1] - 10:6
**mention** [2] - 8:11, 25:10
**mentioned** [2] - 13:19, 13:24
**merely** [1] - 41:24
**met** [2] - 9:12, 10:4
**Michael** [2] - 36:20, 46:25
**MICHAEL** [2] - 1:8, 2:15
**Michelle** [4] - 62:24, 63:9, 76:13, 79:4
**Microsoft** [2] - 17:20
**midafternoon** [1] - 50:9
**might** [10] - 7:25, 8:3, 8:4, 8:7, 8:9, 8:12, 8:24, 12:17, 22:23
**million** [29] - 4:10, 35:13, 35:19, 35:25, 36:7, 37:19, 38:25, 45:1, 45:4, 45:12, 45:25, 46:9, 46:12, 57:10, 58:11, 59:8, 59:16, 59:25, 60:2, 60:13, 61:13, 61:17, 71:23, 72:10, 72:20, 72:23, 72:24, 74:2
**million-six** [1] - 58:11
**mind** [5] - 29:25, 30:5, 30:13, 33:7, 34:16
**minus** [7] - 50:18, 52:24, 52:25, 60:21
**minute** [1] - 14:19
**minutes** [4] - 50:10, 50:18, 83:10, 86:11
**misspoke** [1] - 5:4
**misstates** [1] - 61:24
**mix** [1] - 43:13
**mixed** [1] - 70:20
**mock** [3] - 7:7, 7:10, 7:13
**model** [2] - 19:4
**moment** [2] - 18:21, 32:23, 68:4
**momentarily** [3] - 24:5, 38:15, 39:16
**Monday** [6] - 9:12, 9:15, 9:19, 10:6, 80:14, 85:13
**money** [40] - 33:20, 34:10, 35:4, 36:21, 37:9, 37:16, 38:22, 43:3, 43:25, 45:11, 45:14, 46:19, 49:14, 49:19, 49:23, 50:2,

53:22, 55:25, 57:10, 58:20, 58:23, 59:13, 59:22, 60:5, 61:11, 62:4, 66:21, 66:25, 67:2, 67:10, 67:13, 67:22, 67:25, 68:1, 68:2, 69:18, 72:6, 76:23, 79:11
**monies** [7] - 42:13, 42:14, 42:25, 43:6, 48:22, 60:10, 60:11
**month** [3] - 18:8, 18:10, 18:14
**monthly** [2] - 51:9, 51:15
**months** [1] - 10:19
**morning** [5] - 6:15, 6:18, 80:15, 83:21, 84:1
**most** [1] - 84:9
**move** [12] - 12:22, 21:14, 25:1, 28:18, 34:20, 42:22, 49:4, 54:17, 61:18, 67:14, 72:16, 80:11
**MR** [163] - 2:16, 4:6, 4:9, 5:4, 5:9, 6:3, 6:18, 7:5, 7:18, 7:20, 8:13, 8:16, 8:19, 8:22, 8:25, 9:3, 9:16, 9:18, 9:20, 9:24, 10:15, 10:18, 12:22, 12:25, 16:25, 17:4, 18:21, 18:23, 19:25, 20:4, 20:17, 20:22, 21:14, 21:16, 21:20, 21:22, 21:25, 22:2, 23:22, 24:3, 24:19, 25:1, 25:4, 25:12, 25:14, 28:11, 28:13, 28:18, 28:20, 30:7, 30:15, 32:23, 32:25, 33:25, 34:3, 34:15, 34:20, 34:23, 36:3, 36:9, 39:4, 39:6, 40:18, 40:21, 42:22, 42:24, 49:4, 49:7, 50:8, 50:17, 51:5, 51:11, 51:14, 54:17, 54:19, 59:5, 59:9, 59:17, 59:24, 60:19, 60:21, 61:18, 61:21, 61:24, 62:1, 62:16, 62:18, 62:19, 62:22, 63:3, 63:7, 64:12, 64:16, 66:14, 67:14, 67:17, 67:19, 67:24, 68:4, 68:7, 68:9, 69:2, 69:6, 69:24, 70:11, 70:14, 71:13,

71:21, 72:2, 72:6, 72:15, 73:2, 75:1, 77:4, 77:19, 77:22, 78:12, 79:15, 79:19, 80:8, 80:11, 80:18, 80:21, 81:1, 81:4, 81:13, 81:15, 81:22, 82:2, 82:7, 82:9, 82:11, 82:14, 82:20, 82:23, 82:25, 83:4, 83:6, 83:9, 83:12, 83:24, 84:3, 84:9, 84:13, 84:25, 85:3, 85:7, 85:9, 85:15, 85:18, 85:24, 86:2, 86:3, 86:4, 86:5, 86:7, 86:10, 86:13, 86:15, 86:16, 86:22, 86:24, 86:25

## N

**name** [2] - 22:22, 36:19
**namely** [1] - 33:20
**Nationwide** [4] - 41:1, 41:12, 42:1, 71:4
**need** [3] - 50:23, 80:15, 84:17
**needed** [3] - 21:11, 21:12, 86:22
**needs** [1] - 6:1
**net** [3] - 53:1, 60:6, 60:10
**never** [21] - 4:21, 14:20, 16:20, 16:22, 24:9, 25:4, 25:5, 25:16, 25:20, 25:22, 28:4, 31:13, 46:20, 46:21, 55:1, 55:5, 55:21, 55:23, 58:1, 83:17, 84:5
**Newport** [1] - 2:19
**next** [1] - 81:8
**NICOLA** [2] - 2:4, 2:9
**nitty** [1] - 62:10
**nitty-gritty** [1] - 62:10
**nobody** [4] - 7:12, 13:3, 25:6, 51:18
**None** [1] - 3:15
**none** [6] - 4:23, 8:16, 43:6, 67:12, 73:1, 76:21
**nonresponsive** [8] - 12:23, 21:14, 25:2, 34:21, 42:22, 49:5, 54:17, 61:19
**noon** [1] - 85:12
**North** [1] - 2:11
**notebooks** [1] - 16:18

**notes** [2] - 17:16, 17:22
**nothing** [12] - 5:17, 5:22, 32:19, 42:10, 48:11, 49:18, 56:10, 68:5, 78:23, 80:24, 81:19, 82:12
**notice** [1] - 48:4
**noticed** [2] - 43:9, 84:19
**November** [6] - 48:5, 48:7, 50:1, 50:4, 75:18, 75:22
**number** [12] - 33:7, 38:14, 38:16, 42:1, 42:19, 47:12, 57:25, 64:20, 65:7, 65:10, 70:1, 75:9
**numbers** [2] - 41:3, 64:16

## O

**o'clock** [2] - 79:23, 80:19
**O661** [1] - 35:9
**objection** [16] - 7:18, 8:13, 19:25, 20:17, 25:12, 28:11, 33:25, 39:4, 51:11, 59:5, 61:24, 62:16, 64:12, 72:2, 77:19, 86:17
**Objection** [2] - 36:3, 40:18
**objections** [3] - 8:25, 9:20, 81:16
**obviously** [5] - 50:19, 80:13, 81:14, 83:19, 84:13
**occasion** [1] - 4:15
**occurred** [1] - 7:13
**occurrence** [1] - 10:19
**occurring** [1] - 7:11
**October** [1] - 82:1
**OF** [7] - 1:2, 1:5, 1:14, 2:1, 88:1, 88:3, 88:4
**offered** [1] - 3:15
**offhand** [1] - 43:22
**OFFICES** [1] - 2:17
**Official** [1] - 88:20
**OFFICIAL** [3] - 1:24, 88:1, 88:5
**often** [1] - 41:25
**old** [3] - 54:1, 70:9, 71:1
**omit** [1] - 30:19
**omitted** [1] - 30:19
**once** [1] - 83:7
**one** [35] - 18:21, 21:5, 21:6, 22:4, 23:11,

29:23, 30:3, 30:12, 32:23, 33:19, 37:3, 37:4, 37:5, 37:6, 37:7, 37:18, 38:23, 40:22, 41:4, 41:7, 41:12, 42:8, 51:18, 52:6, 55:20, 57:2, 68:4, 73:18, 73:22, 74:20, 75:21, 75:22, 82:14, 83:12, 85:3
**One** [2] - 33:11, 35:24
**ones** [1] - 14:16
**oOo** [1] - 87:5
**opened** [1] - 83:23
**opening** [2] - 86:3, 86:7
**opening-close** [2] - 86:3, 86:7
**opinion** [1] - 62:3
**opinions** [3] - 21:18, 50:12, 79:25
**orally** [1] - 83:6
**order** [2] - 21:12, 21:17
**ordered** [1] - 81:6
**originated** [1] - 56:15
**otherwise** [2] - 23:14, 28:17
**out-of-pocket** [1] - 52:24
**output** [4] - 19:10, 24:2, 38:1, 38:2
**outputs** [2] - 19:5, 25:7
**outside** [2] - 32:1, 72:3
**overruled** [16] - 8:14, 9:1, 9:21, 10:16, 17:1, 20:1, 20:18, 23:24, 36:5, 40:19, 51:12, 59:7, 61:25, 63:4, 64:13, 72:4
**owed** [8] - 21:24, 43:25, 59:13, 59:22, 73:8, 75:24, 76:7, 77:10
**owned** [4] - 43:16, 43:20, 44:10, 44:13

## P

**p.m** [3] - 50:16, 87:4
**P.M** [2] - 1:16, 4:2
**page** [18] - 14:16, 22:18, 40:21, 40:23, 43:6, 53:25, 54:1, 57:25, 69:25, 70:11, 70:14, 73:16, 73:17, 73:19, 73:21, 74:4, 74:6, 88:11

**PAGE** [1] - 3:2
**pages** [3] - 17:13, 64:5
**paid** [16] - 41:14, 41:16, 41:22, 45:12, 48:17, 48:20, 48:23, 49:23, 53:10, 55:18, 55:22, 66:25, 67:1, 67:7, 68:3, 71:6
**papers** [13] - 14:23, 14:24, 15:6, 15:7, 15:13, 15:19, 16:18, 17:5, 17:10, 17:16, 17:18, 18:11, 18:13
**parameters** [1] - 83:19
**parentheticals** [1] - 73:12
**part** [11] - 10:22, 12:11, 16:6, 22:4, 29:3, 34:20, 39:12, 49:14, 63:24, 65:13, 85:3
**particular** [6] - 22:3, 24:20, 27:17, 27:20, 31:18, 44:21
**partners** [3] - 44:1, 44:8, 44:9
**party** [2] - 28:1, 28:3
**pass** [1] - 29:14
**pasted** [1] - 5:19
**path** [1] - 55:8
**Pause** [2] - 18:22, 83:11
**pay** [2] - 37:9, 44:13
**payable** [1] - 41:12
**payment** [35] - 5:18, 5:19, 35:10, 37:10, 38:18, 39:3, 41:25, 45:18, 46:3, 46:5, 46:6, 46:7, 46:11, 50:4, 58:7, 58:15, 58:21, 59:13, 59:22, 60:5, 60:11, 61:4, 61:6, 61:11, 67:11, 67:23, 71:22, 71:23, 72:8, 72:11, 72:13, 72:24, 73:6, 73:23, 75:18
**payments** [13] - 40:5, 40:9, 40:23, 51:9, 51:15, 53:21, 54:11, 72:19, 74:14, 74:23, 75:21, 75:25, 76:4
**payor** [1] - 45:5
**PDFs** [2] - 14:15, 17:20
**pendency** [1] - 13:7
**people** [5] - 7:14, 13:24, 42:7, 44:1, 44:9
**percent** [24] - 19:16,

19:17, 20:16, 21:1, 21:3, 43:20, 63:17, 63:23, 63:25, 64:3, 64:11, 64:14, 64:17, 64:18, 64:19, 65:14, 65:15, 65:16, 65:18, 66:4, 66:8, 66:14, 66:16, 79:11
**percipient** [1] - 84:21
**perform** [4] - 17:3, 21:7, 21:12, 21:13
**performed** [2] - 15:14, 18:1
**performing** [1] - 19:3
**period** [1] - 49:15
**permitted** [1] - 80:13
**personal** [4] - 36:4, 43:13, 44:13, 44:14
**Phan** [7] - 28:6, 62:10, 62:11, 62:24, 63:9, 76:13, 79:4
**Phan's** [1] - 63:9
**phase** [1] - 82:1
**phone** [1] - 84:5
**phrase** [3] - 18:24, 18:25, 19:1
**placed** [1] - 4:19
**Plaintiff** [1] - 1:6
**PLAINTIFF** [1] - 2:3
**planning** [2] - 84:22, 86:14
**Plaza** [1] - 2:18
**plus** [4] - 48:4, 50:18, 57:11, 57:15
**pocket** [1] - 52:24
**point** [4] - 6:18, 59:14, 60:12, 73:6
**pointed** [2] - 36:7, 70:8
**policy** [1] - 13:18
**portion** [2] - 56:16, 56:21
**posed** [1] - 82:5
**position** [6] - 77:5, 77:7, 77:8, 81:12, 81:15, 81:17
**possible** [3] - 8:17, 20:3, 47:2
**potentially** [1] - 20:21
**practicalitywise** [1] - 82:15
**practice** [2] - 29:2, 29:12
**precise** [1] - 75:12
**preliminary** [1] - 86:1
**preparation** [2] - 81:18, 81:24
**prepare** [4] - 16:4, 17:2, 18:3, 18:14
**prepared** [8] - 15:8,

15:17, 16:10, 16:16, 16:22, 51:7, 66:1, 70:20
**preparing** [2] - 18:7, 66:18
**presence** [4] - 4:5, 6:25, 50:21, 80:5
**present** [3] - 7:10, 7:14, 16:13
**preserve** [2] - 13:21, 13:25
**pretty** [3] - 32:16, 52:19, 53:4
**prevent** [1] - 11:23
**previously** [1] - 83:15
**principle** [1] - 19:6
**printout** [1] - 39:22, 54:5, 70:5
**printouts** [1] - 24:13
**privy** [1] - 7:21
**PRO** [1] - 2:14
**problem** [1] - 85:19
**procedures** [1] - 15:14
**proceedings** [4] - 18:22, 83:11, 87:2, 88:10
**PROCEEDINGS** [1] - 1:14
**Proceedings** [1] - 87:4
**produced** [3] - 4:12, 4:24, 48:2
**product** [4] - 5:14, 5:15, 6:12, 17:9
**proffer** [1] - 80:16
**program** [5] - 11:18, 12:2, 12:9, 14:21, 22:21
**Promise** [2] - 62:11, 63:9
**properly** [1] - 44:16
**propose** [1] - 80:12
**proposition** [1] - 6:14
**proprietor** [1] - 44:17
**prosecutors** [4] - 6:6, 7:21, 7:24, 10:13
**protocol** [1] - 29:17
**provide** [8] - 5:21, 5:23, 6:4, 21:18, 68:23, 80:15, 83:1, 85:13
**provided** [20] - 21:11, 24:14, 26:2, 27:6, 28:15, 29:20, 30:20, 30:23, 31:5, 31:23, 47:5, 49:20, 52:11, 56:24, 66:7, 68:25, 77:11, 77:12, 77:16, 84:15
**provides** [1] - 4:16

**providing** [1] - 83:13
**public** [2] - 19:7, 74:19
**publicly** [1] - 43:23
**pull** [13] - 39:18, 69:2, 69:6, 69:24, 70:15, 70:19, 71:13, 72:15, 72:16, 73:2, 75:1, 75:15, 76:3
**pulled** [2] - 63:17, 65:16
**purpose** [1] - 15:13
**pursuant** [2] - 80:12, 88:8
**put** [11] - 5:20, 17:18, 29:4, 29:14, 49:9, 49:12, 49:17, 51:16, 56:12, 56:17, 57:3
**putting** [1] - 57:13

**Q**

**QUESTION** [5] - 22:25, 23:3, 23:7, 23:11, 23:14
**questions** [14] - 7:24, 8:3, 8:6, 22:12, 25:13, 32:7, 57:6, 65:20, 65:21, 70:1, 70:4, 73:3, 77:1, 79:15
**quick** [1] - 82:14
**QuickBooks** [33] - 23:6, 23:8, 23:20, 24:1, 24:7, 24:8, 24:21, 26:1, 26:14, 26:16, 26:22, 28:9, 28:10, 28:14, 28:15, 28:20, 28:22, 29:5, 29:7, 29:9, 29:14, 29:20, 30:3, 30:11, 31:4, 32:20, 40:11, 40:16, 47:14, 52:1, 52:4, 60:17, 68:16

**R**

**raise** [2] - 4:6, 83:25
**raised** [1] - 4:10
**reach** [2] - 21:8, 21:17
**reaching** [1] - 71:8
**read** [15] - 23:17, 30:7, 30:9, 59:17, 59:20, 63:14, 63:19, 63:20, 64:9, 67:17, 67:20, 78:4, 78:6, 79:2, 79:7
**REALTIME** [1] - 88:5
**reason** [8] - 12:20, 16:1, 25:4, 25:16,

28:17, 31:13, 42:2, 54:23
**reasonable** [1] - 58:14
**rebuttal** [3] - 86:5, 86:9, 86:14
**receipt** [1] - 58:12
**receive** [10] - 42:13, 42:14, 42:18, 43:3, 48:13, 48:19, 48:22, 50:2, 56:16, 65:7
**received** [19] - 26:13, 42:10, 42:20, 42:24, 42:25, 46:19, 48:10, 48:14, 50:4, 56:9, 56:21, 66:21, 66:25, 67:2, 67:6, 67:9, 67:21, 68:2, 76:12
**receiving** [2] - 67:24, 68:1
**recess** [2] - 6:23, 50:10
**Recess** [1] - 50:16
**recognize** [3] - 71:25, 72:5, 72:11
**recollection** [6] - 8:22, 12:2, 18:15, 18:18, 22:25, 40:10
**record** [7] - 14:24, 30:9, 32:24, 59:20, 67:20, 78:6, 80:6
**recorded** [1] - 47:14
**records** [9] - 40:5, 40:23, 41:11, 41:19, 41:24, 41:25, 46:18, 46:20, 49:15
**recover** [1] - 13:10
**Recross** [1] - 3:4
**RECROSS** [1] - 77:3
**Recross-
Examination** [1] - 3:4
**RECROSS-
EXAMINATION** [1] - 77:3
**red** [5] - 42:9, 50:5, 56:9, 56:12, 73:11
**REDIRECT** [1] - 68:8
**Redirect** [1] - 3:4
**Redirect-
Examination** [1] - 3:4
**refer** [4] - 12:17, 12:21, 17:7, 17:9
**referred** [3] - 18:10, 18:13, 53:19
**referring** [1] - 53:15
**reflect** [4] - 15:15, 29:9, 36:21, 50:5
**reflected** [7] - 24:21, 24:22, 34:13, 37:12,

48:25, 68:16, 75:21
**reflects** [2] - 24:1, 46:12
**refresh** [2] - 18:14, 18:18
**refreshed** [1] - 23:1
**regard** [1] - 5:15
**regards** [1] - 82:16
**Regnier** [14] - 22:16, 24:2, 24:4, 25:8, 29:6, 38:1, 38:3, 38:5, 52:5, 53:13, 78:14, 78:15, 78:25, 79:1
**regular** [3] - 10:18, 10:20, 79:23
**regulations** [1] - 88:12
**relate** [1] - 27:24
**related** [16] - 14:12, 23:25, 32:13, 32:18, 37:22, 42:21, 46:14, 47:10, 47:13, 51:23, 52:15, 69:3, 71:9, 76:11, 77:14, 82:17
**relates** [6] - 12:3, 12:16, 32:18, 45:7, 51:20, 65:1
**relating** [11] - 5:10, 6:6, 6:9, 12:7, 13:25, 14:10, 29:13, 57:14, 62:10, 62:23, 83:19
**release** [4] - 81:5, 81:9, 81:18, 81:21
**relevance** [1] - 63:3
**Relevance** [2] - 8:13, 62:16
**reliable** [1] - 19:9
**relied** [4] - 27:1, 28:15, 29:6, 29:19
**rely** [3] - 19:9, 23:11, 63:10
**remain** [3] - 65:8, 65:10, 79:16
**remaining** [1] - 72:23
**remember** [20] - 22:19, 22:22, 22:24, 46:1, 50:11, 66:22, 66:23, 68:20, 71:14, 72:22, 73:3, 73:8, 74:17, 75:6, 75:7, 77:23, 77:24, 79:5, 79:6, 79:24
**remitter** [1] - 69:12
**repeat** [3] - 6:16, 30:6, 60:8
**repeating** [1] - 6:15
**reported** [1] - 88:10
**REPORTER** [3] - 1:24, 88:1, 88:6
**Reporter** [1] - 88:20

**REPORTER'S** [1] - 1:14
**represent** [4] - 4:19, 22:15, 33:9, 72:13
**represented** [1] - 83:15
**represents** [1] - 72:14
**repurchase** [2] - 63:11, 63:18
**request** [2] - 81:4, 81:18
**require** [1] - 81:20
**research** [3] - 5:12, 50:13, 80:2
**reserving** [1] - 50:19
**rests** [1] - 79:20
**resume** [1] - 79:23
**resumed** [2] - 3:3, 7:4
**RESUMED** [1] - 7:3
**review** [4] - 4:14, 14:8, 24:23, 28:3
**reviewed** [3] - 18:4, 25:25, 47:16
**Ricci** [5] - 61:1, 61:6, 61:11, 74:16, 74:20
**rights** [1] - 50:19
**rise** [2] - 50:15, 80:4
**Roasters** [2] - 73:4, 73:24, 74:5
**ROOM** [1] - 1:24
**rounded** [1] - 70:13
**row** [7] - 36:9, 36:10, 71:21, 71:22, 72:8, 72:9, 76:11
**rows** [3] - 71:17, 71:19, 72:18
**Rule** [2] - 6:13, 80:12

# S

**SACR-19-00061-JVS** [1] - 1:7
**Sagel** [2] - 10:8, 13:5
**SAGEL** [14] - 2:5, 79:19, 80:8, 81:15, 82:14, 82:20, 82:23, 84:13, 85:3, 86:3, 86:5, 86:10, 86:22, 86:24
**SANTA** [3] - 1:17, 1:25, 4:1
**Santa** [1] - 2:7
**save** [4] - 12:12, 12:15, 12:17, 12:19
**saved** [4] - 11:23, 12:13, 12:14, 13:16
**saw** [5] - 24:25, 34:8, 46:20, 62:11, 63:23
**scope** [8] - 31:19, 31:20, 31:22, 32:1,

63:1, 63:5, 72:3, 77:20
**scroll** [1] - 73:14
**SE** [1] - 2:14
**sealed** [1] - 87:2
**second** [2] - 34:20, 82:1
**Section** [1] - 88:8
**see** [52] - 22:13, 22:14, 26:25, 27:16, 27:19, 27:23, 32:10, 33:12, 33:13, 33:14, 34:6, 36:12, 39:10, 40:5, 41:1, 41:4, 41:6, 41:8, 41:11, 44:23, 44:25, 45:5, 45:6, 45:13, 45:15, 45:19, 45:20, 46:18, 47:7, 51:21, 51:24, 52:21, 52:22, 53:2, 53:3, 54:1, 54:11, 54:13, 56:3, 57:23, 58:17, 61:2, 61:3, 61:5, 69:8, 73:14, 74:4, 74:5, 74:7, 75:14, 78:21
**seeing** [1] - 84:13
**self** [1] - 81:7
**self-surrender** [1] - 81:7
**SELNA** [1] - 1:3
**send** [2] - 35:4, 82:17
**sensitive** [2] - 85:10, 85:11
**sent** [4] - 11:9, 70:17, 71:23, 72:10
**separate** [1] - 87:3
**September** [6] - 75:13, 81:7, 81:10, 81:20, 82:6, 82:7
**serious** [6] - 13:1, 19:13, 19:20, 20:7, 20:15, 21:1
**served** [3] - 84:24, 85:1, 85:2
**servers** [1] - 15:12
**service** [2] - 84:25, 85:2
**session** [2] - 80:25, 82:13
**setting** [1] - 21:3
**settings** [1] - 15:3
**settlement** [30] - 31:18, 42:10, 42:16, 42:25, 48:4, 48:10, 48:14, 48:20, 48:22, 51:10, 51:16, 56:2, 56:10, 57:23, 58:3, 59:4, 64:3, 66:25, 67:1, 67:7, 67:10,

67:23, 68:2, 69:17, 72:7, 72:14, 72:21, 76:13, 76:23, 77:6
**Settlement** [1] - 52:24
**settlements** [4] - 66:22, 67:3, 67:10, 67:22
**several** [1] - 23:22
**share** [1] - 59:4
**sheet** [3] - 48:25, 55:10, 78:2
**shortcut** [1] - 60:22
**show** [5] - 6:20, 22:10, 33:10, 34:13, 36:24
**showing** [1] - 26:19
**shown** [1] - 43:6
**similar** [2] - 47:16, 75:15
**simple** [5] - 20:14, 32:16, 52:19, 53:4, 55:9
**six** [2] - 10:19, 58:11
**sizable** [1] - 74:1
**slightly** [1] - 61:13
**small** [2] - 41:3, 41:12
**software** [8] - 11:18, 12:2, 12:8, 14:20, 21:19, 55:5, 55:7, 57:14
**sole** [1] - 44:17
**someone** [3] - 53:22, 84:18, 84:20
**sometime** [1] - 80:14
**sometimes** [1] - 40:14
**somewhere** [1] - 62:11
**sorry** [14] - 20:19, 24:19, 30:6, 32:23, 44:5, 55:22, 58:8, 60:8, 70:20, 72:16, 78:19, 79:12, 79:13, 86:4
**source** [3] - 38:25, 46:11, 77:17
**sources** [3] - 32:21, 52:4, 52:6
**SOUTHERN** [1] - 1:2
**Spaan** [1] - 88:20
**SPAAN** [3] - 1:23, 88:5, 88:19
**Special** [1] - 13:5
**specific** [2] - 8:5, 30:25
**specifically** [2] - 10:2, 71:17
**speculation** [2] - 10:15, 51:11
**spend** [1] - 85:21
**splitting** [1] - 86:14
**spot** [2] - 19:16, 19:17

**spot-on** [2] - 19:16, 19:17
**spreadsheet** [9] - 29:9, 47:16, 52:3, 52:5, 53:12, 60:18, 70:16, 70:25, 71:3
**spreadsheets** [11] - 24:1, 24:5, 25:7, 25:10, 29:6, 30:4, 30:12, 31:5, 32:20, 53:14, 53:16
**Spring** [1] - 2:11
**stand** [6] - 4:7, 8:23, 14:3, 16:23, 17:8, 18:2
**STAND** [1] - 7:3
**standard** [1] - 20:21
**STANDBY** [1] - 2:16
**started** [2] - 4:12, 5:5
**STATE** [1] - 88:4
**statement** [1] - 42:25
**statements** [3] - 4:11, 6:11, 15:15
**STATES** [2] - 1:1, 1:5
**States** [7] - 2:4, 2:5, 2:9, 2:10, 88:6, 88:8, 88:13
**statute** [2] - 4:18, 5:3
**stay** [1] - 6:1
**stenographically** [1] - 88:10
**step** [2] - 63:19, 63:20
**steps** [1] - 27:13
**STEWARD** [2] - 2:17, 2:18
**still** [3] - 73:7, 74:1, 80:15
**stolen** [1] - 38:22
**stop** [1] - 79:22
**Street** [2] - 2:6, 2:11
**STREET** [1] - 1:24
**stretch** [1] - 50:24
**stricken** [9] - 12:24, 25:3, 28:19, 34:22, 42:23, 49:6, 54:18, 61:20, 67:16
**strike** [21] - 11:17, 12:22, 15:6, 16:3, 21:14, 24:6, 25:1, 26:5, 27:2, 27:18, 28:18, 33:22, 34:20, 42:13, 42:22, 49:4, 49:8, 54:17, 61:18, 67:14, 79:2
**structure** [1] - 83:22
**stuff** [1] - 5:17
**subject** [6] - 11:10, 12:7, 13:18, 79:18, 79:19, 81:16
**submission** [1] -

80:20
**submit** [1] - 82:16
**submitted** [2] - 50:13, 80:1
**substance** [1] - 5:10
**substantive** [2] - 5:13, 5:16
**sufficient** [1] - 45:17
**suggested** [1] - 65:2
**Suite** [3] - 2:6, 2:11, 2:19
**summaries** [1] - 17:23
**summarized** [1] - 28:22
**summary** [1] - 30:22
**Sunrise** [1] - 46:7
**supporting** [1] - 17:23
**supposed** [1] - 62:4
**surrender** [1] - 81:7
**suspend** [1] - 11:19
**sustained** [11] - 7:19, 8:21, 9:17, 21:21, 22:1, 28:12, 34:2, 39:5, 60:20, 62:17, 77:21
**switch** [1] - 34:16
**system** [2] - 11:14, 12:13

## T

**Tabs** [33] - 14:11, 14:22, 23:1, 23:4, 23:5, 23:8, 23:21, 24:2, 24:9, 24:12, 24:22, 25:5, 25:15, 25:17, 25:23, 29:14, 37:25, 39:23, 40:12, 40:17, 47:15, 47:19, 54:5, 54:14, 54:20, 54:24, 55:1, 55:2, 57:14, 58:1, 68:16, 70:5
**tailor** [1] - 5:1
**takeaway** [1] - 64:10
**team** [1] - 13:23
**temporary** [4] - 81:5, 81:9, 81:18, 81:20
**ten** [3] - 16:8, 33:5, 33:9
**term** [1] - 15:3
**terms** [5] - 64:7, 64:8, 81:5, 81:13, 82:5
**testified** [8] - 29:24, 38:3, 38:5, 41:13, 41:19, 73:11, 74:19, 74:21
**testify** [9] - 16:5, 16:11, 16:17, 18:3, 18:7, 18:14, 18:19,

83:14, 84:16
**testimony** [17] - 4:23, 5:10, 6:6, 6:19, 7:15, 10:14, 11:11, 12:8, 14:8, 15:24, 22:10, 22:16, 40:6, 41:10, 41:21, 61:24, 84:3
**THE** [118] - 2:3, 2:14, 3:3, 4:8, 5:2, 5:7, 5:25, 6:16, 6:22, 7:1, 7:3, 7:19, 8:14, 8:15, 8:21, 9:1, 9:2, 9:17, 9:21, 9:22, 10:16, 10:17, 12:24, 17:1, 17:2, 20:1, 20:2, 20:18, 20:19, 21:15, 21:21, 22:1, 23:24, 23:25, 24:17, 25:3, 25:13, 28:12, 28:19, 30:8, 30:14, 34:2, 34:22, 36:5, 36:6, 39:5, 40:19, 40:20, 42:23, 49:6, 50:9, 50:15, 50:22, 50:25, 51:2, 51:12, 51:13, 54:18, 59:7, 59:8, 59:19, 60:20, 61:20, 61:25, 62:17, 62:21, 63:4, 63:5, 64:13, 64:14, 66:11, 67:16, 67:18, 68:6, 72:4, 72:5, 77:2, 77:21, 78:5, 78:10, 79:17, 79:21, 80:4, 80:6, 80:10, 80:17, 80:19, 80:23, 81:3, 81:11, 81:25, 82:4, 82:8, 82:10, 82:12, 82:19, 82:22, 82:24, 83:3, 83:5, 83:8, 83:22, 84:2, 84:6, 84:12, 84:24, 85:5, 85:8, 85:12, 85:16, 85:20, 85:25, 86:6, 86:9, 86:12, 86:21, 86:23, 87:1
**therefore** [1] - 27:13
**third** [2] - 28:1, 28:3
**third-party** [2] - 28:1, 28:3
**thoroughness** [1] - 66:18
**thousand** [1] - 17:13
**three** [12] - 4:19, 13:6, 37:17, 37:19, 56:2, 56:6, 64:5, 76:4, 76:6, 76:14, 84:11, 86:20
**Thursday** [2] - 84:10, 85:22

**tick** [1] - 17:15
**Timeslips** [1] - 22:23
**timetable** [1] - 65:10
**timing** [1] - 82:15
**Title** [1] - 88:8
**today** [2] - 15:19, 80:17
**together** [1] - 17:18
**took** [5] - 6:23, 8:23, 18:2, 39:9, 64:19
**top** [3] - 52:23, 69:12, 78:21
**topic** [4] - 8:9, 10:1, 31:25, 83:23
**topics** [11] - 8:4, 8:7, 8:11, 8:17, 8:18, 8:24, 9:3, 9:7, 9:8, 9:10, 9:25
**total** [13] - 32:13, 40:16, 48:7, 48:10, 56:5, 57:10, 63:11, 63:18, 65:4, 65:7, 70:12, 75:25
**Total** [3] - 42:9, 56:9, 76:12
**tough** [1] - 17:12
**toughest** [1] - 50:23
**traced** [1] - 39:9
**tracked** [1] - 21:23
**traded** [1] - 43:23
**training** [1] - 64:22
**Tran** [4] - 28:7, 62:11, 63:9, 76:14
**transaction** [1] - 63:13
**transcribed** [1] - 87:3
**TRANSCRIPT** [2] - 1:6, 1:14
**transcript** [3] - 22:13, 88:9, 88:11
**transfer** [10] - 33:14, 34:4, 34:6, 34:8, 35:9, 35:24, 45:17, 71:25, 74:5, 74:10
**transferred** [2] - 34:10, 76:22
**trial** [6] - 14:8, 16:11, 81:17, 81:19, 82:1
**TRIAL** [1] - 1:8
**trials** [1] - 16:14
**true** [21] - 18:11, 21:22, 25:6, 25:18, 25:21, 28:6, 28:14, 31:8, 31:14, 36:2, 40:14, 40:17, 47:23, 49:19, 49:23, 50:3, 50:6, 55:25, 56:25, 67:3, 88:9
**trust** [5] - 44:23, 67:13, 69:17, 74:24, 76:22

**truthful** [1] - 40:8
**try** [3] - 26:11, 26:18, 50:19
**Tuesday** [11] - 79:23, 80:15, 80:19, 81:6, 83:1, 83:14, 83:21, 84:1, 84:8, 84:23, 85:21
**two** [26] - 6:8, 7:8, 7:14, 12:6, 17:23, 19:12, 19:23, 20:11, 20:24, 24:25, 32:21, 52:4, 52:6, 62:19, 71:17, 72:18, 75:21, 75:25, 80:16, 83:10, 84:11, 84:15, 84:17, 84:20, 84:22, 86:19
**two-and-a-half** [4] - 6:8, 7:8, 12:6, 17:23
**two-hour** [1] - 84:20
**two-question** [1] - 62:19
**type** [1] - 39:8
**typically** [2] - 14:24, 15:1

## U

**U.S** [1] - 1:3
**unable** [1] - 9:18
**under** [10] - 31:9, 54:12, 54:20, 57:1, 57:4, 60:2, 60:6, 61:22, 87:3
**underlie** [1] - 17:25
**underlying** [1] - 40:5
**understood** [19] - 19:6, 19:12, 19:15, 19:19, 19:21, 19:23, 20:6, 20:11, 20:14, 20:25, 21:7, 31:24, 43:19, 43:21, 46:14, 80:18, 83:24, 85:7, 85:24
**undertook** [1] - 27:11
**UNITED** [2] - 1:1, 1:5
**United** [7] - 2:4, 2:5, 2:9, 2:10, 88:6, 88:8, 88:13
**unless** [1] - 86:22
**unreliable** [2] - 19:5
**up** [24] - 4:9, 32:9, 34:16, 39:18, 40:25, 44:16, 69:2, 69:6, 69:24, 70:15, 70:19, 70:20, 71:13, 71:21, 72:15, 72:16, 73:2, 75:1, 75:2, 75:15, 76:3, 84:19, 84:22, 85:6

**updated** [4] - 26:20, 56:23, 57:1, 57:2
**upwards** [1] - 20:13
**USA** [1] - 72:10

## V

**Vague** [2] - 20:17, 64:12
**valuation** [4] - 62:12, 62:15, 62:22
**value** [1] - 50:5
**various** [1] - 29:22
**vendors** [1] - 27:20
**verify** [5] - 27:9, 32:19, 52:9, 71:5, 71:11
**verifying** [1] - 79:19
**version** [3] - 30:3, 30:11, 31:4
**versus** [1] - 40:12
**via** [1] - 82:17
**violence** [1] - 83:16
**virtually** [2] - 5:16, 5:22
**voice** [1] - 24:17
**VOLUME** [1] - 1:9
**voluminous** [1] - 17:10
**vs** [1] - 1:7

## W

**waiting** [3] - 6:17, 22:12, 81:7
**week** [3] - 50:23, 81:9, 84:25
**weekend** [4] - 6:2, 80:3, 82:18, 82:21
**weeks** [2] - 7:8, 9:12
**West** [2] - 2:6, 46:7
**WEST** [1] - 1:24
**Whiteside** [1] - 51:10
**wholly** [1] - 44:13
**widely** [1] - 19:6
**wire** [4] - 58:12, 71:22, 71:25, 72:8
**wish** [1] - 41:21
**withdraw** [3] - 36:6, 78:13, 78:14
**withdrawal** [3] - 37:17, 38:25, 45:13
**withdrawals** [2] - 73:12, 74:23
**withdrawn** [3] - 70:22, 72:20, 72:23
**withdrew** [1] - 75:12
**witness** [6] - 6:4, 6:7, 6:11, 66:12, 84:16, 84:23
**WITNESS** [18] - 7:3,

8:15, 9:2, 9:22,
10:17, 17:2, 20:2,
20:19, 23:25, 30:14,
36:6, 40:20, 51:13,
59:8, 63:5, 64:14,
72:5, 78:10
**witness's** [1] - 4:23
**witnesses** [5] - 6:19,
16:5, 17:2, 83:1,
85:5
**WITNESSES** [1] - 3:2
**Word** [1] - 17:21
**works** [3] - 32:15,
52:18, 65:6
**worth** [2] - 39:7, 48:2
**write** [2] - 58:5, 83:9
**written** [7] - 6:5, 6:10,
12:3, 14:4, 14:24,
39:25, 80:20
**wrote** [3] - 39:25,
41:17, 53:19
**WYMAN** [47] - 2:10,
5:9, 7:18, 8:13, 8:19,
8:25, 9:16, 9:20,
10:15, 16:25, 19:25,
20:17, 21:20, 21:25,
23:22, 25:12, 28:11,
33:25, 36:3, 39:4,
40:18, 51:11, 59:5,
60:19, 61:24, 62:16,
63:3, 64:12, 68:7,
68:9, 69:2, 69:6,
69:24, 70:11, 70:14,
71:13, 71:21, 72:6,
72:15, 73:2, 75:1,
77:19, 86:2, 86:4,
86:7, 86:15, 86:25
**Wyman** [13] - 3:4, 5:8,
10:8, 13:5, 39:19,
40:2, 41:18, 43:11,
44:20, 46:24, 58:18,
68:6, 79:4

### X

**X-Law** [1] - 71:24

### Y

**years** [11] - 4:20, 6:8,
12:6, 16:8, 17:23,
19:13, 19:23, 20:12,
20:24, 76:5, 76:6
**yesterday** [3] - 15:21,
18:2, 22:19
**yourself** [1] - 6:16

### Z

**zero** [2] - 76:14, 76:17

# Exhibit 3

1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

THE HONORABLE JAMES V. SELNA, JUDGE PRESIDING

UNITED STATES OF AMERICA,      )CERTIFIED TRANSCRIPT
                  Plaintiff,  )
    vs.                        )
                               )  SACR-19-00061-JVS
MICHAEL JOHN AVENATTI,         )
                  Defendant.  )    TRIAL DAY 26
------------------------------)

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Santa Ana, California

August 24, 2021

SHARON A. SEFFENS, RPR
United States Courthouse
411 West 4th Street, Suite 1-1053
Santa Ana, CA  92701
(714) 543-0870

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

```
 1    APPEARANCES OF COUNSEL:

 2    For the Plaintiff:

 3    NICOLA T. HANNA
      United States Attorney
 4    BRANDON D. FOX
      Assistant United States Attorney
 5    Chief, Criminal Division
      ALEXANDER WYMAN
 6    Assistant United States Attorney
      Major Frauds Section
 7    1100 United States Courthouse
      312 North Spring Street
 8    Los Angeles, CA  90012
      (213) 894-6683
 9
      BRETT A. SAGEL
10    Assistant United States Attorney
      Ronald Reagan Federal Building
11    411 West Fourth Street, Suite 8000
      Santa Ana, CA  92701
12    (714) 338-3598

13    For the Defendant:

14    MICHAEL JOHN AVENATTI, PRO SE

15    H. DEAN STEWARD, ADVISORY COUNSEL
      H. DEAN STEWARD LAW OFFICES
16    107 Avenida Miramar, Suite C
      San Clemente, CA  92672
17    (949) 481-4900

18

19

20

21

22

23

24

25
```

```
09:25   1   SANTA ANA, CALIFORNIA; TUESDAY, AUGUST 24, 2021; 8:05 A.M.
09:25   2           (Jury not present)
08:05   3           THE CLERK:  Item 1, SACR-19-00061-JVS, United
08:05   4   States of America versus Michael John Avenatti.
08:05   5           MR. SAGEL:  Good morning, Your Honor.  Brett Sagel
08:05   6   and Alexander Wyman on behalf of the United States and the
08:05   7   Prosecution Team.  And at counsel table is Patrick
08:05   8   Fitzgerald with the Privilege Review Team of the United
08:05   9   States.
08:05  10           THE COURT:  Good morning.
08:05  11           MR. AVENATTI:  Good morning, Your Honor.  Michael
08:05  12   Avenatti, present with Mr. Steward and Ms. Cummings-Cefali.
08:06  13           THE COURT:  Good morning.
08:06  14           I received last night Mr. Avenatti's status
08:06  15   report, Re:  Search of Service for Financial Data at Docket
08:06  16   No. 775.
08:06  17           Any further supplement on the findings yesterday?
08:06  18           MR. FITZGERALD:  Yes, Your Honor.  I would like to
08:06  19   provide further information to the Court and counsel on
08:06  20   three issues:  one, a small what I believe point of
08:06  21   clarification to the defense status report; two, memorialize
08:06  22   certain agreements that the Prosecution Review Team and the
08:06  23   defense reached yesterday; and, third --
08:06  24           THE COURT:  The Privilege Review Team.
08:06  25           MR. FITZGERALD:  Excuse me.  Thank you, Your
```

08:06  **1**  Honor, the Privilege Review Team.  And third, provide a

08:06  **2**  brief supplement for events that happened yesterday after

08:06  **3**  the conclusion of the meeting with the defense at our

08:07  **4**  office.

08:07  **5**  First, as far as the clarifications go -- and once

08:07  **6**  I'm finished, I'll invite the defense to respond.

08:07  **7**  On lines 4 through 6 on page 2, there is a

08:07  **8**  reference to the number of Tabs files and QuickBooks files.

08:07  **9**  My understanding is that at the moment we are not able to

08:07  **10**  determine which of these files relate to the clients at

08:07  **11**  issue in this case and which relate to all the other clients

08:07  **12**  in the case.  It may be that we will need the license and

08:07  **13**  the software from the vendor to be able to do that.

08:07  **14**  The second clarification is on lines 12 through 14

08:08  **15**  about the discovery that we and the defense made at about

08:08  **16**  6:00 p.m.  I believe this refers to the assessment that we

08:08  **17**  made that there is probably information on the virtual

08:08  **18**  system that was not captured by the forensic searches that

08:08  **19**  Mr. Varani made for us yesterday.

08:08  **20**  Then in regard to the agreements of the parties,

08:08  **21**  first, the Privilege Review Team allowed the defense to take

08:08  **22**  iPhone photographs of certain screens on their review of the

08:08  **23**  virtual system, and we're trying to get screenshots.  They

08:08  **24**  said that they would provide those to the Privilege Review

08:08  **25**  Team.

08:08  **1**      Second, all of this information that was produced

08:09  **2**  yesterday the parties agreed would be produced pursuant to a

08:09  **3**  modified Protective Order, which I would like to memorialize

08:09  **4**  now.

08:09  **5**      It is largely based on the applicable Protective

08:09  **6**  Order in this case, Document No. 74, that was filed on

08:09  **7**  December 31st, 2019, with certain changes.

08:09  **8**      First, in paragraph three, all of the material

08:09  **9**  that was produced yesterday will be deemed sensitive

08:09  **10**  information as that is defined in paragraph three.

08:09  **11**      Second, the permission in paragraph eight that

08:09  **12**  defendant and his counsel may provide this information in

08:09  **13**  other matters relating to Mr. Avenatti is stricken.  The

08:09  **14**  information that was provided by the Privilege Review Team

08:10  **15**  over the weekend and then yesterday is for use only in this

08:10  **16**  case and not for any other criminal, bankruptcy, or civil

08:10  **17**  proceeding absent further permission from the Court.

08:10  **18**      And then finally there is a new provision.  The

08:10  **19**  defense and the government agreed that in accessing this

08:10  **20**  material, the defense and anyone working on behalf of the

08:10  **21**  defense would in no way review or look at or attempt to

08:10  **22**  access any information relating to the clients that were

08:10  **23**  listed in the search warrant, which I believe is in

08:10  **24**  paragraph 17, which I will just say collectively is the

08:10  **25**  Clifford litigation, clients which they should not be

08:11 **1** accessing which is set out in paragraph 17 of the search

08:11 **2** warrant that was filed on March 25th, 2019.

08:11 **3** And then finally as a supplement to what happened

08:11 **4** last night after the defense finished reviewing the virtual

08:11 **5** system, which is in a conference room in the United States

08:11 **6** Attorney's Office, the case agent for the Prosecution Team

08:11 **7** was given access to it under my supervision.

08:11 **8** He looked at an overall list of clients to

08:11 **9** determine which of the clients were applicable to this case.

08:11 **10** Then he clicked on the information for those clients and,

08:11 **11** after exploring the software, he found material that he

08:11 **12** believed was relevant to the Court's inquiry.

08:11 **13** He was allowed to put that on a hard drive and

08:12 **14** have it exported from the virtual system. And my

08:12 **15** understanding is that that material then was sent to the

08:12 **16** Prosecution Team, and it has been produced to the defense.

08:12 **17** THE COURT: Thank you.

08:12 **18** Mr. Avenatti.

08:12 **19** MR. AVENATTI: Your Honor, a couple points. The

08:12 **20** defense agrees with the modifications to the Protective

08:12 **21** Order relating to this information as Mr. Fitzgerald stated

08:12 **22** them in their entirety. So I wanted to put that on the

08:12 **23** record.

08:12 **24** THE COURT: Well, let's follow up when a formal

08:12 **25** document gets filed.

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

08:12  **1**        MR. AVENATTI:  Agreed, Your Honor.

08:12  **2**        As it related to lines 4 through 6 of the status

08:12  **3**   report, the number of files that were listed, each of those

08:12  **4**   Tabs files, Your Honor "relates" to the clients in this

08:13  **5**   case, because when the files were produced, they were not

08:13  **6**   produced by client.  All of the Tabs data and files on the

08:13  **7**   server were produced.  By their very nature, they include

08:13  **8**   information relating to the clients in this case.  So these

08:13  **9**   file numbers are correct because each Tabs file, electronic

08:13  **10**  file, will have some relevance to the clients in this case.

08:13  **11**  They are not client specific.

08:13  **12**        We are still in the process -- we got an enormous

08:13  **13**  amount of data, six gigabytes.  It's going to take us a

08:13  **14**  while to go through this.

08:13  **15**        Number two, Your Honor, at lines 12 through 14, as

08:13  **16**  to this discovery at 6:00 p.m., I want the Court to

08:13  **17**  understand exactly what happened.  Mr. Varani sent over six

08:13  **18**  gigabytes of data from Washington, D.C.  While I was in the

08:13  **19**  offices of the U.S. Attorney's Office in L.A., I said to

08:14  **20**  Mr. Tashchyan is there a way for us to confirm that

08:14  **21**  everything that is on this virtual machine is included

08:14  **22**  within Mr. Varani's files that he just sent over?

08:14  **23**        We then began a process by which we attempted to

08:14  **24**  do that.  It became apparent to Mr. Tashchyan and us that

08:14  **25**  all of the data files on the virtual machine were not

08:14  **1**  included in what Mr. Varani sent over, and it's unclear that

08:14  **2**  those data files were actually accessible on the virtual

08:14  **3**  machine for a technical reason.

08:14  **4**  Rather than -- well, actually it was impossible at

08:14  **5**  that time because of -- in the interest of time to do a full

08:14  **6**  comparison of the two data sets.  It was agreed that that

08:14  **7**  would be done depending on what happens today, this morning,

08:14  **8**  and at a later date.  That still needs to be done.  But

08:14  **9**  there's no question that we don't have data files that were

08:15  **10**  on the virtual machine that are not within Mr. Varani's data

08:15  **11**  set.

08:15  **12**  I'm aware of the production of the government late

08:15  **13**  last night of various reports relating to these clients.

08:15  **14**  I'm going to reserve comment to later as it relates to what

08:15  **15**  those reports show and don't show, and I will leave it at

08:15  **16**  that.

08:15  **17**  THE COURT:  Okay.

08:15  **18**  MR. AVENATTI:  We are in the process of -- due to

08:15  **19**  a computer malfunction, we weren't able to look at any of

08:15  **20**  this data until 4:00 last night at the IRS Office due to a

08:15  **21**  computer misfunction on their end.  But needless to say,

08:15  **22**  it's a lot of information, and there's a lot of different

08:15  **23**  reports that are available now that we have access to the

08:15  **24**  actual date and the software.  There's audit reports.

08:15  **25**  There's entry reports.  There's a bunch of information that

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

08:15 **1** we now have that we did not have from the cold hard page.

08:16 **2** THE COURT: I believe the parties have done what I

08:16 **3** requested yesterday. You've provided me with a sampling of

08:16 **4** what's in the collection of documents held by the Privilege

08:16 **5** Review Team. I think that sufficiently informs me to rule

08:16 **6** on Mr. Avenatti's motion at 706.

08:16 **7** I don't think I need an exhaustive presentation of

08:16 **8** exactly what's there. I think I have enough information to

08:16 **9** intelligently rule on 706.

08:16 **10** With that said, Mr. Avenatti, would you like to be

08:16 **11** heard?

08:16 **12** MR. AVENATTI: I would, Your Honor. Can I use the

08:16 **13** podium?

08:16 **14** THE COURT: Sure.

08:16 **15** MR. AVENATTI: Your Honor, there has obviously

08:16 **16** been a fair amount of briefing on this issue and a fair

08:16 **17** amount of exhibits. I'm not going to rehash the entire

08:17 **18** timeline of what has gone on over this odyssey of the last

08:17 **19** two-plus years, but I do want to bring the Court's attention

08:17 **20** to a few important what I would call guideposts.

08:17 **21** Number one, on March 25th, 2019, a search warrant

08:17 **22** was executed at Ms. Regnier's home. According to her trial

08:17 **23** testimony, she claims that she "probably" told Special Agent

08:17 **24** Karlous and AUSA Sagel at that interview on that date about

08:17 **25** Tabs.

08:17  **1**      The Indictment in this case was issued in April of

08:17  **2**   2019.  In May of 2019 after I retained Mr. Steward as

08:17  **3**   counsel, he requested all Rule 16 and Brady information.  He

08:17  **4**   specifically identified the servers as a location where such

08:17  **5**   information could be found.  That's Exhibits A and B to our

08:18  **6**   reply on the pending motion at Docket 745.

08:18  **7**      Assistant U.S. Attorney Julian Andre responded to

08:18  **8**   those requests on May 24th, 2019, and here is what he said

08:18  **9**   in particular, Your Honor.  And it's Exhibit C to our reply

08:18  **10**  at 745.  I've provided a copy for the benefit of the Court.

08:18  **11**  There should be a packet there.

08:18  **12**      THE COURT:  Okay.  Thank you.

08:18  **13**      MR. AVENATTI:  It should be the first document,

08:18  **14**  May 24th, 2019.  And here is what he said under EA LLP

08:18  **15**  server:  "In connection with the government's investigation,

08:18  **16**  the Court-appointed Receiver for EA LLP consented to IRS-CI

08:18  **17**  creating a forensic image of the six digital devices that

08:19  **18**  comprise the EA LLP server, which were being stored by

08:19  **19**  MixinIT, a company in Orange County that stored and managed

08:19  **20**  computer servers.  After creating a forensic image of the EA

08:19  **21**  LLP server, the EA LLP server was returned to the EA

08:19  **22**  Receiver.  The government has since obtained a warrant to

08:19  **23**  search the forensic copy of the EA LLP server for relevant

08:19  **24**  evidence.  We will produce any relevant evidence seized from

08:19  **25**  the EA LLP server once the government completes the review

08:19  1  protocols set forth in the search warrant."

08:19  2          That was the representation made by Mr. Andre on

08:19  3  May 24th, 2019, very early on in this case, well over two

08:20  4  years ago.

08:20  5          When he mentioned these forensic images, these are

08:20  6  the forensic images that Mr. Varani testified to during the

08:20  7  trial as having been in the possession of the Department of

08:20  8  Justice computer lab in Washington, D.C.  These are the same

08:20  9  forensic images that Mr. Varani searched yesterday for the

08:20  10 first time for the Tabs data and produced it yesterday

08:20  11 through the Privilege Review Team to the defense.  Those are

08:20  12 the exact same forensic images.

08:20  13         Following this representation by Mr. Andre, the

08:20  14 defense continued to demand copies of the servers and all

08:20  15 Brady information in the case to no avail.

08:20  16         On July 25th, 2019, an interview was conducted of

08:20  17 Ms. Regnier.

08:21  18         THE COURT:  Your Exhibit 1084.

08:21  19         MR. AVENATTI:  1084.  Correct, Your Honor.  The

08:21  20 four most senior individuals from the Prosecution Team were

08:21  21 present for this interview -- Special Agent Karlous, Special

08:21  22 Agent Kim, and both Assistant U.S. Attorneys, Mr. Sagel and

08:21  23 Mr. Andre.

08:21  24         The entire purpose of this call according to the

08:21  25 memorandum was to ask questions regarding the Eagan

08:21 **1** Avenatti, LLP, server and how client files are created and

08:21 **2** maintained on the server. During this call, Your Honor,

08:21 **3** Ms. Regnier informed all four members of Tabs, not once but

08:22 **4** twice. Most importantly, she informed them that the client

08:22 **5** billing and client accounting was handled through Tabs,

08:22 **6** quote, "Tabs would be used." That was July 25th, 2019.

08:22 **7** A month later -- and this timing is important. A

08:22 **8** month after that interview Your Honor denied our motion to

08:22 **9** compel a copy of the servers. You only did so after you had

08:22 **10** been provided repeated assurances by the government that

08:22 **11** they were going to comply with Brady.

08:22 **12** In fact, Your Honor's order specifically states:

08:22 **13** "The government has acknowledged its obligation to produce

08:23 **14** all documents within the scope of the search warrants, as

08:23 **15** well as its Brady and Giglio obligations."

08:23 **16** As of that date that Your Honor made that

08:23 **17** statement and as of the date of the representations made by

08:23 **18** the Assistant U.S. Attorneys, they were well aware of the

08:23 **19** existence and importance of the Tabs data. Despite that, it

08:23 **20** was not produced. Nothing was done to look for it.

08:23 **21** On November 19, 2019, Special Agent Roberson,

08:24 **22** Special Agent Karlous, and Assistant U.S. Attorney Sagel had

08:24 **23** another interview lasting over eight hours with Ms. Regnier.

08:24 **24** THE COURT: For the record, that's your

08:24 **25** Exhibit 1085.

08:24  **1**    MR. AVENATTI:  Correct, Your Honor, 1085.

08:24  **2**    Paragraph 14 reflects that each of those gentlemen

08:24  **3**    were advised that there were two systems that were used to

08:24  **4**    track expenses, QuickBooks and Tabs.  The data was still not

08:24  **5**    produced to the defense, and there does not appear to have

08:24  **6**    been any effort whatsoever made to produce it.

08:25  **7**    Your Honor, to be clear, the Tabs data could only

08:25  **8**    be exculpatory.  It could never be inculpatory.  It could

08:25  **9**    never increase the amount of money that was owed to the

08:25  **10**    client.  It could only decrease the amount of money that was

08:25  **11**    owed to each of the clients by its very nature because it

08:25  **12**    did not track income or revenue.  It only tracked case

08:25  **13**    client expenses.

08:25  **14**    I would submit, Your Honor, that is why the

08:25  **15**    government never made an effort to produce it or to provide

08:25  **16**    it, because by its very nature it was exculpatory.

08:25  **17**    THE COURT:  Well, there could have been other

08:25  **18**    reasons why it was exculpatory, but certainly it could be

08:26  **19**    exculpatory on that basis.

08:26  **20**    MR. AVENATTI:  It could be exculpatory on that

08:26  **21**    basis.  It could be exculpatory on Giglio.  It could be

08:26  **22**    exculpatory based on who was working on the case and who had

08:26  **23**    costs on the case.  I mean, there's a myriad of reasons why

08:26  **24**    or how it could be exculpatory.  I agree.

08:26  **25**    Meanwhile, Your Honor, time and time again we

08:26  **1**  complained that all Brady and Giglio information had not

08:26  **2**  been produced.  And time and time again we were told that

08:26  **3**  all of it had been produced.  I'm not going to go through

08:26  **4**  each and every time we have put it in the papers, but the

08:26  **5**  representations were made to us and this Court repeatedly

08:26  **6**  that all Brady and Giglio information had been produced.

08:26  **7**          In fact, I think on one call, a conference that we

08:26  **8**  had sometime in 2020, Mr. Sagel made the representation

08:26  **9**  there was no Brady.  There was no exculpatory information in

08:27  **10**  the entire case, something that I found to be rather

08:27  **11**  remarkable in light of how much discovery had already been

08:27  **12**  produced in the case.

08:27  **13**          But in any event, after the passage of the Due

08:27  **14**  Process Protection Act, we moved for an order before this

08:27  **15**  Court, and we asked the Court to issue an order directing

08:27  **16**  the government to produce all information required under the

08:27  **17**  DPPA.

08:27  **18**          On January 25th, this Court issued an order at

08:27  **19**  Docket 408, and this order directed the government to

08:27  **20**  produce to the defendant in a timely manner all information

08:28  **21**  or evidence known to the government that is either, one,

08:28  **22**  relevant to the defendant's guilt or punishment; or, two,

08:28  **23**  favorable to the defendant on the issue of guilt or

08:28  **24**  punishment.  The order went on to talk about the

08:28  **25**  consequences for noncompliance.

08:28 **1**      In the event there was any question in the

08:28 **2**  government's mind as to whether the Tabs data and all

08:28 **3**  QuickBooks data needed to be produced, this order made it

08:28 **4**  clear as to what had to be produced, crystal clear.  No Tabs

08:28 **5**  data was produced following this order.

08:29 **6**      The defense subsequently moved for contempt.  One

08:29 **7**  of the items that the defense claimed had not been produced

08:29 **8**  in response to the order was all financial data relating to

08:29 **9**  the expenses of the clients.  The government claimed

08:29 **10**  everything had been produced and that we didn't know what we

08:29 **11**  were talking about.  I'm paraphrasing.

08:29 **12**      We continued to complain that we were missing

08:29 **13**  information, including up through the beginning of the

08:29 **14**  trial.  I believe our status report immediately -- final

08:29 **15**  status report referenced our concerns in this regard.

08:29 **16**      Then in the middle of trial, it was established

08:30 **17**  through cross-examination that the Tabs data was an integral

08:30 **18**  part of proving what was owed to the client.  And it's

08:30 **19**  important to recognize in my view, Your Honor, how this came

08:30 **20**  about.

08:30 **21**      The government admitted Exhibits 48 and 174.

08:30 **22**  Exhibit 48 is the cost listing for Johnson, and 174 is the

08:30 **23**  cost listing for Barela, at least interim statements.

08:30 **24**      THE COURT:  Draft statements.

08:30 **25**      MR. AVENATTI:  Draft statements.  Correct, Your

08:30 **1**   Honor.

08:30 **2**          The defense did not admit those.  The defense did

08:30 **3**   not seek to use them.  It was the government that

08:30 **4**   interjected this issue of the costs and expenses first into

08:30 **5**   the case.

08:30 **6**          THE COURT:  Well, whether they did it or not,

08:30 **7**   weren't you entitled to bring that up either in

08:31 **8**   cross-examination or in your case-in-chief if you decided to

08:31 **9**   put one on?

08:31 **10**          MR. AVENATTI:  Absolutely, Your Honor, we would

08:31 **11**   have been entitled to do that, and we would have been

08:31 **12**   entitled to use the data.  The only point that I make is

08:31 **13**   that it was the government that first went down this road of

08:31 **14**   putting this cost and expense data before the jury.  So

08:31 **15**   there can be little question at this point that the

08:31 **16**   government considered it relevant and material.  That's why

08:31 **17**   they used it.

08:31 **18**          Now, they then proceeded to use 48 and 174 with a

08:31 **19**   number of witnesses.  And we attached it as Exhibit A to our

08:31 **20**   filing last night.  I think there's five or maybe six

08:31 **21**   witnesses at minimum that they used these two exhibits with,

08:31 **22**   including Special Agent Karlous, Ms. Regnier, Mr. Barela,

08:31 **23**   Mr. Johnson, Mr. Arden.  I think that may be all five.  I'm

08:31 **24**   not certain.

08:31 **25**          We again demanded the production of the data on

08:32 **1** August 12th at the latest. Nothing happened for eight days,

08:32 **2** literally nothing. The government made no effort to find

08:32 **3** out if this data existed and, if so, where it was or how it

08:32 **4** could be produced to the defense.

08:32 **5** It was not until last Friday when the Court issued

08:32 **6** its directive -- its clear directive -- that we started to

08:32 **7** get traction and actually get the data produced. It was

08:32 **8** finally produced to the defense yesterday as outlined in the

08:32 **9** status report.

08:32 **10** We explained to the Court the very limited review

08:32 **11** that we have been able to do in the last I guess it's 16

08:32 **12** hours or so. That review continues. There is a lot of

08:32 **13** information to go through, a lot of Tabs information to go

08:32 **14** through and a lot of QuickBooks information to go through.

08:33 **15** We cited the Court to the Bundy case from the

08:33 **16** Ninth Circuit. I'm sure Your Honor has read the case. For

08:33 **17** the court reporter, it's at 968 F.3d 1019 (Ninth Circuit

08:33 **18** 2020).

08:33 **19** There are many parallels, Your Honor, between this

08:33 **20** case and the Bundy case. But what the Ninth Circuit made

08:33 **21** clear in Bundy is the materiality standard is a

08:33 **22** post-conviction appellate standard. Now, even under that

08:33 **23** standard, I think this information qualifies easily. But in

08:33 **24** any event, we don't have to meet that standard. The

08:33 **25** question is was this information relevant? It most

08:34 **1** certainly was.  And the question is was it favorable?  It

08:34 **2** most certainly was.

08:34 **3** Bundy makes clear -- and I will cite Olson and

08:34 **4** Price as well, two other Ninth Circuit cases -- that indeed

08:34 **5** even if information is not favorable, if it would cause the

08:34 **6** defense to change the trial strategy or to use a different

08:34 **7** strategy or to abandon a strategy even, that it is required

08:34 **8** to be produced pursuant to Rule 16 and Brady and Giglio.

08:34 **9** There is no question, Your Honor, this data should

08:34 **10** have been produced pursuant to Brady and Giglio.  The

08:34 **11** prejudice is substantial as outlined in our report of last

08:34 **12** night.

08:34 **13** THE COURT:  I think you have very credibly

08:34 **14** outlined what use you could have made of that information.

08:35 **15** MR. AVENATTI:  Then at this point I will not go

08:35 **16** further except to say, Your Honor, we still don't know the

08:35 **17** full extent of the prejudice because we haven't been able to

08:35 **18** review all of the data.

08:35 **19** There is little question, Your Honor, we cannot

08:35 **20** proceed with this trial as it stands.  We need time to

08:35 **21** review this data.  It changes the entire approach of the

08:35 **22** case from the defense perspective.  We would have to recall

08:35 **23** at least five, if not seven, witnesses.  The government's

08:35 **24** expert would have to be struck.

08:35 **25** Again, I'm not going to get into how prejudicial

08:35 **1** this has been. It is beyond substantial.

08:35 **2** THE COURT: You're not suggesting that this trial

08:35 **3** could proceed in some fashion?

08:35 **4** MR. AVENATTI: No, Your Honor, I do not believe

08:36 **5** that it is possible for this trial to proceed in this

08:36 **6** fashion for many, many reasons.

08:36 **7** This information should have been produced two

08:36 **8** years ago. It was not. There are exhibits now in the case

08:36 **9** that are demonstrably false. There are opinions that have

08:36 **10** been put before the jury that are false, that are not

08:36 **11** accurate, namely, because the government never had the

08:36 **12** expert look at any of the Tabs data.

08:36 **13** The expert, despite claiming to be an expert,

08:36 **14** never asked for the actual Tabs data, never asked for the

08:36 **15** cost information, which is frankly shocking.

08:36 **16** For each of these reasons, Your Honor, I believe

08:36 **17** that the motion for relief requested in the motion at 706

08:36 **18** should be granted.

08:37 **19** Now, Brady speaks of the fact that whether the

08:37 **20** government acted in good faith or bad faith is really not a

08:37 **21** consideration when the Court decides motions such as 706.

08:37 **22** I'm not going to spend time casting aspersions on the

08:37 **23** government, et cetera, because I don't think it's

08:37 **24** relevant --

08:37 **25** THE COURT: I agree.

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

| | |
|---|---|
| 08:37 | **1** |
| 08:37 | **2** |
| 08:37 | **3** |
| 08:37 | **4** |
| 08:37 | **5** |
| 08:37 | **6** |
| 08:38 | **7** |

08:37   **1**       MR. AVENATTI: -- frankly. What I will say is

08:37   **2**  this. This was not an isolated, one-time failure. This was

08:37   **3**  not one oversight that occurred in the heat of trial or in

08:37   **4**  the heat of preparing for trial. There was a repeated

08:37   **5**  failure to comply with basic constitutional requirements and

08:37   **6**  the basic requirements of Bundy, Price, and Olson, and

08:38   **7**  others by the government over a period of years.

08:38   **8**       THE COURT: Well, I want to focus on the Tabs. As

08:38   **9**  you recall, you've made a number of motions for a mistrial

08:38  **10**  with respect to allegedly missing documents. On a number of

08:38  **11**  those, I found that the claim wasn't substantiated when the

08:38  **12**  government made a full showing. So I prefer to concentrate

08:38  **13**  on Tabs and QuickBooks.

08:38  **14**       MR. AVENATTI: Your Honor, I didn't mean to

08:38  **15**  suggest otherwise. When I was speaking of a repeated

08:38  **16**  failure, I'm speaking strictly in the context of Tabs and

08:38  **17**  QuickBooks. I'm not dealing with the other issues that we

08:38  **18**  have talked about, Jencks and things of that nature.

08:38  **19**       As to the interview notes that I placed before the

08:38  **20**  Court, Your Honor is clearly familiar with them. You know

08:38  **21**  them by exhibit numbers. They demonstrate how long this

08:38  **22**  problem has gone on and the repeated failures of the

08:39  **23**  government.

08:39  **24**       I think for all of those reasons, Your Honor, I

08:39  **25**  would ask that the Court grant defendant's motion at 706.

08:39    1    Unless the Court has any further questions --

08:39    2              THE COURT:  No.  Thank you.

08:39    3              Mr. Sagel, wouldn't you agree that the financial

08:39    4    data goes to the heart of this case?

08:39    5              MR. SAGEL:  Partially, and I say that in the

08:39    6    sense --

08:39    7              THE COURT:  Well, if we look to the way you've

08:39    8    summed up the case with Mr. Drum, if we go to Exhibits 430

08:39    9    to 457, and 457 especially, he has analyzed the financial

08:39   10    data available to him to establish the losses on the part of

08:39   11    each of the client victims, and that's almost pure financial

08:40   12    data.

08:40   13              MR. SAGEL:  That's why I say partially.  I will

08:40   14    start with that in the sense of with three of the victims,

08:40   15    while he analyzes and does charts showing what probably

08:40   16    based on the finances should have been paid to them and what

08:40   17    they're entitled to and so forth, part of the analysis is

08:40   18    zero dollars of their settlement money goes to them, as well

08:40   19    as $4 million of Ms. Phan's money does not go to her.

08:40   20              And before anything ever happens with determining

08:40   21    the costs, expenses, and so forth --

08:40   22              THE COURT:  Are you suggesting I grant relief with

08:40   23    respect to the claims of some victims but not as to others,

08:40   24    for example, Ms. Phan?

08:40   25              MR. SAGEL:  No, Your Honor.  And I can go through

08:40 **1** some of the finances, too, with regards to what in a short

08:40 **2** period of time we were able to find, which I don't believe

08:40 **3** substantiates the claims that were made both last night and

08:41 **4** today. I think there's other issues, too, that I would like

08:41 **5** to address. But when it comes to the finances of the costs

08:41 **6** and the expenses, it's to put in perspective to the jury

08:41 **7** what was going on, how the defendant was doing it, and that

08:41 **8** these people were entitled to money.

08:41 **9** THE COURT: But if that perspective were incorrect

08:41 **10** because not all of the data was taken into account, wouldn't

08:41 **11** that potentially provide a basis to question everything

08:41 **12** Mr. Drum did, to question across the board the accuracy of

08:41 **13** the government's financial presentation?

08:41 **14** MR. SAGEL: To question, yes, but I guess I would

08:41 **15** point to several things that --

08:41 **16** THE COURT: Well, doesn't the defendant have a

08:41 **17** right to examination, to question the financial analysis

08:41 **18** made by the government?

08:41 **19** MR. SAGEL: He does, Your Honor, but I think we

08:41 **20** are skipping several steps in that process, including what

08:41 **21** the finances even show. I would like to address that,

08:41 **22** because what he's saying in broadbrush wasn't available to

08:42 **23** him is not accurate.

08:42 **24** From a very quick review of what was in Tabs for

08:42 **25** these clients as of the last reports, they support exactly

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

08:42  1   what Mr. Drum testified to.  And even more so --

08:42  2        THE COURT:  Support in a generalized fashion or

08:42  3   support for the analysis he actually makes?  If the costs

08:42  4   that he calculated were incorrect --

08:42  5        MR. SAGEL:  They were not.  They were not, and I

08:42  6   have it right here, Your Honor, and I can walk through each

08:42  7   and every one of them.

08:42  8        THE COURT:  I think the defendant was entitled,

08:42  9   even if they are in fact correct -- if there is evidence out

08:42  10  there that would have allowed the defendant to make a

08:42  11  challenge under any theory, I think the defendant was

08:42  12  entitled to have the data to do that, even if in some other

08:42  13  fashion you can show prima facie that it was correct.  In

08:42  14  other words, I think he is entitled to make non-winning

08:43  15  challenges as well as winning challenges.  The point is he

08:43  16  is entitled to that data to make the challenges.

08:43  17       MR. SAGEL:  So let me go backwards to that first.

08:43  18  The defendant on two occasions that he took advantage of --

08:43  19  and on more occasions, as many as he wanted, had access to

08:43  20  the virtual servers.

08:43  21       THE COURT:  Sir, that doesn't convince me.  It's

08:43  22  the obligation of the government to produce Brady, Giglio,

08:43  23  et cetera.  He is entitled to sit back and wait for you to

08:43  24  serve it up on a platter.  Agreed?

08:43  25       MR. SAGEL:  If it's in our possession, yes.

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

08:43 **1**      THE COURT:  And for this discussion -- go ahead.

08:43 **2**      MR. SAGEL:  That's the part when he talks about

08:43 **3** what Brady says or what he talks about Bundy says or Price

08:43 **4** or Olson, any of the cases, is that it skips past what's in

08:44 **5** our possession.

08:44 **6**      We cannot -- and I can focus on various different

08:44 **7** times in the case, including when he starts talking about

08:44 **8** August 12th to the present.  We as the Prosecution Team do

08:44 **9** not have authority to go into the server that the search

08:44 **10** warrants -- we are beholden on what comes to us in the

08:44 **11** process, what's in our possession.

08:44 **12**      At the earliest time --

08:44 **13**      THE COURT:  Well, I think you've made a good-faith

08:44 **14** showing that the Prosecution Team produced all of the Tabs

08:44 **15** data that it had at Docket No. 737 and the attachment.  I

08:44 **16** believe you put before the Court and the defendant the

08:44 **17** totality of the Tabs data that the Prosecution Team had.

08:44 **18**      MR. SAGEL:  Yes, Your Honor.  And also to

08:44 **19** basically put before the Court and the defendant over -- if

08:44 **20** I'm doing my math right -- over a year ago of what was in

08:45 **21** our possession with regard to costs and expenses,

08:45 **22** including --

08:45 **23**      THE COURT:  Your possession, meaning the

08:45 **24** Prosecution Team?

08:45 **25**      MR. SAGEL:  The Prosecution Team's possession.  If

08:45 **1**  there was a question that there was something was missing --
08:45 **2**  this was even discussed at the specific hearing where Your
08:45 **3**  Honor said if there is something specific, you file a Motion
08:45 **4**  to Compel.
08:45 **5**       Without us having access to the databases
08:45 **6**  themselves and without having access to the servers, we are
08:45 **7**  in a position where this is what we have.  We have provided
08:45 **8**  everything we have.  This is what we have seen.  If there is
08:45 **9**  something missing, there is a mechanism for the defendant to
08:45 **10** say this is pertinent information, and I need it.
08:45 **11**      THE COURT:  Don't the events of the last 72 hours
08:45 **12** suggest that there was a mechanism to determine whether the
08:45 **13** Privilege Review Team in its capture of the subpoenaed
08:45 **14** documents had Tabs data?
08:46 **15**      MR. SAGEL:  By whom?
08:46 **16**      THE COURT:  By the Prosecution Team.  What do you
08:46 **17** make of Mr. Andre's statement in his letter of May 4th,
08:46 **18** 2019:  "In connection with the government's investigation,
08:46 **19** the Court-appointed Receiver for EA LLP consented to IRS-CI
08:46 **20** creating a forensic image of the six digital devices that
08:46 **21** comprise the EA LLP server, which were being stored by
08:46 **22** MixinIT, a company in Orange County that stored and managed
08:46 **23** computer servers.  After creating a forensic image of the EA
08:46 **24** LLP server, the EA LLP server was returned to the EA
08:46 **25** Receiver.  The government has since obtained a warrant to

08:46  **1**  search the forensic copy of the EA LLP server for relevant

08:46  **2**  evidence.  We will produce any relevant evidence seized from

08:46  **3**  the EA LLP server once the government completes the review

08:46  **4**  protocols set forth in the search warrant."

08:47  **5**       It sounds like this is the same forensic copy I

08:47  **6**  think we've been talking about here.

08:47  **7**       MR. SAGEL:  Correct.  So to respond to both that

08:47  **8**  statement and --

08:47  **9**       THE COURT:  It seems that Mr. Andre was

08:47  **10**  acknowledging an obligation to go beyond what you had and to

08:47  **11**  investigate this forensic copy.

08:47  **12**       MR. SAGEL:  I don't know that I read it that way.

08:47  **13**  "We will produce any relevant evidence seized once the

08:47  **14**  government completes the review protocols set forth in the

08:47  **15**  search warrant."  The review protocols does it in a way

08:47  **16**  where it provides it to him.

08:47  **17**       I would also point out, Your Honor, if you turn to

08:47  **18**  the following page of this same section which discusses the

08:48  **19**  Eagan Avenatti servers, the last paragraph says:  "We would

08:48  **20**  also be glad to discuss alternative procedures to ensure

08:48  **21**  that you are able to access any information on the EA LLP

08:48  **22**  server that you believe may be relevant to your client's

08:48  **23**  defense, such as providing you and your client an

08:48  **24**  opportunity to review the forensic image of the EA LLP

08:48  **25**  server at the IRS-CI's Office."

08:48  **1**    THE COURT:  Would access free you of your

08:48  **2**  obligation under Brady to produce Brady material?  Does

08:48  **3**  access free you of your Brady obligation to produce Brady

08:48  **4**  material?

08:48  **5**    MR. SAGEL:  Under this circumstance, I have to

08:48  **6**  believe yes.  And the reason why is because if it's not in

08:49  **7**  our possession, we -- I don't have -- I have a Brady

08:49  **8**  obligation to material that I am in the possession of that I

08:49  **9**  can provide.  I'm not possessing --

08:49  **10**    THE COURT:  Well, suppose for whatever reason the

08:49  **11**  Taint Team, the Privilege Review Team, acting in absolute

08:49  **12**  good faith just misses a substantial volume of relevant data

08:49  **13**  that should have been passed over to the Prosecution Team.

08:49  **14**  Don't the sins of one part of the government, meaning the

08:49  **15**  Taint Team if my facts are accurate, fall upon the

08:49  **16**  Prosecution Team in terms of the Brady obligation?

08:49  **17**    MR. SAGEL:  If it did not exist at all, I would

08:49  **18**  follow your analogy.

08:49  **19**    THE COURT:  But hasn't it been established that

08:49  **20**  there does exist relevant Tabs material and potentially

08:49  **21**  QuickBooks materials that the Privilege Review Team had?

08:50  **22**    MR. SAGEL:  I'm not sure I know the answer to that

08:50  **23**  fully, but I don't believe that's correct.

08:50  **24**    THE COURT:  Well, I believe the representations

08:50  **25**  Mr. Avenatti has made from an initial review citing the

08:50   **1**    specific pieces of evidence undermine that position.

08:50   **2**        MR. SAGEL: Well, to the specific -- that's why I

08:50   **3**    would like to get into some of the specific -- I'm not sure

08:50   **4**    that there are specifics, and I have some examples of

08:50   **5**    specifics that that does undermine.

08:50   **6**        May I proceed with that?

08:50   **7**        THE COURT: Please.

08:50   **8**        MR. SAGEL: With regards to Exhibit 48, Your

08:50   **9**    Honor, defendant references that he believes -- we put this

08:50   **10**    in through multiple witnesses, and it's demonstrably false.

08:50   **11**        Let me start with the fact that I think several of

08:50   **12**    the witnesses -- we never were saying it was accurate. It

08:50   **13**    was the costs that he utilized to withdraw checks in the

08:51   **14**    same amount. Whether it was interim, whether it was -- this

08:51   **15**    was what he was e-mailed and he utilized to withdraw money.

08:51   **16**        THE COURT: Well, if he used inaccurate input, at

08:51   **17**    a minimum isn't he -- you're saying never mind whether it's

08:51   **18**    accurate or not. This is what he relied upon. Fine. But

08:51   **19**    at a minimum would he not be subject to cross-examination if

08:51   **20**    it were shown that that data was inaccurate or outdated; or,

08:51   **21**    alternatively, under an Daubert analysis, it wasn't

08:51   **22**    reliable?

08:51   **23**        MR. SAGEL: You're talking about Mr. Drum now?

08:51   **24**        THE COURT: Right.

08:51   **25**        MR. SAGEL: Correct. Mr. Drum specifically said

08:51   **1**    and testified to that his analysis is based on the costs and

08:51   **2**    expenses of the material up to February 5th after the

08:51   **3**    settlement money came in based on all the records that were

08:51   **4**    there at the time.  He was cross-examined on whether or not

08:52   **5**    he included -- everything that was included after that date.

08:52   **6**    There was extensive cross-examination.

08:52   **7**         If you look -- and I can show you the Tabs reports

08:52   **8**    that are the, quote/unquote "most current," which still show

08:52   **9**    drafts where the defendant refers to what was done.  They

08:52  **10**    are all loan payments and payments to Mr. Johnson from four

08:52  **11**    months and later after his settlement.

08:52  **12**         There are no costs and expenses to the case.  They

08:52  **13**    are payments for his living expenses, his $1,900 payments to

08:52  **14**    him, and FedEx expenses to send him his checks.  There are

08:52  **15**    no costs and expenses for the case.

08:52  **16**         And even the $27,000 or $37,000 he dropped in a

08:52  **17**    footnote is even identified as basically the living expense

08:52  **18**    or medical expense to his new living center.  I would have

08:52  **19**    to look it up, but it's seven months after the settlement

08:53  **20**    when he moves into his new housing facility, Sunrise Living.

08:53  **21**    These are not costs and expenses of the case.  These are

08:53  **22**    what he's paying Mr. Johnson after he lied to him.

08:53  **23**         There are no -- and I can provide Your Honor the

08:53  **24**    Tabs data for Mr. Johnson.  I can do it for Mr. Barela, and

08:53  **25**    I can do it for Ms. Gardner.  I would like to do that so

08:53 **1** that Your Honor has the full --

08:53 **2** THE COURT: Wait a wait. There is no Tabs data

08:53 **3** for Ms. Gardner in the record. You didn't offer any

08:53 **4** support --

08:53 **5** MR. SAGEL: We didn't have it. I agree. And what

08:53 **6** I'm saying is what he's finding --

08:53 **7** THE COURT: Well, isn't that even more egregious

08:53 **8** if it's out there --

08:53 **9** MR. SAGEL: No, because --

08:53 **10** THE COURT: Not if it's perhaps outdated or

08:53 **11** mistaken but no Tabs data? And there's no question there

08:53 **12** were costs for Ms. Gardner.

08:53 **13** MR. SAGEL: We used QuickBooks for her, and we

08:53 **14** used e-mails from Filippo Marchino who said he paid all the

08:53 **15** expenses in the case. And the Tabs data support is even

08:53 **16** less than what we gave him credit for. But the expenses we

08:53 **17** gave him credit for under QuickBooks and Filippo Marchino or

08:54 **18** whatever are greater than what's in Tabs.

08:54 **19** With Johnson, there is nothing. I can walk

08:54 **20** through each and every one of them. There is nothing after

08:54 **21** February 3rd or 4th, which was before 2015 that relates to

08:54 **22** the case. They are all payments to Mr. Johnson's for his

08:54 **23** living expenses, which are even itemized as such in his

08:54 **24** data.

08:54 **25** The Tabs data for the years of 2012 or '11 or '10

08:54 **1** or whatever the start date to February 4th, 2015, are

08:54 **2** identical.  The only difference -- and when he talks about

08:54 **3** these new transactions, they are paying the loan payments

08:54 **4** and the living expenses for Mr. Johnson.

08:54 **5**　　　　 With regards to Mr. Barela, the only difference --

08:54 **6** and I can show you this, too, and I have them printed out --

08:54 **7** the only difference when you look at the two exhibits that

08:54 **8** the government introduced at trial, 174 and 193, 174 is the

08:55 **9** draft Barela bills as of 12/19/2017.

08:55 **10**　　　　 Exhibit 193 is Ms. Regnier's e-mail, which she

08:55 **11** says are the total costs of the Barela matter to take out a

08:55 **12** check for $111,113.22.  The updated Barela Tabs matches to

08:55 **13** the penny 193, $111,113.22, exactly what Ms. Regnier

08:55 **14** testified to, that the reason for the difference was the

08:55 **15** costs that came through in those several weeks.

08:55 **16**　　　　 And the Tabs data supports exactly what was

08:55 **17** introduced at trial.  There is nothing in this data that

08:55 **18** shows prejudice to the defendant.  There is nothing in this

08:55 **19** data that shows anything different at this trial, especially

08:56 **20** as it relates to Mr. Drum and it relates Mr. Johnson.  He

08:56 **21** even said (a) what his analysis was based on up through when

08:56 **22** the settlement comes because that's when the costs would be

08:56 **23** there.

08:56 **24**　　　　 He was cross-examined extensively as to whether or

08:56 **25** not there could have been costs after the case settled that

08:56  **1**  he didn't include.  He said that's correct if it existed.

08:56  **2**  There is nothing to show it existed, Your Honor.

08:56  **3**       And we hear and we see broad statements about what

08:56  **4**  this Tabs data is and how concerning they are and so forth.

08:56  **5**  But the reason he did not show you the -- and I can provide

08:56  **6**  them for the record -- is because they matched exactly what

08:56  **7**  was presented at trial.

08:56  **8**       When it comes to Geoffrey Johnson, the new stuff

08:56  **9**  doesn't change anything at trial.  It actually supports

08:56  **10**  what's already been introduced at trial.

08:56  **11**       Similarly, there was no Tabs data for Michelle

08:57  **12**  Phan and Long Tran for the very reasons that the evidence at

08:57  **13**  trial has also established.

08:57  **14**       THE COURT:  That would delay their contracts a

08:57  **15**  little bit.

08:57  **16**       MR. SAGEL:  Correct.  And the only other data in

08:57  **17**  Tabs that he has referenced repeatedly and that he

08:57  **18**  references how there are all these other transactions, some

08:57  **19**  of his lawyers kept time sheets, but these weren't

08:57  **20**  contingency cases.  So the time sheets are irrelevant.  And

08:57  **21**  when you look at even some of the Tabs sheets, for example,

08:57  **22**  with Mr. Barela, they will have John Arden's time and then

08:57  **23**  how much he would charge if there was an hourly case.  But

08:57  **24**  then it's not there because it wasn't an hourly case.  So

08:57  **25**  they only used the expenses, costs, and so forth.

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

08:57 **1**     He references at least one client who he did other

08:57 **2** work for. You now have Tabs data to see the work that was

08:57 **3** done on the other case. That other case was this Cafe

08:58 **4** Perche case with Mr. Barela. It was nine and ten months

08:58 **5** after Barela's settlement money came in. So it's hard to

08:58 **6** see how that relates to why he didn't get his money nine and

08:58 **7** ten months earlier for $944. So all these other costs were

08:58 **8** from another case which was ten months after he should have

08:58 **9** provided Mr. Barela his money, $900.

08:58 **10**     The numbers and the Tabs records do not support

08:58 **11** what is being told to the Court. I fully appreciate what

08:58 **12** Your Honor is saying. I'm not doubting any of the concerns

08:58 **13** Your Honor has. And I will say to you that every time along

08:58 **14** the way --

08:58 **15**     THE COURT: So your position is my concerns are

08:58 **16** baseless?

08:58 **17**     MR. SAGEL: No, I'm not saying that, Your Honor.

08:59 **18** I am saying that with a review of what Your Honor has taken

08:59 **19** a very cautious approach to in allowing him to gain access

08:59 **20** to these reports -- with a review of those records, we can

08:59 **21** now see why he never asked for these things for two years,

08:59 **22** because they don't support any further costs and expenses on

08:59 **23** these cases, and they don't support any reduction.

08:59 **24**     And for the same reason that we put in the

08:59 **25** recommended jury instruction the dollar amounts, we don't

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

08:59 **1**    have to prove that for wire fraud.  What we have to prove is

08:59 **2**    that the defendant obtained money and property by false

08:59 **3**    statements, representations, and material omissions.  That

09:00 **4**    happened in each and every one of these cases.  Whether he

09:00 **5**    was entitled at the end to $1,810,000, $1,910,000, or a

09:00 **6**    number in between, he has had the data for that.

09:00 **7**           His request for Brady and which we've responded

09:00 **8**    every time -- everything in our possession we've provided.

09:00 **9**    If we are missing something, please let us know.  We have

09:00 **10**   even provided the example.  If there was data, we would

09:00 **11**   extract QuickBooks for him.  He has had QuickBooks since

09:00 **12**   2019.

09:00 **13**          If there was something from he thought from the

09:00 **14**   electronic files were missing, he had two years to ask us

09:00 **15**   what we didn't provide which he had access to.  Again, what

09:00 **16**   we don't know as we sit here is he was produced I think a

09:00 **17**   million more files than we were, or whatever the number was,

09:00 **18**   400,000.  We will never know what's in that delta either.

09:01 **19**   I'm not saying it exists, or I'm assuming not because it

09:01 **20**   hasn't been said, but we don't have access to that.  He has

09:01 **21**   had access to this information, and everything that's in our

09:01 **22**   possession has been provided.

09:01 **23**          To use just one example, to compare this to Bundy,

09:01 **24**   which he did again here today -- in Bundy, these were

09:01 **25**   videotapes that were in the government's possession at all

09:01  **1**   times, and they didn't turn it over.  It's night and day to

09:01  **2**   what we're talking about here.

09:01  **3**          The Tabs data -- all we have were the printout

09:01  **4**   sheets that came through the process.  We provided them to

09:01  **5**   him and let him know this is what we have for costs and

09:01  **6**   expenses, along with QuickBooks.

09:01  **7**          In March of 2020 when we did the expert disclosure

09:01  **8**   on John Drum, this is what he's relying upon.  These are the

09:01  **9**   documents that we have that we provided that he is relying

09:01  **10**  upon.  As to all these things, the government has been

09:02  **11**  extremely transparent of what we have, what we're using, and

09:02  **12**  what we've provided, not just to the defendant but by June

09:02  **13**  of 2020 to the Court.

09:02  **14**         At no point were we hiding anything that we didn't

09:02  **15**  believe -- and as it relates to the Tabs data, which

09:02  **16**  Ms. Regnier testified to, QuickBooks versus Tabs.

09:02  **17**  QuickBooks was tied to the bank records when it was paid.

09:02  **18**  Tabs was not.

09:02  **19**         **And you have seen that with regards to**

09:02  **20**  **Mr. Johnson, they double counted a lot of things because**

09:02  **21**  **they actually didn't pay.  It was how they kept track of**

09:02  **22**  **costs but didn't actually pay the costs.**

09:02  **23**         So there's an extra level of why he could also

09:02  **24**  scrutinize these records, which maybe would not change

09:02  **25**  anything because they aren't tied automatically to bank

09:02  **1**   records.

09:02  **2**            But that's I think tertiary of what was beyond the

09:02  **3**   issue.  I do believe -- one second, Your Honor.

09:03  **4**            (Government counsel conferring)

09:03  **5**            MR. SAGEL:  I will take a cue from the Court, but

09:03  **6**   I obviously have printouts with regards to Johnson, Barela,

09:03  **7**   and Gardner.  I would like to either provide them to the

09:03  **8**   Court and go over it with Your Honor now or be afforded the

09:03  **9**   opportunity to lodge it with the Court so that Your Honor

09:03  **10**  can see what is there to make the relevant and proper

09:04  **11**  inquiry to show the analysis that is needed under Brady, so

09:04  **12**  that when making the Brady analysis or the Brady test for

09:04  **13**  prejudice of what would be useful to the defendant, you

09:04  **14**  would be able to see with this that nothing in this changes

09:04  **15**  what did happen and what was provided to the defendant and

09:04  **16**  what he could have used, whether it be cross-examination of

09:04  **17**  Drum, whether it be for use with Ms. Regnier, which he did.

09:04  **18**           **He cross-examined her that you can't know all the**

09:04  **19**  **right things unless you have both.  He fully did that.  He**

09:04  **20**  **did that with several witnesses.  He wants to call more for**

09:04  **21**  **that very reason.**

09:04  **22**           When you really do the prejudice analysis under

09:04  **23**  the Brady prong -- again, there are other parts to the

09:05  **24**  equation that I would not agree have been established

09:05  **25**  either.  But when you look at these -- that's why I am

09:05 **1** asking the Court if you want me to go over some of them in

09:05 **2** examples now or to lodge with the Court --

09:05 **3** THE COURT: I don't think that's necessary. If

09:05 **4** you want to file anything in addition, that's fine. I

09:05 **5** believe it's my intention to hear Mr. Avenatti in rebuttal

09:05 **6** and rule.

09:05 **7** MR. SAGEL: If I could just cover a couple of

09:05 **8** other things very quickly or give me one second to make

09:05 **9** sure.

09:05 **10** (Pause in proceedings)

09:05 **11** MR. SAGEL: Your Honor, I've obviously been before

09:05 **12** Your Honor for a long time, so I know that you are not

09:05 **13** sitting there without knowing what I'm going to say. But I

09:05 **14** feel the need for the record that I want to make a couple of

09:05 **15** comments.

09:05 **16** With regards to Your Honor on two occasions

09:06 **17** denying the request for full access to the server -- and I

09:06 **18** think the representation was it was only because of the

09:06 **19** government's representation -- I don't think that accurately

09:06 **20** reflects what happened in both 2019 and 2020.

09:06 **21** Obviously we represented that anything that was

09:06 **22** Brady or Giglio in our possession we would turn over, as we

09:06 **23** did. But the servers didn't belong to him. Your Honor gave

09:06 **24** him the -- mentioned on multiple occasions his availability

09:06 **25** and access to them, and he either at one point took no

```
09:06   1   advantage of it and the other time saying what he chose on
09:06   2   his own to do.  He still had the mechanism.
09:06   3        The comments about how Tabs could only be
09:06   4   exculpatory, again, this is a statement that's made without
09:06   5   referencing the Tabs because they are not exculpatory.  If
09:06   6   you want to say they could have been used and would have
09:06   7   been used, fine.  The best case scenario is at least to look
09:07   8   for it, but they don't change the analysis, especially with
09:07   9   regards to what the witnesses specifically testified to.
09:07  10        I'm going to conclude with two points, Your Honor.
09:07  11   Our special agent was at the virtual server last night for I
09:08  12   believe about two hours, maybe less.  And through the
09:08  13   virtual servers, he was able to find in there with no
09:08  14   experience with Tabs any and all of the Barela items, the
09:08  15   Johnson items, the Gardner items, and the lack thereof.  It
09:08  16   did not take very long at all to find each and every one of
09:08  17   them specific to the client to be able to print out any and
09:08  18   all of the related documents that show what they show.
09:08  19        It is not a voluminous, time-consuming process.
09:08  20   And when we mention the 6,000 files or whatever the numbers
09:08  21   are, that's the entirety of the law firm.  That's not
09:08  22   Johnson, Barela, Gardner, Phan, and Tran.  It will not
09:08  23   require a review of 6,000 client files to see what is
09:09  24   relevant for the specific clients.
09:09  25        With regards to -- one second, Your Honor.
```

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
| 09:09 | 1  | (Government counsel conferring)                              |
| 09:09 | 2  | MR. SAGEL:  And then my final thought, comment,              |
| 09:09 | 3  | position, is he says what would be of value to him, what     |
| 09:09 | 4  | would be -- I think his comment was it was the government    |
| 09:09 | 5  | who interjected costs and expenses in this case.  The        |
| 09:10 | 6  | government was the one who went down this road, and it's     |
| 09:10 | 7  | just now that he has to respond.                             |
| 09:10 | 8  | I will respond in this way, Your Honor, twofold.             |
| 09:10 | 9  | One, his opening statements were when he created the chart   |
| 09:10 | 10 | where he showed how you need to calculate the expenses.  He  |
| 09:10 | 11 | has known from -- his defense position from minute one in    |
| 09:10 | 12 | his opening statement is this is what is necessary.  This is |
| 09:10 | 13 | what is necessary to calculate the expenses, the total       |
| 09:10 | 14 | costs, and so forth.                                         |
| 09:10 | 15 | So this isn't anything new.  He has always known            |
| 09:10 | 16 | what it is and what was going on.  These exhibits and        |
| 09:10 | 17 | documents that have been in our possession have been         |
| 09:10 | 18 | provided to him well long before this.  So he still has that |
| 09:10 | 19 | opportunity.  He's still in his defense case-in-chief to do  |
| 09:10 | 20 | what he needs to do to utilize these, to call back John Drum |
| 09:11 | 21 | to continue his cross-examination, to continue to do         |
| 09:11 | 22 | whatever he needs to do.                                     |
| 09:11 | 23 | If Your Honor believes a short recess is necessary          |
| 09:11 | 24 | for that, Your Honor can grant him that.  But there is no    |
| 09:11 | 25 | reason why this jury who has heard the evidence for as long  |

09:11 **1** as they have heard the evidence with regards to what has

09:11 **2** been on the table from the inception -- that anything other

09:11 **3** than a short recess is needed to provide him the opportunity

09:11 **4** to do whatever he needs to do if Your Honor even believes a

09:11 **5** short recess is necessary.

09:11 **6**           Your Honor would need to have found an actual

09:11 **7** violation I believe to get to some of the remedies he is

09:11 **8** asking for.  I believe that the record does not show that at

09:11 **9** all including, as Your Honor has mentioned, whether or not,

09:11 **10** (a) it's in anybody's possession or anybody has acted in bad

09:11 **11** faith or --

09:11 **12**           THE COURT:  Bad faith isn't necessary.

09:12 **13**           MR. SAGEL:  It's not necessary --

09:12 **14**           THE COURT:  And I'm not prepared on this record to

09:12 **15** find that you were inaccurate when you said that the

09:12 **16** Prosecution Team has been transparent.  To the extent of its

09:12 **17** knowledge, I believe that's an accurate statement --

09:12 **18** accurate to the extent of its knowledge.

09:12 **19**           MR. SAGEL:  I guess where I respond to Your Honor

09:12 **20** in that regard is when you look at the cases that are being

09:12 **21** cited and what the remedies are being sought both by the

09:12 **22** defendant or in the cases he references, they are --

09:12 **23**           THE COURT:  I think I have your position.  Thank

09:12 **24** you.

09:12 **25**           MR. SAGEL:  Thank you, Your Honor.

09:12 **1**      THE COURT:  Mr. Fitzgerald, do you want to say

09:12 **2**  something?

09:12 **3**      MR. FITZGERALD:  Yes, I do, Your Honor.  The Court

09:12 **4**  is going to rule.  I need to have before it in the record

09:12 **5**  certain very important facts from the Privilege Review side

09:13 **6**  of the case.

09:13 **7**      The summary of that is to the extent that this

09:13 **8**  Court believes this is a classic Brady case, to the extent

09:13 **9**  that the Court believes that this case is controlled by

09:13 **10**  Bundy, with all due respect, the Court is wrong.  It is

09:13 **11**  wrong on the facts, and it is wrong on the law.

09:13 **12**      Let me start with the facts because that informs

09:13 **13**  why the Court is wrong on the law.  The facts are --

09:13 **14**      MR. AVENATTI:  Your Honor, I'm going to interpose

09:13 **15**  an objection because it's the government who has just

09:13 **16**  opposed the motion.  If Mr. Fitzgerald is here, I don't

09:13 **17**  understand the context of these statements.  This does not

09:13 **18**  sound like this is a factual discussion about what happened

09:13 **19**  with the Privilege Review Team.  Mr. Fitzgerald should not

09:14 **20**  be advocating for either side under these circumstances.

09:14 **21**      THE COURT:  I agree.  Mr. Fitzgerald is here to

09:14 **22**  bring the facts to the Court, not argue the law.

09:14 **23**      MR. FITZGERALD:  Very well, Your Honor.  I will

09:14 **24**  forego the legal part of it, but there are other facts as

09:14 **25**  opposed to just what has happened in the last 36 hours that

09:14  1    I think bear directly on the legal issues that are before

09:14  2    the Court.

09:14  3          THE COURT:  Please.

09:14  4          MR. FITZGERALD:  Those are the Privilege Review

09:14  5    Team really had two tasks.  The one that we have talked

09:14  6    about before -- for example, back in October with clawback

09:14  7    documents was taking the material that was found and

09:14  8    determining what the privilege consequences were and sending

09:14  9    it to the Prosecution Team or sending it to the defense.

09:15  10         But the other part that has turned out really in

09:15  11   the long-run I think to be more important and also more

09:15  12   difficult from my perspective is that we ended up on the

09:15  13   Privilege Review side being responsible for a major part of

09:15  14   the investigation of the case post-Indictment, namely,

09:15  15   making sure that the search warrants were conducted

09:15  16   correctly.

09:15  17         So we were responsible -- putting the digital

09:15  18   things aside, it would be as if we were then responsible to

09:15  19   send agents out to a house to seize things that were allowed

09:15  20   under the search warrant.  And it turned out in retrospect

09:15  21   that the things in the attic weren't seized.  And once they

09:16  22   weren't seized, then they are not part of the case.

09:16  23         **I don't mean that to make a distinction between**

09:16  24   **what the Prosecution Team knew and what I knew.  Obviously**

09:16  25   **for purposes of Brady, we can't rely on that distinction,**

09:16 **1**  and we are not doing that.  But we can rely on the

09:16 **2**  distinction between things that were seized and things that

09:16 **3**  were not seized.  The things that were seized under the

09:16 **4**  search warrant were the things that went through filters,

09:16 **5**  went to the relativity database, were presented to a team of

09:16 **6**  agents who worked very diligently and as hard as they could

09:16 **7**  to fulfill the Court's reasonable request about when the

09:16 **8**  case would be ready for trial.

09:17 **9**  And it was through those two processes, the

09:17 **10**  initial filtering and then the seizure by those agents, that

09:17 **11**  the case material, the things that for legal purposes were

09:17 **12**  in the possession of the government, that was created.

09:17 **13**  Now, again, was that search perfect?  I'm the

09:17 **14**  first to admit now that we know about the Tabs data, no, it

09:17 **15**  was not.  But that is still a difference between having

09:17 **16**  something that was in the government's possession and having

09:17 **17**  something that was not in the government's possession.

09:17 **18**  I may be treading on legal issues, but I would

09:17 **19**  respectfully submit based on this factual analysis there is

09:17 **20**  a legal argument on whether this Tabs data earlier was

09:17 **21**  something that had been, quote/unquote, "seized" and was

09:18 **22**  something that was therefore part of the case.

09:18 **23**  Now, could we have seized it?  Well, obviously

09:18 **24**  yes, because we have been able to do that now.  Should we

09:18 **25**  have seized it and should any consequences of the Privilege

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

09:18 **1**  Review Team's inability to find that or know about it or

09:18 **2**  seize it -- should that be held on behalf of the government?

09:18 **3**  That respectfully without getting into the merits is a

09:18 **4**  different argument than a pure Brady/Bundy argument.

09:18 **5**  In making that determination, the other fact that

09:18 **6**  needs to be in the record is pursuant to the Court's concern

09:18 **7**  in denying the defense full access to the servers in its

09:18 **8**  August 2019 order, it did order the Privilege Review Team to

09:18 **9**  make them available to the defense.

09:19 **10**  THE COURT:  I believe that was voluntary on behalf

09:19 **11**  of the government.  I don't believe I ordered that.  I

09:19 **12**  thought that was a government offer to have them come in and

09:19 **13**  sit down with the IRS rep.

09:19 **14**  MR. FITZGERALD:  I wasn't here when that happened,

09:19 **15**  but whether it was our suggestion as to a staff backlog that

09:19 **16**  they got what they needed or whether it was at the direction

09:19 **17**  or suggestion of the Court, certainly I thought we were

09:19 **18**  acting under the authority of the Court in making that

09:19 **19**  happen.

09:19 **20**  So in September 2019 and then in October 2019,

09:19 **21**  defense counsel and the defendant came to the IRS Offices,

09:19 **22**  and the same computer specialist who set up the system that

09:19 **23**  now exists in our office and which both parties reviewed

09:19 **24**  last night, a similar system, virtual system was set up in

09:20 **25**  September and October.  And based on those searches, certain

09:20 **1** files were requested by the defense.

09:20 **2** I went through and reviewed them. And based on

09:20 **3** the parameters of the search warrant -- because, again, this

09:20 **4** was something that was totally outside the search warrant.

09:20 **5** Obviously these weren't the protocols to let defense counsel

09:20 **6** and the defendant just grab things.

09:20 **7** So once they made their requests, I sat down with

09:20 **8** my then colleague, and we determined that some of them were

09:20 **9** valid, and some of them we thought under the search warrant

09:20 **10** were not valid. There were six of those. So we told them

09:20 **11** no, and we told them why. And for all the others, we turned

09:20 **12** them over to the defense.

09:21 **13** The first one on that list I now feel I can

09:21 **14** certainly say here in open court was a request for

09:21 **15** QuickBooks files, which we produced. And at that point

09:21 **16** after we produced it, we did not get another specific

09:21 **17** request from the defense.

09:21 **18** So when the Court focuses on the issue of who knew

09:21 **19** what and who is responsible for the Tabs data not being

09:21 **20** available to the defense, it needs to take into account that

09:21 **21** it was the defendant and his counsel who had seen this

09:21 **22** virtual system which is now at issue. They've seen it

09:21 **23** twice.

09:21 **24** The Prosecution Team has seen it zero. The

09:21 **25** Prosecution Team was not told about the files which were

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

09:22 **1** produced to the defense two years ago.  And I think both

09:22 **2** under the law and basic fairness that should really make a

09:22 **3** difference.

09:22 **4**            Thank you, Your Honor.

09:22 **5**            THE COURT:  Let me ask you this.  If all this new

09:22 **6** Tabs data and new QuickBooks data had come to light, if you

09:22 **7** were aware of that at the beginning, would you have reviewed

09:22 **8** those materials, made a determination whether anything in

09:22 **9** those newly identified materials were subject to the

09:22 **10** subpoena, and reviewed them and passed on what was

09:22 **11** appropriate to the Prosecution Team?

09:22 **12**            MR. FITZGERALD:  Yes, Your Honor.  A small

09:22 **13** correction.  The Court said subpoena.  Again, this was all

09:22 **14** through the search warrants.

09:22 **15**            THE COURT:  Oh, search warrant.  Yes, that's

09:22 **16** right.

09:22 **17**            MR. FITZGERALD:  We understand, Your Honor.

09:22 **18**            THE COURT:  But because those materials identified

09:22 **19** in the past few days weren't identified by the Privilege

09:23 **20** Review Team at the time, they have not yet been reviewed by

09:23 **21** the Privilege Review Team to determine whether they are

09:23 **22** material under the search warrant that was appropriate to

09:23 **23** produce and would have been passed on to the Prosecution

09:23 **24** Team.

09:23 **25**            MR. FITZGERALD:  Yes, Your Honor.  Of course, in

09:23  **1**  looking at something whether it would have been judged to be

09:23  **2**  relevant to the case and fall under the terms of the search

09:23  **3**  warrant, that of course can be sometimes a close issue or a

09:23  **4**  judgment call.  But here I can definitely say it is not a

09:23  **5**  close issue.  It is not a judgment call.

09:23  **6**        **If I had found out about the existence of the Tabs**

09:23  **7**  **data through the defense request in September of 2019, it**

09:23  **8**  **would certainly, like the QuickBooks data, have been**

09:23  **9**  **included in what was produced.  If any of the searching**

09:23  **10**  **taint agents had seized it and then it had been reviewed by**

09:23  **11**  **the Privilege Review Team, we would definitely have said**

09:24  **12**  **that it (a) is not privileged; and (b) it is certainly**

09:24  **13**  **relevant, and we would have passed it on to the Prosecution**

09:24  **14**  **Team.**

09:24  **15**        Again, this is not an issue where we are quibbling

09:24  **16**  about its relevance or the fact that reasonable prosecutors

09:24  **17**  and defense attorneys would like to have this.  It's just

09:24  **18**  the fact that it was -- again, in retrospect, certain things

09:24  **19**  that I would like to have had seized were not seized.

09:24  **20**        But going back to my earlier analogy where

09:24  **21**  searching agents went to a house and didn't search the attic

09:24  **22**  when one is talking about five terabytes of data, that is

09:24  **23**  more similar to having a search warrant for a small town.  I

09:24  **24**  think it is fair when you have the former mayor of the town

09:25  **25**  on the other side that you can get guidance as to where you

09:25   1   need to look.

09:25   2           Thank you, Your Honor.

09:25   3           THE COURT:  Thank you.  We are going to take about

09:25   4   a ten-minute break here.

09:25   5               (Recess taken at 9:25 a.m.;

09:25   6               proceedings resumed at 9:36 a.m.)

10:10   7

10:10   8

10:10   9

10:10  10

10:10  11

10:10  12

10:10  13

10:10  14

10:10  15

10:10  16

10:10  17

10:10  18

10:10  19

10:10  20

       21

       22

09:35  23           MR. AVENATTI:  Your Honor, can I approach, please?

09:36  24           THE COURT:  Yes.

09:36  25           MR. AVENATTI:  Your Honor, I would like to start

09:36  1    where Mr. Fitzgerald ended.

09:36  2        Mr. Fitzgerald claimed that this data was not

09:36  3    seized. There is no question the data was seized. It was

09:36  4    contained within the forensic images of the servers. In

09:37  5    fact -- and I have handed the Court a copy of the search

09:37  6    warrant application, which is Document 4-1 on 8:19-MJ-00418.

09:37  7    This is the search warrant application for the ten devices,

09:37  8    which included the Eagan Avenatti servers.

09:37  9        This is the application that the Assistant U.S.

09:37  10   Attorneys prepared and which was supported by the affidavit

09:37  11   of Special Agent Karlous back in the spring of 2019. This

09:37  12   warrant which was ultimately issued provides in detail as to

09:37  13   what was to be seized and searched and what the government

09:38  14   was to look for.

09:38  15       In particular, it enumerates a number of

09:38  16   categories of information that the government was to search.

09:38  17   This is what the government asked to search for. This is

09:38  18   what the government claimed in the application they needed

09:38  19   for the prosecution of the case.

09:38  20       I will direct the Court's attention to

09:38  21   paragraphs -- page 7 of 330 at the top, paragraph F:

09:38  22   "Records, documents, programs, applications, or materials

09:39  23   from January 2011 through March 25, 2019, relating to the

09:39  24   accounting records for Avenatti or any of the subject

09:39  25   entities" -- that's a defined term, Your Honor, to include

09:39 **1** the law firm -- "including any Microsoft Dynamics NAV,

09:39 **2** QuickBooks, or other electronic accounting data, files, or

09:39 **3** records" (G) -- I am going to shortcut it -- relating to any

09:39 **4** financial transactions, including any proposed or potential

09:39 **5** financial transactions, including any of the subject

09:39 **6** entities and/or Avenatti.

09:39 **7** If you fast-forward to letter (P) on page 9 of

09:39 **8** 330, this is even more specific. Paragraph P requires the

09:40 **9** "search for documents, records, applications, materials

09:40 **10** relating to attorneys' fees or costs, and client billing

09:40 **11** records."

09:40 **12** If you go on to letter T on page 10 of 330:

09:40 **13** "Records, documents, programs, applications, or materials

09:40 **14** from April 1st, 2011, to March 25, 2019, relating to

09:40 **15** Avenatti and/or EA LLP's representation of Client 1,

09:40 **16** including the approximately $4 million settlement payment."

09:41 **17** If you go to U immediately underneath that, same

09:41 **18** thing relating to Client 2.

09:41 **19** If you go to W, same thing as it relates to Client

09:41 **20** 3.

09:41 **21** So there is no question that this data was seized.

09:41 **22** It was on our forensic copies. If it wasn't seized,

09:41 **23** Mr. Varani could not have accessed it yesterday and provided

09:41 **24** the data to the defense. There is no question it was

09:41 **25** seized.

09:41  **1**    Your Honor, they didn't leave the box behind in

09:41  **2**  the attic.  They took all of the boxes out of the attic, and

09:41  **3**  they've been in the possession of the government -- the

09:41  **4**  boxes from the attic -- for years.

09:41  **5**    There is discussion about what was made available

09:41  **6**  by way of the virtual server, Your Honor.  All of the data

09:42  **7**  from Tabs and QuickBooks was not made available by way of

09:42  **8**  the virtual server two years ago or in September/October of

09:42  **9**  2019.

09:42  **10**    On one occasion a certain e-mail was made

09:42  **11**  available for us to review.  And, in fact, we know all the

09:42  **12**  data wasn't made available because the data from Mr. Varani

09:42  **13**  came from the forensic copies held in Washington, D.C.  We

09:42  **14**  didn't have access to the forensic copies.

09:42  **15**    But putting aside the issue of access, as Your

09:42  **16**  Honor rightfully noted, access does not relieve the

09:42  **17**  government of its affirmative obligation to seek out

09:42  **18**  exculpatory information or information favorable to the

09:42  **19**  defense and to provide it to the defense.  It also doesn't

09:42  **20**  relieve the government from its obligations under your

09:42  **21**  January 2021 order, which could not have been more clear.

09:43  **22**    There is discussion by Mr. Sagel about what this

09:43  **23**  data shows and what it doesn't show, and I'm happy to get

09:43  **24**  into some of those details, although our review continues.

09:43  **25**  There is no question this data was relevant even under his

09:43 **1** theory, and that was specifically one of the things that was

09:43 **2** ordered by Your Honor to be produced in January of 2021,

09:43 **3** relevant information.

09:43 **4** As Your Honor rightfully noted in one of Your

09:43 **5** Honor's questions, even if it didn't show any differences,

09:43 **6** it would still be relevant. Your Honor also rightfully

09:43 **7** noted the existence now of data relating to Ms. Gardner in

09:43 **8** Tabs.

09:43 **9** Whether the data is the same or not -- and I

09:43 **10** submit that it's not. Whether it's the same or not is of no

09:43 **11** consequence. The issue we now have is that there was

09:43 **12** evidence put before the jury that there was no Tabs data for

09:44 **13** Gardner. There was never any Tabs data for Gardner. We now

09:44 **14** know that that's not accurate.

09:44 **15** The printouts that the government provided the

09:44 **16** defense last night, Your Honor, are not complete. They do

09:44 **17** not contain all of the data for the clients in the

09:44 **18** Indictment. There are unallocated costs within Tabs. There

09:44 **19** are other reports in Tabs. There's other information even

09:44 **20** in the short period of time that I was able to review the

09:44 **21** information last night that casts serious doubt as to the

09:44 **22** printouts by the government.

09:45 **23** The information that was provided by way of the

09:45 **24** Tabs data and likely the QuickBooks data goes directly to

09:45 **25** motive and intent, Your Honor, among other things. While it

09:45  **1**  might be true that I in my opening statement referenced the

09:45  **2**  calculations on the chart and talked about what was

09:45  **3**  required, I'm perplexed as to how that helps the government.

09:45  **4**  If the government was aware by way of my opening

09:45  **5**  statement that that was my defense, to the extent that they

09:45  **6**  did not understand the importance of that cost data, the

09:45  **7**  Tabs data and the QuickBooks data, they were certainly on

09:45  **8**  notice at that point in time. And yet they did nothing to

09:45  **9**  look for the data. They did nothing to produce it to the

09:45  **10**  defense.

09:45  **11**  They obviously knew the importance of the Tabs

09:45  **12**  data because they had Mr. Drum rely on the two exhibits, one

09:45  **13**  from Mr. Barela and one from Mr. Johnson. They were on

09:46  **14**  notice from Ms. Regnier of the importance of the Tabs data

09:46  **15**  and the information.

09:46  **16**  Lastly, let me make this point, Your Honor -- and

09:46  **17**  we have another pending filing relating to this issue.

09:46  **18**  There is no question that when the Prosecution Team believed

09:46  **19**  a document existed on those servers or within the

09:46  **20**  information seized that was in the possession of the

09:46  **21**  Privilege Review Team -- there is no question that they had

09:46  **22**  the ability to and in fact did reach out to the Privilege

09:46  **23**  Review Team and inquire as to where A, B, C, D, or E was.

09:46  **24**  That's how Mr. Andre -- we put this in our reply. That's

09:46  **25**  how Mr. Andre was able to represent to the Court that a

09:46 **1** QuickBooks file was on its way to be produced. He would not

09:46 **2** have known that but for communication with the Privilege

09:46 **3** Review Team as to that fact because clearly the government

09:47 **4** wanted the QuickBooks files produced.

09:47 **5**     About a month or two before the trial, Your Honor,

09:47 **6** we had not heard from Mr. Fitzgerald in some time, and the

09:47 **7** defense received notification from Mr. Fitzgerald that all

09:47 **8** of a sudden the Privilege Review Team was getting ready to

09:47 **9** produce to the Prosecution Team about 20 or 25 documents

09:47 **10** that had not been previously produced.

09:47 **11**     We were puzzled by this because we had not heard

09:47 **12** from the Privilege Review Team in some time, and it seemed

09:47 **13** odd to us that just out of the blue the Privilege Review

09:47 **14** Team would have located these 20 to 25 documents to produce

09:47 **15** to the Prosecution Team.

09:47 **16**     Upon review of the documents, Your Honor, we

09:47 **17** discovered that they were relevant, and it told us that the

09:47 **18** prosecution wanted to use the documents in the trial.

09:47 **19** That's why all of a sudden they were being produced to the

09:48 **20** Prosecution Team. Now, I don't know if that's the case or

09:48 **21** not, but there's strong evidence to suggest that it was.

09:48 **22**     **And the one thing that you haven't heard here**

09:48 **23** **today, Your Honor, and the one thing that you've never**

09:48 **24** **heard, the representation that's never been made by either**

09:48 **25** **Mr. Sagel, Mr. Wyman, Mr. Andre prior, or by**

09:48  **1**  **Mr. Fitzgerald -- the one thing the Court has never heard is**

09:48  **2**  **that the Prosecution Team was not in regular contact with**

09:48  **3**  **the Privilege Review Team for the purpose of gaining**

09:48  **4**  **documents and information that they thought would help their**

09:48  **5**  **case.  That representation has never been made, and I would**

09:48  **6**  **submit, Your Honor, it never will be made, because the fact**

09:48  **7**  **of the matter is that the Privilege Review Team has worked**

09:48  **8**  **closely with the government when it benefited the government**

09:48  **9**  **as it related to preparation for trial.**

09:48  **10**  The prejudice associated with this information not

09:48  **11**  being produced is extraordinary.  Your Honor touched on that

09:49  **12**  through some of your questioning.  I should have had the

09:49  **13**  benefit of this information.  I should have been able to use

09:49  **14**  it in cross-examination and otherwise.  And details matter.

09:49  **15**  I should have been able to use the lack of taking

09:49  **16**  into account various costs and even post-settlement

09:49  **17**  payments, Your Honor.  The $37,000 payment I think was made

09:49  **18**  within a few months of the settlement.  Who's to say that

09:49  **19**  wasn't associated with the settlement?  It's not some minor

09:49  **20**  $1,900 payment.  It's a significant payment.  I should have

09:49  **21**  been able to cross-examine Mr. Drum with the benefit of

09:49  **22**  that.  I should have had the data.  I wasn't provided the

09:49  **23**  data.

09:49  **24**  Even when I complained about it, I was repeatedly

09:49  **25**  told that I had everything when they knew I did not have

09:49  **1**  everything.  They knew I didn't have the Tabs data.

09:50  **2**  **For each of those reasons, Your Honor, I would ask**

09:50  **3**  **that the Court grant the defense motion at 706.  I'm happy**

09:50  **4**  **to answer any other questions.**

09:50  **5**  THE COURT:  No.  Thank you.

09:50  **6**  MR. FITZGERALD:  Your Honor, may I address the

09:50  **7**  Court?

09:50  **8**  THE COURT:  Sir, he gets the last word.

09:50  **9**  MR. FITZGERALD:  But he made representations about

09:50  **10**  the 25 documents.

09:50  **11**  THE COURT:  The moving party gets the last word.

09:50  **12**  I want to review the facts in the case as I see

09:50  **13**  them before setting out my ruling.

09:50  **14**  First of all, financial data is critical to this

09:50  **15**  case.  I don't believe the government disputes that,

09:50  **16**  although the government suggests that there may be other

09:50  **17**  critical data.  But if one looks to Mr. Drum's charts,

09:50  **18**  particularly 430 through 457 that sum up the case, those

09:50  **19**  charts are based almost exclusively on financial data.

09:51  **20**  Second, the government was on notice, as

09:51  **21**  Mr. Avenatti pointed out, for some time of the existence of

09:51  **22**  Tabs data.  In a July 25, 2019, interview with Ms. Regnier,

09:51  **23**  the government learned of the Tabs data.  The notes of

09:51  **24**  Special Agent Karlous indicate that it relates to billing

09:51  **25**  and accounting.  That particular handwritten memo is

09:51  **1**   attached to Defense 1084.

09:51  **2**          Of more significance I think is the interview with

09:52  **3**   Ms. Regnier on November 19, 2019.  The report of that

09:52  **4**   interview was Defendant's Exhibit 1085.  At paragraph 14,

09:52  **5**   Ms. Regnier indicated -- I will quote the paragraph -- not

09:52  **6**   her quote but a quote from the report:  "EA used two systems

09:52  **7**   to track case expenses.  The first is QuickBooks, and the

09:52  **8**   accounting entries came from expense reports, et cetera.

09:52  **9**   The second system used by EA to track case expenses is

09:52  **10**  Tabs."

09:52  **11**         I believe that between those two interviews the

09:52  **12**  government was fully on notice of the significance of the

09:52  **13**  Tabs data.  The questioning at trial I believe established

09:53  **14**  that no effort was made to secure the Tabs data.  On

09:53  **15**  August 18, the morning session at page 40 provides the

09:53  **16**  following.  The question was being put to Agent Karlous:

09:53  **17**        "Q    As you sit here today two years after being

09:53  **18**         told in a conference call with other members of

09:53  **19**         the investigative team about the Tabs data -- as

09:53  **20**         you sit here today, do you recall a single thing

09:53  **21**         that you or anyone else did to confirm or deny the

09:53  **22**         existence of the Tabs data on the servers?

09:54  **23**        "A    I don't know if we have Tabs data."

09:54  **24**         Then it continues over on page 41:

09:54  **25**        "Q    Okay.  Well, in light of your answer, have

09:54 **1**      you personally -- let me ask you this.  Are you

09:54 **2**      aware of anyone on the investigative team in the

09:54 **3**      last two years making inquiry as to whether the

09:54 **4**      Tabs data was included within the forensic images

09:54 **5**      on the servers?

09:54 **6**      "A     It may have occurred, but I don't know."

09:54 **7**          Similar questioning was conducted the next day of

09:54 **8**  Agent Tashchyan.  It was apparent from their testimony that

09:54 **9**  no one had gone back to the forensic copies of the servers

09:54 **10**  to conduct a search.

09:54 **11**          I think the significance of the Tabs data was

09:54 **12**  pointed out early in the trial when Ms. Regnier testified on

09:55 **13**  the morning session on July 28 at page 93:

09:55 **14**      "Q     When you had to figure out costs for a

09:55 **15**      case, you would look at Tabs; would you not?

09:55 **16**      "A     No.  I would look at both Tabs and

09:55 **17**      QuickBooks.

09:55 **18**      "Q     Why would you look at both QuickBooks and

09:55 **19**      Tabs?

09:55 **20**      "A     To make sure we had encompassed all the

09:55 **21**      costs.

09:55 **22**      "Q     You couldn't rely on just one?  You had to

09:55 **23**      look at both?

09:55 **24**      "A     Yes.

09:55 **25**      "Q     Otherwise the calculation could be wrong?

09:55 **1**     "A      Correct."

09:55 **2**         I think that testimony in and of itself is

09:55 **3**  sufficient to establish the materiality of the Tabs data,

09:55 **4**  particularly where at least in the case of three of the

09:55 **5**  victim clients the costs were an element in determining what

09:55 **6**  net payment Mr. Avenatti was entitled to out of the

09:56 **7**  settlement.

09:56 **8**         The Prosecution Team conducted a search of its

09:56 **9**  files and provided the Court an extensive filing at Docket

09:56 **10** 737 of various pieces of Tabs data.  Two of the reports were

09:56 **11** identical to the trial exhibits, Exhibit 48, the Johnson

09:57 **12** draft, and Exhibit 174, the Barela Tabs data.

09:57 **13**        All the other Tabs documents related to other

09:57 **14** clients and really aren't material to this case.  It shows

09:57 **15** that the government did a diligent search for Tabs data in

09:57 **16** the materials that the Prosecution Team had, but it by no

09:57 **17** means convinced the Court that that was the only Tabs data

09:57 **18** that was out there to be had in the materials which were

09:57 **19** seized.

09:57 **20**        Tabs data wasn't used at trial, as I indicated,

09:57 **21** Tabs data offered for proving up the Johnson loss, and

09:58 **22** similarly for Barela.  No Tabs data was had for Gardner.  I

09:58 **23** think that it's significant that the prosecution didn't have

09:58 **24** the benefit of other Tabs data relating to those two clients

09:58 **25** and relating to Gardner for whom no Tabs data was offered.

09:58   **1**       I also think Tabs data would have been of

09:58   **2**  assistance to the government even with respect to the two

09:58   **3**  other victims, Tran and Phan.

09:58   **4**       MR. AVENATTI:  Your Honor, you said "government"

09:58   **5**  the last two times.  Was that purposeful, or did you mean to

09:58   **6**  say the "defense"?

09:58   **7**       THE COURT:  I meant to say the defense.

09:58   **8**       MR. AVENATTI:  I'm sorry to interrupt.

09:58   **9**       THE COURT:  Thank you for the correction.

09:58  **10**       **The documents would have been of assistance to the**

09:58  **11**  **defense in questioning the appropriate amount that**

09:58  **12**  **Mr. Avenatti drew down for himself, even though with respect**

09:58  **13**  **to Tran and Phan, no costs were relevant because their fee**

09:59  **14**  **contracts simply provided for a straight net percentage out**

09:59  **15**  **of the amounts recovered.**

09:59  **16**       I believe that the data would have been useful in

09:59  **17**  an overall showing that the government's accounting records,

09:59  **18**  the methods of Mr. Drum in particular, weren't accurate.  He

09:59  **19**  wasn't accurate in part of his analysis.  I think the jury

09:59  **20**  could question the accuracy of his methods and results with

09:59  **21**  respect to other clients.

09:59  **22**       It is no answer that the government is not

09:59  **23**  required to prove the exact amount that Mr. Avenatti

09:59  **24**  misappropriated.  The government put forth a number, and I

09:59  **25**  believe the defendant was entitled to challenge that number

09:59    **1**    and to show that it was not accurate.  It may have shown

09:59    **2**    that the amount was appropriated was lesser or greater, or

10:00    **3**    it would have put a question mark there, and I think the

10:00    **4**    defendant was entitled to have the ability to put that

10:00    **5**    question mark there.

10:00    **6**         I think the testimony -- the factual presentations

10:00    **7**    this morning indicate to me that out of the identified Tabs

10:00    **8**    material it would likely have been relevant material to

10:00    **9**    assist the defense in its cross-examination.

10:00    **10**        Mr. Fitzgerald indicated to me that if the

10:00    **11**   additional materials for Tabs and QuickBooks were identified

10:00    **12**   as part of the initial process of screening the search

10:00    **13**   warrant materials, he would have reviewed these materials,

10:00    **14**   and if anything were relevant, he would have passed them on

10:00    **15**   to the Prosecution Team.  We'll never know the answer to

10:00    **16**   that question because it didn't occur.  It seems to me given

10:00    **17**   the volume of Tabs and the representations I have received

10:00    **18**   from the defense this morning that there would have been at

10:01    **19**   least some data passed on.

10:01    **20**        The question then is is there a violation of

10:01    **21**   Brady?  I focus on Brady because I think the analysis of

10:01    **22**   Brady is sufficient, even though there may be other grounds

10:01    **23**   which would call for the government's production of

10:01    **24**   materials from the Tabs data at least be identified.

10:01    **25**        Brady versus Maryland, 373 U.S. 83-87 (1963),

10:01  **1**  requires production of materials that are advantageous to

10:01  **2**  the defendant or that tend to call into doubt -- call the

10:01  **3**  government's case into doubt.

10:01  **4**  Brady establishes three requirements:  One, the

10:01  **5**  evidence at issue must be favorable to the accused.  I find

10:02  **6**  that the Tabs and other accounting data that was not

10:02  **7**  produced would have been favorable to the defendant.

10:02  **8**  Two, the evidence must have been suppressed by the

10:02  **9**  government willfully or inadvertently.  I find that it was,

10:02  **10**  quote, "suppressed," although I don't think that's the

10:02  **11**  appropriate word in the context.  But it wasn't produced

10:02  **12**  through inadvertence and a failure to appreciate what was

10:02  **13**  there.

10:02  **14**  I find no willful conduct on the part of the

10:02  **15**  Prosecution Team.  I find no willful conduct on the part of

10:02  **16**  the Privilege Review Team.  I think the Taint Team has

10:02  **17**  fairly acknowledged that there may have been some

10:02  **18**  shortcomings in the review process.

10:02  **19**  Finally, there must be a finding that prejudice

10:03  **20**  must have ensued.  I find that prejudice occurred here in a

10:03  **21**  number of ways.  I think the defendant was denied an

10:03  **22**  opportunity to craft his overall theory of the case and

10:03  **23**  presentation, including the opening statement, by not having

10:03  **24**  this additional material.  I believe that the defense was

10:03  **25**  prejudiced in its ability to cross-examine certain

10:03 **1** witnesses, in particular, Mr. Drum.

10:03 **2**     At page 5 of his most recent report at Docket 775,

10:03 **3** Mr. Avenatti outlines a number of things that he could have

10:04 **4** done had he had the Tabs information, including

10:04 **5** cross-examination of certain witnesses, ability to question

10:04 **6** the government's preparation techniques generally, and so

10:04 **7** on.  I won't repeat those.

10:04 **8**     The question is what remedy should I adopt?  I do

10:04 **9** not believe that an adjournment is an appropriate remedy.

10:04 **10** First of all, an adjournment would not solve the problem

10:04 **11** that Mr. Avenatti didn't have this material at the front end

10:04 **12** to craft his theory of the case, his opening statement, and

10:04 **13** examining of the witnesses.  He might have done something

10:04 **14** different, or he might not have done something different if

10:04 **15** he had this data.  The point is he didn't have the

10:04 **16** opportunity to make that choice.

10:04 **17**     I believe that any adjournment wouldn't be a

10:04 **18** short-lived affair but would require a significant amount of

10:05 **19** time (a) to complete the production to the defendant of the

10:05 **20** newly described materials and then allow the defendant

10:05 **21** adequate time to assimilate and craft a strategy based on

10:05 **22** the newly produced material.  I am not prepared to say that

10:05 **23** that would be a short-lived effort.  Given the volume of new

10:05 **24** material, it seems unlikely that effort would be

10:05 **25** short-lived.

10:05 **1**    The representation to the jury was our best

10:05 **2** estimate the case would be concluded by August 20.

10:05 **3** Obviously, we are past that date, and the defense is still

10:05 **4** on the defense's case-in-chief.  I do not believe it would

10:05 **5** be appropriate to hold the jury for an extended period of

10:05 **6** time to allow the defense adequate time to assimilate and

10:05 **7** prepare in light of the newly produced material.

10:06 **8**    I want to go back and emphasize two points.  I

10:06 **9** repeat my findings that I find no misconduct on the part of

10:06 **10** the Prosecution Team and no misconduct on the part of the

10:06 **11** Taint Team.  Shortcomings there may have been, but I find no

10:06 **12** misconduct, intentional or otherwise, on the part of the

10:06 **13** Taint Team in carrying out its activity.

10:06 **14**    For all those reasons, I grant a new trial.  The

10:06 **15** matter will proceed to trial on October 12, 2021, at 8:30

10:06 **16** a.m.  That's the current date that we ought to have in place

10:06 **17** our severed portion of the case.  I set a status conference

10:06 **18** for September 27, 2021, at 9:00 a.m.  I set a further

10:07 **19** interim status conference for September 2 at 8:30 a.m. to

10:07 **20** discuss the overall timing of the case.

10:07 **21**    In terms of a retrial, you should be aware that I

10:07 **22** will be away from October 17th to October 24th.  If we

10:07 **23** proceed on October 12th on the victim counts, we could

10:07 **24** impanel a jury I believe the week before I leave and then

10:07 **25** start the trial probably the week I come back.  I want to

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

| | | |
|---|---|---|
| 10:07 | **1** | give the parties an opportunity to assimilate the schedule |
| 10:07 | **2** | that I have put out there and come back to me with their |
| 10:07 | **3** | thoughts.  That's what we will do on September 2. |
| 10:07 | **4** | All pending motions are denied or moot at this |
| 10:07 | **5** | time. |
| 10:07 | **6** | **Anything further?** |
| 10:08 | **7** | MR. AVENATTI:  Your Honor, from the defense, I |
| 10:08 | **8** | believe that the Motion for Mistrial should be with |
| 10:08 | **9** | prejudice.  I have heard Your Honor's directives this |
| 10:08 | **10** | morning, but I would like to have an opportunity to at least |
| 10:08 | **11** | submit briefing for consideration by the Court on that point |
| 10:08 | **12** | once I have had a chance to look at some of the data.  So |
| 10:08 | **13** | what I would like to do is collect my thoughts and then |
| 10:08 | **14** | propose a briefing schedule to the government and to the |
| 10:08 | **15** | Court. |
| 10:08 | **16** | THE COURT:  That's fine.  I think we would like to |
| 10:08 | **17** | resolve that issue.  The strong presumption is that when a |
| 10:08 | **18** | mistrial is granted at the request of the defendant, the |
| 10:08 | **19** | grant of a new trial is proper.  But I will afford you an |
| 10:08 | **20** | opportunity to move for whatever relief you want.  I don't |
| 10:08 | **21** | think we should do it on an expedited basis, but we |
| 10:08 | **22** | shouldn't drag it out either. |
| 10:08 | **23** | MR. AVENATTI:  I agree, Your Honor.  I'm going to |
| 10:08 | **24** | need some time to look at the data, but I agree that it's |
| 10:09 | **25** | going to have to be dealt with on a measured approach. |

10:09 **1**       THE COURT:  Anything further from the government?

10:09 **2**       MR. SAGEL:  No, Your Honor.

10:09 **3**       THE COURT:  Okay, we will be adjourned.  Thank

10:09 **4** you.

10:09 **5**       MR. AVENATTI:  Your Honor, are you bringing the

10:09 **6** jurors in?  Are they here?

10:09 **7**       THE COURT:  No, they're not here.  I plan to send

10:09 **8** them the usual certificate for service, and I plan to send

10:09 **9** each one a personal letter indicating that I concluded the

10:09 **10** trial and thanking them for their service.

10:09 **11**       MR. AVENATTI:  Understood.

10:09 **12**       THE COURT:  I'm not going to get into the merits

10:09 **13** of anything.  They put in a significant amount of time, and

10:09 **14** I watched these folks.  By and large, they were on time

10:09 **15** every day.  They were diligent.  They were watching what was

10:09 **16** going on.  I think that the parties' efforts to help the

10:09 **17** Court in seating a fair and impartial jury were achieved.

10:09 **18** They were diligent, and they should be told that.

10:10 **19**       Thank you.

10:10 **20**       **(Whereupon, the proceedings were concluded.)**

10:10 **21**                  *      *      *

10:10 **22**

10:10 **23**

10:10 **24**

10:10 **25**

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

10:10  1
10:10  2
10:10  3
10:10  4                        **CERTIFICATE**
10:10  5
10:10  6          I hereby certify that pursuant to Section 753,
10:10  7  Title 28, United States Code, the foregoing is a true and
10:10  8  correct transcript of the stenographically reported
10:10  9  proceedings held in the above-entitled matter and that the
10:10  10 transcript page format is in conformance with the
10:10  11 regulations of the Judicial Conference of the United States.
10:10  12
10:10  13 Date:  August 25, 2021
10:10  14
10:10  15
10:10                        /s/   Sharon A. Seffens  8/25/21
10:10  16            _____
10:10                        SHARON A. SEFFENS, U.S. COURT REPORTER
10:10  17
       18
       19
       20
       21
       22
       23
       24
       25

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

MR. AVENATTI: [25] 3/11 6/19 7/1 8/18 9/12
9/15 10/13 11/19 13/1 13/20 15/25 16/10
18/15 19/4 20/1 20/14 41/14 48/23 48/25 60/4
60/8 65/7 65/23 66/5 66/11
MR. FITZGERALD: [11] 3/18 3/25 41/3 41/23
42/4 44/14 46/12 46/17 46/25 56/6 56/9
MR. SAGEL: [35] 3/5 21/5 21/13 21/25 22/14
22/19 23/5 23/17 23/25 24/2 24/18 24/25
25/15 26/7 26/12 27/5 27/17 27/22 28/2 28/8
28/23 28/25 30/5 30/9 30/13 32/16 33/17 36/5
37/7 37/11 39/2 40/13 40/19 40/25 66/2
THE CLERK: [1] 3/3
THE COURT: [67] 3/10 3/13 3/24 6/17 6/24
8/17 9/2 9/14 10/12 11/18 12/24 13/17 15/24
16/6 18/13 19/2 19/25 20/8 21/2 21/7 21/22
22/9 22/16 23/2 23/8 23/21 24/1 24/13 24/23
25/11 25/16 26/9 27/1 27/10 27/19 27/24 28/7
28/16 28/24 30/2 30/7 30/10 32/14 35/15 37/3
40/12 40/14 40/23 41/1 41/21 42/3 44/10 46/5
46/15 46/18 48/3 48/24 56/5 56/8 56/11 60/7
60/9 65/16 66/1 66/3 66/7 66/12

**$**
**$1,810,000 [1]** 34/5
**$1,900 [1]** 29/13 55/20
**$1,910,000 [1]** 34/5
**$111,113.22 [2]** 31/12 31/13
**$27,000 [1]** 29/16
**$37,000 [2]** 29/16 55/17
**$4 [2]** 21/19 50/16
**$4 million [2]** 21/19 50/16
**$900 [1]** 33/9
**$944 [1]** 33/7

**'**
**'10 [1]** 30/25
**'11 [1]** 30/25

**/**
**/s [1]** 67/15

**0**
**00418 [1]** 49/6
**0870 [1]** 1/21

**1**
**1-1053 [1]** 1/20
**10 [1]** 50/12
**1019 [1]** 17/17
**1053 [1]** 1/20
**107 [1]** 2/16
**1084 [3]** 11/18 11/19 57/1
**1085 [3]** 12/25 13/1 57/4
**1100 [1]** 2/7
**12 [3]** 4/14 7/15 64/15
**12/19/2017 [1]** 31/9
**12th [3]** 17/1 24/8 64/23
**14 [4]** 4/14 7/15 13/2 57/4
**16 [3]** 10/3 17/11 18/8
**17 [2]** 5/24 6/1
**174 [6]** 15/21 15/22 16/18 31/8 31/8 59/12
**17th [1]** 64/22
**18 [1]** 57/15
**19 [2]** 12/21 57/3
**193 [3]** 31/8 31/10 31/13
**1963 [1]** 61/25
**1st [1]** 50/14

**2**
**20 [3]** 54/9 54/14 64/2
**2011 [2]** 49/23 50/14
**2012 [1]** 30/25
**2015 [2]** 30/21 31/1
**2017 [1]** 31/9
**2019 [24]** 5/7 6/2 9/21 10/2 10/2 10/8 10/14
11/3 11/16 12/6 12/21 25/18 34/12 37/20 44/8
44/20 44/20 47/7 49/11 49/23 50/14 51/9
56/22 57/3

**2020 [5]** 14/8 17/18 35/7 35/13 37/20
**2021 [7]** 1/19 35/9 62/22 64/20 67/10 67/14
67/13
**21 [1]** 67/15
**213 [1]** 2/8
**24 [2]** 1/17 3/1
**24th [4]** 10/8 10/14 11/3 64/22
**25 [7]** 49/23 50/14 54/9 54/14 56/10 56/22
67/13
**25th [5]** 6/2 9/21 11/16 12/6 14/18
**26 [1]** 1/12
**27 [1]** 64/18
**28 [2]** 58/13 67/7

**3**
**312 [1]** 2/7
**31st [1]** 5/7
**330 [3]** 49/21 50/8 50/12
**338-3598 [1]** 2/12
**3598 [1]** 2/12
**36 [1]** 41/25
**373 [1]** 61/25
**3rd [1]** 30/21

**4**
**4-1 [1]** 49/6
**40 [1]** 57/15
**400,000 [1]** 34/18
**408 [1]** 14/19
**41 [1]** 57/24
**411 [2]** 1/20 2/11
**430 [2]** 21/8 56/18
**457 [3]** 21/9 62/5
**48 [5]** 15/21 15/22 16/18 28/8 59/11
**481-4900 [1]** 2/17
**4900 [1]** 2/17
**4:00 last [1]** 8/20
**4th [4]** 1/20 25/17 30/21 31/1

**5**
**543-0870 [1]** 1/21
**5th [1]** 29/2

**6**
**6,000 [2]** 38/20 38/23
**6683 [1]** 2/8
**6:00 p.m [2]** 4/16 7/16

**7**
**706 [6]** 9/6 9/9 19/17 19/21 20/25 56/3
**714 [2]** 1/21 2/12
**72 [1]** 25/11
**737 [2]** 24/15 59/10
**74 [1]** 5/6
**745 [2]** 10/6 10/10
**753 [1]** 67/8
**775 [2]** 3/16 63/2

**8**
**8/25/21 [1]** 67/15
**8000 [1]** 2/11
**83-87 [1]** 61/25
**87 [1]** 61/25
**894-6683 [1]** 2/8
**8:05 [1]** 3/1
**8:19-MJ-00418 [1]** 49/6
**8:30 [1]** 64/15
**8:30 a.m [1]** 64/19

**9**
**90012 [1]** 2/8
**92672 [1]** 2/16
**92701 [2]** 1/20 2/11
**93 [1]** 58/13
**949 [1]** 2/17
**968 [1]** 17/17
**9:00 [1]** 64/18
**9:25 [1]** 48/5
**9:36 [1]** 48/6

**A**
**a.m [6]** 3/1 48/5 48/6 64/16 64/18 64/19
**abandon [1]** 18/7
**ability [4]** 53/22 61/4 62/25 63/5
**able [16]** 4/9 4/13 8/19 17/11 18/17 22/2
26/21 36/14 38/13 38/17 43/24 52/20 53/25
55/13 55/15 55/21
**about [35]** 4/15 4/15 9/24 14/24 15/11 15/20
20/18 24/2 24/3 24/7 26/6 28/23 31/2 32/3
35/2 38/3 38/12 41/18 42/6 43/7 43/14 44/1
45/25 47/6 47/16 47/22 48/3 51/5 51/22 53/2
54/5 54/9 55/24 56/9 57/19
**above [1]** 67/9
**above-entitled [1]** 67/9
**absent [1]** 5/17
**absolute [1]** 27/11
**Absolutely [1]** 16/10
**access [19]** 5/22 6/7 8/23 23/19 25/5 25/6
26/21 27/1 27/3 33/19 34/15 34/20 34/21
37/17 37/25 44/7 51/14 51/15 51/16
**accessed [1]** 50/23
**accessible [1]** 8/2
**accessing [2]** 5/19 6/1
**according [2]** 9/22 11/24
**account [3]** 22/10 45/20 55/16
**accounting [7]** 12/5 49/24 50/2 56/25 57/8
60/17 62/6
**accuracy [2]** 22/12 60/20
**accurate [16]** 19/11 22/23 27/15 28/12 28/18
40/17 40/18 52/14 60/18 60/19 61/1
**accurately [1]** 37/19
**accused [1]** 62/5
**achieved [1]** 66/17
**acknowledged [2]** 12/13 62/17
**acknowledging [1]** 26/10
**across [1]** 22/12
**Act [1]** 14/14
**acted [2]** 19/20 40/10
**acting [2]** 27/11 44/18
**activity [1]** 64/13
**actual [3]** 8/24 19/14 40/6
**actually [6]** 8/2 8/4 17/7 23/3 32/9 35/1
35/22
**addition [1]** 37/4
**additional [2]** 61/11 62/24
**address [3]** 22/5 22/21 56/6
**adequate [2]** 63/21 64/6
**adjourned [1]** 66/3
**adjournment [3]** 63/9 63/10 63/17
**admit [2]** 16/2 43/14
**admitted [1]** 15/21
**adopt [1]** 63/8
**advantage [2]** 23/18 38/1
**advantageous [1]** 62/1
**advised [1]** 13/3
**ADVISORY [1]** 2/15
**advocating [1]** 41/20
**affair [1]** 63/18
**affidavit [1]** 49/10
**affirmative [1]** 51/17
**afford [1]** 65/19
**afforded [1]** 36/8
**after [20]** 4/2 6/4 6/11 10/2 10/20 12/8 12/9
14/13 25/23 29/2 29/5 29/11 29/19 29/22
30/20 31/25 33/5 33/8 45/16 57/17
**again [13]** 13/25 14/2 16/25 18/25 34/15
34/24 36/23 38/4 43/13 45/3 46/13 47/15
47/18
**agent [12]** 6/6 9/23 11/21 11/22 12/21 12/22
16/22 38/11 49/11 56/24 57/16 58/8
**agents [5]** 42/19 43/6 43/10 47/10 47/21
**ago [5]** 11/4 19/8 24/20 46/1 51/8
**agree [8]** 13/24 19/25 21/3 30/5 36/24 41/21
65/23 65/24
**agreed [5]** 5/2 5/19 7/1 8/6 23/24
**agreements [2]** 3/22 4/20
**agrees [1]** 6/20
**ahead [1]** 24/1
**ALEXANDER [2]** 2/5 3/6

## A

**all [52]** 4/11 5/1 5/8 7/6 7/25 10/3 11/14 12/3
12/14 14/1 14/3 14/6 14/16 14/20 15/2 15/8
16/23 18/18 20/24 22/10 24/14 27/17 29/3
29/10 30/14 30/22 32/18 33/7 34/25 35/3
35/10 36/18 38/14 38/16 38/18 40/9 41/10
45/11 46/5 46/13 51/2 51/6 51/11 52/17 54/7
54/19 56/14 58/20 59/13 63/10 64/14 65/4
**allegedly [1]** 20/10
**allow [2]** 63/20 64/6
**allowed [4]** 4/21 6/13 23/10 42/19
**allowing [1]** 33/19
**almost [2]** 21/11 56/19
**along [2]** 33/13 35/6
**already [2]** 14/11 32/10
**also [9]** 24/18 26/17 26/20 32/13 35/23 42/11
51/19 52/6 60/1
**alternative [1]** 26/20
**alternatively [1]** 28/21
**although [3]** 51/24 56/16 62/10
**always [1]** 39/15
**am [5]** 27/8 33/18 36/25 50/3 63/22
**AMERICA [2]** 1/9 3/4
**among [1]** 52/25
**amount [11]** 7/13 9/16 9/17 13/9 13/10 28/14
60/1 60/23 61/2 63/18 66/13
**amounts [2]** 33/25 60/15
**Ana [4]** 1/16 1/20 2/11 3/1
**analogy [2]** 27/18 47/20
**analysis [13]** 21/17 22/17 23/3 28/21 29/1
31/21 36/11 36/12 36/22 38/8 43/19 60/19
61/21
**analyzed [1]** 21/9
**analyzes [1]** 21/4
**Andre [8]** 10/7 11/2 11/13 11/23 26/9 53/24
53/25 54/25
**Andre's [1]** 25/17
**Angeles [1]** 2/8
**another [4]** 12/23 33/8 45/16 53/17
**answer [5]** 27/22 56/4 57/25 60/22 61/15
**any [33]** 3/17 5/16 5/22 8/19 10/24 13/6 14/13
15/1 17/24 19/12 21/1 23/11 24/4 26/2 26/13
26/21 30/3 33/12 33/22 33/23 38/14 38/17
43/25 47/9 49/24 50/1 50/3 50/4 50/5 52/5
52/13 56/4 63/17
**anybody [1]** 40/10
**anybody's [1]** 40/10
**anyone [3]** 5/20 57/21 58/2
**anything [14]** 21/20 31/19 32/9 35/14 35/25
37/4 37/21 39/15 40/2 46/8 61/14 65/6 66/1
66/13
**apparent [2]** 7/24 58/8
**appear [1]** 13/5
**APPEARANCES [1]** 2/1
**appellate [1]** 17/22
**applicable [2]** 5/5 6/9
**application [4]** 49/6 49/7 49/9 49/18
**applications [3]** 49/22 50/9 50/13
**appointed [2]** 10/16 25/19
**appreciate [2]** 33/11 62/12
**approach [4]** 18/21 33/19 48/23 65/25
**appropriate [6]** 46/11 46/22 60/11 62/11 63/9
64/5
**appropriated [1]** 61/2
**approximately [1]** 50/16
**April [2]** 10/1 50/14
**April 1st [1]** 50/14
**Arden [1]** 16/23
**Arden's [1]** 32/22
**are [71]**
**aren't [2]** 35/25 59/14
**argue [1]** 41/22
**argument [3]** 43/20 44/4 44/4
**as [69]**
**aside [2]** 42/18 51/15
**ask [6]** 11/25 20/25 34/14 46/5 56/2 58/1
**asked [5]** 14/15 19/14 19/14 33/21 49/17
**asking [2]** 37/1 40/8
**aspersions [1]** 19/22

## 

**assessment [1]** 4/16
**estimate [1]** 11/8
**assist [1]** 61/9
**assistance [2]** 60/2 60/10
**Assistant [8]** 2/4 2/6 2/10 10/7 11/22 12/18
12/22 49/9
**associated [2]** 55/10 55/19
**assuming [1]** 34/19
**assurances [1]** 12/10
**attached [2]** 16/19 57/1
**attachment [2]** 24/15
**attempt [1]** 5/21
**attempted [1]** 7/23
**attention [2]** 9/19 49/20
**attic [5]** 42/21 47/21 51/2 51/2 51/4
**Attorney [6]** 2/3 2/4 2/6 2/10 10/7 12/22
**Attorney's [2]** 6/6 7/19
**attorneys [4]** 11/22 12/18 47/17 49/10
**attorneys' [1]** 50/10
**audit [1]** 8/24
**August [8]** 1/17 3/1 17/1 24/8 44/8 57/15 64/2
67/13
**August 12th [2]** 17/1 24/8
**August 18 [1]** 57/15
**August 20 [1]** 64/2
**August 2019 [1]** 44/8
**AUSA [1]** 9/24
**authority [2]** 24/9 44/18
**automatically [1]** 35/25
**avail [1]** 11/15
**availability [1]** 37/24
**available [9]** 8/23 21/10 22/22 44/9 45/20
51/5 51/7 51/11 51/12
**AVENATTI [21]** 1/11 2/14 3/4 3/12 5/13 6/18
9/10 12/1 26/19 27/25 37/5 49/8 49/24 50/6
50/15 56/21 59/6 60/12 60/23 63/3 63/11
**Avenatti's [2]** 3/14 9/6
**Avenida [1]** 2/16
**aware [6]** 8/12 12/18 46/7 53/4 58/2 64/21
**away [1]** 64/22

## B

**back [9]** 23/23 39/20 42/6 47/20 49/11 58/9
64/8 64/25 65/2
**backlog [1]** 44/15
**backwards [1]** 23/17
**bad [3]** 19/20 40/10 40/12
**bank [2]** 35/17 35/25
**bankruptcy [1]** 5/16
**Barela [3]** 15/23 16/22 29/24 31/5 31/9
31/11 31/12 32/22 33/4 33/9 36/6 38/14 38/22
53/13 59/12 59/22
**Barela's [1]** 33/5
**based [5]** 5/5 13/22 21/16 29/1 29/3 31/21
43/19 44/25 45/2 56/19 63/21
**baseless [1]** 33/16
**basic [3]** 20/5 20/6 46/2
**basically [2]** 24/9 29/17
**basis [4]** 13/19 13/21 22/11 65/21
**be [76]**
**bear [1]** 42/1
**became [1]** 12/23
**because [34]** 7/5 7/9 8/5 13/11 13/16 18/17
19/11 19/23 22/10 22/22 27/6 30/9 31/2 32/6
32/24 33/22 34/19 35/20 35/25 37/18 38/5
41/12 41/15 43/24 45/3 46/18 51/12 53/12
54/3 54/11 55/6 60/13 61/16 61/21
**been [61]** 6/16 9/16 11/7 12/10 13/6 13/17
14/2 14/3 14/6 14/11 14/15 16/1 16/11 16/11
17/11 18/10 18/17 19/1 19/7 19/10 21/16 26/6
27/13 27/19 31/25 32/10 34/20 34/22 35/10
36/24 37/11 38/6 38/7 39/17 39/17 40/2 40/16
43/21 43/24 46/20 46/23 47/1 47/8 47/10 51/3
51/21 54/10 54/24 55/5 55/13 55/15 55/21
60/1 60/10 60/16 61/8 61/18 62/7 62/8 62/17
64/11
**before [17]** 14/14 16/14 19/10 20/19 21/20
24/16 24/19 30/21 37/11 39/18 41/4 42/1 42/6
52/12 54/5 56/13 64/24

## 

**began [1]** 7/23
**beginning [2]** 16/12 60/6
**behalf [4]** 3/6 5/20 44/2 44/10
**behind [1]** 51/1
**beholden [1]** 24/10
**being [33]** 10/18 25/21 33/11 40/20 40/21
42/13 45/19 54/19 55/11 57/16 57/17
**believe [33]** 3/20 4/16 5/23 9/2 15/14 19/4
19/16 22/2 24/16 26/22 27/6 27/23 27/24
35/15 36/3 37/5 38/12 40/7 40/8 40/17 44/10
44/11 56/15 57/11 57/13 60/16 60/25 62/24
63/9 63/17 64/4 64/24 65/8
**believed [2]** 6/12 53/18
**believes [5]** 28/9 39/23 40/4 41/8 41/9
**belong [1]** 37/23
**benefit [4]** 10/10 55/13 55/21 59/24
**benefited [1]** 55/8
**best [2]** 38/7 64/1
**between [6]** 17/19 34/6 42/23 43/2 43/15
57/11
**beyond [3]** 19/1 26/10 36/2
**billing [3]** 12/5 50/10 56/24
**bills [1]** 31/9
**bit [1]** 32/15
**blue [1]** 54/13
**board [1]** 22/12
**both [6]** 11/22 22/3 26/7 36/19 37/20 40/21
44/23 46/1 58/16 58/18 58/23
**box [1]** 51/1
**boxes [2]** 51/2 51/4
**Brady [5]** 10/3 11/15 12/11 12/15 14/1 14/6
14/9 18/8 18/10 19/19 23/22 24/3 27/2 27/2
27/3 27/3 27/7 27/16 34/7 36/11 36/12 36/12
36/23 37/22 41/8 42/25 44/4 61/21 61/21
61/22 61/25 62/4
**Brady/Bundy [1]** 44/4
**BRANDON [1]** 2/4
**break [1]** 48/4
**BRETT [2]** 2/9 3/5
**brief [1]** 4/2
**briefing [3]** 9/16 65/11 65/14
**bring [3]** 9/19 16/7 41/22
**bringing [1]** 66/5
**broad [1]** 32/3
**broadbrush [1]** 22/22
**Building [1]** 2/10
**bunch [1]** 8/25
**Bundy [10]** 17/15 17/20 17/21 18/3 20/6 24/3
34/23 34/24 41/10 44/4

## C

**CA [4]** 1/20 2/8 2/11 2/16
**Cafe [1]** 33/3
**calculate [2]** 39/10 39/13
**calculated [1]** 23/4
**calculation [1]** 58/25
**calculations [1]** 53/2
**CALIFORNIA [3]** 1/5 1/16 3/1
**call [12]** 9/20 11/24 12/2 14/7 36/20 39/20
47/4 47/5 57/18 61/23 62/2 62/2
**came [8]** 15/19 29/3 31/15 33/5 35/4 44/21
51/13 57/8
**can [23]** 9/12 16/15 21/25 23/6 23/13 24/6
27/9 29/7 29/23 29/24 29/25 30/19 31/6 32/5
33/20 36/10 39/24 43/1 45/13 47/3 47/4 47/25
48/23
**can't [2]** 36/18 42/25
**cannot [2]** 18/19 24/6
**capture [1]** 25/13
**captured [1]** 4/18
**carrying [1]** 64/13
**case [70]**
**cases [7]** 18/4 24/4 32/20 33/23 34/4 40/20
40/22
**casting [1]** 19/22
**casts [1]** 52/21
**categories [1]** 49/16
**cause [1]** 18/5
**cautious [1]** 33/19

Case 8:09-cr-00061-JVS Document 868 Filed 01/07/22 Page 22 of 58 Page ID #:2610

**C**

**Cefali** [1] 3/12
**center** [1] 29/18
**CENTRAL** [1] 1/5
**certain** [10] 3/22 4/22 5/7 16/24 41/5 44/25 47/18 51/10 62/25 63/5
**certainly** [8] 13/18 18/1 18/2 44/17 45/14 47/8 47/12 53/7
**certificate** [2] 66/8 67/4
**CERTIFIED** [1] 1/9
**certify** [1] 1/7
**cetera** [3] 19/23 23/23 57/8
**challenge** [2] 23/11 60/25
**challenges** [3] 23/15 23/15 23/16
**chance** [1] 65/12
**change** [4] 18/6 32/9 35/24 38/8
**changes** [5] 5/7 18/21 36/14
**charge** [1] 32/23
**chart** [2] 39/9 53/2
**charts** [3] 21/15 56/17 56/19
**check** [1] 31/12
**checks** [2] 28/13 29/14
**chief** [4] 2/5 16/8 39/19 64/4
**choice** [1] 63/16
**chose** [1] 38/1
**CI** [2] 10/16 25/19
**CI's** [1] 26/25
**Circuit** [4] 17/16 17/17 17/20 18/4
**circumstance** [1] 27/5
**circumstances** [1] 41/20
**cite** [1] 18/3
**cited** [2] 17/15 40/21
**citing** [1] 27/25
**civil** [1] 5/16
**claim** [1] 20/11
**claimed** [4] 15/7 15/9 49/2 49/18
**claiming** [1] 19/13
**claims** [3] 9/23 21/23 22/3
**clarification** [3] 3/21 4/14
**clarifications** [1] 4/5
**classic** [1] 41/8
**clawback** [1] 42/6
**clear** [7] 13/7 15/4 15/4 17/6 17/21 18/3 51/21
**clearly** [2] 20/20 54/3
**Clemente** [1] 2/16
**clicked** [1] 6/10
**client** [17] 7/6 7/11 12/1 12/4 12/5 13/10 13/13 15/18 21/11 26/23 33/1 38/17 38/23 50/10 50/15 50/18 50/19
**client's** [1] 26/22
**clients** [20] 4/10 4/11 5/22 5/25 6/8 6/9 6/10 7/4 7/8 7/10 8/13 13/1 13/11 15/9 22/25 38/24 52/17 59/5 59/14 59/24 60/21
**Clifford** [1] 5/25
**close** [2] 47/3 47/5
**closely** [1] 55/8
**Code** [1] 67/7
**cold** [1] 9/1
**colleague** [1] 45/8
**collect** [1] 65/13
**collection** [1] 9/4
**collectively** [1] 5/24
**come** [4] 44/12 46/6 64/25 65/2
**comes** [4] 22/5 24/10 31/22 32/8
**comment** [3] 8/14 39/2 39/4
**comments** [2] 37/15 38/3
**communication** [1] 54/2
**company** [2] 10/19 25/22
**compare** [1] 34/23
**comparison** [1] 8/6
**compel** [2] 12/9 25/4
**complain** [1] 15/12
**complained** [2] 14/1 55/24
**complete** [2] 52/16 63/19
**completes** [3] 10/25 26/3 26/14
**comply** [2] 12/11 20/5
**comprise** [1] 10/18 25/21
**computer** [6] 8/19 8/21 10/20 11/8 25/23 44/22

**concentrate** [1] 20/12
**concern** [3] 4/1 18/6 26/11
**concerned** [2] 13/20 18/25
**concerning** [1] 32/4
**concerns** [3] 15/15 33/12 33/15
**conclude** [1] 38/10
**concluded** [2] 64/2 66/9 66/20
**conclusion** [1] 4/3
**conduct** [3] 58/10 62/14 62/15
**conducted** [4] 11/16 42/15 58/7 59/8
**conference** [6] 6/5 14/7 57/18 64/17 64/19 67/11
**conferring** [2] 36/4 39/1
**confirm** [2] 7/20 57/21
**conformance** [1] 67/10
**connection** [2] 10/15 25/18
**consented** [2] 10/16 25/19
**consequence** [1] 52/11
**consequences** [3] 14/25 42/8 43/25
**consideration** [2] 19/21 65/11
**considered** [1] 16/16
**constitutional** [1] 20/5
**consuming** [1] 38/19
**contact** [1] 55/2
**contain** [1] 52/17
**contained** [1] 49/4
**contempt** [1] 15/6
**context** [3] 20/16 41/17 62/11
**contingency** [1] 32/20
**continue** [2] 39/21 39/21
**continued** [2] 11/14 15/12
**continues** [3] 17/12 51/24 57/24
**contracts** [2] 32/14 60/14
**controlled** [1] 41/9
**conviction** [1] 17/22
**convince** [1] 23/21
**convinced** [1] 59/17
**copies** [5] 11/14 50/22 51/13 51/14 58/9
**copy** [7] 10/10 10/22 12/9 26/1 26/5 26/11 49/5
**correct** [13] 7/9 11/19 13/1 15/25 23/9 23/13 26/7 27/23 28/25 32/1 32/16 59/1 67/8
**correction** [2] 46/13 60/9
**correctly** [1] 42/16
**cost** [5] 15/22 15/23 16/14 19/15 53/6
**costs** [31] 13/23 16/4 21/21 22/5 23/3 24/21 28/13 29/1 29/12 29/15 31/7 31/11 31/15 31/22 31/25 32/25 33/7 33/22 35/5 35/22 35/22 39/5 39/14 50/10 52/18 55/16 58/14 58/21 59/5 60/13
**could** [28] 10/5 13/7 13/8 13/8 13/10 13/17 13/18 13/20 13/21 13/24 17/4 18/14 19/3 31/25 35/23 36/16 37/7 38/3 38/6 43/23 50/23 51/21 58/25 60/20 63/3 64/23
**couldn't** [1] 58/22
**counsel** [11] 2/1 2/15 3/7 3/19 5/12 10/3 36/4 39/1 44/21 45/5 45/21
**counted** [1] 35/20
**counts** [1] 64/23
**County** [2] 10/19 25/22
**couple** [2] 6/19 37/7 37/14
**course** [2] 46/25 47/3
**court** [51] 1/4 3/19 5/17 7/16 10/10 10/16 14/5 14/15 14/15 14/18 17/5 17/10 17/15 17/17 19/21 20/20 20/25 21/17 24/19 25/19 33/11 35/13 36/5 36/8 36/9 37/1 37/2 41/3 41/8 41/9 41/10 41/13 41/22 42/2 44/17 44/18 45/14 45/18 46/13 49/5 53/25 55/1 56/3 56/7 59/9 59/17 65/11 65/15 66/17 67/16
**Court's** [5] 6/12 9/19 43/7 44/6 49/20
**Court-appointed** [1] 10/16 25/19
**Courthouse** [1] 1/19 2/7
**cover** [1] 37/7
**craft** [3] 62/22 63/12 63/21
**created** [2] 12/1 39/9 43/12
**creating** [4] 10/17 10/20 25/20 25/23
**credibly** [1] 18/13
**credit** [2] 30/16 30/17
**criminal** [2] 2/5 5/16
**critical** [2] 56/14 56/17

**cross** [14] 15/17 16/8 28/19 29/4 29/6 31/24 36/16 38/25 39/6 39/25 42/25 61/9 62/25 63/5
**cross-examination** [9] 15/17 16/8 28/19 29/6 36/16 39/21 55/14 61/9 63/5
**cross-examine** [2] 55/21 62/25
**cross-examined** [3] 29/4 31/24 36/18
**crystal** [1] 15/4
**cue** [1] 36/5
**Cummings** [1] 3/12
**current** [2] 29/8 64/16

**D**

**D.C** [3] 7/18 11/8 51/13
**data** [121]
**database** [1] 43/5
**databases** [1] 25/5
**date** [10] 8/8 8/24 9/24 12/16 12/17 29/5 31/1 64/3 64/16 67/13
**Daubert** [1] 28/21
**day** [4] 1/12 35/1 58/7 66/15
**days** [2] 17/1 46/19
**dealing** [1] 5/9
**dealt** [1] 65/25
**DEAN** [2] 2/15 2/15
**December** [1] 5/7
**December 31st** [1] 5/7
**decided** [1] 16/8
**decides** [1] 19/21
**decrease** [1] 13/10
**deemed** [1] 5/9
**defendant** [33] 1/12 2/13 5/12 14/20 14/23 22/7 22/16 23/8 23/10 23/11 23/18 24/16 24/19 25/9 28/9 29/9 31/18 34/2 35/12 36/13 36/15 40/22 44/21 45/6 45/21 60/25 61/4 62/2 62/7 62/21 63/19 63/20 65/18
**defendant's** [3] 14/22 20/25 57/4
**defense** [56] 3/21 3/23 4/3 4/6 4/15 4/21 5/19 5/20 5/21 6/4 6/16 6/20 11/11 13/13 15/6 15/7 16/2 16/2 17/4 17/8 18/6 18/22 26/23 39/11 39/19 42/9 44/7 44/9 44/21 45/1 45/5 45/12 45/17 45/20 46/1 47/7 47/17 50/24 51/19 51/19 52/16 53/5 53/10 54/7 56/3 57/1 60/6 60/7 60/11 61/9 61/18 62/24 64/3 64/6 65/7
**defense's** [1] 64/4
**defined** [2] 5/10 49/25
**definitely** [2] 47/4 47/11
**delay** [1] 32/14
**delta** [1] 34/18
**demand** [1] 11/14
**demanded** [1] 16/25
**demonstrably** [2] 19/9 28/10
**demonstrate** [1] 20/21
**denied** [3] 12/8 62/21 65/4
**deny** [1] 57/21
**denying** [2] 37/17 44/7
**Department** [1] 11/7
**depending** [1] 8/7
**described** [1] 63/20
**despite** [2] 12/19 19/13
**detail** [1] 49/12
**details** [2] 51/24 55/14
**determination** [2] 44/5 46/8
**determine** [4] 4/10 6/9 25/12 46/21
**determined** [1] 45/8
**determining** [3] 21/20 42/8 59/5
**devices** [3] 10/17 25/20 49/7
**did** [28] 9/1 12/9 13/12 16/2 16/2 16/6 22/12 27/17 32/5 33/1 34/24 35/7 36/15 36/17 36/19 36/20 37/23 38/16 44/8 45/16 53/6 53/8 53/9 53/22 55/25 57/21 59/15 60/5
**didn't** [21] 15/10 20/14 30/3 30/5 32/1 33/6 34/15 35/1 35/14 35/21 35/22 37/23 47/21 51/1 51/14 52/5 56/1 59/23 61/16 61/1 63/15
**difference** [6] 31/2 31/5 31/7 31/14 43/15 46/3
**differences** [1] 52/5
**different** [7] 8/22 18/6 24/6 31/19 44/4 63/14

**D**

**different...** [1] 63/14
**difficult** [1] 42/12
**digital** [3] 10/17 25/20 42/17
**diligent** [3] 59/15 66/15 66/18
**diligently** [1] 43/6
**direct** [1] 49/20
**directed** [1] 14/19
**directing** [1] 14/15
**direction** [1] 44/16
**directive** [2] 17/6 17/6
**directives** [1] 65/9
**directly** [2] 42/1 52/24
**disclosure** [1] 35/7
**discovered** [1] 54/17
**discovery** [3] 4/15 7/16 14/11
**discuss** [2] 26/20 64/20
**discussed** [1] 25/2
**discusses** [1] 26/18
**discussion** [4] 24/1 41/18 51/5 51/22
**disputes** [1] 56/15
**distinction** [3] 42/23 42/25 43/2
**DISTRICT** [2] 1/4 1/5
**DIVISION** [2] 1/6 2/5
**do** [33] 4/13 7/24 8/5 9/19 16/11 17/11 19/4
23/12 24/8 25/16 29/24 29/25 29/25 33/10
36/3 36/22 38/2 39/19 39/20 39/22 40/4
40/4 41/1 41/3 43/24 52/16 57/20 63/8 64/4
65/3 65/13 65/21
**Docket** [6] 3/15 10/6 14/19 24/15 59/9 63/2
**document** [5] 5/6 6/25 10/13 49/6 53/19
**documents** [19] 9/4 12/14 20/10 25/14 35/9
38/18 39/17 42/7 49/22 50/9 50/13 54/9 54/14
54/16 54/18 55/4 56/10 59/13 61/16
**does** [11] 13/5 21/15 21/19 22/19 26/15 27/2
27/20 28/5 40/8 41/17 51/16
**doesn't** [5] 22/16 23/21 32/9 51/19 51/23
**doing** [3] 22/7 24/20 43/1
**dollar** [1] 33/25
**dollars** [1] 21/18
**don't** [29] 8/9 8/15 9/7 17/24 18/16 19/23 22/2
25/11 26/12 27/7 27/14 27/23 33/22 33/23
33/25 34/16 34/20 37/3 37/19 38/8 41/16
42/23 44/11 54/20 56/15 57/23 58/6 62/10
65/20
**done** [9] 8/7 8/8 9/2 12/20 29/9 33/3 63/4
63/13 63/14
**double** [1] 35/20
**doubt** [3] 52/21 62/2 62/3
**doubting** [1]
**down** [5] 16/13 39/6 44/13 45/7 60/12
**DPPA** [1] 14/17
**draft** [4] 15/24 15/25 31/9 59/12
**drafts** [1] 29/9
**drag** [1] 65/22
**drew** [1] 60/12
**drive** [1] 6/13
**dropped** [1] 29/16
**Drum** [13] 21/8 22/12 23/1 28/23 28/25 31/20
35/8 36/17 39/20 53/12 55/21 60/18 63/1
**Drum's** [1] 56/17
**due** [4] 8/18 8/20 14/13 41/10
**during** [2] 11/6 12/2
**Dynamics** [1] 50/1

**E**

**e-mail** [2] 31/10 51/10
**e-mailed** [1] 28/15
**e-mails** [1] 30/14
**EA** [20] 10/14 10/16 10/18 10/20 10/21 10/21
10/23 10/25 25/19 25/21 25/23 25/24 25/24
26/1 26/3 26/21 26/24 50/15 57/6 57/9
**each** [14] 7/3 7/9 13/2 13/11 14/4 19/16 21/11
23/6 30/20 34/4 38/16 56/2 66/9
**Eagan** [3] 13/12 26/19 49/8
**earlier** [1] 33/7 43/20 47/20
**earliest** [1] 24/12
**early** [2] 11/3 58/12
**easily** [1] 17/23

**E** (col 2)

**effort** [6] 13/6 13/15 17/2 57/14 63/23 63/24
**efforts** [4] 5/11 12/23 17/1
**egregious** [1] 30/7
**eight** [3] 5/11 12/23 17/1
**either** [9] 14/21 16/7 34/18 36/7 36/25 37/25
41/20 54/24 65/22
**electronic** [3] 7/9 34/14 50/2
**element** [1] 59/5
**else** [1] 57/21
**emphasize** [1] 30/7
**encompassed** [1] 58/20
**end** [3] 8/21 34/5 63/11
**ended** [2] 42/12 49/1
**enormous** [1] 7/12
**enough** [1] 9/8
**ensued** [1] 62/20
**ensure** [1] 26/20
**entire** [4] 9/17 11/24 14/10 18/21
**entirety** [1] 6/22 38/21
**entities** [2] 49/25 50/6
**entitled** [7] 16/7 16/11 16/12 21/17 22/8 23/8
23/12 23/14 23/16 23/23 34/5 59/6 60/25 61/4
67/9
**entries** [1] 57/8
**entry** [1] 8/25
**enumerates** [1] 49/15
**equation** [1] 36/24
**especially** [3] 21/9 31/19 38/8
**establish** [2] 21/10 59/3
**established** [5] 15/16 27/19 32/13 36/24
57/13
**establishes** [1] 62/4
**estimate** [1] 64/2
**et** [3] 19/23 23/23 57/8
**even** [26] 17/22 18/5 18/7 22/21 23/1 23/9
23/12 25/2 29/16 29/17 30/7 30/15 30/23
31/21 32/21 34/10 40/4 50/8 51/25 52/5 52/19
55/16 55/24 60/2 60/12 61/22
**event** [3] 14/13 15/11 17/24
**events** [2] 4/2 25/11
**ever** [1] 21/20
**every** [8] 14/4 23/7 30/20 33/13 34/4 34/8
38/16 66/15
**everything** [9] 7/21 15/10 22/11 25/8 29/5
34/8 34/21 55/25 56/1
**evidence** [15] 10/24 10/24 14/21 23/9 26/2
26/2 26/13 28/1 32/12 39/25 40/1 52/12 54/21
62/5 62/8
**exact** [2] 11/12 60/23
**exactly** [6] 7/17 9/8 22/25 31/13 31/16 32/6
**examination** [10] 15/17 16/8 22/17 28/19
29/6 36/16 39/21 55/14 61/9 63/5
**examine** [2] 55/21 62/25
**examined** [3] 29/4 31/24 36/18
**examining** [1] 63/13
**example** [5] 21/24 32/1 34/10 34/23 42/6
**examples** [2] 28/4 37/2
**except** [1] 18/16
**exclusively** [1] 56/19
**exculpatory** [12] 13/8 13/16 13/18 13/19
13/20 13/21 13/22 13/24 14/9 38/4 38/5 51/18
**Excuse** [1] 3/25
**executed** [1] 9/22
**exhaustive** [1] 49/17
**exhibit** [11] 10/9 11/18 12/25 15/22 16/19
20/21 28/8 31/10 57/4 59/11 59/12
**Exhibit 1084** [1] 11/18
**Exhibit 1085** [2] 12/25 57/4
**Exhibit 174** [1] 10/9
**Exhibit 193** [1] 31/10
**Exhibit 48** [2] 28/8 59/11
**exhibits** [10] 9/17 10/5 15/21 16/21 19/8 21/8
31/7 39/16 53/22 54/7
**exist** [2] 27/17 27/20
**existed** [4] 17/3 32/1 32/2 53/19
**existence** [5] 12/19 47/6 52/7 56/21 57/22
**exists** [2] 34/19 44/23
**expedited** [1] 65/21
**expense** [4] 16/14 29/17 29/18 57/8

**E** (col 3)

**expenses** [25] 13/4 13/13 15/9 16/4 21/21
28/25 29/2 29/8 29/12 29/13 29/17 29/21
29/21 30/15 30/16 30/23 31/4 32/25 33/22
35/6 35/9 35/10 39/13 57/7 57/9
**experience** [1] 38/14
**expert** [5] 18/24 19/12 19/13 19/13 35/7
**explained** [1] 17/10
**exploring** [1] 6/11
**exported** [1] 6/14
**extended** [1] 64/5
**extensive** [2] 29/6 59/9
**extensively** [1] 31/24
**extent** [6] 18/17 40/16 40/18 41/7 41/8 53/5
**extra** [1] 35/23
**extract** [1] 34/11
**extraordinary** [1] 55/11
**extremely** [1] 35/11

**F**

**F.3d** [1] 17/17
**facie** [1] 23/13
**facility** [1] 29/20
**fact** [13] 12/12 14/7 19/19 23/9 28/11 44/5
47/16 47/18 49/5 51/11 53/22 54/3 55/6
**facts** [8] 27/15 41/5 41/11 41/12 41/13 41/22
41/24 56/12
**factual** [3] 41/18 43/19 61/6
**failure** [4] 20/2 20/5 20/16 62/12
**failures** [1] 20/22
**fair** [4] 9/16 9/16 47/24 66/17
**fairly** [1] 62/17
**fairness** [1] 46/2
**faith** [9] 19/20 20/24 24/13 27/12 40/11 40/12
**fall** [2] 27/15 47/2
**false** [4] 19/9 19/10 28/10 34/2
**familiar** [1] 20/20
**far** [1] 4/5
**fashion** [4] 19/3 19/6 23/2 23/13
**fast** [1] 50/7
**fast-forward** [1] 50/7
**favorable** [6] 14/23 18/1 18/5 51/18 62/5 62/7
**February** [3] 29/2 30/21 31/1
**February 3rd** [1] 30/21
**February 4th** [1] 31/1
**February 5th** [1] 29/2
**Federal** [1] 2/10
**FedEx** [1] 29/14
**fee** [1] 60/13
**feel** [2] 37/14 45/13
**fees** [1] 50/10
**few** [3] 9/20 46/19 55/18
**figure** [1] 58/14
**file** [6] 7/9 7/9 7/10 25/3 37/4 54/1
**filed** [5] 5/6 6/2 6/25
**files** [22] 4/8 4/8 4/10 7/3 7/4 7/5 7/6 7/22
7/25 8/2 8/9 12/1 34/14 34/17 38/20 38/23
45/1 45/15 45/25 50/2 54/4 59/9
**filing** [2] 16/20 53/17 59/9
**Filippo** [2] 30/14 30/17
**filtering** [1] 43/10
**filters** [1] 43/4
**final** [2] 15/14 39/2
**finally** [4] 5/18 6/3 17/8 62/9
**finances** [4] 21/16 22/1 22/5 22/21
**financial** [11] 3/15 15/8 21/3 21/9 21/11 22/13
22/17 50/4 50/5 56/14 56/19
**find** [13] 17/2 22/2 38/13 38/16 40/15 44/1
62/5 62/9 62/14 62/15 62/20 64/9 64/11
**finding** [2] 30/6 62/19
**findings** [2] 3/17 64/9
**fine** [4] 28/18 37/4 38/7 65/16
**finished** [2] 4/6 6/4
**firm** [2] 38/21 50/1
**first** [13] 4/5 4/21 5/8 10/13 11/10 16/4 16/13
23/17 43/14 45/13 56/14 57/7 63/10
**Fitzgerald** [12] 3/8 6/21 41/1 41/16 41/19
41/21 49/1 49/2 54/6 54/7 55/1 61/10
**five** [4] 16/20 16/23 18/23 47/22
**focus** [3] 20/8 24/6 61/21

**F**

focuses [1] 45/18
folks [1] 66/14
follow [2] 6/24 27/18
following [4] 11/13 15/5 26/18 57/16
footnote [1] 29/17
forego [1] 41/24
foregoing [1] 67/7
forensic [20] 4/18 10/17 10/20 10/23 11/5
11/6 11/9 11/12 15/20 25/23 26/1 26/5 26/11
26/24 49/4 50/22 51/13 51/14 58/4 58/9
formal [1] 6/24
format [1] 67/10
former [1] 47/24
forth [9] 11/1 21/17 21/21 26/4 26/14 32/4
32/25 39/14 60/24
forward [1] 50/7
found [7] 6/11 10/5 14/10 20/11 40/6 42/7
47/6
four [3] 11/20 12/3 29/10
Fourth [1] 2/11
FOX [1] 2/4
frankly [2] 19/15 20/1
fraud [1] 34/1
Frauds [1] 2/6
free [2] 27/1 27/3
Friday [1] 17/5
front [1] 63/11
fulfill [1] 43/7
full [6] 8/5 18/17 20/12 30/1 37/17 44/7
fully [4] 27/23 33/11 36/19 57/12
further [9] 3/17 13/19 5/17 18/16 21/1 33/22
64/18 65/6 66/1

**G**

gain [1] 33/19
gaining [1] 55/3
Gardner [11] 29/25 30/3 30/12 36/7 38/15
38/22 52/7 52/13 52/13 59/22 59/25
gave [3] 30/16 30/17 37/23
generalized [1] 23/2
generally [1] 63/6
gentlemen [1] 13/2
Geoffrey [1] 32/8
get [11] 4/23 17/7 17/7 18/25 28/3 33/6 40/7
45/16 47/25 51/23 66/12
gets [2] 6/25 56/8 56/11
getting [2] 44/3 54/8
gigabytes [2] 7/13 7/18
Giglio [8] 12/15 13/21 14/1 14/6 18/8 18/10
23/22 37/22
give [2] 37/8 65/1
given [3] 6/7 61/16 63/23
glad [1] 26/20
go [20] 4/5 7/14 14/3 17/13 17/13 17/14 18/15
21/8 21/19 21/25 23/17 24/1 24/9 26/10 36/8
37/1 50/12 50/17 50/19 64/8
goes [3] 21/4 21/18 52/24
going [20] 7/13 8/14 9/17 12/11 14/3 18/25
19/22 22/7 37/13 38/10 39/16 41/4 41/14
47/20 48/3 50/3 65/23 65/25 66/12 66/16
gone [3] 9/18 20/22 58/9
good [7] 3/5 3/10 3/11 3/13 19/20 24/13 27/12
good-faith [1] 24/13
got [2] 7/12 44/16
government [66] 5/19 8/12 10/22 10/25 12/10
12/13 13/15 14/16 14/19 14/21 15/9 15/21
16/3 16/13 16/16 17/2 19/11 19/20 19/23 20/7
20/12 20/23 22/18 23/23 24/16 24/24 27/14
27/14 31/8 35/10 36/4 39/1 39/4 39/6 41/15
43/12 44/2 44/11 44/12 46/18 46/19 46/19 49/17
49/18 51/5 51/17 51/20 52/15 52/22 53/3 53/4
54/3 55/8 55/8 56/15 56/16 56/16 56/23 57/12
59/15 60/2 60/4 60/22 60/24 62/9 65/14 66/1
government's [13] 10/15 15/2 18/23 22/13
25/18 34/25 37/19 43/16 43/17 60/17 61/23
62/3 63/6
grab [1] 45/6
grant [6] 20/25 21/22 39/24 56/3 64/14 65/19

granted [2] 19/18 65/18
grounds [1] 41/20
grounds [1] 61/22
guess [3] 17/11 22/14 40/19
guidance [1] 47/25
guideposts [1] 9/20
guilt [2] 14/22 14/24

**H**

had [51] 12/9 12/22 13/22 14/1 14/3 14/6 14/8
14/11 15/4 15/7 15/10 19/11 23/19 24/15
24/17 25/14 26/10 37/17 37/20 52/1 54/6 54/10
34/15 34/21 38/2 42/5 43/21 45/21 46/6 47/6
47/10 47/10 47/10 51/24 52/1 54/6 54/10
54/11 55/12 55/22 55/25 58/9 58/14 58/20
58/22 59/16 59/18 59/22 63/4 63/4 63/15
65/12
handed [1] 49/5
handled [1] 12/5
handwritten [1] 56/25
HANNA [1] 2/3
happen [2] 36/15 44/19
happened [9] 4/2 6/3 7/17 17/1 34/4 37/20
41/18 41/25 44/14
happens [2] 8/7 21/20
happy [2] 51/23 56/3
hard [4] 6/13 9/1 33/5 43/6
has [39] 6/16 9/15 9/18 10/22 12/13 17/16
19/1 20/22 21/1 21/9 25/25 27/25 30/1 32/3
32/17 33/13 33/18 34/6 34/11 34/20 34/22
35/10 39/7 39/11 39/15 39/18 39/25 40/1 40/9
40/10 40/16 41/15 41/25 45/24 45/24 55/1
55/5 55/7 62/16
hasn't [2] 27/19 34/20
have [127]
haven't [2] 18/17 54/22
having [7] 11/7 25/5 25/6 43/15 43/16 47/23
62/23
he [97]
he's [5] 22/22 29/22 30/6 35/8 39/19
hear [2] 32/3 37/5
heard [9] 9/11 39/25 40/1 54/6 54/11 54/22
54/24 55/1 65/9
hearing [1] 21/4
heart [1] 21/4
heat [2] 20/3 20/4
held [4] 9/4 44/2 51/13 67/9
help [2] 55/4 66/16
helps [1] 53/3
here [19] 10/8 10/14 23/6 26/6 34/16 34/24
35/2 41/16 41/21 44/14 45/14 47/4 48/4 54/22
57/17 57/20 62/20 66/6 66/7
hereby [1] 67/6
hiding [1] 35/14
him [21] 10/22 23 26/16 29/14 29/14 29/22
30/16 30/17 33/19 34/11 35/5 35/7 37/23
37/24 39/19 39/24 40/3
himself [1] 60/12
his [32] 9/12 25/17 29/11 29/11 29/13 29/13
29/14 29/18 29/20 30/22 30/23 31/21 32/19
33/6 33/9 34/7 37/24 38/2 39/4 39/9 39/11
39/12 39/19 39/21 45/21 51/25 60/19 60/20
62/22 63/2 63/12 63/12
hold [2] 64/5
home [1] 9/22
Honor [96]
Honor's [3] 12/12 52/5 65/9
HONORABLE [1] 1/8
hourly [2] 32/23 32/24
hours [5] 12/23 17/12 25/11 38/12 41/25
house [2] 42/19 47/21
housing [1] 29/20
how [18] 12/1 13/24 14/11 15/19 17/3 18/25
20/21 22/7 32/4 32/18 32/23 33/6 35/21 38/3
39/10 53/3 53/24 53/25

**I**

I'll [1] 4/6

I'm [32] 4/6 8/12 8/14 9/17 14/3 15/11 16/23
17/10 17/21 18/13 19/2 24/2 24/15 25/16 27/9
27/22 28/3 30/6 33/12 33/17 34/19 34/19
37/13 38/10 40/14 41/14 43/13 51/23 53/3
56/3 60/8 65/23 66/12
I've [2] 10/10 37/11
identical [2] 31/2 59/11
identified [8] 10/4 29/17 46/9 46/18 46/19
61/7 61/11 61/24
image [5] 10/17 10/20 25/20 25/23 26/24
images [6] 11/5 11/6 11/9 11/12 49/4 58/4
immediately [2] 15/14 50/17
impanel [1] 64/24
impartial [1] 66/17
importance [4] 12/19 53/6 53/11 53/14
important [5] 9/20 12/7 15/19 41/5 42/11
importantly [1] 12/4
impossible [1] 8/4
inability [1] 44/1
inaccurate [3] 28/16 28/20 40/15
inadvertence [1] 62/12
inadvertently [1] 62/9
inception [1] 40/2
include [3] 7/7 32/1 49/25
included [7] 7/21 8/1 29/5 29/5 47/9 49/8 58/4
including [12] 15/13 16/22 22/20 24/7 24/22
40/9 50/1 50/4 50/5 50/16 62/23 63/4
income [1] 13/12
incorrect [2] 22/9 23/4
increase [1] 13/9
inculpatory [1] 13/8
indeed [1] 18/4
indicate [2] 56/24 61/7
indicated [3] 57/5 59/20 61/10
indicating [1] 66/9
Indictment [3] 10/1 42/14 52/18
individuals [1] 11/20
information [47] 3/19 4/17 5/1 5/10 5/12 5/14
5/22 6/10 6/21 7/8 8/22 8/25 9/8 10/3 10/5
11/15 14/1 14/6 14/9 14/16 14/20 15/13 17/13
17/13 17/14 17/23 17/25 18/5 18/14 19/7
19/15 25/10 26/21 34/21 49/16 51/18 51/18
52/3 52/19 52/21 52/23 53/15 53/20 55/4
55/10 55/13 63/4
informed [2] 12/3 12/4
informs [2] 9/5 41/12
initial [3] 27/25 43/10 61/12
input [1] 28/16
inquire [1] 53/23
inquiry [3] 6/12 36/11 58/3
instruction [1] 33/25
integral [1] 15/17
intelligently [1] 9/9
intent [1] 52/25
intention [1] 37/5
intentional [1] 64/12
interest [1] 8/5
interim [3] 15/23 28/14 64/19
interjected [2] 16/4 39/5
interpose [1] 41/14
interrupt [1] 60/8
interview [9] 9/24 11/16 11/21 12/8 12/23
20/19 56/22 57/2 57/4
interviews [1] 57/11
introduced [3] 31/8 31/17 32/10
investigate [1] 26/11
investigation [3] 10/15 25/18 42/14
investigative [2] 57/19 58/2
invite [1] 4/6
iPhone [1] 4/22
irrelevant [1] 32/20
IRS [6] 8/20 10/16 25/19 26/25 44/13 44/21
IRS-CI [2] 10/16 25/19
IRS-CI's [2] 26/25
is [167]
isn't [4] 28/17 30/7 39/15 40/12
isolated [1] 20/2
issue [16] 4/11 9/16 14/15 14/23 16/4 36/3
45/18 45/22 47/3 47/5 47/15 51/15 52/11

issue... [3] 53/17 62/5 65/17
issued [4] 10/1 14/18 17/5 49/12
issues [5] 3/20 20/17 22/4 42/1 43/18
it [181]
it's [32] 7/13 8/1 8/22 10/9 15/18 17/11 17/17
19/23 22/6 23/21 23/25 27/6 28/10 28/17
29/19 30/8 30/10 32/24 33/5 35/1 37/5 39/6
40/10 40/13 41/15 47/17 52/10 52/10 55/19
55/20 59/23 65/24
Item [1] 3/3
itemized [1] 30/23
items [4] 15/7 38/14 38/15 38/15
its [18] 12/13 12/15 13/11 13/16 17/6 17/6
25/13 40/16 40/18 44/7 47/16 51/17 51/20
54/1 59/8 61/9 62/25 64/13
itself [1] 59/2

J

JAMES [1] 1/8
January [4] 14/18 49/23 51/21 52/2
January 2011 [1] 49/23
January 2021 [1] 51/21
January 25th [1] 14/18
Jencks [1] 20/18
JOHN [6] 1/11 2/14 3/4 32/22 35/8 39/20
Johnson [16] 15/22 16/23 29/10 29/22 29/24
30/19 31/4 31/20 32/8 35/20 36/6 38/15 38/22
53/13 59/11 59/21
Johnson's [1] 30/22
JUDGE [1] 1/8
judged [1] 47/1
judgment [2] 47/4 47/5
Judicial [1] 67/11
Julian [1] 10/7
July [4] 11/16 12/6 56/22 58/13
July 25 [1] 56/22
July 25th [2] 11/16 12/6
July 28 [1] 58/13
June [1] 35/12
jurors [1] 66/6
jury [12] 3/2 16/14 19/10 22/6 33/25 39/25
52/12 60/19 64/1 64/5 64/24 66/17
just [13] 5/24 7/22 27/12 34/23 35/12 37/7
39/7 41/15 41/25 45/6 47/17 54/13 58/22
Justice [1] 11/8
JVS [2] 1/11 3/3

K

Karlous [7] 9/24 11/21 12/22 16/22 49/11
56/24 57/16
kept [2] 32/19 35/21
Kim [1] 11/22
knew [6] 42/24 42/24 45/18 53/11 55/25 56/1
know [19] 15/10 18/16 20/20 26/12 27/22
34/9 34/16 34/18 35/5 36/18 37/12 43/14 44/1
51/11 52/14 54/20 57/23 58/6 61/15
knowing [1] 37/13
knowledge [2] 40/17 40/18
known [4] 14/21 19/11 39/15 54/2

L

L.A [1] 7/19
lab [1] 11/8
lack [2] 18/3 55/15
large [1] 66/14
largely [1] 5/5
last [22] 3/14 6/4 8/13 8/20 9/18 16/20 17/5
17/11 18/11 22/3 22/25 25/11 26/19 38/11
41/25 44/24 52/16 52/21 56/8 56/11 58/3 60/5
lasting [1] 12/2
Lastly [1] 53/16
late [1] 8/12
later [4] 8/8 8/14 12/7 29/11
latest [1] 17/1
law [7] 2/15 38/21 41/11 41/13 41/22 46/2
50/1
lawyers [1] 32/19
learned [1] 56/23

least [8] 15/23 18/23 33/1 38/7 59/4 61/19
leave [8] 8/15 51/1 64/24
legal [5] 41/24 42/1 43/11 43/18 43/20
less [2] 30/16 38/12
lesser [1] 61/2
let [23] 17/23 28/11 34/9 35/5 41/12 45/5 46/5
53/16 58/1
let's [1] 6/24
letter [4] 25/17 50/7 50/12 66/9
level [1] 35/23
license [1] 4/12
lied [1] 29/22
light [4] 14/11 46/6 57/25 64/7
like [17] 3/18 5/3 9/10 22/4 22/21 26/5 28/3
41/3 36/7 41/18 47/8 47/17 47/19 48/25
65/10 65/13 65/16
likely [2] 52/24 61/8
limited [1] 17/10
lines [4] 4/7 4/14 7/2 7/15
list [2] 6/8 45/13
listed [5] 5/23 7/3
listing [2] 15/22 15/23
literally [1] 17/2
litigation [1] 5/25
little [3] 16/15 18/19 32/15
lived [3] 63/18 63/23 63/25
living [6] 29/13 29/17 29/18 29/20 30/23 31/4
LLP [16] 10/14 10/16 10/18 10/21 10/21 10/23
10/25 12/1 25/19 25/21 25/24 25/24 26/3
26/21 26/24
LLP's [1] 50/15
loan [2] 29/10 31/3
located [1] 54/14
location [1] 10/4
lodge [2] 36/9 37/2
long [10] 20/21 32/12 37/12 38/16 39/18 39/25
42/11
long-run [1] 42/11
look [21] 5/21 8/19 12/20 19/12 21/7 29/7
29/19 31/7 32/21 36/25 38/7 40/20 48/1 49/14
53/9 58/15 58/16 58/18 58/23 65/12 65/24
looked [1] 6/8
looking [1] 47/1
looks [1] 56/17
Los [1] 2/8
loss [1] 59/21
losses [1] 21/10
lot [6] 8/22 8/22 17/12 17/13 17/14 35/20

M

machine [4] 7/21 7/25 8/3 8/10
made [33] 4/15 4/17 4/19 11/2 12/16 12/17
13/6 13/15 14/5 14/8 15/3 17/2 17/20 18/14
20/9 20/12 22/3 22/18 24/13 27/25 38/4 45/7
46/8 51/5 51/7 51/10 51/12 54/24 55/5 55/6
55/17 56/9 57/14
mail [2] 31/10 51/10
mailed [1] 28/15
mails [1] 30/14
maintained [1] 12/2
major [2] 2/6 42/13
make [14] 16/12 23/10 23/14 23/16 25/17
36/10 37/8 37/14 42/23 44/9 46/2 53/16 58/20
63/16
makes [1] 18/3 23/3
making [5] 36/12 42/15 44/5 44/18 58/3
malfunction [1] 8/19
managed [1] 19/10 25/22
manner [1] 14/20
many [4] 17/19 19/6 19/6 23/19
March [5] 6/2 9/21 35/7 49/23 50/14
March 25 [2] 49/23 50/14
March 25th [2] 6/2 9/21
Marchino [2] 30/14 30/17
mark [2] 61/3 61/5
Maryland [1] 61/25
matched [1] 32/6
matches [1] 31/12

material [22] 5/8 5/20 6/11 6/15 16/16 27/2
28/17 32/16 32/25 53/25 53/25 54/6 54/9
59/14 61/8 61/8 62/24 63/11 63/22 63/24 64/7
materiality [1] 17/21 59/3
materials [15] 27/21 46/8 46/9 46/18 49/22
50/9 50/13 59/18 61/11 61/13 61/13
61/24 62/1 63/20
math [1] 24/20
matter [5] 31/11 55/7 55/14 64/15 67/9
matters [1] 5/13
may [18] 4/12 5/12 10/2 10/8 10/14 11/3
16/23 25/17 26/22 28/6 43/18 56/6 56/16 58/6
61/1 61/22 62/17 64/11
May 24th [3] 10/8 10/14 11/3
May 4th [1] 25/17
maybe [3] 16/20 35/24 38/12
mayor [1] 47/24
me [16] 3/25 9/3 9/5 23/17 23/21 28/11 37/1
37/8 41/12 46/5 53/16 58/1 61/7 61/10 61/16
65/2
mean [4] 13/23 20/14 42/23 60/5
meaning [2] 24/23 27/14
means [1] 59/17
meant [1] 60/7
Meanwhile [1] 13/25
measured [1] 65/25
mechanism [2] 25/9 25/12 38/2
medical [1] 29/18
meet [1] 17/24
meeting [1] 4/3
members [2] 12/3 57/18
memo [1] 56/25
memorandum [1] 11/25
memorialize [2] 3/21 5/3
mention [1] 38/20
mentioned [1] 11/5 37/24 40/9
merits [1] 44/3 66/12
methods [2] 60/18 60/20
MICHAEL [4] 1/11 2/14 3/4 3/11
Michelle [1] 32/11
Microsoft [1] 50/1
middle [1] 15/16
might [3] 53/1 63/13 63/14
million [3] 21/19 34/17 50/16
mind [2] 15/2 28/17
minimum [3] 16/21 28/17 28/19
minor [1] 55/19
minute [2] 39/11 48/4
Miramar [1] 2/16
misappropriated [1] 60/24
misconduct [3] 64/9 64/10 64/12
misfunction [1] 8/21
misses [1] 27/12
missing [6] 15/12 20/10 25/1 25/9 34/9 34/14
mistaken [1] 30/11
mistrial [3] 20/9 65/8 65/18
MixinIT [2] 10/19 25/22
MJ [1] 49/6
modifications [1] 6/20
modified [1] 5/3
moment [1] 4/9
money [11] 13/9 13/10 21/18 21/19 22/8
28/15 29/3 33/5 33/6 33/9 34/2
month [3] 12/7 12/8 54/5
months [6] 29/11 29/19 33/4 33/7 33/8 55/18
moot [1] 65/4
more [11] 23/1 23/19 30/7 34/17 36/20 42/11
42/11 47/23 50/8 51/21 57/2
morning [10] 3/5 3/10 3/11 3/13 8/7 57/15
58/13 61/7 61/18 65/10
most [6] 11/20 12/4 17/25 18/2 29/8 63/2
motion [10] 9/6 10/6 12/8 19/17 19/17 20/25
25/3 41/16 56/3 65/8
motions [3] 19/21 20/9 65/4
motive [1] 52/25
move [1] 65/20
moved [2] 14/14 55/6
moves [1] 29/20
moving [1] 56/11

## M

**Mr [6]** 6/21 41/16 41/19 53/25 60/18 63/11
**Mr. [73]**
**Mr. Andre [6]** 11/2 11/13 11/23 26/9 53/24 54/25
**Mr. Andre's [1]** 25/17
**Mr. Arden [1]** 16/23
**Mr. Avenatti [10]** 5/13 6/18 9/10 27/25 37/5 56/21 59/6 60/12 60/23 63/3
**Mr. Avenatti's [2]** 3/14 9/6
**Mr. Barela [7]** 16/22 29/24 31/5 32/22 33/4 33/9 53/13
**Mr. Drum [9]** 21/8 22/12 23/1 28/23 28/25 31/20 53/12 55/21 63/1
**Mr. Drum's [1]** 56/17
**Mr. Fitzgerald [8]** 41/1 41/21 49/1 49/2 54/6 54/7 55/1 61/10
**Mr. Johnson [8]** 16/23 29/10 29/22 29/24 31/4 31/20 35/20 53/13
**Mr. Johnson's [1]** 30/22
**Mr. Sagel [5]** 11/22 14/8 21/3 51/22 54/25
**Mr. Steward [2]** 3/12 10/2
**Mr. Tashchyan [2]** 7/20 7/24
**Mr. Varani [7]** 4/19 7/17 8/1 11/6 11/9 50/23 51/12
**Mr. Varani's [1]** 7/22 8/10
**Mr. Wyman [1]** 54/25
**Ms [11]** 9/22 11/17 12/23 16/22 31/10 31/13 36/17 53/14 57/3 57/5 58/12
**Ms. [10]** 3/12 12/3 21/19 21/24 29/25 30/3 30/12 35/16 52/7 56/22
**Ms. Cummings-Cefali [1]** 3/12
**Ms. Gardner [4]** 29/25 30/3 30/12 52/7
**Ms. Phan [1]** 21/24
**Ms. Phan's [1]** 21/19
**Ms. Regnier [3]** 12/3 35/16 56/22
**much [2]** 14/11 32/23
**multiple [2]** 28/10 37/24
**must [4]** 62/5 62/8 62/19 62/20
**my [18]** 4/9 6/7 6/14 15/19 24/20 27/15 33/15 37/5 39/2 42/12 45/8 47/20 53/1 53/4 53/5 56/13 64/9 65/13
**myriad [1]** 13/23

## N

**namely [2]** 19/11 42/14
**nature [4]** 7/7 13/11 13/16 20/18
**NAV [1]** 50/1
**necessary [7]** 37/3 39/12 39/13 39/23 40/5 40/12 40/13
**need [10]** 4/12 9/7 18/20 25/10 37/14 39/10 40/6 41/4 48/1 65/24
**needed [5]** 15/3 36/11 40/3 44/16 49/18
**needless [1]** 8/21
**needs [6]** 8/8 39/20 39/22 40/4 44/6 45/20
**net [2]** 59/6 60/14
**never [17]** 13/8 13/9 13/15 19/11 19/14 19/14 28/12 28/17 33/21 34/18 52/13 54/23 54/24 55/1 55/5 55/6 61/15
**new [11]** 5/18 29/18 29/20 31/3 32/8 39/15 46/5 46/6 63/23 64/14 65/19
**newly [4]** 46/9 63/20 63/22 64/7
**next [1]** 58/7
**NICOLA [1]** 2/3
**night [12]** 3/14 6/4 8/13 8/20 16/20 18/12 22/3 35/1 38/11 44/24 52/16 52/21
**nine [2]** 33/4 33/6
**Ninth [4]** 17/16 17/17 17/20 18/4
**no [53]** 3/16 5/6 5/21 8/9 11/15 14/9 14/9 15/4 17/2 18/9 19/4 21/2 21/25 24/15 29/12 29/15 29/23 30/2 30/9 30/11 31/11 32/11 33/17 35/14 37/25 38/13 39/24 43/14 45/11 49/3 50/21 50/24 51/5 53/3 53/17 54/21 56/5 57/14 58/9 58/16 59/16 59/22 59/25 60/13 60/22 62/14 62/15 64/9 64/10 64/11 66/2 66/7
**non [1]** 23/14
**non-winning [1]** 23/14
**noncompliance [1]** 14/25

**North [1]** 2/7
**not [85]**
**noted [1]** 51/16 52/4 52/7
**notes [2]** 20/19 56/23
**nothing [11]** 12/20 17/1 17/2 30/19 30/20 31/17 31/18 32/2 36/14 53/8 53/9
**notice [4]** 53/8 53/14 56/20 57/12
**notification [1]** 54/7
**November [2]** 12/21 57/3
**November 19 [2]** 12/21 57/3
**now [24]** 5/4 8/23 9/1 16/18 17/22 19/8 19/19 28/23 33/2 33/22 36/8 37/2 39/7 43/13 43/14 43/23 43/24 44/23 44/25 45/13 45/22 52/7 52/11 52/13 54/20
**number [14]** 4/8 7/3 7/15 9/21 16/19 20/9 20/10 34/6 34/17 49/15 60/24 60/25 62/21 63/3
**numbers [4]** 7/9 20/21 33/10 38/20

## O

**objection [1]** 41/15
**obligation [8]** 12/13 23/22 26/10 27/2 27/3 27/8 27/16 51/17
**obligations [2]** 12/15 51/20
**obtained [3]** 10/22 25/25 34/2
**obviously [9]** 9/15 36/6 37/11 37/21 42/24 42/23 45/5 53/11 64/3
**occasion [1]** 51/10
**occasions [4]** 23/18 23/19 37/16 37/24
**occur [1]** 61/16
**occurred [3]** 20/3 58/6 62/20
**October [8]** 42/6 44/20 44/25 51/8 64/15 64/22 64/22 64/23
**October 12 [1]** 64/15
**October 12th [1]** 64/23
**October 17th [1]** 64/22
**October 2019 [1]** 44/20
**October 24th [1]** 64/22
**odd [1]** 54/13
**odyssey [1]** 9/18
**offer [2]** 30/3 44/12
**offered [2]** 59/21 59/25
**office [6]** 4/4 6/6 7/19 8/20 26/25 44/23
**offices [3]** 2/15 7/19 44/21
**Oh [1]** 46/15
**Okay [4]** 8/17 10/12 57/25 66/3
**Olson [3]** 18/3 20/6 24/4
**omissions [1]** 34/3
**once [8]** 4/5 10/25 12/3 26/3 26/13 42/21 45/7 62/15
**one [38]** 3/20 9/21 14/7 14/21 15/6 16/9 20/2 20/3 23/7 27/14 30/20 33/1 34/4 34/23 36/3 37/8 37/25 38/16 38/25 39/6 39/9 39/11 42/5 45/13 47/22 51/10 52/1 52/4 52/13 53/13 54/22 54/23 55/1 56/17 58/9 58/22 62/4 66/9
**one-time [1]** 52/4
**only [14]** 5/15 12/9 13/7 13/10 13/12 16/12 31/2 31/5 31/7 32/16 32/25 37/18 38/3 59/17
**open [1]** 45/14
**opening [6]** 39/9 39/12 53/1 53/4 62/23 63/12
**opinions [1]** 19/9
**opportunity [9]** 26/24 36/9 39/19 40/3 62/22 63/16 65/1 65/10 65/20
**opposed [2]** 41/16 41/25
**Orange [2]** 10/19 25/22
**order [15]** 5/3 5/6 6/21 12/12 14/14 14/15 14/18 14/19 14/24 15/3 15/5 15/8 44/8 44/8 51/21
**ordered [2]** 44/11 52/2
**other [37]** 4/11 5/13 5/16 13/17 18/4 20/17 22/4 23/12 23/14 32/16 32/18 33/1 33/3 33/7 36/23 37/8 38/1 40/2 41/24 42/10 44/5 47/25 50/2 52/19 52/25 56/4 56/16 57/18 59/13 59/13 59/24 60/3 60/21 61/22 62/6
**others [3]** 20/7 21/23 45/11
**otherwise [4]** 20/15 55/14 58/25 64/12
**ought [1]** 64/16
**our [25]** 4/3 10/5 10/9 12/8 15/14 15/15 16/19

18/1 23/25 24/5 24/11 24/21 27/7 34/8 34/21 53/24 64/1 64/17
**out [27]** 6/1 17/3 23/9 26/17 30/8 31/6 31/11 38/17 42/10 42/19 42/20 47/6 51/2 51/17 53/22 54/13 55/16 58/11 58/14 59/6 59/18 60/14 61/7 64/13 65/2 65/22
**outdated [1]** 28/20 30/10
**outlined [3]** 17/8 18/11 18/14
**outlines [1]** 63/3
**outside [1]** 45/4
**over [15]** 5/15 7/17 7/22 8/1 9/18 11/3 12/23 20/7 24/19 24/20 27/13 35/1 36/8 37/1 37/22 45/12 52/24
**overall [4]** 6/8 60/17 62/22 64/20
**oversight [1]** 20/3
**owed [2]** 13/9 13/11 15/18
**own [1]** 38/2

## P

**p.m [2]** 4/16 7/16
**packet [1]** 10/11
**page [11]** 4/7 9/1 26/18 49/21 50/7 50/12 57/15 57/24 58/13 63/2 67/10
**page 10 [1]** 50/12
**page 40 [1]** 57/15
**page 41 [1]** 57/24
**page 5 [1]** 63/2
**page 7 [1]** 49/21
**page 9 [1]** 50/7
**page 93 [1]** 58/13
**paid [3]** 21/16 30/14 35/17
**papers [1]** 14/4
**paragraph [11]** 5/8 5/10 5/11 5/24 6/1 13/2 26/19 49/21 50/8 57/4 57/5
**paragraphs [1]** 49/21
**parallels [1]** 17/19
**parameters [1]** 45/3
**paraphrasing [1]** 15/11
**part [17]** 15/18 21/10 21/17 24/2 27/14 41/24 42/10 42/13 42/22 43/22 60/19 61/12 62/14 62/15 64/9 64/10 64/12
**partially [2]** 21/5 21/13
**particular [5]** 10/9 49/15 56/25 60/18 63/1
**particularly [2]** 56/18 59/4
**parties [5]** 4/20 5/2 9/2 44/23 65/1
**parties' [1]** 66/16
**parts [1]** 36/23
**party [1]** 56/11
**passage [1]** 14/13
**passed [6]** 27/13 46/10 46/23 47/13 61/14 61/19
**past [3]** 24/4 46/19 64/3
**Patrick [1]** 3/7
**Pause [1]** 37/10
**pay [2]** 35/21 35/22
**paying [1]** 29/22 31/3
**payment [5]** 50/16 55/17 55/20 55/20 59/6
**payments [7]** 29/10 29/10 29/13 29/13 30/22 31/3 55/17
**pending [3]** 10/6 53/17 65/4
**penny [1]** 31/13
**people [1]** 22/8
**percentage [1]** 60/14
**Perche [1]** 33/4
**perfect [1]** 43/13
**perhaps [1]** 30/10
**period [4]** 20/7 22/2 52/20 64/5
**permission [2]** 5/11 5/17
**perplexed [1]** 53/3
**personal [1]** 66/9
**personally [1]** 58/1
**perspective [4]** 18/22 22/6 22/9 42/12
**pertinent [1]** 25/10
**Phan [5]** 21/24 32/12 38/22 60/3 60/13
**Phan's [1]** 21/19
**photographs [1]** 4/22
**pieces [2]** 28/1 59/10
**place [1]** 64/16

## P

**placed [1]** 20/19
**Plaintiff [1]** 1/10 2/2
**plan [2]** 66/7 66/8
**platter [1]** 23/24
**please [4]** 28/7 34/9 42/3 48/23
**plus [1]** 9/19
**podium [1]** 9/13
**point [14]** 3/20 16/12 16/15 18/15 22/15 23/15 26/17 35/14 37/25 45/15 53/8 53/16 63/15 65/11
**pointed [2]** 56/21 58/12
**points [3]** 6/19 38/10 64/8
**portion [1]** 64/17
**position [4]** 25/7 28/1 33/15 39/3 39/11 40/23
**possessing [1]** 27/9
**possession [20]** 11/7 23/25 24/5 24/11 24/21 24/23 24/25 27/7 27/8 34/8 34/22 34/25 37/22 39/17 40/10 43/12 43/16 43/17 51/3 53/20
**possible [1]** 19/5
**post [3]** 17/22 42/14 55/16
**post-conviction [1]** 17/22
**post-Indictment [1]** 42/14
**post-settlement [1]** 55/16
**potential [1]** 50/4
**potentially [2]** 22/11 27/20
**prefer [1]** 20/12
**prejudice [9]** 18/11 18/17 31/18 36/13 36/22 55/10 62/19 62/20 65/9
**prejudiced [1]** 62/25
**prejudicial [1]** 18/25
**preparation [2]** 55/9 63/6
**prepare [1]** 64/7
**prepared [3]** 40/14 49/10 63/22
**preparing [1]** 20/4
**present [4]** 3/2 3/12 11/21 24/8
**presentation [1]** 9/7 22/13 62/23
**presentations [1]** 61/6
**presented [2]** 32/7 43/5
**PRESIDING [1]** 1/8
**presumption [1]** 65/17
**previously [1]** 54/10
**Price [3]** 18/4 20/6 24/3
**prima [1]** 23/13
**print [1]** 38/17
**printed [1]** 31/6
**printout [1]** 35/3
**printouts [3]** 36/6 52/15 52/22
**prior [1]** 54/25
**privilege [30]** 3/8 3/24 4/1 4/21 4/24 5/14 9/4 11/11 25/13 27/11 27/21 41/5 41/19 42/4 42/8 42/13 43/25 44/8 46/19 46/21 47/11 53/21 53/22 54/2 54/8 54/12 54/13 55/3 55/7 62/16
**privileged [1]** 47/12
**PRO [1]** 2/14
**probably [4]** 4/17 9/23 21/15 64/25
**problem [2]** 20/22 63/10
**procedures [1]** 26/20
**proceed [6]** 18/20 19/3 19/5 28/6 64/15 64/23
**proceeded [1]** 16/18
**proceeding [1]** 5/17
**proceedings [5]** 1/15 37/10 48/6 66/20 67/9
**process [10]** 7/12 7/23 8/18 14/14 22/20 24/11 35/4 38/19 61/12 62/18
**process of [1]** 8/18
**processes [1]** 43/9
**produce [15]** 10/24 12/13 13/6 13/15 14/16 14/20 23/22 26/2 26/13 27/2 27/3 46/23 53/9 54/9 54/14
**produced [41]** 5/1 5/2 5/9 6/16 7/5 7/6 7/7 11/10 12/20 13/5 14/2 14/3 14/6 14/12 15/3 15/4 15/5 15/7 15/10 17/4 17/7 17/8 18/8 18/10 19/7 24/14 34/16 45/15 45/16 46/1 47/9 52/2 54/1 54/4 54/10 54/19 55/11 62/7 62/11 63/22 64/7
**production [5]** 8/12 16/25 61/23 62/1 63/19
**programs [2]** 49/22 50/13
**prong [1]** 36/23
**proper [1]** 36/10 65/19

**property [1]** 34/2
**proposal [1]** 63/8
**proposed [1]** 50/4
**prosecution [34]** 8/9 15/1 16/15 17/25 18/1 18/9 24/14 24/17 24/24 24/25 25/16 27/13 27/16 40/16 42/9 42/24 45/24 45/25 46/11 46/23 47/13 49/19 53/18 54/9 54/15 54/18 54/20 55/2 59/8 59/16 59/23 61/15 62/15 64/10
**prosecutors [1]** 47/16
**Protection [1]** 14/14
**Protective [3]** 5/3 5/5 6/20
**protocols [5]** 11/1 26/4 26/14 26/15 45/5
**prove [3]** 34/1 34/1 60/23
**provide [13]** 3/19 4/1 4/24 5/12 13/15 22/11 27/9 29/23 32/5 34/15 36/7 40/3 51/19
**provided [20]** 5/14 9/3 10/10 12/10 25/7 33/9 34/8 34/10 34/22 35/4 35/9 35/12 36/15 39/18 50/23 52/15 52/23 55/22 59/9 60/14
**provides [3]** 26/16 49/12 57/15
**providing [1]** 26/23
**proving [2]** 51/18 59/21
**provision [1]** 5/18
**punishment [2]** 14/22 14/24
**pure [2]** 21/11 44/4
**purpose [2]** 11/24 55/3
**purposeful [1]** 60/5
**purposes [2]** 42/25 43/11
**pursuant [5]** 5/2 18/8 18/10 44/6 67/6
**put [18]** 6/13 6/22 14/4 16/9 19/10 22/6 24/16 24/19 28/9 33/24 52/12 53/24 57/16 60/24 61/3 61/4 65/2 66/13
**putting [3]** 16/14 42/17 51/15
**puzzled [1]** 54/11

## Q

**qualifies [1]** 17/23
**question [21]** 8/9 15/1 16/15 17/25 18/1 18/9 18/19 22/11 22/12 22/14 22/17 25/1 30/11 49/3 50/21 50/24 51/25 53/18 53/21 57/16 60/20 61/3 61/5 61/16 61/20 63/5 63/8
**questioning [4]** 55/12 57/13 58/7 60/11
**questions [4]** 11/25 21/1 52/5 56/4
**quibbling [1]** 47/15
**quick [1]** 22/24
**QuickBooks [27]** 4/8 13/4 15/3 17/14 20/13 20/17 27/21 30/13 30/17 34/11 34/11 35/16 35/16 35/17 45/15 46/6 47/8 50/2 51/7 52/24 53/7 54/1 54/4 57/7 58/17 58/18 61/11
**quickly [1]** 37/8
**quote [7]** 12/6 29/8 43/21 57/5 57/6 57/6 62/10
**quote/unquote [1]** 29/8 43/21

## R

**rather [2]** 8/4 14/10
**Re [1]** 3/15
**reach [1]** 53/22
**reached [1]** 3/23
**read [2]** 17/16 26/12
**ready [2]** 43/8 54/8
**Reagan [1]** 2/10
**really [6]** 19/20 36/22 42/5 42/10 46/2 59/14
**reason [8]** 8/3 27/6 27/10 31/14 32/5 33/24 36/21 39/25
**reasonable [2]** 43/7 47/16
**reasons [8]** 13/18 13/23 19/6 19/16 20/24 32/12 56/2 64/14
**rebuttal [1]** 37/5
**recall [3]** 18/22 20/9 57/20
**received [3]** 3/14 54/7 61/17
**Receiver [4]** 10/16 10/22 25/19 25/25
**recent [1]** 63/2
**recess [3]** 39/23 40/3 40/5 48/5
**recognize [1]** 15/19
**recommended [1]** 33/25
**record [9]** 6/23 12/24 30/3 32/6 37/14 40/8 40/14 41/4 44/6
**records [13]** 29/3 33/10 33/20 35/17 35/24 36/1 49/22 49/24 50/3 50/9 50/11 50/13 60/17

**recovered [1]** 60/15
**recovery [1]** 59/16
**redaction [1]** 32/10
**reference [1]** 4/8
**referenced [3]** 15/15 32/17 53/1
**references [4]** 28/9 32/18 33/1 40/22
**referencing [1]** 38/5
**refers [4]** 4/16 29/9
**reflects [2]** 13/2 37/20
**regard [4]** 4/20 15/15 24/21 40/20
**regarding [1]** 11/25
**regards [9]** 22/1 28/8 31/5 35/19 36/6 37/16 38/9 38/25 40/1
**Regnier [12]** 11/17 12/3 12/23 16/22 31/13 35/16 36/17 53/16 54/6 56/22 57/3 57/5 58/12
**Regnier's [2]** 9/22 31/10
**regular [1]** 55/2
**regulations [1]** 67/11
**rehash [1]** 9/17
**relate [2]** 4/10 4/11
**related [4]** 7/2 38/18 55/9 59/13
**relates [9]** 7/4 8/14 30/21 31/20 31/20 33/6 35/15 50/19 56/24
**relating [15]** 5/13 5/22 6/21 7/8 8/13 15/8 49/23 50/3 50/10 50/14 50/18 52/7 53/17 59/24 59/25
**relativity [1]** 43/5
**relevance [2]** 7/10 47/16
**relevant [24]** 6/12 10/23 10/24 14/22 16/16 17/25 19/24 26/1 26/2 26/13 26/22 27/12 27/20 36/10 38/24 47/2 47/13 51/5 52/3 52/6 54/17 60/13 61/8 61/14
**reliable [1]** 28/22
**relied [1]** 28/18
**relief [3]** 19/17 21/22 65/20
**relieve [2]** 51/16 51/20
**rely [4]** 42/25 43/1 53/12 58/22
**relying [2]** 35/8 35/9
**remarkable [1]** 14/11
**remedies [2]** 40/7 40/21
**remedy [2]** 63/8 63/9
**rep [1]** 44/13
**repeat [2]** 63/7 64/9
**repeated [4]** 12/10 20/15 20/22
**repeatedly [3]** 14/5 32/17 55/24
**reply [3]** 10/6 10/9 53/24
**report [10]** 3/15 3/21 7/3 15/14 15/15 17/9 18/11 57/3 57/6 63/2
**reported [1]** 67/8
**reporter [2]** 17/17 67/16
**REPORTER'S [1]** 1/15
**reports [8]** 8/13 8/15 8/23 8/24 8/25 22/25 29/7 33/20 52/19 57/8 59/10
**represent [1]** 53/25
**representation [9]** 11/2 11/13 14/8 37/18 37/19 50/15 54/24 55/5 64/1
**representations [6]** 12/17 14/5 27/24 34/3 56/9 61/17
**represented [1]** 37/21
**request [7]** 34/7 37/17 43/7 45/14 45/17 47/7 65/18
**requested [4]** 9/3 10/3 19/17 45/1
**requests [2]** 10/8 45/7
**require [2]** 38/23 63/18
**required [4]** 14/16 18/7 53/3 60/23
**requirements [3]** 20/5 20/6 62/4
**requires [2]** 50/8 62/1
**reserve [1]** 8/14
**resolve [1]** 65/17
**respect [6]** 20/10 21/23 41/10 60/2 60/12 60/21
**respectfully [2]** 43/19 44/3
**respond [5]** 4/6 26/7 39/7 39/8 40/19
**responded [2]** 10/7 34/7
**response [1]** 15/8
**responsible [4]** 42/13 42/17 42/18 45/19
**results [1]** 60/20
**resumed [1]** 48/6
**retained [1]** 10/2
**retrial [1]** 64/21

**R**

retrospect [2]  42/20 47/18
returned [2]  10/21 25/24
revenue [1]  13/12
review [52]  3/8 3/22 3/24 4/1 4/21 4/22 4/24
5/14 5/21 9/5 10/25 11/11 17/10 17/12 18/18
18/21 22/24 25/13 26/3 26/14 26/15 26/24
27/11 27/21 27/25 33/18 33/20 38/23 41/5
41/19 42/4 42/13 44/1 44/8 46/20 46/21 47/11
51/11 51/24 52/20 53/21 53/23 54/3 54/8
54/12 54/13 54/16 55/3 55/7 56/12 62/16
62/18
reviewed [7]  44/23 45/2 46/7 46/10 46/20
47/10 61/13
reviewing [1]  6/4
right [6]  22/17 23/6 24/20 28/24 36/19 46/16
rightfully [3]  51/16 52/4 52/6
road [2]  16/13 39/6
Roberson [1]  12/21
Ronald [2]  2/10
room [1]  6/5
RPR [1]  1/19
rule [6]  9/5 9/9 10/3 18/8 37/6 41/4
ruling [1]  56/13
run [1]  42/11

**S**

SACR [2]  1/11 3/3
SACR-19-00061-JVS [2]  1/11 3/3
SAGEL [9]  2/9 3/5 9/24 11/22 12/22 14/8 21/3
51/22 54/25
said [15]  4/24 7/19 9/10 10/8 10/14 25/3
28/25 30/14 31/21 32/1 34/20 40/15 46/13
47/11 60/4
same [11]  11/8 11/12 26/5 26/18 28/14 33/24
44/22 50/17 50/19 52/9 52/10
sampling [1]  9/3
San [1]  2/16
Santa [4]  1/16 1/20 2/11 3/1
sat [1]  45/7
say [17]  5/24 8/21 18/16 20/1 21/5 21/13
25/10 33/13 37/13 38/6 41/1 45/14 47/4 55/18
60/6 60/7 63/22
saying [9]  22/22 28/12 28/17 30/6 33/12
33/17 33/18 34/19 38/1
says [5]  24/3 24/3 26/19 31/11 39/3
scenario [1]  38/7
schedule [2]  65/1 65/14
scope [1]  12/14
screening [1]  61/12
screens [1]  4/22
screenshots [1]  4/23
scrutinize [1]  35/24
SE [1]  2/14
search [33]  3/15 5/23 6/1 9/21 10/23 11/1
12/14 24/9 26/1 26/4 26/15 42/15 42/20 43/4
43/13 45/3 45/4 45/9 46/14 46/15 46/22 47/2
47/21 47/23 49/5 49/7 49/16 49/17 50/9 58/10
59/8 59/15 61/12
searched [1]  11/9 49/13
searches [2]  4/18 44/25
searching [2]  47/9 47/21
seating [1]  66/17
second [8]  4/14 5/1 5/11 36/3 37/8 38/25
56/20 57/9
section [2]  2/6 26/18 67/6
secure [1]  57/14
see [8]  32/3 33/2 33/6 33/21 36/10 36/14
38/23 56/12
seek [2]  16/3 51/17
seemed [1]  54/12
seems [3]  26/9 61/16 63/24
seen [5]  25/8 35/19 45/21 45/22 45/24
SEFFENS [3]  1/19 67/15 67/16
seize [2]  42/19 44/2
seized [22]  10/24 26/2 26/13 42/21 42/22
43/2 43/3 43/3 43/21 43/23 43/25 47/10 47/19
47/19 49/3 49/3 49/13 50/21 50/22 50/25
53/20 59/19

seizure [1]  43/10
SELVATH [1]  1/18
send [4]  29/14 42/19 66/7 66/8
sending [2]  42/8 42/9
senior [1]  11/20
sense [2]  21/6 21/14
sensitive [1]  5/9
sent [4]  6/15 7/17 7/22 8/1
September [7]  44/20 44/25 47/7 51/8 64/18
64/19 65/3
September 2 [2]  64/19 65/3
September 2019 [1]  44/20
September 27 [1]  64/18
September of [1]  47/7
September/October of [1]  51/8
serious [1]  52/21
serve [1]  23/24
server [21]  7/7 10/15 10/18 10/21 10/21 10/23
10/25 12/1 12/2 24/9 25/21 25/24 25/24 26/1
26/3 26/22 26/25 37/17 38/11 51/6 51/8
servers [10]  10/4 10/20 11/14 12/9 23/20 25/6
25/23 26/19 37/23 38/13 44/7 49/4 49/8 53/19
57/22 58/5 58/9
service [3]  3/15 66/8 66/10
session [2]  57/15 58/13
set [9]  6/1 8/11 11/1 26/4 26/14 44/22 44/24
64/17 64/18
sets [1]  8/6
setting [1]  56/13
settled [1]  31/25
settlement [11]  21/18 29/3 29/11 29/19 31/22
33/5 50/16 55/16 55/18 55/19 59/7
seven [2]  18/23 29/19
several [5]  22/15 22/20 28/11 31/15 36/20
severed [1]  64/17
SHARON [3]  1/19 67/15 67/16
she [4]  9/23 9/23 12/4 31/10
sheets [2]  32/19 32/20 32/21 35/4
shocking [1]  19/15
short [8]  22/1 39/23 40/3 40/5 52/20 63/18
63/23 63/25
short-lived [3]  63/18 63/23 63/25
shortcomings [2]  62/18 64/11
shortcut [1]  50/3
should [24]  5/25 10/11 10/13 18/9 19/7 19/18
21/16 27/13 33/8 41/19 43/24 43/25 46/22
55/12 55/13 55/15 55/20 55/22 63/8 64/21
65/8 65/21 66/18 71
shouldn't [1]  65/22
show [16]  8/15 8/15 22/21 23/13 29/7 29/8
31/6 32/2 32/5 36/11 38/18 38/18 40/8 51/23
52/5 61/1
showed [1]  39/10
showing [4]  20/12 21/15 24/14 60/17
shown [2]  28/20 61/1
shows [4]  31/18 31/19 51/23 59/14
side [4]  41/5 41/20 42/13 47/25
significance [3]  57/2 57/12 58/11
significant [5]  55/20 59/23 63/18 66/13
similar [3]  44/24 47/23 58/7
similarly [2]  32/11 59/22
simply [1]  57/20
since [3]  10/22 25/25 34/11
single [1]  57/20
sins [1]  27/14
Sir [2]  23/21 56/8
sit [5]  23/23 34/16 44/13 57/17 57/20
sitting [1]  37/13
six [6]  7/13 7/17 10/17 16/20 25/20 45/10
skipping [1]  22/20
skips [1]  24/4
small [3]  3/20 46/12 47/23
so [35]  6/22 7/8 12/16 14/16 17/3 17/12 20/12
21/17 21/21 23/1 23/17 26/7 29/25 32/4 32/20
32/24 32/25 33/3 33/7 33/15 35/23 36/9 36/11
37/12 39/14 39/15 39/18 42/17 44/20 45/7
45/10 45/18 50/21 63/6 65/12
software [2]  4/13 6/11 8/24
solve [1]  63/10

some [23]  7/10 19/3 21/23 22/1 23/12 28/3
28/8 31/15 32/20 45/23 46/23 48/25 49/15
54/6 54/12 55/12 55/19 56/21 61/19 62/17
65/12 65/24
something [15]  14/10 25/1 25/3 25/9 34/9
34/13 41/2 43/16 43/17 43/21 43/22 45/4 47/1
63/13 63/14
sometime [1]  14/8
sometimes [1]  47/3
sorry [1]  60/8
sought [1]  40/21
sound [1]  41/18
sounds [1]  26/5
SOUTHERN [1]  1/6
speaking [2]  20/15 20/16
speaks [1]  19/19
special [9]  9/23 11/21 11/21 12/21 12/22
16/22 38/11 49/11 56/24
specialist [1]  44/22
specific [10]  7/11 25/2 25/3 28/1 28/2 28/3
38/17 38/24 45/16 56/6
specifically [5]  10/4 12/12 28/25 38/9 52/1
specifics [2]  28/4 28/5
spend [1]  19/22
spring [2]  2/7 49/11
staff [1]  44/15
standard [4]  17/21 17/22 17/23 17/24
stands [1]  18/20
start [8]  21/14 28/11 31/1 41/12 48/25 64/25
started [1]  17/6
starts [1]  24/7
stated [1]  6/21
statement [10]  12/17 25/17 26/8 38/4 39/12
40/17 53/1 53/5 62/23 63/12
statements [7]  15/23 15/24 15/25 32/3 34/3
39/9 41/17
states [15]  1/4 1/9 1/19 2/3 2/4 2/6 2/7 2/10
3/4 3/6 3/9 6/5 12/12 67/7 67/11
status [8]  3/14 3/21 7/2 15/14 15/15 17/9
64/17 64/19
stenographically [1]  67/8
steps [1]  22/20
STEWARD [4]  2/15 2/15 3/12 10/2
still [7]  7/12 8/8 13/4 18/16 29/8 38/2 39/18
39/19 43/15 52/6 64/3
stored [4]  10/18 10/19 25/21 25/22
straight [1]  60/14
strategy [4]  18/6 18/7 18/7 63/21
Street [3]  1/20 2/7 2/11
stricken [1]  5/23
strictly [1]  20/16
strong [2]  54/21 65/17
struck [1]  18/24
stuff [1]  32/8
subject [4]  28/19 46/9 49/24 50/5
submit [5]  13/14 43/19 52/10 55/6 65/11
subpoena [2]  46/10 46/13
subpoenaed [1]  25/13
subsequently [1]  15/6
substantial [3]  18/11 19/1 27/12
substantiated [2]  20/11
substantiates [1]  22/3
such [4]  10/4 19/21 26/23 30/23
sudden [2]  54/8 54/19
sufficient [2]  59/3 61/22
sufficiently [1]  9/5
suggest [3]  20/15 25/12 54/21
suggesting [2]  19/2 21/22
suggestion [2]  44/15 44/17
suggests [1]  56/16
Suite [3]  1/20 2/11 2/16
sum [1]  56/18
summary [1]  41/7
summed [1]  21/8
Sunrise [1]  29/20
supervision [1]  6/7
supplement [3]  3/17 4/2 6/3
support [8]  22/25 23/2 23/3 30/4 30/15 33/10
33/22 33/23

**S**

**support is** [1] 30/15
**supported** [1] 49/10
**supports** [2] 31/16 32/9
**suppose** [1] 27/10
**suppressed** [2] 62/8 62/10
**sure** [7] 9/14 17/16 27/22 28/3 37/9 42/15 58/20
**system** [9] 4/18 4/23 6/5 6/14 44/22 44/24 44/24 45/22 57/9
**systems** [2] 13/3 57/6

**T**

**table** [2] 3/7 40/2
**Tabs** [95]
**taint** [6] 27/11 27/15 47/10 62/16 64/11 64/13
**take** [7] 4/21 7/13 31/11 36/5 38/16 45/20 48/3
**taken** [3] 22/10 33/18 48/5
**taking** [2] 42/7 55/15
**talk** [1] 14/24
**talked** [3] 20/18 42/5 53/2
**talking** [5] 15/11 24/7 26/6 28/23 35/2 47/22
**talks** [3] 24/2 24/3 31/2
**Tashchyan** [3] 7/20 7/24 58/8
**tasks** [1] 42/5
**team** [64] 3/7 3/8 3/22 3/24 4/1 4/21 4/25 5/14 6/6 6/9 9/5 11/11 11/20 24/8 24/14 24/17 24/24 25/13 25/16 27/11 27/11 27/13 27/15 27/16 27/21 40/16 41/19 42/5 42/9 42/24 43/5 44/8 45/24 45/25 46/11 46/20 46/21 46/24 47/11 47/14 53/18 53/21 53/23 54/3 54/8 54/12 54/14 54/15 54/22 55/2 55/3 55/7 57/19 58/2 59/8 59/16 61/15 62/15 62/16 62/16 64/10 64/11 64/13
**Team's** [2] 24/25 44/1
**technical** [1] 8/3
**techniques** [1] 63/6
**ten** [5] 33/4 33/7 33/8 48/4 49/7
**ten-minute** [1] 48/4
**tend** [1] 62/2
**terabytes** [1] 47/22
**term** [1] 49/25
**terms** [3] 27/16 47/2 64/21
**tertiary** [1] 36/2
**test** [1] 36/12
**testified** [1] 11/6 23/1 29/1 31/14 35/16 38/9 58/12
**testimony** [4] 9/23 58/8 59/2 61/6
**than** [6] 8/4 30/16 30/18 54/7 54/11 57/2
**Thank** [13] 3/25 6/17 10/12 21/2 40/23 40/25 46/4 48/2 48/3 56/5 60/9 66/3 66/19
**thanking** [1] 66/10
**that** [395]
**that's** [31] 10/5 12/24 16/16 21/11 21/13 24/2 27/23 28/2 31/22 32/1 34/21 36/2 36/25 37/3 37/4 38/4 38/21 38/21 40/17 46/15 49/25 52/14 53/24 53/24 54/19 54/20 54/24 62/10 64/16 65/3 65/16
**their** [12] 4/22 6/22 7/7 8/21 21/18 32/14 45/7 55/4 58/8 60/13 60/16 63/25
**them** [29] 6/22 12/4 16/3 20/20 20/21 21/16 21/18 23/7 30/20 31/6 32/8 35/6 37/1 37/25 38/17 44/9 44/12 45/2 45/8 45/9 45/10 45/11 45/12 46/10 56/13 61/14 66/8 66/16
**themselves** [1] 25/6
**then** [24] 4/20 5/15 5/18 6/3 6/10 6/15 7/23 15/16 16/18 18/15 32/22 32/24 39/2 42/18 42/22 43/10 44/20 45/8 47/10 57/24 61/20 63/20 64/24 65/13
**theory** [4] 23/11 52/1 62/22 63/12
**there** [86]
**there's** [12] 8/9 8/22 8/24 8/25 8/25 13/23 16/20 22/4 30/11 35/23 52/19 54/21
**therefore** [1] 43/22
**thereof** [1] 38/15
**these** [33] 4/10 7/8 8/13 11/5 11/5 11/8 16/21 19/16 22/8 22/25 29/21 29/21 31/3 32/18 32/19 33/7 33/20 33/21 33/23 34/4 34/24 35/8

**they** [70]
**they're** [2] 21/17 66/7
**they've** [2] 45/22 51/3
**thing** [6] 50/18 50/19 54/22 54/23 55/1 57/20
**things** [20] 20/18 22/15 33/21 35/10 35/20 36/19 37/8 42/18 42/19 42/21 43/2 43/3 43/4 43/11 45/6 47/18 52/1 52/25 63/3
**think** [45] 9/5 9/7 9/8 14/7 16/20 16/23 17/23 18/13 19/23 20/24 22/4 22/19 23/8 23/11 23/14 24/13 24/16 34/16 36/2 37/3 37/18 37/19 39/4 40/23 42/1 42/11 46/1 47/24 55/17 57/2 58/11 59/2 59/23 60/1 60/19 61/3 61/6 61/21 62/10 62/16 62/21 65/15 65/21 66/16
**third** [2] 3/23 4/1
**this** [130]
**those** [19] 4/24 6/10 7/3 8/2 8/15 10/8 11/11 13/2 16/2 20/11 20/24 31/15 33/20 42/4 43/9 43/10 44/25 45/10 46/8 46/9 46/18 51/24 53/19 56/2 56/18 57/11 59/24 63/7 64/4
**though** [6] 60/12 61/22
**thought** [6] 34/13 39/2 44/12 44/17 45/9 55/4
**thoughts** [2] 65/3 65/13
**three** [6] 3/20 5/8 5/10 21/14 59/4 62/4
**through** [30] 4/7 4/14 7/2 7/14 7/15 11/11 12/5 14/3 15/13 17/11 17/13 17/14 17/14 21/25 23/6 28/10 30/20 31/15 31/21 35/4 38/12 43/4 43/9 45/2 46/14 47/7 49/23 55/12 56/18 62/12
**tied** [2] 35/17 35/25
**time** [36] 8/5 8/5 11/10 13/25 13/25 14/2 14/2 14/4 18/20 19/22 20/22 24/12 29/4 32/19 32/20 32/22 33/13 34/8 37/12 38/1 38/19 46/20 52/20 53/8 54/6 54/12 56/21 63/19 63/21 64/6 64/6 65/5 65/24 66/13 66/14
**time-consuming** [1] 38/19
**timeline** [1] 9/18
**timely** [1] 14/20
**times** [3] 24/7 35/1 60/5
**timing** [2] 12/7 64/20
**Title** [1] 67/7
**today** [6] 8/7 22/4 34/24 54/23 57/17 57/20
**told** [10] 9/22 15/3 45/10 45/11 45/25 54/17 55/25 57/18 66/18
**too** [3] 22/1 22/4 31/6
**took** [3] 23/18 37/25 51/2
**top** [1] 49/21
**total** [2] 31/11 39/13
**totality** [1] 24/17
**totally** [1] 45/4
**touched** [1] 55/11
**town** [2] 47/23 47/24
**track** [5] 13/4 13/12 35/21 57/7 57/9
**tracked** [1] 13/12
**traction** [1] 17/7
**Tran** [4] 32/12 38/22 60/3 60/13
**transactions** [4] 31/3 32/18 50/4 50/5
**transcript** [4] 1/9 1/15 67/8 67/10
**transparent** [2] 35/11 40/16
**treading** [1] 43/18
**trial** [31] 1/12 9/22 11/7 15/14 15/16 18/6 18/20 19/2 19/5 20/3 20/4 31/8 31/17 31/19 32/7 32/9 32/10 32/13 43/8 54/5 54/18 55/9 57/13 58/12 59/11 59/20 64/14 64/15 64/25 65/19 66/10
**true** [2] 53/1 67/7
**trying** [1] 4/23
**TUESDAY** [1] 3/1
**turn** [3] 26/17 35/1 37/22
**turned** [2] 42/10 42/20 45/11
**twice** [2] 12/4 45/23
**two** [33] 3/21 7/15 8/6 9/19 11/3 13/3 14/22 16/21 18/4 19/7 23/18 31/7 33/21 34/14 37/16 38/10 38/12 42/5 43/9 46/1 51/8 53/12 54/5 57/6 57/11 57/17 58/3 59/10 59/24 60/2 60/5 62/8 64/8
**two-plus** [1] 9/19
**twofold** [1] 39/8

**U**

**U.S** [4] 7/19 10/7 11/22 12/18 12/22 49/9 61/25 67/16
**ultimately** [1] 49/12
**unallocated** [1] 52/18
**unclear** [1] 8/1
**under** [24] 6/7 10/14 14/16 17/22 23/11 27/2 27/5 28/21 30/17 36/11 36/22 41/20 42/20 43/3 44/18 45/9 46/2 46/22 47/2 51/20 51/25
**undermine** [2] 28/1 28/5
**underneath** [1] 50/17
**understand** [4] 7/17 41/17 46/17 53/6
**understanding** [2] 4/9 6/15
**Understood** [1] 66/11
**UNITED** [14] 1/4 1/9 1/19 2/3 2/4 2/6 2/7 2/10 3/3 3/6 3/8 6/5 67/7 67/11
**unless** [2] 21/1 36/19
**unlikely** [1] 63/24
**unquote** [2] 29/8 43/21
**until** [2] 8/20 17/5
**up** [13] 6/24 15/13 16/7 21/8 23/24 29/2 29/19 31/21 42/12 44/22 44/24 56/18 59/21
**updated** [1] 31/12
**upon** [5] 27/15 28/18 35/8 35/10 54/16
**us** [12] 4/19 7/13 7/20 7/24 14/5 24/10 25/5 34/9 34/14 51/11 54/13 54/17
**use** [12] 5/15 9/12 16/3 16/12 16/18 18/6 18/14 34/23 36/17 54/18 55/13 55/15
**used** [14] 12/6 13/3 16/17 16/21 28/16 30/13 30/14 32/25 36/16 38/6 38/7 57/6 57/9 59/20
**useful** [2] 36/13 60/16
**using** [1] 35/11
**usual** [1] 66/8
**utilize** [1] 39/20
**utilized** [2] 28/13 28/15

**V**

**valid** [2] 45/9 45/10
**value** [1] 39/3
**Varani** [7] 4/19 7/17 8/1 11/6 11/9 50/23 51/12
**Varani's** [2] 7/22 8/10
**various** [4] 8/13 24/6 55/16 59/10
**vendor** [1] 4/13
**versus** [3] 3/4 35/16 61/25
**very** [15] 7/7 11/3 13/11 13/16 17/10 18/13 22/24 32/12 33/19 36/21 37/8 38/16 41/5 41/23 43/6
**victim** [2] 59/5 64/23
**victims** [4] 21/11 21/14 21/23 60/3
**videotapes** [1] 34/25
**view** [1] 15/19
**violation** [2] 40/7 61/20
**virtual** [15] 4/17 4/23 6/4 6/14 7/21 7/25 8/2 8/10 23/20 38/11 38/13 44/24 45/22 51/6 51/8
**volume** [3] 27/12 61/17 63/23
**voluminous** [1] 38/19
**voluntary** [1] 40/17
**vs** [1] 1/10

**W**

**wait** [3] 23/23 30/2 30/2
**walk** [2] 23/6 30/19
**want** [12] 7/16 9/19 20/8 37/1 37/4 37/14 38/6 41/1 56/12 64/8 64/25 65/20
**wanted** [4] 6/22 23/19 54/4 54/18
**wants** [1] 35/20
**warrant** [21] 5/23 6/2 9/21 10/22 11/1 25/25 26/4 26/15 42/20 43/4 45/3 45/4 45/6 46/15 46/22 47/3 47/23 49/6 49/7 49/12 61/13
**warrants** [4] 12/14 24/10 42/15 46/14
**was** [196]
**Washington** [3] 7/18 11/8 51/13
**wasn't** [12] 20/11 22/22 28/21 32/24 44/14 50/22 51/12 55/19 55/22 59/20 60/19 62/11
**watched** [1] 66/14
**watching** [1] 66/15
**way** [12] 5/21 7/20 21/7 26/12 26/15 33/14 39/8 51/6 51/7 52/23 53/4 54/1

**W**

**ways [1]** 62/21

**we [137]**

**We'll [1]** 61/15

**we're [3]** 4/23 35/2 35/11

**we've [4]** 26/6 34/7 34/8 35/12

**week [2]** 64/24 64/25

**weekend [1]** 5/15

**weeks [1]** 31/15

**well [23]** 6/24 8/4 11/3 12/15 12/18 13/17 16/6 18/4 20/8 21/7 21/18 22/16 23/15 24/13 27/10 27/24 28/2 28/16 30/7 39/18 41/23 43/23 57/25

**went [7]** 14/24 16/13 39/6 43/4 43/5 45/2 47/21

**were [78]**

**weren't [8]** 8/19 16/7 32/19 42/21 42/22 45/5 46/19 60/18

**West [2]** 1/20 2/11

**what [101]**

**what's [7]** 9/4 9/8 24/4 24/11 30/18 32/10 34/18

**whatever [8]** 27/10 30/18 31/1 34/17 38/20 39/22 40/4 65/20

**whatsoever [1]** 13/6

**when [38]** 6/24 7/5 11/5 17/5 19/21 20/11 20/15 22/5 24/2 24/7 29/20 31/2 31/7 31/21 31/22 32/8 32/21 35/7 35/17 36/12 36/22 36/25 38/20 39/9 40/15 40/20 43/7 44/14 45/18 47/22 47/24 53/18 55/8 55/24 55/25 58/12 58/14 65/17

**where [14]** 10/4 17/3 25/2 25/7 26/16 29/9 39/10 40/19 47/15 47/20 47/25 49/1 53/23 59/4

**Whereupon [1]** 66/20

**whether [22]** 15/2 16/6 19/19 25/12 28/14 28/14 28/17 29/4 31/24 34/4 36/16 36/17 40/9 43/20 44/15 44/16 46/8 46/21 47/1 52/9 52/10 58/3

**which [37]** 4/10 4/11 5/3 5/23 5/24 5/25 6/1 6/5 6/9 7/23 10/18 19/15 22/2 25/21 26/18 29/8 30/21 30/23 31/10 33/8 34/7 34/15 34/24 35/15 35/24 36/17 44/23 45/15 45/22 45/25 49/6 49/8 49/10 49/12 51/21 59/18 61/23

**while [4]** 7/14 7/18 21/15 52/25

**who [13]** 13/22 13/22 30/14 33/1 39/5 39/6 39/25 41/15 43/6 44/22 45/18 45/19 45/21

**Who's [1]** 55/18

**whom [2]** 25/15 59/25

**why [16]** 13/14 13/18 13/23 16/16 21/13 27/6 28/2 33/6 33/21 35/23 36/25 39/25 41/13 45/11 54/19 58/18

**will [27]** 4/12 5/9 5/24 7/10 8/15 10/24 18/3 18/15 20/1 21/13 26/2 26/13 32/22 33/13 34/18 36/5 38/22 39/8 41/23 49/20 55/6 57/5 64/15 64/22 65/3 65/19 66/3

**willful [2]** 62/14 62/15

**willfully [1]** 62/9

**winning [2]** 23/14 23/15

**wire [1]** 34/1

**withdraw [2]** 28/13 28/15

**within [8]** 7/22 8/10 12/14 49/4 52/18 53/19 55/18 58/4

**without [5]** 25/5 25/6 37/13 38/4 44/3

**witnesses [10]** 16/19 16/21 18/23 28/10 28/12 36/20 38/9 63/1 63/5 63/13

**won't [1]** 63/7

**word [3]** 56/8 56/11 62/11

**words [1]** 23/14

**work [2]** 33/2 33/2

**worked [2]** 43/6 55/7

**working [2]** 5/20 13/22

**would [84]**

**wouldn't [3]** 21/3 22/10 63/17

**wrong [5]** 41/10 41/11 41/11 41/13 58/25

**WYMAN [3]** 2/5 3/6 54/25

**Y**

**year [1]** 24/20

**years [12]** 9/19 11/4 19/8 20/7 30/25 33/21 39/4 48/23 54/6 54/6 64/25 65/22

**yes [12]** 3/18 22/14 23/25 24/18 27/6 41/3 43/24 46/12 46/15 46/25 48/24 58/24

**yesterday [12]** 3/17 3/23 4/2 4/19 5/2 5/9 5/15 9/3 11/9 11/10 17/8 50/23

**yet [2]** 46/20 53/8

**you [90]**

**you're [3]** 19/2 28/17 28/23

**you've [5]** 9/3 20/9 21/7 24/13 54/23

**your [113]**

**Z**

**zero [2]** 21/18 45/24

# Exhibit 4

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

THE HONORABLE JAMES V. SELNA, JUDGE PRESIDING

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CERTIFIED TRANSCRIPT |
| Plaintiff, | ) | |
| vs. | ) | |
| | ) | SACR-19-00061-JVS |
| MICHAEL JOHN AVENATTI, | ) | |
| Defendant. | ) | |
| ----------------------------- | ) | |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Santa Ana, California

October 15, 2021

SHARON A. SEFFENS, RPR
United States Courthouse
411 West 4th Street, Suite 1-1053
Santa Ana, CA  92701
(714) 543-0870

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

2

```
 1    APPEARANCES OF COUNSEL:

 2    For the Plaintiff:

 3    NICOLA T. HANNA
      United States Attorney
 4    BRANDON D. FOX
      Assistant United States Attorney
 5    Chief, Criminal Division
      ALEXANDER WYMAN
 6    Assistant United States Attorney
      Major Frauds Section
 7    1100 United States Courthouse
      312 North Spring Street
 8    Los Angeles, CA  90012
      (213) 894-6683
 9
      BRETT A. SAGEL
10    Assistant United States Attorney
      Ronald Reagan Federal Building
11    411 West Fourth Street, Suite 8000
      Santa Ana, CA  92701
12    (714) 338-3598

13    For the Defendant:

14    MICHAEL JOHN AVENATTI, PRO SE

15    H. DEAN STEWARD, ADVISORY COUNSEL
      H. DEAN STEWARD LAW OFFICES
16    107 Avenida Miramar, Suite C
      San Clemente, CA  92672
17    (949) 481-4900

18

19

20

21

22

23

24

25
```

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

| | |
|---|---|
| 1 | SANTA ANA, CALIFORNIA; FRIDAY, OCTOBER 15, 2021; 9:01 A.M. |
| 2 | THE CLERK:  Calling Item No. 3, SACR-19-00061-JVS, |
| 3 | United States of America versus Michael John Avenatti. |
| 4 | Appearances on behalf of the government, please. |
| 5 | MR. SAGEL:  Good morning, Your Honor.  Brett Sagel |
| 6 | on behalf of the United States, and on the phone is AUSA |
| 7 | Alex Wyman. |
| 8 | THE COURT:  Good morning. |
| 9 | THE CLERK:  Appearance on behalf of the defendant, |
| 10 | please. |
| 11 | MR. AVENATTI:  Good morning, Your Honor. |
| 12 | defendant Michael Avenatti present by telephone, along with |
| 13 | Ms. Cummings-Cefali, and my understanding is that Advisory |
| 14 | Counsel, Mr. Dean Steward, is there in the courtroom. |
| 15 | THE COURT:  Good morning. |
| 16 | MR. STEWARD:  I'm here, Your Honor.  Dean Steward, |
| 17 | Advisory Counsel, for Mr. Avenatti. |
| 18 | THE COURT:  Good morning. |
| 19 | I received the parties' briefs with respect to the |
| 20 | issue of the Court's continuing jurisdiction in light of the |
| 21 | Notice of Appeal that Mr. Avenatti has filed. |
| 22 | I also note that the government has brought in the |
| 23 | Ninth Circuit a Motion for Dismissal of Summary Affirmance. |
| 24 | It appears there is going to be a fairly quick briefing |
| 25 | schedule on that motion. |

1          As far as my role as district judge, I find that I

2     have been diversed of jurisdiction by virtue of the Notice

3     of Appeal.  Double jeopardy is a unique issue that makes it

4     appropriate for an interlocutory appeal, and it's fairly

5     clear in the case law and not really contested.  The only

6     exception to that is if the District Court determines that

7     the appeal is frivolous.

8          I do not make such a finding as part of entering

9     my ruling on the double jeopardy motion, and I'm unable to

10    make such a finding now.  I found a Brady violation with

11    respect to a very important range of documents relating to

12    the financial affairs of Mr. Avenatti's firm.  I think that

13    conclusion alone would indicate that the appeal is not

14    frivolous.

15         Mr. Avenatti raises a number of other issues

16    besides the financial data relative to his argument that the

17    Court should not exercise its discretion to conduct a new

18    trial.

19         I think there is also a substantial question as to

20    with what the term "goading" means.  I found that the

21    government did not take any action to provoke the defendant

22    into seeking a mistrial.  Other courts have interpreted the

23    term "goading" more extensively such that an intent to

24    provoke a Motion for Mistrial is not required to establish

25    "goading."

1          Accordingly, given the Brady violation that the

2     Court found and the somewhat undeterminate definition of the

3     term "goading," I find that the appeal is not frivolous.

4     For that reason, the Court vacates the November 2 trial

5     date.  The Court also vacates all pending motions to be

6     renoticed once jurisdiction is restored to this Court if

7     jurisdiction is restored to this Court.

8          I believe that I still have jurisdiction to

9     consider nonsubstantive matters that do not affect in any

10    way the Notice of Appeal and the issues raised by

11    Mr. Avenatti on appeal.  Among those ministerial matters is

12    continued document production.

13         I had asked for a report yesterday, Thursday, the

14    14th, by noon with respect to what TABS or QuickBooks

15    material with respect to the four or five individual clients

16    appeared in the production and subsequent to August 23.  I

17    received a day early -- maybe it was on time.  I received a

18    response from Mr. Avenatti filed in-camera.  I also received

19    an application from the government to continue the date for

20    its response.

21         I grant the government a continuance of 30 days to

22    prepare its response.  I'm prepared to address the rest of

23    the government's ex parte application with regard to its

24    Rule 17 subpoena.

25         First, I will ask is there any objection on

| | |
|---|---|
| 1 | jurisdictional grounds for me to consider that portion of |
| 2 | the government's application? |
| 3 | MR. AVENATTI:  Your Honor, this is the defendant, |
| 4 | Michael Avenatti. |
| 5 | Provided there would be no argument that somehow |
| 6 | this is an acquiescence or acknowledgment that the Court |
| 7 | still retains jurisdiction, I have no objection. |
| 8 | THE COURT:  Okay.  Well, I'm prepared to quash the |
| 9 | Rule 17 subpoena.  If the government wants to brief it |
| 10 | further, I would welcome that and hold in abeyance any |
| 11 | ultimate decision, but it seems to me that the government is |
| 12 | asking a third party to perform certain work for the |
| 13 | government.  Clearly, the subpoenas aren't -- a Rule 17 |
| 14 | subpoena doesn't have that function. |
| 15 | Also, I think there is a substantial question as |
| 16 | to whether -- Software Technology, LLC, isn't a consultant |
| 17 | to the defendant such that there would be an invasion of |
| 18 | work product and/or privileged materials to compel under any |
| 19 | rubric that firm to comply. |
| 20 | So with those thoughts, I would be happy to hear |
| 21 | you.  It's the government's application. |
| 22 | MR. SAGEL:  Well, I will start, Your Honor, with |
| 23 | the application that we asked Rule 17 to be enforced.  What |
| 24 | we were asking for was at the request of the company.  What |
| 25 | they had said to us is they do not mind cooperating.  They |

```
 1   do not want to be on the end of a litigation by the
 2   defendant, so they need the Court's order to give them
 3   coverage to provide the assistance they want.
 4            THE COURT:  Is that firm a consultant to the
 5   defendant?
 6            MR. SAGEL:  No, not that they have ever said to
 7   us.
 8            THE COURT:  Is that accurate, Mr. Steward?
 9            MR. STEWARD:  I'm not sure, Your Honor.  You will
10   have to ask Mr. Avenatti.
11            THE COURT:  Mr. Avenatti.
12            MR. AVENATTI:  Your Honor, let me be clear about
13   the role of the software company.  The law firm and me
14   contracted with the software company when I was managing the
15   law firm as it relates to compiling the data, purchasing
16   their software, technical support, and the like.  They have
17   not served as a consultant since the Indictments were issued
18   in connection with the case, but they certainly served as a
19   consultant for many years when we had the software at the
20   firm.
21            THE COURT:  Okay.
22            Mr. Sagel.
23            MR. SAGEL:  I would also point out, Your Honor, we
24   don't have the possession of it, but the firm in which we're
25   setting the software or the TABS data especially for the
```

1    clients we are talking about is Eagan Avenatti.  It's not

2    the defendant that we briefed extensively in various other

3    things.  It would be the bankruptcy trustee who would need

4    to assert any claim for that.  We have also said that to the

5    company.  They just obviously want coverage for themselves

6    so that they are not -- even if it's a frivolous civil

7    lawsuit later, they are not subjecting themselves to that by

8    providing just the technical assistance.

9         The Rule 17 subpoena was their request to produce

10   what they said they would need to produce.  I'm okay with

11   that being quashed, because they wanted that as initially

12   what they wanted as a Court order.  They have since changed

13   what they claim they need in that Court order.

14        We're just trying to comply with what Your Honor

15   wants.  As we sit here right now, the thumb drives and the

16   flash drives that were produced to the defendant with the

17   TABS data that came from the forensic server in Washington,

18   D.C. and then locally -- when it's extracted the way it is,

19   you cannot look at it other than with the software itself.

20        To merge them -- and, again, I'm the third,

21   fourth, fifth line of the messenger at this point.  From

22   what I have been told, the software we now hold is the 2019

23   or 2020, whatever their latest version of the software is.

24   The TABS data was produced on -- I may be getting the years

25   wrong but the 2011, 2014, and 2016 version.  We're just

1   trying to make sure that (a) we can see the data on it so

2   that we can show Your Honor when we produce it to the

3   defense if we are going to use it; and (b) make sure we

4   haven't changed any data by using it on newer software.

5          That's the only thing that we are asking of the

6   company, is to be able to assist us in taking the raw data

7   that we have, none of which is what we are asking them to

8   produce, and to -- probably it's the wrong term -- merge it

9   with the software that we have so it's in a readable,

10   unchanged format so that it can be printed, produced, shown,

11   what have you, both for Your Honor's direction and any

12   discovery obligations we have.  That's all that we are

13   asking to do.

14          We obviously have what we produced to you and to

15   the defense previously.  The screenshots that we got from

16   the stand-alone forensic computer on August 22nd or 23rd,

17   those have been produced.  The subsequent productions of the

18   flash drives and the thumb drives that came off those

19   computers that were produced, we have not seen those, and we

20   are working with the company trying to do that.

21          THE COURT:  So would you use their services only

22   with respect to documents that have been disclosed to the

23   Prosecution Team?

24          MR. SAGEL:  To the defense.

25          THE COURT:  No, I'm saying to the Prosecution

1   Team.  I mean, Mr. Fitzgerald pointed out I think earlier in

2   the week that not all of the documents that have come to the

3   fore since August 23 are materials that have been passed to

4   the Prosecution Team, and he pointed out that those would

5   have to be reviewed to be screened for privilege and other

6   materials that shouldn't come to the Prosecution Team.

7            So I guess my question is if you are only seeking

8   to obtain their services with respect to the materials in

9   the possession of the Prosecution Team, it seems to me that

10  that assistance would be appropriate.

11           MR. SAGEL:  That is correct, Your Honor.  I could

12  even limit it further in one second.  It's only the stuff

13  that has been produced to us, which is a mirror of what has

14  been produced to the defense to which has been determined by

15  the privilege review based on discussions in this court and

16  other reasons, none of which I'm always privy to, that these

17  do not contained privileged information and can be shared.

18  So, yes, to the first part of the question.

19           The second part which I think Your Honor has more

20  so directed and which is what our task will be is when we

21  take the data -- or when we upload the data, we are looking

22  for four or five names, and from what we can tell, we are

23  only going to find three.  So we're not looking at really

24  anything other than Geoffrey Johnson, Gregory Barela, Alexis

25  Gardner, and hypothetically if they exist Michelle Phan and

1    Long Tran.

2              THE COURT:  What about Mr. Johnson?

3              MR. SAGEL:  I thought I named him.

4              THE COURT:  Oh.

5              MR. SAGEL:  Yes.  So that's all we are looking.

6    Even though the TABS data itself that has been extracted

7    from the forensic software may include 100 other names and

8    clients, we're not looking in any of those files and have no

9    intention of looking in any of those files.

10             To the extent that the defendant believes there is

11   something in another client's file that relates to these

12   clients, he would probably either alert that through

13   reciprocal discovery obligations, or it will come up some

14   other way.  But we don't plan on looking at anything other

15   than those that appear to be identified by the client names,

16   and from the initial review on, again, I think it was

17   August 23, the ones that were identified by Johnson 001 or

18   Barela 001.  So they could be identified to the named

19   clients with regard to the ten wire fraud counts.  That's

20   all we would be looking at.

21             THE COURT:  It seems that narrow focus addresses

22   the concerns in Mr. Avenatti's opposition to the ex parte

23   application at Docket 847.

24             MR. AVENATTI:  Can I respond, Your Honor?

25             THE COURT:  Yes, please.

1           MR. AVENATTI:  I have some comments, and then I
2    have a suggestion.  The comments are as follows.  Your
3    Honor, what the government is seeking to do is gain
4    unfettered access to the entire TABS database of all the
5    clients of which they were thousands at the law firm.
6           THE COURT:  Sir, that's inaccurate.
7           MR. AVENATTI:  Not -- no --
8           THE COURT:  Just a minute.  Are you contending
9    that the government has privileged documents with respect
10   to -- that is, the Prosecution Team -- with respect to other
11   clients other than those in issue here?
12          MR. AVENATTI:  Yes, and if I could explain why I'm
13   asserting that.  The TABS data that has now been provided by
14   the Privilege Review Team to the Prosecution Team is not
15   client specific.  The Privilege Review Team we have now
16   learned gave the entire TABS database of all of the client
17   cost information for all of the clients of the law firm to
18   the Prosecution Team, because the Privilege Review Team did
19   not segregate out the specific client data for the five
20   clients.
21          So now the Prosecution Team has this entire
22   database of all of the confidential privileged financial
23   information of all of the firm's clients since its inception
24   in its possession.  It wants the software company to load
25   that entire database into the software so that the

```
1    government can then according to Mr. Sagel look for the data

2    for the five clients.

3          I have no objection obviously to an examination of

4    the data for the five clients, but I don't believe it is

5    appropriate or legal for the government to have -- the

6    Prosecution Team to have unfettered access to all of the

7    client data for all of the other clients, especially when

8    those clients have not received notice.  And that's one of

9    the issues that the software company is evidently concerned

10   about based on my review of the correspondence.  So those

11   are my objections.

12         The solution I think is as follows, and this is

13   what I would propose, Your Honor.  The Privilege Review Team

14   has the software and the entirety of the data on a computer

15   in the U.S. Attorney's Office in Los Angeles.  There is no

16   reason why that the government investigators, prosecutors,

17   and its expert cannot go to that office and review the data

18   only relating to the five clients in the Indictment under

19   the supervision of the Privilege Review Team to ensure that

20   no other client's data is accessed.

21         Frankly, I'm surprised if hasn't already been

22   done, but that's neither here nor there.  That's the

23   solution.  They can simply go to the U.S. Attorney's Office

24   in Downtown Los Angeles and review the data on that

25   terminal, export it, print it, do whatever they need to do
```

1    with it.

2              THE COURT:  So are you suggesting that neither the

3    Prosecution Team nor the Privilege Review Team need the

4    assistance of Software Technology, LLC.?

5              MR. AVENATTI:  Yes, for the reason that I just

6    stated, because the data is available on this terminal in

7    the U.S. Attorney's Office in Downtown Los Angeles.

8              THE COURT:  You also suggest in your Memorandum in

9    Opposition that the Court appoint a special master to

10   undertake this task.

11             MR. AVENATTI:  Your Honor, that's my preference,

12   but in the interest of time and efficiency, I have no

13   objection to the Privilege Review Team supervising the

14   access of the prosecutors and the expert to ensure that

15   another client's data is accessed.  I have no objection to

16   them supervising the process at this point.

17             THE COURT:  Do you have any objection to the

18   Prosecution Team seeking the assistance of the Software

19   Technology firm?

20             MR. AVENATTI:  I do if the intent is as has been

21   stated in the application, which is to get access to the

22   entire database, as opposed to access to any information

23   pertaining to the clients in the Indictment.

24             THE COURT:  So does that mean you have no

25   objection to the extent the assistance is limited and

1  focused to the clients involved in Counts 1 through 10?

2          MR. AVENATTI:  I have no objection provided that

3  that is a transparent process and that we have visibility

4  into that process.

5          THE COURT:  What does that mean?

6          MR. AVENATTI:  Well, that means I think that if

7  the technology company is going to assist either party, it

8  should basically be a neutral third party that assists

9  either party, either the government or the defendant, to the

10  extent that access is needed to the software.

11          Frankly, I think if we are not going to have the

12  supervision of the Privilege Review Team, if that idea is

13  not going to be taken up, then I think perhaps the Court

14  should issue an order permitting both parties to use the

15  technology company so that the technology company can

16  extract the data relating to the five clients and provide it

17  to both the government and the defense.

18          THE COURT:  Any objection to that?

19          MR. SAGEL:  That's all we have ever wanted, so,

20  no, no objection from the government.

21          THE COURT:  All right.  Why don't you tender me an

22  order that captures that limited function that the Court

23  will permit.

24          MR. SAGEL:  Yes, Your Honor, I have no problem I

25  guess --

```
 1              THE COURT:  I want to have in writing what the
 2    ground rules are so everybody understands them, including
 3    the Court.
 4              MR. SAGEL:  Understood, Your Honor.
 5              I guess my hesitation as I stand here being
 6    someone who is in the dark -- presumably stuff has been
 7    provided to the Court dealing with these clients from this
 8    information.  We have no idea if through this they're going
 9    to be providing us the universe.  We are just going to have
10    to trust the process.  I set that out for Your Honor, that
11    if there is something that is missing, we need to know --
12    since we aren't the ones actually doing it, we can't double
13    check the work.
14              THE COURT:  Well, I'll look for your order on it.
15              MR. SAGEL:  Understood, Your Honor.
16              THE COURT:  Let me say that as part of my
17    administrative and supervisorial duties, I direct the
18    government to continue its efforts with respect to reviewing
19    the remaining at this point 2.2 million files.  I think
20    that's the number Mr. Fitzgerald used earlier in the week.
21              MR. SAGEL:  I'm not sure that there was ever a
22    doubt about looking at them.  It was just a matter of
23    whether the indexing of them was going to continue.
24              THE COURT:  I direct that to go forward.
25              MR. SAGEL:  Okay.
```

1          THE COURT:  Depending on the result of the motion

2     in the Ninth Circuit and the Ninth Circuit appeal, I'm going

3     to review the status of production.  At that point, when the

4     jurisdiction one way or another is returned to this Court,

5     and in light of the facts with respect to production that

6     exist at that time, we're going to move forward very

7     promptly to a new trial.  I can't tell you what that date is

8     because I don't know the status of the production at that

9     point in time.  But once I have jurisdiction, we're going to

10    move.  So, therefore, the parties need to go keep going on

11    document production and document analysis on both sides.

12          MR. AVENATTI:  Understood, Your Honor.

13          THE COURT:  Okay.  Anything else we ought to take

14    up today?

15          MR. SAGEL:  I want to clarify -- and I'm assuming

16    Your Honor is agreeing with this -- the Ninth Circuit case

17    law that I think that you are referring to is Nascimento and

18    other cases that basically say you are only divested of

19    jurisdiction of the issue on appeal, which would basically

20    be the double jeopardy and related to the ten counts.

21          Anything that is administrative, ministerial, or

22    separate from those ten counts, Your Honor is agreeing that

23    you retain jurisdiction for those purposes?

24          THE COURT:  Yes.

25          MR. SAGEL:  I just wanted to clarify before we

1    file anything related to this matter.

2           THE COURT:  As to any substantive issues, I

3    believe I'm divested of jurisdiction with respect to.

4           MR. SAGEL:  The issue before the Ninth Circuit?

5           THE COURT:  At least those.  And I believe with

6    respect to the remaining 26 counts, it seems to me that the

7    issue of document production relates to some or all of those

8    counts.

9           MR. SAGEL:  I obviously disagree, but we can take

10    that up if and when --

11          THE COURT:  Well, you know, present what you wish.

12    If I make a determination that the issue you want to raise

13    is a substantive issue that I think conflicts with the

14    divesture of jurisdiction, I probably just won't consider

15    it.

16          MR. SAGEL:  Understood.

17          THE COURT:  Okay.  Anything else?

18          Thank you.

19          MR. AVENATTI:  Thank you, Your Honor.

20          (Whereupon, the proceedings were concluded)

21                *    *    *

22

23

24

25

19

**CERTIFICATE**

     I hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Date:  October 19, 2021


             /s/   Sharon A. Seffens  10/19/21
             SHARON A. SEFFENS, U.S. COURT REPORTER