UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

-against-

MICHAEL AVENATTI,

Defendant.

**MEMORANDUM
OPINION & ORDER**

(S1) 19 Cr. 373 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

On February 14, 2020, a jury found Defendant Michael Avenatti guilty of (1)

transmitting interstate communications with intent to extort, in violation of 18 U.S.C. § 875(d)

(Count One); (2) Hobbs Act extortion, in violation of 18 U.S.C. § 1951 (Count Two); and (3)

honest services wire fraud, in violation of 18 U.S.C. §§ 1343 and 1346 (Count Three).  (Verdict

(Dkt. No. 265))

On July 6, 2021, this Court denied Avenatti's post-trial motions for a judgment of

acquittal or for a new trial (July 6, 2021 Mem. Op. & Order (the "July 6, 2021 Opinion") (Dkt.

No. 336)), and on July 8, 2021, Avenatti was sentenced to 24 months' imprisonment on Count 1,

and 30 months' imprisonment on each of Counts 2 and 3, with all terms to be run concurrently.

Judgment was entered on July 15, 2021 (Dkt. No. 339), and Avenatti filed a notice of appeal on

July 22, 2021.  (Dkt. No. 343)

In a December 2, 2021 letter, Avenatti contends that the Government withheld

Brady material, in the form of expert reports concerning his financial condition during the period

between 2009 and 2018.  (Dec. 2, 2021 Def. Ltr. (Dkt. No. 358))  Avenatti contends that these

reports "powerfully undercut the government's trial theory that [he] acted with intent to extort

and defraud."  (Id. at 2)  Given that Avenatti's appeal is pending before the Second Circuit, he

seeks an indicative ruling from this Court concerning his Brady claims, pursuant to Fed. R. Crim.

P. 37.  (Id.)

The Government opposes Avenatti's application, arguing – <u>inter alia</u> – that (1) the material cited by Avenatti is not exculpatory, because it concerns a time period that preceded Avenatti's commission of the instant offenses; (2) Avenatti was well aware of "his own finances"; and (3) the material cited by Avenatti does not undermine the Government's financial motive evidence or the evidence regarding his commission of the extortion and fraud offenses, most of which was audio and/or video recorded.  (Govt. Opp. (Dkt. No. 360) at 1-2)[1]

For the reasons stated below, Avenatti's request for an indicative ruling will be denied.

## BACKGROUND[2]

## I.    THE EVIDENCE AT TRIAL

The evidence at trial showed the following:  Gary Franklin was an amateur youth basketball coach in Los Angeles whose teams had formerly been sponsored by Nike, Inc.  Nike terminated its sponsorship of Franklin's teams after the 2018 season, and Franklin blamed two allegedly corrupt Nike employees for the termination.  Franklin wanted to regain the Nike sponsorship, and he sought legal assistance from Avenatti.  (Trial Transcript ("Tr.") at 716, 1520-22, 1524, 1527-30, 1622-34)

The evidence showed that Avenatti highjacked Franklin's claims against Nike for his own purposes.  Without Franklin's knowledge, he demanded that Nike hire him and his colleague – Mark Geragos – to perform an internal investigation at Nike, for which Avenatti and Geragos would be paid $15 to $25 million.  Avenatti threatened that if Nike did not agree to his demands, he would conduct a press conference at which he would disclose Nike's alleged

---

[1]  The page numbers of documents referenced in this opinion correspond to the page numbers designated by this District's Electronic Case Files ("ECF") system.

[2]  The evidence at trial is discussed at length in this Court's 96-page memorandum opinion and order denying Avenatti's post-trial motions.  (July 6, 2021 Opinion (Dkt. No. 336))  Familiarity with the July 6, 2021 Opinion is assumed.

corruption of youth basketball, and that as a result Nike would suffer tremendous economic and reputational harm. Avenatti's extortionate threats were delivered at meetings and on telephone calls with Nike's in-house and outside counsel, and most of his threats were captured on audio and/or video recordings. (GX 1 through 4; Tr. 247, 313-15, 321, 325-26, 717-18, 745-46, 763, 798, 806, 808, 1585-86)

At his initial March 19, 2019 meeting with Nike's lawyers, Avenatti explained that he represented a "whistleblower" who had knowledge of improper payments Nike had made to amateur youth basketball players. (Tr. 211-12) Avenatti said that Nike would have "to do two things. Nike was going to pay civil settlement to [Franklin], . . . and Nike was going to hire [Avenatti and Geragos] to conduct an internal investigation into corruption in [youth] basketball." (Tr. 213, 242-43, 1155, 1418)

Avenatti told Nike's lawyers that "he was going to blow the lid on this scandal, that it was going to be a major scandal, that he had a reporter, Rebecca Ruiz, at the New York Times either on speed dial or on call and that he could reach out to her and have her write a story at a moment's notice." (Tr. 217, 244, 1157, 1437) Avenatti said that if Nike did not comply with his demands, he would "hold a press conference the next day," during which "he could and would take billions of dollars off the company's market cap." (Tr. 218, 244, 1163-64, 1419-20, 1422) Avenatti's threatened press conference was carefully timed to cause maximum damage to Nike's stock price, as it coincided with an upcoming Nike earnings call and with "March Madness," when the country's attention would be focused on youth basketball. (Tr. 257-58, 1166-67, 1423-24)

Shortly after the March 19, 2019 meeting, Nike's lawyers contacted the U.S. Attorney's Office about Avenatti's threats, and the U.S. Attorney's Office brought in the FBI to pursue an investigation. From that point forward, Avenatti's communications with Nike's lawyers were recorded by the FBI. (Tr. 272-75, 509-10, 1139, 1296)

3

In a March 20, 2019 recorded telephone call, Avenatti repeated his demands to Scott Wilson, Nike's outside counsel:

> [W]e're gonna get a million five for our guy, and we're gonna be hired to handle the internal investigation, and if you don't wanna do that, we're done. . . .  I wanna be really clear with you. . . .  I'm not fucking around with this, and I'm not continuing to play games. . . .  You guys know enough now to know you've got a serious problem.  And it's worth more in exposure to me to just blow the lid on this thing.  A few million dollars doesn't move the needle for me.  I'm just being really frank with you.  So if that's what, if that's what is being contemplated, then let's just say it was good to meet you, and we're done.  And I'll proceed with my press conference tomorrow and I'll hang up with you now and I'll call the New York Times, who are awaiting my call.  I-I'm not fucking around with this thing anymore.  So if you guys think that you know, we're gonna negotiate a million five [for Franklin], and we're gonna, you're gonna hire us to do an internal investigation, but it's gonna be capped at 3 or 5 or 7 million dollars, like let's just be done. . . .  And I'll go and I'll go take and I'll go take ten billion dollars off your client's market cap.  But I'm not fucking around.

(GX 1 at 02:33-03:57)

In a March 21, 2019 audio and video-recorded meeting with Nike's attorneys, Avenatti demanded a "12 million dollar retainer upon signing.  Evergreen.  Um, that's gonna be deemed earned when paid, we'll cap it at 25 million dollars, minimum of 15 million dollars, unless the scope changes."  (GX 2 at 17:36-17:57)

Nike outside counsel Scott Wilson told Avenatti "that the . . . settlement of Mr. Franklin's civil claims for 1.5 million dollars is [not] going to be the stumbling block here," and asked whether "there is a way to avoid your press conference without hiring you and Mark [Geragos] to do an internal investigation[.]"  (Id. at 21:50-22:09)  Avenatti responded, "I'm not gonna answer that question" (id. at 22:09-22:10), but Wilson continued to pursue whether the dispute between Franklin and Nike could be resolved entirely through a settlement agreement between Franklin and Nike.  Avenatti rejected the idea stating, "I don't think it makes any sense for Nike to be paying, um, an exorbitant sum of money to Mr. Franklin, in light of his role in this. . . .  I mean, imagine that."  (Id. at 23:20-23:41)

Later in the March 21, 2019 meeting – after Wilson had continued to object to Avenatti's insistence that Nike hire him and Geragos to perform an internal investigation at Nike – Avenatti told Nike that it could buy his silence, and avoid the threatened press conference, for "22 and a half million dollars." (Id. at 34:12-35:01)

Avenatti was very clear as to what would happen if Nike did not accede to his demands:

> Have you ever held the balls of the client in your hand where you can take 5, 6 billion dollars in market cap off of 'em? This is gonna be a major fucking scandal. . . . I'm going tell ya, if we don't – if we don't figure this out, from moment one, I'm gonna be asking, why Nike hasn't been indicted.
>
> I'm gonna break, I'm gonna bring the power of my platform to bear – to expose what the fuck is goin' on here – appropriately[,] [i]f we can't reach a settlement in the next week.
> . . . .
> [L]et me just explain something to you.  This is not gonna be a single press conference, okay? . . .  No, no this is gonna be, no this is gonna be a scandal.  This is gonna be the biggest scandal in sports, in a long time.  That's what this is gonna be.

(Id. at 32:26-33:46)

Avenatti was arrested on March 25. 2019, as he approached Wilson's office building for a scheduled meeting to consummate the purported settlement.  (Tr. 1840-41, 1897; GX S-1)

The evidence further demonstrated that Avenatti never discussed with Franklin Avenatti's threats to hold a press conference; his demand that Nike retain Avenatti and Geragos to conduct an internal investigation and pay them tens of millions of dollars to do so; or his proposal that Nike pay him $22.5 million in return for confidentiality.  (Tr. 717-18, 745-46, 762-63, 770-71, 797-99, 806, 806, 808, 1563-64, 1568, 1571, 1577-78, 1585-86)

The jury heard limited evidence concerning Avenatti's financial condition in March 2019, when he committed the charged offenses.  The primary evidence on this point was a stipulation entered into by the parties in which Avenatti admitted that – as of March 25, 2019 –

approximately $11 million in judgments had been entered against him in four different courts.

(Tr. 1409-10; GX S-4)  In addition, Judy Regnier – the office manager for Avenatti's law firm –

Eagan Avenatti LLP – testified that the firm had been evicted from its offices in November 2018

for failure to pay rent.  (Tr. 1402)  Regnier also testified that, in March 2019, Avenatti told her

that he was "working on something that could potentially provide a way to . . . resolve a lot of

the debt that had currently been hanging over the law firm," and allow Avenatti to "start a new

firm."  (Tr. 1405-06)  Regnier's testimony occupies nine pages of a nearly 2400-page trial

transcript.  (Tr. 1398-1407)  She was not cross-examined.[3]

---

[3]  Avenatti had moved in limine to exclude evidence of his allegedly poor financial condition
(Dkt. No. 89)  The Government sought to introduce testimony from five witnesses, and more
than eighty-two exhibits, concerning Avenatti's financial condition.  (Jan. 22, 2020 Tr. (Dkt. No.
235) at 3)  In a January 22, 2020 pretrial ruling, this Court excluded most of the Government's
proffered evidence regarding Avenatti's poor financial condition.  (Id. at 13-17)

While acknowledging that the evidence regarding Avenatti's debts "constitutes direct evidence
of motive," the Court concluded that most of the Government's proposed evidence had limited
probative value and presented a risk of unfair prejudice.  (Id. at 8)

As to probative value, the Court noted that "no one on the jury is going to have any difficulty
understanding the motive offered by an opportunity to quickly obtain $15 to $25 million.  And
that powerful motive exists whether or not Avenatti was in debt."  (Id. at 7)  The Court also
noted that Avenatti had represented that he did "not intend to put his financial condition at
issue."  (Id.)

As to the risk of unfair prejudice, much of Avenatti's debt arose from unpaid child support,
unpaid taxes, and money allegedly owed to clients.  Evidence regarding these matters presented a
significant risk of unfair prejudice, and "threaten[ed] to turn a trial about whether Avenatti
committed extortion and honest services fraud into a trial about whether he was in difficult
financial straits in March 2019."  (Id. at 15; see also id. ("I cannot permit the trial to devolve into
a lengthy analysis of Avenatti's financial condition.  That is ultimately not what the trial is
about."))

Accordingly, the Court excluded all evidence of Avenatti's allegedly poor financial condition,
except for the stipulation regarding the judgments against him, and Regnier's limited testimony
regarding (1) the eviction of Eagan Avenatti from its offices for non-payment of rent; and (2) her
conversation with Avenatti in March 2019 – in the midst of Avenatti's commission of the
charged offenses – in which Avenatti linked the recovery of his law firm to "something" he was
then "working on."  (Id. at 15-16)  Given the timing of this conversation, a reasonable jury could
have found that Avenatti was alluding to his ongoing extortion of Nike.

As this summary of the evidence indicates, Avenatti was convicted largely on the basis of his own audio and video-recorded statements.

## II.    POST-TRIAL MOTION REGARDING WITNESS REGNIER

After the jury returned a verdict convicting Avenatti on all counts, he moved for a judgment of acquittal or for a new trial pursuant to Rules 29 and 33 of the Federal Rules of Criminal Procedure.  In connection with his post-trial motions, Avenatti argued that the Government had failed to produce certain prior statements of Regnier, in violation of, inter alia, Brady and Giglio.  (Def. Post-Trial Motions (Dkt. No. 291); July 5, 2021 Def. Ltr. (Dkt. No. 333))  Avenatti moved to compel the production of "certain notes created during [the Government's] meetings with . . . Regnier," as well as "text messages that . . . Regnier sent [to an SDNY U.S. Attorney's Office agent] before the trial" that Avenatti contended the agent had failed to preserve.  Avenatti also sought to compel the production of statements Regnier made to an Internal Revenue Service ("IRS") agent working with the U.S. Attorney's Office for the Central District of California on an unrelated prosecution of Avenatti.  (June 4, 2021 Def. Ltr. (Dkt. No. 315) at 1; June 17, 2021 Def. Reply Ltr. (Dkt. No. 323) at 5; July 5, 2021 Def. Ltr. (Dkt. No. 333) at 1-2)

The Court concluded that the Government's failure to disclose the Regnier statements did not constitute a Brady or Giglio violation.  (July 6, 2021 Opinion (Dkt. No. 336) at 73-88)  In denying Avenatti's application, the Court noted that

> Regnier was an inconsequential witness.  She had no direct knowledge of, and did not testify concerning, Avenatti's alleged crimes.  To the extent that Regnier's testimony suggests that Avenatti's law firm was in financial distress, there was abundant evidence that Avenatti was in financial distress, including a stipulation that unpaid judgments amounting to $11 million had been entered against Avenatti.

(Id. at 87 (citation omitted))

## III.   **MISTRIAL IN THE CALIFORNIA ACTION**

In the Central District of California action (the "California action"), Avenatti is charged with ten counts of wire fraud in violation of 18 U.S.C. § 1343, arising out of his alleged embezzlement and misappropriation of settlement funds relating to five clients he had represented; eight counts of tax evasion, in violation of 26 U.S.C. § 7202; obstruction of federal tax laws arising out of transfers among bank accounts to hide income, in violation of 26 U.S.C. § 7212(a); ten counts of willful failure to file tax returns, in violation of 26 U.S.C. § 7203; two counts of bank fraud, in violation of 18 U.S.C. § 1344(1) and (2); identity fraud in violation of 18 U.S.C. § 1028A(a)(1), arising out of false and fraudulent information he provided to obtain loans from Peoples Bank; and four counts of filing a false declaration or making a false oath in a 2017 bankruptcy action relating to his law firm, Eagan Avenatti LLP. (Indictment (United States v. Avenatti, No. 19 Cr. 61 (JVS) (C.D. Cal.) (Dkt. No. 16))

The California Action is premised almost entirely on alleged fraudulent conduct that took place during the period between January 2014 and November 2018. (Id.) The subject matter of these charges is entirely unrelated to the charges against Avenatti in the Southern District of New York.

The judge presiding over the California action granted a severance as to certain counts, and trial as to the wire fraud counts began on July 13, 2021. (Avenatti, No. 19 Cr. 61 (JVS) (C.D. Cal.) (Dkt. Nos. 265, 364, 553)) As part of its case in chief, the Government offered expert testimony from Robert Drum, a certified public accountant. (Def. Jan. 3, 2022 Subm., Ex. 1, Transcript of C.D. Cal. proceedings (Dkt. No. 369) at 52) Drum was retained by the Government to analyze financial records regarding Avenatti's "handling of funds concerning various clients." (Id. at 55) In order to conduct his financial analysis, Drum was given access to Eagan Avenatti's QuickBooks records, settlement agreements, retention agreements, and bank records. (Id. at 55)

On August 14 and 15, 2021, during the trial, Avenatti moved for a mistrial, arguing that the California prosecutors had improperly withheld materials from the defense, including email communications between Drum and the prosecutors, and Eagan Avenatti accounting data – referred to as "Tabs data" – that is essential to calculating the costs and fees associated with each client. Avenatti argued that, in not producing these materials to the defense, the California prosecutors had violated the Jencks Act, Rule 26.2 of the Federal Rules of Criminal Procedure, and Brady/Giglio. (Avenatti, No. 19 Cr. 61 (C.D. Cal.) (JVS), Mistrial Motions (Dkt. No. 705 at 7-12; Dkt. No. 706 at 7-11))

On August 24, 2021, the presiding judge in the California action – the Hon. James V. Selna – declared a mistrial, finding that the California prosecutors should have produced the Tabs accounting data cited by Avenatti. (Def. Jan. 3, 2022 Subm., Ex. 3, Transcript of CDCA proceedings (Dkt. No. 369) at 187-249) In granting a mistrial, Judge Selna found that the "financial data [cited by Avenatti] is critical to this case," that the Tabs data is material "in determining what net payment Mr. Avenatti was entitled to out of the settlement[s]" for at least three of the victim clients, and that "the data would have been useful in an overall showing that the government's accounting records . . . weren't accurate." (Id. at 240, 243-44) Although Judge Selna concluded that the California prosecutors had not engaged in any intentional misconduct, he found that their failure to produce the Tabs accounting data constituted a Brady violation, and required that a mistrial be declared. (Id. at 246-48)

## DISCUSSION

## I.   LEGAL STANDARDS

### A.   New Trial Motions

Pursuant to Federal Rule of Criminal Procedure 33, a court may "vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). "Rule 33 confers broad discretion upon a trial court to set aside a jury verdict and order a new

trial to avert a perceived miscarriage of justice." United States v. Sanchez, 969 F.2d 1409, 1413 (2d Cir. 1992). Courts may not only grant a Rule 33 motion where the evidence is legally insufficient, see United States v. Leslie, 103 F.3d 1093, 1100-01 (2d Cir. 1997), but also where a jury's verdict is contrary to the weight of the evidence, United States v. Ferguson, 246 F.3d 129, 136 (2d Cir. 2001) ("We cannot say that the district judge abused her discretion when she concluded that the weight of the evidence showed that [the defendant] was an outside hit man and not a [gang] member acting to further that membership."). Moreover, in contrast to the analysis under Rule 29, a district court considering a Rule 33 motion need not view the evidence in the light most favorable to the Government. United States v. Lopac, 411 F. Supp. 2d 350, 359 (S.D.N.Y. 2006) (citing United States v. Ferguson, 49 F. Supp. 2d 321, 323 (S.D.N.Y. 1999), aff'd, 246 F.3d 129 (2d Cir. 2001)).

The Second Circuit has explained that

> [t]he ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice. The trial court must be satisfied that competent, satisfactory and sufficient evidence in the record supports the jury verdict. The district court must examine the entire case, take into account all facts and circumstances, and make an objective evaluation. There must be a real concern that an innocent person may have been convicted. Generally, the trial court has broader discretion to grant a new trial under Rule 33 than to grant a motion for acquittal under Rule 29, but it nonetheless must exercise the Rule 33 authority sparingly and in the most extraordinary circumstances.

Ferguson, 246 F.3d at 134 (internal quotation marks and citations omitted).

Under Rule 33, "[i]n the exercise of its discretion, the court may weigh the evidence and credibility of witnesses." United States v. Autuori, 212 F.3d 105, 120 (2d Cir. 2000) (citing Sanchez, 969 F.2d at 1413). However, "[t]he district court must strike a balance between weighing the evidence and credibility of witnesses and not 'wholly usurp[ing]' the role of the jury." Ferguson, 246 F.3d at 133 (quoting Autuori, 212 F.3d at 120) (second alteration in Ferguson). "Because the courts generally must defer to the jury's resolution of conflicting evidence and assessment of witness credibility, '[i]t is only where exceptional circumstances can

be demonstrated that the trial judge may intrude upon the jury function of credibility assessment.'" Id. at 133-34 (quoting Sanchez, 969 F.2d at 1414) (alteration in Ferguson).  Such "exceptional circumstances" may exist "where testimony is 'patently incredible or defies physical realities.'" Id. at 134 (quoting Sanchez, 969 F.2d at 1414).

**B.**   **Indicative Rulings**

Where – as here – a direct appeal is pending, a district court lacks the authority to grant a new trial motion.  Fed. R. Crim. P. 33(b)(1) ("If an appeal is pending, the court may not grant a motion for a new trial until the appellate court remands the case.")  In such circumstances, the district court may issue an "indicative ruling" in which it

> (1) defer[s] considering the motion;
>
> (2) den[ies] the motion; or
>
> (3) state[s] either that it would grant the motion if the court of appeals remands for that purpose or that the motion raises a substantial issue.

Fed. R. Crim. P. 37(a).

**C.**   ***Brady* Violations**

"The government has a duty to disclose evidence favorable to the accused when it is material to guilt or punishment." United States v. Madori, 419 F.3d 159, 169 (2d Cir. 2005) (citing Brady v. Maryland, 373 U.S. 83, 87 (1963)).  To prove a Brady violation, a defendant must establish that (1) the evidence at issue is "favorable to the accused"; (2) the evidence was "suppressed by the State, either willfully or inadvertently"; and (3) "prejudice . . . ensued" from the lack of disclosure such that it is "material." Strickler v. Greene, 527 U.S. 263, 281-82 (1999); United States v. Coppa, 267 F.3d 132, 140 (2d Cir. 2001).

As to the first element, evidence that is "favorable to the accused" "includes not only evidence that tends to exculpate the accused, but also evidence that is useful to impeach the

credibility of a government witness," that is, <u>Giglio</u> material.  <u>Coppa</u>, 267 F.3d at 139 (citing

<u>Giglio v. United States</u>, 405 U.S. 150, 154 (1972)).

As to the second element, a defendant must show that the Government suppressed

evidence, meaning that the Government violated its "affirmative duty to disclose favorable

evidence known to it." <u>United States v. Payne</u>, 63 F.3d 1200, 1208 (2d Cir. 1995). "'[T]he

[G]overnment cannot be required to produce that which it does not control and never possessed

or inspected.'" <u>United States v. Hutcher</u>, 622 F.2d 1083, 1088 (2d Cir. 1980) (quoting <u>United</u>

<u>States v. Canniff</u>, 521 F.2d 565, 573 (2d Cir. 1975)).  A prosecutor, however, is "presumed . . . to

have knowledge of all information gathered in connection with his office's investigation of the

case and indeed 'has a duty to learn of any favorable evidence known to the others acting on the

[G]overnment's behalf in the case.'" <u>United States v. Avellino</u>, 136 F.3d 249, 255 (2d Cir. 1998)

(quoting <u>Kyles v. Whitley</u>, 514 U.S. 419, 437 (1995)).

As to prejudice and materiality, a defendant must show that "there is a reasonable

probability that, had the evidence been disclosed, the result of the proceeding would have been

different." <u>Turner v. United States</u>, 137 S. Ct. 1885, 1893 (2017) (quoting <u>Cone v. Bell</u>, 556

U.S. 449, 469-70 (2009)).  "A reasonable probability of a different result is one in which the

suppressed evidence undermines confidence in the outcome of the trial." <u>Id.</u> (internal quotation

marks omitted) (quoting <u>Kyles</u>, 514 U.S. at 434); <u>see also</u> <u>Strickler</u>, 527 U.S. at 281 ("[T]here is

never a real '<u>Brady</u> violation' unless the nondisclosure was so serious that there is a reasonable

probability that the suppressed evidence would have produced a different verdict.").  "Where the

evidence against the defendant is ample or overwhelming, the withheld <u>Brady</u> material is less

likely to be material than if the evidence of guilt is thin." <u>United States v. Gil</u>, 297 F.3d 93, 103

(2d Cir. 2002) (citation omitted).

## II.   **ANALYSIS**

### A.   **What Avenatti Claims the New York U.S. Attorney's Office Should Have Produced to Him**

In arguing that this Court should issue an indicative ruling stating that Avenatti is entitled to a new trial based on <u>Brady</u> violations, Avenatti does not rely on the New York prosecutors' failure to produce the Tabs accounting data cited by Judge Selna in granting a mistrial in the California action.  Avenatti's request is in instead based on documents that Judge Selna did not address in his mistrial ruling.

The materials that Avenatti cites in support of his instant motion are attached to his December 2, 2021 letter seeking an indicative ruling.  (Dec. 2, 2021 Def. Ltr. (Dkt. No. 358))  All of these documents (the "Drum Documents") appear to have been prepared by John Drum of Analysis Group, Inc., or his staff.  As noted above, Drum served as the Government's financial expert in the California action.  (Def. Jan. 3, 2022 Subm., Ex. 1, Transcript of C.D. Cal. proceedings (Dkt. No. 369) at 54)

The Drum Documents include a number of draft graphs, with attached cover emails indicating that Drum sent them to one or more of the California prosecutors between May 2019 and November 2019.  The draft graphs include the following headings:

Cumulative Net Flows (in Thousands)
Excluding Transactions with Owners
2009-2018

Cumulative Net Flows to AA (in Thousands)
2009-2018

Cumulative Net Flows to MA Personal Accounts (in Thousands)
2009-2018

Eagan Avenatti (EA) Generates Positive Net Flows From Third Parties
2009-2018

Eagan Avenatti (EA) Transfers Its Positive Net Flow[]to Avenatti and Associates (AA)
2009-2018

Avenatti and Associates (AA) Transfers Its Positive Net Flow to Michael Avenatti
Personal Accounts
2009-2018

EA Generates Positive Net Flows From Third Parties
2011-2018

EA Transfers Its Positive Net Flow to Avenatti & Associates (A&A)
2011-2018

A&A Generates Negative Net Flow from Third Parties and Receives Significant Net
Flows from Other Avenatti-Owned Entities (Primarily EA)
2011-2018

A&A Transfers Its Positive Net Flow to Michael Avenatti Personal Accounts
2011-2018

(Dec. 2, 2021 Def. Ltr., Ex. A (Dkt. No. 358) at USAO_01144272, USAO_01144285,

USAO_01144286, USAO_01144287, USAO_01144289, USAO_01144299, USAO_01144300,

USAO_01144302, USAO_01144316, USAO_01144320, USAO_01144321, USAO_01144325,

USAO_01144326, USAO_01144388, USAO_01144389, USAO_01144394, USAO_01144395,

USAO_01144399, USAO_01144400)

In addition to the graphs, the Drum Documents include a number of appendices,

also in draft form.  The appendices reflect the following headings:

EA Net Flows by Account (2011)

EA Net Flows by Account (2012)

EA Net Flows by Account (2013)

EA Net Flows by Account (2014)

EA Net Flows by Account (2015)

EA Net Flows by Account (2016)

EA Net Flows by Account (2017)

EA Net Flows by Account (2018)

(Id. at USAO_01144346 through USAO_01144353)

Avenatti contends that these documents show that he "owned and ran a law practice that received hundreds of millions of dollars from 2009-2018 and generated millions of dollars in annual revenues," and that his "financial circumstances . . . were far from 'desperate.'" (Dec. 2, 2021 Def. Ltr. (Dkt. No. 358) at 1)  According to Avenatti, the Drum Documents

> powerfully undercut the government's trial theory that Mr. Avenatti acted with intent to extort and defraud. While it told the jury over and over that Mr. Avenatti was "desperate" and had no other way out, it withheld its expert's contrary opinion that Mr. Avenatti's practice was profitable and generated positive cash flow, meaning that he would have been able to generate the case required to manage his debts without a penny from Nike; thus, the $12 million debt, while appreciable was manageable given the millions in positive net flows that his firm consistently generated. There is no question that these analyses – directly contradicting the government's trial theory about Mr. Avenatti's motive and intent – are <u>Brady</u> that should have been disclosed before the trial.

(<u>Id.</u> at 2 (footnote omitted))

## B.    Whether the Drum Documents Are Exculpatory

The Drum Documents are not relevant to the charges in the instant case, much less exculpatory.  The Drum Documents – as the headings set forth above indicate – address the 2009 to 2018 time period.  Avenatti's criminal conduct in the instant case took place in March 2019.  It matters not at all – for purposes of the charges against Avenatti in the instant case – what the cash flow of Eagan Avenatti was during any year between 2009 and 2018, nor does it matter what amounts Avenatti's law firms – whether Eagan Avenatti or Avenatti and Associates – transferred to his personal accounts during the 2009 to 2018 time period.

As discussed above, the Government's evidence at trial concerning Avenatti's allegedly poor financial condition was limited to a stipulation showing that – as of March 2019 – judgments totaling more than $11 million had been entered against him (GX S-4), and that in November 2018 his law firm had been evicted from its offices because of a failure to pay rent, and that since that time the lawyers and other firm employees had been forced to work from home.  (Tr. 1401-02)  Finally, the Government introduced evidence that – between March 15, 2019 and March 25, 2019 – Avenatti told his office manager that he was "working on something

that could potentially provide [his law firm with] a way to . . . resolve a lot of the debt that had currently been hanging over the law firm," and permit Avenatti to "start a new firm." (Tr. 1405-06)  As discussed above, given the timing, a reasonable jury could have found that when Avenatti told his office manager that he was "working on something" that could address Eagan Avenatti's debt, and permit Avenatti to "start a new firm," he was alluding to his ongoing extortion of Nike, which he hoped would yield $15 to $25 million.

Accordingly, when the Government argued to the jury that Avenatti's financial condition in March 2019 was "desperate," this is the evidence that the Government relied on. And nothing in the Drum Documents casts doubt on the evidence of Avenatti's financial condition that was introduced at trial.  The Drum Documents do not address (1) the $11 million in judgments that had been rendered against Avenatti; (2) the fact that his law firm was evicted from its offices in November 2018 for non-payment of rent; or (3) Avenatti's statement to his office manager that he was "working on something" that would allow him to address Eagan Avenatti's debt and allow Avenatti to "start a new firm."

In sum, Avenatti's <u>Brady</u> claim fails because the Drum Documents are not exculpatory in the context of the instant case.

**C.    Whether Introduction of the Drum Documents**
       <u>**Would Have Changed the Outcome of the Case**</u>

There is likewise no reason to believe that introduction of the Drum Documents would have changed the outcome of the case.

As discussed above, the Drum Documents do not address the relevant time period, and do not undermine the limited evidence that was admitted concerning Avenatti's financial condition.

Moreover, the evidence against Avenatti consisted primarily of his own audio and video-recorded statements, in which he repeatedly and vividly (1) threatened enormous

16

economic and reputational harm to Nike if it did not quickly agree to pay him and Geragos tens

of millions of dollars to conduct an internal investigation or otherwise buy their silence; and (2)

acted in a manner that was clearly adverse to his client's interest.[4]  (See Tr. 247, 313-15, 321,

325-26, 717-18, 745-46, 763, 770-71, 796-99, 806, 808, 1585-86; GX 1-4)

   While the Government argued in summation that in March 2019 Avenatti's

financial condition was "desperate" (Tr. 153, 2127, 2166, 2184, 2266, 2280, 2286-87),

Avenatti's financial condition was no more than a footnote during the proof at trial, because the

Court excluded most of the Government's evidence concerning Avenatti's allegedly poor

financial condition.  As the Court stated in making this ruling, the lure of the $15 to $25 million

that Avenatti was demanding from Nike was sufficient to explain his financial motive.  (Jan. 22,

2022 Tr. (Dkt. No. 235) at 7 ("[N]o one on the jury is going to have any difficulty understanding

the motive offered by an opportunity to quickly obtain $15 to $25 million.  And that powerful

motive exists whether or not Avenatti was in debt."))

   As to the limited evidence the Court admitted concerning Avenatti's financial

condition, as discussed above, the Drum Documents shed no light on the $11 million in

judgments entered against Avenatti or on the eviction of his law firm from its offices because of

non-payment of rent.

   In sum, given the overwhelming evidence of Avenatti's guilt, the irrelevance of

the Drum Documents, and the fact that (1) only limited evidence of Avenatti's allegedly poor

financial condition was admitted at trial, and (2) most of the evidence that was admitted on this

---

[4]  The evidence showed that Avenatti did not discuss with Franklin his plot to extract tens of
millions of dollars from Nike for Avenatti's personal benefit.  (Tr. 717-18, 745-46, 770-71, 796-
99, 806, 808, 1563-64, 157-73, 1585-86)  Moreover, when Nike's lawyer inquired whether the
dispute between Nike and Franklin could be resolved entirely through a settlement agreement
between Nike and Franklin, Avenatti flatly rejected that proposal.  (GX 1 at 23:20-23:41)

point came in by stipulation, there is no reason to believe that admission of the Drum Documents would have changed the outcome of the trial.

Accordingly, Avenatti's <u>Brady</u> claim also fails because there is no reasonable probability that introduction of the Drum Documents would have changed the outcome of the trial.

### D.     Whether the New York and California Prosecutors Were Engaged in a Joint Investigation

The Government argues that Avenatti's <u>Brady</u> claim also fails because the New York prosecutors did not possess and had no knowledge of the Drum Documents prior to trial. (Govt. Opp. (Dkt. No. 360) at 1, 3, 6-9) ("The Government never received Mr. Drum's reports, never had them described, never communicated with Mr. Drum, never paid Mr. Drum, and had no other awareness of Mr. Drum or his analysis [until after trial].")

Where a <u>Brady</u> claim is premised on another agency or office's possession of alleged exculpatory material, a defendant must show that the two offices or agencies were engaged in a joint investigation.  See <u>United States v. Martoma,</u> 990 F. Supp. 2d 458, 460 (S.D.N.Y. 2014) ("'Where the USAO conducts a "joint investigation" with another state or federal agency, courts in this Circuit have held that the prosecutor's duty extends to reviewing the materials in the possession of that other agency for <u>Brady</u> evidence.'" (quoting <u>United States v. Gupta,</u> 848 F. Supp. 2d 491, 493 (S.D.N.Y. 2012)))

Here, the Government asserts that "[t]he interactions between the [Southern District of New York U.S. Attorney's Office and the Central District of California U.S. Attorney's Office] principally have involved deconfliction, as well as accommodating a limited number of specific requests for information transfer between the offices and permitting members

of the other office to join or listen to a small number of meetings with certain witnesses of

mutual interest, so as to avoid duplication. . . ."[5] (Govt. Opp. (Dkt. No. 360) at 3)

        Avenatti contends that the two offices collaborated with each other, particularly in

the "investigat[ion of] Mr. Avenatti's finances, which "was primarily developed by the DOJ

lawyers in California" and was "critical to both cases." (Def. Reply (Dkt. No. 363) at 1-2) In

this regard, Avenatti points to a number of documents – many of which concern his finances –

that the California prosecutors shared with the New York prosecutors. (Id. at 3-4) Avenatti also

notes that prosecutors from the two offices met jointly with Judy Regnier, who testified at both

the New York and California trials regarding Avenatti's finances (id. at 4), and cites this Court's

previous finding that the two offices "at least as to Regnier, engaged in joint and coordinated fact

gathering." (Id. at 2; July 6, 2021 Opinion (Dkt. No. 336) at 85) Finally, Avenatti contends that

the two offices coordinated the timing of his arrest, the unsealing of the complaints against him,

and their press conferences, and that they engaged in joint witness preparation prior to and

during the New York trial, which was attended by the California prosecutors. (Id. at 2-3, 4, 8)

        Two prosecution teams "'are engaged in joint fact-gathering, even if they are

making separate investigatory or charging decisions,'" when the "'degree of cooperation

between agencies' . . . [involves] their coordination in conducting witness interviews and

otherwise investigating the facts of the case." Martoma, 990 F. Supp. 2d at 461 (quoting Gupta,

848 F. Supp. 2d at 494, 495). In assessing whether two offices or agencies engaged in a joint

prosecution, courts consider a number of factors, including "whether the other agency: (1)

participated in the prosecution's witness interviews, (2) was involved in presenting the case to

the grand jury, (3) reviewed documents gathered by or shared documents with the prosecution,

(4) played a role in the development of prosecutorial strategy, or (5) accompanied the

---

[5] The reference to "deconfliction" relates to the "potential retention of a legal ethics expert."
(Govt. Opp. (Dkt. No. 360) at 2)

prosecution to court proceedings." Gist v. United States, No. 1:16-CR-656-6-GHW, 2021 WL

3774289, at *17 (S.D.N.Y. Aug. 24, 2021) (internal quotations and citations omitted).

In the July 6, 2021 Opinion, this Court found that "the two prosecution teams, at

least as to Regnier, engaged in joint and coordinated fact gathering." This finding was premised

on evidence showing that the two offices had conducted four joint interviews of Regnier, and had

shared documents relevant to Avenatti's financial condition. (July 6, 2021 Opinion (Dkt. No.

336) at 85-86) The Court noted that the California "prosecutors asked Regnier questions

pertaining to Avenatti's interactions with Nike, [even when New York prosecutors were not

present]." (Id. at 86) And, the California "prosecution team provided the SDNY prosecution

team with a copy of certain text messages between Regnier and Avenatti which the CDCA

prosecution team had obtained by search warrant." (Id.)

While this evidence shows that the two offices collaborated with respect to

Regnier – who was a witness at both the New York and California trials – it is not sufficient to

demonstrate that the two offices were engaged in a joint investigation and prosecution. As noted

earlier, the charges in the California action are entirely unrelated to those in New York, and the

Drum Documents cover an earlier time period not relevant to the time at which Avenatti was

extorting Nike. And while Avenatti's finances during the 2014 to 2018 time period were

relevant at the California trial – because the California charges are premised on allegations of

long-running theft from clients, tax evasion, bank fraud, and bankruptcy fraud between 2014 and

2018[6] – his financial condition during that period is not relevant to whether he was extorting

Nike in March 2019. Moreover – as discussed above – Avenatti's finances were not central to

---

[6] In his motion for a mistrial in the California action, Avenatti argued that – because a number of
the California charges are premised on his alleged theft of client settlement funds – an accurate
calculation of fees and costs properly deducted from each settlement is the "sine qua non" of the
case. (See Avenatti, 19-CR-61 (JVS) (C.D. Ca.), Motion for Mistrial (Dkt. No. 706) at 7
(emphasis omitted))

the evidence offered at the New York trial.  And while Avenatti contends that the two U.S. Attorney's offices shared certain documents regarding his finances, he does not contend that the New York and California prosecutors jointly analyzed those documents or pursued a joint strategy to introduce them at the two trials.  (See Def. Reply (Dkt. No. 363) at 4 (noting that "raw documents were being transferred from California to New York"); Govt. Opp. (Dkt. No. 360) at 9).

In sum, Avenatti's <u>Brady</u> claim also fails because the New York and California prosecutors were not engaged in a joint investigation or prosecution.  Given that (1) the Drum Documents were not in the possession of the New York U.S. Attorney's Office, and (2) the New York prosecutors were not privy to Drum's analyses or conclusions until after the conclusion of the New York trial, the absence of a joint investigation or prosecution is fatal to any <u>Brady</u> claim premised on the Drum Documents.

### E.      Whether the Absence of the Drum Documents Influenced Avenatti's Decision Not to Testify

Avenatti contends that the Government's failure to produce the Drum Documents "affected [his] decision [not] to testify," which standing alone requires a new trial.  (Dec. 2, 2021 Def. Ltr. (Dkt. No. 358) at 9 (citing <u>United States v. Thomas</u>, 239 F.3d 163, 168 (2d Cir. 2001) and <u>United States v. Lam Lek Chong</u>, 544 F.2d 58, 69 (2d Cir. 1976)))  For the reasons discussed above, production of the Drum Documents would not have affected Avenatti's decision whether to testify at trial, because the Drum Documents are not relevant or exculpatory.

Avenatti also argues that "[t]he Government won an <u>in limine</u> ruling permitting cross examination about [his] financial situation," which "would have permitted the government to use their warped presentation of his finances against him at the same time that it withheld information showing the opposite."  (<u>Id.</u>)  As an initial matter, the Court was not called upon to rule, and did not rule, as to what evidence of Avenatti's financial condition would be admitted

were he to testify.  The Court merely informed Avenatti that its decision granting his motion to exclude most of the Government's financial condition evidence (Jan. 22, 2020 Tr. (Dkt. No. 235) at 2-3, 6, 13-17) was premised on his representation that he did "not intend to put his financial condition at issue."  (Id. at 7)  The Court went on to warn Avenatti that, "[w]ere [he] to make . . . a suggestion [that he was so wealthy, so successful, and so financially secure that he had no motive to extort $15 to $25 million from Nike], in either witness examination or argument, then obviously the analysis of the probative value of the Government's proposed financial condition evidence would change."  (Id.; see also Tr. 1822 (noting that "a blanket prohibition on all cross-examination regarding Mr. Avenatti's financial condition is obviously not appropriate"))  Avenatti never sought a ruling from the Court as to what financial condition evidence would be admitted were he to testify.

In sum, there is no basis for this Court to find that the Government's failure to produce the Drum Documents influenced Avenatti's decision whether to testify at trial.[7]

---

[7]  Given the rulings set forth above, this Court does not reach the Government's remaining arguments that (1) Avenatti had knowledge of his own finances such that the non-disclosure of the Drum Documents does not constitute a Brady violation; and (2) Avenatti waived his claim under Federal Rule of Criminal Procedure 12(b)(3)(e), which requires that a motion for discovery under Rule 16 be made before trial, absent a showing of good cause.  (Govt. Opp. (Dkt. No. 360) at 8 n.3 & 10-11)

## CONCLUSION

For the reasons stated above, and pursuant to Fed. R. Crim. P. 37, this Court

issues an indicative ruling denying Avenatti's motion for a new trial.

Dated: New York, New York
February 9, 2022

SO ORDERED.

Paul G. Gardephe
United States District Judge